## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| United States of America ex rel.,<br>JENNIFER DEL PRETE, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. |
| MELODY HULETT, Warden,<br>Lincoln Correctional Center, | ) ) ) | Judge |
| Respondent. | ) ) | |

## PETITION UNDER 28 U.S.C. §2254 FOR WRIT OF
## HABEAS CORPUS & REQUEST FOR AN EVIDENTIARY HEARING

Petitioner, **JENNIFER DEL PRETE**, by and through her attorneys,

**PATRICK W. BLEGEN** and **JODI L. GARVEY**, in custody pursuant to a

judgment of the Circuit Court of Will County, Illinois, pursuant to 28 U.S.C. §2254,

the Rules Governing Proceedings in the United States District Courts under said

section, and the Due Process and Effective Assistance of Counsel Provisions of the

Fifth and Sixth Amendments to the United States Constitution, respectfully moves

this Court for its order vacating the conviction and sentence in *People of the State of*

*Illinois v. Jennifer Del Prete*, No. 03 CF 199. Petitioner requests an evidentiary

hearing to further develop the allegations set forth herein.

This pleading is set forth in the form dictated by the Rules Governing

Proceedings in the United States District Courts Under §2254 of Title 28, United

States Code, and the Model Form for Motions under 28 U.S.C. §2254. The opening

section states the offense of conviction and sentence imposed; Part I sets forth the

history of this proceeding through trial and direct review; Part II sets forth any collateral proceedings that were pursued; Part III states the grounds and supporting facts upon which Petitioner claims her conviction is in violation of the Constitution; and, Parts IV and V contain further required technical information.

In support of this request for relief, Petitioner states the following:

**CONVICTION AND SENTENCE IMPOSED**

1. *Name and location of court where conviction entered.*

Conviction and sentence in Case No. 03 CF 199 was imposed by the Circuit Court of Will County, Illinois, the Honorable Judge Carla Allessio-Goode, presiding.

2. *Date of judgment of conviction.*

Petitioner entered a plea of not guilty to a single count first superseding indictment charging her with first degree murder. After a bench trial, on March 4, 2005, a judgment of guilty was entered.

3. *Nature of the offense involved.*

Petitioner was charged in a one count indictment with first degree murder.

4. *Length of sentence.*

On November 30, 2005, Petitioner was sentenced to twenty (20) years in the custody of the Illinois Department of Corrections.

5. *Details of Petitioner's plea.*

Petitioner pled not guilty.

## PART I – TRIAL AND DIRECT REVIEW

1.      *Kind of Trial.*

Petitioner waived her right to a jury trial, and proceeded to a bench trial.

2.      *Whether Petitioner Testified.*

Petitioner did not testify at trial.

3-5.     *Kind of Appeal.*

Petitioner filed an appeal from the judgment of conviction in the Appellate Court of the State of Illinois, Third Judicial District, No. 3-05-0868.  On appeal Petitioner argued that the evidence was insufficient to support a finding of guilt.

Petitioner also filed a petition for leave to appeal in the Supreme Court of Illinois.  On September 26, 2007, the Supreme Court of Illinois denied the petition. *People v. Del Prete*, 225 Ill.2d 646, 875 N.E.2d 1116 (2007).

Petitioner did not petition the United States Supreme Court for a writ of *certiorari*.

## PART II – COLLATERAL PROCEEDINGS

1.      *Previous petitions, applications, or motions.*

Petitioner filed her post-conviction petition on March 24, 2008.  In her post-conviction petition, Petitioner alleged that: (1) trial counsel was ineffective for failing to investigate and present expert testimony to rebut the State's theory of shaken baby syndrome; and, (2) trial counsel was ineffective for failing to inform Petitioner that he had previously been suspended from the practice of law for behavior engaged in while he served as an Assistant State's Attorney for Will

3

County, the same agency that prosecuted Petitioner. The petition was summarily dismissed on May 30, 2008.

Petitioner appealed the summary dismissal of her post-conviction petition. The Illinois Court of Appeals affirmed the circuit court's dismissal on July 20, 2009. *People v. Del Prete*, Case No. 3-08-0431. Petitioner's petition for leave to appeal to the Illinois Supreme Court was denied on November 25, 2009. *People v. Del Prete*, 234 Ill.2d 531, 920 N.E.2d 1076 (2009).

2-4. *Other proceedings.*

Petitioner has filed no other petitions in state court in relation to this conviction. Petitioner has filed no previous petitions for habeas corpus relief in federal court with respect to this conviction. There are no other legal proceedings pending in any court other than this petition with respect to this conviction.

**PART III – PETITIONER'S CLAIMS**

Petitioner asserts that her conviction and sentence are in violation of the Constitution of the United States in that: (1) she has been convicted of an offense for which insufficient evidence exists to support the conviction, as guaranteed by the Fifth Amendment and the principles enunciated in the Supreme Court's opinion in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); and, (2) she was denied the effective assistance of counsel as guaranteed by the Sixth Amendment and the principles enunciated in the Supreme Court's seminal opinion of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984), and its progeny.

4

## I.    Statement of Facts

Following a bench trial, Petitioner Jennifer Del Prete was found guilty of one count of first degree murder.  (Tr. 848) Jennifer was subsequently sentenced to 20 years in prison.  At trial, the State introduced evidence that on the afternoon of December 27, 2002, a three and a half month old baby, I.Z., stopped breathing while in Jennifer's care at daycare, but was subsequently resuscitated.  (Tr. 349) Eleven months later, on November 9, 2003, I.Z. passed away from complications of her medical care.  (Tr. 237-38) Jennifer was subsequently charged with the murder of I.Z. and was prosecuted under a theory of shaken baby syndrome.

### A.    The Trial Evidence

The State's evidence consisted primarily of the medical testimony of Dr. Emalee Flaherty, who was qualified by the Court as an expert in child abuse and pediatrics.  The State also called several police officers, and a number of civilian witnesses.

I.Z.'s mother testified first.  Barbara Zielinski testified that she first met Jennifer on October 31, 2002, when she interviewed Jennifer and Gleanne Kehr, the owner of a daycare.  (Tr. 220) The daycare was operated from Kehr's home. Zielinski testified that she did not begin bringing I.Z. and her four year old son R.Z. to the daycare until early December 2002.  (Tr. 219-20) On December 27, 2002, she had planned to take I.Z. and R.Z. to the daycare, but received a call from Jennifer that she was running late due to car trouble.  (Tr. 218)

Jennifer called Zielinski again at approximately 7:00 a.m., and informed her

that she was en route to the daycare. (Tr. 218) Zielinski then brought her children to the daycare. (Tr. 219) As Zielinski arrived, Jennifer arrived too with her own son. (Tr. 219) Jennifer let them all into the residence. (Tr. 221) Zielinski described a good relationship with Jennifer. (Tr. 221)

After dropping off the children, Zielinski went to work. By this time, I.Z. had been attending the daycare for approximately three weeks without incident. Zielinski called and spoke with Jennifer at approximately 11:30 a.m., and Jennifer informed her that I.Z. had been fed and changed, and was napping in the swing at that time. (Tr. 223-24) Zielinski subsequently received a call at work regarding I.Z., and she proceeded to St. Joseph's Hospital in Joliet, Illinois. (Tr. 225)

Once at the hospital, Zielinski testified that I.Z. was admitted to the intensive care unit, and she had machines to help her breathe. (Tr. 229) At approximately midnight, I.Z. was transferred to University of Illinois Chicago Hospital (UIC), where she stayed for three weeks. (Tr. 229) After three weeks at UIC, I.Z. was transferred to Children's Memorial Hospital. (Tr. 231) During her stay there, a gastrostomy tube was placed in her stomach to provide nutrition. (Tr. 232)

In February 2003, I.Z. was released from the hospital, but was readmitted after nine days due to breathing difficulties. (Tr. 233) I.Z. stayed in the hospital for four to five weeks, and was then transferred to the Rehabilitation Institute of Chicago. (Tr. 233) I.Z. was released to Zielinski's home on March 23, 2003. (Tr. 234)

While at home, I.Z. received in-home nursing care.  (Tr. 235) A tracheostomy tube had been placed in her throat to aid breathing.  (Tr. 235)

According to Zielinski, in the early morning of November 8, 2003, the in-home nurse notified her that I.Z. was not breathing.  (Tr. 237) I.Z. was transported to the hospital, and pronounced dead the next day.  (Tr. 238)

Zielinski denied that she had harmed I.Z. on December 27, 2002, and denied having seen her husband harm I.Z.  (Tr. 238)  With respect to I.Z.'s physical health prior to December 27, 2002, Zielinksi testified that I.Z. had been suffering from an ear infection for the past week, and was taking amoxicillin.  (Tr. 222) Zielinski also admitted, on cross examination, that when I.Z. was seven weeks old she was hospitalized for two days due to a fever.  (Tr. 241) During that time, I.Z. was given intravenous antibiotics.  (Tr. 241) Zielinski testified that she was never told what caused the fever.  (Tr. 241)  Zielinski denied that I.Z. had difficulty eating, but admitted that I.Z. was given gas drops, and that she kept the drops in her diaper bag for the daycare to use as needed.  (Tr. 244, 260)

Zielinski further acknowledged on cross examination that she felt there was nothing inappropriate about the daycare, and that it had been highly recommended by a friend whose children also attended the daycare.  (Tr. 246-48) She had also exchanged Christmas gifts the week before with Jennifer and her family.  (Tr. 249)

Zielinski further testified on cross examination that both her and her husband disciplined their children.  (Tr. 255) She denied, however, that they employed physical discipline.  (Tr. 256)

7

Gleanne Kehr testified that she owned and operated a daycare from her home, and that Jennifer had been one of her employees since September or October 2002. (Tr. 267) Jennifer was the only adult working at the daycare on December 27, 2002, as Kehr was on her way to Colorado. (Tr. 267, 269)

On cross examination, Kehr testified that she had a stepdaughter the same age as Jennifer's daughter, and the two had attended the same school. (Tr. 271) According to Kehr, she had observed Jennifer interact with kids from 1998 through 2001, when their children were in the same class. (Tr. 272) Kehr considered Jennifer to be very creative with the kids, and thought that Jennifer tried to include all of the kids in any activities. (Tr. 272) Kehr described Jennifer as an active parent. (Tr. 273) Kehr further described Jennifer as very patient and calm with children, noting specifically that Jennifer was more patient with Kehr's two year old than Kehr was herself. (Tr. 274) Based on her experience with Jennifer, Kehr testified that she had no concerns about leaving Jennifer in charge of the daycare while she was out of town. (Tr. 274)

Lockport Fire Department paramedic Dan Casagrande testified that he received a call from police dispatch on December 27, 2002, at 1:38 p.m., to respond to the daycare. (Tr. 2/23/05, p. 6) He arrived shortly thereafter, entered the residence, and immediately began CPR on I.Z. (Tr. 2/23/05, p. 7) Casagrande testified that the babysitter, who he later learned was Jennifer, told him I.Z. had stopped breathing. (Tr. 2/23/05, p. 8) He then carried I.Z. out of the house to the ambulance, while simultaneously doing CPR. (Tr. 2/23/05, p. 7) I.Z. had no pulse or

heart rate, but Casagrande testified that he gave her medication, and her heart rate returned.  (Tr. 2/23/05, p. 10)

On cross examination, Casagrande acknowledged that when he arrived, the babysitter was performing CPR on I.Z., and was doing so appropriately.  (Tr. 2/23/05, p. 17, 19) He also acknowledged that he observed no signs of trauma on I.Z. (Tr. 2/23/05, p. 19)

Romeoville Police Officer Michael Michienzi testified that he was dispatched to assist the paramedics on the call to the daycare.  (Tr. 2/23/05, p. 23) Michienzi testified that, when he arrived he observed the paramedics and Jennifer.  (Tr. 2/23/05, p. 24) Jennifer was crying and speaking with fire department personnel. (Tr. 2/23/05, p. 24) Michienzi spoke with Jennifer, and she told him that prior to the 911 call, I.Z. had diarrhea that soaked through her clothing.  (Tr. 2/23/05, p. 27) Jennifer explained that she changed I.Z.'s clothing and diaper on the couch.  (Tr. 2/23/05, p. 27-28)

According to Michienzi, after changing I.Z., Jennifer told him that she picked up I.Z., I.Z. made a snorting sound and her head fell backward.  (Tr. 2/23/05, p. 28) Jennifer said I.Z. was limp, so she attempted to give her a bottle.  (Tr. 2/23/05, p. 28) I.Z. did not suck on the bottle, and milk ran from the corner of her mouth.  (Tr. 2/23/05, p. 28) At that point, Jennifer called 911.  (Tr. 2/23/05, p. 29) Michienzi testified that Jennifer explained how the 911 operator walked her through CPR, and that she continued CPR until the paramedics arrived.  (Tr. 2/23/05, p. 29) Jennifer also informed him that I.Z. was on amoxicillin for an infection.  (Tr.

