```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4   JENNIFER DEL PRETE,           )
                                   )
 5                  Petitioner,    )   Docket No. 10 C 5070
                                   )
 6             vs.                 )
                                   )
 7   MELODY HULETT,                )   Chicago, Illinois
                                   )   June 21, 2013
 8                  Respondent.    )   10:30 a.m.

 9

10                   TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12   APPEARANCES:

13

14   For the Plaintiff:    BLEGEN & GARVEY
                           BY:  MR. PATRICK W. BLEGEN
                                MS. JODI L. GARVEY
15                              MR. DANIEL A. RUFO
                           53 West Jackson Boulevard
16                         Suite 1437
                           Chicago, Illinois  60604
17

18   For the Defendant:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                           BY:  MR. KARL R. TRIEBEL
19                              MR. NEAL GOODFRIEND
                                MR. ARI TELISMAN
20                              MS. MONIQUE A. ANAWIS
                                MR. ZACHARY KAUFMAN
21                         100 West Randolph Street
                           13th Floor
22                         Chicago, Illinois  60601

23

     Also Present:                   MR. ROBERT STANLEY
24

25
```

1

LAURA M. BRENNAN - Official Court Reporter
219 South Dearborn Street - Room 2102
Chicago, Illinois  60604
(312) 435-5785

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (The following proceedings were had in open court:)

2              THE COURT:  10 C 5070, Del Prete v. Hulett.

3              Can one person on each side can give everybody's

4       names?

5              MR. BLEGEN:  Patrick Blegen, Dan Rufo and Jodi Garvey

6       on behalf of Ms. Del Prete.

7              MR. GOODFRIEND:  Judge, Neal Goodfriend, Ari

8       Telisman, Monique Anawis, Zach Kaufman and Karl Triebel on

9       behalf of the respondent.

10             THE COURT:  I'm told that Ms. Del Prete is, quote,

11      unquote, on her way down here, but we need to get going here.

12             So I just want to preface this by saying, you know, I

13      looked back just now at the motion to supplement the record

14      that led to this, and I'm making these comments because of the

15      phone conversation I had with people the other day where I was

16      told that, you know, this was going to take hours and hours

17      and hours.  Don't give me the look, Mr. Blegen.  I was told by

18      somebody there was like several hours of preparation involved

19      and, you know, nobody knows what the people --

20             You can bring her on out.

21             MR. BLEGEN:  Judge, I think what I said is I haven't

22      talked to the police.

23             THE COURT:  I'm in the middle of a sentence actually.

24             MR. BLEGEN:  I'm sorry.

25             THE COURT:  Yes.  The request to reopen the hearing

1    is focused on one thing, one thing.  It's this document that

2    surfaced that talks about something that somebody said, you

3    know, during the course of the autopsy or the work by the

4    medical examiner -- the record should reflect Ms. Del Prete is

5    present -- and then what happened as a result of that.

6           Okay.  And so my going-in assumption is I'm not sure

7    why this hearing should take any longer than about half an

8    hour.  Okay.  So if it's going to take longer than that, I

9    need somebody to tell me right now why they think it's going

10   to take longer than that.

11          MR. BLEGEN:  Judge, you mean the entirety of the

12   hearing, a half an hour?

13          THE COURT:  Yes, because you want to bring out a

14   person said this, it didn't get disclosed, and that's pretty

15   much what I understood from the document.

16          MR. BLEGEN:  Well, there's four witnesses, Judge.

17          THE COURT:  I understand, but --

18          MR. BLEGEN:  I think there will be more than

19   15 minutes per witness.

20          One, I'm not sure about the police officer testimony.

21          Two, I don't think that Dr. Flaherty is going to be

22   very long because she did have a conversation with us, and I

23   don't -- I think she's going to say she doesn't remember very

24   much.  But Dr. Harkey we did have a conversation with, and

25   he's the medical examiner.

1          THE COURT:  Right.

2          MR. BLEGEN:  And what I think is important for him

3    that might take more than 15 minutes is the implications of

4    what he said at the time, which is, you know, the letter just

5    says he disagrees with SBS.

6          THE COURT:  Okay.

7          MR. BLEGEN:  He questioned the diagnosis.  So he's

8    going to tell us, I presume, why.

9          THE COURT:  But I guess the point I'm trying to get

10   across to you is I don't need, and I will not sit here and

11   take, you know, a full blown re-examination of the issues

12   that, you know, we spent eight or nine or ten days going over

13   before and people have filed very voluminous briefs on and

14   I've got hundreds of exhibits on, you know.  That's not what

15   this is for.

16         MR. BLEGEN:  I understand.  I wasn't the one who told

17   you on the phone it was going to take all day.

18         THE COURT:  I understand that.

19         MR. BLEGEN:  I don't think it is.

20         THE COURT:  I'm saying it to everybody, but you just

21   told me just now that his testimony is going to take longer

22   than a few minutes because you have got to go into other

23   stuff.  Okay.  So just keep in mind that I'm the one who

24   decides how much people get to go into, and so I wouldn't save

25   all of your good stuff for the end of a lengthy examination.

 1    I would get to it quickly.  That's the point I'm trying to
 2    make, okay.
 3            And the same is true on the other side.  And I think
 4    it was somebody on this side of the room that told me that,
 5    you know, the preparation that one of these doctors took -- I
 6    don't remember how many hours it was, but it was a number of
 7    hours, and it wasn't one.
 8            MR. TRIEBEL:  Yes, your Honor, because we didn't
 9    understand exactly what the focus --
10            THE COURT:  I'm saying the same thing to you.  We're
11    not going back and raking over all of this old stuff.  So
12    we're ready to go.  Who's going first?
13            MR. BLEGEN:  Tracy Caliendo.  She's a police officer.
14            THE COURT:  Let's get her.
15            (Brief interruption.)
16            THE COURT:  You're coming right up here.
17            (Witness sworn.)
18            THE COURT:  Have a seat.
19            Just give me a second, Mr. Blegen.
20        (Brief interruption.)
21            THE COURT:  Okay.
22        TRACY CALIENDO, PLAINTIFF'S WITNESS, DULY SWORN
23                    DIRECT EXAMINATION
24    BY MR. BLEGEN:
25    Q   Ma'am, could you please tell us your name and spell your

Caliendo - direct

1  last name for the court reporter?

2  A   Sure.  Officer Tracy Caliendo, C-a-l-i-e-n-d-o.

3  Q   And are you a police officer for the --

4           THE COURT:  Spell it slower for me.  I'm sorry.

5           THE WITNESS:  C-a-l-i-e-n-d-o.

6           THE COURT:  Thank you.

7           THE REPORTER:  And the first name.

8           THE WITNESS:  Tracy, T-r-a-c-y.

9           THE COURT:  Okay, go ahead.

10  BY MR. BLEGEN:

11  Q   I take it you're a police officer for the Plainfield

12  Police Department?

13  A   Yes, sir, I am.

14  Q   And you and I met for the first time outside in the hall,

15  is that correct?

16  A   Yes, sir.

17  Q   And previously you had expressed through the village

18  attorney that you were declining to speak with me about this

19  case?

20  A   Yes, sir.

21  Q   Okay.  Do you recall attending an autopsy of an individual

22  named Isabella Zielinski on November 10th of 2003?

23  A   Yes.

24  Q   Do you recall making a phone call after that autopsy to a

25  Detective Kroll in the Romeoville Police Department?

Caliendo - direct

1   A    I do not recall that.

2   Q    Do you recall what was said by the medical examiner during

3   the autopsy of Ms. Zielinski?

4   A    Yes, I do.

5   Q    What did you hear the medical examiner say?

6   A    He had said several things, that he wanted to review some

7   medical records of the child until he made a positive

8   affirmation of the cause of death.

9   Q    Did he indicate that he questioned the diagnosis of shaken

10  baby syndrome?

11  A    No, I don't believe it was a question.  He just wanted to

12  review the medical records to concur with another doctor.

13  Q    Did the medical examiner indicate that he was specifically

14  looking -- specifically looking for fractures in the rib cage

15  and found none?

16  A    I believe he had stated something about the rib cage, that

17  there were no fractures, there were no new or old injuries

18  from my understanding.

19  Q    And do you recall him saying that?

20  A    I recall -- I don't have a very good recollection of it.

21  I do recall the rib fractures being noted and also that there

22  was no new or old injuries, as my report stated.

23  Q    Did you review documents in preparation for testifying

24  today?

25  A    No.

Caliendo - direct

1  Q   Did you speak with any other attorneys or other

2  individuals in preparation for testifying today?

3  A   I did speak with a few on the attorney general's side.

4  Q   And what did you discuss with them?

5  A   Just my report.

6  Q   And at the time, your name was -- your last name was

7  Bauer, is that right?

8  A   Yes, in 2000 -- yes, in 2003 it would have.

9  Q   So you would have been listed in the report as Tracy

10  Bauer?

11  A   Yes, sir.

12  Q   Let me show you what I've marked as Petitioner's Exhibit

13  Kroll Letter Number 1.

14  A   Thank you.

15        THE COURT:   Thanks.

16  BY MR. BLEGEN:

17  Q   Would you just take --

18        I understand you haven't looked at it before.  Would

19  you just read the body of it to yourself quickly?

20     (Brief interruption.)

21  BY MR. BLEGEN:

22  Q   Have you read it?

23  A   Yes.

24  Q   Does that help you to remember whether you did or did not

25  call Detective Kroll after the autopsy?

Caliendo - direct

1    A    I still don't recall how I would have had any

2    communication with him.

3    Q    All right.  Do you see the part in the letter that

4    indicates on 11/10/03, "I," meaning Detective Kroll, "spoke to

5    a Plainfield evidence technician who was present at the

6    autopsy"?

7    A    Yes.

8    Q    Were you a Plainfield evidence technician at the time?

9    A    Yes.

10   Q    And you were present at the autopsy?

11   A    Yes, sir.

12   Q    And does the next sentence, "The ET advised that Dr. Jeff

13   Harkey did, in fact, question the diagnosis of SBS," does that

14   help you remember what Dr. Harkey did or didn't say at the

15   time of the autopsy?

16   A    I don't recall any question of the SBS.

17   Q    You don't recall?

18   A    I don't recall him questioning it other than that he had

19   to look at medical records.

20   Q    All right.  And just to be clear, are you saying you don't

21   recall whether he said that or not, or you're saying, I recall

22   that he did not say that?

