1   IN THE UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
2   EASTERN DIVISION

3

4   JENNIFER DEL PRETE,              )
                                     )
5                    Petitioner,     )   Docket No. 10 C 5070
                                     )
6            vs.                     )
                                     )
7   MELODY HULETT,                   )   Chicago, Illinois
                                     )   January 14, 2013
8                    Respondent.     )   10:00 a.m.

9                           VOLUME 6
10                   TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12  APPEARANCES:

13

14  For the Plaintiff:      BLEGEN & GARVEY
                            BY:  MR. PATRICK W. BLEGEN
15                               MS. JODI L. GARVEY
                                 MR. DANIEL A. RUFO
16                          53 West Jackson Boulevard
                            Suite 1437
17                          Chicago, Illinois  60604

18  For the Defendant:      ILLINOIS ATTORNEY GENERAL'S OFFICE
                            BY:  MR. KARL R. TRIEBEL
19                               MR. NEAL GOODFRIEND
                                 MR. ARI TELISMAN
20                               MS. MONIQUE A. ANAWIS
                            100 West Randolph Street
21                          13th Floor
                            Chicago, Illinois  60601
22
    Also Present:                  MR. ROBERT STANLEY
23

24          LAURA M. BRENNAN - Official Court Reporter
                219 South Dearborn Street - Room 2102
25                  Chicago, Illinois  60604
                        (312) 435-5785

1  (The following proceedings were had in open court:)

2  THE COURT:  10 C 5070, Del Prete v. Hulett.

3  Can I get the lawyers' appearances for the record,

4  please?

5  MR. BLEGEN:  Good morning, Judge; Patrick Blegen and

6  Dan Rufo on behalf of Ms. Del Prete.

7  MR. TELISMAN:  On behalf of the respondent, your

8  Honor, assistant attorney general Ari Telisman; assistant

9  attorney general Neal Goodfriend and assistant attorney

10  general Monique Anawis.

11  THE COURT:  Okay.  Ready to resume?

12  MR. TELISMAN:  Yes, we are, Judge.  Two preliminary

13  matters, though.

14  Number one is that one of the witnesses for the

15  petitioner is Shaku Teas.  Dr. Teas --

16  Before the hearing began, the evidentiary hearing

17  began, the Court allowed Dr. Teas to be present for the

18  duration of the witness testimony.  At this point the people

19  have only one more witness to call -- pardon me -- the

20  respondent has only one more witness to call, and that is

21  Carole Jenny.  Dr. Jenny and Dr. Teas are more or less the

22  global summary witnesses for each side, and because of that,

23  your Honor, I'm respectfully requesting that Dr. Teas not be

24  allowed to sit in during the course of Dr. Jenny's testimony.

25  I don't believe that there is anything specific that entitles

1  Dr. Teas to be present.  I believe it's a discretionary issue.

2          And so I'm simply asking that the Court not allow her

3  to sit in for the portion of Dr. Jenny's testimony.

4          THE COURT:  Mr. Blegen.

5          MR. BLEGEN:  I don't see any reason to change what we

6  previously had.

7          THE COURT:  So what -- remind me, and you probably

8  told me this at some point in time, but I've forgotten.

9  What's the purpose for which you have Dr. Teas in here?

10          MR. BLEGEN:  So that she can consult with me about

11  what experts say about complicated --

12          THE COURT:  And I guess I've noticed from time to

13  time during the questioning during cross examinations or

14  whatever Dr. Teas has -- I'm just making some inferences here

15  -- prompted you on things you might want to ask about and

16  things like that.

17          MR. BLEGEN:  Yes, with notes.

18          THE COURT:  I think that's appropriate, and if you

19  want to keep Dr. Jenny in during Dr. Teas' testimony, you can

20  do that.  So I'm not going to change it the other direction.

21          MR. TELISMAN:  Okay.  Your Honor, the only other

22  issue is that we had a little bit of a technical issue this

23  morning regarding the gathering of exhibits.  They're on their

24  way.  Literally they're on their way right now, and so I would

25  like to start with Dr. Jenny's testimony with the

Jenny - direct

1   understanding that at some point I'll be handing you and
2   counsel --
3           THE COURT:  Don't worry.  That's fine.
4           MR. TELISMAN:  Thank you, Judge.
5           THE COURT:  Thanks.
6           MR. TELISMAN:  The respondent calls Dr. Carole Jenny
7   to the stand.
8       (Brief interruption.)
9           MR. TELISMAN:  Your Honor, is it okay if I use a
10  water bottle?
11          THE COURT:  Sure, sure.
12          MR. TELISMAN:  Thank you.
13      (Brief interruption.)
14      (Witness sworn.)
15      DR. CAROLE JENNY, RESPONDENT'S WITNESS, DULY SWORN
16                  DIRECT EXAMINATION
17  BY MR. TELISMAN:
18  Q   Are you all set, Dr. Jenny?
19  A   I'm ready.
20  Q   Okay.  Please state your name for the record, spelling
21  both your first and last name.
22  A   Carole Jenny.  C-a-r-o-l-e J-e-n-n-y.
23  Q   What do you do for a living?
24  A   I'm a professor of pediatrics at Brown Medical School in
25  Providence, Rhode Island, and the director of the child

Jenny - direct

1   protection program at the Hasbro Children's Hospital in

2   Providence.

3   Q    Could you please tell us about your -- briefly about your

4   educational background as it relates to your career in

5   medicine and as a professor?

6   A    I have a bachelor's degree from the University of

7   Missouri, a bachelor in medical science from Dartmouth Medical

8   School, and an M.D. degree from the University of Washington.

9          I was a resident in pediatrics at University of

10  Colorado and then at Philadelphia Children's Hospital, and

11  then I did a fellowship at University of Pennsylvania at

12  the --

13         During my fellowship I received an MBA from the

14  Wharton School.

15  Q    Dr. Jenny, are you board certified in any specialties

16  currently?

17  A    Yes, I am.

18  Q    In what?

19  A    In pediatrics and in the subspecialty of child abuse

20  pediatrics.

21  Q    Did you play any role in the creation of the board

22  certification for child abuse pediatrics?

23  A    Yes, I did.

24  Q    Could you please explain?

25  A    I wrote the first application from the American Academy of

Jenny - direct

1  Pediatrics to the American Board of Pediatrics requesting that

2  this field be made a recognized subspecialty.  And I served on

3  the first board that defined the professional qualifications

4  and wrote the first examinations for board certification in

5  the field.

6  Q  Currently how many physicians are board certified in child

7  abuse pediatrics?

8  A  In the U.S. and Canada, I think 214.

9  Q  Now, Dr. Jenny, you mentioned before that you're the

10  director of the child protection center at Hasbro Children's

11  Hospital, is that right?

12  A  Yes.

13       THE COURT:  How do you spell Hasbro?

14       THE WITNESS:  H-a-s-b-r-o, like the toy company.

15       THE COURT:  Like the toy-making.

16       THE WITNESS:  Yes.  They paid for it.

17       THE COURT:  Oh, all right.

18  BY MR. TELISMAN:

19  Q  What are your day-to-day duties there at the child

20  protection center?

21  A  I run a clinical service where we see all of the children

22  who are patients at the hospital where there's concerns about

23  possible abuse or neglect.  We provide 24/7 coverage to the

24  wards and to the emergency department.

25       We run clinics where people refer children where,

Jenny - direct

1  again, there's concerns about possible abuse or neglect.

2          We do intake care for all the children who come into

3  state care in Rhode Island, kind of do a tune-up to find out

4  what their, you know, medical needs are and what things have

5  to be addressed while they're taken care of by the state to

6  improve their health.

7          We have a fellowship program where we train board

8  eligible or board certified pediatricians in the subspecialty

9  of child abuse pediatrics.

10          I do an enormous amount of teaching and lecturing

11  both at Brown and around the country and around the world.

12  And I have an active research program as well at the hospital.

13  Q    How many cases of suspected child abuse and neglect do you

14  review each year at the child protection center?

15  A    About 1,500 a year.

16  Q    Is that you personally that does that?

17  A    Well, I review all the cases.  I see a third of those.

18  There's three attendees that share the primary clinical duties

19  and supervise the fellows.

20  Q    So you actively handle about a third of the 1,500 cases

21  per year?

22  A    That's right.

23  Q    In what percent of those cases have you confirmed abuse or

24  neglect?

25  A    Between 30 and 40.

Jenny - direct

1    THE COURT:  30 and 40 percent?

2    THE WITNESS:  Percent, yes.

3  BY MR. TELISMAN:

4  Q   Dr. Jenny, as part of your duties, do you also attend any

5  autopsies?

6  A   Whenever any of our kids die, yes, we go to the autopsies,

7  whoever the treating physician was.

8  Q   How frequently does that happen?

9  A   A couple of times a year, two or three times a year.

10 Q   For how long have you been the director of the child

11 protection center?

12 A   Since 1996.

13 Q   For how long have you been working in the area of child

14 abuse?

15 A   Since 1983, with one year.  I did do one year of private

16 practice and then went back into my field.

17 Q   Now, you mentioned before that you also do researching and

18 you teach as well.  Have you --

19     Are you involved in any review work for any journals?

20 A   Oh, yes.

21 Q   Will you please explain?

22 A   Well, I'm on the editorial board of the Quarterly, which

23 is a journal on child abuse.  I was on the editorial board of

24 Child Maltreatment, which is the Journal of the American

25 Professional Society on Abusive Children.

Jenny - direct

1    And I review for Pediatrics, JAMA, New England

2    Journal, Pediatric Infectious Diseases, Pediatric Emergency

3    Medicine.  About 30 or 40 different journals send me articles

4    that I review.

5    Q    Among those that you just mentioned, you mentioned the New

6    England School of Medicine?

7    A    New England Journal.

8    Q    New England Journal of Medicine.  Pardon me.

9         And, also, you said JAMA?

10   A    Yes.

11   Q    What does that stand for?

12   A    Journal of the American Medical Association.

13   Q    Now, you said before that you do a lot of writing.

14        Could you please highlight a few of your publications

15   that are relevant to the field of child abuse or pediatric

16   brain injury?

17   A    Well, I've published research on missed abusive head

18   trauma, cases that physicians misdiagnose.

19        I've published papers on coagulation problems in

20   abusive head trauma, on rebleeding of subdurals and what the

21   physiology is of that particular condition.

22        I've published on biomechanical issues in head

23   trauma, and I've written some books about it.

24   Q    And how about the --

25        Is there a text that is considered, for lack of a

Jenny - direct

1    better term, the definitive text on child abuse?

2    A    In my opinion.

3    Q    And you wrote that?

4    A    I was the editor, yes.

5    Q    What is it called?

6    A    It's called "Child Abuse and Neglect:  Diagnosis,

7    Treatment and Evidence," published by Elsevier in 2010.

8    Q    Have you been qualified as an expert to render an opinion

9    in the field of pediatrics or child abuse?

10   A    Yes.

11   Q    About how many times?

12   A    Twice a month for the last 30 years.

13   Q    Have you ever testified for the defense in a child abuse

14   case?

15   A    Yes.

16   Q    Have you ever refused to testify for the prosecution in a

17   child abuse case?

18   A    That is more common actually than testifying for the

19   defense, but, yes, I have.

20   Q    Could you explain briefly?

21   A    Well, if I get sent a case and I don't feel comfortable

22   that the diagnosis is correct or well-thought out, I send it

23   back and say, sorry, I'm not interested and I don't charge.

24   It's free.

25            MR. TELISMAN:  Your Honor, at this time I'm tendering

Jenny - direct

1    Dr. Jenny as an expert in pediatrics and child abuse
2    pediatrics.
3              THE COURT:  Just proceed as we have been doing.
4              MR. TELISMAN:  Yes, your Honor.
5    BY MR. TELISMAN:
6    Q    Dr. Jenny, how did you become involved in this case?
7    A    Mr. Goodfriend contacted me and asked me if I would review
8    it.
9    Q    What was the purpose of your review?
10   A    To evaluate the medical information and the medical
11   evidence in the case.
12   Q    What sorts of documents did you review?
13   A    The birth records of the child, the hospital records from
14   her hospitalization in I think it was October, her hospital
15   records that began December 27th.  I reviewed police reports.
16   I've reviewed her well-child records, DCFS record.
17   Q    And are these the types of records that are reasonably
18   relied upon by experts in your field in conducting these types
19   of evaluations?
20   A    Yes.
21   Q    And did you rely on these documents as part of the basis
22   for your opinion?
23   A    I did.
24   Q    Now, Dr. Jenny, what is abusive head trauma?
25   A    It is traumatic injury to the head and brain that is not

Jenny - direct

1  caused by natural causes or accidental injury.

2  Q   Are you familiar with the term "shaken baby syndrome"?

3  A   Yes.

4  Q   What is the difference between abusive head trauma and

5  shaken baby syndrome?

6  A   Well, shaken baby syndrome presumes a mechanism that is

7  much more limited.  The American Academy of Pediatrics has

8  recommended that pediatricians use the term "abusive head

9  trauma" because it does not presume a mechanism.

10           And certainly when you're at the bedside, you don't

11  have all the information available to you in terms of making a

12  final diagnosis, and so that is the term that is preferred by

13  the academy.

14  Q   What happens to a baby's brain in abusive head trauma?

15  A   Well, there is primary injury that occurs when forces are

16  applied to the head that cause damage, and then there's

17  secondary injuries that result from that or that spring from

18  that primary force causing the brain to get sick, to leak

19  toxic chemicals, to have swelling, to have damage secondary to

20  lack of oxygen or lack of circulation.

21  Q   The last part that you just talked about, the damage

22  secondary to a lack of oxygen, how does -- how well can a baby

23  regulate its blood pressure to the head?

24  A   Not nearly as well as adults.  In fact, adults have this

25  very sophisticated system whereby if your blood pressure drops

1   in your body, your head particularly spares -- has a separate

2   regulatory system that spares the circulation to the brain

3   because if you lose your brain, you know, that's it.  I mean,

4   life is not worth living.

5        So babies -- in babies this system is very poorly

6   regulated.  So after rotational forces are applied to the

7   head, they have profound periods of hypotension, of low blood

8   pressure and poor circulation to the brain.

9        In animal models, it's up to a half hour.  It's been

10  documented in intensive care units with living infants to also

11  be similar, a half hour to 45 minutes of profound hypotension

12  in the brain.

13       So that mechanism is just really immature and

14  functioning much more poorly than an adult's or older child's

15  ability to regulate blood pressure to their head after injury.

16  Q   Okay.  Now, what happens to the size of a baby's brain

17  after an episode of abusive head trauma?

18  A   Well, if it's a severe brain injury, they will generally

19  get swelling.  In the short term, the brain will swell up.

20  There will be extra fluid both within the cells and outside

21  the cells and the tissues around the cells themselves.

22       And after that, again, if it's a severe injury, as

23  the edema resolves, the head returns to a normal size, and

24  then you actually get shrinkage as scar tissue sets in and

25  contracts the tissues.

Jenny - direct

1    And you also have a pretty dramatic lack of brain

2    growth thereafter because, you know, a baby's brains double in

3    the first year of life.  And once they have an injury, that

4    growth stops and they appear to have very small heads.

5    Q    Now, how long does it take for the shrinkage process

6    to start?

7    A    Well, I think it starts right away, but we don't really

8    see it on x-rays, you know, for days to weeks really.

9    Q    Does abusive head trauma ever cause the brain to suffer

10   contusions or lacerations?

11   A    Yes.

12   Q    What's the best way to identify brain contusions or

13   lacerations?

14   A    Autopsy is the gold standard.

15   Q    Do three-and-a-half-month-old babies get contusions on the

16   brain?

17   A    Yes.

18   Q    But at that point, isn't the head malleable?  Isn't the

19   skull not fused, the different segments of the skull?

20   A    Yes.

21   Q    Would that have any sort of effect on the baby's ability

22   to get contusions or lacerations on the brain?

23   A    Well, I mean, if an impact occurs on the brain, the brain

24   will actually indent quite substantially because it's a

25   single-layered skull that is very flexible, and they would be

1  more likely to have that impacted force actually impede a
2  brain, impinge on the brain.
3  Q   Dr. Jenny, how do treating physicians diagnose abusive
4  head trauma?
5  A   We begin with, obviously, signs and symptoms of head
6  trauma; a very, very thorough history, medical history,
7  complete medical history back to conception and beyond; family
8  medical history.
9      We take -- we look at social factors, social risk
10 factors.  We do complete physical exams, very extensive
11 laboratory work, other x-ray studies of the bones and soft
12 tissues, obviously radiologic studies of the head.
13     If autopsy data is available, that becomes part of
14 the diagnostic work-up.
15     And certainly we also rely on peripheral records from
16 other related agencies, social service agencies, police
17 agencies, home nursing agencies, and so on.
18 Q   Now, the first thing you mentioned there were signs and
19 symptoms.  What sorts of things do you look for?
20 A   Well, in infants, in young infants, it's sometimes
21 difficult to diagnose because babies don't function at a very
22 high level neurologically.  They eat; they poop; they might
23 smile.  They don't walk; they don't talk; they don't do higher
24 math or write letters or play with computers.
25     So the number of things that can show us are wrong

1   are fairly limited, and so irritability, lethargy and vomiting

2   are the primary signs and symptoms that we see, but it can be

3   confused with flu or other conditions.

4   Q   In more severe cases, can abusive head trauma result in

5   immediate neurological collapse?

6   A   Yes.

7   Q   Now, Dr. Jenny, I have a question about part of the

8   anatomy of the outside of the brain.  What is the subdural

9   space or subdural compartment?

10  A   In a healthy individual, there is no such thing.  It's a

11  potential space.

12  Q   What do you mean by that?

13  A   Well, a dura is a thick fibrous membrane that covers the

14  brain to protect it, and in infants it's tightly attached to

15  the skull.

16          And then the dura is adjacent to the arachnoid, which

17  is a very thin, delicate membrane.  And, again, in the normal

18  state, there is nothing in that space.  It's a potential

19  space.

20  Q   When you say that there is nothing in that space, is that

21  because the dura is essentially sitting on the arachnoid

22  membrane?

23  A   Yes.

24  Q   Where is that located in relation to the brain?

25  A   Both of those layers are outside the brain.

Jenny - direct

1    Q   What does the term "subdural hemorrhage" mean, or
2    "subdural hematoma"?
3    A   It means blood accumulating between the dura and the
4    arachnoid.
5    Q   How does blood get into there?
6    A   Through shearing of vessels.
7    Q   What is the significance of identifying subdural
8    hemorrhage in cases of suspected abusive head trauma?
9    A   Well, most of the things that cause subdurals don't happen
10   in infants.  You know, in older kids and adults, falls and,
11   you know, falling off your bicycle or your horse or hitting
12   your head on -- or sliding in to home plate and hitting your
13   head on the base, I mean, those are things babies don't do.
14           And so subdurals are really very rare in infants.
15   And so when we see a subdural, we certainly want to rule out a
16   wide variety of conditions.  We want to distinguish it from,
17   say, a subdural empyema or infection or distinguish it from
18   other conditions.  But, again, it's very rare and often
19   associated with trauma, and usually that's not accidental
20   because babies don't do things, you know, that cause them to
21   bleed in their heads.
22   Q   Now, when you are talking about the other things that you
23   want to rule out, you said subdural empyema.
24           Could you spell that?
25   A   E-m-p-y-e-m-a.

1  Q   And you said infection.  Are those the same thing?

2  A   Yes.  It's just pus in that space.

3  Q   And how do you rule that type of thing out?

4  A   It looks very different, and the child has an obvious

5  infection, infectious source.

6  Q   Can blood leak into the subdural space from the dura?

7  A   That's a hypothetical situation, and it is hypothesized.

8        Obviously, if the dura itself is torn, you can get

9  leakage; like, for instance, the large vessels that collect

10 blood at the top of head, if you happen to tear one of those

11 vessels in an injury, you can certainly get blood leaking out

12 of the dura itself.

13       You can get blood coming from, say, the arachnoid or

14 the brain if you have tumors that eat through the dura and eat

15 through the arachnoid, as examples.

16 Q   Is there any clinical data establishing that blood can

17 leak into the subdural space from the dura absent some sort of

18 tearing of the dura?

19 A   No.

20 Q   The hypothesis that blood leaking into the subdural space

21 from the dura, is that a generally accepted hypothesis in your

22 field?

23 A   No, it's not.

24       MR. TELISMAN:  Your Honor, if I could have one moment

25 to distribute the exhibits that just arrived?

Jenny - direct

1    THE COURT:  Sure.

2        MR. TELISMAN:  Thank you.

3    (Brief interruption.)

4        MR. TELISMAN:  Your Honor.

5        THE COURT:  Thanks.

6    (Brief interruption.)

7  BY MR. TELISMAN:

8  Q    Dr. Jenny, I do have a copy here of respondent's exhibits

9  1 through 17 that I will hand to you.  I've provided a copy to

10 opposing counsel and two copies for the Court.

11       THE COURT:  Thanks.

12 BY MR. TELISMAN:

13 Q    Now, Dr. Jenny, just a little bit of housekeeping first.

14 I'd like to direct your attention to Exhibit 1.  This is

15 Respondent's Dr. Carole Jenny Exhibit 1.

16 A    Okay.

17 Q    Is this a true and accurate copy of your curriculum vitae

18 other than the redactions?

19 A    Yes, as of May of this year.  I've published some other

20 papers since then.

21 Q    Okay.  Now, Dr. Jenny, did you author a report in this

22 case?

23 A    I did.

24 Q    Is a true and accurate copy of that report marked as

25 Respondent's Exhibit Carole Jenny Number 2?

Jenny - direct

1   A    Yes.

2   Q    And, Dr. Jenny, at the back of your report you list I

3   think it's 45 references, is that right?

4   A    Yes.

5   Q    Now, three of those references, numbers 18, 31 and 32,

6   those are biomechanical studies, right?

7   A    Yes.

8   Q    Are those studies, references, that you included

9   essentially in your report, you explain that you don't agree

10  with those?

11  A    Yes.

12  Q    With respect to the other 42 references, are those

13  generally accepted as authoritative in your field?

14          THE COURT:  I'm sorry.  Which were the three again?

15          MR. TELISMAN:  I apologize.  18, 31, and 32.

16          THE COURT:  Thanks.  Go ahead and ask your question.

17  BY THE WITNESS:

18  A    Yes, they are.

19  BY MR. TELISMAN:

20  Q    And are they reasonably relied upon by experts in your

21  field?

22  A    Yes.

23  Q    Now, Dr. Jenny, in discussing the --

24          If you will excuse me for just one second here.

25          (Brief interruption.)

1  BY MR. TELISMAN:

2  Q    All right.  At this point I'm going to move on and we'll

3  get back into the references in just a minute, okay.

4         I want to ask you about another topic and that is

5  hypoxia ischemia.  What is hypoxia and ischemia?

6  A    Hypoxia is lack of oxygen to the brain, and ischemia is

7  lack of circulation of blood supply.

8  Q    What role does it play in abusive head trauma cases?

9  A    It's a very important part of abusive head trauma.  Most

10 babies aren't going to die from subdurals.  They're usually

11 fairly small and, in fact, it's what kills kids.

12 Q    How does it kill kids?

13 A    The brain swells up.  It compromises the ability of blood

14 to flow into the head.  Eventually the blood flow gets

15 obliterated and the brain dies.

16 Q    Does hypoxia ischemia itself cause subdural hemorrhaging?

17 A    No, it does not.

18 Q    Do you cite to any research on that issue?

19 A    Well, there's both research and common practice.  There's

20 been studies done of children who die from drowning, from

21 anesthetic accidents where, you know, the oxygen gets turned

22 off during anesthesia; blinds, cords wrapped around their

23 necks; kids that fall face forward and babies that are

24 crawling around and fall face forward into trash cans with

25 plastic bags in them; kids that drown in toilets and bath

Jenny - direct

1    tubs, those children never have subdurals.

2         And I see every child for the last 16 years that has

3    come into our hospital with drowning and is under five years

4    of age, and all of the children who are severely affected get

5    CT scans as a prognostic indicator of the extent of their

6    injury, and they never have subdurals.

7    Q    In addition to that, do you also --

8         In addition to your clinical experience, you also

9    cited to three articles, research articles, in your report.

10   Those are references 24, 25 and 26, and if you could for one

11   moment just take a look at those?

12   A    All right.

13   Q    My question to you is essentially:  In summary, what do

14   those studies show?

15   A    Again, they were very large -- well, 24 was a very large

16   study of radiologic findings in children with cardio

17   respiratory arrests and found no correlation with subdurals.

18        Biyard's study was done both in San Diego and in

19   Australia where they looked at children, particularly infants

20   who had -- who had died of proven hypoxia and had no

21   subdurals.

22        And the third study was done again in San Diego where

23   they looked at a large number of children admitted to San

24   Diego Children's Hospital, many of whom didn't die, but they

25   all had CT scans, and they were children who had drowned,

Jenny - direct

1    including infants, and none had subdurals.

2    Q    Now, are there alternative theories about the relationship

3    between hypoxia ischemia and subdural hemorrhages?

4    A    Yes.

5    Q    Could you please explain?

6    A    Well, it started in England in early 2000, I think 2002,

7    where a pathologist named Jennian Geddes wrote a paper when

8    she had examined severely ill infants, babies who were

9    stillborn, spontaneous abortions, and found subdural -- not

10   subdural bleeding, intradural bleeding in several of the

11   children.

12        I actually was part of the court case where she

13   presented this in the courts of appeal in London, and during

14   that court case, she withdrew her hypothesis.  She said it was

15   only a hypothesis; there was no scientific fact backing it up.

16        And the other thing that came out in the court case

17   that I think was very important is she collected her specimens

18   by just picking up dural specimens out of autopsy buckets, and

19   she had no idea how the specimens were collected.  And when

20   you rip dura off of a skull, you often tear it and separate

21   the layers and cause bleeding.

22        So my concern was that I have not seen a study where

23   subdural bleeding has been proven to be caused by hypoxia.

24   And certainly when you're comparing a study with macerated

25   fetuses, you know, that are spontaneously aborted to normal

1    babies, that's a pretty wide stretch.

2    Q    Now, Dr. Jenny, one thing that you mentioned before was

3    you talked about intradural bleeding versus subdural bleeding.

4    Is there some sort of question about whether, in fact,

5    bleeding in the subdural space is actually intradural?

6    A    Well, I think that's a semantic issue.

7    Q    Could you please explain?

8    A    There's a layer of cells, basal layer of cells, on the

9    dura that is close to the arachnoid, are called the dural

10   border cells.  And those kind of stick to the arachnoid, and

11   then when you get bleeding, you get bleeding between that

12   single layer of cells and the dura.

13            And the question is, you know, is that the arachnoid

14   or is that the dura.  And so it's more of a semantic issue.

15            When you're at the autopsy table and you take the

16   skull off in an infant and you pull it up, the dura comes off

17   with the skull, and you look down at the arachnoid, and it

18   looks perfectly separated into two completely separate

19   compartments.  So I think it's more of a, you know, what

20   you're going to name that layer of cells rather than an actual

21   phenomenon.

22   Q    Now, earlier when I asked you about the subdural space and

23   you explained it and we talked about subdural hemorrhaging and

24   about the hypothesis that blood can leak into, from the dura

25   into the subdural space, could you explain that hypothesis in

Jenny - direct

1    the context of this border cell layer that you were just
2    talking about?
3    A    Well, I think that, again, this all goes back to Dr.
4    Geddes' study where she found blood within the dural leaflets
5    but no blood except for one case that was all terribly,
6    terribly ill, premature, very premature baby with overwhelming
7    sepsis and a clotting disorder.  That was the one case where
8    there was actual visible blood beneath the dura.
9          The rest was microscopic, within the dura, and,
10   again, since we don't know how the specimens were collected,
11   we don't know if that was artifact.
12   Q    But for purposes of the research that has been done
13   regarding the presence of subdural hemorrhaging, when we talk
14   about that and when the research talks about that, is it
15   referring to hemorrhaging?
16         Well, what is it referring to since there's this
17   whole issue of subdural border cell and all that stuff?
18   A    They're talking about the hemorrhage that occurs between
19   the dura and the border cell layer of the dura --
20   Q    Okay.
21   A    -- which is attached to the arachnoid fairly tightly.
22   Q    And this issue about blood leaking from the dura, an
23   intact dura, into the subdural space, that would still be
24   above that border cell layer?
25   A    Yes.  That's highly -- yes.

