1          IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION

3

4  JENNIFER DEL PRETE,        )

5                Petitioner, )  Docket No. 10 C 5070
                        )
6         vs.          )

7  MELODY HULETT,         )  Chicago, Illinois
                        )  January 15, 2013
8            Respondent. )  10:00 a.m.

9
                    VOLUME 7
10           TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12  APPEARANCES:

13

14  For the Plaintiff:    BLEGEN & GARVEY
                     BY:  MR. PATRICK W. BLEGEN
15                     MS. JODI L. GARVEY
                     MR. DANIEL A. RUFO
16                 53 West Jackson Boulevard
                 Suite 1437
17                 Chicago, Illinois  60604

18  For the Defendant:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                     BY:  MR. KARL R. TRIEBEL
19                     MR. NEAL GOODFRIEND
                     MR. ARI TELISMAN
20                     MS. MONIQUE A. ANAWIS
                 100 West Randolph Street
21                 13th Floor
                 Chicago, Illinois  60601
22

23  Also Present:         MR. ROBERT STANLEY

24       LAURA M. BRENNAN - Official Court Reporter
        219 South Dearborn Street - Room 2102
25          Chicago, Illinois  60604
             (312) 435-5785

1    (The following proceedings were had in open court:)

2         THE COURT:  10 C 5070, Del Prete v. Hulett.

3         Can the lawyers give your appearances for the record,

4    please?

5         MR. BLEGEN:  Good morning, Judge; Patrick Blegen and

6    Dan Rufo on behalf of Ms. Del Prete.

7         MR. TRIEBEL:  Good morning, your Honor; Karl Triebel

8    with Neal Goodfriend and Ari Telisman and Monique Anawis on

9    behalf of the respondent.

10        THE COURT:  Okay.  Do we have --

11        I'm not seeing Dr. Jenny.  Is she out there?

12        MR. GOODFRIEND:  We're checking on it right now.

13        MR. BLEGEN:  Judge, we have that issue about the --

14   remember the trigeminal nerve?

15        THE COURT:  Yes.  Can we talk about that while we're

16   waiting?

17        MR. BLEGEN:  Yes.

18        THE COURT:  All right.

19        MR. BLEGEN:  Judge, we told them yesterday that we do

20   intend, with your approval, of course, to have Dr. Teas go

21   into it.  It was previously raised not in Dr. Teas' report,

22   but in a PowerPoint prepared by Dr. Julie Mack who ended up

23   not testifying.

24        And so a brief explanation.  Trigeminal nerves are

25   small nerves that are in the dura, and part of our theory is

1  that one of the potential causes of subdural bleeding or

2  bleeding that looks like it's subdural is because the dura is

3  a very vascular membrane and it can bleed and rebleed, as we

4  think happened in this case.

5          THE COURT:  Okay.

6          MR. BLEGEN:  Yesterday, and I think with other

7  witnesses, but I'm not a hundred percent sure of that, but

8  yesterday Dr. Jenny said that dural bleeding cannot lead to a

9  collapse.  The trigeminal nerve issue explains how subdural

10  bleeding can cause a collapse because the bleeding in the dura

11  aggravates the nerves, and the nerves, of course, affect your

12  body's systems and can lead to a collapse.

13          That theory is disclosed in the previous PowerPoint

14  of Dr. Julie Mack, and, frankly, the slides that are now in

15  the Teas PowerPoint are essentially -- I'm not sure they're a

16  hundred percent the same -- but essentially the same ones that

17  have been disclosed in a preexisting PowerPoint.

18          That's the extent of it, and the testimony might take

19  five minutes from Dr. Teas just to explain.

20          THE COURT:  The trigeminal nerve, that's the thing

21  that causes brain freeze, right?

22          MR. BLEGEN:  I don't -- I thought --

23          THE COURT:  You know what brain freeze is.  I think

24  that's what it is.

25          MR. BLEGEN:  Yes, maybe.

1   THE COURT:  That's my experience with the trigeminal

2   nerve.

3   MR. BLEGEN:  So, in essence, that's the relevance of

4   it.  We think it was previously disclosed.  I will confess

5   that trigeminal nerve does not appear in --

6   THE COURT:  Her report.

7   MR. BLEGEN:  -- Dr. Teas' report although an

8   explanation of the dural anatomy does appear in her report.

9   THE COURT:  Okay.  And as far as Dr. Mack is

10  concerned, remind me what Dr. Mack's area of expertise is.

11  MR. BLEGEN:  Radiology, but also she and another

12  doctor who was never going to be called, but they have written

13  multiple papers on the dural anatomy as an explanation for

14  subdural.

15  THE COURT:  And Dr. Mack, it was in her --

16  Was there something that touched on this in her

17  report or was it just in the PowerPoint?

18  MR. BLEGEN:  Just in the PowerPoint.

19  THE COURT:  And the PowerPoint was one of the things

20  that was provided back in December sometime?

21  MR. RUFO:  Mid-November, I believe.

22  THE COURT:  In other words, in advance of the

23  December hearing, all right.

24  And you're saying that the slides from Dr. Teas and

25  her testimony are not materially different from what Dr. Mack

1  was going to be testifying about and what her slides were.

2          MR. BLEGEN:  Correct.

3          THE COURT:  Mr. Triebel.

4          MR. TRIEBEL:  Your Honor, Dr. Mack's PowerPoint was

5  turned over to us, I believe, one business day, possibly two

6  business days, prior to the December 17th hearing started.  It

7  was one of the things that we were going to object to, but

8  then they didn't call Dr. Mack.  I think we decided that on

9  the first or second day of the first week of hearings.

10          THE COURT:  Yes.

11          MR. TRIEBEL:  So we have not prepared to cross Dr.

12  Mack.

13          THE COURT:  Fair enough, okay.

14          In other words, because of the timing of when it was

15  produced and when she got called off, you didn't get to the

16  point of having to prepare for that.

17          MR. TRIEBEL:  Precisely, your Honor, and I suppose

18  there's two ways to handle it.  One is we would prefer that

19  the Court just order Dr. Teas to not testify as to anything

20  that is not in her report.  That's the way I think that

21  Rule 26 should work.

22          Another way to look at it is, you know, the fact

23  finder could take it as part of the credibility of the

24  determination that this was something that has been prepared

25  at the last minute after a witness has been sitting listening

1  to every other witness testify and take it into account as far

2  as the credibility determination.

3      THE COURT:  So that's plan A and plan B.

4      Plan C could be I give you some time, you know, to --

5  I don't make you cross Dr. Teas on that point right now and I

6  give you some time to come back -- as much as I want to have

7  this done, I give you some time to come back later on and

8  complete your cross, and if you intended to call somebody in

9  rebuttal to her on that point, to bring that person back, too.

10 That would be another possibility.

11     MR. TRIEBEL:  Yes, your Honor.  That is a third

12 possibility that I thought the Court wouldn't prefer because

13 of scheduling.

14     THE COURT:  Well, yes.

15     So let me ask you this.  One of the down sides to

16 having a hearing that starts at one point and then gets put

17 off for its completion for a month is I don't necessarily

18 remember every procedural ruling I've made.

19     Have there been other issues like this that have come

20 up in the context of this and, if so, what have I done?  I

21 don't remember.

22     MR. TRIEBEL:  We made a similar objection to Dr.

23 Barnes' testimony.  He had made a supplemental report at the

24 last minute.  And then I think we effectively -- ended up

25 effectively crossing him.  We basically reserved objection

1  until we heard his testimony, so we basically waived our
2  objection on that.
3          THE COURT:  So if I was to go with what I threw out
4  there as plan C, I mean, the idea of -- the idea of having --
5          I mean, I think Dr. Teas is local, right?
6          MR. BLEGEN:  She is.
7          THE COURT:  So theoretically she could come back.
8  I'm guessing it would be a fairly compact amount of time just
9  to be crossed on that.  But if there were somebody that you
10  were going to consult with and potentially -- and I know I'm
11  asking you this on the fly, okay -- but somebody that you were
12  going to consult with and potentially call back to rebut her
13  on that point, of the various people you have, which one would
14  it be?  Would it be Dr. Jenny or would it be somebody else?
15          MR. TRIEBEL:  No.  It would be Rorke-Adams probably,
16  your Honor, and she is at the same hospital that Dr. Forbes
17  did the video conference from.
18          THE COURT:  So we could theoretically question her by
19  video from there.
20          MR. GOODFRIEND:  Can I make a comment?
21          THE COURT:  Yes.
22          MR. GOODFRIEND:  We got this late last week and we
23  only talked to our experts.
24          THE COURT:  No, I understand.  I'm just trying to get
25  a handle on logistically what it would entail.

1    MR. GOODFRIEND:  Yes.  I just don't want us to be

2  committed to call Dr. Rorke-Adams.

3    THE COURT:  I understand.  Okay.

4    So what are your thoughts about this other

5  alternative?

6    MR. BLEGEN:  My thought is I'm going to talk to Dr.

7  Teas.  We may not -- I mean, I don't know that it's worth --

8    THE COURT:  I think that's the way I would prefer to

9  go.  I think that's the way I would prefer to go.  I think I

10 would prefer to go in a way that, you know, allows people to

11 put on the evidence but gives people enough time to be able to

12 plan for it and rebut it if necessary.

13    I think that's the operative plan, and let me just

14 tell you, because I've got a bunch of trials coming up, and

15 so -- and the other thing is --

16    So thing number one is I'm not going to put off the

17 posthearing briefing for this.  We can always supplement it

18 after, if necessary.

19    And thing number two is I've got to really kind of

20 wedge this in because of trials I have.  So I had a case that

21 was set for trial the week after next that just settled, and

22 so I actually have some time that week.  So that would be the

23 week of the 28th, 29th, 30th and 31st although I don't really

24 have time on the 31st.  So once we get past that, my schedule

25 is really kind of quite ugly.

1    MR. BLEGEN:  Judge, I'm starting a trial on the 22nd

2    in front of Judge Pallmeyer that is going to run like six or

3    eight weeks, they say.

4         THE COURT:  Oh, God.

5         MR. BLEGEN:  With Fridays off.

6         THE COURT:  Well, so then you would be coming in on

7    Friday.  I mean, that's about the only way I can do it.  So we

8    would be talking about like the 1st of February then.

9         You're going to have Fridays off.  We would be

10   talking about the 1st of February or the -- no, it can't be

11   the 25th of January because I'm going to be out of town.  So

12   you will process all that and you'll figure out what you're

13   going to do.

14        MR. BLEGEN:  Yes.

15        THE COURT:  Did we locate the witness?  Okay, she can

16   get back on the witness stand.

17        MR. TRIEBEL:  Judge, if we have a minute, you had

18   mentioned several times posthearing briefing.  Do you have a

19   more firm schedule in mind?

20        THE COURT:  I'm still thinking about it.  Actually

21   while you guys are here talking, I had a note that I think may

22   have now become moot.  I was going to ask you to provide me

23   with whatever reports there were regarding any statements that

24   Ms. Del Prete gave to the authorities.

25        The four reports I got yesterday, is that the entire

1    universe?

2              MR. BLEGEN:  I think so, Judge.

3              We were going to --

4              For exhibits, we were going to give you a CD that has

5    the medical records which I think you said you wanted, and the

6    police reports on that.  So those would be contained in there.

7    Those statements are also reflected in the trial testimony.

8              THE COURT:  No, understood, understood.  But I wanted

9    to actually see this.

10             So there is no handwritten statement; there is no

11   court reported statement; there's no taped statement or

12   recorded statement or anything like that?

13             MR. BLEGEN:  Correct.

14             THE COURT:  It's just what's in the police reports

15   and the testimony about that.

16             MR. BLEGEN:  Yes.  I think there is a recorded 911

17   call, but I don't know that we ever got that.  I don't

18   think -- I remember reading about it in the transcripts, but I

19   don't think we have it.

20             THE COURT:  Do you have access to that, do you know?

21             MR. TRIEBEL:  I don't.  I don't remember seeing the

22   tape ever, your Honor.  I think it might be in the

23   transcripts.

24             THE COURT:  Well, if you have got that, I'd like it

25   at some point.

Jenny - cross

1       So, Dr. Jenny, you can come on back up here.

2       Go ahead and have a seat.  Do you understand, of

3 course, you're still under oath?

4       THE WITNESS:  Yes.

5       THE COURT:  Mr. Blegen, you can go ahead.

6       MR. BLEGEN:  Thank you, Judge.

7   DR. CAROLE JENNY, RESPONDENT'S WITNESS, PREVIOUSLY SWORN

8         CONTINUED CROSS EXAMINATION

9 Q   Good morning, Dr. Jenny.

10 A   Good morning.

11 Q   One of the articles that you talked about and put into

12 evidence yesterday was an article related to finding sort of,

13 I guess, subtle injuries in the spine or neck area in cases of

14 suspected abusive head trauma?

15 A   Yes.

16 Q   Do you have your exhibits there in front of you?

17       THE COURT:  She has got the whole pile of them.

18 BY MR. BLEGEN:

19 Q   So take a look at Exhibit 4 and tell me if that is one of

20 the articles you were referring to.

21 A   Yes.

22       THE COURT:  You know what, we need to get that

23 microphone in front of you.

24    (Brief interruption.)

25 BY MR. BLEGEN:

Jenny - cross

1  Q    Am I correct, that the point of --

2          THE COURT:  Which number?  I'm sorry.  Which number,

3  Mr. Blegen?

4          MR. BLEGEN:  14.

5          THE COURT:  14.  Thanks.

6          THE WITNESS:  4.

7          MR. BLEGEN:  I'm sorry, 4.

8  BY MR. BLEGEN:

9  Q    Am I correct that your reference to the article was to

10  make the point that in some cases of suspected abusive head

11  trauma, there's no neck injuries found on radiology, but if an

12  autopsy is performed in a specific way, sometimes evidence of

13  neck injury can be found?

14  A    Yes.

15  Q    All right.  And you had -- I think you said that with the

16  exception of maybe three articles, all of the articles that

17  you have referenced you believe are generally accepted in the

18  medical community, is that right?

19  A    Yes.

20  Q    And is this one you think is generally accepted?

21  A    Yes.

22  Q    And you think it's generally accepted that these subtle

23  neck injuries can be found doing a special kind of autopsy?

24  A    Yes.

25  Q    All right.  Well, turn to page 238 of that article, and if

Jenny - cross

1  you would look at the third paragraph at the bottom starting

2  with "the present study" on the left.

3        (Brief interruption.)

4  BY MR. BLEGEN:

5  Q   Do you see the paragraph I'm talking about?

6  A   Yes.

7  Q   That paragraph indicates that the present study is not

8  without limitations, correct?

9  A   Yes.

10 Q   And then it goes on to describe the limitations, right?

11 A   Yes.

12 Q   One of the limitations is our sample population is small,

13 which limits our subgroup analysis, correct?

14 A   Yes.

15 Q   Clinical histories in these patients were spotty and often

16 unavailable, right?

17 A   That's right.

18 Q   So we were unable to perform any analysis of injuries in

19 relation to the presenting complaint, correct?

20 A   Yes.

21 Q   All right.  So that's a significant limitation of the

22 conclusions in this article, right?

23 A   Yes, it is.

24 Q   All right.  But then it also goes on to say:

25        "Only one pediatric forensic neuropathologist

Jenny - cross

1    performed the postmortem examinations and described the
2    findings, and although this neuropathologist is very
3    experienced, there was no second reviewer to support her
4    findings objectively," correct?
5    A    Yes.
6    Q    So only one person in the entire world has made these
7    findings of neck injury on autopsy using this special
8    technique, correct?
9    A    That's right.
10   Q    And that one person in the world is Dr. Lucy Rorke-Adams,
11   right?
12   A    That's right.
13   Q    So would you then still argue that this article and all of
14   its conclusions are generally accepted in the scientific
15   community?
16   A    Well, actually there are some other pathologists who have
17   started doing this technique and have also in clinical cases
18   found similar findings.
19        She was the first one to do this, and she described
20   it, and some other forensic pathologists who are
21   neuropathologists have since adopted this technique, and they
22   have found neck injuries that would otherwise not have been
23   found.
24        THE COURT:  You said they had found it in clinical
25   cases.  You mean in an individual case as opposed to a study?

Jenny - cross

1    THE WITNESS:  Yes.  There's individual cases where
2  they have used this technique.
3  BY MR. BLEGEN:
4  Q   Have they published those results?
5  A   I don't think so, but I've certainly seen -- like out of
6  the New Mexico medical examiner's office, I did a case where
7  they had done this work.
8  Q   I'm sorry.  So how did you see it if they didn't publish
9  it?
10  A   Well, because I reviewed the case.
11  Q   And they said they found it using a similar technique?
12  A   Yes.
13  Q   In one case?
14  A   Well, in the case I reviewed.  That was the only one that
15  I reviewed.
16  Q   Right.  That's what I am talking about.
17    What other cases have you come across for that
18  recently?
19  A   I don't recall.  Most people have not used it because it's
20  so time consuming.
21  Q   In this case, obviously, this special technique wasn't
22  done, correct?
23  A   Right.
24  Q   It hadn't been developed yet, correct?
25  A   Correct.

Jenny - cross

1  Q   And you included in your report that any sort of injury

2  along that regard would probably have healed by the time of

3  autopsy?

4  A   I would think so.

5  Q   You discussed yesterday a doctor named Geddes,

6  G-e-d-d-e-s, correct?

7  A   Yes.

8  Q   And you testified that she had a theory which she then

9  retracted?

10 A   Yes.

11 Q   First of all, is Dr. Geddes the doctor who first concluded

12 that hypoxia ischemia is what leads to swelling of the brain

13 in suspected abusive head trauma as opposed to the tearing of

14 axons?

15 A   She was one of the -- there was another person before her

16 who -- actually one of her mentors was the first person to

17 publish a study on that.  She was the second.

18 Q   The relevance of that issue is that it used to be believed

19 that brain swelling in a suspected abusive head trauma case

20 was the result of tearing of axons in the brain, correct?

21 A   You know, I don't know.  I think in some cases it

22 certainly was the case, but in a lot of cases, the child by

23 the time they died, their brains are so destroyed, you really

24 can't tell one way or the other.

25          And there are some people who refute her findings,

Jenny - cross

1    saying that she -- her definition of hypoxic ischemic injury

2    is not in line with other neuropathologists' ways that they

3    define it.

4    Q    I'm not sure I understood the relevance of that, but let

5    me ask you another question.

6            Is it not generally accepted now that it is hypoxia

7    ischemia that causes brain edema in suspected abusive head

8    trauma cases as opposed to shearing of axons?

9    A    I think in some cases we see one; in some cases we see the

10   other; and in some cases you can't distinguish.

11           The distinguishing hypoxic ischemic injury from

12   traumatic ischemic injury is very difficult, and you have to

13   have certain --

14           The original Graham, Dr. Graham who defined this

15   difference, had very specific criteria in terms of where the

16   axonal staining was, in what portions of the brain, in what

17   patterns, does it occur around vessels, does it occur in

18   sheets as opposed to, you know, circular areas.  And it's

19   somewhat controversial.

20           I think that hypoxia is very important in these kids

21   partly because after they have a head injury, they stop

22   perfusing their brain.  But in a lot of cases, you really

23   can't distinguish between the two, particularly if they have

24   been kept on a ventilator for a day or two.

25   Q    All right.  So Dr. Geddes was at least right in the

Jenny - cross

1  respect that it is difficult or maybe impossible to

2  distinguish between edema caused by axonal shearing and edema

3  caused by hypoxia ischemia, correct?

4  A   Well, not the edema; the traumatic axonal injury.

5  Q   Well, is there any evidence in this case of traumatic

6  accidental injury that was found on radiology?

7  A   No.

8  Q   Was there any evidence elsewhere of traumatic axonal

9  injury?

10 A   One neurologist hypothesized or suggested or said, when he

11 reviewed the EEG, he thought that the maintenance of the

12 background material and the absence of higher center material

13 was evidence of it.  I've never heard that before.  I read it

14 and I noted it, but I don't know that much about that

15 particular conclusion.

16 Q   All right.  But that doctor was not relying on the

17 radiology, correct?

18 A   No.  It's very hard to see traumatic axonal injury in

19 babies.

20 Q   One of the things that you just mentioned was that this

21 doctor hypothesized something, correct?

22 A   Yes.

23 Q   You testified yesterday that Dr. Geddes had withdrawn a

24 different theory that she had, correct?

25 A   No.  This theory, the theory about hypoxia causing leaky

Jenny - cross

1    dura.

2    Q    Right.  That's different from hypoxia causing brain

3    swelling, right?

4    A    Well, hypoxia does cause brain swelling.

5    Q    I know.  That's what Geddes postulated first, correct?

6    A    No.  She talked about the difference between hypoxic

7    ischemic injury and traumatic -- traumatic axonal injury and

8    hypoxic axonal injury.

9         She's talking about axons.  She's talking about the

10   pieces of the nerve cells that emanate from the cell body.

11   That's very different than edema.

12   Q    Let's leave axons aside for a second.  One of the other

13   things she postulated, or some things she postulated, was that

14   hypoxia ischemia can lead to subdural hemorrhages or bleeding

15   in the brain?

16   A    Yes.  That was her hypothesis.

17   Q    Okay.  And you said that yesterday, that she has withdrawn

18   that hypothesis?

19   A    Well, what she said in the trial, and I was there, was she

20   said, actually it's only a hypothesis; we haven't proven this.

21   We don't have it right.

22        And the prosecutor said, or the Crown's attorney

23   said:  But, Dr. Geddes, cases up and down the country are

24   being thrown out on the basis of your work and now you're

25   saying this is only a hypothesis and we don't have it right?

Jenny - cross

1   And she said, yes.

2   Q   Well, there's an actual transcript of what she said,

3   right?

4   A   Yes.  I have it in my briefcase, if you need it.

5   Q   But yesterday you said that she withdrew the hypothesis?

6   A   Well, she said it was only a hypothesis, it wasn't fact.

7   Q   All right.  So let's go back to the beginning.  She did

8   not withdraw her hypothesis, did she?

9   A   You know, it depends on how you define "withdraw," I

10  guess.

11          To me she was saying this is not fact, this shouldn't

12  be used in court, because that's what she said.

13  Q   All right.  Well, you wrote an article called "The

14  Intimidation of British Pediatricians," correct?

15  A   Yes.

16  Q   And in there you cited what Dr. Geddes said, right?

17  A   I don't recall.  It's been several years.

18  Q   Well, why don't you take a look at the place I've -- make

19  sure that's your article, and look at the place where I put

20  the tab.

21  A   Okay.

22      (Brief interruption.)

23  BY MR. BLEGEN:

24  Q   Is that your article?

25  A   Yes.

Jenny - cross

1    Q    Do you see the quote of the transcript?

2    A    Yes.

3    Q    And I take it you accurately put the quote into your

4    article?

5    A    Yes.

6              (Brief interruption.)

7    BY MR. BLEGEN:

8    Q    Dr. Jenny, Dr. Geddes was asked the following question:

9              "Dr. Geddes, cases up and down the country are taking

10   part where Geddes 3 is cited by the defense time and time

11   again as the reason why the established theory is wrong."

12             Correct?

13   A    Yes.

14   Q    And she replied:

15             "That I am very sorry about.  It is not fact.  It is

16   hypothesis.  But as I have already said, so is the traditional

17   explanation.  I have never sought -- I would be unhappy to

18   think that cases were being thrown out on the basis that my

19   theory was fact."

20             Right?

21   A    Yes.

22   Q    So what she actually said was this theory is not fact;

23   it's a hypothesis, correct?

24   A    Yes.

25   Q    That is in no way a withdrawal of a hypothesis, is it?

Jenny - cross

1  A   Well, she certainly said that it shouldn't be used in
2  court because it was not, in fact, proven.
3           THE COURT:  You know what, Mr. Blegen, I think I
4  understand now, okay.  So you don't have to keep asking a
5  question that you're not getting an answer to because I get
6  it.
7           MR. BLEGEN:  Okay.
8           THE COURT:  All right.  And I guess that's a nice way
9  of telling the witness:  Please don't give speeches, okay,
10  unless you want to be here for a third day.
11          THE WITNESS:  No, I don't.
12          THE COURT:  So please don't give speeches.  Please
13  just answer the questions.
14          THE WITNESS:  All right.
15  BY MR. BLEGEN:
16  Q   And are you aware that Dr. Geddes wrote a letter to
17  pediatric radiology saying that she never did withdraw the
18  hypothesis?  Have you seen that letter?
19  A   I don't recall.
20  Q   Would you take a look at Petitioner's Jenny 19?
21          (Brief interruption.)
22  BY MR. BLEGEN:
23  Q   Let me know when you have a chance to look at it.
24  A   I did.
25  Q   She says:

Jenny - cross

1          "I did not retract our theory and have never done

2     so."

3          Correct?

4     A    Okay, yes.

5     Q    What she was saying is that she had a hypothesis much like

6     the shaken baby syndrome theory is a hypothesis, correct?

7     A    That's what she's saying, yes.

8     Q    That's what she said in her testimony, too, right?

9     A    Yes.

10    Q    I may have misheard you on this, so I apologize if I did.

11    But did you say yesterday that the chronic subdural hematoma

12    was getting -- got smaller upon admission to the hospital or

13    decreased in size?

14    A    The size of the subdurals, you know, in total did.

15    Q    All right.  Maybe I misunderstood.

16          Are you talking about the acute, the chronic

17    subdurals, or all of them?

18    A    I'm talking about the fluid in the extra-axial space, all

19    of them.

20    Q    Isn't it a fact that the chronic subdural continued to

21    increase in size in the hospital?

22    A    Well, I would assume that the acute subdural evolved into

23    chronic subdural.

24    Q    All right.  Remember the chronic subdural that's up

25    towards the front of the brain from the imaging?

Jenny - cross

1   A    Yes.

2   Q    Are you saying that that decreased or increased in size in

3   the hospital or stayed the same?

4   A    I'm saying that she had extra-axial space because of the

5   decrease in the size of the brain itself.  That's what the

6   radiologist had said.

7   Q    Well, you read Dr. Hedlund's radiology report, did you

8   not?

9   A    Yes, I did.

10  Q    Why don't you take a look at it.  I can't remember exactly

11  what --

12       MR. TELISMAN:  Your Honor, I have an objection just

13  as far as the -- I'm not clear as to what time period we're

14  talking about here.

15       THE COURT:  I think he's saying while she was in the

16  hospital.

17       Are you intending to narrow it down any further?

18       MR. BLEGEN:  I am after showing her the document

19  because I don't think she will remember the dates.

20  BY MR. BLEGEN:

21  Q    Take a look at this report just for a second and see if

22  it's the Hedlund report that you reviewed.

23  A    It is.

24  Q    And look at the tabs that I have put on there.  I'll just

25  stand here if that's okay.

Jenny - cross

1     (Brief interruption.)

2    BY MR. BLEGEN:

3    Q    The tab in the highlighted portions, isn't Dr. Hedlund

4    saying that on December 28th, 2002, that there was an interval

5    increase in size of the bilateral, frontal and temporal

6    chronic subdural hemorrhages, the hydromas, meaning he hadn't

7    really decided what they were yet?

8    A    That's what it says on the 28th of December.  That was

9    early on, yes.

10   Q    Right.  Now, take a look down on January 4th, 2003,

11   starting there.

12   A    Interval increase in the size of the bilateral, frontal

13   and temporal chronic subdurals.

14   Q    Right.  So he's saying that they continued -- the chronic

15   subdural continued to increase in size, right?

16   A    Yes.

17   Q    And that's actually why they ended up having to evacuate

18   the chronic subdural with the surgery that you spoke about

19   yesterday?

20   A    Yes.

21   Q    So the chronic subdural kept growing in the hospital,

22   correct?

23   A    Yes, the extra-axial spaces.

24             THE COURT:  I want to make sure I'm getting this.

25             THE WITNESS:  Yes.

Jenny - cross

1        THE COURT:  You're saying -- here's what I'm getting

2   from you.  You will tell me if I'm getting it wrong.

3        What I'm getting from you, it's not so much that the

4   chronic subdural was growing in and of itself; it's that the

5   brain was shrinking, leaving more space, and the chronic

6   subdural was essentially expanding into it?

7        THE WITNESS:  Yes.

8        THE COURT:  Okay.  Is that different from it growing?

9        THE WITNESS:  Well, no.  I mean, it's --

10       THE COURT:  The mechanism might be different.

11       THE WITNESS:  The mechanism is different because

12   nature pours a vacuum.

13       THE COURT:  All right.  There's a hole and this is

14   going into it.

15   BY MR. BLEGEN:

16   Q   You also testified yesterday that UIC, the hospital, did

17   extensive lab work, and I think you said that they tested for

18   virtually everything, or words to that effect?

19   A   It was a very -- a very complete, I thought, laboratory

20   evaluation of this child.

21   Q   What tests did they do for thrombophilia?

22   A   They did not test for thrombophilia.

23   Q   All right.  So there is one thing they did not test for,

24   correct?

25   A   Yes.

Jenny - cross

1   Q   And in your report --

2           Do you have your report in front of you?

3   A   Yes.

4   Q   Turn to page 14 where you start the chart of things that

5   were tested.  Do you see at the bottom where you indicate that

6   there was a test for homocystinuria?

7   A   Yes.

8   Q   Homocystinuria is associated with CVT, is it not?

9   A   I don't know.

10  Q   Okay.  Do you know that they -- do you know whether they

11  tested for homocystinuria or not?

12  A   Yes.

13  Q   Take a look on the document that is listed as UIC 237.

14      (Brief interruption.)

15  BY MR. BLEGEN:

16  Q   Is that the lab results or at least the lab results that

17  you were relying on to indicate what tests were done?

18  A   Yes.

19  Q   Line 31 has homocysteine.  Do you see that?

20  A   Yes.

21  Q   Is that the test for homocystinuria that you are referring

22  to?

23  A   That's one of them.

24  Q   Does it indicate that that test was done?

25  A   They didn't look specifically for that amino acid, but

1  they did look for metabolites of that amino acid.

2  Q   But the test for homocysteine was specifically not done,

3  correct?

4  A   For that particular amino acid, right.

5  Q   And this homocysteine, the particular amino acid, that is

6  affiliated with homocystinuria?

7  A   It is.

8          MR. BLEGEN:  Judge, that is line --

9          THE COURT:  I see it there, line 31.

10         You said something about metabolites.  Are they

11  metabolites of homocysteine?

12         THE WITNESS:  Yes.

13         THE COURT:  Which are the metabolites?

14         THE WITNESS:  I would have to go back to the --

15         THE COURT:  You're saying that one of these -- one or

16  more of these are metabolites of that.

17         THE WITNESS:  Yes.

18         THE COURT:  So is testing for a metabolite another

19  way of testing for homocysteine?

20         THE WITNESS:  Yes.

21         THE COURT:  You have to do some sort of calculations

22  to kind of back you into it or something, right?

23         THE WITNESS:  Right.

24  BY MR. BLEGEN:

25  Q   Is anemia a risk factor for CVT?

1   A   I know that high hematocrit is.  I don't know that anemia

2   in and of itself is.

3   Q   This girl had anemia, correct?

4   A   Yes.

5   Q   I'm sorry?

6   A   Yes, she did.

7   Q   That's my fault.  I spoke over you.

8          MR. BLEGEN:  Judge, if I could just have a moment?

9          THE COURT:  Yes.

10      (Brief interruption.)

11         MR. BLEGEN:  Judge, I believe that is all I have.

12         THE COURT:  Redirect.

13         MR. TELISMAN:  Thank you, your Honor.

14                    REDIRECT EXAMINATION

15  BY MR. TELISMAN:

16  Q   Hi, again, Dr. Jenny.

17  A   Good morning.

18  Q   Good morning.

19         Counsel asked you some questions about the old blood

20  on the brain, the chronic subdural hemorrhage, the old blood

21  on the brain, and I'd like to start with a record.

