<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3

 4   JENNIFER DEL PRETE,             )
                                     )
 5                     Petitioner,   )  Docket No. 10 C 5070
                                     )
 6              vs.                  )
                                     )
 7   MELODY HULETT,                  )  Chicago, Illinois
                                     )  January 16, 2013
 8                     Respondent.   )  10:10 a.m.

 9
                               VOLUME 8
10                     TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12   APPEARANCES:

13
     For the Plaintiff:      BLEGEN & GARVEY
14                           BY:  MR. PATRICK W. BLEGEN
                                  MS. JODI L. GARVEY
15                                MR. DANIEL A. RUFO
                             53 West Jackson Boulevard
16                           Suite 1437
                             Chicago, Illinois  60604
17

18   For the Defendant:      ILLINOIS ATTORNEY GENERAL'S OFFICE
                             BY:  MR. KARL R. TRIEBEL
19                                MR. NEAL GOODFRIEND
                                  MR. ARI TELISMAN
20                                MS. MONIQUE A. ANAWIS
                             100 West Randolph Street
21                           13th Floor
                             Chicago, Illinois  60601
22
     Also Present:                MR. ROBERT STANLEY
23

24           LAURA M. BRENNAN - Official Court Reporter
              219 South Dearborn Street - Room 2102
25                   Chicago, Illinois  60604
                           (312) 435-5785
</pre>

1    (The following proceedings were had in open court:)

2              THE COURT:  10 C 5070, Del Prete v. Hulett.

3              Can the lawyers give your appearances for the record,

4    please?

5              MR. BLEGEN:  Good morning, Judge; Patrick Blegen and

6    Dan Rufo on behalf of Ms. Del Prete.

7              MR. GOODFRIEND:  Good morning, Judge; Neal

8    Goodfriend, Karl Triebel, Monique Anawis and Ari Telisman from

9    the attorney general's office on behalf of the respondent.

10             THE COURT:  Dr. Teas, you understand you're still

11   under oath?

12             THE WITNESS:  Yes, I do.

13             THE COURT:  Okay.  So, Mr. Goodfriend, you can

14   proceed.

15             MR. GOODFRIEND:  Thank you, Judge.

16      DR. SHAKU TEAS, PETITIONER'S WITNESS, PREVIOUSLY SWORN

17                  CONTINUED CROSS EXAMINATION

18   BY MR. GOODFRIEND:

19   Q    Dr. Teas, I think yesterday when we left off, we were at

20   the point where Isabella had her collapse, correct?

21   A    Correct.

22   Q    Now, in terms of what Jennifer Del Prete reported to the

23   police as to what happened in that period of time, she

24   indicated that Isabella became limp?

25   A    Yes, at some point.

1  Q   She also reported that Isabella's eyes were closed?

2  A   Yes.

3  Q   At some point in time, Jennifer Del Prete said she shook

4  the child several times to see if she could get her -- wake

5  her up?

6  A   Yes, she shook her gently.

7  Q   And at some point, she placed Isabella over her knee and

8  patted her on the back?

9  A   Yes.

10  Q   She tried to feed Isabella?

11  A   Yes.

12  Q   And Jennifer Del Prete indicated that Isabella did not

13  suck the formula and the formula dripped out of her mouth?

14  A   Yes, out of the corner of her mouth, right.

15  Q   Now, 911 was called, is that correct?

16  A   Yes.

17  Q   And the ambulance responded fairly quickly?

18  A   Yes.

19  Q   Within five or six minutes?

20  A   Yes.

21        MR. GOODFRIEND:   Judge, this is Respondent's Exhibit

22  Number 100.

23        THE COURT:   Thanks.

24  BY MR. GOODFRIEND:

25  Q   Did you get a chance to look at that, Dr. Teas?

1  A   Yes, I did.

2  Q   People's Exhibit Number 100 is a two-page document?

3  A   Yes.

4  Q   The first page is an ambulance report or emergency

5  services report, is that correct?

6  A   Yes.

7  Q   And page 2 of Exhibit 100 is a summary taken from one of

8  the paramedics?

9  A   Yes.

10  Q   Now, in terms of the EMTs' observations, when they arrived

11  at the house --

12          MR. BLEGEN:  Just so the record is clear, I think my

13  second page says Respondent's Exhibit 101.

14          THE COURT:  You have a different second page.

15          MR. GOODFRIEND:  You know what, Judge, I might have

16  misnumbered that.  I meant -- I think I have the number 101

17  coming up.  So if you could correct the second page to also

18  reflect that that is Exhibit 100.

19          THE COURT:  Okay.  So it's not really 101.  Got it,

20  okay.  You will scratch that out.  Thanks.

21          THE WITNESS:  Actually, I'm sorry.  I have 101, too.

22  BY MR. GOODFRIEND:

23  Q   Okay.  So we will go to the first page of Exhibit 100, and

24  you had an opportunity to review the second page, too?

25  A   Just briefly, yes.

Teas - cross

1   Q   Okay.  And in terms of when the EMTs arrived at the house

2   at 1:44 p.m., they found Isabella cyantic?

3   A   Cyanotic.

4   Q   Cyanotic.  Thank you.

5           And at that point in time, she had no respiratory

6   effort?

7   A   No.

8   Q   There was no palpable pulse?

9   A   Correct.

10  Q   They started a CPR?

11  A   Yes.

12  Q   The EMTs eventually placed Isabella in the ambulance?

13  A   Yes.

14  Q   They continued their efforts to revive her, is that

15  correct?

16  A   Yes.

17  Q   And they gave her several doses of epinephrine?

18  A   Yes.

19  Q   Eventually they heard some type of pulse and some type of

20  heart tones?

21  A   Yes.  They got a pulse at 1:54.

22  Q   Now, during the time that they were at the house and

23  during the time that they took Isabella in the ambulance, did

24  they report that Isabella had any tremors of any kind?

25  A   I don't recall that they did.

Teas - cross

1   Q   Is that anywhere in the document on Exhibit Number 100?

2   A   Not here.

3   Q   I'm sorry?

4   A   No.  It's not here.

5   Q   They did not report any seizure activity, is that correct?

6   A   Correct.

7   Q   Now, in terms of after her arrival at the hospital and her

8       treatment over the next several weeks, there were certain

9       tests run on a fairly regular basis, is that correct?

10  A   Yes.

11  Q   They tested for infection in a number of ways?

12  A   Yes.

13  Q   And in terms of the elevated -- there's an elevated white

14      count on December 27th, 2002, is that correct?

15  A   Yes.

16  Q   And trauma can cause an elevated white count?

17  A   It could.

18  Q   When they did the spinal tap, there was no indication of

19      any white cells, is that correct?

20  A   I don't remember any.

21  Q   In terms of their assessment, they looked at her ears,

22      nose, eyes, is that correct?

23  A   Yes.

24  Q   In terms of the nose, they reported there was no drainage?

25  A   Yes.

Teas - cross

1  Q    In terms of her throat, they indicated that it was normal?

2  A    Yes.

3  Q    And in terms of her ears, they also found that there was

4  no drainage?

5  A    Yes.

6  Q    Now, we have talked about a number of tests that were

7  done, and I think we talked about a latex agglutination

8  bacterial antigen test, is that correct?

9  A    Yes.

10 Q    And Dr. Jenny talked about that yesterday?

11 A    Yes.

12 Q    She indicated that that type of test, or the tests under

13 that, are not affected by any antibiotic or amoxicillin?

14 A    They may not be.

15 Q    She said they weren't, right?

16 A    Yes.

17 Q    And that would include the four tests of group D

18 streptococcus that was done?

19 A    Yes.

20 Q    That was negative for any type of --

21 A    Yes.

22 Q    -- bacteria?

23 A    Well, it's one type of bacteria.  It's not any type of

24 bacteria.  There are many, many, many bacteria, and the

25 antigen agglutination tests are available for certain

1  bacteria.  They were less available in 2002 and 2003 than now.

2  Q   But there were five separate latex agglutination bacterial

3  tests done, weren't there?

4  A   Yes, they did it for the -- probably for the available

5  tests at that time.

6  Q   Well, they did an influenza B test also, is that correct?

7  A   Yes.

8  Q   That was negative for bacteria?

9  A   No, it was negative for the influenza virus.

10  Q   There was no virus reported, is that correct?

11  A   There was no influenza virus.

12  Q   What about the neisseria meningitidis?

13  A   I don't remember specifically.  If you give me the lab

14  report, I will read it.

15           MR. GOODFRIEND:  Judge, I'm on page -- I'm on

16  Exhibit 76.

17           THE COURT:  This is from your binder?

18           MR. GOODFRIEND:  Yes, from yesterday.

19           THE COURT:  I know I have it here.  Where is it?

20      (Brief interruption.)

21           THE COURT:  Exhibit which number?

22           MR. GOODFRIEND:  76.

23           THE COURT:  76 you said.

24           MR. GOODFRIEND:  76, first page in the bottom

25  right-hand corner.

Teas - cross

1     THE COURT:  I have it.  Thanks.

2     MR. GOODFRIEND:  Provena 24.

3     THE WITNESS:  Is this the page?

4     MR. GOODFRIEND:  Yes.

5  BY MR. GOODFRIEND:

6  Q    And in the bottom half of that report, it indicates that

7  five tests were done, and those were the latex agglutination

8  bacterial test, is that correct?

9  A    Yes.

10  Q    And we were talking about neisseria mengin -- meningitidis

11  -- is that correct?

12  A    Yes.

13  Q    Hopefully I can pronounce that correct.

14          And that was negative, is that correct?

15  A    Yes.

16  Q    And then there was another meningitidis test done, is that

17  correct?

18  A    Yes, there were two different kinds done for neisseria

19  meningitidis.

20  Q    That was negative for bacteria?

21  A    Yes.

22  Q    And they finally did a streptococcus pneumonia test, too,

23  is that correct?

24  A    Yes.

25  Q    And that was negative for virus?

Teas - cross

1    A    Yes.

2    Q    And all these tests are not -- aren't affected by the use

3    of an antibiotic such as amoxicillin?

4    A    They shouldn't be.

5    Q    Now, do you remember them doing a cerebral spinal tap on

6    December 27th, 2002?

7    A    I do.

8              THE COURT:  You asked if she did one.

9              MR. GOODFRIEND:  Okay.

10             THE WITNESS:  He said, "do you remember them."

11             THE COURT:  Oh, I thought he said, "do you remember

12   doing."  Okay, maybe I heard it wrong.

13   BY MR. GOODFRIEND:

14   Q    Do you remember that at the hospital at Provena that they

15   did a cerebral spinal fluid test?

16   A    Yes.

17   Q    That was negative for any type of virus?

18   A    That's the way I remember the tests, by both negative for

19   bacteria and virus.

20   Q    They did blood tests on that, too, blood cultures?

21   A    Yes.

22   Q    At Provena?

23   A    Yes.

24   Q    On 12/27?

25   A    Yes.

Teas - cross

1    Q    Those were negative for virus?

2    A    Yes.

3    Q    They did a urine culture on 12/27?

4    A    Yes.

5    Q    That was negative for virus?

6    A    Yes.

7    Q    And two days later at University of Illinois Chicago, they

8    did a trachea test, too, is that correct?  Is that your

9    recollection?

10   A    They may have.  I don't remember.  If you tell me what

11   page it is.

12   Q    Now, in terms of any type of ethmoid, mastoid or maxillary

13   sinus inflammation, they looked at CAT scans for that, is that

14   correct?

15   A    That's one way to examine them.

16   Q    Was there a CAT scan done at Provena on December 27th,

17   2002?

18   A    Yes.

19   Q    And in terms of the CAT scan of December 27th, 2002, there

20   was no evidence of ethmoid, mastoid or maxillary sinus

21   infection, is that correct?

22   A    There were no opacities described in the report at

23   Provena.  I think that's the way I remember it.  And, again,

24   if --

25   Q    If you turn to Exhibit 78?

Teas - cross

1    A    78?

2    Q    Yes, 78.

3    A    Yes.

4    Q    And on the first page of 78, that indicates a CAT study of

5    the brain dated December 27th, 2002, was done, is that

6    correct?

7    A    Yes.

8    Q    And in terms of that CAT scan, they didn't report any

9    evidence of ethmoid, mastoid or maxillary sinus infection, do

10   they?

11   A    They did not describe it.

12   Q    I didn't understand your answer.

13   A    They did not describe it.

14              THE COURT:  Basically you're saying it's not

15   mentioned one way or another.

16              THE WITNESS:  Right, exactly.

17   BY MR. GOODFRIEND:

18   Q    But a CAT scan can pick up that type of infection

19   inflammation?

20   A    You can see -- you might be able to see fluid.  You might

21   be able to see that it's opacified.  That means it's darker

22   and it's not as air-filled.  Sometimes you have to look

23   specifically for it.

24              So I don't see -- I don't see mention either way that

25   it's there or not.  It doesn't tell me it's clear or that it

1   has air either.

