1              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3

4  JENNIFER DEL PRETE,        )
                        )
5            Petitioner,  )  Docket No. 10 C 5070
                        )
6         vs.           )
                        )
7  MELODY HULETT,         )  Chicago, Illinois
                        )  December 17, 2012
8         Respondent.  )  10:15 a.m.

9                    VOLUME 1
10            TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12  APPEARANCES:

13

14  For the Plaintiff:    BLEGEN & GARVEY
                        BY:  MR. PATRICK W. BLEGEN
                            MS. JODI L. GARVEY
15                      MR. DANIEL A. RUFO
                      53 West Jackson Boulevard
16                      Suite 1437
                      Chicago, Illinois  60604
17

18  For the Defendant:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                        BY:  MR. KARL R. TRIEBEL
19                      MR. NEAL GOODFRIEND
                      MR. ARI TELISMAN
20                      MS. MONIQUE A. ANAWIS
                      100 West Randolph Street
21                      13th Floor
                      Chicago, Illinois  60601
22

23  Also Present:             MR. ROBERT STANLEY

24        LAURA M. BRENNAN - Official Court Reporter
         219 South Dearborn Street - Room 2102
25           Chicago, Illinois  60604
                (312) 435-5785

| | |
|---|---|
| 1 | (The following proceedings were had in open court:) |
| 2 | THE CLERK:  10 C 5070, Del Prete v. Hulett. |
| 3 | MR. TRIEBEL:  Good morning, your Honor; Karl Triebel, |
| 4 | with the attorney general's office, on behalf of the |
| 5 | respondent.  I'm here with Neal Goodfriend and Ari Telisman, |
| 6 | also from the attorney general's office. |
| 7 | THE COURT:  The third person's name, say it again. |
| 8 | That would be you, I think. |
| 9 | MR. TELISMAN:  Ari Telisman, your Honor. |
| 10 | THE COURT:  Spell the last name. |
| 11 | MR. TELISMAN:  A-r-i T-e-l-i-s-m-a-n. |
| 12 | THE COURT:  There's a fourth person. |
| 13 | MR. TELISMAN:  Yes.  Also present on behalf of the |
| 14 | respondent is Monique Anawis. |
| 15 | THE COURT:  A-n-a-w-i-s, you said. |
| 16 | MS. ANAWIS:  Yes. |
| 17 | THE COURT:  Okay. |
| 18 | MR. BLEGEN:  Good morning, Judge; Patrick Blegen, Dan |
| 19 | Rufo and Jodi Garvey on behalf of the petitioner. |
| 20 | THE COURT:  Okay.  And Ms. Del Prete is here. |
| 21 | MS. BLEGEN:  Ms. Del Prete is here. |
| 22 | THE COURT:  Del Prete, is that the right |
| 23 | pronunciation? |
| 24 | MR. BLEGEN:  Yes.  And Rob Stanley, a law clerk, is |
| 25 | sitting at the table. |

1      THE CLERK:  Okay.  And is this stuff set up the way
2  you wanted it to be set up?
3      MR. TRIEBEL:  We have a call in.  We had thought that
4  there were going to be cables coming to the tables for the
5  laptops, but I don't think we'll need that for at least a few
6  minutes.  There's already a call in.  There we go.
7      THE COURT:  That's the response to the call.
8      MR. TRIEBEL:  Then we have a couple of preliminary --
9      THE COURT:  Hang on one second.
10      How soon are you going to need it?
11      MR. BLEGEN:  With the first witness, so pretty soon.
12      THE COURT:  How long does it take to do that?
13    (Brief interruption.)
14      THE COURT:  Okay.  So let's just do a couple of
15  preliminary things.  We'll take a break to do that.
16      MR. BLEGEN:  I should -- I think both sides want to
17  do a short opening, so we could do that while we're --
18      THE COURT:  No, you can't because they're going to be
19  doing stuff here, and there's going to be people milling
20  around and nobody is going to -- it's going to be distracting.
21      MS. BLEGEN:  Fair enough.
22      THE COURT:  All right.  There was a request -- and so
23  I'm saying this for the benefit of folks that might be sitting
24  out there.  There was a request that came in through my
25  courtroom deputy, I think, or it may have been through my

1    judicial assistant from some -- a journalist who wanted to

2    know if it was a problem if they took notes on a laptop, and I

3    guess this morning it was modified.  It might be an iPad or it

4    might be a laptop.

5            So here is the answer to the question.  The answer is

6    it is a problem if it becomes annoying to anybody in the

7    courtroom, and that includes people that might be sitting

8    three or four feet from you.  So if you have a laptop and it's

9    going to make noise, you might want to sit farther back

10   because the minute it becomes an annoyance, it gets shut off.

11   That's the first thing.

12           The second thing is -- and I'm saying this to

13   everybody in the courtroom -- it's against the law to

14   photograph, record, audio record or video record anything.

15   And if anybody is doing any of that or I find out that anybody

16   is doing any of that with any kind of a device of any kind,

17   not only will it be taken from you, but you will be held in

18   contempt of Court, and it's a crime.  So just be warned.

19           All right.  So why don't we pause.  I guess he's

20   going to come -- I suspect he had to leave to go get

21   something.

22           MR. TRIEBEL:  We just have a couple of short

23   preliminary things.

24           THE COURT:  Let's go ahead and do that.

25           MR. TRIEBEL:  One short one, one might be longer.

1          THE COURT:  Fine.

2          MR. TRIEBEL:  The first thing, your Honor, is Mr.

3   Telisman has been practicing here for a number of years but

4   has still not been admitted to the Northern District.

5          THE COURT:  It doesn't matter.  That's okay.

6          MR. TELISMAN:  Thank you, Judge.

7          MR. TRIEBEL:  That was the first preliminary thing.

8          The second is we have a motion in limine objecting to

9   some of the first witness' testimony.  We received a report on

10  Friday that basically changed the nature of his opinions,

11  rationale.  It included a number of references.

12         THE COURT:  Who is the first witness?

13         MR. TRIEBEL:  They're calling Dr. Barnes.

14         THE COURT:  Okay.

15         MR. TRIEBEL:  And so I understand that some of that

16  report is responding to our experts, and because there was no

17  deposition in this case, we wouldn't object to that type of

18  testimony, but there's testimony in there that is basically

19  making his original possibilities -- he's saying now some of

20  them are concrete.  And, also, he's including a list of

21  references that we just got on Friday.  And it's not fair to

22  ask us --

23         THE COURT:  Is Dr. Barnes local?  Is it a he or a

24  she?

25         MR. BLEGEN:  It is a he.  And he's actually sitting

1  in court.  If we want him to leave, Ms. Garvey has
2  mentioned --
3           THE COURT:  Is he local or not local?
4           MR. BLEGEN:  No, he's not.
5           MS. GARVEY:  Stanford, Judge.
6           THE COURT:  Okay.
7           MR. TRIEBEL:  You know, obviously, we didn't have
8  time to read through those references on Friday and prepare
9  our cross examination on those issues.
10          THE COURT:  This is the first witness?
11          MR. BLEGEN:  It is.
12          I have maybe a suggestion.
13          THE COURT:  Yes.
14          MR. BLEGEN:  One, I think it is responsive.  I guess
15  that is indicated by people --
16          THE COURT:  I haven't seen any of it, so I have no
17  clue one way or the other.
18          MR. BLEGEN:  The first part that they're saying he
19  didn't reach conclusions in his initial report, I think maybe
20  that's just not being terribly familiar with how radiologists
21  write reports.  I believe -- and I'm pretty sure this is the
22  case -- his initial opinion -- his initial report does have
23  conclusions.  They're written kind of strangely.  We had him
24  write a responsive report which, frankly, I was -- I guess I
25  was trying to be helpful so that they could have a better

1  understanding of what he would say and responding to their
2  experts.

3        But I don't think anything he is going to say on the
4  stand is -- I don't think he's going to really talk much about
5  the references that are in there.  So my suggestion would be
6  if they can point out things in the supplemental report that
7  they think are a problem --

8        THE COURT:  I think those are my tech guys.

9        MR. BLEGEN:  -- then we could maybe just
10 conditionally admit his supplemental report and then they can
11 tell us --

12        THE COURT:  Then the issue is --

13        It's Triebel, right, not Triebel?

14        MR. TRIEBEL:  It's Triebel.  Thank you.

15        THE COURT:  Mr. Triebel.  One of the things I got
16 from what he was saying is that, you know, it's conceivable he
17 might want to cross-examine Dr. Barnes on some of the -- some
18 or all of the new references that he's given in addition to
19 other things, and I don't know how many there are.  I don't
20 know how long they are.  He's basically saying, we got them on
21 Friday, here it is Monday morning, I would like more time to
22 be able to do that.

23        And so we need to come up with a way of dealing with
24 that, too, unless somebody can convince me that it's not
25 really a problem because, again, I haven't seen any of this

1  because, you know, these things don't get filed with me for

2  all sorts of good reasons.

3          Hang on one second.  This can be off the record.

4          (Brief interruption.)

5          THE COURT:  So I don't know how to do that.  I mean,

6  there's ways it could be dealt with.  You know, there is such

7  a thing as video conferencing, and I'm guessing that Stanford,

8  you know, might, unlike, you know, the federal courts because

9  Stanford is probably richer than the federal courts, not

10 probably, probably has video conferencing facilities, and it

11 might be that you could sort of resume your cross examination

12 if you thought you had more later in the week, something like

13 that.

14         So my suggestion is talk about that or see if you can

15 come up with some other mechanism while we're pausing so that

16 they can plug this stuff in.  Okay.

17         MR. BLEGEN:  Okay.

18         MR. TRIEBEL:  Thank you, your Honor.

19         THE COURT:  So let's pause while they get hooked up

20 here.

21         (Brief interruption.)

22         THE COURT:  Is everything hooked up okay now?  All

23 right.

24         So have you come up anything on what we were talking

25 about before?

1    MR. TRIEBEL:  Yes, your Honor.  I think our request

2  is that we be permitted to bring out on cross the portions

3  that we find that are problematic, and they may not even go

4  into everything that is in the report that we object to.  If

5  that's the case, then we may be able to get together and come

6  up with some kind of redacted report to give the Court as an

7  exhibit after talking about it.  And since it's a bench trial,

8  you know, we wouldn't have a problem with saying to the

9  Court --

10    THE COURT:  Subject to the objections or whatever.

11    MR. TRIEBEL:  Right.

12    THE COURT:  Yes, that sounds fine.

13    MR. TRIEBEL:  Then we would ask, during our short

14  opening statements, if it's possible, for the three witnesses

15  that are here --

16    THE COURT:  Yes, for the openings they don't need to

17  be here.  So the witnesses are excluded for the openings.

18  Then there is the one witness who I said could stay for the

19  hearing.  That was Dr. Teas, right?

20    MR. BLEGEN:  For the opening, too.

21    THE COURT:  Yes, for the opening, right.

22    So I will leave it to --

23    Ms. Garvey is dealing with that.

24    MR. TRIEBEL:  Since it's their petition, I think --

25    THE COURT:  Yes.  You said you wanted to give an

1  opening, Mr. Blegen.

2        MR. BLEGEN:  Yes, Judge.

3        OPENING STATEMENT ON BEHALF OF THE PETITIONER

4        MR. BLEGEN:  I thought I would start off by talking a

5  little bit just briefly about the standard here at this actual

6  innocence hearing to excuse the procedural default below in

7  the state.  So the standard is to prove actual innocence, the

8  petitioner is required to come forward with some new evidence

9  showing that it is more like likely than not that no

10 reasonable juror would have convicted him or her in light of

11 the new evidence.  The new reliable evidence can include a lot

12 of things, but one of the things it can include is exculpatory

13 scientific evidence, and that's what we have got here.

14        More likely than not is a lower burden than clear and

15 convincing evidence, and in reaching a ruling on whether there

16 has been a finding that no reasonable juror would have

17 convicted in light of the new evidence, courts are directed to

18 assess how reasonable jurors would react to the overall newly

19 supplemented record.  And the analysis has to incorporate the

20 understanding that proof beyond a reasonable doubt is the

21 standard that divides guilt from innocence.

22        And in a hearing like this -- and I think this is

23 also a little unusual to me; I don't know about the Court --

24 but everything is considered, according to the Supreme Court,

25 meaning the old, the new, the exculpatory and the inculpatory.

1   So all of the record below is part of the record for making

2   the determination and any of the new stuff.  What you're going

3   to find here is that, I believe, that the state is putting in

4   some new evidence.  We considered objecting to that until we

5   saw the cases that said old, new, exculpatory and inculpatory

6   is admissible, and there are also very much lowered

7   evidentiary rules for admissibility.  It's not like a trial.

8   There's a Supreme Court case where somebody's confession was

9   suppressed at trial but was admitted against him or her in the

10  actual innocence hearing.

11          THE COURT:  What is that case?

12          MR. BLEGEN:  Mr. Rufo may know it better than I do.

13          THE COURT:  Well, you will find it at some point.

14  You're saying there's a lower threshold of admissibility for

15  this hearing --

16          MR. BLEGEN:  Correct.

17          THE COURT:  -- than it would be for a trial.

18          MR. BLEGEN:  Right.  So evidence that comes from a

19  police report, for example, can come in even without a

20  witness.  Medical records that weren't admitted could come in.

21  We'll probably have a debate later on about whether all of

22  those are coming in or not.  But there is a lower standard of

23  admissibility.

24          So then turning to what we think we're going to

25  establish here is that we do have new scientific evidence in

Blegen - opening

1    the form of the -- you're going to hear it through the

2    testimony of various doctors that the injury, the thing that

3    caused this baby in this case to crash, was not abusive head

4    trauma as it's now called, or shaken baby syndrome as it was

5    called at the time of trial, by Ms. Del Prete.  There are

6    several things that were missed in the previous trial that we

7    have now found and some other things that were known but they

8    had it wrong and are now cleared up.

9        One of the things that we're going to submit is that

10   shaking, which is -- the theory at trial was this was shaking

11   alone, and the state's expert at trial, who is not going to be

12   recalled by the attorney general's office, said that this was

13   a shaking case and shaking actually causes more force than

14   blunt trauma, for example, from a short fall.  That's the

15   evidence.

16       THE COURT:  You said that's what the expert testified

17   in the trial.

18       MR. BLEGEN:  Correct.

19       You're going to hear that that's not the case, and

20   you're also going to hear from a biomechanical engineer on our

21   part who says that if shaking were to cause these brain

22   injuries that they're describing or that they attribute to the

23   theory, there would have to be neck injuries first, and there

24   are no neck injuries here.  One of the pieces of new evidence

25   that the state has come up with is sort of related to neck

Blegen - opening

1  injuries, we think, and I will tell you the response to that,

2  and you're going to hear it with the first witness.

3         But what we have found is -- and here's some other

4  things that were wrong at the initial trial.  Dr. Flaherty was

5  the shaken baby expert.  The force, causing greater force than

6  a fall, she testified that the girl had contusions and

7  lacerations on her brain and that that was seen on radiology.

8  That was the only place that it was ever suggested.  And the

9  contusions and lacerations on the brain, of course, would be

10  some suggestion that the brain was hitting the skull inside

11  the head while shaking and some evidence of shaken baby

12  syndrome.

13         Four separate radiologists have now reviewed the

14  scans, the imaging, and there's a lot of imaging, and also the

15  radiologist at the time reviewed it.  None of them, including

16  the state's new expert, see contusions and lacerations on the

17  brain.  The only person who did apparently was a neurosurgeon

18  at the time way back when in 2002 who wrote some note about it

19  in the medical records.  And as far as we can tell, that's

20  what the shaken baby expert was relying on.  But even their

21  own experts now, their reports do not contain a finding of

22  contusions or lacerations.

23         There are, of course, and this was known at trial, no

24  other evidence of injury, no external signs of injury, no

25  bruising, no broken bones, and also no other imaging signs of

Blegen - opening

1  injury like strains in the neck, strains in the ligaments, any

2  sort of swelling in the neck area.  There are no signs like

3  that.

4          And their shaken baby expert also testified that

5  retinal hemorrhages, which they found that extended to the ora

6  serrata -- so what I call in my head extensive retinal

7  hemorrhages -- can only be caused by shaken baby syndrome,

8  only.

9          THE COURT:  Give me that sentence again.

10         MR. BLEGEN:  That retinal hemorrhages to the extent

11  found in this case can only be caused by shaken baby syndrome.

12         THE COURT:  And, again, that's what you're saying

13  that the expert at trial testified for the state.

14         MR. BLEGEN:  Correct.

15         THE COURT:  Okay.

16         MR. BLEGEN:  And, in fact, the judge then kind of

17  interrupted her, the trial judge, and said, "are you saying

18  only caused," and she said, "yes, only caused."

19          So there wasn't really a ruling from the judge,

20  certainly not when she found her guilty.  There was a bit more

21  detail in response to posttrial motions, but we think that was

22  a critical detail.  And now their own experts -- ours, of

23  course, say there are many other causes for retinal

24  hemorrhages and even extensive retinal hemorrhages, and you

25  will hear from somebody named Pat Lantz, a doctor, about that

Blegen - opening

1  from our side.

2          But even their own experts, or expert, now agrees

3  that it's not the only cause of retinal hemorrhages, that are

4  other causes for the extensive retinal hemorrhages.  Now, he

5  says it's things like crushing injuries or falls from high

6  distances or infections that he doesn't think are present

7  here.  So he says it wouldn't have been caused by that.

8          But the missing part of their argument is that there

9  are now more known causes and there are likely more causes of

10  these kind of retinal hemorrhages out there that just haven't

11  been found because an ophthalmological consult doesn't happen

12  in every case or even in a lot of cases.  And those are the

13  three primary things that their expert got wrong, we think.

14          What we have found is that there was a preexisting

15  condition for this child.  She had a chronic subdural

16  hematoma.  That was known at the time of trial.  A chronic

17  subdural hematoma is a collection -- I shouldn't say hematoma.

18  We know that there was a chronic subdural collection, a

19  collection of fluid, which later was learned to be some sort

20  of blood that predated the incident when the child collapsed.

21  12/27 of '02, that's when she collapsed.  Only two people

22  discussed the chronic subdural at trial, the attending ER

23  physician and the defense expert.  But both of them were wrong

24  about the timing of a chronic subdural collection.  They both

25  said essentially it's older than just that day, but the

Blegen - opening

1    defense expert said out to ten days, and that's it.

2          There is an agreement now among the experts,

3    including their own experts, that it's greater than two weeks

4    or more old.  That pushes it well beyond, of course, the time

5    of the collapse and also undercuts the theory that was

6    presented at trial and I think is going to be presented here

7    that there is no lucid intervals in these cases.

8          THE COURT:  Lucid intervals.

9          MR. BLEGEN:  Lucid interval, and that's the argument

10   that says whoever is with the child when she collapses is the

11   one who did it because the symptoms come on immediately and

12   there is no delay.

13         THE COURT:  Okay.

14         MR. BLEGEN:  That is completely undercut by the

15   evidence of this chronic subdural collection which we know

16   from surgery also had blood in it.  So the child had a

17   propensity to bleed and rebleed.

18         The child also had infections, an infection, was on

19   antibiotics at the time.  That was known.  But how it fits

20   into what happened was not known, and that will be explained

21   much better than I can by the doctors.  But also thrombosed

22   cortical veins in the brain -- meaning clotted veins, cortical

23   veins, are just a certain kind of vein in the brain -- were

24   misdiagnosed at the time as acute, meaning newish or new

25   subdural hematomas, new bleeds on the brain.

Blegen - opening

1      Our experts have concluded that those are actually

2  thrombosed cortical veins, meaning clotted veins, and that can

3  lead to seizure, which can leave to apnea, meaning not

4  breathing, which can lead to no more heartbeat, the exact same

5  things that happened to this child.

6      And also it's been concluded by our experts -- I'm

7  not sure to the extent that theirs will disagree -- that the

8  injury to the brain is not a traumatic injury, meaning what

9  actually happened to the brain, but it's rather a hypoxia

10  injury, meaning lack of oxygen, and that was a result of

11  seizures brought on by the CPT.  And they will do a much

12  better job of explaining it and fitting in all the details

13  than I can do.  So that's our theory that this was naturally

14  caused.

15      Now, one, I think, critical factor, Judge, about this

16  actual innocence hearing is that they were never, the state --

17  and I know it's not the same people -- but the state was not

18  forced in the past, in the first trial, to explain this

19  chronic, this old subdural collection, which is found out to

20  be an old bleed.  It wasn't timed properly.  We can time it

21  to --

22      Let me just take an aside here.  The child was in day

23  care for three weeks before she crashed.  She started day care

24  on December 6th.  She crashed on December 27th.  Just on

25  imaging, the chronic bleeding in the brain was two weeks

Blegen - opening

1    minimum and probably more like three or four weeks old and

2    could have dated back to birth, but it's very likely that it

3    extends beyond the time that the child started attending the

4    day care center where Ms. Del Prete worked.  It's not really a

5    center; it was just a home that was kind of getting licensed

6    as day care.  She was not the owner.  Somebody else was.

7            But even if they want to date this prior bleed within

8    the three weeks, there is no evidence that Ms. Del Prete was

9    alone with the child except on the day of the crash because

10   the owner was going out of town that day.  So essentially

11   they don't have any --

12           THE COURT:  Owner of the day care center, you mean?

13           MR. BLEGEN:  Yes.  She was going out of town that

14   day.  So that's why Ms. Del Prete was alone with the children

15   that day.  Generally speaking, there was more than one person

16   there.

17           But, also, we can tie the chronic subdural collection

18   to an increase in head circumference that was reported in the

19   pediatric records that was missed by the defense below, and

20   it's a faster than normal increase in head circumference,

21   which is a sign of a chronic collection of fluid in your head.

22   And the child -- as we're probably going to do some messing

23   around with circumference charts -- we can see that she had

24   this chronic collection before Ms. Del Prete ever met her.

25           And what I think we're going to hear, because their

1   experts disagree that there is a natural cause for these kind

2   of bleeds, that there was a previous incident of trauma, that

3   the child suffered more than one incident of trauma.  And I'm

4   not sure they're going to go this far -- I guess we'll see

5   what the experts say -- that this might have been abusive

6   trauma, not accidental trauma, this prior incident.  And the

7   prior incident, there is nothing in the record about any

8   accidental trauma.

9           So I think -- I don't know this for sure -- that they

10  may suggest Ms. Del Prete abused the baby twice.  And I think

11  once they do that, the actual innocence hearing is essentially

12  over because they have no evidence that she had the

13  opportunity to do it twice.  They didn't ever have to prove

14  that she did it twice because nobody forced them to confront

15  the chronic subdural collection.

16          And so, in summary, we have got a natural cause

17  explanation for what happened.  They have an explanation now

18  because they know they have to take into account this old

19  collection of blood, they have an explanation that says she

20  must have done it twice, that they don't have any evidence

21  that she did it twice, and it completely undercuts the lucid

22  interval argument, which is what tied it to her in the first

23  place.  If there's lucid intervals, they can't tie it to Ms.

24  Del Prete.  And if the prior incidents that caused the bleed

25  was either accidental or abusive trauma, then there must be

1    lucid intervals, or at least there was in this case, and they

2    can't tie it to her.  They can't pin it on her.

3          So that's essentially what the hearing is going to be

4    about.  I went a little longer than I had hoped to, but we're

5    going to try to be as brief as we can with the witnesses.

6          THE COURT:  Thank you.

7          MR. TELISMAN:  May it please the Court?

8          THE COURT:  Mr. Telisman, right?

9          MR. TELISMAN:  Yes, your Honor.

10         OPENING STATEMENT ON BEHALF OF THE RESPONDENT

11         MR. TELISMAN:  Well, your Honor, the evidence is

12   going to show that Isabella Zielinski was born on

13   September 6th, 2002, as a result of a normal pregnancy.  She

14   was a healthy baby.  She had attentive doting parents who --

15         THE COURT:  Give me the date again.

16         MR. TELISMAN:  September 6th, 2002, your Honor.

17         THE COURT:  Thanks.

18         MR. TELISMAN:  The parents sent her -- took her to

19   regular visits to the pediatrician.  Anytime there was

20   anything wrong with Isabella, they called the doctor, they

21   went to the doctor.  Isabella Zielinski didn't have a bowel

22   movement for a day, they called the doctor's office.  Isabella

23   ran a fever, they took the baby to the doctor.  Isabella had a

24   typical upbringing, a typical normal course of health until

25   the age of three and a half months old when on December 27th,

1    2002, Isabella's mom took her to day care where she had been

2    going for about three weeks.  And the petitioner was the only

3    caretaker there, the only adult present that day.

4          Isabella was asleep when mom dropped her off.

5    Isabella slept, woke up and fed and then slept again.  And she

6    woke up at around 1:00 o'clock in the afternoon with a dirty

7    diaper, and it was kind of a doozy.  It was a big mess.  It

8    was a bowel movement that had gone out of her diaper and had

9    soiled her clothes.  Well, the petitioner had to clean it up.

10         Now, the petitioner claims that she changed Isabella

11   and placed her on a couch and then went into another room for

12   a minute and that when she came back, the petitioner claims

13   Isabella was limp, nonresponsive, not breathing, no pulse.

14         Now, some time passed before the petitioner called

15   911.  Fortunately, after she called, EMS, the paramedics,

16   arrived in about six minutes.  And yet when they arrived,

17   Isabella's skin was blue.  By the time they got her to the

18   hospital -- and they were intubating her and shooting her up

19   with multiple doses of epinephrine to try to get her heart

20   going to revive her.  By the time they got her to the

21   hospital, her body temperature was extremely low, and her body

22   was acidotic, which basically means that her pH levels were

23   extremely low.  And what the evidence is going to show is that

24   means that the petitioner didn't really call 911 too quickly

25   after Isabella collapsed.

Telisman - opening

1       And the treating doctors that were trying to revive

2   Isabella and keep her alive, when they saw Isabella, they

3   didn't automatically assume abusive head trauma.  They did not

4   jump to conclusions.  They didn't automatically assume abuse.

5   Rather, they ran tests, and here is what they found.

6       They found that she suffered a devastating

7   neurological collapse involving, as I said before, cardiac

8   arrest and respiratory arrest; that she had substantial

9   retinal hemorrhages, bleeding on the back of the eyes, and

10  that was in both eyes, that it was severe, multilayered, and

11  you will hear some testimony about that, and that it extended

12  all the way out towards the fronts of the eyes; that her brain

13  had acute and chronic bleeding, new and old blood all over;

14  that her brain was swelling, showing damaged brain; that

15  subsequent EEGs, brain wave tests, showed that her brain wave

16  activity was severely suppressed, it was a severely damaged

17  brain.  And this was all a progression after she immediately

18  arrived that they saw the brain swelling, they saw the brain

19  dying.

20      What Isabella's doctors did not see was any

21  catastrophic infection, any genetic disorders, metabolic

22  disorders or bleeding disorders.  The doctors did not treat

23  her for any kind catastrophic infection, genetic disorders,

24  metabolic disorders or bleeding disorders.  And here is what

25  is telling, your Honor.  Isabella didn't die from any

1    unidentified untreated infection, genetic disorders, metabolic

2    disorders or blood disorders.  She lived for 11 months after

3    her devastating collapse.  Her brain was a shadow of what it

4    had been.  She couldn't breathe on her own.  She couldn't feed

5    on her own.  She never smiled again.  But her body grew and

6    developed and maintained good health for a child with a

7    breathing tube and a feeding tube and a brain that hardly

8    worked.

9        Isabella lived for 11 months after the petitioner

10   inflicted abusive head trauma upon her, and she only died when

11   her breathing tube got a kink in it, and she ultimately

12   suffocated in November of 2003.  It was the breathing tube, a

13   direct consequence of the petitioner's abuse, that led to

14   Isabella's death and not some undetected, fatal, untreated

15   infection or disorder as the petitioner is going to claim.

16       The petitioner -- or pardon me.  The respondent, your

17   Honor, is going to present the testimony of seven expert

18   witnesses in various fields of discipline, and they're going

19   to explain how they relied on this information to reach

20   conclusions about what happened to Isabella.  And you're going

21   to hear from various specialists, neuroradiologists,

22   neuropathologists, forensic pathologists, a child abuse

23   pediatrician and others.  But ultimately these six medical

24   doctors -- there were six medical doctors and one

25   biomechanical engineer -- but the six medical doctors will all

1    explain that they determined from their own review of

2    everything that happened that Isabella died because of abusive

3    head trauma at the hands of the petitioner.

4          And the other expert, your Honor, that the respondent

5    will present -- excuse me -- is a biomechanical engineer by

6    the name of Dr. Rangarajan.  And he is going to explain that

7    he is not going to offer an opinion about what caused

8    Isabella's collapse and ultimate death, but, rather, Dr.

9    Rangarajan will explain to the Court that his field, the field

10   of biomechanics, is not developed enough.  There has not been

11   sufficient research or sufficient developments in the field to

12   be able to explain the causes of Isabella's injury.