9

2/23/05, p. 29) Jennifer also advised Michienzi that after the paramedics arrived, she called I.Z.'s father and informed him of what occurred. (Tr. 2/23/05, p. 30)

On cross examination, Michienzi agreed that Jennifer was crying and concerned about I.Z. (Tr. 2/23/05, p. 37) He further agreed that her behavior was consistent with the scenario she described as having occurred. (Tr. 2/23/05, p. 37)

Romeoville Police Officer Kelley Henson testified that she responded to the daycare on December 27, 2002, along with Detective McLaughlin. (Tr. 2/23/05, p. 41) Upon arriving, Henson testified that she spoke with Jennifer. (Tr. 2/23/05, p. 42) According to Henson, Jennifer told her that she was watching a number of children that day, including I.Z., who had been napping in the swing in the living room. (Tr. 2/23/05, p. 44) At approximately 1:00 or 1:30 p.m., Jennifer prepared a bottle for I.Z. and took her out of the swing. (Tr. 2/23/05, p. 44) At that time, Jennifer noticed that I.Z. had soiled herself, and that the diarrhea had soaked through her clothing. (Tr. 2/23/05, p. 44)

Jennifer explained that she retrieved an outfit from the diaper bag, and then returned to the couch where she had propped I.Z. (Tr. 2/23/05, p. 45) Jennifer explained that she also needed a burp cloth to feed I.Z. because she had reflux and spit up frequently during a feeding. (Tr. 2/23/05, p. 45) When Jennifer returned, I.Z. was in the same spot on the couch. (Tr. 2/23/05, p. 45) After changing I.Z.'s diaper and clothing, Jennifer picked I.Z. up and she appeared limp. (Tr. 2/23/05, p. 46) Jennifer thought I.Z. may have fallen asleep again, so she tried to give I.Z. the bottle. (Tr. 2/23/05, p. 46) The milk trickled out of I.Z.'s mouth. (Tr. 2/23/05, p. 47)

10

Jennifer also noticed that I.Z.'s eyes were half open and slightly rolled back into her head. (Tr. 2/23/05, p. 47) Jennifer indicated that was not unusual for a sleeping baby. According to Henson, Jennifer said that when the milk trickled out of I.Z.'s mouth, she became concerned that something was medically wrong with I.Z. (Tr. 2/23/05, p. 47)

Jennifer, who Henson testified became noticeably more upset at this point, explained to Henson that she then picked up I.Z. underneath the armpits, held her out in front and called out her name in a slightly higher voice in an attempt to arouse her. (Tr. 2/23/05, p. 48) Jennifer also described how she gave I.Z. a very slight shake to arouse her, while holding her under the armpits. (Tr. 2/23/05, p. 48)

When I.Z. did not wake, Jennifer knew something was wrong, and checked her mouth for a choking object. (Tr. 2/23/05, p. 48) Finding nothing in I.Z.'s mouth, Jennifer checked her heartbeat, which was still beating. (Tr. 2/23/05, p. 48) At this point, Jennifer became more panicked, and called 911. (Tr. 2/23/05, p. 48) The 911 operator talked Jennifer through CPR until the paramedics arrived. (Tr. 2/23/05, p. 48)

Henson further testified that Jennifer told her of I.Z.'s reflux problem, and that Jennifer never left her alone that day save for a few minutes when she went upstairs, while I.Z. slept in the swing, to print out projects for the other children. (Tr. 2/23/05, p. 49) Jennifer denied that I.Z. had fallen or been dropped, and that nothing abnormal happened before I.Z. became unresponsive. (Tr. 2/23/05, p. 50) Jennifer also described I.Z. as a generally crabby baby. (Tr. 2/23/05, p. 50) Henson

11

testified that after speaking with Jennifer, the soiled diaper and diaper bag were recovered and inventoried. (Tr. 2/23/05, p. 50) The burp cloth with milk on it was also recovered. (Tr. 2/23/05, p. 66)

On cross examination, Henson testified that the slight shake Jennifer demonstrated was not inappropriate, and that Jennifer answered all of her questions and was cooperative. (Tr. 2/23/05, p. 54, 62) Henson observed no signs of anything unusual having occurred in the home. (Tr. 2/23/05, p. 57)

Romeoville Police Detective Scott McLaughlin testified that he accompanied Officer Henson to the daycare to interview Jennifer. (Tr. 2/23/05, p. 75) In addition to the same details Henson provided as to Jennifer's statement,[1] McLaughlin also testified that Jennifer told him that Kehr owned the daycare, and that the daycare's license was in processing. (Tr. 2/23/05, p. 78) Jennifer said that she worked anywhere from 6:30 or 8:00 a.m., to 2:30 or 5:00 p.m., Tuesday through Friday. (Tr. 2/23/05, p. 78) Jennifer also explained that I.Z. was taking amoxicillin for a cold. (Tr. 2/23/05, p. 78)

According to McLaughlin, Jennifer told him that I.Z. was somewhat fussy while she prepared I.Z.'s bottle. (Tr. 2/23/05, p. 80) After changing her diaper, Jennifer recalled that I.Z. made an irritated cry, her body began an irritable shake, and her lip quivered. (Tr. 2/23/05, p. 80, 91) Jennifer explained that she then heard

---

[1] Henson testified that McLaughlin began the interview and then she joined in shortly thereafter. (Tr. 2/23/05, p. 57, 92) There were not, in other words, two separate interviews of Jennifer at that time.

a sort of snorting sound, at which point she picked I.Z. up and her body was limp. (Tr. 2/23/05, p. 81) Jennifer also said that I.Z. took three breaths before she called 911. (Tr. 2/23/05, p. 83)

On cross examination, McLaughlin testified that Jennifer was cooperative and answered all questions. (Tr. 2/23/05, p. 88) Jennifer informed him that she had already contacted I.Z.'s parents. (Tr. 2/23/05, p. 89) McLaughlin also recalled that Jennifer told him that after checking I.Z.'s mouth for a choking hazard, she turned I.Z. over on her lap and patted her on the back to ensure nothing was blocking her airway. (Tr. 2/23/05, p. 94)

Romeoville Police Detective Kenneth Kroll testified that he interviewed Jennifer on December 29, 2002, two days after I.Z. was taken to the hospital. He had contacted Jennifer that morning and she agreed to come to the police station to meet with him. (Tr. 290) According to Kroll, Jennifer told him that she was a daycare worker, and that she had been watching I.Z. on December 27, 2002. (Tr. 291) Kroll testified that Jennifer related details of I.Z. generally; *i.e.*, she was a gassy baby who cried a little more than some other babies, and that she was fussy eater. (Tr. 292)

According to Kroll, Jennifer told him she was late getting to the daycare because she had car trouble in the morning. (Tr. 293) When she arrived at 7:00 a.m., the Zielinskis were waiting. (Tr. 293) Everyone went inside, and Barbara Zielinski left. (Tr. 294)

Kroll testified that Jennifer told him that she gave I.Z. a bottle around 8:00

13

or 9:00 a.m., and that she then slept in the swing from approximately 9:30 a.m. until around noon time. (Tr. 295) Jennifer told him that when I.Z. awoke, she took her out of the swing, and found her clothes soiled through with diarrhea. (Tr. 295) Jennifer changed I.Z.'s diaper and clothing on the couch, and then prepared a bottle. (Tr. 295) When Jennifer returned, I.Z.'s eyes were half open, and she was making a snorting or labored breathing sound. (Tr. 295) Jennifer also noticed that she appeared limp. (Tr. 295) This was when Jennifer first noticed that I.Z. was not normal. (Tr. 298)

According to Kroll, faced with the limp baby, Jennifer said that she tried to get a response. Jennifer said that she picked I.Z. up under the arms, and with I.Z. facing her, said her name and gave a very slight shake. (Tr. 296) Jennifer also said that she laid I.Z. across her lap and gave her three to five pats on the back in an attempt to dislodge anything that might have been blocking her airway. (Tr. 296) Jennifer also tried to get I.Z. to take a bottle, but the milk ran out of her mouth. (Tr. 297) At that point, Jennifer called 911.

Kroll testified that Jennifer described her emotions as becoming increasingly panicked. (Tr. 297) Jennifer denied that I.Z. had fallen or that the swing had been knocked over. (Tr. 297) Jennifer admitted being panicked, but stated that she did not feel she was rough with I.Z. (Tr. 299, 322) Jennifer also said that it was hard to remember each event clearly because with each unsuccessful attempt to arouse I.Z., she became increasingly panicked. (Tr. 299)

According to Kroll, he then "introduced a theme" to Jennifer, that being that

14

perhaps I.Z. had been suffering from some unknown illness. (Tr. 301) Kroll testified that in response to his "theme," Jennifer said that I.Z.'s head may have flopped more violently when she patted I.Z.'s back than when she first picked her up. (Tr. 302) At that point, the interview broke for five to ten minutes. (Tr. 302)

Upon returning to the interview room, Kroll testified that he employed a new, more confrontational interview technique. (Tr. 303) Kroll testified that he told Jennifer that he thought she was involved in I.Z.'s illness. (Tr. 303) According to Kroll, Jennifer became upset and began to cry. (Tr. 303) Kroll testified that Jennifer then said she was very panicked and maybe she shook I.Z. a little harder than she thought she had. (Tr. 303) According to Kroll, Jennifer also asked him a question to the effect of, even if she had panicked, was she not still responsible, and would she go to jail. (Tr. 304)

On cross examination, Kroll acknowledged that Jennifer told him that I.Z. would clench her fists and shake when eating, which Jennifer thought was a reaction to reflux or gas. (Tr. 311) Jennifer also informed him that I.Z.'s mother had provided the daycare with gas drops to administer as needed. (Tr. 311) Specifically as to December 27, 2002, Kroll testified on cross examination that Jennifer told him that I.Z. took a bottle in the morning, during which she clenched her fists as she had on prior occasions. (Tr. 312)

Kroll also agreed that Jennifer never said she did not remember what happened; rather, she told him that the sequence of events was hard to remember because of her increasing panic. (Tr. 321) Kroll also acknowledged that when

15

people are faced with traumatic situations it is not uncommon for them to have difficulty recalling every detail. (Tr. 327)