23   A    No.  I recall that he did not say that.

24   Q    Okay.  Did you speak with anyone else regarding what Dr.

25   Harkey said at the autopsy?

Caliendo - direct

1  A    Not that I recall, no.

2  Q    Did you ever speak to any prosecutors other than the

3  attorney generals here about what Dr. Harkey said --

4  A    No.

5  Q    -- at the autopsy?

6  A    No, sir.

7  Q    Was there another law enforcement officer present at the

8  autopsy, do you recall?

9  A    I had thought there was, but I don't recall in my report.

10  I noted everybody that was present, which I normally do, and I

11  don't have anybody listed other than myself.

12  Q    Do you recall a police detective Ron Mikos or Mikos being

13  there?

14  A    If that was --

15       There was somebody from my department that had went

16  with me.  I don't know if he was present at the autopsy or

17  not.

18  Q    Do you recall whether you spoke to him about Dr. Harkey's

19  statements during the autopsy?

20  A    No, I don't recall.

21       MR. BLEGEN:  Can I just have a second, Judge?

22       THE COURT:  Sure.

23  (Brief interruption.)

24       MR. BLEGEN:  That is all, Judge.

25       THE COURT:  Mr. Goodfriend?

1          MR. GOODFRIEND:  No questions.

2          THE COURT:  Do I have somewhere Officer Caliendo's

3    report that she has referred to a couple times during her

4    testimony?

5          MR. RUFO:  Yes, sir.

6          THE COURT:  Does somebody have it so that you can

7    hand me a copy of it so that I can look at it, seeing as how I

8    have boxes and boxes full of stuff?

9          MR. GOODFRIEND:  Judge, I have an extra copy.

10         THE COURT:  Thanks.  I mean, I've got this memo.  I'm

11   talking about her report that she referred to.

12         MR. GOODFRIEND:  Right.  I highlighted some sections.

13         THE COURT:  It's okay.  I just want to look at it for

14   a second.  Thanks.

15      (Brief interruption.)

16         MR. BLEGEN:  Are you ready for the next witness,

17   Judge?

18         THE COURT:  No.  I'm looking at this to figure out

19   whether I need to ask her anything.

20      (Brief interruption.

21         THE COURT:  Have you looked recently at the report

22   that you did?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  So the people you identified as being

25   there was a DuPage deputy coroner named Steven Coleman; an

1  assistant pathologist named Mary Bleicher or Bleicher,

2  B-l-e-i-c-h-e-r; Dr. Harkey; and then a detective Kevin

3  Karley, K-a-r-l-e-y, from the DuPage County sheriff's office.

4       I just want to make sure I was understanding.  Do you

5  know -- are you thinking that there was somebody else there

6  from Plainfield?

7       THE WITNESS:  Yes, sir.  I know that there would have

8  been one other person.  Our normal protocol is an evidence

9  tech and a detective would go to an autopsy.

10       THE COURT:  Okay.  So that would be standard

11  procedure?

12       THE WITNESS:  Yes, sir.

13       THE COURT:  Would it have made a difference in terms

14  of standard procedure that there was a detective there from

15  another jurisdiction, in other words, DuPage County?  Would

16  you still --

17       In other words, if there is a detective there, even

18  if it's not one of your detectives, would you still typically

19  have somebody from Plainfield there?

20       THE WITNESS:  Yes, sir.

21       THE COURT:  Okay.  I mean, this document looks like

22  it probably got generated through a computer or something.

23  You were probably taking notes at the time.  Do you know if

24  those notes still exist anywhere?

25       THE WITNESS:  I don't believe so.

 1    THE COURT:  Generally speaking, you discard them once
 2  you prepare the written report; that's the standard procedure?
 3    THE WITNESS:  Yes.
 4    THE COURT:  And as you sit there right now, you don't
 5  remember --
 6    Assuming there was another detective from Plainfield
 7  there, you don't remember who it was?
 8    THE WITNESS:  I normally wouldn't put them down
 9  unless they had a part in the autopsy.
10    THE COURT:  Okay.  But if there was somebody else
11  there, you don't remember, as you sit here, who it was?
12    THE WITNESS:  Correct.
13    THE COURT:  Are you pretty --
14    From the memorandum of Detective Kroll that counsel
15  just showed you, it kind of sounds like it wouldn't have been
16  Detective Kroll who was there.
17    THE WITNESS:  No, he was not.
18    THE COURT:  He was definitely not there, okay.
19    All right.  Do you want to ask any follow-up
20  questions based on the questions I asked?
21    MR. BLEGEN:  Yes.
22  BY MR. BLEGEN:
23  Q   Let me show you what I've marked as --
24    THE COURT:  Mr. Telisman, here is your copy, or Mr.
25  Goodfriend, whoever it was.

1       (Brief interruption.)

2    BY MR. BLEGEN:

3    Q    Let me show you what I've marked as Petitioner's Exhibit

4    Deputy Coroner Report.

5           Judge, do you mind writing an exhibit on it?

6       (Brief interruption.)

7    BY MR. BLEGEN:

8    Q    I'm sorry.  I know this isn't your report, but if you

9    would turn to --

10          THE COURT:  Whoa, small print.

11   BY MR. BLEGEN:

12   Q    -- page 6 numbered at the bottom.

13          You might want to start at the bottom of page 5.  And

14   then just let me know if that helps you remember whether

15   police detective Ron Mikos of the Plainfield Police Department

16   was present for the autopsy.

17   A    According to this, he was.

18          THE COURT:  Does it help you remember personally

19   whether he was there or not?

20          THE WITNESS:  No.

21          THE COURT:  Not really, okay, fine.

22          She said it doesn't help her remember.

23   BY MR. BLEGEN:

24   Q    Do you recall whether there were any other evidence

25   technicians other than you present for the autopsy?

1   A    This was my first DuPage County one, so it ran a little

2   different.  So I believe if there was, it would have been from

3   DuPage County.

4   Q    Do you recall anybody?

5   A    I don't.

6          MR. BLEGEN:  That's all, Judge.

7          MR. GOODFRIEND:  Nothing, Judge.

8          THE COURT:  Thanks.  Wait across the hall, though,

9   because I might have some more questions depending upon what

10  Detective Harkey says, or Detective Kroll says or Dr. Harkey.

11         MR. BLEGEN:  I think it's now Commander Kroll.

12         THE COURT:  Is he the next person?

13         MR. BLEGEN:  Yes.

14         THE COURT:  Okay.

15      (Brief interruption.)

16         THE COURT:  Right up here.  Raise your right hand,

17  please.

18      (Witness sworn.)

19         THE COURT:  Have a seat, please.

20      KENNETH KROLL, PLAINTIFF'S WITNESS, DULY SWORN

21                  DIRECT EXAMINATION

22  BY MR. BLEGEN:

23  Q    Sir, can you please tell us your name and spell your last

24  name for the court reporter?

25  A    My name is Kenneth Kroll, K-r-o-l-l.

1   Q   And where are you employed, sir?

2   A   With the Romeoville Police Department.

3   Q   And what is your rank?

4   A   Commander with the police.

5   Q   Did you participate as a detective in the investigation

6   into the death of Isabella Zielinski?

7   A   I did.

8   Q   And were you the lead or one of the lead detectives in

9   that investigation?

10  A   It was myself and Detective McLaughlin who shared the

11  responsibility.

12  Q   But you testified at Ms. Del Prete's trial, correct?

13  A   I did.

14  Q   And you were the detective who took statements from Ms.

15  Del Prete, correct?

16  A   Correct.

17  Q   Let me show you what is marked as Petitioner's Exhibit

18  Kroll Letter 1.

19          Have you seen this letter before?

20  A   I have.

21  Q   Did you, in fact -- are you the author of it?

22  A   That's correct.

23  Q   All right.  It's got a date of November 10th of 2003.  Is

24  that when you wrote the letter?

25  A   Yes.

Kroll - direct

1  Q   All right.  Tell us how it came about that you wrote the

2  letter.

3  A   I had learned that Isabella had died, and I contacted Dr.

4  Flaherty in regards to -- well, I learned that Isabella had

5  died and that she was going to have an autopsy in DuPage

6  County.

7           I also learned that the pathologist in DuPage County

8  was a, I was told, someone that was not a believer in shaken

9  baby syndrome.

10 Q   And when you say you contacted Dr. Flaherty, you contacted

11 her via this letter or --

12 A   Correct.

13 Q   Okay.  And did this letter get faxed to Dr. Flaherty?

14 A   Yes, this was a fax.

15 Q   Who was it that contacted you and told you that the

16 medical examiner was not a believer in shaken baby syndrome?

17 A   I don't recall.

18 Q   You say in your letter, you say it was an attorney who

19 notified you of that?

20 A   Yes.

21 Q   Was it a prosecutor or a defense attorney?

22 A   I would very, very, very much believe it was one of the

23 state's attorneys.  I really don't have any contact with

24 defense attorneys.

25 Q   All right.  One of the state's attorneys who was handling

Kroll - direct

1  the prosecution of Ms. Del Prete or a separate state's

2  attorney?

3  A   Somebody in the Will County state's attorney's office.

4  Q   So maybe or maybe not one of the state's attorneys who was

5  handling the prosecution?

6  A   Correct.

7  Q   All right.  You indicate in the letter that you spoke to a

8  Plainfield police evidence technician who was present at the

9  autopsy?

10 A   That's correct.

11 Q   Was that officer then Bauer, now Caliendo?

12 A   Correct.

13 Q   Tell us as best you can recall what Officer Caliendo told

14 you about the autopsy.

15 A   The best I can recall at this point in time is it was a

16 phone call I had with her.  And what I can remember of the

17 contents of the phone call had to do with when they examined

18 Isabella, when they opened up her skull, that the brain didn't

19 come out in one piece like many times.  It kind of poured out

20 like oatmeal, she told me, something to that effect.  That's

21 what I can recall of the conversation.

22 Q   All right.  You wrote in your letter in the second

23 paragraph:

24        "The ET advised that Dr. Jeff Harkey did, in fact,

25 question the diagnosis of SBS."

Kroll - direct

1              Do you see that?

2    A    I see it.

3    Q    Do you recall Officer Caliendo telling you that?

4    A    At this point, I don't.

5    Q    But at the time that's what you wrote down, correct?

6    A    Correct.

7    Q    Do you have any reason to believe she did not tell you

8    that Officer Harkey, in fact, questioned the diagnosis of SBS?