1  Q   Now, Dr. Teas wrote in her report that hypoxia ischemia

2  may occur at the time of a participating event, as part of an

3  ongoing process or as part of a secondary cascade that occurs

4  days to weeks after a precipitating event.

5       Do you agree with that statement?

6  A   You know, I find that very confusing.  I'm not sure what

7  it means.  If a child has a bad injury and they get injured

8  and they have brain damage, they may have other episodes of

9  trouble breathing as time goes on.

10      But to have a child be normal for days to weeks after

11 injury and then suddenly collapse doesn't make a whole lot of

12 sense.

13 Q   Now, Dr. Jenny, I would like to talk with you now about

14 neck injury.  Does neck injury commonly occur in abusive head

15 trauma cases?

16 A   Well, it depends on whether or not you do an autopsy and

17 how the autopsy is done.  I think for years we never

18 recognized it because the typical way you do an autopsy is to

19 cut the spinal cord at the bottom of the brain right at the

20 top of -- right at the canal where it enters into the spine.

21      And a group in Philadelphia began doing a different

22 type of study where they first would release the spinal cord

23 and then pull the spinal cord and brain out as one unit and

24 then take sections from that area that most pathologists just

25 cut right through and found, in fact, bleeding in about

1   73 percent, I think, of infants who died of abusive head

2   trauma, would have bleeding either in the cord or in the nerve

3   roots surrounding the cord at that level.

4           So I don't think we have recognized that very subtle

5   injury that does occur at the cord level before Dr. Rorke and

6   her colleagues' study.

7   Q   Now, I want to direct your attention to two studies that

8   you have referenced in your report.  The first is Respondent's

9   Carol Jenny Exhibit 3.  This is the --

10          At the top of the page, it says "Technical

11  Communication"?

12  A   Yes.

13  Q   Do you see that?  What is this?

14  A   This is how the group in Philadelphia described their

15  method of doing an autopsy and preserving the cervical spinal

16  junction and then examining it for evidence of trauma.  And

17  this was really a radical communication.

18          It really, I think, changed things markedly, and a

19  lot of medical examiners' offices still don't do this.  It's

20  an enormously time-consuming, you know, expensive procedure to

21  do.  But I think it's very important.

22  Q   What is the date of this publication?

23  A   2004 March.

24  Q   And I would direct your attention on the first page, on

25  the left-hand column, there's a paragraph that starts with a

Jenny - direct

1    large "T," "The majority of victims."

2           Do you see that there, the left-hand side?

3           THE COURT:  First paragraph.

4           THE WITNESS:  Yes.  Okay, got it.

5    BY MR. TELISMAN:

6    Q   Going down nearly almost to the second line from the

7    bottom there, it says:

8           "No external injury of the head or back is obvious in

9    many victims, especially if the primary mechanism was shaking

10   rather than battering."

11          What is the significance of that?

12   A   Well, it is that shaking does not leave external signs in

13   most cases.  And so unless you look for these more subtle

14   signs, you're going to miss some important injuries.

15   Q   And right after that, the next sentence reads:

16          "Under these circumstances, there are four specific

17   injuries that result from violent shaking:

18          1.  Subdural hematoma, typically between the two

19   cerebral hemispheres;

20          2.  Retinal and optic nerve sheath hemorrhages;

21          3.  Tears of cerebral white matter, especially corpus

22   callosum; and

23          4.  Tears and hemorrhages of cervical or more caudal,

24   c-a-u-d-a-l, spinal cord and/or nerve roots."

25          Did I get that right?

Jenny - direct

1    A    Yes.

2    Q    Now, another study that you cited is Exhibit 4.  That's

3    the Brennan study, Laura Brennan, Dr. Laura Brennan.

4            And that was published in 2009, is that correct?

5    A    That's right.

6            THE COURT:  Spelled the same way.

7            MR. TELISMAN:  I'm sorry?

8            THE COURT:  That's the name of my court reporter.

9    She's not the author of the article, though.  Laura Brennan.

10           MR. TELISMAN:  Same name?

11           THE COURT:  Yes.  At least I don't think she's the

12   author of the article.

13           MR. TELISMAN:  You never know.

14   BY MR. TELISMAN:

15   Q    So, Dr. Jenny, if you could summarize, what is this

16   article about?

17   A    Well, this is the children that were autopsied at the

18   medical examiner's office in Philadelphia.  They had 52

19   children who died of abusive head trauma, and they did this

20   particular type of dissection that was described in the

21   previous paper and found that 71 percent of those children had

22   primary cervical cord injuries using this particular

23   technique.

24   Q    If I could direct your attention to page 237 of that

25   article, on the left-hand side of the page in the paragraph

Jenny - direct

1    underneath the word "discussion," just past halfway down that

2    paragraph, there's a sentence that begins with the word

3    "currently."

4            Do you see that?

5    A    Yes.

6    Q    It reads:

7            "Currently, it seems that radiographic evaluation,

8    primarily MR imaging, of the apparently intact neck has not

9    been useful in identifying SCI," which, and tell me if I'm

10   wrong here, but is that defined as spinal cord injury --

11   A    Yes.

12   Q    -- in this paper?

13   A    Yes.

14   Q    "The presence of cervical SCI, hematomas, and nerve root

15   damage has been documented postmortem in infants who have

16   sustained abusive head trauma.  However, MR imaging failed to

17   identify the cervical injuries among inpatients."

18           And when we're talking about cervical injuries, we're

19   talking about the neck?

20   A    Yes.

21   Q    Now, Dr. Jenny, there is one more place in that article

22   that I'd like to direct your attention to, and that is the

23   following page, page 238.  On the right-hand column at the

24   very top, the first full sentence, it reads:

25           "In the present study, parenchymal and/or root

Jenny - direct

1    injuries usually occurred without evidence of muscular or
2    ligamentous damage or dislocation or fracture."
3         What does that mean?
4    A   Well, infants have very loose ligaments in their necks,
5    and children certainly even more so than adults as well, but
6    infants particularly.  And so they have a lot of mobility
7    between the vertebrae when forces are applied that then snaps
8    back into place and leaves no particular trace.
9         There's a well-known phenomena called SCIWORA, which
10   is spinal cord injury in the absence of radiologic findings.
11        THE COURT:  Spell that.
12        THE WITNESS:  S-C-I-W-O-R-A.
13        THE COURT:  So it's an acronym.
14        THE WITNESS:  SCIWORA, yes.
15        And so that's, you know, something you're always
16   concerned about in pediatrics because after an injury, you can
17   actually damage the cord and yet see no -- no external damage
18   or no damage to the bones because of the mobility, the excess
19   mobility in the infant neck.
20   BY MR. TELISMAN:
21   Q   Now, these injuries that this study talks about, the
22   cervical spinal cord injury, the hematomas, nerve root damage,
23   are these the type that will --
24        Well, what happens to these injuries if a patient
25   survives for 11 months after a period of abuse?

Jenny - direct

1  A    You mean in terms of histologically?

2           THE COURT:  When you say "these injuries," I want to

3  make sure I understand what you're referring to.

4           MR. TELISMAN:  Oh, the injuries that I just listed,

5  the ones that were identified in the Brennan study.

6           THE COURT:  All right.

7  BY THE WITNESS:

8  A    You mean the spinal cord injuries?

9  BY MR. TELISMAN:

10 Q    Yes.

11 A    Yes.  I would expect that in the absence of a very large

12 infarction of the spinal cord, that would heal and you would

13 see no long-term residual.

14          THE COURT:  Infarction.

15          THE WITNESS:  Infarction, meaning large portion of

16 the spinal cord dying.

17          THE COURT:  Okay.

18 BY MR. TELISMAN:

19 Q    And in mentioning, we talked before about the previous

20 article, that Judkins article from 2004, that discussed a way

21 of examining the neck microscopically on pathology?

22 A    I guess.

23 Q    Or I guess preserving it pathologically on autopsy, is

24 that right?

25 A    Yes.

Jenny - direct

1  Q    Did the autopsy report in Isabella Zielinski's case

2  reflect whether her neck was preserved in that manner?

3  A    There was no description of this type of procedure done

4  and no description of any types of sections taken from that

5  portion of the neck.

6  Q    In fact, the autopsy predated the publication of this

7  article, correct?

8  A    That's right.

9  Q    Dr. Jenny, I would now like to talk with you a little bit

10 about retinal hemorrhaging.

11         How does retinal hemorrhaging help in determining

12 whether a child has been the victim of abusive head trauma?

13 A    Well, there are particular distributions, patterns and

14 numbers of hemorrhages that you see often in children who have

15 been abused and babies who have been abused that you just

16 don't see in other conditions except leukemia, severe clotting

17 disorders or overwhelming trauma like major crush injuries to

18 the head.

19 Q    About that, have there been questions in your field about

20 whether doctors are only looking for retinal hemorrhages in

21 the eyes of children who are possible victims of child abuse?

22 A    Yes.

23 Q    Has there been any research done recently that has looked

24 for retinal hemorrhages in the eyes of children who were not

25 suspected of being abused?

Jenny - direct

1  A   Yes.

2  Q   And did you cite to that in your paper?

3  A   I did.

4  Q   Now, I would like to direct your attention to Respondent's

5  Carole Jenny Exhibit 5.

6           This is a study by Dr. Agrawal, A-g-r-a-w-a-l, and

7  this is from 2012.  Do I have that right?

8  A   Yes.

9  Q   Now, first turning your attention to -- pardon me -- page

10 e1389, if you could look at the middle column, the very top,

11 the first full sentence, it reads:

12          "We undertook a prospective study to define the

13 prevalence, distribution and extent of RH" --

14          And it's defined as retinal hemorrhage, right?

15 A   Yes.

16 Q   -- "in critically ill children between six weeks and

17 16 years of age, excluding patients with AHT," which is

18 defined as abusive head trauma?

19 A   Yes.

20 Q   What is a prospective study?

21 A   That means they started out and looked at these children

22 when they came into the intensive care unit.  This was done at

23 Great Ormond Street Hospital, which is the premier children's

24 hospital in England, and so they would get permission from the

25 parents to do indirect ophthalmologic exams by an

1    ophthalmologist on all the children that came in who were
2    critically ill.  And if the parents agreed, they were included
3    in the study, assuming they were not children who were
4    suspected of being abused.
5    Q   And the children who were suspected of being abused, were
6    they excluded from the study?
7    A   They were not included in the study.
8    Q   Now, I want to direct your attention to page e1391, the
9    bottom right-hand corner of that page.
10          There is the paragraph that begins, "we report"?
11   A   Yes.
12   Q   It says:
13          "We report a 15.1 percent prevalence of the presence
14   of any RH in critically ill children; however, severe
15   bilateral multilayered RHs, similar to those reported as
16   typical of abuse, are rare in this critically" -- and then you
17   have to go to 1393 -- "in this critically ill population, 3.7
18   percent, 6 of 159.  When severe multilayered RH did occur, it
19   was exclusively in association with severe trauma, sepsis,
20   coagulopathy or any combination of these factors."
21          First off, did I read that correctly?
22   A   Yes, you did.
23   Q   What is the significance of that?
24   A   Well, this is critically important because they identified
25   lots of things cause retinal hemorrhages and we -- you know,

Jenny - direct

1  the differential diagnosis is very large.  Most are just a few

2  scattered hemorrhages in the very back of the eye.

3        And when we see these massive hemorrhages throughout

4  the eyegrounds, all the way out to the periphery of the eyes,

5  you know that's a very unusual finding.  And what they found

6  was they did see those types of hemorrhages in kids with

7  leukemia, bad coagulation disorders, overwhelming sepsis and

8  severe trauma or some combination thereof.

9        So there are other children that get hemorrhages like

10  the ones that we see in abused kids, but it's pretty obvious

11  what the diagnosis is.  I mean, when a child is in a multi-

12  rollover car crash, you know, you're not going to say, I

13  wonder if they were abused.

14  Q   Now, with respect to that, I believe that the paper

15  provides a couple of, or a few, definitions, and I just wanted

16  to get into those.

17        Turning your attention to page e1390, on the

18  left-hand column near the top, it defines how they

19  characterize the severity of retinal hemorrhaging.

20  A   Okay.

21  Q   And it says that "greater than 20 RH is severe."

22  A   Yes.

23  Q   And so with respect to this case, Isabella Zielinski, did

24  she have more than 20 retinal hemorrhages?

25  A   Yes.

Jenny - direct

1  Q   Now, you talked before about the coagulopathy being an
2  issue here in this article.
3           The article defines coagulopathy -- and I will direct
4  your attention to page e1389, the top right-hand corner of the
5  page.  It reads:
6           "Coagulopathy was defined as prothrombin time more
7  than three seconds above normal and/or twice normal partial
8  thromboplastin time and/or platelet count less than 50,000 per
9  millimeter cubed."
10          What type of -- when we talk about coagulopathy here,
11 how is it being defined?  Is it being defined as a tendency to
12 clot too much or a tendency to clot too little?
13 A   A tendency to clot too little.
14 Q   Finally, you talked before about sepsis, how the study
15 mentions sepsis as being a possible cause of severe bilateral
16 retinal hemorrhaging.  If you could, briefly, what is sepsis?
17 A   It's an infection in the bloodstream, a systematic
18 infection in the bloodstream.
19 Q   Now, ultimately this paper concluded, and I'll direct your
20 attention to e1394.  The very bottom center of the page, there
21 is a paragraph that begins "our results."
22          It reads:
23          "Our results substantiate the importance of defining
24 the severity, distribution and extent of RH in any clinical
25 setting.  The overall prevalence of mild or moderate RH in

Jenny - direct

1    critically ill children is three times that of severe multi-
2    layered RH."
3              So essentially what is it saying about the importance
4    of documenting the extent and distribution and type of retinal
5    hemorrhaging in a child?
6    A    It's critically important in making that differentiation
7    between other conditions and these three conditions and severe
8    abuse.
9    Q    Now, in addition to the study, you also cited to another
10   paper regarding retinal hemorrhaging by McGuire from 2012, is
11   that right?
12   A    Right.
13   Q    And I'm not going to delve into that one in as much
14   detail, but I just wanted to get one thing out of it.
15             If I could just have one second to find it, these are
16   a little out of order.  Here we go.  It's Respondent's Jenny
17   Exhibit 10.
18             And is this the study that you cite?
19   A    Yes.
20   Q    Now, what was the gist of this study?  What did it look
21   at?
22   A    Well, this is what's called a meta-analysis, and it's a
23   very carefully done study of the entire literature, both the
24   English literature and literature in foreign languages over a
25   period of time examining not only the results of the study,

1  but the quality of the work that was done, whether they

2  defined accurately what their study groups were, was there

3  bias in the study and so on.

4         And you put this together and use particular

5  statistical methods that are actually quite complex and you do

6  what is referred to as a meta-analysis, and it's considered a

7  very high standard of medical evidence.

8  Q   Now, this particular study, did it look at the prevalence

9  and severity of retinal hemorrhaging in cases of accidental

10 head trauma versus nonaccidental head trauma?

11 A   Yes.

12 Q   Or inflicted head trauma?

13 A   Yes.

14 Q   And ultimately what did it find with respect to --

15        Did this study identify a difference in the number,

16 type and distribution of retinal hemorrhaging between those

17 two groups?

18 A   They found that in abuse, the retinal hemorrhages were

19 numerous.  In accidental cases, they were few and located in

20 the posterior pole just in the back of the eye, and only 10

21 percent actually led to the periphery.

22        So they found that it was much more common to have

23 very severe retinal hemorrhages in abusive head trauma

24 compared to accidental trauma.

25 Q   Now, also in your report you cite to research regarding

1 whether retinal hemorrhages are prevalent in children who have

2 seizures, is that right?

3 A    Yes.

4 Q    Specifically in your references in your report, your

5 reference is 8, 9 and 10.  You have three different studies

6 there.  I just want to know if you could tell me or if you

7 could advise in summary what those studies say.

8 A    That, in fact, when you actually look at children after

9 seizures, they don't have retinal hemorrhages.  So convulsions

10 cannot in and of itself in the absence of some underlying

11 medical condition cause a child to have retinal hemorrhages.

12 Q    Now, moving on, how does the child physically react to

13 abusive head trauma?

14 A    Immediately or over the long term?

15 Q    Immediately.

16 A    Well, in parents who have told me what happened, or in

17 clinical studies of confessions, uniformly they describe the

18 same thing.  I mean, it's really quite amazing that they

19 describe after the event the child looks very shocked and sort

20 of startled or stunned, and then they have this funny pattern

21 of breathing where they kind of gasp for breath.  And I wonder

22 if that's just an adrenaline rush, you know, a fight or flight

23 kind of response on the part of the baby.

24         That's generally followed by a decreasing level of

25 consciousness, vomiting, convulsions, sometimes complete

Jenny - direct

1  cessation of breathing or at least impaired breathing.

2  Q   Now, you said that one of the reasons that you know about

3  this is because of studies that were done on people who have

4  admitted to child abuse?

5  A   Yes.

6  Q   And do you cite to any in your paper?

7  A   I cited Starling's paper.

8  Q   And is that Starling from 2004?

9  A   Yes.

10 Q   If I could direct your attention to Respondent's Carole

11 Jenny Exhibit 12, what is the gist of this study?

12 A   Well, we were looking at -- they were looking at the

13 analysis of what people admitted to when inflicted brain

14 injury occurred.

15 Q   What did they find?

16 A   The symptoms were immediate, most perpetrators admitted to

17 shaking without impact and that they described the children as

18 not being normal after the event.

19 Q   Did the study reflect that 32 of the perpetrators admitted

20 to shaking alone?

21 A   Yes.

22 Q   And of the 32, and I will just direct your attention over

23 to the results on the very first page, how many had any sort

24 of apparent impact injury?

25 A   There were a few.

1  Q   Right.

2  A   I'm sorry, I've forgotten the --

3  Q   It's the middle of the paragraph there on Results.  It's

4  four of 32 with skull or scalp injury?

5  A   Yes.

6  Q   So that leaves the remaining?

7  A   28.

8  Q   28 hadn't -- confessions of shaking without impact and no

9  evidence of impact?

10  A   Right.

11  Q   And of the cases of inflicted traumatic brain injury,

12  ITBI, as it's defined here in this study, did any perpetrator

13  report normal child behavior following the injury?

14  A   No.

15  Q   In addition to that confessional study, and I believe you

16  cited a couple others, but in addition to those that you

17  cited, are you also familiar with the confessional study done

18  by Dr. Matthieu Vinchon, V-i-n-c-h-o-n?

19  A   Yes.

20  Q   And I'm not going to ask you specifically about it; I just

21  would like for you to lay a foundation for it.

22        Directing your attention over to Respondent's Carole

23  Jenny Exhibit 7, is that study generally accepted as

24  authoritative --

25  A   Yes.

Jenny - direct

1   Q   -- in your field?

2   A   Yes, it is.

3   Q   Is this study reasonably relied upon by experts in your

4   field?

5   A   It is.

6   Q   The prior exhibit before that, Exhibit 6, which is

7   Catherine Adamsbaum from 2010, that is also a confessional

8   study, is that right?

9   A   Yes.

10  Q   Is that also generally accepted as authoritative in your

11  field?

12  A   Yes.  These were both done by very prominent European

13  authors.

14  Q   And the Adamsbaum article is also reasonably relied upon

15  by experts in your field?

16  A   Yes.

17  Q   Thank you.

18          Now, earlier you had talked about the different types

19  of brain injury that occurs in abusive head trauma and the

20  onset of symptoms.  One of the things that you mentioned was

21  brain swelling or edema.  Is the onset of brain swelling

22  always immediate?

23  A   No.  It's really quite variable.

24  Q   Why not?  Why isn't it always immediate?

25  A   I assume it has something to do with the nature of the

1    original injury, whether there's a period of time when the

2    child doesn't have any circulation to the brain because you

3    have to at least have some circulation to develop edema.

4              And the studies that have looked at this, mostly they

5    have been done in adults, but certainly they found that it

6    takes, you know, two hours to days for edema to really begin

7    to develop.  And in most of the cases I see, you know, it can

8    continue to develop for a day or two after the event.

9    Q    Now, I would like to talk with you a little bit now about

10   clotting and bleeding.  And I know this may sound a little

11   elementary, but can you explain the difference between

12   bleeding and clotting?

13   A    Well, bleeding is the escape of blood from blood vessels,

14   and clotting is what stops the blood from escaping from blood

15   vessels.

16   Q    How about the word "thrombus"?  What does the word

17   "thrombus" mean?

18   A    Thrombus is another word for clot.

19   Q    Now, is there a difference between the term "bleeding

20   disorder" versus a "clotting disorder"?

21             How about this?  Let me ask you it this way.  What is

22   a bleeding disorder?

23   A    A bleeding disorder is the inability to effectively clot

24   blood.

25   Q    What about a clotting disorder?  Is that a general term,

Jenny - direct

1   specific?

2   A   Generally it's the same.

3   Q   What about the word "coagulopathy"?  What does that mean?

4   A   That, again, means inability to clot blood.

5   Q   So all of those things kind of mean -- generally mean the

6   same thing roughly?

7   A   Yes.

8   Q   What is the term for not -- pardon me -- for clotting too

9   much?

10  A   Thrombophilia.

11  Q   How do treating physicians determine if someone has a

12  problem with clotting too much, or thrombophilia?

13  A   Well, there's blood tests to look for it.  Certainly you

14  generally don't do those tests until you find some evidence

15  that there may be a problem like repeated miscarriages or

16  somebody who develops deep vein thrombosis on an international

17  plane flight would be examples of people who would then get

18  worked up for thrombophilias.

19  Q   So what types of signs do they look for in addition to

20  those two things that you just said?

21  A   Again, abnormal coagulation in large vessels, usually the

22  legs and the lungs.

23  Q   Does physical activity have any effect on thrombophilia?

24  A   Well, that's the treatment.  That's why people are

25  supposed to get up and walk around on international flights

Jenny - direct

1    and do those exercises that they show you on the movies and

2    when you sit in your seats.  Obviously, the use of your

3    muscles mobilizes blood and protects against abnormal blood

4    clotting.

5    Q    Does untreated thrombophilia just spontaneously disappear?

6    A    No, but a lot of times people will have one episode and

7    then not have others.

8    Q    Now, are you familiar with the term called thrombocytosis?

9    A    Yes.

10   Q    What is that?

11   A    That's high platelet count.

12   Q    What causes high platelet count?

13   A    Well, there's two different types.  There's primary and

14   secondary or reactive.

15          Primary thrombocytosis is a -- it's a bone marrow

16   disorder.  You make too many platelets.  And often those

17   platelets are not effective or not normal platelets.  And it's

18   kind of like a platelet, leukemia.

19          And a reactive thrombocytosis is something we see

20   very commonly in infants when they get stressed or infected or

21   injured.  Their platelet counts go sky high.  It's something

22   that is seen every day in the intensive care unit.

23   Q    Now, with respect to that first type of thrombocytosis,

24   the primary thrombocytosis, do platelet levels normalize in

25   those patients?

Jenny - direct

1  A   Not without treatment.

2  Q   How is it treated?

3  A   With various chemicals, you know, in the same way you

4  would treat a leukemia.

5  Q   Now, you also talked about how the platelets themselves,

6  in addition to the count, that the type of -- the shape of the

7  platelet, or what is it?

8  A   Well, in many conditions there will be abnormal appearing

9  platelets that have peculiar vacuoles or inclusion bodies or

10 look funny under the microscope.

11 Q   And for patients with the primary thrombocytosis, that

12 first kind, does that platelet -- is the term "morphology"?

13 Is that right?

14 A   Yes.

15 Q   Does the platelet morphology ever normalize on its own

16 without treatment?

17 A   Well, if it is one of the types that has very abnormal

18 morphology, it stays that way generally.

19 Q   Now, do increased platelet levels automatically result in

20 thrombophilia or too much clotting?

21 A   No.  In secondary thrombocytosis, we don't see clots

22 resulting from that.

23 Q   Even when platelet levels go over a million?

24 A   That's right.  It's not something that we treat in the

25 intensive care unit.

1  Q   Do you cite in your paper -- pardon me -- in your report

2  in this case to any studies that discuss that exact

3  phenomenon?

4  A   I did.

5  Q   And I will direct your attention to Respondent's Carole

6  Jenny Exhibit Number 8.  Tell me when you're ready, Dr. Jenny.

7  A   I've got it.

8  Q   This is an article entitled "Thrombocytosis and

9  Thrombosisa," is that right?

10  A   Yes.

11  Q   It's authored by Dr. Vannucchi, V-a-n-n-u-c-c-h-i?

12  A   Yes.

13  Q   And this is from 2007, right?

14  A   Yes.

15  Q   Now, directing your attention to page 366, in the

16  right-hand column towards the bottom, you will see in bold, it

17  says "Thrombocytosis and Thrombosis:  An Uneven Relationship"?

18  A   Yes.

19  Q   The first sentence there reads:

20          "Generally speaking, reactive thrombocytosis is not a

21  risk factor for thromboembolic complications."

22          THE COURT:  I'm sorry.  Where am I looking?

23          MR. TELISMAN:  It's on page 366, your Honor.

24          THE COURT:  Which?

25          MR. TELISMAN:  On the right-hand column, you will see

Jenny - direct

1  towards the bottom there, it says -- there's a bold few words

2  about thrombocytosis.

3          THE COURT:  Okay, it's right under that.  I see it.

4  Thanks.

5  BY MR. TELISMAN:

6  Q   It says:

7          "Generally speaking, reactive thrombocytosis is not a

8  risk factor for thromboembolic complications, notwithstanding

9  that the rate of thrombosis, preferentially restricted to the

10 venous system, is increased in patients with underlying

11 malignancy, especially when additional risk factors are

12 present."

13         What does that mean?

14 A   Well, that means that high platelet count in and of

15 itself, if it's a secondary type and not a permanent condition

16 with abnormal platelets and abnormal bone marrow, doesn't

17 increase your risk of thrombus, of forming clots in the

18 absence of something like -- anybody with a malignancy has a

19 very -- is prone to deep vein clotting.

20         Diseases like lupus erythematosus is another one

21 where we see people that develop clots, some of the autoimmune

22 diseases, but that's not related to the platelets in and of

23 itself.  That's related to vascular inflammation and a wide

24 variety of other factors.

25         And anybody who gets severely dehydrated can get

1   blood clot problems.  The blood sludges essentially.

2   Q   Now, moving on, I would like to talk with you a little bit

3   about cortical venous thrombosis.

4           What is cortical venous thrombosis?

5           THE COURT:  This is where we'll take a break since

6   you're going on to a new topic.  We'll break for ten minutes.

7           MR. TELISMAN:  Thank you.

8           (Brief recess.)

9           THE COURT:  You can resume.

10  BY MR. TELISMAN:

11  Q   Dr. Jenny, before we left off, I was just asking you what

12  is cortical venous thrombosis?

13  A   It is a clot in one of the large veins in the brain.

14  Q   Now, are you familiar with the terms "primary phenomenon"

15  versus "secondary phenomenon"?

16  A   Yes.

17  Q   What is the difference between those two things?

18  A   You mean in terms of cortical venous thrombosis.

19  Q   Sure.

20  A   Well, primary thrombosis would be just the vein clotting

21  off for some reason as opposed to a tumor perhaps pressing on

22  the vein so blood doesn't flow through it and it clots, or a

23  child having a severe brain injury and the brain around the

24  blood vessel dies, so it clots.

25  Q   So is cortical venous thrombosis a primary phenomenon or a

Jenny - direct

1  secondary phenomenon?

2  A   Well, if it occurs without local physical phenomenon

3  causing it, it would be primary.

4  Q   What causes cortical venous thrombosis?

5  A   It's usually associated with severe dehydration.  That's

6  when we see it in kids anyway.  It's very unusual in kids in

7  the absence of very severe vomiting and diarrhea causing

8  severe dehydration.

9        It can be caused by lupus; it can be caused by other

10  infections, but, again, it's usually -- it's the result of

11  illness.

12  Q   How can an infection trigger cortical venous thrombosis?

13  A   Well, if you have an infection that has -- and the vessels

14  of the walls are very inflamed, you can sludge blood up and

15  cause a thrombi in a vein.

16  Q   Does it --

17        So in that scenario, is the cortical venous

18  thrombosis going to be focal to where the infection is, the

19  inflammation is?