22         Dr. Jenny, I'm handing you what's been marked as

23  Respondent's Exhibit Jenny 18, and I will let you know, and

24  for the record, this is a composite exhibit.

25         What I would like you to do is turn to the second

Jenny - redirect

1   page of this composite exhibit and tell me if you recognize

2   that.  On the bottom right-hand corner you will see UIC 85.

3   A    It's a neurosurgery consult.

4   Q    Okay.  And what's the date of it at the top?

5   A    December 28th, 2002.

6   Q    All right.  Now, could you do me a favor and turn to

7   page 86, UIC 86?  It's the next page there.

8            And tell me in the middle of the page under the

9   section where it says Head, what does it say there, the first

10  sentence?

11  A    "Anterior fontanelle bulging even in the 45 degree

12  reclining position."

13  Q    What is the anterior fontanelle?

14  A    It's where the segmented skull of the infant comes

15  together at the top and the back of the head where there is no

16  actual bone.  There is just connective tissue, scalp and dura.

17  Q    What is the significance of a bulging anterior fontanelle

18  in a baby with bleeding on the brain?

19  A    That's a sign of increased pressure, increased fluid

20  around the brain.

21  Q    And counsel asked you questions along this line, right,

22  about the role of the chronic subdural and whether it caused

23  increased intracranial pressure, right?

24  A    Yes.

25  Q    And this is -- essentially this is the same theory.

Jenny - redirect

1    You read Dr. Teas' report, right?

2  A    Yes.

3  Q    And this is the same theory that was espoused by Dr. Teas

4  in her report, correct?

5  A    Yes.

6  Q    Dr. Jenny, I'm handing you what's been marked as

7  Respondent's Exhibit Jenny 21 here.  Do you recognize that?

8  A    Yes.

9  Q    Is that Dr. Teas' report from this case?

10  A    Yes.

11  Q    Could you do me a favor and turn to page 6?

12        Near the top of the page -- and I will give you one

13  second just to get to it.

14        Near the top of the page, the first full paragraph,

15  does Dr. Teas write:

16        "Sometimes rebleeds resolve without intervention.

17  Other times the cycle may continue, leading to increased

18  intracranial pressure and its consequences"?

19  A    Yes.

20  Q    Now, can you turn to the conclusions, the very end?

21        In the conclusions, summary and conclusion, does it

22  state:

23        "The medical records established that Isabella had

24  chronic subdural/subarachnoid collections, in parentheses,

25  chronic subdural hemorrhage and/or BECC, that expanded over

Jenny - redirect

 1   her first months of life."

 2          Is that what that says?

 3   A    Yes.

 4   Q    Essentially Dr. Teas --

 5          And the theory here is that Isabella collapsed on

 6   December 27th, 2002, as a result of this growing chronic

 7   subdural hemorrhage, correct?

 8   A    That's what the record says, yes.

 9   Q    Now, you just talked before about the anterior fontanelle

10   showing increased intracranial pressure, right?

11   A    Yes.

12   Q    What I'd like you to do is go back to Jenny Exhibit 18,

13   and now look at the first page.  This is Hinsdale IZ 3.

14   A    I don't have it here.

15   Q    I'm sorry.

16   A    At least that I know of.

17   Q    Oh, I didn't --

18   A    Oh, I see it.  Here's one.  I'm sorry.  This is it.  Got

19   it.  Jenny 18, got it.

20          THE COURT:  Let me do something for you because those

21   are going to be flying apart.  Apparently there's a stapler

22   shortage in the attorney general's office.  I observe this

23   generally among lawyers in Chicago, I will just say that.

24   Apparently there is a world-wild -- it's either staplers or

25   staples, I'm not sure which it is.

1       Okay, we have got some.  I've got them salted away in
2   a government bunker.
3   BY MR. TELISMAN:
4   Q   Dr. Jenny, the first exhibit, the first page there on that
5   exhibit, on the bottom right-hand corner it's marked Hinsdale
6   IZ 3?
7   A   Yes.
8   Q   What is the date of this record on the top left-hand
9   corner?
10      THE COURT:  It's a little bit down from the upper
11  left-hand corner.  9/6/2002, that's what you're looking at?
12      MR. TELISMAN:  Yes.
13  BY MR. TELISMAN:
14  Q   Are you there, Dr. Jenny?
15  A   The date of birth?
16      THE COURT:  No.  Upper left.
17  BY MR. TELISMAN:
18  Q   Upper left-hand corner of the entire page.
19  A   Oh, I see.  9/6, got it.
20  Q   Very good.
21      Now, what I'd look you to do is go down to the
22  section marked Physical Exam, maybe about, just about halfway
23  down the page.
24      Do you see a sentence there that says, "The AF was
25  soft and flat and the head exam was normal"?

Jenny - redirect

1    A    Yes.

2    Q    So on September 6th, 2002, the day that Isabella was born,

3    what was the condition of her anterior fontanelle?

4    A    It was soft and flat.

5    Q    What indication does that give about the presence of

6    intracranial pressure?

7    A    There was none.

8    Q    All right.  Do me a favor.  Can you now turn in the same

9    exhibit to Pediatrician 32, which is about five pages in?

10        (Brief interruption.)

11   BY MR. TELISMAN:

12   Q    Are you there?

13   A    Yes.

14   Q    Now, this is a progress note?

15   A    Yes.

16   Q    And on the left-hand side, what is the date?

17   A    10/23/02.

18   Q    Could you please go down to where -- it's about halfway

19   down the page, it says "PE"?

20   A    Yes.

21   Q    Is that PE?

22   A    Physical exam, yes.

23   Q    And what is the second line under there?

24   A    "Anterior fontanelle, not bulging."

25   Q    All right.  So on October 23rd, 2002, we don't have an

1    open and bulging anterior fontanelle, or we have an open but

2    not bulging anterior fontanelle?

3    A    Yes.

4    Q    And now --

5              THE COURT:  What does that mean, open?

6              THE WITNESS:  That means it hasn't fused.

7              THE COURT:  All right.

8              THE WITNESS:  The bones haven't fused.

9    BY MR. TELISMAN:

10   Q    Just so we're clear for the record, the bones of a baby's

11   skull are not fused together initially, is that right?

12   A    Right, and at this age, they shouldn't be.  That would be

13   a bad sign.

14   Q    And so there's actually -- naturally, is there a space, a

15   hole, in between the sutures of the bone, and that's the area

16   we call the fontanelle?

17   A    Yes.

18   Q    And over time the fontanelle closes and the bones fuse

19   together?

20   A    Yes.

21   Q    And that's adults have a fused skull but babies have a

22   segmented skull?

23   A    That's right.

24   Q    Now, if you could do me a favor and turn to the next page,

25   and I will direct your attention now to Provena 42.

Jenny - redirect

1   What do we have here?

2   A   This is the admission note on the 27th, after her

3   collapse, of December.

4   Q   And if you could do me a favor and turn to page Provena

5   45, part of the same record there, part of the same admission

6   record.

7        Under the section marked Neurological, does it give a

8   description of Isabella's fontanelle?

9   A   Yes.

10  Q   What does it say?

11  A   Soft and flat.

12  Q   Was this before or after she collapsed?

13  A   This was after.

14  Q   Now, the first record I showed you was from the following

15  day, right?

16  A   Yes.

17  Q   And what was her fontanelle like the next day?

18  A   It was bulging and full.

19        THE COURT:  Remind me which page that was.

20        MR. TELISMAN:  It was the first page of the exhibit,

21  your Honor.

22        THE COURT:  Got it.  No.

23        MR. TELISMAN:  I'm sorry.  The second page, second

24  page.  I apologize.

25        THE COURT:  UIC 85.

Jenny - redirect

1    MR. TELISMAN:  UIC, starting at 85, which is the

2   date, and 86 which is under the section of Head.

3    THE COURT:  Got it.  Now I have it.  Thanks.

4   BY MR. TELISMAN:

5   Q   Now, as counsel spoke to you about during cross

6   examination, the blood collecting in Isabella's subdural space

7   needed to be evacuated in January, I think.  Was it

8   January 10th she had her surgery?

9   A   Yes.

10  Q   Somewhere around there?

11   To release pressure, right?

12  A   Yes.

13  Q   Now, how --

14   Let me ask it this way.

15   Can trauma cause damage to the arachnoid membrane?

16  A   Yes.

17  Q   Where is the arachnoid membrane in relation to a chronic

18  subdural hemorrhage?

19  A   It's below it, toward the brain.

20  Q   What does the arachnoid membrane encase?

21  A   Cerebral spinal fluid, clear fluid.

22  Q   And when the arachnoid membrane is torn, where does that

23  cerebral fluid go?

24  A   It leaks into the subdural space.

25  Q   Can trauma cause the arachnoid membrane to tear, resulting

Jenny - redirect

1   in cerebral spinal fluid leaking into the subdural space?

2   A   Yes.

3   Q   Will that result in an increase in intracranial pressure?

4   A   It can.

5   Q   Now, based upon Isabella's -- the presentation of

6   Isabella's anterior fontanelle, what does that tell us about

7   the presence of intracranial pressure in her head as a result

8   of this chronic subdural hemorrhage?

9   A   Well, at the time she was admitted, there was no sign that

10  it was causing pressure.  It increased over the next 24 hours.

11  Q   Now, Dr. Jenny, do you know for sure when Isabella got the

12  first subdural hemorrhage that became chronic and appeared as

13  chronic on December 27th, 2002, imaging?

14  A   No.

15  Q   Do you know for sure how Isabella got that subdural

16  hemorrhage?

17  A   No.

18  Q   Do you know whether that old subdural hemorrhage is what

19  caused her collapse?

20  A   It did not.

21  Q   Why not?

22  A   Well, because it wasn't large enough at that point to have

23  affected her and caused her to have severe brain injury.

24  Q   Now, about the head circumference, counsel asked you

25  further questions about your head circumference plotting.  Do

Jenny - redirect

1    you recall that?

2    A    Yes.

3    Q    Actually with respect to the head circumference, what

4    counsel was asking you about was whether the head

5    circumference increase was the result of this growing chronic

6    subdural hemorrhage that was causing pressure, right?

7    A    Yes.

8    Q    And what does the absence of a bulging anterior fontanelle

9    in the baby up to the day where she collapsed, what indication

10   does that give about that theory?

11   A    Well, she didn't have -- her brain was not under unusual

12   pressure up until the final event.

13   Q    One of the first questions that I had asked you after we

14   established your credentials on direct examination was I asked

15   you about what sort of injury does the brain sustain as a

16   result of abusive head trauma.

17           Do you recall that?

18   A    Yes.

19   Q    What was the answer?  You talked about primary and

20   secondary injuries?

21   A    Yes.

22   Q    And so what are the --

23           If you could please just explain again, what is the

24   primary injury there?

25   A    Well, primary injury is a direct result of forces applied

Jenny - redirect

1  to the head.  So that would be brain contusions, torn bridging

2  veins, shearing tears, axonal injury in the deep white matter.

3  Q   And the secondary injuries?

4  A   The secondary injuries include hypoxia and ischemia and

5  also metabolic collapse where toxic substances are released

6  from dying cells, which then essentially poison healthy cells

7  nearby and kind of lead to a cascade, a metabolic cascade of

8  decompensation.

9  Q   Now, with respect to the issue of head circumference --

10       And just so that we're clear on that issue, on the

11  issue of that, so does the subdural hemorrhage itself -- in

12  abusive head trauma, is subdural hemorrhage the cause of brain

13  injury or is it a marker of abusive head trauma?

14  A   Rarely you will have -- you will lacerate a large vessel

15  such as the collecting veins at the top of the head and get a

16  massive bleed, but that's not what we usually see.

17       Usually the subdurals are a marker of trauma, and the

18  brain injury is another event that actually causes the child

19  to die.

20  Q   Okay.  And in addition to potential cerebral spinal fluid

21  leaking into the subdural space, can the presence of new

22  subdural hemorrhaging, new blood in there, also increase

23  intracranial pressure?

24  A   If it's a substantial amount, yes.

25  Q   Now, with respect to the increase in head circumference,

Jenny - redirect

1   just directing your attention to --

2          Do you have still have the original respondent's

3   exhibits?

4   A   Yes.

5   Q   I'm going to try to find it here.  Here we go.  It's

6   Respondent's Jenny Exhibit 11, which is your head

7   circumference growth chart and the head circumference records?

8   A   Yes.

9   Q   Now, on direct examination you talked about what can

10  affect the initial head circumference measurement, right?

11  A   Yes.

12  Q   And you explained that there is molding from the vaginal

13  delivery, the delivery through the vaginal canal?

14  A   Yes.

15  Q   Then there is also the intrauterine conditions.

16  A   That's right.

17  Q   And that affects how the baby develops inside the mother's

18  womb, right?

19  A   Yes.

20  Q   And then after that, then you have this transition, the

21  additional -- the subsequent head circumference measurements

22  start reflecting the absence of molding as the baby's head

23  forms back, and then also the genetic -- the baby's genetic

24  predisposition towards her height and weight and head

25  circumference, right?

Jenny - redirect

1   A    That's right.

2   Q    Now, with respect to the head circumferences, what was the

3   first measurement after -- the first measurement was two hours

4   after her birth.  What was the next measurement after that?

5   A    It was at her one-month exam.

6   Q    And that's two pages into this exhibit, Pediatrician 3.

7   How much was that?

8   A    It was 14 and three-quarters inches.

9   Q    Now, let's jump ahead to the date of the -- that Isabella

10  collapsed, 12/27/02.  And I will direct your attention to two

11  pages after that, Provena 45.

12          What was her head circumference then?

13  A    I'm sorry.  Tell me again where I'm supposed to look.

14  Q    Two pages right after the one that you were looking at.

15  A    Okay.

16          THE COURT:  It says Provena 45 at the bottom.

17          THE WITNESS:  Okay.

18  BY MR. TELISMAN:

19  Q    What was her measurement then?

20  A    42 centimeters.

21  Q    All right.  Now, looking at --

22          I apologize.  Counsel had asked you some questions

23  about that on cross examination, and I think he had actually

24  done the calculation regarding the difference -- changing that

25  inches to centimeters, the inches measurement.

Jenny - redirect

1     But essentially by looking at your chart, can you

2     explain --

3     Pardon me.  Actually let's move on to the October

4     measurement, and I apologize, because this will be an easier

5     comparison.

6     THE COURT:  Which page?

7     MR. TELISMAN:  I'm sorry about that, Judge.

8     (Brief interruption.)

9     BY MR. TELISMAN:

10    Q   It's Pediatrician 3.  Actually it's Pediatrician 3.  I'm

11    sorry.  That was the October measurement.

12    And by looking at your chart, can you identify how

13    many centimeters 14 and three-quarters inches is?

14    A   If I had a pencil, I could.

15    THE COURT:  You said "pencil."  I've got a pencil.

16    THE WITNESS:  Thank you.

17    You said 14 and three-quarters.  Is it all right if I

18    write on the back of a --

19    THE COURT:  Those aren't the official ones.  You can

20    write on those.  That's fine.

21    THE WITNESS:  All right.

22    (Brief interruption.)

23    THE WITNESS:  37.46.

24    BY MR. TELISMAN:

25    Q   So what was the difference -- and that was done on

Jenny - redirect

1    October 8 --

2    A    Yes.

3    Q    -- is that right, 2002?

4    A    Yes.

5    Q    And then the next one I asked you to look at was 12/27/02,

6    the Provena 45?

7    A    Yes.

8    Q    And on that day it was 42 centimeters?

9    A    Yes.

10   Q    So what is the difference between 42 and what did you say?

11   A    37 and a half basically.

12   Q    And what's the difference there?

13   A    It's 4.5.

14   Q    4.5 centimeters?

15   A    Yes.

16   Q    Over a course of two-and-a-half months?

17   A    Yes.

18   Q    October 8th to December 27th?

19   A    Yes.

20   Q    Now, counsel had presented you yesterday with Petitioner's

21   Jenny Number 4.  Do you recall this one?

22   A    Yes.

23   Q    One of the things he asked you to look at was average

24   monthly gain.  There's a table on page 203.

25              THE COURT:  Which number was this, Mr. Telisman?

Jenny - redirect

1    MR. TELISMAN:  This is Petitioner's Number 4.

2    THE COURT:  Okay, thanks.

3  BY MR. TELISMAN:

4  Q   What does it say is the average monthly gain for head

5  circumference for a child aged zero to three months?

6  A   Two centimeters.

7  Q   Two centimeters per month on average, right?

8  A   Yes.

9  Q   And do you agree with this as an average, or do you know?

10  A   It's not a number I've ever seen.  I just rely on growth

11  charts.

12  Q   All right.  Well, so over the course of two-and-a-half

13  months, Isabella's head circumference increased by

14  four-and-a-half centimeters?

15  A   Yes.

16  Q   Is that about in line with two centimeters per month?

17  A   Yes.

18  Q   Counsel asked you some questions about feeding.

19          Well, actually let me back up while we're still

20  talking about head circumference.  With respect to the issue

21  of head circumference, counsel pointed out to you on your

22  growth chart that on Isabella's two-month well visit 11/11/02,

23  that her measurement was -- you had marked it around the

24  90th percentile, and he said it was actually around the

25  95th percentile.  Does that sound about right?

                          Jenny - redirect

1   A    I don't recall.

2            MR. TELISMAN:  Do you have the one you marked with

3   the red dots?

4            MR. BLEGEN:  Somewhere, I'm sure.

5        (Brief interruption.)

6   BY MR. TELISMAN:

7   Q    Well, if you could look at your chart, Dr. Jenny?

8   A    Okay.

9   Q    If you look at the two-month visit?

10  A    Yes.

11  Q    Do you have it?  Actually Mr. Blegen has it.

12           Thank you.

13           So counsel asked you about how on November 11th about

14  how Isabella's head circumference was much -- that it was

15  higher than the 90th percentile at that point, right?

16           Do you recall counsel asking you about that?

17  A    Yes.

18  Q    At that point on that day, was Isabella's -- was that one

19  of the days that -- pardon me.

20           What was Isabella's clinical picture on that day?

21           THE COURT:  Which day are we talking about?

22           MR. TELISMAN:  November 11th, 2002, the day of

23  Isabella's two-month well visit.

24  BY THE WITNESS:

25  A    She was healthy at that time.

1  BY MR. TELISMAN:

2  Q   Does her clinical picture as of that date support brain

3  injury and increased intracranial pressure?

4  A   No.

5  Q   Going back in time to Isabella's one-month visit,

6  October 8th, 2002, does Isabella's clinical picture on that

7  day support brain injury and increased intracranial pressure?

8  A   No.

9        THE COURT:   The date you just mentioned again was?

10       MR. TELISMAN:   October 8th.

11       THE COURT:   Thanks.

12       MR. TELISMAN:   Isabella's one-month visit, well

13  visit.

14  BY MR. TELISMAN:

15  Q   In fact, does the record show that Isabella had problems

16  feeding or had lethargy before Isabella was in Jennifer Del

17  Prete's care?

18  A   I didn't see it in the well-child visits.

19  Q   Now, do the records reflect that Isabella began that day

20  care in I think it was December 6th, 2002?

21  A   I believe so.

22  Q   And up to December 6th, 2002, was there any indication in

23  the record that Isabella was a sick baby other than the

24  instance of the fever that she had to be hospitalized for,

25  anything else?

Jenny - redirect

1   A    No.  She had no other illness visits.

2   Q    Now, counsel during cross examination showed you

3   statements that the petitioner gave to the police.  Do you

4   recall that?

5   A    Yes.

6   Q    And he asked you about the various statements and whether

7   there were inconsistencies; do you recall that?

8   A    Yes.

9   Q    And he also asked you about whether or not what Jennifer

10  Del Prete told the police showed that Isabella was a sick

11  baby.  Do you recall that?

12  A    Yes.

13  Q    I'm going to show those back to you again, and I will

14  start with Petitioner's Jenny 15.  Do you see that?

15  A    Yes.

16  Q    What is the date of Isabella -- that the officer there

17  spoke with Isabella?

18  A    With Ms. Del Prete?

19  Q    I'm sorry.  With Jennifer Del Prete.  My apologies.

20  A    It was 12/27/02 at 2:17 in the afternoon.

21  Q    Now I'm going to show you another one.  Just so that we're

22  clear, that's Petitioner's 15?

23  A    Yes.

24  Q    Now, Petitioner's 16, that also contains a statement that

25  the petitioner gave to the police, right?

1   A    Yes.

2   Q    And what is the date that she spoke to the police there?

3   A    12/27/02.

4   Q    And now Petitioner's 17, is that another police report

5   that the petitioner gave a statement to the police?

6   A    Yes.

7   Q    What is the date of that one?

8   A    12/27/02 at 15:00 hours.

9   Q    And each of those give an account by the petitioner of

10  what happened that day and how Isabella was that day, right?

11  A    Right.

12  Q    Now, take a look at those, and I will just ask you a

13  couple of questions from there.

14        Directing your attention to the one that is

15  Romeoville, page 15, which is --

16  A    Number 17.

17  Q    -- Petitioner's 17.

18        At the bottom of the page, what does Jennifer Del

19  Prete say?

20  A    "Jennifer stated that Isabella appeared to be fine all day

21  prior to the incident.  Jennifer explained that Isabella is

22  what she would call a crabby baby normally but did not act out

23  of the norm at all today."

24  Q    If I can take a look at that.

25        Now, directing your attention to Petitioner's

Jenny - redirect

1    Exhibit 16, and this is also on December 27th, what did --

2            Was the petitioner asked whether Isabella had any

3    medical conditions?  And I will direct your attention to the

4    middle of the page, the second full paragraph.

5            THE COURT:  Which one are you on now?

6            MR. TELISMAN:  This is Petitioner's 16, Romeoville

7    13.

8            THE COURT:  Okay.

9    BY MR. TELISMAN:

10   Q    Do you see here the highlighted portion that I have here?

11   A    Yes.

12   Q    Could you read that?

13   A    "I asked Jennifer if she knew of any medical conditions

14   that Isabella may have had.  She advised she only knew of the

15   amoxicillin she was taking for her cold but did mention that

16   every once in a while, they will give her gas relief drops

17   made by Gerber for gas pain.  Jennifer was not aware of any

18   other health issues with Isabella."

19   Q    Now, do any of the statements here that Jennifer Del Prete

20   gave on December 27th talk about excessive crying?

21   A    No.

22   Q    Do any of them mention clenching fists and shaking while

23   feeding?

24   A    Not that I see right off the bat.

25   Q    They talk about her being crabby, but other than that?

                          Jenny - redirect

1    A    Right.

2    Q    Okay, I will take these back.  I will take this one back,

3    too.

4              Now, these were not the only statements that Jennifer

5    Del Prete gave to the police, correct?

6    A    Yes, I believe so.

7    Q    There is one other because counsel talked to you about

8    four, right?

9    A    Okay.

10   Q    I'm now handing you Petitioner's Jenny Number 18.  What is

11   the date of this statement?

12   A    12/29/02.

13   Q    This is two days after the collapse, right?

14   A    Yes.

15   Q    And now Jennifer Del Prete talks to the police again,

16   right?

17   A    Yes.

18   Q    And this statement, the first full paragraph in the middle

19   of the paragraph, what does it say about what Isabella does

20   when she eats?

21   A    "She clenches her fists and shakes while eating."

22   Q    And what does it say two lines down about Isabella's

23   crying or irritability?

24   A    "She cries a lot and is crabby when she eats.  She does

25   cry a bit more than other infants."

Jenny - redirect

1    Q    Is there anything in this record where the petitioner

2    states that Isabella appeared to be fine prior to the

3    incident?

4    A    She doesn't overtly say that, no.

5    Q    Counsel asked you questions regarding thrombocytosis.  Do

6    you recall that?

7    A    Yes.

8    Q    Basically we're talking about clotting at this point?

9    A    Yes.

10   Q    And is the study that you cited, the Vannucchi article, is

11   that the only article that talks about reactive

12   thrombocytosis?

13   A    That was a review.  Certainly there are other articles in

14   the literature.

15   Q    Dr. Jenny, I'm handing you what has been marked as

16   Respondent's Exhibit 20.  Is this an article by Valerio

17   Cecinati?

18   A    Yes.

19   Q    C-e-c-i-n-a-t-i?

20   A    Yes.

21   Q    Is it from the journal, the Pediatric Infectious Disease

22   journal?

23   A    Yes.

24   Q    It's dated January 2012?

25   A    That's right.

Jenny - redirect

1  Q    And just directing your attention to the second page,

2  under Treatment, what does it read there?

3  A    "As thromboembolic events have not been reported in

4  children with reactive thrombocytosis secondary to infections,

5  treatment with platelet aggregation inhibitors is not required

6  even when the platelet counts are high; i.e., greater than ten

7  to the ninth -- greater than, a thousand times, ten to the

8  ninth per microliter."

9  Q    Now, to be clear, this article deals with thrombocytosis

10  in the context of infections, correct?

11  A    Yes.

12  Q    But did you review among the respondent's or petitioner's

13  experts' reports -- one of the petitioner's experts is Dr.

14  Scheller?

15  A    Yes.

16  Q    Okay.  Did you review that?

17  A    I did.

18  Q    In fact, Dr. Scheller's theory as to what caused

19  Isabella's thrombocytosis was infection, correct?

20  A    Yes.

21  Q    Infection caused an increase in platelets which caused the

22  CVT?

23  A    Right.

24  Q    And this article states that thromboembolic events have

25  not been reported in children with reactive thrombocytosis

1    secondary to infections?

2    A   That's right.

3    Q   Counsel asked you questions about contusions; do you

4    recall that?

5    A   Yes.

6    Q   And he showed you the -- he spoke to you about your prior

7    testimony that you had in an Arizona case, is that right?

8    A   Yes.

9    Q   What was the --

10        Matt, do you have that or not?

11        One of the articles that we had just talked about and

12   I think was even brought up on cross examination was in

13   Respondent's Jenny Number 4, the Brennan article from 2009?

14   A   That's right.

15   Q   Do you have that?  It should be there, number 4 --

16   A   Yes.

17   Q   -- in front of you.

18        THE COURT:  Whose Jenny Number 4, respondent's?

19        MR. TELISMAN:  Respondent's Jenny Number 4.

20   BY MR. TELISMAN:

21   Q   I would direct your attention to page 236 of that article.

22        Again, this study, if you could, what were the types

23   of kids they were looking at?  Were these all kids with

24   abusive head trauma?

25   A   Yes.  They were all children who had -- who were dead,

Jenny - redirect

1    yes.

2    Q    So it was all homicide; it was homicide victims?

3    A    Yes, homicides, yes.

4    Q    Over a period of time, and I'm just getting this from the

5    first page?

6    A    Right.

7    Q    A total of 52 homicide victims two years of age or younger

8    in the city of Philadelphia, Pennsylvania, between 1995 and

9    2003 who underwent postmortem examinations at the OME, office

10   of the medical examiner?

11   A    Yes.

12   Q    So that's the sample group we're talking about here,

13   right?

14   A    Yes.

15   Q    Now, if you look on the left-hand side of page 236 under

16   the section marked Head Injuries, the first paragraph there,

17   does that identify 41 infants in this sample that had abusive

18   head trauma?

19   A    Yes.

20   Q    And so with respect to those 41 kids who had abusive --

21   who died from abusive head trauma, if you could go down about

22   six lines, there's a sentence that begins "in one child"?

23   A    Yes.

24   Q    It says --

25            THE COURT:   I'm trying to catch up here because --

Jenny - redirect

1    MR. TELISMAN:  I'm sorry.

2    THE COURT:  -- it's everywhere.

3    Which page are you on?

4    MR. TELISMAN:  Page 236.

5    THE COURT:  Thanks.  Okay.

6  BY MR. TELISMAN:

7  Q   On the left-hand side, the section marked Head Injuries,

8  about seven lines down, there's a sentence that begins "in one

9  child."  Do you see it, Dr. Jenny?

10 A   Yes.

11 Q   It reads:

12      "In one child the condition of the brain was such

13 that the presence of cerebral contusions and lacerations could

14 not be ascertained, but of the remaining 40 children, 32 --

15 and it says 80 percent in parentheses -- had some cerebral

16 contusion or laceration, whether superficial or deep."

17      So what does this say about the presence of

18 contusions, cerebral contusions, or lacerations with respect

19 to severe abusive head trauma?

20 A   That they're commonly present.

21 Q   I'm sorry?

22 A   That they're commonly present.

23 Q   And these are all kids who died as a result of it, right?

24 A   That's right.

25 Q   And so when counsel presented your testimony from another

1  case on cross examination regarding Arizona v. Mesa, and he

2  quoted you and your testimony as saying:

3          "And, you know, we don't even see the most -- we --

4  those are unusual in child abuse because it takes an enormous

5  amount of force to contuse the brain," right?

6  A   Right.

7  Q   When you say that it's unusual in child abuse, what do you

8  mean by that?

9  A   Well, you know, first, only 20 percent of the kids that we

10  see die.  The other 80 percent don't.  And it's not, you know,

11  a very common finding in general.  Lots of kids don't even get

12  admitted to the ICU.  So it would be a particularly severe

13  group at that one end of the spectrum.

14  Q   One other area I want to go into is the issue of feeding.

15  Counsel asked you questions about Isabella having problems

16  feeding.

17          THE COURT:  I'm sorry.  Let me just tell you why I'm

18  having all these problems.  It's a combination of two things.

19          Number one, your exhibits are just paper clipped

20  together.  And, number two, although they're in tabs, there's

21  no numbers on the exhibits, and, therefore, when I take them

22  out, I've got to figure out where to put them back in.

23          MR. TELISMAN:  I'm sorry, Judge.

24          THE COURT:  So just future reference, although I

25  guess there isn't going to be much future reference, don't do

Jenny - redirect

1    that.

2              MR. TELISMAN:  Okay.  Thank you, Judge.

3    BY MR. TELISMAN:

4    Q    Now, I handed what has been marked as Respondent's Exhibit

5    Jenny 19.

6              With respect to the first page there on that exhibit,

7    it's marked Pediatrician 1.  Is this Isabella's initial

8    newborn visit?

9    A    Yes.

10   Q    On the top left-hand corner, what's the date?

11   A    The 13th of September, 2002.

12   Q    So Isabella is a week old here?

13   A    Four days.

14   Q    She was born September 6th?

15   A    Oh, the 6th, right.  Seven days, you're right.

16   Q    Now, near the bottom left-hand corner, there is a section

17   marked Diet?

18   A    Yes.

19   Q    What does it say there?

20   A    She was breastfeeding every one to two hours.

21   Q    Any sort of indication on this record that Isabella was

22   having problems feeding?

23   A    That's perfectly normal for a one-week-old baby.

24   Q    Now, turning to the next page, this is marked Pediatrician

25   03.

Jenny - redirect

1   A    Yes.

2   Q    Is this Isabella's one-month visit?

3   A    Yes.

4   Q    And this is from October 8th, 2002?

5   A    Yes.

6   Q    What does it say about Isabella's breastfeeding, feeding

7   habits, under Diet?

8   A    She was breastfeeding 10 to 12 times a day and taking

9   supplemental Enfamil with iron, three to four ounces every

10  day.

11  Q    And the supplemental Enfamil with iron, is that baby

12  formula?

13  A    Yes.

14  Q    So we have a little bit of, I guess, starting to wean off

15  of the breast milk or just supplement the breast milk?

16  A    That's right.

17  Q    Does it give any sort of indications about problems

18  feeding?