2           So what I'm saying is I really can't draw any

3   conclusion from looking at this.

4   Q   They didn't mention it in the report, did they?

5   A   Correct.

6   Q   Now, in terms of December 28th, 2002, at the University of

7   Illinois Chicago, they also did a CAT scan of the brain with

8   and without contrast, is that correct?

9   A   Yes.

10  Q   I'm going to show you Respondent's Exhibit 102.

11  Exhibit 102 is a CAT scan taken on December 28th, 2002, at the

12  University of Illinois Chicago Hospital, is that correct?

13  A   Yes.

14  Q   And in that report, there is no mention of them finding

15  any evidence of ethmoid, mastoid or maxillary sinus infection,

16  correct?

17  A   Again, they don't describe any changes, so --

18  Q   Well, if there were changes, wouldn't they report it on a

19  CAT scan if they saw it?

20  A   Not necessarily.  It all depends on who's reading it and

21  what else they're finding.  So they may or they may not report

22  it.  I don't know the radiologist.  So I can't answer that

23  question for you.

24          But when I don't have a mention of it, I do not

25  draw -- I cannot draw the conclusion that it wasn't there.

Teas - cross

1  Q   Now, if you turn to Exhibit Number 74 -- let me make sure
2  I've got that right.

3          I'm sorry, no.  Exhibit 79.

4  A   That is the same report that you gave as Exhibit 102.

5  Q   Go to Exhibit Number 79.  One second.  79, the second
6  page.  In the lower right-hand corner, it says UIC films, page
7  number 5.

8  A   Yes.

9  Q   And once again, it was a CAT scan done with and without
10 contrast, is that correct?

11 A   Yes.

12 Q   And once again, there is no indication of evidence in the
13 report of ethmoid, mastoid or maxillary sinus infection, is
14 that correct?

15 A   Yes.

16 Q   Now, in terms of your review of the medical records, there
17 was one indication at one of the hospitals that Isabella had
18 some type of redeye or pinkeye; do you remember that?

19 A   Yes, I vaguely remember it, yes.  I vaguely remember it.

20 Q   Now, in terms of her hospitalization at Provena University
21 of Illinois Chicago and Children's Memorial, they continually
22 tested Isabella Zielinski for any evidence of infection, is
23 that correct?

24 A   Yes.

25 Q   They tested blood, urine and cerebral spinal fluid?

Teas - cross

1   A   Yes.

2   Q   They tested it on multiple occasion?

3   A   Yes.

4   Q   They tested blood, urine and syncytial spinal fluid in

5   different ways?

6   A   Yes.

7   Q   In terms of the tests of the blood, urine and cerebral

8   spinal fluid at Provena, was it ever positive?  Were those

9   tests ever positive for bacterial infection?

10  A   No.

11  Q   In terms of those tests done at Provena, were any of the

12  tests ever positive for a viral infection?

13  A   At Provena?

14  Q   Right.

15  A   No.

16  Q   Now, in terms of the tests done at University of Illinois

17  Chicago, were any of the blood, urine and syncytial cerebral

18  spinal fluid ever positive for a bacterial infection?

19  A   Not that I remember.

20  Q   In terms of the tests done at University of Illinois

21  Chicago, were they ever positive for a viral infection?

22  A   University of Chicago?

23  Q   University of Illinois Chicago.

24  A   Okay.  I don't remember, but I do remember that she

25  developed RSV virus infection, which is respirator syncytial

1    virus, at some point.

2    Q   Isn't that an infection that is common when you're in the

3    hospital?

4    A   Yes.  You can have it commonly.

5    Q   In terms of when she had her spinal surgery on

6    January 10th, 2003, they tested --

7    A   I'm sorry.  You mean the cranial?

8    Q   The cranial surgery.

9    A   Okay.  You said "spinal."

10   Q   Okay.  Thank you for correcting me.

11         In terms of the surgery done on January 10th, 2003,

12   they tested the fluid removed for bacteria, is that correct?

13   A   Correct.

14   Q   And that was negative for bacterial infection, is that

15   correct?

16   A   Yes.

17   Q   In terms of Children's Memorial Hospital, they did test

18   her blood, urine for bacterial infection, is that correct?

19   A   Yes.

20   Q   And those tests were negative, also?

21   A   Yes, except she did have the RSV.

22   Q   Except for the RSV?

23   A   Yes, for a long period of time.

24   Q   In terms of viral infection testing done at Children's

25   Memorial, except for what you referred to as the respiratory

Teas - cross

1  virus test, those other tests were also negative for viral

2  infection, is that correct?

3  A   Yes.

4  Q   Moving on to the subject of hematology, is it your opinion

5  that Isabella Zielinski had a clotting disorder?

6  A   I cannot answer that question because I don't know.  She

7  was not tested for any clotting disorders.

8  Q   Well, they did examine her on various bleeding -- bleeding

9  disorders and made observations regarding clotting?

10  A   I would not draw any conclusions from that.  They did do

11  some bleeding disorder tests, but not all.  But they didn't do

12  any of the tests that should be done to detect a coagulation

13  problem.

14  Q   Well, in terms of bleeding, you're not a hematologist, is

15  that correct?

16  A   I'm not.

17  Q   In reviewing these records, did you consult with a

18  hematologist?

19  A   Actually, I did.  Julie Mack did.

20  Q   Julie Mack, she's a radiologist?

21  A   Yes.

22  Q   You say Julie Mack consulted a hematologist?

23  A   Hematopathologist.

24              THE COURT:  Hematopathologist, got it.

25              THE WITNESS:  In pathology we have different

Teas - cross

1   subsections.

2           THE COURT:  Yes.

3   BY MR. GOODFRIEND:

4   Q   Well, they did have a hematologist examine and recommend

5   certain tests for Isabella unless she was in University of

6   Illinois Chicago Hospital?

7   A   Yes.

8   Q   And in terms of that, let's go to page 7 -- Exhibit 75, I

9   believe.  On Exhibit Number 75, can we go to page 95?

10  A   94 is what you mean.

11  Q   No.  The first one I want --

12          Turn to the second page of that exhibit, please.  And

13  in terms of hematology, there is a Dr. Labotka that performed

14  an examination of Isabella on January 3rd, 2003, is that

15  correct?

16  A   Yes.

17  Q   And in terms of Dr. Labotka, L-a-b-o-t-k-a, he is a

18  hematologist?

19  A   Yes.

20  Q   He performed a pediatric oncology consult?

21  A   Yes.

22  Q   And in terms of his consult, he looked at the history of

23  Isabella basically from birth through the time he completed

24  his examination?

25  A   Yes.

Teas - cross

1  Q    And in terms of his history, he indicated that it was an

2  uncomplicated spontaneous vaginal birth, is that correct?

3  A    Yes.

4  Q    And in terms of Isabella's history before January 3rd,

5  2003, there was no history of her suffering any bruise?

6  A    Yes.

7  Q    And she never had any bleeding from the mouth, umbilicus

8  cord, stool or urine?

9  A    Yes.

10  Q    Dr. Labotka also checked the family out for bleeding

11  disorders?

12  A    For bleeding excessively.

13  Q    Bleeding disorders.

14  A    That doesn't cover all disorders of the blood.

15  Q    But he did do a consultation on bleeding disorders, is

16  that correct?

17  A    For excessive bleeding, yes.

18  Q    And there was no indication in the family history that

19  she -- that anybody had any bleeding disorders?

20  A    Nobody in the family had any history of bleeding easily.

21  Q    And in terms of bleeding disorders, there is no indication

22  that anyone in the family had any clotting disorders either,

23  did they?

24  A    I don't see any reference to asking that question, so I

25  cannot answer on that.

Teas - cross

1   Q    Now, when Isabella was at University of Illinois Chicago

2   Hospital, she had various venipuncture sites on her body, is

3   that correct?

4   A    Yes.

5   Q    In terms of these sites, they were on her hands as well as

6   her feet, her arms and feet?

7   A    Yes.

8   Q    Were there any reports of excessive bleeding on those

9   sites?

10  A    No.

11  Q    Were there any reports of abnormal clotting at those

12  points?

13  A    No.

14  Q    In terms of the bleeding history, they did check that

15  history in the family for coagulopathy, is that correct?

16  A    They --

17  Q    I mean, they took a history?

18  A    To rule out a coagulopathy, but all the questions that are

19  written in the history are in reference to excessive bleeding.

20  There was no question asked if anybody ever suffered, in the

21  family, suffered a clot, had suffered DVTs or any of that.

22  Q    Well, Isabella had a variety of exams, a variety of tests

23  done.  She had intravenous fluids with needles imposed on her

24  hands and feet.  During all this time of her having these

25  procedures done, was there any evidence at all of abnormal

1   clotting?

2   A    There was no evidence of abnormal clotting from her IV

3   sites and from her other catheters that were put in.

4            (Brief interruption.)

5   BY MR. GOODFRIEND:

6   Q    Now, in terms of Dr. Labotka, he did perform a number of

7   tests, is that correct?

8   A    He performed some tests, but most of them relating to Von

9   Willebrand disease, which is a bleeding disorder.

10  Q    Negative, also?

11  A    The three that he performed that are resulted here were

12  negative.  I can't say they were negative.  The ristocetin

13  cofactor, r-i-s-t-o-c-e-t-i-n, and the Factor VIII related

14  antigen were high.  But at this point it doesn't mean anything

15  because these factors, when you have an acute stress reaction,

16  they go up.  So you cannot evaluate that the child may have

17  Von Willebrand's disease or not.  It's V-o-n

18  W-i-l-l-e-b-r-a-n-d.

19  Q    In terms of your re --

20  A    And let me finish.

21            And there should actually be Factor VIII done which

22  actually might relate to even some of the coagulation problems

23  that were -- at least I didn't see a result.

24            And there's a whole slew of results that you should

25  do if you are thinking about clotting problems, and none of

1    them were done either at University of Illinois or at

2    Children's or subsequently.

3    Q    Well, turn to the first page of Exhibit Number 75 under --

4    in the lower right-hand corner UIC, page 94.

5         THE COURT:  This is 75, you said, Mr. Goodfriend?

6    Exhibit 75?

7         MR. GOODFRIEND:  75.

8         THE COURT:  Which page?

9         MR. GOODFRIEND:  UIC 94 in the bottom right-hand

10   corner.

11        THE COURT:  Thank you.

12   BY MR. GOODFRIEND:

13   Q    You said that test number VIII wasn't done, is that

14   correct?

15   A    Yes.

16   Q    In that report, doesn't it indicate that Factor VIII was

17   done?

18   A    It says Factor VIII related antigen.  Factor VIII by

19   itself is a separate test.

20   Q    Well, Dr. Labotka, the hematologist, didn't feel that any

21   other tests were necessary based on his examination of

22   Isabella, is that correct?

23   A    I don't know what he felt.  You would have to ask him.  It

24   depends.  It seems like he was called in to do the

25   consultation for ruling out bleeding disorders.  And so there

1  were other consults where he said, you should do some of these

2  other things, but this is not the time to do because some of

3  these factors in a time of stress react and may be normal or

4  high, but when the stress is taken away, then they go back to

5  baseline, so that's the time to do them.

6  Q   Now, in terms of your report, you described type one

7  primary thrombocytosis and type two reactive thrombocytosis,

8  is that correct?

9  A   Can you tell me --

10 Q   In your report, you refer to those.

11 A   Yes.

12 Q   And in terms of reactive thrombocytosis, you can have a

13 high platelet count in reaction to a stressful situation, is

14 that correct?

15 A   You could.

16 Q   And in terms of the high platelet count, actually it's

17 common in young infants, is that correct?

18 A   Yes, it could be.

19 Q   And there's different causes for it, is that correct?

20 A   Yes.

21 Q   Now, I'm going to --

22        MR. GOODFRIEND:  This is Exhibit Number 103, Judge.

23        THE COURT:  103.  Okay, thanks.

24 BY MR. GOODFRIEND:

25 Q   Dr. Teas, could you please take a look at this article

Teas - cross

1  written by S. E. Wiedmeir, W-i-e-d-m-e-i-r?

2  A   I have not read this before, but I will quickly.

3  Q   Will you take a look at it, please?

4  A   Sure.

5      (Brief interruption.)

6          THE WITNESS:  Okay.  I read the conclusion.

7  BY MR. GOODFRIEND:

8  Q   Okay.  In terms of Dr. Wiedmeir, he did a study of infants

9  with extreme thrombocytosis.  Those were the platelet count

10 over 1 million, is that correct?

11 A   Yes, up to, he said, 1.3 million.

12 Q   Up to 1.3 million.  And he tested infants during the

13 period of January 2003 through December 2008?  It's under

14 Study Design.

15 A   Okay.

16 Q   And in terms of his research and studies, he came to a

17 conclusion, is that correct?

18 A   Yes.

19 Q   And he concluded that "thrombocytosis cases that we report

20 were all consistent with reactive thrombocytosis, also known

21 as secondary thrombocytosis; none seemed to be essential

22 primary thrombocytosis," is that correct?