13         And this is going to be a direct rebuttal to the

14   statements of the petitioner's biomechanical engineer who not

15   only states, as counsel mentioned during his opening, that if

16   you're going to shake a baby and cause brain damage, there

17   must be concurrent neck damage.  Rather, you're going to hear

18   that biomechanical engineer actually say that, according to

19   his field, an adult could never shake a baby enough to cause

20   any brain injury at all under any circumstances.

21         Now, let's be clear.  The petitioner is not claiming

22   that someone else abused Isabella, nor does the evidence

23   support that.  The petitioner is not claiming that Isabella

24   suffered some accidental trauma, nor does the evidence support

25   that.  The petitioner is claiming that Isabella didn't suffer

1    any trauma on 12/27 of '02, that her neurological collapse,

2    the massive amounts of blood, including a lot of acute blood

3    found on the surface of her brain, the retinal hemorrhaging,

4    was all the result of some other cause.

5           And as counsel mentioned, the petitioner's burden at

6    this hearing is to establish that, in light of the new

7    evidence, it is more likely than not that no reasonable juror

8    would have found the petitioner guilty beyond a reasonable

9    doubt.  And, your Honor, our Supreme Court has described that

10   this burden is met in only a truly extraordinary case.  Your

11   Honor, the petitioner will not be able to meet her burden

12   because a reasonable juror would have convicted the petitioner

13   because she is guilty.  And it was not just one particular

14   finding, but it was a constellation of findings that proved to

15   her treating doctors and proved to the trial judge and proved

16   to the physicians that we will present that Isabella Zielinski

17   suffered abusive head trauma at the petitioner's hands.

18          The fact that she was a normal newborn, had a normal

19   early childhood, and then suffered a massive neurological

20   collapse, had the retinal hemorrhages that were as severe as

21   they were, the massive brain findings that were found, and

22   then the lack of any sort of catastrophic infection, any other

23   sort of predisposing disorders, that that constellation all

24   put together in light of the circumstances under which

25   Isabella collapsed pointed to one answer, which is that

1  Isabella collapsed and ultimately died because of abusive head
2  trauma at the hands of the petitioner.
3         With respect to a couple of points that the
4  respondent -- or the petitioner made during opening, his
5  opening, he talks a lot about this chronic subdural hemorrhage
6  and/or chronic subdural collection, and there is really no
7  dispute that it is there.  It is important to note, however,
8  your Honor, that that is not what caused Isabella Zielinski to
9  die.  That is not what caused Isabella Zielinski to collapse.
10  And if the purpose of this hearing is to see whether or not
11  the petitioner could meet her burden to show that she is not
12  responsible for what happened to Isabella, then the question
13  is what significance does that have.  And I'm confident that
14  you will see that the evidence will show that this chronic
15  collection was benign and that it was not the cause of what
16  happened to her.  It was not the cause of her brain to
17  suddenly go into devastating collapse, start bleeding
18  everywhere and her ultimately to die.
19         With respect to the issue of the retinal
20  hemorrhaging, your Honor, counsel says it will be established
21  that it can be caused by other things.  What you will see,
22  your Honor, is that the retinal hemorrhages that Isabella
23  suffered, however, given everything else that is known about
24  Isabella and the lack of other disorders, other infections
25  that the petitioner claims might be there, that under those

Telisman - opening

1    circumstances, her retinal hemorrhages could only be caused as

2    a result of abusive head trauma.

3            And with that, your Honor, I thank you very much for

4    your attention.

5            THE COURT:  Spell Zielinski for me.

6            MR. TELISMAN:  Z-i-e-l-i-n-s-k-i.

7            THE COURT:  Okay, I got it right.  Thank you.

8            MR. TELISMAN:  Thank you.

9            THE COURT:  Okay.  You can call the first witness.

10           MR. BLEGEN:  Judge, I'm going to call Dr. Barnes.

11           MR. GOODFRIEND:  Judge, was there a motion to

12   exclude?

13           THE COURT:  I think last week, and I allowed the one

14   person to be in here.

15           MR. GOODFRIEND:  Dr. Teas.

16           MR. BLEGEN:  Judge, I thought you said anybody could

17   sit in for anything.

18           THE COURT:  No.  I think what you had asked me was

19   about Dr. Teas.

20           MR. BLEGEN:  That is what I asked, but it's fine.  I

21   thought you had said either side can have anybody sitting they

22   want, but it doesn't matter.

23       (Witness sworn.)

24     DR. PATRICK BARNES, PETITIONER'S WITNESS, DULY SWORN

25                   DIRECT EXAMINATION

1  BY MR. BLEGEN:

2  Q    Sir, could you tell us your name and spell your name for

3  the court reporter?

4  A    Yes, sir.  My name is Patrick David Barnes.  That's B, as

5  in Boston, a-r-n-e-s.

6  Q    And how are you employed, Dr. Barnes?

7  A    I'm employed by Stanford University Medical Center.

8  Q    And in what area?

9  A    I'm a pediatric neuroradiologist and pediatric

10  radiologist.

11  Q    And can you tell us a little bit about your background,

12  education and training in that area?

13  A    Certainly.

14        I graduated from the University of Oklahoma College

15  of Medicine in 1973, and residency in diagnostic radiology

16  also at the University of Oklahoma College of Medicine.

17  That's in Oklahoma City, Oklahoma.  Then that was 1976.

18        Finished that, then off to Boston for a fellowship

19  training in pediatric radiology with specialization in

20  pediatric neuroradiology and pediatric cardiovascular

21  radiology.  That was 1977.

22        Then after that, certified by the American Board of

23  Radiology in diagnostic radiology, and then in 1995, when

24  first offered, further certification in neuroradiology.

25  Q    Do you have any current or past clinical and academic

1  appointments related to pediatric radiology?

2  A   Certainly.

3          Went back home after all that, back to Oklahoma to

4  the Oklahoma Children's Memorial Hospital at that time, where

5  I was a practicing pediatric neuroradiologist and section

6  chief of pediatric neuroradiology for the next nine years;

7  also became an associate professor at the University of

8  Oklahoma College of Medicine.

9          In 1986, returned to Boston for the next 14 years,

10  became chief of pediatric neuroradiology, director of the

11  pediatric MRI and CT center there, and then associate

12  professor at the Harvard Medical School, then in 2000 was

13  invited to come out West.

14          And for the past 12 years, I am chief of pediatric

15  neuroradiology at the Lucile Packard Children's Hospital, and

16  I'm comedical director of our pediatric MRI and CT center, and

17  finally, after all of this, professor at the Stanford School

18  of Medicine.

19          I'm also cofounder of a northern California child

20  abuse task force which has now become the SCAN team -- that's

21  Suspected Child Abuse and Neglect team at the Lucile Packard

22  Children's Hospital partnering with the Stanford University

23  Medical Center and also with Santa Clara Valley Medical

24  Center.

25  Q   Can you tell us just a little bit about what the SCAN team

1    does?

2    A    Yes.   That is the emerging or developing multidisciplinary

3    model of a child abuse team usually centered at children's

4    hospitals across the country and other major medical centers

5    comprised of child abuse pediatricians, radiologists of which

6    I am the radiology consultant to that, other medical

7    specialists that may be in ophthalmology, eye doctor,

8    neurosurgery, brain surgeon, ped neurologist and other

9    physicians plus our social workers and our child protection

10   professionals from surrounding counties.

11           So that makes up our team that meets monthly,

12   regularly, as well as when any new case comes through that is

13   suspected child abuse or neglect.

14   Q    And can you just briefly tell us what the goal of the team

15   is, what is it you're intending to do?

16   A    Yes.   It's using multiple resources and specialists to

17   assist in suspected child abuse and neglect cases such that we

18   get input not only for what we may think are, in fact, child

19   abuse cases, inflicted injury, but also so that we do a more

20   thorough work-up for what we call the mimics.   And those are

21   the other conditions that can look like child abuse clinically

22   or by imaging but, in fact, are not and may be due to clinical

23   or medical conditions.

24           So that's the goal of our team.

25   Q    Have you been qualified as an expert in court in the past?

1   A    Yes, sir, I have.

2   Q    In what areas?

3   A    As a pediatric radiologist, as a pediatric

4   neuroradiologist and as a specialist in imaging of child abuse

5   and the mimics of child abuse.

6           MR. BLEGEN:  Judge, I would tender Dr. Barnes as an

7   expert in those areas.

8           MR. GOODFRIEND:  I just have one --

9           THE COURT:  You know what, we're going to do this.

10  There is no jury in the box, okay.  So you're going to hold

11  this until the cross examination, and if you have an argument

12  about it, then you can deal with it later and I will --

13          MR. GOODFRIEND:  I think it's more the question goes

14  to weight, not the admissibility.

15          THE COURT:  Yes.  So let's just hold it for cross.

16  That's going to be the practice with all the witnesses.

17  BY MR. BLEGEN:

18  Q    Let me show you --

19          THE COURT:  And I guess what I would say is that if

20  there is an objection -- if on any witness -- this goes for

21  either side -- if there is an objection that the witness

22  hasn't been qualified to give opinions, you will state the

23  objection and I will deal with it, okay.

24          All right, go ahead.

25  BY MR. BLEGEN:

Barnes - direct

1  Q   Let me show you four exhibits that I have marked as
2  Petitioner's Exhibit Barnes CPS Resume.
3  A   That's correct.  Even though the date is May 2012, I think
4  it's current as of today.
5  Q   And is that a resume explaining your work and training in
6  the area of child protective services?
7  A   It is.  It is extracted from my overall curriculum vitae
8  and covers all aspects including clinical work, research, and
9  education --
10 Q   Let me show you --
11 A   -- and child protection.
12 Q   Sorry.
13        Let me show you Petitioner's Barnes CV.  Is that a
14 copy of your curriculum vitae?
15 A   Yes.  And even though it says May 2012, I think it is
16 current to this time.
17 Q   Let me show you two exhibits, Petitioner's Barnes Report
18 and Petitioner's Exhibit Barnes Supplemental Report.
19        Are those reports that you wrote in this case?
20 A   Yes, sir, that is correct.  Yes, sir.
21 Q   Thank you.
22        MR. BLEGEN:  Judge, I will move the admission.
23        THE COURT:  Are you going to have copies of all this
24 stuff for me?
25        MR. BLEGEN:  These are your copies.

Barnes - direct

1        THE COURT:  These are my copies.

2        MR. GOODFRIEND:  Are there numbers on the exhibits?

3        THE COURT:  Mr. Blegen has been trying criminal cases

4   in this building so long that he has adopted the U.S.

5   attorney's office practice of giving names to exhibits as

6   opposed to numbers, which I've never been a big fan of, but

7   whatever.

8        MR. BLEGEN:  I'm sorry.

9        THE COURT:  It's all right.  So every exhibit has a

10  name.  So it's Barnes CPS Resume, Barnes CV, Barnes Report and

11  Barnes Supplemental Report.

12       MR. BLEGEN:  Correct, Judge.

13       THE COURT:  So is there any objection to any of

14  those?

15       MR. GOODFRIEND:  No, Judge.

16       THE COURT:  All right, they're all admitted.  Thanks.

17  BY MR. BLEGEN:

18  Q    Dr. Barnes, did you examine medical records, imaging

19  records and various other documents related to this case?

20  A    Yes, sir, I did.

21  Q    All right.  And I want to talk to you about the imaging.

22       When I say "imaging," do we have an understanding

23  that that means CTs and MRIs?

24  A    Yes, sir.

25  Q    And can you tell us just very briefly what a CT is and

1  what an MRI is?

2  A   Certainly.  In medicine there is the field of radiology

3  that we use technologies such as x-ray, ultrasound, and

4  magnetism.

5       And particularly for a CT scanning, as in this case,

6  that's where we use a computer and x-rays to generate images,

7  for instance, in this case, of the brain.

8       The more advanced technique that has become the gold

9  standard is MRI, which is magnetic resonance imaging.  And

10  since the tissues of the human body are magnetic, it's a

11  natural interaction such that you place a child inside a very

12  powerful magnet many times the strength of earth's gravity,

13  and that's the M.

14       And the R is radio waves, and we tune those radio

15  waves to the frequency of the child's tissues, and we can

16  interact back and forth, and it produces the I, which is

17  imaging.

18       So that's CT and MRI.

19  Q   Upon your review of the imaging in this case, did you find

20  any important features?

21  A   Yes.

22  Q   We'll get to in a minute where you can show them to us.

23  But can you briefly describe what you thought the important

24  features were?

25  A   Yes, sir.

1          Number one, chronic or old collections in this child

2    between the brain and the skull that could be several weeks to

3    months old and date back to birth.  Those could be referred to

4    as benign extracerebral collections.  They could also be

5    referred to as chronic subdural hematomas or hygromas.  That's

6    number one.

7          THE COURT:  Benign extracerebral --

8          THE WITNESS:  Collections.

9          THE COURT:  Okay.  Give me the next one.  Something

10   subdural hematomas.

11         THE WITNESS:  Chronic subdural hematomas.

12         THE COURT:  Right.

13         THE WITNESS:  And the last is chronic subdural

14   hygromas.

15         THE COURT:  Hygroma?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  Spell that.

18         THE WITNESS:  H-y-g-r-o-m-a-s.

19         THE COURT:  What is a hygroma?

20         THE WITNESS:  It's essentially water instead of

21   blood.

22         THE COURT:  Okay, got it.

23   BY MR. BLEGEN:

24   Q    Any other important findings?

25   A    Number two, more recent hemorrhage and/or thromboses

1    between the brain and the baby's skull within the more chronic
2    collections.
3            THE COURT:  And I'm going to just feel free to
4    interrupt when I need something clarified.
5            When you say "within the more chronic collections,"
6    you mean there was a collection and the more recent hemorrhage
7    and/or thromboses were within that same space?
8            THE WITNESS:  Yes, sir.  These are general --
9            THE COURT:  Okay, that's fine.
10           THE WITNESS:  -- to start out with, a summary.
11           THE COURT:  Understood.  I just want to make sure I'm
12   understanding as you go.
13           MR. BLEGEN:  It will be better when I put the
14   pictures up in a minute.
15   BY MR. BLEGEN:
16   Q    Did you also find brain injury due to a lack of oxygen?
17   A    That's number three is brain injury due to a lack of
18   oxygen or a lack of blood flow to this baby's brain.
19   Q    And did you find any contusions, lacerations or other
20   signs of injury in the imaging?
21   A    That's number four, and the answer is no.  No evidence of
22   direct traumatic injury to this child's head, skull or brain.
23   Q    How about --
24   A    Or to the neck region.
25   Q    There was some testimony at the previous trial in this

Barnes - direct

1    case that there were contusions or lacerations on the brain.
2    Did you find any of that on imaging?
3    A    No, sir, none whatsoever.
4    Q    Is either CT or MRI, for lack of a better word, good at
5    finding those things?
6    A    Yes, they're relied upon.
7    Q    Did you review a PowerPoint presentation prepared by Dr.
8    Julie Mack in this case?
9    A    I did.
10   Q    All right.  And are some slides on there that you thought
11   would be helpful to explain your findings?
12   A    Yes, sir.
13   Q    All right.
14        MR. BLEGEN:  Rob, would you pull it up?
15        (Brief interruption.)
16   BY MR. BLEGEN:
17   Q    And does this PowerPoint --
18        You have reviewed the PowerPoint previously, correct?
19   A    Yes, sir, I have.
20   Q    It doesn't contain all the imaging done in this case,
21   correct?
22   A    That's correct, it does not.
23   Q    Does it contain selected imaging that Dr. Mack and you
24   thought were helpful to explain what you saw?
25   A    Yes, sir.

Barnes - direct

1  Q   So let's look at slide 3.  And can you tell us what is

2  important about this imaging, noting that it's from 12/27/02?

3  A   Yes, sir.

4          Does anyone have an electronic pointer?

5  Q   I don't think --

6          THE COURT:  Me, but it's back in my office there.

7          MR. BLEGEN:  I don't have one.  Is it all right if he

8  stands up, if need be?

9          THE COURT:  Yes.  I have what we will just call an

10 analog pointer.  At least I thought I did.  Yes, here it is.

11         MR. BLEGEN:  Or a pencil.

12         THE WITNESS:  Thank you, sir.

13 BY MR. BLEGEN:

14 Q   First of all, would you tell us --

15         THE COURT:  Am I going to get this PowerPoint at some

16 point?

17         MR. BLEGEN:  My plan was to put all the PowerPoints

18 in.  There might be an objection from the other side on that,

19 but I was hoping to do that.

20         THE COURT:  All right.

21         MR. BLEGEN:  Now that they know what you think, they

22 might not object as strenuously.

23         THE COURT:  Okay.

24 BY MR. BLEGEN:

25 Q   Dr. Barnes, can you tell us in time or in order whether

Barnes - direct

1  this was the first, second and third CT that was done?

2  A   This is the initial brain CT on this child on December 27,

3  2002.

4  Q   And can you point out what you find significant from this

5  photo or slide?

6  A   Yes, sir.

7          And I'm going to talk like I'm a radiologist who has

8  seen this case come through as a clinician, if that's okay.

9          THE COURT:  Okay.

10         THE WITNESS:  And like I --

11         THE COURT:  Can you --

12         Whoever is going to cross-examine, can you see what

13 he's doing okay?

14         MR. GOODFRIEND:  I'm going to --

15         THE COURT:  If you need to move, just go ahead and

16 move.

17         MR. GOODFRIEND:  Thank you.

18 BY MR. BLEGEN:

19 Q   Let me interrupt for a second, Dr. Barnes.

20         Are you saying you're going to go through this as if

21 you had just seen this radiology fresh?

22         THE COURT:  Hang on a second.  Let's do this.

23         THE WITNESS:  Yes, sir.

24         Do you want me to turn this?

25         THE COURT:  I'm going to turn it.

Barnes - direct

1        (Brief interruption.)

2   BY MR. BLEGEN:

3   Q    You're going to go through this?

4   A    I am.

5            THE COURT:   That's fine.

6   BY MR. BLEGEN:

7   Q    Dr. Barnes, you're going to go through these slides and

8   images as if this child had presented at your hospital?

9   A    Yes.

10  Q    Okay, go ahead.

11          What do you see of significance on slide 3?

12  A    So this baby, you remember, is on a table inside of a

13  donut-shaped machine.  There's an x-ray source on one side of

14  the donut.  The x-rays will go through the brain.  The other

15  side has detectors.

16          So differences in x-ray absorption will be

17  transmitted to the computer and will generate images such as

18  this.  And it will be slice by slice, starting usually near

19  the eyes, and it will be a picture at the level of the eyes

20  and then a series of pictures all the way to the top of the

21  head.

22          So it's as if we're looking down on the baby's head,

23  but right and left are going to be reversed.  So the top of

24  each image is the front.  The bottom is the back of the head,

25  and then this is right and left.

1        The white circle on the outside is where the x-rays

2    absorb in bone because it contains a metal that is calcium, so

3    it's white.

4        Inside that we would expect to see the next thing is

5    the brain tissue that has gray matter, computer chips like

6    which are the computer chips of the brain, then the white

7    matter which is the wiring that interconnects it all.

8        And so we can see these areas of gray and white

9    matter on either side of the right and left cerebral

10   hemispheres.  These are at the top of the head.

11       Also, at the center of the brain, we see three dark

12   areas.  That's chambers within the brain that contain tap

13   water that is called cerebral spinal fluid, and it's produced

14   there and will circulate through these chambers and then come

15   around and circulate between the brain and the skull, very

16   much like what we see between the brain and skull in the

17   front, those dark collections.  So that's what we're looking

18   at.

19       Now, for the abnormalities, what we would do is

20   describe -- it's my job -- the abnormalities to see if they

21   fit a particular pattern of injury, see if there is any timing

22   we can provide for those abnormalities and provide a list of

23   possible or potential causes, what we call a differential

24   diagnosis.

25       And then the last part of that, when we talk to the

1  doctors, is correlating these findings with what is in the

2  medical record and, if we lose the child, what may be their

3  postmortem.

4          So the number one finding here on both of these

5  images is that in the front of the baby's head are these dark

6  collections, almost black, between the brain and the skull.

7  Those are the findings that suggest by their appearance,

8  because they're dark and they look like water, and these don't

9  contain findings for hemorrhage or clot, we would tell the

10  doctors there are some collections between the brain and the

11  skull that look old.

12          Number two finding where you see the red arrow --

13  Q   Let me stop you for a second on the old finding.

14          On 12/27/02 from this CT, can you date that old

15  collection?

16  A   Okay.

17  Q   As in how old it might be?

18  A   Yes.  We would tell the doctors that because this is

19  water, this -- if it represents that it was at one time

20  hemorrhage, it has evolved to where we see no blood products.

21  So they're gone and it's turned to water, so it's several

22  weeks to months old.  It's at least two to three weeks old

23  most likely but could go back to birth.  So we would tell the

24  doctors that these could go back to birth, so we have to check

25  the baby's head circumferences since birth and now and see if

1   it's too large for this to have happened, let's say, overnight
2   or in the last 24 hours.
3           And then we would tell them that those collections
4   could be due to trauma, old trauma, including birth trauma.
5   We can't tell whether if it's postbirth trauma, if it could be
6   due to accidental or nonaccidental, we can't tell that apart
7   by imaging, and that there are a number of medical conditions
8   that they will have to look at also for those old collections.
9   Q   And when you were talking about looking at head
10  circumference, are you talking about currently or historical
11  head circumference?
12  A   Not only currently, but what we have learned from this is
13  that we need to go all the way back to birth and before and
14  look at if there were any risk features, any labor delivery
15  problems subsequent to that that could produce these
16  collections to be that large.  So that's the first component.
17  That's what we would tell them is the potential causes and
18  what to look for.
19  Q   All right.  And before I interrupted you, you were about
20  to do something with the red arrow, I think?
21  A   Yes, sir.
22          What this red arrow is pointing to, if you consider
23  what we're looking at here is a clock, is at about 10:00
24  o'clock between the gray matter of the brain and the white of
25  the skull and surrounded by the dark of this chronic

1  collection is this bright white line that is white.

2      When we see white like this, and this will also

3  include for the white stripe that runs at about 6:00 o'clock,

4  from about the center of the image to about 6:00 o'clock, we

5  tell the doctors, for instance, in the intensive care unit or

6  the emergency room, that when we see something white like

7  this, this is most likely one of two things, and that's acute

8  or recent hemorrhage or thrombosis.

9      The difference between those two is, number one,

10  hemorrhage is when flowing blood gets outside of a blood

11  vessel.  It's normally -- we have flowing blood in a blood

12  vessel, that's a normal thing.  When it gets outside of a

13  blood vessel, it's called hemorrhage.

14      Number two, the other thing this could be is where

15  liquid blood becomes clotted and solid and it's inside a blood

16  vessel, and particularly for this, it's inside a vein for

17  venous thrombosis.

18      Also, because this white line looks like it's

19  floating inside of this water around it, it tells us it should

20  be associated with a structure that it's in, either a membrane

21  or a vein, for instance.  It's not free blood.  It's confined

22  to a structure.

23  Q    What were you going to tell us about the blue arrow?

24  A    The blue arrow is a white stripe that also follows a known

25  membrane and known blood vessels in this particular area

1    between the brain and the skull as well as between portions of

2    the brain, there are a series of normal membranes.  You're

3    going to be hearing these terms.

4           One of the membranes is called arachnoid.  Another

5    one is called dura.  And between each one of those membranes

6    are real or potential spaces where we find fluid and blood

7    vessels.

8           This particular white stripe that we see here is

9    right along a membrane called the falx, f-a-l-x, and that is a

10   membrane that runs from front to back between the two cerebral

11   hemispheres, but you're only seeing it in the back right here.

12   And it sets right at the top of a tent-shaped membrane called

13   the tentorium, t-e-n-t-o-r-i-u-m, that separates the cerebral

14   hemispheres above from what is called the cerebellum and brain

15   stem below.

16          In that falx and in that tentorial membrane are large

17   blood vessels called dural venous sinuses, and along this

18   particular membrane is one of those called the straight,

19   s-t-r-a-i-g-h-t, sinus; and at 6:00 o'clock is where the

20   superior sagittal sinus is.

21          THE COURT:  Straight.  Spell it again.  Straight as

22   in --

23          THE WITNESS:  Straight like s-t-r-a-i-g-h-t.

24          THE COURT:  Just regular straight, okay.

25   BY MR. BLEGEN:

Barnes - direct

1   Q   Can you tell from this image whether there is any acute or
2   new hemorrhage or bleed?
3   A   Yes.  This is also bright white, just like the small area
4   and what we're calling the right frontal.  It's at the front
5   region, so those are bright white.  So we're not going to be
6   able to tell the time difference between what is an acute
7   hemorrhage versus what is a clot or thrombosis in a membrane
8   or in the veins because the CT as done at this time is not
9   specific enough.
10  Q   Let me ask you a couple of questions about the size of
11  what you see.
12          Do you see any gigantic or massive hemorrhaging or
13  bleeding on the brain?
14  A   No, sir.  Both of these white areas are very small, but
15  what is large are the dark collections between the brain and
16  the skull.  Those are the large.  Those are the older
17  collections.
18  Q   All right.  And having seen this scan, would you have
19  suspected that there were ruptured bridging veins in this
20  child's head?
21  A   No, sir.
22  Q   Why not?
23  A   That is because these hemorrhages or clots are very small.
24          If there is rupture of a bridging vein, and what that
25  means is the veins -- when we talk about the heart and the

Barnes - direct

1    blood vessels, the heart pumps blood via the arteries to the

2    brain to take oxygen and nutrients -- it will drop oxygen and

3    nutrients off, and then that blood has got to recirculate back

4    to the heart.  That side is called the veins, and there are

5    small ones and there are large ones.

6          When that returning blood between the brain -- in the

7    veins between the brain are the bridging veins, between the

8    brain and where they go to the major draining blood vessels,

9    the dural venous sinuses.  Those are large, carry high flow of

10   blood normally, even in a young infant, and a bridging vein

11   rupture where you tear the vein will lead to a large

12   hemorrhage.  We see no large white hemorrhages here.

13   Q    With regard to the chronic or old collections, the dark

14   areas?

15   A    Yes, sir.

16   Q    Can those cause or be associated with rebleeding?

17   A    Yes, and that's what we tell the doctors according to the

18   current evidence-based medicine literature that has

19   accumulated particularly over the last decade.

20         We know that these darker, older collections can

21   predispose a child to hemorrhage, either spontaneous with

22   normal handling, sometimes with trauma, whether that be

23   accidental or nonaccidental, and sometimes triggered by a more

24   recent medical condition.  So we would tell them that seeing

25   this particular type of hemorrhage or thrombosis requires a

1   work-up, an immediate work-up, for a bleeding or clotting

2   disorder.  The general term for that is coagulopathy,

3   c-o-a-g-u-l-o-p-a-t-h-y.  So that's one of the medical

4   conditions they need to work up.

5          We have mentioned trauma, accidental versus

6   nonaccidental, and now the medical potential causes,

7   coagulopathy, bleeding or clotting problem.  And then we start

8   mentioning the triggers for some of these bleeding or clotting

9   problems, and a major one in children at this age is

10  infection.

11         So that's kind of the findings that we would describe

12  component by component.  We don't see any evidence of injury

13  to the brain itself yet.  We give them the differential

14  diagnosis.  That leads them to do the proper testing, whether

15  it's laboratory testing or going back in great detail looking

16  at the past history of the child, the mother, et cetera,

17  particularly at birth, plus we try to give them some timing

18  parameters which, as you know for the dark collections, we

19  gave them those and said these look very old, and that may be

20  supported by abnormally increasing head circumferences from

21  birth.

22         Number two, the best that CT can do to time these

23  white areas is those hemorrhages or clots, thromboses, could

24  be anywhere from a few hours old up to seven days, maybe even

25  ten days old.

Barnes - direct

1      So then as our job is, following the American College
2   of Radiology standard on radiologists interpreting and
3   recording images, it's then to make recommendations.  And the
4   recommendations here would be, from an imaging point of view,
5   we need an MRI, magnetic resonance imaging, right away, plus
6   you need to test for all of the categories in the differential
7   diagnosis that we just provided you.
8   Q   Do you know whether an MRI was done right away in this
9   case?
10  A   It was not done until, I think, 11 days later, I think not
11  until January 7th.
12  Q   All right.  Are you ready to move on to slide 4?
13  A   Yes.
14          THE COURT:  Can I just interject a question?
15          So the reason -- I take it from what you say that the
16  MRI would do a better job at aging than the CT would.
17          THE WITNESS:  Yes, sir, two areas for the MRI.  It's
18  a hundred to a thousand times more powerful than CT.  It's not
19  just looking at how x-rays are absorbed.  It's looking at
20  seven, eight or nine different parameters based on magnetic
21  characteristics of the brain.
22          So it will give us more information regarding what we
23  call pattern of injury, number one; and, number two -- and
24  this is according to the evidence-based standards and
25  guidelines for timing that appear in the literature for both

1  CT and MRI -- it will give us a much better idea of timing of
2  the injury components.
3  BY MR. BLEGEN:
4  Q   All right.  You see slide 4 is up?
5  A   Yes, sir.
6  Q   What did you want to tell us about slide 4?
7  A   Well, on slide 4, what we're doing is we're taking this
8  kind of slice by slice from maybe at or just above the ear,
9  and we're going to go toward the top slice by slice.  What we
10 notice --
11          THE COURT:  So this is higher up in the head, in
12 other words?
13          THE WITNESS:  Yes, sir.
14          THE COURT:  All right.
15          THE WITNESS:  That's correct.
16          And what we notice in the right frontal region where
17 the red arrow is is this white line continues to follow a
18 course that would predict either it's in a membrane, one of
19 the membranes I mentioned that could be a normal membrane, but
20 we also warn the doctors that that could be in an abnormal
21 membrane, in other words, scarring in an area that could be
22 where this bleeding has come from that is well known to be
23 associated with chronic subdural hemorrhage no matter what
24 caused it, over weeks, sometimes even months that these
25 membranes form with abnormal blood vessels, or that it's

1 │ following a vein.