Kroll further admitted that when he became more confrontational with Jennifer, she advised him that she did not shake I.Z. violently or do anything to purposefully hurt I.Z. (Tr. 326) Jennifer told Kroll that on a scale of one to ten, her panic level was an eight during the incident. (Tr. 326) In fact, Kroll wrote in his report that Jennifer never confessed to shaking I.Z., and only acknowledged that in her panic she was more physical in trying to arouse I.Z. (Tr. 329) Finally, Kroll agreed that Jennifer never made any inconsistent statements. (Tr. 330)

On redirect, Kroll testified that when he became more confrontational with Jennifer, he told her that I.Z. was suffering from shaken baby syndrome and subdural hematoma. (Tr. 335) According to Kroll, in response to that statement, Jennifer said I.Z.'s head moved more during her attempt to clear I.Z.'s airway than it did when she held I.Z. out and tried to arouse her. (Tr. 335)

Kroll further testified that during the break in the interview, he spoke with a doctor. (Tr. 337) According to Kroll, when he re-initiated the interview, he told Jennifer that her story was not consistent with the medical evidence. (Tr. 337) At that point, Jennifer asked if she was going to jail. (Tr. 339) Nonetheless, Kroll agreed that Jennifer never admitted to harming I.Z. in any way. (Tr. 342)

The State's next witness was emergency room doctor, Adrian Nica. Dr. Nica testified that on December 27, 2002, he received a call to evaluate I.Z. for possible seizures, respiratory distress, and respiratory failure. (Tr. 349) Dr. Nica testified

16

that in babies of I.Z.'s age presenting with respiratory distress, it was common to evaluate for seizures, infectious diseases, child abuse and trauma. (Tr. 351) With respect to I.Z., Dr. Nica testified that he had blood drawn, that he did a urine culture and a spinal tap, and that he began her on antibiotics. (Tr. 351) A CT scan of the brain was also ordered. (Tr. 351)

Dr. Nica explained that he first looked into infection based on I.Z.'s recent history of antibiotic use. (Tr. 352) While Dr. Nica was unable to get results on the urine cultures, he testified that I.Z.'s white blood count was elevated, which could be indicative of an infection or it could be stress related. (Tr. 352-53) According to Dr. Nica, I.Z.'s sugar levels were also elevated, which indicates diabetes or stress. (Tr. 353-54) As for the spinal tap, Dr. Nica testified that there was blood in the spinal fluid, indicating either the technique used to obtain the fluid was poor or there was a bleed in the brain. (Tr. 354)

Dr. Nica also testified that the neurologist relayed his findings from the CT scan. (Tr. 355) According to Dr. Nica, I.Z.'s CT scan showed a fracture mildly depressed on the right temporal area, and acute and chronic changes to secondary bleeds indicating that I.Z. had suffered a previous bleeding episode. (Tr. 355) Based on the brain bleeds, Dr. Nica testified that he assumed I.Z. was suffering from child abuse or shaking. (Tr. 356) Based on his findings, Dr. Nica testified that within eight hours of her arrival at St. Joseph's Hospital, he ordered her to be transferred to UIC Hospital. (Tr. 359)

On cross examination, Dr. Nica acknowledged that I.Z. had no external

17

indications of trauma or bruising on the body. (Tr. 364) Dr. Nica also agreed that because of the nature of a newborn skull, a fracture to the skull could appear that upon further review is not actually a fracture. (Tr. 366) Indeed, in this instance, it was later determined that I.Z. did not suffer from a skull fracture. (Tr. 366)

As to the chronic bleeding, Dr. Nica testified that chronic indicates old bleeding. (Tr. 367) A chronic bleed would have originated days or a week before the acute, or instant, episode. (Tr. 367) Dr. Nica testified that the chronic bleeding had to have begun prior to the day he examined I.Z., but as to when exactly, he could not be more specific. (Tr. 372) Nonetheless, he testified that it could have been as much as a week to ten days before December 27, 2002. (Tr. 372)

DuPage County Coroner Jeff Harkey testified that he performed an autopsy on I.Z. on November 10, 2003. (Tr. 378) Dr. Harkey testified that he observed no external signs of injury, and the x-rays showed no signs of trauma. (Tr. 380, 382) Dr. Harkey testified that he observed anoxic injury to the brain due to not getting enough oxygen; this was a result of I.Z. having been placed on a respirator more than twenty-four hours before her death. (Tr. 386)

Dr. Harkey testified that he reviewed the report of Dr. Emalee Flaherty before performing the autopsy, as well as police reports, and that he was aware I.Z. had been injured in December 2002. (Tr. 391, 398) Because the alleged trauma was long ago, however, Dr. Harkey did not microscopically examine the eyes for retinal hemorrhages. (Tr. 391) Based on his review of the police reports and medical reports, Dr. Harkey testified that his opinion as to cause of death was multiple

18

system failure due to anoxic-ischemic injuries resulting from abusive head trauma. (Tr. 398) Dr. Harkey explained that anoxic-ischemic injury is a lack of oxygen and blood flow to organs, causing damage thereto. (Tr. 399-400)

On cross examination, Dr. Harkey testified that he observed no signs of the alleged old trauma. (Tr. 401) And, he admitted that his opinion that old trauma had occurred was entirely based on the medical records he reviewed, particularly Dr. Flaherty's. (Tr. 402) Dr. Harkey also agreed that a kink in I.Z.'s tracheostomy tube shortly before her death, which limited her oxygen, was medically significant in causing her ultimate death on November 9, 2003. (Tr. 409)

Dr. Howard Hast testified that he was a pediatric critical care physician at UIC hospital. (Tr. 425) He was qualified to testify as an expert in pediatric critical care, but not in child abuse. (Tr. 429-30) He first saw I.Z. on December 30, 2002. (Tr. 430) At that time, according to Dr. Hast, I.Z.'s anterior fontanel was slightly full, her pupils were sluggish, and there was a mild increase in her intracranial pressure. (Tr. 431-32)

Dr. Hast testified that he was present for a retinal examination, and the picture of I.Z.'s retinal showed a lot of blood. (Tr. 435) According to Dr. Hast, I.Z. had suffered seizures. (Tr. 437) While a CT scan was performed at St. Joseph's Hospital, several more were also done at UIC. (Tr. 438) Dr. Hast testified that he observed bifrontal subdural hematomas on the CT scans. (Tr. 438)

Dr. Hast testified that he ordered a variety of lab tests to look for rare causes of subdural hematomas in infants, but he found no cause for a bleeding tendency, or

19

other metabolic disease. (Tr. 441) Dr. Hast further testified that he considered

whether I.Z. suffered from an apparent life-threatening event (ALTE) – an

occurrence that is also called "near miss SIDS." (Tr. 441) In an ALTE, an incident

occurs where an infant stops breathing, typically becomes limp, skin tone changes,

and there is usually a very frightened caretaker who attempts CPR. (Tr. 441-42)

Dr. Hast testified that on January 10, 2003, I.Z. underwent surgery to drain

the hematomas because they were getting larger. (Tr. 443) Dr. Hast testified that

while no seizures were ever documented on an EEG, there were several instances

where a seizure was suspected based on abnormal movements. (Tr. 446) According

to Dr. Hast, there was no family history of epilepsy or seizures. (Tr. 447)

Dr. Hast opined that the "most likely cause" of the subdural hematomas was

a shaking or some other acceleration/deceleration injury such as being dropped or

thrown. (Tr. 448) As for the ALTE, Dr. Hast testified that the extensive tests

performed would have revealed an ALTE, but nothing was found. (Tr. 449) He

admitted, however, that one other cause could have been reflux, but that he was

unable to test for it because reflux is common in children with brain injuries. (Tr.

449-50) In the end, Dr. Hast testified that, despite what his testing revealed, he

believed I.Z. suffered from an ALTE, but he could not determine if the brain injury

caused the ALTE, or vice versa. (Tr. 450)

On cross examination, Dr. Hast acknowledged that one indicator of seizures

is a large, loose bowel movement. (Tr. 454) Dr. Hast also testified that I.Z. had no

broken bones or fractures, including along the spine. (Tr. 456) In I.Z.'s case, there

was also no evidence of blunt force trauma.  (Tr. 460)

Dr. Hast further agreed that in forty to fifty percent of ALTE cases, no underlying diagnosis is ever made.  (Tr. 456-57) Furthermore, according to Dr. Hast, if he was faced with an infant who stopped breathing, and he was not in the pediatric ICU, he would be very nervous.  (Tr. 459)  In addition, Dr. Hast admitted that, even assuming any shaking occurred, he could not determine whether an ALTE occurred before or after any shaking.  (Tr. 460)

Finally, with respect to the issue of reflux causing the ALTE, Dr. Hast agreed that it was a possibility, but that because the brain damage had occurred before he examined I.Z., he could not confirm a connection.  (Tr. 464) On re-direct, Dr. Hast testified that there was no record indicating that I.Z. had been previously diagnosed with reflux.  (Tr. 465)

The State's final witness was Dr. Emalee Flaherty.  Dr. Flaherty testified that she is a pediatrician at Children's Memorial Hospital in Chicago.  (Tr. 471) According to Dr. Flaherty, she had been a pediatrician for thirty (30) years, and is board certified in pediatrics.  (Tr. 472) She also testified that she is the medical director of the Protective Services Team at Children's Memorial, and chairs the Child Abuse Team within the Protective Services Team.  (Tr. 472-73) Dr. Flaherty also testified that she is a member of a group of pediatricians who are self-described child abuse experts called the Helfer Society.  (Tr. 473)

As to prior testimony, Dr. Flaherty testified that she had been previously qualified to testify as an expert one hundred times.  (Tr. 474) During *voir dire*, Dr.

Flaherty admitted that all of the times she testified as an expert, save for one, was at the behest of the State. (Tr. 475) Furthermore, of those one hundred times, twenty-five to thirty-five of them were in criminal trials. (Tr. 475) The court allowed Dr. Flaherty to testify as an expert in both pediatrics and child abuse. (Tr. 476)

Dr. Flaherty testified that, relative to I.Z.'s case, she reviewed medical records from UIC Hospital, imaging studies from UIC Hospital, police reports, and EMS reports, she spoke with Dr. Hast and I.Z.'s parents, and she examined I.Z. (Tr. 476-77) Based on that review, Dr. Flaherty testified that it was her opinion that I.Z. suffered abusive head trauma, or as it is more commonly known, SBS. (Tr. 477) According to Dr. Flaherty, abusive head trauma is child abuse where the child suffers an acceleration/deceleration injury to the brain, from, for example, shaking, causing a constellation of injuries. (Tr. 477)

To aid in her testimony, Dr. Flaherty prepared a power point presentation for the court. (Tr. 478) According to Dr. Flaherty, I.Z. had suffered subdural hemorrhage, subarachnoid hemorrhages, diffusing injury, and parenchymal laceration and contusions. (Tr. 479) Dr. Flaherty testified generally that due to weak neck muscles, and disproportionately large heads, infants are more vulnerable to abusive head trauma. (Tr. 479) Thus, according to Dr. Flaherty, the injuries are caused by violent shaking and sometimes impact. (Tr. 480) Dr. Flaherty testified that the central vein that runs between the center of the two hemispheres of the brain has bridging vessels that come out of it; differential forces on the bridging

22

veins cause them to break, resulting in subdural hematoma or hemorrhage. (Tr. 481-82)

Dr. Flaherty also discussed axons in the brain, and that through movement of the brain axons become damaged. (Tr. 483) With respect to eye injury, Dr. Flaherty testified that violent shaking causes mechanical stresses to the eyes, resulting in hemorrhages in the retina and optic nerve. (Tr. 485) The hemorrhages were present in I.Z.'s case, which Dr. Flaherty claimed only occur in acceleration/deceleration forces seen in shaken baby cases. (Tr. 486)