9    A    I don't have any reason to believe that.

10   Q    Am I correct that, based on your letter, you assume that's

11   what she told you?

12   A    Yes, based on the letter.

13   Q    You describe in the first sentence, or I'm sorry, the

14   second sentence of your letter, that this was a twist in your

15   case.

16              Tell us what you meant by a twist.

17   A    I understand your question.  I guess it was something

18   unexpected.

19   Q    All right, and something unexpected favorable to the

20   prosecution or not favorable to the prosecution?

21   A    Unexpected.

22   Q    Well, did you consider the fact that the medical examiner

23   did, in fact, question the diagnosis of SBS to be favorable to

24   the prosecution?

25   A    Well, it would be unfavorable.

1  Q   Okay.  That was my -- I'm sorry.  Maybe I confused you.
2  That was my question.

3       Was it a favorable twist or an unfavorable twist?
4  A   Oh, I understand what you're saying.  Unfavorable.
5  Q   Okay.  You also indicate that you were told that Dr.
6  Harkey specifically looked for fractures in the rib cage, and
7  then you put "adult grabbing point" in parentheses "and found
8  none."

9       Do you see that?
10 A   I see it.

11 Q   Was that told to you by Officer Caliendo?
12 A   To the best of my recollection, because I wouldn't have
13 had anybody -- I didn't speak to -- I didn't speak to anybody
14 else about the autopsy other than her.

15 Q   And then you have indicated that Dr. Harkey intends to
16 summons all of Isabella's medical records to see who
17 determined this was SBS and why they reached that diagnosis?
18 A   That's correct.

19 Q   And did you learn that also from Officer Caliendo?
20 A   Yes.

21 Q   The next sentence you write is:

22       "I have great confidence in your findings and our
23 investigation.  This correspondence is FYI."

24       What did you mean by "this correspondence is FYI"?
25 A   Information.  It's information only.

1  Q   So this was only for Dr. Flaherty's eyes or ears, correct?

2  A   Not necessarily just for her.  This was for -- to apprise

3  her of what I learned.

4  Q   All right.  But you said it was for your information only,

5  right?

6        THE COURT:  It doesn't say "only."

7  BY MR. BLEGEN:

8  Q   I know, but that's what you said on the stand.

9        THE COURT:  Okay.

10  BY THE WITNESS:

11  A   Then I misspoke.  It was FYI, meaning information only,

12  nothing more than information.

13  BY MR. BLEGEN:

14  Q   I see what you mean.  Not just her.  You mean just for

15  information?

16  A   Correct, yes.

17        Does that make sense?

18  Q   Um --

19        THE COURT:  You don't get to ask.

20  BY MR. BLEGEN:

21  Q   I'll ask the questions.

22        Aren't all letters for somebody's information when

23  there is information in them?

24  A   Yes.

25  Q   All right.

1          THE COURT:  Just so you know, I've sent at least

2     three emails to people this morning with the subject line FYI,

3     and, of course, they all are.  Every email is for people's

4     information.  I'm just giving you a little --

5     BY MR. BLEGEN:

6     Q    Let me ask you then, did you talk to Dr. Flaherty about

7     this letter?

8     A    I don't have any recollection of that.  I believe I did

9     because she was very good at returning my phone calls, but I

10    don't have any recollection of a conversation that took place

11    specifically about the letter.

12    Q    Did you talk to Dr. Harkey about the subject of the

13    letter?

14    A    I've never spoken to Dr. Harkey.

15    Q    Do you see the "re Jeff Harkey" and a phone number in the

16    upper-right corner?

17    A    I do.

18    Q    Did you write that on there?

19    A    That's my handwriting.

20    Q    Was that intending the number to be for you or to give to

21    Dr. Flaherty, or do you recall?

22    A    I don't even know what that phone number is, to be honest

23    with you.  That could be a fax number.  That could be a phone

24    number.  "Re Jeff Harkey" would be regarding Jeff Harkey and a

25    phone number.

Kroll - direct

1   Q   Aside from Dr. Flaherty, did you speak to anyone else

2   about the subject of the letter?

3   A   Can you say that again, please?

4   Q   Aside from Dr. Flaherty, did you speak to anyone else

5   around the time regarding the subject of the letter?

6   A   Evidence tech Caliendo.  Well --

7   Q   I'm sorry, go ahead.

8   A   I imagine I did speak to people about it.  I just don't

9   recall who or how many people or what.

10  Q   Am I correct that the possibility that the evidence

11  technician was going to -- strike that.

12          Am I correct that the possibility that the medical

13  examiner was going to conclude that this was not shaken baby

14  syndrome was important to you?

15  A   Of course.

16  Q   All right.  And so did you or do you recall talking to

17  your co-lead detective about it?

18  A   Yes.

19  Q   What did you and he discuss, as best you can recall?

20  A   I don't recall exactly other than I'm sure we discussed

21  it.  I'm sure we talked about it.

22  Q   You indicated that you anticipate having to answer several

23  questions for my prosecuting attorney.

24          Do you see that at the very end?

25  A   I do.

1    Q    Did you speak to the prosecuting attorney about this?

2    A    About this letter or about the circumstances?

3    Q    Let's start with the letter.

4         Did you give the letter to the prosecuting attorney?

5    A    I don't recall.

6    Q    Do you recall whether you gave it to the Will County

7    state's attorney's office in general?

8    A    No, I don't recall.

9    Q    All right.  Do you recall speaking about the subject of

10   the letter, meaning Dr. Harkey questioning SBS, with the

11   prosecuting attorney in the case?

12   A    At some point, yes.

13   Q    When was that?

14   A    When we were preparing for trial.

15   Q    How close in relation to trial was that?

16   A    Maybe a month beforehand, maybe two months before trial.

17   Q    Before.  Was the trial set on multiple occasions?

18   A    Oh, yes.  This was a long process.

19   Q    And so this time you're speaking of, is it a month or two

20   before the trial actually commenced?

21   A    That's what I believe, yes.

22   Q    All right.  Do you recall the name of that prosecuting

23   attorney?

24   A    I recall Brian Barrett and Sarah Jones were the two Will

25   County assistants that I had primary contact with this.

1   Q    Do you recall which or both of them you spoke with?

2   A    Probably both.

3   Q    And do you recall what was said by either side?

4   A    I recall that Dr. Harkey's conclusion supported shaken

5   baby syndrome.  Then he said that it was abusive head trauma.

6         And I recall that the prosecuting attorneys, the

7   assistant state's attorneys, were pleased with his independent

8   opinion.

9   Q    Did you speak to them regarding his initial questioning of

10  SBS?

11  A    Did I speak with Sarah and Brian regarding the initial

12  questioning?

13  Q    We can start with them, yes.

14  A    I would guess so.  I don't remember exactly.

15  Q    All right.  Do you recall speaking with any other

16  prosecuting attorneys about Dr. Harkey initially questioning

17  SBS?

18  A    Yes.

19  Q    Who?

20  A    I believe Ken Zelazo.

21  Q    And can you tell us who that is?

22  A    He was a Cook County state's attorney that then went to

23  Will County.  He was the first assistant during the time of

24  this case, and he was the person that primarily -- he made a

25  lot of decisions in the office.

1  Q   And what did you tell Mr. Zelazo?

2  A   I told Mr. Zelazo that Isabella had died.  He was aware of

3  that.

4          There was some confusion as to the Plainfield Police

5  Department versus the Romeoville Police Department, who was

6  going to handle this, and that she had passed away

7  in actually -- sorry -- yes, in DuPage, and that's why the

8  autopsy was going to be in DuPage.

9  Q   What did you tell him about Dr. Harkey's initial

10 questioning of the shaken baby diagnosis?

11 A   I don't recall having a conversation with Zelazo about it

12 at this time.  It was after we had already -- after they had

13 already received the findings from Dr. Harkey.

14 Q   All right.  Let's focus then on --

15         I think you told us earlier that you were concerned

16 that Dr. Harkey had expressed initial questioning of shaken

17 baby syndrome, correct?

18 A   Yes.

19 Q   You believed that you talked to Dr. Flaherty about it but

20 you don't recall the conversation, correct?

21 A   Correct.

22 Q   Who else did you talk to about your concerns that Dr.

23 Harkey had initially questioned the shaken baby syndrome

24 diagnosis?

25 A   I think I told you, evidence tech Caliendo.

Kroll - direct

1    Q    She's the one who told you about it, right?

2    A    She is the one who told me about how the autopsy went.

3    Q    Right.  Did you have a conversation with her after that

4    phone call?

5    A    No, just that one call.

6    Q    All right.  So leaving her aside and leaving Dr. Flaherty

7    aside, who else did you speak to regarding your concerns that

8    Dr. Harkey had initially questioned the diagnosis of SBS?

9    A    At this point I would be surmising.  I would be guessing.

10   I would say Detective McLaughlin because he was equally

11   involved in the case; assistant state's attorney Brian

12   Barrett, assistant state's attorney Sarah Jones; at some point

13   Ken Zelazo; and the others I don't know.  There could have

14   been plenty of others.

15   Q    Now, you told us you talked to those three state's

16   attorneys previously, correct?

17   A    Yes.

18   Q    Are you saying now that you believe or you surmised that

19   you told those three state's attorneys about your concerns

20   regarding Dr. Harkey's questioning of SBS?

21   A    All of them with the exception of Zelazo because in our

22   conversation with Zelazo, it was after they had already gotten

23   Harkey's findings.

24   Q    So you surmise that you spoke to the two prosecutors who

25   were handling the actual prosecution about your concerns

Kroll - direct

1   regarding Dr. Harkey and his questioning of SBS?

2   A   Yup.

3   Q   Is that a yes?

4   A   That's a yes.

5   Q   Okay.  Can you recall as you sit here now any specifics

6   regarding those conversations?

7   A   I can't.

8   Q   Do you know whether Dr. Harkey's initial questioning was

9   passed along to the defense of Ms. Del Prete?

10  A   No, I don't know.

11  Q   All right.  And I think you told us you don't know whether

12  your letter was given to the state's attorney's office?

13  A   No, I don't know.

14  Q   And I take it -- maybe this isn't a question.

15          Do you know whether the letter was given to the

16  defense of Ms. Del Prete?