20  A   Yes.

21  Q   And in the case of cortical venous thrombosis with respect

22  to the cortical veins of the brain, how does an infection

23  trigger that?

24  A   Again, it would cause the cells to get inflamed and the

25  tissues to get swollen, and that would -- that would impede

Jenny - direct

1    blood flow.

2    Q    So where does the infection -- where must the infection be

3    in relation to the brain?

4    A    Somewhere close to the vessel that is getting affected.

5    Q    Can mastoid disease trigger cortical venous thrombosis?

6    A    Locally in the area of the mastoid, but you would have to

7    have erosion of the bone.  Mastoiditis is an infection of the

8    bone, of the mastoid bone, which is a part of the skull.

9           And you would get chronic infection in the mastoid

10   which then would leak out when the bone was destroyed by the

11   infection.

12   Q    What will happen to the spinal fluid if that occurs?

13   A    You would get white cells in the spinal fluid, infection,

14   signs of infection.

15   Q    White blood cells in the spinal fluid?

16   A    Yes.

17   Q    Now, Dr. Jenny, at this point I would like to talk with

18   you about the medical chronology of Isabella beginning with

19   her mother's pregnancy.

20          Could you please describe Barbara Zielinski's

21   pregnancy with Isabella?

22   A    It seemed very normal.  She had no unusual complications.

23   She did have one urinary tract infection that was treated, one

24   upper respiratory tract infection that was treated.  She had a

25   good weight gain.  She took good care of herself.  She didn't

Jenny - direct

1    drink or smoke.  She took her vitamins.  She didn't have
2    problems with her blood pressure or with premature labor.
3    Q    Was there any indication that Mrs. Zielinski's upper
4    respiratory infection caused any harm to Isabella?
5    A    No.
6    Q    Did you also review the hospital delivery records for both
7    Isabella and her mother?
8    A    I did.
9    Q    In your practice as a pediatrician, do you commonly rely
10   upon these records when treating patients?
11   A    Yes.
12   Q    Could you please describe the labor and delivery?
13   A    Labor was uncomplicated.  The child, I think it was a
14   seven-hour labor.  There was some variable decelerations, but
15   they weren't described further than that in the record and
16   obviously didn't lead to any type of emergency procedure like
17   a C-section.
18   Q    What are variable decelerations?
19   A    Well, decelerations are heart slowing that occurs in
20   relationship to the mother's contractions.  And some
21   decelerations are normal.  If you don't have any
22   decelerations, that would be very odd.  And so they didn't
23   really describe them in any detail.
24   Q    What is the significance of these decelerations in this
25   case?

Jenny - direct

1   A   Well, if you have a labor with very prolonged

2   decelerations and the child doesn't recover after

3   contractions, you would worry that the infant was really

4   stressed and was in danger.

5   Q   Did that happen here?

6   A   Not that was recorded in the record.

7   Q   What did the record reflect regarding the Apgar scores for

8   Isabella upon birth?

9   A   The Apgar scores that were taken in the delivery room were

10  9 and 9, which is about as good as it gets, which that's just

11  a score that indicates the adequacy of the transition from

12  intrauterine life to extrauterine life.

13  Q   Directing your attention to Respondent's Carole Jenny

14  Exhibit Number 9, we have here a composite exhibit, but I will

15  direct your attention to the first page, which on the bottom

16  right-hand corner is Bates stamped Pediatrician 12.  Do you

17  see that there?

18  A   Yes.

19  Q   Now on the right-hand side in the middle of the page, does

20  it reflect those Apgar scores?

21  A   Yes, it does.

22  Q   And at what time after birth are the Apgar scores taken?

23  A   One and five minutes.

24  Q   Then was there another one also taken at ten minutes?

25  A   Yes.

Jenny - direct

1    Q    Immediately to the left there?

2    A    Yes, yes.

3    Q    And what were the scores for all?

4    A    They were all 9s.

5    Q    Now, do the records also reflect that a neonatologist was

6    brought into the delivery room?

7    A    Yes.

8    Q    What was that for?

9    A    They noted some staining of the amniotic fluid with

10   meconium.

11   Q    What is meconium?

12   A    It's baby poop.

13   Q    A medical term?

14   A    Yes.

15   Q    Now, what is the -- what was the significance of that?

16   A    Well, if meconium gets -- if the baby is born and

17   aspirates meconium and it gets below the vocal cords, it can

18   cause very severe pneumonia and very, very dangerous lung

19   disease.

20   Q    Did that happen here?

21   A    It did not.

22   Q    Did Isabella receive any sort of oxygen supplementation

23   after her birth?

24   A    Yes, for a few minutes, blow-by.

25   Q    What is the significance of that?

Jenny - direct

1  A    I mean, most babies get that.  It just pinks them up.

2  Q    How was Isabella's birth weight?

3  A    It was 50th percentile, I think.  It was perfectly normal.

4  Q    How about her newborn screening test?

5  A    Her newborn screening test for metabolic disease and

6  hearing were normal.

7  Q    Now, did Isabella come out with an occipital caput and

8  cephalohematoma?

9  A    Yes.

10  Q    What are those?

11  A    Caput is just a little bit of swelling on the back of the

12  head.  Babies often have kind of pointy-looking heads from the

13  journey down the vaginal canal, in the birth canal.

14         And cephalohematoma is a small amount of swelling on

15  the outside of the skull, on a membrane between the skull and

16  the bone itself, again, caused by traction on the skull during

17  the birth process.

18  Q    What is the significance of those two things?

19  A    They're very common.  I mean, we see them in lots of kids.

20  You note them in the record.  And, in general, you would note

21  them in the record, and then in a baby who is doing well, it's

22  of no significance.

23  Q    Did Isabella receive any sort of special treatment as a

24  result of that cephalohematoma and occipital caput?

25  A    No.

Jenny - direct

1  Q   Did she spend any time in the neonatal intensive care unit

2  at any time as a result of her delivery?

3  A   No.

4  Q   What is the typical length of hospital stay for a normal

5  newborn?

6  A   Two days.

7  Q   How long was Isabella in the hospital for?

8  A   Two days.

9  Q   What was her discharge diagnosis?

10  A   Normal newborn.

11  Q   I will direct your attention to Respondent's Exhibit

12  Number 9.  It's the second page in that exhibit.

13          In the bottom right-hand corner, it's Bates stamped

14  Hinsdale IZ 17.  Does that record reflect --

15          Tell me when you're ready.

16  A   Okay.

17  Q   Does that record reflect the diagnosis of normal newborn?

18  A   Yes, it does.

19          THE COURT:  Hang on a second.  Which one are you on?

20          MR. TELISMAN:  Number 9, your Honor.

21          THE COURT:  Oh, 9, still on 9.  I'm sorry.

22          MR. TELISMAN:  The second page of that.  It's

23  Hinsdale IZ 17.

24          THE COURT:  Thanks.  Because I was hunting for it, I

25  didn't catch the question or the answer.  Can you put your

1  question again?

2          MR. TELISMAN:  Sure.

3  BY MR. TELISMAN:

4  Q   What does the record reflect the diagnosis for Isabella?

5  A   Normal newborn.

6          THE COURT:  All right.

7          MR. TELISMAN:  Just for the benefit of your Honor and

8  the record, when it comes to the records, I tried to make

9  them group exhibits by subject matter.

10         THE COURT:  Okay.

11 BY MR. TELISMAN:

12 Q   Dr. Jenny, did you also review Isabella's pediatric

13 records prior to her collapse on December 27th, 2002?

14 A   Yes.

15 Q   Could you please describe her health and development up

16 until December 27th, 2002?

17 A   On her well-child exams, she was described as a healthy

18 child.  Her development was normal; her growth was normal.

19 There were no problems described on her well-child exam.

20 Q   First, directing your attention again to Respondent's

21 Jenny Exhibit 9, the following page, which is listed as

22 Pediatrician 3, what do we have here?

23 A   This is her one-month well-child exam.

24 Q   Under Assessment and Plan, what does it say?

25 A   "One-month-old female healthy."

Jenny - direct

1   Q    And the next page in the same exhibit, Pediatrician 04,
2   what do we have there?
3   A    "Two-month-old female healthy."
4   Q    And this is for the pediatric two-month evaluation?
5   A    Yes.
6   Q    Now, between those two, did Isabella have to go to the
7   hospital?
8   A    Yes, she did.
9   Q    What happened?
10  A    She had a fever.
11  Q    What was the -- and what was the reason for going to the
12  hospital?
13  A    Well, whenever a child six weeks of age has a fever over
14  102, they immediately get admitted to hospital because infants
15  are very susceptible to bacterial infections and they haven't
16  developed the antibody response it would take to fight an
17  infection.  So they can be overwhelmed by bacteria in a very
18  short period of time.
19         So it's routine standard that any infant who has a
20  fever in this age group up to eight weeks of age, they go to
21  the ED, they get spinal tap, they get blood cultures and urine
22  cultures.  They get put on antibiotics for two days.  And when
23  the cultures come back negative, by then they're almost always
24  a hundred percent normal, and they get sent home.
25  Q    But in this case --

Jenny - direct

1    A    It's a routine conservative care.

2    Q    And this happened when Isabella was approximately six

3    weeks old; does that sound about right?

4    A    Yes.

5    Q    When Isabella went to the emergency department, what

6    happened to her fever?

7    A    It was down.

8    Q    And, in fact, were the cultures taken?

9    A    Yes.

10   Q    What were the results of the cultures?

11   A    They were all normal.

12   Q    Directing your attention to the following page in the same

13   exhibit that is Bates stamped Pediatrician 5, on the left-hand

14   side under the column Significant Diagnoses Or Conditions,

15   what is the notation right beneath that?

16   A    "Fever six-week-old, 10/2 admitted to CH for rule out

17   sepsis, work-up negative.

18   Q    In fact, could that be EH for Edward Hospital, if you

19   know?

20   A    Oh, EH.  I thought it was Children's Hospital.  I'm sorry.

21   Q    And so the work-up was negative?

22   A    Yes.

23   Q    Did the records reflect that Isabella had an elevated

24   platelet count when she was in the hospital at that time?

25   A    I believe so, yes.

Jenny - direct

1  Q   What is the significance of that?

2  A   Again, it's very common in any baby with a fever.

3  Q   Did the doctors find it necessary to treat her for that?

4  A   No.

5  Q   Now, after that we talked about the two-month well-child

6  visit being normal, and then on December 18th of 2002, did

7  Isabella again get sick?

8  A   Yes.

9  Q   Directing your attention to the following page in the same

10 exhibit, the one that says Pediatrician 36 on the bottom

11 right-hand corner --

12 A   Okay.

13 Q   -- is this the medical record from that date from that

14 doctor visit?

15 A   Yes.

16 Q   So what was wrong with Isabella?

17 A   She had a fever the evening before, an occasional cough.

18 She was hoarse.  And she had -- they talked that she had a

19 hospitalization at six weeks which was negative.

20        They described her as alert and smiling, but she had

21 moderate redness on her left tympanic membrane, or her

22 eardrum, so the nurse practitioner said that she had left

23 otitis media, or ear infection, and treated her with

24 amoxicillin.

25 Q   What is amoxicillin?

Jenny - direct

1  A    It's an antibiotic.

2  Q    Now, how were Isabella's parents about bringing Isabella

3  to her pediatric well visits?

4  A    They were -- they were always present.  There was no

5  evidence of any medical neglect.

6  Q    How were the parents about notifying the pediatrician

7  about changes in Isabella's conditions?

8  A    They made several phone calls to the nurse line about, you

9  know, not having stools or unusual -- unusual things in her

10 routine.

11 Q    So up to this point, what was Isabella's health like?

12 A    She was a normal baby.

13 Q    What about the fever in October of 2002 and the ear

14 infection in December of 2002?  Are babies expected to get

15 sick like this during their first three and a half months of

16 life?

17 A    Especially if they have older siblings.  The average

18 healthy child with an older sibling gets at least eight viral

19 infections in the first year of life.  So to get one every

20 month or so is not unusual.

21 Q    In fact, did Isabella have an older brother at home?

22 A    She had a four-year-old brother, yes.

23 Q    Now, Dr. Jenny, I'd like to ask you questions regarding

24 Isabella's head circumference.

25          During the first three-and-a-half months of

Jenny - direct

1    Isabella's life, what was the growth of her head like?

2    A    Well, she started off at about the 50th percentile, and

3    then over the first month and a half increased to the 90th and

4    then grew consistently at the 90th until her catastrophe at

5    the end of December.

6    Q    What factors affect the initial head circumference

7    measurement at birth?

8    A    Well, the nature of the birth, the delivery, whether or

9    not there was molding or pushing the plates of bone in the

10   head together.

11   Q    How did that happen?

12   A    From coming down the birth canal.

13            And after that sort of equalizes and everything kind

14   of goes back to normal, then most kids will get on a

15   parameter, on a growth parameter, and continue to grow very

16   consistently on that parameter.

17   Q    Other than molding, what other -- what else will help to

18   determine the baby's head circumference at the point of birth?

19   A    Well, all of the growth parameters at birth represent --

20   highly represent intrauterine conditions.

21   Q    By that what do you mean?

22   A    Well, by, you know, the nutrition, the amount of space,

23   how the uterus grew and whatever.  After birth the child then

24   begins to demonstrate their genetic potential, assuming that

25   they're well-fed and well-nourished.

Jenny - direct

1   Q   Now, did you make a chart of Isabella's head circumference
2   progression?
3   A   Yes.
4   Q   I would like to direct your attention now to Respondent's
5   Carole Jenny Exhibit 11, and the first two pages of that.
6           That first page, what does that reflect?
7   A   The first page is the child's height and weight with all
8   of the parameters that were listed in the medical records.
9   Q   And who authored this -- I don't want to say authored.
10          Who put the points in on this record?
11  A   I did.
12  Q   Where does the actual chart itself come from?
13  A   Well, this particular chart that I put the values on?
14  Q   Yes.
15  A   This is the standard CDC World Health Organization growth
16  charts for children zero to two.
17  Q   Now, turning to the next page, did you also plot the dots
18  on these charts as well?
19  A   I did.
20  Q   And where did the chart come from?  Is this from the same
21  place?
22  A   Yes.
23  Q   The Centers For Disease Control and World Health
24  Organization?
25  A   Yes.

Jenny - direct

1   Q   And here on the top of this second page in this exhibit,

2   does this show the plotting that you did for Isabella's head

3   circumference?

4   A   Yes.

5   Q   Can you please walk us through the plots?

6   A   Well, she was again the 50th percentile at birth and 75th

7   at one month.

8           At two months she hit 90th and stayed there.  There's

9   a mistake on the chart -- I didn't have any White Out -- where

10  there's one odd point that is in the wrong place.  I tried to

11  scratch it out, but that high point is not supposed to be

12  there.

13  Q   Okay.

14  A   It's my mistake.

15  Q   I apologize.  I think maybe we got into this without me

16  kind of asking you to explain the chart a little bit.

17          What do we have on the X axis?

18  A   On the X axis is the child's age.

19  Q   And on the vertical, the Y axis, what do we have?

20  A   Is the circumference of the head, the occipital frontal

21  circumference.

22  Q   And we have these wavy lines, the curved lines, that go

23  through the middle of the chart there.  What do those reflect?

24  A   Those are percentile norms for populations of children.

25  Q   And how do you plot?  How do you plot those dots?

1   A   Well, you take whatever the person measured at whatever

2   particular age, and then you put them on the graph.

3   Q   And what do --

4           And then how do you use those wavy lines, or the

5   curved lines?  What does that signify?

6   A   Well, it just tells you what that particular child's --

7   what percentile track that child is growing on compared to all

8   other children.

9   Q   Okay.  So at birth we have -- it looks like it's somewhere

10  between 33 and 34 centimeters, is that right?

11  A   Yes.

12  Q   And then at one month where I guess we have -- hold on one

13  second actually.  We can do this a little bit easier.

14          Directing your attention to the next page on the

15  exhibit that's marked Hinsdale IZ 24, on the top right-hand

16  corner, what does that indicate?

17  A   33 and a half centimeters for her birth head

18  circumference.

19  Q   And at the very bottom where it says "first exam," that

20  little box there at the bottom, how old was Isabella at the

21  time of this?

22  A   Two hours.

23  Q   And then the next page in the exhibit that is marked

24  Pediatrician 3, near the top where it says Pediatric One-Month

25  Evaluation, two lines down from there where it says HC?

Jenny - direct

1   A   Head circumference was 14 and three-quarters inches.

2   Q   That was on October 8, 2002, is that right?

3   A   Yes.  No.  9/6/02.

4   Q   9/6/02, is that her birthdate actually?

5   A   I'm sorry.

6   Q   The top left-hand corner, does it reflect the date?

7   A   What --

8   Q   Are we on Pediatrician 03 on the bottom right-hand corner?

9   A   Pediatrician 03.

10  Q   On the top.

11  A   Oh, that's her date of birth.  I'm sorry.  Excuse me.

12  Yes.

13  Q   In the top left-hand corner of that, that record -- the

14  top left-hand corner, does it reflect --

15  A   10/8.  I'm sorry.

16  Q   Very good.

17          And then the following page, Pediatrician 04, what

18  date is this record?

19  A   11/11.

20  Q   What was her head circumference on 11/11?

21  A   15 and seven-eighths inches.

22  Q   And then the next page here, what is the date of this

23  record?

24  A   This is --

25  Q   Just for the record, it's Provena 45.

Jenny - direct

1   A    It's the day that she was admitted to the intensive care

2   unit, the 27th of December.

3   Q    In fact, Isabella only spent one day at Provena, correct?

4   A    Yes.

5   Q    December 27th, 2002?

6   A    Yes.

7   Q    What was her head circumference if you look under Patient

8   Assessment about four lines down?

9   A    42 centimeters.

10  Q    So going back to your chart, you talked there about how --

11          Now, did you plot those lines on the chart, those

12  dots on the chart?

13  A    I did.

14  Q    Now, in looking at just past the three-month mark, you

15  have just -- somewhere between three and four months, you do

16  have a dot at around 42 centimeters, is that right?

17  A    Yes.

18  Q    And then the one after that, that looks kind of like a

19  smudge above it?

20  A    That's my mistake.

21  Q    Okay.  Does that reflect Isabella's head circumference at

22  all?

23  A    No.

24  Q    What about the dots that follow?

25  A    Those were from the record.

Jenny - direct

1    Q    And those occurred after her collapse?

2    A    Yes.

3          THE COURT:  So which one is the one from the -- which

4    one is the one that you took from the Provena record on her

5    admission on 12/27?  Which dot?

6          THE WITNESS:  It's between three and four months.

7          THE COURT:  So it's the one right --

8          THE WITNESS:  It's the fourth dot from the left.

9          THE COURT:  It's the one more or less below the

10   smudge?

11         THE WITNESS:  Yes, to the left of the smudge.

12         THE COURT:  Where does the one immediately to the

13   right of that one, in other words, sort of southeast of the

14   smudge, come?

15         THE WITNESS:  That is also from the hospital record.

16         THE COURT:  Also from the hospital, okay.  All right,

17   thanks.

18   BY MR. TELISMAN:

19   Q    Now, Dr. Jenny, what do the records reveal about

20   Isabella's collapse on December 27th, 2002?

21   A    The record said that she was perfectly healthy in the

22   morning, that she had a normal feed between 8:00 and 10:00,

23   that she napped.

24   Q    What is the significance of the normal feed between 8:00

25   and 10:00?

Jenny - direct

1    A    Well, that's something we don't expect a child who has a
2    severe and near fatal brain injury to be able to do.  It takes
3    coordination to suck and to swallow, to understand that you're
4    hungry, to be awake and alert, and, you know, coordinate those
5    muscular events.
6              And so that would indicate to me that at that point
7    she was functioning normally.
8    Q    During that time period up until the point where she
9    collapsed, whose care was she under?
10   A    From 8:00 in the morning until 1:00 in the afternoon, she
11   was with Ms. Del Prete.  Del Prete.
12   Q    Now, did the petitioner Jennifer Del Prete provide an
13   account of what happened to Isabella immediately before her
14   collapse?
15   A    Yes.
16   Q    And during her collapse?
17   A    Yes.
18   Q    Could you please describe for the Court what she stated?
19             THE COURT:  Let's do this first.  Why don't you
20   elicit the specific source from which she draws the account.
21             MR. TELISMAN:  Sure.
22             THE COURT:  Because it relates to a question I'm
23   going to ask people about later.
24   BY MR. TELISMAN:
25   Q    Dr. Jenny, where did you get the information regarding

Jenny - direct

1    Jennifer Del Prete's account of what happened to Isabella?

2    A    Well, there were some interviews by the police officers of

3    her.  That's where her quotes were from.  And the mother

4    described in medical records to the doctors what she knew of

5    the events.

6            THE COURT:  So when you say the interviews by the

7    police officers, what are you actually looking at?

8            THE WITNESS:  The interviews that were done by --

9            THE COURT:  You're looking at a police report.

10           THE WITNESS:  The police report, yes.

11           THE COURT:  When you're talking about the mother's

12   statement to the doctors, what are you looking at?

13           THE WITNESS:  The medical history that's recorded in

14   the medical record.

15           THE COURT:  All right, thanks.

16   BY MR. TELISMAN:

17   Q    So what did the petitioner report happened?

18   A    It was a little confusing and there were some differences

19   in the report.

20           The child -- she took the child and changed her

21   diaper -- the child had had a bowel movement and made a

22   mess -- changed her diaper.

23           She propped her up on a pillow on the couch.  And

24   then one report said she then went to the kitchen to warm a

25   bottle.  Another report said she walked across the room to

1  pick up a burp cloth.  She came back to find the child limp

2  and with her eyes rolled back.

3        The sequence of events again differed in the reports,

4  but there were described her trying to stimulate the child,

5  picking the child up and very gently shaking and calling her

6  name, putting her over her knees and patting her on the back

7  in case she was choking, and attempting to feed her even

8  though the child was not alert or awake and was limp.

9  Q   What is the significance there in terms of the

10 petitioner's description of what had happened?

11 A   Well, there were differences in the sequence and of the

12 events.  I didn't understand why you would prop a baby up on

13 pillows on a couch.  That seemed to me to be kind of a

14 dangerous thing to do, a three-month-old baby.

15       And then I also found it hard to understand why, if a

16 baby was unconscious, you would try to feed it.  It seemed

17 like that would be just the opposite of what a person would

18 do.

19 Q   In her account of what happened, did the petitioner ever

20 say that Isabella accidentally fell or suffered some sort of

21 accidental trauma?

22 A   No.  There was no history of trauma.

23 Q   Did the police specifically ask her?

24 A   Yes.

25 Q   What do the records reveal about Isabella's condition when

Jenny - direct

1  the EMS arrived at the day care?

2  A   She was in full cardiac arrest.  She was -- she had no

3  heart rate.  She was not breathing.  She was blue.  She was

4  limp.  She was unconscious.

5  Q   What did they do to revive her?

6  A   They intubated her.

7  Q   What does that mean?

8  A   They put a tube down her throat and ventilated her and

9  they gave her epinephrine to revive her heart rate.

10  Q   How many times did they have to administer epinephrine to

11  her to revive her?

12  A   Twice.

13  Q   How much time elapsed between the point where the

14  petitioner called 911 and the paramedics brought Isabella to

15  the hospital?

16  A   According to the records, it was about 20 minutes.

17         THE COURT:  20 minutes between what time?

18         THE WITNESS:  The time the call was made until the

19  time she arrived at the ED.

20         THE COURT:  Between the time she arrived at the ED.

21  So, in other words, in between there is when the EMTs came and

22  got her.

23         THE WITNESS:  I believe that's right, yes.

24         THE COURT:  All right.

25  BY MR. TELISMAN:

Jenny - direct

1   Q   And, in fact, the EMTs responded within, I think -- well,
2   you tell me.
3   A   Five minutes, six minutes.
4   Q   It was fast, right?
5   A   It was very quick, yes.
6   Q   What was Isabella's body temperature when she arrived at
7   the hospital?
8   A   I was a little confused about that.  I thought it was
9   93.1, but apparently the first record was 93.1 Fahrenheit.
10  Q   I'm sorry.  The first one was?
11  A   I'm sorry.  95.1 Fahrenheit.
12  Q   And directing your attention now to Respondent's Carole
13  Jenny Exhibit 12 -- or pardon me -- 13, 13.
14          Is this one of the triage records from Provena St.
15  Joseph Medical Center?
16  A   Yes.
17  Q   And on the top left part of the page, and just so that
18  we're clear, Isabella, she only spent one day at Provena St.
19  Joseph Medical Center, right?
20  A   Yes.
21  Q   And that was --
22  A   And not even a full day.
23  Q   Right.  December 27th, 2002?
24  A   Yes.
25  Q   And looking on the top left part of that record, what time

Jenny - direct

1    does it say under box Hour?

2    A    14:02.

3    Q    Now, looking at the right-hand side near the top, what is

4    the temperature that's given there?  Do you see where it

5    says --

6          Underneath where it says Private Physician on the

7    right-hand side, there's a BP and then a P and a few other

8    things, and it says T?

9    A    I'm still looking for it.

10   Q    I apologize.

11         THE COURT:  I can see it's 95.1.  It's right next to

12   where it says --

13         THE WITNESS:  Got it.  Thank you.

14   BY MR. TELISMAN:

15   Q    What about her serum pH?

16   A    Her pH was, I think, 7.18 initially.

17   Q    Is that reflected on the next page on that exhibit,

18   Provena 22?

19   A    7.18, yes.

20   Q    And that's reflected in about the middle of the page under

21   where it says "blood gases"?

22   A    Yes.

23   Q    And at what time was that taken?

24   A    14:10.

25   Q    What is serum pH?

1  A   That's the acidity of the blood, the amount of acid in the

2  blood.

3  Q   What does it indicate here?

4  A   It means that she was very acidotic.  She had a large

5  amount of acid in her blood.

6  Q   What causes that?

7  A   Respiratory arrest, tissues breaking down, not ventilating

8  the body, not being able to blow off $CO_2$.

9  Q   What is the significance of these findings in the context

10 of considering a diagnosis of abusive head trauma?

11 A   Well, I found this pretty stunning because this generally

12 is what we see in a child who has been down for quite a period

13 of time.  You know, when you see a pH that low, that generally

14 indicates that the child has been in full arrest for a

15 substantial period of time.

16 Q   And is it something you can specifically quantify?

17 A   You know, it's a clinical observation you make, and

18 certainly that's why you get blood gases first thing, to get a

19 sense of just how severe this is.

20        But, you know, when you have a kid come in from an

21 automobile accident and they're brought right in, it's more

22 likely to be 737, 725, but 718 is extremely and dangerously

23 low.

24 Q   Now, what did the doctors do at Provena St. Joseph Medical

25 Center to treat Isabella?

Jenny - direct

1  A    They put her on a ventilator.  They established her heart

2  rate and rhythm.

3          They did quite a few diagnostic tests, including a

4  spinal tap, and their initial diagnosis was sepsis, rule out

5  sepsis, that she had an overwhelming infection, and so they

6  started her on antibiotics.

7  Q    What did the spinal tap reveal?

8  A    The spinal tap had some red blood cells and no white blood

9  cells, no organisms and negative viral and bacterial cultures.

10 Q    What is the significance of the no white blood cells?

11 A    Well, she clearly didn't have meningitis because to have

12 meningitis, you have to have inflamed meninges, and zero white

13 blood cells means there was no inflammation at that point of

14 her meninges, of the coverings of her brain.

15 Q    What does the finding of no white blood cells at that

16 point indicate with respect to the possibility of infection

17 causing cortical venous thrombosis in her brain?

18 A    She did not have a cerebral brain infection at that point

19 because you can't have a brain infection with zero white blood

20 cells in your spinal fluid.

21 Q    Now, in addition to the spinal tap, were there also

22 cultures taken of other fluids?

23 A    Yes, they did blood and urine cultures.

24 Q    What were the findings of those cultures?

25 A    Those were negative.

Jenny - direct

1   Q   What was -- what were -- what was Isabella's white blood

2   count level in her blood?

3   A   It was elevated.

4   Q   What is the significance of that?

5   A   Again, that could be infection, that could be trauma, that

6   could be stress.

7       It's a very common finding in children who arrive in

8   the emergency room in extremis.

9   Q   What did the blood test reveal about Isabella's platelet

10  count?