19  A    No.

20  Q    And how does this compare with what you would hope to see

21  in a baby who is one month old?

22  A    Well, again, the baby was gaining weight beautifully, and

23  so it's hard to imagine that she was unable to feed and yet

24  gain normally.

25  Q    Now, directing your attention to the next page in the

Jenny - redirect

1  exhibit, Pediatrician 21, is this a progress note from

2  Isabella's hospitalization on October 23rd, 2002, for the

3  fever?

4  A   It's part of the emergency department note.

5  Q   And directing your attention to the third line down in the

6  handwriting on the right-hand column where all that

7  handwriting is?

8  A   Yes.

9  Q   It says, "patient irritable."  Do you see that there?

10 A   Yes.

11 Q   Right after that, what does it say?

12 A   "Nursing well last night.  Nursing well, slept last

13 night."

14 Q   Okay.  So even with a fever, she's still nursing well?

15 A   That's right.

16 Q   Finally, looking at the next page, Pediatrician 4, is this

17 Isabella's two-month evaluation?

18 A   Yes.

19 Q   Dated November 11th, 2002?

20 A   That's right.

21 Q   What does it say with respect to diet?

22 A   She's breast feeding and taking Enfamil with iron Lipil,

23 which is a standard formula, in about a 50/50 ratio.

24 Q   What is the significance of that?

25 A   Well, she was transferring, I guess, probably getting

1  ready to go back to work, but she was transferring from breast

2  milk to formula.

3  Q    Any indication that Isabella was having problems feeding

4  prior to being in the care of Jennifer Del Prete?

5  A    No.

6         THE COURT:  We're going to take a 10-minute break

7  here.

8         (Brief recess.)

9         THE COURT:  Okay, let's go.

10  BY MR. TELISMAN:

11  Q    Dr. Jenny, counsel asked you questions regarding the

12  concept of a lucid interval on cross examination.  Do you

13  recall that?

14  A    Yes.

15  Q    And he talked to you about the American Academy of

16  Pediatrics regarding their position on lucid intervals.  Did I

17  get that right, or no?

18  A    I don't recall.

19  Q    But counsel asked you about there being some sort of -- I

20  think he said some organization had made a change regarding

21  their position on lucid intervals or something like that.  Do

22  you recall that, or no?

23  A    No.

24  Q    But the bottom line is that do you have an opinion as to

25  whether Isabella had a lucid interval on December 27th, 2002?

Jenny - redirect

1  A    It seems to me that she was feeding and acting normally
2  and then had a collapse.  Again, I don't know what happened
3  between the time her mother left her off and the time that she
4  arrived -- that the paramedics arrived.
5  Q    What is the significance of the fact that Isabella took a
6  bottle and fed while she was in the sole care of Jennifer Del
7  Prete after her mom had dropped her off?
8  A    Again, that's a very normal and -- a normal activity that
9  requires a child to be alert and to be neurologically intact.
10  Q    Now, Doctor, there was discussion on cross examination
11  this morning about Dr. Geddes, right?
12  A    Yes.
13  Q    That Jennian Geddes, G-e-d-d-e-s?
14  A    Yes.
15  Q    Jennian, J-e-n-n-i-a-n?
16  A    Yes.
17  Q    And did counsel show you Petitioner's Jenny Number 19
18  earlier?
19  A    I believe so.
20  Q    And he might have given you a copy.  I've marked mine.
21  I'm sorry.
22        THE COURT:  Which one was that?
23        MR. TELISMAN:  It's Petitioner's Jenny 19.
24        THE COURT:  What is it?
25        MR. TELISMAN:  It's a letter to the editor,

1   "Nonaccidental Trauma:  Clinical Aspects in Epidemiology of

2   Child Abuse."  It's one page.

3             THE COURT:  I don't think I have it.  I think he just

4   showed it to you.

5             MR. TELISMAN:  Actually, Judge, there's two copies of

6   it right here.  I think counsel left it for you here.

7             THE COURT:  All right, thanks.

8   BY MR. TELISMAN:

9   Q    Do you know if you have your copy here?

10            THE COURT:  This is Dr. Geddes' letter to the editor,

11  okay.

12            THE WITNESS:  Right.

13            MR. TELISMAN:  If it's okay with counsel, I put an

14  asterisk here.  I just want to make sure you're okay with me

15  showing that to the doctor.

16            MR. BLEGEN:  Yes.

17  BY MR. TELISMAN:

18  Q    I will just show you my copy of it.

19            Dr. Jenny, looking at the portion there where I have

20  the asterisk, it's the second paragraph, starting "the

21  theory."

22            What does it say?

23  A    "The theory that we proposed is that profound hypoxia in

24  the presence of raised central venous pressure, not hypoxia

25  alone, can lead to subdural bleeding."

Jenny - recross

1    Q    So Dr. Geddes' theory is that there has to be -- in order

2    for profound hypoxia to cause subdural bleeding, there has to

3    be raised central venous pressure as well?

4    A    That was her theory.

5    Q    Does this change your opinion?  Does Geddes' theory change

6    your opinion about the cause of Isabella's collapse on

7    12/27/02?

8    A    No.

9    Q    Why not?

10   A    Well, because it's a theory.  It's never been shown to be

11   proved in any kind of animal model or in any kind of clinical

12   setting.

13              MR. TELISMAN:  If I could just have one moment, your

14   Honor?

15              THE COURT:  Yes.

16         (Brief interruption.)

17              MR. TELISMAN:  I have no further questions at this

18   time.

19              THE COURT:  Any recross, Mr. Blegen?

20              MR. BLEGEN:  Yes.

21                         RECROSS EXAMINATION

22   BY MR. BLEGEN:

23   Q    Dr. Jenny, you answered a few questions from Mr. Telisman

24   about Isabella's condition after she came in the care of

25   Jennifer Del Prete.  Do you remember that?

1  A   Yes.

2  Q   You understand, do you not, that Jennifer Del Prete was

3  not the only person caring for Isabella, correct?

4  A   I don't know what the day care's staffing pattern was.

5  Q   So are you acting under the presumption that Ms. Del Prete

6  watched Isabella every day from December 6th to December 27th?

7  A   I don't know.

8  Q   You didn't know that there were other workers at the day

9  care center?

10 A   No, I don't know anything about the staffing at the day

11 care center.

12 Q   Well, you told us earlier that you knew that other people

13 at the day care center had described the baby as crying a lot

14 and having trouble eating, right?

15 A   Yes.

16 Q   So you know that there was other staff at the day care

17 center, correct?

18 A   Yes.

19 Q   Did you know that the only reason that Jennifer Del Prete

20 was alone with Isabella the day of her collapse was that the

21 day care owner was going out of town that day?

22 A   I knew that she was out of town.

23 Q   All right.  How did you know that?

24 A   Because she said she was at a wedding.

25 Q   So did you know that she was in town prior to going out of

Jenny - recross

1   town?

2   A   Well, I assume at some point.

3           THE COURT:  It's kind of the way it works.  It's like

4   the third law of motion or something like that.

5   BY MR. BLEGEN:

6   Q   With regard to the head circumference, Mr. Telisman asked

7   you some questions about the change in head size from

8   November 11th, 2002, to December 28th, 2002, correct?

9   A   Yes.

10  Q   And the difference was the head size was 40.32 centimeters

11  on November 11th and 42 centimeters on December 28th, correct?

12  A   Yes.

13  Q   All right.  So that's more than a month period, correct?

14  A   Was it November or October?  I'm sorry.  Maybe I miss --

15  Q   November 11th, 40.32 centimeters, correct?

16  A   I don't think that's what he talked about.  He talked

17  about October, a two-month period, a two-and-a-half-month

18  period, October to December.

19  Q   Well, on October 8th, 2002, we know that the head

20  circumference was 14 and three-quarters inches, or

21  37.47 centimeters, correct?

22  A   Yes.

23  Q   And we know that on November 11th, 2002, the head

24  circumference was 15 and 7/8 inches, or 40.32 centimeters,

25  correct?

Jenny - recross

1    A    That's what is written, yes.

2    Q    Those are both dates prior to Jennifer -- or prior to

3    Isabella's starting day care, correct?

4    A    Yes.

5    Q    And the difference in those measurements is

6    2.86 centimeters, correct?

7    A    Yes.

8    Q    More than average head growth?

9    A    Well, certainly within two standard deviations of the

10   mean.

11   Q    The head circumference at birth was 33.5 centimeters,

12   correct?

13   A    Yes.

14   Q    And the next measurement was 40.32.  That's a difference

15   of 3.96 centimeters, correct?

16   A    Yes.

17   Q    So what happened was her head grew larger than the average

18   amount prior to her hospitalization, correct?

19   A    Right.  But 50 percent of kids grow larger than the

20   average amount.

21   Q    All right.  But 50 percent of kids don't have chronic

22   subdural hematomas, do they?

23   A    I hope not.

24   Q    All right, good.

25          Her head grew within normal rates once she got to the

Jenny - recross

1   hospital, right?  Well, 12/28/02 she is in the hospital,

2   correct?

3   A   Yes.

4   Q   And the head circumference measurement of 42 centimeters

5   is in the hospital, right?

6   A   Right.

7   Q   And the previous measurement was 40.32, correct?

8   A   Yes.

9   Q   So her head did not increase more than two centimeters

10  between 11/11/02 and 12/28/02, correct?

11  A   Yes.

12  Q   All right.  And so it was an increase less than two

13  centimeters over more than a period of a month, correct?

14  A   Right.

15  Q   So that would tell you, would it not, that whatever was

16  causing her head to grow faster preexisted 11/11/02, right?

17  A   Not necessarily if this was her normal growth pattern.

18  Q   Well, but if it's not her normal growth pattern, if it's

19  related to a chronic subdural, it preexisted 11/11/02, right?

20  A   If it were, yes.

21  Q   Okay.  Now, you told us --

22          Mr. Telisman went through several documents talking

23  about either a bulging or a flat fontanelle, right?

24  A   Yes.

25  Q   That is not the only sign of a subdural hematoma, is it?

Jenny - recross

1   A    No.

2   Q    And it's not a necessary sign of a subdural hematoma,

3   correct?

4   A    Yes.

5   Q    I'm correct, right?

6   A    Yes.

7   Q    So you can have a subdural hematoma and have a fontanelle

8   that looks perfectly normal, right?

9   A    Yes.

10  Q    But there may be other symptoms that show you do have a

11  subdural in an infant, correct?

12  A    That's right.

13  Q    Irritability, right?

14  A    Yes.

15  Q    Increased head size, correct?

16  A    Yes.

17  Q    And all the things we went over yesterday, right?

18  A    Yes.

19  Q    Mr. Telisman also asked you some questions about the

20  police reports and three of them being given on one day and

21  then another statement from Ms. Del Prete given two days

22  later, correct?

23  A    Yes.

24  Q    You don't know what questions were asked of her in the

25  intervening days, do you?

Jenny - recross

1   A   No.

2   Q   You don't know what questions the police officer who

3   interviewed her two days after the incident asked, do you?

4   A   No.

5   Q   So the fact that she said something new in a later

6   interview could be the result of what questions were asked of

7   her, right?

8   A   I would assume so.

9   Q   You said again that the chronic subdural hematoma in this

10  case did not cause Isabella's collapse, right?

11  A   Yes.

12  Q   Neither did the acute subdural hematomas, did they?

13  A   Well, they weren't of large enough size that they would

14  have caused brain damage.

15  Q   Right.  Just like the chronic one, correct?

16  A   Right.

17  Q   They were both so small or of a size they would not in and

18  of themselves have caused the collapse, correct?

19  A   Right.

20  Q   So if they -- if those subdural hematomas are the result

21  of something other than abuse, they're not a marker for abuse,

22  correct?

23  A   I guess the question is what's the other that they're

24  caused by.  That hasn't been determined.

25  Q   Right.  Well, we have talked about cerebral venous

Jenny - recross

1    thrombosis and those sorts of things, right?

2    A   Yes, but I think that's not true.

3    Q   I know you do.

4           If there is a natural explanation for her collapse,

5    then the subdural hematomas are not a marker for abuse,

6    correct?

7    A   Somehow the --

8           THE COURT:  Put that question again, Mr. Blegen,

9    please.

10   BY MR. BLEGEN:

11   Q   Hopefully I can.

12          If there were a natural cause for her collapse, then

13   the subdural hematomas are not a marker for abuse, correct?

14   A   They're a marker for trauma.

15   Q   Excuse me.  If there is a natural cause for Isabella's

16   collapse, then the subdural hematomas are not a marker for

17   trauma, correct?

18   A   I disagree.

19   Q   I wanted to ask you about that because it seems to me --

20   correct me if I'm wrong -- that what you're saying is that the

21   combination of subdural hematomas, retinal hemorrhages and the

22   actual collapse are what indicate that this was child abuse in

23   the absence of some other explanation.  Did I sum that up

24   properly?

25   A   I think that's a simplification.  Certainly I would have

Jenny - recross

1    looked for a variety of other causes that could have caused

2    similar pictures.

3    Q    That's what I meant by the absence of other explanations.

4    A    That's right.

5    Q    All right.  So you need those things, those three things,

6    and the absence of another explanation to call it child abuse,

7    correct?

8    A    In the presence of those very severe extensive retinal

9    hemorrhages, I would agree.

10   Q    Then how are you calling child abuse based on the chronic

11   subdural hematoma?

12   A    I'm saying I don't know where the chronic subdural

13   hematoma came from.  I don't know when that occurred.  I think

14   it's suspicious for child abuse, but I don't know that that

15   was what the event was that led to that.

16   Q    And that's just based on one thing.

17        Chronic subdural hematoma, you are suspicious and, in

18   your report, said most likely the result of child abuse,

19   correct?

20   A    I think it's quite likely, yes.

21   Q    Without any evidence of retinal hemorrhages, right?

22   A    Well, nobody looked.

23   Q    So without any evidence of retinal hemorrhages, correct?

24   A    Yes.

25   Q    And without any collapse, correct?

Jenny - recross

1    A    Yes.

2    Q    Now, you answered some questions about lucid interval that

3    Mr. Telisman asked you, and you said the baby would not be

4    able to feed, correct?

5    A    Yes.

6    Q    I thought you said yesterday that a lucid interval could

7    be just when the baby is not normal, such as irritable,

8    sleeping too much, vomiting, those sorts of things, correct?

9    A    That's right.

10   Q    I take it, during all of those processes, the baby could

11   still be feeding, right?

12   A    Well, this baby had a devastating brain injury, and so I

13   would find it hard to believe that a baby that had that type

14   of brain injury would -- after the event would be sucking down

15   a bottle.

16   Q    But if there is a lucid interval during which the baby is

17   simply not normal but has not yet crashed, the baby could feed

18   during that lucid interval, correct?

19   A    I think it would depend on the severity of the initial

20   injury.

21   Q    But it could happen, right?

22   A    Well, I think if a child has a much less severe injury

23   that it would -- that it possibly could happen.

24   Q    And the baby could present normally but perhaps crabby or

25   irritable?

Jenny - recross

1  A    Well, not normal.

2  Q    The baby would not be unconscious, correct?

3  A    Depending on the nature and the severity of the initial

4  injury, yes.

5  Q    And the caretaker could misstate the symptoms for

6  something else, right?

7  A    Yes.

8  Q    And a baby sucking on a bottle is actually a reflex, is it

9  not?

10  A    Well, sucking on a bottle is not all you have to do to

11  eat, and if the child is neurologically damaged, I would

12  expect she would be aspirating and having respiratory

13  distress.

14  Q    A child with neurological damage could have trouble

15  eating, correct?

16  A    I'm sorry?

17  Q    A child with neurological damage could have trouble eating

18  but still get it done, correct?

19  A    It depends on the nature of the damage.

20  Q    Right.  It depends on the nature of the damage, correct?

21        I'm sorry.  I just said that.

22        That's all I have, Judge.

23        THE COURT:  Anything else?

24        MR. TELISMAN:  One issue.

25                    REDIRECT EXAMINATION

Jenny - redirect

1  BY MR. TELISMAN:

2  Q   Dr. Jenny, in preparing for this case, did you make

3  yourself like a note of the different head circumferences at

4  different times?

5  A   Yes.

6  Q   Do you have a copy of that or not?

7  A   I have it on my computer.

8  Q   Okay.  Maybe the easiest way to do this --

9        MR. TELISMAN:  Your Honor, if I could have one

10  moment?

11        THE COURT:  Yes.

12        MR. TELISMAN:  I didn't think this was going to come

13  up.  I need to try to locate a record.  It's one issue.

14        THE COURT:  All right.

15        MR. TELISMAN:  Thank you, Judge.

16     (Brief interruption.)

17  BY MR. TELISMAN:

18  Q   I was able to find the record.  Thank you, counsel.

19        Dr. Jenny, counsel asked you questions about the

20  growth of Isabella's head circumference after her collapse.

21  Do you recall that?

22  A   Yes.

23  Q   She collapsed on 12/27, right?

24  A   Yes.

25  Q   And on that date her head circumference was, I believe,

Jenny - redirect

1    42 centimeters, is that right?

2    A    Yes.

3    Q    Now, did she have surgery on I believe it was January

4    10th, 2003?

5    A    Yes.

6    Q    What was the purpose of the surgery?

7    A    To drain the right side of the subdural.

8    Q    That was to reduce the pressure that was growing at that

9    point?

10   A    Yes.

11   Q    Now, was her head circumference measured the day before?

12   A    I don't remember.

13   Q    All right.  Rather than do it as an exhibit, I will

14   simply --

15        Would it refresh your recollection to take a look at

16   the neurology note which is UIC 50 and 51?

17   A    Yes.

18   Q    Okay.  If you could, take a look here specifically at UIC

19   51.

20   A    Okay.

21   Q    Tell me when you're done looking at it.

22   A    Okay.

23   Q    I will take it back from you.  Is your recollection

24   refreshed?

25   A    Yes.

Jenny - redirect

1   Q   What was Isabella's head circumference on January 9th,

2   2003, the day before her surgery?

3   A   43 centimeters.

4   Q   So it had grown by a centimeter during that time?

5   A   Yes.

6   Q   And then the day after that, the surgery was done to

7   relieve the pressure?

8   A   Yes.

9   Q   And after that, I guess --

10          Well, would there be any significance regarding the

11  head circumference after that --

12  A   On --

13  Q   -- neurological devastation after the surgery?

14  A   You mean the day after the surgery?

15  Q   No.  I mean in the days, the weeks and months following.

16  A   Well, her head got smaller.  I mean, her head didn't grow.

17  It stopped growing.

18  Q   And why is that?

19  A   Because her brain was so damaged it wasn't pushing on the

20  skull to expand the head.

21          MR. TELISMAN:  Thank you.

22          If I could have just one moment?

23          THE COURT:  Yes.

24      (Brief interruption.)

25          MR. TELISMAN:  I have nothing further.  Thank you.

1    MR. BLEGEN:  No, thanks.

2    THE COURT:  Give me just a second to see if I had any

3    questions that didn't get answered here.

4    (Brief interruption.)

5    THE COURT:  That's all I have.  You're excused.

6    (Witness excused.)

7    THE COURT:  Next witness, please.

8    MR. BLEGEN:  Judge, could I raise a brief issue?

9    THE COURT:  Yes.

10   MR. BLEGEN:  You asked a question this morning about

11   whether you had all of the statements from Ms. Del Prete.

12   At the break Dr. Teas reminded me that we have a

13   statement or a written -- I don't know if I would call it a

14   statement -- what we believe is a letter from Ms. Del Prete to

15   her lawyer, although it doesn't have his name on it or

16   anything, of a statement that she gave to her lawyer.

17   We're not intending to rely on it.  I talked to the

18   attorney generals about it, and as long as we're not going to

19   rely on it, they don't think it's a problem, but I just didn't

20   want you to --

21   When you asked the question, I had forgotten about

22   it.

23   THE COURT:  I was looking for statements to the

24   authority.

25   MR. BLEGEN:  Okay, fair enough.

1      THE COURT:  And I've got another note that I made

2   which may have partly gotten answered.

3      You know, some of this is conceivably answered within

4   the trial transcript, but there may be reports and other

5   things that didn't get into the trial transcript for one

6   reason or another because maybe -- where, you know, who had

7   care of the child might not have been perceived as significant

8   then as it might be perceived at this point, and, that is,

9   where am I going to find information about who had contact

10  with the child at the day care center in the, you know, weeks

11  preceding the 27th of December.  Are there other police

12  reports, I guess, is really what this largely boils down to.

13     MR. BLEGEN:  I don't know if there's any police

14  reports on that issue.  I don't remember any.  But there's

15  transcripts of the owner of the day care and another person

16  who worked there.

17     THE COURT:  Part of the trial transcript, in other

18  words.

19     MR. BLEGEN:  I don't know that they go into detail

20  about when they're working, but there was no evidence in the

21  record that she was alone with the child other than that --

22  the day of the collapse.

23     THE COURT:  Okay.  Well, I guess what I would ask you

24  to do, because I'm assuming both sides have access to the

25  police reports, just go back through that, the police reports.

1  The police reports typically would not be part of the evidence

2  at the trial.  But I think there is something that I can

3  consider based on what I was told at the beginning of this

4  about a somewhat relaxed standard of proof.

5          I would appreciate if you could go through those.

6  And anything there is that's in there, even if you think it

7  might be duplicated in the trial transcript, about who had

8  contact with the child at the day care center prior to the

9  27th of December, just get those for me, and you can bring

10 them to me tomorrow maybe.

11         MR. TRIEBEL:  Yes, your Honor.

12         There's similar factual issues that I intended just

13 to bring out in our posthearing briefing.

14         THE COURT:  I'm trying to get all this stuff -- as I

15 think about it, I'm trying to get it out on the table.

16         MR. TRIEBEL:  I appreciate that.

17         THE COURT:  Okay.  Call the next witness.

18         MR. BLEGEN:  Judge, we call Shaku Teas.

19         (Witness sworn.)

20         THE COURT:  Mr. Telisman, your exhibits from your

21 witness are all up here.

22         MR. TELISMAN:  Pardon me.

23      (Brief interruption.)

24         THE COURT:  Thanks.

25       DR. SHAKU TEAS, PETITIONER'S WITNESS, DULY SWORN

1 DIRECT EXAMINATION

2 BY MR. BLEGEN:

3 Q   Ma'am, please tell us your name, and spell your first and

4 last name for the court reporter.

5 A   My name is Shaku Teas.  My first name is spelled

6 S-h-a-k-u.  It's an abbreviation of a much longer name, but

7 that's what I use.  And the last name is spelled as T-e-a-s.

8 Q   And I take it you're a doctor?

9 A   I am.

10 Q   Could you tell us a little bit about your education?

11 A   I went to high school and then to college and medical

12 school in India, in Bombay, with Bombay University.

13        I received my M.B. B.S. degree, which is equivalent

14 to the M.D. degree in America, in January of 1972.

15        Following that I came to America.  Actually following

16 that I worked in a small maternity home in India, in Bombay or

17 Mumbai, whatever you like to call it.  And then I came to

18 America in June of 1972.

19        I did a year of internship at St. Joseph Hospital in

20 Chicago with six months spent in OB/GYN.

21        Following that I did four years of residency training

22 in anatomic and clinical pathology at University of Illinois

23 Hospital.  I finished that in June of 1977, and then July 1st

24 I joined the Cook County Medical Examiner's office and did

25 forensic pathology.

Teas - direct

1   Q    How long did you work in the Cook County Medical
2   Examiner's office?
3   A    I worked in the medical examiner's office from July 1st,
4   1977, to the early part of 1991.
5   Q    Have you worked in any other medical examiners' offices?
6   A    Actually, well, excepting for Kenosha, Wisconsin, where
7   I've given coverage for a couple years, covering pathologists
8   who was on vacation, and it wasn't a whole year; it was just a
9   week or two I worked actually for the coroner's system.
10          In Illinois the only office -- the only county that
11   has a medical examiner's system is Cook County.  The rest of
12   the counties in Illinois have what we call a coroner's system.
13          So after I left the ME's office, a few months after I
14   left, I started doing some autopsies for the different
15   coroners in Illinois.
16   Q    Are you licensed in any states?
17   A    I am.
18   Q    Which ones?
19   A    I'm licensed in Illinois and in Wisconsin.
20   Q    Do you have any board certifications related to pathology?
21   A    Yes, I do.
22   Q    With whom?
23   A    I'm both certified by the American Board of Pathology and
24   Anatomical, Clinical and Forensic Pathology.
25   Q    Are you a member of any organizations related to forensic

1  sciences?

2  A    I am.

3  Q    Which ones?

4  A    I'm a member of -- actually pathology and forensic

5  pathology.  I'm a member of National Association of Medical

6  Examiners, the American Academy of Forensic Sciences, College

7  of American Pathologists, the International Society or the

8  Academy of Pathology of United States and Canada Academy.

9          I'm also a member of the Chicago Pathology Society

10  and the College of American Pathologists.

11  Q    I'm sorry.

12          I show you a document entitled Exhibit Petitioner's

13  Teas CV.  Is that a copy of your curriculum vitae?

14  A    Yes, it is.

15  Q    Was there a period of time that you worked at the DuPage

16  County coroner's office?

17  A    Yes.  When I was doing autopsies for the coroners, I was

18  also doing autopsies for DuPage, and towards the end I

19  actually mainly did DuPage.

20  Q    Were you ever a member of a child death review team?

21  A    I was.

22  Q    Can you tell us about that?

23  A    I was a member of the Aurora child death review team.  The

24  child review teams are mandated teams.  There are nine in

25  Illinois.  And they have certain criteria for what cases that

Teas - direct

1    they would review.

2          There was a multidisciplinary team consisting of

3    forensic pathologists, coroners, police officers,

4    pediatricians, state's attorneys, social workers,

5    psychologists.  There was a list.

6          And so there were nine of them divided into different

7    regions.  I was a member.  It was started in 1995, and I was a

8    member of the Aurora team.

9    Q   All right.  And what was the purpose of the child death

10   review team in Aurora?

11   A   All over these were formed.  There are two in Cook County

12   actually and one in the other regions.

13         They were formed actually to investigate child deaths

14   where DCFS had been previously involved, and then the child

15   died subsequently, to figure -- to find out if there would be

16   any recommendations to help prevent some of these deaths.

17   Q   In your career, Dr. Teas, can you estimate how many

18   autopsies you have performed?

19   A   I have probably performed about 6,000 autopsies.

20   Q   How many examinations of brains?

21   A   Probably the same amount and probably have looked at other

22   brains because usually when we have brain cutting, the

23   pathologists save their brains and then a neuropathologist

24   like Dr. Leestma or Dr. Haller used to come to the ME's

25   office, and then Dr. Reyes from -- who was working at Cook

Teas - direct

1  County.  So I would see all those brains, too, when I was
2  there.
3  Q    How many of the autopsies that you have done related to
4  children; can you estimate that?
5  A    I would say around 500.
6  Q    Have you had any affiliation with universities or
7  teaching?
8  A    Yes.  I trained at University of Illinois Hospital, and
9  following that when I actually joined the medical examiner's
10  office, I was an instructor and then an assistant professor.
11  I still have the appointment though I really do not do
12  anything with them.
13  Q    You're not currently teaching?
14  A    Correct, and I actually was also -- after I left the ME's
15  office, I also worked part-time in the department of pathology
16  at Cook County Hospital where I was actually doing some of the
17  surgical pathology, supervising the residents who did
18  autopsies, and I was also teaching medical students from
19  Chicago medical school who came down there.
20  Q    How did you come to be involved in this case?
21  A    I was called by Jodi Garvey from your office asking me if
22  I would be interested in looking at the case.
23  Q    And did you ultimately get appointed by the Court?
24  A    Correct.
25  Q    After agreeing to work on the case, what did you do?

Teas - direct

1  A   Well, I actually asked Jodi Garvey that I would need a

2  list of material, and I think I sent her a list because I have

3  a prepared list that I give attorneys usually.

4       And so I didn't hear for a couple of months after

5  that, and then I did hear and get a call that she had most of

6  the material ready and sent me the materials.  So I reviewed

7  the material.

8  Q   All right.  At some point did you, with the assistance of

9  other people, develop something that is called a clinical

10 history?

11 A   What are you referring to because I --

12 Q   Let me show you Petitioner's Exhibit Teas Clinical

13 History.

14 A   Oh, this was developed much later after I had written my

15 report and everything.

16 Q   Well, since I've brought it up, we can talk about it now.

17 A   Okay.

18 Q   What is this clinical history, Petitioner's Exhibit Teas

19 Clinical History?

20 A   It was just written as a summary to actually assist you or

21 anybody else who may be wanting to go back and look at the

22 records to see the references as to the clinical parts of the

23 case.

24 Q   And does it have various aspects of the case that you

25 considered to be relevant?

Teas - direct

1   A   Yes.

2   Q   And then does it have in bold citations to where those

3   facts are found in either the medical records, police reports,

4   trial transcripts, et cetera?

5   A   Correct.

6   Q   All right.  And did you prepare this solely on your own or

7   did you have help?

8   A   No.  Actually Heather Kirkwood, who is an attorney who

9   helped you, prepared a lot of it.  And then I went back and

10  checked it and checked it again.  I had actually already gone

11  through the medical records with her physically to talk to her

12  about the case.

13  Q   All right.  And did I assist in taking out or suggesting

14  some stuff?

15  A   Right.  Actually she prepared it and she had written some

16  stuff that came to me.  I removed some stuff.  I added some

17  stuff, and then it came to you and you removed more stuff.

18  Q   All right.  But the final product was reviewed and

19  endorsed by you, correct?

20  A   I reviewed the final stuff again, right.

21  Q   And did there come a point in time where you authored a

22  report in this case?

23  A   Correct.

24  Q   Let me show you what I've marked as Petitioner's Exhibit

25  Teas Report.  Is this the report that you authored in this

1    case dated August 29th of 2012?

2    A    Yes.

3    Q    And prior to authoring the report, did you look at

4    relevant medical records, police reports, transcripts?

5    A    Correct.

6    Q    Essentially did you look at everything that the lawyers

7    gave you?

8    A    Yes, though there were some things missing that I informed

9    the lawyers that are missing.  I eventually got some of them,

10   but I don't think I've still got everything.

11   Q    So there's a footnote on your clinical history suggesting

12   that in many cases sometimes medical records are missing?

13   A    Yes.

14   Q    All right.  And do you think there is anything significant

15   missing in this case?

16   A    I really can't tell what is significant unless I look at

17   them.

18           I know there are some stuff even from the autopsy

19   reports still missing.  I do not have the coroner's

20   investigative report which was requested specifically.

21           There is a mention of the -- what the toxicology was,

22   but I don't have an original toxicology report.

23           I do know that the records that I got from Children's

24   are probably not complete because there were parts and bits

25   from different admissions.

1  Q   After reviewing the records, did you consult with any

2  other doctors or experts?

3  A   I did.

4  Q   Who did you consult with?

5  A   Actually I consulted with -- Dr. Barnes was the first one.

6  I also consulted with Dr. Julie Mack.  And since the brain had

7  been sectioned but not -- but no histology had been done, I

8  requested to go and examine the brain and take sections.  And

9  I went actually to the coroner's office with Dr. Leestma and

10 actually what is his name -- Dr. Tourtelotte, who was a

11 neuropathologist from Northwestern, along with Mr. Goodfriend,

12 to review the brain slices and then to take sections from

13 them.

14       I also consulted with Dr. Patrick Lantz, who is a

15 forensic pathologist, who testified already.

16       I actually also showed the case to Dr. Norman

17 Guthkelch, who is supposed to be the father of shaken baby

18 syndrome.