23 A   That's the conclusion he came to.

24 Q   And he indicated that they speculated that the

25 pathogenesis involved in increased platelet production due to

1    megakaryopoietic stimulators induced by an infectious or

2    inflammatory condition, is that correct?

3    A    Yes.

4            THE COURT:  Where are you reading that?

5            MR. GOODFRIEND:  I'm under Conclusion, Judge, in the

6    lower left-hand corner on the first page.

7            THE COURT:  Okay.  In the little shaded area.  Okay,

8    got it.  I was looking for a conclusion at the end.  Silly me.

9            MR. GOODFRIEND:  Okay.  Can I proceed?

10           THE COURT:  Now I see it.  Sure, go ahead.

11   BY MR. GOODFRIEND:

12   Q    And in terms of his final sentence, Dr. Wiedmeir concluded

13   that from the series and previous reports, young infants with

14   platelet counts up to 1,300,000 do not seem to have a

15   significant risk of thrombotic or hemorrhagic problems and do

16   not generally require antiplatelet or cytoreductive treatment,

17   isn't that correct?

18   A    Yes, he came to that conclusion.

19   Q    Now, in terms of --

20           If Isabella had a clotting disorder, would that

21   affect the arteries and veins and other vessels throughout her

22   body?

23   A    Not necessarily.

24   Q    It could affect other --

25   A    It could.

Teas - cross

1    Q    -- arteries, veins and vessels throughout her body?

2    A    It could but not necessarily.

3    Q    Well, in terms of the eye examinations or the eyes, in

4    particular the eyes, would you agree that there was severe and

5    extensive bleeding in the retinas of both eyes?

6    A    She had bilateral retinal hemorrhages and --

7    Q    Would you agree that the vessels that carried the blood to

8    the eyes are smaller than the cortical veins?  Do you know

9    that?

10   A    You're talking about the artery or the vein?

11   Q    In terms of the veins or any type of vessels that carry

12   blood to the eyes.

13   A    It depends on which vessels you're looking at.  So I don't

14   know what the diameter of the optic vein is or the artery is.

15   Q    Well, in terms of Isabella's eyes, were there any clots

16   observed during her treatment?  Were there any clots in the

17   eyes or the vessels of the eyes?

18   A    In the retina or in the -- no.  In the vein coming out

19   from the eye?

20   Q    In terms of the retina, were there any reports of

21   clotting?

22   A    There was bleeding.

23   Q    Were there any reports of clotting?

24   A    No.

25   Q    If she had a clotting disorder, would we see certain --

1   would it be exhibited in terms of other surgeries and other

2   organs of the body?

3   A    I don't know if I understand your question.

4   Q    Well, if she had a clotting disorder, would she possibly

5   have vein thrombosis in her legs?

6   A    No.  Babies really do not develop DVTs, you know.  What I

7   have seen is maybe thrombus in the coronary artery, and it's

8   usually CVT.  And you can have an episode and then have

9   nothing.

10        Hillary Clinton is an excellent example.  She had an

11  episode of DVT back in '98 or whenever, and then now she

12  presents with cerebral sinus thrombus.

13  Q    Well, in terms of the examinations done of Isabella

14  throughout the hospital and her treatment, there was never any

15  observations that Isabella had clotting disorders in any part

16  of her body, is that correct?

17  A    She was not tested for the risk factors associated with

18  clotting.

19  Q    Well, wouldn't there be reactions to other parts of her

20  body if she had a clotting disorder?

21  A    No, not necessarily.

22        MR. GOODFRIEND:  Could we put slide number 7 up,

23  please?

24        (Brief interruption.)

25  BY MR. GOODFRIEND:

Teas - cross

1  Q   This is slide number 7 entitled MRI Brain shown by Dr.

2  Barnes, is that correct?

3  A   Yes.

4  Q   Now, when an MRI is taken, would you agree that there are

5  hundreds of images and pieces or slices done to determine

6  whether there is anything unusual going on in the brain; is

7  that correct?

8  A   Yes.

9  Q   And in Exhibit Number 7, it's just two slices, is that

10  correct?

11  A   Yes.

12  Q   Did you examine some of the other slices of the brain to

13  determine if there were any abnormalities or contusions?

14  A   I'm not a radiologist, but there have been, let's see,

15  four radiologists now who examined all the CTs and MRIs, and

16  there were -- I did not count the number of radiologists who

17  read all the procedures that were done at University of

18  Chicago and -- I'm sorry -- University of Illinois and

19  Children's Memorial Hospital.  None of them described

20  contusions.

21  Q   Well, in terms of contusions, would you agree that

22  sometimes contusions are difficult to pick up on a CAT scan or

23  an MRI?

24  A   They may be, but if there's a contusion, it's a blood

25  product and it will appear as a blood product.

1 Q   You remember Dr. --

2 A   There is bleeding when there is a contusion.

3 Q   Do you remember Dr. Barnes testifying a few weeks ago?

4 A   Yes.

5 Q   And didn't Dr. Barnes testify that in terms of picking up

6 a contusion on imaging that actually the gold standard in

7 finding contusions or lacerations is pathology?

8 A   Yes.  If you don't pick it up on scans, then you pick it

9 up on autopsy.  Probably you cannot just have one person look

10 at a picture and say they're contusions and draw the

11 conclusion that it's contusions.  You always correlate it.  So

12 if I am seeing --

13         MR. GOODFRIEND:  Judge, I have no question pending.

14         THE COURT:  All right, fine.  Ask another question.

15 BY MR. GOODFRIEND:

16 Q   Could we go to slide number 10?

17         Now, in this slide number 10, images presented by Dr.

18 Hedlund, the images in this picture are related to showing

19 bridging veins, is that correct, ruptured bridging veins?

20 A   Actually, what it's showing me are thrombosed veins.

21 Q   You don't see any ruptured bridging veins in those

22 pictures?

23 A   I do not see any ruptured bridging vein.

24 Q   Well, in terms of the concept or the problem of ruptured

25 bridging veins, they can be caused by abusive head trauma, is

1   that correct?

2   A   They could be caused by any kind of trauma.

3   Q   Well, can they be caused by acute head trauma?

4   A   They can be, yes, abusive or nonabusive.

5           THE COURT:  Which slide is this, Mr. Goodfriend?

6           MR. GOODFRIEND:  I think it's the tenth one.  I

7   labeled it 10 because that was the -- they weren't numbered,

8   but it was the tenth one that I had.

9           THE COURT:  Thanks.

10  BY MR. GOODFRIEND:

11  Q   And in terms of the Adamsbaum article, she did examine

12  four children that had torn bridging veins, is that correct?

13  A   That's what she said, based on radiology.  The slide that

14  you showed before was the only pathology slide, but that

15  pathology slide did not have a related radiology slide to make

16  the comparison.

17  Q   Well, she was looking at the contusions that were noted at

18  autopsy, is that correct?

19          I'm sorry.  Not the contusions; the torn bridging

20  veins at autopsy?

21  A   I don't know if she showed any other pictures of torn

22  bridging veins in the other cases that she showed from autopsy

23  because there were no other autopsy pictures.

24  Q   But on slide number 10, on slide number 10, there is

25  evidence of torn bridging veins?

1  A   No, there is not, and that's what I am saying, that there

2  is not.  That's what Dr. Hedlund said, but Dr. Hedlund is a

3  radiologist trying to interpret an autopsy picture, and so Dr.

4  Hedlund should evaluate the other radiology cases in

5  Adamsbaum's paper and not this one.

6          MR. GOODFRIEND:  Judge, I move to strike the answer

7  as nonresponsive.

8          THE COURT:  Overruled.

9  BY MR. GOODFRIEND:

10 Q   Now, in terms of the other slides, you had some slides up

11 regarding sometimes a misdiagnosis in a certain case?

12 A   I don't know exactly what slide you are referring to.

13 Q   Let me ask you another question.  If one has a subdural

14 hemorrhage, can one also have intradural bleeding?

15 A   Yes.

16 Q   And in terms of intradural bleeding that results from a

17 subdural hemorrhage, can trauma be the cause of that bleeding?

18 A   I don't know if I followed your question.

19 Q   Well, if one has intradural bleeding, can trauma be the

20 cause of that bleeding?

21 A   Yes.

22 Q   Can abusive head trauma be the cause of intradural

23 bleeding?

24 A   I don't know what the question really is, but if you have

25 intradural bleeding, I cannot draw the conclusion that it's

Teas - cross

1  abusive head trauma, which is a term I wouldn't use again.  So

2  I don't know what your question is.

3          Can a child who's been abused have intradural

4  bleeding?  Yes.

5  Q   Okay.

6  A   But I have to see other things to draw the conclusion that

7  the child has been abused.

8          MR. GOODFRIEND:  Excuse me one second, Judge.

9          THE COURT:  Sure.

10     (Brief interruption.)

11         MR. GOODFRIEND:  I seem to be missing a page of my

12  outline.  I'm sorry, Judge.

13         THE COURT:  It's okay.

14     (Brief interruption.)

15         MR. GOODFRIEND:  Can I have a minute?  I'm sorry.

16         THE COURT:  Yes.

17     (Brief interruption.)

18         MR. GOODFRIEND:  Judge, here is Exhibit Number 86.

19         THE COURT:  You said 86?

20         MR. GOODFRIEND:  Yes.

21  BY MR. GOODFRIEND:

22  Q   Now, Dr. Teas, I think you have concluded that Isabella

23  Zielinski had cortical venous thrombosis, is that correct?

24  A   Yes, most likely in December.

25  Q   And that is relatively rare, would you agree with that?

Teas - cross

1  A    It may be, but I think it's more common than we think and

2  it's missed, and I probably have missed many cases.

3  Q    Now, you indicated in your report that the contrast

4  enhanced CAT scan resulted in your diagnosis of CVT?

5  A    What page are you reading from?

6  Q    If you look at page 10 of your report.

7        THE COURT:  Of her report.

8        MR. GOODFRIEND:  Of her report.

9        THE COURT:  Got it.

10        THE WITNESS:  Which line are you reading?

11        THE COURT:  Why don't you put the question again, Mr.

12  Goodfriend.

13  BY MR. GOODFRIEND:

14  Q    In terms of page 10 of your report, the second to the last

15  paragraph, you state:

16        "In this case, the diagnosis is confirmed on contrast

17  enhanced CT."

18  A    Yes.

19  Q    Now, you wrote your report, and it's dated August 29th,

20  2012?

21  A    Yes.

22  Q    Which CAT scan with contrast resulted in your conclusion

23  that Isabella suffered from CVT?

24  A    That was only one done with contrast.  I think it was on

25  the 28th, the one you just used as an exhibit somewhere.

Teas - cross

1  Q   Now, in terms of coming to this conclusion, you relied on
2  Dr. Barnes and his report dated June 29th, 2002, is that
3  correct?
4  A   I relied actually on Dr. Barnes, Dr. Julie Mack, and
5  actually I also sent the CTs to Michael, whatever his name
6  is -- I have to look at it to say it correctly -- Krasnokutsy
7  because he's the one who wrote the paper on CVT, and so I
8  actually sent it to him to confirm that he agreed.
9  Q   Well, in terms of your report, did you indicate that you
10  sent this report to this Dr. Krasnokutsy?
11  A   No, I didn't because I got what we call a curbside opinion
12  from him, and he actually works, I think, for the Navy, and he
13  cannot write reports or testify on cases that --
14  Q   Well, did anybody, any of the other --
15          THE COURT:  Hang on a second.  Now, you have been
16  doing this long enough to know that you don't just talk over
17  somebody.
18          Finish what you were saying.
19          THE WITNESS:  Because he cannot get involved in cases
20  that are not military related.
21          THE COURT:  Okay.
22  BY MR. GOODFRIEND:
23  Q   Well, did any of the experts rely on the information from
24  Dr. Krasnokutsy?
25  A   No.

Teas - cross

1    MR. BLEGEN:  Judge, just so the record is clear, I

2    think it's Krasnokutsy.  His name came up yesterday.

3    THE COURT:  Okay.

4    MR. BLEGEN:  You have been working on the

5    pronunciation and you just wanted to make sure you got it in

6    there.

7    MR. BLEGEN:  That was it.

8    THE COURT:  Okay.  We will just call him --

9    THE WITNESS:  I call him Michael.

10   K-r-a-s-n-o-k-u-t-s-y, and I've actually written down some of

11   the names to give to the court reporter when I am done.

12   BY MR. GOODFRIEND:

13   Q   Now, in terms of Dr. Barnes, would you agree he's been

14   reading images for decades?

15   A   Yes.

16   Q   And in terms of Dr. Barnes, you did rely on his findings

17   to come to your conclusion?

18   A   Yes.

19   Q   Now, why don't we turn to Exhibit Number 86, page 2.

20   A   Page 2?

21   Q   Page 2.

22       This is Dr. Barnes' report of the brain CT conducted

23   on 12/28/02 with images before contrast and after contrast, is

24   that correct?