2 │     And that's what the arrows indicate here, that it

3 │ continues to follow a path.  And if we watch where it's going,

4 │ it's going toward this triangular area at noon which is the

5 │ front part of what is called the superior sagittal sinus.

6 │ It's following the course of what we would look at and call

7 │ cortical vein.  That just means it's a vein between the brain

8 │ and the skull.

9 │     Also, when we look at the back, that's a continuation

10 │ along that membrane as we go up of the white area.  That can

11 │ be hemorrhage.  It can be hemorrhage in one of the spaces

12 │ between the membranes we call subarachnoid.  It could be also

13 │ what we call in another space subdural, but it also can be, as

14 │ we often see in infants, within the membrane itself called the

15 │ falx because there are literally thousands of veins in what is

16 │ called the dural vascular plexus.

17 │     One of those structures is the inferior sagittal

18 │ sinus, a larger vein.  And so this can be a sign not only of

19 │ possible hemorrhage there but clotting within a large vein

20 │ called the inferior sagittal sinus.

21 │ Q   Can we move to slide 6?

22 │ A   Yes.

23 │ Q   Okay.

24 │ A   Now, this is the next -- I'm pretty sure this is the next

25 │ CT that was done on 12 -- December 20 -- excuse me --

Barnes - direct

1  December 28th, 2002.  I think that's what --

2              MR. GOODFRIEND:  Excuse me.  What number are we on?

3              THE COURT:  Slide 6.

4              MR. GOODFRIEND:  Thank you, Judge.

5              THE WITNESS:  And what the doctors did at that time

6  is they took a series of CT scans, just like we did on the

7  previous one, from the lower to the upper part.  Then after

8  that, they put a needle in the baby's vein, usually in the

9  arm, and they inject through that a liquid that contains

10  iodine.  We call that a contrast agent.  And that iodine has

11  metal in it.  That will absorb x-rays and appear white when it

12  circulates throughout all the blood vessels like the metal in

13  the bone called calcium.  And the reason we see hemorrhage

14  because it contains a metal called iron, so it will all appear

15  white.

16  BY MR. BLEGEN:

17  Q   Is that the picture on the left before contrast and on the

18  right after contrast?

19  A   That is correct.

20  Q   Tell us what you see in regard to the red and then the

21  blue arrows.

22  A   What we see here are a number of normal blood vessels.

23  This almost looks like a stick figure, if you will, arms and

24  legs here, and those are normal arteries.  We see some blood

25  vessels between the brain and the skull out here.  Those are

1   normal veins that don't have any clot in them, so they collect

2   this contrast media.

3           Then along the membranes that we talked about, the

4   tentorium and falx, they have thousands of blood vessels in

5   them.  So we're seeing that dye collect there.  And otherwise

6   we don't see any abnormality here except the reason that we

7   have the red arrows here before we gave the dye is because

8   these white areas along those membranes where there's lots of

9   vessels can cause confusion because, as I said before, normal

10  blood in vessels can be a little white.  Clotted blood gets

11  even whiter.  Hemorrhage can also be bright or white.  And

12  because the CT is not as good as an MRI, we often can't

13  distinguish among them.

14  Q   So am I correct that the red arrows could be pointing to

15  hemorrhage but may not be?

16  A   That's correct.

17  Q   All right.  But I see -- I take it you have seen the

18  reports from I think a Dr. Hedlund who indicates that that is

19  hemorrhage in his view?

20  A   Correct.  And that may be true, but it's a small amount of

21  hemorrhage, and we don't even know where and what space that

22  hemorrhage is in on a CT scan.  That's why we don't rely on a

23  CT scan to tell us specifically where it is and specifically

24  where it comes from.  That's why we use MRI.

25  Q   If it is hemorrhage, is it hemorrhage resulting from

1  ruptured bridging veins?

2  A   No, because its volume is small, and it actually follows

3  the membranes, so it's confined by something.  Just like the

4  other hemorrhage is smaller hemorrhages, they're confined by a

5  structure.

6          Characteristically with tearing by way of trauma or

7  whatever, or if a surgeon happens to cut it, is these bridging

8  veins are large blood vessels in infants.  They carry a lot of

9  blood at high rate.  You would expect to see much more

10  bleeding and a large amount of bleeding than what we see here.

11  And, in fact, there are cases of trauma with bridging vein

12  rupture that we have seen, whether it's accidental or

13  nonaccidental trauma, that you can predict bridging vein

14  rupture.  We would never predict that with the small amount of

15  hemorrhage here.

16  Q   I think we're on to slide 8.

17          MR. GOODFRIEND:  What number, please?

18          MR. BLEGEN:  8.

19  BY MR. BLEGEN:

20  Q   Tell us what you see here, Dr. Barnes.

21  A   This is the same study, but we're going higher, and now

22  we're going to follow, just like what we saw on the first CT

23  scan.  This white line that we first saw on the first CT scan,

24  this is before we give the contrast.  This is after it.

25          Now, what we notice is the white line is bright here

1    and it's bright here, and only of a portion of it is a little

2    bit brighter like there's a little bit of collection from the

3    contrast media.  And because we know that the normal veins

4    that aren't clotted are going to collect the contrast media,

5    we use the other side.  We find normal veins.

6            Notice before we give the contrast, we can't even see

7    any veins between the brain and the skull here, and we won't

8    see them until after we give it, and here they are.  They show

9    up as white, these little areas here.  So those are normal

10   veins that the iodinated contrast media or dye is floating in,

11   yet we see incomplete enhancement of this.  This is one of the

12   findings that rely on that there's a clot inside that vein or

13   venous thrombosis, but we're not going to just stop here.

14   It's suspect.  It's a question.  We're going to go ahead and

15   do some more pictures on this baby at this time.

16           THE COURT:  Pause for a second.  When you say --

17           So you are looking on the right, the right part, the

18   postcontrast where the red arrow is, you're saying that the

19   way that shows up suggests -- you referred to it as incomplete

20   enhancement.  That suggests a clot.

21           THE WITNESS:  Yes, sir.

22           THE COURT:  Do you mean as opposed to a hemorrhage?

23           THE WITNESS:  Yes, sir, that's correct.  That is

24   correct.

25           THE COURT:  All right.  Okay, go ahead.

1    THE WITNESS:  And the blue here is just showing

2   between before we see some blood in part of this membrane, the

3   falx, where all the veins are, and then after the contrast, we

4   see that it's collecting in a number of veins that aren't

5   clotted.  So some are, some aren't.  That's what would be part

6   of our differential diagnosis here is we're dealing with

7   hemorrhage and/or thromboses.

8   BY MR. BLEGEN:

9   Q   Am I correct from what you have been saying that finding

10   these thrombosed veins is sometimes difficult or they're easy

11   to miss?

12   A   Yes.  It's not as --

13    It's easier for the large ones, what we call the

14   dural venous sinuses, but it's much more difficult for the

15   smaller ones.  Yet this case right here, particularly since

16   they gave the iodinated contrast medias, helps us to track

17   this and other what we call smaller or cortical veins.

18   Q   Let's take a look at slide 9.

19   A   And so now we continue.  This is before we give the

20   contrast; this is after.

21    Here is this bright line here that matches up with

22   where the arrow is pointing here.  Notice it's not as bright

23   as this part of the vein which appears that it is getting some

24   contrast in it.  So this vein from an imaging point of view is

25   -- at least has a partial clot blocking that vein.

1    Q    And the blue arrows?

2    A    The blue arrows show you the normal nonclotted veins.  We

3    don't even see them on pre- or pre -- I'm sorry -- before we

4    give the contrast.  We don't see them and we shouldn't see

5    them for normal flowing blood, but once we give the contrast

6    media that is in the blood system, we'll see them.

7            But notice this persists and is the same before and

8    after.  That's telling us that there is abnormal clotted blood

9    there.  When it's inside a vessel, we call it a thrombosis.

10   Q    Slide 10.

11   A    And just to be consistent on findings that continue to go

12   up, we're tracing this white area here.  The before, after,

13   that's where the red arrow is here, and then we're beginning

14   to see the rest of this vein light up and branches come off

15   that vein.  That tells us that that is the cortical vein, and

16   it's got a clot in it.  Again, before we give the contrast,

17   the other normal veins don't show up, but then they will show

18   up because they have the contrast media in there.

19           Also, just to point out between the pre and the post

20   is we don't really see any clot in the major vein, the

21   superior sagittal sinus, but we do see some white areas of

22   recent hemorrhage around it.

23   Q    Slide 11 -- or excuse me.  Slide 10.

24   A    And this is just a magnification of one of those -- I'm

25   sorry.

1    Q    Actually slide 11.  Jump to 11.  That's the magnification.

2    A    And this one is just a magnification of that last one I

3    showed you after we give the contrast.  This part of the vein

4    collects it.  This one doesn't.  That's blocked by a clot or

5    thrombosis.

6          Next.

7          THE COURT:  Wait a second.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Then I was getting this backwards.  So

10   the vein goes -- is basically going from 10:00 to

11   11:00 o'clock along the side there.

12         THE WITNESS:  Yes, sir.

13         THE COURT:  The part that is lit up is the non-

14   thrombosed portion or the thrombosed portion?

15         THE WITNESS:  Nonthrombosed.

16         THE COURT:  Okay.

17         THE WITNESS:  Because it collects the dye.

18         THE COURT:  It collects the dye, and if it's

19   thrombosed, it's got clotted blood, so it can't collect the

20   dye.

21         THE WITNESS:  Right, but the clotted clot will shine

22   through on this image, but it's not as bright as where the

23   contrast media is, and that's an indicator that it's clotted.

24         THE COURT:  Okay.

25   BY MR. BLEGEN:

1   Q   So by this point, have you confirmed that it's a clotted

2   vein, or do you still need to wait for MRI?

3   A   Well, from a CT point of view, now it's highly suggestive.

4   It's not the modern form of what we call a CT venogram that we

5   now do where it's much more of a dynamic study.  This is just

6   a study where we did a series before we gave the dye.

7          Then we injected the dye and did another series, but

8   it was not in a timed fashion, to watch it go through the

9   arteries, across the brain into the veins.  So this would be

10  highly suggestive.

11  Q   All right.  Let's jump to slide 15 unless --

12          Let's jump to 15.

13  A   Okay.  Now, this, I think, is the same CT study, and this

14  is before and after contrast.  Notice before we give it,

15  there's another kind of irregular bright area here.  Now, this

16  is kind of left frontal.

17          And that's white, so we would look at that and say,

18  well, that's either a very small hemorrhage or it's a clot in

19  something, but it's confined.  It's not spread out through the

20  subarachnoid space or through a subdural space like some large

21  acute hemorrhages are.  It's confined by something and that we

22  notice after we give the contrast media that all these other

23  veins are lighting up because they're collecting the contrast.

24  So those can't be blocked.

25          But then we still see this one here, and it's not as

1    bright like it collected the contrast.  So that's a possible

2    area of venous thrombosis.  So now we're thinking maybe

3    there's two areas.  The more you look, the more you find.

4         Next.

5    Q    Let me ask -- before you move on from 15, let me ask you

6    this question.  In a recent PowerPoint presentation that we

7    sent you from Dr. Hedlund, there is some indication of

8    bridging vein clot being associated with trauma.

9         Do you remember seeing that?

10   A    I do.

11   Q    Okay.

12   A    I do.

13   Q    Do you disagree with that assessment?  If Dr. Hedlund is

14   saying that this could be clotted bridging veins as a result

15   of trauma, do you disagree with that?

16   A    I disagree.  And just from what I said before, in the

17   early point, the early part, of his PowerPoint, he's showing

18   some images of very large what we call acute hemorrhage

19   between the brain and the skull due to bridging vein ruptures

20   is how he represents it.

21        We have nothing here that is that large or extensive.

22   These are small and confined.  If these were ruptures of

23   bridging veins, which means tearing, they're going to bleed

24   because of the amount of blood flowing through them at a high

25   rate, and it's going to be much more extensive than what we

1  see here.  These are very small areas of white areas, and this

2  is what is reported in venous thrombosis.

3        The clots inside the vein, as the clot -- as the

4  blood clots further, it expands the vein.  The vein can break

5  down a little bit and some hemorrhage will seep out, but it's

6  a small amount of hemorrhage, particularly in the subarachnoid

7  space which is characteristic of venous thrombosis sometimes

8  in the subdural space.

9        But in this particular case, the subdural space in

10  collections are preexisting, and this has much recently been

11  reported by Dr. Vinchon, a well-known pediatric neurosurgeon.

12  Q   Let me ask you this.  Before you had a ruptured -- or

13  excuse me.

14        Before you had a thrombosed bridging vein as a result

15  of trauma, would you necessarily have to have a ruptured

16  bridging vein first?

17  A   Say that again.  I'm sorry.

18  Q   If you had a ruptured bridging vein that resulted from

19  trauma, could that lead to a thrombosed bridging vein?

20  A   Potentially, but there should be -- ultimately, but there

21  should be a large hemorrhage associated with it.

22        I mean, either you have a ruptured bridging vein or

23  you don't.  And the confirmed cases by imaging and postmortem

24  are associated with large hemorrhages that spread throughout

25  the space.  These are confined to specific areas that are

Barnes - direct

1    either in a membrane or in a blood vessel such as the vein.

2    Q    Move to slide 17.

3    A    And this is --

4         MR. GOODFRIEND:  Did you say 17?

5         MR. BLEGEN:  Yes.

6         THE WITNESS:  Thanks for doing the numbers.  Doctors

7    aren't good at numbers or spelling.

8         So we're near the very top of the child's head now,

9    almost to the very top, the crown.  And here is before.

10   That's the pre and here is after.  We have the contrast.

11        And here we start seeing other small or tiny, little

12   white areas that the red arrows are pointing to.  And we

13   notice that after we give the contrast, these are definitely

14   veins coursing through that area where the small white areas

15   are right next to them.  And so the MRI -- excuse me.

16        The CT is not good enough to say are those small,

17   little hemorrhages either in an adjacent membrane, are they in

18   the wall of that blood vessel from venous thrombosis.  We

19   don't know, but we keep getting more and more clues that we're

20   dealing with more than one cortical vein thrombosis.

21   BY MR. BLEGEN

22   Q    Can you see bridging veins on either one of those images?

23   A    Well, that's what we're looking at on this second image

24   after we give the contrast media, and this is a so-called

25   bridging vein.

1  THE COURT:  The squiggly thing on the right there?

2  THE WITNESS:  Yes, sir, and these are up over the

3  side and top, and so they will be draining blood from the

4  adjacent brain.  They will bridge the space between the brain

5  and the skull as they go to empty into the major venous

6  structures, the dural venous sinuses, and they're going

7  through membranes on the way there, including the arachnoid

8  and the dura, both of which are actually a single membrane

9  with two different substructures.

10 BY MR. BLEGEN:

11 Q   Are any of those bridging veins ruptured?

12 A   No.  This is not consistent with rupture because we know

13 bridging vein rupture is associated with large hemorrhage.  We

14 have no large hemorrhages here.

15 Q   And do you understand from your review of the records that

16 the theory at Ms. Del Prete's trial was that the hemorrhages

17 in the brain were the result of ruptured bridging veins?

18 MR. GOODFRIEND:  Objection, Judge, beyond the scope

19 of his expert.

20 THE COURT:  State the question again, if you would,

21 Mr. Blegen.

22 BY MR. BLEGEN:

23 Q   I said:  Do you understand from your review of the records

24 that the theory at Ms. Del Prete's prosecution in the state

25 court was that the hemorrhages were the result of ruptured

1    bridging veins?

2            THE COURT:  The objection is overruled.  You can

3    answer.  That's fine.

4    BY THE WITNESS:

5    A   Yes, sir.  And, in fact, the darker, older collections

6    were never mentioned.

7    BY MR. BLEGEN:

8    Q   And have you seen that Dr. Hedlund, one of the state's

9    experts, has indicated that what he sees on imaging is very

10   concerning for ruptured bridging veins?

11   A   I see that in his report, but it doesn't match the model

12   that he shows of subdural hemorrhage due to bridging vein

13   rupture that he starts his PowerPoint with.  They are night

14   and day different.

15           So I don't quite understood how he extrapolates from

16   a model that is supposed to represent bridging vein rupture

17   with hemorrhage to another model that we don't have that type

18   of hemorrhage.

19   Q   Let's go to slide 19.  Slide 19 is a CT scan from

20   January 4th, 2003?

21   A   Yes, sir.

22           And now at this time, sir, we have two pictures.

23   This is January 4th, so this is eight days following the

24   initial CT from December 28th to January 4th.  Once in a

25   while --

1    Q    Seven maybe.

2    A    All right.

3              And what we notice here is the dark collections

4    between the brain and the skull are getting larger on both

5    images.

6              What we notice here, also, is at this level we're not

7    seeing the bright white hemorrhages or thromboses as well,

8    plus now we're getting some confirmation from CT that this

9    baby does have major brain injury because if you look in the

10   front part of the frontal lobes, you see some nice gray areas

11   that are gray matter.  You see slightly less gray areas that

12   are the white matter, so that's the computer chips and the

13   wiring.

14             Now, look at the back of the brain.  We have lost or

15   are beginning to lose differentiation of gray versus white.

16   That's water.  It's dark.  It's edema or swelling.  It's in a

17   pattern that is characteristic of brain injury due to a lack

18   of oxygen or lack of blood flow.

19             So now we're telling the doctors, and actually we had

20   clues maybe on the earlier CT that was this, that now we're

21   sure it's there.  We would tell the doctors that you have

22   really got to look at causes in this baby for it not getting

23   enough oxygen, did the baby stop breathing, so the oxygen is

24   not coming through the mouth, the throat and down into the

25   lungs.  Is there something wrong with the lungs, something

1   wrong with the baby's airway?

2           Or even though those are open, is there something

3   wrong with the baby's heart not pumping oxygenated blood to

4   the brain?  That's what we would -- that's what we would tell

5   them.

6   Q   Let's jump to slide 21.

7   A   And now here we are January 4th again, and these are two

8   side-by-side areas as we get to the top of the head, and here

9   is this persistent white area following that same vein that we

10  saw from the beginning, and it shouldn't be there.  We see no

11  other white areas around it or in that fluid on that side or

12  in the fluid on the other side, and now we would be saying

13  this is looking more definitely like persistent cortical vein

14  thrombosis.

15  Q   Slide 24.

16  A   And that same CT I think is way toward the top, almost to

17  the top of the crown.  I always point to the wrong side, but

18  whatever is right and left here, we see this one area that is

19  linear or relatively straight that is also brighter than any

20  other structures between the brain and the skull.  And we

21  would question if that is another area of cortical brain

22  thrombosis.

23          So far these are all questions that we're proposing,

24  and then we would say a timely MRI would help us confirm that

25  we're dealing with venous thrombosis.

1    Q    Let's jump to slide 26.  This is the --

2         Is this an MRI?

3    A    Yes, sir.  This is January 7th.

4         THE COURT:  This is 26, you said, Mr. Blegen?

5         MR. BLEGEN:  Yes.

6         THE COURT:  Okay.

7         THE WITNESS:  And regrettably 11 days later.  And I

8    say regrettably because it is 11 days later, this is going to

9    stretch out the process in terms of its evolution or

10   progression in terms of timing.

11        So if we had had the MRI earlier, maybe the day the

12   baby presented or the next day, including with these

13   findings --

14   BY MR. BLEGEN:

15   Q    Can you tell from this slide whether there is a --

16        Have you been able to conclude now whether there is

17   thrombosed vein or veins or not?

18        THE COURT:  I'm sorry.  Is this a CT or an MRI?

19        THE WITNESS:  MRI.

20        THE COURT:  This is an MRI.

21        THE WITNESS:  So this is the baby inside a huge

22   magnet now, deep tunnel.  The baby has a helmet that is a

23   radio frequency transmitter.  And so now we have this very

24   powerful technology since the tissues are magnetic that now we

25   can interact with the tissues using this radio frequency

1   antenna and sending in radio frequency pulses communicating
2   with the brain just like a satellite dish communicates with a
3   satellite back and forth.

4           And so we have a number of techniques we can use, and
5   I will just name them for the record.  Capital T, arabic
6   numeral 1, and these techniques are determined by the timing
7   of when we sent these radio frequency pulses in during
8   transmission and receive them back during reception.

9           And another one is T2.  Another one is T2 with a
10  little asterisk, and then there's several others that we can
11  use.

12          That's why according to the evidence-based medicine
13  literature, pattern of injury, component abnormalities and
14  timing are much more precise with MRI.

15  Q   You have said and used the term "evidence-based medicine"
16  a couple of times.  Is it going to be explained briefly?
17  A   Yes.  During the last decade, decade and a half, maybe
18  even longer, the new law in medicine, and I think it may
19  surprise or even upset people, is that actually what we do in
20  medicine has to have a scientific basis.

21          And in the authoritative era of medicine, what we do,
22  the standards and guidelines that we formulate for diagnosis
23  and treatment of patients for prognosis have to be based on
24  scientific methodology by statistical significance so that
25  we're not treating patients with certain conditions

1  differently across the country with different outcomes.

2         In medicine, according to the American Medical

3  Association and other associations, this is the law that we

4  have to follow, and it also applies on the medical side with

5  regard to testimony of expert witnesses.

6  Q   Let's move to slide 27.

7  A   No.  I need to go back.

8  Q   Oh, I'm sorry.  Back one.

9  A   Is that where we started?

10        THE COURT:  That's where we were, 26.

11        MR. GOODFRIEND:  26?

12        THE COURT:  26 still, yes.

13        THE WITNESS:  So, again, we're looking down on top of

14  the baby's head, but right and left are reverse.  So top is

15  front, bottom back.  Viewer's left is right.  Viewer's right

16  is left.

17        This is a T2.  Using that technique, it makes all

18  water, whether it's normal or abnormal, bright white.  So when

19  we look at that because sometimes we can't tell normal from

20  abnormal water, we want to look for a dark area on T2 that

21  would be abnormal.  That's where the red arrow is and that's

22  dark.

23        Notice that between the brain and the skull now,

24  which looks different, is a bright white collection that is

25  mostly water, and it's a little bit brighter than collections

1    elsewhere.  It's bright in the front, bright in the back.

2    It's mixed brightness between the brain and the skull on the

3    left side, and right deep to that is a dark structure that

4    matches up with what we were seeing on the CT scan that was

5    white on that structure.

6         But also on the other side where the blue is is a

7    smaller dot that is also dark.

8         Now we go to the definitive technique to tell us if

9    that's just blood flowing in the vein or is it a clot or

10   hemorrhage.

11        So this next technique, T2*, or asterisk, is very

12   susceptible to iron.  And remember iron is in our red blood

13   cells.  That's why we take iron.  When we bleed or we clot, it

14   will show up as iron, and it will show up darker and be more

15   blurry, which it does here.

16        Now, this shows us microscopic iron.  So we don't

17   look at it and say that's a huge hemorrhage or clot.  It's

18   microscopic in and around that small vein right there.

19        So this matches up with what we're seeing on the CT

20   scan whereas on the other side, the normal vein with the

21   little flow does not change because there is no abnormal iron

22   in it either by way of hemorrhage in or around it or a clot

23   within it.  And we'll see this on the next several sides --

24   slides -- that matches up with what we saw.

25        THE COURT:  So on the T2*, the other one, the T2*,

1   the area you're pointing to right there, which would be on the

2   right side of the head, the way that shows up is indicative of

3   a thrombosis or a clot.

4            THE WITNESS:  That's correct.

5            THE COURT:  And the other one on the other side,

6   which would be on the left side of the head, is not.

7            THE WITNESS:  That's correct.

8            THE COURT:  Okay.  I just wanted to make sure I got

9   it.

10           THE WITNESS:  That is correct.

11           So this is what we call the blooming effect when we

12  go from this to this.  And we'll have the same theme on

13  several images for this particular technique or sequence

14  11 days after the baby had its first CT.

15  BY MR. BLEGEN:

16  Q   Ready for the next slide, 27?

17  A   So we're going to follow this with our T2 technique, which

18  you can just see a dark squiggle here, and it's between the

19  brain within this brain collection, and we do the T2*, which

20  is microscopic iron, and it's bigger, darker or it blurs.

21  That tells us that that is a clot.

22           And it's within something.  It's not throughout the

23  entire fluid collection like we might expect for a large acute

24  collection.  In fact, the MRI is now confirming by the T2

25  characteristics that I have shown you, and I'm going to

1    combine it with a T1, that this bright collection over here is

2    several weeks old, and the collection on the other side is

3    probably older.

4    Q    Slide 28.

5          THE WITNESS:  Your Honor, I'm not pointing out the

6    brain injury as we go, as I maybe should, but it's there, and

7    all of the observers agree that it's there.

8          A little bit higher --

9          THE COURT:  Okay.

10         THE WITNESS:  -- getting toward the top of the head,

11   just like we did on the CT, T2 -- there's the little T2*.  We

12   have been following this vein, that little dark thing there,

13   and it gets darker and blurs, and notice how it branches.

14   It's got these branches in it.  That's what the veins do.

15   They branch.  The vein and the branches have clot within them,

16   venous thrombosis.

17   BY MR. BLEGEN:

18   Q    Dr. Barnes, you mentioned brain injury that you weren't

19   pointing out.  Can you tell us where you see it and what you

20   think it's the result of?

21   A    Yes, sir.

22         This is not the most characteristic technique to show

23   it, but this does show it.  And notice if I draw a line right

24   here between the upper parts of the cerebral hemispheres, we

25   have these little white areas with this nice band, dark band.

Barnes - direct

1    The dark band is the gray matter, the computer chips.  This
2    little white band here is the white matter.

3              Notice below that how everything is much brighter and
4    whiter.  That's the edema or swelling in the brain from the
5    lack of oxygen or blood flow.

6    Q    Slide 29.

7    A    And we just keep following this vein up.  T2, we see a
8    couple of little dark structures, and the reason they look a
9    little different than the CT is the head position is different
10   than with the CT.

11             We position the child for the CT differently than we
12   do with the MRI.  So they're just kind of dark.  Here they
13   blend.  Notice no other structures do that.

14   Q    Slide 30.

15   A    That's a venous thrombosis.  Now we get to the very top of
16   the head, near the top.  And we see some very dark structures
17   on the T2.  We see another curving structure here, probably a
18   vein, maybe some veins over here, but look what happens when
19   we go to the T2*.  These tiny little, some of which are
20   microscopic, pop out, new little areas of small hemorrhage or
21   thrombosis.  So now we're getting the idea that this may be
22   more extensive than we thought.

23   Q    What may be more extensive?

24   A    The venous thrombosis.

25   Q    Meaning the clotted veins?

1    A    Yes.  And now it makes sense with how extensive the baby's

2    brain injury is that we may have more extensive venous

3    thrombosis.  But notice how they're all little focal areas

4    like they're in something.  They're not distributed like

5    hemorrhage throughout a space like we would expect for a large

6    volume hemorrhage due to a bridging vein rupture.  That's what

7    we would expect.  We do not see that here.

8    Q    Is there any way to describe what a large volume

9    hemorrhage would look like?

10   A    Yes, if you go back a slide, and another slide, and

11   another slide.

12           What we would be looking for is for something this

13   big to be all black.  It's all bright white.  It's old, much

14   older than these.  The black areas tell us they're recent.

15   The white areas tell us they're old.

16   Q    So big, large, black areas would show large bleeds?

17   A    Yes, for a recent, what we're talking about within the

18   past few days or weeks, we would expect to see black there on

19   T2 throughout the collection for a bridging brain rupture.

20           And that's been -- we have seen that in our

21   experience.  That has been reported in literature.  We don't

22   see it here.

23   Q    Slide 31.

24   A    And up at the very top of the head, T2, looking at a

25   structure here, it looks like it curves.  And here is where it

1   is on the T2 like it's got excess iron in it, and these

2   others, it's kind of falling on that vein, in other words,

3   more evidence that probably what we're dealing with here is

4   one or more sites of venous thrombosis.

5   Q   Slide 32.

6   A   Now, this will address -- think this may be our last slide

7   here.

8   Q   It is.

9   A   You might be relieved.

10  Q   It is.

11  A   Same study, same day, same time.  This is a T1.  Same

12  format looking down on top of the baby's head, right and left

13  reversed.  Top is front; bottom is the back of the baby's

14  head.