With respect to I.Z., Dr. Flaherty testified that the subdural hematomas she suffered could only be caused by violent shaking. (Tr. 487) Dr. Flaherty characterized the level of violent shaking needed to achieve the hematomas as "[f]orces so severe that if anyone witnesses that shaking occurring or someone shaking a child like that, they would know that that child would suffer severe injury." (Tr. 487)

According to Dr. Flaherty, I.Z. suffered from a deadening or softening of her brain tissue, related to her loss of consciousness and failure to be resuscitated. (Tr. 488) Dr. Flaherty also claimed that retinal hemorrhages extending to the ora serrata[2] occur only in children who have suffered an acceleration/deceleration injury. (Tr. 490)

As to the timing of the injury, Dr. Flaherty testified that because I.Z. ate

---

[2] The extension of the retinal hemorrhages to the ora serrata related to the severity of the injury, according to Dr. Flaherty. (Tr. 490)

normally in the morning, and was smiling but crabby around 1:00 p.m., no brain injury had occurred prior to that time. (Tr. 490) Thus, the brain injury occurred just before she lost consciousness. (Tr. 490) According to Dr. Flaherty, the effects of the abuse would be immediate. (Tr. 491) Dr. Flaherty also opined that if I.Z. suffered from an ALTE, it was caused by the child abuse. (Tr. 491)

Dr. Flaherty testified that poorly performing CPR could not cause the injuries; a simple fall could not cause the injuries; and, no child five or under could cause the injuries. (Tr. 492) Dr. Flaherty did agree that a child I.Z.'s age could suffer from seizures and it go unnoticed. (Tr. 493) She denied, however, that a seizure could have caused I.Z.'s injuries, but posited that I.Z.'s injuries could have caused the seizures. (Tr. 494)

On cross examination, Dr. Flaherty admitted that the power point presentation she prepared for this case was actually prepared in 2001 for a different case, but she routinely used it in testifying and teaching. (Tr. 496) Dr. Flaherty also testified that she knew of no instances where CPR had caused retinal hemorrhages, but that if it could it would be very rare, and would not cause the extensive hemorrhages seen in I.Z. (Tr. 497) Dr. Flaherty also denied reviewing any studies that had revealed CPR to cause retinal hemorrhaging. (Tr. 497)

Dr. Flaherty agreed that I.Z. had no external indications of having been grabbed and shaken. (Tr. 498) Dr. Flaherty also admitted that in her report she never mentioned the presence of subarachnoid hemorrhages. (Tr. 500)

On re-direct, Dr. Flaherty testified that only one thing can cause retinal

24

hemorrhages to extend to the ora serrata, and that is SBS or child abuse. (Tr. 503) Dr. Flaherty also claimed that external bruising is uncommon in SBS, and that she would be speculating as to why that is. (Tr. 504) On re-cross examination, Dr. Flaherty reiterated that she had never seen nor read about CPR causing retinal hemorrhaging. (Tr. 505)

After the completion of Dr. Flaherty's testimony, the State rested. (Tr. 514) The court heard argument on the defense motion for directed finding, which was subsequently denied. (Tr. 517) The defense then began its case by presenting numerous character witnesses.

Andrea Ashmus testified that she had known Jennifer her whole life. (Tr. 526) Ashmus testified that she knew Jennifer's reputation in the community to be that of a law-abiding and peaceful person, who was friendly, easy to talk to and liked kids. (Tr. 531) Ashmus was aware of Jennifer's reputation from Jennifer's work in the juvenile circulation department of the local library. (Tr. 528) Jennifer had also babysat for Ashmus' children. (Tr. 536)

Joann Gailus-Brotsch testified that she had known Jennifer for a year and half while their sons were in Scouts together. (Tr. 539) According to Gailus-Brotsch, Jennifer had a reputation as peaceful, law-abiding, honest, and as a good parent. (Tr. 541)

Julie Morlock testified that Jennifer watched her son after Morlock's maternity leave. (Tr. 546) Morlock knew Jennifer's reputation to be dependable, trustworthy, friendly, and honest. (Tr. 546)

Pastor Douglas Fulmer testified that he hired Jennifer as a nursery attendant for the church in 1994, and that she was paid to supervise the nursery. (Tr. 550) According to Pastor Fulmer, Jennifer had a very good reputation for integrity, peacefulness, honesty and being law-abiding. (Tr. 551) He also permitted Jennifer to watch his children when they were ages two and three. (Tr. 554)

Erin Rose Prunty testified that she met Jennifer when Jennifer was moderating children's story hour at the library, and that they subsequently attended the same church. (Tr. 590-91) According to Prunty, Jennifer's reputation was that of an honest, trustworthy, sincere, intelligent and kind person. (Tr. 592)

Megan Heligas testified that she was an assistant director of the library where Jennifer worked, and that she knew Jennifer to be well liked and respected. (Tr. 628-30) Likewise, Pastor James Beckiring testified that he had known Jennifer ten to fourteen years, and knew her to be well liked and respected. (Tr. 636-37)

In addition to these character witnesses, the defense called additional lay witnesses related to the daycare. Steve Blake testified that he met Jennifer in September 2002, when his son attended the daycare where she worked. (Tr. 611) Blake testified that he spoke with other parents and teachers at the daycare, and learned that Jennifer was well-respected. (Tr. 612-13) Blake further testified that he saw I.Z. at the daycare on three to four occasions when he picked up his son. (Tr. 615) According to Blake, I.Z. did not seem comfortable or well, and she cried a lot. (Tr. 616) Blake acknowledged on cross examination that he did not personally attempt to comfort I.Z. (Tr. 618) On re-direct, he explained that Jennifer was

26

comforting I.Z., and that she did not appear at all frustrated by I.Z.'s crying. (Tr. 624-25)

Called in the defense case, Gleanne Kehr testified again that she had a Master's Degree in rehabilitation counseling and psychology, and that she was a consultant for people with disabilities. (Tr. 556) Kehr testified that she knew Jennifer from the school that both their children attended. (Tr. 557) According to Kehr, she knew Jennifer to be honest, trustworthy, caring and good with children, and that was why she hired Jennifer for the daycare. (Tr. 558)

Kehr testified, in December 2002, that Jennifer had carpal tunnel syndrome and was wearing splints on her wrists the week before Christmas. (Tr. 559) She also noticed Jennifer having difficulty with fine dexterity. (Tr. 560) Kehr testified that I.Z. was an uncomfortable eater, and that I.Z. would tense up, arch her back and cry a lot while eating. (Tr. 562) Kehr testified that I.Z. required more burping than other babies based on her observations and more than twenty years of caring for children. (Tr. 565)

According to Kehr, in early December she observed I.Z.'s brother refusing to put on his shoes when his father came to pick him up. (Tr. 568) I.Z.'s father grabbed R.Z. by the foot and physically dragged him, over to where his shoes were. (Tr. 568)

Kehr testified that she had no concerns about leaving Jennifer alone with the children on December 27, 2002. (Tr. 584) Kehr also explained that she informed the parents that Jennifer would be alone. (Tr. 584) Lastly, Kehr testified that she had

27

observed Jennifer feed I.Z., and that Jennifer was very calm and patient with I.Z. (Tr. 586) In fact, Kehr testified that there was never a time when Jennifer was not calm and patient with the children. (Tr. 586)

Karli Hinton testified that she worked with Jennifer at the library and again at the daycare. (Tr. 600) She knew Jennifer's reputation to be that of a well respected and trusted individual. (Tr. 601) According to Hinton, the discipline employed at the daycare was always time outs, and never physical discipline. (Tr. 602) With respect to I.Z., Hinton testified that she was colicky, cried a lot, her nose always ran, she was phlegmy, and she coughed frequently. (Tr. 603)

Christine Lee Murphy testified that she was a registered nurse for the pediatric intensive care unit at Central DuPage Hospital. (Tr. 649) Her three children, ages five years, four years and five months, attended the daycare where Jennifer worked. (Tr. 650-51) On December 27, 2002, Christine testified that she received a call from Jennifer that she was running late. (Tr. 652) According to Christine, Jennifer seemed fine, albeit apologetic. (Tr. 653) Christine subsequently left the children at the daycare.

Christine testified that she received a call from Jennifer asking to have Christine's husband pick up their children. (Tr. 653) Christine testified that Jennifer was crying, and told her that a baby had stopped breathing. (Tr. 653) Christine testified that she knew I.Z.'s parents, and that she had referred them to the daycare. (Tr. 654)

Christine also testified that after I.Z. was born, Barbara Zielinski seemed

28

tired. (Tr. 656) Christine also testified that in October 2001, she observed an incident wherein Richard Zielinski grabbed his son, R.Z., by the arm and dragged him from the pumpkin patch because he cried. (Tr. 663-64) According to Christine, this conduct occurred regularly when R.Z. acted out. (Tr. 670) Christine testified that she observed hands on discipline by Richard Zielinski, such as grabbing R.Z., yelling at him, or tossing him on the couch. (Tr. 671-72)

Brennan Murphy testified that he routinely picked up his children from the daycare in the afternoons. (Tr. 681) He also would come unannounced on occasion. (Tr. 682) Brennan testified that he observed Jennifer administer discipline in the form of time outs where the child had to sit on the stairs. (Tr. 683-84) According to Brennan, he also observed the Zielinski's discipline their son. (Tr. 685) Brennan testified that he observed Richard Zielinski grab his son, age three or four, by the arm, pull him close and yell at him. (Tr. 686) Brennan testified that he also saw R.Z. get spanked when R.Z. was three. (Tr. 687)

On December 27, 2002, Brennan retrieved his children from the daycare after Jennifer called. (Tr. 689) According to Brennan, the house looked normal, the police had not arrived yet, and Jennifer was distraught. (Tr. 689-90)

The final defense witness was Dr. Wayne Tucker, who testified as an expert in pediatrics and pathology. (Tr. 727) Dr. Tucker had been licensed to practice medicine since 1957. (Tr. 701) He spent the beginning of his medical career in the military, where he reached the rank of Colonel. (Tr. 701) During his military career, he served in every war from World War II through Desert Storm. (Tr. 702)

29

His commendations included a Silver Star, a combat medic badge, five Bronze Stars for valor, and five Purple Hearts for being wounded in action. (Tr. 729-31)

Since 1964, he had conducted more than 7,000 autopsies. (Tr. 703) Over his career, he had treated approximately 1,500 children. (Tr. 704) Dr. Tucker was also the Chairman of the Child Abuse and Home Environment Committee for all of the military. (Tr. 704) He had previously testified as an expert, and specifically in cases involving shaken baby syndrome on three prior occasions. (Tr. 705) Dr. Tucker acknowledged, however, that he had not had a pediatric practice since 1983, and was last qualified to testify in court as an expert in 1994. (Tr. 709, 711) He also agreed that he had no training in the care of problems related to child abuse. (Tr. 715)

With respect to I.Z.'s case, Dr. Tucker testified that he reviewed approximately 5,000 pages of medical records and police reports. (Tr. 731) Based on his review of these documents, it was his opinion that the incident or injury was suffered by I.Z. eighteen to twenty-four hours prior to the onset of symptoms. (Tr. 735) This determination was based in large part on the chronic nature of the frontal hematoma. (Tr. 736) Furthermore, Dr. Tucker testified that he found the 9:00 a.m. feeding insignificant due to the strength of the infant sucking reflex, which would override even in severe situations. (Tr. 736)

According to Dr. Tucker, based on I.Z.'s history of feeding problems, seizure related to reflux was a possibility as the cause of the onset of symptoms. (Tr. 737) Likewise, an overdose of antibiotic or allergic reaction thereto, for which I.Z. was