17  A   I don't know.  I don't recall.

18  Q   Would it be typical for you to turn over this kind of

19  letter to the state's attorneys handling a prosecution?

20  A   Yes.

21  Q   All right.  And you are --

22          I assume you're aware that defendants are entitled to

23  favorable evidence that the state -- is in the state's

24  possession, correct?

25  A   Yes, I am aware of discovery.

Kroll - direct

1    Q    All right.  And you're aware of discovery particularly of

2    what is called Brady material?

3    A    I'm aware.

4    Q    You have had training on that?

5    A    Yes.

6    Q    And this is Brady material, is it not?

7    A    I understand.

8         MR. GOODFRIEND:  Objection, Judge, speculation.

9         THE COURT:  Overruled. The answer can stand.

10        MR. BLEGEN:  I'm sorry.  I don't think I heard the

11    answer, Judge.

12        THE COURT:  Just repeat your answer.

13        THE WITNESS:  I understand, and the answer is yes.

14    BY MR. BLEGEN:

15    Q    That it is Brady material?

16    A    Yes.

17        MR. BLEGEN:  Can I just have a moment, Judge?

18        THE COURT:  Yes.

19      (Brief interruption.)

20        MR. BLEGEN:  That's all, Judge.

21        THE COURT:  Mr. Goodfriend.

22        MR. GOODFRIEND:  No questions, Judge.

23        THE COURT:  I actually -- the very last line of

24    the -- well, the last line before "thanks" in your memo to Dr.

25    Flaherty says, "please call me when you have a few minutes to

1   discuss the case."

2          This may have been asked.  I just want to make sure I

3   got it straight.  Do you know if you had a conversation either

4   in person or over the phone with Dr. Flaherty about the

5   subject that you had in this memo?

6          THE WITNESS:  Your Honor, Dr. Flaherty was very good

7   at returning my phone calls, but I don't recall anything

8   specifically.

9          THE COURT:  Don't recall specifically.  Okay, fair

10  enough.  All right.

11         Typically she would call you back, but you don't

12  remember specifically?

13         THE WITNESS:  That's correct.

14         THE COURT:  Any follow-up based on that?  He's

15  testified to it previously, too.  Okay, thanks.  You're

16  excused.

17         THE WITNESS:  This goes where?

18         THE COURT:  Just leave it there.

19         (Witness excused.)

20         THE COURT:  I think as far as Officer Caliendo is

21  concerned, I'm not going to need to ask her any more

22  questions.  So as far as I'm concerned, they can both leave.

23         MR. BLEGEN:  Can I tell --

24         THE COURT:  Yes.

25      (Brief interruption.)

1    THE COURT:  Mr. Blegen, do you still need this

2  exhibit up here?

3    MR. BLEGEN:  I need to use it.

4    THE COURT:  Okay.

5    (Witness sworn.)

6    THE COURT:  Have a seat.

7    EMALEE FLAHERTY, PLAINTIFF'S WITNESS, DULY SWORN

8    DIRECT EXAMINATION

9  BY MR. BLEGEN:

10  Q    Ma'am, would you please tell us your name and spell your

11  last -- maybe your first and last name for the court reporter?

12  A    My name is Emalee Flaherty, and it's E-m-a-l-e-e.

13  Flaherty is F-l-a-h-e-r-t-y.

14  Q    And are you a physician?

15  A    Yes, I am.

16  Q    Can you just very briefly tell us what kind of physician

17  you are?

18  A    I'm a pediatrician and a child abuse pediatrician.

19  Q    You are the Emalee Flaherty who testified in the

20  prosecution of Jennifer Del Prete, is that right?

21  A    Yes.

22    MR. BLEGEN:  And, Judge, just so you're aware, her

23  sort of CV information is already in the record, so I'm not

24  going to --

25    THE COURT:  Fine.  That's fine.

Flaherty - direct

1   BY MR. BLEGEN:

2   Q   Dr. Flaherty, in front of you is an exhibit entitled

3   Petitioner's Exhibit Kroll Letter 1.  Do you see that?

4   A   Yes.

5   Q   Have you seen this letter before?

6   A   Yes.

7   Q   Can you tell us when you first saw it?

8   A   I don't recall.

9   Q   Okay.  Did you -- do you see a date at the --

10         Actually, let me show you what I've marked as

11  Petitioner's Exhibit Kroll Letter 2.  Do you see that

12  document?

13  A   Yes.

14  Q   It's almost the same as the first one, right?

15  A   Yes.

16  Q   And did you through your attorney produce Petitioner's

17  Exhibit Kroll Letter 2 to me in response to a subpoena?

18  A   Yes.

19  Q   As well as other documents from your file regarding the

20  Zielinski case?

21  A   Yes.

22  Q   Does seeing your copy of the letter help you remember when

23  you got it?

24  A   No.

25  Q   All right.  Do you recall getting it?

1  A    No.

2  Q    I take it you have read the letter?

3  A    Yes.

4  Q    I guess I understand you don't recall your response to it

5  when you got it, but can you tell us in your view what the

6  letter is informing you?

7  A    Yes.  It's informing me that Isabella died and some twist

8  in the case and that there was some information about the

9  medical examiner who was going to do the autopsy or who did

10  the autopsy and about what his opinions might be and that the

11  detective anticipated having to answer several questions to

12  the prosecuting attorney.

13  Q    Did you speak to Detective Kroll about this letter?

14  A    I don't recall.

15  Q    Did you speak to anyone else about this letter?

16  A    I don't recall.

17  Q    One of the -- strike that.

18        The letter indicates that Detective Kroll had heard

19  that the pathologist does not agree with shaken baby syndrome

20  and has testified for the defense in two DuPage County SBS

21  cases.  Do you see that?  It's at the bottom of the first

22  paragraph.

23  A    Yes.

24  Q    Did you ever come to find out why the pathologist does not

25  agree with shaken baby syndrome?

Flaherty - direct

1  A    No.

2  Q    Did you ever speak to the pathologist?

3  A    No.

4  Q    And do you recall that you did not speak to him?

5  A    I don't recall specifically, but if I had spoken to him, I

6  think it would stand out in my memory.

7  Q    So the best of your recollection is you did not speak to

8  the pathologist?

9  A    That's correct.

10  Q    All right.  In the second paragraph, the letter indicates

11  that the ET advised that "Dr. Jeff Harkey did, in fact,

12  question the diagnosis of SBS.  I was told that Dr. Harkey

13  specifically looked for fractures in the rib cage, adult

14  grabbing point, and found none."

15          Do you see that?

16  A    I do.

17  Q    What was your understanding of what was being expressed in

18  those two sentences?

19  A    That he didn't agree with the diagnosis because he didn't

20  find rib fractures.

21  Q    And are --

22          You testified regarding the presence of external

23  injuries, bruises, fractures, those sorts of things during the

24  Del Prete trial, correct?

25  A    No.  That's not accurate.

Flaherty - direct

1   Q   Okay.  Were you asked about whether it is common or

2   uncommon to have bruising associated with shaken baby syndrome

3   in the Del Prete trial?

4   A   Yes, I was asked that.

5   Q   Your response was that it is uncommon, correct?

6   A   Yes.

7   Q   Are rib fractures common or uncommon for shaken baby

8   syndrome in your opinion?

9   A   They're uncommon.

10  Q   So am I right that if the pathologist was saying -- was

11  questioning whether this was shaken baby syndrome because of

12  the lack of rib fractures, would you have agreed or disagreed

13  with that, I guess, back in 2005?

14  A    If I understood your question --

15  Q   I will ask it again if it's --

16          THE COURT:  Yes, it is a little convoluted.

17          MR. BLEGEN:  Sorry.

18  BY MR. BLEGEN:

19  Q   You understood that the pathologist was questioning the

20  diagnosis of SBS because of the lack of rib fractures,

21  correct?

22  A   Yes.

23  Q   Okay.

24          THE COURT:  If somebody said to you back then, I

25  question SBS because there weren't any rib fractures, would

1  you have agreed with them questioning the diagnosis or

2  disagreed?

3           That's your question, right?

4           MR. BLEGEN:  Yes.

5           THE WITNESS:  I would have disagreed.

6           THE COURT:  Okay.

7  BY MR. BLEGEN:

8  Q   Do you recall whether you ever spoke to any of the state's

9  attorneys prosecuting the case about the pathologist's initial

10 questioning of SBS?

11 A   No, I don't recall.

12 Q   Do you recall speaking to anyone else regarding the

13 pathologist's initial questioning of SBS?

14 A   No.

15          MR. BLEGEN:  Can I have a moment, Judge?

16          THE COURT:  Sure.

17     (Brief interruption.)

18 BY MR. BLEGEN:

19 Q   I understand that you disagree with rib fractures raising

20 questions, but should the pathologist have been looking for

21 rib fractures?

22 A   Yes.

23 Q   And why is that?

24 A   Because rib fractures are sometimes found in children who

25 have suffered abusive head trauma.

1          MR. BLEGEN:  Judge, I think that's all.

2          MR. TELISMAN:  No questions, your Honor.

3          THE COURT:  The last line or the last paragraph of

4     this memo, Detective Kroll says, "please call me when you have

5     a few minutes to discuss the case."

6          Did you call him?

7          THE WITNESS:  I don't recall.

8          THE COURT:  He says you were pretty good about

9     calling him.  Does that help you remember at all?  I mean,

10    would you have been likely, if you got a memo like this, to

11    pick up --

12         When somebody like Detective Kroll asked you to call,

13    would you have been likely to pick up the phone and call him

14    at some point?

15         THE WITNESS:  It depends on how busy I was and how

16    many other things were going on at the time.

17         THE COURT:  How close does anybody --

18         What were the dates of the trial?

19         MR. BLEGEN:  The trial was in '05.

20         THE COURT:  It wasn't until a couple of years later,

21    okay.  All right.

22         Did you ever find out who the -- whether the

23    reference in the -- oh, it's about six lines down -- to

24    pathologist's schedule to perform the autopsy, is not agreeing

25    with SBS, did you have an understanding about whether that was

Harkey - direct

1    a reference to Dr. Harkey as opposed to somebody else?

2            THE WITNESS:  No.

3            THE COURT:  No, you don't have an understanding one

4    way or the other?

5            THE WITNESS:  No.

6            THE COURT:  All right.  Does anybody have any further

7    questions based on the questions that I asked?