11  A   Her platelet count was also high.

12  Q   What is the significance of that?

13  A   Again, that's a reactive -- what we call an acute phase

14  reactant.  It means that she was very stressed and her body

15  was responding vigorously.

16  Q   Did the clinical picture show that sepsis was likely at

17  this point?

18  A   No.

19  Q   Could you please explain?

20  A   Well, she didn't have a high fever.  She didn't have

21  chills.  None of her cultures were positive.  She didn't go on

22  to exhibit, you know, signs or symptoms of diffuse sepsis.

23  Q   Was there also a CT scan ordered?

24  A   Yes.

25  Q   What did it show?

Jenny - direct

1    A    It showed acute and chronic subdural hemorrhages.

2    Q    What is the significance of that?

3    A    Well, something happened to her head that caused her to

4    bleed between the skull and the brain.

5    Q    The acute blood that was found there, is that just

6    rebleeding of the chronic subdural hemorrhage?

7    A    No.

8    Q    Why not?

9    A    Well, it was in the wrong location, and there was too much

10   of it.

11   Q    What do you mean?

12              First off, when you say it was in the wrong location,

13   what do you mean by that?

14   A    It was along the falx, along the midline of the skull, of

15   the brain, and along the tentorium, which is the membrane that

16   separates the back of the brain from the two frontal parts of

17   the brain.

18   Q    Where was that in relation to where the chronic subdural

19   hemorrhage was?

20   A    The chronic subdurals were mostly over the convexities of

21   the brain over on the sides.

22   Q    So when you say --

23              And I apologize for not having something for you

24   here, but when you say the convexities of the brain, you

25   pointed to --

Jenny - direct

1  A   The round parts, you know, out on -- from the sides, on

2  the side in the temporal region and the parietal region.

3  Q   Where the logo of a team would be on a football helmet

4  maybe?

5  A   Yes, that's good enough.  A little higher actually,

6  probably.

7  Q   A little higher than that?

8  A   Yes.

9  Q   How about the --

10         When you described the falx, f-a-l-x, is that right?

11 A   Yes.

12 Q   Is that sometimes referred to as the Mohawk?

13 A   Yes.  I guess you could call it that.

14         It's a large collecting conduit for blood, venous

15 conduit for blood, within the layers of the dura.

16 Q   Does it run along the --

17 A   The midline of the brain.

18 Q   The midline, which is where a person's Mohawk would be if

19 they were --

20 A   Right, but it goes down further into the brain between the

21 two frontal lobes.

22 Q   Okay.  And you also said too much blood, that that's a

23 reason why this wasn't just a rebleed.  What do you mean by

24 that?

25 A   Well, when we see --

Jenny - direct

1    We see rebleeds very commonly in children who have

2    had severe brain injury of either birth or trauma or post-

3    infection.  And particularly as their brain kind of shrinks,

4    you know, nature pours a vacuum, and so you're not going to

5    end up with just an empty space when that brain starts to

6    recede.  And so those chronic subdurals fill that space.

7    And the membrane around the subdural has little, tiny

8    capillaries in it that can be disrupted and bleed, but you see

9    just a little outline around the preexisting subdural.  And

10   those kids don't change their clinical status.  This is a tiny

11   amount of blood that doesn't cause them to have brain injury,

12   doesn't cause them to decompensate.

13   Q    Now, what causes --

14   In a case of abusive head trauma, what causes the

15   blood to collect in that subdural space?

16   A    Ruptured vessels.

17   Q    How much blood do the ruptured vessels -- I'm sorry.

18   Are we talking about bridging veins here?

19   A    Yes.

20   Q    How large are bridging veins in comparison to the

21   capillaries that you were talking about earlier on a chronic

22   subdural?

23   A    The capillaries and the membranes around the subdural

24   carry much less blood than a bridging vein.  A classical

25   bridging vein would carry 90,000 times the amount of blood

Jenny - direct

1  that a capillary would carry.  Blood goes through capillaries
2  literally one cell at a time.
3  Q  So in comparison to these capillaries, bridging veins are
4  large?
5  A  Well, in comparison.  They're not large compared to
6  arteries or to the iliac vein or some of the other veins in
7  the body.  But compared to capillaries, they carry quite a bit
8  more blood.
9  Q  And the rate of blood flow that goes through the bridging
10  veins, how is it compared to, first off, compared to the
11  capillaries on the membrane of a chronic hemorrhage?
12  A  It's thousands of times higher.
13  Q  What about compared to something like an artery?
14  A  Many, many times smaller.
15  Q  Will tearing a bridging vein necessarily result in a
16  massive amount of bleeding?
17  A  No, but it will cause bleeding, but generally it doesn't
18  cause so much bleeding that the child needs emergency surgery.
19  Q  Now, when there is an -- actually, pardon me.  Let me ask
20  it this way.
21      When the acute blood was found in Isabella's subdural
22  space there, was that blood -- can that blood just roam
23  throughout the subdural space?
24  A  There are three compartments in the brain, and you don't
25  trade blood between the compartments.  There's a right side, a

Jenny - direct

1    left side, and then the posterior fossa.

2              So there's three distinct compartments.  And you

3    would not see, say, blood from the right compartment trickling

4    down into the posterior fossa.

5    Q   The new blood that was found in Isabella's subdural space,

6    was it found in more than one compartment?

7    A   Yes.

8    Q   What is the significance of that?

9    A   Well, there was rupture of veins in more than one

10   compartment.

11   Q   Now, did you review the report of Dr. Jan Leestma, one of

12   the petitioner's experts?

13   A   Yes.

14   Q   In his report does Dr. Leestma say that he identified what

15   he called neomembranes?

16   A   Yes.

17   Q   What are those?

18   A   Well, when you have chronic subdurals, the body attempts

19   to heal the subdural by surrounding that blood clot with a

20   fibrous, a very thin fibrous membrane, and then very tiny,

21   little capillaries go into that area to speed healing and to

22   deliver healing cells through that membrane.

23   Q   Was rebleeding the cause of Isabella's brain injury?

24   A   No.

25   Q   Did rebleeding cause Isabella's collapse on December 27th,

Jenny - direct

1    2002?

2    A    No.

3    Q    Why not?

4    A    Well, rebleeding, again, is a small amount of blood.  It's

5    similar to saying that you could bleed to death from picking

6    at a scab, and the amount of blood that would come out of

7    those capillaries would not cause an acute and serious

8    collapse.

9    Q    How about the size of the chronic hemorrhage, did that

10   cause Isabella's collapse on December 27th, 2002?

11   A    No.  It was not a large hemorrhage.

12   Q    Had the -- pardon me.  Let me rephrase that.

13            Did the chronic hemorrhage grow in subsequent

14   imaging?

15   A    Actually it got better initially.  It improved over the

16   first few weeks, and then as she developed kind of a shrinking

17   brain, the hemorrhage stabilized, or the hematoma, the

18   material that was left over, stabilized.

19   Q    What can cause a subdural hemorrhage to grow, a chronic

20   subdural hemorrhage to grow?

21   A    It you have repetitive small, little bleeds into the

22   original cavity, over a period of time you can gradually

23   accumulate more blood products and more liquid --

24   Q    Pardon me.  Please continue.

25   A    -- over, you know, weeks to months.

Jenny - direct

1  Q   Can cerebral spinal fluid enter into a chronic hemorrhage?

2  A   It shouldn't unless you have a tear in the arachnoid,

3  unless you have an acute arachnoid tear.

4  Q   Can trauma cause damage to an arachnoid membrane?

5  A   Yes.

6  Q   Now, Dr. Jenny, when Isabella was at Provena, was she

7  given an EEG?

8  A   Yes.

9  Q   What is an EEG?

10 A   It's a way of measuring the electrical activity of the

11 brain cells.

12 Q   Does it test for seizures?

13 A   Yes.

14 Q   How so?

15 A   Well, when you look at the brain wave patterns on the EEG,

16 when there is abnormal electrical activity, which is what a

17 seizure is, you will see very unusual looking waves and spikes

18 on the EEG.

19 Q   Why was Isabella given an EEG at Provena?

20 A   She had some unusual movements, and the nurses were

21 concerned that she was having seizures.

22 Q   I don't know if I asked you this.  What does EEG stand

23 for?

24 A   Electroencephalogram.

25 Q   What were the results of that EEG at Provena on

Jenny - direct

1  December 27th, 2002?

2  A   It showed that she had a generally sick brain.  She had

3  slow waves and suppressed waves but there were no seizure

4  focuses found, fossae found.

5  Q   Directing your attention to Respondent's Carole Jenny

6  Exhibit 14, the first page there in that exhibit with the

7  Bates stamp Provena 19.  Do you see that?

8  A   Yes.

9  Q   What do we have there?

10  A   It's a result of an EEG taken on the 27th of December.

11  Q   Now, under Interpretation it says "abnormal EEG"?

12  A   Yes.

13  Q   And what is the abnormal finding there?

14  A   Severely suppressed with low amplitude waves and

15  frequency, which was consistent with a severe diffuse

16  encephalopathy or very sick brain.

17  Q   Was there any indication of a seizure?

18  A   No.

19  Q   Now, that same day was Isabella then transferred to the

20  University of Illinois at Chicago Hospital?

21  A   The next morning, at 2:00 in the morning, I think it was.

22  Q   What do the records reveal about Isabella's neurological

23  condition after she arrived at UIC?

24  A   She was devastated.  She was unconscious.  She was

25  minimally reactive.  Her pupils were fixed and dilated.  She

1    was getting stiff.

2    Q    Now, with respect to neurological intervention, what did

3    the doctors find?

4    A    The neurologists at University of Chicago?

5    Q    Yes.

6    A    That she had very severe brain damage and a very poor

7    prognosis.

8    Q    Did Isabella also undergo a neurological consult?

9    A    Yes.

10   Q    What was the purpose of that?

11   A    To have the neurologist look at her case and make

12   suggestions about a further diagnostic work-up that had to be

13   done, to make sure that an organic cause wasn't underlying the

14   child's illness.

15   Q    What sort of work-up was ordered at UIC?

16   A    They did a really extensive metabolic work-up.  They

17   literally tested for everything.  They tested for lots of

18   inborn errors of metabolism, inherited, genetic and metabolic

19   diseases.

20   Q    Now, directing your attention to Jenny Exhibit 2, which is

21   your report, on page 15 of that report -- pardon me -- page 14

22   of that report, did you produce a chart?

23   A    Yes, 14 and 15.  It goes on.

24   Q    What does that chart represent?

25   A    I made a list of all of the inborn errors of metabolism,

Jenny - direct

1    all of genetic and metabolic diseases that the neurologist

2    asked the child be tested for.

3    Q    What were the results of all these tests?

4    A    They were all normal.

5    Q    Did Isabella exhibit any signs or symptoms of any genetic

6    diseases?

7    A    No, she did not.

8    Q    What types of things would you look for?

9    A    Joint laxity; unusual spots, you know, dark spots or light

10   spots on her skin; again, abnormal testing when these various

11   things are done; ongoing seizures, uncontrollable seizures.

12   Q    Do the records reflect that the doctors looked for these

13   things?

14   A    Yes.

15   Q    And what did the records find?

16   A    They found no evidence of a chronic underlying metabolic

17   or genetic disease.

18   Q    What about any signs or symptoms of autoimmune disorders,

19   or is that the same thing?

20   A    That's different, but they did not find that either.

21   Q    Now, you just mentioned seizures there, also.

22        Did the treating physicians at the University of

23   Illinois at Chicago Hospital, did they conduct further EEG

24   testing?

25   A    Yes.

Jenny - direct

1    Q    What did the EEG testing reveal?

2    A    She never had seizures diagnosed on EEG.

3    Q    Did the doctors also check for infection at UIC?

4    A    Yes.

5    Q    What did they find?

6    A    Well, they again repeated cultures on several occasions

7    and found no evidence of an underlying infection.

8    Q    At some point while at UIC Hospital, did Isabella contract

9    an infection while there?

10   A    Yes, she did get a pseudomonas eye infection,

11   conjunctivitis, pink eye, caused by a bacteria.

12   Q    And what happened to that?

13   A    They didn't treat it.  It went away on its own.

14           Pseudomonas is a very common hospital-acquired

15   organism that kind of lives in hospitals, and it's not

16   uncommon to get a superficial infection with that particular

17   organism.

18   Q    Did a hematologist also evaluate Isabella at UIC?

19   A    Yes.

20   Q    What did he find?

21   A    He found no evidence of an underlying bleeding disorder,

22   and he suggested some extra tests that should be done.

23   Q    And is the hematologist's report reflected in Respondent's

24   Carole Jenny Exhibit 15?

25   A    Yes.

Jenny - direct

1   Q   Now, while at UIC did the doctors also examine the
2   morphology of Isabella's blood cells?
3   A   They did.
4   Q   What is the purpose of that test?
5   A   To see if there is underlying genetic problems with the
6   blood cells.
7   Q   What types of cells were examined?
8   A   Red cells, white cells and platelets.
9   Q   What were the results?
10  A   The red cells had various morphologic issues that were
11  associated with a child who's had bleeding and been critically
12  ill, and it improved over time.
13          The white cells occasionally had what we call toxic
14  granulations which, again, is a sign of stress, but not
15  specific.
16          And the platelet morphology showed increased
17  platelets, but they mentioned no morphological problem with
18  the platelets.
19  Q   Now, you just mentioned the platelet counts.  You said
20  that they showed increased platelets?
21  A   Yes.
22  Q   So Isabella's platelet levels were above normal there?
23  A   Yes.
24  Q   What is the significance of that?
25  A   You know, in a child whose platelets counts return to

Jenny - direct

1    normal when the stress is removed, it's not significant at
2    all.  If they stayed elevated once she got through the acute
3    illness, then that would be a concern that she had some
4    primary thrombocytosis.
5    Q    What sort of -- what type of thrombocytosis did Isabella
6    have?
7    A    She had reactive or secondary thrombocytosis.
8    Q    How you know that?
9    A    Well, because it went away.
10   Q    So were there -- so did some of the --
11        You said before that some of the platelet level
12   counts revealed -- the tests revealed that her platelet levels
13   were elevated?
14   A    Yes.
15   Q    Were there other tests that revealed that her platelet
16   levels were normal?
17   A    Yes.
18   Q    Now, directing your attention to Respondent's Carole Jenny
19   Exhibit 17, the first page of that -- actually, pardon me.
20   The first page of that is from Children's.
21        I will return to that in just a minute.
22        Did the records reflect what was the cause, likely
23   the cause, of Isabella's high platelet counts?
24   A    I'm not sure it was addressed, but I don't recall.
25   Q    Okay.  Directing your attention -- I apologize for

Jenny - direct

1  bouncing around a little bit here -- but Respondent's Carole
2  Jenny Exhibit 16.
3      (Brief interruption.)
4  BY MR. TELISMAN:
5  Q   If you go to about the middle of the pack there to a page
6  marked UIC 181 in the bottom right-hand corner.
7      (Brief interruption.)
8  BY MR. TELISMAN:
9  Q   Are you on that page?
10 A   Yes.
11 Q   If you look under Heme, H-e-m-e, the last sentence in that
12 section?
13 A   Yes.
14 Q   It begins, "CBC today with an Hgb of 9?
15 A   Yes.
16 Q   What does it say?
17 A   "Elevated platelet count is likely due to stress reaction
18 in combination with the bleed."
19 Q   Which is consistent with which type of thrombocytosis?
20 A   The secondary.
21 Q   Did Isabella have problems with too much clotting?
22 A   There was no evidence that she did.
23 Q   What would you expect to see?
24 A   Clots in various parts of her body, difficulty managing
25 lines, in dwelling lines.

Jenny - direct

1  Q   Are we talking about IVs?

2  A   IVs.  Well, pick lines or -- more than an IV.  They put

3  lines in that are longer and are easier to maintain over time,

4  but they're also -- if you have thrombophilia, it would be

5  much more likely to clot off and have to be replaced

6  frequently.

7  Q   One of the things that you mentioned before that is a

8  consequence of thrombophilia is you said pulmonary embolism?

9  A   Well, the most common findings are deep vein thrombosis in

10 the legs, swelling and tenderness and large veins in the legs

11 getting clotted, and then clots being thrown to the lungs

12 where they develop and get worse and cause respiratory

13 compromise.

14 Q   Was there any indication in the records that Isabella's

15 legs swelled up?

16 A   No.

17 Q   Was there any --

18     How are pulmonary emboli, how are they recognized?

19 How are they identified?

20 A   Generally you end up in bad respiratory distress.  In a

21 patient that's alert and awake, they can describe chest pain,

22 acute onset of an inability to get your breath, feelings of

23 oxygen lack.

24 Q   Are pulmonary emboli identifiable on an x-ray?

25 A   Initially maybe not, but over time they cause changes in

Jenny - direct

1  the x-rays.

2  Q   Did Isabella have multiple chest x-rays?

3  A   Yes.

4  Q   Did any ever indicate a pulmonary embolism?

5  A   No.

6  Q   After her collapse, was Isabella ever physically active

7  again?

8  A   No.  She never walked.  She didn't roll over.

9  Q   How would that affect her susceptibility to clotting if

10 she did have thrombophilia?

11 A   She would have been very susceptible to developing deep

12 vein thrombosis because of the fact that she couldn't move.

13 Q   Was Isabella ever diagnosed with thrombophilia?

14 A   No.

15 Q   Was she ever treated for it?

16 A   No.

17 Q   When Isabella was at UIC, was she seen by ophthalmologists

18 there?

19 A   Yes.

20 Q   Directing your attention to the end of Respondent's

21 Exhibit Carole Jenny 17, the back two pages, with records that

22 are marked AG 312 and 313, are these some --

23         Pardon me.  Tell me when you're ready.

24     (Brief interruption.)

25         THE WITNESS:  Yes, I see them.

Jenny - direct

1   BY MR. TELISMAN:

2   Q    Are these some of the ophthalmology records from the

3   University of Illinois at Chicago?

4   A    Yes.

5   Q    What do they reflect about retinal hemorrhaging in

6   Isabella?

7   A    She had a lot of them and they went all the way out to the

8   periphery of the eyes, and they were in multiple layers.

9   Q    Now, Dr. Jenny, what did subsequent imaging show with

10  respect to Isabella's brain?

11  A    Over time she developed what they call laminary necrosis,

12  which is loss of brain structure.  She developed

13  encephalomalacia, which are fluid-filled holes in the brain

14  that takes the place of regular brain tissue.  And she

15  developed enlarging ventricles because there was less brain

16  tissue to fill the space and the contraction of the size of

17  her brain.

18  Q    That last part, when you say "contraction of the size of

19  her brain," did her brain get smaller?

20  A    It shrunk, yes.

21  Q    Why did that happen?

22  A    It scarred down.  Scar tissue replaced normal tissue.

23  Q    Did Isabella have surgery on January 10th, 2003?

24  A    She did.

25  Q    What was that for?

Jenny - direct

1  A   She had a craniectomy to relieve her chronic subdural on

2  the right side.

3  Q   After the fluid was removed from the surface of her brain,

4  was it tested?

5  A   Yes, it was.

6  Q   What level was the white blood cell count?

7  A   I don't recall the exact number.

8  Q   No, I don't mean the exact number.  I mean, was it --

9  A   It was elevated more than you would expect in normal --

10         Well, I don't know, not more than you would expect in

11  subdural fluid, but she did have white blood cells in the --

12  but not a large amount.

13  Q   What is the significance of that?

14  A   It was blood.  She had blood in her head.

15  Q   Was the fluid also cultured?

16  A   Yes.

17  Q   What was the result?

18  A   Cultures were negative.

19  Q   What is the significance of that?

20  A   There was not sign of infection.

21  Q   What was Isabella's condition like after her surgery?

22  A   She had a hard time getting off the ventilator.  They had

23  some difficulty weaning her from the ventilator after the

24  surgery.

25         Initially they thought her neurologic status was

1   improved, but apparently it really wasn't.  It didn't seem to

2   make much difference.

3   Q   One question I forgot to ask you.  Before her surgery when

4   she had some imaging done -- we were talking about the

5   subsequent imaging -- was there any sort of problems in the

6   ear or the mastoid that was identified?

7   A   They identified, quote, mastoid disease and fluid on one

8   MRI, I believe.

9   Q   What is the significance of that?

10  A   You know, all -- it's very common to see fluid in the ears

11  of kids who are on ventilators and to see fluid in the

12  mastoids.

13  Q   Why is that?

14  A   Because you have positive pressure blowing into your mouth

15  and ears and eustachian tubes, and fluid collects.

16          I don't -- you know, if the question is did she have

17  acute mastoiditis, which is an infection of the bone,

18  essentially an osteomyelitis or an infection of the bones in

19  the mastoid, there doesn't seem to be any erosion of the

20  bones.

21          She didn't have, you know, any sign of infection in

22  her CSF.  She didn't have draining ears.  And, you know,

23  mastoiditis is something that we -- there was lots of until

24  the fifties when kids started getting antibiotics.

25          Now I've probably seen two cases in the last 20 years

1    except when I was in Cambodia, we saw it there, but not in the
2    U.S.
3    Q    Now, going back to where we were before in the chronology,
4    we were talking about Isabella's condition after the surgery.
5    What did the physicians recommend to do next?
6    A    I'm sorry.
7    Q    After Isabella's surgery, when she was still
8    neurologically devastated, what did the physicians at UIC
9    Hospital recommend would be the next course of action?
10   A    They thought that she would need chronic care and should
11   have a tracheostomy and a gastric tube put in place for
12   chronic care.
13   Q    What is a tracheostomy?
14   A    That is putting a tube in the neck that connects with the
15   airway, and so you can ventilate the child through that neck
16   tube and control secretions and do pulmonary toilet through
17   that particular opening.
18   Q    What about gastric tube?  What is a gastric tube?
19   A    That's a tube that's put into the stomach to provide food.
20   Q    What were the parents' reaction to this recommended course
21   of action?
22   A    Apparently they resisted.  I think that that was too much
23   for them.
24   Q    As a result, was Isabella transferred to Children's
25   Memorial Hospital?

Jenny - direct

1  A    Yes.  They wanted to get a second opinion.

2  Q    When she went to Children's Memorial Hospital, did she

3  undergo another EEG?

4  A    Yes.

5  Q    Why did she do that?

6  A    She was having some unusual movements, some bicycling

7  movements and some facial movements, and the question was, is

8  this seizures or was this something else?

9  Q    What were the results?

10  A    They did video EEGs.  They videotaped her for a period of

11  time, I think 24 hours, 48 hours, I forget, and then did a

12  simultaneous EEG, and they found that these movements had

13  no -- were not originating from a seizure focus.  There was no

14  evidence of seizures.

15  Q    I mean, she was still having these awkward movements,

16  right?

17  A    Yes.

18  Q    But it wasn't a seizure?

19  A    Right.

20  Q    Okay.  Was further testing done at Children's Memorial

21  Hospital on Isabella's blood?

22  A    Yes, she did have some blood tests done.

23  Q    How were her platelet counts at that point?

24  A    At some point they came down.  I don't know if it was at

25  Chicago -- at Children's or at the rehab hospital, but they

Jenny - direct

1    came down to normal.

2    Q    Now, I will direct your attention to Respondent's Exhibit

3    Carole Jenny 17, starting with the first page there.

4              THE COURT:  CM 343?

5              MR. TELISMAN:  Yes.

6    BY MR. TELISMAN:

7    Q    Dr. Jenny, what do we have here?

8    A    This was the transfer note or the acceptance note at

9    Children's Memorial.

10   Q    And the date near the top left there?  I apologize.  These

11   were highlighted.

12             THE COURT:  Oh, it's in the chart part.

13   BY THE WITNESS:

14   A    Oh, I see.  It's January 30th.

15   BY MR. TELISMAN:

16   Q    Right.

17             And if you go about just over halfway down, there's a

18   section entitled Heme, H-e-m-e.  Do you see that?  Are you

19   about two-thirds of the way down?

20   A    Yes.

21   Q    What does it say the platelet level was at that point?

22   A    It was normal.

23   Q    I'm sorry?

24   A    It was normal, 166.

25   Q    Now, turning to the next page, which is CM 422, what is

Jenny - direct

1    this?

2    A    That's several days worth of blood work from 1/23 to 2/8.

3    Q    During this time Isabella was at Children's Memorial

4    Hospital, is that right?

5    A    Yes.

6    Q    And if you look under the chart there about the seventh or

7    eighth one down, it says Platelets.  Do you see that?

8    A    Yes.

9    Q    What were Isabella's platelet counts starting on

10   January 23rd and going on?

11   A    They were normal except for one day, they were a little

12   elevated, 547.

13   Q    And does it give a normal range there on the chart?

14   A    Yes.

15   Q    150 to 450?

16   A    That's right.

17   Q    Looking on the next page, we have a little bit of overlap

18   here as far as the dates.

19        But, unfortunately, the date of -- the Bates stamp is

20   a little goofy, but it's an AG Bates stamp.

21        Does this also reflect the platelet level now going

22   to mid-February, February 8 to February 16?

23   A    Yes.

24   Q    What were the platelet levels there?

25   A    Of the four levels, three were normal and one was

Jenny - direct

1    elevated.

2    Q    Now, did Isabella's --

3         We talked before about platelet morphology.  Did

4    Isabella's platelet morphology ever produce an abnormal

5    reading?

6    A    On the computerized machine generated studies, there were

7    a couple of abnormals.

8    Q    And when that happens, what is the next course of action?

9    A    Well, usually if it's persistent --

10        You know, this happens a lot, that the computers will

11   shoot out a result and it doesn't make sense clinically, and

12   mostly you ignore it.  If it was consistently abnormal, you

13   would have a pathologist actually look at the slide.

14   Q    Was there any sort of confirmatory observation or testing

15   done?

16   A    Well, she did have platelet morphology examined by a human

17   being on three occasions.  They were not -- abnormal platelets

18   were not noted.

19   Q    Okay.  Did Isabella undergo any surgery at Children's

20   Memorial Hospital?

21   A    She did.

22   Q    What surgery was that?

23   A    She had a gastric tube placed.  She had a tracheostomy

24   done.  And then she had a tracheal bypass.

25        So essentially they took the tracheostomy site and

Jenny - direct

1    brought it out to the world so that her upper airway didn't

2    communicate with her trachea because she was chronically

3    aspirating formula.  And so the only way to stop that was to

4    make sure there's no connection between her airway and her

5    esophagus.

6    Q   So in lay terms, did they essentially stop any connection

7    between her mouth and her lungs?

8    A   Right.

9    Q   What did the Children's Memorial Hospital records reflect

10   about the behavior of Isabella's parents?

11   A   They both --

12           All of the hospital records actually said that they

13   were very appropriate.  They were very involved.  They met her

14   needs.  Nurses would say things like, mother never leaves the

15   bed side.  They learned all her care and were anxious to take

16   her home.

17   Q   Was Isabella discharged home on February 18th, 2003?

18   A   Yes.

19           MR. TELISMAN:  Your Honor, that's all I have for this

20   section.  I didn't know --

21           THE COURT:  Yes, we're going to stop right here.

22           I have a sentencing at 1:30.  It should take about

23   25, 30 minutes.  So let's figure -- why don't you be back here

24   about 10 minutes to 2:00, but you may have to wait a little

25   bit.

Jenny - direct

1        MR. TELISMAN:  Okay.  Thank you, Judge.

2        (The trial was adjourned until 2:00 p.m. of this same

3    day and date.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JENNIFER DEL PRETE,            )
                              )
                Petitioner,   )    Docket No. 10 C 5070
                              )
        vs.                   )
                              )
MELODY HULETT,                )    Chicago, Illinois
                              )    January 14, 2013
                Respondent.   )    2:21 p.m.