19            THE COURT:  What is the last name?

20            THE WITNESS:  Guthkelch.

21            THE COURT:  Spell it.

22            THE WITNESS:  G-u-t-k-e-l-c-h.  G-u-t --

23 BY MR. BLEGEN:

24 Q   I think there's an "h."

25 A   There's an "h" that I missed.

Teas - direct

1   Q   I believe it's G-u-t-h-k --

2   A   -- k-e-l --

3   Q   -- k-e-l-c-h.

4   A   Right. The rest was right. I just missed the "h."

5         THE COURT: Okay.

6         MR. BLEGEN: Spelled just like it sounds.

7         THE COURT: Yes. That's kind of what I would have

8   said.

9   BY MR. BLEGEN:

10   Q   At some point in time, did either you or somebody from our

11   office ask some of these other doctors whether they would be

12   willing to testify?

13   A   Yes.

14   Q   Was it the original plan that they were going to testify?

15   A   No.

16   Q   One of the -- you mentioned going to examine the brain and

17   to get some slides prepared?

18   A   Yes.

19   Q   You were in court, were you not, when Dr. Rorke-Adams

20   testified about her belief that a slide that was indicated to

21   be from the back of the brain was actually from the front of

22   the brain?

23   A   Yes.

24   Q   All right. Can you tell us briefly how the labeling of

25   the slides and the taking of the blocks for the slides was

1   done?

2   A    Okay.  So when we got to the coroner's office, we actually

3   went into the autopsy suite.  My understanding was that

4   actually Dr. Tourtelotte was going to be processing the brain

5   and Dr. Leestma and I would be observing, but when we got

6   there, he said he wanted Dr. Leestma to process.

7   Q    Let me stop you there.  Who is Dr. -- is it Tourtelotte?

8   A    Tourtelotte.

9   Q    Who is Dr. Tourtelotte?

10  A    He is a neuropathologist from Northwestern University

11  Hospital.

12  Q    Do you know how it is that he came to be at the brain

13  examination?

14  A    He was called by the attorney general's office, and so he

15  was there.

16  Q    So was it his job to essentially participate and/or watch

17  what you and Dr. Leestma were doing?

18  A    Before we got there, it was my understanding that he would

19  be processing it and that we would be watching, but when we

20  got there, he wanted Dr. Leestma to process it, or me.  I

21  don't know who it was.  But that's how it happened.

22         Dr. Leestma and I both had our cameras, so we took

23  photographs.  And Dr. Tourtelotte was standing there, and so

24  was Dr. -- Mr. Goodfriend.

25  Q    Tell us about the process of labeling the sections or

1  pieces of the brain that were made into slides.

2  A   So the brain had already been sliced.  The routine on how

3  to do a brain is you remove the brain.  You are supposed to

4  fix it in formaldehyde for about two weeks and then cut it,

5  photograph it, and then cut it in a particular fashion.

6         What we usually do is separate the base of the brain,

7  which is connected to the cerebral hemispheres by the

8  peduncles of the midbrain.  So we usually make a slice through

9  that, separate out the cerebellum, the pons medulla with the

10  midbrain separately, and then we just slice the cerebrum just

11  like a bread, loaf it.

12         And you're supposed to lay down.  I usually start

13  from the -- since I'm right handed -- from the right upper

14  hand and then go down and then process it in that way.

15  Q   Let me stop you there for a second.

16         Was the brain already sliced when you and Dr. Leestma

17  and Dr. Tourtelotte went to view it?

18  A   Yes.  It was already sliced.

19  Q   All right.  Let me just go now to the issue of taking the

20  sections for slides.  Tell us how that happened.

21  A   So we take the slices out, try to lay them in a fashion

22  that we think would be the right fashion, but it was not that

23  easy because it was distorted.

24         And so we took out the dura first and examined the

25  dura.  I think Dr. Leestma showed you the photograph of the

1   dura.  Only the dura on the top was present in the bucket.

2   There was no dura from the base of the brain.  The sagittal

3   sinus had not been opened, so Dr. Leestma opened the sagittal

4   sinus.

5           There was a technician from the coroner's office who

6   was there.  She labeled the blocks.  These are little plastic

7   blocks about this size, and I was writing the list on a paper

8   towel, and Dr. Leestma was cutting the slides and calling out

9   the name, which is what we usually do.  I write it on a paper

10  towel because we can contaminate it.  We have got gloves on,

11  and then I usually discard the paper towel, but I didn't in

12  this case.

13          And then I copy it to another paper and then type it.

14  Q   Let me stop you there for a second.

15          So Dr. Leestma was calling out what part of the brain

16  a block was coming from?

17  A   Well, you put it in this thing and he would just say

18  number one is the dura or whatever side, and number two is the

19  dura, and number three is the sinus.  I think that's how it

20  went, and he was taking the sections.

21  Q   And then on to various parts of the brain?

22  A   Correct.

23  Q   Where was Dr. Tourtelotte while this was going on?

24  A   He was right across the table.

25  Q   From whom?

1    A    From Dr. Leestma.

2    Q    Did he ever raise any objections about what part of the

3    brain a certain block was coming from?

4    A    No.

5    Q    After that process was complete, did you send the blocks

6    out to be made into slides?

7    A    Right.  I put it in a container in formaldehyde.

8         And, again, it wasn't my understanding that I would

9    be taking the tissue to be processed, but Dr. Tourtelotte said

10   that he doesn't have a place to have it processed because even

11   though he's at Northwestern, when you're bringing outside

12   work, you have to have a -- you have to be like a vendor.

13   Q    What was the general state of the brain when you examined

14   it?

15   A    It was -- it was soft, discolored, and it looked like

16   there were a lot of artifacts, removal artifacts, which are --

17   which is what you get when you remove a soft respirator brain.

18   Q    All right.  I'd like to ask you some questions regarding

19   Dr. Rorke-Adams' testimony where she indicated that there were

20   contusions on certain parts of the brain.  Were you here when

21   she testified about that?

22   A    I was.

23   Q    All right.  Would you put up Teas PowerPoint slide 1?  Can

24   you see?

25   A    Yes, I can see that.  I'm just looking at so I know what

1   slide numbers they are.

2   Q   All right.

3       (Brief interruption.)

4   BY MR. BLEGEN:

5   Q   Is this the picture of the brain in this case in which Dr.

6   Rorke-Adams indicated there were contusions and lacerations to

7   the front part of the brain?

8   A   Yes.

9   Q   All right.  And did Dr. Rorke-Adams indicate that this was

10  the front part of the brain?

11  A   Yes.

12  Q   All right.  Is that the front part of the brain?

13  A   No, it is not.

14  Q   All right.  Now, this might be a little tricky, so keep

15  your answers short, and I will try to move it along.

16          How do you know that this is not the front part of

17  the brain?

18  A   It's because I'm a pathologist, because when I --

19  Q   Speaking from the physical picture of the brain, how do

20  you know it's not the front?

21  A   Because when you look at a photograph of the base of the

22  brain and the cerebellum in the right position, you should be

23  able --

24  Q   I will stop you there.  Is this the cerebellum?

25  A   Yes.

1    THE COURT:  The sort of triangular structure at the

2    bottom there, the bottom of the photograph?

3    THE WITNESS:  Yes, it is.

4    BY MR. BLEGEN:

5    Q    Let me ask you a question.

6    Can the cerebellum in a brain in this state be

7    flopped or flipped back and forth?

8    A    It could because it's soft and it's not properly fixed.

9    Q    When you say properly fixed, you mean it hasn't properly

10   been hardened by soaking in formaldehyde, correct?

11   A    Right.

12   Q    Now, tell us which way you believe the cerebellum is

13   flopped in this picture.

14   A    So if I were to take that cerebellum and move it up like a

15   light switch, that would be the correct position.  But we're

16   looking at a photograph, so you're really seeing a two-

17   dimensional object -- two-dimensional picture of a three-

18   dimensional object.

19   Q    So is it your view that the cerebellum is flopped in this

20   picture towards the front of the brain?

21   A    Yes.

22   Q    And what would you be able to see in this area if the

23   cerebellum were flopped towards the back of the brain?

24   A    You would see the pons, the medullae, and you should be

25   able to actually see the midbrain, too, which held the two

1    peduncles that come out, where the white matter comes out.

2            THE COURT:  Stop.  I want to make sure I'm

3    understanding here.

4            So you're saying that if the -- what you're

5    identifying as the cerebellum, it's essentially a flap.  If it

6    were flapped the other way, underneath where you're seeing it

7    in that picture there, you would see the two --

8            What were the two things again?

9            THE WITNESS:  Pons.

10            THE COURT:  P-o-n-s.

11            THE WITNESS:  And medulla.

12            THE COURT:  And the medulla.

13            THE WITNESS:  And perhaps the midbrain, which are the

14    two -- we call them the cerebral peduncles where the white

15    matter joins from the cerebrum and comes down.

16            THE COURT:  Okay.  And is the fact that you do not

17    see those things in this picture part of what tells you that

18    the cerebellum has been flopped the wrong direction?

19            THE WITNESS:  Correct.

20            THE COURT:  Okay.

21            THE WITNESS:  And it's just from looking at it.

22            THE COURT:  Okay.

23            THE WITNESS:  Many times.

24    BY MR. BLEGEN:

25    Q    You have two arrows -- I assume that's to note the

1    cerebellum?

2         THE COURT:  Those are those two little white lines

3    there?  Those are arrows?

4         THE WITNESS:  Those were arrows, technical problems

5    because --

6         THE COURT:  That was something that was added.

7    That's not part of the picture, in other words?

8         THE WITNESS:  That's not part of the picture.  Those

9    white arrows were added to point out.

10         There are other clues, too.  The occipital lobes

11   always bend a little bit inwards, so they don't have exactly

12   the same shape as the frontal lobes.  So that is another clue

13   that the cerebellum has been flipped.  It is not in its

14   anatomical position when the photograph was taken.

15   BY MR. BLEGEN:

16   Q   Let's go to the next slide, Rob.

17         Tell us what we're looking at here, Dr. Teas.

18   A   So these are two photographs from another case actually

19   taken by Dr. Pat Lantz.  I requested him to do it for me since

20   I'm not doing autopsies anymore.

21         So the photograph on the right here, on my right, is

22   what the brain should look like, if you were to take the top

23   of the brain and put the bottom.  And I think I have some

24   models which we can use.

25         So you would be able to see the pons, the medulla.

1    Actually the midbrain is right about where I have marked the
2    arrow with the pons.
3             THE COURT:  So the midbrain is sort of the
4    upside-down sort of darker triangle that is right above the
5    pons there?
6             THE WITNESS:  No.
7             THE COURT:  Point to it.
8             THE WITNESS:  Can I?
9             THE COURT:  My pointer --
10            THE WITNESS:  I know you have your pointer.
11            THE COURT:  You know what, a judicial officer of this
12   Court walked off with it.
13            THE WITNESS:  Oh-oh.
14            THE COURT:  I'm not pointing any fingers, but I've
15   got it narrowed down to four people.
16            THE WITNESS:  Okay.  So this is the inferior aspect
17   of the brain.  These are the temporal lobes.  This is the
18   optic nerve, which is where we cut it off.
19            You see this little thing here, those are the
20   cerebral peduncles.  They come in, they join --
21            THE COURT:  Spell peduncle.
22            THE WITNESS:  P-e-d-u-n-c-l-e.
23            THE COURT:  Okay.
24            THE WITNESS:  This is the pons.
25            THE COURT:  Right.

Teas - direct

1    THE WITNESS:  This is the medulla, and then each of
2    those -- and this is the pons -- junction, and this is the
3    cerebellum.
4        THE COURT:  So the right-handed -- the photo on the
5    right side is the way it looks when things are in the correct
6    anatomical position?
7        THE WITNESS:  Correct.  That's how we take
8    photographs usually.
9        THE COURT:  Okay.
10       THE WITNESS:  So on the left side is what happened
11   with this case.
12       THE COURT:  Except the difference is is that it's
13   rotated 180 degrees.
14       THE WITNESS:  Correct.
15       THE COURT:  Yes, okay.
16       THE WITNESS:  But I wanted to leave it in the same
17   position.
18       THE COURT:  I get it, yes.
19       THE WITNESS:  So here is the frontal lobes, and
20   here's the occipital lobes.  So instead of the cerebellum
21   being down here, it's pushed up.
22       This is a fresh brain, and if you can look at the
23   structure which is seen underneath here, that is actually what
24   is called the vermis.
25       THE COURT:  Spell it.

1   THE WITNESS:  V-e-r-m-i-s.

2         And as we go to the next slide to compare the two,

3   you will see that.  So now these are flipped in the right

4   position as this one.

5         THE COURT:  Now, wait a second.

6         So you have taken on the right side of this and you

7   have taken that left picture from the other one and you rotate

8   that 180 degrees.

9         THE WITNESS:  Correct, exactly.

10        THE COURT:  Okay.

11  BY MR. BLEGEN:

12  Q   Are these two pictures essentially the same way with the

13  cerebellum flipped towards the --

14  A   Occipital.

15        THE COURT:  I need to ask you a question.

16        THE WITNESS:  Toward the occipital lobe.

17        THE COURT:  So in this right-hand picture, which is

18  the one that the other doctor took for you, this structure

19  right above where the cerebellum is here, this white thing,

20  what is that?

21        THE WITNESS:  That is actually inside of the brain

22  because this brain is not a respirator brain and it hasn't

23  been fixed.  When Dr. Pat Lantz tried to move it that way, it

24  was actually tearing into the tissue.

25        THE COURT:  Okay.  And this little thing here, it

Teas - direct

1    looks like a cavity or a hole.  What's that?

2         THE WITNESS:  That's the inside of the brain, and if

3    you were to look at the sagittal section of some of the

4    brains, you will see that -- you will probably see part of the

5    corpus callosum and the other structures that are inside the

6    brain.

7         THE COURT:  So is this little cavity here what

8    corresponds to what looks like a cavity there?

9         THE WITNESS:  No.

10        THE COURT:  Or not really.

11        THE WITNESS:  No.  You should actually ignore this --

12        THE COURT:  Ignore that, okay.

13        THE WITNESS:  -- because it really should be that

14   it's flat, but when you're trying to take a picture not quite

15   in the anatomical position in a brain that is not decomposed,

16   it will tear the tissue.  So it has essentially torn some of

17   the tissue there.

18        What you are seeing here, which looks like a cavity

19   to you, is really a little curvature in the occipital lobes.

20   And so you're looking at a flat picture which gives you that

21   impression.  It's not flat, right, exactly.

22        What you see --

23        Well, so here are the frontal lobes where Dr. Lucy

24   Rorke has described contusions are actually covered by the --

25        THE COURT:  You can't see them.

Teas - direct

1      THE WITNESS:  You can't see them.

2      The other thing that -- I don't know if you want me

3  to --

4  BY MR. BLEGEN:

5  Q   I was just going to ask you, you can also not see the pons

6  and the medulla?

7  A   Correct.  And you cannot see the pons and the medulla, and

8  that's a definite clue that the cerebellum has been flipped.

9  Q   Can you go to the next slide, Rob?

10     Dr. Teas, Dr. Rorke-Adams also testified about the

11  way that the brain was sectioned and laid out on a table.  Do

12  you recall that?

13  A   Yes.

14  Q   Can you tell from --

15     First of all, this was a picture taken around the

16  time of the original autopsy?

17  A   Actually the autopsy was done on the 10th of November, and

18  then the brain wasn't cut, I think, until the 27th of

19  February, which is a pretty long time to leave the brain in,

20  especially a brain that is a respirator brain.

21     What happens with the respirator brain is that the

22  formaldehyde which it is fixed to doesn't penetrate inside,

23  and that's why if you look at the slices --

24     Can I step down?

25     THE COURT:  Sure.

Teas - direct

1    THE WITNESS:  If you look at the slices, inside is
2    pink, the outside is not so pink.  The whole brain should
3    actually look much more fixed and brownish.  That means the
4    formaldehyde wasn't penetrating it, and that's part of the
5    reason is that because the brain is a respirator brain.
6    Isabella was on a respirator for over -- about 24 hours when
7    she died.
8         There are a couple things you could do to make it fix
9    a little bit better is you could either slice the brain into
10   two halves, through the midline, so that more of it is exposed
11   to the formaldehyde, but I don't think that was done, so we
12   have what we have.
13   BY MR. BLEGEN:
14   Q   Just to be clear, this photo was taken, what, in 2003?
15   A   Correct.
16   Q   Not recently when you and Dr. Leestma and Dr. Tourtelotte
17   did your examination?
18   A   Correct.
19   Q   Can you tell from this photograph which way the sections
20   of the brain are laid out related to front and back of the
21   brain?
22        THE COURT:  When I saw this photograph, was it that
23   direction?
24        Before was it that direction, or was it turned around
25   180 degrees?  I don't remember.

1    So does anybody know?

2    THE WITNESS:  Can I explain?

3    THE COURT:  Yes.

4    THE WITNESS:  I do not think you saw this photograph.

5    You only saw what --

6    THE COURT:  I saw a photograph with a whole bunch of

7    pieces of brain sliced out and laid out.  I definitely did.  I

8    remember it quite well.

9    THE WITNESS:  All right.  It may be I don't remember

10   it.

11   THE COURT:  Okay.

12   THE WITNESS:  But these were the three pieces that

13   were in issue.

14   So technically what you would do is you would be

15   cutting and you would put the frontal lobe here and go down

16   there if you're going to take pictures and go in this way.

17   BY MR. BLEGEN:

18   Q   Let me stop you there for a second.

19   What you're saying is that in a typical autopsy

20   involving the brain, you would start in the upper left corner

21   with the front of the brain?

22   A   Yes.

23   Q   Go down to the bottom and then start up at the top again

24   or start down here?

25   A   I would start at the top.  There are no written rules as

1    to how you've got to lay it out.  We all have our own methods
2    of doing things.
3    Q    All right.  I believe that Dr. Rorke-Adams testified that
4    this was the front of the brain?
5            THE COURT:  So the sort of very mangled thing sort of
6    in the top middle of the picture?
7            MR. BLEGEN:  Right, what you called gnarly
8    previously.
9            THE COURT:  That's the word she used, in fact.
10           MR. BLEGEN:  Maybe so.
11           THE WITNESS:  Okay.
12   BY MR. BLEGEN:
13   Q    Can you tell whether that's the front of the brain or not?
14   A    You know, I could not tell.  It could be.  It looks like
15   this is a slice that is closer to the front, but I cannot
16   recognize any of the architecture here.
17           This slice looks like it's more posterior, but,
18   again, I cannot say.  So is this the frontal lobe or the
19   occipital lobe, I can't, because, again, we have a flat
20   picture.
21           THE COURT:  Okay.  Actually I have to go to a
22   meeting, and so we're going to break right now.  So my
23   suggestion is, Mr. Blegen, when we start back up after,
24   there's been a lot of pointing and references to "this" that
25   you might want to sort of clear that up as to what the

Teas - direct

1    "thises" are.  There have been about five "thises."

2            MR. BLEGEN:  I will do my best.

3            THE COURT:  So I have two short statuses at 1:30, and

4    so we'll resume at 1:40.

5            (The trial was adjourned until 1:40 p.m. of this same

6    day and date.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JENNIFER DEL PRETE,                 )
                                    )
                    Petitioner,     )    Docket No. 10 C 5070
                                    )
             vs.                    )
                                    )
MELODY HULETT,                      )    Chicago, Illinois
                                    )    January 15, 2013
                    Respondent.     )    1:42 p.m.

VOLUME 7
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiff:     BLEGEN & GARVEY
                       BY:  MR. PATRICK W. BLEGEN
                            MS. JODI L. GARVEY
                            MR. DANIEL A. RUFO
                       53 West Jackson Boulevard
                       Suite 1437
                       Chicago, Illinois  60604

For the Defendant:     ILLINOIS ATTORNEY GENERAL'S OFFICE
                       BY:  MR. KARL R. TRIEBEL
                            MR. NEAL GOODFRIEND
                            MR. ARI TELISMAN
                            MS. MONIQUE A. ANAWIS
                       100 West Randolph Street
                       13th Floor
                       Chicago, Illinois  60601

Also Present:                  MR. ROBERT STANLEY

LAURA M. BRENNAN - Official Court Reporter
219 South Dearborn Street - Room 2102
Chicago, Illinois  60604
(312) 435-5785

Teas - direct

1    (The following proceedings were had in open court:)

2    THE COURT:  You understand you're still under oath?

3    THE WITNESS:  Yes, I am.

4    THE COURT:  Okay.

5    All right.  Mr. Blegen, you can proceed.

6    DR. SHAKU TEAS, PETITIONER'S WITNESS PREVIOUSLY SWORN

7    CONTINUED DIRECT EXAMINATION

8    BY MR. BLEGEN:

9    Q    Dr. Teas, when we left off we were looking at the Power

10   Point of the brain sectioned on the table.

11   A    Yes.

12   Q    And I believe you had indicated that you don't believe

13   that you can tell from this photo whether the section of the

14   brain in the lower left corner is the front or whether the

15   section of the brain in the upper right corner, at least in

16   the middle, is the front?

17   A    Yes.  I can't really say how it's laid out.

18   Q    All right.  Is there any way to give an indication of

19   which is the front or back part of the brain in this two

20   column of four slices on the left of the Power Point?

21   A    It may be that this is the -- the one to the left is the

22   front, but I can't identify any structures there because the

23   tissue is so friable and distorted.

24   Q    When you say the ones to the left, you mean the parts that

25   are encircled --

Teas - direct

1    A    Correct.

2    Q    -- on the Power Point?

3    A    Yes.

4    Q    Can you see anything in the structure of the sections that

5    are not encircled to the far left that might indicate whether

6    it's front or back?

7    A    The second section from the bottom on the left looks like

8    it's the posterior section because of the shape of the lateral

9    ventricles.  The one that's on the bottom on the right side

10   looks like it's more to the front than the back.

11   Q    When you say "bottom on the right side," do you mean -- is

12   this the one you're speaking of?

13   A    Yes.

14   Q    So it's the second column to the right closest to the

15   bottom?

16   A    Yes.

17   Q    Dr. Rorke-Adams indicated that she believed the uppermost

18   section on the right column is -- represents severe or I think

19   she said horrible contusions and lacerations to the brain?

20   A    Yes.

21   Q    Do you agree with that?

22   A    No, I don't.

23   Q    Tell us why.

24   A    This is a brain that's so distorted that you -- I would

25   not make any conclusions about any contusions.  Besides, if I

1   were going to say that there were contusions that were old,

2   which is what she said, and had healed, there should have been

3   evidence in the CT and MRI scans that were done when Isabella

4   was admitted to Provena and then to St. Joseph -- then to

5   University of Illinois Hospital.

6   Q    And would you look for contusions and lacerations on the

7   brain before you take the brain out of the skull or after?

8   A    Well, it depends on what you're looking at.  When we take

9   the brain out of the skull, what we do is make an incision

10  that goes from one ear to the other, reflect the scalp, and

11  then we saw the skull starting from the front to the back.

12  And then you first examine the brain when it is still sitting

13  in the skull, and then you take it out carefully and you look

14  at it at the bottom before you put it in formaldehyde.  So,

15  yes, you would examine the brain both while it is in the skull

16  and then right after you take it out before you fix it.

17           THE COURT:  I need to interrupt with a question just

18  to get a definition of a term so I understand now.

19           You said that the brain was so distorted, the word

20  you used was "distorted," that you can't draw certain

21  conclusions from it.  What do you mean by distorted?

22           THE WITNESS:  Because when you have a respirator

23  brain, it's very soft.  Just touching it, moving it, causes

24  indentation and causes the tissue to crumble.

25           THE COURT:  You've used the term "respirator brain"

Teas - direct

1    several times, and it's possible that that may have been used

2    in the earlier hearing back in December, but can you give me

3    a -- what does it mean?

4         THE WITNESS:  What happens is when a person is put on

5    the respirator, essentially they have no blood flow to the

6    brain, and legally they're supposed to demonstrate that

7    there's no blood flow at least three times before they

8    pronounce a person dead.  So the person is without blood flow

9    to the brain for a while usually, and so the tissue actually

10   starts to decompose.  It's like almost taking it out and

11   leaving it out.  And sometimes it's actually worse.  The

12   appearance and the way it looks is worse.

13        THE COURT:  Okay.  Thanks.  Go ahead, Mr. Blegen.

14   BY MR. BLEGEN:

15   Q   Have you reviewed the testimony at trial from the coroner,

16   the Dr. Harkey who performed this autopsy?

17   A   Yes.  And I read his report too.

18   Q   Did he indicate that there were any -- any old or new

19   trauma to the brain?

20   A   No.  He indicated there was none, just to clarify it.

21        THE COURT:  Mr. Blegen, that slide with all the

22   slices of the brain, what number was that?  Whose and what

23   number?  Do you remember?

24        MR. BLEGEN:  Originally in here?

25        THE COURT:  Well -- oh, is this going to be part of

Teas - direct

1    the deck that I get for Dr. Teas as well?

2         MR. BLEGEN:  Yes.  This is Teas Power Point 4.

3         THE COURT:  I know it was in somebody else's, but I'm

4    going to get it again.  Fine.  That's all I need to know.

5    BY MR. BLEGEN:

6    Q   Back on Teas Slide No. 1, this was the photo of the brain

7    that we discussed about whether the cerebellum was flipped one

8    way or the other?

9    A   Correct.

10   Q   Can you tell from looking at this brain whether there is

11   any indication of the brain being removed from the skull other

12   than the fact that it's not in the skull?

13   A   Well, I -- oh, yes.  What you can see, and if I can point.

14   Q   Yes.

15   A   If you look laterally on the sides, you can see on the

16   left side on the picture, you can see there is a cut all the

17   way across.  This is typically what a saw will do when you --

18   because you are sawing the skull off, in a 14-month old, you

19   have to saw it off as opposed to when they're two or three

20   months sometimes we take a scissor and open it along the

21   suture line so you're not distorting the brain as much or, you

22   know, poking it.  So you can literally see that the saw has

23   gone through the brain tissue.  And the same thing, you can

24   see it on this side here, at least partially.

25        So you're seeing that the saw has cut into the brain

1   tissue, which you avoid to do, but it doesn't always happen.

2         MR. BLEGEN:  Rob, can you go to Slide 7.

3   BY MR. BLEGEN:

4   Q   You said a minute ago that contusions or lacerations would

5   have shown up on radiology?

6   A   Yes.

7   Q   Is this one of the -- is this an MRI image of Isabella's

8   brain?

9   A   Yes.  I think this was done on 1/4.  And it shows that

10  blooming of the thrombus that was described by Dr. Barnes.

11  And you can see the chronic subdural, but you can see -- you

12  can see that the brain doesn't show anything.  Whenever there

13  is a contusion, a contusion is like a bruise, so there's

14  tearing of the tissue.  And whenever there is tearing of the

15  tissue there should be hemorrhage.  And the MRI is pretty

16  sensitive to any hemorrhage there, and it doesn't show any

17  hemorrhage in the brain tissue in the frontal lobes.

18        I don't know what to say, the frontal lobes or the

19  occipital lobes because what was described as contusions by

20  Dr. Lucy Rorke was actually occipital lobes, but you don't see

21  anything either in the frontal or the occipital lobe.

22  Q   You don't see any contusions or lacerations anywhere on

23  MRI or CT's, correct?

24  A   Correct.

25        MR. BLEGEN:  Can you go to the next slide, Rob.

Teas - direct

BY MR. BLEGEN:

Q    Dr. Rorke-Adams also testified that she believed one of
the slides was mislabelled.  We talked a little bit about this
earlier.

A    Yes.

Q    Does this picture on Teas Power Point 7, is that the slide
she was talking about?

A    Yes.  She was talk -- I think she was -- it was Slide
No. 16, and you can see that it's labeled with the coroner's
case number, 031717, and then it says 16, and the little
squiggle is L1.

So when the technician takes the piece of tissue that
we put in the cassette, she processes overnight and then she
turns -- she or he turns it around and imbeds that piece of
tissue in paraffin.  And then they take the block and they cut
it on a microtome in five to eight micron sections which then
they stain and then put a cover slip.  So they can cut -- you
can cut maybe 200 slides from each block.  So --

Q    Let me stop you there.

What part of the brain does Slide 16 relate to?

A    Okay.  Slide 16 was labeled as coming from the posterior
periventricular white matter.

Q    And that was as part of the system with you and
Dr. Leestma and Dr. Tourtellotte?

A    Correct.

Teas - direct

1    MR. BLEGEN:  Can we go to the next slide, Rob.

2    BY MR. BLEGEN:

3    Q   Dr. Rorke-Adams testified that she believed things that

4    she saw on the slide indicated that it was actually from the

5    front of the brain.  Do you remember that testimony?

6    A   Correct.

7    Q   Tell us your thoughts on whether this appears to be from

8    the front of the brain, Slide 16.

9    A   The one on the right side she said was the gyrus rectus

10   from a 14-month-old child which she used as a control.  And

11   that looks like the rectus gyrus, but Slide No. 16 from

12   Isabella doesn't look anything like it, and actually under the

13   microscope you could see that there was some white matter on

14   the edge there.  So I do not see that there are any

15   similarities for me to say that that came from -- that could

16   have come from the gyrus rectus.

17   Q   And of course it was labeled as being from the back of the

18   brain?

19   A   Correct.

20   Q   Now, Dr. Teas, I want to turn to your report.  Your report

21   begins with a medical history, am I right?

22   A   Yes.

23   Q   Starting essentially from birth, correct?

24   A   Correct.

25   Q   Tell us why it's important to go back to birth records in

1  this kind of case.

2  A   When you're evaluating a chronic -- a child that may have

3  a chronic subdural, or may have a subdural anyway, it's

4  important to look at what may have happened starting right

5  from birth to see if you can trace things backwards and see

6  what -- whether you can put things together.  It's what

7  pathologists do when they do an autopsy.  We call it clinical

8  pathological correlation.

9  Q   All right.  And how old was this child at the time of

10 death approximately?

11 A   She was about 14 months old.

12 Q   And how about at the time she collapsed?

13 A   She was three and a half months old.

14 Q   So she had only been born three and half months

15 previously?

16 A   Correct.

17 Q   You indicate that one of the findings from the birth was

18 that the child was intubated with a No. 10 French suction

19 catheter and received oxygen for two to three minutes.

20 A   Yes.

21 Q   Tell us why that's important.

22 A   Well, it just shows that the physicians who -- the

23 physician who delivered the baby and the neonatologist who was

24 called in attendance may have felt that she needed oxygen to

25 stimulate her to a certain extent.

Teas - direct

1   Q   All right.  And you've also noted that there was meconium

2   stained amniotic fluid?

3   A   Correct.

4   Q   What does that tell us?

5   A   Meconium is the fecal matter in a fetus.  And the fetus is

6   not supposed to let the meconium out while in utero.  So if

7   the amniotic fluid is stained with that, that's an indication

8   that there has been some leakage of the meconium, and that

9   usually happens when there is some amount of hypoxia.

10  Q   So, again, it's another possible showing that the child

11  suffered some oxygen deprivation from birth?

12  A   Correct.

13  Q   You've also noted a occipital caput and cephalohematoma?

14  A   Yes.

15  Q   Can you tell us why that's important?

16  A   These were recorded in the medical records.  The occipital

17  caput is -- usually that is the point where the child presents

18  in the pelvis or -- so it could be a pressure mark.  It's

19  swelling in the scalp itself.  The cephalhematoma is

20  hemorrhage in the periosteum, which is the covering of the

21  bone.

22          So those are two different locations, two different

23  sites.  The cephalhematoma is more indicative of that, but

24  both may not have been as atraumatic as may appear to be.