25   A   Yes.

Teas - cross

1  Q    And in terms of his analysis of those CT scans, does he

2  ever come to the conclusion that this CT scan confirmed the

3  presence of cortical venous thrombosis?

4  A    No.

5  Q    In terms of --

6          If you look at Dr. Barnes' report, does he ever

7  conclude that there was cortical venous thrombosis in this

8  case?

9  A    You know, I don't know what he concludes, but Dr. Barnes

10 always writes a general report because it's a radiology

11 report.  So you have to look at everything else along with the

12 radiology, and there are some subtle things that he writes

13 that lead me to conclude that that's what he's thinking maybe

14 because I have been reading his reports.

15         So if you look at some of this, "some cortical or

16 subpial, question mark, some along veins, question membranes,"

17 he doesn't write that in all reports.  So his reports are

18 general, and there are certain subtle things that lead me to

19 conclude that that's what he is thinking.  And since he's

20 difficult to reach and very busy, I talked to Julie Mack about

21 it.

22 Q    Now, yesterday --

23 A    I'm reading --

24 Q    Yesterday you cited to an article written by a Cohen and

25 Schweinberg, is that correct?

Teas - cross

1    A    Yes.

2         MR. GOODFRIEND:  And that's Petitioner's Teas

3    Exhibit 5, Judge.

4         THE COURT:  Okay.

5    BY MR. GOODFRIEND:

6    Q    In terms of this report, you cited an article in support

7    of your theories and your diagnosis of Isabella Zielinski, is

8    that correct?

9    A    I cited it as a reference for -- about the intradural

10   blood going to the subdural space and being secondary to

11   hypoxia.

12   Q    Now, in this report in the abstract section, doesn't it

13   talk about who was -- what patients he studied?

14   A    She.  They are both she's.

15   Q    What patients they studied?

16   A    Yes.

17   Q    And in terms of this study, it was conducted on 25 fetuses

18   and 30 neonates up to one month old who had died?

19   A    Yes, who were in the hospital and that had not left the

20   hospital and gone.

21   Q    Well, in terms of this study, it does not apply to

22   Isabella Zielinski because she was three months old, is that

23   correct?

24   A    I would disagree with that.  She's still pretty young.

25   And I take the articles, the anatomy and my experience also

1    into consideration.  So --

2         THE COURT:  Okay.  You can stop right there.  Ask

3    another question.

4    BY MR. GOODFRIEND:

5    Q    Now, you also cited, and this is Teas Exhibit Number 3, to

6    Julie Mack's article, is that correct?

7    A    Which one is that?

8    Q    Petitioner's Exhibit Number 3 entitled "Anatomy And

9    Development of the Meninges:  Implications for Subdural

10   Collections and CSF Circulations"?

11   A    Yes.

12   Q    Now, Julie Mack, her job is to -- I'm sorry -- examine

13   breast imaging, is that correct?

14   A    That's what she does now.

15   Q    She's been doing that since 2003?

16   A    You know, I don't know.  I didn't look at her CV to

17   scrutinize that.

18   Q    She's been doing that for quite a while?

19   A    For a while.

20   Q    She is not a neuroradiologist, is that correct?

21   A    She's not a neuroradiologist; she's a pediatric

22   radiologist.

23   Q    But right now she's doing issues dealing with women and

24   breast imaging?

25   A    She is reading breast imaging.

Teas - cross

1  Q    Okay.  Now, yesterday you did cite to one of her articles,

2  is that correct, the article "Anatomy and Development of

3  Meninges:  Implications for Subdural Collections and CSF

4  Circulations"?

5  A    Yes.

6  Q    And above her title, it indicates that this is theoretical

7  considerations, is that correct?

8  A    Yes.

9  Q    It's only a theory?

10  A    Yes.

11        MR. GOODFRIEND:  Judge, I'm handing out Exhibit

12  Number 105.

13        THE COURT:  Thanks.

14  BY MR. GOODFRIEND:

15  Q    Now, in terms of Julie Mack's article, two individuals

16  wrote an editorial regarding Julie Mack's article, is that

17  correct?

18  A    Yes.

19  Q    And it's entitled "Pathophysiology Does Not Denote the

20  Mechanism," is that correct?

21  A    Yes.

22  Q    And that's a review of Mack's article that we just

23  referred to?

24  A    It's a criticism of the article.

25  Q    It's a criticism of the article, isn't it?

1  A    Yes.

2  Q    And, in fact, on the page that I've handed to you, on the

3  first column, left-handed column, they write that:

4       "The editorial team spent an enormous amount of time

5  with this paper because of our fear of misuse of the

6  information.  In the child with subdural hematomas without

7  adequate history to explain their occurrence, nonaccidental

8  trauma needs to be the primary consideration.  Of course,

9  other medical diseases and bleeding disorders need to be

10  investigated and excluded, but NAT, which is nonaccidental

11  trauma, is the correct diagnosis in the majority of cases.  We

12  believe that the article of Mack, et al. reflects this."

13       Is that correct?

14  A    That's his opinion.  That's the -- it's Dr. Slovis and Dr.

15  Chapman's opinion.

16  Q    And in that opinion, I think you indicated they're

17  critiquing and are critical of Dr. Mack's article?

18  A    Well, yes.  That happens in medicine all the time.  I

19  think Dr. Barnes indicated that.

20  Q    Now, in the right-handed column, they talk about the

21  Geddes hypothesis and how it was treated in the Court of

22  Appeals in the United Kingdom, is that correct?

23  A    They make a mention of it.

24  Q    And in terms of the conclusion or summary regarding that

25  proceeding, they indicate and quote part of the opinion, is

Teas - cross

1  that correct?

2  A    Yes.

3  Q    And they state:

4         "However, in the judgment, their Lordships stated,

5  'in our view, cases of serious injuries caused by very minor

6  force such as might occur in normal handling or rough handling

7  of an infant, are likely to be rare or even extremely rare'"?

8  A    They have quoted part of that opinion.

9  Q    And then in terms of Slovis and Chapman, they go on to say

10 that:

11        "We repeat, the vast majority of subdural hematomas

12 in infants without adequate historical verification to explain

13 the etiology are caused by nonaccidental trauma child abuse,"

14 is that correct?

15 A    That's what it says.

16 Q    Now, we did talk about retroclival imaging in this case,

17 is that correct?

18 A    Yes.

19 Q    And in terms of the retroclival injury, that is bleeding

20 between the junction of the brain and spine, is that correct?

21 A    Yes.

22 Q    And bleeding in that area can be indicative of cranial

23 cervical trauma, is that correct?

24 A    You know what, I do not know that.  I have just seen

25 exclusively trauma in that area without trauma elsewhere.

Teas - cross

1   Q    So without trauma elsewhere, would that coincide with

2   subdural hemorrhage and retinal hemorrhage?

3            THE COURT:  I don't understand that question.

4            MR. GOODFRIEND:  Okay.

5            THE WITNESS:  And I don't either.

6            THE COURT:  You know what, since I don't understand

7   it, he's going to have to try it again.

8            MR. GOODFRIEND:  Okay.  Thank you, Judge.

9   BY MR. GOODFRIEND:

10  Q    I think you were saying that injury in the retroclival

11  area is usually accompanied by other injuries; is that what

12  you mean?

13  A    Yes.

14  Q    And in terms of other injuries, could that be subdural

15  hemorrhage and retinal hemorrhage?

16  A    It could be as a gravity pull to that area because, as I

17  showed you a case yesterday, and I have many, where when I do

18  an autopsy or somebody else does an autopsy, we often see

19  hemorrhage in that area and actually don't pay much attention

20  to it.

21            So I have never gone back to look at or have the

22  radiologist look at it to see if they are seeing anything in

23  those areas in the cases where there is just subdural

24  hemorrhage.

25  Q    Well --

Teas - cross

1    A    What I have seen is sometimes associated with automobile

2    accidents and stuff like that where there are much more

3    extensive injuries that it doesn't even warrant a mention.  So

4    I really can't comment on it because I really haven't studied

5    it.  And the papers that were given when this issue came up

6    through your experts, the papers all really did not relate to

7    a case like this.

8    Q    Well, Dr. Barnes did find evidence of bleeding in the

9    retroclival area when he wrote his second report, is that

10   correct?

11   A    When he went back and checked, he didn't find it.  It's my

12   understanding that he didn't find it on the first CT, but it

13   was on the 28th.

14   Q    And in terms of bleeding in the retroclival area, that

15   could be the result of trauma, is that correct?

16   A    You could have trauma, and if that's trauma and the

17   bleeding is manifesting itself more than 24 hours after

18   presentation, you should see a big hematoma and not a little

19   area, especially in that area that is so vascular.

20   Q    Well, could it be the result of trauma?

21   A    It could be, but if I just saw that, I wouldn't say it's

22   trauma.

23   Q    I've handed you Exhibit Number 104.  Please take a look at

24   the top heading paragraph, please.

25   A    Okay.

1522

Teas - cross

1  Q   The title of this article is "The Infant Whiplash-Shake
2  Injury Syndrome:  A Clinical and Pathological Study," is that
3  correct?
4  A   Yes.
5          THE COURT:  This is a good place for me at least to
6  take a break.  So before you get into this, let's take 10
7  minutes.
8          MR. GOODFRIEND:  Thank you, Judge.
9          THE COURT:  We'll go to 12:30.
10          (Brief recess.)
11          THE COURT:  Mr. Goodfriend, you can resume.
12          MR. GOODFRIEND:  Thank you, Judge.
13  BY MR. GOODFRIEND:
14  Q   I think we were on that article, the infant whiplash
15  article, is that correct?
16  A   Yes.
17  Q   And in terms of Dr. Hedlund and the other doctors, they
18  did a study of certain infants who had sustained nonaccidental
19  trauma, is that correct?
20  A   That's what they claim.
21  Q   Well, it's in the article, is that correct?
22  A   That's what they say, but they don't define what
23  nonaccidental trauma was and how they made the diagnosis.
24  Q   Well, didn't they indicate in their heading there that the
25  infants presented with profound neurological impairment,

1   seizures, retinal hemorrhages and intracranial subarachnoid

2   and/or subdural hemorrhage?

3   A    That's what they said, yes.

4            THE COURT:  One of the things -- this actually is a

5   good place for me to inject this.

6            So both sides in cross-examining the other side's

7   witnesses have sort of given articles to the witness and to me

8   and have attempted to elicit things from those articles.  Now,

9   in some of those situations, the article has been -- I'm

10  groping for the right word here.

11           So in some of those situations when the

12  cross-examiner's own expert has testified, the expert has said

13  this is a generally accepted thing, I've relied on it and so

14  on and so forth.  I get how to handle those.

15           But I am less certain of, I'll just say, the

16  evidentiary status of an article, that the only way in which

17  it's presented is by saying here is an article from so and so,

18  doesn't it say this, that and the following.  And both sides

19  have done this to some extent.  So I'm not calling out Mr.

20  Goodfriend directly.  It's just what prompts me to ask it

21  because it has been something I have been thinking about.

22           The fact that an article is published in a journal

23  doesn't mean it's right.  I mean, I'm sure we can go

24  through -- and this is true for both sides.  I'm sure we could

25  go through, you know, the medical journals going back a

1    century and come up with a very long list of all of the

2    articles that have been proven to be wrong.  So I don't know

3    the evidentiary status of this.

4            So I guess what I'd like is, you know, if people are

5    relying on some of this stuff or want me to rely on articles

6    that have been presented in that way, you're going to need to

7    address this in your posthearing briefs.  Okay.  So just pass

8    that along to whoever is drafting those things.

9            Go ahead.

10   BY MR. GOODFRIEND:

11   Q    Dr. Teas, just in terms of this article, they did autopsy

12   six infants, is that correct?

13   A    Yes.  That's what they say though I cannot identify the

14   author who is a pathologist.

15   Q    Okay.  And five of those six patients on autopsy, they

16   found injuries at the cervical medullary junction consisting

17   of sub or epidural hematomas of the spinal cord with proximal

18   spinal cord contusions, is that correct?

19   A    That's what they say.

20   Q    And they did conclude that direct cranial trauma is not an

21   essential element of the injury mechanism in young patients

22   who sustain severe whiplash-shake injuries, is that correct?

23   A    That's that conclusion.

24   Q    And in addition, they also concluded:

25            "In addition to the classic injuries reported to

1    occur with the shaken baby syndrome, hemorrhages and

2    contusions of the high cervical spinal cord may contribute to

3    morbidity and mortality," is that correct?

4    A    That's what they say in the abstract.

5    Q    Now, Dr. Teas, you indicated that in your testimony as

6    well as your report that there's a possible rebleed in this

7    case, is that correct?

8    A    Yes.

9    Q    A rebleed of a chronic subdural hematoma, is that correct?

10   A    Yes.

11   Q    And Dr. Jenny in her testimony indicated that rebleeds do

12   not really change the mental status of an infant.  Do you

13   remember her testifying to that?