15          All dark areas that we see here are water, abnormal

16  or normal.  For instance, within -- here are these ventricular

17  chambers again that contain tap water called cerebral spinal

18  fluid.  That's tap water.  We use that as a reference.

19          When we look at these other collections that are out

20  here, that's tap water.  Those are old, weeks to months old.

21  We see them that dark.  And when we go back and compare them

22  with the T2, they're bright white on the T2.

23          Now, the obvious thing that you might notice here is

24  we have got a white area within the dark area that extends all

25  around the right side of the cerebral hemisphere is the back.

1   It goes from maybe 10:30, 11:00 all the way around to about

2   6:00 o'clock and crosses over to the other side, and it's

3   bright white.  And on the T2, it's also bright white.

4           So when we look at the scientifically-based timing

5   criteria for that part of the collection, bright on T1, bright

6   on T2, not only older than seven days, but likely older than

7   14 to 21 days and can even go further out.  It can go further

8   out for weeks.

9           So this is not a new collection.  It's a large

10  collection.  It is large volume, but it's an old collection.

11  The even older collections are dark here.  And now we use the

12  T2* to tell us and show us the more recent hemorrhage.

13          When we go to the T2*, more recent hemorrhage is

14  black on T2 and T2*.  That can be less than a day old, less

15  than seven days old.  So that's the more recent part.

16          This small part here, this small part here, less than

17  seven days old.  The rest of it, weeks to even months old.

18  Q   So having seen these images in your role at your job with

19  the university and with SCAN, what would you have done and

20  what would you have concluded?

21  A   Okay.  Pretty much what I summarized here as part of my

22  job as part of the multidisciplinary SCAN team, I would say

23  that we do -- we have old collections with two different

24  timings, weeks to months old, can date back to birth.

25          We have some newer areas of smaller hemorrhage, and

1    we have multiple findings that are consistent with venous

2    thrombosis.

3             And once again, we would list our differential

4    diagnosis for the team to consider that would be recommended

5    to the doctors.  Let's do our work-up for bleeding or clotting

6    problems.  Let's see what happened at birth.  Let's look at

7    the head circumferences.  Let's see if there's a recent, what

8    we call trigger, and the trigger that is quite common actually

9    is infection in children.  So we would be looking at all of

10   that.

11            At this point we would say, okay, our social workers

12   would be looking at the situation with regard to caretakers

13   over those previous weeks or months in terms of if we are

14   dealing with something here that is abuse or neglect or

15   whatever.  I am very sorry, but we can't point to a particular

16   caretaker over that particular time on the social side.

17            MR. GOODFRIEND:  Objection, Judge.  What's the basis

18   for this opinion?

19            THE COURT:  You can ask that on cross.  The objection

20   is overruled.

21            Go ahead.

22            THE WITNESS:  Okay.  And that's -- like I do, like I

23   did when I first got this case, I look at this case at the

24   imaging first, totally blindly, got some of the medical

25   records later, didn't change my impressions because this is

1    what a radiologist is supposed to do is not be biased by what

2    the doctors say, what even the medical records say.  We're

3    supposed to let the imaging speak for itself and then later on

4    let the other qualified people work this up although I was

5    then sent reports and opinions of other people and asked to

6    respond to that, and that's the basis for the supplemental

7    report.

8    BY MR. BLEGEN:

9    Q   Would you have concluded based on the imaging that this

10   child suffered abusive head trauma on December 27th that led

11   to ruptured bridging veins?

12   A   No, because we can't blame everything we see on something

13   happening that day.  A number of the components stretch out

14   long before that if we're going to be talking about inflicted

15   injury.

16          Number two, and now that we have evolved out of the

17   era into the new era where -- and I still say that from the

18   imaging only, we can't rule out abuse, but with these

19   findings, we can't rule it in.  We're now in the era where

20   imaging should be used to rule it in, and we can't rule it in,

21   particularly if we go to the medical records and see that

22   there are other aspects medically for this baby that explains

23   what we're seeing.

24   Q   And is one of those medical aspects the chronic

25   collection?

Barnes - direct

1   A   That's probably the most important aspect as a

2   predisposing condition, particularly when we consider the

3   current literature all the way through Dr. Vinchon's work,

4   recent work.

5   Q   I take it another condition is the cortical venous

6   thrombosis?

7   A   Yes, including the current literature, including Dr.

8   Vinchon's work that talks about venous thrombosis being

9   associated with similar findings on children with predisposing

10  large collections, Dr. Eichler's literature, Dr.

11  Krazmakutzki's paper as well as other current literature.

12  Q   And, also, is the lack of any direct evidence of trauma

13  like contusions or lacerations or strains of ligaments, does

14  that also play into the equation?

15  A   Yes, because that's what we're looking for direct evidence

16  of trauma here, and from the imaging findings, we don't have

17  it, and from my understanding from the clinical findings in

18  this child, we don't have it.

19  Q   All right.  I want to briefly have you look at a couple of

20  images from Dr. Hedlund's PowerPoint.

21  A   Okay.

22          MR. BLEGEN:  Rob, if you would put up Hedlund's

23  PowerPoint slide 2?

24          THE WITNESS:  May I step down?

25          THE COURT:  That's fine.

Barnes - direct

1   BY MR. BLEGEN:

2   Q    I think you said earlier on direct that one of Dr.

3   Hedlund's images showed what would be maybe a typical subdural

4   hemorrhage resulting from ruptured bridging veins, is that

5   right?

6   A    That's correct.  And that's -- this is one of his early

7   slides.

8            Now, this is a front view like we're looking at the

9   face of the baby, right cerebral hemisphere, left cerebral

10  hemisphere, and color.

11           A recent hemorrhage would be all bright white.  Look

12  how large this is.  It's what we would call holohemispheric.

13  It means it's around the entire hemisphere.

14           This is the model for the bridging vein rupture and

15  associated subdural hemorrhage.  We do not have this in this

16  case.

17           THE COURT:  When you say "the model," you mean at

18  least in part the area that it covers?

19           THE WITNESS:  Yes.

20  BY MR. BLEGEN:

21  Q    Slide 3.

22  A    And another slide with the same thing but --

23           THE COURT:  This one is from the top down then on the

24  right there?

25           THE WITNESS:  Yes, sir.  I'm sorry.  It's a front

Barnes - direct

1  view again, top of the head, bottom.

2          And now this is -- this one is looking down on top of

3  the head, from the head, back to the head, right and left.

4          And so, again, color shows this very large throughout

5  that entire space between the brain and skull on both with

6  different coloration to show the phase of hemorrhage that

7  we're in.  That's not what we have in this case using the gold

8  standard, particularly magnetic resonance imaging.

9  Q    Slide 6.

10         I had asked you previously, and I'm not sure I said

11  it correctly, but this is a slide from Dr. Hedlund indicating

12  that abusive head trauma, don't overlook bridging vein

13  thrombosis.  Do you think that's a possibility in our case?

14  A    A venous thrombosis?

15  Q    No, that there were thrombosed bridging veins resulting

16  from trauma.

17  A    That is not my opinion.

18  Q    Okay.  And tell us why not.

19  A    Number one, the venous thrombosis that has been reported

20  with trauma is overwhelmingly accidental trauma and usually

21  associated with other direct findings of trauma, such as a

22  skull fracture.

23         Number two, there has never been a report of non-

24  impact or shaken baby syndrome or nonimpact type inflicted

25  injury causing venous thrombosis.  There has never been a

1  report.

2          Number three, this is Dr. Adamsbaum's paper, which

3  was recently published in response to a number of recent

4  papers on venous thrombosis being a mimic of abuse where she

5  shows a postmortem image and puts an arrow on this one clot

6  right here saying that that can represent bridging vein

7  thrombosis -- bridging vein rupture -- BVR.  Sorry.

8          When you look at it, there's several veins that are

9  black here.  And there's no -- she doesn't show any of the

10  hemorrhage around it for a large volume hemorrhage, shows no

11  CT or MR to correlate with this.  So we're not sure what this

12  really means.

13  Q   Let me ask you it this way and see if I understand it

14  correctly.

15          In order to have bridging vein thrombosis as a result

16  of trauma, would you necessarily also have to have a large

17  amount of bridging vein hemorrhage?

18  A   Yes.  That's the only way you can put the two together.

19  Q   And we don't have that in our case, correct?

20  A   That's correct.

21  Q   Slide 7.

22  A   And this is just to show images that he shows actually

23  that match up with images that I just showed you, just to let

24  you know that his images match up and the findings actually

25  match up with what I'm telling you even though there are

Barnes - direct

1  differences in our opinions.

2  Q   And the difference in opinion is you don't believe that is

3  nearly enough blood to constitute bridging vein rupture?

4  A   Correct.  He's shown us two, three slides of what you

5  would expect to see with bridging vein rupture, and that is

6  not what we see here.  We see very small blood collections

7  superimposed upon much older collections.

8  Q   Slide 9.

9  A   And very interesting now, I guess these are three -- these

10  are two CT scans in this case, I presume, and this is the MR

11  in this case, I presume.

12  Q   I believe that's right.

13         And he puts Adamsbaum up here pointing to one vein

14  here that is supposed to be bridging vein rupture.

15         THE COURT:  So wait a second.  The picture in the

16  upper right-hand corner, which is a photograph of an actual

17  brain, is not from this case, at least from what you

18  understand.

19         THE WITNESS:  That's what I understand.

20         THE COURT:  All right, go ahead.

21         THE WITNESS:  And it's not just this, but there are

22  many small veins that look thrombosed to me.

23         THE COURT:  That's the same image you were pointing

24  to a couple of minutes ago.

25         THE WITNESS:  Yes, sir.

Barnes - direct

1        And actually when you match it up with what we see on

2   this child for venous thrombosis, it matches up quite well.

3   So this picture of a postmortem brain without any further

4   explanation was thrown into this case report.  No story, no

5   imaging, nothing.

6        Also in this report are other images of CTs and MRs,

7   some of which can look similar to this, alleged to be shaken

8   baby syndrome or as the result of it, and bridging vein

9   rupture based on confessions.  And confessions are not

10  recognized as a gold standard in evidence-based medicine for

11  publishing.

12  BY MR. BLEGEN:

13  Q   In any event, Dr. Barnes, if these areas are, in fact,

14  thrombosed bridging veins, they're naturally thrombosed

15  bridging veins as opposed to traumatically thrombosed bridging

16  veins?

17  A   Correct.  And naturally, we mean by natural conditions or

18  diseases, and this has been recognized over the last 10,

19  15 years with increasing number of studies showing that venous

20  thrombosis is now a major cause of brain injury in children

21  six months and under, particularly what we call strokes.  This

22  brain injury we could think of as a stroke along with the

23  collections that we see.

24  Q   The reason we know it's not traumatic in origin is there

25  it not enough blood for it to be?

1      MR. GOODFRIEND:  Objection to the leading nature of
2  the question.
3      MR. BLEGEN:  I will withdraw it, Judge.  I already
4  said it.
5  BY MR. BLEGEN:
6  Q   Let's go to slide 12.  There is --
7      Let me just ask you some questions about this.  Dr.
8  Hedlund's report and Dr. Smith's report, another radiologist
9  for the state, talked about something called a retroclival
10  epidural hematoma.  Have you seen those reports?
11  A   I have seen the reports.
12  Q   All right.  And they have indicated that the retroclival
13  epidural hematoma that they say they find on the images is a
14  proxy for injury somewhere near the neck or in the neck.  Have
15  you seen that?
16  A   I did see that opinion.
17  Q   Tell us what you think about this slide.
18  A   Well, this slide is a CT scan taken at the bottom of the
19  head, at the bottom of the brain.  We see the eyes.  This is
20  the front where the eyes are, right, left and back.  And this
21  is right at the bone of the skull base.
22      So this is all white bone at the skull base, and this
23  is where at that level the brain stem that connects the
24  cerebellum and the cerebral hemisphere to the cervical spinal
25  cord, and that's the cervical spinal cord.  There are two

Barnes - direct

1  black arrows pointing to a white area, a slightly gray to

2  white area there.  And they're calling this a retroclival

3  epidural hematoma.

4       I think it's an artifact that we see quite often

5  because when we take these images, the thickness of these

6  images is probably 5 to 10 millimeters.  If you get part of

7  the brain and the bone in it, it will look like gray, and

8  that's where we see normal bone as well as a normal part of a

9  dural vascular plexus there normally in children.

10      So I would not have called this abnormal.  I think

11  Dr. Smith didn't call this abnormal in his report.

12  Q    Meaning he did not call it an epidural hematoma as of

13  12/27/02?

14  A    That's s correct.

15  Q    Let's go to slide 13.

16      THE COURT:  Then we're going to stop right after we

17  finish slide 13.

18  BY MR. BLEGEN:

19  Q    There is another arrow pointing at an indication that says

20  "retroclival hematoma IZ."

21      Can you explain?

22      THE COURT:  What kind of an image is that on the left

23  there?

24      THE WITNESS:  That's an MRI.

25      THE COURT:  It's an MRI, but from the side.

Barnes - direct

1       THE WITNESS:  Very good.  It's from the side.  It's a
2   side view, what we call a sagittal.

3       And this would be the front of the baby's head.  In
4   fact, here is the tongue in the mouth right here.  This is the
5   back of the baby's head, the top and the bottom.  And this is
6   where the bones of the cervical spine within the neck come up
7   to meet the skull base, and here is the brain stem from the
8   side view that I was just talking about that will interconnect
9   with the spinal cord that goes down within the bones.

10      And that green arrow is pointing to this white stripe
11  coming down along a structure.  This is called the clivus.
12  It's part of the bone of the skull base.  And it continues at
13  the back of the bones of the upper cervical spine.

14      Notice it's bright white.  It's bright white just
15  like a similar collection at the back.  That is the back of
16  the head called the occipital region.  It's bright white just
17  like a collection between the brain and the skull, just like I
18  showed you on the axial T images earlier, bright white
19  collection that when we time it by MRI is weeks to several
20  weeks old.  It's not recent.  It's not acute.

21      And this is a finding that we often see in children,
22  particularly who have had large collections up above, and when
23  they get some new bleeding in it, it goes with gravity.

24      It goes with gravity to the back of the head because
25  they're lying down, and it goes with gravity right down to the

1  skull base.

2          It's a common finding that we see all the time in

3  infants with a variety of conditions, sometimes trauma like

4  birth trauma, sometimes like bleeding and clotting disorders,

5  infection, venous thrombosis, and babies, including babies who

6  are born with problems with oxygen or blood flow, what we call

7  hypoxia, ischemia, and it's related to what is called dural

8  vascular plexus.  It's all those veins just like we see all

9  the other membranes.

10         So I don't have any idea where Dr. Smith or Dr.

11  Hedlund are telling us that this is a retroclival hematoma

12  that is particularly epidural.  That has never been reported

13  in any single child this age.  It has been reported in older

14  children who are particularly victims of high force impact

15  trauma; for instance, automobile accidents.  This has never

16  been reported in shaken baby syndrome.

17  BY MR. BLEGEN:

18  Q   You told us a little about --

19         THE COURT:  We are going to stop with that question.

20  We're going to resume at -- I have a couple of cases up at

21  1:30.  It shouldn't take long.  So it's going to be about

22  1:40.

23         I need to talk to the lawyers at sidebar for a

24  second.  I don't need the court reporter.

25         You can step down.  It has to do with scheduling is

Barnes - direct

1    all.

2              (The trial was adjourned until 1:45 of this same day

3    and date.)

1               IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

4  JENNIFER DEL PRETE,         )

5                  Petitioner,  )  Docket No. 10 C 5070

6             vs.           )

7  MELODY HULETT,           )  Chicago, Illinois
                         )  December 17, 2012
8              Respondent.  )  1:46 p.m.

9                       VOLUME 1
10               TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12  APPEARANCES:

13

14  For the Plaintiff:    BLEGEN & GARVEY
                      BY:   MR. PATRICK W. BLEGEN
                          MS. JODI L. GARVEY
15                        MR. DANIEL A. RUFO
                     53 West Jackson Boulevard
16                     Suite 1437
                     Chicago, Illinois  60604
17

18  For the Defendant:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                      BY:   MR. KARL R. TRIEBEL
19                          MR. NEAL GOODFRIEND
                          MR. ARI TELISMAN
20                        MS. MONIQUE A. ANAWIS
                     100 West Randolph Street
21                     13th Floor
                     Chicago, Illinois  60601
22
    Also Present:             MR. ROBERT STANLEY
23

24        LAURA M. BRENNAN - Official Court Reporter
          219 South Dearborn Street - Room 2102
25             Chicago, Illinois  60604
                 (312) 435-5785

Barnes - direct

1          (The following proceedings were had in open court:)
2          THE CLERK:  Recalling 10 C 5070, Del Prete versus
3    Hulett.
4          THE COURT:  Good afternoon.  All right.  So are we
5    ready to resume with Dr. Barnes?
6          MR. BLEGEN:  Yes.
7          THE COURT:  Dr. Barnes, you can come back up here.
8          MR. BLEGEN:  Miss Del Prete might not be here yet.
9          THE COURT:  I need to use the time I have, so she'll
10   get here when she gets here.
11         MR. BLEGEN:  Fine.
12         THE COURT:  Okay.  Do you understand you're still
13   under oath?
14         THE WITNESS:  Yes, sir.
15         THE COURT:  All right.  Have a seat.
16         Okay.  All right.  Mr. Blegen, you can go head.
17   DR. PATRICK D. BARNES, PETITIONER'S WITNESS PREVIOUSLY SWORN
18                  CONTINUED DIRECT EXAMINATION
19   BY MR. BLEGEN:
20   Q   When we left off, we were discussing slide 13 from
21   Dr. Hedlund's Power Point.  Do you see that up on the screen?
22   A   Yes, sir.
23   Q   And you told us about your thoughts on that -- the white
24   area that green arrow is pointed at?
25   A   Yes, sir.

Barnes - direct

1    Q    Dr. Hedlund, I assume you've seen in his report, has also

2    indicated that this what he calls retroclival hematoma is a

3    proxy for trauma or injury.  Do you remember that?

4    A    I remember that statement, yes.

5    Q    All right.  Do you agree with that?

6    A    I do not.  This doesn't resemble any of the cases that --

7    that was even provided in the literature that they provided in

8    terms of the age of the patient, the other findings that we

9    see here, so this, in my view, can't be a proxy for trauma,

10   particularly since there are no -- there's no other evidence

11   on the imaging, particularly the MRI here, of any traumatic

12   abnormalities with regard to the upper neck or skull base.

13   Q    So would the same MRI that's being taken here also reveal

14   trauma or injury in that area if it existed?

15   A    Yes.  Particularly in a particular case like this, we

16   would expect there to be additional findings of trauma, not

17   just this one finding, which clearly matches up with findings

18   of similar distribution with regard to the dural membranes and

19   the associated vascular plexus at other sites in the brain and

20   in terms of its intensity characteristics with regard to

21   timing.

22   Q    Have you ever seen these sorts of markings show up

23   spontaneously in the hospital?

24   A    Yes, in cases like I described before from a variety of

25   causes that will show up just -- particularly just like this.

1    These are -- they're usually associated with other

2    intracranial collections just like in this case.  They match

3    up in terms of their anatomic distribution, with regard to

4    dural membrane structures, their vascular components and their

5    intensity characteristics.  That's what they match up with.

6    There is nothing in the neck, the cervical spinal cord, in the

7    soft tissues of the neck or the bones of the spine that

8    matches up and supports that is a proxy, whatever that means,

9    for trauma, particularly if they're talking about shaken baby

10   syndrome.  This has never been reported in shaken baby

11   syndrome, this finding.

12   Q   Is there a particular sort of MRI called FLAIR?

13   A   Correct.

14   Q   Was that done in this case?

15   A   No, not the type of FLAIR or STIR imaging, it's referred

16   to as, all letters capitalized, S-T-I-R, to specifically look

17   at the, neck, cervical spine or spinal cord.

18   Q   Can we switch to slide 14.

19       And is that just another picture of the same area?

20   A   Yes.

21       THE WITNESS:  And if I may step down, your Honor.

22       THE COURT:  Sure.

23       THE WITNESS:  Now, I guess is this to show is of the

24   MRI of January 30th, right?

25       MR. BLEGEN:  Yes.

1        THE WITNESS:  That this is gone, and it is, but look

2  what else is gone.  Remember this bright area here?  This

3  bright area at the back and this bright area here, they're all

4  gone.  It's evolving with the intracranial findings.  Nothing

5  to do with the skull base, the neck, the cervical spinal

6  column, the muscles of the neck or the spinal cord.

7  BY MR. BLEGEN:

8  Q   Can we go to slide 16.  This is also from Dr. Hedlund's

9  group of slides.   Can you tell us anything about the black

10  and white arrows?

11  A   Well, I think I can, looking at it as when I first

12  reviewed it.  These are at the -- this is another axial

13  looking down on top.  This is front, back, right, left.  And

14  this is specifically for the orbit.  That's the bone that

15  contain the eye, the eyeballs.  And there's -- the black

16  arrows here are pointing on this technique, I think this is a

17  technique that's sensitive for iron, to these splotchy areas

18  that are dark for some hemorrhages that are part of the

19  eyeball, the globe and particularly the lining of it that

20  might be associated with retinal hemorrhages.

21  Q   What about the white arrows?

22  A   The white arrows I'm not quite sure what he's pointing to

23  here.  From the eyeball going back is a nerve that attaches

24  the eye to the brain.  That's the optic nerve.  That's on the

25  left.  This one is on the right.  Not sure what the white

1    arrows are pointing to.  Is it this dark stripe here, or is

2    the optic nerve itself?  I don't know if the white arrows are

3    trying to point to dark areas that are to represent hemorrhage

4    like we see in the eye.  But notice that there is black

5    everywhere behind the eyeball normally in the orbit from the

6    fact there's fat behind the eye in the orbit, so I don't know

7    what he's pointing to there, or if he's pointing to something

8    about the optic nerve, that it's too thick or --

9    Q    So if he's --

10   A    I don't understand what he's pointing to.

11   Q    If he's intending to show hemorrhage of the optic nerve

12   sheath, for example, do you agree with that?

13   A    No, I don't agree with that.  I don't quite understand

14   what he's pointing to.

15         MR. GOODFRIEND:  Objection, Judge.  I think he's

16   trying to guess what Dr. Hedlund is going to say, and I think

17   that's speculative at this point in time.

18         THE COURT:  It goes to weight.  The objection is

19   overruled.

20         THE WITNESS:  So if he's pointing to these dark areas

21   as representing hemorrhage, well, that's just the way the fat

22   looks in the orbit.  If he's talking to something about the

23   optic nerves, the optic nerves, just like the hemorrhage in

24   the eye, can be that prominent due to any cause of increased

25   pressure in the brain that gets transmitted to the eyes.  It's

Barnes - cross

1    not specific for trauma or abuse versus nonaccidental injury,
2    or just having bleeding in the head could be associated with
3    bleeding in the eye or the optic nerve so --
4           MR. BLEGEN:  Can I just have a moment?
5           THE COURT:  Okay.
6           THE WITNESS:  I'm just kind of guessing you're right.
7           MR. BLEGEN:  Judge, that's all we have on direct.
8           THE COURT:  All right.  Cross.
9           MR. BLEGEN:  Judge, I have Barnes Exhibits 1
10   through 8.
11                      CROSS EXAMINATION
12   BY MR. GOODFRIEND:
13   Q   Dr. Barnes, you've testified in a number of criminal cases
14   in the last twelve years; is that correct?
15   A   Many.  That's correct.
16          MR. GOODFRIEND:  Judge, may I approach the witness?
17          THE COURT:  Yes.
18   BY MR. GOODFRIEND:
19   Q   Dr. Barnes, I'm drawing your attention to Barnes Exhibit
20   No. 2.  Could you please tell Judge Kennelly what is Barnes
21   Exhibit No. 2 -- or Exhibit -- our Exhibit No. 2?
22   A   It is a chronological listing of testimony, both
23   deposition and trial.  It includes primarily civil medical
24   malpractice cases, personal injury cases particularly with
25   regard to fetal, neonatal and infant brain injury, but it also

Barnes - cross

1   includes criminal as well as civil cases in child abuse cases,

2   including family court dependency cases and so forth.

3   Q   You have testified in a number of criminal cases since the

4   year 2000; is that correct?

5   A   Since 2000, that is correct.

6   Q   Could you please turn to the last page of our Exhibit

7   No. 2.

8   A   Yes, sir.

9   Q   Are you on the last page?

10  A   I think so.  With the statistics?

11  Q   Yeah, with the statistics.

12      Between the year of 2000 and 2001 did you testify six

13  times for the criminal defense?

14  A   In 2000, 2001?

15  Q   Right.

16  A   That's correct.

17  Q   Did you testify for the prosecution anytime during the

18  period between 2000 and 2001?

19  A   Not as an expert witness, only as a fact witness or a

20  treating witness as part of our child abuse team.

21  Q   Well, did you list those other cases that you testified

22  you say as a fact finding witness?

23  A   No.  That's part of our child abuse team, so I don't list

24  those as expert work.

25  Q   Well, this is your list of testimony, isn't it?

Barnes - cross

1    A    As expert -- as expert testimony, I do not --

2    Q    This is your list?

3    A    -- list fact -- I do not list -- it's our hospital policy,

4    if you're representing a patient at the hospital, we do not

5    list it as expert work.

6    Q    Well, sir, at the beginning on Page 1 of that exhibit you

7    list chronological listing of testimony; is that correct?

8    A    Yeah.  It's --

9    Q    Do you --

10   A    -- as I explained.

11   Q    Do you differentiate between expert testimony and other

12   testimony?

13   A    Absolutely.

14   Q    No.

15   A    As is hospital policy.

16        THE COURT:  He's answered your question.  Now ask

17   another question.

18   BY MR. GOODFRIEND:

19   Q    Sir, in the year of 2002 to 2003, how many times did you

20   testify for the criminal defense?

21   A    As an expert, none.

22   Q    Criminal defense?

23   A    Four times.

24   Q    And how many times did you testify for the prosecution?

25   A    None.

Barnes - cross

1   Q   Between the period of 2004 and 2005, how many times did
2   you testify for the criminal defense?
3   A   17.
4   Q   How many times did you testify for the prosecution during
5   that time period?
6   A   None.  None as an expert witness, only as a fact witness
7   and a treating physician for our SCAN team.
8   Q   Sir, between the years of 2006 and 2012, how many times
9   did you testify as an expert witness for the criminal defense?
10  A   74.
11  Q   And how many times did you testify for the prosecution as
12  an expert witness?
13  A   None.
14  Q   Now, in terms of that number, that's 101 times that you
15  testified for a criminal defendant between the years of 2000
16  and 2012; is that correct?
17  A   Yeah.  I only do expert work on the defense side.
18  Q   Well, the question is did you testify 101 times in the
19  last twelve years as an expert witness for the criminal
20  defense?
21  A   I'm never asked to testify for -- as an expert, only on
22  the criminal defense team -- on criminal cases for the
23  prosecution because our child abuse team is represented by our
24  child abuse pediatrician, so as a policy I don't do that
25  except as a fact witness when called upon, and that's our

Barnes - cross

1   system in Northern California.

2          MR. GOODFRIEND:  Judge, I'd ask -- objection.

3   Nonresponsive.

4          THE COURT:  Overruled.

5   BY MR. GOODFRIEND:

6   Q   Sir, you've -- in your curriculum vitae and resumes you

7   indicated that you've published many times; is that correct?

8   A   Yes, sir.

9   Q   And in terms of your publications, have you received any

10  criticism for your publications?

11  A   Oh, certainly, certainly.  That's the nature, by way of

12  commentaries, editorial replies, yeah.  That's the nature of

13  it.

14  Q   Who is Lori Frasier?

15  A   She's a child abuse pediatrician at Primary Children's

16  Hospital in Salt Lake City, and she's one of the major

17  leaders, child abuse pediatrician leaders in the county.

18  Q   And has she criticized you for some of your work?

19  A   Yeah, which is -- which is expected.

20  Q   Are you familiar with her criticism of your paper of

21  Imaging of Nonaccidental Injury and the Mimics?

22  A   In the what?

23  Q   And the mimics?

24  A   Oh, certainly.

25  Q   And she said in terms of your paper:  "Many of the

Barnes - cross

1    citations in Barnes's paper fall far below the author's

2    standards for evidence based medicine that he champions in the

3    title.  This article appears to be less like a review for

4    radiologists and more of a road map for defense attorneys."

5    Is that what she said about your paper?

6    A    Yes.  But that was not accepted by the peer reviewed

7    journal.

8              THE COURT:  Hang on a second.

9              THE WITNESS:  I'm sorry.

10             THE COURT:  I know you've already changed your flight

11   once, because I had to approve it.  Okay.  Unless you want to

12   be changing it a whole bunch more times and staying overnight,

13   you just start answering the question.  Answer it directly.

14   Stop editorializing.  Mr. Blegen if he thinks there's

15   something appropriate to bring out on redirect, he will do so.

16   But you don't do it yourself.  Your job is to answer

17   questions, not to make arguments, not to editorialize.  It

18   detracts from the quality of your testimony if you do that.