30

not tested, could have caused the seizures and related symptoms. (Tr. 738-39) Dr. Tucker further testified that retinal hemorrhages in an infant under six months, when the retinal vessels are fragile, can be caused by rolling over, coughing, sneezing, or holding of breath, all of which create intraocular pressure. (Tr. 742) Likewise, pressure from seizures or CPR could cause retinal hemorrhages, as well as a lack of oxygen, according to Dr. Tucker. (Tr. 743, 746)

Dr. Tucker testified that, pursuant to Taber's Medical Dictionary, the definition for SBS includes external bruising on the body where the victim is held during the shaking. (Tr. 747-48) I.Z. had no external bruising. (Tr. 748) According to Dr. Tucker, he had never seen a case of SBS without external bruising. (Tr. 748)

According to Dr. Tucker, a seizure can lead to an ALTE, and toxicity could lead to a seizure. (Tr. 751) According to the medical records he reviewed, Dr. Tucker testified that it appeared I.Z. was taking an adult dosage of antibiotics instead of an infant dosage. (Tr. 752) Dr. Tucker noted as well that reflux could cause an ALTE. (Tr. 752)

In conclusion, Dr. Tucker testified that it was his medical opinion that I.Z. did not suffer from SBS. (Tr. 754) Instead, he opined that almost anything could have caused the chronic hematoma to re-bleed, including sneezing, coughing or acid reflux. (Tr. 754-55)

On cross examination, Dr. Tucker reiterated that the records he reviewed reflected I.Z. was being administered an adult dosage of antibiotics. (Tr. 759) Dr. Tucker also noted that the medical records did not reflect any sheering at the base

31

I.Z.'s brain. (Tr. 763) As for the three prior SBS cases in which he was involved, Dr. Tucker testified that all three had external bruising. (Tr. 761) According to Dr. Tucker, because those cases occurred in the mid-1980s, CT scans were unavailable, as was the ability to examine for retinal hemorrhages. (Tr. 761-62)

After hearing the arguments of counsel, and without making any findings of fact for the record, the trial court found Jennifer guilty of first degree murder. (Tr. 848) At the hearing on the post-trial motion, the trial court discussed some reasoning for finding Jennifer guilty. In essence, it was the judge's opinion that Jennifer's story did not make sense in that if she had extensive child care experience, she would not put a baby with a soiled diaper on a cloth couch, and would not try to give a limp, unresponsive baby a bottle. (Tr. 976-77)

A lengthy sentencing hearing was subsequently conducted. The defense called thirty-seven (37) witnesses on Jennifer's behalf, including her own two children whom she raised as a single mother, relatives, friends and former co-workers. Every witness who testified described a woman who loved children, and devoted her life to working with children. (Tr. 1120-1396)

Jennifer also spoke on her own behalf at the sentencing hearing. (Tr. 1424-33) Jennifer discussed her childhood, raising her own children, and working in the child care profession. Jennifer also maintained her innocence, and denied that she had done anything to harm I.Z. (Tr. 1431-32) Instead, she tried with all her might to save I.Z.'s life, but was unsuccessful. (Tr. 1432)

The trial court sentenced Jennifer to the minimum statutory term of twenty

(20) years in the custody of the Illinois Department of Corrections.  (Tr. 1438)

## B.    Appeal and Post Trial Proceedings

On direct appeal, Jennifer argued that the evidence was insufficient to support a finding of guilty of first degree murder.  In an order entered on April 26, 2007, the appellate court affirmed her conviction.  *People v. Del Prete*, No. 3-05-0868, a copy of which is attached hereto as Exhibit A.  Jennifer next filed a Petition for Leave to Appeal which was denied on September 26, 2007.  *People v. Del Prete*, 225 Ill.2d 646, 875 N.E.2d 1116 (2007).

Jennifer filed her post-conviction petition on March 24, 2008.  In that petition, she raised the following issues: (1) trial counsel was ineffective for failing to investigate and present expert testimony to rebut the State's theory of shaken baby syndrome; and, (2) trial counsel was ineffective for failing to inform Jennifer that he had previously been suspended from the practice of law for behavior engaged in while defense counsel was an Assistant State's Attorney for Will County, the agency prosecuting Jennifer.

With respect to the failure to present expert testimony to rebut the State's theory of SBS, Jennifer's post-conviction petition presented substantial evidence demonstrating that the scientific underpinnings of SBS relied on by Dr. Flaherty were faulty.  This evidence consisted of a similar case that had resulted in a new trial, as well as recent medical studies and scientific articles detailing the advances in science that had begun to disprove Dr. Flaherty's theories regarding SBS.  Despite the inclusion of this evidence, the post-conviction petition was summarily

dismissed on May 30, 2008, on the grounds that it was frivolous and patently without merit.

Jennifer appealed the dismissal of her post-conviction petition. The Illinois Court of Appeals affirmed the circuit court's dismissal on July 20, 2009. *People v. Del Prete*, Case No. 3-08-0431, a copy of which is attached hereto as Exhibit B. Jennifer's request for leave to appeal to the Illinois Supreme Court was denied on November 25, 2009. *People v. Del Prete*, 234 Ill.2d 531, 920 N.E.2d 1076 (2009).

## II. The Illinois Appellate Court's Decisions Related to Issues Raised by Jennifer Del Prete Constitute Unreasonable Applications of Relevant Supreme Court Law.

On federal habeas review, an application for a writ of habeas corpus may be granted where the state court's adjudication of the claim has resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. 28 U.S.C. §2254(d)(1); *Boss v. Pierce*, 263 F.3d 734, 739 (7th Cir. 2001). In other words, a federal court may grant habeas relief when a state court has misapplied a governing legal principle to a set of facts different from the case in which the principle was announced. *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527 (2003). Thus, a writ of habeas corpus may be granted where the state court's application of the governing legal principle was objectively unreasonable. *Id.*

## A.    Sufficiency of the Evidence

A claim that the evidence is insufficient to sustain a conviction is a federal constitutional claim that is cognizable in a federal habeas corpus proceeding. *Jackson v. Virginia*, 443 U.S. 307, 321, 99 S.Ct. 2781 (1979).  A defendant is entitled to habeas relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id*., at 324.  As the *Jackson* Court noted, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and the same may be said of a judge sitting as a jury." *Id*., at 317.  When such a situation arises, the conviction cannot constitutionally stand. *Id*. This is one such situation.  Indeed, this case presents the most egregious of all situations – the conviction of an innocent woman.

In this case, the Illinois Appellate Court concluded that the evidence was sufficient to prove Jennifer guilty of first degree murder beyond a reasonable doubt. The Appellate Court's opinion detailed very little facts upon which Jennifer's conviction was based.  And, with virtually no legal analysis whatsoever, the Appellate Court merely stated:

> The trial court had before it the conflicting opinions of expert witnesses.  The opinion of the State's expert supported a finding of guilty. The opinion of the defendant's expert supported a finding of not guilty. It was for the trial court, as the trier of fact, to resolve those conflicts.

*People v. Del Prete*, No. 3-05-868; Exh. A, p. 4.

To sustain a conviction for first degree murder in Illinois based on SBS, the

35

State was required to prove that Jennifer caused the death of I.Z. by shaking her about the body, knowing that such conduct created a strong probability of death or great bodily harm to I.Z. *See*, 720 ILCS 5/9-1(a)(2). The evidence in this case, even when taken in the light most favorable to the State, fell woefully short of establishing that Jennifer harmed I.Z. in any way, let alone performed any act that caused her death.

Jennifer was prosecuted on a theory of "shaken baby syndrome." In other words, the State argued that Jennifer shook I.Z. with such force as to cause subdural hematoma, yet managed to do so without leaving any external bruising, evidence of cranial impact, or damage to the neck. The medical underpinnings for an SBS diagnosis were based on a faulty theory, however, as more recent scientific studies demonstrate that without evidence of impact or damage to the neck, merely shaking an infant cannot cause the injuries suffered by I.Z.

The "shaken-baby syndrome" was postulated in the 1970's as a form of child abuse, whose triad symptomology included subdural hematoma, retinal hemorrhaging, and a care provider's explanation that does not seem consistent with the constellation of injuries produced. *See*, Genie Lyons, Comment, *Shaken Baby Syndrome: A Questionable Scientific Syndrome and a Dangerous Legal Concept*, 2003 Utah L. Rev. 1109, 1119-20, a copy of which is attached hereto as Exhibit C. Accordingly, SBS has become a diagnosis by exclusion for cases where a child is brought to the emergency room, found to have a subdural hematoma and retinal hemorrhaging, and a caregiver's explanation which does not seemingly fit the

36

injuries.

Since the postulation of this theory in the 1970s, a number of authors have questioned the axiom that subdural hemorrhaging in combination with retinal hemorrhaging is symptomatic of inflicted trauma. As one author noted:

> [T]he term "shaken-baby syndrome" tends to be automatically applied to any infant with a swollen brain, subdural and retinal bleeding. This label, alleging as it does non-accidental injury, effectively precludes any further discussion of how these clinical features might have been caused, even though all of them, both singly and in combination, may be seen in conditions other than trauma.

J.F. Geddes, *et al.*, *Dural Haemorrhage in Non-traumatic Infant Deaths*, 29(1) Neuropathology & Applied Neurobiology, 14, 14-15 (Feb. 11, 2003), a copy of which is attached hereto as Exhibit D.

In addition to questioning the shortcomings of diagnosing inflicted trauma from the dual presence of retinal hemorrhages and subdural hematoma, many scientists have questioned the underlying claims that shaking can produce the injuries associated with SBS. A number of other researchers, and, in particular, biomechanical engineers, have likewise concluded that shaking a baby cannot produce the type of acceleration/deceleration forces necessary to cause the injuries associated with shaken baby syndrome. *See*, A.K. Ommaya, *et al.*, *Biomechanics & Neuropathology of Adult & Paediatric Head Injury*, 16(3) British J. of Neurosurgery, 220 (2002), a copy of which is attached hereto as Exhibit E.

In addition to questioning the underlying physics, numerous experts have observed that the acceleration/deceleration forces necessary to cause a rotational

head injury by violently shaking an infant would also necessarily result in severe

damage to the neck and spinal cord. One study concluded:

> Thus, while it is possible to produce trauma in an infant by shaking, *e.g.*,
> a SDH [subdural hematoma], . . the injuries would include the cervical
> cord and spine, but not the brain case, nor contusions in the cerebrum or
> cerebellum. No impact was also imposed. It is far more likely that
> impacts due to falls and other causes are more probable at producing TBI
> [traumatic brain injury] by short duration impulsive loading.

*Id.*, at 246.

The Ommaya study determined that the levels of stress necessary to produce

brain injuries by rotational injury would result in severe cervical cord and spinal

injury: "At these levels of inertial loading, induced impulsively without contact, the

neck torque in the infant would cause severe injury to the high cervical cord and

spine long before the onset of cerebral concussion. . . . [T]he level of forces necessary

to produce equivalent stresses in a child are far in excess of those that can be

reasonably achieved without significant injury to the cervical spinal cord and neck

structures." *Id.*, at 228-29. *See also*, F.A. Bandak, *Shaken Baby Syndrome: A*

*Biomechanics Analysis of Injury Mechanisms*, 151 (1) Forensic Science

International 71, 71-79 (June 30, 2005), a copy of which is attached hereto as

Exhibit F.