8            MR. TELISMAN:  No, your Honor.

9            MR. BLEGEN:  No.

10           THE COURT:  Thanks.  You're excused.

11           (Witness excused.)

12           (Brief interruption.)

13           (Witness sworn.)

14           THE COURT:  Have a seat, please.

15        JEFFERY HARKEY, PLAINTIFF'S WITNESS, DULY SWORN

16                      DIRECT EXAMINATION

17   BY MR. BLEGEN:

18   Q   Sir, could you please tell us your name and spell your

19   last name for the court reporter?

20   A   Jeff Harkey, H-a-r-k-e-y.

21   Q   And what is your profession?

22   A   I'm a forensic pathologist.

23           THE COURT:  Is it Jeff or Jeffrey?

24           THE WITNESS:  It's Jeffery, e-r-y.

25           THE COURT:  e-r-y, not r-e-y.

1    THE WITNESS:  Yes.

2    THE COURT:  Thanks.

3  BY MR. BLEGEN:

4  Q   Are you currently a forensic pathologist for any county?

5  A   Yes.

6  Q   Which county?

7  A   I work for about 35 counties.

8  Q   Then you don't need to name them all.

9  A   Thank you.

10  Q   Back in 2003 and 2005, were you a pathologist for DuPage

11  County?

12  A   Yes.

13  Q   And back in 2003, did you perform the autopsy of Isabella

14  Zielinski?

15  A   Yes.

16  Q   I think in front of you is an exhibit.  There may be two

17  exhibits marked Petitioner's Exhibit Kroll Letter 1 and Kroll

18  Letter 2.

19    THE COURT:  Yes, you can flip them over.

20  BY MR. BLEGEN:

21  Q   You can take a look at Kroll Letter 1.

22    THE COURT:  The little markings at the bottom, it's

23  the one without the business card in the upper left-hand

24  corner.

25    THE WITNESS:  Yes, I see them.

Harkey - direct

1  BY MR. BLEGEN:

2  Q   And you and I have spoken before, correct?

3  A   Yes.

4  Q   And that was at your house, and Mr. Stanley was there?

5  A   Yes.

6  Q   Correct?  Okay.

7         At the time of the autopsy of Isabella Zielinski, do

8  you recall expressing doubts regarding a shaken baby syndrome

9  diagnosis in her case?

10 A   I have no independent recollection of that.

11 Q   Back in 2003, did you have disagreements with shaken baby

12 syndrome in general?

13 A   Yes.

14 Q   Tell us what your disagreements were.

15 A   The name of the syndrome implies a mechanism that I don't

16 believe can be separated from blunt force trauma.

17 Q   All right.  And by blunt force trauma, do you mean

18 inflicted or uninflicted blunt force trauma?

19 A   Yes.

20 Q   So am I right that one of your concerns with shaken baby

21 syndrome is that there is great difficulty in distinguishing

22 it from accidental trauma?

23        You may have put it a better way.  So if you just

24 want to repeat what you said, that's fine.

25 A   You're asking me to compare something that I don't believe

1   exists to something that I do believe exists, and I'm at a

2   loss as to how to do that.

3   Q    Fair enough.  It may have slipped my mind.

4        Tell me again why -- tell us why you don't believe

5   shaken baby syndrome exists.

6   A    I do believe that children can be shaken and that children

7   can be injured and that children can die of that.  I don't

8   know of any pathognomonic finding that you can't get with

9   blunt force trauma, too.

10       So when you see a constellation of injuries in a

11  child, I don't have faith in somebody being able to say this

12  head injury came from shaking and not from blunt force trauma.

13  It is possible that they have reason to believe that it's

14  shaking because of neck injury, that the neck injury might

15  have caused the head injury, and in that case, then they have

16  a reason to do it.  Then they have a reason to say this is

17  shaken baby type of injuries.  If they catch the whole thing

18  on a nanny cam, they have got a reason to say this is shaken

19  injuries.

20       But when I am looking at pathology in an autopsy, I

21  don't believe that I can say this child was shaken rather than

22  this child was hit.

23  Q    Did you have those beliefs back in 2003 and 2005?

24  A    Yes.

25  Q    And had you been asked about that at the trial of Ms. Del

1  Prete, would you have essentially given the same answer that
2  you just gave us now?

3  A   Yes.

4  Q   You have another problem with shaken baby syndrome or
5  abusive head trauma diagnosis relating to pinpointing a
6  perpetrator, correct?

7  A   Yes.

8  Q   Tell us what that problem is.

9  A   The problem with head injuries is a child can go
10 unresponsive at a time that is remote -- depending upon on the
11 type of injury -- that is remote from the actual injury, and
12 so if the child has been in the care of a number of different
13 people, which one inflicted the trauma that eventually led to
14 the child's collapse.

15         With the shaken baby philosophy, this was supposed to
16 solve all of our problems because it's obvious that the type
17 of injury that you get from shaking is going to make the baby
18 go unresponsive immediately.  And, therefore, it's whoever the
19 baby was with that is the perpetrator.  And that would be
20 magic for us.  We could solve lots of problems.

21         The problem is --

22         And solve lots of problems, that is, as to who did
23 it.

24         But the problem that I have with it is that the
25 people that purport to be able to say these injuries are due

Harkey - direct

1    to shaking and not due to blunt trauma that may have occurred
2    earlier, I don't agree with them.  I don't agree that they're
3    able to divine that.
4    Q    All right.  And so I think I understand, but what you're
5    saying is that you do not believe that medicine can pinpoint a
6    perpetrator as the last person with the child before the
7    collapse, correct?
8    A    Not from the autopsy, they can't.
9              Again, you know, if you catch it on a nanny cam of
10   this is the injury, they didn't hit them, the kid was fine,
11   they shook him, now he's unresponsive, yes, that can happen.
12   I do believe that children can get injured.
13             But then if you look at those injuries that they have
14   that led to the child's collapse, all of those injuries that
15   you can find with shaking, you can find with blunt trauma.
16   Q    All right.  And with regard to timing, do you believe it's
17   correct that an infant who has subdural hematomas and retinal
18   hemorrhages and brain swelling could not, for example, drink
19   milk from a bottle before collapsing?
20   A    I believe that a child could do those things.  There are
21   children that have subchronic hematomas and their head grows
22   and the rest of them may not, but they are -- they're feeding
23   even with a chronic subdural hematoma.
24   Q    So the ability to feed cannot pinpoint the perpetrator in
25   your view, correct?

1   A    It could be useful in some cases, but it's not black and
2   white, one or the other.
3   Q    All right.  And these opinions that you're expressing now,
4   did you have these opinions back in 2003 and 2005?
5   A    Yes.
6   Q    And would you have testified essentially the same way had
7   you been asked at Ms. Del Prete's trial?
8   A    Yes.
9   Q    In your conclusion and in your testimony, you indicated
10  that Isabella Zielinski suffered abusive head trauma.  Do you
11  recall that?
12  A    Yes.
13  Q    And have you looked at your reports and your testimony
14  prior to testifying today?
15  A    Yes.
16  Q    All right.  What led you to come to the conclusion that
17  the child suffered abusive head trauma?
18  A    It had nothing to do with my autopsy findings.  That trail
19  had gone cold.
20          So I go to the history as was determined by the
21  people that did see her during life, and I wrote in my autopsy
22  report that eventually it was determined that she had suffered
23  physical abuse.  Those are the words I used in my narrative in
24  my autopsy, and at the conclusion I said abusive head trauma.
25          In my testimony that you referred to, during cross

1   examination, I was asked whether my conclusion that this was

2   abusive was dependent entirely on other doctors' conclusions,

3   and I said yes.

4   Q   All right.  And so what you are telling us today is that

5   you deferred to another physician as to the abusive portion of

6   your conclusion?

7   A   Yes.

8   Q   Your testimony and your autopsy report do not mention the

9   existence of a chronic subdural hematoma in Isabella; do you

10  recall that?

11  A   Yes.

12  Q   All right.  Do you now know that there was a chronic

13  subdural hematoma?

14  A   I've heard from you that there was a chronic subdural

15  hematoma.

16  Q   All right.  Let me show you --

17          MR. BLEGEN:  Judge, I'm not going to remark this.

18  You have a disk of it.

19          THE COURT:  Just tell me what the exhibit number is.

20          MR. BLEGEN:  Provena Films 000001.

21          THE COURT:  You said this is one of the exhibits from

22  the --

23          MR. BLEGEN:  It's on the disk.

24          THE COURT:  It's on the disk.  Thanks.

25      (Brief interruption.)

Harkey - direct

1  BY MR. BLEGEN:

2  Q   Take a look right in the middle where it says Findings.

3  A   Oh, Findings, yes.

4  Q   Okay.  Just look and see if you can find the part that

5  says, "This pattern raises the possibility of bilateral

6  subdural hematomas in both acute and more chronic subdural

7  hematomas."

8  A   Yes, I see that sentence.

9  Q   All right.  Had you been aware that there were chronic

10 subdural hematomas in Isabella Zielinski, how would that

11 impact your opinions about the timing and pinpointing of a

12 perpetrator?

13 A   I don't have opinions about the pinpointing of a

14 perpetrator.  So I don't have any opinions to change on that.

15 Q   All right.  And I take it in your autopsy conclusion, you

16 did not indicate who the perpetrator was?

17 A   Correct.

18 Q   But you have told us that you have problems with shaken

19 baby syndrome related to the efforts to time the infliction of

20 the abuse by connecting it to the collapse, correct?

21 A   Correct.

22 Q   How would the finding of a chronic subdural hematoma have

23 influenced your thoughts about that?

24     For example, would it have -- I think you told us

25 previously it would have diverted attention away from the

1    babysitter, correct?

2    A    Well, yes, I suppose it may have.  Certainly a babysitter

3    can abuse somebody chronically.  So it doesn't --

4            It doesn't exclude, but it would be another example

5    of that just because the baby went unresponsive in the care of

6    somebody doesn't necessarily mean that they are responsible

7    for all of the injuries.

8    Q    And it's your opinion that a chronic subdural hematoma

9    means that it is greater than three weeks in age, correct?

10   A    Yes.

11   Q    The letter, Kroll Letter 1, indicates that somebody

12   recalled you looking for -- specifically for fractures of the

13   rib cage, adult grabbing point, and found none.