VOLUME 6
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiff:      BLEGEN & GARVEY
                        BY:  MR. PATRICK W. BLEGEN
                             MS. JODI L. GARVEY
                             MR. DANIEL A. RUFO
                        53 West Jackson Boulevard
                        Suite 1437
                        Chicago, Illinois  60604

For the Defendant:      ILLINOIS ATTORNEY GENERAL'S OFFICE
                        BY:  MR. KARL R. TRIEBEL
                             MR. NEAL GOODFRIEND
                             MR. ARI TELISMAN
                             MS. MONIQUE A. ANAWIS
                        100 West Randolph Street
                        13th Floor
                        Chicago, Illinois  60601

Also Present:                   MR. ROBERT STANLEY

LAURA M. BRENNAN - Official Court Reporter
219 South Dearborn Street - Room 2102
Chicago, Illinois  60604
(312) 435-5785

1    (The following proceedings were had in open court:)

2    THE COURT:  Mr. Telisman, you can proceed.

3    MR. TELISMAN:  Thank you, your Honor.

4    DR. CAROL JENNY, RESPONDENT'S WITNESS PREVIOUSLY SWORN

5    CONTINUED DIRECT EXAMINATION

6    BY MR. TELISMAN:

7    Q    Dr. Jenny, when we had left off we -- I believe that you

8    had testified about Isabella's course of treatment at

9    Children's Memorial Hospital and then she was discharged home

10   on February 18th, 2003.  Before we proceed to the next point

11   in the chronology, I had a question about the testing that was

12   done for infections while Isabella was in the hospital for the

13   previous hospital stays up to this point.  Okay?

14        Was Isabel on antibiotics when she first collapsed?

15   A    She was completing a 10-day course of amoxicillin.

16   Q    Could the antibiotics --

17        And when she was in the hospital, first at Provena

18   and then at the University of Illinois in Chicago, was she

19   given antibiotics at certain points?

20   A    Yes.  She was given them just in case she had some

21   overwhelming systemic infection.

22   Q    Now, when the various tests were done for -- to check for

23   infections, the cultures and the gram stains, those other

24   things that you had testified to, could the fact that Isabella

25   was receiving antibiotics have affected some of those tests?

Jenny - direct

1    A    It could.

2    Q    How so?

3    A    Obviously, you go on antibiotics to treat infection, and

4    if the infection that she was being treated for was gone, that

5    would have been an effect of the antibiotics.  It could -- if

6    she had very low organism counts in her bloodstream, it could

7    cause a false negative.  But she wouldn't be very sick if she

8    had low counts.  And it would not affect the CSF results

9    because she had zero white cells --

10   Q    When you say she had -- pardon me.

11   A    The cerebral spinal fluid results.

12             And also amoxicillin at the doses she was taking

13   doesn't cross the blood/brain barrier effectively.

14   Q    Also with respect to sort of the other tests that you

15   testified to, for instance, the latex agglutination test,

16   would that be something that would be affected by the

17   antibiotics?

18   A    That would not be affected by antibiotics.

19   Q    Now, moving on in the chronology, after Isabella was

20   discharged home on February 18th, 2003, at some point in time

21   after that did she -- was she then brought back to the

22   hospital by her parents?

23   A    Yes.

24   Q    Did her parents bring her to Rush-Copley Hospital ten days

25   later, on February 28th, 2003?

Jenny - direct

1   A   Yes.

2   Q   What was that for?

3   A   They thought she was having increasing seizures.

4   Q   Did the doctors do any blood tests?

5   A   They did.

6   Q   What did it reveal?

7   A   I believe at that point her white cell count and her

8   platelet count had normalized, but I'd have to go back and

9   look at the numbers.

10  Q   Would it refresh your recollection to take a look at your

11  report?

12  A   Yes.

13  Q   Specifically on Page 9 of your report, which is Exhibit 2.

14  A   Her white blood cell count was a little elevated at

15  16,000.  She had a normal differential, and her platelet count

16  was high again.  Sorry.

17  Q   Was she then transferred to another hospital?

18  A   Yes.

19  Q   Did she go to Children's Memorial Hospital at that point?

20  A   She did.

21  Q   What did the doctors find at Children's Memorial Hospital

22  with respect to the seizure-like activity that brought her

23  back to the hospital?

24  A   They said it wasn't actually seizures, it was -- she was

25  having -- you know, she was used to having lots of input from

1   her brain into her brain stem and into her nuclei in the

2   center of her brain, and once her brain got so damaged there

3   was not that inhibitory force from the -- from the higher

4   centers influencing the lower central centers of her brain,

5   and so she was having abnormal movements and bicycling-like

6   movements and waving movements with her arms that weren't

7   actually seizures but what they referred to as vagal episodes

8   or thalamic storm episodes.

9         THE COURT:  What was the date she was taken back to

10   Children's?

11         THE WITNESS:  The 28th of February she went to

12   Children's.

13         THE COURT:  Okay.  Thanks.

14   BY MR. TELISMAN:

15   Q   Throughout the course of all of her treatment did any of

16   the EEG tests that were run ever identify seizures?

17   A   No.

18   Q   From Children's Memorial Hospital was Isabella transferred

19   the Rehabilitation Institute of Chicago?

20   A   Yes, she was.

21   Q   Did that take place on March 7th, 2003?

22   A   Yes.

23   Q   What services did the Rehab Institute of Chicago provide?

24   A   They did occupational therapy, physical therapy.  There

25   was a physiatrist or a rehabilitation doctor who was sort of

Jenny - direct

1  running the show.  Speech therapy, oral motor therapy.

2  Q   Was Isabella discharged home after about three weeks?

3  A   Yes.

4  Q   What sort of care did Isabella receive when she was at

5  home?

6  A   She received extensive care for all of her needs.  She

7  received tube feedings, frequent suctioning of her

8  tracheostomy tube.  She had extensive in-home nursing care,

9  in-home physical therapy and occupational therapy.  And she

10 was neurologically devastated.

11 Q   What was Isabella's physical growth and development like,

12 not talking about her brain, but her actual physical body,

13 what was that growth and development like from that point

14 until November of 2003?

15 A   Well, her -- obviously her motor skills were terrible, as

16 was her neurologic exam.  She actually gained quite a bit of

17 weight and gained quite a bit of height.  You know, once a

18 child is being fed by gastric tube and can't say I'm not

19 hungry, the parents put in what the doctors tell them to put

20 in the tubes, and so I think that she basically was overfed

21 and really became quite heavy and quite large.

22 Q   But speaking with respect to her physical development,

23 given the fact that she was neurologically devastated, how was

24 her body doing?

25 A   She really had no other chronic medical problems other

Jenny - direct

1  than related to her nervous system.

2  Q    Now, directing your attention to November 8th, 2003, what

3  happened on that day?

4  A    Her home health nurse found her in arrest and not

5  breathing.  Apparently her tracheostomy tube early that

6  morning became kinked, and somehow somebody didn't notice.

7  She then proceeded to a full cardiopulmonary arrest.  The 911

8  was called.  They had difficulty reestablishing a pulse or

9  reestablishing breathing.  She was -- eventually they

10 figured -- they found out that there was a mechanical

11 malfunction in the Ambu bag that they were using at home, the

12 bag they were using to try to resuscitate her.  She was taken

13 to the hospital, and two days later she died.

14 Q    When she was first brought to the hospital, was she

15 brought to Rush-Copley Medical Center?

16 A    Yes.

17 Q    And at that point was -- did the doctors order blood

18 testing?

19 A    Yes.

20 Q    Directing your attention to Respondent's Jenny Exhibit 17,

21 third page from the back.  There's a page marked AG 1377.

22 A    Okay.

23 Q    What does this record reflect?

24         THE COURT:  This one right here.

25         THE WITNESS:  Oh, 1377?  It's the lab results that

Jenny - direct

1  were done during her admission to Copley.

2  BY MR. TELISMAN:

3  Q    Does the date reflect that this was done on November 8th,

4  2003?

5  A    Yes.

6  Q    What was her platelet count?

7  A    Her platelet count was normal.

8  Q    Was Isabella then transferred to Central DuPage Hospital?

9  A    Yes.

10 Q    What was her condition on arrival?

11 A    She was neurologically -- she was essentially brain dead.

12 Q    Are you familiar with the term diffuse intravascular

13 coagulation?

14 A    Yes.

15 Q    What is that?

16 A    It is a response to severe decompensation.  The most

17 common cause would be prolonged shock and hypoxia.  It can

18 also happen as a result of a severe infection.

19 Q    Was Isabella found to have DIC at this point --

20 A    Yes.

21 Q    -- on November 8th of 2003?

22 A    Yes, she was.

23 Q    Ultimately what happened to Isabella?

24 A    She died.

25 Q    And did she die on November 9th, 2003?

Jenny - direct

1  A    Yes.

2  Q    Was an autopsy conducted on her body?

3  A    Yes.

4  Q    What did the autopsy reveal?

5  A    Chronic degenerated brain, poor muscle fibers.  Otherwise

6  she had what they call acute tubular necrosis of the kidneys,

7  which was the result of, again, the prolonged period of shock

8  and hypotension that she had when she was in full cardiac

9  arrest for an exceedingly long time.  That causes the kidneys

10 to shut down.  She had some liver damage from that as well.

11 Q    On autopsy was there any indication that Isabella suffered

12 from any sort of clotting of her organs or any other

13 indication of thrombophilia?

14 A    Well, she had diffuse -- she did have diffuse

15 intravascular coagulation, which was a result of, again, the

16 prolonged period of time without oxygen.

17 Q    Is that in any way indicative of whether or not she

18 suffered from cortical venous thrombosis on the day of her

19 collapse?

20 A    No.  Totally unrelated.

21 Q    And the fact she had DIC, is that in any way indicative

22 that she had primary thrombocytosis?

23 A    No.  It's just the opposite.

24 Q    How so?

25 A    Well, you use up clotting factors.  You use up platelets,

Jenny - direct

1    and you end up bleeding because you use up all the factors you

2    need to keep your blood liquid -- or, I'm sorry, to keep your

3    blood clotted, or to make your blood clot.

4    Q    Dr. Jenny, I had asked you earlier about a report by one

5    of the petitioner's experts, Dr. Leestma.  Dr. Leestma when

6    he --

7             Did you receive two reports that he had authored?

8    A    Yes.

9    Q    In the second report did he say that he had identified

10   several small cortical veins in a section of the cerebrum with

11   recent fibrin platelet thrombi?

12   A    Yes.

13   Q    What's the significance of that?

14   A    You know, she essentially was brain dead for 24 hours

15   before they took her off the ventilator, or more than

16   24 hours, 36 hours.  And she did not have good circulation in

17   her head.  She had diffuse intravascular coagulation.  All of

18   those things could have caused that.

19   Q    Does Dr. Leestma's finding of recent fibrin platelet

20   thrombi show that Isabel had previously had cortical venous

21   thrombosis?

22   A    No.  It has no relationship to that.  This was a

23   preterminal event.

24   Q    Dr. Jenny, do you have an opinion to a reasonable degree

25   of medical certainty as to what caused Isabella's collapse on

Jenny - direct

1    December 27th, 2002, and her eventual death?

2    A    I do.

3    Q    What is your opinion?

4    A    That she died of -- that she collapsed because of an

5    episode of abusive head trauma leading to cardiorespiratory

6    arrest and severe brain damage.

7    Q    And is it your opinion ultimately that that resulted in

8    her death?

9    A    Eventually, yes.

10   Q    What do you base your opinion on?

11   A    On the autopsy findings, the imaging studies, the clinical

12   history, the literature and my own clinical experience.

13   Q    What is the significance of Isabella's growth and

14   development after she was stabilized physically and

15   discharged?

16   A    She did not show signs of underlying genetic or metabolic

17   disease or inherited disease.

18   Q    Dr. Jenny, in your opinion to a reasonable degree of

19   medical certainty, did Isabella collapse as a result of

20   cortical venous thrombosis?

21   A    No.

22   Q    What do you base that on?

23   A    Well, first, kids who get cortical venous thrombosis have

24   preexisting illness.  They get very sick, and then the

25   cortical venous thrombosis happens as a result of the illness.

Jenny - direct

1        Second, in all of the imaging studies that I looked

2   at, or that I -- you know, the reports that I read, except for

3   Dr. Barnes, nobody else thought she had any cortical venous

4   thrombosis.  It certainly doesn't -- and most of the kids that

5   we see, when kids get cortical venous thrombosis, they go on,

6   you know, on blood thinners for a while and they do fine.

7   They don't die from it.  That would be a very unusual outcome.

8   It's very treatable, and it's not that serious an illness.

9   Q    In your opinion to a reasonable degree of medical

10  certainty, did Isabella collapse from a -- an accumulating

11  chronic subdural hemorrhage?

12  A    No.

13  Q    What do you base that on?

14  A    Well, her subdural hemorrhages weren't -- her chronic

15  hemorrhage was not that large.  It was, what, a centimeter to

16  a centimeter and a half.  It didn't cause increased

17  intracranial pressure.  It wouldn't in and of itself cause her

18  brain to fail.  Another event would have had to precipitate

19  the failure of her brain.

20  Q    When you say it didn't cause intracranial pressure, what

21  do you base that on?

22  A    Her ventricles were of normal size, and she didn't have

23  what we call papilledema, or swelling of the optic nerve, on

24  her exam.

25  Q    And, Dr. Jenny, in your opinion to a reasonable degree of

Jenny - cross

1   medical certainty, did Isabel collapse because blood leaked
2   from her dura?
3   A   No.
4   Q   What do you base that on?
5   A   First, that there's no evidence that blood leaks from the
6   dura.
7          Second, if she did have neomembranes around the old
8   subdural, she could have had very minor capillary leakage, but
9   it would not cause her to change her clinical state.
10          MR. TELISMAN:  If I may have one moment, your Honor.
11          THE COURT:  Sure.
12          MR. TELISMAN:  Thank you.
13          I have no further questions at this time.  Thank you.
14          THE COURT:  Mr. Blegen.
15                       CROSS EXAMINATION
16  BY MR. BLEGEN:
17  Q   Good afternoon, Dr. Jenny.
18  A   Hello.
19  Q   A moment ago you indicated that it was your belief to a
20  reasonable degree of medical certainty that Isabella Zielinski
21  collapsed as a result of abusive head trauma on December 28th
22  of 2002, correct?
23  A   Yes.
24  Q   When you say "abusive head trauma," what do you mean?
25  A   I mean a traumatic event that affects the head and brain

Jenny - cross

1  that was not accidental.

2  Q   And what kind of event was it?

3  A   It was shaking, impact, or a combination of the two.

4  Q   I'm a little confused.

5       THE COURT:  Shaking, comma, impact.

6       THE WITNESS:  Impact, comma.

7       THE COURT:  Or a combination.

8       THE WITNESS:  Yes.

9  BY MR. BLEGEN:

10 Q   So it was one of three things, shaking, impact, or the

11 both together?

12 A   Yes.

13 Q   All right.  Do you understand that at the trial of this

14 case the theory was that Isabella was shaken but there was no

15 impact?

16 A   I knew there was no obvious site of impact on the external

17 exam.

18 Q   All right.  But did you read the trial transcripts?

19 A   I did not.

20 Q   So you don't know what Dr. Emily Flaherty testified was

21 the cause of the injuries in the brain?

22 A   The trial transcripts were not provided to me.

23 Q   Would it surprise you to learn that the testimony was that

24 it was a shaking only event?

25 A   It wouldn't surprise me.

Jenny - cross

1  Q   Why?

2  A   Well, because she said that in her expert report.

3  Q   All right.  But is there something in this case that makes

4  you think it was impact plus shaking possibly or impact

5  separate and apart from shaking?

6  A   You can't rule out impact in any case.

7  Q   Explain to me what you mean by that, you can't -- you can

8  rule out impact if somebody sees the event, right?

9  A   Oh, yes.  If somebody -- if it's witnessed you can, yes.

10 Q   Has there -- just for my edification, has there ever been

11 a case of shaking only that was witnessed by a third party

12 that led to the kind of collapse we're talking about here?

13 A   Yes.

14 Q   When was that?

15 A   There was a case that was presented via video from

16 Australia two years ago at the Chadwick meetings in San Diego

17 where a woman in Australia described going to her neighbor's

18 house, watching her neighbor violently shake the baby.  She

19 grabbed the baby from the woman and held the baby, and the

20 baby collapsed in her arms and then went on to die.

21 Q   Did the baby have subdural hematomas?

22 A   Yes.

23 Q   Did the baby have chronic subdural hematomas?

24 A   That was not reported.

25 Q   So probably not, then, right?

Jenny - cross

1   A   I don't remember.  I'm sorry.

2   Q   You've -- you testified towards the end of your

3   examination about the chronic subdural hematoma and your

4   conclusion that the chronic subdural did not lead to the

5   child's collapse, correct?

6   A   Yes.

7   Q   But you have an opinion as to what caused the chronic

8   subdural, do you not?

9   A   Some type of rupture of the bridging veins.

10          THE COURT:  You said the bridging?

11          THE WITNESS:  Right, bridging veins, yes.

12  BY MR. BLEGEN:

13  Q   Well, you have an opinion as to what caused the bridging

14  veins to rupture sometime in the past, don't you?

15  A   I would -- I could only speculate, but I would imagine

16  that some type of forces were applied to the head.

17  Q   Do you still have your report in front of you?

18  A   Yes.

19  Q   Didn't you in fact -- I'm not sure.  Did you just say now

20  that you could only speculate as to the cause?

21          THE COURT:  That's what she said.

22          MR. BLEGEN:  Okay.

23  BY MR. BLEGEN:

24  Q   Why don't you take a look at Page 13 of your report at

25  Paragraph 5.

Jenny - cross

1  A    Okay.

2  Q    You indicate that Isabella was also found to have

3  bilateral acute and chronic subdural hematomas; this would

4  most likely indicate that the child experienced more than one

5  episode of trauma.

6  A    That's right.

7  Q    And you mean trauma on a day prior to December 28th of

8  2002, correct?

9  A    At some time prior to that, yes.

10 Q    Have you -- I think you said that you've read some of the

11 other expert reports.  Have you read all of the expert reports

12 in this case?

13 A    I think so.  I believe I have.

14 Q    All right.  Have you read Dr. Hedlund's report?

15 A    I did.

16 Q    Would you agree with -- do you agree with him that the

17 chronic subdural was two weeks or greater in age at the time

18 she was admitted to the hospital on 12/28?

19 A    I would leave that to the radiologists.  Dating subdurals

20 is a very complex science, and that's -- pediatricians depend

21 on what the radiologists tell them, so I would leave that to

22 him to decide.

23 Q    And that's true -- regarding radiologists and you

24 depending on them, that's true for things other than just

25 dating, correct?

Jenny - cross

1    A    Yes.  Oh, absolutely.

2    Q    You depend on them to locate the subdural hematomas,

3    right?

4    A    I would never opine what the significance of a

5    neuroradiograph was without a neuroradiologist consulting

6    me -- with me.

7    Q    So if you were to learn that the chronic subdural hematoma

8    in this case -- strike that.  Let me start over.

9         Just suppose along with me that Dr. Hedlund testified

10   that the chronic subdural hematoma was at least two weeks in

11   age and if somebody told him it was three weeks in age or more

12   he would not argue with that.  Can you suppose that with me

13   for a moment?

14   A    Yes.

15   Q    All right.  And also suppose that it's true that Isabella

16   did not start attending the daycare that Jennifer Del Prete

17   was at until three weeks before her collapse.  Can you suppose

18   that along with me?

19   A    Sure.

20   Q    Would that change your opinion as to the cause of her

21   collapse or who caused her collapse?

22   A    I can't tell you one way or the other.  I don't know when

23   this first event happened.

24   Q    All right.  And so therefore you don't know who did it,

25   correct?

Jenny - cross

1  A   The first event?

2  Q   Yes.

3  A   No, I don't.

4  Q   Or whether it was caused by a person or not, correct?

5  A   I would assume that if there was no history of an

6  accidental injury it was in fact inflicted.

7  Q   All right.  Well, that's what I was trying to get at

8  because your report isn't perfectly clear.  Your report says

9  more than one episode of trauma, right?

10 A   Right.

11 Q   Why didn't you say more than one episode of abusive head

12 trauma?

13 A   Because I was trying to be as accurate as possible, and

14 since I didn't have history that would -- that would be

15 helpful to me in making that determination, I said it was most

16 likely trauma.

17 Q   Well, but you just said a second ago that because nobody

18 reported any accidents in the past, it would have been

19 inflicted by someone, right?

20 A   That's what I would assume.

21 Q   Well, you just said assume, and earlier you said I would

22 only be guessing or something like that, but in your report

23 you say most likely indicate, correct?

24 A   That leaves a little wiggle room.

25 Q   Maybe so, but assume and most likely are wide apart,

Jenny - cross

1    aren't they?

2    A    I'm not sure I understand what the difference is.

3           THE COURT:  Let's get to something a smidgeon more

4    productive here than this particular question.

5    BY MR. BLEGEN:

6    Q    There is a way to date a chronic subdural hematoma, is

7    there not?

8    A    The radiologists can give us estimates of date.

9    Q    There is a way to date a chronic subdural hematoma without

10   radiology, is there not?

11   A    Well, on autopsy you can do it, or if you -- sometimes

12   there is some data that you could look at, bilirubin in the

13   fluid, although it's very old data and it's done in old

14   people, and I don't know of more modern studies that have been

15   done on dating subdurals.

16   Q    I should have just asked you directly.  You can date a

17   chronic subdural hematoma through head circumference, correct?

18   A    Depends.

19   Q    All right.  You can -- a chronic subdural hematoma can

20   sometimes manifest itself with an increase in head size,

21   right?

22   A    If it's very large, yes.

23   Q    Well, let me show you what I've marked as Petitioner's

24   Exhibit Jenny 3.  This is a -- sort of an Internet printout

25   from Penn State Hershey.  Do you see that?

Jenny - cross

1    A    Yes.

2    Q    And it's essentially a little explanation of subdural

3    hematomas, correct?

4    A    I haven't read it.  I would assume so.

5    Q    Take a quick look.  Don't -- you don't have to read it

6    word for word.  But if you would, could you just focus on the

7    second page and the symptoms of subdural hematomas.

8    A    Okay.

9    Q    Do you see under Infants?

10   A    Yes.

11   Q    There's one of the symptoms is bulging fontanelle?

12   A    Yes.

13   Q    Feeding difficulties?

14   A    Yes.

15   Q    Now, there is evidence in this case that Isabella indeed

16   had feeding difficulties, correct?

17   A    Well, she was growing at a perfectly normal rate, and her

18   mother did not say that.  The babysitter apparently had said

19   that.

20   Q    The baby -- you're talking about Miss Del Prete said that?

21   A    Oh, I don't recall.  Somebody had mentioned that in one of

22   the police reports.

23   Q    The daycare owner said she had feeding difficulties.

24   A    Right.

25   Q    Correct?

Jenny - cross

1    A    Right.

2    Q    She would eat, cry, eat, cry in that sort of pattern.  Do

3    you recall that?

4    A    That's what she said, yes.

5    Q    And there was also evidence that she when feeding would

6    clench her fists and sort of tense up?

7    A    That was in the record.

8    Q    And she was getting gas drops for problems with feeding,

9    correct?

10   A    Yes.

11   Q    High pitched cry is another possible symptom of a subdural

12   hematoma in an infant, right?

13   A    It is.

14   Q    And increased head circumference, correct?

15   A    It can be, yes.

16   Q    Increased sleepiness or lethargy?

17   A    Yes.

18   Q    And she had that, correct, Isabella?

19   A    I don't recall reading that.  She might have.

20   Q    Didn't she sleep a significant amount of time on the day

21   in question?

22   A    Well, she slept from, what, ten to -- she slept from nine

23   to noon-ish, three hours.

24   Q    Is that a significant amount of time for an infant to

25   sleep?

Jenny - cross

1   A    For a three-month-old that's not unusual.

2   Q    How about irritability?

3   A    She was reported by the sitters to be irritable at times.

4   Q    And you don't have any reason to think that the sitters

5   aside from Miss Del Prete were lying, do you?

6   A    I'd have no idea.  I don't know them.  I know nothing

7   about them.

8   Q    Right.  But you told us earlier today that you reviewed

9   the medical records and the police reports.  You take what is

10  in those reports and records as true, right?

11  A    Yes.

12  Q    You don't sit there and say, well, I think person A is

13  lying but person B is telling the truth, do you?

14  A    Well, it would depend.  I mean, the mother did not

15  perceive this child as being particularly difficult or

16  irritable.

17  Q    I guess you do sort of make a decision about whether the

18  alleged perpetrator is telling the truth or not at some times,

19  correct?

20  A    No.  I have no way of knowing.

21  Q    I know, but you testified earlier today that Miss Del

22  Prete's statements changed, right?

23  A    Yes.

24  Q    All right.  We'll get to that.

25       Let's talk about increased head circumference.  There

Jenny - cross

1   was an abnormal increase in head circumference in this child

2   before she collapsed, was there not?

3   A    She had grown steadily at the same rate for the

4   previous -- for those three -- she was growing at a normal

5   rate at the 90th percentile.

6   Q    She didn't reach the 90th percentile until shortly before

7   her collapse, right?

8   A    I think it was about, what, a month and a half, two

9   months.

10  Q    What do you think is a marker of an abnormal increase in

11  head circumference at the age from zero to three months?

12  A    It would really depend on the pattern of growth the child

13  would have.  In other words, what we look for is the child

14  reaching a stable growth pattern that reflects their, you

15  know, genetic potential.

16  Q    Let me show you what I've marked as Petitioner's Exhibit

17  Jenny 4.  Are you familiar with a medical textbook called

18  Pediatric Primary Care?

19  A    No.

20  Q    You're not familiar with this textbook?

21  A    No, I'm not.

22  Q    All right.  Well, would you take a look on the second page

23  in.  It will say Page 87.  Excuse me, I'm sorry.  The third

24  page in.  It will say Page 203 in upper right corner.

25  A    Yes.

Jenny - cross

1   Q   And look down in the table marked 11-6.

2   A   Yes.

3   Q   Do you agree with this textbook that an average monthly

4   gain in head circumference from the age of zero to three

5   months is two centimeters?

6   A   On an average?

7   Q   Yes.

8   A   You know, I don't know.  I'd have to go back and look at

9   the primary data.  I'm sorry.  I wouldn't have that statistic

10  readily at hand.

11  Q   All right.  Well, take a look at the next page, which says

12  664 in the upper left corner.  Do you see under disturbances

13  of head growth macrocephaly?  Is that how you pronounce that?

14  A   Yes.

15  Q   Do you agree that macrocephaly is defined as head

16  circumference more than two standard deviations above the mean

17  for age and sex or one that increases too rapidly?

18  A   Yes.

19  Q   All right.  And she, Isabella, between zero and three

20  months jumped two standard deviations, didn't she?

21  A   No.

22  Q   She didn't?

23  A   No.  She was under -- two standard deviations is 96

24  percent.  She was at the 90th percentile.

25  Q   Did she jump any curves?

Jenny - cross

1    A    She jumped two percentile curves.

2    Q    All right.  And you don't consider that to be abnormal?

3    A    Not in a child that then establishes a stable growth

4    pattern.

5    Q    All right.  But you can establish a stable growth pattern

6    after having a chronic subdural hematoma, right?

7    A    Yes.

8    Q    So the fact that she established a chronic -- or strike

9    that.  The fact that she established a stable growth pattern

10   at some point does not indicate that she didn't have a chronic

11   subdural hematoma before stabilizing, right?

12   A    It does not.

13   Q    So that means I'm right, correct?

14   A    Yes.

15   Q    All right.  Let me show you your growth measurement chart.

16   Can you see the -- is this the growth chart that you did?

17   A    Yes.

18   Q    And the top is the head chart, correct?

19   A    Yes.

20         THE COURT:  Which one of your exhibits was this,

21   Mr. Telisman?  It was part of something else.

22         MR. TELISMAN:  Your Honor.  It is --

23         THE COURT:  Because I wrote on it.  I just want to

24   have the same one.

25         MR. BLEGEN:  I think it's 11.  It's 11.

Jenny - cross

1    THE COURT:  Thanks.  I have it.  Thank you.

2        Okay.  Go ahead.

3  BY MR. BLEGEN:

4  Q    You got, I take, the head circumference measurements from

5  the medical records, correct?

6  A    Yes.

7  Q    And the first record you used was related to the birth,

8  which indicated that the centimeters were 33 1/2 centimeters

9  at birth, correct?

10  A    Yes.

11  Q    And I'm going to zoom in on the head part just so we can

12  see it a little better on the screen.

13        And so that first mark on the very first line would

14  be 33 1/2, correct?

15  A    Yes.

16  Q    And so 33 is this line where my gigantic finger is

17  pointing right there, correct?

18  A    Halfway between 32 and 34, yes.

19  Q    And the intervals are two tenths going up, correct?

20  A    Right.

21  Q    So you've got 33.2, .4, and you've kind of got the dot

22  just right on what would be the .6, correct?