25  Q   When you say "atraumatic," do you mean non-traumatic?

Teas - direct

1   A   Correct.  "A" means without, right.

2   Q   The birth may have been to some extent more traumatic than

3   a typical birth?

4   A   Yes.

5   Q   And am I correct that these are not the kind of findings

6   that would lead one to have great concerns at the time?

7   A   No.

8   Q   But --

9        THE COURT:  No, he's not correct, or yes, he is

10  correct?

11       THE WITNESS:  He's correct.  No, they would not have

12  somebody to think that they may necessarily be a problem.

13  BY MR. BLEGEN:

14  Q   Why do you think that they're relevant here?

15  A   Well, they're relevant here because you have a child that

16  collapsed at three and a half months old and showed a chronic

17  subdural.

18  Q   So they're relevant to perhaps figuring out when the

19  chronic subdural began?

20  A   Well, maybe not just that, but to say that this birth

21  wasn't as atraumatic as -- as you may have thought at that

22  time.

23  Q   Do you believe that the chronic subdural hematoma in this

24  case is likely the result of from birth?

25  A   I think it could have been.

Teas - direct

1    Q    There is -- we've had some discussion already today about

2    head circumference, but what conclusions did you come to as a

3    result of looking at the head circumference measurements?

4    A    I looked at the measurements.  I also plotted them and

5    then tried to go back and see how they were plotted, at least

6    at birth, because I did not receive any chart from the

7    pediatrician that he had plotted it.

8          It's essential in the first year of life not only to

9    measure the head, but also to plot it, because when you plot

10   it is when you see that there is a difference in the

11   percentiles.  So what I noticed is that when Isabella was

12   born, she was -- her head circumference was 33 1/2

13   centimeters, and they -- the thing is she was born at over

14   40 weeks gestation.  She was born at 40 weeks plus five days,

15   which is actually more like 41 weeks, though her head

16   circumference on the chart was marked at the 40-week mark.  So

17   it appeared to be like she was at the 50th percentile.  She

18   was actually somewhere between the 25th and the 50th

19   percentile.

20         And then when her head was measured at one month, she

21   had grown, I think, so four centimeters, when the average

22   should have been about two, maybe two and a half centimeters.

23   Q    Did -- does the increase in head circumference give you

24   any indication about the timing of the chronic subdural

25   hematoma?

1   A    Well, what it tells me is that the head was enlarging more

2   rapidly than it should have at that particular point.  And

3   then it actually grew a little bit more the following month

4   too, and then it stabilized.

5   Q    And can a rapidly enlarging head be a sign of a subdural

6   hematoma?

7   A    Yes.

8   Q    Isabella was admitted to Edwards -- Edward Hospital on

9   October 23rd of 2002.  What did you find important from that

10  hospital admission?

11  A    Well, she was admitted with fever, and they admitted her

12  to rule out sepsis.  What was important was some of her labs

13  there.  She had an elevated platelet count, which I think

14  we've already gone into, but she -- what we haven't mentioned

15  is she also had an elevated potassium level, which was pretty

16  high and I -- I don't know how to explain that or what it

17  meant.  It was really never followed up.

18  Q    What are the -- are there potential risks associated with

19  a high potassium level?

20  A    Potassium can be very toxic to the heart.  The problem

21  with potassium levels is that when you draw blood and the

22  blood hemolyzes, that means that the red blood cells break

23  down, they release potassium into the serum, and so you might

24  get a level that's higher than what it actually is, but

25  usually the technicians will mention that there is evidence of

1   hemolysis so the physician knows that, well, maybe you should

2   draw another sample and send it in.  But there was no mention

3   in this report that there was any hemolysis, though the nurse

4   was notified, and I didn't see any follow-up on that either.

5   Q   Was there any signs of anemia?

6   A   When she was at Edwards Hospital she -- her hemoglobin was

7   in the normal range for a child that's about two and a half or

8   three months, but it was at the lower end.  So she wasn't

9   anemic then, but when -- later on there was evidence that she

10  was anemic.

11  Q   What kind of risks are associated with anemia that are

12  relevant here?

13  A   Well, I mean, there are risks with anemia for many, many

14  things, but in a case of cortical vein thrombosis that is one

15  of the risk factors.

16  Q   Now, I'm going to ask you a little bit about platelet

17  counts.  You've heard some testimony today, I believe, from

18  Carol Jenny that she concluded that Isabella had reactive

19  thrombocytosis.

20  A   Yes.

21  Q   Do you know whether that's true or not?

22  A   Well, it very well may be true.  But I don't know if it

23  makes any difference whether it's hereditary or reactive or

24  essential thrombocytosis.

25  Q   Tell us why you don't think it makes a difference.

1    A    Okay.  So in reference to coagulation, the way the process

2    occurs are the platelets are what kind of initiate the process

3    and what form part of the thrombus.  They stick to the

4    endothelium.  So there is a triad involved.  So if you have

5    elevated thrombocytosis, elevated platelets or thrombocytosis,

6    that means there is more platelets in the blood.  First of

7    all, they make the blood a little more viscous.  The second is

8    that the integrity of the blood vessel itself is another

9    factor.  And the third is how the blood is flowing through

10   there.  So if there's a slowing down of the blood, you're more

11   likely to get thrombosis.  So you usually have a combination

12   of those three factors, though you don't have to have all

13   three of them.

14   Q    Are there conditions that can cause your platelet count to

15   fluctuate without reacting to stress?

16   A    There are some kinds of thrombocytosis where there might

17   be a fluctuation.

18   Q    And in relation to -- strike that.

19        You've concluded and believe that there was at least

20   one thrombosed cortical vein at the time of Isabella's

21   admission to the hospital on December 27th of '02, correct?

22   A    Actually I would say the radiologists have concluded, and

23   I agree with that.

24   Q    All right.  How does that relate to your opinion that

25   whether the thrombocytosis was reactive or not doesn't really

1  matter?

2  A    It really doesn't matter.  It was the increased platelets

3  that were -- are the problem because they can lead to

4  thrombosis and excessive clotting.

5  Q    Can reactive thrombocytosis lead to thrombotic issues?

6  A    Yes.

7  Q    Is it common or rare?

8  A    It's probably rare.  It all depends on the levels.  I

9  haven't seen levels in the records I reviewed going up to 1.2

10  million.

11  Q    You mean in other cases you haven't seen levels going up

12  to 1.2 million?

13  A    Correct.

14  Q    Is that a very high number in your experience?

15  A    It is.

16  Q    You've also indicated in your report and you've noted the

17  pediatric visit on -- I'm sorry, the doctor visit on

18  December 18th of 2002 for the ear infection?

19  A    Yes.

20  Q    Tell us why you think that's important.

21  A    Again, this is the most proximate visit to the time

22  Isabella collapsed.  And she had gone in with the ear

23  infection and was being treated with an antibiotic for ten

24  days and actually had not even come off the course of the

25  antibiotic.

Teas - direct

1          Infections are another risk factor for cortical vein

2   thrombosis.

3   Q   Dr. Jenny testified that in order to get cortical venous

4   thrombosis from an ear infection it would have to be a vein

5   near the ear and a bone in the ear would have to deteriorate.

6   Did you hear that testimony?

7   A   Yes.

8   Q   Do you think that's correct?

9   A   No.

10  Q   Tell us why not.

11  A   I think you can have an infection anywhere.  Even if you

12  have a pneumonia or an infection in the lungs, you are at a

13  higher risk to have CVT.

14  Q   And is that particularly so with someone who gets very

15  high platelet counts?

16  A   Yes.  Because the cellular counts in the blood go up.  If

17  you have an infection, you have elevated white cell count,

18  which Isabella had too.  Her white cell count was elevated to

19  38,000, wasn't it, 3800, when she was admitted to Provena.

20  And then she had an elevated platelet count.

21  Q   When she went to the doctor for the ear infection, she

22  actually saw a nurse practitioner; is that right?

23  A   Correct.

24  Q   Did they -- do you know whether they did any tests for

25  platelet counts then?

Teas - direct

1   A   No.  They did no lab tests.

2   Q   Let's discuss the day of the child's collapse, 12/27/02.

3   A   Yes.

4   Q   You noted in your report that Miss Del Prete indicated

5   that the child had -- shortly before the collapse the child

6   had diarrhea, that she was shaking and her lips were

7   quivering; is that correct?

8   A   Yes.

9   Q   Tell us the relevance of that.

10  A   Well, what Miss Del Prete was describing could very well

11  have been a seizure that she did not recognize as a seizure.

12  Q   There was some testimony earlier today that EEGs taken in

13  the hospital did not find any seizures.  Do you remember that?

14  A   Yes.

15  Q   Is it possible for a child to have one seizure and then

16  not have additional seizures?

17  A   Well, it may be possible, yes.

18  Q   And do the EEG results necessarily rule out that she was

19  having seizures in the hospital?

20  A   No, they don't.

21  Q   Tell us why not.

22  A   An EEG may not show you a focus.  You know, what the EEGs

23  showed like a generalized depression.  And I'm not a

24  neurologist.  Dr. Scheller might have been the better person

25  to ask those questions.  But you don't have to have a focus to

1  say it is the -- that the person is having a seizure.

2  Q   And the child --

3  A   They obviously treated her with anticonvulsants.

4  Q   Let me ask you about that.  You mentioned in your report

5  Phenobarbital.

6  A   Yes.

7  Q   What is Phenobarbital?

8  A   Phenobarbital is one of the drugs that you use to treat

9  convulsions.

10 Q   And so could that -- could that have suppressed seizures

11 that she might have had?

12 A   You know, I don't know if it would have suppressed a

13 focus.

14     They also gave her other sedatives, so I don't know

15 if it could have suppressed a focus.

16     MR. GOODFRIEND:  Judge, I'm sorry.  I could not

17 understand.  I didn't get what she said.  Could the court

18 reporter read it back to me, please.

19     THE COURT:  Can you just repeat the answer.

20     THE WITNESS:  I can.

21     I said she had received Phenobarbital and she had

22 also received other sedatives when she had gone in, so I don't

23 know if they would have suppressed a specific focus of

24 seizures in the EEG.

25     MR. GOODFRIEND:  Thank you.

Teas - direct

1    BY MR. BLEGEN:

2    Q    Your report discusses various lab report -- or your report

3    discusses various lab results upon admission to the hospital?

4    A    Yes.

5    Q    You discussed the platelet count?

6    A    Yes.

7    Q    You indicated -- we've talked about that a little bit?

8    A    Initially it wasn't 1.2 million.  It was 760, if I

9    remember right.

10   Q    Does 768 ring a bell?

11   A    Yes.

12   Q    Is that high?

13   A    It is high.

14   Q    Was there any further evidence of low blood potassium?

15   A    Yes.  So instead of having a high potassium level, she now

16   had slightly low potassium.  It was 3.4.  The normal should be

17   at least 3.5.

18   Q    At some point upon admission she was given a spinal tap,

19   correct?

20   A    Yes.

21   Q    Do you know whether that spinal tap came before or after

22   the first CAT scan?

23   A    It came before the first CAT scan.

24   Q    And was she given antibiotics early on?

25   A    Yes.

Teas - direct

1  Q   Tell us the relevance of her being given antibiotics early

2  on and the relevance of the fact that she was on antibiotics

3  for nine days leading up to her admission?

4  A   Well, the importance comes in when you're trying to

5  evaluate whether the blood culture or the CSF is negative and

6  you get a negative result.  With blood cultures the rules are

7  that you actually have to take it -- to give it any value, you

8  have to take it before administration of any antibiotics.  And

9  actually if you talk to microbiologists, you have to take

10  three blood cultures.  You take two at the same time from two

11  different sides and then another one before you can really say

12  that a blood culture is totally negative.

13         That's rarely done.  I rarely see it done.  But since

14  Isabella had already been on antibiotics and she was given an

15  antibiotic before the blood cultures were taken, I cannot

16  interpret the results as being negative just because they were

17  negative, that she did not have any kind of a bacteremia at

18  the time that they were drawn.

19  Q   Was the child examined for bruising, broken bones or other

20  outward signs of injury?

21  A   Yes.

22  Q   Were any found?

23  A   No.  There were no external injuries.  There were no

24  injuries to the bones or anywhere.  The findings were all in

25  the brain, in the cranial cavity.

Teas - direct

1  Q   On the early morning the next day the child was
2  transferred to the University of Illinois Hospital?
3  A   Yes.
4  Q   And did they report her having focal left leg seizures?
5  A   Yes.
6  Q   There's an indication in the report, in your report that
7  her temperature on admission was 98.8 degrees.  Do you see
8  that?
9  A   Admission where?
10 Q   At the University of Illinois.
11     Let me just ask you about body temperature.
12 A   Okay.
13 Q   Do you attribute any relevance to the body temperature of
14 Isabella upon her admission to St. Joseph's Hospital in the
15 first instance?
16 A   No.
17 Q   Do you attribute any relevance to the level of her pH upon
18 admission to St. Joseph's Hospital?
19 A   No.
20 Q   Tell me why not.
21 A   Because her body temperature was 95.1.  It was almost
22 taken a little bit over 20 minutes after the 911 call was
23 made.  Babies often show a rapid drop in temperature.  I've
24 seen temperatures go down much faster when there is
25 corroborating history saying that somebody else saw the baby

1    maybe 10 minutes or 30 minutes before.  So I don't know if I

2    would give that any relevance.

3    Q    Let me ask you a follow-up question.  In your experience,

4    do pathologists or anyone else, to your knowledge, attempt to

5    time the moment of a collapse based on body temperature?

6    A    No.  There have been -- there is some literature on trying

7    to assess time of death with body temperature taken at death,

8    but it's totally unreliable because body temperature depends

9    on a multitude of factors.

10   Q    What about trying to time such things based on pH level?

11   A    Again, I find that not of any relevance because babies can

12   show pretty rapid acidosis, so I actually did not find 7.18 to

13   be that unusual from the cases that I see of what's presumed

14   to be head trauma in babies.

15   Q    You've heard it testified in court that some of the

16   experts believe that the acute subdural hematomas are the

17   result of ruptured bridging veins.

18   A    Yes.  That's one of the theories.

19   Q    Do you agree with that theory?

20   A    Well, if a bridging vein ruptures, yes, you can get a

21   subdural.

22   Q    Do you agree with the theory that the acute subdural

23   hematomas in this case are the result of ruptured bridging

24   veins?

25   A    No.

1  MR. BLEGEN:  Can you go to Slide 11, Rob, I think.
2  BY MR. BLEGEN:
3  Q   I'm showing you on the screen Teas Slide 11.  Can you tell
4  us what this slide shows us.
5  A   Okay.  This is actually, again, was in Dr. Julie Mack's
6  Power Point.  It's just showing you bridging veins that have
7  been injected with a dye, with a colored latex so that you can
8  see them and to see how they're draining into the superior
9  saggital sinus, which is the sinus that runs from front to
10  back.  So the right side is the anterior.  It's marked.  And
11  the back is the posterior.  So you can see that it is
12  entering -- the closer to the posterior you get, it becomes
13  more angled.  So you can see that these are fairly large
14  vessels.  They are not tiny little vessels that would not
15  bleed extensively if they were torn.
16  Q   Are there -- is there some other anatomy, part of the
17  anatomy that is, in your view, more likely to have caused the
18  chronic subdurals in this case?
19  A   So, the two theories, and I think you've talked about some
20  of it, are as to why subdural occur.  So if you rupture a
21  bridging vein, the bridging veins are fairly large.  They can
22  be one to two millimeters.  That means you can see them with
23  your eye.  And they actually carry a lot -- a high volume of
24  blood, anywhere from seven to 11 milliliters every second.  So
25  if you were going to rupture them, they would bleed

1   extensively.  If they were to thrombose to stop the bleeding,

2   but before they could get thrombosed, they would still bleed,

3   so what you would see is a high volume subdural hemorrhage

4   that could be space occupying.

5            The problem is that in a lot of these baby cases what

6   we see is a thin layer of subdural hemorrhage, so some of the

7   work that has been done -- so there has to be another reason,

8   so there have been several papers that have examined first the

9   anatomy of the dura and the distribution of the vasculature in

10  the dura to see what is the function of the dura, and then to

11  corroborate with that there have been other studies done by

12  names that have already been mentioned, like Dr. Gettis, and

13  then her work was corroborated and repeated by Dr. Cohen and

14  Schweinberg from England.  One is from Sheffield and the other

15  one is from London.  And they actually pulled and looked at

16  their cases that were either fetuses, because oftentimes fetus

17  suffer intrauterine asphyxia and that they are born as

18  stillborn, so we know they were having some hypoxia in utero,

19  and they also took some of the babies, I think it was like 25

20  and 30, that were born in the hospital and had to be kept on

21  life support after being born who -- in whom there was

22  clinical evidence of hypoxia and looked at them, examined the

23  duras, and the anatomy shows that the dura has a dense plexus

24  in the falx.  So you have a dura that goes on both sides of

25  the brain, goes in between the two cerebral hemispheres, and

1   that's called the falx, f-a-l-x, and then it also actually

2   goes between the cerebrum and the cerebellum, and that's

3   called the tentorium.  It spreads out like a tent, separating

4   the two parts of the brain.

5         The compartments are all connected.  They are not

6   separated.  If you have a subdural on one side -- on two

7   sides, the neurosurgeon will only drain one side and both

8   sides will be drained.

9   Q   All right.  Let me stop you there.  Let's go on to the

10   next slide.

11         So am I -- to sum it up, am I correct to say that

12   there is a competing theory with the -- that competes with the

13   ruptured bridging vein theory indicating that blood in cases

14   like Isabella's could come from dural bleeding?

15   A   Correct.

16   Q   I think you covered this already.

17   A   Right.

18   Q   But tell us what the importance of this slide is.

19   A   So this just says, you know, that -- that blood -- that

20   may not be the only source, that the dura has these

21   capillaries or that -- these plexuses that can bleed in the

22   dura itself, and because the dura and the arachnoid are really

23   one contiguous compartment, they're only separated by a thin

24   few layer cell -- dural border cell layer, that once the

25   volume of this bleeding in the dura reaches a critical level,

Teas - direct

1   that thin layer will just tear away and you will see blood in

2   the dural compartment.  And that's one explanation that we see

3   this diffused, thin subdural that is not space occupying.

4   Q   And that would appear to be a subdural hemorrhage?

5   A   Correct.

6   Q   What's a capillary plexus?

7   A   A capillary plexus -- and I know there are some other

8   photographs that show what it is.  It's a collection of veins

9   that are pretty dense.

10  Q   Tell us the relevance of this slide.

11  A   Okay.  So the anatomy -- actually this has been reexamined

12  by Dr. Mack and Waney Squier, who's a neuropathologist at

13  Oxford, and they went back and looked at what has been written

14  and then looked at their own cases.

15         So the brain has the dura and then the arachnoid and

16  then the pia.  The dura and the arachnoid are essentially

17  touching each other.  There is no space.  Actually there is no

18  space.  There's no potential space.  There's a created space

19  if there is hemorrhage within the dura because the separation

20  between the arachnoid and the dura is just a few very thin

21  layers that are not very dense, so they can tear away easily.

22         So what you see is this is an MRI actually.  You're

23  seeing the subdural, though it will just expand and rupture

24  the layer, so it's not like it's separate from the dura.

25         MR. BLEGEN:  Go to the next slide, Rob.

Teas - direct

1    THE WITNESS:  So the anatomy also shows that the

2  plexus is very dense posteriorly and in the tentoria, and that

3  becomes important when you're trying to interpret radiological

4  findings of subdural hemorrhage.  And there are several papers

5  correlating radiology and pathology to show that some of the

6  hemorrhages that are described as subdural hemorrhages in

7  radiology at autopsy do not show any hemorrhage, and what

8  you're seeing is some leakage from the plexus and that the

9  plexus has become more dense.

10 BY MR. BLEGEN:

11 Q   Is the dural plexus larger in infants than older people?

12 A   Yes.

13    MR. BLEGEN:  Go on to the next slide, Rob.

14    THE WITNESS:  This is just a diagrammatic

15 presentation of what the dura is.  It's actually are labeled.

16 What you're seeing on the top is the dura, and what you see

17 that triangular shape, that's the saggital sinus, which is the

18 big sinus in the center.  And the BV stands for the bridging

19 vein, and the DP stands for the plexus or veins inside the

20 dura itself.

21    And what you see on the top are actually the

22 perforating -- the arteries that supply the dura with its

23 blood and then the veins that take the deoxygenated blood from

24 the dura away.

25    THE COURT:  What does MA stand for then?

Teas - direct

1      THE WITNESS:  That is meningeal artery.

2      THE COURT:  Meningeal artery.  And then the other one

3  is meningeal vein?

4      THE WITNESS:  Correct.  And the PA is the perforating

5  artery.  So you have the main meningeal arteries and then you

6  have the smaller ones that spread out.

7      MR. BLEGEN:  Go to the next slide, Rob.

8      THE WITNESS:  So the next slide shows what happens --

9  if you're looking at that orange layer, that's the dural

10  border cell layer or the interface with the arachnoid.  What

11  happens is if that plexus starts to leak, when the blood comes

12  out, it appears to be in a space where there was no space, but

13  it's still inside the dura, excepting the volume may rupture

14  the thin layer of cells.

15      The other thing that's important is that we all know

16  as pathologists with hypoxia or anoxia, the blood vessels,

17  smaller capillary vessels become dilated and their

18  permeability increases, so there's leakage of blood around it.

19  So that is the thing that ties into why you get these thin

20  subdural hemorrhages.

21  BY MR. BLEGEN:

22  Q   Explain that a little more.  How does hypoxia cause blood

23  vessels to leak?

24  A   Well, it's probably a self-protective thing.  This is

25  something all pathologists observe.  When we -- when you have

Teas - direct

1  hypoxia, you may also go into DIC, so there are a multitude of

2  factors.

3       THE COURT:  DIC.

4       THE WITNESS:  Disseminated intravascular

5  coagulopathy.  I think it was mentioned earlier.

6       So the blood vessels, they have gaps where things can

7  come out.  There is a passage of solute inside and outside the

8  blood vessels, so the gaps widen and blood can leak out.

9       MR. BLEGEN:  Go on to the next slide, Rob.

10      THE WITNESS:  This is just again showing the

11 radiology, the gross pathology in a diagrammatic fashion and

12 the histology as to why they say that it is -- that you can

13 see this layer.  So you're seeing the dura, and what you're

14 seeing is that what we call as a subdural space, it's really

15 just in the dura.

16 BY MR. BLEGEN:

17 Q  Is there -- are there -- is there evidence in this case of

18 multiple dural bleeds?

19 A  In Isabella you mean to say?

20 Q  Yes.

21 A  Isabella showed multiple areas of hemorrhages in the

22 overlying, on the surface, so you could call them multiple

23 subdurals.  But are they necessarily subdurals, we don't know.

24 Q  Dr. Leestma testified about layers seen microscopically.

25 A  Yeah.  But that was when she died at 14 months.

Teas - direct

1  Q  Okay.  So clearly those were not a result of anything that

2  happened on December 27th, but does it show that she had a

3  propensity to bleed from the dura?

4  A  Well, once there is a subdural hemorrhage, the natural

5  history of any healing is that -- of subdurals is that they'll

6  form a membrane, and eventually the membrane may be absorbed

7  and incorporated into the dura.  But the process -- or the

8  process may just keep on continuing.  So when you have

9  healing, what happens is the white cells go into the area

10  first and then macrophages go in to take the dead tissue out,

11  and then the fibroblasts go in there to lay down the new

12  collagen tissue.  So when this new collagen tissue is being

13  lain down, part of the thing is they form tiny little blood

14  vessels.  It's not that different from what you see in a

15  decubitus ulcer.

16  Q  I'm sorry.  In a what?

17  A  Decubitus ulcer, like bedsores in sick people on the back

18  because they are laying and they have these big, gapping

19  wounds.  And the word granulation tissue actually comes from

20  the way -- the appearance of this healing tissue, is because

21  it has a granular appearance because these blood vessels stick

22  up.

23        So these blood vessels are small and delicate, and

24  they can bleed very easily.

25        MR. BLEGEN:  Skip ahead two slides, Rob.

Teas - direct

1  BY MR. BLEGEN:

2  Q    I think we've already covered that.  What does this

3  radiologic image show us?

4  A    This is actually a paper from Kilbayashi, who wrote a

5  paper about correlating radiological findings with autopsy

6  findings.  So what it shows is that bright light that you see

7  in the back --

8  Q    In the center of the --

9  A    In the center.

10 Q    -- of the brain?

11 A    Yes.

12 Q    And what was this interpreted as on radiology?

13 A    This was interpreted as being subdural hemorrhage, but at

14 autopsy there was no subdural hemorrhage.  This was all

15 hemorrhage in the falx.

16         MR. BLEGEN:  Can we turn to the next slide.

17         THE COURT:  In the falx.

18         THE WITNESS:  Yes, in the falx.

19         THE COURT:  Remind me what the falx is again.  I know

20 it's back here somewhere, but --

21         THE WITNESS:  It's the falx that goes down between

22 the right and the left cerebellum.

23         THE COURT:  Where the dura goes down.

24         THE WITNESS:  Dips, right.

25         THE COURT:  Okay.

Teas - direct

1   BY MR. BLEGEN:

2   Q    What does this next slide show?

3   A    This is the pathology of that case from the previous slide

4   showing that there is actually no subdural hemorrhage but all

5   the hemorrhage is in the falx.

6   Q    And so you've indicated on the slide --

7   A    I need to correct myself.  This was probably -- the first

8   slide was from Squier's paper.  Kilbayashi has another slide.

9   Q    So from Squier's paper, but what it represents is

10  radiology -- a radiology image that was thought to be a

11  subdural hematoma but turned out to be entirely intradural?

12  A    Yes.

13  Q    Meaning inside the dura?

14  A    Correct.

15       MR. BLEGEN:  Next slide.

16  BY MR. BLEGEN:

17  Q    Is this the Kilbayashi slide you were speaking of?

18  A    Yes, this is the Kilbayashi slide.

19       And actually this correlates a little bit with what

20  Isabella had.  This is the intradural hemorrhage in the

21  tentorium.  The tentorium is the same thing but separating the

22  up and the down.  So you can see that it looks much denser and

23  it could be interpreted as subdural hemorrhage.

24  Q    In this case was it mistakenly characterized as

25  subarachnoid hemorrhage?

Teas - direct

1    A    Yes.

2              It's difficult to tell whether it's subarachnoid or

3    subdural on CT's.

4              MR. BLEGEN:  Next slide, Rob.

5              THE WITNESS:  So this is a slide from Michael

6    Krasnokutsky.  Even I cannot say his name.  It's spelled

7    K-r-a-s-n-o-k-u-t-s-k-y.

8              He wrote a paper on CVT and the radiological

9    diagnosis, and this shows a small subdural hemorrhage very

10   similar to what we saw on Isabella.

11   BY MR. BLEGEN:

12   Q    What did it turn out to be in this case?

13   A    It was a CVT.

14   Q    So a --

15   A    Or cortical vein thrombosis.

16             MR. BLEGEN:  Next slide, Rob.

17             THE WITNESS:  This is from Dr. Barnes' paper about

18   the mimics of subdural hemorrhage.  This was a case, as you

19   can see, the arrows are pointing to the center read as

20   subdural hemorrhage, but, again, the radiology is reversed,

21   the right and the left side, and the pathology shows that

22   there was a thrombus in the saggital sinus, so this was a

23   saggital sinus thrombus, and then there were little cortical

24   vein thrombi too.

25   BY MR. BLEGEN:

Teas - direct

1  Q   So not only can subdural hemorrhages be mistakenly

2  identified because they're really intradural hemorrhages, but

3  subdural hemorrhages might also be clots or thrombosis?

4  A   Within the vessels.

5  Q   Correct.  Within the vessel.

6        MR. BLEGEN:  Rob, you can take that slide down.

7  BY MR. BLEGEN:

8  Q   You have shown us a slide of subdural -- what was thought

9  to be a subdural hematoma misdiagnosed and was actually

10 cortical venous thrombosis or cerebral venous thrombosis,

11 correct?

12 A   Yes.

13 Q   Is that what you think -- one of the things you think

14 happened in Isabella's case?

15 A   Yes.

16 Q   Tell us why.

17 A   Well, there are several reasons.  Isabella's presentation,

18 which sounds like a seizure, so if you have cortical vein

19 thrombosis, you can --

20 Q   Let me stop you there.  Oh, I'm sorry.

21        Can cortical vein thrombosis lead to seizures?

22 A   Yes.

23 Q   All right.  And can a seizure stop your heart from

24 beating?

25 A   Yes.

Teas - direct

1   Q   And cause you to stop breathing?

2   A   It could.

3   Q   All right.  What are the other reasons you think this was

4   CVT?

5   A   So it was actually the appearance on the CT that was

6   important.  It was the presentation.  Then Isabella had

7   several risk factors.  There is nothing that you can say is

8   just a cause of CVT or thrombosis anywhere.  You just look for

9   what are the risk factors for that somebody may be more

10  susceptible to it.

11          She had infections.  She had ear infection.

12  Naturally she continued to have infections while she was in

13  the hospital too.  She had anemia.  That was another risk

14  factor.  She also actually had an increased extraaxial space

15  where some of these veins may have been stretched so that the

16  blood flow through them could have been altered or slowed.

17          And so those are the risk factors that she had.

18  Q   Can you explain that a little more.  How does the

19  stretching of a vein cause it to clot?

20  A   One of the factors you look at CVT is to see is the blood

21  flow altered in any way.  Similarly when we are looking at

22  deep vein thrombosis in the leg to prevent pulmonary embolism,

23  do you have a fracture, you're not moving around, and that's

24  one of the things that may happen, and that's why they ask you

25  to move, and that's why they put those compressing things so

1  that they can keep the blood flow moving.  So if there is a

2  stretch, it -- again, this is a hypothesis, is that the

3  vessels may be stretched to a certain extent, and so they may

4  be causing slowing of the blood flow or may be causing some

5  changes in the endothelium of the blood vessel.

6  Q   Do the high platelet counts also create a risk for CVT?

7  A   Yes.  And maybe the high white count too creates a risk.

8  Actually Dr. Jenny mentioned that, because people with what we

9  call polycythemia vera who have increased red blood cells also

10  are at risk.

11  Q   Dr. Jenny also testified that no tests for thrombophilia

12  were done.

13  A   Correct.

14  Q   Do you agree with that?

15  A   There was nothing done to rule out and -- there was

16  nothing done to rule out that Isabella had a propensity to

17  have thrombosis.  There were tests done to rule out some

18  bleeding disorders, but not clotting, you know, not excessive

19  clotting.

20  Q   On January 10th of 2003 Isabella had surgery, correct?

21  A   Yes.

22  Q   What kind of surgery did she have?

23  A   She had a craniectomy or making burr holes to remove -- to

24  decrease the pressure on her brain.

25  Q   And what did the surgeon find?

1   A   What the surgeon described in his operative report that he

2   saw a bluish membrane.  That means he could identify the

3   membrane that was there in the chronic subdural.

4   Q   And does that help to date the chronic subdural?

5   A   Well, if I were to say that somebody could look at it and

6   say this is definitely a membrane and it's bluish, that it's

7   old, it's not ten or 13 days old, that it's probably at least

8   a month old maybe or four weeks old and maybe more.

9   Q   You have -- following your description of the various

10   medical -- excuse me, of the various medical findings you

11   discuss medical issues in your report, correct?

12   A   Yes.

13   Q   The first issue you discuss is subdural hemorrhages.

14   A   Yes.

15   Q   And we've discussed the alternative findings that could --

16   it could be a subdural hemorrhage or it could be something

17   else, correct?

18   A   Correct.

19   Q   You discuss -- at the end of that you refer to two papers,

20   a Sirotnak 2006 paper and a Barnes 2011 paper?