14   A    She may have said that, yes.

15   Q    And in terms of her testimony, she indicated that

16   neurological status does not change?

17   A    With what?  With rebleeding?

18   Q    Maybe I will phrase it this way.

19           Her testimony and opinion is that rebleeding of an

20   old subdural does not cause catastrophic neural collapse?

21   A    That was her opinion, yes.

22   Q    Now, in terms of your report and your indication that

23   rebleeding might have been a part of Isabella's collapse, did

24   you cite any authority?

25   A    No, I didn't.

Teas - cross

1    Q    So in your report, you do not name a single study showing

2    that a child's chronic subdural hemorrhage can rebleed and

3    cause the sudden onset of catastrophic clinical deterioration?

4    A    No, because this is basic pathology.

5    Q    Can trauma cause hypoxia ischemia?

6    A    Yes.

7    Q    Can head trauma cause hypoxia ischemia?

8    A    Yes.

9    Q    Can abusive head trauma cause hypoxia ischemia?

10   A    Any trauma can cause hypoxia and ischemia.

11   Q    And in terms of an infant, if the infant suffers head

12   trauma, the reaction can be immediate; do you agree with that?

13   A    Could be.

14   Q    Now, Dr. Teas, in your report you talk about the presence

15   of retinal hemorrhages, is that correct?

16   A    Yes.

17   Q    You have given various reasons for the presence of retinal

18   hemorrhages in Isabella's eyes?

19   A    Yes.

20   Q    In terms of some of the reasons you gave, you indicated

21   her retinal hemorrhages might be the result of birth

22   complications?

23   A    I don't think I said that.  I don't know where you -- one

24   of your experts got that.

25   Q    If you could turn to page 7 of your report, please.  There

1  is a section on retinal hemorrhages at the top of page 7 of

2  your report.

3  A   Yes, I read it there, but that's not what I said, that

4  Isabella died of -- had retinal hemorrhages from birth.

5        If you go back to page 5, the title of those two

6  pages is Medical Issues.  So what I have done is given you a

7  history.  Then I've said, you know, these are the issues that

8  need to be addressed in these kind of cases.  And so that's --

9  the section is in reference to the medical issues.

10        But then my evaluation of the case starts on page 7

11  and goes further down, and that section there in this

12  particular case is on page 10.

13  Q   Well, I'm directing your attention to page 7 of the

14  paragraph.  Doesn't it read:

15        "Retinal hemorrhages.  Like subdural hemorrhages,

16  retinal hemorrhages can occur from a multitude of causes,

17  Lantz 2006, including birth complications, illness, trauma or

18  lack of oxygen; e.g., high attitudes.  The physiological

19  mechanisms include increased intracranial pressure and/or

20  thrombosis.  Retinal hemorrhages are even harder to date than

21  subdural hemorrhages.  There is no biomechanical evidence to

22  suggest that shaking causes retinal hemorrhages."

23        Did you write that?

24  A   I did, but that's in my Issue section.

25  Q   Now, in terms of this case, I think you already indicated

1    yesterday that you had contact with Dr. Patrick Lantz?

2    A    Yes.

3    Q    And he's a forensic pathologist?

4    A    Yes.

5    Q    Now, in this case, did you consult with a pediatric

6    ophthalmologist?

7    A    No, I did not.

8    Q    In this case, did you consult with any ophthalmologist?

9    A    No, I did not.

10   Q    In terms of formulating your opinion regarding retinal

11   hemorrhages, did you consider the medical records from the

12   University of Illinois Chicago?

13   A    I did.

14   Q    And in terms of those records, did you also look at the

15   pictures of the retinal hemorrhages?

16   A    I did.

17   Q    In terms of the records and pictures of the retinal

18   hemorrhages, they did show extensive intradural and preretinal

19   hemorrhages in both eyes?

20   A    They did.

21   Q    Now, also they found intraretinal hemorrhages that went

22   out to the far retinal periphery in both eyes?

23   A    Yes.

24   Q    And they indicated that patterns of the intraretinal

25   hemorrhages were dot and blot patterns and flamed patterns, is

Teas - cross

1  that correct?

2  A   Yes.

3  Q   And the optic nerve sheath hemorrhages were seen on

4  imaging?

5  A   Yes.

6  Q   Now, in terms of the birth complications causing retinal

7  hemorrhages, what birth complications are you referring to?

8  A   There have to be no complications, just the process of

9  birthing itself.  40 to 50 percent of babies, if their eyes

10  are examined after the birthing process, may have retinal

11  hemorrhages.

12  Q   Did you cite to any authority on that?

13  A   No.  There's several papers out there.  I didn't cite to

14  everything.

15  Q   In terms of thrombosis, I think on page 10 you indicate,

16  and I quote:

17       "By hospital admission, she was seriously ill with

18  likely thrombosis, and retinal hemorrhages were to be

19  expected."

20       Is that what you said on page 10?

21  A   Yes.

22  Q   Do you cite to any literature that supports your theory

23  that the retinal hemorrhage in Isabella's eyes was a result of

24  thrombosis?

25  A   I don't know if I understood you really.

Teas - cross

1  Q    Okay.  In terms of your finding that -- you found that by

2  hospital admission Isabella was seriously ill will with likely

3  thrombosis, and retinal hemorrhages were to be expected,

4  right?

5  A    Yes.

6  Q    Do you cite --

7         In your conclusions, do you cite to any literature

8  that supports your theory that the retinal hemorrhage in

9  Isabella's eyes was the result of thrombosis?

10 A    What I'm saying is that by the time she was in the

11 hospital, she was seriously ill and unconscious at that point

12 and that there has been a diagnosis of CVT made by radiology,

13 and actually there are clinical findings of that.  So I would

14 expect that there may be retinal hemorrhages.

15 Q    The question I'm asking you is:  Did you cite to any

16 authority supporting your opinion?

17 A    No.

18 Q    Now, in your testimony yesterday, we talked about the body

19 temperature drop and the acidosis, is that correct?

20 A    Yes.

21 Q    In terms of your experience regarding temperature drops

22 and acidosis, or increased pH level, is your experience

23 limited to your experience as a forensic pathologist?

24 A    My experience is reviewing records and having investigated

25 cases that I have done over the years, and also sometimes even

1  when I am reviewing, I do investigate cases.

2  Q    Now, do you see any --

3        I think you said yesterday it's of no significance to

4  you that Isabella had a body temperature of 95.1 upon her

5  arrival at the emergency room?

6  A    It's of no significance in drawing conclusions that 911

7  was not called right away.  This was a 30-minute period from

8  the time the 911 call was placed and the time the temperature

9  was taken.

10 Q    Now, you have heard in the last week and a half of

11 testimony that there are certain cases where confessions have

12 been made where a baby has been shaken and that the baby

13 suffered subdural hemorrhages and retinal hemorrhages, is that

14 correct?

15 A    I've heard a lot there and also at the SBS conference

16 where you were.

17 Q    And in terms of these cases, they do take into account the

18 confessions that have been made in these situations?

19 A    I don't know what you mean by they take into account, but

20 that's what they rely on to draw the conclusion that the case

21 is abusive head trauma.

22 Q    And they conclude that there can be abusive head trauma

23 and retinal hemorrhages to shaking without impact, is that

24 correct?

25        MR. BLEGEN:  Judge, objection.

Teas - cross

1   BY THE WITNESS:

2   A    That's what they conclude.

3          THE COURT:  Hang on a second.

4          MR. BLEGEN:  I don't know who the "they" is.

5          THE COURT:  Me neither.  The objection is sustained.

6   BY MR. GOODFRIEND:

7   Q    Dr. Teas, are you familiar with the articles written by

8   Starling and Vinchon that have been discussed in court the

9   last week and a half?

10  A    I am.

11  Q    Now, I'd like to give you a hypothetical.  Assume that we

12  have a four-month-year-old infant who has subdural

13  hemorrhages, retinal hemorrhages, no signs of impact, symptoms

14  exhibiting immediately and that there's a confession

15  indicating that the perpetrator shook the baby without impact.

16  Those are the hypothetical.  Could you assume those facts?

17  A    I am.

18  Q    Under these circumstances, would you agree that the child

19  suffered abusive head trauma caused by shaking without impact?

20  A    No, I would not.

21          MR. GOODFRIEND:  Could I have one minute, Judge?  I

22  just want to confer.

23          THE COURT:  Yes.

24      (Brief interruption.)

25  BY MR. GOODFRIEND:

Teas - cross

1   Q   Dr. Teas, in this case you consulted with various experts,
2   is that correct?
3   A   I did.
4   Q   Radiologists?
5   A   Yes.
6   Q   Pathologists?
7   A   Yes.
8   Q   Biomechanical engineers or one biomechanical engineer?
9   A   I didn't really consult with Dr. Prange.  I was told that
10  he was retained, and then I subsequently got his report.  I
11  really didn't talk to him at all.
12  Q   In this case, did you ever consult with a pediatrician who
13  specializes in diagnosing and treating child abuse?
14  A   No.
15  Q   In this case, did you ever consult with any pediatrician
16  who treats infants and children on a daily basis?
17  A   Well, Dr. Scheller was involved, so I had a brief
18  conversation with him.  He's a pediatrician.
19  Q   He's not a pediatrician, is he?
20  A   He is.  He's a pediatric neurologist.  His sub --
21          MR. GOODFRIEND:  Judge, I have no further questions.
22          MR. BLEGEN:  Did she finish her answer?
23          THE WITNESS:  I said he's a pediatric neurologist.
24          THE COURT:  Go ahead.  Redirect.
25                    REDIRECT EXAMINATION

Teas - redirect

1  BY MR. BLEGEN:

2  Q   Dr. Teas, under Mr. Goodfriend's hypothetical about the

3  confession and certain findings, what else would you want to

4  know?

5  A   Well, I would want to know a lot of the details of the

6  history and the medical findings, whether they were clinical

7  findings or autopsy findings or radiological findings.

8       I would also want to know under what circumstances

9  this, in quotations, "confession" was made, what was the

10  quality of it, when was it taken.  And if there were tapes, I

11  would watch them before I would draw the conclusion that the

12  confession fits the medical findings.

13  Q   Didn't Dr. Jenny tell us yesterday that that's what she

14  recommends being done in every case of suspected abusive head

15  trauma, meaning do a detailed history, look at all the medical

16  records?

17  A   Correct.

18  Q   Mr. Goodfriend asked you some questions about retinal

19  hemorrhages and what findings were made at the hospital.

20       Do you recall that?

21  A   Yes.

22  Q   Were there any findings of perimacular folds?

23  A   No.

24  Q   How about retinoschisis?

25  A   No.

Teas - redirect

1  Q   Mr. Goodfriend also asked you some questions about whether

2  trauma can lead to hypoxia ischemia; do you remember that?

3  A   Yes.

4  Q   Cannot breathing for 30 minutes lead to hypoxia ischemia?

5  A   Definitely.

6  Q   I mean, isn't hypoxia essentially just lack of oxygen?

7  A   Correct.

8  Q   And is ischemia just lack of blood?

9  A   Right.  And they sort of go hand in hand because once you

10 have lack of oxygen, the brain swells and actually decreases

11 the blood supply, too.

12 Q   I'm going to show you, after giving the respondent's

13 attorneys a second to look at it, Petitioner's Exhibit, I will

14 just call it Photo 1.

15         MR. BLEGEN:  Judge, this is an original autopsy --

16 not original autopsy photo, but a printed-out autopsy photo --

17         THE COURT:  Okay.

18         MR. BLEGEN:  -- of which I have only one copy, but I

19 will put it on the Elmo after Dr. Teas takes a look at it.

20 BY MR. BLEGEN:

21 Q   Dr. Teas, can you take a look at that photo and tell us

22 what it is?

23 A   It's a photo of the slices of the brain that were shown

24 yesterday.

25 Q   Is this the issue that has been debated regarding how the

1    slices of brain were laid out?

2    A    Yes.

3    Q    All right, let me put it on the Elmo.

4         MR. BLEGEN:  Judge, there's a new ink smudge on the

5    photo, but I don't think it really affects anything.

6         THE COURT:  Okay.  The thing you're going to find

7    when you put that on there is since the photo is a little

8    curled, it's not going to show up too well.

9         MR. BLEGEN:  Maybe then I will just end up handing it

10   to you, Judge.

11        THE COURT:  Let's see how it works.  It's a little

12   better.  You will have to zoom out, I think.

13        MR. BLEGEN:  I will.

14        THE COURT:  Somebody was asking a question.

15   BY MR. BLEGEN:

16   Q    Dr. Teas, is this the photo that Dr. Rorke-Adams relied on

17   to find damage to the brain and to determine how the sections

18   of the brain were laid out?

19   A    She used this as to how the sections were laid out and

20   maybe used this also to say that there were contusions on the

21   frontal lobes, but there's the other picture, too.

22   Q    Okay.

23   A    Both of them.

24   Q    She indicated that this photo would be the typical way to

25   lay out sections of the brain, and starting with the front of

Teas - redirect

1    the brain here and then where my pen is pointing?