19             Am I making myself clear?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Good.  That was responsive.

22             Go ahead, Mr. Goodfriend.

23             MR. GOODFRIEND:  Thank you, Judge.

24   BY MR. GOODFRIEND:

25   Q    Now, in terms of your expert testimony, as you already

Barnes - cross

1  said, as your expert testimony you testify principally for the

2  criminal defense bar?

3  A    Yes.

4  Q    And in terms of your testimony, do you testify as to

5  differential diagnosis with respect to abusive head trauma,

6  particularly shaken baby syndrome?

7  A    Yes.

8  Q    Is it your belief that shaking a child cannot cause brain

9  injuries?

10  A    No.

11  Q    It can cause brain injuries, shaking a child?

12  A    Yes, particularly if there's neck, spine or spinal cord

13  injury.  That's possible.

14  Q    And you said this morning that in this case you cannot

15  rule out abuse as the precipitating factor that led to the

16  collapse of Isabella on December 27, 2002?

17  A    I can't rule it out just from the imaging only.  That's

18  correct.

19  Q    Before testifying today did you read the reports of our

20  expert witnesses?

21  A    Yes.

22  Q    Did you read the report of Dr. Smith?

23  A    Yes.

24  Q    Did you read the report of Dr. Hedlund?

25  A    Yes.

Barnes - cross

1    Q    Did you read the report of Dr. Case?

2    A    Yes.

3    Q    Did you read the report of Dr. Carol Jenny?

4    A    Yes.

5    Q    Did you read the report of Dr. Rangarajan?

6    A    Yes.

7    Q    Did you read the report of Dr. Forbes?

8    A    Yes.

9    Q    And, finally, did you read the report of Dr. Rorke-Adams?

10   A    Yes.

11   Q    In terms of your testimony today, did you consider the

12   findings of these doctors when you gave your testimony this

13   morning?

14   A    No.

15   Q    Did you feel that in terms of the information they

16   provided you that it was irrelevant to your testimony?

17   A    Yes.

18   Q    But you did testify about Dr. Hedlund during your direct

19   examination?

20   A    Yes.

21   Q    Did you find that his findings or his report were

22   irrelevant to your conclusions?

23   A    Yes.

24        Sorry.

25   Q    Did you read the reports of the expert witnesses that were

Barnes - cross

1    hired by the defense?

2    A    Yes, I did.

3    Q    And did you read the report of Dr. Teas?

4    A    Yes.

5    Q    Did you consider her findings in terms of the conclusions

6    you gave on direct examination today?

7    A    No.

8    Q    Did you consider any of the conclusions made by any of the

9    experts that the defense had in this case?

10   A    No.

11        THE COURT:  When you say "the defense," you mean the

12   petitioner.

13        MR. GOODFRIEND:  Oh, thank you, Judge.  I'm sorry.

14   BY MR. GOODFRIEND:

15   Q    Did you consider any of the reports of the petitioner's

16   other experts in reaching your conclusions in this case?

17   A    No.

18   Q    Now, Dr. Barnes, would you believe -- would you agree that

19   there's general agreement that violently shaking a child is

20   unacceptable and could cause injury and death?

21   A    Yes, particularly under six months of age.

22   Q    And you already testified basically that shaking alone can

23   cause an acute injury to the immature central nervous system;

24   is that correct?

25   A    Potentially, yes.

Barnes - cross

1    Q    Can shaking and soft surface impact result in major

2    intracranial injury without obvious scalp or cranial injury,

3    particularly in acute/hyperacute presentations?

4    A    Yes, it can.

5    Q    In terms of shaking -- strike that.

6            So you believe that shaking without impact can

7    produce significant intracranial injury in a child?

8    A    As I explained earlier, if there's injury to the neck,

9    spinal cord or spinal column, yes.

10   Q    Well, actually, I was asking in terms of intracranial

11   injury.  Can shaking cause severe intracranial injury?

12   A    Yes.  And the same answer before.  If it's associated with

13   neck, spinal cord or spinal column injury.

14   Q    And in terms of a child that was shaken, could that cause

15   immediate onset of symptoms?

16   A    Yes.  The way I explained before, particularly associated

17   with spinal column, neck or spinal cord injury.

18   Q    Dr. Barnes, can seizures result from shaking?

19   A    Certainly.  In the context that I gave, in the same

20   context that I keep giving, yes.

21   Q    Well, actually, I'm just asking the general question.

22   A    Well, then I can't answer it.

23   Q    You can't answer in --

24   A    Not as --

25            THE COURT:  Look, what Dr. Barnes has made clear

Barnes - cross

1    here, I think, in the last four questions is that he agrees

2    with everything that you say in the category of cases where

3    there's an injury to the spinal cord, the spinal column or the

4    neck, if I'm hearing Dr. Barnes correctly.  So that's why he's

5    citing that.  It's completely appropriate for him to do that.

6              MR. GOODFRIEND:  Okay.

7              THE COURT:  And so I'm going to let him do it.

8              MR. GOODFRIEND:  Okay.

9    BY MR. GOODFRIEND:

10   Q    In a case of shaking, can the baby become ill shortly

11   after the assault?

12   A    In the context that I -- of the answer I gave earlier,

13   yes.

14   Q    Well, assume there's no craniocervical injury.  Can

15   shaking cause the child -- a child to become ill shortly after

16   assault?

17   A    Not according to the evidence based medicine literature.

18   Q    Dr. Barnes, could you please turn to, let's see, it's

19   Exhibit No. 4, Page 289.

20             THE COURT:  In the same book?

21             MR. GOODFRIEND:  Same book, Judge.

22             THE COURT:  Okay.  Exhibit 4 for me only has Pages 74

23   through 80.

24             MR. GOODFRIEND:  I'm sorry, Judge.

25             THE COURT:  You mean Exhibit 3?

Barnes - cross

1    MR. GOODFRIEND:  Three.

2    THE COURT:  Okay.  Page 289?

3    MR. GOODFRIEND:  Right, Page 289, point number two.

4    BY MR. GOODFRIEND:

5    Q   By the way, before I get to the point, Dr. Barnes, in

6    terms of Exhibit No. 3, is this a chapter that you wrote?

7    A   Oh, Exhibit 3?

8    Q   Yeah.  I'm sorry.  If you could turn to the front of

9    Exhibit 3, I need to lay a foundation.

10   A   That's okay.

11       Yes, it is.

12   Q   You wrote this -- a chapter for Dr. Paul Kleinman; is that

13   correct?

14   A   Kleinman?

15   Q   Kleinman?

16   A   Yes, that's correct.

17   Q   It was a book entitled Diagnostic Imaging of Child Abuse?

18   A   That is correct.

19   Q   It was published, I think it was 1998, was it?

20   A   That's correct.  Yes, 1998.

21   Q   Now, could you please then turn to Page 289.  And I direct

22   your attention to point number two.

23   A   Yes, sir.

24   Q   And this is your article, correct?  This is your chapter?

25   A   Yeah.  It's obsolete and outdated, but yes.

Barnes - cross

1  Q   Well, when you say it's obsolete now, do you still cite to

2  this book when you write articles?

3  A   Oh, certainly.  I cite chapters of previous books whether

4  they support what I'm saying or not.

5  Q   So in terms of your articles that you write, you're saying

6  you cite a chapter which has become obsolete?

7  A   Yes.  Because it's portions of it that are obsolete; other

8  portions of it are not obsolete.

9  Q   Now, in terms of point number two, you stated in this

10  section, "Most symptomatic shaken injured or shaken impact

11  injured infants have seizures, lethargy or coma" --

12          THE COURT:  Where are you reading from?

13          MR. GOODFRIEND:  I'm on Page 289, Judge.

14          THE COURT:  Second column?

15          MR. GOODFRIEND:  Second column.  And I label it

16  No. 2.

17          THE COURT:  Top of the second column.  Got it.

18          Start the question over.

19  BY MR. GOODFRIEND:

20  Q   Dr. Barnes, did you write:  "Most symptomatic shaken

21  injured or shaken impact injured infants have seizures,

22  lethargy or coma; those suffering ultimately fatal injuries

23  are ill shortly after the assaults and without a lucid

24  interval"?

25  A   Yes, according to reference No. 375.

Barnes - cross

1    Q    You wrote that?

2    A    Yes.  I was quoting the reference 375 published in 1997,

3    which is also outdated and obsolete.

4    Q    But as you said earlier, you still cite this chapter when

5    you write articles?

6    A    Yes, because there are some portions of it that are not

7    obsolete or outdated and apply in 2012.

8    Q    If I can go back a second, Judge, you indicated -- did

9    you -- I'm sorry.  Let me start again.

10            In terms of a child that is shaken that does not have

11   craniocerebral injuries, would you agree that the symptoms

12   could be immediate?

13   A    That does not have craniocerebral injuries?

14   Q    Right.

15   A    I'm not sure I understand the question.

16   Q    I think you indicated that children need to have

17   craniocervical injuries or neck injuries in order to sustain

18   certain head injuries; is that correct?

19            THE COURT:  I think the question he was asking is if

20   there's shaking but no cranial or cerebral injuries, can there

21   be immediate symptoms.  Is that your question?

22            MR. GOODFRIEND:  Yes.  Thank you, Judge.

23            THE COURT:  Okay.

24            THE WITNESS:  I don't know how to answer that.

25            THE COURT:  Well, do your best.

Barnes - cross

1    THE WITNESS:  I don't know.  I don't know the

2  evidence base for that.

3  BY MR. GOODFRIEND:

4  Q   Well, did you ever write anything regarding that fact?

5  A   I may have at one time.

6    MR. GOODFRIEND:  Judge, could we turn to -- this now

7  I'm turning to Exhibit No. 4.

8  BY MR. GOODFRIEND:

9  Q   Dr. Barnes, can you turn to Exhibit No. 4 and tell me what

10  this article is.

11  A   CT Findings in Hyperacute Nonaccidental Brain Injury,

12  another old and outdated paper from January 1999 --

13  Q   It was written by you; is that correct?

14  A   -- which was the --  oh, I'm sorry.  Go ahead.

15  Q   It was written by you; is that correct?

16  A   It was written by me.  It's -- it -- it's about the nanny

17  or au pair case in Boston in 1997.

18  Q   Well, if you could turn to Page 78.

19  A   Yes, sir.

20  Q   And if you could turn your attention to the number 3 on

21  the right-hand side, doesn't it read that "The neuroradiologic

22  findings of abuse are often present within a few hours of the

23  assault, particularly with the combination of violent shaking,

24  high force impact and severe hypoxia-ischemia"?

25  A   Yes.  That's the neuroradiology or the imaging findings,

Barnes - cross

1   yes.

2   Q   You wrote that?

3   A   And that's a true statement.

4   Q   Now, just one other question regarding types of injuries

5   seen in babies that are shook.  Can shaking without any injury

6   to the craniocerebral junction without impact produce

7   significant intracranial injuries?

8   A   I'm sorry.  You may mean craniocervical junction?

9   Q   Let's use neck injuries, okay?

10  A   Okay.  Thank you.

11  Q   Let's assume a child doesn't have any neck injuries.

12  A   Okay.

13  Q   Can shaking without impact produce significant

14  intracranial injury?

15  A   Without impact?

16  Q   Right.

17  A   Is that what you're --

18          Not according to the evidence -- current evidence

19  based literature.

20  Q   Well, I'm going to direct your attention back to People's

21  Exhibit No. 3.

22  A   Okay.

23  Q   And we're going to Page 288.

24  A   Okay.

25  Q   And there's a number one on the right-hand column at the

Barnes - cross

1    bottom.

2              Did you write in this chapter, "All of these studies

3    in conjunction with extensive anecdotal experience, both

4    clinical and pathologic, in the past 30 years indicates that

5    impact is not necessary to produce significant intracranial

6    injuries in shaken babies; furthermore, the presence of an

7    impact site in cases of shaken baby syndrome does not preclude

8    the possibility that the shaking and not the impact is

9    responsible for the intracranial injuries"?

10   A   That's true in 1998.  It's not true now.

11   Q   Now, Dr. Barnes, in this case did you prepare a report?

12   A   I did.

13   Q   Is your report in my binder Exhibit No. 1?

14   A   That is correct.

15   Q   Now, in terms of your section in your -- in your report on

16   Page 6, do you have a analysis and discussion section?

17   A   That is correct.

18   Q   And in terms of preparing a report, would you say that --

19   I think you said each case is different; is that correct?

20   A   Sometimes, yes.

21   Q   And the CT scans on each case reveal a variety of results?

22   A   Sometimes.

23   Q   The MRI scans can be different?

24   A   Sometimes.

25   Q   When you prepare a report, would you say that no two cases

Barnes - cross

1   are alike?

2   A    Sometimes.

3   Q    Now, in terms of this case involving Del Prete, you have

4   the analysis and discussion section on Page 6; is that

5   correct?

6   A    That is correct.

7   Q    Could you please read the first paragraph of the analysis

8   and discussion.

9   A    Yes.  The entire paragraph?

10  Q    Please.

11  A    That begins:  "The CT and MRI findings are nonspecific as

12  to causative pattern of injury and timing, and a differential

13  diagnosis is required, including for an infant acute life

14  threatening event or ALTE.  Imaging cannot distinguish

15  nonaccidental injury from accidental injury or from

16  predisposing or complicating medical conditions.  According to

17  the evidence based medical literature, there is nothing about

18  the imaging findings in this case, including in the presence

19  or absence of retinal hemorrhage, that is specific for or

20  characteristic of NAI.  Although shaking NAI may be a

21  theoretical consideration, the current literature indicates

22  that shaking alone, i.e., without impact, is unlikely to

23  produce intracranial injury in the absence of requisite injury

24  to the spinal cord, spinal column or neck.  Furthermore, the

25  medical literature indicates that intracranial injury can

1   result from short distance impact scenarios."

2   Q   That paragraph, do you put it in every report that you

3   write on a shaken baby case?

4   A   Many of them if -- often, if not all of them, that have

5   the triad of findings.

6   Q   And would you say -- if you could look at the rest of the

7   analysis and discussion sections all the way to Page 9, do you

8   put the same analysis and discussion section in all of your

9   reports that you have on shaken baby syndrome or abusive head

10  trauma?

11  A   No.  This paragraph is different because it includes

12  craniocerebral disproportion and head circumferences, but

13  there are other cases that don't include that, so that is more

14  specific to this case.

15  Q   In terms of Exhibit No. 5, could you please turn to that,

16  beginning of that one.

17  A   Certainly.

18  Q   That's a report in a different case; is that correct?

19  A   Yes, sir.  Yes, it is.

20  Q   People versus A. Reim or the A. Reim case, R-e-i-m?

21          THE COURT:  It wouldn't be People versus because I

22  think A. Reim was the --

23          MR. GOODFRIEND:  You're right.  I'm sorry, Judge.

24          It's regarding A. Reim, R-e-i-m, date of birth --

25          THE COURT:  Don't put the date of birth in the

Barnes - cross

1    record, please.

2              MR. GOODFRIEND:  I'm sorry?

3              THE COURT:  Don't put the date of birth in the

4    record, please.

5              MR. GOODFRIEND:  Okay.

6              THE COURT:  Thank you.

7              THE WITNESS:  Yes, sir.

8    BY MR. GOODFRIEND:

9    Q    That's a report that you prepared; is that correct?

10   A    A recent one, in June of 2012.

11   Q    And if you go to -- there's no page numbers, but on the

12   third page of that exhibit do you begin the analysis and

13   discussion section?

14   A    I do.

15   Q    In terms of the analysis and discussion section, would you

16   take a look at that and let me know when you're done?

17   A    Yes.  The first paragraph?

18   Q    No.  If you could just look at the whole section.

19   A    Okay.

20   Q    Is the analysis and discussion section in the Reim case

21   identical to the analysis and discussion section in our case?

22   A    No, it is not.  Under differential diagnosis it doesn't

23   mention cranial cephalic disproportion, head circumference

24   macrocephaly and other conditions that apply to this case but

25   that do not apply to that.

Barnes - cross

1   Q   Other than that, are the two sections basically the same?

2           MR. BLEGEN:  Judge, I'm going to object.  I don't

3   know what he means by basically the same other than that.

4           THE COURT:  You know what, I think I can compare the

5   two.

6           MR. GOODFRIEND:  Okay.  That's the point, Judge.

7           Now, what exhibit, excuse me, was the new report?

8           MR. BLEGEN:  Petitioner Exhibit Barnes Supplemental

9   Report.

10          MR. GOODFRIEND:  Barnes supplemental report, do you

11  have --

12          THE COURT:  Is this the one dated December the 13th?

13          MR. GOODFRIEND:  Yes, Judge.

14          THE COURT:  Okay.

15  BY MR. GOODFRIEND:

16  Q   Dr. Barnes, I'm going to show you this exhibit.  Is that

17  the supplemental report that you prepared dated December 13th,

18  2012?

19  A   Yes, sir, after many revisions, that's correct.

20  Q   Before writing the report, did you review the medical

21  records again?

22  A   This report?

23  Q   Yes.

24  A   Yes.

25  Q   Did you review the reports of expert witnesses for the

1 petitioner?

2 A   Yes.

3 Q   Did you review the expert reports of the respondent's

4 individuals and doctors?

5 A   Yes, sir.

6 Q   Would I be correct to say that you finished writing this

7 report on December 13th, 2012?

8 A   That's probably -- that's correct, yes.

9 Q   Was that four days ago that you finished with the report?

10 A   That's correct.  That's shortly after I got all of these

11 materials to review for the supplemental report.

12 Q   When did you receive the supplementary reports to review?

13 A   Sometime in the past week, maybe two weeks.

14 Q   How long did it take you to write the second report?

15 A   One long time, after going through all the materials and

16 doing all the comparisons, so on and so forth.

17 Q   Did anyone help you write the report?

18 A   Yeah.  The final draft, after I did all the work, was put

19 into better language than I usually put together.  That's --

20 that commonly is what the lawyers will do for a supplement

21 like that.

22 Q   Who helped you prepare the final version of the

23 supplemental report?

24 A   I think it was from Mr. Blegen's office.  I don't know

25 specifically.

Barnes - cross

1  Q   Who in particular from Mr. Blegen's office?

2  A   I don't recall.  It -- he may have had some help from

3  Miss Kirkwood on --

4  Q   Who is Miss Kirkwood?

5  A   Another attorney who I think was assisting Mr. Blegen in

6  this case.

7  Q   Now, how many drafts were done of this report?

8  A   Oh, my goodness.  Three, four, maybe five.  I can't count

9  them all.

10 Q   And in terms of -- let's say you would do let's say draft

11 number one.  Assume you do draft number one.  Who reviewed

12 your draft number one?

13 A   I think Miss Kirkwood and others in Mr. Blegen's office.

14 Q   After you did draft number one, you got back corrections

15 or additions, right?

16 A   Yes.  And I corrected those.

17 Q   And you followed the same procedure for basically every

18 draft.  You write it, and they would amend it?

19 A   Or vice versa.  It depends on the case.

20 Q   Now, in terms of this report, you have citations to

21 various journals; is that correct?

22 A   That is correct.

23 Q   Now, would you say that's different from your first report

24 that you wrote in this case?

25 A   Yeah.  I provided no references.

Barnes - cross

1   Q   And in terms of the Reim case that I showed you

2   previously, did you have any references in that case report?

3   A   I may have because it was requested.

4   Q   Why don't you take a look at Exhibit No. 5.

5   A   Okay.

6   Q   I guess on the last page you have three references; is

7   that correct?

8   A   Yes.  References were specifically asked for for that

9   particular case.

10  Q   In terms of this case, your responsibilities were to

11  review the imaging; is that correct?

12  A   That is correct, sir.

13  Q   In terms of reviewing the imaging, would you agree that

14  you cannot distinguish nonaccidental injury from accidental

15  injury or from pre-dis -- from disposing or complicating

16  medical conditions?

17  A   Yeah.  That not only goes for me, but I think others.

18  Q   So you cannot distinguish between the two, between

19  accidental injury and nonaccidental injury based on the

20  radiology?

21  A   In general that's true.

22  Q   Now, in terms of the second report you did in this case --

23          MR. GOODFRIEND:  One second, Judge.

24  BY MR. GOODFRIEND:

25  Q   Did you at all limit yourself to being unable to

Barnes - cross

1   distinguish nonaccidental injury from accidental injury or
2   from disposing or complicating medical conditions, or did you
3   reach other conclusions?
4   A   I reached some additional conclusions in this case after
5   re-reviewing the medical records, other expert reports,
6   references and so forth, as was requested by the defense team.
7   Q   Well, in terms of your profession as a pediatric
8   neuroradiologist, do you feel qualified to give opinions based
9   on the reports of others and opinions as to the actual cause
10  of injury to an infant?
11  A   I'm not sure how to answer that.  Sometimes it's not only
12  requested but required of me, so I will try my best to do
13  that.  It depends on the jurisdiction.
14  Q   But the question is do you feel qualified to give
15  additional opinions?
16  A   Oh, sure.  It's the fourth step that I described earlier
17  about correlating imaging findings with what may be found in
18  the medical records, other reports, yes.
19  Q   I thought you said a radiologist can't distinguish between
20  accidental injury and nonaccidental injury?
21  A   By radiology alone, that's correct.  By imaging alone.
22  Q   Well, do you have any expertise in pediatrics?
23  A   Only as relates to correlating with imaging findings.
24  Q   Do you have any experience in diagnosing the severity of
25  retinal hemorrhages?

Barnes - cross

1   A   Only as correlates with imaging, but I'm not an

2   ophthalmologist.

3   Q   When you proceeded to correlate images in this case to the

4   clinical history, did you offer opinions about retinal

5   hemorrhages in report number two?

6   A   I think just in general.  Nothing specific, I don't think.

7   I have to go back and look at it.

8   Q   Do you have a copy in front of you of report number two?

9   A   I do.

10  Q   Did you at the bottom of Page 8 --

11  A   Yes, sir.

12  Q   -- did you offer opinions as to the retinal hemorrhages

13  that were found in this case?

14  A   Only in response to Dr. Hedlund and Dr. Smith's report.

15  Q   Well, didn't you write down on Page 8 under retinal

16  hemorrhages, "The retinal hemorrhages identified on the day

17  following admission are, however, consistent with hypoxia,

18  thrombosis and increased intracranial pressure, all of which

19  are well documented in the medical records and I understand

20  will be addressed by other witnesses"?

21          MR. BLEGEN:  Objection, Judge.  He's leaving out the

22  first sentence of the paragraph.

23          THE COURT:  Well, seeing as how I've got it right in

24  front of me, I have seen the first sentence, so I'm not too

25  worried about that.  The objection is overruled.

Barnes - cross

1  BY MR. GOODFRIEND:

2  Q   Did you write that?

3  A   Yes, I did.

4  Q   Weren't you offering your opinion as to what the retinal

5  hemorrhages meant?

6  A   Oh, yes, in the context of the medical imaging.

7  Q   And you looked at the imaging?

8  A   The X-rays, the radiological imaging.

9  Q   Well, did you look at the photos of the retinal

10  hemorrhages?

11  A   No.  I'm not qualified to do that.

12  Q   But you still feel qualified to give an opinion as to what

13  the retinal hemorrhages mean without looking at the pictures?

14        THE COURT:  Well, now you do have to read the first

15  sentence because it's referring to something that relates

16  specifically to MRI, which would be the imaging.

17  BY MR. GOODFRIEND:

18  Q   Well, let me ask you this, Dr. Barnes:  In your first

19  report did you indicate any findings as to retinal

20  hemorrhages?

21  A   I did not.

22  Q   Well, in terms of the retinal hemorrhages, did you see any

23  retinal hemorrhages when you looked at the brain scan MRI of

24  1/7/03?

25  A   I did not.  I don't agree with the findings as interpreted

Barnes - cross

1    by Dr. Smith or Dr. Hedlund.  That's why I addressed that in

2    the supplemental report.

3    Q    So in terms of the MRIs in this case, you never saw any

4    evidence of retinal hemorrhages?

5    A    No, not reliable evidence of retinal hemorrhages.

6    Q    Well, in terms of your review of all the reports, did the

7    reports reflect that Isabella Zielinski had severe retinal

8    hemorrhages?

9    A    Yes.

10   Q    Did you take that into consideration when writing the

11   second report dated December 13th, 2012?

12   A    Yes, in response to Dr. Hedlund and Dr. Smith.

13   Q    Well, in this report did you at any time refer to the

14   retinal hemorrhages as being severe?

15   A    I don't recall that, that I did.

16   Q    Do you remember reading the report of Dr. Forbes, an

17   ophthalmologist that's going to testify for the respondent?

18   A    Certainly.

19   Q    And did he find severe retinal hemorrhages?

20   A    That may be true.  I don't recall.

21   Q    You don't recall?

22   A    No.

23   Q    Did you consider the findings of Dr. Forbes when you wrote

24   your supplemental report that's in front of you?

25   A    No.

Barnes - cross

1    Q   When you correlated the clinical history in your

2    supplemental report, did you come up with any new opinions?

3    A   No.

4    Q   Well, let's look at your original report, which is Exhibit

5    No. 1.

6    A   Okay.

7    Q   On the first page does it state Summary and Conclusions?

8    A   Yes, sir.

9    Q   Those were your summary and conclusions at the time that

10   you completed this report on June 29, 2012; is that correct?

11   A   Yes, sir.

12   Q   And in terms of your revised report, dated December 13th,

13   2012, could you look at that page.

14   A   Yes, sir.  Which page is that?

15   Q   Page 1.

16   A   Page 1.  Okay.

17   Q   And in that report you indicated that your intent was to

18   supplement your initial report by addressing the more recent

19   radiology views by Dr. Hedlund, 11/13/12, and Dr. Smith,

20   10/26/12, and commenting on how the radiology images correlate

21   to the clinical history.

22   A   Correct.

23   Q   Now, if you turn to Page No. 2, there's a paragraph about

24   four paragraphs down that starts with "my conclusion."

25   A   Okay.

Barnes - cross

1   Q   And in your first sentence you state, "My conclusion is

2   that the small neuro findings on the day of admission consist

3   largely of thrombosed veins and dural

4   hemorrhage/rehemorrhage"; is that correct?

5   A   That is correct.

6   Q   Did you reach that conclusion and write it down in report

7   number one dated June 29th of 2012?

8   A   Yes.

9   Q   Why don't you look at the report dated June 29th, 2012,

10  and tell me where you wrote that in your summary and findings

11  and conclusions.

12  A   Well, it's right there in the paragraph summary and

13  conclusions:  "In this case special attention should be

14  directed predisposing chronic extracerebral collections

15  associated with later hemorrhage, rehemorrhage or venous

16  thrombosis which may be triggered by trauma or by acute/

17  subacute medical conditions, for example, infection and

18  complicated hypoxia-ischemia or seizures."

19  Q   Well, wasn't that -- the summary and conclusions, weren't

20  you throwing out a few diagnoses at the time?

21  A   In the first one?

22  Q   In the first one.

23  A   That's correct.

24  Q   Did you ever come to a conclusion in the first report that

25  the small neuro findings on the day of admission consisted

Barnes - cross

1   largely of thrombosed veins and dural hemorrhage/

2   rehemorrhage?

3   A    Yes.  Even though it's not stated identically to me, it's

4   equivalent.

5   Q    That's in your opinion?

6   A    That is in my opinion, correct.

7   Q    In terms of Page 2 of your new report.

8   A    Okay.

9   Q    You stated, "At the time of the first CT scan, these

10  findings were three hours to seven to ten days old"; is that

11  correct?

12  A    Is that at the bottom?

13  Q    The middle of Page 2 of your new report, the paragraph

14  that starts as "my conclusion," do you state in that section

15  at the first, "At the time of the first CT scan, these

16  findings were three hours to seven to ten days old"?

17  A    Correct.

18  Q    Do you see anything like that in your conclusions and

19  summaries in your report of June 29th, 2010?

20  A    No.  But it's in the body of my first report.

21  Q    Where is it in the body of your first report?

22  A    Let me find it here for you.

23       Page 8, three lines down from the top by CT, "They

24  have a wide timing range, for example, from about three hours

25  up to seven to ten days old."

Barnes - cross

1   Q    Okay.

2        Now, in your new report on the same Page 2, we're

3   still at the paragraph which states "my conclusion," okay?

4   A    Yes, sir.

5   Q    In your new report it says, "Neuropathology reviewed by

6   Dr. Leestma indicates that the rebleeds continued until her

7   collapse with recent rebleeds at the time of death"; is that

8   correct?

9   A    That is correct.

10  Q    Could you please tell me if that's anywhere in your first

11  report?

12  A    No.  I mean, it's not in my first report.  Sorry.

13  Q    Now, in terms of Page 2, the next paragraph down, it

14  starts -- the paragraph starts, "The images confirm"; is that

15  correct?

16  A    Yes, sir.

17  Q    "The images confirm that the insult to the brain was due

18  to hypoxia, lack of oxygen rather than trauma"; is that

19  correct?

20  A    Yes, sir.

21  Q    In your first report did you ever state that the images

22  confirm those findings?

23  A    It's in my summary and conclusions, last sentence of

24  summary and conclusions, "and complicated by hypoxia-ischemia

25  or seizures."