Moreover, the criticisms aimed at "shaken-baby syndrome" have questioned

not only the underlying basis for the hypothesis, but the scientific methodology used

in the case studies and "research" which, for years, has been relied upon as proof in

shaken-baby cases. An article published in the American Journal of Forensic

38

Medicine Pathology carefully scrutinized the quality of the evidence used in "shaken-baby" research from 1966 through 1998, and determined that the research failed to meet accepted standards for scientific validity. The article explains:

> In recent years, there has been a clear move toward basing medical practice and opinions on the best-available medical and scientific evidence. This process has been termed *evidence-based medicine* (EBM) and involves a review of the quality of evidence that is available in various diseases and fields of inquiry within medicine. The aim of this review is to be neutral on the subject of SBS. Neutrality is difficult to define in this field, in part because of the polarization of opinions on the highly-emotional subject of infant injury and death, and in part because of clear data deficiencies arising from difficulties in performing experiments. It is clearly unethical to intentionally shake infants to induce trauma, and there is an obvious problem with studies and reports that rely on either indirect or disputed evidence of the occurrence, severity, or type of trauma.

M. Donohoe, *Evidence-Based Medicine and the Shaken-Baby Syndrome, Part 1: Literature Review, 1966-1998*, 24(3) Am. J. of Forensic Medicine & Pathology, 239, 239 (Sept. 2003), a copy of which is attached hereto as Exhibit G.

After conducting an exhaustive review of the research, Donohoe noted the lack of quality involved in most of the research which for years had been used as "evidence" to support the SBS hypothesis:

> There exists major data gaps in the medical literature about SBS. There is a very obvious lack of clear definition of cases. For valid studies, some method of determining cases of actual proven shaking must be found, and appropriate control groups (trauma without shaking, other illness, health controls) must be defined and assessed blindly. This gold standard has yet to be achieved in even a single study in the field of SBS. There is a lack of useful and specific laboratory or other markers proven to identify SBS. There is poor definition and quantification of the social and family risk factors to provide guidance on the likelihood of abuse for a given set of circumstances. Last, there is a strong need for a check list or other diagnostic or management tool to assess cases and to quantify index of

suspicion of shaking.

*Id.*, at 241. In conclusion, the author stated:

> Before 1999, there existed serious data gaps, flaws of logic, inconsistency of case definition, and a serious lack of tests capable of discriminating NAI (non-accidental injury) cases from natural (accidental) injuries. By 1999, there was an urgent need for properly controlled, prospective trials into SBS, using a variety of controls. *Without published and replicated studies of that type, the commonly-held opinion that the finding of SDH (subdural hematoma) and RH (retinal hemorrhaging) in an infant was strong evidence of SBS is unsustainable, at least from the medical literature.*

*Id.* (Emphasis added).

Similar observations have been made by others:

> The controversies arise mainly because of the impossibility of carrying out objective experimental injuries to a child's brain. The bulk of the available information is abstracted from injuries, animal experiments, and theoretical models. Speculative extrapolations from these data may lead to difficulty. Such uncertainties apply to other areas of medicine but few, if any, are subject to such intense public scrutiny. . . . Diagnosis errors have been made in the past when competently stated dogma has been repeated and built upon. Increasing experience may merely allow the same mistake to be made with increasing confidence. Over enthusiastic extrapolation from speculative theoretical studies may result in an over-confident opinion that can, in the long term, serve only to harm. . . . It is however not scientifically certain that such a constellation of injuries is always due to abuse; the truth may lie between these extremes.

B. Wilkins & R. Sunderland, *Head Injury - Abuse or Accident*, 76 Disease in Childhood 393, 396-97 (1997), a copy of which is attached hereto as Exhibit H. *See also*, J. Plunkett, *Fatal Pediatric Head Injuries Caused by Short Distance Falls,* 22(1) American J. of Forensic Medicine & Pathology, 1, 1-12 (2002), a copy of which is attached hereto as Exhibit I.

40

What this scientific research makes clear is that serious questions exist concerning the scientific validity of several fundamental aspects of the SBS theory. Donohoe's study indicates that virtually all of the purported research and studies which for years were relied upon as proof, are not scientifically valid and, in fact, should not be relied upon by experts at all.

The dispute surrounding the validity of an SBS diagnosis reflected in the academic and scientific literature addressing the subject of abusive versus accidental infant brain injury clearly belies the certainty of the State's case against Jennifer. Dr. Flaherty's conclusion that I.Z.'s death was a homicide, and could have been caused by nothing other than a violent shaking immediately before the onset of the symptoms is belied by the actual science.

Here, there was no evidence that I.Z.'s neck or brain stem were injured. She suffered no external bruising. Thus, at its base, the facts presented by the State, in the face of more recent scientific research, prove there was insufficient evidence to establish Jennifer's guilt.

What is more, contrary to Dr. Flaherty's testimony regarding the precise timing of the injury because of I.Z.'s earlier feeding, "[t]he sucking reflex is a brainstem reflex, is present in children who are anencephalic, and is not abolished until brainstem function has been compromised (i.e., the child is not breathing)." J. Plunkett, *Letter to the Editor*, 22(10) Child Abuse and Neglect, 943-44 (Oct. 1998), a copy of which is attached hereto as Exhibit J. Research has also revealed that a "lucid interval" may well follow a fatal head injury, and that the lucid interval has

41

been documented to be as much as seventy-two hours after the fall before the onset of symptoms. S. Denton & D. Mileusnic, *Delayed Sudden Death in an Infant Following an Accidental Fall*, 24(4) The American Journal of Forensic Medicine and Pathology, 270, 371-76 (Dec. 2003), a copy of which is attached hereto as Exhibit K.

It is also significant to note that subdural hematomas can occur after an apparently normal birth. R. Uscinski, *Shaken Baby Syndrome: Fundamental Questions*, 16(3) British J. Of Neurosurgery 217, 217-219 (2002), a copy of which is attached hereto as Exhibit L. Thus, it is possible that a child sustaining a subdural hematoma during birth could suffer a re-bleed and present with a chronic hematoma weeks, or even months, later. *Id*.

Moreover, there was no dispute among the trial witnesses that what Jennifer described was indicative of an ALTE. The only dispute was which came first, the brain injury or the ALTE. One study has described a situation not unlike the events that unfolded here, and which demonstrates that an ALTE can generate the same symptoms that were attributed to SBS in I.Z.

In this case study, a four and a half month old was left alone in his crib with a bottle of formula. When his father returned, the baby was choking and blue. Attempts to clear the airway and perform CPR were unsuccessful until the paramedics arrived and resuscitated the infant. At the hospital, an examination revealed a swollen brain, retinal hemorrhages, subdural hematoma and subarachnoid hemorrhaging. There were no external signs of injury, and no internal neck injury. The infant died less than three days later, and the diagnosis

was an ALTE. The cause for the ALTE was uncertain, but fit with a dysphagic choking type of ALTE as described by the infant's caregiver. *See*, Patrick D. Barnes, *et al.*, *Infant Acute Life-Threatening Event – Dysphagic Choking Versus Nonaccidental Injury*, 17(1) Elsevier Seminars in Pediatric Neurology, 7, 7-8 (2010), a copy of which is attached hereto as Exhibit M.

In light of all of the above, it is not surprising that the American Academy of Pediatrics (AAP) has recently amended its policy statement on SBS. No longer does the AAP advocate use of the term SBS, opting instead for the term "abusive head trauma." The AAP now recognizes that:

> Although shaking an infant has the *potential* to cause neurological injury, blunt impact or a combination of shaking and blunt impact cause injury as well. Spinal cord injury and secondary hypoxic ischemic injury can contribute to poor outcomes of victims.

J.W. Christian, *et al.*, *Abusive Head Trauma in Infants and Children*, 123(5) American Academy of Pediatrics, Pediatrics, 1409, 1409-11 (May 2009) (emphasis added), a copy of which is attached hereto as Exhibit N.

The debate over the validity of an SBS diagnosis has not only spawned much scientific debate, but it has also attracted the attention of the legal community. This is obviously so because, in cases such as Jennifer's, the State's evidence depends solely on the testimony of a doctor who believes in the SBS theory to the exclusion of all other innocent explanations for the injuries, even where the scientific evidence does not support the finding.

In her article for the Wisconsin Law Review, Molly Gena concluded that:

[I]nfant deaths can lead to homicide convictions of innocent people. The medical community does not agree that subdural hemorrhaging and retinal hemorrhaging without evidence of an impact are necessarily indicative of shaking. The standard of "reasonable medical certainty" that medical experts often use at trial is not appropriate for SBS cases and can be extremely misleading. When medical experts cannot come to an agreement about SBS, a jury cannot understand the science well enough to make a reasonable decision. Without corroborating evidence of child abuse, a defendant should not be convicted of any crime due to SBS based only on the existence of the triad of symptoms.

Molly Gena, Comment, *Shaken Baby Syndrome: Medical Uncertainty Casts Doubt on Convictions*, 2007 Wis.L.Rev. 701, 706, a copy of which is attached hereto as Exhibit O.

Likewise, Professor Deborah Tuerkheimer has likened SBS convictions to the wrongful convictions that came to light after the invention of DNA testing.[3] Based on the evolving science, and the discovery that the prior methodology was flawed, according to Professor Tuerkheimer, numerous innocent individuals are currently incarcerated who committed no crime whatsoever. As Professor Tuerkheimer puts it, "the science of SBS can no longer support a finding of proof beyond a reasonable doubt in triad-only cases – cases which represent a significant number of SBS prosecutions. Put simply, 'change has raised the real possibility of past error.' " Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the*

---

[3] Professor Tuerkheimer states, "these scientific developments have cast into doubt the guilt of an entire category of defendants: those convicted of crimes based on a triad-only SBS diagnosis. While we cannot know how many convictions are 'unsafe' without systematic case review, a comparison of the problematic category of SBS convictions to DNA – and other mass exonerations – reveals that this injustice is commensurate with any seen in the criminal justice arena to date."

*Criminal Courts*, 87(1) Washington University Law Review, 1, 4-5 (2009), a copy of which is attached hereto as Exhibit P.

As Professor Tuerkheimer notes, the prior methodology for SBS was based on medical literature that contained inadequate scientific evidence, serious data gaps, flaws of logic and inconsistency of definition. More recent studies, however, have employed "evidence-based" research, which relies on scientific studies and laboratory experiments instead of theory and rhetoric. *Id.*, at 12. The evidence-based research has proven that the old theories behind SBS are unsustainable.

The change in the scientific community has already led to at least two exonerations of people convicted based on facts strikingly similar to those of this case. In the case of *State v. Edmunds*, 308 Wis.2d 374, 746 N.W.2d 590 (2008), the Wisconsin Appellate Court reversed Audrey Edmunds' conviction and remanded for a new trial[4] based on the "shift in mainstream medical opinion since the time of Edmund's trial as to the causes of the types of trauma [the victim] exhibited." *Id.*, at 391.

In *Edmunds*, the defendant was a daycare provider for several children, including seventh month old N.B. While in Edmunds care, N.B. became limp, with liquid coming from her mouth and nose. *Id.*, at 379. Edmunds immediately called 911, but attempts at resuscitation were unsuccessful, and N.B. subsequently died.

---

[4] The state dismissed all charges against Edmunds rather than retry the case. *See*, University of Wisconsin Law School, *Wisconsin Innocence Project Client Audrey Edmunds Wins Freedom*, (July 14, 2008), a copy of which is attached hereto as Exhibit Q.

*Id*. The state's experts testified that the presence of subdural hematoma, retinal hemorrhages, and no external signs of abuse indicated SBS, and that the violent shaking had occurred immediately prior to the onset of symptoms when N.B. was in Edmunds' exclusive care. *Id*., at 378.