14           Do you recall that in the letter?

15   A    Yes.

16   Q    I take it you don't recall saying that at the time?

17   A    I haven't -- that's correct.  I don't recall saying that.

18   Q    Would you have looked for rib fractures?

19   A    I would look for healed rib fractures and for fresh rib

20   fractures.

21   Q    Tell us why.

22   A    Well, I would look for the first rib fractures because the

23   child had died within 24 hours of going unresponsive, and it's

24   possible that they may have been resuscitative or they might

25   have been abusive, but I didn't see any fresh ones.

1    I would look for old rib fractures to see whether

2    there was any sign from the event of ten months ago that would

3    tell me on that date, the date of the autopsy, that this is a

4    case that is suspicious for child abuse literally at the hands

5    of an adult.

6    Q    And would that kind of finding be important to you in

7    concluding that the child suffered abuse --

8    A    Yes.

9    Q    -- as opposed to some other head trauma?

10   A    Yes.

11   Q    Do you recall at the time of the autopsy indicating that

12   you were going to request all of the medical records?

13   A    I don't recall that, and I would not have said that

14   because what they wrote down here is that I'm going to summons

15   all of them, and I don't have summons power.

16   Q    Might you have said something like, I'm going to gather

17   the medical records, or told someone to gather the medical

18   records?

19   A    Certainly.

20   Q    Okay.  But you wouldn't have used the word "summons"?

21   A    Yes, correct.

22   Q    These problems that you have with SBS, do you recall

23   mentioning any of them to the state's attorney handling the

24   Del Prete prosecution?

25   A    No, I don't recall it.

1  Q   Do you recall mentioning them to the defense lawyer

2  handling Ms. Del Prete's defense?

3  A   No, I don't recall that either.

4  Q   Do you recall anybody from the prosecution side asking you

5  about any problems you had with shaken baby syndrome?

6  A   I don't recall it, but it has been over ten years.  So I

7  can't say it didn't happen, but I don't recall it.

8  Q   The letter indicates that an attorney called Detective

9  Kroll to tell him that the pathologist, meaning you, does not

10  agree with SBS and has testified for the defense in two DuPage

11  County SBS cases.

12          Do you recall that?

13  A   I see that.

14  Q   Had you testified for the defense in two SBS cases?

15  A   I recall one case, and it may have been two, but I recall

16  one.

17          MR. BLEGEN:  May I have a moment, Judge?

18          THE COURT:  Yes.

19      (Brief interruption.)

20  BY MR. BLEGEN:

21  Q   In addition to looking for rib fractures, were you also

22  looking for any other signs of injury like, for example, to

23  the brain?

24  A   Yes.

25  Q   And you are the medical examiner who, in fact, removed the

Harkey - direct

1   brain?

2   A   I'm the forensic pathologist that removed the brain, yes.

3   Q   I'm sorry.  And did you find any evidence of injuries?

4   A   There was -- well, certainly there was brain injury due to

5   anoxic encephalopathy and encephalomalacia, and those were

6   both present.

7           If your question was traumatic injuries, no, I did

8   not find evidence of traumatic injuries.

9   Q   So no contusions or lacerations --

10  A   Correct.

11  Q   -- to either the back or front of the brain?

12  A   Correct.

13  Q   And you were specifically looking for that?

14  A   Yes.

15  Q   Can you describe for us what the brain was like when you

16  removed it?

17  A   It was excessively soft, which is what I would expect for

18  a child that has been brain dead and on a respirator.

19          MR. BLEGEN:  Judge, in light of your ruling, I was

20  thinking of going into an area that you might say is out of

21  bounds.  I was going to show him the Petitioner's Exhibit

22  Photo 1, that question of which is the front and which is the

23  back of the brain.  Do you remember the --

24          It's out of bounds.

25          THE COURT:  That is not within the scope of what you

1    asked me to reopen.

2                MR. BLEGEN:  Fair enough.

3                THE COURT:  And it was discussed in great, great,

4    great, great, great, great, great, great, great detail at the

5    other --

6                MR. BLEGEN:  Then I have no other questions.

7                THE COURT:  Okay.

8                MR. TELISMAN:  Thank you, your Honor.

9                          CROSS EXAMINATION

10   BY MR. TELISMAN:

11   Q    Good morning, Dr. Harkey.

12   A    Good morning.

13   Q    Dr. Harkey, I'm going to ask you some questions regarding

14   a few different topics, but I'd like to first start with the

15   issue of whether your opinions were unduly influenced in any

16   way when you made your opinion regarding the cause of death

17   here in this case.

18            Do you know Dr. Emalee Flaherty?

19   A    I know the name.  I don't know if I have spoken with her

20   on the phone or written a letter to her in the past or

21   anything.  I don't believe I've ever met her before today.

22   Q    What about Kenneth Kroll with the Romeoville Police

23   Department?

24   A    I've met hundreds of police officers over the years, and I

25   can name by name very few of them.  I may have met him, but I

1    wouldn't know him.

2    Q    And also another officer, this one with the Plainfield

3    Police Department, Tracy Caliendo, and before she was married,

4    her name was Tracy Bauer.

5    A    It doesn't ring a bell.

6    Q    Did any of these people ever contact you about this case?

7    A    Not that I recall.

8    Q    To your knowledge, did any of them ever try to influence

9    you to arrive at a certain opinion in this case?

10   A    Not that I recall.

11   Q    To your knowledge, did anyone else try to influence you to

12   arrive at a certain opinion in this case?

13   A    No.

14   Q    Okay.  Dr. Harkey, I want to ask you questions about

15   shaken baby syndrome and abusive head trauma.

16        Dr. Harkey, the term "abusive head trauma," does that

17   describe a certain mechanism of injury?

18   A    No, not specifically, just that it's traumatic or

19   injurious.

20   Q    Does it include head injury that results from impact?

21   A    Yes.

22   Q    Or, as you said during direct examination, blunt force

23   trauma?

24   A    Yes.

25   Q    And does it also include injury that is sustained as a

1   result of a combination of shaking and blunt force trauma?

2   A    Yes.

3   Q    And does it also include injuries sustained from shaking

4   alone?

5   A    Yes.

6   Q    Now, in abusive head trauma, does impact or, as you called

7   it, blunt force trauma, necessarily leave a visible sign of

8   injury?

9   A    No.

10  Q    Does it necessarily result in bruising?

11  A    No.

12  Q    Does it necessarily result in fractures?

13  A    No.

14  Q    Would there need to be a fracture for impact to result in

15  abusive head trauma?

16  A    No.

17  Q    Would there need to be a bruise?

18  A    No.

19  Q    Counsel asked you questions about rib fractures, and what

20  he asked you was would finding rib fractures be important in

21  making a finding of abuse.  Do you recall that?

22  A    Yes.

23  Q    I'm going to ask you the opposite.  Would finding no rib

24  fractures, what would that tell you about whether or not the

25  baby was abused?

1    A    That's not helpful.

2    Q    Why not?

3    A    You can abuse a baby without breaking ribs.  You can abuse

4    a baby with breaking ribs.

5    Q    How about a lack of bruising?  Same question.

6    A    And same answer.

7    Q    So a lack of bruising would not be helpful in terms of

8    determining whether the cause of the injury was abuse?

9    A    Correct.

10   Q    Now, counsel asked you questions about trying to pinpoint

11   the timing of abuse in an abusive head trauma case.

12          With respect to this case, was it your job to try to

13   determine who committed abuse upon Isabella?

14   A    No.  My job is cause of death.

15   Q    Did you ever attempt to identify who caused Isabella to

16   die?

17   A    No.

18   Q    Now, you had talked before about the delayed onset of

19   symptoms, the delayed onset, for instance, of collapse as a

20   result of prior abuse.

21          Do you recall that or am I not getting it totally

22   right?

23   A    The question had been whether a child can feed with

24   preexisting subdural, and I said yes.

25   Q    And you said yes.

1    Now, when there is prior abuse, what happens -- a

2    prior abusive head trauma -- what is it that progresses?

3    What, if anything, progresses that ultimately would lead to a

4    collapse?

5    A    One thing would be increased intracranial pressure.

6    Q    And is that because there is blood building up around the

7    brain?

8    A    That can add to it, but another factor is brain swelling.

9    Q    Is that also known as edema?

10   A    Yes.

11   Q    Now, when there is increased intracranial pressure, can

12   that be identified through -- let me back up a little bit.

13        The skull of a baby is not fused, correct?

14   A    Correct.

15   Q    And there is a space in the opening on the top of the

16   head, right?

17   A    Yes.

18   Q    And that's called the anterior fontanelle?

19   A    Yes.

20   Q    And when a baby is suffering increased intracranial

21   pressure that would lead to the collapse, would the anterior

22   fontanelle be hard or bulging?

23   A    It can be, yes.

24   Q    And if the anterior fontanelle is soft and not bulging, is

25   that a marker for a lack of increased intracranial pressure?

1    A    I don't know that it's a marker for a lack of increased.

2    I would say that it's consistent with normal, but I don't know

3    if it goes beyond that to, you know, a marker for lack of.

4         I would just say that that would be an expected

5    normal finding.

6    Q    Okay.  And would it be consistent with a child on the

7    verge of collapse from increased intracranial pressure?

8              THE COURT:  What is the "it"?

9    By MR. TELISMAN:

10   Q    Would a bulging anterior fontanelle?

11   A    Yes.  A bulging anterior fontanelle could be a preamble,

12   precursor, presage, a collapse.

13   Q    Now, would a soft anterior fontanelle be characteristic of

14   a baby that is on the verge of collapse because of increased

15   intracranial pressure?

16   A    I don't believe so.  I think that that would be an

17   unexpected result.

18   Q    Counsel asked you questions regarding the word "chronic"

19   and what "chronic" means, and I think that you had said that

20   "chronic" means more than three weeks in age, is that right?

21   A    Yes.

22   Q    Do different medical professionals have different

23   definitions for terms like "chronic" and "acute" and

24   "subacute"?

25             THE COURT:  Do you mean in the context of subdural

1    hematoma or do you mean in the context of, let's say, you

2    know, an ingrown toenail?

3            MR. TELISMAN:  That's a fair question.  I will

4    rephrase it.

5    BY MR. TELISMAN:

6    Q    In the context of the subdural hematomas and specifically

7    with respect to the Provena imaging report that I think

8    counsel had handed to you, do you know what the --

9            And this report was authored, I believe, by a

10   radiologist, is that correct, if you know?