23  A    Yes.

24  Q    So pretty close to .5.

25        You've indicated that that's at the -- in your

Jenny - cross

1    testimony that that's at the 50th percentile.  It's actually

2    between the 25th and the 50th, is it not?

3    A    Yes.

4    Q    All right.  So the jump -- and I'll zoom out so you can

5    see better the percentile.

6                Do you have your chart in front of you, by the way?

7    A    I think it's in one of these exhibits.

8    Q    Yes.  It's Exhibit 11.  I don't know if it's easier to

9    look on the chart or on the screen.

10   A    Probably easier to look at it on the screen.

11   Q    So the jump is not from the 50th percentile to the -- what

12   you call the 75th percentile; it's actually from between the

13   25th and the 50th to the next one up, correct?

14   A    I believe on the birth records it said 50th.

15   Q    Well, but the birth records might have used the wrong

16   chart or a premie chart, right?

17   A    No.  The birth records used the standard intrauterine

18   growth charts.

19   Q    All right.  Well, if they wrote down 33 1/2 centimeters

20   but said that that was 50th percentile, would you go by the

21   centimeters they gave you or the percentiles they gave you?

22   A    I don't know.  Either one.

23   Q    Do you remember what you did when you were making this

24   chart?

25   A    No.

Jenny - cross

1   Q   Let's look at your next dot, which is the second one
2   there, correct?  Do you see that?
3   A   Yes.
4   Q   All right.  The second measurement was on October 8th of
5   2002 and was 14 and three quarter inches.  Do you remember
6   that?
7   A   Yes.
8   Q   Do you recall that -- you must have done the math or the
9   whatever, the changing inches to centimeters.  You've got
10  37.47 centimeters?
11  A   Yes.
12  Q   Do you recall that?  Okay.
13          Do you see where you've marked the second dot,
14  though?  You marked it at 37.2, right?
15  A   The dot -- the lines are pretty close together, between
16  two and four.
17  Q   Do you see your second dot is at 37.2?
18  A   Yes.  It's a little low.
19  Q   So it should actually be up above -- it should actually be
20  closer to the .6 line, right?
21  A   37 -- what did I say, 37.4?
22  Q   37.47.
23  A   Somewhere between .4 and .6.
24  Q   And so that would put the jump above the 75th percentile,
25  right?

Jenny - cross

1  A   That's right.

2  Q   Okay.  And now look at -- let's look at your third dot,

3  and that's from a head circumference measurement that was

4  taken on November 11th of 2002, right?

5  A   Yes.

6  Q   So that would be --

7          And the child was born on September 6th of '02?

8  A   Yes.

9  Q   So that's essentially two months and five days, correct?

10 A   Yes.

11 Q   Your third dot on this chart is almost at three months, is

12 it not?

13 A   I tried to put it in the middle, but it's a little closer

14 to three months than it is to two months.

15 Q   Well, it should be very close two months, right, because

16 we're talking about two months and five days, correct?

17 A   Yes.

18 Q   So for actually at two months and five days might be right

19 there, right?  See where I've just put that red dot?

20 A   I'd have to go back and look at the original data.

21 Q   Well, I'm happy to show it to you.

22 A   Yeah.

23 Q   Do you see pediatrician four?

24 A   Then it should be 40.32 centimeters.  It should be down.

25 They have it at 44 -- 40.4 centimeters.

Jenny - cross

1   Q   So it should be a little bit below where I put the red
2   mark?
3   A   Yes.
4   Q   But still above the 90th percentile curve, right?
5   A   Yes.
6   Q   So 40.32, a little bit lower there?
7   A   Yes.
8   Q   All right.  So the next jump was not to the 90th
9   percentile but above the 90th percentile, correct?
10  A   Which one is that?  I'm sorry.
11  Q   Where the red dot is.  We'll say it's a little bit below
12  the 95th --
13          THE COURT:  The one that you just placed there.
14          THE WITNESS:  Yes.
15          THE COURT:  That's what he's talking about.
16          THE WITNESS:  Yes.
17  BY MR. BLEGEN:
18  Q   So the jump is actually bigger, correct?
19  A   Slightly, yes.
20  Q   And she did not consistently stay on the 90th percentile
21  curve; she was above 90th percentile and actually went -- it
22  looks like I guess she went down a little bit after her
23  collapse.  The next dots are both on the 90th percentile?
24  A   That's right.
25  Q   Does that change your thought as to whether she had

Jenny - cross

1    consistent or normal head growth?

2    A    No, it doesn't.

3    Q    Does it lead you to conclude that that may have been when

4    she had her chronic subdural hematoma?

5    A    I don't think I can tell you one way or the other.

6    Q    Well, you said in your report that the reason you didn't

7    find her head growth early on to be abnormal was because of

8    molding, right?

9    A    Yes.

10   Q    Molding resolves itself in days or weeks, right?

11   A    Weeks.

12   Q    How many weeks?

13   A    I don't think anybody has that data.  I don't know of any

14   data set that would address that.

15   Q    But not from one month to two months, right?

16   A    I think it could.

17   Q    Do you have any reason to think that it did here?

18   A    I think that it would be odd that she would have chronic

19   subdurals that would go away and then come back.  You're

20   saying that her head was larger and then shrunk, right?

21   Q    Well, I'm saying that her head may have shrunk after her

22   collapse, but up until her collapse it was growing at a pretty

23   abnormal rate, was it not?

24   A    Not in my opinion.

25   Q    Why do they keep these head charts for between zero and

Jenny - cross

1    three months if the only thing that matters is whether you

2    level off at some point?

3    A    Well, you have to examine each individual growth chart

4    based on the child's total picture, and there are some

5    variations.  And there's also measurement variations.  You

6    know, we're talking about measuring very -- you know, tenths

7    of centimeters, and different people measure different ways.

8    So what we're looking for is a very consistent and obvious

9    change in head circumference over time.

10   Q    So are you suggesting in this area we should not trust the

11   medical records like we have in the other areas?

12   A    Well, I can tell you that there's lots of different

13   measurements that you see often jumping around in head

14   circumferences.

15   Q    There are also lots of different ways to mess up a blood

16   test, right?

17   A    Not as much as there is a head circumference.

18   Q    You told us earlier that computers are no good at finding

19   morphology?

20            MR. TELISMAN:  Objection.  That's argumentative.

21            THE COURT:  Overruled.

22   BY THE WITNESS:

23   A    They aren't.  They give pretty -- some random results.

24   It's not unusual when you're a clinician to have odd

25   morphological results on a single test.

Jenny - cross

1  BY MR. BLEGEN:

2  Q    And on a, for example, a lumbar puncture could, because it

3  wasn't done expertly, cause there to be some blood in the

4  spinal fluid, right?

5  A    Yes.

6  Q    Okay.  So there's another way that things can mess up,

7  correct?

8  A    That's right.

9  Q    But I thought that you early on said that you were basing

10  your conclusion on the medical records?

11  A    I am.

12  Q    But in this instance you think maybe they measured the

13  heads wrong?

14  A    I can't tell you one way or the other.  I think that I

15  wasn't particularly concerned, looking at the overall chart of

16  her head growth, that it was abnormal.

17  Q    That's -- if you were a pediatrician examining at the

18  time, am I right that you would not have been particularly

19  concerned?

20  A    Well, if she had a soft, which -- a soft, pulsatile

21  fontanelle, which she consistently had on all her exams, and

22  no signs of any increased pressure, I wouldn't be concerned.

23  If she had a bulging fontanelle, I would send her for a CAT

24  scan.

25  Q    But looking back in hindsight, knowing that she had a

1   chronic subdural hematoma, are you telling us that the head

2   circumference increase doesn't tell us anything about when

3   that first came about?

4   A   I don't think it can tell you when it first came about.  I

5   don't know when it first came about.

6   Q   When a mother comes in with her child who's a few days old

7   or a day old and says, oh, my goodness, the head is misshapen,

8   it looks like a cone head, what do you tell that mother about

9   the molding and when it will go away?

10  A   I would tell them to wait and see, the baby should look

11  better over time.

12  Q   How much time?

13  A   I don't think that I have any data on the length of time

14  that takes.

15  Q   I'm going to show you what I've marked as Petitioner's

16  Exhibit Jenny 1.  Does that appear to be an Internet printout

17  from the University of Maryland Medical Center?

18  A   Yes.

19          MR. TELISMAN:  Your Honor, I'm going to object at

20  this point based on an improper foundation for this document

21  for purposes of impeachment.

22          THE COURT:  Overruled.

23  BY MR. BLEGEN:

24  Q   Can you read what it says under the two child head

25  pictures.

Jenny - cross

1  A    Minutes after birth, after 24 hours.

2  Q    I'm sorry.  Then the sentence that starts under the word

3  Adam.

4  A    During a headfirst birth --

5        "During a headfirst birth, pressure on the head

6  caused by the tight birth canal may mold the head into an

7  oblong rather than round shape.  Newborn head molding is a

8  common occurrence that usually disappears after a few days."

9  Q    Do you think that they're wrong about that, that they

10 don't really know when it goes away?

11 A    I've certainly seen some kids that have it over time where

12 it persists.

13 Q    Have you seen any who have it up to their second month of

14 life from molding?

15 A    No.

16 Q    And that's what you would have to have here in order to

17 attribute the increase in head size to molding resolving

18 itself, right?

19 A    That's right.

20 Q    And that has never happened in your experience, correct?

21 A    I haven't seen molding up to two months.

22 Q    Early on in your testimony you gave us sort of a list of

23 things that you and other doctors I think in your hospital --

24 I think it's Hasbro; is that right?

25 A    Yes.

1  Q   -- look at when you're trying to determine whether there

2  was a abusive head trauma incident.  Do you recall that list,

3  starting with like signs and symptoms?

4  A   Yes.

5  Q   Okay.  First of all, the name abusive head trauma is a

6  recent change from shaken baby syndrome, right?

7  A   Well, some of us have been using it.  I wrote papers on it

8  in the '90s actually, so some of us used the term for a long

9  period of time.  The Academy of Pediatrics statement I think

10 was in 2010.

11 Q   All right.  So when you say you've been using the term a

12 long time, do you mean with like your friends, or have you

13 been writing articles saying we've got to change the name from

14 shaken baby syndrome to abusive head trauma?

15 A   I've been using it in articles that I've written.

16 Q   And isn't one of the reasons that the name was changed

17 because doctors, scientists and everyone are having trouble

18 concluding what the mechanism is in shaken baby syndrome that

19 causes the injuries?

20 A   It's -- in any individual case it's very difficult to know

21 what the mechanism was if you weren't actually observing the

22 event.

23 Q   I mean, it's -- well, leaving aside individual cases, it's

24 difficult in general, right?

25 A   I'm sorry.  I don't understand.

Jenny - cross

1   Q   I'm sorry.  It was probably a bad question.

2          You said in an individual case it's hard to decide

3   what the mechanism is without a witness.

4   A   Well, we don't always know.  Sometimes it's obvious;

5   sometimes it's not.

6   Q   But the shaking theory is also difficult to prove, is it

7   not?

8   A   To prove using what?

9   Q   Evidence.

10  A   Well, certainly it's not difficult to prove if you use

11  confessions and perpetrator admissions.

12  Q   Aren't those two the same things?

13  A   I guess.

14  Q   Okay.  Let's talk about that for a second.  You -- correct

15  me if I'm wrong, and I may not word it exactly right, but

16  there is in somewhat recent years in medicine a demand that

17  doctors use what is called evidence based medicine in order to

18  make a diagnosis, correct?

19  A   Yes.

20  Q   And that's a shift from the old days where they just kind

21  of used to see a bunch of symptoms and then prescribe it to a

22  cause?

23  A   That's right.

24  Q   Okay.  Am I correct that the evidence base for abusive

25  head trauma or shaken baby syndrome is confessions?

Jenny - cross

1   A   There is more than that.  That is not the entire evidence
2   base.
3   Q   So it's part of the evidence base, correct?
4   A   Yes.
5   Q   What are the other parts?
6   A   The other parts are differences in the abusive head trauma
7   signs and symptoms that we see versus accidental head trauma
8   signs and symptoms in well-documented case series.  Obviously
9   nobody's ever going to do a controlled clinical trial.  You're
10  never going to pick up a half a dozen babies and shake them
11  and compare them to a half a dozen babies you don't shake, but
12  there are certainly other ways of obtaining data through
13  clinical inquiry.
14  Q   There is a particular aspect of abusive head trauma or
15  shaken baby syndrome that has to do with whether there is a
16  lucid interval or not, correct?
17  A   Yes.
18  Q   Am I right that the evidence base for the theory that
19  there is no lucid interval is entirety based on confessions?
20  A   It depends on how you define lucid interval.  The problem
21  is, you know, does the child immediately lose consciousness,
22  do they get sleepy, do they start -- you know, what do you
23  call lucid interval, and when people have looked at that, they
24  have not been precise in defining how they -- how they've
25  defined that term.

Jenny - cross

1    Q    All right.  But is -- are confessions the evidence base

2    for saying that there is no lucid interval?

3    A    There is no lucid interval.  I think that's part of it.

4    And also comparable injuries, brain injuries that occur in

5    automobile accidents and falls out of windows.  We have

6    comparable data.

7    Q    Let me go back to the evidence base for shaking.  Do you

8    agree that there is a problem in developing a comprehensive

9    argument supporting shaking as the mechanism that causes -- as

10   the mechanism in abusive head injury, shaking alone?

11   A    As a potential mechanism, no, I do not agree with that.

12   Q    You do not agree with that?

13   A    No.

14   Q    What was the name of the book that you wrote that you said

15   was a very authoritative or the most authoritative book on --

16   A    Child Abuse and Neglect:  Diagnosis, Treatment and

17   Evidence.

18   Q    All right.  Did a Dr. Diaz write a chapter in that book?

19   A    Yes, he did.

20   Q    Can I show you -- or I will show you what's marked as

21   Petitioner's Exhibit Jenny 9.  This is a chapter.  It looks to

22   me like it was finished in maybe -- you tell me.  Do you know

23   when this chapter was completed?

24   A    Well, the book was published in November of 2010, so I

25   assume sometime in that summer.

Jenny - cross

1    Q    All right.  In the upper right-hand part of his chapter

2    doesn't Dr. Diaz say, "Unfortunately, nobody has yet

3    marshalled a coherent and comprehensive argument in support of

4    shaking as a causal mechanism for abusive head injury"?

5    A    He says that, yes.

6    Q    Is he wrong?

7    A    Well, he then goes on for the next, you know, ten pages to

8    talk about the scope of the evidence, so I think he was being

9    very conservative there.

10   Q    Well, it was your book, right?

11   A    Yes.

12   Q    So you could have told him not to put that in there, I

13   presume?

14   A    I could have.

15   Q    Or rejected his chapter?

16   A    Oh, I wouldn't have.  It's one of the best chapters in the

17   book.

18   Q    Okay.  But he believes that no one has marshalled a

19   coherent and comprehensive argument in support of shaking as a

20   causal mechanism for abusive head injury?

21   A    Yes.  That's what he wrote.

22   Q    And then he goes on to conclude that confessions are the

23   evidence base for shaking in abusive head trauma cases,

24   correct, on Page 368 in the upper right corner?

25   A    Well, I think that's certainly one of the -- one of the

Jenny - cross

1   things that he relied on, although he gave an enormous amount
2   of other data in this chapter about the metabolic responses of
3   children to head injuries, the spectrum of accidental injuries
4   that we see.  It's a wonderful chapter, so anything -- I would
5   stand by anything that he wrote in this chapter.
6   Q   So if he says, "To those who argue that the contribution
7   of shaking to the pathophysiology of AHT is a hypothesis
8   lacking a sufficient evidentiary base, the consistent and
9   repeated observations that confessed shaking results in
10  stereotypical injuries that are so frequently encountered in
11  AHT and which are so extraordinarily rare following accidental
12  impact injuries is the evidentiary base for shaking," right?
13  A   Yes.  That's what he says, yes.
14  Q   And you said you agree with him?
15  A   I agree with -- yes.  I agree with anything he says in
16  this chapter.
17  Q   All right.  So confessed shakings is the evidence base,
18  right?
19  A   I guess what he didn't say is it's not the only evidence
20  base, but it certainly is, I think, important.
21  Q   All right.  Well, you were the editor of this book,
22  though, right?
23  A   Yes.
24  Q   And you edited this chapter?
25  A   I did.

Jenny - cross

1  Q   And you had the opportunity back in 2010 to tell him, wait

2  a minute, you're leaving some stuff out as the evidentiary

3  base, right?

4  A   Well, I think that's the whole chapter actually.

5  Q   You think he talks about other evidentiary bases in there?

6  A   Yes.

7  Q   Am I correct that when you review police reports regarding

8  an alleged perpetrator statements that if they confess to

9  shaking the baby, you accept that as true, but if they deny

10  shaking the baby, you look for inconsistencies in order to

11  indicate that the person is lying?

12  A   What I look for is consistencies between what people say

13  and the types and nature of injuries that the child has.

14  Q   Well, but that's not what you did in this case, is it?

15  A   That's what I did in this case.

16  Q   You said there was an inconsistency based on whether

17  Miss Del Prete went into the kitchen or not.

18  A   I just mentioned that that was an inconsistency in the

19  history and I was unclear what the sequence of events was.

20  Q   No.  What you said was that you mentioned that

21  inconsistency because it showed some lack of caring or

22  callousness or words to that effect, right?

23  A   I never said that.

24  Q   You didn't say something about propping somebody -- a

25  young child up on the couch and then leaving them?

Jenny - cross

1    A   Well, I thought that was not a good thing to do.  Yeah, I
2    thought that was not good childcare.
3    Q   But that's the inconsistency you're talking about?  You
4    said it was inconsistent in her -- she was inconsistent in her
5    statements to police as to whether she propped the child up on
6    the couch and went all the way into the kitchen or propped the
7    child up on the couch and went a few feet away to get a cloth
8    out the bag.
9    A   She wasn't inconsistent about propping.  She mentioned it
10   in all of the versions, that she propped the child.
11   Q   I know.  It's the going to the kitchen or not.  Do you
12   think that's an inconsistency or no?
13   A   I wasn't quite sure what order things happened and how
14   long she was gone.
15   Q   And there was another not so much an inconsistency, but
16   you had another problem with her statement with regard to
17   trying to feed the baby milk at one point, right?
18   A   Yes.  I had a problem with that.
19   Q   And you said, "I don't know why she would do that when the
20   baby was limp," correct?
21   A   Yes.
22   Q   All right.  Well, in her statements to police she told
23   them why she did that, right?
24   A   Well, she said she thought the baby was asleep, but it's
25   also not safe to feed a baby when they're asleep.  They can

Jenny - cross

1    aspirate.

2    Q    Didn't she previously say that sometimes the baby would

3    suck on a bottle when she was asleep or half asleep?

4    A    I thought she said she sucked on the pacifier.

5    Q    Well, let's take a look at the reports.  I'll show you

6    what I marked as Petitioner's Exhibit Jenny 15.

7              MR. BLEGEN:  This is going to take a second, Judge.

8    There's multiple reports.

9    BY MR. BLEGEN:

10   Q    Petitioner's Exhibit Jenny 16, Petitioner's Exhibit Jenny

11   17, and Petitioner's Exhibit Jenny 18.

12             Are these the police reports you relied on when you

13   were testifying on direct about the inconsistencies?

14   A    I did review these, yes.

15   Q    Okay.  Tell me where you found the inconsistency regarding

16   the going to the kitchen or not.

17   A    Well, on one she says she propped the baby up on the couch

18   and she was away for a moment or two.

19   Q    Which report are you looking at?

20   A    I can't read the person's signature.  It starts with a K.

21   Q    Just give us the exhibit.

22   A    I'm sorry.  Exhibit 18.

23             In this one she said --

24   Q    Give us the -- I'm sorry.

25   A    In 17 she said she propped her up on the couch, leaned her

Jenny - cross

1   against a pillow, stepped away to grab a burpy cloth so she
2   could feed her a bottle.
3   Q   Did she say how long she was away from the child?
4   A   No, she did not.
5   Q   And you're on 17?
6   A   That was 17, yes.
7   Q   Doesn't she say, "Jennifer said she was only away from
8   Isabella a couple of seconds"?  It's the third line down
9   under -- I'm sorry, the line right under burpy.
10  A   Yes, she was away for a couple of seconds.
11  Q   All right.  And do you see an inconsistency between a
12  couple of seconds and a moment or two?
13  A   No.
14  Q   All right.
15  A   In the Exhibit 15 she said that Isabella soiled her
16  diapers, I placed a new outfit on her, she observed that she
17  appeared to be sleeping, made a snorting sound and her head
18  fell backwards, picked her up and attempted to give her a
19  bottle, she didn't suck, the milk fell out of her mouth, she
20  was limp, she called 911.
21  Q   Is that an inconsistency you're pointing to?
22  A   No.
23      The next one she said she went and made a bottle and
24  that she put her in the swing, they're eating -- the kids
25  finished lunch, she heard her start to fuss, she went to get a

Jenny - cross

1  bottle, prepared it for the microwave, walked over to

2  Isabella, began talking to her.

3  Q  Let me stop you there for a second.  You're on

4  Petitioner's Exhibit --

5  A  I'm sorry.  This is 16.

6  Q  And this part about going into the kitchen to prepare the

7  bottle, the child is in the swing at this point, correct?

8  A  It's unclear.

9  Q  Read from the beginning of the paragraph to yourself.  You

10  don't have to read it out loud.

11  A  All right.  She doesn't say she took her out of the swing

12  at that point, so she was most likely in the swing.

13  Q  So and that's one of the inconsistences you had is you

14  were wondering whether she stepped only a few feet away from

15  the couch or went all the way into the kitchen, right?

16  A  Right.

17  Q  But that's not an inconsistency, is it, because she was in

18  the swing?

19  A  Right.

20      She walked over to Isabella, began talking to her,

21  she was -- the baby was smiling, somewhat crabby, she went to

22  the diaper bag, pulled out medication, prepared it with the

23  wipes, the rice bowl and the bib, laid her down on the couch,

24  had a large bowel movement, went and changed her, she started

25  to cry, cleaned her up.

Jenny - cross

1  Q   And maybe the inconsistency you're looking for is there,

2  in parenthesis, 15 to 20 seconds at the top of the second to

3  last paragraph on that first page?

4  A   Oh, I see.  She went, yeah, to the diaper, to the diaper

5  bag.

6  Q   Is that the inconsistency you were referring to?

7  A   No.  I must -- I misstated.  She -- I thought that she had

8  gone to the kitchen after she had put the baby on -- propped

9  up.

10 Q   So in fact she was very consistent in her statements about

11 what happened, was she not?

12 A   Yes.

13 Q   Okay.  So that undercuts part of your conclusion that this

14 baby suffered abusive head trauma at the hands of Jennifer Del

15 Prete, right?

16 A   A part of it, yes.

17 Q   Okay.  And the fact of the matter is, is that she was

18 giving -- she gave four statements at four different times to

19 four different people, right?

20 A   Right.

21 Q   And I don't know -- it sounds like you're pretty familiar

22 with police reports, but the police don't let you write down

23 your own police report, do they?

24 A   It depends.

25 Q   Well, you can give a confession in writing, correct?

Jenny - cross

1    A    Yes.

2    Q    But you don't get to write it yourself in the middle of a

3    police report, do you?

4    A    I don't know.  I've never -- I've never been arrested.

5    Q    All right.  You know from looking at police reports,

6    however, that it is the policemen who are taking the

7    statements, correct?

8    A    That's right.

9    Q    And they are characterizing what is said, correct?

10   A    That's right.

11   Q    And that's the same thing that happens in these

12   confessions, is it not?

13   A    I'm not sure I understand.

14   Q    An evidentiary base for shaken baby syndrome is

15   confessional studies, right?

16   A    That's part of it, yes.

17   Q    You don't know when you decide to rely on a confession as

18   an evidentiary base, you don't know what questions the police

19   officer asked, correct?

20   A    Often I do.

21   Q    You do?

22   A    Yes.

23   Q    Do you know what the atmosphere of the interrogation was,

24   whether it was antagonistic, yelling and screaming, those kind

25   of things?

Jenny - cross

1   A   Yeah.  I watched many videos.

2   Q   You have?

3   A   Yes.

4   Q   Have you watched the videos for all of the confessions

5   that you're using as the evidentiary base?

6   A   No.

7   Q   You don't know whether the police officers made misleading

8   statements to the perpetrator before they confessed, do you?

9   A   No.

10  Q   You know that that happens sometimes, though, right?

11  A   Yes.

12  Q   Sometimes the police officer will say, you know,

13  everything you just told us a doctor said is medically

14  impossible even though they've never even spoken to a doctor,

15  right?

16  A   That has happened, I'm sure.

17  Q   Okay.  And it leads to a confession, right?

18  A   Sometimes.  I guess.  I don't know.

19  Q   You don't know whether some of the confessions in your

20  confessional study base are those kind of confessions, right?

21  A   I don't know.

22  Q   So what you're relying on is essentially the criminal

23  justice view of whether somebody confessed or not?

24  A   Well, not really, because I've had many people come in and

25  I say what happened and they tell me.  You know, they're in

Jenny - cross

1    tears, and they're devastated, but the patient -- parent walks

2    in and they just start telling me what they did.  And I don't,

3    you know, say bad things to them or lie to them or in any way

4    interrogate them.  I just take a medical history.

5    Q    In addition to confessions to police, you think the

6    confession base is also people confessing to you?

7    A    Well, they're not confessing.  I ask them what happened,

8    and they're giving me a medical history.

9    Q    All right.  Well, I didn't pick the term confessional

10   studies.  You call them confessional studies, right?

11            Are those part of your confessional studies that

12   you're relying on?

13   A    Some of the kids that cases that we reported in our --

14   cases we reported in our studies were parents who came in and

15   described to us what happened --

16   Q    All right.

17   A    -- in the emergency department.

18   Q    And I take it some of those parents said I only shook the

19   baby, right?

20   A    Well, they say things like I was furious, I was so upset,

21   the baby wouldn't stop crying, I picked her up and I shook him

22   really hard multiple times and he collapsed in my arms.  And

23   the father comes in just totally dissolved in tears.  And I've

24   had that happen on more than one occasion.

25   Q    But you don't know whether that individual is telling the

Jenny - cross

1    truth or not?

2    A    Is he lying to me?

3    Q    Correct.

4         They could have done significantly more than just

5    shaking, right?

6    A    They could have, yes.

7    Q    Could have hit the kid on the head multiple times with

8    their fist or a phone book or something else, right?

9    A    That's right.

10   Q    Okay.  So you don't know even when they make the statement

11   to you that what they're telling you is the truth, right?

12   A    No.  I don't know that they're telling me the truth.

13   Q    I want to talk to you a little bit about the theory of

14   lucid intervals that we were discussing a little bit earlier.

15   Okay?

16   A    Right.

17   Q    Whether there are lucid intervals or not is critical to

18   your conclusion that Jennifer Del Prete subjected this child

19   to abusive head trauma, right?

20   A    Yes.

21   Q    Because if there can be lucid intervals of any length of

22   time or more than four or five hours, then she's not the only

23   person who could have done this, right?

24   A    Right.

25   Q    And that's why it's critical, correct?

Jenny - cross

1   A   Yes.

2   Q   Now, in your report you indicate that lucid intervals

3   essentially exist, right?

4   A   Can you refer me to the --

5   Q   Sure.

6   A   -- the --

7   Q   Paragraph 13 on Page 16 of your report.

8   A   Paragraph 13?

9   Q   Yes.

10  A   Okay.

11  Q   On Page 16.  Do you see that paragraph?

12  A   Yes.

13  Q   So you state, "In cases where people confess to shaking or

14  slamming an infant causing serious head injury, they describe

15  the infant as looking symptomatic immediately after the injury

16  occurs," correct?

17  A   Yes.

18  Q   So that's the confessional studies used to validate the

19  lack of lucid intervals, right?

20  A   Right.

21  Q   But then you say next, "Certainly the progression of the

22  symptoms can occur more slowly in some infants than in others,

23  but an infant would not appear normal after a serious brain

24  injury," correct?