21   A   Yes.

22   Q   All right.  Let me show you what's marked as Exhibit

23   Petitioner Teas 1.  Is this the -- is this a book containing

24   the Sirotnak chapter that you were discussing?

25   A   Correct.  I know he has a differential diagnosis in it.

1  Q   All right.  And so what's the relevance of Sirotnak's

2  chapter on medical disorders that mimic abusive head trauma in

3  this case?

4  A   So he's got several different listings, I read this long

5  time ago, that says that there are other causes for subdural

6  hemorrhages.

7  Q   And is that what a physician is supposed to do when

8  considering whether something is abusive head trauma or not?

9  A   Yes.

10 Q   Tell us a little bit about what a differential diagnosis

11 is.

12 A   A differential diagnosis is what we do with every disease.

13 You look at the signs and symptoms and go through a list of

14 diseases that may produce that combination of signs and

15 symptoms and try to rule them out as much as you can.

16 Q   The next article you reference in relation to medical

17 history is an article from Barnes from 2011?

18 A   Correct.  And I think some of the slides I showed were

19 from that article.

20 Q   All right.  Let me show you what's marked as Exhibit

21 Petitioner Teas 2.

22 A   Yes.

23 Q   Is this the Barnes article you were referring to?

24 A   Yes.

25 Q   Is this Dr. Patrick Barnes who testified here some time

Teas - direct

1   ago?

2   A   Correct.

3   Q   What's the relevance of this article to your conclusions?

4   A   Well, he again discusses some of the -- this is a very

5   controversial subject, so he discusses some of the

6   controversies and also discusses some of the differential

7   diagnoses that may appear to be abuse but are other diseases.

8   Q   And does he focus for the most part on imaging in his

9   paper?

10  A   Correct.

11  Q   You -- in your section entitled Subdural Hemorrhages, you

12  have a reference to venous sinus thrombosis or cortical venous

13  thrombosis.  Do you see that?

14  A   On Page 5?

15  Q   It's on Page 5.

16          THE COURT:  We're now on her report, not on these

17  articles?

18          MR. BLEGEN:  I'm sorry.  Yes.  Page 5.

19          THE COURT:  Just want to be sure.

20  BY MR. BLEGEN:

21  Q   Page 5, the paragraph that starts Subdural Hemorrhages,

22  Subdural Hemorrhage, SDH in italics.

23  A   I see it.

24  Q   Do you see towards the bottom of that paragraph where you

25  say venous sinus thrombosis or cortical venous thrombosis?

Teas - direct

1   A   Yes.

2   Q   Which one do you think Isabella had in this case?

3   A   Isabella had cortical venous thrombosis.

4   Q   All right.  Have you suggested here or anywhere else that

5   she had venous sinus thrombosis?

6   A   No.

7   Q   All right.

8   A   You know, though I have to add a little caution to that

9   because they are just looking at radiology.  If any of the

10   sinuses are blocked partially, there's no way radiology would

11   pick that up, and then radiology wouldn't pick up all of the

12   sinuses that are at the base of the brain.

13   Q   Could there have been other thrombosed cortical veins in

14   this case?

15   A   Yes.

16   Q   You next reference a paper by Rooks from 2008 that's

17   already been admitted when I was cross examining Dr. Jenny.

18   Do you know that article?

19   A   Yes, I do.

20   Q   What's the importance of the Rooks article as it relates

21   to Isabella's case?

22   A   Well, the Rooks article is an article about birth related

23   subdurals.  It's actually a series of articles.  There was

24   Looney before that, and there was Witby before that.  Just

25   different methodologies used for the same thing.  Rooks used I

Teas - direct

```
 1    think 101 cases of newborns and did MRIs on them and found
 2    that 46 percent of them had subdural hemorrhages at birth.
 3  Q    So 46 percent of 101 randomly selected kids had subdural
 4    hematomas that resulted from birth?
 5  A    Correct.
 6          And actually she took kids that did not -- that there
 7    were infections, but there weren't any kids that had any kind
 8    of complications, so these were all deemed as normal
 9    deliveries.
10  Q    And does that article and its findings inform your
11    conclusion that Isabella's chronic subdural hematoma could
12    have resulted from birth?
13  A    Well, not directly because the numbers are very small, and
14    she followed, what was it, like 40 some odd, and many of them
15    were lost to follow-up.  She really had 18 that she followed
16    for three months, and one of them did develop actually a
17    frontal subdural very similar to Isabella's, though initially
18    the CT -- the MRIs had just shown posterior fossa subdurals,
19    so it may have some relevance.  It's just another piece of
20    information that we should be looking at.
21  Q    And would it prevent -- does it provide an alternative
22    explanation for the chronic subdural as opposed to someone
23    abusing the child?
24  A    Correct.
25  Q    You've also referred to some articles related to the dural
```

Teas - direct

1    anatomy that you discussed earlier?

2    A    Correct.

3    Q    Squier and Mack in 2009?

4    A    Yes.

5    Q    Is that actually two articles that you're referring to?

6    A    Yeah.  They were two separate articles.  One was by

7    Squier, Mack and Eastman, and the other was just by two of

8    them.  I think they were both in 2009.

9    Q    Let me show you Respondent's Exhibit -- excuse me, Exhibit

10   Petitioner Teas 3.  And is that the first of the Mack, Squier,

11   Eastman articles that you're referring to?

12   A    Correct.

13   Q    And is that where much of your information regarding the

14   dural anatomy comes from, articles like this and other

15   articles?

16   A    Yes.

17   Q    And you heard Dr. Jenny testify that she does not agree

18   with the theory of dural bleeding?

19   A    Yes.

20   Q    All right.  But these articles were peer reviewed,

21   correct?

22   A    Yes.

23   Q    And they've been discussed?

24   A    Yes.

25   Q    In the years after 2009?

Teas - direct

1   A   Yes.

2   Q   Let me show you Exhibit Petitioner Teas 4.  Is this the

3   second in the Squier and Mack articles about -- that relates

4   to subdural hemorrhages in comparison to dural bleeding?

5   A   Yes.

6   Q   And then the last article that you refer to in that same

7   paragraph is from Cohen & Schweinberg of 2009?

8   A   Yes.

9   Q   I'm going to show you Petitioner's Exhibit Teas 5.

10  A   Yes.

11  Q   Tell us the relevance of this article and why you cited it

12  in your report.

13  A   Well, this is the article that corroborates Dr. Gettis's

14  work, and actually in her letter she references to it.

15  Q   And there's sort of an ongoing debate amongst physicians

16  about Gettis' work, the work of doctors like Rorke-Adams, et

17  cetera, correct?

18  A   And Drs. Cohen and Schweinberg too.

19  Q   Am I correct that previously it was thought that the

20  injury to the brain as a result of abusive head trauma or at

21  least part of the injury came from the tearing of axons?

22  A   Yes.  That was the theory for shaken baby syndrome.

23  Q   Tell us what that theory is, or was.

24  A   So the theory was that when you shake a baby and since we

25  saw these thin nonspecific subdurals that really were not

Teas - direct

1  space occupying, why do they cause these babies to collapse.
2  So the theory was that the axons that come from the neurons
3  are sheared when the baby is shaken, and that's why if they're
4  sheared, then they become comatose, or they should become
5  comatose right away.  And so though none of us saw these
6  retracted axons that we do see in automobile accidents and
7  other kind of cases in some of these cases, so it was that you
8  cannot see them easily in babies, and that they had an immuno
9  stain called the beta amyloid protein or the APP stain which
10 was done and then was read as positive, and that you're seeing
11 this positive stain, and so that means that these axons were
12 sheared.

13 Q   Has that theory been replaced or undercut?

14 A   Yeah.  Then Dr. Gettis did a series of three articles, and
15 the last one was to say that the axonal damage is actually not
16 the kind that you would see with trauma but is what you would
17 see with hypoxia-ischemia.  What happens if you look at the
18 neuron and they have an axon, so when you have
19 hypoxia-ischemia you have -- the neuron will die along with
20 the neuron -- after the neurons's dead, the axon will die too.
21 You used to learn it in medical school as Wallerian
22 degeneration.  So what she came out with, that's probably what
23 you're seeing here.  And the staining pattern is a little
24 different.

25          So the theory that the axons are tearing has

1   decreased, though there are still some people who believe and

2   persist in saying that's what the mechanism is.

3   Q   Was there any radiological or other finding of torn axons

4   in Isabella's case?

5   A   No.

6   Q   Your report also discusses the issue of rebleeding.

7   A   Yes.

8   Q   Tell us how that's relevant to Isabella's case.

9   A   Well, there was some question about her anterior

10  fontanelle and her intracranial pressure changing.  Since she

11  had a chronic subdural, she could have at times had a little

12  rebleed that would cause certain fluctuations.

13  Q   Fluctuations in?

14  A   In the intracranial pressure.

15      Since the autopsy was done so many months later, it's

16  really hard to put it back together and do a pathological

17  correlation.

18  Q   To what do you attribute the brain swelling that Isabella

19  ultimately suffered in this case?

20  A   Children react a little differently to how brain swelling

21  occurs.  Sometimes in adults it's pretty slow.  In children it

22  may not occur, but once it occurs then it goes up pretty fast

23  depending on the cause.  So for whatever reason her

24  intracranial pressure was going up, and that's why they had to

25  evacuate the chronic subdural.

Teas - direct

1   Q   I want to ask you some questions about lucid intervals.

2   A   Yes.

3   Q   Is it now generally understood that there can be a lucid

4   interval even in the case of actual abusive head trauma?

5   A   Well, it has always been accepted that there can be a

6   lucid interval after any kind of head trauma.

7   Q   Tell us a little about that.  What does a doctor tell you

8   when you go to see him after having a head injury?

9   A   Oftentimes if you go to the emergency room they'll examine

10  you.  If there's nothing, they'll send you home with a list of

11  things to watch out for.

12  Q   Why do they tell you to do that?

13  A   Because they know that you may not have any symptoms right

14  away, but you could still be having bleeding that could

15  manifest itself later.

16      I've had several cases where lawyers have talked

17  about malpractice suits against hospitals for certain things

18  like that.

19  Q   In this case the state's expert at trial, Emily Flaherty,

20  testified that Jennifer Del Prete had to be the perpetrator

21  because the child would have become immediately symptomatic or

22  immediately would have crashed, correct?

23  A   Correct.

24  Q   And Carol Jenny, Dr. Jenny told us today that she believes

25  the child was abused by Jennifer Del Prete because the child

Teas - direct

1  had taken a bottle some hours, three or four hours before her

2  collapse.  Did you hear that testimony?

3  A    Yes, I did.

4  Q    Do you agree with those assessments?

5  A    No, I don't.

6  Q    Tell us why not.

7  A    Because actually sucking and maybe even swallowing are

8  pretty primitive reflexes, you don't need higher brain

9  function.  And especially in Isabella's case.  She had this

10 chronic subdural for a while.  It didn't occur even the day

11 before.

12 Q    Let me ask you about that.  That's a good point.

13           Dr. Jenny has postulated that the child suffered a

14 prior incident of abuse, abusive head trauma.  Isn't that what

15 she testified to?

16 A    Yes.

17 Q    Or it was likely that that was the case?

18 A    Yes.

19 Q    And she did not crash after that incident of abuse,

20 correct?

21 A    And that's exactly what I'm saying.  She had a chronic

22 subdural that had to have been an acute at some point, and she

23 didn't crash then, so why would I draw the conclusion that if

24 you have an acute subdural you have to crash right away and

25 that you couldn't have been feeding four hours earlier?

Teas - direct

1  Q   You just correct me if I'm wrong, so certainly there was a

2  lucid interval under Dr. Jenny's theory between the initial

3  infliction of abusive head trauma and the child's collapse?

4  A   Correct.

5  Q   You have not concluded that the child suffered two

6  incidents of abusive head trauma, correct?

7  A   No.

8  Q   You mention in your section about lucid intervals an

9  ongoing process and a cascade that occurs days to weeks after

10 a precipitating event?

11 A   Yes.

12 Q   Tell us what you mean by that.

13 A   Well, it all depends on what is happening.  If I look at

14 Isabel, if I could take out some of the factors that she had,

15 she had a chronic subdural, then she developed a ear

16 infection, actually probably more than one infection, and then

17 she developed a thrombus of a vein maybe because she had --

18 she reacted abnormally to infections with thrombocytosis, or

19 maybe she actually had other factors that made her more

20 susceptible to have thrombosis.  When we look at some of these

21 factors, we shouldn't equate deep vein thrombosis and

22 pulmonary embolism with what we are seeing in the brain, so

23 they are different -- they may be different, and children may

24 react differently.

25         So it's all those factors together that then led to

Teas - direct

1   the seizure, and that's why she collapsed.  And there are

2   other theories as to what may have been happening to lead to

3   her collapse.

4   Q   You have briefly mentioned retinal hemorrhages in your

5   report, correct?

6   A   Correct.  Because I thought Dr. Lantz was going to handle

7   that.

8   Q   Fair enough.

9          You've also talked, however, about the absence of rib

10  and long bone fractures and/or grip marks.

11  A   Yes.

12  Q   Tell us the importance of those kind of -- the lack of

13  those kind of findings.

14  A   So the theory of shaken baby syndrome has evolved over the

15  years, and since I've been doing this for a long time, the

16  triad has changed a little bit.

17  Q   Tell us what the triad used to be.

18  A   The triad used to be that there was a subdural, there were

19  retinal hemorrhages and that there were chest injuries, either

20  rib fractures or grip marks or whatever, that you could see.

21  So --

22  Q   How did the triad change over time?

23  A   So over time the subdural and the retinal hemorrhages have

24  remained around, but then they've changed them from rib

25  fractures to bruising elsewhere, and then now it is -- it's

Teas - direct

1    retinal hemorrhages, chronic subdurals and then

2    encephalopathy.

3    Q    What is encephalopathy?

4    A    Encephalopathy is any pathology, so it's encephalop --

5    it's like the brain and pathology of the brain.  So it's the

6    swelling, the swelling of the brain, the hypoxic-ischemic

7    changes in the brain.  So that's where it is, and I think I

8    heard in this courtroom that you don't even have to have that

9    third part.

10   Q    Was that something we heard about, the Ontario triad?

11   A    We heard about the Ontario -- seems like it was the bi-ad,

12   so --

13   Q    What -- do you find the lack of fractures, grip marks,

14   bruising, et cetera, to be relevant?

15   A    I do find it to be relevant to a certain extent, though I

16   think even if you have rib fractures and other fractures you

17   really should be evaluating what are the causes because there

18   are many nutritional deficiencies that can cause all of the

19   things that we have seen.  Your vitamin D is associated with

20   rickets, and we are reading more papers now that vitamin D is

21   also associated with coagulation issues.

22   Q    But we don't have rib fractures in this case?

23   A    We don't have any of it, so we don't have to worry about

24   it.

25   Q    How has impact come to affect the shaken baby diagnosis?

Teas - direct

1    A    So when it was first described by Dr. Guthkelch and then
2    Dr. Caffey, who is a radiologist, and Dr. Guthkelch is still
3    living and is a neurosurgeon, was a neurosurgeon, practicing
4    neurosurgeon, they described a series of cases with very
5    little details.  And so it was that they proposed as a
6    hypothesis that the mechanism was shaking.  Back in 1987
7    Duhaime did an experiment with models that I think has already
8    been talked about where she demonstrated that if you impact
9    the head, you produce much greater forces, so even falls of
10   not that great a height could possibly produce more force.
11   Q    More force than what?
12   A    Than shaking alone.
13         So shaking alone wasn't producing the thresholds that
14   would be needed to cause subdural hemorrhages.
15   Q    The theory that was espoused by the state's expert at
16   trial back in 2005, did that involve shaking alone or shaking
17   plus impact, or what was the theory?
18   A    I think it was shaking alone.  I'm really not sure because
19   it changes.
20   Q    Was there any outward evidence of impact in this case?
21   A    There was no outward impact.  There was no radiological
22   evidence of impact, because if there was impact, the radiology
23   would show scalp changes.
24   Q    We've heard some testimony, although I cannot remember who
25   it was from, about soft surface impact or the possibility or

1  theory that Isabella was thrown onto a couch.  Do you remember
2  that?

3  A   Yes.  Yeah.  I don't remember who, but I remember --
4  vaguely remember it.

5  Q   Have you heard that sort of testimony before?

6  A   Yes.

7  Q   Tell us is that something that's relatively recent?

8  A   Well, I think it's been evolving.  I don't know since
9  when.

10         So the theory when the biomechanical experiments did
11  not produce results that would go along with the theory, so
12  then the theory became that you do not see any external
13  injuries because they're impacting a soft surface such as a
14  bed or a couch.  But there have been experiments done, and I
15  know by Dr. Bandak, and actually I think Dr. Prange also used
16  a soft surface.  They -- it did produce I think more forces
17  than shaking, but it still did not reach the thresholds that
18  you would see even with a short fall.

19  Q   There was -- there's some evidence in this case that
20  Miss Del Prete gave the baby a slight shake at one point?

21  A   Yes.

22  Q   Do you attach any significance to that?

23  A   No.  No, I do not.

24  Q   Tell us why not.

25  A   Well, that is what's recommended by I think the American

1  Heart Association, and my notes referred in a co-judgment, and
2  you can Google it, that if you see anybody, you know, becoming
3  unresponsive, you shout and shake.  You shout at them and then
4  you shake them to stimulate them.

5  Q   Does that included an infant?

6  A   Yes.

7  Q   And is it described literally as a slight shake or a
8  gentle shake?

9  A   Yes.  In this case it was.

10 Q   There's been some debate here in court about whether CVT
11 is difficult or easy to diagnose.

12 A   Yes.

13 Q   Do you have a position on that?

14 A   It is difficult to diagnose.  I have missed it many times.

15 Q   And are there multiple articles discussing that it's
16 difficult to diagnose?

17 A   Yes.

18 Q   One of the other issues that's been discussed is neck
19 injury.

20 A   Yes.

21 Q   Was there any radiological findings in this case of neck
22 injury?

23 A   No.

24 Q   Was there any finding at autopsy of neck injury?

25 A   No.  But the autopsy was done many months later.

Teas - direct

1  Q   Okay.  So that if there was an injury, it may have gone

2  away by then?

3  A   If there was a significant injury, you would see it as

4  scarring.  You would still see it.  But I'm not sure as to how

5  the neck or the spinal cord were examined.

6  Q   There has been some testimony in this case about a clival

7  epidural hemorrhage?

8  A   Yes.

9         THE COURT:  Retroclival.  Wasn't it retroclival?

10        MR. BLEGEN:  Probably was, yes.

11  BY MR. BLEGEN:

12  Q   Retroclival epidural hemorrhage, do you recall that

13  testimony?

14  A   Yes, yes.

15  Q   Do you believe that --

16        And that was something that was found by Dr. Hedlund?

17  A   Yes.

18  Q   Do you believe that Dr. Hedlund's finding is a proxy for

19  trauma to the neck?

20  A   No.

21  Q   Tell us why not.

22  A   First of all, if there is going to be a traumatic injury

23  to the upper spinal cord or the lower medulla oblongata, you

24  should have actually seen this hemorrhage right away when

25  Isabella was first taken to the hospital.  And it's my

1  understanding that none of the radiologists could see it on

2  the first CT that was taken.  And even the first CT was done

3  after the lumbar puncture, so gravity, if there is hemorrhage

4  in the brain, gravity will pull it down.

5          In fact, when there is chronic subdural hemorrhages,

6  when I do an autopsy I often see chronic subdural around the

7  membranes in the spinal cord, and it has -- that's what has

8  tracked down.  Sometimes you can hardly see it in the cerebral

9  dura but you can see more in the spinal dura.

10          Besides, if you look at the anatomy of the dural

11  sinuses and how these plexuses are at certain places, you can

12  understand why you're seeing some hemorrhage in these areas.

13  Frankly speaking, I know I've put a slide from another case.

14  I often see hemorrhage by the clivus and around the foramen

15  magnum and I don't even describe it in my autopsy report.  And

16  I know other people don't describe it in their reports because

17  this is a case that I'm reviewing, not that I did myself, and

18  it wasn't described in the autopsy report.

19          MR. BLEGEN:  Judge, can I just have a second to see

20  if we have that slide here?

21          THE COURT:  Tell you what, let's take ten minutes so

22  you can see if you have that slide, and then we'll resume

23  after that.

24          (Recess taken.)

25          (The following proceedings were had in open court:)

Teas - direct

1    BY MR. BLEGEN:

2    Q    Dr. Teas, when we left off I was asking you about

3    retroclival hemorrhage.  Remember that?

4    A    Yes.

5    Q    You indicated that there were some slides that you'd

6    prepared?

7    A    Yes.

8    Q    Let's take a look at the slide that's up there.  What does

9    this tell us about your conclusion regarding the retroclival

10   epidural hemorrhage issue?

11   A    This is a anatomy picture of the base of the skull before

12   the dura has been ripped off or removed, so it shows the

13   different sinuses.

14           Can I just step down?

15           So it shows the transverse sinus and the petrous, the

16   sigmoid sinus, but there's the pituitary gland here, and then

17   you can see that this is the clivus here.  This is going down

18   into the foramen magnum.

19           THE COURT:  Which thing is the clivus?

20           THE WITNESS:  This portion of the lobe.

21           THE COURT:  Okay.

22           THE WITNESS:  So all these.

23           THE COURT:  You can come closer if you want.  There's

24   a lot of words on here.  It's kind of hard to see.

25           Okay.  Go ahead.

1       THE WITNESS:  So you could see it's pretty vascular.

2       THE COURT:  Keep your voice up.

3       THE WITNESS:  It's pretty vascular, and there are

4   many vessels there mainly for that.  And then there's another

5   picture that shows this -- the vessels around the foramen

6   magnum.  But this also shows the -- this is the tentorium.

7   You're seeing the separation, and then you see that there are

8   many sinuses.  There's the sigmoid sinus, the transverse sinus

9   and then the straight sinus here.  So it shows that there are

10  a lot of sinuses.

11  BY MR. BLEGEN:

12  Q   The fact that it's a very vascular area, what does that

13  tell us?

14  A   Well, it tells that when you see bleeding in that area,

15  that it could again come from hypoxia or it could be -- could

16  be bleeding, those blood vessels are leaking blood in that

17  area.

18  Q   What does this slide show us, Dr. Teas?

19  A   This actually shows the same thing but with all the other

20  things taken away from it.  So this is the clivus.  Then it

21  says note the basilar plexus, the upper arrow dorsal to the

22  clivus.  That means behind the clivus.  And then you also have

23  a marginal sinus, which is right -- this is the foramen

24  magnum.  This is where the spinal cord goes down.  So it's

25  pretty vascular there.  They're off of the little sinuses like

1    the cavernous sinus here.  If you have a thrombus of that,

2    it's very hard to detect.  There are many little sinuses.

3    Q   So again it tells us it's a very vascular area?

4    A   Correct.

5        MR. BLEGEN:  Next slide.

6    BY MR. BLEGEN:

7    Q   Tell us what we're looking at on this slide.

8    A   This is actually from a case that I was reviewing and --

9    Q   So not this case?

10   A   Not this case.

11       And I see this all the time.  This is not described

12   in the autopsy report, but you can see there's a clivus, and

13   you're seeing hemorrhage, and you're also seeing actually part

14   of the dura here has been ripped off, but there is hemorrhage

15   even around it.  You can see that the spinal cord is going

16   down.

17   Q   And in this case was that blood there a proxy for neck

18   trauma?

19   A   No.

20   Q   Dr. Teas, I think this is the last slide I'm going to show

21   you.

22       Did Dr. Hedlund present some testimony about the

23   possibility of thrombosed bridging veins?

24   A   Yes.

25   Q   Tell us what you put on this slide and what you're

1  describing.

2  A    Can I step down?

3  Q    Yes.

4  A    So this is the picture that Dr. Hedlund used from

5  Adamsbaum's paper about -- it was actually about confessions

6  and subdural hemorrhages.  So he showed this photograph, which

7  is the same case as -- that is the picture in the paper

8  itself.  I lifted it off the paper.  And he says that this was

9  a -- he pointed this out and said this was a ruptured bridging

10 vein that had thrombosed.

11        First of all, if you've got to have a ruptured

12 bridging vein that thromboses, you need to see thromboses on

13 both sides of the vein.

14        THE COURT:  What do you mean by both sides?

15        THE WITNESS:  So you have an elongated tube and

16 you're breaking it, so to control --

17        THE COURT:  Thrombosed on either side of the break?

18        THE WITNESS:  On either side of the break.

19        THE COURT:  Okay.

20        THE WITNESS:  Exactly.

21        So the point is the reason it thrombosed is because

22 it's the body's mechanism of protecting it from bleeding.  So

23 it should thrombose on both sides.  So I should really be

24 seeing a thrombosed area right in that area too.  And there's

25 no indication that there's a thrombosed vessel.

1    Number two, he said that the subdural was wiped away.

2  You cannot wipe away subdural completely.  You always see

3  staining.

4  BY MR. BLEGEN:

5  Q   When you say "subdural," you mean a subdural hemorrhage?

6  A   Correct.

7  Q   All right.

8  A   So there was -- there was no indication that there was

9  subdural here.  So this is a thrombosed vein with some

10  subarachnoid hemorrhage around it which you can see around the

11  vein.  The redness is that the blood is leaking out, because

12  the vein is in the subarachnoid space at that point.  So I

13  don't see that as being a ruptured bridging vein that has

14  thrombosed.

15    Not only that, in the paper when it's described, it

16  says there are multiple bridging vein thrombosis.  That means

17  several of them have thrombosed after rupturing.  It takes

18  some time for the thrombosis to occur.  You should see a large

19  volume subdural hemorrhage, which you don't see.  And this

20  baby lived for 12 days, and there was actually no pre-mortem

21  imaging available.  Dr. Hedlund testified that the pre-mortem

22  imaging was characteristic, but the paper says that there was

23  no pre-mortem imaging available, so I don't know what cases

24  were involved in that.

25  Q   Dr. Teas, even under the Adamsbaum theory that Dr. Hedlund

1   was presenting, there would first be ruptured bridging veins

2   before thrombosis, correct?

3   A   Correct.

4   Q   All right.  In this case was there any radiological

5   findings of a ruptured bridging vein?

6   A   No.

7   Q   Was there any radiological finding of a thrombosed

8   bridging vein?

9   A   There was radiological evidence of a cortical vein that

10  had thrombosed.

11  Q   Dr. Teas, you ultimately reached a conclusion in this case

12  to a reasonable degree of medical certainty?

13  A   Yes.

14  Q   Did you conclude that Isabella suffered abusive head

15  trauma at the hands of Jennifer Del Prete?

16  A   I concluded that there was no evidence of abusive head

17  trauma at anybody's hands.

18  Q   That's what I was about to ask.  By anyone's else's hands

19  either?

20  A   No.

21  Q   What is your conclusion to a reasonable degree of medical

22  certainty as to the cause of Isabella's collapse and ultimate

23  demise?

24  A   My opinion was that Isabella had a chronic subdural or

25  subdural collection, and she developed seizures and cortical

1   venous thrombosis and maybe some small rebleeds from the

2   chronic subdural which probably led to her -- led to seizures

3   and her collapse on the 27th of December 2002.

4   Q   Did you find any medical, radiological or pathological

5   evidence that Isabella was subjected to trauma on

6   December 27th of 2002?

7   A   I did not find any evidence of trauma.  This was a natural

8   death.

9               MR. BLEGEN:  Judge, could I just have a moment?

10              THE COURT:  Yes.

11              MR. BLEGEN:  Judge, that's all.

12              THE COURT:  You evidently decided not to offer the

13  thing about the trigeminal nerve.

14              MR. BLEGEN:  Correct.

15              THE COURT:  Okay.  Fine.

16              All right.  Cross.

17              Was I right about brain freeze?  You know what brain

18  freeze is, right?  You eat ice cream and you get brain freeze.

19  That has something to do with the trigeminal nerve, right?

20              THE WITNESS:  I was a little amused because long time

21  ago I had a case of a kid who was eating a popsicle and just

22  collapsed when the popsicle got stuck in his throat.

23              THE COURT:  Oh, okay.  Different story, right?

24              THE WITNESS:  So same sort of thing.  I don't know

25  what brain freeze really means.

1   THE COURT:  You don't eat enough ice cream is what

2   that means, so I advise you to eat more of it.

3       Okay.

4                    CROSS EXAMINATION

5   BY MR. GOODFRIEND:

6   Q   Dr. Teas, as a forensic pathologist you have experience in

7   examining brains?

8   A   Yes.

9   Q   You have considerable experience in examining brains?

10  A   I have some experience, yes.

11  Q   In this case you asked to -- Dr. Leestma to assist you in

12  examining the brain tissue of Isabella?

13  A   Yes.

14  Q   And in terms of asking him to examine the brain tissue

15  with you, you wanted somebody who had even more experience

16  than yourself?

17  A   Yes.

18  Q   Now, in terms of the brain tissue in this case, it was

19  preserved in formaldehyde?

20  A   It was in formaldehyde.  I can't say it was really

21  preserved.

22  Q   Now, in terms of this case, wasn't it the law offices of

23  Mr. Blegen and Miss Garvey that asked you to look at the brain

24  tissue?

25  A   Yes.

Teas - cross

1  Q   Weren't they the ones who got the court order allowing you

2  to go into the medical examiner's office and -- or the

3  coroner's office and look at the brain?

4  A   Yes.

5  Q   It wasn't our office?

6  A   No.

7  Q   So in terms of your description of what happened when we

8  got there, it was you and Dr. Leestma that removed the brain

9  from the formaldehyde and placed it on the examining table?

10 A   Yes.

11 Q   It wasn't Dr. Tourtellotte?

12 A   No.

13 Q   He was there strictly as an observer?

14 A   I don't know.  My understanding was before we went out

15 that he was going to process and we were going to be

16 observing.  But when we got there, it was the other way

17 around, and it didn't matter either way.

18 Q   Okay.  And in terms of the removal of the brain from the

19 formaldehyde, that was something that Dr. Leestma did?

20 A   Yes.

21 Q   Dr. Leestma placed it on an examining table?

22 A   Yes.

23 Q   And after he --

24         It was in a jar?

25 A   It was, yeah, in a brain bucket.

Teas - cross

1   Q   And when he removed it and placed it on the table, it was
2   described to be somewhat very friable and easily fragmented?
3   A   Yes.
4   Q   I think Dr. Leestma called it -- I think in his opinion or
5   during his testimony he called it somewhat messy.
6   A   I don't remember the tone.  If you say so, it may be so.
7   Q   Now, Dr. Leestma was the one who cut sections out?
8   A   Yes.
9   Q   And as he cut a section out, he would dictate to you what
10  section he was taking?
11  A   Yes.  And I was watching too.
12  Q   And when he took a section out, you would -- you wrote it
13  down on a towel?
14  A   Yes.
15  Q   And later on at some point in time you transferred the
16  writing to another document?
17  A   Actually, right there before we left I transferred it to a
18  yellow pad sheet, and then actually Dr. Tourtellotte wrote his
19  email down on that paper for me so that I could email him the
20  typed list.
21  Q   Did it take approximately a half an hour for Dr. Leestma
22  to cut the sections?
23  A   Probably.  I don't remember the time.
24  Q   And if -- in terms of the brain tissue being friable, at
25  times Dr. Leestma may have had trouble determining which part

1  of the brain it was from?

2  A   He didn't -- he took some sections from the parts that

3  were friable, especially after I requested him to take couple

4  areas that had a little clotted vessel, but the last one,

5  No. 16 that's in question, was taken by him, and it's fairly

6  well preserved, though there are little areas of infarction

7  under the microscope.