2           THE COURT:  That's the second column from the right

3    on this particular photo, then going down the page, then to

4    the column further to the right and up to down, right?

5           MR. BLEGEN:  Yes.

6    BY MR. BLEGEN:

7    Q   Do you see that, Dr. Teas?

8    A   Provided you have the ink mark on the top.

9    Q   Yes.  That's an artifact.

10          Can you explain why this photo looks like it's taken

11   up against a wall?

12   A   It's just all the photographs were not taken correctly.

13   It's taken at an angle, and that's the wrong way to take

14   autopsy photographs.  You always put your specimen here and

15   have your camera less pointing at a 90-degree angle.

16          THE COURT:  Looking straight down, in other words.

17          THE WITNESS:  Like looking straight down to it.

18          This is taken by the DuPage sheriff's evidence

19   technician.  Now, evidence technicians are more used to doing

20   scene photographs, and so they like to take overalls, and it

21   creates a lot of distortion, so you can't see the detail.

22   BY MR. BLEGEN:

23   Q   Let me stop you there.  This brain is sectioned on a

24   table, correct?

25   A   And it's the way the photograph is taken because you're

Teas - redirect

1    looking at a two-dimensional figure of a three-dimensional --

2         THE COURT:  It looks like if you were taking a

3    picture of a skyscraper from below, looking up, it's going to

4    look distorted because it kind of goes out as you go up.

5    BY MR. BLEGEN:

6    Q    Take a look at the far left column.

7    A    Yes.

8    Q    Is it typical to start laying out slices halfway down the

9    table as happens with the smaller sections to the left on the

10   photo?

11   A    You know, there are no written rules on how you should do

12   this, unfortunately.  But it just depends on the person and

13   how important you feel it is to preserve what you saw at that

14   point.  I would not lay it out that way, either way.

15        If I'm right-handed --

16        If I could step down?

17        THE COURT:  Yes.

18        THE WITNESS:  I would start right at this corner with

19   the right frontal lobe and go down and then go here, and then

20   I would start with the cerebellum here, so I would start

21   with --

22        THE COURT:  You would start on the left-hand side

23   with what?

24        THE WITNESS:  With the frontal lobe.

25        THE COURT:  Okay, rather than having it on the

Teas - redirect

1    right-hand side.

2              THE WITNESS:  Correct.

3              And if I am left-handed, if I'm going to start, I

4    would start at the corner, whatever it is, in one corner

5    rather than in the middle.

6              THE COURT:  Okay.

7              THE WITNESS:  Maybe Dr. Harkey is left handed.  I'm

8    not sure.  I'm not sure.

9              So if I'm left-handed, maybe I would start it here.

10   I don't know what a left-handed person would do.  They would

11   probably start -- what you would do is start it at a corner.

12   You wouldn't start it in the middle.

13             THE COURT:  Okay.

14   BY MR. BLEGEN:

15   Q   Dr. Teas, let me interrupt you there.

16             Is there any way to tell just from looking at this

17   photo itself, which I'm going to hand to you, which way is the

18   far part or near part of the table?

19   A   I cannot tell.

20             THE COURT:  The question is:  Which way is up on the

21   photo?

22             MR. BLEGEN:  Correct.

23             THE COURT:  I was going to ask the same question, so

24   I'm glad you asked.

25             THE WITNESS:  The other thing that's wrong is that

1  you usually put in, like, one of those little tags with a

2  ruler, so you have a method that you always use.

3              THE COURT:  You have a point of reference.

4              THE WITNESS:  You have a point of reference, and then

5  if they get -- if they get like what happened yesterday with

6  the mirror image, you know that you have got a mirror image

7  and that you have to convert it.

8  BY MR. BLEGEN:

9  Q   Now, Dr. Teas, if I simply flip the photo over and have

10  the top of the table be the opposite of what we previously

11  saw, does this appear now to be a photo that somebody took

12  looking at a table?

13  A   Yes.

14  Q   And then assuming that Dr. Rorke-Adams is correct on how

15  the brain would or should be laid out, then the front of the

16  brain is starting in this far left column, correct?

17  A   Yes.

18  Q   And finishing at the end here, correct?

19  A   Yes, but I don't know how he laid them.

20  Q   I understand.  You don't know how.

21              Do you even know that Dr. Harkey did this himself?

22  A   It would be unusual that somebody else would do it for

23  him.  I would hope not.  I worked in that office for many

24  years.  I always cut my own brains.  In fact, I did all the

25  baby autopsies for the years that I was there.

Teas - redirect

1    I happened to be out of town that weekend.

2  Q   All right.  Look at the column that is now on the far

3  right.

4  A   Yes.

5  Q   The two columns.  Does this now start at the top of the

6  table and then finish halfway down the table?

7          MR. GOODFRIEND:  Judge, I'm going to object to this

8  whole line of questioning.

9          THE COURT:  Why?

10          MR. GOODFRIEND:  A lot of it is speculation.

11          THE COURT:  So is everything else.

12          And I've got to tell you, any person, if you go home

13  tonight -- in fact, I will come out here and do it.  If you go

14  home with a camera, okay, and if you try to take a picture

15  down at the end of that table, looking down the table, you're

16  going to notice that the bottom looks bigger than the top.

17  This is the right orientation for the photo right here.  It's

18  obvious.  It's just a matter of perspective.  It's not

19  speculative at all.

20          The objection is overruled.

21          MR. BLEGEN:  I don't think I have any more questions

22  about the photo, Judge.

23          THE WITNESS:  You got it better than I got it, Judge.

24  I had to work a long time to get it.

25  BY MR. BLEGEN:

Teas - redirect

1   Q   Dr. Teas, Mr. Goodfriend asked you some questions about

2   Dr. Geddes and the issue related to her and the Court in the

3   United Kingdom.  Do you recall that?

4   A   Yes.

5   Q   And then pointed out that there was some criticism by the

6   Court regarding her testimony?

7   A   Yes.

8   Q   What was the Court in the United Kingdom doing when they

9   took her testimony?

10  A   They were reviewing all these cases.

11  Q   Were they, in fact, reviewing four specific cases?

12  A   They were reviewing at that time four specific cases.

13  Subsequently they reviewed more cases.  So they had -- since

14  there was such a controversy, they had, both the sides,

15  different people testify.

16  Q   And of the four cases they reviewed, do you recall what

17  happened to the four?

18  A   I think two were reversed.  One went down in the -- in

19  whatever the sentencing was, and I think they upheld one.  I'm

20  not sure.  It's a long time ago.  I've forgotten.

21          I mean, they reviewed these cases in Canada with the

22  big -- inquiry.

23  Q   Mr. Goodfriend asked you some questions about whether

24  there were signs or lab results showing infections; do you

25  recall that?

Teas - redirect

1    A    Yes.

2    Q    Were there radiological signs of an ear infection when

3    Isabella was at the hospital?

4    A    Yes.

5    Q    Mr. Goodfriend also asked you whether you consulted with

6    any hematopathologists; do you recall that?

7    A    Yes.

8    Q    And you said that you did?

9    A    Yes.  Actually Julie Mack sent him the e-mail with a copy

10   to all of us.  Do you want me to tell you who it is?

11   Q    Sure.

12   A    It's Michael Laposata.  He's actually a hematopathologist

13   at Vanderbilt.

14   Q    What did he say?

15   A    He said --

16        MR. GOODFRIEND:  Objection.  There is nothing in the

17   report, Judge, that indicates that she consulted anyone.

18        THE COURT:  Understood.  This is a topic --

19        You're fleshing out a topic that was brought up on

20   cross, right?

21        MR. BLEGEN:  Yes.

22        THE COURT:  The objection is overruled.

23   BY THE WITNESS:

24   A    He sent an e-mail and said that at that time, Julie had

25   thought that the platelet level was 900.  So he said it would

1   be significant and that it could be -- it would be a risk

2   factor for thrombosis and that here's the list of other tests

3   that should be done to rule out that the baby had

4   thrombophilia.

5   BY MR. BLEGEN:

6   Q   Were those tests done in this case?

7   A   None of them were done, and actually there is a whole slew

8   of tests on the Mayo Clinic website.

9   Q   Mr. Goodfriend gave you Respondent's Exhibit 103, which is

10  an article entitled "Thrombocytosis in Neonates and Young

11  Infants"?

12  A   Yes.

13  Q   A report of 25 patients with platelet counts greater than

14  or equal to, is that 1 million per micrometer?

15  A   Yes, which is how you really measure them.

16  Q   All right.  Did you get a chance to read through this

17  entire exhibit?

18  A   Just briefly.

19  Q   Does it essentially conclude that high platelet counts do

20  not have a significant risk of thrombotic or hemorrhagic

21  problems?

22  A   Correct.

23  Q   But that doesn't say it has no risk, correct?

24  A   Yes, and I think a lot of these articles are looking for

25  thrombosis in major arteries and not CVT.

1   Q   Mr. Goodfriend asked you about whether Dr. Barnes had said

2   that autopsy is the gold standard for determining whether

3   there's contusions on the brain?

4   A   Yes, he probably did.

5   Q   All right, I don't remember either.

6           But when was the autopsy in this case performed?  How

7   long after her collapse on 12/27/02?

8   A   Ten plus months after her collapse.

9   Q   And even then, did the autopsy find any evidence of

10  contusions?

11  A   No, and the brain is not consistent with having any kind

12  of massive contusions.

13          MR. BLEGEN:  Judge, if I could just have a moment?

14          THE COURT:  Yes.

15      (Brief interruption.)

16          MR. BLEGEN:  That is all, Judge.

17          THE COURT:  Recross.

18          MR. GOODFRIEND:  One second, Judge.

19          THE COURT:  Sure.

20      (Brief interruption.)

21                      RECROSS EXAMINATION

22  BY MR. GOODFRIEND:

23  Q   Dr. Teas, do we know from this photo where the person was

24  standing when they laid out the brain?

25          THE COURT:  Wait a second.  There's two photos up.

Teas - recross

1    MR. GOODFRIEND:  I'm sorry, Judge.

2    THE COURT:  Which one?

3    BY MR. GOODFRIEND:

4    Q   In terms of the photo on the right, do we know from this

5    photo where the person was standing when they laid it out?

6    A   You know, I really can't tell.

7    THE COURT:  Where the person was standing not when

8    they took the picture, but when they actually put the brain

9    sections on the table.

10    MR. GOODFRIEND:  Yes.

11    THE COURT:  Okay.

12    THE WITNESS:  I don't know.  I don't see -- from this

13    perspective, I can't even tell you how the board was placed

14    there.  These photos are all cleaned up.

15    THE COURT:  You said "the bowl"?

16    THE WITNESS:  The board, because the white --

17    THE COURT:  It's what you referred to as a bucket

18    before?

19    THE WITNESS:  No.  This is a cutting board.

20    THE COURT:  Oh, the board.  Okay, board.  I

21    misunderstood what you were saying.  Sorry.

22    THE WITNESS:  I can't see the rest of the table.  So

23    I don't know where the person who was cutting the brain is

24    standing, where the person who took the photograph is there.

25    There isn't a tag.  If there was a tag right here

 1  with a number facing me, then I would know the person is
 2  probably, you know, putting it on the face.  It's like when I
 3  take body photos, I always put the tag facing the feet.  So,
 4  you know, I don't know.  I cannot answer a lot of questions.
 5  BY MR. GOODFRIEND:
 6  Q   Now, in terms of the photo on the left of this image,
 7  isn't this the photo that Dr. Rorke-Adams used when she
 8  testified?
 9  A   You mean that one, yes.  Yes.
10          MR. GOODFRIEND:  Thank you, Judge.
11          THE WITNESS:  These photos are all cleaned up,
12  though.
13          THE COURT:  What do you mean by that?
14          THE WITNESS:  These are photoshopped.  They have
15  cleaned up the background and I don't what else.
16          THE COURT:  How do you know that?
17          THE WITNESS:  Because compare the original.
18          THE COURT:  Compare them to the originals.
19          THE WITNESS:  Yes.
20          THE COURT:  Mr. Blegen --
21          THE WITNESS:  And I wouldn't do that.
22          THE COURT:  Mr. Blegen, do you have anything else?
23          MR. BLEGEN:  No.
24          THE COURT:  Can you get the photograph that you had
25  on there and put it on there in the correct orientation, which

Teas - recross

1    I believe is the larger part of the table at the bottom?  I

2    need to ask just a question about one thing.

3         When I say the correct orientation, I mean, it just

4    seems to me as a matter of perspective that this is the

5    person -- we're looking at it the way it would have looked in

6    the viewfinder of the person taking the photographs.

7         So the second column from the left, what's been

8    referred to as the gnarly part -- and I know this has been

9    testified about before.  And I understand that the autopsy was

10   done, obviously, after the death, which is a number of months

11   after the hospital visit or the hospital admission.

12        Can you just give me any perspective on why that

13   looks so mushy?