Barnes - cross

1    Q    Isn't -- doesn't your conclusion state "which may be

2    triggered by trauma or by acute/subacute conditions and

3    complicated by hypoxia-ischemia"?

4    A    That's correct.

5    Q    You're not sure exactly whether there was hemorrhage,

6    rehemorrhage or venous thrombosis; is that correct?

7    A    At that time.  That's why I was asked to re-review all the

8    materials and submit the supplemental report.

9    Q    Well, didn't you review all the materials before you wrote

10   your first report?

11   A    Yes.  But I didn't -- no, I -- before I submitted my first

12   report, yes, but I only reported findings based on the

13   imaging.  Then I was requested to do the step four, the

14   clinical correlation, including comments regarding some of the

15   other experts' reports, so that's what I did.

16   Q    In the case that we cited before, I think, which is

17   Exhibit No. 5, the Reim case --

18   A    Yes, sir.

19   Q    -- were you ever asked to correlate the findings in that

20   case?

21   A    Not specifically, I was not.

22   Q    Now, if we could turn to your new report, Page No. 12.

23   A    Okay.

24   Q    It says "Conclusion"; is that correct?

25   A    Yes, sir.

Barnes - cross

1  Q   And in the first sentence of the conclusion it states,

2  "The radiology images and medical records confirm chronic

3  subdural collections consistent with the abnormal increases in

4  head circumference occurring by two months of age and most

5  likely beginning at birth."  Is that your new conclusion?

6  A   Yes.

7  Q   Did you make that conclusion -- did you state that

8  conclusion in report number one dated 6/29/12?

9  A   Yes, in general terms as part of the differential

10 diagnosis then.

11 Q   Well, were you -- did you actually say the records confirm

12 that the subdural collections are consistent with the abnormal

13 increases in head circumference occurring by two months of age

14 and most likely beginning at birth?

15 A   No, because I was requested to submit the supplemental

16 report after reviewing and commenting on the medical records

17 as well as other reports of experts.

18 Q   Well, you did have the radiology images and medical

19 records when you wrote your first report; is that correct?

20 A   Yeah.  But I was only asked to report on the imaging

21 findings, which I did and what I do in most cases --

22 Q   And --

23 A   -- unless there's a question for a supplemental report.

24 Q   And once again, you feel qualified to make these

25 conclusions based on your expertise in radiology?

1    A   Absolutely, after 40 years of doing this.

2    Q   Now, in terms of the conclusion, on Page 12 you state in

3    the second sentence, "This is consistent with the feeding

4    difficulties, seizure-like activity and failure to meet

5    developmental milestones described by her caretakers."  Is

6    that one of your new conclusions?

7    A   Yes, after correlating the imaging with that being

8    recorded in the medical records.

9    Q   Well, didn't you have the medical records when you wrote

10   your first report on 6/29/2012?

11   A   I did, but once again, I only submitted a report on the

12   imaging findings as originally requested.  Subsequently please

13   correlate with the clinical findings and other expert reports,

14   which I complied with.

15   Q   Now, in terms of your original report, you indicated that

16   you reviewed certain records; is that correct?

17   A   Yes.  Radiology reports, medical records and postmortem

18   records.

19   Q   Now, today in your testimony you stated the number one

20   finding that you made were old collections; is that correct?

21   A   Yes, sir.

22   Q   In your report from June 29, 2012, do you state anywhere

23   in that report that your number one finding is old

24   collections?

25   A   Yes, in the summary and conclusions, in this case special

Barnes - cross

1    attention, so the first thing I list there is predisposing

2    chronic extracerebral collections.

3    Q    Don't you list a number of possibilities?

4    A    I didn't number them, but they're listed there in order.

5    Q    Is that your own order?

6    A    Oh, yes.

7    Q    You didn't put any numbers next to them, did you?

8    A    No.

9    Q    Now, in your testimony today you said something about

10   checking the head size; is that correct?

11   A    That is correct.

12   Q    Did you state anything in your first report about checking

13   the head size of Isabella Zielinski?

14   A    I did.

15   Q    Did you actually state exactly what the head size was?

16   A    I did not.  But I did state the importance of head

17   circumference measurements in my first report.

18   Q    Now, in terms of that report, your first report and your

19   findings, you indicated that an MRI wasn't done for a period

20   of time; is that correct?

21   A    That's correct.

22   Q    How long does it take to do an MRI?

23   A    It could take up to an hour.

24   Q    Now, you recommend giving a child in distress such as

25   Isabella an MRI when she's in such distress?

Barnes - cross

1    A    Absolutely.  But the hospital should have the

2    qualifications to do that, yes.

3    Q    Do you think on 12/27 of '02, the date that Isabella

4    Zielinski made it to Provena St. Joseph's Hospital, do you

5    think they should have conducted an MRI that day?

6    A    Maybe not that day.  They would probably need to have

7    stabilized her, but they should not have waited 11 days, in my

8    view.

9    Q    Now, this morning did you also state something about a

10   membrane?

11   A    Yes, sir.

12   Q    What, again, did you state about a membrane?

13   A    Say that again?

14   Q    I forgot what you stated this morning.  You were talking

15   about a membrane in your review of the radiology on 12/27; is

16   that correct?

17   A    That's correct.

18   Q    Now, in your report dated 6/29/2012 is there any mention

19   of the word "membrane" in your image finding?

20   A    Yes.

21   Q    There is?

22   A    Yeah.  Let me look here.  For the first CT you mean --

23   Q    Yeah.

24   A    -- specifically?

25         Yes, sir.  Page 1 at the bottom, and it's line --

Barnes - cross

1    Q    I see.  I'm sorry.  It's my mistake.

2    A    That's okay.  That's all right.

3    Q    Now, in terms of -- you talked about sinuses in the brain;

4    is that correct?

5    A    If you're talking about dural venous sinuses?

6    Q    Yes, dural venous sinuses.

7    A    Yes, sir.

8    Q    How many dural venous sinuses are there in the brain?

9    A    Oh, my goodness.  Seven at least, of the major named ones.

10   Q    Now, in terms of some type of injury or abnormality in the

11   sinuses, that would be very problematic for a child; is that

12   correct?

13   A    A direct injury like a traumatic injury to the sinuses,

14   you mean?

15   Q    Right.

16   A    Oh, yes.  That could be quite dramatic.

17   Q    It would be extremely serious; is that correct?

18   A    It could certainly be, yes.

19   Q    Like a hemorrhage in one of the sinuses?

20   A    Or a hemorrhage from a sinus you mean?

21   Q    I'm talking about if the sinus was compromised in some

22   way.

23   A    Yes, it could be serious.

24   Q    Now, in this case was there any indication that one of the

25   sinuses was compromised or affected?

Barnes - cross

1    A    Not of the major dural venous sinuses except maybe for the

2    inferior saggital sinus.

3    Q    Well, in your report dated 6/29/12, do you indicate

4    anywhere in there that there was this compromise of the

5    inferior saggital sinus?

6    A    I do not specifically.

7    Q    In your report dated December 13, 2012, do you indicate

8    anywhere in there that the inferior saggital sinus was

9    affected?

10   A    Not specifically.  That's correct.

11   Q    In terms of the first report of your image findings, I'm

12   going to direct your attention to December 27, 2002; is that

13   correct?

14   A    Yes, sir.

15   Q    If you could direct your attention to that.

16   A    Yes, sir.

17   Q    Now you found bilateral prominent extracerebral low

18   density collections, especially frontal temporal; is that

19   correct?

20   A    Yes, sir.

21   Q    But you could not tell what these low density collections

22   were?

23   A    Not by CT.  That's correct.

24   Q    They may have been subarachnoid collections?

25   A    Possible.

Barnes - cross

1  Q   They may have been subdural collections?

2  A   Possible.

3  Q   Now, you also found smaller bilateral frontal convexity/

4  vertex linear and modular high density images; is that

5  correct?

6  A   Yes, sir.

7  Q   You could not tell what these high density images were,

8  though, could you?

9  A   Not specifically.  That's correct.

10 Q   They may have been veins?

11 A   Veins or membranes is what I have listed there.

12 Q   Then you also found that these images were right greater

13 than left, plus you found high density along the falx,

14 tentorium and dural venous sinuses; is that correct?

15 A   That's correct.

16 Q   You could not tell what these high densities were?

17 A   That's correct.

18 Q   They may have been acute/subacute hemorrhages?

19 A   Yes.

20 Q   They may have been rehemorrhages?

21 A   Yes, sir.

22 Q   They may have been thrombosis?

23 A   Yes, sir.  All of those or any combination of those.

24 Q   Now, in terms of your possible finding that there may have

25 been acute subdural hemorrhages, is that something that may

Barnes - cross

1   have occurred within a few hours of taking the CT scan?

2   A    Potentially, yes.

3   Q    And in terms of acute subdural hemorrhages, can they be

4   caused by trauma?

5   A    Certainly.

6   Q    Now, in terms of that same report, you state, Question

7   bilateral cerebral low densities with decreased gray white

8   matter differentiation; is that correct?

9   A    Yes, sir.

10  Q    But you're not sure whether there was brain edema or

11  swelling?

12  A    That's correct.

13  Q    Now, in terms of the images on the CAT scan of 12/27, you

14  couldn't tell whether there were low density collections which

15  were chronic subarachnoid or subdural collections; is that

16  correct?

17  A    Yes, sir.

18  Q    You could not tell whether certain linear and nodular high

19  density images were veins or membranes?

20  A    Correct.

21  Q    You could not tell whether other densities were

22  acute/subacute hemorrhages, rehemorrhages or thrombosis?

23  A    Correct.

24  Q    And you could not tell whether other low density images

25  were brain edema or swelling?

1   A    Correct.

2   Q    Could we pull up your image slides, or what exhibit --

3   what are they called?

4            Dr. Barnes, we have Mack Exhibit, and we're up on

5   image 3; is that correct?

6   A    I don't know the image number.

7   Q    In the lower right-hand corner.

8            THE COURT:  Little three down there.

9            THE WITNESS:  Oh, the three.  Thank you.

10           THE COURT:  Yeah.

11           THE WITNESS:  Yes, sir.

12  BY MR. GOODFRIEND:

13  Q    Okay.  In terms of image 3, there's -- would you say that

14  image three that either on the blue arrows or the red arrows

15  there is any acute subdural hemorrhage?

16  A    Could be.

17  Q    Which one would it be?

18  A    The blue one.

19  Q    And that could show acute subdural hemorrhage, then; is

20  that correct?

21  A    Yes, sir.

22  Q    And in terms of acute subdural hemorrhage, I think you

23  indicated that could be caused by trauma; is that correct?

24  A    Could be.

25  Q    Now, could we please go to image No. 4.

Barnes - cross

1          Dr. Barnes, you see image No. 4?

2    A    Yes, sir.

3    Q    And in terms of the blue arrows, do you see those?

4    A    I do.

5    Q    And could that be acute subdural hemorrhage?

6    A    Possibly, yes.

7    Q    Could that be caused by trauma?

8    A    Possibly, yes.

9    Q    Could that be caused by abusive head trauma?

10   A    Yes.

11   Q    In terms of the red arrows, could those be clotted veins,

12   blood in a membrane or slow flow through a vein?

13   A    I don't think it could be the last.

14   Q    So it could either be a clot or blood in a membrane?

15   A    Yes.

16   Q    If it is a clotted membrane, could that be caused by

17   trauma?

18   A    Yes.

19   Q    If we could go to image No. 6.  Hold it right there.

20          Now, once again I'm going to actually direct your

21   attention to your report of 6/29/2012.

22   A    Okay.

23   Q    In terms of your report of 6/29 -- I'm sorry, your report

24   of the CT scan of 12/28/02, we had before contrast and after

25   contrast; is that correct?

Barnes - cross

1   A    Yes, sir.

2   Q    And in terms of your summary, you said there were

3   bilateral prominent extracerebral low density collections

4   especially frontal temporal; is that correct?

5   A    Yes, sir.

6   Q    You were unable to tell what these low density collections

7   were; is that correct?

8   A    Correct.

9   Q    They may have been chronic subarachnoid collections?

10  A    Yes.

11  Q    They may have been chronic subdural collections?

12  A    Correct.

13  Q    And you also indicated that there were smaller bilateral

14  frontal convexity/vertex linear and nodular extracerebral high

15  density images; is that correct?

16  A    Yes, sir.

17  Q    And you weren't sure whether they were cortical of

18  subpial?

19  A    That is correct.

20  Q    You weren't sure whether they were along veins or

21  membranes?

22  A    Correct.

23  Q    Once again you found that there were high density images

24  along falx, tentorium and dural venous sinuses?

25  A    Correct.

Barnes - cross

1   Q   They may have been acute/subacute hemorrhage; is that
2   correct?
3   A   That's correct.
4   Q   And if they were acute they could have been trauma, caused
5   by trauma?
6   A   Yes, sir, that's possible.
7   Q   And they could have been caused by abusive head trauma?
8   A   That's possible.
9   Q   In addition you weren't sure whether these were
10  rehemorrhages either, were you?
11  A   Correct.
12  Q   You weren't sure whether there was thrombosis?
13  A   Correct.
14  Q   In terms of image No. 6, if you could please look at the
15  screen.
16  A   Okay.
17  Q   In terms of the red arrows, would you say they're high
18  density?
19  A   Yes.
20  Q   And in terms of the red arrows, it would be high density
21  for what would -- would they be?  What could they be?
22  A   Hemorrhage, acute hemorrhage, rehemorrhage, or thrombosis.
23  Q   Could it be a subdural -- acute subdural blood?
24  A   Possible.
25  Q   Could it be acute subarachnoid blood?

Barnes - cross

1  A   Possible.

2  Q   And both of those could be caused by trauma to the head;

3  is that correct?

4  A   Possible.

5  Q   And both of those could be caused by abusive head trauma?

6  A   Possible.

7  Q   And if we could go to image No. 8, please.

8          Are you looking at image No. 8?

9  A   Yes.

10 Q   And the red arrow, is that pointing to what you believe is

11 a thrombosed vein?

12 A   Yes, sir.

13 Q   Can trauma be a cause of a thrombosed vein?

14 A   Possible.

15 Q   Could abusive head trauma be a cause for a thrombosed

16 vein?

17 A   Possible.

18 Q   In terms of the -- strike that.

19         If we could turn to image No. 9.  Is this a image at

20 the top of the brain?

21 A   Getting close.

22 Q   And in the red do you believe that's a thrombosed vein or

23 something else?

24 A   Thrombosed vein.

25 Q   Is that an acute image?

Barnes - cross

1   A   We don't have accurate timing parameters for venous

2   thrombosis, but I would say acute/subacute.

3   Q   And if they were acute or subacute, they could be caused

4   by trauma to the head?

5   A   Possible.

6   Q   If we could turn to image No. 10, please.

7        This is also an image from 12/28.

8   A   Yes, sir.

9   Q   And I believe you said you believed that the -- one of the

10  arrows was pointing to a cortical vein that was clotted; is

11  that correct?

12  A   That was what?

13  Q   Clotted.

14  A   Correct.

15  Q   And which arrow is that, please?

16  A   The red.

17  Q   And in terms of that cortical vein that you believe is

18  clotted, would you say that might be an acute injury?

19  A   Acute or subacute.

20  Q   And that could be caused by trauma also?

21  A   Possibly.

22  Q   And that could also be caused by abusive head trauma?

23  A   Possibly.

24  Q   And I think you also indicated that in this image there

25  was no clot in the superior saggital sinus?

Barnes - cross

1    A    Correct.

2    Q    If we could turn to image 15.

3         In terms of the contrast image, I think on the red

4    arrows you indicated that that was a possible area of venous

5    thrombosis?

6    A    Correct.

7    Q    And would that be an acute bleed or acute injury?

8    A    Acute to subacute.

9    Q    And if it's an acute, that could be caused by trauma also;

10   is that correct?

11   A    Possibly.

12   Q    Now, in terms of your report dated June 29th, 2003, there

13   was another CAT scan done; is that correct?

14   A    You mean June 29th, 2012?

15   Q    I'm sorry.  The report of June 29th, you made certain

16   observations regarding the CAT scan that was done on

17   January 4th, 2003?

18   A    Correct.

19   Q    And in terms of the report for January 4th, 2003, you

20   noticed that there was increased extracerebral iso-hypodense

21   collections?

22   A    Correct.

23   Q    And in terms of your observations, you were not sure

24   whether these were chronic subarachnoid collections?

25   A    Or chronic subdural collections.  That's correct.

Barnes - cross

1    Q    You're not sure which one it is?

2    A    CT can't tell you for sure.

3    Q    And in terms of the extracerebral high density

4    collections, you were not sure whether they were

5    acute/subacute hemorrhages or thrombosis?

6    A    Correct.

7    Q    If they were acute/subacute hemorrhages, this could be

8    caused by trauma also; is that correct?

9    A    At a level of possibility.

10   Q    And in terms of thrombosis that you may have seen, that

11   could also be caused by trauma?

12   A    At a level of possibility.

13   Q    And in terms of both of those, the acute/subacute

14   hemorrhages and the thrombosis, the trauma may have been

15   abusive head trauma?

16   A    At a level of possibility.

17   Q    Now, you also noticed increased sulci and fissures; is

18   that correct?

19   A    Yes, sir.

20   Q    And you weren't sure whether that may indicate decreased

21   swelling?

22   A    Correct.

23   Q    It may be communicating hydrocephalus?

24   A    Correct.

25   Q    It may be atrophy?

Barnes - cross

1    A    Correct.

2    Q    You weren't sure?

3    A    Correct.

4    Q    Now, Dr. Barnes, what is a differential diagnosis?

5    A    It's a list of possible probable or possible cause for

6    findings, for instance, on imaging --

7    Q    Now --

8    A    -- other clinical findings.

9    Q    As a radiologist, you are -- you receive the CAT scans and

10   MRIs to interpret?

11   A    Correct.

12   Q    And that's to help other doctors treat patients?

13   A    Yes.

14   Q    And in terms of giving a differential diagnosis, you give

15   them the best information that you have at hand?

16   A    Yes.

17   Q    When testifying as an expert witness in those one hundred

18   criminal trials, you would review the medical records?

19   A    Some yes, some no.  It depends on what I was asked to do.

20   Q    In this case before giving a differential diagnosis you

21   reviewed the radiology reports; is that correct?

22   A    I did.

23   Q    And you reviewed the medical records?

24   A    I did.

25   Q    You reviewed the postmortem records?

Barnes - cross

1    A    I did.

2    Q    And would you say that the medical records from the

3    various hospitals in this case were quite extensive?

4    A    Yes, I would say that.

5    Q    And after reading those, you gave a differential

6    diagnosis?

7    A    Based on the imaging findings only.

8    Q    In your first report you gave a number of differential

9    diagnoses?

10   A    That's correct.

11   Q    In terms of your list delineated in the report of June 29,

12   2012, you gave quite a few predisposing or complicating

13   conditions; is that correct?

14   A    That's correct.

15   Q    And in terms of your diagnosis, one of the things that

16   you've talked about this morning was a birth subdural

17   hemorrhage; is that correct?

18   A    That is correct.

19   Q    Would you say that almost half of the babies born in this

20   county have birth subdurals at the time they are born?

21   A    Well, according to reports -- I don't know if we can

22   extrapolate it to all babies, but according to some reports,

23   that's correct.

24   Q    According to reports, it's close to 50 percent of all

25   babies?

1   A   That's correct.

2   Q   And they are the usually begin?

3   A   Usually are.  That's correct.

4   Q   They usually disappear within one month?

5   A   According to one report, that's correct.

6   Q   Now, in terms of your -- one of your initial differential

7   diagnoses, you indicated that an intracranial injury can

8   result from a short distance impact scenario?

9   A   Correct.

10  Q   You're talking about a fall?

11  A   Well, that would be one of them, one example of that, yes.

12  Q   You're talking about an accidental injury?

13  A   Correct.

14  Q   In your review of the records in this case, was there any

15  evidence of a fall or accidental injury?

16  A   Not that I saw in the records.

17  Q   Despite that fact that you didn't see it in the records,

18  did you list accidental injury in your differential diagnosis?

19  A   Yes.

20  Q   Why would you list accidental injury in your differential

21  diagnosis when there was no evidence of accidental injury?

22  A   Because I'm giving a differential diagnosis based on the

23  imaging findings.  If you're talking about my first report,

24  all of my findings there and opinions are based on the

25  imaging, and that's to warn the doctors to go look for a

1   possible accidental injury.

2   Q   Even though there was none?

3            MR. BLEGEN:  Objection, Judge.

4            THE COURT:  The objection is sustained.  The

5   objection is sustained.

6   BY MR. GOODFRIEND:

7   Q   Now, in terms of your review of the records -- and now I'm

8   going to ask you to talk about your review of the records you

9   had on June 29th as well as the records you had that ended up

10  in your report of December 13th.  Okay?

11  A   Okay.

12  Q   You indicated perinatal issues as a differential

13  diagnosis?

14  A   Correct.

15  Q   Did you review the medical records in this case?

16  A   I did.

17  Q   Was there any history of perinatal injury or issues?

18  A   In my opinion, yes.

19  Q   Wasn't this a normal full-term delivery?

20  A   Yes, but that's still traumatic.

21  Q   Are you saying a normal full-time pregnancy is traumatic?

22  A   Is traumatic.

23  Q   Yes.

24  A   Yes, I am.

25  Q   Does that mean that every woman within the state of

Barnes - cross

1   Illinois has a -- it's traumatic to have a full-term
2   pregnancy?
3   A    Yes.  Particularly if you go through labor and delivery
4   and a vaginal delivery, the answer is yes.
5   Q    And in terms of --
6   A    Out of respect.
7   Q    In terms of this case, in terms of the delivery of the
8   baby in this case, was there anything that was more than
9   traumatic?
10  A    No.  But that doesn't matter.
11  Q    It doesn't matter?
12  A    It's still traumatic, and there were findings of labor and
13  delivery trauma here.  It's natural, and even if it ends in a
14  C section, that is traumatic.
15  Q    What exactly was traumatic besides the delivery itself?
16  A    I don't know there was anything traumatic other than the
17  delivery itself, or the labor and delivery issues.
18  Q    So when you talk about a traumatic birth in this case,
19  you're just talking about what normally happens during the
20  delivery of a child?
21  A    Yes.  Or if there is anything that's considered beyond
22  normal labor and deliver issues.
23  Q    Did you find anything in this case that was beyond that?
24  A    Not really, but that doesn't matter.
25  Q    Can you name one thing about the delivery that was

Barnes - cross

```
 1    traumatic besides the fact that all births are traumatic?
 2              THE COURT:  I think you've now asked that question
 3    three times.
 4              MR. GOODFRIEND:  Okay.
 5              THE COURT:  You've gotten the same answer the first
 6    two, so let's move on.
 7              MR. GOODFRIEND:  Thank you, Judge.  Sorry.
 8    BY MR. GOODFRIEND:
 9    Q   Now, in terms of the infant in this case, Isabella, were
10    you aware of what her Apgar reading was?
11    A   Yeah.
12    Q   And what is an Apgar reading?
13    A   That's a reading of certain aspects of the child when
14    they're born, including respiratory, color, pulse, that gives
15    them an idea of well-being of the newborn.
16    Q   What are the range of scores that you can get on an Apgar?
17    A   Now you're getting out of my area of expertise.
18    Q   You don't know what the Apgar score was in this case?
19    A   I do know what the Apgar score is.
20    Q   What was the Apgar score?
21    A   I think they were eight and eight.
22    Q   Would it be possible that they were nine, nine and nine,
23    or nine at one minute, nine at five minutes and nine at
24    ten minutes?
25    A   That may be true.
```

Barnes - cross

1   Q    If they were nine at one minute, if the Apgar was nine at

2   one minute, would that be a high score indicative of a healthy

3   baby?

4   A    Yes.  But it doesn't rule out trauma.

5   Q    Would a Apgar score of nine at five minutes indicate to

6   you that this was a healthy baby?

7   A    Yes.  But it doesn't rule out trauma --

8   Q    Well --

9   A    -- of birth.

10  Q    If there was an Apgar score of nine at ten minutes, would

11  that indicate to you that it was a healthy baby at birth?

12  A    Still doesn't rule out trauma.

13  Q    Well, I guess the answer -- I don't know if you've

14  answered my question, but would an Apgar score at ten minutes

15  indicate to you that it was a healthy baby?

16  A    Not necessarily.  According to the Apgar scores, but not

17  necessarily.

18  Q    I don't know if I asked you this question.  What's the

19  highest Apgar score you can get?

20  A    I'm not sure.  Could be a nine or a ten.

21  Q    Now, in terms of the head circumference in this case, are

22  you aware of what percentile Isabella was measured at at

23  birth?

24  A    I don't recall.

25  Q    In terms of her head circumference?

1   A   I don't recall.  All I recall is that it increased, in my

2   view, and what was recorded and reported on by a number of the

3   other experts that it was increasing at an abnormal rate.

4   Q   You don't know what percentile she began at?

5   A   I don't.  I don't recall.

6   Q   Do you know --

7   A   I wasn't planning on testifying on all this.

8   Q   Well, you did prepare to testify, didn't you?

9           THE COURT:  Do you know what, if you want him to come

10  up with it, just show it to him.  If you don't, let's move on.

11          I say this to both sides because I'm sure I'm going

12  to get some of this stuff when you cross.  There is no jury in

13  the box.  Okay.  There's no jury in the box.  It's a bench.

14  Okay.  So a lot of the sort of ruffles and flourishes can be

15  left out on this on both sides.  Because I'm sure I'm going to

16  get it from the other side too.

17          We are at 3:10 in the afternoon.  We are still on the

18  first expert in this 13-expert case for which everybody told

19  me five days was going to be enough.  And I told everybody at

20  side bar and I'm telling you now on the record if we don't

21  finish at the end of this week, we're going to resume on the

22  3rd of January, and we're going to keep going until we're done

23  because it is not going to be prolonged.  It's going to be

24  done in a compact period so that I can remember.  It's very

25  complicated, and there's a lot of information, and so you can

Barnes - cross

1    use the time as you want, and you're using your own time,

2    because it's going to keep going until it's done.  It's going

3    to stop at the end of the day on the 21st of December.  It's

4    going to pick up at the beginning of the day on the 3rd of

5    January, continue day to day until it's finished.

6    BY MR. GOODFRIEND:

7    Q    Dr. Barnes, you listed as one of your differential

8    diagnoses that there were -- this possibility of developmental

9    disorders.

10   A    Correct.

11   Q    Were there any developmental disorders listed in the

12   medical records?

13   A    Not specifically that I recall.

14   Q    Coagulopathy, is that a clotting disorder?

15   A    Clotting or bleeding disorder.  That's correct.

16   Q    Was there any evidence of a clotting or bleeding disorder?

17   A    I thought so.

18   Q    And what did you think was a disorder in terms of clotting

19   or bleeding?

20   A    Well, the baby had excessively high platelets.  I think

21   there was even a subsequent diagnosis of disseminated

22   intravascular coagulopathy.

23        THE COURT:  Say that slower, disseminated

24   intravascular.

25        THE WITNESS:  Intravascular coagulopathy in this

Barnes - cross

1  case.

2       MR. GOODFRIEND:  Could I have one second, Judge?

3       THE COURT:  Um-hum.

4  BY MR. GOODFRIEND:

5  Q   Did you read the hematology consult in this case?

6  A   I may have, but I don't recall it.

7  Q   Do you recall that in the hematology consult there was no

8  abnormalities found?

9  A   That may be true.

10 Q   Now, as another differential diagnosis you listed vascular

11 disease?

12 A   Correct.

13 Q   What is vascular disease?

14 A   That would include venous thrombosis, for instance, and

15 other blood vessel abnormalities.

16 Q   Before December 27th, 2002, did Isabella have any vascular

17 disease?

18 A   Before when?

19 Q   December 27th, 2002.

20 A   I don't know the answer to that.

21 Q   In terms of a differential diagnosis you listed metabolic

22 disorders.

23 A   Yes.

24 Q   Was Isabella tested for metabolic disorders?

25 A   I think she did have some testing, and some of the results

Barnes - cross

1  came back, as I recall, abnormal, but I don't know anything

2  was subsequently done about it.

3  Q   Do you know what was abnormal?

4  A   I don't recall.  I wasn't planning on testifying on this.

5  Q   You listed nutritional disorders as a differential

6  diagnosis in your report; is that correct?

7  A   That is correct.

8  Q   Did you see any evidence in the medical records of

9  nutritional disorders?

10 A   Not specifically tested for or commented on.

11 Q   You listed infections as a differential diagnosis; is that

12 correct?

13 A   I did.

14 Q   Which infection are you talking about?

15 A   The signs of infection that the baby had with a high white

16 count and other findings and symptoms that could go along with

17 it that were documented in the medical record that the baby

18 was even treated with antibiotics for for a period of time,

19 that all points in the medical record to infection.

20 Q   Well, she had a possible ear infection; is that correct?

21 A   I guess that's correct.  She was treated for an infection.

22 You don't give antibiotics unless you're treating for an

23 infection.