As the Wisconsin Appellate Court noted, however, since Edmunds' conviction:

> a significant and legitimate debate in the medical community has developed ... over whether infants can be fatally injured through shaking alone, whether an infant may suffer head trauma yet experience a significant lucid interval prior to death, and whether other causes may mimic the symptoms traditionally viewed as indicating shaken baby or shaken impact syndrome.

*Id*., at 385-86.

The facts of *Edmunds* are on all fours with the facts of this case. Indeed, the similarities between the two cases are remarkable. Jennifer cared for I.Z. on December 27, 2002, until she became noticeably limp, with milk running from the corner of her mouth. Jennifer immediately called 911 and began performing CPR. Sadly, Jennifer's efforts were unsuccessful, and I.Z. eventually died. But the significant debate in the medical community makes clear that lucid intervals do occur, that other causes for subdural hematoma and retinal hemorrhages do exist, and that shaking alone, with no signs of impact or injury to the neck or spinal cord, cannot cause fatal head injury.

In *Smith v. Mitchell*, 437 F.3d 884 (9th Cir. 2006),[5] the Ninth Circuit reversed

_____

[5] *Smith* has a complicated appellate history. The original *Smith* decision was vacated by the United States Supreme Court. *See*, *Patrick v. Smith*, 550 U.S. 915, 127 S.Ct. 2126 (2007). The opinion was reinstated by *Smith v. Patrick*, 508 F.3d

46

the conviction of a defendant on habeas corpus review. In that case, the victim, who was the grandchild of the defendant, suffered sudden loss of consciousness during the night and then died. There was evidence of brain bleeding, but no retinal hemorrhages, and no external injuries save for one slight scratch on the back of the neck. *Id.*, at 887. The state's experts testified that the victim suffered a shaking so violent that it sheared the brain stem. Yet no evidence of brain stem shearing was discovered. *Id.*

The Ninth Circuit, while acknowledging the "very strict limits" placed on collateral review of state court convictions, nonetheless granted the writ. *Id.*, at 888-89. The Ninth Circuit concluded that the evidence presented was "simply not the stuff from which guilt beyond a reasonable doubt can be established, especially in the face of all the other circumstances . . . making the crime unlikely." *Id.*, at 890.

The crime was equally as unlikely in this case. Jennifer had nearly twenty years of experience caring for young children, and had raised two of her own children. Not one witness ever described Jennifer as being anything but patient and caring with children in general, and with I.Z. in particular. I.Z. exhibited no

---

1256 (9th Cir. 2007). The decision was again vacated and remanded by the United States Supreme Court. *See*, *Patrick v. Smith*, 130 S.Ct. 1134 (2010). The case is currently pending in the Ninth Circuit Court of Appeals on the second remand. The parties submitted briefing on the proper resolution of the remand on May 5, 2010. The court has not yet ruled on the remand. Having reinstated the opinion once, however, it stands to reason that the same will occur. In the event the Ninth Circuit rules differently, counsel will so inform this Court.

external signs of abuse, and Jennifer made no inculpatory statement. Most significantly, the recent scientific evidence proves that the theory under which Jennifer was convicted is simply wrong.

The facts of this case point to multiple possibilities as to the cause of I.Z.'s death. I.Z. indisputably suffered from an ALTE. No doctor could testify with any certainty what caused it or whether it precipitated the unconsciousness or was a symptom thereof. Moreover, the fact that I.Z. had *chronic* subdural hematoma established that Jennifer did not abuse I.Z. on December 27, 2002. Dr. Flaherty never accounted for the chronic hematoma, instead proclaiming that I.Z. became immediately unresponsive after being shaken. Based on the current state of the science related to SBS, that simply cannot be the case.

This is not a situation, as the Appellate Court would have it, where the State's evidence was sufficient to prove Jennifer's guilt of first degree murder. There was no evidence on an essential element of the offense; *i.e.*, that Jennifer ever harmed I.Z. Indeed, it is equally as likely that no one harmed I.Z. Not only is it clear that the evidence was insufficient to prove that Jennifer caused I.Z.'s death, the evidence is insufficient to prove that *anyone* caused I.Z.'s death. It may well be that there simply was no crime committed. The Illinois Appellate Court's conclusion that the evidence was sufficient is an unreasonable application of *Jackson*.

This Court should grant the writ of habeas corpus on the basis that insufficient evidence exists to support the conviction. Jennifer's conviction should

48

be vacated accordingly.

### B.    Ineffective Assistance of Counsel

To make a successful claim of ineffective assistance of counsel, a defendant must show that: (1) counsel's performance was deficient; and, (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). Deficient performance is evaluated by determining whether counsel's assistance was objectively unreasonable considering all the circumstances. *Id.* at 688. However, the Supreme Court has "declined to articulate guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527 (2003), *quoting, Strickland*, 466 U.S. at 688.

A claim that deficient performance prejudiced the defense can be made by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Connor v. McBride*, 375 F.3d 643, 656-57 (7th Cir. 2004), *quoting, Strickland*, 466 U.S. at 694. The *Strickland* court further explained that for a defendant to show there is a " reasonable probability," it is not enough to show the errors had some conceivable effect on the outcome. *Strickland*, 466 U.S. at 669. On the other hand, the defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.*, at 693.

1.   **Petitioner was denied effective assistance of counsel where trial counsel failed to present the testimony of noted experts in the scientific community who could have disputed the State's theory of shaken baby syndrome.**

Jennifer argued in her post-conviction petition that trial counsel was ineffective for failing to present the testimony of noted scientific experts that have challenged the faulty bases for SBS.  Jennifer's post-conviction petition included articles and briefs related to the *Edmunds* case, as well as scholarly articles proving links between vaccines and infant brain bleeds.  The evidence presented in the petition made clear that the debate in the medical field had reached a fever pitch even prior to Jennifer's conviction such that a new trial was warranted where these experts could counter the State's expert.  Specifically, Jennifer argued that trial counsel's decision to call a military pathologist with virtually no SBS experience, instead of a noted expert in the field who could testify in detail as to the new scientific findings, was constitutionally deficient.  Calling such experts would have significantly undercut the State's theory of prosecution.  Those witnesses would have both provided testimony to rebut the State's claim of a violent shaking, and confirmed that no abuse whatsoever had been perpetrated upon I.Z.  Nonetheless, the Illinois Appellate Court upheld the summary dismissal of the petition, and in doing so unreasonably applied the principles enunciated in *Strickland*.  There can be no question but that these witnesses were necessary, and trial counsel's failure to present them or to even challenge Dr. Flaherty with their findings cannot be explained other than by a lack of sufficient attention to a case based on complicated

50

medical and scientific evidence.

In affirming the dismissal of Jennifer's post-conviction petition, the Illinois Appellate Court concluded that trial counsel was not ineffective for failing to call other experts because Dr. Tucker testified to much of what the other experts would have said anyway. *People v. Del Prete*, No. 3-08-431; Exh. B, p. 10. According to the Appellate Court, while the facts of *Edmunds* were similar to Jennifer's case, "[t]he 'new evidence' discussed in *Edmunds* was evidence that was actually presented in this case." *Id.*, at 9-10. The Appellate Court is wrong because it overlooks several key points missing from Dr. Tucker's testimony, as well as the fact that he was not the same caliber of witness as those presented to the court in *Edmunds*.

As the *Strickland* court stated, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. While trial counsel has no duty in every case to consult experts, in the right circumstances it may constitute ineffective assistance to fail to do so. *See*, *Miller v. Anderson*, 255 F.3d 455, 458-49 (7th Cir. 2001), *order vacated by*, 268 F.3d 485 (7th Cir. 2001) (where the Seventh Circuit ordered the granting of the writ of habeas corpus based on trial counsel's failure to consult experts to rebut the state's DNA, treadmark, and footprint evidence because the crux of the defense was that the defendant was not present at the scene of the crime).[6] Furthermore, to

---

[6] The writ was vacated because the state and the defense resolved the matter without the need for a retrial. *See*, *Miller v. Anderson*, 268 F.3d 485 (7th Cir. 2001).

establish counsel's deficient performance for failing to call an expert, it is necessary that an expert capable of supporting the defense was available at the time of trial. *Ellison v. Acevedo*, 593 F.3d 625, 634 (7th Cir. 2010).

In this case, Jennifer was denied effective assistance of counsel based on trial counsel's decision to call Dr. Tucker as the only defense expert witness despite Dr. Tucker's woefully lacking credentials. This is particularly so where more qualified experts would have been able to testify to matters outside the scope of knowledge of Dr. Tucker. Indeed, the debate over the validity of SBS had been rising since the late-1990s, and by 2005, when this case proceeded to trial, numerous well-qualified experts existed who could have refuted the State's theory.

As set forth *supra* herein at Section II.A., prior to 2005, numerous scientists and doctors had published articles debunking the "science" behind the SBS theory. *See*, *e.g.*, J.F. Geddes, *et al.*, *Dural Heamorrhage in Non-traumatic Infant Deaths*, 29(1) Neuropathology & Applied Neurobiology, 29, 14-15 (Feb. 11, 2003); A.K. Ommaya, *et al.*, *Biomechanics & Neuropathology of Adult & Paediatric Head Injury*, 16(3) British J. of Neurosurgery, 220 (2002); F.A. Bandak, *Shaken Baby Syndrome: A Biomechanics Analysis of Injury Mechanisms*, 151 (1) Forensic Science International 71, 71-79 (June 30, 2005); M. Donohoe, *Evidence-Based Medicine and the Shaken-Baby Syndrome, Part 1: Literature Review, 1966-1998*, 24(3) Am. J. of Forensic Medicine & Pathology, 239, 239 (Sept. 2003); B. Wilkins & R. Sunderland, *Head Injury - Abuse or Accident*, 76 Disease in Childhood 393, 396-97 (1997); J. Plunkett, *Fatal Pediatric Head Injuries Caused by Short Distance Falls,* 22(1)

52

American J. of Forensic Medicine & Pathology, 1, 1-12 (2002); S. Denton & D.

Mileusnic, *Delayed Sudden Death in an Infant Following an Accidental Fall*, 24(4)

The American Journal of Forensic Medicine and Pathology, 270, 371-76 (Dec. 2003).

Instead of any one of these experts, or a combination thereof, trial counsel used Dr.

Tucker.

Dr. Tucker's qualifications as a pathologist were acceptable, but he had

essentially no experience in the field of SBS. Indeed, his only experience in the field

came in three cases between 1983 and 1984. Those cases occurred prior to the use of

CT scans to examine subdural hematomas, and when no tests existed for

ascertaining the presence of retinal hemorrhages. Moreover, those cases occurred

at a time when SBS was a widely accepted diagnosis, and anyone who suggested

otherwise was considered a "fringe" thinker.

Pitting Dr. Tucker against Dr. Flaherty was tantamount to having no expert

at all. Dr. Flaherty testified with the authority of thirty (30) years experience in

child abuse cases. She was the medical director of the Protective Services Team at

Children's Memorial Hospital, chaired the Child Abuse Team within the Protective

Services Team, and was a member of a society of pediatricians who are self-

proclaimed child abuse experts. Dr. Flaherty had worked on hundreds of child

abuse cases, and had testified as an expert in the field more than one hundred

times. She prepared lectures on the topic and toured the country educating others

on SBS and child abuse. Contrary to what the Appellate Court concluded, Dr.

Tucker's testimony simply could not counter that of Dr. Flaherty.

53

In addition, the Appellate Court's conclusion that Dr. Tucker covered everything that any of the other experts could have said is simply inaccurate. Dr. Tucker did not testify about the scientific evidence that had confirmed the existence of lucid intervals between injury and death. Such evidence would have flown directly in the face of Dr. Flaherty's assertion that I.Z. was healthy immediately prior to her cessation of breathing. This evidence would also have opened the window of opportunity for the injury, if there was one, to have occurred sometime prior to when Jennifer was caring for I.Z.