11           MR. TELISMAN:  Your Honor, may I approach the

12   witness?

13           THE COURT:  Yes, that's fine.

14   BY MR. TELISMAN:

15   Q    I'm handing you the Provena films, turning to page 2 in

16   the middle of page where it says "dictated and signature on

17   file."  That's Robert Earl Boyd, M.D.?

18   A    Yes, I see that.

19   Q    Do you know what his specialty is?

20   A    No, I don't.

21   Q    Do you know what he meant by chronic?

22   A    I think that he meant by chronic, more than three weeks.

23   Q    And what do you base that on?

24   A    I think that that is something that hasn't changed over

25   the years, that radiologists, the signals that they can see on

Harkey - cross

1    CT scans of the blood aging and maturing, that signal is the

2    same.  I don't think that is something that's evolved.

3          I do have -- I did read something long ago about

4    acute being up to one week by radiologist standard.  Now they

5    take the acute and they divide it into acute and subacute

6    going up to one week.  I think that is just better imaging.

7          But as far as the chronic, I think chronic has always

8    meant three weeks or more.

9    Q    Okay.

10        MR. TELISMAN:  Your Honor, may I have a moment?

11        THE COURT:  Sure.

12        MR. TELISMAN:  Thank you.

13     (Brief interruption.)

14   BY MR. TELISMAN:

15   Q    Dr. Harkey, I want to ask you questions on one more topic,

16   and it will be brief.  In this particular case, there was a

17   lengthy period of time between Isabella's collapse and her

18   ultimate death, correct?

19   A    Yes, ten and a half months.

20   Q    Ten and a half months.

21        Under these circumstances, when you have a situation

22   where the collapse is ten and a half months prior to you --

23   prior to the death and prior to you being able to do your

24   autopsy, is it normally your custom and practice to review

25   records before arriving at a cause of death?

Harkey - redirect

1  A    Yes.

2  Q    And in doing so, do you rely on that information and the

3  opinions of other medical professionals in arriving at your

4  determination as to the cause of death?

5  A    Yes.

6           MR. TELISMAN:  Thank you.  I have nothing further.

7           THE COURT:  Mr. Blegen.

8                    REDIRECT EXAMINATION

9  BY MR. BLEGEN:

10 Q    Dr. Harkey, Mr. Telisman was asking you some questions

11 about increased intracranial pressure and a bulging or not

12 bulging fontanelle; do you remember that?

13 A    Yes.

14 Q    One of the other signs of increased intracranial pressure

15 would be an abnormal growth in head size in an infant,

16 correct?

17 A    Yes.

18 Q    And you could have increased intracranial pressure

19 resulting from a subdural hematoma and have increased head

20 circumference measured on those charts but not have a bulging

21 or hard fontanelle, correct?

22 A    Yes.

23 Q    In fact, you know that one of the things that doctors look

24 for in infants, one of the reasons they're measuring head

25 circumference is to check for subdural hematomas?

1   A    Yes.

2   Q    I want to ask you some questions about your answers to Mr.

3   Telisman about the importance of lack of bruising or lack of

4   fractures, okay?

5   A    Yes.

6   Q    I think what you told us at the beginning of your

7   testimony when I was asking you questions is that one of your

8   problems with shaken baby syndrome or abusive head trauma is

9   that the symptoms are not pathognomonic for abuse.

10           THE COURT:  Pathognomonic.

11   BY MR. BLEGEN:

12   Q    Pathognomonic for abuse, correct?

13   A    Yes.

14   Q    And so that means that someone could get accidental head

15   trauma or head trauma caused by something other than abuse and

16   have the same symptoms as one who was abused, correct?

17   A    Yes.  When I used pathognomonic, I was using it as

18   something that is specific to shaking, that when you see this,

19   it means shaking and it means nothing else, it nails the

20   diagnosis, rather than pathognomonic meaning abuse versus

21   nonabuse.

22           So I did use the word, but it was -- I was saying

23   that there was no special manifestation in shaking, shaking

24   alone, that you can't see in blunt trauma abuse, also.

25           Now, I do agree with you that we can use the word

1　"pathognomonic" as saying is there something pathognomonic

2　about accidental trauma versus intentional trauma, and, no, I

3　don't know what those would be except for the pressure points

4　on the fingertips where the adult squeezes the chest so hard

5　that they break the ribs.  This is something that very much

6　concerns me.  That's hard to do that accidentally.

7　Q　All right.  So when you use "pathognomonic," are you using

8　it essentially to mean diagnostic, meaning if you have this

9　symptom, this is what happened to you, or this is the disease

10　you have?

11　A　Yes.  It's very, very important to the diagnosis.

12　Q　All right.  And so what you just said, though, I think,

13　and correct me if I'm wrong, is that the evidence of fractures

14　or those sorts of injuries are important because they can help

15　you distinguish between abusive trauma and accidental trauma,

16　or trauma caused not by abuse, correct?

17　A　Yes, they can help.

18　Q　All right.  And so I don't know if you were trying to

19　convey this, but it sounded like when you were answering Mr.

20　Telisman's questions that you didn't think they were important

21　at all, fractures.

22　　　　　THE COURT:  What I heard him to say was that the

23　absence really doesn't tell you anything.  Now what I hear him

24　to say is that the presence would tell you something.

25　　　　　Do I pretty much have it right?

1          THE WITNESS:  Yes.

2          MR. BLEGEN:  That's what I was getting at.  Thank

3     you.

4          THE COURT:  Mr. Telisman, anything else?

5        (Brief interruption.)

6          MR. TELISMAN:  No, your Honor.

7          THE COURT:  Does anybody happen to have handy Dr.

8     Harkey's report from the autopsy?

9          MR. BLEGEN:  Yes.

10         THE COURT:  I just wanted to look at one or two

11    things in it to figure out what I need to ask him, if

12    anything.  I've got it here.  Thanks.  Bear with me just a

13    moment.

14       (Brief interruption.)

15         THE COURT:  I'm just going to read this to you.  I

16    think it will be clear enough.

17            So at page 5 of your report of your postmortem

18    examination, in discussing the brain, you write, quote:

19            "The brain was very soft, consistent with autolysis,

20    a-u-t-o-l-y-s-i-s."

21            And you go on to say it was placed into the formalin.

22    Autolysis meaning?

23         THE WITNESS:  Now --

24         THE COURT:  In this context, what does it mean?

25         THE WITNESS:  In this context there are enzymes.  Now

1    that the brain is dead, there are enzymes in the brain that

2    start to break it down.  It's not decomposition.

3    Decomposition is bacteria in there putrefying it and digesting

4    it.

5         THE COURT:  Got it.

6         THE WITNESS:  But it's the auto, meaning self, and

7    lysis, breaking down, means that this is a sign that the baby

8    was brain dead but the body kept alive on a respirator.

9         THE COURT:  That was going to be my question.  Does

10   that relate to what you had said before about the consistency

11   of the brain being sort of what you would expect for somebody

12   who had been brain dead plus on a respirator for that length

13   of time?

14        THE WITNESS:  Yes.

15        THE COURT:  If you were to describe it in sort of

16   layperson's terms, mushy?

17        THE WITNESS:  Yes.

18        THE COURT:  All right.  I will give this back to you

19   in a second, Mr. Telisman.

20        One or two other things.  Give me just a second.

21     (Brief interruption.)

22        THE COURT:  I want to make sure that I understood

23   something the way you said it.  When you were shown this memo

24   here, Mr. Blegen asked you at the time of the autopsy whether

25   you had expressed doubts about the diagnosis of shaken baby

1    syndrome, and you said you had no independent recollection.

2    Those were your words.

3           I take it what you meant by that is that looking at

4    this memo doesn't refresh your recollection at all about what

5    you did or said at the time.

6           THE WITNESS:  That's correct.

7           THE COURT:  Okay, all right.  It's just a question of

8    wording on that one.

9        (Brief interruption.)

10          THE COURT:  Okay.  I believe that I understand your

11   testimony about what I will just generically refer to as your

12   concerns about, quote, unquote, shaken baby syndrome as

13   distinguished from abusive head trauma, but I want to be sure

14   that I understand it.

15          So what I wrote down in my notes is that one of your

16   problems with the theory or the idea of shaken baby syndrome

17   is that it -- by those who are proponents of that theory, is

18   that it basically doesn't just identify what caused the

19   person's injury or death; it also identifies the perpetrator,

20   it's whoever they were with at the time.  And your problem is

21   with that aspect of it, I take it.

22          THE WITNESS:  Yes.

23          THE COURT:  At least your primary problem is with

24   that aspect of it.

25          THE WITNESS:  Yes, that's a problem.

1      THE COURT:  Can you just flesh that out for me a

2   little bit?  I think I get it, but I think I'd like to get a

3   little bit more fulsome explanation, I think.

4      THE WITNESS:  It would make death investigation in

5   cases like this very easy if we had something that says, this

6   baby went unresponsive and has the types of injuries that

7   would make the baby go immediately unresponsive and,

8   therefore, those injuries occurred immediately.

9      THE COURT:  Yes.

10      THE WITNESS:  And with the shaking, it is G forces,

11   that with the forward and back motion, there are G forces

12   there that can be disruptive to the neurons in the brain

13   causing diffuse axonal injury and shutting off the brain in

14   the same way that a boxer getting struck in the head can have

15   a concussion.

16      THE COURT:  Okay.

17      THE WITNESS:  So you do go unresponsive immediately.

18      And the fact that you go unresponsive immediately

19   tells you who did it.  It was the one that was holding the

20   baby at the time.  So we look for things that will say we find

21   this kind of brain injury in shaking but we don't find it in

22   other G forces.  And because the blunt impact, when you throw

23   the baby even against a soft surface, that deceleration,

24   the --

25      THE COURT:  The brain hitting against the skull

1  basically.

2          THE WITNESS:  Right.  So the baby is in motion and

3  the brain hits and it stops.  So it's been in motion and now

4  it's suddenly decelerated.  Those G forces are many times

5  those that you can generate with shaking.

6          THE COURT:  Okay.

7          THE WITNESS:  So when you have one mechanism that can

8  make you go unresponsive due to low G forces and you have

9  impact as another mechanism that can make you go unresponsive

10  due to high G forces, how can you say that you can pick out in

11  the background of these more devastating traumatic kinetic

12  forces, in the background of that you can pick out something

13  that says this baby was shaken?