25  A   That's right.

Jenny - cross

1    Q   But by not appearing normal, you don't mean unconscious
2    and not breathing, right?
3    A   No, I do not mean that.
4    Q   Not normal could be listless, right?
5    A   That's right.
6    Q   Which could mean sleeping a lot, right?
7    A   Yes.
8    Q   It could mean irritability, correct?
9    A   Yes.
10   Q   It could mean vomiting?
11   A   Yes.
12   Q   What about diarrhea?
13   A   We don't see that often after an abusive head trauma
14   episode acutely.
15   Q   That is associated with seizures, though, right, lose
16   stools?
17   A   No.  I read that in one of the reports, and I'm thinking
18   I've seen an awful lot of kids seize, and they rarely lose
19   their bowel -- well, they rarely have massive diarrhea after a
20   seizure.  I've not seen it.
21   Q   Okay.  But that doesn't mean that it doesn't happen, does
22   it?
23   A   I looked in the literature, and I really couldn't find any
24   articles that would substantiate that.
25   Q   And just talking about seizures again for a second, in one

Jenny - cross

1  of the police reports Miss Del Prete does indicate that the

2  child -- at the time of the incident the child's lips were

3  quivering, right?

4  A   Yes.

5  Q   That's consistent with a seizure, is it not?

6  A   It can be, but it doesn't necessarily mean -- her lips

7  quivered a lot when she was in the hospital without seizure

8  foci at the time.

9  Q   Okay.  But it could be the sign of a seizure, right?

10 A   It could be.

11 Q   And you don't have any evidence to believe that Jennifer

12 Del Prete somehow knew what signs or symptoms to make up to

13 make something look like a seizure, do you?

14 A   I'm sorry.  I can't answer that question.

15 Q   Never mind.

16       But to finish up with your paragraph on lucid

17 intervals, you say, "Certainly the progression of symptoms can

18 occur more slowly," right?

19 A   Yes.

20 Q   Meaning they can come on over a matter of hours?

21 A   That's right.

22 Q   Or even days, right?

23 A   It would really depend on the nature of the initial

24 injury.  In an injury that's as devastating as this one, I

25 would think that days would be surprising.

Jenny - cross

1    Q    So under your own theory and presuming that you're right

2    that the chronic subdural was a result of abusive head trauma,

3    that could have occurred prior to 12/28/02, correct?

4    A    Yes.

5    Q    And she could have collapsed as a result of that prior

6    incident of abusive head trauma?

7    A    Well, I would expect if she collapsed because of that

8    prior event on 12/28, she would not have chronic subdurals.

9    She would have subacute subdurals that were two or three days

10   old, not ten days old.

11   Q    Do you agree with the theory that a chronic subdural

12   hematoma can stretch the veins in the brain around it and then

13   maybe can -- those veins can rupture with normal handling or

14   minimal trauma?

15   A    I disagree with that.  I disagree with that because when

16   we see kids that have rebleeds from old subdurals, they really

17   don't get a clinical change in their status.  They don't go

18   from being very well to being critically ill.  We don't see a

19   change in the neurologic status with rebleeding of old

20   subdurals.

21   Q    Maybe I asked the question poorly.  Can an old -- a

22   chronic subdural that is increasing in size cause the veins

23   around it to stretch and either leak or rupture?

24   A    It can.

25   Q    All right.  And I'm not talking about the tiny little

Jenny - cross

1  capillaries.  I'm talking about either cortical veins or
2  bridging veins or any of those bigger kind of veins.
3  A   That's right.
4  Q   It can cause that, correct?
5  A   Right.
6  Q   So we know that this child had a chronic subdural
7  hematoma, correct?
8  A   Yes.
9  Q   And that could have caused other veins to stretch and then
10 either leak or rupture, correct?
11 A   Not spontaneously as far as I know.
12 Q   How about with normal handling?
13 A   I have not seen that, but I -- I -- I really -- I don't
14 know.
15 Q   How about with minor trauma?
16 A   With trauma I expect you could get rebleeding from
17 bridging vein disruption.
18 Q   I don't want to quibble about the word "minor," but from
19 minor trauma that would not necessarily be intentionally
20 abusive.
21 A   Yeah.
22 Q   Could it happen there?
23 A   Yes.  But you wouldn't get the massive brain injury.
24 Q   All right.  Well, let's -- let me finish my point on lucid
25 interval and then I'll go back to the --

Jenny - cross

1   A   Okay.

2   Q   It is in fact pretty well established now, is it not, that

3   there can be a lucid interval following some episode of abuse,

4   correct?

5   A   It depends on how you define lucid interval.  Not all

6   children who get abused immediately decompensate and stop

7   breathing and die.  What I would -- I think what the

8   literature is very clear about is that kids don't look normal

9   after they have a massive head injury.

10  Q   And we've -- but we've discussed what normal means, right?

11  A   Right.

12  Q   It doesn't mean collapsing, correct, necessarily?

13  A   Not necessarily.

14  Q   It means something that could be mistaken as another

15  problem, right?

16  A   Yes.

17  Q   Could be mistaken as a colicky baby, right?

18  A   Yes.

19  Q   Could be mistaken as a stomach virus that's causing the

20  baby to vomit, correct?

21  A   Yes.

22  Q   It could be mistaken as the baby was up all night cause

23  the dog was barking and now it's sleeping all day, right?

24  A   Yes.

25  Q   Are you familiar with the -- I assume you are familiar

Jenny - cross

1  with the -- with -- I think it's, what is it, a magazine
2  Pediatrics from the American Academy of Pediatrics?
3  A   That's the journal of the academy, yes.
4  Q   Right, the journal.  I didn't mean to denigrate it by
5  calling it a magazine.
6          You know that the American Academy of Pediatrics now
7  agrees that there can be these kind of lucid intervals where
8  the baby is not perfectly normal but is not crashed?
9  A   That's right.
10 Q   And that's changed in recent years, correct?
11 A   I don't know.  I think that it's certainly been something
12 that we've been talking about for a long time, and I think
13 that in general most pediatricians would say that after an
14 abusive head trauma episode, you know, you may see --
15 including myself, I would say, you'll see vomiting,
16 irritability in the absence of fever and increased sleepiness
17 and lethargy as signs of trauma.  It can be, and that's why
18 it's so hard to diagnose, because it can be flu.
19 Q   Right.  But that's also what makes it so hard to pinpoint
20 timing-wise, right?
21 A   It can, yes.
22 Q   You can no longer say that the last person to see the
23 child conscious must have been the person who abused the
24 child, right?
25 A   That's right.

Jenny - cross

1    Q    And isn't that exactly what happened here?

2    A    I'm sorry.

3    Q    Jennifer Del Prete didn't confess to hurting this child,

4    correct?

5    A    No.

6    Q    She happened to be the last person with the child when the

7    child was conscious, correct?

8    A    I'd say the last person with her when the child was

9    normal.

10   Q    The child had eating problems in the days and weeks

11   leading up to her collapse, correct?

12   A    I really don't know what the nature of those problems

13   were.  It sounds like she had reflux and some irritability

14   with feeding.

15   Q    Okay.  Isn't that a sign of being not normal?

16   A    40 percent of babies have reflux, so I guess if 50 percent

17   would be normal, it's close to normal.

18   Q    Could a problem resulting from an issue in the brain

19   appear to be acid reflux?

20   A    Yes.

21   Q    How about irritability?  We know, do we not, from -- at

22   least from the records that the child was considered to be a

23   crabby, cryey, colicky child, right?

24   A    Yes.

25   Q    So that's one of these other things that could appear to

Jenny - cross

1    be -- that could be something completely normal or could be a
2    sign of an issue in the brain, right?
3    A    That's right.
4    Q    And all of those things predated December 28th of 2002,
5    correct?
6    A    Well, depending on whose version you look at, yes.
7    Q    But you've already told us you don't have any reason to
8    believe that the owner of the daycare center and the other
9    babysitter who came in were lying, right?
10   A    I have no idea.
11   Q    Okay.  So you take their statements at face value, right?
12   A    Okay.  Yes.
13   Q    All right.  And they said those things, correct?
14   A    Yes.
15   Q    Okay.  So when you say Jennifer Del Prete was the last
16   person to see the child normal, she wasn't the last person to
17   see the child normal, was she?
18   A    Well, according to the reports that I read, when the child
19   left home and arrived at the babysitter, she was perfectly
20   normal, she wasn't irritable, she wasn't vomiting, she wasn't
21   crying, she wasn't lethargic.
22   Q    All right.  Well, she might have been lethargic because
23   she slept quite a bit that morning, correct?
24   A    She slept, yes.
25   Q    Quite a bit, right?

Jenny - cross

1   A   That's not an unusual nap for a three-month-old.

2   Q   But she might have had these signs of irritability, eating

3   problems, the day before, right?

4   A   I don't know.

5   Q   I don't mean to argue with you.  You keep saying you don't

6   know, but you read the reports that said she did have those

7   problems, correct?

8   A   I'm sorry.  I don't recall.  I didn't memorize the

9   records, so I don't recall the exact phrases.

10          THE COURT:  Is this a good place?

11          MR. BLEGEN:  Sure.

12          THE COURT:  We're going to break for ten minutes.

13          You can discuss my suggestion of how much longer he's

14   got and you'll make your decision on the flight situation.

15   We're not going to go past 4:45.

16          (Recess taken.)

17          THE COURT:  Okay.  Mr. Blegen, you can proceed.

18   BY MR. BLEGEN:

19   Q   Dr. Jenny, you had said earlier, I believe, that the

20   chronic subdural hematoma did not cause the child to collapse,

21   correct?

22   A   Yes.

23   Q   And I think you said that was because it was relatively

24   small, like a centimeter and a half?

25   A   Yes.

Jenny - cross

1 Q   And is the reason that it would not have caused the child
2 to collapse because it wasn't big enough to push the brain and
3 smush it so that the child would collapse?
4 A   Yes.
5 Q   All right.  But it's also true, is it not, that the acute
6 subdural hematomas were not big enough to cause the child to
7 collapse for that reason, correct?
8 A   Yes.
9       MR. BLEGEN:  Rob, could you put up slide Julie Mack
10 Slide 3.
11 BY MR. BLEGEN:
12 Q   Ignore the little red arrow for a second, but am I right
13 that this dark area here and here is the chronic subdural
14 hematoma?
15 A   Yes.
16 Q   And it's -- and this is at least one of the acute subdural
17 hematomas?
18 A   Yes.
19 Q   But the chronic is bigger than the acute, right?
20 A   Right.
21 Q   And that's true for all of the acute subdural hematomas,
22 correct?
23 A   Yes.
24 Q   The chronic is much bigger than the acute, correct?
25 A   That's right.

Jenny - cross

1  Q   Now, does that lead you to believe that the chronic
2  subdural was caused by greater force than the acute subdural
3  hematomas?
4  A   I don't think it's at all related.  I mean, there's no way
5  of knowing.  You can't -- you can't equate force to size in
6  hematomas.
7  Q   All right.  You said that you believe the acute subdural
8  hematomas are the result of ruptured bridging veins, correct?
9  A   Yes.
10  Q   And you think that that ruptured bridging -- those
11  ruptured bridging vein or veins is the result of abusive head
12  trauma, correct?
13  A   Yes.
14  Q   That's the same cause you attribute to the chronic
15  subdural hematoma?
16  A   I think that's the most likely cause.
17  Q   But I would -- would it be incorrect to conclude that
18  there must have been more bridging veins ruptured as part of
19  the chronic episode than the acute episode based on the size?
20  A   No, I don't think you could say that.
21  Q   Now let's talk about the little red arrow for a second.
22  You said that you read in the report that Dr. Barnes indicated
23  that he found a thrombosed cortical vein, correct?
24  A   Yes.
25  Q   Did you read that Julie Mack also found that thrombosed

Jenny - cross

1    cortical vein?

2    A    Yes.

3    Q    And did you know, although he didn't say it in his report,

4    that Dr. Hedlund said that they might be right that this is a

5    thrombosed cortical vein?

6    A    I didn't know.

7    Q    If you knew that, would that change your opinion about

8    whether the child suffered from CVT?

9    A    Well, CVT is the large venous sinuses.  This is not a

10   large venous sinus.

11   Q    Well, maybe I'm confused.  I thought there was something

12   called cerebral venous sinus thrombosis, correct?

13   A    Right.

14   Q    There's also something called cerebral venous thrombosis?

15   A    Well, a small peripheral vein is not going to cause you to

16   collapse.  Cerebral venous, the sinus thrombosis is a large

17   collecting vein that directs blood back to the heart.

18   Q    CVT, leaving out the sinus, cannot cause seizures?  Is

19   that what you're saying?

20   A    Can it cause seizures.  I don't know.

21   Q    Do you agree with me that CVT is recently becoming known

22   as a hard to find disease?

23   A    You know, you're out of my field here.  I can't comment on

24   the radiological findings.

25   Q    All right.  But forget about radiology for a second.  In

Jenny - cross

1    your treatment of children, do you agree that CVT is kind of a

2    tricky diagnosis?

3    A    No.

4    Q    You don't agree?

5    A    No.

6    Q    And why do you think it's a relatively simple diagnosis?

7    A    Well, I mean, it's not a diagnosis I make.  It's a

8    radiologic diagnosis.

9    Q    Oh, all right.  Do you think it's tricky for the

10   radiologists?

11   A    My radiologists don't seem to think so.

12   Q    Let me show you what's previously been admitted as

13   Petitioner's Exhibit Rorke-Adams 1, which is an article from

14   looks like Stroke, the Journal of American Heart -- from the

15   Journal of American Heart Association.  Do you see that?

16   A    Yes.

17   Q    Can you look at the first paragraph on Page 1159 in the

18   upper right corner and just read to yourself starting with

19   "Thrombosis."

20   A    Okay.

21   Q    So do you agree with me now that despite advances in the

22   recognition of CVT in recent years, diagnosis and management

23   can be difficult because of the diversity of underlying risk

24   factors and the absence of a uniform treatment approach?  Do

25   you agree with that, I mean?

Jenny - cross

1    A    Yeah.  The treatment can be difficult, especially since
2    there's so many associated, like pregnancy and dehydration, so
3    many associated conditions.
4    Q    Right.  But you forgot about the word "diagnosis,"
5    diagnosis and management can be difficult.
6    A    It's -- I don't -- it's something we don't see very often
7    in children, and I think that these underlying conditions are
8    not things we see very often in children.  I'm sure it may be
9    very difficult for the adult doctors to diagnose, but it just
10   is not an issue in pediatrics to a great extent.
11   Q    Meaning you don't see it a lot or it's easy to find?
12   A    It's a radiologic diagnosis.  I don't diagnose it.
13   Q    Okay.  So it's out of your realm?
14   A    Yes.
15   Q    All right.  But you do agree with me now at least that
16   there are two different kinds of thrombosis in veins; there's
17   dural sinus and/or cerebral vein thrombosis, correct?
18   A    Yes.  Small veins.
19   Q    When we first started talking about your work at Hasbro
20   Hospital, you said that there's several things that you look
21   at when you're trying to determine if a case involves abusive
22   head trauma, correct?
23   A    Yes.
24   Q    Signs and symptoms, correct?
25   A    Yes.

Jenny - cross

1  Q   Extensive history?

2  A   Yes.

3  Q   Skeletal study?

4  A   Yes.

5  Q   Autopsy?

6  A   Yes.

7  Q   Lab testing, correct?

8  A   Yes.

9  Q   All right.  So I'm correct that whether or not bone

10 injuries are found is important in making a diagnosis of

11 abusive head trauma, correct?

12 A   Yes.

13 Q   And the fact that there were no skeletal injuries in this

14 case is an important factor weighing against the conclusion of

15 abusive head trauma, correct?

16 A   It's an important factor.

17 Q   All right.

18 A   Yes.

19 Q   And similarly, the lack of bruising is an important factor

20 weighing against the diagnosis of abusive head trauma,

21 correct?

22 A   It's one of the factors, yes.

23 Q   And it's an important factor, correct?

24 A   Yes.

25 Q   And the lack of other sorts of outward injuries is

Jenny - cross

1  similarly important in making a diagnosis of abusive head
2  trauma, right?
3  A   Yes.
4  Q   You said something about contusions to the brain on direct
5  testimony, and I'm not sure I completely understood it, so
6  correct me if I'm wrong.  You said that an infant's brain can
7  get contusions, correct?
8  A   Yes.
9  Q   Is there a difference between contusions and lesions?
10 A   I'm sorry?
11 Q   Is there a difference between contusions and lesions?
12 A   Well, a contusion means, you know, essentially a bruise or
13 a bleeding into the tissues.  A lesion could be a tumor or
14 anything.
15 Q   Okay.  Is it common for infant brains to get contusions?
16 A   Well, it's not common for infants to get brain trauma, so
17 I can say no, it's not common.
18 Q   All right.  Is it common for infant brains to get
19 contusions even when there is some impact to the head?
20 A   Yeah.  It is common, yes.
21 Q   It doesn't require an excessive or unusual amount of
22 force?
23 A   I mean, we see it in kids that fall from their parents'
24 arms onto a concrete step and they don't lose consciousness,
25 but they'll get a localized contusion under the impact site.

Jenny - cross

1  Q   Do you recall testifying in a case called State of Arizona
2  versus William Mesa, Jr?
3  A   No.  Well, I did, but I don't -- that was a long time ago.
4  There was a case called that.
5  Q   All right.  Do you recall testifying in the case?
6  A   I don't know if that one -- I don't know.  I don't
7  remember.  I did three cases in Arizona and one of them didn't
8  go to court.
9  Q   Well, why don't you take a look -- I want to ask you a
10 question, but take a look at Page 170 and your answer there.
11 Just take a look at it and let me know when you've had a
12 chance to see it.
13 A   Okay.
14         MR. BLEGEN:  Judge, I don't have another copy.
15         THE COURT:  That's all right.
16         MR. BLEGEN:  I think there's going to be an
17 objection, Judge, but I'll ask the question first.
18 BY MR. BLEGEN:
19 Q   Didn't you indicate in this case in your testimony that it
20 is unusual to get contusions in a child's brain because it
21 takes an enormous amount of force to contuse or contuse the
22 brain?
23         MR. TELISMAN:  I'll object.  It's not impeaching.
24         THE COURT:  Overruled.  Goes to weight.
25 BY THE WITNESS:

Jenny - cross

1  A    It's rare to see contusions in children's brains because

2  they don't get them with, you know, normal handling or even

3  with minor accidents.  But certainly in abuse cases we do see

4  them, and in substantial accidents we see them.

5  BY MR. BLEGEN:

6  Q    All right.  But do you agree with me that you previously

7  said that it would take -- they are unusual because it takes

8  an enormous amount of force to contuse the brain or contuse

9  the brain?

10  A    Yes.

11  Q    All right.  You are aware, are you not, that there was no

12  finding of contusions to the brain on radiology in this case,

13  correct?

14  A    Yes.

15  Q    And then --

16  A    There was one mention.  One neurosurgeon said that he

17  interpreted the scan as having a contusion, but that was

18  not -- nobody else mentioned that.

19  Q    Including the experts who have looked at it recently from

20  our side and your side, right?

21  A    Right.

22  Q    But then you said something about the gold standard for

23  contusions on the brain being autopsy, right?

24  A    Yes.

25  Q    But the autopsy of the brain in this case also found no

Jenny - cross

1   contusions, correct?

2   A   I -- I'm not sure that that was the case.  According to --

3   my understanding of Dr. Rorke's report was that she saw some

4   secondary scarring resulting from contusion.

5   Q   Well, she didn't perform the autopsy, did she?

6   A   She reviewed the slides, or the slides and the

7   photographs.

8   Q   You reviewed the autopsy report in this case, right,

9   Dr. Harkey's report?

10  A   Yes.

11  Q   Okay.  And he found no contusions or lacerations or

12  anything on the brain?

13  A   Not that I recall.

14  Q   And you've been -- you testified that you go to, what,

15  three autopsies a year?

16  A   About that, yes.

17  Q   Where is that?  Where do you do that?

18  A   At the medical examiner's office.

19  Q   In where?

20  A   Providence.

21  Q   Providence?  Okay.

22      And I take it that when they do autopsies there, the

23  medical examiner actually handles the brain, right?

24  A   Yes.

25  Q   And takes a close look at it, correct?

Jenny - cross

1  A   Yes.

2  Q   Manipulates it to see if there's any contusions or

3  lacerations or anything like that?

4  A   Yes.

5  Q   Correct?

6        The gold standard for determining contusions and

7  lacerations on the brain is definitely not looking at

8  photographs of the brain years after the autopsy, correct?

9  A   I'm -- you're out of my field.  I can't comment on the

10  relative value of different types of pathological analysis.

11  Q   You can't comment on whether looking at photographs is

12  better than actually handling and personally examining the

13  brain?

14  A   I'm not a neuropathologist.  I can't go there.

15  Q   Well, then how do you know what the gold standard is at

16  pathology?

17  A   Because that's what I'm told.

18  Q   And the gold standard is actually physically handling the

19  brain yourself, right?

20  A   Is autopsy findings.

21  Q   The fact --

22        Right.  And autopsy is a physical handling, correct?

23  A   Well, it's a physical handling, it's the microscopic

24  evaluation, it's the toxicology, it's a very large variety of

25  things.

Jenny - cross

1  Q   You wrote a section in your report based on the autopsy,
2  correct?
3  A   Yes.
4  Q   You said that no focal lesions were noted in the brain,
5  correct?
6  A   Yes.
7  Q   Sorry.  Page 11.
8  A   Okay.
9  Q   You also noted that the brain was semisoft, correct?
10 A   Yes.
11 Q   What the coroner actually reported was that the brain was
12 very soft.  Do you recall that?
13 A   No.  I'm sorry, I didn't -- don't recall that.
14 Q   Why don't you take a look just at the coroner's report
15 here, starting where the brain is.
16         MR. TELISMAN:  What page?
17         MR. BLEGEN:  Harkey 5.
18         THE WITNESS:  Well, it said "Despite weeks in
19 formalin, the cortex remained semisolid and didn't become
20 firm."
21 BY MR. BLEGEN:
22 Q   Right.  Do you see the part where before they put it in
23 formalin what it says about the brain?
24 A   It was very soft.
25 Q   Right.  And he said that even after putting it in

Jenny - cross

1  formalin, it wouldn't fix properly, correct?

2  A   Right.

3  Q   And he said that it was very soft, consistent with

4  autolysis, right?

5  A   Yes.

6  Q   Do you know what autolysis is?

7  A   It's the breakdown of the tissues.

8  Q   And so the brain becomes essentially mushy, correct?

9  A   Yes.

10  Q   And literally pours out of the skull when it's opened?

11  A   Well, not usually.  Usually it's when you pick it up you

12  have to be very, very careful to keep from breaking it apart.

13  Q   Because it's so soft that even the slightest amount of

14  force can mush up parts of it, right?

15  A   Yes.

16  Q   Or the chopping up of it can mush parts of it up?

17  A   Correct.

18  Q   You testified at some length about the various platelet

19  counts in this case, correct?

20  A   Yes.

21  Q   And you agree that there were times where the platelets

22  were very high?

23  A   Yes.

24  Q   1.2 million is very, right?

25  A   Yes.

Jenny - cross

1   Q   And then there were other times when the platelets were
2   normal, correct?
3   A   That's right.
4   Q   And because of that, you've determined that Isabella had
5   reactive thrombocytosis as opposed to primary thrombocytosis,
6   correct?
7   A   Yes.
8   Q   Are there any disorders that can cause your platelet count
9   to fluctuate without being reactive to anything?
10  A   I don't know.
11  Q   And it's your view that the high platelet counts in this
12  case are essentially irrelevant, correct?
13  A   Yes.
14  Q   They were reactive, correct?
15  A   Yes.
16  Q   And your report states that reactive thrombocytosis or
17  type two thrombocytosis is not associated with abnormal
18  bleeding or abnormal clotting of blood?
19  A   That's right.
20  Q   Correct?
21          And then you cited to an article to support that
22  proposition?
23  A   Yes.
24  Q   And that's one of the articles that we discussed here in
25  your direct testimony, correct?

Jenny - cross

1    A    Yes.

2    Q    Is that the Vannucchi article?

3    A    Yes.

4    Q    All right.  So that was Respondent's Exhibit Carol Jenny

5    8, correct?  Remember that?  Or if you could turn to it, if

6    you can find it.

7         Have you found it?

8    A    Yes.

9    Q    Can you point me to the portion of that article that

10   indicates that reactive thrombocytosis is not associated with

11   abnormal clotting of blood?

12        And if it was the part that you and Mr. Telisman

13   discussed, I can point you to that.

14   A    Okay.

15   Q    First let me ask you this question:  What do you mean when

16   you say reactive thrombocytosis is not associated with

17   abnormal clotting of blood?

18   A    Clinically it's not an issue.  We don't treat it.  You

19   don't put a kid with reactive thrombocytosis on chemicals or

20   aspirin or blood thinners or plasmapheresis.

21   Q    So by saying it's not associated, do you mean that it

22   doesn't ever happen, clotting problems don't happen as a

23   result of reactive thrombocytosis?

24   A    Not that I know of.

25   Q    All right.  Well, let's look at the paragraph that

Jenny - cross

1  Mr. Telisman pointed you to, which is on Page 366 and the

2  subheading Thrombocytosis and Thrombosis:  An Uneven

3  Relationship.

4          THE COURT:  Which exhibit was this?  Is this 8?

5          MR. BLEGEN:  8.

6  BY MR. BLEGEN:

7  Q   Do you see that paragraph?

8  A   Yeah.

9  Q   Now, first of all, the part that you did read says

10 generally speaking, reactive thrombocytosis is not a risk

11 factor for thromboembolic complications notwithstanding some

12 other stuff, correct?

13 A   Notwithstanding that the rate of thrombosis is restricted

14 to the venous system in patients with underlying malignancy.

15 Q   All right.  So, first of all, it says generally speaking,

16 right?

17 A   Yes.

18 Q   So reactive thrombocytosis can be a risk factor for

19 thromboembolic complications, correct?

20 A   In the presence of things like malignancies.

21 Q   And the thromboembolic complication, what is that?

22 A   That's an embolus.

23 Q   And is that an embolism that --

24 A   A clot.

25 Q   -- breaks off and then floats down your veins or arteries

Jenny - cross

1   or whatever?

2   A    Yes.

3   Q    That's what an embolism is?

4   A    The arteries.

5   Q    Go down a little farther in the paragraph that starts with

6   "thrombotic complications."  Do you see that right after

7   footnote 29?

8   A    I'm looking to see what HT is.  I'm sorry.  I forgot what

9   they were calling HT.

10  Q    If you read on, I think you'll figure out that HT doesn't

11  really matter from my point of view, but feel free to look it

12  up.

13  A    Okay.

14        THE COURT:  Hereditary thrombocytosis.

15        THE WITNESS:  Which is a primary disease, okay.  Now,

16  where should I start?  I'm sorry.

17  BY MR. BLEGEN:

18  Q    Start from right after footnote 29, "thrombotic

19  complications."

20  A    29.  I'm sorry.  I'm not finding it.

21  Q    I'll read it to you.

22  A    All right.

23  Q    Or maybe I can point it to you.

24  A    Oh, okay.  Oh, here it is.  I'm sorry.

25  Q    Read right after footnote 29.

Jenny - cross

1   A   "Thrombotic complications have been reported infrequently

2   with hereditary thrombocytosis as well as in childhood

3   reactive thrombocytosis although some occurred in children

4   with thalassemia or following splenectomy for different

5   reasons."

6   Q   So --

7   A   So kids with other underlying illnesses.

8   Q   Yeah, some with underlying illnesses, correct?

9   A   Yes.

10  Q   So reactive thrombocytosis in childhood is associated

11  rarely with thrombotic complications?

12  A   In a child who has another underlying illness, yes.

13  Q   Well, where does it say that in that sentence?

14  A   Well, it talks about thalassemia and splenectomies and

15  inherited thrombocytosis.

16  Q   Are you ignoring the part that says although some occurred

17  in children with thalassemia, et cetera?

18  A   I think that's what they were referring to, children that

19  had underlying severe illnesses.

20  Q   Right.  But they're saying only some had those other

21  underlying illnesses, correct?

22  A   I think -- my interpretation is that they do see it occur

23  rarely and the kids have underlying illnesses.  I guess it

24  would depend on how you would interpret the semantics of it.

25  Q   It says, "Thrombotic complications have been reported

Jenny - cross

1    infrequently with HT as well as in childhood reactive

2    thrombocytosis although some occurred in children with

3    thalassemia or following splenectomy for different reasons."