8  Q   Well, if he dictated to you the wrong section, then it

9  would have gotten mislabeled; is that correct?

10  A   It could have, but then I would have to see something on

11  the histology to say it's wrong.

12  Q   Now, once you -- once Dr. Leestma put the -- took the

13  tissue out, you put it in a somewhat a small plastic box?

14  A   Yeah.  They call it cassettes.

15  Q   Cassettes.

16  A   Yes.

17  Q   Okay.  So you put the 16 sections in the cassettes?

18  A   Yes.

19  Q   Where did you take the cassettes?

20  A   I took them to Loyola directly from there.  I went from

21  the coroner's office, took the Eisenhower.

22  Q   I don't need your route.

23  A   So I went -- I went to Loyola there because I live north

24  and Loyola is south.

25  Q   And.  And when you got to Loyola --

Teas - cross

1       That was the medical center?

2   A   I went to the department of pathology.

3   Q   And who did you give the cassettes to?

4   A   I gave them to Roger, who's the chief technician there.

5   Q   When you gave them to Roger, did you then leave Loyola

6   Medical Center?

7   A   Yes.

8   Q   Did you give Roger certain instructions on what to do with

9   the cassettes?

10  A   I told him I -- I have them process my tissue before, so

11  that's why I have an account with them, so I told him to

12  run -- cut two sections of each and call me when they're ready

13  or email me when they're ready and I'll --

14  Q   Okay.  So Roger did the placing -- or the staining and the

15  placing in the slides?

16  A   I don't know whether he did it or one of the other

17  technicians there did it.

18  Q   So he may have given the brain tissue to somebody else to

19  process?

20  A   It's a whole process.  That's how the laboratory runs in

21  histology.  It's not a one-person laboratory at Loyola.  It's

22  a big laboratory.

23  Q   So several people may have processed the cassettes?

24  A   No.  Usually what happens, they put it in a machine that's

25  called a Technicon, because it has to go through processes of

1   hydration, rehydration and overnight.  And the next day the

2   technician who's assigned to do that takes all the blocks out

3   and takes each block and embeds it in paraffin.  They have

4   like a paraffin bath there.

5   Q   Okay.  So it's either somebody at Loyola took care of this

6   for you?

7   A   Correct.  It's -- I mean, that's -- that's the way it's

8   done.

9   Q   Then they called you when it was done?

10  A   Yeah.  They either called me or emailed me.

11  Q   And then you had two sets of slides?

12  A   Correct.

13  Q   And going back one step, were they only processed using

14  one type of stain?

15  A   Yes.  They were processed only using H&E.

16  Q   And Dr. Rorke-Adams, when she got additional specimens,

17  processed them in several ways?

18  A   She did.  I don't know she -- I think she mentioned three

19  different stains in her report.

20  Q   So Dr. Rorke-Adams went further along in terms of using

21  different stains to bring out different characteristics of the

22  tissue?

23  A   I don't know what the purpose of her doing some of those

24  stains were.

25  Q   Well, there are multiple stains that you can put on a

1  tissue sample to bring out different characteristics; is that

2  correct?

3  A   Absolutely.  But there's always got to be a reason.

4  Q   Okay.  And obviously she had a reason to do additional

5  testing?

6  A   She probably did.

7  Q   Now, at some point in time after the -- you picked up the

8  slides and the paraffin blocks, you didn't pick up the

9  paraffin blocks again, right?

10  A   I picked up -- Loyola doesn't keep my paraffin blocks.  I

11  usually bring them back, and then I sent them -- I think you

12  requested them, so I sent them back to the law office.

13  Q   Okay.  Where were the paraffin blocks stored before we

14  made a request to take additional cuts?

15  A   They were probably with me in my storage area.

16  Q   Is that in your house?

17  A   Yes.

18       MR. GOODFRIEND:  Now, in terms of the Power Point,

19  Judge, I'm going to use the Power Point right now.

20       THE COURT:  Okay.

21       MR. GOODFRIEND:  Excuse me one second.

22  BY MR. GOODFRIEND:

23  Q   Okay.  Dr. Teas, do you see the Power Point there?

24  A   Yes.

25  Q   Now, in terms of the right side of the Power Point, you've

1   got the three sections that Dr. Rorke-Adams used; is that

2   correct?

3   A   Yes.

4   Q   And that's a picture you took from her presentation?

5   A   I don't know if I took it from her presentation.  I just

6   used the -- I actually got prints, and I think I scanned them,

7   or I -- maybe the law office scanned them and sent them to me.

8   But these are originally from prints.  They're not -- they

9   were never taken digitally.

10  Q   You got a set of -- these are from photographs taken at

11  the original autopsy; is that correct?

12  A   Right.  When the brain was cut originally.

13  Q   Okay.  Now, I'm looking at -- on the right side at the

14  first image.  You see that one there?

15  A   Yes.

16          THE COURT:  The one on the top?

17          MR. GOODFRIEND:  The one on the top.

18  BY MR. GOODFRIEND:

19  Q   Dr. Teas, in showing you this first piece on the top of

20  the right slide, you're not sure what that is, what part of

21  the brain?

22  A   I'm not sure that that is the -- the -- I cannot see any

23  landmarks on it to recognize it and say that's the frontal.

24  Q   But Dr. Rorke-Adams did identify that as the front?

25  A   Right.  And she could be right.  I'm not saying that she's

Teas - cross

1  wrong so --

2  Q   And then on the left, this is your Slide No. 4, and in

3  the -- on the left side there's two rows?

4  A   Yes.

5  Q   Okay.  And I'm going to point to the -- the row on the

6  right, is this the same piece that's on -- and I'm pointing to

7  the top piece.  Is that the same piece that's on the slide

8  over here on the top?

9  A   Yes.

10  Q   Now, it looks like it's inverted or flip-flopped.

11  A   It could be.  Because they came from prints and they're

12  not -- you know, so it's how they were scanned.  I don't know.

13  I'd have to look at the -- I was just trying to put that one

14  picture so that I could get them all in a row.

15  Q   Okay.  So you might have inverted the image?

16  A   I could have, or that's how I got it.  I don't know what

17  it is.  Because I had to put them in every which way to try

18  and figure out if I can figure out how the slices are going.

19        THE COURT:  When you say you scanned them, you had a

20  print.

21        THE WITNESS:  Correct.

22        THE COURT:  You put it through a scanner.

23        THE WITNESS:  Correct.

24        THE COURT:  Okay.

25  BY MR. GOODFRIEND:

1  Q   So in some way -- in some form or fashion you may have

2  inverted the slides when you were putting the exhibits

3  together?

4  A   Or I may have gotten it that way.  I don't know.  I'd have

5  to go back and compare them.

6  Q   Okay.  Could we go to --

7  A   How they were printed.

8  Q   -- No. 2.

9      Okay.  And in terms of our slide comparison, in the

10  second slide we have here, on the left side it says Teas Slide

11  4 inverted horizontally, and then on the right side we have

12  the original autopsy photo; is that correct?

13  A   Yes.  It would be just how it's laid out.  It's still the

14  same thing.

15  Q   Okay.  And the original autopsy photo on the right here,

16  that's what was taken at the time of Isabella's autopsy?

17  A   Yes.  Those are the same pictures.

18  Q   Okay.  And it was organized according to the images on the

19  right under original autopsy photo; is that correct?

20      THE COURT:  I don't understand the question.

21      THE WITNESS:  I don't understand.

22      THE COURT:  Hang on a second.  I'm going to have him

23  rephrase the question, make sure I get it right.

24      MR. GOODFRIEND:  Yeah.  Let me rephrase the question.

25  BY MR. GOODFRIEND:

1  Q   On the right is the -- what's labeled the original autopsy
2  photo; is that correct?
3  A   Yes.
4  Q   And then on the left it says Teas Slide 4 inverted
5  horizontally; is that correct?
6  A   Yes.
7       THE COURT:  That's what it says.
8  BY MR. GOODFRIEND:
9  Q   Okay.  And that's our labeling there.  And in terms of the
10 slide on the left, that's one that you prepared?
11 A   Yes.
12      MR. GOODFRIEND:  Okay.  Next slide, please.
13 BY MR. GOODFRIEND:
14 Q   Now, you indicated that you could not tell the anterior
15 from the posterior; is that correct?
16 A   I could not tell exactly what they are because I don't
17 have any of the landmarks that I would see with each of those
18 slides.  I could tell that the one that's on your photograph
19 on the right, the second slice is probably more posterior, but
20 I -- I could not recognize anything in the second frontal
21 slide to say that is definitely the frontal.
22 Q   Now, and Dr. Leestma looked at these photos too; is that
23 correct?
24 A   Yes.  I think he did.
25 Q   And could you tell Judge Kennelly what is depicted under

1  Teas Slide No. 5?

2  A   I should tell you?

3  Q   Tell us what's depicted.

4  A   That is actually from -- and I don't think it was used in

5  my Power Point.  This is -- I took it from a textbook actually

6  trying to explain as to how I should see what landmarks to be

7  able to say that that is definitely the frontal and to try and

8  say whether that slide came from the rectus gyrus or not.

9  Q   Okay.  Now, in Teas Slide No. 5 in the upper left-hand

10  corner, is that the front of the brain?

11  A   That's the front of the brain.

12  Q   And if we go down on the left side.

13          THE COURT:  Wait a second.  On Teas Slide No. 4 in

14  the which corner?

15          MR. GOODFRIEND:  I'm sorry, Judge.  Maybe can I

16  stand --

17          THE COURT:  No.  Just tell me.  I didn't hear what

18  you said.  Upper left?

19          THE WITNESS:  Yes.

20          MR. GOODFRIEND:  In Teas Slide No. 5 in the upper

21  left-hand corner of that.

22          THE COURT:  That's the front.

23  BY MR. GOODFRIEND:

24  Q   Is that the front?

25  A   It's the front.  It's the second slide, not the first

1    slide.

2    Q    But it's from the front?

3    A    It's from the front.

4    Q    And in terms of progression --

5    A    Yes.

6    Q    -- the middle slide on the left would be going front to

7    back?

8    A    Correct.

9    Q    And the third slide would go, once again front to back

10   would be the next cut?

11   A    Correct.

12   Q    And the slide in the upper right-hand corner would be

13   labeled the fourth cut?

14   A    Correct.

15   Q    And then there's the fifth cut?

16   A    Right.

17   Q    And then there's the sixth cut?

18   A    Right.

19   Q    And it went from anterior to posterior?

20   A    Correct.

21   Q    So the slide in the lower right-hand corner is posterior

22   in terms of the order?

23   A    Correct.

24        MR. GOODFRIEND:  Next slide, please.

25   BY MR. GOODFRIEND:

1  Q   Now, basically we've had the same image there, but now
2  we've added that the -- Teas Slide No. 5 we have in the upper
3  left-hand corner front of the brain and back of the brain; is
4  that correct?
5  A   Correct.  Excepting I don't know what your ones, twos and
6  threes mean.  That's not the first slice.  That's the second
7  slice.  And you really don't have the last slice either.
8  Q   When you say I don't have the first slide, what do you
9  mean?
10          THE COURT:  First slice.
11          MR. GOODFRIEND:  First slice?  Oh.  Okay.  The first
12  slice.
13  BY MR. GOODFRIEND:
14  Q   Okay.  So we don't have the first slice?
15  A   Right.
16  Q   And we don't have the last slice?
17  A   Yes.
18  Q   So there should be eight slides in Teas Slide No. 5 if
19  we're going to show all the cuts?
20  A   Honestly, that's from a textbook.  You can have eight
21  slices, you can have ten, you can have six.  It depends on how
22  you cut the brain.  So it depends on how thick you cut them,
23  but what I'm telling you that that is from Helen Whitewall's
24  book, textbook, and the first slice was on another page, so I
25  didn't put it in there.

1  Q    Now, in comparing Teas Slide No. 5 with the original

2  autopsy photos, are you able to determine based on the

3  original autopsy photos what is the front of the brain and

4  what is the back of the brain?

5  A    Well, I can determine somewhat the slices, but I can't

6  determine all of them, and I think that's what I said.

7  Q    Well, in terms of conducting the autopsy, did the doctor

8  in terms of his autopsy photos arrange them from front to

9  back?

10  A    Well, we usually arrange them from front to back, so I --

11  and then when I'm looking at his cerebellum and pons and

12  midbrain, they don't seem to be necessarily arranged in order,

13  so I don't know what order Dr. Harkey follows, or if he

14  follows an order, or that one -- some of the slices were

15  misplaced, so I'm not drawing any conclusions from that.

16  Q    But when an autopsy is done, do the individuals, whether

17  they be medical examiners or coroners, arrange them usually in

18  a front to back order?

19  A    We usually try to.

20  Q    So then in terms of what's called the original autopsy

21  photo, the eight slices on the right could have been arranged

22  from anterior to posterior?

23  A    They could have.

24         MR. GOODFRIEND:  Okay.  And the next slide, please.

25  BY MR. GOODFRIEND:

Teas - cross

1  Q   Now, in terms of the numbers that we have put up, we have

2  labeled on the Teas Slide No. 5 now six different numbers; is

3  that correct?

4  A   Yes.

5  Q   And in terms of the number one, that's the front of the

6  brain and number six is the back of the brain?

7  A   Yes.

8  Q   Now, in terms of looking at the original autopsy photos,

9  does it appear that Dr. Harkey arranged them going from the

10  front to the back?

11  A   I -- I'm saying they could have, and that's what I said.

12  Excepting I can't recognize any anatomical landmarks on one,

13  two or -- on the one that you haven't labeled and what you

14  label as one and two.  They very well could have been arranged

15  in that fashion.

16  Q   Aren't the original autopsy photos similar to your Teas

17  No. 5 in showing the different slices of the brain?

18  A   What -- and that's what I said, that what you've labeled

19  as number six from the textbook and what's six here, they look

20  similar.  That's why I know that is posterior, because that's

21  the shape of the ventricles posteriorly.  And what you've

22  labeled as number three looks like -- looks like it could be

23  what's labeled as number two from the textbook.

24          You got to realize these slices are not taken at

25  exactly the same distance to see the anatomical structure, so

Teas - cross

1    when you can see some of the anatomical structures, you can

2    recognize that if it's front to back.  And also when you're

3    cutting the brain, you slice it, and you have to be very

4    careful that you put it in that order because you turn it

5    around and it's the same -- it's the same slice but just a

6    little different.

7              So I'm not -- I can't take this one picture and look

8    at it and say that's exactly how they're arranged.  They may

9    be arranged --

10   Q    So it's possible that Dr. Harkey arranged the original

11   autopsy photos from front to back according to basically our

12   numbers and the way they're placed?

13   A    It is.

14   Q    And Dr. Rorke-Adams could be right that the front of the

15   brain -- and I'm going to point to it.  She might be right

16   that this image right here is the anterior; is that correct?

17   A    She could be right.

18             MR. GOODFRIEND:  And I'm -- Judge, for the record I'm

19   pointing to the image above --

20             THE COURT:  Right.

21             MR. GOODFRIEND:  -- number one.

22             THE COURT:  The one that was described as gnarly

23   before.

24             MR. GOODFRIEND:  Right.

25   BY MR. GOODFRIEND:

Teas - cross

1   Q   Now, in terms of your testimony today, did you rely on the

2   report or reports given by Dr. Leestma?

3   A   I read his report. I actually consulted with him. I sat

4   and looked at the slides with him, looked at the pictures,

5   and, you know, so, yeah, I consulted with him. I don't know

6   what you mean by relying. When I --

7   Q   Well, did you --

8   A   -- consult with another physician I usually discuss the

9   issues.

10   Q   After you got the slides back from Loyola, you and

11   Dr. Leestma sat down and looked at the slides under a

12   microscope?

13   A   I actually looked at it under my microscope before, and

14   then I had a meeting with him, and we looked at it together,

15   and he has a camera attached to his microscope, and he took

16   some of the photographs that he used in his Power Point.

17   Q   And in terms of his first report, you reviewed that; is

18   that correct?

19   A   Yes.

20   Q   And in terms of the report Dr. Leestma made of August

21   20th, 2012, he concluded in that report that he was not able

22   to discover any vessels that appeared to contain thrombi?

23   A   Yes.

24         And we're talking of two different things. I think

25   it's really a nonissue. The big black mark that you saw on

Teas - cross

1    the slide that you showed, that was marked by me.

2    Q    Okay.  But that was his conclusion, right?

3    A    Yes.

4    Q    And you had looked at the same slide him with; is that

5    correct?

6    A    Yes.

7    Q    Was that your conclusion also, that you were not able to

8    discover any vessels that appear to contain thrombi?

9    A    There were no vessels that I would say that were

10   consistent with CVT.

11   Q    And you did not find any evidence of any cortical veins

12   that had fibrin platelet thrombi; is that correct?

13   A    There were veins, small veins that had fibrin thrombi.

14   Q    Well, that's not what Dr. Leestma reported, was it?

15   A    You know, I had -- I was already writing my report based

16   on what -- I didn't really sit and compare as to what he wrote

17   on each one.  He took a photograph of that, and I think it's

18   there in his Power Point, so we can look at that again.

19            MR. GOODFRIEND:  Excuse me one second, Judge.

20            Judge, these are the two Leestma reports.

21   BY MR. GOODFRIEND:

22   Q    And in Dr. Leestma's original report, I'm going to ask you

23   to read the last line of his report -- I mean the second --

24   the last full paragraph, last line.

25   A    So you want me to read the last one:  "Accurate aging and

1  dating of this process is not possible.  I was not able to

2  discover any vessels that" --

3         THE COURT:  Slow down.  She's still got to take it

4  down.

5         THE WITNESS:  Sorry.

6  BY MR. GOODFRIEND:

7  Q   Under Conclusions.

8  A   All right.

9  Q   You're reading under Conclusions?

10  A   Yes.

11  Q   Go ahead.

12  A   "Accurate aging," is that where you want me to start?

13  Q   Actually, just read the last sentence, "I was not able

14  to."

15  A   "I was not able to discover any vessels that appear to

16  contain thrombi."

17  Q   And then he wrote an amended report dated December 14th.

18  How does the last -- same sentence read, where it says, "I was

19  not able to"?

20  A   "I was not able to discover any vessels that appear to

21  contain thrombi," and in brackets, "in the sections of the

22  dura, but some small cortical veins had fibrin platelet

23  thrombi."

24  Q   So Dr. Leestma changed his report from the sentence you

25  read from the original report on August 20th and the report of

Teas - cross

1  December 14th, 2012?

2  A    I think it's totally immaterial.  He did change it, but I

3  think it's immaterial.

4  Q    Well, do you know the circumstances that precipitated

5  Dr. Leestma preparing a second report?

6  A    No, I don't recall, but it very well could have been that

7  I said, Jan, that there are some fibrin thrombi in this little

8  infarct that I had marked with a big black dot.

9  Q    Well, did you have a conversation with him prior to

10  testifying in this case about his report?

11  A    Well, I was told that he added that, and I felt like, gee,

12  there's no need to do it, because I think it's totally

13  immaterial.  It's not related to cortical vein thrombosis.

14  That is probably secondary to Isabella having DIC terminally.

15  And the reason I marked that area is to show that there was a

16  little area of infarction in the brain, and there were

17  multiple little areas of infarction in the brain that are real

18  like infarct, that you would call them strokes.  They're not

19  just laminar necrosis that we see with generalized

20  hypoxic-ischemic changes.

21  Q    I'm not sure if you answered my question, but did you talk

22  to Dr. Leestma about the fact that he omitted information in

23  his original report?

24  A    You know, I don't remember having any extensive

25  conversation with him.

Teas - cross

1    Q    I think you indicated at the beginning of your testimony

2    that currently you're not doing autopsies?

3    A    Correct.

4    Q    And also in your curriculum vitae, you've been a physician

5    for approximately 40 years?

6    A    Yes.  I guess.

7    Q    Well, in your 40 years of experience, have you conducted

8    any research, written any articles or made any presentations

9    regarding the cause of subdural hemorrhages in children?

10   A    I haven't done any research.  I've done a lot of

11   autopsies.  I have given talks on subdural hemorrhages in

12   children.

13   Q    Now, in terms of your giving presentations or talks

14   regarding subdural hemorrhages in children, you did submit for

15   the court the curriculum vitae where you list your

16   qualifications as well as what you've done throughout your

17   career; is that correct?

18   A    Yes.

19   Q    I'm going to direct your attention to our Exhibit No. 70.

20        THE COURT:  Seven, zero?

21        MR. GOODFRIEND:  I think it's seven, zero, yes,

22   Judge.

23        THE COURT:  Oh.  It's the same thing.

24        MR. GOODFRIEND:  Yeah, it's the same thing.  I just

25   put it together.  That's all.

Teas - cross

1  BY MR. GOODFRIEND:

2  Q   Okay.  Is that a copy of your curriculum vitae that you

3  submitted in this case?

4  A   Yes.

5  Q   And in terms of your submission this is -- this is -- it's

6  three pages?

7  A   Yes.

8  Q   And it's your total curriculum vitae?

9  A   Yes.

10 Q   And it lists publications and presentations?

11 A   Yes.

12 Q   In the publications and presentations section, do you list

13 the fact that you gave any presentations regarding the cause

14 of subdural hemorrhages in children?

15 A   You know, I just list the publications and presentations

16 that I give at meetings.  I never kept track of any of the

17 lectures that I gave.

18 Q   Well, in terms of your years as a physician, have you

19 conducted any research, written any articles or made any

20 presentations regarding the cause of retinal hemorrhages in

21 children?

22 A   No, I haven't.

23 Q   In your time as a doctor, have you written any papers,

24 conducted any research or made any presentations in the cause

25 of cerebral edema in children?

Teas - cross

1   A   No.

2   Q   Have you done any lectures or presentations regarding the

3   birth process and subdural hemorrhages in children?

4   A   No.

5   Q   Have you done any research or given any lectures in the

6   cause of cortical venous thrombosis in children?

7   A   No.

8   Q   Have you done anything in terms of the relationship of

9   subdural hemorrhages and cortical venous thrombosis in

10  children?

11  A   No.

12  Q   And in terms of Exhibit No. 70, on the third page have you

13  listed all of your publications and presentations?

14  A   Most of them.  There's one that I haven't listed that's

15  missing.

16  Q   So there would be -- you'd add one more?

17  A   One more.  Maybe I -- I don't know.  There may be more.

18  The one I remember is because --

19  Q   So you might have 14 presentations and publications?

20  A   Correct.

21  Q   In terms of your testimony involving head trauma of

22  children, in the last three years have you testified in a case

23  involving head trauma to a child?

24  A   Yes.

25  Q   How many times?

1  A   You know, I gave you my list.  I don't memorize them, so

2  I -- if you have a copy, maybe I can look at them.

3  Q   If you go to Exhibit No. 85, your testimony is listed

4  there.

5  A   Okay.

6  Q   Can you tell me which case in the last three years

7  involved testimony involving head trauma to a child?

8  A   Okay.  I -- People versus Delashia Wyatt was a child.

9  Q   And in the Delashia Wyatt case you testified for the

10 defense; is that correct?

11 A   I testified for the defense, though I thought I would have

12 called that case a homicide.

13 Q   Okay.

14 A   And --

15 Q   But you testified for the defense?

16 A   Correct.

17 Q   Okay.

18 A   Because --

19 Q   What other cases involved --

20 A   Then I testified for Texas versus James Fernandez this

21 past year.

22 Q   And that was a head case involving trauma to a child?

23 A   Correct.  Both of these were impact traumas.

24 Q   Were what?

25 A   Impact trauma to the head.

Teas - cross

1  Q   Okay.  But you testified for the defense?

2  A   I did.

3  Q   And when you testified for the defense, did you help the

4  defendant in terms of asserting a defense?

5  A   You know what, I actually testified to my evaluation of

6  the case, and the other thing I did was help the attorneys who

7  were defending the case understand the issues.

8  Q   Okay.  Now, in 2011 we have listed your testimony; is that

9  correct?

10 A   Yes.

11 Q   That's your -- from your -- what you supplied to us?

12 A   Yes.  Those are the ones I have.

13 Q   And in terms of the cases which were criminal cases, did

14 you testify for the defense?

15 A   Yes.

16 Q   And in terms of those cases, it would be People versus

17 Murphy, People versus Medley, People versus Wilborn, People

18 versus Cook, People versus Avila, and People versus

19 Caulsinski, C-a-u-l-s-i-n-s-k-i?

20 A   Correct.

21        Actually, in the interest of Kalinowski was also a

22 baby.

23 Q   In how many of these cases that I just read off were cases

24 involving trauma to a child?

25 A   They were all alleged traumas.

Teas - cross

1  Q   Okay.  All of them alleged trauma to a child?

2  A   Correct.

3  Q   And you testified for the defense in all those cases?

4  A   Yes.

5  Q   What about in 2010?  There's a number of cases listed

6  which were criminal cases; is that correct?

7  A   Yes.

8        So do you want me to read them?

9  Q   Just read it -- tell me which ones are the criminal cases

10  in which --

11  A   Kalinowski, which is actually the same case that I

12  testified in juvenile court on 2011.  People versus Joe

13  Mendez, People versus I think Justin Taylor.

14  Q   What about People versus Claudia Jimenez-Cedillo?

15  A   You know, that may have been a baby because it's out of --

16  yeah, that was a baby too.  That was a child.  I think it was

17  an older child.

18  Q   People versus Sims?

19  A   No.  I don't think that was a child.

20  Q   Maybe I'm confused.  How many of those criminal cases in

21  2010 involved trauma to a child?

22  A   Five.  Five out of the eight, I think, so --

23  Q   And out of the five that involved trauma to a child, you

24  testified for the defense?

25  A   Yes.

Teas - cross

1  Q   How many of them involved head trauma to a child?

2  A   You know, I don't remember.  The Joe Mendez may have been

3  abdominal trauma.  The others were probably head.  Most of the

4  traumas are due to the head.  There are some to the abdomen.

5  Q   In terms of your income in the last three years, does it

6  strictly come from being a consultant and testifying in civil

7  and criminal cases?

8  A   Most of the time, yes.

9  Q   In terms of --

10 A   I've done a few autopsies here and there.

11 Q   In terms of 2010 how much would you say you earned as an

12 expert witness testifying in court?

13 A   You know, an expert witness testifying in -- I think it

14 was probably not a big percentage because, as you see, I don't

15 testify that often, so I really don't keep a record of where

16 my income is coming from.  Actually I don't even know what my

17 income was.

18 Q   Okay.  And are you -- do you know your income from

19 testifying or being retained as an expert witness in 2011?

20     THE COURT:  So you're actually wanting me to let you

21 put on the public record what somebody's income was?  Really,

22 seriously?

23     MR. GOODFRIEND:  I can withdraw --

24     THE COURT:  Do you think that has some material

25 probative value?  Because if you do, tell me right now so I

Teas - cross

1  can figure it out.

2        MR. GOODFRIEND:  Judge, I'll agree with you.  It

3  probably has slight or minimal value, so I'll move on.

4        THE COURT:  Good.  My sentiment exactly.

5        THE WITNESS:  I can add a sentence to that.

6        THE COURT:  You don't have to answer the question.

7  BY MR. GOODFRIEND:

8  Q   Dr. Teas, do you believe that a child can suffer subdural

9  hemorrhage or subarachnoid hemorrhage by being shaken?

10 A   I have to say that I have not seen evidence to draw the

11 conclusion that subdural or subarachnoid hemorrhage can result

12 from shaking.

13 Q   Do you believe that a child can suffer retinal hemorrhages

14 by being shaken?

15 A   Again, my answer would be the same.  It's not my belief

16 that counts.  It's what the science tells me.

17 Q   And have you ever diagnosed a child as being a victim of

18 what we know as shaken baby syndrome?

19 A   I have never used the terminology shaken baby syndrome on

20 a death certificate, though I have to say when I went back and

21 looked at all my cases that I did when I was at the medical

22 examiner's office, I was calling them blunt trauma.  I would

23 say chronic subdural due to blunt trauma.

24 Q   But in those cases there was some evidence of blunt

25 trauma?

Teas - cross

1    A    Sometimes there was, sometimes there was not.  There's no

2    way for me to -- I would love to go back and reevaluate all

3    those cases.

4    Q    So are you saying when you went back and looked at your

5    cases there were some cases involving shaken baby syndrome

6    where there was not trauma?

7    A    No.  I don't know.  I -- there's no way.

8    Q    I'm sorry.  Impact, impact trauma or injury to the head.

9    A    There is no way because I don't have access to those

10   records, but I keep a -- I used to keep a log when I was at

11   the ME's office, so I went through my log to see what was I

12   calling these cases, and so I only have like the name, the

13   case number and the cause of death and that I called it a

14   homicide.  I don't have any other information.

15           I -- what got me thinking on this is a case that I

16   had at the medical examiner's office back I think it was in

17   1989 or '90 where I had a kid that came in as so-called shaken

18   baby syndrome after being at two different hospitals, and I

19   was just proceeding with my autopsy thinking that this is

20   shaken baby syndrome, all I have to do is take the brain out,

21   document it and I'm done.  And I actually discovered that the

22   baby had really actually died of asphyxia because I discovered

23   a backing of an earring in the bronchus of the child.  The

24   child was like ten or eleven months old.

25           And so I investigated the case and actually drew the

1  conclusion that the child died of asphyxia and then had a huge

2  discussion with Dr. Kirschner, who was a big believer who

3  worked with me, that the subdural probably had nothing to do

4  with it and it was either the extensive resuscitation, at that

5  time I believed it was the resuscitation that caused the

6  subdural and the retinal hemorrhages.  I don't remember the

7  extent or what it was.  So I refused to call it a homicide.

8  Q  Now, in terms of this case, did you ask some of the

9  petitioner's other experts to testify in this case?

10  A  No, I did not.  Actually --

11  Q  Did you -- I mean were you the one who contacted

12  Dr. Barnes, or did the law office contact Dr. Barnes?

13  A  Oftentimes when I get these cases I just send the

14  radiology --

15       THE COURT:  Just answer him.  Okay.  It's 4:15 in the

16  afternoon.

17  BY THE WITNESS:

18  A  I did not ask him to testify.  I just asked him to write a

19  report for me.

20  BY MR. GOODFRIEND:

21  Q  Did you contact Dr. Mack?

22  A  Again, I asked her to look at the CT's.  I actually didn't

23  even ask her to write a report for me, but after I talked to

24  her, I said, "Would you just write me a report."

25  Q  Did you contact Dr. Leestma?

Teas - cross

1  A   I contacted Dr. Leestma to go and examine the brain with

2  me, and then I told him, "Would you just write this report.

3  You probably do not have to testify."

4  Q   Did you contact Dr. Scheller?

5  A   I gave Dr. Scheller's name to Jodi Garvey.  She contacted

6  him.

7  Q   Did you contact Dr. Prange?

8  A   No.  Actually I did not even give her Dr. Prange's name.

9  Q   What about did you contact Dr. Lantz?

10 A   I did.  I gave her -- I gave Jodi Garvey Dr. Lantz's

11 email, and he didn't respond to her, and so then I contacted

12 him and said, "Would you just look at the eyes and write a

13 short report.  You may not have to testify," is what I told

14 him.

15 Q   In terms of Dr. Barnes, have you testified in other cases

16 with Dr. Barnes?

17 A   Yes.

18 Q   Approximately how many other cases have you testified with

19 Dr. Barnes?

20 A   You know, I really don't keep a track.  I -- I -- I like

21 the way he reads radiology.  I've tested him a couple of times

22 on cases that I know the pathology and he doesn't.  And so

23 I -- I've learned how to read his -- in the lines, the

24 language he writes in his report.  So I often send him CT's

25 and tell him just to write me a report.