14        THE WITNESS:  Because the brain was a respirator

15   brain and if you know --

16        THE COURT:  So it goes back to that issue, in other

17   words.

18        THE WITNESS:  Right.  If you know how we take the

19   brain out -- and actually there is another photograph that Mr.

20   Blegen didn't want to use because it's ugly, with the brain in

21   the cranial cavity.  So when the brain was taken out, we cut

22   the skull around.

23        THE COURT:  Right.

24        THE WITNESS:  And then --

25        THE COURT:  I have seen plenty of autopsy photos, so

1    I know that.

2              THE WITNESS:  Okay, good.

3              When it was taken out, you can see in that photograph

4    that the dura, which is pretty thick, first of all, is

5    pressing into part of the brain.  It's almost like you have

6    something soft and you have a string cutting it.  And we

7    usually put our hands on the front part and try to lift it

8    out.  So when you're trying to lift -- if it's the frontal, if

9    you're trying to lift that out --

10             THE COURT:  If it's mushy, you're just going to

11   squish into it.

12             THE WITNESS:  -- it just becomes, you know, semi more

13   mushy.

14             THE COURT:  Okay.  Let me just walk you through that

15   again.  So you're doing an autopsy and you're going to remove

16   the brain.  You do a circular cut around the top of the head.

17   You basically take the cap of the skull off.  Then you have

18   the exposed brain.

19             THE WITNESS:  Correct.

20             THE COURT:  Do you have to do further cutting to free

21   the brain from the skull?  That's what you referred to with a

22   saw or something?

23             THE WITNESS:  Right.  You have to cut the cranial.

24             THE COURT:  Actually, once you've taken the cap off

25   of the head, you have to do more cutting to be able to take

Teas - recross

1    the brain out?

2         THE WITNESS:  You have to lift it up so that --

3         THE COURT:  You can cut at the bottom.

4         THE WITNESS:  -- so you can see the foramen magnum

5    and then you can go down into the foramen magnum and cut the

6    spinal cord.

7         THE COURT:  You slice there because that's what you

8    have to do to take it out.

9         THE WITNESS:  Right, right.  As you're lifting it

10   up --

11        THE COURT:  Hang on a second.

12        THE WITNESS:  Okay.

13        THE COURT:  So what you said a second ago -- at least

14   what I think you said is that your usual way of doing that

15   would have been to reach down into the front of the skull, get

16   your fingers underneath the brain and then lift it up so that

17   you can cut the thing that you just talked about.

18        THE WITNESS:  Right.  But first what I would do, if

19   the dura is putting pressure on the brain tissue, I would

20   release that right away.

21        THE COURT:  How do you do that?

22        THE WITNESS:  You just take a scissors and cut it on

23   the side.  So the dura has --

24        It's encompassing the whole brain.  It's going

25   underneath into the temporal lobe.  So when you saw it off,

1    you only cut part of it, and parts of it are still --

2            THE COURT:  So when you say you're going to cut the

3    dura, are you going to cut it all the way around then?

4            THE WITNESS:  It depends on what happens.  Sometimes

5    you can lift it off, if it's a fresh brain, with the dura.

6    But if the dura is pressing on the brain in any way, then I

7    would release those little areas that are pressing on it so

8    that --

9            THE COURT:  Which makes it easier to lift the brain

10   out.

11           THE WITNESS:  Well, which doesn't cause damage to the

12   brain.

13           THE COURT:  Okay.  Let me stop you there because I

14   need to do this a step at a time.

15           So the reason it would cause damage to the brain if

16   you don't do that is that it's still pressing, and if you're

17   going to lift it out, it's going to compress it even more.

18           THE WITNESS:  Correct.

19           THE COURT:  So you would want to release that

20   pressure.

21           THE WITNESS:  Correct.

22           THE COURT:  Okay.  So let's say you have done --

23           Well, let me ask you this.  What are the types of

24   conditions that cause the dura -- to cause that to have that

25   kind of pressure?

Teas - recross

1    THE WITNESS:  Whenever there is brain swelling

2    because, again, it's like you have a thick bag and you're

3    trying to put something in it which it's too small.

4    THE COURT:  Fair enough.

5    Let's say you have done all that and now you're going

6    to lift it out.  You said the normal way you would do that

7    would be to reach down into the front of the skull, get your

8    fingers underneath the brain and then lift it up so that you

9    can cut the spinal cord.

10    THE WITNESS:  Correct.  First, you would cut the

11   optic nerve because --

12   THE COURT:  Those are attached.

13   THE WITNESS:  So you cut the optic nerve and then you

14   lift it more gently, trying to free the temporal lobes which

15   are also down in the hole, and then you reach your scalpel

16   down in the spinal canal and cut the spinal cord.

17   THE COURT:  And is that the standard way of doing it?

18   THE WITNESS:  That is the standard way, though you

19   can do it the way Dr. Lucy Rorke is --

20   THE COURT:  No, no, I understand.

21   Putting aside that, the standard way, aside from Dr.

22   Rorke-Adams, a different method --

23   THE WITNESS:  Yes.

24   THE COURT:  -- in other words, does anybody reach in

25   from the back of the brain to pull it up?

1        THE WITNESS:  Not usually.

2        THE COURT:  You wouldn't be able to deal with the

3    optic nerves if you did it.

4        THE WITNESS:  Correct.  It's easier to go from the

5    front.

6        THE COURT:  So now just to get back, I wanted to make

7    sure I understood sort of the process.

8        So what you're saying in terms of this mushy part of

9    the brain -- let's assume that is the front of the brain, just

10   for purposes of discussion.  One of the things you're saying

11   might have happened is that as the pathologist reached down

12   into there, it's mushy, and your fingers are going to go into

13   it and it's going to kind of gunk it up a little bit.

14       THE WITNESS:  Correct.

15       THE COURT:  Okay, thanks.  On your --

16       THE WITNESS:  The pathologist usually knows that.

17       THE COURT:  Yes, understood.

18       Completely different topic.  On your list of

19   testimony, it only went back to 2005.  Obviously, you have

20   been testifying way, way, way longer than that.

21       THE WITNESS:  Yes.  I thought I gave more years.

22       THE COURT:  That's okay.

23       I just had one question generally.  I mean, I'm

24   assuming that at some point in time in your past, your

25   testimony was virtually all for the state's attorney's office.

Teas - recross

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  That was when you were working for

3     the medical examiner and doing autopsies in homicide cases.

4          THE WITNESS:  Yes, even when I was working for the

5     coroners in 2004 and '5.

6          THE COURT:  Fine.  Then the other question I had

7     about that is there was some questioning about a case called

8     People v. Delosha Wyatt.  Did I get that right?

9          THE WITNESS:  Yes, Delosha Wyatt.  It was actually

10    this year.

11         THE COURT:  Just this past year.

12         And there was some questioning about that.  And you

13    said that you concluded that it was a homicide, and then

14    another question was asked.  So can you tell me a little bit

15    more about it?

16         THE WITNESS:  It was a case of a woman who said that

17    she was swinging her child around, like she was playing with

18    her child, and somehow she let go of the child and the child's

19    head hit a radiator.

20         THE COURT:  Okay.

21         THE WITNESS:  And the child had a big skull fracture.

22    So the question posed to me was that is this fracture and

23    subdural consistent with that history, and my answer was yes

24    though the child abuse pediatrician either never got that

25    history or said she didn't consider it, and she said that it

1  wasn't consistent with that.

2      THE COURT:  So you disagreed with the other side's

3  expert but you concluded it was, nonetheless, a homicide.

4      THE WITNESS:  I would have called it a homicide, but

5  a homicide doesn't mean first degree murder.

6      THE COURT:  No, I understand.  Homicide just means

7  it's a death caused by another person.

8      THE WITNESS:  Yes.  I concluded that.

9      THE COURT:  Okay.  I think there was one other thing.

10  Give me a second to find it.

11     (Brief interruption.)

12     THE COURT:  I may have covered it actually.

13     (Brief interruption.)

14     THE COURT:  I covered it already.

15     Follow-up questions based on any of my questions?

16     MR. BLEGEN:  No, thank you.

17     THE COURT:  Mr. Goodfriend.

18     (Brief interruption.)

19     MR. TELISMAN:  Your Honor, pardon me.  I know that I

20  didn't do the cross examination.

21     THE COURT:  Go.  That's fine.  It doesn't matter.  Go

22  ahead.  You have got to tell me what that is, though.

23     MR. TELISMAN:  It's a tablet.  It's the Google Nexus.

24  I have my whole case on here so I can actually review.

25     THE COURT:  All right, that's fine.  Just curious.

1    MR. TELISMAN:  Sorry, Judge.

2                    RECROSS EXAMINATION

3    BY MR. TELISMAN:

4    Q    Dr. Teas, when the judge was just asking you questions

5    regarding how the brain is removed during autopsy, you talked

6    about how the dura can be sometimes pressed down on the brain?

7    A    Yes.

8    Q    Is that a normal phenomenon or is that an unusual

9    phenomenon?

10   A    It all depends on your technique, but sometimes when you

11   have a swollen brain -- so if you look at the pictures on this

12   case, you can see that the dura is pressing right in the

13   frontal region.  That picture has not been shown.

14   Q    Was there any indication --

15              As part of the materials you reviewed, you reviewed

16   the autopsy report of Dr. Harkey, is that right?

17   A    Yes.

18   Q    And did Dr. Harkey make any mention in the report at all

19   about the dura pressing on the brain?

20   A    No, you usually don't.  It's a procedure thing.  And so

21   that's why you take a picture and you can see it in there.

22              THE COURT:  And you're saying you can see it on that

23   particular picture.

24              THE WITNESS:  Yes.

25              THE COURT:  Which is one that hasn't been shown yet.

1       THE WITNESS:  Yes.

2       MR. BLEGEN:  Judge, I have the picture.

3       THE COURT:  We're going to talk about that in a

4    second.  We're not going to put it on the screen.  You can

5    show it to her.  We're not going to put it on the screen.

6       (Brief interruption.)

7       MR. TELISMAN:  I have a couple questions.

8       THE COURT:  Yes.

9    BY MR. TELISMAN:

10   Q   Dr. Teas, was Isabella's brain at the time of her death,

11   was it bigger or smaller or the same size of an infant's brain

12   for that age?

13   A   I was hoping somebody would ask me that.

14       THE COURT:  Well, there you go.

15       THE WITNESS:  Her brain weighed, according to the

16   autopsy, 930 grams.  Am I remembering correctly?

17   BY MR. TELISMAN:

18   Q   I'm not asking about the weight; I'm asking about the

19   size.

20       THE COURT:  Well, I think she's getting there.

21       THE WITNESS:  I'm getting there.

22       And so she -- the average size for a one-year-old or

23   so would be like 980 plus or minus 150, so she was actually

24   almost at the normal weight.

25       And I know Dr. Jenny said, or was it Dr. Rorke-Adams

1    who said that it was atrophic.  The brain doesn't look as

2    atrophic as I would think it should, and the ventricles are

3    not as dilated as I would like to see it on a case that the

4    baby has been.

5            So it's really within the normal range.  It may be a

6    little small, but I would not call it completely atrophic.

7    BY MR. TELISMAN:

8    Q    So what you're saying -- and I apologize.  That last part

9    there, you're saying it's a little bit smaller than you would

10   have expected?

11   A    Yes, for that age.

12   Q    But when you say it's not necessarily atrophic, you mean

13   the brain wasn't --

14   A    It wasn't --

15           Usually if you have a brain that has sustained

16   trauma, it shrinks a lot and the lateral ventricles, which you

17   can see here, are big and dilated, and that wasn't the case.

18   And I know Dr. Leestma and I discussed it a little.

19           MR. TELISMAN:  If I could have one moment, your

20   Honor?

21           THE COURT:  Yes.

22       (Brief interruption.)

23           MR. TELISMAN:  One other follow-up question.

24   BY MR. TELISMAN:

25   Q    Dr. Teas, this brain prior to being sectioned, you said,

1 | was placed in formaldehyde or formalin?

2 | A    Yes.

3 | Q    Is that right?  Is the weight done before or after it's

4 | soaked in the formaldehyde?

5 | A    It was after.  It was after.

6 | Q    Okay.  And you had explained earlier that this brain did

7 | not do a very good job of soaking up the formaldehyde, is that

8 | right?

9 | A    Yes.

10 | Q    Okay.  And so the weight that you are referring to, that

11 | generally assumes that the entire brain gets soaked up by

12 | formaldehyde, right?

13 |             THE COURT:  Which weight, the 930 or the 980?

14 |             MR. TELISMAN:  The general weight, the average.

15 |             THE COURT:  The 980 that she referred to.

16 |             MR. TELISMAN:  The 980.

17 |             THE COURT:  Let me make sure I understand the

18 | question right.  So I'm going to say it in a different way.

19 | You tell me if this is your question.

20 |             MR. TELISMAN:  Probably better than I can, Judge.