24 Q   Now, was there any problem in terms -- after her collapse

25 on December 27th of 2002, was there any indication that an ear

Barnes - cross

1   infection developed upon her admission to the hospital?

2   A    After when?

3   Q    December 27th, 2002.

4   A    She had abnormalities in her ears and her sinuses on the

5   initial CT.

6   Q    In terms of sinuses you're talking about her nasal

7   sinuses?

8   A    Her paranasal sinuses and her ears she had findings on her

9   CT scan.

10  Q    Well, after she was admitted in the hospital did anybody,

11  any physician, find any ear infection during her treatment

12  from December of 2002 to February of 2003?

13  A    I don't recall that.

14  Q    Did this child get that ill from an ear infection?

15  A    Possible, yes.  That's in the differential diagnosis from

16  the imaging findings.

17  Q    Well, did she ever develop any meningitis from this

18  serious ear infection?

19  A    Don't know that it was diagnosed or tested for.

20  Q    Did Isabella Zielinski have any seizure disorder before

21  12/27?

22  A    Potentially, yes.

23  Q    What do you refer to when you say "potentially"?

24  A    Some accounts of what were considered abnormal movements

25  of hands and legs that I recall in the medical record.

Barnes - cross

1    Q   What abnormal movements of hands and legs?

2    A   I don't recall.  I wasn't planning on being questioned on

3    this.

4    Q   As a differential diagnosis you also listed deterioration

5    which may have been triggered by vaccination.

6    A   Correct.  That is a consideration in a case like this.

7    Q   Well, is there any evidence in the medical records that a

8    vaccination led to Isabella's collapse?

9    A   I don't recall.

10   Q   You listed as a differential diagnosis --

11          THE COURT:  We need to take a ten-minute break at

12   this point for -- until the big hand hits the five.

13          (Recess taken.)

14          (The following proceedings were had in open court:)

15          THE COURT:  All right.  You can all have a seat.

16          A couple of things while I'm thinking about them.

17   Number one, today not a problem, but henceforth you're giving

18   me exhibits two copies.  Okay?  I'm getting blank stares.

19   That's why I'm saying okay, question mark.

20          MR. GOODFRIEND:  You want two copies.

21          THE COURT:  I need two copies of them, yes, because,

22   as you might have observed, someone is assisting me with this,

23   so it's helpful to have both of us be able to look at this

24   stuff as we're going along.  That's for both sides.

25          Second thing, Mr. Blegen, I want you or somebody when

Barnes - cross

1    you go back to your office tonight fill out the form for

2    ordering a transcript under the CJA and bring it in with you

3    tomorrow so I can sign it.  It doesn't need to be expedited or

4    anything like that, but I just want to have it ordered because

5    there's no question I'm going to need it.  Okay.

6              Okay.  Mr. Goodfriend, you can go ahead.

7    BY MR. GOODFRIEND:

8    Q    Dr. Hedlund, in your report of June 29th, 2012, you

9    indicated that Isabella Zielinski may have had predisposing

10   chronic extracerebral collections; is that correct?

11   A    Did you say Dr. Hedlund's report?

12   Q    No.  In your report dated June 29th of 2012.

13   A    And I'm sorry.  Reask the question.

14             THE COURT:  It's Exhibit 1.  He wants to know what

15   the question is.

16             MR. GOODFRIEND:  He wants to know the question or the

17   page?

18             THE COURT:  The question.  He was confused about the

19   report, so now ask the question again.

20             MR. GOODFRIEND:  Okay.

21   BY MR. GOODFRIEND:

22   Q    Dr. Barnes, in your report of June 29th, 2012, do you

23   refer to predisposing chronic extracerebral collection in your

24   summary and conclusions?

25   A    Yes, sir.

Barnes - cross

1   Q   And you indicated that it could be associated with

2   hemorrhage, rehemorrhage or venous thrombosis?

3   A   That's correct.

4   Q   It could be triggered by trauma or acute/subacute medical

5   conditions?

6   A   That's correct.

7   Q   And possibly complicated by hypoxia-ischemia or seizures?

8   A   That's correct.

9   Q   So any of these scenarios could have happened; is that

10  correct?

11  A   Or all of them.

12  Q   Okay.

13      Now I'm going to direct your attention to your report

14  of December 13, 2012.

15  A   Okay.

16  Q   In your report of December 13, 2012, you raised other

17  differential diagnoses; is that correct?

18  A   That may be true.  If you'll direct me more specifically.

19      MR. BLEGEN:  Judge, if we could get the page numbers.

20      THE COURT:  Yes.  That's what he just asked, so I'm

21  sure Mr. Goodfriend is working on it.

22      MR. GOODFRIEND:  Well, it starts on Page 1.  There's

23  in the fourth paragraph of that page --

24      THE WITNESS:  Yes.

25      MR. GOODFRIEND:  And there's other ones mentioned

Barnes - cross

1    later on on page -- I can't find it right away.

2          Maybe I could proceed, Judge.

3          THE COURT:  That's fine.

4          MR. GOODFRIEND:  Okay.

5    BY MR. GOODFRIEND:

6    Q    You brought up other differential diagnoses as a possible

7    cause of what happened; is that correct?

8    A    Yes, after further review of all of these materials, as I

9    mentioned before, as requested for the supplemental report.

10   Q    Now, you indicated as one of your differential diagnoses

11   surgical intervention?

12   A    Correct.

13   Q    Was there any evidence of any surgical intervention before

14   December 27, 2002?

15   A    No, but there was subsequent.

16   Q    Well, that surgery wasn't until January 10th of 2003; is

17   that correct?

18   A    That's correct.  But that's not the only procedure.  The

19   child had also a spinal tap lumbar puncture, I think, just

20   right before the first CT maybe.

21   Q    But before the first CT she had already suffered her

22   collapse.

23   A    Correct.

24   Q    In terms of additional differential diagnoses, you listed

25   genetic disease.

Barnes - cross

1    A    Correct.  Certainly.

2    Q    Is there any evidence of genetic disease in this case?

3    A    There was no testing for genetic disease for the

4    thrombophilias that I recall.

5    Q    Well, I'm just talking about in terms of general genetic

6    disease.  Did she display any generic disease before --

7    genetic disease before December 27th?

8    A    Not that was diagnosed or tested that I recall.

9    Q    Was there any genetic disease diagnosed after

10   December 27th, 2002?

11   A    Particularly not for the thrombophilias.  They didn't run

12   the tests.

13   Q    What about -- I think you mentioned a hemophiliac as a

14   differential diagnosis; is that correct?

15   A    That's true.  And I didn't see any testing for those

16   either.

17   Q    Well, doesn't that occur about within one out of one

18   million people?

19   A    Well, you're talking about a specific type of hemophilia.

20   The hemophilias are a range of bleeding disorders just like

21   the thrombophilias.  I didn't see a complete work-up in this

22   child for the range of hemophilias and, most importantly, for

23   not the thrombophilias.

24   Q    Well, if she had excessive bleeding disorder, would that

25   have manifested itself when they put in an intravenous needle?

1   A    Maybe for the hemophilias but not -- it wouldn't rule out

2   the thrombophilias, and that's the main theme here, is the

3   thrombophilias, not the hemophilias.

4   Q    But you did -- you put in the word "hemophilia" in your

5   first report?

6   A    Yeah.  Oh, in the first report because that's one of the

7   ranges of coagulopathies that need to be addressed.

8   Q    What about oncological disease?  Is that cancer?

9   A    Yeah.  And there are certain cancers in babies that can

10  produce findings that look like abuse, but I think that's

11  highly unlikely in this case.

12  Q    But you listed that as a differential diagnosis?

13  A    Absolutely.  Leukemia is one of them; neuroblastoma's

14  another one.

15          MR. GOODFRIEND:  Judge, there's no question pending.

16          THE WITNESS:  Sorry.

17          THE COURT:  Okay.

18  BY MR. GOODFRIEND:

19  Q    You listed anti-immune disease or disorders?

20  A    Autoimmune diseases.

21  Q    Was there any evidence of that in this case?

22  A    Not that I saw was tested for that was -- that can occur

23  in the mother, be passed on to the fetus and the newborn.  I

24  didn't see any testing for that.

25  Q    Was there any evidence of anti-immune disorders?

Barnes - cross

1    A   Autoimmune you mean?

2    Q   Maybe I'm not reading my writing.  Autoimmune disorders.

3    A   Not that I saw that were tested for.

4    Q   No.  The question is was there any evidence of autoimmune

5    disorders?

6    A   Autoimmune disorders could produce the findings we see on

7    the imaging.

8        MR. BLEGEN:  Judge, I'm going to object.  He's

9    referring to a 2002 article that lists various different

10   differential diagnoses for subdural and retinal hemorrhage.

11       THE COURT:  The objection is overruled.

12       MR. GOODFRIEND:  Judge --

13       THE COURT:  I've overruled the objection.  Do you

14   want to keep arguing?  I mean, I could change my ruling if you

15   talk me out of it.

16       MR. GOODFRIEND:  I'm just trying to get the witness

17   to answer the question.

18       THE COURT:  He did.  I thought he answered the

19   question.

20       MR. GOODFRIEND:  Okay.

21   BY MR. GOODFRIEND:

22   Q   Just a few other questions regarding the ear infection.

23   A   Yes, sir.

24   Q   Did any doctor from Provena diagnose Isabella with an ear

25   infection?

Barnes - cross

1    A    I don't recall.

2    Q    Did any doctor from University of Illinois Chicago

3    diagnose Isabella with an ear infection?

4    A    I don't recall that either.

5    Q    When they ran certain tests for sepsis or infection, were

6    they all negative?

7    A    I think they were, but the child was on antibiotics.

8    Q    Now, in terms of your diagnosis, are you saying that her

9    collapse was due to cortical venous thrombosis?

10   A    I'm saying that, yeah, that can be the initial process or

11   a complication of the process that certainly triggered

12   seizures followed by apnea.  It's the cascade.  That's why

13   those are all listed in my summary opinion.  It's a classic

14   cascade of events that can be seen in infants.

15   Q    Have you conducted any studies to determine if cortical

16   venous thrombosis can cause retinal hemorrhages?

17   A    I have not personally conducted any studies.

18   Q    Have you published --

19   A    But others have.  Dr. Vinchon recorded -- reported retinal

20   hemorrhages in his most recent cases of large extracerebral

21   collections with rebleeds, some of which he commented that --

22   Q    Sir --

23   A    -- thrombosis is in the differential diagnosis.

24   Q    Well, the question -- I guess you answered my question,

25   but the other question I have, have you published any papers

Barnes - cross

1    or articles to determine if cortical venous thrombosis can

2    cause retinal hemorrhages?

3    A    Yes.

4    Q    You have published that?

5    A    Yeah, in the reviews that -- at least the two reviews that

6    I've written, I have case reports in there of venous

7    thrombosis associated with retinal hemorrhages, at least two,

8    maybe three cases in my two reviews.

9    Q    And in terms of the retinal hemorrhages in this case, how

10   would you characterize them?  Would you say mild, moderate or

11   severe?

12   A    That's not my area of expertise.  I'll defer to that.

13   Q    Now, just so I understand this one point, in terms of the

14   tests that were done on the CAT scans and the MRIs, there was

15   no evidence of dural venous sinus thrombosis in this case, was

16   there?

17   A    I think that's correct.

18   Q    Now, you indicated something about contusions or

19   lacerations of the brain in your testimony this morning; is

20   that correct?

21   A    Certainly contusions.  I don't know if I mentioned

22   lacerations.

23   Q    Would you agree that not all contusions are picked up on

24   an MRI, contusions of the brain?

25   A    I would agree, but that's all we had in this case.

Barnes - cross

1  Q   Would you agree that contusions are hard to pick up on a
2  CAT scan?
3  A   I would agree with that.
4  Q   Now, in terms of your reading the expert reports, you
5  indicated in your report of December 13th, 2012, that you read
6  the report of Dr. Rorke-Adams?
7  A   That is correct.
8  Q   However, you indicated that you did not consider the
9  report of Dr. Rorke-Adams in making your conclusions in your
10 report of December 13, 2012?
11 A   That's correct.  I -- yeah.
12 Q   Well, were you aware that Dr. Rorke-Adams found evidence
13 of contusions in the brain when she looked at the brain
14 tissue?
15 A   I'm aware of that.  They do not show up on the imaging,
16 and she was looking at pathology ten months after the baby
17 died.
18 Q   I guess the question is did you see that she found
19 evidence of contusion when she examined the pathology of the
20 slides in this case?
21 A   I did read that, yes.
22 Q   When you wrote your opinion on December 13, 2012, did you
23 take into consideration Dr. Rorke-Adams found contusions of
24 the brain?
25 A   Yes.  And the imaging doesn't support it.

Barnes - cross

1   Q   That's not what I'm asking.

2   A   Well, that's what I'm answering.

3           THE WITNESS:  Sorry, your Honor.

4   BY MR. GOODFRIEND:

5   Q   In giving a differential diagnosis, isn't it necessary to

6   list what is the most likely diagnosis?

7   A   If one can, and that's why I have the summary.

8   Q   You listed about 30 conditions as differential diagnoses

9   in this case?

10  A   Yes.  And that's the actual differential diagnosis for

11  this case, including as published by the child abuse

12  pediatricians and Dr. Frasier in her book.

13  Q   When you listed the 30 conditions as a differential

14  diagnosis, did you delineate which ones to consider first?

15  A   In my summary and conclusions, yes.

16  Q   Did you list them in numerical order?

17  A   Yeah.  Well, in order.

18  Q   Are you saying that the first ones you listed would be the

19  first in importance?

20  A   No.  They're all -- it's a combination of what is in my

21  summary and conclusions.

22  Q   Now, Dr. Barnes, you indicated that -- in your report that

23  although shaking, not accidental injury, may be a theoretical

24  consideration, the current literature indicates that shaking

25  alone, i.e., without impact, is unlikely to produce

Barnes - cross

1  intracranial injury in the absence of requisite injury to the
2  spinal cord, spinal column or neck; is that correct?
3  A   That is correct.
4  Q   Now, haven't you written that shaking alone without impact
5  can produce intracranial injury?
6  A   If you injure the neck.
7  Q   Could we please turn to Exhibit No. 3.
8        THE COURT:  Isn't this where we started?
9        MR. GOODFRIEND:  No, Judge.  I wasn't talk -- I
10  didn't talk about biomechanics.
11        THE COURT:  Okay.  I thought you really covered this
12  in some detail, but go ahead.
13        MR. GOODFRIEND:  I'm on Page 289, and I'm looking at
14  point No. 3.
15        THE WITNESS:  Asked and answered.
16        THE COURT:  Well, do you know what, with due respect,
17  I don't have your job, you don't have mine.
18        THE WITNESS:  Okay.
19        THE COURT:  So let's knock that nonsense out.
20        THE WITNESS:  Sorry, your Honor.
21        Did you say No. 2?
22  BY MR. GOODFRIEND:
23  Q   I'm on Page 289.  I'm looking at point No. 3.
24  A   Yes.
25  Q   This is your book chapter again.  It was found in

1    Diagnostic Imaging of Child Abuse; is that correct?

2    A    In 1998, that's correct.

3    Q    And your chapter was No. 15, Head Trauma?

4    A    That's correct.

5    Q    Did you write the following:  "Furthermore, it is

6    reasonable to conclude that the repetitive angular

7    accelerations that occur with violent shaking may generate

8    sufficient cumulative biomechanical forces to produce

9    intracranial injury.  The frequent presence of subdural

10   hemorrhage in shaken infants without blunt impact indicates

11   that sufficient tensile and shear strains are produced over

12   the surface of the brain to result in cortical venous injury.

13   It is also likely that the shear strains produce cortical

14   contusions and diffuse axial injury, both of which are

15   characteristic features of inflicted head injury.  Even if

16   shaking alone is insufficient to produce direct brain injury

17   in the infant, it is widely reported that apnea with

18   subsequent hypoxic ischemic encephalopathy often develops as a

19   result of shaking.  Diffuse brain injury or apnea may lead to

20   hypoxic ischemic injury, and this secondary injury is one of

21   the most important contributors to fatal outcomes in shaken

22   baby syndrome."

23           Did you write that?

24   A    Yes.  That's the old literature, and that's outdated and

25   obsolete.

Barnes - cross

1  Q   Now, Dr. Barnes, I think you talked on direct examination

2  about retroclival injury and the MRI that you observed on

3  1/7/03; is that correct?

4  A   Yes, sir.

5  Q   Now, you did in your report of 12/13/2012 that there was

6  evidence of retroclival epidural hemorrhage?

7  A   Yes.  And I was referring, if you'll show me where that

8  is, I think specifically to --

9  Q   If we go to Page 7 at the top line, you indicated:  "There

10  are likely retinal hemorrhages.  There is a linear retroclival

11  epidural hemorrhage one to two weeks in age."

12  A   I did say that.

13  Q   Now, in terms of your report of June 29th, 2012, you had

14  the imaging in this case; is that correct?

15  A   Yes.

16       Actually I was referring to what doctor -- back on

17  Page 6 what Dr. Hedlund was talking about.

18  Q   But didn't you, when you re-reviewed this case, find that

19  there was a linear retroclival epidural hemorrhage one to two

20  weeks in age?

21  A   I don't think that was my specific finding in this case.

22  Q   Well, if we --

23  A   I think I was referring to what Dr. Hedlund was talking

24  about there.

25  Q   Well, if we go back to the last sentence on Page 6.

Barnes - cross

1   A   Okay.

2           THE COURT:  Page 6 of what?

3           MR. GOODFRIEND:  I'm sorry, Judge.

4           THE COURT:  Which report?

5           MR. GOODFRIEND:  The second report.

6           THE COURT:  Okay.  Thanks.

7   BY MR. GOODFRIEND:

8   Q   You talk about Dr. Hedlund's findings; is that correct?

9   A   I do.

10  Q   And you indicate that you disagree with Dr. Hedlund's

11  findings regarding the torn bridging veins?

12  A   That's correct.

13  Q   Then you indicate, and this is, I think, your finding,

14  that the right linear structure remains in evidence, and, I'm

15  sorry, he believes it is adjacent to a vein.  I do not agree

16  with this assessment.

17  A   That's correct.

18  Q   Then you state, "The superior saggital sinus, the large

19  vein that runs down the back of the head, is not thrombosed"?

20  A   I agree with that.

21  Q   Was that your conclusion, though?

22  A   I did.  That is.

23  Q   That's not Dr. Hedlund's conclusion that you were

24  commenting on, is it?

25  A   That's correct.

Barnes - cross

1   Q   That's your own finding?

2   A   That is.

3   Q   Then you state, the next sentence, "The brain continues to

4   deteriorate"; is that correct?

5   A   Correct.

6   Q   That is your finding?

7   A   I don't think that is my finding.  That's not my language.

8   I think that was from Dr. Hedlund.  In fact, all of that was

9   from Dr. Hedlund.

10  Q   You said there were --

11  A   I'm sorry.

12          I think even after that where I say "I do not agree

13  with this assessment," the rest of that is all his language.

14  I didn't -- you know, the rest of that is, I didn't say that.

15  That is what he said.

16  Q   Well --

17  A   That's under the paragraph of what he said.  I said one

18  part of it I did not agree with.  The rest of that is what he

19  said.  I didn't say that.

20  Q   Well, in terms of your review of the case --

21  A   Correct.

22  Q   -- did Dr. Mack find something unusual when she looked at

23  the MRI of 1/7?

24  A   Doctor who?

25  Q   Dr. Mack.

Barnes - cross

1    A    Yes.

2    Q    She found something when she read the MRI of 1/7/03,

3    right?

4    A    That is correct.

5    Q    And what did she find?

6    A    Well, it's listed right there.  Let's see.  I thought it

7    was listed right there.

8         I'm not sure I find what she --

9    Q    Okay.

10   A    -- said.

11   Q    Let me ask you another question.

12   A    Okay.

13   Q    You did find -- didn't you find something in the area of

14   the retroclival structure?

15   A    Absolutely.

16   Q    What did you find?

17   A    What I found was what I described in general on my first

18   report, that was dural based hemorrhage or a thrombosis along

19   the membrane's tentorium and falx and on the clivus as well as

20   on the -- in the occiput just like I showed earlier are part

21   of those membranes with associated veins.  I lumped them all

22   together because that's what I usually see.

23   Q    So there was something at the retroclival area; is that

24   correct?

25   A    Yeah, but it was associated, as I showed, with the

Barnes - cross

1   intracranial hemorrhage.  Nothing to do with the neck.

2   Q   Well, why don't you point to us where the retroclival area

3   is.  Just point on your own body.

4           THE COURT:  It's inside, right?

5           THE WITNESS:  Yes, sir.  It's like.

6   BY MR. GOODFRIEND:

7   Q   Is it in the back of the head?

8   A   No.  It's in kind of the middle.  It's --

9   Q   Is it --

10  A   Can't really point it to.

11          THE COURT:  There was a slide that had a side view up

12  there, which would probably make it easier to illustrate.  It

13  was one of the last ones that Mr. Blegen used.  I forget which

14  one it was.  It wasn't from the first doctor's slides.  It was

15  the second.

16          MR. GOODFRIEND:  Dr. Hedlund's slides?

17          THE COURT:  No.  I think it was the second doctor's

18  slides.

19          THE WITNESS:  It was Dr. Hedlund's slides.

20          THE COURT:  Maybe it was Dr. Hedlund's.

21          THE WITNESS:  Yeah, it was Dr. Hedlund's slides.

22          THE COURT:  That's it.

23          MR. GOODFRIEND:  Thank you, Judge.

24          THE WITNESS:  That's where it is.

25          MR. GOODFRIEND:  Okay.

Barnes - cross

1      THE COURT:  Where the green arrow is there, right?

2      THE WITNESS:  Yes, sir.

3      THE COURT:  So it's the space basically, I think, as

4  you described it before, where the brain stem or sort of in

5  the area where the brain stem connects to the spine cord.

6      THE WITNESS:  That's correct, sir.

7  BY MR. GOODFRIEND:

8  Q   Now, you indicated that this was not evidence of trauma to

9  the area; is that correct?

10  A   That is correct.

11  Q   And you indicated that there's spontaneous nontraumatic

12  bleeding that occurs in the retroclival area; is that correct?

13  A   That is true.

14  Q   When you wrote your report of December 13th, 2012, did you

15  cite to one piece of literature supporting the proposition

16  that spontaneous nontraumatic bleeding occurs in the

17  retroclival area?

18  A   I did not.

19  Q   Are you aware of literature regarding the retroclival

20  epidural hemorrhages which have occurred in children?

21  A   I am.

22  Q   And in terms of that literature, they talk about a

23  traumatic incident like an auto accident; is that correct?

24  A   That's the point.

25  Q   Well, is it possible that Isabella Zielinski had a

Barnes - cross

1   traumatic shaking of her brain and suffered a retroclival

2   epidural hemorrhage?

3   A   Not in my opinion.

4   Q   Now, I think you indicated in your report that the

5   collection at the retroclival area may represent a subdural

6   fluid which has migrated from a larger subdural collection; is

7   that correct?

8   A   Yes, or was part of the original subdural collections

9   because they appeared at the same time and went away at the

10  same time.

11  Q   Are they in different compartments, the subdural versus

12  the retroclival area?

13  A   There is a subdural compartment everywhere that's the same

14  compartment.

15  Q   Well, is the retroclival area in a different compartment

16  than the subdural compartment?

17  A   Well, it's in a different area, but the subdural

18  compartment extends all around the inside of the cranium and

19  the skull base.

20  Q   Are you saying that there was fluid from the subdural

21  compartment that leaked into the retroclival area?

22  A   Yes.  That's one cause of it, and it's borne up on this

23  first image versus the second image.  They appear together;

24  they disappear together.

25  Q   Well, is the fluid at the retroclival area, did you say it

Barnes - cross

1   was a -- it could be from birth trauma?

2   A   Oh, that's one -- that's one cause of it that we could see

3   at birth, due to the trauma of birth, yes.

4   Q   Well, except for the part of going through the birth

5   process, I thought you said that Isabella Zielinski didn't

6   suffer any other birth trauma?

7   A   I was talking about in general, I'm sorry, with that last

8   point.

9   Q   Now, you've written about the piece of evidence regarding

10  of confessions and how it relates to shaken baby syndrome or

11  acute head trauma; is that correct?

12  A   Well, I've summarized the literature.  I haven't actually

13  researched it and written about it except to quote the

14  literature in general terms.  I'm not an expert on

15  confessions.

16  Q   You don't believe that an individual can confess

17  voluntarily -- or strike that question.

18          Some caretakers do confess to shaking a child; is

19  that correct?

20  A   Oh, yes.

21  Q   Do you give any weight to the fact that a caretaker would

22  admit to confessing to shaking a child when you consider --

23  A   Yes.  But we need to have more details for our SCAN team

24  committee, not just a sentence that says that.

25  Q   Well, in your SCAN committee do you have cases where there

Barnes - cross

1  is a confession in a written form or a videotape form that you

2  have at your disposal?

3  A   Very rarely but occasionally.

4  Q   And do you consider that when making your determination

5  whether there's abusive head trauma?

6  A   If from the description of the caretaker, if it meets the

7  current biomechanical models, we may.  But it often doesn't.

8  Q   Now --

9       MR. GOODFRIEND:  Judge, could I have a minute,

10 please?

11      THE COURT:  Sure.

12 BY MR. GOODFRIEND:

13 Q   In terms of retinal hemorrhages, Dr. Barnes, would you

14 agree that the presence of retinal hemorrhages are

15 considered -- is considered a factor in determining whether a

16 child has been the victim of physical abuse, specifically

17 being shaken?

18 A   Well, it's considered, but once again, the current

19 literature doesn't support retinal hemorrhages on the basis of

20 shaking only.

21 Q   Aren't there hundreds of articles that say the presence of

22 retinal hemorrhages is a sign that the child has been a victim

23 of abusive head trauma?

24 A   Yes.  And they've all been challenged over the last decade

25 with more modern science.

Barnes - cross

1    Q    I guess the question is how many articles are out there

2    that state that the presence of retinal hemorrhages is a sign

3    that the child has been a victim of abuse?

4            MR. BLEGEN:  Objection, Judge.

5            THE COURT:  Overruled.

6            THE WITNESS:  I don't know.

7            THE COURT:  Ballpark.

8            THE WITNESS:  Oh, ballpark?

9            THE COURT:  Yeah.

10           THE WITNESS:  I'd say scores of articles.

11   BY MR. GOODFRIEND:

12   Q    You agree that in the pediatric community many doctors

13   diagnose that retinal hemorrhage is an indicator that the

14   child was a victim of abusive head trauma?

15   A    Certainly.

16   Q    Do medical schools teach that retinal hemorrhage in

17   children is a sign of abusive head trauma?

18   A    Certainly.  And it is a cause of retinal hemorrhage, yes.

19   Q    Does Stanford Medical School, where you teach the young

20   doctors and pediatrics, taught that retinal hemorrhage is a

21   factor to be considered whether a child is abused?

22   A    Absolutely.

23   Q    Now, in your first report on Page 9 you indicated you

24   weren't sure how complete was the medical evaluation or

25   postmortem evaluation in this case; is that correct?

Barnes - cross

1   A   That is correct.

2   Q   Are you aware of all the tests that were done in this

3   case?

4   A   No.  But I am aware of the important tests for this case

5   that were not done.

6   Q   You're not aware of all the tests that were done?

7   A   I -- you know, I've read them.  I've read as much as I

8   could.  All I know is the important tests, in my view, that

9   were not done.

10  Q   Now, Dr. Hedlund -- I'm sorry.  Dr. Barnes, how many CT

11  scans of the brain were done in this case?

12  A   Oh, my goodness.  Let me count.  I think ten that I

13  reviewed through February 28th, 2003.

14  Q   And in terms of X-rays, there were skeletal surveys done?

15  A   Yes, sir.

16  Q   Chest X-rays?

17  A   Yes, sir.

18  Q   X-rays of the left wrist and abdomen?

19  A   I think that's correct.

20  Q   In terms of when Isabella first arrived at Provena St.

21  Joseph, was a white blood cell count test done?

22  A   That's my memory.  And it was -- there was an early white

23  count that was elevated, is my memory.

24  Q   Now, in terms of some of the tests done, they were looking

25  for other reasons why Isabella suffered this traumatic

Barnes - cross

1  collapse; is that correct?

2  A   Other than trauma you mean?

3  Q   They looked at other reasons, right?

4  A   They did some of that, yes.

5  Q   I mean, they considered whether sepsis was a reason; is

6  that correct?

7  A   That is correct.

8       THE COURT:  What was the reason?

9       MR. GOODFRIEND:  Sepsis.

10      THE COURT:  Sepsis.

11      THE WITNESS:  They considered it.

12 BY MR. GOODFRIEND:

13 Q   And in terms of the tests done, there were numerous tests

14 done to see if sepsis was a cause of the collapse; is that

15 correct?

16 A   I think there was.

17 Q   I mean, there were several tests done to check the urine;

18 is that correct?

19 A   I'll defer on that.  I don't remember the details.

20 Q   You don't know?

21 A   I'll defer to the clinical experts.  All I know is that

22 the tests that were not done that were important from my --

23 from the imaging.