Likewise, Dr. Tucker, who was not a biomechanical engineer, did not testify, because he could not testify, that vigorous shaking would necessarily result in injury to the neck and/or cervical spine. Neither such injuries were found here. Instead, the trial court was left only with the testimony of Dr. Flaherty, who testified with one hundred percent certainty that the presence of subdural hematoma and retinal hemorrhages made SBS the only possible diagnosis.

Perhaps even more significantly, by electing to call Dr. Tucker, as opposed to the host of experts who have successfully challenged the SBS theory, trial counsel significantly limited his theory of the defense. The question became one of "When did I.Z. get purposefully harmed?" instead of "Was there ever a purposeful harm?" In other words, the question was who committed this crime and not whether a crime was even committed. The evidence-based medicine suggests that no crime was even committed in this case, not just that Jennifer did not do it. Without experts who have extensively studied the lack of science behind the SBS theory,

54

trial counsel was only able to consider the defense that someone else must have done it.  Limiting possible defenses, while the most cursory research would reveal that other, better defenses exist, is the very hallmark of deficient performance.  An attorney cannot make a strategic choice where he does not know there is a choice in the first place.

It is abundantly clear from the record in this case that defense counsel was unaware of this research.  For example, defense counsel failed to ask a single question of Dr. Flaherty related to injury to the neck or cervical spine.  Nor did he ever question Dr. Flaherty on the documented instances of lucid intervals or the possibility of a chronic hematoma resulting from a natural birth.  Defense counsel's entire cross examination of Dr. Flaherty – the State's star witness – lasted a mere six pages of transcript.  (Tr. 495-501)

In that trial counsel's performance was patently deficient, the question of whether Jennifer was prejudiced by that performance is easily answered.  The testimony of experts such as Dr. John Plunkett[7] or Dr. Lawrence Thibault,[8] with

_____

[7] Dr. Plunkett is a board certified pathologist, who is currently in private practice.  Before retiring, he was the Laboratory and Medical Education Director of Regina Medical Center in Minnesota.  He has authored or co-authored numerous articles on the existence of lucid intervals, short-fall head injury in infants and the biomechanics of infant brain injury.  *See*, Medical Misdiagnosis Research Blog, http://medicalmisdiagnosisresearch.wordpress.com/2010/04/16/shaken-baby-syndrome-and-other-mysteries/.

[8] Dr. Thibault has spent twenty-nine years in the area of injury biomechanics, and spent twenty years at the University of Pennsylvania, where he was a bioengineering professor and Chairman of the Department of Bioengineering.  *See*, Biomechanics, Inc., website, Lawrence Thibault Biography,

resumes at least as impressive as Dr. Flaherty's,[9] would undoubtedly have altered the outcome of this case. To call instead a physician with no substantial credentials in the field at issue was not merely irresponsible, but undoubtedly led directly to Jennifer's conviction.

In light of all of the foregoing, the Appellate Court's conclusion that trial counsel was not ineffective for failing to call other experts because Dr. Tucker testified to the same things was clearly an unreasonable application of *Strickland*. Not only did Dr. Tucker not testify to several key matters that other experts could have, his qualifications to testify as an expert in an SBS case were simply insufficient. Perhaps even more egregious, however, is that by electing to call Dr. Tucker instead of a qualified expert, trial counsel limited Jennifer's defense in such a way that the only argument left was who perpetrated this crime. Of course, the only people at whom trial counsel could point the finger were the grieving parents. Opting to use other experts, ones who could have challenged the entire premise of SBS would have obviated this need to finger point. Trial counsel could have argued instead that while I.Z.'s death was a tragedy, there was insufficient evidence to conclude that anyone at all was to blame as no crime was committed. Jennifer is

---

http://www.biomechanicsinc.com/newsite/StaffLT.htm, for more information.

[9] Indeed, the record is abundantly clear that the trial court was very impressed with Dr. Flaherty's testimony. At the conclusion of her power point presentation, and before the defense case had even begun, the trial court asked how Dr. Flaherty's presentation could be preserved for an eventual appellate review. (Tr. 512)

entitled to a new trial where she can present the testimony of these highly qualified experts. A writ of habeas corpus should issue on this basis.

At the very least, an evidentiary hearing must be held where this Court can consider the significance of the testimony that these experts could provide, and can determine whether the Appellate Court correctly concluded that Dr. Tucker's testimony covered the same areas.

> **2. Trial counsel was ineffective for failing to challenge the admission of expert testimony on the theory of SBS under *Frye*.**

Despite the rising debate in the medical and scientific community concerning the validity of an SBS diagnosis, trial counsel made no objection to the introduction of Dr. Flaherty's expert testimony under *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923). Had trial counsel challenged the admission of expert testimony that the presence of subdural hematomas and retinal hemorrhages is indicative only of SBS, and presented the more recent evidence-based medicine indicating that shaking alone cannot produce the injuries I.Z. suffered, Jennifer would have been acquitted. There can be no excuse for trial counsel's failure to challenge the admission of this evidence. Indeed, it was the entire basis for the prosecution.

The standard in Illinois for determining whether a new scientific technique is admissible is set forth in *Frye*. Under *Frye*, medical and scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is " 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *Donaldson v. Central Illinois Public*

*Service Company,* 199 Ill.2d 63, 77, 767 N.E.2d 314 (2002), *quoting, Frye v. United States*, *supra*. Additionally, in Illinois, an expert's acceptance of a particular methodology must be reasonable. *Agnew v. Shaw*, 355 Ill.App.3d 981, 823 N.E.2d 1046 (1st Dist. 2005) (the court must look to the underlying methodology used to generate the conclusion).

Although testimony regarding SBS has been introduced in Illinois courts, no reported decision exists in which a reviewing court has assessed whether it comports with the requirements of *Frye*. Consequently, admission of such expert testimony was not automatic. *See, Donaldson*, 199 Ill.2d at 868 ("As has been observed in the context of *Frye*, 'relying exclusively upon prior judicial decisions to establish general scientific acceptance can be a 'hollow ritual' if the underlying issue of scientific acceptance has not been adequately litigated.'") (citations omitted). Indeed, at the time of Jennifer's trial, as noted previously in Section II.A., which is incorporated herein by reference, there had been increasing and significant disagreement over the validity of SBS as a diagnosis and the methodology that underlies it.

Despite the relevant standards, and the fact that this "scientific" testimony had never before been found admissible under *Frye* by any reviewing court in the state, trial counsel never challenged its admissibility. This is particularly problematic when, by the time of Jennifer's trial, the medical community was no longer in agreement as to the validity of SBS. Under *Frye*, if a theory is not generally accepted in the scientific community, then the testimony related thereto is

58

inadmissible. Because SBS was no longer generally accepted based on the rising debate in the scientific community, trial counsel had a duty to object to the admission of this evidence under *Frye*.

This issue has not previously been raised in the Illinois state courts, and is therefore procedurally defaulted. *See*, *U.S. ex rel. Johnson v. Tally*, 47 F.Supp.2d 943, 947 (N.D.Ill. 1999 )(Alesia, J.), *citing*, *McGowan v. Miller*, 109 F.3d 1168, 1172 (7th Cir. 1997). A claim that has been procedurally defaulted may nonetheless be reviewed on federal habeas if the petitioner can establish that refusal to consider the claim would result in a fundamental miscarriage of justice. *Id*.

According to the United States Supreme Court, a fundamental miscarriage of justice occurs when the petitioner presents a compelling claim of actual innocence. *House v. Bell*, 547 U.S. 518, 521, 126 S.Ct. 2064 (2006); *Schlup v. Delo*, 513 U.S. 298, 319-22, 115 S.Ct. 851 (1995). As the *Schlup* Court held, prisoners asserting innocence as a gateway to have a defaulted claim considered must establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. The new evidence referred to in *Schlup* includes "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." *Id.*, at 324. "The *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538.

In *House*, the Supreme Court held that the petitioner had presented sufficient evidence of actual innocence to have his defaulted claims considered.

There, the petitioner presented DNA evidence that excluded him, and implicated another in the death of the victim. *Id.*, at 540-41. The new evidence presented also called into question the state's theory as to how the victim's blood appeared on the petitioner's pants. *Id.*, at 541-48. According to the Supreme Court, although the question was close, the evidence presented by the petitioner was sufficient to establish that a reasonable juror would have a reasonable doubt as to the petitioner's guilt. *Id.*, at 554.

In this case, as set forth herein in Section II.A., scientific evidence exists which establishes Jennifer's actual innocence. I.Z. suffered no outward signs of abuse, and her only injuries consisted of subdural hematomas and retinal hemorrhages. Scientific evidence has established that subdural hematoma and retinal hemorrhages would necessarily be accompanied by other physical injuries if they were the result of shaking. In short, there must also be neck or spinal cord injury. The only evidence of Jennifer's guilt was that I.Z. became symptomatic while in Jennifer's care. Jennifer has steadfastly maintained that she never harmed I.Z., but rather that she did everything in her power to save I.Z.'s life.

The trial court was presented with the testimony of Dr. Flaherty, who claimed that SBS was the *only* cause for I.Z.'s injuries and death. But it is clear from the evidence-based medicine that this is simply not the case. Absent any corroborating evidence of child abuse or impact, it simply cannot be said that Jennifer, or anyone else for that matter, intentionally harmed I.Z.

Moreover, without any evidence of neck or cervical spine injury, the new

60

evidence establishes that shaking alone could not have caused these injuries. The State never argued that I.Z. suffered from blunt force trauma, as no evidence of such was found. The State's theory amounted to nothing more than pure speculation as to what caused I.Z.'s injuries. New scientific evidence, however, completely excludes the State's theory as a possible cause. A jury or fact-finder presented with the new evidence would likely have a reasonable doubt as to Jennifer's guilt. Thus, this Court should consider the claim that trial counsel was ineffective for failing to challenge the expert SBS testimony under *Frye* despite its procedural default. At the very least, Jennifer submits that an evidentiary must be held where she can present the testimony of experts cited herein to further support her claim of actual innocence.

## PART IV – REPRESENTATION

(A)-(G)      Petitioner was represented at all proceedings in the trial court by attorney Charles L. Bretz, 58 North Chicago Street, 2nd Floor, Joliet, Illinois. Petitioner was represented on direct appeal, post-conviction, and appeal from the denial of the post-conviction by attorney Thomas C. Brandstrader, 53 West Jackson Boulevard, Suite 615, Chicago, Illinois.

## PART V – FUTURE SENTENCE

Petitioner is currently serving a sentence of twenty (20) years in the custody of the Illinois Department of Corrections, and has no future sentence to serve upon its completion.

WHEREFORE, Petitioner respectfully requests that this Court grant a writ of habeas corpus vacating her conviction and setting aside the sentence previously imposed. Petitioner further requests an evidentiary hearing at which she can present witnesses and evidence to further support the claims raised herein.

Respectfully submitted,

 **s/ Jodi L. Garvey**
**JODI L. GARVEY**, One of the
Attorneys for Petitioner.

**BLEGEN & GARVEY**
53 West Jackson Boulevard, Suite 1437
Chicago, Illinois 60604
(312) 957-0100

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that foregoing Petition Under 28 U.S.C. §2254 for a Writ of Habeas Corpus & Request for an Evidentiary Hearing was served on August 12, 2010, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

 s/ Jodi L. Garvey                          
**JODI L. GARVEY**
53 West Jackson Boulevard, Ste. 1437
Chicago, Illinois 60604
(312) 957-0100