14          THE COURT:  Okay.

15          THE WITNESS:  So the shaken baby has evolved, as I'm

16  sure you have heard, from shaken to shaken impact.  But does

17  that really add anything that they were shaken and impact?

18  Again, how do you pick out the shaking trauma from the

19  background of the impact trauma which is greater?

20          THE COURT:  All right.  The term "blunt force trauma"

21  was kind of scattered around in both questions and answers.

22  So when you use the term "blunt force trauma," do you include

23  in that the injury that might occur when a baby is merely

24  shaken, doesn't hit against anything, but the brain in the

25  course of the shaking is hitting against the side, hitting

1    against the skull?

2           Do you consider that blunt force trauma, or would you

3    call that something else altogether?

4           THE WITNESS:  I'm using it today, blunt force trauma,

5    as impact.

6           THE COURT:  Impact, okay.  Impact, in other words --

7           THE WITNESS:  External.

8           THE COURT:  External impact as opposed to internal

9    impact.

10          THE WITNESS:  Right.

11          THE COURT:  All right.  Any other questions, Mr.

12   Blegen?

13          MR. BLEGEN:  Yes.

14   BY MR. BLEGEN:

15   Q   Dr. Harkey, you were answering the judge's questions about

16   shaken baby syndrome versus perhaps a baby getting thrown on a

17   couch or falling onto a soft surface and how that relates to

18   timing.

19          Am I right that in both of those incidents, in your

20   view, there can be a lucid period where the baby would not

21   immediately collapse, correct?

22   A   Yes.

23   Q   Okay.

24          MR. BLEGEN:  That's all, Judge.

25          THE COURT:  Mr. Telisman.

1        MR. TELISMAN:  Thank you, your Honor.

2                    RECROSS EXAMINATION

3   BY MR. TELISMAN:

4   Q    Dr. Harkey, I'm going to try to do this in as clear a way

5   as possible, but I'm going to ask you to assume a few things,

6   okay.

7            I want you to assume that if a baby's anterior

8   fontanelle is soft immediately after the time of her collapse

9   and that about 24 hours later her fontanelle is observed to be

10  hard and bulging, does that give an indication as to whether

11  or not the collapse was the result of an acute event?

12  A    There could be an acute event.  We have talked about one

13  of them, the acute event being a new bleed.  And there is

14  also --

15           And with a new bleed, that could build up and you

16  have a collapse later on with increased intracranial pressure.

17           Another acute event would be there was an impact to

18  the skull, and with that there was brain injury, but the brain

19  doesn't begin to swell immediately.  So you could have an

20  impact brain injury and increased intracranial pressure a day

21  or two later.

22           Another mechanism would be you have got an old

23  chronic hematoma and it rebleeds, and when it rebleeds,

24  whether traumatically or spontaneously, it can put some blood

25  into the subarachnoid space.  And the subarachnoid space is

1   supposed to have only cerebral fluid in it, which is very low

2   in protein and cells.  And now you're dumping blood in it,

3   which is high in protein and cells, and that's an irritant to

4   the surface of the brain, and that can cause a seizure.  And

5   the seizure could be an immediate event from the spontaneous

6   rebleed.

7           When the child then has a lack of oxygen following

8   that, if they are deprived of oxygen for a while because of

9   the seizure, you can get later brain swelling from that.

10          So I have here three acute events, and they're all

11  different scenarios, and I don't know which one of them

12  occurred here.

13          So back to your question, if you are able to phrase

14  it, then I can answer it.  With that background that I just

15  said, I can answer it with a yes or no, I believe.

16  Q   Okay.  So if the --

17          THE COURT:  Or you could just sort of accept his

18  answer as really the more complete answer to your question and

19  let it go at that.  I mean, I'm just telling you what the

20  options are.

21          MR. TELISMAN:  I understand, your Honor.  Could I

22  have one moment?

23          THE COURT:  Yes.

24          MR. TELISMAN:  Thank you.

25      (Brief interruption.)

1  BY MR. TELISMAN:

2  Q   Dr. Harkey, when you arrived, were those considerations --

3  would those have been considerations that you would have made

4  at the time that you arrived at your opinions in this case?

5  A   No, because at the time that I arrived at my opinion, I

6  was not informed of chronic hematomas.

7  Q   Okay.

8  A   And so I would not have been able to opine that a chronic

9  hematoma had a rebleed.

10 Q   Now, during this type of scenario, as you stated before,

11 you rely on the records that you receive from the treating

12 physicians, correct, from the hospitals?

13 A   Yes.

14 Q   And you --

15     And you look at the conclusions that they relied

16 upon, correct, or that they formed, the actual treaters,

17 correct?

18 A   Yes.

19 Q   And the Provena film record that you observed that --

20     Now, do you know whether you had that at the time or,

21 no, that you made your -- that you formed your opinions?

22 A   I don't know if I had that.

23 Q   Okay.  But you did have records from Provena?

24 A   I did have records, but I've never believed that I always

25 get the complete records.

Harkey - recross

1  Q   Sure.

2  A   The records that I have do exist, but they're not in my

3  possession.

4  Q   And they're not something that you have looked at

5  recently, correct?

6  A   Correct.

7  Q   Now, is it safe to say that the treating physicians were

8  aware of the presence of chronic blood based upon the Provena

9  film saying that there was chronic blood?

10  A   If those records went with the baby to the next treating

11  hospital, then they would have that information.  If they

12  didn't go along, then they wouldn't have that information.

13  Q   And the doctors who arrived at the opinions regarding --

14  pardon me -- the doctors who arrived at the opinions regarding

15  the cause of Isabella's collapse, they were the ones who

16  actually treated Isabella, correct?

17  A   Yes.

18  Q   And you looked to them for guidance in arriving at your

19  opinions, correct?

20  A   Yes.

21              MR. TELISMAN:  Okay, thanks.  I have nothing further.

22              MR. BLEGEN:  I know we're a little over the time.

23              THE COURT:  Do you really need to?  I'm just asking.

24              MR. BLEGEN:  I want to.

25              THE COURT:  Okay.  I mean, everybody so far has

Harkey - redirect

1  gotten up and asked questions that they got answers that they

2  didn't like to, so why don't you just jump right in, too.

3        MR. BLEGEN:  Well, at this point I don't think it

4  would hurt me.

5                    REDIRECT EXAMINATION

6  BY MR. BLEGEN:

7  Q   Do you recall whether you -- do you recall the contents of

8  the two Dr. Flaherty reports that you relied on in reaching

9  your conclusion?

10 A   No, I don't, other than where I cited them in my report.

11 Q   Have you looked at them recently?

12 A   I've looked at my report recently but not Dr. Flaherty's

13 letters.

14 Q   Do you recall whether her letters even mention chronic

15 subdural hematoma in them?

16 A   I don't recall that they did.  I believe that if they did,

17 I would have cited it, but I did not cite it, so I don't know.

18 I can't say.

19        MR. BLEGEN:  That's all, Judge.

20        MR. TELISMAN:  No, nothing, your Honor.

21        THE COURT:  Thanks, Doctor, you're excused.

22        (Witness excused.)

23        THE COURT:  I take it that those are the four

24 witnesses?

25        MR. BLEGEN:  That's them.

1        THE COURT:  Okay.  All right.  So are we done?

2        MR. BLEGEN:  Yes.

3        MR. GOODFRIEND:  Judge, I just have one housekeeping

4   matter.

5        THE COURT:  Sure.  Oh, your motion.

6        MR. GOODFRIEND:  Right.

7        THE COURT:  Right.  I had it right here.  Let me just

8   get it.

9        So, yes, this was the motion asking to disclose the

10  listing of testimony for Dr. Barnes, and I think Mr. Blegen

11  had said he needed to check with Dr. Barnes, or Mr. Rufo.

12       MR. RUFO:  With Dr. Barnes.  He has no objection, and

13  we have no objection.

14       THE COURT:  The motion to disclose is granted, and I

15  will make sure an order gets entered.

16       MR. GOODFRIEND:  Thank you, Judge.

17       THE COURT:  Okay.  Anything else anybody wants to

18  talk about?

19       MR. TRIEBEL:  Judge, I have something else similar

20  that comes up in that case.  Can we just assume, as long as it

21  doesn't involve privacy information --

22       THE COURT:  What I would do is I would just -- on

23  each side, I would just first check with the other side and

24  then, you know, try to get an answer and just submit it as an

25  agreed motion.  And unless I see a problem with it, that will

1  be good enough.

2         MR. GOODFRIEND:  Okay.

3         MR. TRIEBEL:  Thank you.

4         MR. BLEGEN:  If it's just CV related material, Dr.

5  Barnes is not going to care.  If it's, like, his opinions in

6  this case, then you might care.

7         THE COURT:  Well, yes.  I mean, my only concern is if

8  it touches on one of the things that I expressly, you know,

9  kept under seal, but, you know, I think I can rely on both of

10  you to police that pretty well.

11         So, like I say, if you have something, talk to each

12  other.  If it's agreed, present it as agreed.  If I see a

13  problem, I will let you know.  Okay.

14         MR. TRIEBEL:  Did the Court want to hear argument or

15  a motion?

16         THE COURT:  I'm just asking you whether you want to

17  do anything else.  I'm not saying I necessarily am going to

18  let you.

19         MR. BLEGEN:  I was going to suggest brief briefing.

20         THE COURT:  If you want to file a brief of no more

21  than five pages by noon on Monday, I will take that.

22         MR. BLEGEN:  Does it have to be Monday?  Can it be

23  Tuesday?

24         THE COURT:  No, it can't.  Sorry.  You guys both

25  talked to these doctors before they came in, right?

1          MR. BLEGEN:  Yes.

2          THE COURT:  You had seen the records.  Get something

3     to me, no more than five pages, by noon on Monday.  I will

4     take that.  Nothing else will I take.  That's it.  See you.

5     Have a good day.

6          (Which were all the proceedings had in the above-entitled

7     cause on the day and date aforesaid.)

8

9

10                    C E R T I F I C A T E

11

12          I hereby certify that the foregoing is a true and

13     correct transcript of the above-entitled matter.

14

15

16     */s/ Laura M. Brennan*                    July 8, 2013

17

18     _____          _____

19     Laura M. Brennan
       Official Court Reporter                  Date
20     Northern District of Illinois

21

22

23

24

25