4  A    I think that's what he's -- he's talking about as the

5    exceptions.  He doesn't go on to give an example of a normal

6    child getting reactive thrombocytosis and having clotting

7    problems.

8  Q    Do you not agree that reactive thrombocytosis can in rare

9    occasions cause thrombotic complications?

10 A    I think if the child has other underlying illnesses like

11   malignancies or thalassemia.

12 Q    And you think that's what the author is saying right

13   there?

14 A    That was my interpretation.

15          MR. TELISMAN:  Asked and answered.

16          THE COURT:  I'm sorry?

17          MR. TELISMAN:  Asked and answered, your Honor.

18          THE COURT:  I think it's been covered.

19 BY MR. BLEGEN:

20 Q    It's not just common -- strike that.

21          When you're doing your review to determine if a child

22   suffered abusive head trauma, what you're essentially doing is

23   trying to exclude other possibilities, correct?

24 A    Yes.

25 Q    AHT is a diagnosis of exclusion, correct?

Jenny - cross

1    A    Yes.

2    Q    And so you have to consider other possibilities before

3    concluding that it's AHT, right?

4    A    That's right.

5    Q    And you don't only consider the common illnesses that

6    could mimic AHT, right?

7    A    That's right.

8    Q    You also consider the uncommon or rare conditions that

9    could mimic AHT?

10   A    Yes.

11   Q    Correct?

12   A    Yes.

13   Q    In fact, you've said, have you not, that the triad of

14   symptoms for AHT is a myth, right?

15   A    That's not exactly what I said.  I think I was misquoted

16   in that article.

17   Q    Oh.  What did you say?

18   A    Well, I said that nobody makes the diagnosis of abusive

19   head trauma by saying, oh, the child has encephalopathy,

20   subdurals and retinal hemorrhages, and then I went on to

21   present, you know, another ten slides that looked at the

22   differential diagnosis and the types of diagnostic workup that

23   has to be done before you would reach that conclusion.

24   Q    Okay.  So did you or did you not say that the triad is a

25   myth?

Jenny - cross

1  A   The fact that it is used to diagnose abusive head trauma
2  in the absence of a very thorough diagnostic workup, yes,
3  that's a myth.
4  Q   Okay.  So what you mean is you can't just see these three
5  things and then automatically jump to abusive head trauma?
6  A   That's right.
7  Q   Correct?
8         You have to do other things like the skeletal survey
9  we talked about, correct?
10 A   Yes.
11 Q   How about a complete family history going back
12 generations?
13 A   That would have been helpful.
14 Q   We didn't have that in this case, though, did we?
15 A   The history was pretty minimal.
16 Q   Okay.  You also have to consider the feeding history,
17 correct?
18 A   Yes.
19 Q   All right.  And the feeding history we have in this case
20 is that feeding was difficult, correct?
21 A   It was variable.  The feeding reported by the mother, she
22 didn't seem to think it was a problem.  The babysitter did.
23 Q   You also have to consider growth charts, right?
24 A   Yes.
25 Q   Those were not considered until we took a look at them,

Jenny - cross

1 right?

2 A   Oh, I considered them very thoroughly, I think.

3 Q   I know you have, but back at the time the case was

4 initially brought, nobody mentioned anything about head

5 circumference in growth charts, did they?

6 A   I didn't read the trial transcript, so I don't know.

7 Q   Coagulopathies need to be considered?

8 A   Yes.

9 Q   And thrombocytosis is a coagulopathy, correct?

10 A   Not necessarily.

11 Q   Well, it's a coagulopathy having to deal with clotting

12 rather than excessive bleeding, right?

13 A   You're talking about primary or reactive?

14 Q   Reactive.

15 A   A reactive thrombocytosis is not -- in the absence of

16 other hematologic or malignant diseases doesn't in and of

17 itself cause clotting.

18 Q   I'm going to show you what I've marked as Exhibit

19 Petitioner's Jenny 14.  I won't ask you to read the whole

20 thing while you're sitting here, but if you turn to Page 6.

21 Do you see the upper left corner where it starts talking about

22 the risk of thrombotic complications?

23 A   Yes.

24 Q   And this article indicates that the risk is thought to be

25 low.  1.6 percent of patients with reactive thrombocytosis had

Jenny - cross

1     complications in one large case series.  All of these

2     thrombotic events were venous in location and occurred in

3     patients with other risk factors.  And that's what you've been

4     talking about, correct?

5   A    Yes.

6   Q    But it says, "Even in cases of extreme reactive

7     thrombocytosis, the risk of thrombotic complication is

8     relatively low," and then it goes on to say, "although

9     reactive thrombocytosis has been shown to be an independent

10    risk factor for thrombosis in patients otherwise at high risk

11    for thrombosis, including trauma patients, and following

12    coronary artery bypass grafting."  See that?

13  A    Yes.

14  Q    So Isabella had extreme reactive thrombocytosis, did she

15    not?

16  A    Yes.

17  Q    And that's because she got all the way up to 1.2 million

18    at one point, correct?

19  A    That's right.

20  Q    And there may be other risk factors present that can cause

21    the reactive thrombocytosis to lead to clotting, correct?

22  A    But it would not have preceded her -- it would have had

23    to -- it would have happened after her collapse.  It wouldn't

24    have caused the collapse.

25  Q    Well, you've said that she had high platelet counts when

Jenny - cross

1    she went to the hospital in October, right?

2  A    Yes.

3  Q    That had nothing to do with Jennifer Del Prete, did it?

4  A    No.

5  Q    All right.  Did it have anything to do with this previous

6    existing chronic subdural?

7  A    I don't know.

8  Q    Well, it's your belief that Isabella's platelet counts go

9    up very high in response to trauma, correct?

10  A    Stress.

11  Q    All right.  And we know they went up very high back in

12    October of 2002 prior to Miss Del Prete ever meeting the

13    child, correct?

14  A    Yes.

15  Q    So can that give us another clue as to how to date this

16    chronic subdural hematoma?

17  A    No.

18  Q    Why not?

19  A    I don't see the relationship.  I'm sorry.

20  Q    Well, you've said that her platelets spiked as a result of

21    trauma on 12/28/02.

22  A    I didn't say that.  I said stress.

23         Oh, 12/28.  Yes.

24  Q    Okay.  How do you know that they didn't spike as a result

25    of trauma in October?

Jenny - cross

1    A    I don't know.

2    Q    So it could be, right?

3    A    It could or it could not.  I don't know.

4    Q    But if we're looking for a way to date the chronic

5    subdural hematoma that we know existed but we don't know when

6    it started, one of the things we could look at is the

7    rocketing up platelet counts, correct?

8    A    Not the platelet counts in and of itself.  I would look

9    for signs of some type of trauma or stress.

10            I don't know when the chronic subdural occurred.

11   Q    I know.

12   A    And I can't tell you whether it happened in October or

13   November or December.

14   Q    Okay.  Just follow me for a moment and then I'll move on.

15   You've said that the platelet counts went up very high as a

16   result of trauma that you believe was inflicted on the child

17   on 12/28/02, correct?

18   A    Yes.

19   Q    12/27/02.  I'm sorry.

20            And we know that there was a prior incident of her

21   platelet counts also being very high, correct?

22   A    Yes.

23   Q    So that could similarly be the result of trauma, could it

24   not?

25   A    It could have; it could not have.

Jenny - cross

1   Q   You've testified and your report indicates that as
2   compared to capillaries in the brain --
3           Sorry.
4           You've indicated that as compared to capillaries in
5   the brain, bridging veins carry a very large amount of blood,
6   correct?
7   A   In comparison.
8   Q   In comparison, correct?
9   A   Yes.
10  Q   You said something like 90,000 times the amount of
11  blood --
12  A   Yes.
13  Q   -- in the capillary?
14          And you believe that the acute subdural hematomas
15  here are the result of ruptured bridging veins, correct?
16  A   Yes.
17  Q   But that they did not cause the child's collapse, the
18  subdurals, correct?
19  A   Yes.
20  Q   So what you're saying is they are a marker of trauma?
21  A   Yes.
22  Q   They could also just be the result of an unrelated natural
23  cause, correct?
24  A   In this case or in general?
25  Q   Let's start with in general.

Jenny - cross

1    A    Yes.

2    Q    And in this case they could be the result of a natural

3    cause?

4    A    There was no natural cause determined after a very careful

5    workup.

6    Q    Is it not correct that something like 46 percent of

7    children are found in a study to have subdural hematomas

8    resulting from birth?

9    A    Yes.

10   Q    And birth is by nature, at least vaginal birth is by

11   nature traumatic, correct?

12   A    To some degree, yes.

13   Q    That's what causes the head to get molded, right?

14   A    Yes.

15   Q    And the caput and the cephalohematoma?

16   A    Yes.

17   Q    All from trauma of birth, right?

18   A    Yes.

19   Q    So the chronic subdural in this case could have come from

20   birth?

21   A    In the prospective studies that have been done, they all

22   resolve by six weeks of age in an otherwise normal child.

23   Q    How many people were involved in that study, how many

24   children?

25   A    A hundred or so.

Jenny - cross

1  Q   And how many did they get to follow long enough to see
2  whether those things would resolve?
3  A   I don't recall.
4  Q   You're talking about the Rooks study, right?
5  A   Yes.
6  Q   So I'll show you what's previously been -- well, actually
7  what's previously been marked as Petitioner's Hedlund 7.
8        MR. BLEGEN:  Can I leave it as that, Judge?
9        THE COURT:  Go ahead.
10 BY MR. BLEGEN:
11 Q   All right.  So -- and I wasn't trying to make it a quiz.
12 Does it look like there were actually -- there was a hundred
13 patients enrolled initially in the study?
14 A   46.  Sorry.  I misstated.
15 Q   All right.  46.
16       And you indicated that they were all resolved by six
17 weeks.  It's actually by three months that the 18 that they
18 did follow-up studies to resolved, right?
19 A   Right.
20 Q   One of the patients had a new frontal subdural hematoma on
21 the two-week MR, correct?
22 A   Yes.
23 Q   And Isabella collapsed not terribly long after being three
24 months old, right?
25 A   Yes.

Jenny - cross

1   Q   Three months and 21 days?

2   A   Yes.

3   Q   So could the chronic subdural have been the result from --

4 resulting from birth?

5   A   I think it's unlikely in that when children have that

6 rapid brain growth in the first couple of months of life, they

7 put a lot of -- you know, they don't -- they're not likely to

8 develop chronic subdurals. They're much more likely to have

9 pressure, the osmotic pressure on the brain essentially

10 resolve the subdurals.

11       And also most of these were intratentorial. They're

12 either within or below the tent. They're posterior, not

13 anterior.

14   Q   Okay. So it's your conclusion that there is no natural

15 cause for the chronic subdural in this case?

16   A   I could not identify a natural cause.

17   Q   All right. Let me ask you then about your conclusion in

18 your report that as of 12/27/02 Isabella was in her usual

19 state of good health. How was she in good health?

20   A   She was a normal sized baby. She was developing normally.

21 She was reportedly smiling and neurologically normal.

22   Q   She had -- neurologically normal. She had a chronic

23 subdural hematoma. Is that neurologically normal?

24   A   Well, she didn't have manifestations of it. She had no

25 signs or symptoms at that point.

Jenny - cross

1  Q   My question is, is it neurologically normal to have a
2  chronic subdural hematoma at three and a half months of age?
3  A   No, it's not.
4  Q   All right.  So she was not in good health, was she?
5  A   Well, she certainly manifested good health.  She had no
6  signs or symptoms of disease.
7  Q   Well, that's what I'm trying to get at.  You as a doctor
8  know that you are often required to look beyond external signs
9  in an infant, correct?
10 A   Yes.  But we don't routinely do CT scans on all babies.
11 Q   I know.  But in this case we happen to have one which
12 shows the chronic subdural, right?
13 A   That's right.  Yes.
14 Q   So what you're really saying is she appeared outwardly to
15 be in good health, correct?
16 A   That's right.
17 Q   But in reality she had a chronic collection of blood in
18 the subdural space of her head, right?
19 A   That's right.
20 Q   So she was not in good health, correct?
21 A   That would have been a factor, yes.  Yes.
22 Q   So why did you indicate in your report on multiple
23 occasions that she was in good health?
24 A   She was eating and growing and gaining and developing
25 normally.

Jenny - cross

1   Q   If a child was eating and growing and developing normally

2   and unbeknownst to anybody had a tumor which was later found,

3   you wouldn't say they were in good health then, would you?

4   A   No.

5   Q   So why did you say in your report that she was in good

6   health, knowing that there was an old collection of blood?

7   A   I should have said that she appeared to be in good health.

8   Q   One of the other issues with the platelets that I forgot

9   to mention was you said that the morphology of the platelets

10  was consistently normal?

11  A   On the three morphologic reviews done in the lab, yes,

12  they --

13  Q   Wasn't there an indication that her platelets were giant

14  at one point?

15  A   On one of the computer-generated reports that was there,

16  but not on the reports of the lab techs actually looking at

17  the platelets, or the pathologists.

18  Q   That's where the giants came from, from the computers?

19  A   Yes.  There was one report of giant platelet.

20  Q   So you disagree that there was any morphological problems

21  with the platelets?

22  A   We see that all the time on -- you know, these odd little

23  things that come out of the computer, and we -- if it's

24  consistent, if we saw it on every blood test, we would

25  certainly take it a step further, but that's not an unusual

Jenny - cross

1    finding.

2    Q    I want to talk to you a little bit about your conclusion

3    that there was some sort of delay in calling 911.  You have

4    concluded that, correct?

5    A    I'm very concerned about that possibility.

6    Q    All right.  Well, your report indicates, "These numbers

7    indicate that care was delayed after the child collapsed,"

8    correct?

9    A    That's what my clinical opinion would be, yes.

10   Q    So are you now telling us that you're just merely

11   concerned about it, not that you've concluded it?

12   A    No.  I think that this is a whole lot of acidosis for a

13   20-minute delay.

14   Q    First of all, your conclusion in the report that there was

15   a delay was a result of the combination of body temperature

16   and the pH reading, correct?

17   A    That's right.

18   Q    But half of your equation for delay is gone, right?

19   A    Well, 95.1 is still hypothermia.  That's still a very cold

20   body temperature for a normal baby.

21   Q    But it wouldn't lead you to conclude that delay -- that

22   there had been a delay in calling 911, right?

23   A    That tied with the acidosis would be concerning for a

24   delay in seeking care.

25   Q    So even though the temperature was actually two degrees

Jenny - cross

1    higher than you thought it was on admission, you think that
2    that results in a -- that also indicates there was a delay in
3    care?
4    A    That's, again, hypothermic.  She was hypothermic and
5    acidotic.
6    Q    So after she got to the hospital she was 95.1; having been
7    at the hospital for two hours, she was 93.1, correct?
8    A    Yes.
9    Q    So did somebody at the hospital delay the care?
10   A    No.  She just had a very dysfunctional brain at that point
11   and was not regulating her temperature.
12   Q    Couldn't that be the case at the time she arrived at the
13   hospital?
14   A    Yes.  But that wouldn't cause the acidosis.
15   Q    All right.  Let's talk about the acidosis for a second.
16   You said that the amount of time it would take for a baby to
17   be crashed and get to this pH level was substantial, right?
18   A    Yes.
19   Q    You're going to have to be a little more specific than
20   substantial.
21   A    Well, nobody has ever actually done the study where they
22   actually looked at the time frame between the onset of cardiac
23   arrest and the measurement of the first pH, but I can tell you
24   that in clinical practice that's an unusually low pH to see in
25   a child who has not been -- had a prolonged cardiac arrest.

Jenny - cross

1  Q   How long are we talking?

2  A   45, 50 minutes.

3  Q   So close to an hour?

4  A   Yeah.

5  Q   So you think that maybe she delayed calling 911 for 30 or

6  40 minutes?

7  A   I don't know.

8  Q   You also indicated in your report that the babysitter gave

9  no history of trauma or abnormal behavior before the baby had

10  her cardiac arrest, right?

11  A   Yes.

12  Q   Now, you just read the police reports maybe an hour or so

13  ago.  She gave multiple indications of abnormal behavior,

14  didn't she?

15  A   Baby had a stool, baby had -- was crabby, quote, although

16  smiling.

17  Q   The stool was diarrhea, right?

18  A   Yes.

19  Q   She mentioned the lips quivering?

20  A   Yes.

21  Q   She mentioned the tensing up, correct?

22  A   But apparently she did that with every feed.

23  Q   All right.  But wouldn't that be considered abnormal

24  behavior?

25  A   Not if she did it with every feed.

Jenny - cross

1    Q    What about the lips quivering?

2    A    I don't know what to make of that.

3    Q    When you say abnormal behavior, do you mean abnormal for

4    this baby in particular or abnormal for babies in general?

5    A    Both.

6    Q    I mean, if the baby passed out once a day, you wouldn't

7    say that that was normal behavior, would you?

8    A    No.

9    Q    All right.  Even though it happened to that baby every

10   single day?

11   A    No.

12   Q    So why do you say problems with feeding is normal

13   behavior?

14   A    Because about 30 percent of babies have colicky feeding

15   and reflux.

16   Q    All right.  Well, again, we're not up to 50 percent,

17   right?

18   A    That's right.

19   Q    And, secondly, those babies don't have chronic subdural

20   hematomas, right?

21   A    That's right.

22   Q    You testified a little bit on direct about retinal

23   hemorrhages, correct?

24   A    Yes.

25   Q    You're not an ophthalmologist, correct?

Jenny - cross

1    A    No.

2    Q    But you said something like you don't think that there's a

3    problem -- or maybe I misunderstood.  Is there or is there not

4    a problem with ophthalmologists not getting to see enough eyes

5    to conclude that the kind of retinal hemorrhages found here

6    are exclusive to abusive head trauma?

7    A    I'm not sure what -- I don't understand the question.

8    Q    Bad question.

9         You agree with the theory that the kind of retinal

10   hemorrhages found here are highly associated with abusive head

11   trauma, correct?

12   A    Yes.

13   Q    Do you or do you not agree that ophthalmologists

14   themselves are concerned that they don't get to see enough

15   eyes to come to that conclusion?

16   A    Well, I think that the study done in England was very

17   helpful in terms of addressing that issue.

18        I also think that we're being much more aggressive in

19   having ophthalmology consultants see children on a wide range

20   of injury and causations, and we're not finding, as we do more

21   and more ophthalmologic exams, that we see these cases in kids

22   who have, you know, like automobile accidents or fall out of

23   windows.

24   Q    But that recent -- I'm sorry.  That aggression is recent,

25   right, having -- looking at more eyes?

Jenny - cross

1    A    About the last four or five years, yes.

2    Q    In the article from England, do you remember the name of

3    that one?

4    A    It was -- Agarwal was the author.

5    Q    In that article they kind of did a retrospective.  Is it

6    Respondent's Jenny 5?

7    A    I don't recall.  I can look it up.

8    Q    I see the name Shruti Agarwal.

9    A    Yes, that's it.

10   Q    One of the things that they did in that study is preclude

11   children for which they had concluded had suffered AHT, right?

12   A    Yes.

13   Q    So they gathered up a bunch of kids to look at their eyes,

14   correct?

15   A    Well, they were all children in intensive care units.

16   Q    I'm sorry.  Intensive care units, correct?

17        And they precluded the ones that somebody had

18   concluded suffered from AHT, right?

19   A    That's correct.

20   Q    But we don't know whether the conclusion that those

21   children suffered from AHT were accurate conclusions, do we?

22   A    We have no data on that.

23   Q    Right.

24        In fact, it even says that in the study somewhere,

25   doesn't it?

Jenny - cross

1  A    I don't recall.

2  Q    All right.  But we don't know whether they were right or

3  wrong in concluding AHT, right?

4  A    Right.

5  Q    So they may have excluded children who had something that

6  mimicked AHT and resulted in retinal hemorrhages, correct?

7  A    They might have.

8  Q    You yourself have indicated that you should look at high

9  altitudes when considering retinal hemorrhages, correct?

10 A    Yes.

11 Q    And am I right that the reason you said that is because

12 lack of oxygen can have some impact on retinal -- causing

13 retinal hemorrhages?

14 A    At very high altitudes people will have just a few tiny

15 little hemorrhages in the back of their eyes.  They don't have

16 these massive hemorrhages.

17 Q    And nobody has suggested that the child in this case was

18 taken to very high altitudes as far as you know, correct?

19 A    Not in Pittsburgh.

20 Q    Do you mean Plainfield?

21 A    Wasn't this in -- I'm sorry.  Wasn't this in Pittsburgh?

22 Oh, no.  I'm sorry.

23 Q    Plainfield, Illinois.

24 A    Plainfield, Illinois.  I'm sorry.  Wrong -- wrong -- wrong

25 case.  Sorry.

Jenny - cross

1    Q    There are no mountains?

2    A    Not in Illinois, not this close to the lake.

3    Q    But because high altitudes can cause retinal hemorrhages,

4    other events creating a significant lack of oxygen can cause

5    retinal hemorrhages?

6    A    We don't know whether it's oxygen or pressure or what the

7    event is, but the retinal hemorrhages are very tiny --

8    Q    All right.

9    A    -- and few.

10   Q    Are you familiar with any studies about retinal

11   hemorrhages appearing in a hospital when they had not been

12   there at the onset of the hospital visit?

13   A    Yes.

14   Q    Does that change your opinion about the high association

15   of retinal hemorrhages with abusive head trauma?

16   A    They can certainly get worse after the child is admitted,

17   but, no, the association is very strong.

18   Q    How about not being present at all on admission to the

19   hospital and then showing up a day later in the hospital?

20   A    Well, I'd be concerned about what the nature of the

21   initial exam was because if you're not an opthalmologist it's

22   pretty hard to see it.  You're only seeing a few millimeters

23   on the back of the eye.  And I would say that I would trust

24   the ophthalmologic exam done indirectly by the ophthalmologist

25   rather than that pediatrician or the emergency room doctor.

Jenny - cross

1  Q   One of the issues in this case is that there was no
2  ophthalmological examination until 24 hours after admission,
3  correct?
4  A   Yes.
5  Q   So we don't know if the retinal hemorrhages were present
6  on admission to the hospital, correct?
7  A   Nobody mentioned it.
8  Q   And we don't know if they predated the admission to the
9  hospital by hours or days, do we?
10 A   Well, there were splinter hemorrhages present, which
11 generally clear up very quickly, so I would say that they were
12 not more than two days prior to the event because the splinter
13 hemorrhages will clear up in 48 hours.
14 Q   But they could have been two days old?
15 A   They could.
16 Q   This child was essentially in cardiac arrest and without
17 oxygen for twenty minutes or more, correct?
18 A   She did have her heart rate reestablished on the way to
19 the hospital, so it was less than twenty minutes.
20 Q   Do you know how much less than twenty minutes?
21 A   I don't recall.
22 Q   A significant -- strike that.
23      Would you consider that to be a significant period
24 for an infant to be without oxygen?
25 A   Yes.

Jenny - cross

1    Q    And that can cause damage to the brain in and of itself,
2    can it not?
3    A    Yes.
4    Q    That can cause the edema that we ultimately saw in this
5    case --
6    A    Yes.
7    Q    -- correct?
8             What other kind of damages can it cause?
9    A    Brain swelling and edema, brain swelling and metabolic
10   damage.
11   Q    And brain swelling and edema are essentially the --
12   A    Right.
13   Q    -- same thing, correct?
14   A    Well, there's two different kinds of edema but --
15   Q    You can tell us what the two different kinds are if you'd
16   like.
17   A    Well, there's the edema from cytotoxic edema, and then
18   there's inflammatory edema.
19   Q    Which kind did Isabella have?
20   A    I think she had both.
21   Q    But that was a result not of -- strike that.
22            That was a result of the lack of oxygen and lack of
23   blood to the brain, correct?
24   A    That could be part of it, yes.  That was a big part of it.
25   Q    One of the other things that you talked about in your

1  direct testimony was --

2      THE COURT:  We're going to another thing.  This is

3  where we're going to stop because I need to deal with

4  Mr. Triebel's issue before we stop for the day.

5      So we'll start right at 9:45 tomorrow with the

6  testimony.  So you can step down.

7      Mr. Triebel, what was the issue?

8      MR. TRIEBEL:  Just briefly, your Honor.

9      We received a Power Point presentation from Dr. Teas

10 I believe it was Wednesday last week.  The last five or six

11 slides contain references that were not previously reported,

12 and some of the language in the Power Points may be indicating

13 a new opinion forming, but I'm doing some reading in the tea

14 leaves, some speculating on exactly what she's going to

15 testify to as to those Power Points, but it's difficult to

16 prepare a cross at the last minute on these materials.

17     THE COURT:  And you say you got this this Wednesday?

18     MR. BLEGEN:  I think we can probably put this up on

19 the screen so we can -- I hope, so we can see what we're

20 talking about.

21     THE COURT:  You said you got this last Thursday?

22     MR. TRIEBEL:  Wednesday.

23     MR. GOODFRIEND:  Got it last Wednesday afternoon.

24     THE COURT:  Tell me what the point is.

25     MR. TRIEBEL:  We got them Wednesday afternoon, and as

1   I said, the last five or six slides contain new references.

2   They seem to be talking about a trigeminal nerve.  This isn't

3   a terminology that's in any of the prior expert reports that

4   were submitted to us.  It was a term that I think we saw in

5   that Mack Power Point slide that was also given to us a couple

6   of days before the hearing started on December 17th, but

7   because Dr. Mack didn't testify, obviously that wasn't

8   something that we looked into at all.

9        So if she -- if Dr. Teas is going to go into

10  testimony about a new topic like that, I just want to get an

11  objection on the record and know tonight if I need to prepare

12  cross on some new theory.

13       THE COURT:  So the question is -- I mean, I haven't

14  seen any of this stuff.

15       MR. TRIEBEL:  Right.  I understand.

16       THE COURT:  So what you're focusing on is testimony

17  relating to something concerning the trigeminal nerve?

18       MR. TRIEBEL:  Exactly, your Honor, and any of the

19  theories that evolve out of that that were not in her report.

20       THE COURT:  Okay.  Is there going to be something

21  like that or not?

22       MR. BLEGEN:  I frankly don't remember.  Can I -- I'm

23  not sure that it's critical, so we may be able to cut --

24       My recollection of the new Power Point is most of it

25  are pictures of the brain and -- that are part of this case

1  and then a different brain to kind of show Dr. Teas's opinion

2  that Dr. Rorke-Adams had the brain looking at it upside down.

3  There may be something about the trigeminal nerve towards the

4  end.  We think it was in the Mack Power Point initially,

5  but --

6            THE COURT:  In the?

7            MR. BLEGEN:  The Mack.

8            THE COURT:  What Mr. Triebel just said.

9            MR. BLEGEN:  Yeah.  The Julie Mack Power Point

10  initially.

11            THE COURT:  She didn't testify.

12            MR. BLEGEN:  Essentially I think the theory of that

13  is related to the anatomy of the dura, which has small blood

14  vessels in it that can bleed and has nerves in it that can

15  cause collapse-like symptoms.

16            THE COURT:  Okay.  So is this an additional opinion

17  that's not in Dr. Teas's report or not?

18            MR. BLEGEN:  It's not in Dr. Teas's report, I don't

19  believe, but I think it's an opinion that was given by

20  Dr. Mack.

21            THE COURT:  I don't -- honestly, I don't remember

22  where Dr. Mack fits in.

23            MR. TRIEBEL:  It's because she didn't testify, your

24  Honor.

25            THE COURT:  Okay.  Whose witness was she going to be?

1    MR. TRIEBEL:  I'm sorry.

2    THE COURT:  Whose witness was she going to be?

3    MR. BLEGEN:  Ours.

4    THE COURT:  She was going to be yours.  Okay.

5    Well, so here's what you need to do.  You need to

6    figure out like very quickly here after I leave whether you're

7    planning to offer this testimony or not.  Okay.  You need to

8    let Mr. Triebel know or whoever it is that's going to deal

9    with this -- I guess it's Mr. Triebel -- whether you're

10   planning to offer it or not, and then you'll take this up with

11   me in the morning and just be prepared to talk about it at the

12   very beginning.

13   Okay?  Thanks.

14   (Which were all the proceedings had in the

15   above-entitled cause on the day and date aforesaid.)

16

17

18

19

20

21

22

23

24

25