1                    I don't even give him a lot of clinical information.
2       I may just say can you comment on whether there is any impact
3       or things like that to him.
4       Q    I guess my question was how many cases have you contacted
5       Dr. Barnes on to work with you?
6       A    I -- recently I haven't been sending him that many cases.
7       Maybe a dozen.
8       Q    Okay.  Have you testified or used Dr. Mack in other cases
9       besides this one?
10      A    This is the first time I've asked Dr. Mack to write a
11      report for me, though I have informally had a -- have a look
12      at some CT's to, that I have questions.
13      Q    Have you testified or talked to Dr. Leestma about other
14      cases?
15      A    Oh, yes.  Many times.
16      Q    How many times would that be?
17      A    Oh, many times.
18      Q    When you say --
19      A    I don't --
20      Q    -- many, would that be over 20 times?
21      A    It could be.  I don't know over the years.
22      Q    Have you testified or worked with Dr. Lantz in other
23      cases?
24      A    I -- you know, I don't recall, but it's -- it's possible.
25      I've talked to him.  I've had discussions with him about

Teas - cross

1    retinal hemorrhages.

2    Q    Before -- I'm sorry.  Let me strike that.

3         Before testifying today did you at some point in time

4    review Dr. Barnes's amended report of December 13th, 2012?

5    A    I did.

6    Q    In terms of Dr. Barnes's report of December 13th, 2012,

7    did you participate in the writing of that report in any way?

8    A    No.  I kind of read it and edited it maybe, but I don't

9    even think I did any editing.  I read it.

10   Q    Did you read it before he submitted it for -- as a

11   completed document?

12   A    You know, it may have been, yes.

13   Q    Now, I think you -- you indicated that there was a

14   clinical history prepared in this case.

15   A    Yes.

16   Q    And I think you also indicated that other people besides

17   you worked on preparing the clinical history.

18   A    Yes.

19   Q    Who else worked on preparing the clinical history besides

20   you?

21   A    Well, Heather Kirkwood, the attorney who was helping the

22   attorney on the case, the attorneys on the case, actually

23   prepared it, but I had -- I had gone through the records with

24   her previously.  She was in town for another matter, and she

25   was helping the attorneys understand the issues, so she spent

Teas - cross

1  a lot of time with them explaining things to them, and so I'd

2  gone through the records, and I don't know exactly when she

3  wrote it, but she wrote it, and it was sent to me, and I was

4  told that it needed to be submitted the next day, and I was --

5  and I remember I was up till 1:30 trying to figure everything

6  out.  But then all the -- all other records had these

7  different numbers, you know, for giving references to.  And so

8  finally Mr. -- the attorneys told me just send it to us and

9  they'll do the references.

10 Q   But it was Attorney Cook that prepared the document?

11 A   It was Kirkwood is her name.

12 Q   I'm sorry?

13 A   Kirkwood.

14 Q   Kirkwood.

15 A   Yeah.  But she had -- I helped her with it.

16 Q   Okay.

17 A   I helped her go through the records.

18 Q   Now, in terms of your evaluation of this case, did you

19 look at the pregnancy of Barbara Zielinski to determine if

20 there was any abnormalities or illnesses that she had before

21 she delivered Isabella?

22 A   I looked at the records that I got on Barbara Zielinski.

23 Q   Well, would you say that the prenatal course was

24 uneventful?

25 A   Yes.

Teas - cross

1   Q   Now, in terms of the birth of Isabella, did you -- you

2   indicated that it was a traumatic birth; is that correct?

3   A   I don't know if I said that.  I think I said that it

4   wasn't as atraumatic as some people may think.  I don't think

5   just looking at it we'd say that there was great birth trauma.

6   Q   But there were several reasons that you thought that there

7   were some aspects of either trauma or irregularity in the

8   birth; is that correct?

9   A   I thought that there were some changes that suggested that

10  Isabella had some hypoxia during the delivery process.

11  Q   That she had hypoxia during the delivery process?

12  A   Yes.

13          MR. GOODFRIEND:  Excuse me one second, Judge.

14          THE COURT:  Sure.

15  BY MR. GOODFRIEND:

16  Q   Dr. Teas, do you have your report in front of you?

17  A   Yes.

18  Q   And in terms of your stating that Isabella Zielinski had

19  hypoxia during birth, did you make any notation of that in

20  your report?

21  A   You know, I don't know if I just said she had hypoxia.  I

22  described some of the things that would indicate that she had

23  hypoxia.

24  Q   Well, you just stated that she -- you believe she had

25  hypoxia during birth.  Did you use the word "hypoxia" when you

Teas - cross

1  described the birth of Isabella Zielinski?

2  A  No.

3  Q  Now, in terms of the birth, what else did you consider in

4  saying that there were some irregularities or some kinds of,

5  well, maybe trauma in her birth?

6  A  Okay.  There were -- there were -- there was the

7  decelerations that were noted.  I don't know how extensive

8  they were because I did not get any of the tracings.  Those

9  are things that usually lawyers who are looking at birth

10  trauma usually get so you can evaluate it much better.

11      Then the fact that there was a neonatologist called

12  to the delivery room, that means -- it indicates that this was

13  a relatively high risk birth because neonatologists are not

14  usually in attendance for all deliveries.

15      And then they used suction right after she was born,

16  at least for a short time.

17      Then she had physical findings that could be

18  associated with birth trauma, and that included the

19  cephalhematoma and the caput that has been described and gone

20  through.

21  Q  Well, in terms of her birth, do you know what a vertex

22  birth is?

23  A  Yes.

24  Q  What is a vertex birth?

25  A  It means that you're headfirst.

1  Q  And that is the preferable way for that baby to be born?

2  A  Yes.

3  Q  In terms of any risk factors, did Barbara Zielinski before

4  she delivered the child, were there any antenatal risk

5  factors?

6  A  You know, I did not see any in the records that I had

7  excepting that she was 35 years old, so --

8  Q  In terms of labor and delivery complications, you

9  mentioned two of them, is that correct, the meconium and the

10  variable decelerations?

11  A  Correct.

12  Q  Now, in terms of the meconium stained amniotic fluid, it's

13  not that unusual for an infant to have that or a baby to have

14  that upon birth, is it?

15  A  It's -- it's not unusual.  It doesn't indicate that it's a

16  calamity.  But it indicates that maybe there were some periods

17  of -- associated with the deceleration that there were some

18  periods of hypoxia that she may have had intrauterine.

19  Q  You said it might indicate hypoxia?

20  A  Yes.

21  Q  When you wrote your report in this case, in terms of the

22  birth did you mention the word "hypoxia"?

23  A  No, I didn't.

24  Q  In terms of the meconium stained amniotic fluid, that's

25  why the neonatologist was called, right?

Teas - cross

1    A    Correct.

2    Q    And once the baby was born, they discovered there was no

3    meconium below the vocal cords; is that correct?

4    A    Yes.

5    Q    So the fact that there was no meconium below the vocal

6    cords indicated that they weren't concerned necessarily that

7    the child would get pneumonia?

8    A    Yes.  But the fact that there was meconium in the amniotic

9    fluid, that's why the neonatologist was called, that this

10   might be a baby who might have -- may need more care at birth.

11   Q    Well, in terms of the more care after birth, did Isabella

12   have to go to the neonatology unit or any special unit after

13   birth?

14   A    No.  She was fine.

15   Q    In terms of the variable decelerations during delivery,

16   would you agree that some patterns of variable decelerations

17   are considered to be a normal phenomena?

18   A    To a certain extent.  Whenever there's a contraction, the

19   heart rate of the fetus may go down.  But if it's going down

20   significantly, so if it's going down to say 60 beats per

21   minute, there is concern that that fetus will suffer some

22   hypoxia.

23   Q    There's no indication in the records in this case that

24   Isabella had hypoxia, is there?

25   A    There is no indication that she had any hypoxia of any

Teas - cross

1    significance.  I do not know what her decelerations are or how

2    extensive they were.

3    Q    Have you had experience in delivering children in any way?

4    A    Yeah.  I actually was going to become and obstetrician,

5    and I delivered children and a child who had severe

6    deceleration.

7    Q    How long ago was that?

8    A    It was 31 years ago.

9    Q    And in terms of this delivery, it was a spontaneous

10   delivery?

11   A    Yes.

12   Q    That would be normal?

13   A    Yes.

14   Q    There were no forceps used?

15   A    Yes.

16   Q    Correct?

17   A    Yes.

18   Q    And there was no -- extraction was not necessary?

19   A    Yes.

20   Q    And all these three things that I said, those indicate a

21   normal delivery; is that correct?

22   A    Even if you use forceps and maybe a ventouse extraction,

23   it still may be considered normal.

24   Q    And she came out headfirst?

25   A    Yes.

Teas - cross

1  Q   And Isabella was delivered about five hours after
2  admission?
3  A   Approximately.  I don't remember the time.
4  Q   So these are all good signs in terms of how the birth
5  went?
6  A   Yes.
7  Q   Now, in terms of the occipital caput and the right
8  cephalohematoma, you indicated that those might be signs of
9  some abnormalities; is that correct?
10 A   They could.  Not necessarily so.
11 Q   Okay.  And it's not unusual for a -- an infant to have an
12 occipital caput, is it?
13 A   The caput is not unusual, right.
14 Q   Now, did you review the pediatric records in this case?
15 A   Yes.
16 Q   Now, in the pediatric records in this case, after delivery
17 through December 27th, was there any mention in those records
18 of any problems with the occipital caput?
19 A   No.
20 Q   And in terms of the pediatric records, the words occipital
21 caput are not even mentioned; is that correct?
22 A   No, they're not.
23 Q   It wasn't noted at any other examination?
24 A   Correct.
25 Q   In terms of the cephalohematoma, it was noted at birth; is

Teas - cross

1   that correct?

2   A   Correct.

3   Q   After it was noted at birth was there any mention of

4   cephalohematoma in the pediatric records between September 6th

5   of 2002 and December 27th of 2002?

6   A   No.

7   Q   Now, at birth I think you indicate in your report that

8   Isabella needed oxygen for two to three minutes?

9   A   Yes.

10  Q   That's not unusual for a child, is it?

11  A   I don't know.  I don't think it's unusual.  I don't know

12  how many children need oxygen for two to three minutes.

13  Q   In terms of her transition off the oxygen, she made a

14  excellent transition off the oxygen to normal breathing; is

15  that correct?

16  A   Yes, she did.

17  Q   Now, in terms of her Apgar scores, what is an Apgar?

18  A   An Apgar score, I think we've been through this several

19  times, it measures heart rate, respiratory rate, color,

20  reflexes and tone, and each is given two or one or zero,

21  depending on what it is.  And so she was either eight and nine

22  or nine and nine at one and five minutes, which are the

23  important ones, because the neonatologist noted that she was

24  eight and nine, and the nurse noted she was nine and nines.

25  Q   So in terms of the Apgar scores, Isabella Zielinski had

Teas - cross

1    excellent Apgar scores?

2    A    She had good Apgar scores.

3    Q    In terms of the birth in terms of the head circumference

4    you've talked about that; is that correct?

5    A    Yes.

6    Q    She was in the 50th percentile at birth.

7    A    Actually when she was born, if you mark it correctly, she

8    was somewhere between the 25th and the 50th.  She was not

9    quite at the 50th.

10   Q    Well, in your report you say that she was at the 50th

11   percentile?

12   A    In the medical history part?

13   Q    No.  In your report.  Page 2, first full paragraph.

14        THE COURT:  That's in the medical history part.

15        MR. GOODFRIEND:  Oh.  I was --

16   BY MR. GOODFRIEND:

17   Q    And at birth Isabella Zielinski's neurological exam was

18   normal?

19   A    Yes.

20   Q    Her hearing exam was normal?

21   A    Yes.

22   Q    There were no neurological issues?

23   A    None, that I could see in the records.

24   Q    In terms of her initial newborn visit, that occurred on

25   September 13th of 2002; is that correct?

1    A    Yes.

2            MR. GOODFRIEND:  Judge, I'm going to Exhibit No. 74.

3    BY MR. GOODFRIEND:

4    Q    Dr. Teas, in that exhibit book could you look at Exhibit

5    No. 74, please.

6    A    Yes.

7    Q    Now, in terms of -- this is Elizabeth -- I'm sorry,

8    Isabella Zielinski's newborn visit for September 13th, 2002;

9    is that correct?

10   A    Correct.

11   Q    And in terms of her developmental history at the bottom,

12   do you see that?

13   A    Yes.

14   Q    Okay.  And in terms of the developmental history, they

15   made some observations about Isabella at that time; is that

16   correct?

17   A    Yes.

18   Q    And she fixes, meaning, I guess, her eyes fixated on some

19   type of movement?

20   A    Or object, yes.

21   Q    She moved her extremities, all four of them?

22   A    Yes.

23   Q    She responded to loud noises?

24   A    Yes.

25   Q    So at the point of time of the visit on September 13th,

Teas - cross

1    2002, her developmental history was good?

2    A    Yes.

3    Q    And I think we went over this, but there's no mention of

4    any cranial issues in that report, are there?

5    A    No.  But there was no head circumference taken.

6    Q    I'm sorry?

7    A    No head circumference was measured.

8    Q    But, I mean, there was no mention of any issues regarding

9    the head or the caput or the encephalohematoma?

10   A    No.

11   Q    There was no report of any seizure-like activity?

12   A    No.

13   Q    No report of any tremors?

14   A    No.

15   Q    And then if we go on to the Provena --

16              MR. GOODFRIEND:  I'm sorry, Judge.  I got to go back.

17              Never mind.  I'm good.

18   BY MR. GOODFRIEND:

19   Q    The next page or Pediatrician No. 3.  I think it's two

20   pages out.

21   A    What exhibit?  Are we still on the same exhibit?

22   Q    Her visit was on October 8th of 2002; is that correct?

23   A    Yes.

24   Q    And in terms of her feeding, that was -- she was being

25   breast fed ten to twelve times a day?

Teas - cross

1    A    Yes.

2    Q    Her weight had increased?

3    A    Yes.

4    Q    In terms of her developmental history, on October 8th she

5    was alert?

6    A    Yes.

7    Q    Turned her head to sound?

8    A    Yes.

9    Q    And there was nothing unusual at that point in time

10   regarding her developmental history?

11   A    Yes.

12   Q    In terms of her elimination system, they made notations

13   yellow and CD; is that correct?

14   A    Yes.

15   Q    I mean in terms of the observations they made on

16   October 8th, was there anything unusual?

17   A    No.

18   Q    It was a normal visit?

19   A    Yes.

20   Q    Showing that she was in good health?

21   A    Yes.

22   Q    Now, the next time she had medical care was on

23   October 23rd of 2002; is that correct?

24   A    Yes.   That was at Edwards Hospital, right.

25   Q    That was when she had a fever?

Teas - cross

1    A    Yes.

2    Q    And in terms of -- in terms of that admission, if we could

3    go to the same exhibit number, pediatrician record number --

4    it's in the bottom.  It's Page 32, Pediatrician 32.  Tell me

5    when you find that.

6    A    Okay.

7    Q    And that was her admission on October 23rd, 2002; is that

8    correct?

9    A    Yes.

10   Q    And at that point in time, although she had a fever, she

11   was still nursing well?

12   A    Yes.

13   Q    Her anterior fontanelle were open and not bulging?

14   A    Yes.

15   Q    She was admitted to the hospital to rule out sepsis; is

16   that correct?

17   A    Yes.

18   Q    In terms of her admission, they collected blood and urine?

19   A    Yes.

20   Q    And the results, the blood was negative; is that correct?

21   No infection?  No evidence of infection?

22   A    Are you talking about blood culture?

23   Q    In terms of a blood culture done during that

24   hospitalization.

25   A    There was no growth.

1 Q   I'm sorry.  I didn't hear you.

2 A   There was no growth.  There was no growth.  There was no

3 growth of any bacteria.

4 Q   So she didn't have an infection?  That's indicative that

5 she didn't have an infection?

6 A   No, no evidence of it.

7 Q   And they also checked her urine; is that correct?

8 A   Yes.  Again, they did a urinalysis and a culture.

9 Q   It was negative for infection?

10 A   Negative for any detectable bacteria.

11 Q   In terms of her chest X-ray, that was also negative in

12 terms of any abnormalities?

13 A   Yes.  Her chest X-ray was normal.

14 Q   We -- you talked about her platelets being somewhat high;

15 is that correct?

16 A   Yes.

17 Q   In terms of her platelets, the shape or the morphology of

18 the platelets was normal; is that correct?

19 A   Yes.

20 Q   And that's a -- that's a -- an indication in terms of

21 whether, if they were not -- if they were abnormal, one would

22 be concerned?

23 A   It just says that they look -- appeared normal, yes.  It

24 doesn't tell me a whole lot about the function, though.

25 Q   In terms of her hospitalization on October 23rd, 2002, her

Teas - cross

1    anterior fontanelle were open and not bulging; is that

2    correct?

3    A    Yes.

4    Q    Okay.  And then she had a visit on November 11th, 2002,

5    which is like her two-month visit?

6    A    Yes.

7    Q    And I think if we could turn back to the beginning of that

8    Exhibit No. 74, I think that visit is four pages in with a

9    date in the upper left-hand corner of November 11th.

10   A    Yes.

11   Q    On November 11th, 2002, she was -- she had no fevers?

12   A    No.

13   Q    A review of all the systems were within the normal range?

14   A    Yes.

15   Q    Her fontanelle were fine?

16   A    Yes.

17   Q    There was no bulging?

18   A    Right.

19   Q    No report of seizures?

20   A    No.

21   Q    No report of tremors?

22   A    No.

23   Q    She lifted her head when upright?

24   A    Yes.

25   Q    She had no notation of any feeding problems?

Teas - cross

1   A   There was nothing noted, right.

2   Q   In terms of her development, they indicated that she

3   smiles?

4   A   Yes.

5   Q   And she -- her extremities were moving fine; is that

6   correct?

7   A   Yes.

8   Q   And they concluded that it was a two-month-year-old

9   healthy child?

10  A   Yes.

11  Q   Now, on December 18th of 2002, that's when she went to

12  Edward Medical Group for treatment; is that correct?

13  A   Yes.

14  Q   And it had to do with a possible ear infection?

15  A   Yes.

16  Q   Now, at that point in time did they check out her urine by

17  using a dipstick?

18  A   Probably, yes.  I don't specifically recall.

19  Q   Turn to the last -- I'm sorry.  Turn to the last page of

20  that exhibit, Page No. 37, Pediatrician 37.

21  A   Yeah.  Actually that's a culture.

22  Q   Okay.  And the culture was taken; is that correct?

23  A   Yes.

24  Q   And it was negative for --

25  A   Yes.

1    Q    -- infection?

2    A    Yes.

3    Q    And at that point in time we talked about her being

4    described -- prescribed amoxicillin for the possible

5    infection?

6    A    Yes.

7    Q    In terms of that, that's an antibiotic; is that correct?

8    A    Yes.

9    Q    And they gave her a normal dose for a child of three

10   months --

11   A    Yes.

12   Q    -- weighing 5.3 kilograms?

13   A    I'm seemed like it was normal, though there was some

14   discussion about it in the previous trial, that was maybe a

15   little bit higher.  And it may happen, but I don't think it

16   would have any consequence.

17   Q    Okay.  And in terms of your having an ear infection, that

18   is very common in infants and young children?

19   A    Yes.

20   Q    And is that one of the most common reasons for a child to

21   go to the hospital or go to a doctor?

22   A    Probably.  I don't know about three-month-olds, but as

23   they get a little older, yes.

24   Q    Children have multiple ear infections over the first few

25   years of life.  Would you agree with that?

Teas - cross

1  A   Some have, yes.  If they are little and they're swimmers,
2  yes, they do.
3  Q   Now, in terms of the period from Isabella's birth through
4  December 27th of 2002, did her parents report any problems
5  with feeding?
6  A   To the pediatrician?
7  Q   Right.
8  A   No, they did not.
9  Q   Do the medical records that you viewed in this case
10 indicate any problems involving the feeding of Isabella during
11 that same time period?
12 A   No.  I don't recall specifically seeing anything.
13 Q   I'm going to direct your attention to December 27th of
14 2002.  On that date Isabella arrived at the babysitter's at
15 approximately 7:00 a.m.?
16 A   Correct.
17 Q   And she was at the end of the period of taking the
18 amoxicillin; is that correct?
19 A   Right.
20 Q   In terms of her -- Jennifer Del Prete's statement to the
21 Romeo Police Department, did she tell the police that
22 Jennifer -- that she stated Isabella appeared to be fine all
23 day prior to the incident?
24 A   I don't know if she said all day.  She said she appeared
25 to be fine that day.  I don't know about the previous day.  I

Teas - cross

1    don't remember that specifically.

2    Q    But --

3    A    She may have said so.

4    Q    Yeah, but on December 27th Jennifer Del Prete reported to

5    the detectives that she appeared to be fine all day before her

6    collapse?

7    A    On that day, yes.

8    Q    And somewhere around 8:30 in the morning Isabella took a

9    bottle?

10   A    Yes.

11   Q    And she drank the bottle?

12   A    Yes.

13   Q    She had no problems in terms of not wanting to eat or

14   drink that day?

15   A    She didn't report any problems.

16   Q    And Isabella slept until some point in time after lunch?

17   A    After lunch, no.  After having that bottle between 8 and

18   9, she slept till 1:00.

19   Q    At some point in time at around between 12 and 1:00 that

20   afternoon Isabella had a diaper with diarrhea?

21   A    She woke up and -- right.  She woke up when she was

22   sleeping.

23   Q    And Miss Del Prete changed Isabella's diaper?

24   A    Yes.

25   Q    After changing her diaper she walked away temporarily; is

Teas - cross

1  that correct?

2  A    I don't know the sequence is exactly that way, but it

3  seems like she prepared a bottle, she got a diaper, then

4  picked her out of the swing, and as she picked her off the

5  swing she realized that her diaper had actually leaked into

6  her clothing and that she needed a change of clothing.  So

7  then she went with -- the bag was a few feet away, and she

8  went to get the clothing to change her to.

9  Q    And Jennifer Del Prete changed Isabella's diaper?

10  A    Correct.

11  Q    And shortly after that the condition of Isabella changed

12  dramatically?

13  A    Correct.

14        THE COURT:  This is a good place to stop.

15        MR. GOODFRIEND:  Okay.

16        THE COURT:  So let's --

17        You can step down.

18        Let's just talk for a second about tomorrow.  We'll

19  be able to start at ten.

20        MR. BLEGEN:  Judge, I have a status at 9:45 in front

21  of Judge Coleman and a status at 10:30 in front of Judge Dow.

22  And the issue with the Dow status is, if memory serves, he

23  said last time that he wants to set a trial date this time.

24  And I have a co-counsel on the case, but he is going to either

25  not make it or be late.  So I'm trying to figure out what I

 1    can do to -- I don't really know Judge Dow very well.

 2          THE COURT:  Okay.  So hang on one second.

 3          MR. BLEGEN:  I guess I could send somebody with -- I

 4    could send Miss Garvey with my schedule.  She could

 5    probably --

 6          THE COURT:  What's your case?

 7          MR. BLEGEN:  U.S. versus Robert Mitchell.

 8          Judge, I don't mean to interrupt your typing, but I

 9    literally just got an email from my co-counsel said he's got

10    his other case covered, so he will be there on time.  The only

11    issue is I don't know if Judge Dow wants all parties or all

12    lawyers --

13          THE COURT:  Can you give your co-counsel your

14    schedule so that your co-counsel knows what your schedule is?

15          MR. BLEGEN:  Absolutely.  Or I could send

16    Miss Garvey.

17          THE COURT:  Send Miss Garvey.  That's less

18    complicated than what I'm proposing to Judge Dow, so I'll

19    delete that email.

20          So hang on one second.

21          I know that the transcripts from the week that we did

22    in December are relatively close to being done.  I've actually

23    seen drafts of them.  And the court reporter advised me she

24    expects they'll be done at the end of this week.  The ones

25    from now, obviously, are not going to be done in the near

1    future.

2            So I'll give you my perspective as the decision maker

3    in this and then tell you where that gets me.  So I noticed --

4    I mean, I retain stuff pretty well, and I take really good

5    notes, but I had to do a massive amount of getting back up to

6    speed just from a month ago, as I'm sure you all did.  But, of

7    course, you don't have to decide anything afterwards.  I do.

8    I cannot have that same kind of time lag after this.  I need

9    to have this on a short enough string that I at least get your

10   materials and can start looking at them, you know, within some

11   period of time where this is still in whatever lobe of the

12   brain memory is retained in, or at least short-term memory.

13   And so that's one thing.

14           Second thing is I don't want anybody to be unfairly

15   disadvantaged with regard to the transcript issue.  So

16   normally what you'd do -- this is a bench trial basically.

17   Normally what you'd be doing is we'd finish tomorrow and you'd

18   come back here Thursday and argue and that would be the end of

19   it.  And the petitioner, who has the burden on this particular

20   issue, would argue first, the respondent would argue and the

21   petitioner would give rebuttal.  If I do the briefing that

22   way, what that probably would end up meaning is that the

23   petitioner would not have the benefit of this week's

24   transcripts when he filed his first brief, the respondent

25   would.  The petitioner would have them for the rebuttal but --

1   for their reply brief if I did this the sort of a normal three

2   brief kind of thing, and somebody might think that that's not

3   quite, you know, on an even keel.  So this is where I come

4   out:  Simultaneous post-hearing briefs, simultaneous replies.

5   Nobody is going to have this week's transcripts.  Well, you

6   might.  I don't know.  It depends on the court reporters.  But

7   I'm not going to condition it on that.

8          And so what I'm inclined to do is say the opening

9   briefs are due two weeks from Friday.  That would be the 1st.

10  And the reply briefs would be due ten days later, which is

11  make it the 12th, actually 11 days later, the 12th of

12  February.  So that's the plan.

13         And in terms of the exhibits, what I'm going to

14  really want you to do, and it's probably not a bad time to

15  start on this, you may have done it already, is to be able to

16  give me and not wait until the first briefs, give me like a

17  comprehensive list of these are all my exhibits.  I think I've

18  got somewhere over 95 percent of them, but I'm pretty sure

19  that I don't have all of them, and I just want to make sure

20  that I've got everything here.

21         MR. BLEGEN:  Judge, could I just ask for a little

22  indulgence?  Can we file our opening briefs on the Monday

23  after that Friday?

24         THE COURT:  So you want to spend the weekend doing

25  it.

1    MR. BLEGEN:  Well, it's not me, but somebody else.

2    THE COURT:  You want somebody else to spend the

3  weekend doing it.

4    MR. BLEGEN:  We're starting this trial.

5    THE COURT:  Doesn't due process give him an

6  opportunity to be heard?

7    MR. BLEGEN:  I think he'd like to have the weekend,

8  but you never know.  Young kids.

9    MR. RUFO:  More time is always better, I suppose.

10    THE COURT:  Okay.  But that's not going to affect the

11  date for the reply brief.

12    MR. TRIEBEL:  That's fine.

13    THE COURT:  So the 4th and the 12th.  That's fine.

14    Okay.  So 10:00 tomorrow.  And so if you're not done

15  with your Judge Coleman status, I'll just wait for you.

16    MR. BLEGEN:  Fine.  That should only take a few

17  minutes.

18    THE COURT:  That's what I'm guessing.

19    See you tomorrow.

20    MR. BLEGEN:  Judge, can I just -- we're in the

21  process of redacting the medical records, which Mr. Stanley

22  has -- a lot have been done.  There's one giant file of them.

23  So unless you want them immediately, my thought was we would

24  do --

25    THE COURT:  I don't need them immediately.  I'd

1  prefer to have you redact them in the way you need to redact

2  them before you do that.

3       MR. BLEGEN:  And is it okay to get them on a disk

4  rather than --

5       THE COURT:  Oh, I'd prefer that they're on a disk

6  actually, just so long as they're sort of individually tabbed

7  as to what exhibit number they are and whatnot.

8       MR. TRIEBEL:  Judge, so I understand your ruling

9  correctly, our understanding was that we would submit it to

10  you but we're not necessarily asking that you admit it.

11      THE COURT:  Yes.  So, well, no, I think what I was

12  talking about before is that during the hearing I wasn't going

13  to admit things.  At the end of the hearing I got to admit

14  stuff.  I mean, I can't consider something I haven't admitted.

15  So at some point in time, and, I mean, maybe if you can tell

16  me tomorrow when this redaction process is going to be done,

17  at some point in time prior to the submission of the opening

18  briefs I'm going to say, okay, Exhibits 1 through whatever are

19  admitted in evidence, and that's going to have, obviously,

20  certain consequences for the other people who are wanting to

21  look at all this stuff.  But that needs to be done before I

22  get the briefs.

23      MR. TRIEBEL:  Would you prefer that we put sensitive

24  exhibits like the autopsy photos under seal?

25      THE COURT:  That's a very good question.  And I think

1    it depends.  I mean, the sections of the brain, there are

2    other autopsy photos, which are a different story, but I don't

3    know if anybody is going to be offering any of those.  So I

4    guess what I would suggest is that if you have something, if

5    anybody has something that either side thinks ought to be

6    treated in a different way from the standpoint of

7    confidentiality, just flag that for me in some way.  And we'll

8    talk about that more tomorrow.  Just flag it for me in some

9    way so that I can make a determination about it.  I mean, I

10   think that I probably have some flexibility in terms of, you

11   know, particular exhibits I make a finding that it would be

12   inappropriate to have in the public record or whatever.

13            MR. GOODFRIEND:  Judge, I have one question.  In

14   terms of the medical records, are we limiting ourselves in

15   terms of what is admitted in the exhibits?  I wasn't sure if

16   counsel was talking about admitting the whole medical record.

17            THE COURT:  I don't know, so why don't you discuss

18   that between the two sides and then you'll tell me.  At some

19   point somebody is going to say, okay, Judge, we're offering

20   everything on this list, and you're going to say you're

21   offering everything on this list, and you're either going to

22   have all agreed to it or you're not.  I'll rule on the things

23   you haven't agreed on.

24            MR. BLEGEN:  Judge, I thought you had -- we had this

25   discussion previously and you said you wanted all the medical

1    records.  That's why I started Mr. Stanley on the process

2    of --

3              THE COURT:  If I said that, then I meant it at the

4    time.

5              MR. BLEGEN:  Okay.

6              THE COURT:  Like I say, I don't remember everything

7    that I said four weeks after the fact.  That could be one of

8    the things.  So if I actually said that, then you can go with

9    it.

10             MR. GOODFRIEND:  Because, Judge, the medical records,

11   they're different groups, and some are repetitive, and there's

12   like two thousand pages, and I guess my thought is that we

13   confine the medical records to those that were introduced or

14   offered at the hearing.  That might make more sense.

15             THE COURT:  Do you have any memory of the context in

16   which I said what you just told me that I said?

17             MR. BLEGEN:  I thought we had this debate over

18   whether we were going to put in parts of the medical records,

19   and you said, "I want all of them.  Why wouldn't I look at" --

20   I mean, maybe I dreamed that.  I don't know.  I thought you

21   said it.

22             THE COURT:  Was it something during one of the

23   hearings back in December?

24             MR. BLEGEN:  No.  It was when -- oh, yeah.  It was

25   when we had actually started the hearing.

1   THE COURT:  If it's there, you'll see it in the

2   transcript that you're going to get on Friday, and you'll find

3   what I said, and then we'll all be enlightened.  I don't

4   remember.

5   See you tomorrow.

6   MR. TRIEBEL:  Thank you, Judge.

7   (Which were all the proceedings had in the

8   above-entitled cause on the day and date aforesaid.)