21 |             THE COURT:  So you described that the sort of

22 | normal -- quote, unquote "normal" weight for a child this age

23 | would be 980 grams.  This brain was either 930 or 935, I

24 | forget what you said.

25 |             So the question is:  Are those weights, are those

1    weights after something has been soaking in formaldehyde and

2    might have soaked it up or before?  Is that your question?

3              MR. TELISMAN:  Yes.

4              THE WITNESS:  Usually the tables that we compare it

5    are probably fresh brain, but the difference is --

6              THE COURT:  Fresh brain, in other words, not in

7    formaldehyde.

8              THE WITNESS:  Not in formaldehyde.

9              THE COURT:  Okay.

10             THE WITNESS:  The difference is not that much.

11   It's --

12             THE COURT:  So how much would it be?

13             THE WITNESS:  I don't know, 15, 20.  I have had cases

14   where --

15             THE COURT:  15, 20 grams?

16             THE WITNESS:  Grams, yes.  I have had cases where

17   actually either way; they're either more or less.

18             THE COURT:  So what you're saying is it's not a

19   terribly significant factor.

20             THE WITNESS:  Yes.

21             MR. TELISMAN:  I have nothing further on that.

22             THE COURT:  Mr. Blegen, anything else?

23             MR. BLEGEN:  I just wanted to show her this photo.

24             THE COURT:  Ask if it's --

25             What I want you to do is I want you to have her

 1  identify the photo that she's referring to, which would allow
 2  you to see, I'm assuming, with the cap taken off of the head.
 3  Have her identify it.  You're going to give it a number.  I'm
 4  going to admit it in evidence.  It's not going to be made part
 5  of any public record ever.  You're going to put it an envelope
 6  and you're going to get it to my chambers.
 7          MR. BLEGEN:  Okay.
 8                  REDIRECT EXAMINATION
 9  BY MR. BLEGEN:
10  Q   Let me show you what I've marked as Petitioner's Exhibit
11  Photo 2.
12          THE COURT:  You have seen this, right, Mr. Telisman,
13  or Mr. Goodfriend, or whoever?
14          MR. TELISMAN:  Yes, your Honor.
15          THE COURT:  You know what he's talking about.  Okay.
16          MR. GOODFRIEND:  Let me just take a look.
17          THE COURT:  Is this the one that was shown for a
18  brief moment up on the screen at one point?
19          MR. TELISMAN:  No.
20          THE COURT:  It's completely different.
21          MR. TELISMAN:  Different.
22          THE COURT:  It's a much closer-up picture?
23          MR. TELISMAN:  Yes.
24  BY MR. BLEGEN:
25  Q   Dr. Teas, is Petitioner's Exhibit Photo 2 the photo you're

1   discussing with the cap taken off and some person's fingers?

2   A   Yes.

3   Q   Tell us what this photo shows.

4   A   So this is a photo -- if you look at this way, I guess you

5   have written it the correct way if you're holding it. What

6   you are seeing, you are seeing the baby on the table. The cap

7   has been taken off, and it's held right next to the head. And

8   then you can see the flap of the skin behind.

9         And then you can see on the front that there are

10   fingers between the -- between the skull and where the brain

11   is. And then if you look at the middle to just in front of

12   the ears, you can see that the dura is partially covering the

13   back part of the brain. But on the front part, there is no

14   dura, and you can see that the edge of the dura is sort of

15   digging into the frontal.

16         THE COURT: So in that picture, there is sort of a

17   yellowish thing, that is on the right-hand side of the

18   picture, and you see fingers up at the top of the picture.

19         THE WITNESS: Yes, you see the fingers.

20         THE COURT: I just want to have that in the record so

21   that when somebody looks at this, they're going to look at it

22   in the correct organization.

23         So the fingers are coming down from the top.

24         THE WITNESS: The way Mr. Blegen has written.

25         THE COURT: Oh, so we don't know really.

Teas - redirect

1    THE WITNESS:  He's written it correctly.  It's okay.

2    THE COURT:  Fine, all right.  But the fingers are at

3  the top.

4    THE WITNESS:  The fingers are at the top like in the

5  front.

6    THE COURT:  That's all I wanted to get in the record.

7  Thanks.

8    (Brief interruption.)

9    MR. BLEGEN:  I have one question, Judge, that I

10  forgot to ask.

11  BY MR. BLEGEN:

12  Q   Dr. Teas, I take it that the fingers in this photo are at

13  the front of the brain?

14  A   Yes.

15  Q   Does --

16  A   There are two sets of fingers.  One is where the brain is

17  in the skull.  They're in the front of the brain.  And on the

18  wall --

19    THE COURT:  The cap.

20    THE WITNESS:  The cap of the brain.  The fingers are

21  to the left side of the skull.

22  BY MR. BLEGEN:

23  Q   The fingers that are on the left that are touching the

24  front of the brain, do you see the part I'm referring to?

25  A   Yes.

Teas - recross

1    Q    Does that front part of the brain in this photo look as

2    gnarly as the section of the brain that Dr. Rorke-Adams has

3    indicated as horrible contusions and lacerations?

4    A    It probably doesn't, but a lot of that may have been

5    caused by the removal when the brain was being removed.

6    Q    Can the sectioning also cause distortion to the pieces of

7    the brain?

8    A    Yes, if it's a soft brain.

9        (Brief interruption.)

10        MR. TELISMAN:  Your Honor, two follow-up questions on

11   this.  Thank you.

12                    RECROSS EXAMINATION

13   BY MR. TELISMAN:

14   Q    Dr. Teas, based upon the photo we have here, this is

15   looking from the top, looking at the top of the brain,

16   correct?

17   A    Yes.

18   Q    You can't see the underside, correct?

19   A    No.

20   Q    And you can't see the underside of where the front, the

21   frontal poles meet the base of the brain?

22   A    Yes.

23   Q    Or the base of the skull, I mean.

24   A    Yes.

25   Q    And what's that called?  Is that where the gyrus rectus

1    is?

2    A    Yes.

3    Q    Okay.  And that's not visible on this photo, right?

4    A    Correct.

5              MR. TELISMAN:  Okay.  I have nothing further.

6              THE COURT:  That's fine.  You can give that back to

7    Mr. Blegen.

8              Let me just ask, because you folks have had access to

9    all this stuff and I have not, are there other -- the answer

10   to the first part of this question is clearly yes.  Are there

11   other photos from the autopsy?

12             But more specifically, are there other photos from

13   the autopsy that would depict anything more about the removal

14   of the brain sequentially, chronologically, after the one you

15   have just been showing to Dr. Teas?

16             MR. TELISMAN:  I don't know because it was very

17   difficult to look at those photos.

18             THE COURT:  Believe me, I understand.

19             MR. TRIEBEL:  We have them on the computer right

20   here, Judge.  If we have a couple of minutes, we can look at

21   those.

22             THE COURT:  Why don't you take a break and look at

23   them.  And before you do that, turn your computer this way, or

24   just turn it so that only you can see it I guess is my point,

25   because if there are, I'd like to see those.  And so I'm just

1  going to step out for a couple of minutes to just do one

2  thing.  I'll come back in five minutes and we'll talk about

3  what we do from here.

4          MR. BLEGEN:  Can I have Dr. Teas' assistance?

5          THE COURT:  Absolutely, you should.

6          I take it that neither side has any more witnesses

7  that you're calling.  I just want to confirm that.

8          MR. TELISMAN:  That's correct.

9          MR. BLEGEN:  Correct.

10          THE COURT:  Okay.  So in five minutes I will come

11  back out and we'll kind of close this up.

12          (Witness excused.)

13          (Brief recess.)

14          THE COURT:  Are there any?

15          MR. BLEGEN:  It does not appear so.

16          THE COURT:  It doesn't appear so.  Okay, fine.

17          So I think one of the things I said yesterday that I

18  needed you all to do was to -- you're going to need to do some

19  of this individually -- make sure we have a comprehensive list

20  of exhibits.  And I don't --

21          I guess what I'd like to do is set a check date with

22  you, you know, maybe around the middle of next week to just

23  have you come to chambers maybe at 9:00 o'clock some morning

24  so that you can let me know where that is and if I'm going to

25  have to decide anything.  I'm guessing that the answer to that

1    is likely to be no.  That will be the first thing.

2        I will set -- I'm going to set the schedule I told

3    you about yesterday.

4        A couple of other questions, or one other question

5    about evidence.  Do I have somewhere the autopsy report?  Is

6    that an exhibit, or is it part of somebody's --

7        MR. TRIEBEL:  Dr. Harkey's report.

8        THE COURT:  Doctor?

9        MR. TELISMAN:  Harkey, H-a-r-k-e-y.

10        THE COURT:  Do I have it?

11        MR. TRIEBEL:  That's one of the exhibits that we're

12    redacting to submit amongst all the other medical records.

13        MR. BLEGEN:  I know I used it.  I don't remember if I

14    actually -- I showed it to someone.

15        THE COURT:  I would like it, so just make sure that's

16    included.

17        And as far as the redactions are concerned, you're

18    redacting these largely for purposes of whatever use may be

19    made of them after that, but I'd like to have the unredacted

20    versions.

21        MR. TRIEBEL:  You'd like to have the?

22        THE COURT:  I'd like the unredacted versions.

23        MR. TRIEBEL:  That's easy to do, your Honor.

24        THE COURT:  So when you get those to me, just make

25    sure you do that.  That's the first thing.

1    So make sure the autopsy report is in there.

2    Secondly, I assumed people would be doing this

3    anyway, but I don't want to leave it to chance.  And obviously

4    understanding what the theory or what the primary theory of

5    the petitioner is, I'm hoping to see some discussion in the

6    briefs about what's the consequences if one reaches a

7    conclusion that the chronic subdural hematoma was caused by

8    some earlier episode of abusive head trauma, in other words,

9    how that fits in with the other evidence and what the

10   implications of that are.

11   So you may be planning to do that anyway, but if not,

12   please do.

13   Aside from that, I think that covers everything I

14   wanted to.

15   MR. TRIEBEL:  Normally I think we talked about we're

16   set by 15 pages.

17   THE COURT:  You know, it's a posttrial brief, so that

18   doesn't apply.  So just file what you're going to file.

19   MR. TRIEBEL:  Okay.

20   THE COURT:  That doesn't mean add a zero to the end.

21   MR. TRIEBEL:  I will try to stick close to that,

22   Judge, but with the --

23   THE COURT:  No, it's going to need to be more than

24   15.  If it's 15 pages, it's going to be too superficial,

25   frankly.  So don't be concerned about that.  All right.

1      MR. BLEGEN:  Judge, am I correct that you won't

2  start -- you don't need the exhibits before you get --

3      THE COURT:  I don't need the exhibits before I get

4  the briefs, yes.

5      So the date I'd like you to come in, just to sort of

6  tell me where you are as far as pulling exhibits together,

7  would be a week from today.  That's the 23rd at 9:00.  So just

8  come to chambers.

9      And so I guess what I would say is if you tell me, we

10  have gone through all the exhibits, there aren't going to be

11  any issues, here's a list, just bring the list along with you.

12  If there are going to be issues, bring me a list that has, you

13  know, some breakdown for stuff that I'm going to have to

14  decide because then I will have to figure out when and how we

15  get together for me to decide that.

16      MR. TRIEBEL:  Earlier, Judge, you had asked for a

17  cleaned-up redacted copy of the exhibits we have been giving

18  you as we have gone along.

19      THE COURT:  I think if I did, I think what makes more

20  sense is if you give me the list, then I will be able to go

21  back through and figure out what I don't have.  I mean, I've

22  got a ton of stuff and I don't, frankly, need another ton of

23  it.

24      MR. TRIEBEL:  Okay.

25      MR. BLEGEN:  We could put the exhibits on the same

1  disk that we give you.

2         THE COURT:  Well, that would work, too.  As long as

3  you're not adding to the volume of paper, that would be fine.

4         Okay.  And I think I told you this morning that one

5  of the things I'm hoping that people will discuss, also, is

6  sort of what is the evidentiary status of articles that have

7  been shown on cross.

8         MR. TRIEBEL:  All right.

9         THE COURT:  Is there anything else anybody wants to

10  bring up?

11         All right, thanks very much.

12         And so give some thought to -- and it will be a topic

13  for discussion on the 23rd when you come in at 9:00 -- about

14  the whole issue of what goes into the public record and when.

15         Okay.  All right.  I will see you next Wednesday

16  then.  Thanks.

17         MR. TELISMAN:  Thank you, Judge.

18         MR. TRIEBEL:  Thank you, Judge.

19    (Which were all the proceedings had in the above-entitled

20  cause on the days and dates aforesaid.)

21

22

23

24

25

1   C E R T I F I C A T E

2

3        I hereby certify that the foregoing is a true and

4   correct transcript of the above-entitled matter.

5

6

7   */s/ Laura M. Brennan*

8   _____                    _____

    Laura M. Brennan
9   Official Court Reporter                              Date
    Northern District of Illinois the trial was and adjourned.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25