24 Q   When you say you would defer to the clinicians regarding

25 the testing done, did you feel that you had adequate knowledge

Barnes - cross

1    of the testing done to give us a diagnosis?

2    A    I meant the clinical experts that are going to debate this

3    case is what I meant.

4    Q    So you don't feel qualified to give an opinion regarding

5    the radiology as compared to the clinical information?

6    A    Yes, I do but --

7    Q    Despite the fact that you don't know all the tests that

8    were done?

9    A    No.  Only with regard to the pertinent tests that were not

10   done as indicated by the imaging findings.

11   Q    Dr. Barnes, in terms of the imaging in a case such as you

12   have here today, would you say imaging is really inconclusive

13   by itself?

14   A    In some cases, yes.  In this case, I think there's

15   findings that indicate strongly conditions other than

16   nonaccidental injury.

17   Q    Well --

18   A    I wouldn't call these inconclusive, and you will not find

19   that in my report.

20   Q    Well, in terms of the CAT scan, you indicated that the CAT

21   scan cannot distinguish nonaccidental injury from accidental

22   injury.  Do you agree with that?

23   A    In general and in this case.  That's correct.

24   Q    And would you agree that in this case the MRI cannot

25   distinguish between nonaccidental injury and accidental

Barnes - cross

1  injury?

2  A   In general, but in this case neither can rule it in, and

3  that's our new standard in medicine, is ruling it in, on

4  nonaccidental injury.

5  Q   Well, didn't you state in your summary and conclusions in

6  your initial report that imaging cannot distinguish

7  nonaccidental injury from accidental injury or from

8  predisposing or complicating medical conditions?

9  A   As a general statement, in general that is true.

10       MR. GOODFRIEND:  Judge, may I have a moment to

11  consult?

12       THE COURT:  Yes.

13  BY MR. GOODFRIEND:

14  Q   Dr. Barnes, I think this morning you referred to some

15  articles, particularly a Vinchon article?

16  A   Vichon, V-i-c-h-o-n.

17  Q   And who is he again?

18  A   He's a pediatric neurosurgeon, French pediatric

19  neurosurgeon that is highly regarded internationally with

20  regard to his views on child abuse.

21  Q   And in your second report I think you refer to an

22  individual by the name of Rooks?

23  A   What is that?

24  Q   Rooks?

25  A   Oh, that is correct.  Former fellow of mine that I

Barnes - cross

1    trained.

2    Q    Now, in terms of your testimony this morning, you

3    indicated that there was a change in some of the literature or

4    ideas about shaken baby syndrome or abusive head trauma?

5    A    That's true.

6    Q    And when do you say those changes occurred?

7    A    Probably started in earnest in the mid to late '90s.

8    Q    Okay.  Now, in terms of Dr. Vinchon, I think, as I said,

9    you cited to one paper he did; is that correct?

10   A    Yes.  But he's had a -- quite a series of papers.

11   Q    Are you familiar with a paper of his, Confessed Abuse

12   Versus Witnessed Accidents in Infants, Comparison of Clinical,

13   Radiological and Opthalmological Data in Corroborated Cases?

14   A    Yes, I am.  But that paper, in my view, doesn't apply to

15   this case.

16   Q    Well, in that paper did he state something to the effect

17   that we conclude that shaken impact baby syndrome represents a

18   subgroup of inflicted head injury with a worse prognosis, but

19   that shaken baby syndrome without impact can also be fatal?

20   A    What year is that?

21   Q    2009.

22   A    2009.

23        Yeah, I'm aware that he says that.

24   Q    And I think -- and he's a well-respected individual, and

25   you rely on him for some of your findings?

Barnes - cross

1    A    Yeah, particularly that apply to this case like his more

2    recent article.  That doesn't apply to this case, that

3    article.

4    Q    In terms of the more recent article, are you referring to

5    Subdural Hematoma in Infants.  Can It Occur Spontaneously?

6    Data From a Prospective Series and Critical Review of the

7    Literature?

8    A    Absolutely.

9            MR. GOODFRIEND:  Judge, in terms of this article, we

10   just got notice of it on Friday, and we'd like to reserve

11   making some comments about it at a later time.

12           THE COURT:  Fine.

13   BY MR. GOODFRIEND:

14   Q    Did you ever consult with a child abuse pediatrician in

15   this case?

16   A    I did not.

17   Q    Now, in terms of head trauma, trauma can cause subdural

18   hemorrhages; is that correct?

19   A    That's correct.

20   Q    Trauma can cause subarachnoid hemorrhages?

21   A    Correct.

22   Q    Trauma can cause retinal hemorrhages?

23   A    Correct.

24   Q    Trauma can cause retroclival hemorrhage?

25   A    Correct.

1    Q    Trauma can cause brain contusions?

2    A    Correct.

3    Q    And trauma can cause cerebral edema; is that correct?

4    A    Correct.

5    Q    Would you agree that when a child suffers abusive head

6    trauma the symptoms can be immediate?

7    A    They can be, yes.

8    Q    When a child suffers abusive head trauma, there may be an

9    immediate decrease in the level of consciousness?

10            MR. BLEGEN:  Judge, I'm going to object.  We went

11   through this.

12            THE COURT:  Sustained.  Rule 403.

13   BY MR. GOODFRIEND:

14   Q    Dr. Barnes, have you ever read a statement to the effect

15   that pediatric abusive head trauma is defined as injury to the

16   skull or intracranial contents of an infant or child, young

17   child less than five years of age due to inflicted blunt

18   trauma and/or violent shaking?

19   A    I'm aware of that phrase, yes.

20   Q    And do you know where that quote came from?

21   A    It could have come from some of my writing, but it sounds

22   awfully like the American Academy of Pediatrics' recent

23   guidelines.

24   Q    If you could turn, finally, to Exhibit No. 7, the front

25   page, and I have included what's a document called Pediatric

1  Abusive Head Trauma, Recommended Definitions For Public Health

2  Surveillance and Research; is that correct?

3  A    Correct.  That's the CDC.

4  Q    And on Page 10, in terms of definition of abusive head

5  trauma, they define it as pediatric abusive head trauma is an

6  injury to the skull or intracranial contents of an infant or

7  young child less than five years of age due to inflicted blunt

8  trauma, impact and/or violent shaking; is that correct?

9  A    That is correct.

10  Q    So, Dr. Barnes, wouldn't you say that nonaccidental

11  injuries is one of the differential diagnoses that should be

12  considered in this case?

13  A    Correct.

14         MR. GOODFRIEND:  Nothing further, Judge.  Thank you.

15         THE COURT:  Mr. Blegen.

16                     REDIRECT EXAMINATION

17  BY MR. BLEGEN:

18  Q    Do you still have that quote from the CDC in front of you,

19  Dr. Barnes?

20  A    Yeah.  I do.

21  Q    Was there any evidence of injury to the skull in this

22  case?

23  A    No.

24  Q    Was there any evidence of inflicted blunt impact?

25  A    No.

Barnes - redirect

1    Q    Was there any evidence of torn bridging veins resulting

2    from violent shaking?

3    A    No.

4    Q    Towards the end of his questions Mr. Goodfriend asked you

5    about literature cited by Dr. Hedlund regarding epidural

6    hemorrhages?

7    A    Yes.

8    Q    Remember those questions?

9    A    Yes, sir.

10   Q    Have you seen the references that were relied on by

11   Dr. Hedlund regarding epidural hemorrhages?

12   A    Yes, sir.

13   Q    And are the articles by I believe Mr. or Miss Kwon,

14   K-w-o-n?

15   A    Correct.

16   Q    Do you know if that's a man or a woman?

17   A    I do not.

18   Q    And a Mr. Tubbs?

19   A    Correct.  I think, yeah, Tubbs.

20   Q    Doesn't the Kwon article indicate that spontaneous or

21   nontraumatic retroclival -- strike that.

22         Does the Kwon article indicate that there can be

23   spontaneous or nontraumatic retroclivals in adults?

24   A    It does.

25   Q    And is it known whether or not there can be spontaneous

1    retroclivals in children?

2    A    Yes.

3    Q    Can there be?

4    A    Yes.

5    Q    Did you --

6    A    Can't provide a reference, but yes.

7    Q    Did you know that the Kwon article also indicates that the

8    mechanism of retroclival EDH is controversial?

9    A    Yes.

10   Q    And does that mean that it has not been figured out yet

11   where they come from or how they get there?

12   A    That's correct.

13   Q    Did you -- Mr. Goodfriend indicated that children who had

14   retroclival epidural hemorrhages in these case reports had

15   been in automobile accidents.  Do you remember that question?

16   A    Correct.

17   Q    The fact of the matter is that the children in these

18   articles had been hit by cars as pedestrians, correct?

19   A    Correct.

20   Q    Or they had been inside cars and not in their car seats or

21   not with seatbelts and had impact, correct?

22   A    Correct.

23   Q    And did the children -- do you know whether the children

24   in any of those case reports had reported injuries to their

25   necks and spine that were visible or could be seen on CT or

1    MRI?

2    A    I thought that some had, yes.

3    Q    So no one needed to find a proxy for neck injury in those

4    cases because they had neck injury, right?

5    A    That's correct.

6    Q    Mr. Goodfriend asked if you had reviewed the report of

7    Dr. Rorke-Adams, who says she found evidence of contusion on,

8    I guess, postmortem.

9    A    Yes, sir.

10   Q    Remember those questions?

11   A    Yes, sir.

12   Q    Remember those questions?

13   A    Yes, sir.

14   Q    The analysis by Dr. Rorke and by our expert, Dr. Leestma,

15   was performed recently, correct?

16   A    Correct.

17   Q    And so many years after the death?

18   A    Correct.

19   Q    Do you know whether the autopsy of -- excuse me -- the

20   coroner who performed the autopsy found any evidence of

21   contusions or lacerations to the brain back in 2003?

22   A    I don't think that was in that report.

23   Q    And do you know whether or not the shaken baby expert at

24   the trial in the state court was relying on radiology when she

25   testified that there were contusions and lacerations on the

Barnes - redirect

1    brain?

2    A    I think that's correct.

3    Q    You were asked some questions about whether there was

4    infections found on 12/27/02 and thereafter in the hospital.

5    Remember those questions?

6    A    Yes, sir.

7    Q    And you said something about the child was on antibiotics.

8    A    Correct.

9    Q    What do you -- what impact does it have that the child was

10   on antibiotics?

11   A    Antibiotics can suppress infection, including testing of

12   infection, particularly bacterial infections, and antibiotics

13   will not treat other infections such as viral infections.

14   Q    Did the testing that was done at the hospital, would that

15   have revealed viral infections?

16   A    I don't recall if there was extensive testing for viral

17   infections.

18   Q    And is what you're saying is that antibiotics can mask

19   infections that were there previously or even currently?

20   A    Correct.

21   Q    Mr. Goodfriend asked you to -- about your report

22   indicating that there were potential signs of a seizure

23   disorder before 12/27/02.  Do you recall that?

24   A    I do.

25   Q    Do you recall there being evidence from the trial and

Barnes - redirect

1  police reports that the child in this question arched her back

2  and clenched her fists during feeding?

3  A   Correct.

4  Q   Is that something that you considered to be potential

5  signs of a seizure?

6        MR. GOODFRIEND:  Objection, Judge.  I think it's

7  beyond the scope of his expertise.

8        THE COURT:  Well, you did too, but this is where I'm

9  going to cut it off.  The objection is sustained.  You'll do

10  that through another witness.

11        MR. BLEGEN:  Fine.

12  BY MR. BLEGEN:

13  Q   Mr. Goodfriend asked you about the number of children who

14  have chronic subdural collections from birth and said that it

15  was close to 50 percent.  Remember that?

16  A   I think he asked about subdural hemorrhages at birth, and,

17  yeah, up to 50 percent.

18  Q   I'm sorry.  Then I may have --

19        There are children who have also chronic subdural

20  collections from birth, correct?

21  A   That's correct.

22  Q   And I believe you said that they are often or can be

23  benign?

24  A   That's correct.

25  Q   Are there problems associated with chronic subdural

Barnes - redirect

1    collections related to bleeding of veins?

2    A    Yes, sir.

3    Q    Can you tell us what that is?

4    A    As Dr. Vinchon describes in his article and quotes the

5    literature, that those collections from birth can be

6    associated with spontaneous hemorrhage or hemorrhage brought

7    on by other conditions including retinal hemorrhage, and ten

8    of his personal 16 cases had labor and delivery issues.

9    Q    Mr. Goodfriend also asked you about the labor and delivery

10   issues in this case?

11   A    Yes, sir.

12   Q    Do you recall whether the baby had an occipital caput or

13   not at birth?

14           THE COURT:  Occipital what was the second word?

15           MR. BLEGEN:  Caput, c-a-p-u-t.

16   BY THE WITNESS:

17   A    A caput.  That's correct.  And a cephalohematoma.

18   BY MR. BLEGEN:

19   Q    Did the baby have that?

20   A    Yes, sir.

21   Q    Was the baby intubated at birth?

22   A    That's correct.

23   Q    Was there a suction and free flow of oxygen given to the

24   baby at birth?

25   A    That's correct.

1  Q  And did she have a right cephalohematoma at birth?

2  A  That's correct.

3  Q  Would those be signs that it was not a completely normal

4  birth?

5  A  That's correct, despite the Apgar scores.

6  Q  Mr. Goodfriend asked you a couple of times whether acute

7  subdural hematomas can result from accidental injury or

8  nonaccidental injury, correct?

9  A  Correct.

10 Q  And you said several times possibly, correct?

11 A  Correct.

12 Q  Can they occur from other means?

13 A  Yes, sir.

14 Q  And are some of the means the natural means we've

15 discussed today?

16 A  Yes, sir.

17 Q  I won't put the images back up there, but Mr. Goodfriend

18 went through and showed you some of the same images you had

19 seen before, showed you either the clotted vein or the small

20 subdural hematomas and asked whether they could be from

21 abusive head trauma.  Do you recall that?

22 A  Yes, sir.

23 Q  Could they be from torn bridging veins as the result of

24 abusive head trauma?

25 A  Not in my opinion.

Barnes - redirect

1    Q    And is that because the volume of blood is too small?

2    A    Correct.

3    Q    You also said that the thrombosed vein could be the result

4    of abusive head trauma.  You said it was possible.

5    A    Possible.

6    Q    Is that what you believe it was caused by in this case?

7    A    Not in this case because we have no signs of impact.

8    Q    If a vein is going to thrombose as the result of abusive

9    head trauma, would it have to rupture first?

10   A    Not necessarily.  In the case reports, for instance, with

11   impact trauma and with skull fracture, there is partial injury

12   to those veins at thrombose as opposed to rupture of those

13   veins.  So it may -- it could be one or both.

14   Q    But that would only be in cases where there's skull

15   fractures or other significant physical trauma?

16   A    Yes.  And that's what's reported in the literature.

17   There's no report of any thrombosis with shaken baby syndrome

18   in the literature.

19   Q    I just want to ask you a couple of questions about how

20   your two reports came about.  When you submitted your first

21   report to Dr. Shaku Teas, were you under the impression or

22   intending to be a expert witness in this matter?

23   A    Not at that time.

24   Q    Were you hired to be an expert witness by anyone?

25   A    Not at that time.

Barnes - redirect

1   Q   Were you consulting with Dr. Shaku Teas on a case that she

2   asked you to consult about?

3   A   That's what I was doing, yes.

4   Q   And have you been hired or paid for this case?

5   A   No.

6   Q   Are you doing it pro bono?

7   A   Yes.

8   Q   Did anyone tell you what conclusions to reach in your

9   second supplemental report?

10  A   No, sir.

11  Q   Are the conclusions in there yours?

12  A   Yes, sir.

13  Q   Were some typos and language cleaned up?

14  A   Yes, sir.

15  Q   Mr. Goodfriend asked you some questions about whether a

16  reference to Dr. Leestma's report that was in your

17  supplemental report was in your original report.

18  A   Correct.

19  Q   Do you remember that question?

20  A   Yes, sir.

21  Q   Can you tell me the date of Dr. Leestma's report?

22  A   It is August 20th, 2012.

23  Q   What's the date of your original report?

24  A   It is June 29th, 2012.

25  Q   Mr. Goodfriend asked you whether seizures can result from

Barnes - redirect

1  shaking, and you said that they can, correct?

2  A   I -- well, in the context if they're -- that I said before

3  about the neck injury with the -- secondary from the neck

4  injury and the secondary cause of the intracranial

5  abnormalities, which could be hemorrhage, hypoxia-ischemia,

6  yeah, you can get seizure from that scenarios.

7  Q   And is what you're telling us is that only the kind of

8  shaking that also results in a neck injury?

9  A   Yes.

10 Q   But there are other things that can cause seizures,

11 correct?

12 A   That's correct.

13 Q   Is there anything in this case in particular aside from

14 the theory of shaken baby syndrome that can cause seizures?

15 A   Yes.  Classically cerebral venous thrombosis.

16 Q   Mr. Goodfriend asked you about your testimony for the

17 defense starting in 2000 and counted up the number of times

18 you had testified for the defense.

19 A   That's correct.

20 Q   Had you testified for the prosecution in any cases prior

21 to 2000?

22 A   Yes.  Many cases in the first 20 years of my career, in

23 fact, most of the cases were prosecution cases.

24 Q   And --

25 A   All of them.

Barnes - redirect

1  Q    In fact, you list from 1993 to 1999 five prosecution cases
2  that you testified in?
3  A    That's correct.
4  Q    Do you know the -- is there something that happened
5  between 1999 and 2000 that caused you to become a more
6  frequent expert for defendants than prosecution?
7  A    Yes.
8  Q    Were you a witness for the prosecution in any high-profile
9  shaken baby cases?
10 A    Yes.
11 Q    Which one?
12 A    Well, the main one was the, I think it was 1997, the au
13 pair or nanny case in Boston.  I was a prosecution expert in
14 that case.
15 Q    And did your participation in that case cause you to
16 reconsider your previous thoughts about shaken baby syndrome
17 and abusive head trauma?
18 A    That was -- yeah, that was part of it, and it was because
19 I was asked to monitor the entire case by the two district
20 attorneys at that time, and I was impressed with the quality
21 of the experts on the defense side, the issues they read --
22 the issues they brought up from areas of the evidence based
23 medicine literature out of the child abuse literature, so I
24 made the decision I need to be reading something other than
25 the child abuse literature, so that's what I did, and that was

Barnes - redirect

1    when the era of evidence based medicine came in, and I went to

2    the scientific literature after that, and that's where I've

3    been ever since.

4             MR. BLEGEN:  Judge, if I could just have a moment.

5             (Brief pause.)

6    BY MR. BLEGEN:

7    Q    Dr. Barnes, Mr. Goodfriend asked if you had consulted with

8    a I think he said child abuse pediatrician.  Do you remember

9    that?

10   A    I do.

11   Q    Have you read the report from a defense pediatric

12   neurologist, Joseph Scheller in this case?

13   A    I have.

14            MR. BLEGEN:  Judge, I think that's all I have.

15            THE COURT:  There are three areas that I would like

16   to clarify with you.  One has to do with that list.  I think

17   it's Exhibit 2 in the binder of the list of testimony.

18            You were trying to make a point, which I think I got

19   but I'm not sure, about certain things that were not on here.

20   In other words, you were listing that -- you were saying that

21   this is only your assignments as an expert, and the stuff that

22   you're doing for the team, the acronym for which escapes me

23   right now --

24            THE WITNESS:  SCAN.

25            THE COURT:  -- the SCAN team isn't on here.  Did I

Barnes -

1    get that right?

2              THE WITNESS:  You did get that right.

3              THE COURT:  Okay.  And tell me why.  They're

4    considered patients or something like that?  Is that the deal?

5              THE WITNESS:  Yeah.  And it falls within Stanford

6    University and Lucile Packard Children's Hospital risk

7    management.

8              THE COURT:  Got it.

9              THE WITNESS:  So those attorneys assist us in that,

10   and they make the rules.

11             THE COURT:  Okay.  And so what is the SCAN?  Does

12   that stand for something, SCAN?

13             THE WITNESS:  Suspected child abuse and neglect.

14             THE COURT:  And who runs this?

15             THE WITNESS:  Our child abuse -- we have two child

16   abuse pediatricians.

17             THE COURT:  At your hospital, in other words.

18             THE WITNESS:  Yeah.

19             THE COURT:  Okay.  Got it.  Okay.  That answers that

20   question.  That was item number one.

21             Item number two, I think that got dealt with during

22   the redirect, so I don't need to deal with that.

23             Mr. Goodfriend on cross examination asked you about a

24   report or conclusions by somebody named, and I may have gotten

25   the name wrong, Dr. Rorke-Adams?

Barnes -

1      THE WITNESS:  That's correct.

2      THE COURT:  And I think he was asking whether you had

3  seen a report that -- I assume this is a -- Dr. Rorke-Adams is

4  a she?

5      THE WITNESS:  Yes.

6      THE COURT:  -- that she had written in which she said

7  she had seen contusions, if I got it right, on the brain, and

8  you made the comment that this was ten months after the fact

9  and that it didn't show up on the imaging that you looked at.

10  Did I pretty much get that right?

11      THE WITNESS:  I think that's right.

12      THE COURT:  Can you tell me what the significance is

13  of those two things that you pointed out in terms of, if you

14  will, the reliability of what Dr. Adams says she found, at

15  least from your standpoint in your expertise?

16      THE WITNESS:  I can't really speak to that.  I need

17  the other experts to --

18      THE COURT:  Okay.  That's a fair answer.  All right.

19  So your point, though, is that in terms of contusions, they

20  didn't show up on the imaging that you looked at?

21      THE WITNESS:  That's correct, sir.

22      THE COURT:  Does anybody have any further questions

23  based on my questions?

24      All right.  Thanks.  You're excused.

25      I honestly think it is relatively pointless to start

1   another expert at this moment.

2         You can step down when you're ready to go.

3         THE WITNESS:  Thank you, sir.

4         THE COURT:  So we need to have a discussion here.

5         MR. BLEGEN:  I was going to make a proposal to the

6   State that might cause us to shorten at least one of the

7   group.

8         THE COURT:  Talk amongst yourselves for a few

9   minutes.  I'll just wait here.

10         (Discussion off the record.)

11         MR. GOODFRIEND:  One question.  In terms of finishing

12   the hearing, is it January 3rd through January 11th?

13         THE COURT:  January 3rd until we're done.

14         MR. GOODFRIEND:  Right.  Okay.  I just wanted to make

15   sure I got the date right.

16         MR. BLEGEN:  Well, I think we're ready.  We've had

17   our discussion.

18         THE COURT:  Talk to me.

19         MR. BLEGEN:  I think they're going to think about

20   whether we can limit it.  I don't know that we can.  I was

21   thinking of each side has two radiologists.  My thought was to

22   cut --

23         THE COURT:  Cut it from 13 to 11?

24         MR. BLEGEN:  Yeah, except I hesitated to interrupt

25   you and tell you it was actually 14 all the times you were

1    saying 13.

2            THE COURT:  Oh, God.  Six plus seven.  All right.  So

3    cut it from 14 to 12.

4            MR. BLEGEN:  Right.  But they have to talk to people

5    in their office to do that.

6            Our radiologist, who we were hoping to get on and off

7    today, is able to stay till tomorrow morning, but if --

8            THE COURT:  All right.  Well, the one place where I

9    am going to need to weigh in here is that on certain of these

10   people, you know, they're being paid for, either their time or

11   their transportation or both are being paid for under the

12   Criminal Justice Act, and already on this fellow I got emails

13   while I was sitting up here saying his plane needed to be

14   moved and so I needed to approve an extra X amount of dollars.

15           MR. BLEGEN:  What was the X amount?

16           THE COURT:  Five hundred.

17           So we're not going to have that happen again.  So I

18   don't know who the people are that their transportation only

19   is being paid for than him.  I think there were a couple of

20   others.  They are coming and leaving when they're scheduled to

21   even if that means that they're out of order.  And if that

22   means that maybe you don't cover every subject that's going to

23   be covered with every other witness with them, as you arguably

24   did with Dr. Barnes, then that is what it means.

25           Secondly, if there are people who, you know, are

1   sitting out there in some sort of a holding pattern whose

2   holding pattern -- I mean that figuratively -- whose holding

3   pattern hours are going to be charged to the Criminal Justice

4   Act, if somebody thinks that, they have another think coming.

5           MR. BLEGEN:  Time sitting around waiting to testify

6   or something?

7           THE COURT:  Yeah.  That's got to stop, number two.

8           Number three, I believe you said something to me

9   about this, but I honestly don't recall what it was.  I know

10  Dr. Teas is sitting in here.  Is that time CJA time?

11          MR. BLEGEN:  No.

12          THE COURT:  Okay.  You told me that the other day.

13  Okay.  I wasn't sure.  I thought you had, but I wasn't sure.

14          So those are the parameters I'm setting because I

15  don't want to have to go back to the well, so to speak, on

16  approvals of some of those amounts.

17          And as far as the rest of it is concerned, you know,

18  it may be that this will be the only five-hour and 45-minute

19  witness we have.  And if so, and if we actually get done this

20  week, fine.  If we don't, I'm really serious about what I'm

21  saying.  And just so you know what it means, okay, I

22  essentially cleared things out of this week with one exception

23  tomorrow that I couldn't clear out, a guilty plea that I got

24  to take at 1:30.  I cleared stuff out of this week, and I

25  moved it to January the 3rd through January the 13th.  I can't

1    move it again.  And there's one day in there that I definitely

2    moved because of this that involves, you know, like ten people

3    coming, half of them from out of state, that I can't move.  So

4    when I say we're going to continue, it's not going to be like

5    today.  You're going to be here.  Then you're going to be

6    waiting.  Then you're going to be here.  Then you're going to

7    be waiting.  Then you're going to be here.  Then you're going

8    to be waiting.

9            But since I'm the finder of fact on this part of the

10   case, I need to have this evidence all coming in within some

11   relatively compact period just from a comprehension

12   standpoint.  I can't have a situation where I say, okay, well,

13   we'll do this week and then I set you over to, which I'd have

14   to do, April, because I've got jury trials in between there.

15   Because then I'd essentially have to relearn all of this

16   stuff, which it's just not a good way of deciding things.  So

17   that's what's going to happen.

18           And so what I guess I need you to do sometime -- what

19   I'm going to need you to do sometime tomorrow, and I'm going

20   to insist that you do, is give me some sort of a revised time

21   frame based on how things seem to be going, and I guess what I

22   would -- and I've only heard one witness so far, and I've

23   heard one direct, and I've heard one cross.  You know, I know

24   that there's witnesses who have different areas of expertise.

25   We really don't need to have every witness -- and this is true

1    on both sides because both sides were asking this gentleman to

2    comment on things that I think he conceded were outside of his

3    area.  We don't need to have every witness covering every

4    topic.  That's why presumably you have seven on each side.  If

5    you didn't, then I'd only need one on each side.  Okay.  So

6    that might be a way of shortening things somewhat if that was

7    the plan.

8        So tomorrow it should be pretty close ten.  As I

9    said, I got to take a guilty plea at 1:30.  That will take

10   about a half hour, but, you know, I've tried to move other

11   stuff, including over lunch we were frantically trying to move

12   as much stuff off of tomorrow morning as we could, but there's

13   limits to my ability to do that.  So see you tomorrow.  So

14   just remember the two exhibit -- two copies in the exhibits

15   thing, and don't forget to have somebody fill out that CJA

16   form for ordering the transcript.

17       MR. TELISMAN:  One question, Judge.  What time do you

18   want us here in the morning, make sure we're here when the

19   court's ready?

20       THE COURT:  You know, the problem is, is that my

21   court call is kind of -- you know, it's variable, and I'm

22   going to try to keep it as short as I can, but the stuff isn't

23   going to move.  As long as you're in the room by 10:00, that's

24   fine.  And there may be some days where Ms. Del Prete doesn't

25   get here by ten.  We're just going to start anyway.  There's a

1   finite amount of time available.

2          MR. GOODFRIEND:  Judge, I have a second copy.

3          THE COURT:  There's one up here.  We'll just borrow

4   this one, the one that the witness had.

5          MR. GOODFRIEND:  And we'll talk to Pat about --

6          THE COURT:  You know, I don't want to tell somebody

7   not to do something that you think that you need to do, but

8   just keep in mind there's a finite amount of time in the

9   world.

10         MR. TRIEBEL:  Judge, were you asking about

11  transcripts, I assume, with a post-hearing brief in mind or --

12         THE COURT:  Yeah.  And so I'm really kind of going to

13  be very disinclined to do closing arguments.  My inclination

14  is going to be we're going to do post-hearing briefing.  I,

15  frankly, started thinking about that today when I saw how long

16  this witness was going to go, so I'll think about it some

17  more.

18         MR. BLEGEN:  Do you have an inclination of how soon

19  you will want the post-hearing briefing after the hearing is

20  over?

21         THE COURT:  No.  It's too hard to say.  Too early to

22  tell.

23         MR. GOODFRIEND:  Thank you, your Honor.

24         (Which were all the proceedings had in the

25             above-entitled cause on the day and date aforesaid.)