```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3

 4   JENNIFER DEL PRETE,            )
                                    )
 5                   Petitioner,    )  Docket No. 10 C 5070
                                    )
 6           vs.                    )
                                    )
 7   MELODY HULETT,                 )  Chicago, Illinois
                                    )  December 18, 2012
 8                   Respondent.    )  10:15 a.m.

 9                             VOLUME 2
                        TRANSCRIPT OF PROCEEDINGS
10           BEFORE THE HONORABLE MATTHEW F. KENNELLY

11

12   APPEARANCES:

13

14   For the Plaintiff:    BLEGEN & GARVEY
                           BY:  MR. PATRICK W. BLEGEN
15                              MS. JODI L. GARVEY
                                MR. DANIEL A. RUFO
16                           53 West Jackson Boulevard
                             Suite 1437
17                           Chicago, Illinois  60604

18   For the Defendant:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                           BY:  MR. KARL R. TRIEBEL
19                              MR. NEAL GOODFRIEND
                                MR. ARI TELISMAN
20                              MS. MONIQUE A. ANAWIS
                             100 West Randolph Street
21                           13th Floor
                             Chicago, Illinois  60601
22
     Also Present:                 MR. ROBERT STANLEY
23

24           LAURA M. BRENNAN - Official Court Reporter
               219 South Dearborn Street - Room 2102
25                     Chicago, Illinois  60604
                            (312) 435-5785
```

1    (The following proceedings were had in open court:)

2        THE COURT:  10 C 5070, Del Prete v. Hulett.

3        Can the lawyers give your appearances for the record?

4        MR. BLEGEN:  Good morning, Judge; Patrick Blegen and

5    Dan Rufo on behalf of Ms. Del Prete.

6        MR. TRIEBEL:  Good morning, your Honor; Karl Triebel

7    on behalf of --

8        THE COURT:  Just give everybody's names, if you

9    would.

10        MR. TRIEBEL:  Also, there is Neal Goodfriend, Ari

11   Telisman, Monique Anawis, and a law clerk, Katie Corban.

12   (Brief interruption.)

13        MR. TRIEBEL:  Kirwan, sorry.  Thank you.

14        THE COURT:  And we called -- my clerk called the

15   marshals.  Ms. Del Prete is on her way down, but we're going

16   to go ahead and get going.  She's evidently here.

17        MR. BLEGEN:  All right.

18        THE COURT:  You have got the transcript thing, right?

19   I will take care of that today.  Thank you.  Just give that to

20   me.

21        Okay, you can call the next witness then.

22        MR. GOODFRIEND:  Judge, we call Gary Hedlund.

23        THE COURT:  So this is respondent's witness.

24        MR. GOODFRIEND:  Yes.

25        THE COURT:  He's the corresponding person --

Hedlund - direct

1    MR. GOODFRIEND:  Yes.

2    THE COURT:  -- I take it.

3    MR. GOODFRIEND:  Yes.  He's our radiologist.

4    THE COURT:  Just come on right around here.

5    (Witness sworn.)

6    All right, Mr. Goodfriend, you can proceed.

7    GARY HEDLUND, RESPONDENT'S WITNESS, DULY SWORN

8    DIRECT EXAMINATION

9  BY MR. GOODFRIEND:

10  Q   Sir, can you please state your name and spell your last

11  name for the court reporter?

12  A   Gary Hedlund, H-e-d-l-u-n-d.

13  Q   Mr. Hedlund, where are you employed at?

14  A   Primary Children's Medical Center, Salt Lake City, Utah.

15  Q   You're a neuroradiologist there?

16  A   I'm a practicing pediatric neuroradiologist.

17  Q   Do you also teach?

18  A   Yes, I do.  I have responsibility to teach residents in

19  radiology at the University of Utah and fellows in

20  neuroradiology at the University of Utah.

21    THE COURT:  The institution is called Primary

22  Children's Medical Center?

23    THE WITNESS:  Yes, sir.

24    THE COURT:  Okay.  I just want to make sure I got it

25  right.  Thanks.

1   BY MR. GOODFRIEND:

2   Q   Can you give Judge Kennelly a summary of your education

3   beginning when you were in medical school?

4           THE COURT:  We're talking about the executive summary

5   version because I'm going to have your CV.

6           THE WITNESS:  I studied medicine here in Chicago at

7   Chicago College of Osteopathic Medicine and graduated

8   valedictorian there in 1981.

9           And I went through school on an Air Force program,

10  Air Force scholarship.  So I left Chicago and went to

11  Washington, DC, did my internship there at the Air Force

12  Medical Center.

13          Then I went out into the field with the Air Force for

14  two years doing emergency medicine and flight medicine, flight

15  surgery, in Albuquerque, New Mexico.  So I paid two of my

16  years of obligation back.

17          Then I entered my residency in 1984 at Wilford Hall

18  U.S. Air Force Medical Center in San Antonio, Texas.  And I

19  completed a four-year training program in diagnostic

20  radiology.

21          Then I entered into my first fellowship in

22  Cincinnati, Ohio, at Cincinnati Children's Medical Center

23  where I completed a fellowship in general pediatric radiology;

24  returned to the Air Force, finished my commitment as a faculty

25  member on their teaching staff for two years.

1    Then I took a job in Birmingham, Alabama, at the
2    University of Alabama Children's Hospital, and I worked there
3    for about eight years.
4        Then I entered my second fellowship in
5    neuroradiology, again at Children's Hospital Medical Center in
6    Cincinnati, and from that point, I returned to Salt Lake where
7    I took a job as faculty pediatric neuroradiology.
8    BY MR. GOODFRIEND:
9    Q    Now, in terms of what you do on a daily basis at Primary
10   Children's Medical Center, could you please describe your
11   responsibilities?
12   A    Well, I'm the head of MR imaging and pediatric
13   neuroradiology, and so my focus is on diagnosing brain and
14   spine diseases in children.  And so we're an active clinical
15   center, and so I'm primarily interpreting MRI examinations and
16   CAT scans that relate to the brain, face, neck, spine, in
17   children.
18   Q    How many cases do you go through in a given day in terms
19   of radiology?
20   A    Well, if I'm assigned to the MRI department, I would be
21   reading between 35 and 50 MRI cases of children that would be
22   brain, spine, head and neck areas, so the neuroimaging parts
23   of their body.
24       If I was assigned to the CT rotation, I might be
25   reading 25 to 30 CTs of the brain but also other CTs of the

1  spine, the neck, the face.

2  Q   And you indicated you're an adjunct professor of

3  radiology?

4  A   So we have teaching appointments.  I am not a University

5  of Utah employee.  And so the appointments are called adjunct

6  appointments, but I'm a professor, an adjunct professor, on

7  the teaching staff.

8  Q   Now, Mr. Hedlund, in terms of books, are you currently

9  working on a book or a chapter in a book of the book

10 "Diagnostic Imaging in Child Abuse"?

11 A   Yes.

12 Q   Could you please describe that book for the judge and what

13 chapter you're working on?

14 A   Dr. Paul Kleinman is the editor.  Dr. Kleinman is

15 professor of radiology at Harvard and Children's Hospital in

16 Boston and wrote the first and second editions of that book.

17 The last edition was about 10 years ago, maybe almost 11 years

18 ago.

19         He called me about two years ago and asked if I would

20 lead the authoring team for writing the abusive head trauma

21 part of that book, which will be roughly between 180 and 200

22 pages on the brain imaging alone.  So I'm the lead author.  I

23 have a couple of colleagues, Ellen Grant, Michelle Silvera,

24 helping me with our project in addition to Dr. Kleinman

25 contributing.

Hedlund - direct

1  Q    And is that the chapter that Dr. Barnes wrote about 10 or
2  12 years ago?
3  A    He wrote it in conjunction with Dr. Kleinman.  Dr.
4  Kleinman was the first author, and Dr. Barnes was the second
5  author for that chapter.
6  Q    Just in terms of one other book, did you participate in
7  writing part of a book called "Diagnostic Imaging Pediatric
8  Radiology"?
9  A    "Pediatric Neuroradiology."
10 Q    I'm sorry.
11 A    Yes, that's all right.  Yes.
12 Q    And in terms of your CV --
13        Judge, I just state for the record that is
14 Exhibit 11.
15        THE COURT:  11, thanks.
16 BY MR. GOODFRIEND:
17 Q    Did you recently give a presentation in Chicago at a
18 radiologists convention?
19 A    Yes, I did.
20 Q    Briefly describe for the judge what your role was in that
21 convention.
22 A    Every year the RSNA, the Radiologic Society of North
23 America, gathers, this year I think over 65,000 physicians
24 from around the world for an annual meeting.  And I gave a
25 symposium on child abuse with particular focus upon the

 1  bleeding that goes inside the head in child abuse.

 2  Q   Now, in the last five or ten years, have there been

 3  certain advances in the technology and science of abusive head

 4  trauma?

 5  A   Yes.

 6  Q   Could you briefly explain some of the advances and

 7  particularly in terms of the triad?

 8  A   Well, I think advances in several areas:  Number one, our

 9  evolving understanding of the mechanics of injury of head

10  injury in general in children.

11       And by that I mean we're moving away from, I would

12  say, very primitive models.  Those were adult primate animal

13  models.  They were, you know, plastic dummy models.  They were

14  not biofidelic; that is, they did not truly reflect the nature

15  of a young child's neck and head.

16       MR. BLEGEN:  Judge, I'm going to object to the

17  witness' report.  It deals only with radiology.  It doesn't

18  deal with models, biofidelics.  There is no notice of that.

19       THE COURT:  Is it covered somewhere someplace by

20  somebody?

21       MR. GOODFRIEND:  I would have to look through his CV,

22  Judge, and if you want me to move on, I will.

23       THE COURT:  Why don't you move on.

24       THE WITNESS:  In the technical --

25       THE COURT:  I'm guessing you're going to --

1    I'm telling him to move on.

2    THE WITNESS:  I'm sorry.

3    THE COURT:  I'm guessing you're going to have other

4  witnesses that are going to talk about this.

5    MR. GOODFRIEND:  Yes.

6    THE COURT:  Let's save it for that.

7    THE WITNESS:  On the technical imaging side, yes,

8  sir.

9    THE COURT:  No.  He's going to ask --

10 BY MR. GOODFRIEND:

11 Q   I have to ask you another question.

12    Just in speaking about, could you please explain to

13 the judge in terms of what the triads are in terms of

14 diagnosing neuropathology and neuroradiology in children?

15 A   As it refers to child abuse?

16 Q   Yes.

17 A   Well, I think there's two recognized triads that are

18 discussed.  One is, if you will, the classic triad of the

19 shaken baby syndrome.  That would be the triad of retinal

20 hemorrhages, subdural hemorrhages and encephalopathy, which

21 implies brain tissue abnormality, swelling or deprivation of

22 oxygen in blood supply.

23    The second triad which has become more focused upon,

24 I would say, in the last couple of years is also -- is called

25 the Ontario triad.  And the Ontario triad is the triad of

1  retinal hemorrhages, subdural hemorrhage and the absence of
2  scalp or skull injury.

3          THE COURT:  Absence of?

4          THE WITNESS:  The absence of scalp or skull injury.

5          THE COURT:  Got it.

6          MR. BLEGEN:  Judge, I'm going to object again.  This
7  is all beyond the scope of the report we were tendered.  There
8  is nothing in there about the Ontario triad, nothing in there
9  about the classic triad.

10         THE COURT:  Okay.  So I need to be shown at this
11 point.  What document is the report?  Is it number 10?

12         MR. GOODFRIEND:  Judge, that is document number 10.
13 I would state the triad is not in there, but I think it's
14 within his general knowledge of how diagnoses are made
15 regarding findings in pediatric neuroradiology, and I think
16 that is within his knowledge as an expert witness.  And I
17 think that he's trying to cover advances in the field.

18         And I think that is well within the scope of
19 qualifications, Judge.

20         THE COURT:  Mr. Blegen.

21         MR. BLEGEN:  Judge, one, this is the same objection
22 that they made regarding Dr. Barnes.

23         THE COURT:  Did I sustain it?

24         MR. BLEGEN:  What you did is allowed them to leave
25 open the possibility of recross examination, but at the very

1   least --

2           THE COURT:  Why should I not do the same thing here?

3           MR. BLEGEN:  Because they didn't give us even a

4   supplemental report.

5           THE COURT:  Oh.  So this is what was in Dr. Barnes'

6   supplemental report that they had two days.

7           MR. BLEGEN:  This area is not in it.  I'm just saying

8   arguably new areas were in that.  I thought it was all

9   responsive.  They disagreed.  But nobody argues that this is

10  responsive or in some report.  It's not.

11          THE COURT:  I need you to step out for a second.

12          THE WITNESS:  Yes, sir.

13          THE COURT:  So I can have a discussion with the

14  lawyers.

15              (Brief interruption.)

16          THE COURT:  Okay.  So, first of all, Mr. Blegen, you

17  have to sign off on this thing.  You can do it later.  But

18  it's on the lower left-hand side about a third of the way

19  down.  That's the CJA transcript request.

20              So can you point to me somewhere -- the first

21  question is:  Is it in here?  Is it in the disclosure

22  somewhere?

23              And then the second question is:  If the first answer

24  is no, then what, if anything, do I do about it?

25              So let's deal with those one at a time.  Is what he's

1  talking about or what you propose to have him talking about

2  now covered somewhere in the disclosures concerning this

3  witness?

4       I said halfway down on the left-hand side.  You just

5  signed where the court reporter is supposed to sign.  Halfway

6  down.  That would be half.  The left-hand side of this would

7  be left.

8     (Brief interruption.)

9       THE COURT:  Okay, so I need an answer.  Is it

10  somewhere in the disclosures?

11       MR. GOODFRIEND:  I don't find a specific reference to

12  it, but it's general knowledge within the --

13       THE COURT:  I don't think anybody disputes it's

14  within his general knowledge.

15       So here is the deal, though.  I mean, it's important

16  for all of the obvious reasons, and so I won't state them

17  since they're obvious that I need to apply the same rules to

18  everybody, okay.

19       Now, granted, Mr. Blegen, they had two days' notice

20  of the supplemental report as opposed to your getting it on

21  the fly.  And I understand there's a difference between those

22  two things.  You know, I opted into Rule 26(a)(1) or 26(a)(2),

23  which doesn't ordinarily apply in these cases, for a very

24  specific reason, and I think I made it clear to the lawyers at

25  earlier status hearings -- I opted into it because I thought

1    it was important for everybody to have, you know, a handle

2    before the hearing on what the opposing expert was going to

3    say.

4            You would get that even in a criminal case.  At least

5    if it were tried in federal court, you would get some sort of

6    a disclosure under criminal Rule 16.  The state court rules I

7    understand are a little bit different on that, but you would

8    get something.

9            And, you know, there had been some discussion at an

10   earlier point in time about taking depositions, but because,

11   you know, I've approved for payment of certain experts on the

12   plaintiff's -- on the petitioner's side under the Criminal

13   Justice Act, I had a hard time justifying that, and that's the

14   other big reason why I opted into 26(a)(2).  And so, you know,

15   26(a)(2) carries some baggage with it, and the baggage is,

16   generally speaking, in a civil case if something is not in a

17   disclosure that's served at an appropriate time, you don't get

18   to go into it unless it's substantially justified or it's

19   harmless.

20           Now, I don't think we need to make, you know, for

21   want of a better word a federal case out of this particular

22   issue.  And I guess what I would say is that I don't know if

23   there's other witnesses, Mr. Blegen, who have made

24   supplemental disclosures on your side.  Are there?

25           MR. BLEGEN:  Just a corrected one.  I wouldn't say

1    supplemental, nothing of -- not changing a sentence.

2        MR. GOODFRIEND:  Well, the other thing, Judge, is

3    there was a late exchange of discovery by both sides as to

4    demonstrative evidence.

5        THE COURT:  Fair enough.

6        MR. GOODFRIEND:  It's happened on both sides.

7        THE COURT:  No, I understand that.  I mean, that's

8    even on both sides.

9        But, you know -- so yesterday, I mean, there was at

10   least two days' notice of it, and what I said is I would

11   permit the -- I would permit the respondent, since you had

12   only had a couple of days to look at it, I would permit the

13   respondent to reopen the questioning later when we would make

14   arrangements for Dr. Barnes to be available by video.

15       What I'm going to --

16       What I'm not going to permit is for this to be kind

17   of a rolling hearing.  There's going to be a finite end date

18   to it, and as far as, you know, any further examination of

19   Barnes on the new stuff that is in the additional disclosures,

20   to the extent you didn't get to do it, that's all going to

21   happen during the week of the 14th of January as well.  But I

22   really don't want to have a situation here where, you know,

23   with every witness I'm being given not just their testimony,

24   but, also, you know a whole bunch of other stuff.

25       Now, that happened -- well, I don't know whether that

Hedlund - direct

1    happened yesterday or not because I haven't compared the

2    testimony to the disclosures.  What did happen yesterday, I

3    think it's fair to say, is that, you know, and maybe this was

4    anticipated, that Dr. Barnes ended up testifying about a whole

5    lot of things.  And I have some authority under Rule 403 to

6    sort of tell people it's going to be one witness per topic.  I

7    mean, that's been the rule in civil cases in this district

8    since before I was a lawyer.  It's embodied in our pretrial

9    order rules.

10          And so here is the deal, okay, and this is going to

11   apply to everybody, and it's going to apply starting now, and

12   your remedy on Dr. Barnes is I've given you the opportunity to

13   question him further.  If you want to elicit this from this

14   guy, that's fine, but you don't get to elicit it from other

15   people.  Now, if I were in your shoes I would say, yes, there

16   is somebody that I would rather get this from because it's

17   better, okay.  So that's going to be the rule, and it's going

18   to apply to you, too.

19          So if I get testimony about a topic from one person,

20   then barring something, you know, extraordinary, that's going

21   to be the person who talks about that.  The one exception to

22   that that I can imagine as I sit here is that if somebody is

23   needing to explain the differences between what happened, you

24   know, what the discussion was at some earlier point in time

25   and now, why is your diagnosis different from some other

1    person's diagnosis, I think it might be legitimate, might be

2    legitimate, for somebody to explain, well, you know, stuff has

3    changed in the science since then, stuff has changed since we

4    looked at it since then, but that would need to be the

5    predicate.

6              MR. GOODFRIEND:  That would what?

7              THE COURT:  That would need to be the predicate for

8    it.  I'm not getting that here.  I'm just getting it cold.

9    Stuff has changed.

10             Okay.  I've said what I'm going to say, and so you

11   will make a choice.  And so if he gets back up there and you

12   start asking him these questions, that means you have decided

13   that this is your witness who is going to be talking about

14   these triads and how they have changed and whatnot, the single

15   one, okay.  And if you don't, then I will assume from that

16   that you have decided you're going to deal with this with

17   somebody else.

18             Can somebody get Dr. Hedlund back in here?

19        (Brief interruption.)

20             THE WITNESS:  I can have a seat?

21             THE COURT:  Go ahead.  That's fine.

22        (Brief interruption.)

23             MR. GOODFRIEND:  Judge, I think we're going to take

24   that up with another witness.

25             THE COURT:  All right.

Hedlund - direct

1  BY MR. GOODFRIEND:

2  Q   Dr. Hedlund, just one other point about your

3  responsibilities.  Could you please tell the judge what your

4  child protection service team is and what is your role on

5  that?

6  A   I'm really the point person for pediatric neuroradiology

7  that interfaces with our child protective services team.

8  There are four pediatric neuroradiologists in our children's

9  medical center:  Three other colleagues of mine and myself,

10 and I would be the point person interfacing with that team

11 comprised of pediatricians and social workers.

12 Q   What does that team do?

13 A   They investigate alleged child abuse.

14 Q   Okay.  Now, in terms of this case that you're here on

15 today, were you contacted by our office in October of 2012 to

16 assist in radiology imaging reviews in a case involving the

17 trauma that Isabella Zielinski had suffered back in December

18 of 2002?

19 A   I was contacted in the early part of October, yes.

20 Q   And in terms of your contact with our office, did we send

21 you certain imaging from back in 2002 and 2003?

22 A   Yes, you did.

23 Q   What did we send you?

24 A   I initially received a series of CDs with CAT scan and MRI

25 images.

Hedlund - direct

1   Q   Did you also receive like an old-type-style x-ray or CD?

2   A   Yes.

3   Q   I'm sorry.  CAT scan.

4   A   I later received films, radiographic films, of a CAT scan

5   dated 27 December 2002.

6   Q   Did you review those images?

7   A   Yes, I did.

8   Q   After you reviewed those images, did you get any other

9   documents from us in regards to the injuries suffered by

10   Isabella Zielinski?

11   A   Yes.

12   Q   What records did we send to you?

13   A   I received medical records.  I received some emergency

14   department records I think from the original hospital.  I

15   received reports that at that time had been rendered by some

16   of the defense experts.

17         And initially I didn't have other reports like by Dr.

18   Smith, which I ultimately did receive.  There was really a mix

19   of medical records and some of the expert reports.

20   Q   Okay.  Now --

21   A   And imaging reports, medical imaging reports.

22   Q   Now, in terms of explaining how you proceed in looking at

23   a case, did we prepare a PowerPoint presentation?  Did you?

24   A   I prepared a short PowerPoint presentation.

25         MR. GOODFRIEND:  Judge, we're going to go through

1  that short PowerPoint.

2         THE COURT:  Which exhibit is that in here?

3         MR. GOODFRIEND:  Judge, we didn't number it.  So why

4  don't we call it Exhibit Number 18.  I'm sorry.

5         THE COURT:  It's actually 17.  It's in the book.

6         MR. GOODFRIEND:  You're right, Judge.  It is 17.

7         MR. BLEGEN:  I'm wondering because I don't have a

8  binder of exhibits.

9         THE COURT:  Do you have a copy for Mr. Blegen?

10       (Brief interruption.)

11        THE WITNESS:  Your Honor, I wonder if I might be able

12  to approach the screen.  I brought a pointer, an electronic

13  pointer, but it's not actually -- when I shine it on the

14  screen --

15        THE COURT:  I've got a -- ooh, where did it go?

16        THE WITNESS:  I have a metal pointer.

17        THE COURT:  Where was it?  Is it right there?

18        THE WITNESS:  Yes, sir.

19        THE COURT:  Good, that's the one.

20        THE WITNESS:  May I go ahead and approach?

21        THE COURT:  Yes.

22       (Brief interruption.)

23  BY MR. GOODFRIEND:

24  Q   Dr. Hedlund, could you please explain to the judge what is

25  depicted in the image subdural hemorrhage?

1  A    Your Honor, this is an artist's rendition of the human

2  brain as if the patient would be looking at us and if -- as if

3  the brain has been in cut in half in such a fashion.

4         And it's simply to display what a subdural hemorrhage

5  looks like and the characteristic shape that it has.

6         And the subdural hemorrhage in this case, which is

7  depicted in purple, has a characteristic crest end shape that

8  defines the location it is in.  And it extends here, as you

9  can see, from the top of the brain.  The pink is the brain.

10  And it extends all the way around the margins of the brain and

11  sort of wraps underneath the brain.

12         So it's just the artist showing us where a subdural

13  hemorrhage would be and its shape.

14         I would also just like to point out that you can see

15  on the left side of the picture along the edge of the brain,

16  there is a black margin.  That would be defining the

17  subarachnoid space, which is a normal anatomic space, and

18  normally there is a small amount of fluid in that space in

19  every human being.

20         THE COURT:  What kind of fluid?

21         THE WITNESS:  It would be cerebral spinal fluid, also

22  noted as CSF.

23         THE COURT:  Okay.

24         THE WITNESS:  That would be normal.

25         You can note here, your Honor, that the blackness is

1 very much that of the blackness of fluid in the ventricle

2 system, which is a normal chamber in the brain.

3          THE COURT:  Okay.

4          THE WITNESS:  Yes, sir.

5          Then there is one other point because it will have

6 some relevance to other slides, sir.

7          You can see at the top of this picture, there is a

8 triangle, and it is sort of turquoise or blue-ish, and that's

9 an important structure.  It is a low-pressure, relatively low

10 flow part of our venous system, and we call it the superior

11 sagittal venous sinus.  So it's a very important structure

12 that helps to carry blood back from the brain.  Eventually it

13 will get back to the heart where it will go to the lungs and

14 be reoxygenated.

15 BY MR. GOODFRIEND:

16 Q   Dr. Hedlund, what are the causes of subdural hemorrhage?

17 A   Well, in large part it depends on the patient's age.  As a

18 pediatric neuroimager, if I'm looking -- your Honor, if I'm

19 looking at a child who is nonambulatory who presents to our

20 facility with a subdural hemorrhage, trauma would be at the

21 top of my list.  We'll look for other things as well, but

22 really it depends on the age of the patient.

23          Once the child starts moving around walking and so

24 forth, then the occurrence of accidental trauma becomes also

25 important in the consideration.  But trauma is always very

1    important as well as other considerations that we're going to

2    objectively evaluate when we look at the images.

3    Q   In this image that we have in front of us right now, was

4    it meant at all to depict bridging veins?

5    A   No, sir.

6    Q   Why don't we go to the second image, please.

7    A   In this example, I only simply wish to convey, your Honor,

8    that we move from the picture in the left, which is what we

9    just looked at, and we move through time and we show in this

10   artist's rendition as if the brain has now been sliced

11   parallel to the floor.

12        And in this example, your Honor, the arrows are

13   pointing to membranes which form inside the subdural blood as

14   it ages.  And so the arrow is just to indicate that time is

15   passing and blood is aging, and when blood ages, it changes

16   its physical chemical character.  That's the purpose of this.

17   Q   I think I missed asking a question.  If you can just

18   explain the difference between acute, subacute and chronic

19   hemorrhage?

20   A   Yes.  Can we go back to the first slide briefly, please?

21        I've just indicated these terms, and this is what I

22   think would be standardly used in the neuroimaging arena.  So

23   acute would typically indicate, oh, two to three hours to

24   three days.

25        Subacute would indicate three days to seven days.

1    And I think that is a generally internationally accepted

2    terminology.

3              Next slide, please.

4              The chronic --

5              There will be some variation if you're talking about

6    CT or MRI data or MR reports, but I would say certainly

7    greater than two weeks.  Some people might say greater than

8    three weeks.

9              THE COURT:  I'm sorry to interrupt.

10             When you say membranes form in the subdural blood

11   there as it ages, can you be more specific about what you mean

12   by a membrane?

13             THE WITNESS:  Sure, absolutely.  Thank you.

14             In my references, there is an article by Walter and

15   others in Germany where they looked in a very detailed way at

16   the evolution of what is happening in the subdural hemorrhage

17   on a microscopic level, and there's been other authors who

18   have looked at that.

19             But we know that in time, there's an organization of

20   that blood clot, if you will, that is in the subdural

21   compartment.  There are fibroblasts that come in.  These are

22   small cells, and with those tiny little vessels start to come

23   in to organize, and then other cells come in and start to

24   gobble up the blood cells to try to get rid of it in time.

25             And so part of the membrane formation is collagen

1   formation and fibrous formation and tiny vessels that will

2   start to form in what we would call the organization and the

3   eventual -- usually the eventual evolution and shrinkage and

4   resolution of the clot.

5           So most acute subdural hemorrhages, most will resolve

6   without ever getting here.

7           THE COURT:  When you say "membrane," membrane, clot,

8   two different things.

9           THE WITNESS:  Yes, sir.  So imagine you have got this

10  purple clot.  This is the newer clot.

11          THE COURT:  Because when I think of membrane, I think

12  of something that might enclose or partially enclose

13  something.

14          THE WITNESS:  And that is also true, that there is an

15  outer and an inner membrane.  So there would be a developing

16  membrane along the inner part of this interface with the old

17  subdural blood, and there will be a membrane along the outer

18  part.

19          But what I think is particularly interesting and

20  relevant for us as medical imagers is when we see the membrane

21  structure defined macroscopically, and so that might be by CT

22  or MRI, this has relevance for estimating the age.

23          THE COURT:  Okay.  I'm glad you -- because I was just

24  going to ask you the significance of this.

25          THE WITNESS:  I spoke about a month ago with Dr.

1    Walter in Germany about his article because one of the things

2    I wanted to clarify was in their article, they state that at

3    about ten days of age, they detected membrane formation.  And

4    my question for Dr. Walter was:  Is that microscopic detection

5    or is that macroscopic detection?

6         THE COURT:  Macroscopic, meaning you can see it on a

7    CT.

8         THE WITNESS:  A pathologist could see it with the eye

9    or I could see it on my imaging test.

10        THE COURT:  Okay.

11        THE WITNESS:  And his answer to me was it was

12   microscopic detection.  So that is subresolution for us as

13   medical imagers, and that was important because my clinical

14   experience is being that I rarely would ever see this within

15   the first couple weeks after a hemorrhage, and more likely

16   moving toward the two-to-four-week time period is when I would

17   detect it.

18        But I find it helpful, particularly when you have a

19   lot of different characteristics of blood and you're trying to

20   determine and estimate age or if there's new and old blood.

21   It's a very helpful finding.

22        THE COURT:  So bottom line is when you see these

23   membranes, it's a tool that is used to help you age whatever

24   is in there.

25        THE WITNESS:  Yes, sir.

1     THE COURT:  Okay.  Go ahead, Mr. Goodfriend.

2  BY MR. GOODFRIEND:

3  Q    Now, I think there is one other question.  I'm sorry.

4  Let's go to the next slide, please.

5     Could you please tell Judge Kennelly what is depicted

6  in this slide?

7  A    Your Honor, two slides back --

8     THE COURT:  That's the picture of that little

9  triangle.

10     THE WITNESS:  That's right.  Thank you.

11     So this as if again we have sliced the brain in this

12  fashion as if I'm looking at you, and it's in the plane of my

13  face, and we're looking at the scalp and we can see the hair

14  follicles and the soft tissue of the scalp.  Then we can see

15  this flesh-colored structure.  That's the bone.

16     And then this blue triangle, that represents the

17  venous sinus, a very, very important structure receiving blood

18  returning predominantly from the outer part of the brain.

19     And a couple things I've noted here.  One of the

20  black arrows, the black arrows delineate what we would call

21  bridging veins.  In fact, if I could just use my hand, I will

22  try to make some distinctions here because I don't want to be

23  confusing at all.

24     If you envision my hand and the fingers as the

25  cortical veins, these are mini-veins that will be draining

Hedlund - direct

1    from the tissue of the brain crossing the subarachnoid space

2    that we looked at, crossing the arachnoid membrane, coalescing

3    eventually into my arm, which would be a bridging vein.  That

4    bridging vein is going to dump into the venous sinus.  So

5    there is a continuity or connectedness of these low-pressure,

6    low-flow structures beginning outwardly as the cortical veins

7    and eventually coalescing.  As these veins are coming closer

8    to the midline of the brain, they're coalescing to dump into

9    and empty the venous blood into the venous sinus.

10           THE COURT:  When you say "low-pressure, low-flow

11   structures," does low-pressure, low-flow include the bridging

12   vein?

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Okay, thanks.

15   BY MR. GOODFRIEND:

16   Q   Now, in terms of the number and size of bridging veins,

17   could you please tell Judge Kennelly and address that issue?

18   A   Well, you know, the beautiful thing about the human body,

19   it's like looking in this courtroom, and we're all a bit

20   different.  And bridging veins are like that, too, that when

21   we look at a human brain, there's a variable number of

22   bridging veins.

23           On an estimate basis, for each side of our brain,

24   there's between about 6 to 12.  That's an average now.  And

25   that's on each side.  So you might say a person could have

1    roughly 24 or they could have roughly 12.

2         What we do know is the more you have, the smaller

3    they are.  And there's a normal variation.  We call it just a

4    reciprocal relationship.

5         So the bigger the veins are, the fewer the number.

6    The smaller the veins are, the larger the number.  And there's

7    quite a variability, as you can see, if you're going from

8    perhaps 12 to 24 as an average, but it is variable.

9    Q    And in terms of the bridging veins, what happens when a

10   bridging vein is torn?

11   A    Well, it's like anything in the body.  It first bleeds and

12   then it clots.  That's a normal mechanism of our human body is

13   to stop bleeding, and we call that our system of coagulation.

14   Q    And in terms of the tearing of bridging veins, what

15   happens when more bridging veins are torn?

16   A    Well, I would expect the more veins are torn, the more

17   bleeding you have.

18   Q    Now, in terms of -- I think you talked about low pressure

19   in the veins.  Could you describe what happens in regards to

20   arteries and what kind of pressure those are?

21   A    Well, this is a relative comparison.  You know, again,

22   whether we're talking about the brain or we're talking about

23   any other organ or tissue in our body, we have got to get

24   blood and nutrients and oxygen out through that tissue, and

25   that's our arterial system.  That's our higher pressure

1  system.

2          And then once the tissue uses the energy and oxygen

3  and has put waste products into that blood, it's got to get

4  back to the lungs and get renewed.  And so it returns back

5  through a lower-pressure venous system, and so it is a

6  relative pressure comparison.

7  Q    Okay.  Now, just a little bit about the sinuses.  How many

8  sinuses are in the brain?

9  A    Well, there are several.  Would you like me to name them?

10  Q    Please.

11  A    Okay.

12  Q    Is that relevant to our discussion?

13  A    I don't think it's particularly relevant.

14          THE COURT:  Then don't name them.  Just name the ones

15  that are relevant.

16          THE WITNESS:  I think the one that is particularly

17  relevant in this case is the superior sagittal venous sinus.

18          MR. GOODFRIEND:  One second, Judge.

19          THE COURT:  It's called superior because it's on the

20  top?

21          THE WITNESS:  Yes, sir.

22  BY MR. GOODFRIEND:

23  Q    Next slide, please.

24  A    Oh, before we leave that, may I point out the white arrow

25  indicates the point in which the bridging vein -- and I've

1    just given one example -- is penetrating the lining of the

2    sinus, the venous sinus, and that is made up of dura.  We

3    talked about subdural blood and so forth, but that's the point

4    in which it penetrates.

5            And the value of understanding that is that many

6    microscopists and pathologists have noted and reported that

7    this is the relatively weakest point in this system where the

8    integrity of the vein wall is thinner and relatively at risk

9    in the context, let's say, of a shearing injury, for example,

10   and a common place where tearing at that interface might

11   occur.

12           THE COURT:  This is going to sound like a dumb

13   question.

14           THE WITNESS:  No, it won't.

15           THE COURT:  But the term "sinus" basically means

16   cavity, right, more or less?

17           THE WITNESS:  Yes.

18           THE COURT:  This is a venous sinus.  Is it a vein or

19   is it something different?  I mean, I know what a vein is.  Is

20   it something different from a vein?

21           THE WITNESS:  I think it's different from a vein

22   because the structure that houses it is different.  It's dura.

23   Typically a vein does not have dura.  It is carrying venous

24   blood.  So it's like a cousin to a vein.

25           THE COURT:  Okay, all right, fair enough.

1        THE WITNESS:  And on a pressure perspective, it is

2    very similar, yes.

3        THE COURT:  Okay.

4    BY MR. GOODFRIEND:

5    Q    Could we go to the next slide, please?

6        What is depicted in the slide entitled "Origin of

7    Subdural Hemorrhage"?

8    A    So as the slide depicts, I've taken one theory that

9    relates to subdural hemorrhage and its proposed occurrence

10   related to tearing of a bridging vein.

11       So, your Honor, on the top this is again that color

12   -- orientation showing us the triangle.  This particular

13   artist has made it red rather than blue.  And I just wanted to

14   point out for a moment I put up here a white arrow on the

15   normal subarachnoid space.  Now, we talked a bit about that.

16       I think the relevance of that is there are certain

17   characteristics when fluid is there, it can be normal.  And I

18   showed you the example of how it kind of just caresses the

19   edge of the brain and its position relative to the dura.

20       So here is the scalp up here, the bone and the skull.

21   The dura is the light blue and the black is the subarachnoid

22   space.  And it always has some fluid in it.  That's normal.

23   It's never normal to have subdural blood.  There is always an

24   explanation for it, or we hope we can find an explanation for

25   it.

1          Here these represent the black arrows, the intactness
2    of the bridging veins.  On the picture below, which is marked
3    by Alissa Gean, the author, as injured, the artist depicts a
4    breakage of that vein and blood that is accumulating in what
5    we would call the subdural compartment, and it would have the
6    characteristic shape, the crested shape, that I mentioned on
7    that early slide that was purple.
8    Q    Could we go to the next slide, please?
9          First, at the top of that slide is an article, is
10   that correct?
11   A    That's correct.
12   Q    Who are the authors of that article?
13   A    These are two French authors with pediatric expertise who
14   have written in the area of head trauma and abusive head
15   trauma:  Catherine Adamsbaum, who is a pediatric
16   neuroradiologist in Paris, and Caroline Rambaud, who is a
17   pediatric neuropathologist.
18   Q    Now, in terms of these two authors, do you know and
19   respect them, and is their work reliable?
20   A    Yes.  This is an internationally read peer-reviewed
21   journal.
22   Q    Which peer-reviewed journal is it?
23   A    This is published in Pediatric Radiology.  It was
24   published in August of 2012.
25   Q    In terms of your presentation today, have you relied on

1  the article?

2  A   Yes, sir.

3  Q   And are the reports of -- strike that.

4      Could you please tell the judge what the article,

5  what it addresses?

6  A   Yes, briefly.

7      This radiologist and this pathologist brought

8  together four cases.  These pediatric cases were deemed to be

9  inflicted or abusive head trauma, and this was based on

10  confessional data.  The uniqueness of the article, I believe,

11  is a fact that there is this clinical confessional component.

12      There is the neuropathologic component where the

13  autopsies were done investigating specifically this area of

14  the bridging veins, and there was what we call radiologic

15  correlation; that is, with CT and MRI imaging that was

16  correlated to the gross pathology at autopsy.

17      So that kind of a study is extremely valuable as

18  we're trying to understand and build our knowledge base, our

19  evidence-based medicine, to understand some of the what we

20  call radiologic, pathologic correlations.  So it's very

21  valuable, I think, in that regard.

22  Q   And in the four cases that the authors studied, were

23  confessions part of the study?

24  A   Yes, sir.  I had stated so, yes.

25  Q   And how did those relate to what they found when they did

1    the autopsy?

2    A    Could you restate your question?

3    Q    How did the confessions relate to the study?

4    A    I still don't understand.

5    Q    Were the confessions relied upon in the authors reaching

6    their conclusion?

7    A    Well, the confession was the clinical piece.  The

8    confession was how they put that case, if you will, into a

9    bucket of cause, causation.

10            In other words, there was no -- there was no history,

11   no indication of accidental trauma or other explanations that

12   would help them understand why the child died and why they

13   were seeing what they were seeing on imaging or on pathology.

14   Q    Could you please tell Judge Kennelly what is shown in the

15   picture below the article head?

16   A    So this would be the view the pathologist would see.  And

17   imagine you are looking down upon the top of the brain, and

18   the pathologist has reflected the dura, that thick sheath, and

19   it has been reflected to the right of the screen.

20            THE COURT:  Reflected, meaning pulled back?

21            THE WITNESS:  Yes, sir, just pulled across, and it's

22   giving us this view upon the surface of the brain.

23            And so we can see the bumpy character of the brain.

24   We can see numerous very dark veins.

25            Now, remember my example.  We go from cortical veins

1  outwardly.  So the edge of the brain, you would have a

2  cortical vein.  Numerous cortical veins, as you can see, come

3  together.

4       THE COURT:  Those are the little purple things that

5  you see there.

6       THE WITNESS:  Yes, sir.

7       These cortical veins will coalesce into a larger

8  trunk or pipe, and here we can see several of them being quite

9  dark.  I've put an arrow on the largest of those.  These were

10 found pathologically and reported as such to be torn

11 thrombosed bridging veins.

12      THE COURT:  Thrombosed, meaning clot?

13      THE WITNESS:  There's clot.  They have been torn from

14 their mooring.

15      The picture I've showed where the vein was

16 penetrating the wall of the dura, they have been torn from

17 their mooring and they have clotting.  And they had bled

18 because the imaging depicted associated subarachnoid

19 hemorrhage and subdural hemorrhage relating to --

20      THE COURT:  So it wasn't like these had clotted and

21 there was no subdural hemorrhage.

22      THE WITNESS:  That's correct.

23      THE COURT:  It was both.

24      THE WITNESS:  Yes, sir.

25      THE COURT:  Okay.

1    THE WITNESS:  And that was very well-depicted on the

2  accompanying image.

3    I guess for purposes of brevity, I excluded some of

4  those that were originally in my PowerPoint.  Yes, they're in

5  the article and they're beautifully correlated with the

6  pathology.

7  BY MR. GOODFRIEND:

8  Q  In terms of Adamsbaum in this article, did she address the

9  issue of reports of venous thrombosis occurring in abusive

10  head trauma?

11  A  Did she address the issue?

12  Q  Yes.

13  A  Well, the purpose of the article, I think, Mr. Goodfriend,

14  was to alert predominant radiologists to be aware of

15  appearance of blood, its shape and its position that should

16  give us a hint that we're seeing torn clotted bridging veins.

17  I think that was the purpose of the article.

18  Q  Okay.  You can take your seat, please.

19    (Brief interruption.)

20    MR. GOODFRIEND:  Judge, I'm going to Exhibit

21  Number 10.

22    May I approach the witness?

23    THE COURT:  You don't need to ask.  Just do it.

24    MR. GOODFRIEND:  I'm sorry, Judge?

25    THE COURT:  You don't need to ask.

1       MR. GOODFRIEND:  Okay.

2       (Brief interruption.)

3    BY MR. GOODFRIEND:

4    Q    Dr. Hedlund, what is Exhibit Number 10, please?

5    A    This is a report that I rendered dated 13 November 2012

6    that relates to my evaluation and observations of the imaging

7    studies that span times and dates from 27 December 2002 to 28

8    February 2003.

9    Q    And would that help you and assist you in your testimony

10   today?

11   A    Yes.

12   Q    In terms of making findings in this case, did you go

13   through what is called a differential diagnosis?

14   A    Yes, sir.

15   Q    What is a differential diagnosis?

16   A    It's really our daily process of a thoughtful ordered

17   consideration of possibilities to explain a finding or

18   findings that we're seeing.

19   Q    Do you go through certain steps in coming to a

20   differential diagnosis?

21   A    Yes, sir.

22   Q    What steps do you take?

23   A    Well, it begins by taking the study that we're looking at

24   at hand.  For example, it might be a CAT scan or it might be

25   an MRI study, an imaging study.  And it's the careful analysis

1  of all of the images that we're presented with, making

2  observations about what I would call positive findings, and

3  also making consideration of things that are not there but are

4  important in their absence.

5  Q   Which records did you review in coming up with a diagnosis

6  in this case?

7  A   Well, initially I asked you, Mr. Goodfriend, to send me

8  the images without any accompanying reports.

9  Q   Why did you ask for only the images?

10  A   Well, you know, oftentimes in my clinical work, a case

11  will come in and there will be no history or very limited

12  history.  That's pretty common.  And I like to look at the

13  images for my own initial opinions and try to diminish some

14  bias in that process.

15  Q   Okay.  Now, in terms of the images that you received and

16  reviewed, is that the kind of material that pediatric

17  neuroradiologists review before reaching an opinion or

18  conclusion?

19  A   Yes.

20  Q   In reaching your opinion in this case, did you rely on

21  your training, experience, the literature and research in the

22  field of pediatric neuroradiology?

23  A   Yes.

24  Q   Is the opinion that you reached within a reasonable degree

25  of medical certainty?

Hedlund - direct

1   A   Yes, it is.

2   Q   Now, in terms of this case, did you reach six separate

3   conclusions based upon the imagery?

4   A   Yes.

5   Q   Could you please explain to Judge Kennelly what your first

6   conclusion was?

7   A   My first conclusion and observations related to blood in

8   the subdural compartment and my appreciation that there was

9   blood in both what I would call the acute or early subacute

10  type and also blood that was older than that, and that would

11  be in the chronic category, and more specifically that there

12  was blood in several locations of the brain, several locations

13  inside the skull related to the brain, several areas.

14  Q   What is the significance of the blood being in several

15  areas?

16  A   Well, I think it speaks for the -- first of all, the fact

17  that there is new and older blood or different age blood is

18  important because it speaks to me in the context of other

19  findings we will go on to talk about, that inflicted head

20  injury or abusive head trauma is very strongly considered to

21  be considered that way.

22  Q   Now, in terms of your first finding of the hemorrhages,

23  are they consistent at all with --

24          THE COURT:  Hang on a second.  You're going to come

25  back and have him explain what he just said, right?  I'm just

1  asking.

2     I think Dr. Hedlund said, I'm going to get to this

3  later, but I just want to make sure he's going to get to it.

4  If not, I would like to know now.  So you will do it however

5  you want to.

6  BY MR. GOODFRIEND:

7  Q   Dr. Hedlund, please explain.

8     THE COURT:  Let me tell you specifically what my

9  question is.

10    THE WITNESS:  Yes, sir.

11    THE COURT:  You said that you saw -- and I'm going to

12 put this in layperson's terms -- you saw hemorrhaging where it

13 was different ages.  Some was acute, some was subacute, some

14 was chronic.

15    THE WITNESS:  Yes, sir.  Let me clarify that.

16    THE COURT:  I may have gotten it wrong.

17    THE WITNESS:  I may not have been clear.

18    When I say acute, and I would say acute/early

19 subacute, and my terminology there is that, for example, when

20 you look at a CAT scan, based on the whiteness or brightness

21 of the blood, you can legitimately create a bracket of time.

22 And so when I say -- in this case, when I describe different

23 ages, I'm really speaking of what I would say acute and

24 subacute as a term --

25    THE COURT:  Okay.

1       THE WITNESS:  -- and chronic as a term.

2       THE COURT:  But you saw both.  You saw some in either

3  the acute or early subacute and you saw some chronic.

4       THE WITNESS:  Yes, sir.

5       THE COURT:  And you derive from that that makes

6  abusive head trauma, it goes higher to the top of the list.

7       THE WITNESS:  It does because I know --

8       THE COURT:  The because is what I am looking for.

9  Why?

10      THE WITNESS:  Yes.

11      First of all, because of the age of the patient, the

12  discussion that I have read, and others' reports that birth

13  related subdural persistence is a consideration, I would

14  reject that.  And I would reject it on the recent, I think,

15  largest series of 101 patients that Dr. Rooks and Eaton

16  published in the AJNR where they looked at, quote, unquote,

17  normal, mostly vaginally-delivered babies, and they looked at

18  the incidence of subdural, which was high, about 46 percent.

19      But to quote their conclusion, "the presence of

20  subdural hemorrhage after a month of life should not be

21  considered to be birth related," and that's really a direct

22  quote from their assessment of that 101-patient group.

23      THE COURT:  Pause.  Does that mean that in that type

24  of situation that you wouldn't see it anymore after a month or

25  that it would just look different?

1        THE WITNESS:  You would not see it.

2        Their study -- the elegance of their study was that

3   they took babies, did not sedate any of them.  They basically

4   fed and swaddled them.  All were initially scanned by MRI

5   within 72 hours, and when they detected the presence of

6   subdural hemorrhage and when they were detected, they were

7   thin.  I think one was thinner than 3.4 millimeters; almost

8   all were under 3 millimeters in thickness.  They were located

9   in the back of the head, and, again, resolution by one month

10  was quite common in that scenario.  And they followed them.

11        THE COURT:  You said resolution.

12        THE WITNESS:  Going away.

13        THE COURT:  Going away, all right.

14        THE WITNESS:  Going away, and they followed them

15  until they did go away.  So if child A had a subdural

16  hemorrhage, they would do MRIs sequentially.

17        THE COURT:  I got that part.

18        Let me ask you a different question then.  So when

19  you see in this particular case that you're looking at here,

20  you're seeing both acute or early subacute, whichever it is,

21  and chronic, what is the chronic part from?

22        THE WITNESS:  That's a great question.  I believe it

23  is not from birth.

24        THE COURT:  Okay.  Some other trauma at an earlier

25  point in time?

1        THE WITNESS:  That's my concern, yes, sir.

2        THE COURT:  All right.

3        Okay.  Go ahead, Mr. Goodfriend.

4   BY MR. GOODFRIEND:

5   Q    Now, you indicated that the findings you made regarding

6   the subdural hemorrhages raised a concern over abusive head

7   trauma?

8   A    Yes, sir.

9   Q    And why was that?

10  A    Well, first of all, their multiplicity; that is, there are

11  different locations, there are different ages.  The brain

12  otherwise on that first snapshot on 27 December showed no

13  other findings such as atrophy or shrinkage or any other

14  indicators to me of an underlying metabolic or any

15  malformation.  Nothing was apparent to me looking at the brain

16  tissue on the 27th.

17       And then there's other findings that I have gone on

18  to discuss, and I can do that now or I can do that later, that

19  also raise my bar of concern.

20  Q    Okay.  And in terms of your conclusions, what was the

21  second conclusion that you made?

22  A    That there were multiple focal cerebral convexity

23  hemorrhages that strongly suggest torn bridging veins

24  resulting from trauma.

25  Q    Could you please explain what that means to Judge

1  Kennelly?

2  A   Well, I hope that the slides we just went through helped,

3  and I'm referring to that.  I'm referring to a lot of the

4  discussion we just had.

5        THE COURT:  Focal means in particular spots?

6        THE WITNESS:  Yes, sir.

7        THE COURT:  Okay.  The convexity part?

8        THE WITNESS:  This is the top of the brain.  So I'm

9  particularly concerned in that comment about that part of the

10  brain that is a line on top, and so we're getting very close

11  to the midline part of our brain.  If we imagine kind of

12  splitting our head from our nose to the back of our skull, we

13  would call that the mid-sagittal plane, and it's near that top

14  part of the brain that is most concerning to me where some of

15  these hemorrhages are.

16        THE COURT:  The use of the term "convexity" means

17  what?

18        THE WITNESS:  It really means the top curve.

19        THE COURT:  Got it, okay.  Go ahead.

20  BY MR. GOODFRIEND:

21  Q   In terms of these -- I'm sorry.

22        Let me back up, Judge.

23        I think you once were talking about describing these

24  veins and getting somehow ripped off their moorings.  Could

25  you please explain in terms of these veins kind of being torn

1  in some way?

2  A    Absolutely.

3           Some of this discussion actually takes its origin

4  from a fairly early New England Journal article that Dr.

5  Duhaime, a neurosurgeon, and Dr. Lucy Rorke-Adams wrote a

6  number of years ago where they looked at where blood was

7  coming from in newborn babies and made some distinction of the

8  torn bridging veins there.

9           And then Dr. Robert Zimmerman and colleagues at

10  Philadelphia Children's Hospital a few years back also

11  reported some of these concerns over injured bridging veins.

12           And what I'm really just referring to is, as the

13  picture showed, that you have these veins with some

14  vulnerability, that as those bridging veins are piercing the

15  lining of the venous sinus, particularly in the context of a

16  motion that is going from front to back, they remain

17  relatively unprotected, and strain and stress on those

18  connections can lead to tearing and bleeding and eventual

19  clotting of the veins.

20  Q    Is there anything else you want to explain regarding your

21  second finding?

22  A    No.   I had, as you know, sir, submitted a revised report

23  that was never submitted to the Court because I tried to

24  combine --

25  Q    Dr. Hedlund, we're not going to talk about --

1    THE COURT:  He's not going to ask you about the

2  revised report.

3    THE WITNESS:  All right.

4    MR. BLEGEN:  I would like to see it, Judge.

5    THE COURT:  He is done with number two.  Well, watch

6  what you ask for because if you get it, then maybe he's going

7  to testify about it.  And if you don't get it, then he's not

8  going to testify about it because Mr. Goodfriend just withdrew

9  the question.

10    Actually I have been out here for about two hours,

11  and we need to take a short break.  We're going to break for

12  10 minutes, and then we're going to go until about 12:25.

13    MR. BLEGEN:  I will think about my objection.

14    (Brief recess.)

15    THE COURT:  Mr. Goodfriend, you can pick up where you

16  left off.

17  BY MR. GOODFRIEND:

18  Q  Dr. Hedlund, I think you also reached a third conclusion.

19  A  Yes.  I will just read it, if I may.

20    "Doctors J. Mack and P. Barnes posit the presence of

21  several thrombosed cortical veins.  I do not agree.  The IV

22  contrast brain CT examinations of 28 and 29 December show to

23  very good advantage, normal enhancing cerebral dural venous

24  sinuses.

25    Additionally, in children with proven cerebral

1    sinovenous thrombosis, recent articles have shown no support

2    -- no evidence to support the position that cerebral

3    sinovenous thrombosis leads to subdural hemorrhage."

4    Q    Now, could you please explain what you mean by normal

5    enhancing cerebral dural venous sinuses?

6    A    So we have in some of the earlier slides, we talked about

7    the one sinus, the one venous sinus, the sagittal sinus, as

8    just one example, one of the biggest ones.

9            And normally if you give -- put a needle in the vein

10   and you give contrast for radiology tests, either CAT scan or

11   an MRI, that contrast will circulate in the blood system.  And

12   on a CAT scan, it will look white, and on an MRI scan, it

13   depends on the type of technique, but it will often look

14   white, and we call that enhancement.

15           And what I mean by my statement is those are very

16   high quality images of CT on the 28th and the 29th of

17   December, very good studies.  There was no motion artifact.

18   And those structures, those sinuses, those venous structures,

19   looked normal.

20           THE COURT:  In other words, they didn't show

21   thrombosed veins.

22           THE WITNESS:  That is correct.

23           Let me just -- your Honor, could I just clarify that?

24           THE COURT:  Yes.

25           THE WITNESS:  So the venous sinuses are very

1  critical, as I was alluding to, about being able to -- to the

2  final common pathway to take this returning low-pressure blood

3  and eventually get it back to the heart.

4          When they are clotted, when there is thrombus or clot

5  in the venous sinuses, in my clinical and radiologic

6  experience, that's when kids really tend to get into trouble

7  clinically and can have problems.

8          Now, the reason I put this -- the comments in there

9  about the posited relationship that Dr. Mack points out in her

10  report, that the relationship of clot to subdural collections

11  implies, I believe, that there's a problem with the venous

12  sinuses, which I believe there is not.  I believe they are

13  normal.  That's the point I'm really trying to make.

14          THE COURT:  Stop for a second.  I just want to make

15  sure I've grasped that.  So just give me a second.

16          THE WITNESS:  Yes, sir.

17      (Brief interruption.)

18          THE COURT:  Okay.  I need to ask you a couple of

19  questions so I'm making sure I understand this.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  And I'm looking at point 3 in your

22  report.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  So the first sentence, you say that Dr.

25  Barnes and Dr. Mack believed that there were thrombosed

1  cortical veins.  Basic question:  Are cortical veins different
2  from the sinuses?
3          THE WITNESS:  Yes, sir.
4          THE COURT:  Two different things.
5          THE WITNESS:  Yes, sir.
6          THE COURT:  And so then you say you don't agree, and
7  then you go on to say that this contrast CT, or the two
8  contrast CTs that you looked at from December 28th and 29th,
9  showed that the sinuses look pretty normal.
10         THE WITNESS:  They looked normal.
11         THE COURT:  Not pretty normal, normal, period.
12         THE WITNESS:  They look normal.  I think it was a
13  diagnostic study.
14         THE COURT:  So give me the connection between
15  thrombosed cortical veins on the one hand and normal sinuses
16  on the other or the lack of correlation.  That's the part I
17  just want to make sure I've got my head around.
18         THE WITNESS:  And I apologize because I think I could
19  have been clearer in my writing.
20         THE COURT:  That's why we have testimony.
21         THE WITNESS:  What I'm trying to get at here is,
22  again, this diagram, if you will let me use my hand again,
23  where we have these more outer cortical veins, they're
24  bringing blood back to the central part of the brain
25  eventually to empty their contents into bridging veins and

1    then into the venous sinuses.

2         And first and foremost, I'm trying to make a point

3    here that I believe we have in a very adequate way,

4    particularly with the CT exam of the 28th and the 29th of

5    December that contained contrast enhancement, that we have in

6    a very accurate and diagnostic way cleared or shown normal

7    venous sinuses of the brain, all of them, to be normal, not

8    just one, but all of them to be normal.

9         And I point that out because, again, there are

10   comments made in Dr. Mack's report about this proposed

11   relationship of the subdural collections or subdural fluid and

12   venous sinus thrombosis.  And I'm just telling you, sir, that

13   I see no evidence for that, and I believe it was studied in a

14   diagnostic way.

15        THE COURT:  Okay.  But just looking -- sticking with

16   the CT examinations here, is what you're saying that if there

17   were, in fact, thrombosed cortical veins, as Dr. Mack and Dr.

18   Barnes opine, then the CT, the contrast CTs, would not show

19   normal enhancing dural venous sinuses.

20        THE WITNESS:  No, that's --

21        THE COURT:  That's not your point.

22        THE WITNESS:  I'm not trying to make that point, sir,

23   and I think -- and forgive me if I have not been very accurate

24   semantically.

25        The point in which we might start talking about a

1   cortical vein versus bridging vein, as I've kind of tried to

2   show you on my hand, there is no -- there is no clear roadmap

3   that says, you know, at this -- you know, at 2.5 centimeters

4   from the midline, now it's a bridging vein.

5          What we say is that when we reach the point of

6   convergence of these cortical veins, when we reach that

7   convergence point, we're now into what we call a bridging

8   vein.  That's the next part of the anatomy, if you will.  And

9   my focus in my review of the imaging and my focus in the

10  discussion is that I think there was major injury and

11  disruption, bleeding and thrombosis or clot, that involved the

12  bridging veins.

13         So, you know, I may have been inaccurate or I may

14  have been somewhat not as precise as I needed to be in

15  pointing out that, yes, there is a continuity.  There is a

16  continuity between cortical vein and bridging vein.

17         THE COURT:  Okay.

18         THE WITNESS:  But what I am really trying to

19  emphasize here, I guess, would be two things, sir.  I think

20  that there has been an injury to the bridging veins, at least

21  several of them, and I think there is a patency of the deep

22  venous system.  I think it's clearly open.

23         And you can have injury to the cortical veins and you

24  can have injury to the bridging veins and still have a patency

25  or openness of the venous sinus.  That can exist, and I

Hedlund - direct

1    believe it exists in this case.

2           THE COURT:  All right, go ahead.

3    BY MR. GOODFRIEND:

4    Q    Dr. Hedlund, did you make a fourth conclusion?

5    A    I did.

6    Q    What was that conclusion?

7    A    "Retroclival epidural hemorrhage -- parentheses --

8    (bleeding at the junction between the skull and the cervical

9    spine.)  And this blood collection is a proxy for cranial

10   cervical trauma."

11   Q    Could you please explain to the Court what you mean and

12   how would you describe retroclival area in the cranial

13   cervical junction?

14   A    Could I approach the screen, sir?

15          (Brief interruption.)

16          THE WITNESS:  So, your Honor, the clivus refers to a

17   piece of anatomy at the bottom of our skull.  If you think

18   about looking down into an empty skull and you think about the

19   hole that the brain stem and the spinal cord runs through, if

20   you imagine the bone that touches the front part of that hole,

21   that would be the clivus, and it's just part of what we call

22   the central skull base.

23          So this is an image from the CAT scan dated 27

24   December 2002, and it is a slice of the CAT scan, an image of

25   CAT scan, that is through the bottom part of the skull.  The

1    whitest or brightest areas that we see represent the bone.

2         And on this particular view, we can see a lot of that

3    bone structure, the eyes in the front.  And the back of the

4    neck, the upper back of the neck and back of the head is here.

5         And I put my white arrow on a darkness.  That

6    darkness is normal CSF, or cerebral spinal fluid, and that

7    should completely invest the junction between the spinal cord

8    and the lower brain stem.  It should completely, naturally and

9    normally surround it.

10         The finding here that I believe is of some importance

11    is we are at the level of the bottom part of the skull.  We

12    have not entered into the upper neck yet.  We're higher than

13    that.  And my black arrows point to a grayness.  There's an

14    interface between very white and darkness, which is fluid,

15    spinal fluid, and that grayness should never be there.  That

16    should be filled in in the front of the cord with a blackness

17    or spinal fluid.

18         Now, this is the CT appearance.  This became evident

19    to me initially when I reviewed the MRI, which if we could

20    look at the next slide, that would be great.  And then I went

21    back and I looked at the CT with more diligence and was able

22    to see the finding there as well.

23         Your Honor, what I have here on the left side of the

24    screen is an image from the MRI scan of 7 January 2003.  The

25    baby's face would be to the left, and the back of the head is

1    to the right of the picture, and it is depicting showing us

2    the anatomy where the brain is connecting to the spine.

3          And I put an arrow on an abnormal finding, and you

4    can see this white signal, this white brightness.  It's almost

5    as if you can imagine, you know, white wax dripping down the

6    back of the skull and into in front of the spinal cord.  It

7    looks like a white line, if you will.

8          MR. BLEGEN:  Could I ask what slide number this is?

9          THE COURT:  It's farther back in the deck here.

10          MR. GOODFRIEND:  I'm sorry.

11          THE COURT:  They're not numbered.

12          MR. GOODFRIEND:  We neglected to number.  I

13   apologize.

14          THE COURT:  It's in exhibit --

15          MR. BLEGEN:  I can see it.

16          THE COURT:  -- 17, if you page back a bit.  It says

17   "Retroclival Hematoma IZ" at the top of it, just for the

18   record.

19          THE WITNESS:  Then I have just posted a normal

20   patient that is two months older, and it shows the same

21   anatomic comparison, and it shows an absence of what I contend

22   is blood in the retroclival space on Isabella's initial MRI.

23          THE COURT:  And on the left picture there, what you

24   call blood is that little white striped area.

25          THE WITNESS:  This white band.

1      If you could go to the next slide.  To confirm that

2   this is not a normal structural finding, which it is not, I'm

3   showing you now a picture from Isabella's MRI conducted on 30

4   January 2003.  And I hope that the audience can, and, Judge,

5   you can appreciate the absence of that white stripe.  It has

6   gone away.  It has vanished.

7      Can I have the next slide, please?  That's fine.  Go

8   back, please.  And go back one more, please.

9      So as I --

10      THE COURT:  What is the significance of the fact that

11   it's gone away at that point?  Has it resolved itself in the

12   way you described?

13      THE WITNESS:  It's a culmination of aging and

14   resolution or going away, which it's like blood in other

15   spaces like the subdural space.  That's its natural history.

16   It will go away.

17      THE COURT:  You have explained it.  Go ahead.

18      THE WITNESS:  Then I just -- in all honesty then, I

19   went back and looked at the 27 December study in more detail

20   to see if I could see it.  It's a harder call to make on CT

21   because we have a lot of bone in the area, and we don't have

22   the multiplanar capability to slice and show it like the MRI

23   does.  So the MRI, it's a little bit easier to make the

24   detection of that fluid.

25      THE COURT:  And the side views were MRIs.

1          THE WITNESS:  Yes, sir.

2          THE COURT:  All right.

3          THE WITNESS:  And so in my report, I describe an

4     attempt to create an age bracket around the appearance of the

5     blood, and I would do that both by how it looks on CT but also

6     how it looks on MRI.  And, again, I can't precisely tell you

7     how old it is, but I believe I can create a reasonable

8     bracket.

9          And by the MRI assessment, my estimation of age of

10    that blood was what I call transitional, between early and

11    late subacute, so, you know, between one and two weeks on the

12    MRI.

13         THE COURT:  As of the 7th of January?

14         THE WITNESS:  Yes, sir, as of the 7th of January.

15         THE COURT:  Give me the bracket again.  How long?

16         THE WITNESS:  Between a week and two weeks.

17         Now, the same technique that we used to estimate age

18    of blood on CT, I believe we can apply here because it's

19    similar comparisons.  We have the comparison of the spinal

20    cord, which we can consider part of the central nervous system

21    like the brain, and we can look at what its grayness or

22    brightness is, or density is the term we would use, and I can

23    compare this blood in front of it to the spinal cord as a

24    relative comparison.  And I would offer to you, sir, that this

25    is brighter.  It is of higher density.

1    THE COURT:  I just want to -- I'm going to walk over

2  there so I can point.

3    When you say the spinal cord, you mean this kind of

4  circular thing in the middle.

5    THE WITNESS:  Yes, sir.

6    THE COURT:  So what you're saying is that what you're

7  pointing to is brighter than that.

8    THE WITNESS:  Yes, sir.

9    THE COURT:  I get it.

10    THE WITNESS:  So this is very bright.  Intermediate

11  brightness is the retroclival blood, and lower in density is

12  the cord, and lowest in density is the fluid.

13    THE COURT:  What do you derive from that, from that

14  difference?

15    THE WITNESS:  Well, it's just like if I was trying to

16  estimate the age of subdural hemorrhage.  We talked about in

17  that early slide of what acute and subacute means, and so I

18  think you could apply the same terminology estimated in age

19  between a few hours to maybe seven days.

20    THE COURT:  As of 12/27.

21    THE WITNESS:  As of the 27th, yes, sir.

22    THE COURT:  Okay.  I'm waiting for you.

23  BY MR. GOODFRIEND:

24  Q   Dr. Hedlund, can you please resume the witness stand?

25    THE COURT:  He already did.

1       THE WITNESS:  Close enough.

2  BY MR. GOODFRIEND:

3  Q    What is the anatomical source of the blood in the

4  retroclival area?

5  A    I believe, and I think others who have written in this

6  area believe, it comes from a venous plexus that hugs up

7  against the bone, hugs up against the clivus underneath the

8  dura or epidural in location.

9  Q    What is a venous plexus?

10  A    So it's a -- imagine like a network, tiny lower-pressure

11  veins that hug up against the bone.  So plexus means --

12  imagine a fishnet, if you will, with many lines and

13  connections, and that would be what a plexus is, just many,

14  many small veins.

15       THE COURT:  I would call it a glob.

16       THE WITNESS:  Okay, a glob.  They're connected.

17       THE COURT:  A bunch of veins all in the same spot.

18       THE WITNESS:  Yes, but it's more like a sheet.  It's

19  more like laid out like a sheet.  Again, like if you managed a

20  commercial fishing net, that would be like a plexus.

21       THE COURT:  Like a fishing net.

22  BY MR. GOODFRIEND:

23  Q    Dr. Hedlund, I think Dr. Barnes says that the retroclival

24  hemorrhage was blood from the subdural space that leaked into

25  the retroclival area.  What remarks would you say about that?

1    A    Well, they're not anatomically connected, so I would

2    reject that.  It has to make sense.  I have to be able to

3    convince you, I hope, that things have some logic.  And we're

4    talking about a compartment or a space of localization that is

5    completely and anatomically remote from the subdural

6    collections around this child's brain.  These are not in

7    continuity, these spaces.  They are not connected.  So I

8    cannot accept that.

9    Q    In terms of the finding of retroclival hemorrhage, is that

10   a common finding?

11   A    No, it is not.

12   Q    And why is that -- why is that?

13   A    Well, first of all, I think it's a hard diagnosis.  I'm

14   sure I've probably missed this diagnosis if I think back in my

15   career.  It's a challenging diagnosis because it's down in an

16   area that is surrounded by a lot of bone.  I think we're

17   getting better at the diagnosis because we have got better

18   tools nowadays, that we have got more sophisticated MR

19   sequences and equipment.  We can see things better.

20          And nowadays a lot of us on our CAT scans, we do

21   multiplanar reconstructions all the time in trauma, and so we

22   can see the anatomy differently than we were doing, you know,

23   a decade ago.

24          THE COURT:  So you're saying that if you were doing

25   these scans today, the technology and the way you do them is

1    better and it would make it easier to see something like this,

2    but what you are looking at there isn't something recent.

3    This is a scan from '03.

4            THE WITNESS:  That's right, and I think the finding

5    is there.  Now, I admitted to --

6            THE COURT:  What you're saying, though, is if you had

7    had in '03 the technology you have now, it would be a lot

8    clearer and a lot easier to see than it was then.

9            THE WITNESS:  Yes, and I was trying to answer the

10   question, well, why do we make the diagnosis or why is it so

11   uncommon.  I think partially it's because we missed the

12   diagnosis.

13           THE COURT:  All right.

14   BY MR. GOODFRIEND:

15   Q   Have you seen it before?

16   A   Yes, I have.

17   Q   Under what circumstances have you seen it before?

18   A   I have seen it in the study of significant trauma, and

19   motor vehicle accident would be where I have seen it.

20   Q   Approximately how many times have you seen it before you

21   saw these slides?

22   A   Well, I think I've recognized it in maybe half a dozen,

23   maybe ten, cases in my career.

24   Q   Is there literature that supports hemorrhage in the

25   retroclival area from some type of traumatic incident?

1    A    Yes, trauma, certainly.

2         If you look in the literature, it's actually more

3    commonly reported in children, and it's probably because they

4    tend to survive the injury to this area even more so than some

5    adults that might have injury to the area.  And so you will

6    find in the literature most of the case series are looking at

7    motor vehicle accidents.  There's a couple ATV accidents, but

8    mostly it's motor vehicle accidents.

9         And I think the youngest reported age is four years,

10   and that's from the Tubbs article that's in my reference list.

11   Q    Now, the Tubbs article is Exhibit Number 13, and do you

12   have any comments regarding his article called "Retroclival

13   Epidural Hematomas:  A Clinical Study"?

14   A    Well, I think it's a very reputable group.  I worked with

15   that group when I was at the University of Alabama in

16   Birmingham.  I think he's written some very thoughtful things,

17   and I think they produced some good literature.

18        I think it really reflects other authors.  They do

19   report a nice series.  I think there's eight patients in that

20   series, and all of them had accidental -- MVA trauma.  So it's

21   a good summary, I think, of trauma population.

22        THE COURT:  MVA, motor vehicle accident?

23        THE WITNESS:  Motor vehicle accident, yes, sir.

24   BY MR. GOODFRIEND:

25   Q    I think there's a second article that you used in this

1  case from an author that's called "Traumatic Retroclival

2  Epidural Hematoma In A Child," authored by several people.

3  The first author is Kwon, is that correct?

4  A    Yes.

5  Q    That's another article.  What publication is that in, its

6  exhibit number?

7  A    Yes, sir.  That's in the journal Neurology Medical.

8  Q    What is that journal?

9            THE COURT:  Whatever C-h-i-r stands for, Lord knows.

10 BY THE WITNESS:

11 A    It's a journal that relates to oftentimes neurotrauma.

12 BY MR. GOODFRIEND:

13 Q    And did you rely on this article in terms of reaching your

14 decision here today?

15 A    Not really.

16 Q    Okay.

17 A    No.  I mean, I made the observation before I ever pulled

18 some of the articles for the reference list.

19 Q    Are you aware of any current study being conducted

20 regarding the finding of retroclival epidural hemorrhage in

21 child abuse?

22 A    Yes, I am.

23 Q    Who is doing that study right now, and what do you know

24 about it?

25 A    Dr. Michelle Silvera, and I mentioned her name from the

1  outset, she is one of the contributing authors to the project

2  we're doing with Dr. Kleinman, and she has a particular -- she

3  is a neuroradiologist at Boston Children's Harvard.  And she

4  has a particular interest in injuries of the neck and neck and

5  skull junction, and she is preparing a manuscript with 10

6  patients, confirmed inflicted trauma patients, that exhibit

7  this.

8           MR. BLEGEN:  I'm going to impose an objection.

9           THE COURT:  I mean, honestly, you're going to have

10  him testify about a study that isn't done yet that he's just

11  talked to the author about and it's not published and it's not

12  peer reviewed?  Is that what you're proposing?

13          MR. GOODFRIEND:  I'm going to withdraw the question,

14  Judge.

15          THE COURT:  Okay.

16  BY MR. GOODFRIEND:

17  Q   Dr. Hedlund, there was some talk yesterday in court

18  regarding an artifact in relation to certain findings that Dr.

19  Barnes made.  Could you please tell us what an artifact is?

20  A   The use of the term "artifact," really, it could be seen

21  on a CAT scan and it could be seen on an MRI or even in an

22  ultrasound, and so I'm going to describe it as it relates to

23  medical imaging tests.

24          And an artifact really is seeing something on the

25  image that does not reflect anatomy.  It does not reflect

1  pathology.  It's just what the term says.  It's an artifact.

2  It's something that perhaps is generated by the machine or

3  something extrinsic like, you know, electrical equipment in

4  the MRI scanner that causes an artifact to be generated.

5       So it's something that doesn't really belong there

6  naturally.  And it could be an ultrasound, it could be a CAT

7  scan, it could be an MRI.  So artifacts are things we can see

8  in several different medical imaging tests.

9  Q   Could the images in the retroclival area of 12/27 and

10  1/7/03 be artifacts?

11  A   I don't believe so.

12       Can I approach the screen, sir?

13       THE COURT:  Sure.  Don't ask.  Just go when you need

14  to go.  That's fine.

15       THE WITNESS:  One of the most common artifacts on an

16  MRI, and let me just address the picture on the left, would be

17  what we call the phase in coding artifacts, and it is an MRI

18  related artifact.  It is clearly the most common.  And it

19  represents something that is not really there, an artifact,

20  and it's propagated along what we call the horizontal axis.

21       And so most artifacts, whether they're propagated

22  along the horizontal axis or the vertical axis, will be

23  multiple.  So you might see the white band and the white band

24  and the white band and the white band and the white band.

25  That will be quite characteristic either in the horizontal or

1    the vertical direction.  That's one reason why I don't believe

2    this is an artifact.

3              This abnormality is contained in an anatomic space,

4    and there is no other indicator on that sequence, what we call

5    the sagittal T1 sequence, that there is any replication of the

6    artifact.  And that's a common thing in MRI artifacts.

7              Secondly, we see this blood on this sequence, which

8    is called the sagittal T1 sequence; we see it on the axial T1

9    sequence; and we see it on the axial gradient recall or T2*

10   sequence.

11   BY MR. GOODFRIEND:

12   Q    Could you please explain those terms?

13   A    Let me just backtrack, your Honor, and just say that an

14   MRI is a test that is composed of several sequences.  And if

15   you have had an MRI or have a loved one that's had one, you

16   know you sit in there for about 40 minutes or an hour and you

17   hear a lot of knocking and noisy banging.

18             And what's happening is with that time, there's a

19   series, sometimes between 8 and 12 sequences.  These are

20   different techniques to show different things.  And each takes

21   a block of time.  So in that total time of imaging, we have

22   series one, series two, series three, and each one of those

23   shows something different to us.

24             So what I am getting at, actually we have four

25   sequences.  We have four sequence that were done separated in

1    time that show an abnormality there.  So it's implausible to
2    me that all of that is artifact.
3            THE COURT:  When you say "separated in time," you
4    mean different dates?
5            THE WITNESS:  No, sir.
6            THE COURT:  You mean different parts of the same
7    45 minutes that the person was in?
8            THE WITNESS:  Isabella was in the MRI scanner, and
9    let's just say she was in there for 48 minutes, whatever the
10   exam, the total exam time was.  And if we took that total
11   block of time and we divided it up into the number of
12   sequences she had, that comprised her total examination.
13           THE COURT:  Pause for a second.
14           So these sequences aren't sort of the computer
15   reshuffling the same views.  It's actually four separate
16   things that are happening.
17           THE WITNESS:  That's exactly right.
18           THE COURT:  And what you're saying is that this, what
19   I'm calling a little band or a stripe here, if that area, if
20   you will, showed up in all four of them, and if it had been an
21   artifact, you wouldn't expect it to show up in all four.
22           THE WITNESS:  That's correct.
23           THE COURT:  Okay.  And they're called T1 and T2 and
24   T2* and T3?
25           THE WITNESS:  Well, T2* equals GRE, or gradient

1  recall.

2        And we attach these -- I'm sorry that it has to be so

3  confusing.  These terms -- these terms relate to parameters

4  that are established as the scan is done to emphasize certain

5  qualities of the tissue or in blood.

6        THE COURT:  All right.

7  BY MR. GOODFRIEND:

8  Q   On the 1/7/03 MRI, do you expect to see any edema or

9  swelling in the neck?

10  A   No, sir.

11  Q   Why is that?

12  A   Well, this MRI is done approximately ten days after the

13  initial CT.  Edema that might relate to an injury of the upper

14  neck or the junction of the neck and the head would likely

15  resolve within 72 hours.  So we're way beyond that period.

16  Q   Is a retroclival hemorrhage more -- I'm sorry.

17        I think we're going to go to your other slides in

18  this sequence, so if we could go back to the beginning.

19        Dr. Hedlund, why don't you come off the stand.  And

20  you have prepared images to assist the Court in understanding

21  your testimony, is that correct?

22  A   Yes, sir.

23  Q   Okay.  And the image we're looking at now is entitled

24  "Acute/Subacute Subdural Hemorrhage IZ 12/27/02," is that

25  correct?

1  A   Yes, it is.

2  Q   And could you please explain what you see in those two
3  images?

4  A   So these are two images from the CAT scan of the brain
5  from 27 December 2002, and let me first address the picture on
6  the right.

7        So the location of this is through the upper part of
8  the brain.  And, again, imagine the orientation:  As you're
9  standing, a slice parallel to the floor cuts through the
10  brain, and we're looking at the top.

11        The black area shows a region of whiteness or
12  brightness.  This is representing an acute or early subacute
13  subdural hemorrhage.

14        Also, there is a linear bright white structure that
15  sits just in front of the frontal lobe, the right.  This is
16  the patient's right side, the right frontal lobe.

17        And my differential, and as I reported in my initial
18  -- my report to you, my consideration on a differential
19  diagnosis perspective would be, number one:  Is this
20  hemorrhage in a membrane, as we have discussed, in the
21  subdural space?  Is it clotted blood in a vein or thrombosed
22  vein or is it very slow flow within a vein that might make it
23  look brighter?

24        So I invoked a differential on that initial CT.

25        I would also --

1          THE COURT:  Differential, meaning these are the two
2    choices?
3          THE WITNESS:  There is consideration.  We see
4    something, and oftentimes in medicine and in radiology, we
5    say:  I see this.  What are the possibilities to explain this?
6          THE COURT:  Yes.
7          THE WITNESS:  Also, I just would like to point out to
8    your Honor that there is this darker fluid that is seen
9    anterior, or in front of, the edge of the brain, and it's deep
10   to the skull.  And at that point, we see that same fluid lower
11   down.
12         And on the initial CT, my consideration, again my
13   differential diagnosis, included three things:  Does this
14   represent fluid in the subarachnoid space?  And we talked
15   about that space.  Does this represent an old subdural
16   hemorrhage, or does this represent what myself and other
17   authors would call a subdural hygroma?  And a hygroma, by most
18   of us in neuroradiology, would imply cerebral spinal fluid
19   that had leaked into the subdural space.
20         So the differential is based on the fact that these
21   are not particularly large yet and the density or the grayness
22   or blackness of the fluid.  This becomes more amplified as to
23   what it is very shortly, particularly when we look at the CAT
24   scan of 28 and 29 December because contrast was given, which
25   becomes very helpful as a localizer as to where the fluid is,

1    what compartment or space it's in.

2    BY MR. GOODFRIEND:

3    Q    In terms of the images in this exhibit, the front of the

4    head is on the top?

5    A    It's on the top, yes, and the back of the head on the

6    bottom.

7    Q    Okay.

8    A    And then on the left, the black arrows have pointed to a

9    brightness, sort of a linear or white brightness, and that

10   brightness is pointing to a part of the anatomy that we call

11   the tentorium cerebelli.  And if you just imagine a general

12   picture of the brain, or if I could --

13            Can I go back to the MRI image, please?  You go

14   forward.  Thank you.  Stop there, please.

15            So, your Honor, if you imagine looking from side to

16   side, and let my pointer prescribe a plane that is running

17   like this, that plane describes a sheet of tissue called the

18   tentorium.

19            If we go back to the slides now.  And so the image

20   we're looking at now is now we're looking at that tentorium,

21   but it's horizontal now.  It's running in the plane of the

22   picture.

23            THE COURT:  So that's what the diagonal lines

24   represent.

25            THE WITNESS:  They represent blood.

1          THE COURT:  Blood.

2          THE WITNESS:  The whiteness represents blood that is

3   in what we call the leafs of the tentorium or subdural

4   compartment blood.

5   BY MR. GOODFRIEND:

6   Q    Now, the blood is in a different location, is that

7   correct?

8          THE COURT:  Wait a second.  Is that blood that is

9   supposed to be there or it is not supposed to be there?

10         THE WITNESS:  I'm sorry.  So it's subdural

11  hemorrhage.

12         THE COURT:  It's hemorrhaging, got it.

13         THE WITNESS:  Or subdural compartment hemorrhage, and

14  there should never be -- there should never be anything there

15  at all, unlike the subarachnoid space where there can be

16  normal natural fluid in the subarachnoid space.

17  BY MR. GOODFRIEND:

18  Q    In the blood that is depicted here, is it in different

19  locations?

20  A    I've depicted it for you in different locations, yes, sir.

21         So we have what we call parafalcine; that is, near

22  the falx, which is another curtain that divides the

23  hemispheres; parafalcine subdural and tentorial subdural.  So,

24  yes, those are different locations.

25  Q    What is the significance of having hemorrhages in

1    different locations?

2    A    Well, there's authors who have written about in non-

3    ambulatory children subdural hemorrhages in several locations,

4    and certainly at different ages, which we'll talk about, is

5    much more commonly seen in inflicted trauma than, let's say,

6    for example, accidental trauma when there is no other

7    reasonable explanation.

8    Q    In terms of the hemorrhage we're having here, some of them

9    you're listing acute and subacute, is that correct?

10   A    Yes, sir.

11   Q    Let's go to the next slide, please.

12        What is depicted in this slide?

13   A    I've taken three pictures from the CAT scan of the 28th of

14   December, and I would just point out that there is no

15   contrast.

16        Your Honor and counsel, you probably know that on the

17   28th and on the 29th, the CAT scan was composed of two facets.

18   There was a noncontrasted and there was a contrasted part on

19   those two dates.  Very helpful.

20        These are three pictures from the noncontrasted study

21   on the 28th:  From the middle part of the brain to slightly

22   higher to the very top part of the brain.  That's the level,

23   so from lower to higher.

24        And let's just start on this picture.  So I put

25   arrows on what would be acute or early subacute subdural

1   hemorrhage.

2   Q    For the record, that's the image in the right-hand corner,

3   the first image on the right.

4   A    I would also like to point out, your Honor, that there are

5   in the front -- this is the front, the forehead.  This is the

6   back of the head.

7        I would like to point out to you that there are

8   these, if you will, tubular areas, serpentine or kind of wormy

9   areas, of high density.  They're white, they're bright.  Now,

10  these are not conforming, or they're not adapting to the

11  normal sulcus or space of the subarachnoid space.  Their

12  morphology, their shape, is very consistent, I believe, with

13  bridging veins that have been torn and have clotted.

14       I think this is a very important finding,

15  particularly in conjunction with the acute or early subacute

16  subdural hemorrhage.

17  Q    In --

18  A    As is pointed out by other authors such as the Adamsbaum

19  paper.

20  Q    Could you please explain what the middle image depicts?

21  A    The middle image, again, is kind of just slightly above

22  the midpoint of the brain, and we sort of see this almost

23  teepee-shaped brightness or whiteness.  And the black arrow is

24  pointing to that, and that is acute or early subacute subdural

25  hemorrhage.

1    And notice a small dark triangle in the middle.
2    Well, that's the normal venous sinus without blood in it.
3    It's the way it normally looks when there is no contrast
4    given.  And it's accentuated because there is all this blood
5    in the subdural compartment that should not be there that is
6    outlining.  So the dark triangle, that's normal.
7    And you will see in a little bit, when we give
8    contrast, it lights up like a light bulb.
9    THE COURT:  That's the same thing that's at the top
10   of this particular slide?
11   THE WITNESS:  Yes, but we're looking at it in a
12   different perspective.
13   THE COURT:  Really at the back of the head.
14   THE WITNESS:  Yes, sir.  And we're cutting the brain
15   differently.
16   THE COURT:  Yes.
17   THE WITNESS:  But, absolutely.
18   So that dark triangle is normal, and the white teepee
19   is acute or early subacute blood should not be there.
20   And moving down a little further, now we're at that
21   level of the tentorium, that sheet of tissue we just spoke
22   about.  And when you look down on that tentorium or that sheet
23   of tissue, there is actually a hole in it.  Well, the reason
24   there's a natural hole in it is because the brain stem has to
25   go through that.  We call that the incisura.  It's just an

1    opening.

2            And this whiteness that we're seeing around that area

3    is subdural blood in the tentorium at the incisura of the

4    tentorium, or the opening of the tentorium.

5    BY MR. GOODFRIEND:

6    Q    Once again, the blood is seen in different locations?

7    A    Yes, sir.

8    Q    Once again, what is the meaning of it being in different

9    locations?

10   A    Well, if I can comment, the observation of the acute or

11   early subacute hemorrhage in different locations, the findings

12   of areas of blood that probably are in the subarachnoid space,

13   these tubular, I think, clots within torn bridging veins I

14   think are strongly suggestive of inflicted trauma or abusive

15   head trauma.

16   Q    Could we go to the next slide, please?

17   A    This is a composite image.  I have on your left a

18   noncontrast CT picture through the top of the brain from the

19   27th.  I have a noncontrast CT picture of the brain, of the

20   upper part of the brain, on the 28th.

21           I've selected what is called the GRE or T2* image

22   sequence from the MRI also from the 7th of January.  And for

23   our reference only, this is the same picture I showed you from

24   the Adamsbaum article.  This is not Isabella's picture.  What

25   I showed is an anatomic reference.

1      And look at these three images from Isabella's

2   portfolio of imaging that are relating to structures.  And my

3   open black arrows, I would contend, represent clotted torn

4   bridging veins laying on the surface or the top of the brain.

5      And there are -- there are multiple ones, and they

6   are exhibited by these lines and dots, and this is right up

7   near the top of the brain, as those veins, those bridging

8   veins, are getting ready to dump their blood into the superior

9   sagittal sinus.

10      And I would say the correlate is the demonstration of

11   the gross picture from another patient that showed the

12   thrombosis of torn bridging veins.  That's the purpose of the

13   slide.

14   Q   Could we go to the next slide, please?

15      What is depicted in the slide entitled "Intracranial

16   Venous Sinuses"?

17   A   In reading Dr. Mack's report, there is the allusion or

18   there is the comment made that there is incomplete opacity of

19   the venous sinuses.  To me that's an implication that there is

20   partial clot or that it's not completely normal.

21      And so what I've done in Isabella's case, and I have

22   reviewed comprehensively both the 28th and 29th contrast

23   studies, which I think were of excellent diagnostic quality,

24   and I'm taking a one-slice selection, one anatomic location,

25   through the middle of the brain.  And I'm showing you what is

1   called the vein of Galen, a very important venous sinus, and

2   I'm showing you the back part of the sagittal sinus with these

3   arrows, and they're lighting up like light bulbs.  That's what

4   they should do.  When you have given contrast, they should

5   light up like this.  This is normal, and at other locations,

6   they were normal as well.  And I'm just simply showing you one

7   picture.

8           And then I have taken a very similar aged patient

9   that I have just named John Doe, another patient, who had iron

10  deficiency anemia as the cause of the thrombosis.  And I'm

11  showing you that in this patient, we don't see the light bulb.

12  There's a darkness to that structure in both locations, and

13  the reason there's a darkness in the sinus is because there's

14  blood clot, because contrast, your Honor, cannot fill the

15  space.  It's being restricted in getting to there, the space,

16  because there is clot occupying the space.

17          That is the purpose is to show what clot looks like

18  and what normal looks like, and Isabella's CT with contrast on

19  28 and 29 with contrast were normal, in regards to the sinuses

20  were normal.

21  Q   Let's go to the next slide, please.  It's entitled

22  "Intracranial Venous Sinuses," and can you please once again

23  explain what is depicted in the slide?

24  A   So I've just picked another anatomic location.  You

25  probably know now we're near the top of the brain.  We're

1  almost out of the brain altogether, and, your Honor, we're

2  seeing that big sagittal sinus running from front to back, and

3  it should normally fill like this.  It should fill with white

4  contrast, if you will.  That would be normal.

5           This is the same patient at another location, and it

6  shows a stringy dark, what we would call a filling defect.

7  That's blood clot.  That's thrombosis.

8           So this would be normal, and this was a different

9  patient showing clot.

10 Q   Next slide, please.  We're going to skip the three slides

11 of the retroclival, and we're on the slide indicating a

12 cerebral edema.

13 A   Well, this might be hard to see in the audience, and, your

14 Honor, it might be hard as well to see in that I picked a CT

15 select from the mid part of the brain from the 28th, from the

16 4th of January, and then I picked an image that is a very

17 sensitive image to depict edema or swelling or abnormal water

18 accumulation in the brain.  I use all those sort of

19 interchangeably, and this is from the MRI.

20          And I hope what you can appreciate, and let me just

21 sort of trace it generally, this is the front of the forehead.

22 This is the back of the brain.

23 Q   You're pointing to the slide on the left?

24 A   The 28th of December.

25 Q   Okay.

1    A    And I'm using the pointer to point out that there is an

2    area, this region in the back of the brain.  And this is the

3    patient's left and this is the patient's right side.

4         And what I'm pointing out to you is there's a

5    relative darkness of this tissue.  It's blacker, if you will,

6    than the front part of the brain.  And there's that -- it's

7    seen on both sides.  And so it just looks like a zone, a

8    region, of lower, I would say, density.  It's darker on the

9    gray scale from white to black than other parts of the brain

10   in the central or front part of the brain.

11        And it becomes more evident.  It becomes more evident

12   on the 4th.  We can see it more distinctly because I think

13   evolution, the natural evolution, of the swelling that began

14   early, I can certainly see it easily here.  I can't

15   confidently see it on the 27th, but sometimes it takes 12 to

16   24 hours to really be able to see the edema expressing itself

17   on the CAT scan.

18        So we're seeing, I believe, the progression or

19   evolution of this swelling, this accumulation of fluid in

20   tissue.

21        And then there's a couple of other things, if I may,

22   before I leave the CTs.  There, again, is the brightness, the

23   whiteness; that is the subdural hemorrhage that would be of

24   the acute or early subacute category that is seen related to

25   the dura in the back of the head.  And we see that on both of

1    these scans.

2         And then I would like to point out, your Honor, that

3    if you look at the dark fluid spaces that are in front,

4    they're getting bigger.  If we look at the 28th, that actually

5    is a little bit bigger than the 27th.  And if you compare the

6    28th to the 4th, they have gotten bigger.

7         And what we know from the earlier CAT scan, and when

8    we gave contrast, is we can confidently identify that that

9    fluid is getting bigger in the subdural compartment.  It's

10   enlarging in that compartment.

11        And then, finally, the MRI, it's just showing us some

12   areas of brightness or whiteness, and part of it involves what

13   we call the deep nuclei of the brain.  These are the high

14   energy requiring heavy machinery doing lots of work, requiring

15   all sorts of nutrients and oxygen, and then the back part of

16   the brain, it's relatively whiter.  And it reflects the

17   magnitude, I think, of the tissue injury, the deprivation of

18   nutrients and oxygen from the tissue.

19   Q    Anything else you want to point out in regards to the

20   cerebral edema?

21   A    No.

22   Q    Let's go to the next slide, please.

23        Okay.  This is entitled "Retinal Hemorrhages."

24   A    So this is just a single slice.  I obviously magnified

25   this so we could focus on a point of anatomy being the eyes.

1    And I just would like to point out, your Honor, to

2  you and the Court, that when we look at the optic nerve in the

3  eyes, this is really an extension of the brain.  We look at

4  the optic nerve as a true anatomic extension of brain tissue.

5  And the fluid spaces that invest or surround those nerves are

6  actually connected to the same fluid spaces of the brain.

7    I think it has some importance here.  This is the GRE

8  or T2*.  This is the blood sensitive technique that we do when

9  we're investigating blood on MRI.

10    And what I'm pointing out is that black arrows are

11  showing some irregularity or more bumpiness of darkness along

12  the back part of the globe, or the eyeball.  Normally, that

13  should be a thin, curved, crisp line, and so it looks

14  thickened.  It looks more indistinct than it should.  And then

15  it looks a little beaded like there's little focal small areas

16  of darkness.

17    And then with the white arrows, I've delineated these

18  black stripes, which are laying right next to the optic nerve,

19  and the optic nerve is running like this.  It's a gray

20  structure.  It looks like a big worm.  It's running like this

21  and it's running back in here.  That's the optic nerve.

22  That's a structure, again, that connects to the brain.

23    And so those black lines that are delineated by the

24  white arrows I believe is blood in the sheath around the optic

25  nerves.

1  Q   Any other commentary on the retinal hemorrhage slide?

2  A   No.

3  Q   Can we have the next slide, please?  It's called

4  "Subarachnoid Spaces."

5       Dr. Hedlund, can you please explain what is

6  demonstrated in this slide?

7  A   The purpose of me creating these two pictures was to

8  address comments that I have read that were given in the

9  reports by defense experts that are talking about the

10  prominence of the subarachnoid space.

11       Now, I mention from the very outset that normally we

12  expect to have a small amount of fluid in our subarachnoid

13  space.  That's normal.  It should be there.  And I want to

14  point out to you the size of it in Isabella.

15       So I picked out a slice select from the enhanced

16  study from the 28th.  This is a CAT scan.  Now, just for point

17  of reference, this is the front of the head, this is the back

18  of the head, and these dark spaces are the ventricles.

19       And, your Honor, I want to point out to you there are

20  these white dots, these white areas.  Those white areas

21  represent the cortical veins, or they represent some cortical

22  veins.  There are many.

23       I just would like to point out that their relative

24  position related to the brain and related to the edge of the

25  bone, I think you would agree, sir, that these structures are

1    hugging up against the brain.  They are relatively closer to

2    the brain than they are to the bone, and the fluid is much

3    more prominently seen outward of those veins, and that helps

4    us clearly identify that the fluid is in the subdural

5    compartment.

6         Now, the reason I point that out is because when we

7    look to see, well, how big is the subarachnoid compartment, my

8    arrows are pointing to tiny little dark regions.  That's the

9    subarachnoid space.  It's very small.  It's actually a little

10   smaller than you would expect.  And why is that?  It's because

11   we have this subdural fluid that is actually compressing them

12   slightly.

13        So this is a very helpful study.  It shows me that,

14   if anything, the subarachnoid spaces were slightly smaller in

15   Isabella.  Certainly when we gave contrast on the 28th, we

16   could clearly see that and confidently see that.  And we can

17   identify that the fluid prominence, if you will, is in the

18   subdural compartment.

19        And then what I'm showing you here is not Isabella;

20   it is a normal infant of a very similar age.  It is an MRI

21   picture.  And you would say that that whiteness now, the

22   fluid, it looks pretty prominent.

23        This child was completely developmentally normal,

24   growing and feeding well in every way.

25        MR. BLEGEN:  I'm going to object to that.  It's also

1  not in his report.

2  THE COURT:  Well, did you not have the slides?

3  MR. BLEGEN:  I had this slide, yes, but nothing about

4  -- he's now talking about developmental clinical issues.

5  THE COURT:  The objection is overruled.  Go ahead.

6  THE WITNESS:  I'm only simply trying to point out

7  here that a child, and not Isabella, a normal child of this

8  age can have somewhat prominent subarachnoid spaces that can

9  be completely normal.

10  Now, this is a different test.  I'm showing you an

11  MRI, but I'm simply showing you this test to show you that the

12  fluid spaces which are white here, white in the ventricles,

13  white coating the brain, that's all fluid, and we can see here

14  that the veins are running through the fluid, particularly in

15  the front of the head.  They're running through the fluid, and

16  that delineates and defines the fluid compartment as the

17  subarachnoid space.

18  BY MR. GOODFRIEND:

19  Q    Now, in the picture of Isabella, in terms of the

20  significance of the enlarged subdural space versus the smaller

21  subarachnoid space, is that because of the swelling of the

22  subdural space pressing on the space in the subarachnoid?

23  A    Yes, sir.

24  Q    Next slide, please.

25  What is depicted in the slide entitled "Middle Ears

1  and Mastoids Showing Normal Middle Ears and Mastoids"?

2  A    So these are pictures from a CAT scan.  They are from

3  Isabella's CAT scans, and they're from the 28th, and they're

4  from the 29th.  And these are also from the bottom part of the

5  skull with particular reference to what we call the mastoids.

6  Those are air cells behind your ears in the middle ear

7  cavities, and the middle ear cavity is connected to the

8  mastoid.

9          And the reason I'm showing you two is because it's

10  hard sometimes on one picture because a child can be a little

11  tilted.  It's hard to depict the anatomy.  So I want you to

12  understand that I'm going to show you two different levels.

13          For example, this level, the top picture from both

14  the 28th and 29th, that picture is just a little bit lower,

15  and this is just a little bit higher.  But the reason I'm

16  showing those two is I want to point out to you the areas of

17  blackness.  So here is the left ear, this is the right ear.

18  That's just the convention.  And so we see this blackness, and

19  that blackness represents air that is in the middle ear cavity

20  and in parts of the mastoid air cells.

21          This picture, which is a little bit higher cut, is

22  showing the upper part of the mastoids.  Blackness means air,

23  and that is normal.  Normal air content in those structures,

24  that is normal.

25          And the same thing here.  The mastoids are very, very

1    normal, black.  It should be black.  They should have air in

2    them.  Fluid would look much grayer.

3         And I've just tried to depict very similar levels on

4    the follow-up, the next day depicting again the aerated

5    appearance of the middle ear cavities and the mastoid ear

6    cells.

7         Next slide, please.

8         THE COURT:  We're going to stop there.  We're going

9    to break for lunch.  At 1:30 I have to take a guilty plea from

10   two people.  We're going to do it in tandem.  So I think 2:00

11   o'clock is a reasonable start time.

12        This afternoon -- I have been doing some thinking.

13   I'm going to --

14        First of all, just make a mental note on these

15   slides.  Since the hard copy printout is nowhere near the

16   quality of the slide, I'm going to need an electronic version

17   of that at some point so I can have a flash drive or something

18   like that.

19        By the end of Dr. Hedlund's testimony, each side will

20   have essentially called a corresponding expert, and so it's

21   roughly even in that regard.  So in addition to dealing with

22   dates, frankly, I'm going to impose time limits on people, and

23   you can use your time however you want.  If you use it all up

24   on the first two people, then you're not going to have much

25   time for the other four.  I'm going to ask you at the end of

1    the day to come up with a plan for, you know, who is going to

2    testify when, and so you should start thinking about that now.

3           As far as the posthearing briefs are concerned, I

4    have -- I'm going to get the transcript and you're all going

5    to get the transcript.  However, you're not going to be able

6    to wait for the transcript to file your brief.  So I hope

7    everybody is taking good notes.  The reason for that, frankly,

8    is very simple.  That would add another month onto the

9    process, and I need to be able to grasp all of this in my head

10   sooner than that.

11          So just be thinking about it, and you won't have to

12   address it today, but you will pretty soon.

13          MR. TRIEBEL:  I'm sorry, your Honor.  Just to

14   clarify, I didn't hear you specifically.  You said we're not

15   going to be able to --

16          THE COURT:  I'm going to set a date for posthearing

17   briefs, which is not going to be long enough after the hearing

18   for you all to get the transcript, digest the transcript,

19   think about the transcript, ponder the transcript and

20   incorporate the transcript.  You're going to be doing your

21   posthearing briefs based on your recollection of this.

22          I will have the transcript by the time I rule on it,

23   but you won't by the time you brief it.

24          MR. TRIEBEL:  Okay.

25          THE COURT:  All right.  I will see you after lunch at

1      2:00 o'clock.

2                MR. TRIEBEL:  Thank you, your Honor.

3                (The trial was adjourned until 2:00 p.m. of this same

4      day and date.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2             EASTERN DIVISION

3

4  JENNIFER DEL PRETE,        )

5               Petitioner,  )  Docket No. 10 C 5070

6          vs.           )

7  MELODY HULETT,          )  Chicago, Illinois
                     )  December 18, 2012
8           Respondent.  )  2:20 p.m.

9               VOLUME 2
10          TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12  APPEARANCES:

13

14  For the Plaintiff:    BLEGEN & GARVEY
                    BY:  MR. PATRICK W. BLEGEN
                       MS. JODI L. GARVEY
15                     MR. DANIEL A. RUFO
                  53 West Jackson Boulevard
16                 Suite 1437
                  Chicago, Illinois  60604
17

18  For the Defendant:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                    BY:  MR. KARL R. TRIEBEL
19                    MR. NEAL GOODFRIEND
                    MR. ARI TELISMAN
20                    MS. MONIQUE A. ANAWIS
                  100 West Randolph Street
21                 13th Floor
                  Chicago, Illinois  60601
22

    Also Present:          MR. ROBERT STANLEY
23

24       LAURA M. BRENNAN - Official Court Reporter
        219 South Dearborn Street - Room 2102
25           Chicago, Illinois  60604
               (312) 435-5785

1     (The following proceedings were had in open court:)

2     DR. GARY HEDLUND, RESPONDENT'S WITNESS PREVIOUSLY SWORN

3            CONTINUED DIRECT EXAMINATION

4   BY MR. GOODFRIEND:

5   Q    Dr. Hedlund, I think we were talking about the mastoids in

6   terms of your view on 12/28/02 and 12/29/02; is that correct?

7   A    Yes.

8   Q    I believe you stated they were -- the images were both

9   normal without any evidence of infection; is that correct?

10  A    That's correct.

11  Q    Now, if an infant had an ear infection, what would you

12  expect to see on a CAT scan?

13  A    You most likely would just see fluid within the middle ear

14  and perhaps the mastoids, but in the middle ear particularly

15  you would see fluid on the CAT scan.

16  Q    Is there anything else you might see?

17  A    If you're referring to a simple ear infection, then the

18  answer would be no.

19  Q    What about a more serious ear infection?

20  A    If you're referring to what we would call acute

21  otomastoiditis where you have infection of the air cells

22  within the mastoid temporal bone and the middle ear, which is

23  a serious infection, you would typically have swelling of the

24  soft tissues behind the ear that you would feel a puffy

25  swelling to the clinical exam, you may see pus between the

Hedlund - direct

1    outer bone and the tissues, you may see pus within the inner

2    part of bone and the brain, and you could see clot within the

3    adjacent venous sinus.

4    Q    If an ear infection spread to the brain, what might you

5    see on the imaging?

6    A    Well, I've just mentioned several things I would expect to

7    see in the region where the ear infection was occurring, and

8    then you might also see more remote findings within the head,

9    and that might be the clotting of the veins, or you might see

10   signs of meningitis.  But you're particularly looking in the

11   locality, the region where the ear infection was occurring.

12   Q    Is imaging the best way to diagnose an ear infection?

13   A    No.  There's much more effective and cheaper ways like

14   looking at the ear.

15   Q    Okay.  Now, we've talked about chronic subdural

16   hemorrhage.  Doctor, did the chronic subdural hemorrhage cause

17   Isabella's collapse on 12/27/02?

18   A    No.

19   Q    Why not?

20   A    Well, the appearance of the chronic fluid collections as

21   they were shown initially were fairly small.  They did grow

22   through time, as I have described earlier.  And the size of

23   those chronic collections initially were placing just minimal

24   mass effect on the brain, and I suspect that they had been

25   clinically compensated, that they were not the cause of a

Hedlund - direct

1    catastrophic change in her clinical status.  There's ample

2    evidence that I've described earlier for other newer findings.

3    Q    Those would be the acute hemorrhages?

4    A    Yes.

5    Q    Now, as a neurologist, can you --

6    A    Neuroradiologist.

7    Q    I'm sorry.

8         As a neuroradiologist, is there any way you can tell

9    via the images whether Isabella had a metabolic disorder?

10   A    Well, the imaging isn't a microscope, and it's not a

11   laboratory test, but there are several metabolic problems that

12   we can see changes on in some conditions with imaging, CT and

13   MRI.  I did not see anything on the imaging to make me suspect

14   that, either the CT's or the MRI.

15   Q    I think when Dr. Barnes testified yesterday he indicated

16   that if there was a torn bridging vein there would be massive

17   bleeding.  Do you have a response to that conclusion made by

18   Dr. Barnes?

19   A    Well, I addressed this earlier, but I'm happy to repeat

20   it.  And I think it really depends on the number of veins that

21   might have been broken or torn and their size.

22   Q    In terms of the torn bridging veins, did you actually see

23   what might be called as massive bleeding in this case?

24   A    Well, massive, no.  But certainly we see on the early

25   studies several locations where bleeding has occurred.  I

1  think massive is a relative term.  I'd say massive, no, but

2  certainly signs of acute or subacute hemorrhage.

3  Q    I think Dr. Barnes also had the opinion or stated in his

4  testimony that the acute hemorrhages were within the chronic

5  collections.  Is that true?

6  A    Well, remember, we're talking about a compartment, the

7  subdural compartment.  So you can have bleeding that had

8  occurred previous.  We could call that chronic subdurals.  And

9  then you can have new bleeds like from a new injury, for

10 example, and they're still in the same compartment, so they're

11 still subdural compartment hemorrhages.  And you can have

12 newer and you have older bleeding elements in the same

13 compartment.

14        MR. GOODFRIEND:  Judge, I just want one minute to

15 confer.

16 BY MR. GOODFRIEND:

17 Q    Now, Dr. Hedlund, could we just go to your report for one

18 final piece on your report.  You might have talked about part

19 of it, but I'd ask you to address your attention to finding

20 No. 5.

21 A    Could I have you hand me the notebook you had me look at

22 earlier.

23        Thank you.

24 Q    Dr. Hedlund, could you please explain to the judge what

25 finding No. 5 was in your report.

1    A    Posterior cerebral hemispheric edema, and that would mean

2    a deficiency of oxygen. Brain parenchymal injuries including

3    ischemic injuries seen in conjunction with hemorrhagic

4    injuries as described above are more commonly associated with

5    abusive head trauma than accidental head trauma.

6    Q    And if you could talk about ischemia and brain

7    parenchymal --

8    A    Parenchymal.

9    Q    -- parenchymal injuries.

10    A    When talking about the actual swelling, of fluid

11    accumulation in the tissue, fluid leaking out of the cells of

12    the brain, and you might remember there was an earlier slide

13    where I pointed out the darker areas in the back of the brain,

14    and so in a sense the term edema is a general term. It's

15    describing swelling. The cells are not working properly, and

16    so fluid is leaking out of the cells into the tissue that

17    surrounds the cells. Normally it's contained in the cells.

18    And so the tissue starts to get larger. It starts to swell.

19    There can be several means by which that can happen.

20    That is, there are several pathways to lead to edema of

21    tissue. You can deprive it of inflowing blood. That would be

22    arterial flow. You can deprive it of oxygen delivery with the

23    blood flow. You can affect its function by trauma that

24    there's certain chemicals we call excitatory chemicals that

25    can also make the brain swell. So there could actually be

1   several reasons why it's swelling.

2   Q   Now, I think I forgot to go to the last slide on the Power

3   Point.  And in terms of the middle ears and mastoids, did you

4   make any findings as to the CAT scan of January 4, 2003?

5   A   Yes.  So I've just posted, much like I did on the 28th and

6   29th, two different levels to the base of the skull.  These

7   are from a CAT scan.  And one of the things I think you can

8   recall from the middle ear and air in the mastoid air cells

9   showed up as blackness.  And that's normal.  That's what we

10  expect to see.

11          And here again this is a cut a little bit lower, and

12  this is a little bit higher, both from the fore.  And this in

13  reviewing the imaging is the first time that I could

14  competently say that I could see fluid in these structures

15  that we're speaking of, the middle ear and the mastoids.  And

16  when I say "fluid," I don't know if you can see, your Honor,

17  from your position, but there's not a complete blackness

18  anymore.  There's actually a fluid level.  You can see what's

19  called a meniscus.  It's a curved fluid level interfacing with

20  the air.  That's precisely specific for fluid in that chamber.

21  That wasn't present before.

22          And on the right side as well where the bones of

23  hearing are seen in the middle ear, now there's fluid

24  occupying almost all of that space.  And that fluid is gray.

25  Before that was all air.  It was all black.  And previously it

1  was normal.  Now there is fluid.

2  Q   And what can you attribute that to in view of the record

3  in this case?

4  A   Well, certainly simple fluid, uninfected fluid accumulated

5  in a hospitalized patient could look like this.  I cannot tell

6  you if this child had an ear infection on the 4th of January,

7  but I can tell you on the 28th and 29th there was normal air

8  content in that part of the bone.  It was normal.

9  Q   If Isabella was on a ventilator, would that in any way

10  affect the -- or lead to the collection of fluid in the ear?

11  A   Well, in our sick hospitalized patients, it's very common

12  when they're at bed rest, intubated, as you've said, that

13  they'll start to accumulate fluid in the sinus chambers, that

14  is the -- behind the nose, behind the eyes, these air

15  containing sinuses in the ears.  We can start to see fluid

16  accumulate there.

17       It doesn't mean it's infected, but we can certainly

18  see that in hospitalized patients, and it's very common.

19  Q   And the sinuses you're talking about now do not relate to

20  the sinuses of the brain; is that correct?

21  A   Right.

22       Your Honor, to be clear, the sinuses I'm speaking

23  about now are typically air containing and not blood

24  containing sinuses.  That's correct.

25  Q   Finally, Dr. Hedlund, in terms of reaching your

Hedlund - cross

1  conclusions, are the methods that you used commonly accepted

2  in the field of medicine?

3  A    Yes.

4  Q    Now, when you take all of your findings together, what is

5  your opinion to a reasonable degree of medical certainty as to

6  the cause of Isabella's collapse on December 27th, 2002?

7  A    I believe the findings are indicative of inflicted trauma

8  or abusive head trauma.

9           THE COURT:  Is there a difference between those two

10  things?

11           THE WITNESS:  No.  I would say those -- use those as

12  synonyms.

13           THE COURT:  Okay.

14           THE WITNESS:  To be precise, using the terminology

15  recommended by the American Academy of Pediatrics in 2009,

16  abusive head trauma would be the newest recommendation.

17           MR. GOODFRIEND:  Judge, thank you.  I have no other

18  questions.

19           THE COURT:  Mr. Blegen.

20                     CROSS EXAMINATION

21  BY MR. BLEGEN:

22  Q    Dr. Hedlund, good afternoon.

23  A    Good afternoon.

24  Q    Is what you're telling us from this, the slide that was

25  just up there, 1/4/03, the MRI regarding the ears, that the

Hedlund - cross

1   child may or may not have had an ear infection on that date

2   based on what you see on imaging correct?

3   A    Well, first of all, just to be correct, it's a CAT scan.

4   It's not an MRI.  So we're looking at -- all those ear

5   pictures were really from CAT scans, so just so it can be

6   clear for the record.

7   Q    I apologize.

8            Is what you're telling us about the last slide that

9   was just up there that the child may or may not have had an

10  ear infection on 1/4/03?

11  A    That's correct.  This would not be the most specific exam

12  for that diagnosis.

13  Q    All right.  But you also can't tell us from the CT's of

14  12/28 whether the child had an ear infection on the days

15  leading up to 12/28/02, correct?

16  A    What kind of date range are you implying, sir?

17  Q    Well, did you know that the parents reported on

18  December 28th of '02 that the child had an ear infection?

19           MR. GOODFRIEND:  Objection, Judge.  I think he just

20  means the December --

21           THE COURT:  Overruled.  Put your question again,

22  Mr. Blegen, so he's got it in mind.

23           MR. BLEGEN:  Judge, are you aware that the --

24           THE COURT:  No.  I'm the judge.

25           MR. BLEGEN:  I'm sorry.

1      Mr. Hedlund, are you aware --

2      THE COURT:  It would be, Dr. Hedlund, but that's

3   okay.  He knows who you mean.

4   BY MR. BLEGEN:

5   Q   Dr. Hedlund, are you aware that the parents on 12/28/02 of

6   Isabella reported that she had been more irritable due to a

7   recent ear infection?

8   A   I wasn't aware of that report on that date.  I was aware

9   there was a previously treated ear infection.

10  Q   And do you know what the date of that was?

11  A   I'm not sure.  I thought it was maybe ten days or two

12  weeks before.

13  Q   All right.  And so she could have had an ear infection

14  that cleared up by the time of the first CT on 12/28/02,

15  correct?

16  A   This is correct.

17  Q   And that ear infection could have come back on 1/4/03,

18  correct?

19  A   That is correct.

20      MR. BLEGEN:  Would you put up the very first slide of

21  Dr. Hedlund, Rob.

22      I'm sorry.  Go to slide No. I think it's 3.

23      One more.  One more.  Another one.  There we go.

24  BY MR. BLEGEN:

25  Q   You've described this slide called acute/subacute subdural

Hedlund - cross

1  hemorrhage as representing areas of somewhat or possibly

2  recent subdural bleeding, correct?

3  A   The blood on CT would fall into a category of either acute

4  or early subacute from a time bracketing.

5  Q   All right.  You didn't call it purely acute, correct?

6  A   That's correct.

7  Q   And what is the time range, in your view, for a purely

8  acute subdural hemorrhage?

9  A   Purely acute?

10  Q   Yes.

11  A   Well, from maybe a couple of hours up to perhaps around

12  three days.

13  Q   And what's the time range for subacute?

14  A   Extending from about three days to perhaps sevens days.

15  Q   So when you call something acute or early subacute, you're

16  leaving out the first few hours, right?

17  A   We would call that hyperacute.

18  Q   Hyperacute would be how long?

19  A   Oh, within a couple of hours.

20  Q   And acute starts after that?

21  A   Yes.

22      And hyperacute blood would typically not have this

23  appearance on CT.

24  Q   Hyperacute blood would look different, correct?

25  A   Yes, sir.

Hedlund - cross

1  Q   All right.  So we're talking about something that you

2  think looks like acute/subacute, right?

3  A   That is correct.

4  Q   What's your range for acute as opposed to hyperacute?

5  A   I would say hyperacute is within the first couple of

6  hours, so first two hours.

7  Q   All right.  And so subacute -- excuse me.  Acute starts

8  when?

9  A   Oh, two to three hours after a bleeding occurs and extends

10  for about three days.

11  Q   So it's at least two to three hours old, correct?

12  A   For acute blood.

13  Q   Yes.

14  A   Yes.  Typically that's true.  There are some features that

15  can modify that, but typically that's true.

16  Q   But when you were answering questions on direct, you were

17  using the general terms that you say people are -- have

18  essentially agreed on for the timing, right?

19  A   Yes, sir.

20  Q   So when we get to acute/early subacute, you're talking

21  about something that you know to be beyond three or so hours

22  old, right?

23  A   Yes, sir.

24  Q   All right.  What's the minimum age for acute/early

25  subacute?

Hedlund - cross

1    A    Well, for purposes of speaking to you now, I would say
2    it's after two to three hours would be the minimal, the
3    earliest that we would transition our language, and also
4    couple it with our observation of the findings.  So we're
5    going to start talking about acute, including that in our
6    discussion of findings like this on this slide, when we see
7    high attenuation or bright blood on a CAT scan, on a
8    noncontrast CAT scan.  So the earliest would be about three
9    hours.
10   Q    The earliest of?
11   A    To use the term acute, yes, sir.
12   Q    All right.  But you haven't called it acute; you've called
13   it acute/early subacute, correct?
14   A    That's right.
15   Q    So you mean by that that it is actually older than three
16   hours or you could have just called it acute, right?
17   A    Yes.
18   Q    So it's older than three hours.  Do you know how --
19        MR. GOODFRIEND:  Objection, Judge.  Asked and
20   answered.
21        THE COURT:  Okay.  The last answer can stand.  Ask
22   another question.
23   BY MR. BLEGEN:
24   Q    Do you know how many hours old the blood that you
25   described as acute/early subacute is?

Hedlund - cross

1   A   Are you asking for a precise delineation of the age of the

2   blood?

3   Q   I will, and you can tell me if you can't do it, and then

4   we can try --

5   A   I can't tell you precisely, sir.

6   Q   All right.  In general terms, then, not precise, how old

7   minimum is acute/early subacute blood in your view?

8         MR. GOODFRIEND:  Objection, Judge.

9         THE COURT:  I really do think that he answered that a

10   little while ago.

11         MR. BLEGEN:  Okay.  I'll move on.

12         THE COURT:  At the beginning of this series of

13   questions.

14         MR. BLEGEN:  Can you, Rob, move to the next slide.

15   BY MR. BLEGEN:

16   Q   What's the slide that has the, Dr. Hedlund, the name of

17   the slide that has the chronic subdural collection on it?  Do

18   you know?

19   A   You mean it was a very early slide, the graphic slide?

20   Q   Yes.

21   A   It should be slide No. 3, I believe.

22         MR. BLEGEN:  Slide 3.

23   BY MR. BLEGEN:

24   Q   On this slide you were describing a -- what you called a

25   chronic subdural hemorrhage, correct?

1  A   Yes, sir.

2  Q   And you have told us that Isabella had a chronic subdural

3  hemorrhage?

4  A   Yes, sir.

5  Q   Correct?

6      And do you know that she had that chronic subdural

7  hemorrhage as of 12/28/02?

8  A   It was in my differential.  If you read my first -- if you

9  read my report, I include it in my differential for describing

10 the low density on CT fluid collections.

11 Q   Right.  Your differential said there were a couple things

12 it could have been, right?

13 A   That's right.  That's what a differential diagnosis is.

14 Q   Right.  So have you concluded now that as of 12/28/02

15 Isabella had a chronic subdural hemorrhage?

16     MR. GOODFRIEND:  Objection.  Asked and answered.

17     THE COURT:  Overruled.

18     THE WITNESS:  Please restate the question.

19 BY MR. BLEGEN:

20 Q   Have you concluded now that as of 12/28/02 Isabella had a

21 chronic subdural hemorrhage?

22 A   Have I concluded now?

23 Q   Yes.

24 A   Yes.

25 Q   Okay.  So as of December 28, 2002 -- strike that.  Let me

1  go back one day.

2  　　　　Have you concluded now that Isabella had a chronic

3  subdural collection on 12/27/02?

4  A　 Given the evolution of -- review of all the imaging

5  studies and particularly taking me up to the 7 January 2003

6  MRI, looking at everything and the evolution of the findings,

7  to me it is convincing to me now that indeed those small

8  collections were likely chronic subdural collections on the

9  27th.  It's harder originally -- if that's the only study

10  you're looking at, you know, if we take this like we do as

11  radiologists, we start chronologically and we look through

12  that, it was less certain to me initially.  As the days went

13  by and the studies included contrast and the MRI, it became

14  clearer.

15  Q　 Doctor, I think I'm with you what you're telling us is

16  that because of later information you learned, you now know

17  that as of 12/27/02 Isabella had a chronic subdural

18  hemorrhage?

19  A　 Yes, sir.

20  Q　 And that means in your view that it's greater than two

21  weeks of age, as you put on the slide, correct?

22  A　 Yes, sir.

23  Q　 But you said some people would call it three weeks or

24  older?

25  A　 Um-hum.  That's correct.

Hedlund - cross

1   Q  And you don't have any quarrel with that, do you?

2   A  No, I don't.

3   Q  All right.  So the subdural blood that you called chronic

4  was at least two weeks -- or, excuse me, it was greater than

5  two weeks old as of 12/27/02, correct?

6   A  Yes, sir.

7   Q  And it would not be unreasonable to say that it was three

8  weeks or greater old, correct?

9   A  It's possible.

10   Q  All right.  And it could go back -- we'll talk about

11  birth, but it could go back a significant amount of time,

12  correct?

13   A  As long as you, I think, have a tenable explanation.

14        MR. BLEGEN:  You can go to slide 2, Rob.

15  BY MR. BLEGEN:

16   Q  On this slide you've pictured not Isabella, but a drawing

17  of a subdural hemorrhage, correct?

18   A  That's correct.

19   Q  And that is a large subdural hemorrhage, right?

20   A  Yes, sir.

21   Q  So large that it's actually kind of smushed the right part

22  of the brain, correct?

23   A  Yes, sir.

24   Q  And in that person, if he or she really exists, that would

25  cause severe problems because the brain is being compressed,

1  correct?

2  A   Yes.  This depicts a new or acute or subacute hemorrhage.

3  Q   And that's the typical depiction of subdural hemorrhage

4  that results from torn bridging veins, correct?

5  A   That's incorrect.

6  Q   It's not?  Do you know what this is from?

7  A   Do I know what this is from?

8  Q   Yes.

9  A   I don't know if you were listening carefully to my

10  discussion earlier --

11         THE COURT:  You know what, let's just kind of keep

12  that out of it.  Okay?

13         THE WITNESS:  Okay.

14         THE COURT:  Thanks.  It's unbecoming.

15         THE WITNESS:  No, it's not related to torn bridging

16  veins.  This was simply the artist's ability to render what

17  the shape and appearance of a subdural hemorrhage would be.

18         MR. BLEGEN:  All right.  And what --

19         THE WITNESS:  It has nothing to do -- the artist --

20  it has nothing to do with bridging veins from the perspective

21  of what was the proposed etiology.  It's simply the artist

22  conveying what the position and the extent and the shape of

23  the subdural hemorrhage is.

24  BY MR. BLEGEN:

25  Q   All right.  Where would the -- what would be the source of

1  the subdural hemorrhage?  Where would the blood come from?

2      THE COURT:  What you're basically saying is that this

3  shows the outcome, the result, not where it comes from.

4      THE WITNESS:  That is correct.

5      THE COURT:  Could come from anywhere that subdural

6  hemorrhages come from basically, right?

7      THE WITNESS:  That's correct.

8      THE COURT:  Okay.

9  BY MR. BLEGEN:

10 Q   Where else do they come from in the context of abusive

11 head trauma?

12 A   Where else can they come from?

13 Q   Yes.

14 A   Well, they can come from many sources.  They can come from

15 actual injury to the dura with or without injury to the

16 bridging veins.  Bleeding can occur there and fill the

17 subdural compartment.  That's probably the next most common

18 cause in addition to tearing of the bridging veins.

19 Q   You sounded like there were other ones.  Are there other

20 sources?

21 A   Those are the two principal causes of the lower pressure

22 subdural bleeding.

23 Q   All right.  So either bridging veins or veins within the

24 dura; is that right?

25 A   Correct.  That's correct.

Hedlund - cross

1   Q   Okay.  Which sort of veins carry more blood, bridging
2   veins or veins within the dura?
3   A   Well, I'm not sure if you're speaking about taking the
4   dura in its entirety, its total surface area.  I suspect if
5   you took the total surface area of the dura and compared with
6   the bridging veins that perhaps the dura would.  But I don't
7   know a study that's looked at that.
8   Q   But you're talking about multiple veins, correct?
9   A   Multiple what?
10  Q   Multiple veins in the dura?
11  A   Uh-huh.
12  Q   All right.  So let's say --
13  A   These would typically be very small.
14  Q   Let's say one bridging vein versus one dural vein.  Which
15  carries more blood?
16  A   Well, one tiny vein within the substance of the inner dura
17  would carry less blood than a bridging vein.
18  Q   But what you're saying is, I guess, if there were
19  multiple, multiple ruptures of veins within the dura, that
20  might equal the amount of a bridging vein.
21  A   It's possible.
22  Q   But generally speaking, bridging veins are the large veins
23  that carry large amounts of blood in the brain, right?
24  A   Sir, they -- it's variable.  As I was saying earlier, it
25  depends on your own individual unique anatomy.  It depends on

1    the number of veins.  And it depends on the age of the

2    patient.  Isabella was three and a half months of age when

3    this occurred.  The veins in an adult, the bridging veins in

4    an adult are larger than an infant.  So it depends on several

5    things.

6    Q   Let's compare them to the other veins in a child, in the

7    same child.  Okay?  So we're talking about the same child who

8    has the same number of bridging veins.  Let's call it twelve.

9    A   Yes.

10    Q   Those veins, those twelve veins carry a large amount of

11    blood, don't they?

12    A   Sure.

13    Q   And they carry a larger amount of blood than those veins

14    within the dura that you're talking about, right?

15    A   It depends on the area I think that you're talking about,

16    what kind of a surface area.

17    Q   Well, we're talking about one to one, one vein, one

18    bridging vein versus one dural vein.

19    A   Well, a vein within the inner dura would be a

20    microscopic -- it would be a tiny, tiny vein.  So you're

21    pulling out a microscopic finding and comparing it to a larger

22    macroscopic vein.

23    Q   Right.  Because one is bigger than the other, right?

24    A   Right.  It would be quite unusual --

25    Q   Did you say right?  I'm sorry.  One --

Hedlund - cross

1    A    The bridging vein --

2    Q    -- is bigger than the other, right?

3    A    The bridging vein would be larger than a microscopic vein

4    within the inner dural margin.

5    Q    What about a cortical vein?  Is a bridging vein bigger

6    than that?

7    A    Yes, it is.

8    Q    All right.  And are cortical veins veins in the brain,

9    correct?

10   A    Yes, sir.

11          MR. BLEGEN:  Can we go to slide 7, Rob.

12   BY MR. BLEGEN:

13   Q    Slide 7 shows both what you called the acute/subacute

14   subdural hemorrhages and the chronic subdural hemorrhages,

15   correct?

16   A    Yes, sir.

17   Q    And the acute/subacute are where I'm pointing to with

18   black arrows, correct?

19   A    Correct.

20   Q    How would you describe them in terms of size, meaning

21   large, small, medium?

22   A    Small to medium.

23   Q    All right.  How would you describe them in comparison to

24   the chronic subdural hemorrhage, bigger, smaller, the same

25   size?

1    A    Well, I've just shown you two images.  I haven't shown you

2    the complete study.  So if we would like to speak of a

3    comprehensive study, which would be more appropriate, I

4    believe, I would say the acute or the newer blood was greater

5    or equal to.

6    Q    Greater or equal to?

7    A    Size of the chronic.

8    Q    All right.  So --

9    A    We're just looking at two pictures here.

10   Q    I understand.  There's more.  And there's more that show

11   that the chronic subdural hemorrhage actually increases in

12   size.

13   A    It does.

14   Q    Do you know why that is?

15   A    Yes, I do.

16   Q    Why?

17   A    My belief is on the 27th the patient was injured, and the

18   preexisting chronic subdurals, which I think were small, began

19   to accumulate cerebral spinal fluid, what we would call a

20   hygroma component, that there may have been injury to the

21   arachnoid membrane separating the subdural compartment from

22   the subarachnoid space, and as a result of that, through time,

23   in those days that followed, the volume of fluid, which was, I

24   believe, a combination of chronic subdural hemorrhage,

25   acute/subacute subdural hemorrhage and CSF, was enlarging

1  principally because of the accumulation of CSF.

2       I believe that's why they were getting bigger.

3  Q  So you think there was CSF but also some blood going into

4  the chronic subdural?

5  A  Well, earlier I spoke to the fact that it's the same --

6  you know, the subdural compartment is a subdural compartment.

7  In time, it can become complicated with membranes.  We talked

8  about that earlier.  And if there's new bleeding that occurs,

9  it's in the same compartment.  If it is in the subdural

10  compartment, it's in the same compartment as the CSF might be

11  leaking and that old blood might be occupying.

12  Q  And the combination of that is causing the subdural --

13  chronic subdural hemorrhage to increase?

14  A  It's causing the overall volume of these components in the

15  subdural compartment to be increasing in volume.

16  Q  And it's your view, Dr. Hedlund, that the chronic subdural

17  hemorrhage is a result from previously inflicted abusive head

18  trauma, correct?

19  A  Yes.

20  Q  And do you have any idea whether or not that was caused by

21  Miss Del Prete?

22  A  No, sir.

23  Q  Do you know that Isabella Zielinski did not start

24  attending the day care center that Miss Del Prete worked at

25  until three weeks before she was hospitalized?

1   A   I'm aware of that.

2   Q   So all we have to do is get to the three weeks or more of

3   the chronic and we know that Miss Del Prete did not commit the

4   previous incident of abuse, correct?

5           MR. GOODFRIEND:  Objection, Judge.

6           THE WITNESS:  Sir, I'm not here to really --

7           THE COURT:  Hang on a second.  When you hear an

8   objection, stop talking.

9           It's an argument.  Save this for an argument.

10          MR. BLEGEN:  You're right.  I agree.

11          Can we go to slide 12.

12  BY MR. BLEGEN:

13  Q   You've discussed a little bit with us today the

14  retroclival epidural hematoma that you say you saw on

15  12/27/02.

16  A   Yes, sir.

17  Q   You understand that three other radiologists have

18  indicated that they cannot see a retroclival epidural hematoma

19  on 12/27/02, correct?

20  A   I'm aware of -- I'm aware of two --

21          MR. GOODFRIEND:  Objection, Judge.

22          THE COURT:  Hang on a second.

23          What's the objection?

24          MR. GOODFRIEND:  Assuming a fact not in evidence.

25          THE COURT:  Overruled.

Hedlund - cross

BY THE WITNESS:

A    I'm aware of two that did not observe it.  And in fact --
in fact, on Dr. Barnes's most recent report he calls it a
retroclival hemorrhage.

BY MR. BLEGEN:

Q    But he doesn't say he saw it on 12/27/02, does he?

A    He described it on the MRI.

Q    Right.  But the MRI wasn't 12/27/02, correct?

A    Correct.

Q    So what I'm talking about, doctors who have said they can
see it on 12/27/02 -- excuse me, radiologists.  You're saying
you can see it, right?

A    Yes, sir.

Q    Dr. Barnes does not say he can see it then, correct?

A    Correct.

Q    Dr. Mack does not say she can see it then, correct?

A    She starts talking about dural thickening on the 28th in
this location.

Q    All right.  But we're still talking about the 27th, right?

A    Yes, we are.

Q    So she cannot -- she says she cannot see it on 12/27,
correct?

         You have to speak out loud.

A    Correct.

Q    And Dr. Smith, an expert also hired by the Attorney

1  General, says he cannot see it on 12/27 --

2          MR. GOODFRIEND:  Objection, Judge.

3  BY MR. BLEGEN:

4  Q   -- '02, correct?

5          MR. GOODFRIEND:  Assumes a fact not in evidence.

6          THE COURT:  But it's going to come in, right?

7          MR. GOODFRIEND:  No, Judge.

8          THE COURT:  It's not going to come in.

9          MR. GOODFRIEND:  Dr. Smith is not going to testify.

10         THE COURT:  Okay.  Well, then maybe somebody else is

11  going to put it in.  And if it doesn't come in, I think I can

12  sort out what comes into evidence from what doesn't come into

13  evidence.  The objection is overruled.

14         THE WITNESS:  Restate your question, please.

15  BY MR. BLEGEN:

16  Q   Dr. Smith says that he cannot see the retroclival epidural

17  hematoma on 12/27/02, correct?

18  A   Yes.

19         THE COURT:  Besides which, I will say that it is an

20  appropriate question for an expert under it's either 703 or

21  704 if they're aware of what some other expert has said.

22  BY MR. BLEGEN:

23  Q   You have indicated, Dr. Hedlund, that the retroclival

24  epidural hematoma is a proxy for trauma in that area, correct?

25  A   Yes, sir.

1    Q    Now, you've looked at more images than just the ones that

2    are in your Power Point, correct?

3    A    Yes, I have.

4    Q    Have you looked at the skeletal images?

5    A    Yes, I have.

6    Q    Images of the neck area, correct?

7    A    I have.

8    Q    And you have seen no imaging evidence of injury in that

9    area, correct?

10   A    This is the evidence.

11   Q    All right.  Let's leave this aside.  This is a proxy,

12   right?

13   A    I think it's an indicator of injury.

14   Q    Did you see any indications of swelling in any ligaments

15   in the neck or soft tissue in the neck?

16   A    No.  However, we're outside of the appropriate window for

17   inquiry with the MRI.  We're too late.

18   Q    All right.  Well, there were people who were looking also

19   grossly, right?

20   A    This is very deep tissue.  This would be really invisible

21   to the clinical evaluation.

22   Q    Leaving aside your issue regarding the timing of the

23   imaging, did you see any evidence of injury to the neck, the

24   skull, or any other part of the body aside from inside the

25   brain?

Hedlund - cross

1    A    In this area of the retroclival region you're including?

2    Q    I'm including the retroclival region, but we're leaving

3    out for the moment this hematoma.  Any other evidence of

4    injury?

5    A    No, sir.

6    Q    None, correct?

7    A    That's correct.

8    Q    And you read the medical reports, right?

9    A    Yes, I did.

10   Q    And there's no -- there were no reports at the time of any

11   of that sort of injury, any soft tissue injury, correct?

12   A    But this was not included in the autopsy, this area, and

13   this would be virtually impossible to detect clinically,

14   injury to this area, unless one was highly suspicious, but it

15   was never really observed to be a problem initially.

16   Q    Let's talk about prior to autopsy when the girl arrived at

17   the hospital.  They did an examination, right?

18   A    They did a clinical exam, yes.

19   Q    Okay.  And they found no evidence of bruising, correct?

20   A    I would not have expected that for this kind of injury.

21   Q    All right.  But the answer to my question is they did not

22   find any, right?

23   A    Correct.

24   Q    Okay.  They did not find any bone fractures, correct?

25   A    Correct.

1  Q   Did they find any other injuries aside from what you say
2  is this proxy for injury in that retroclival area?
3  A   I believe there was retinal hemorrhage detected.
4  Q   All right.  Let's leave the eye and the brain out.  Any
5  other physical injuries?
6  A   Not to my knowledge.
7  Q   In claiming that this retroclival epidural hematoma is a
8  proxy for some injury that can't be seen, you're relying on a
9  couple of articles, correct?
10 A   Well, there are several articles in the literature.  I put
11 a couple into my references, including one of the larger
12 pediatric series, and then I have an experience to draw upon
13 clinically.
14 Q   Can I assume you picked what you thought were the best
15 articles for that?
16 A   I think the Tubbs article is a very good article.
17 Q   All right.  Well, let's talk about Tubbs.
18        Actually let's talk about the Kwon article, Traumatic
19 Retroclival Epidural Hematoma In A Child.
20 A   Um-hum.
21 Q   And that's No. 14 in your exhibit book.
22 A   Okay.
23 Q   That is in fact a case report, correct?
24 A   Uh-huh.
25 Q   Regarding --

1      THE COURT:  That's a yes, right?

2      THE WITNESS:  Yes.  Excuse me.  Yes.

3   BY MR. BLEGEN:

4   Q   Regarding a 11-year-old girl who was in a motor vehicle

5   accident.

6   A   Yes.

7   Q   In fact, it wasn't just -- it wasn't two cars colliding

8   only.  She was thrown from the passenger seat and collided

9   with the front windshield, correct?

10  A   Yes.

11      Most of the case reports are from the MVA or motor

12  vehicle accident type of injury.

13  Q   Most of them involve pedestrians, though, right?

14  A   Oftentimes.  Not all, but oftentimes, yes.

15  Q   Not two cars running into each other, but a car running

16  into a pedestrian?

17  A   Yes.

18  Q   Or a bicyclist?

19  A   Sure.

20  Q   And that's in the Tubbs article?

21  A   Yes, it is.

22  Q   First of all, the Kwon article tells us that spontaneous

23  or nontraumatic retroclival are also known in adults, correct?

24  A   I found one reported case in the Japanese literature of a

25  36-year-old male that had multiple sites of subdurals,

Hedlund - cross

1   including retroclival.

2   Q   Okay.  Well, we can get to what you found in a second, but

3   what does the article say about that?  Doesn't it say that?

4   A   Yes, it does.

5   Q   And doesn't it cite to several other reports?  In fact,

6   you're looking at it now.

7   A   I'm looking at my reference sheet.  I don't have the

8   article in front of me.

9   Q   You don't have the notebook up there with you anymore?

10  A   I have the notebook.  Where would it be located?

11  Q   Exhibit 14.

12  A   Exhibit 14?

13  Q   Excuse me.

14  A   Okay.  All right.  I have it.

15  Q   Look on Page 2 under Discussion.

16  A   All right.

17  Q   Do you see where I'm taking about, spontaneous or

18  nontraumatic retroclival also known in adults?

19  A   I've never seen it in children.

20  Q   All right.  We can talk about that in a second.  We agree

21  that it happens in adults, right?

22  A   Yes.

23  Q   And the case -- the report that you're relying on has five

24  end notes to back up that claim, correct?

25  A   Yes.

Hedlund - cross

1   Q  Now, you say you've never known it to occur in children,

2  but that may be because nobody has found it yet, right?

3   A  Well, that's possible.

4   Q  Okay.  There's nothing that prevents it from occurring

5  spontaneously in children that you know of, is there?

6   A  No.

7   Q  The article also indicates that the mechanism of

8  retroclival epidural hematoma is controversial, correct?

9   A  Well, I think there are some people that feel that

10  hyperextension is a very important part of the injury that

11  might strip away the dura.

12   Q  Does the article say that or not?

13   A  No.  It just says there's controversy.

14   Q  Okay.  It does say that, correct?

15   A  Um-hum.

16   Q  And so what that means is that not everybody agrees on how

17  these epidural hematomas get there in the first place, right?

18   A  That's correct.

19   Q  You've said that it's a proxy for injury that cannot be

20  seen or was too late to see, right?

21   A  Yes.

22        Do you understand why I said that?

23   Q  I do.  Because of the dating of the MRI, right?

24   A  Well, there's a multitude of findings here.  There's not

25  just one abnormality.  We look at the whole patient, all of

1    the imaging, all of the abnormalities, and come to a

2    conclusion or come to an opinion.  So to look at it and

3    discuss it in isolation like we're looking at it solely

4    through a microscope as a single sole finding does not do

5    justice to all of the abnormalities that are seen here in this

6    case.

7    Q    But you didn't find any injury to that area around the

8    epiclival (sic) hematoma, correct?

9    A    Sir, with all due respect --

10              THE COURT:  Sir, with all due respect, and, you know,

11   my fuse on witnesses who don't respond to questions on cross

12   examination is going to get progressively shorter as this

13   hearing goes on.  I let it go until a little after this

14   yesterday.  This is where I'm cutting it off today.

15              I'm saying this to everybody.  I'm a finder of fact

16   here.  I don't know if any of you have ever had the privilege

17   of being a finder of fact or being on a jury or anything like

18   that.  When a witness spars with the lawyer, it detracts from

19   the witness's credibility, and at some point the finder of

20   fact shuts down and says, guy's not going to answer a

21   question, I'm not going to believe a word he says.  So take

22   that to heart.

23              The answer is stricken as nonresponsive.  Keep doing

24   it and I'll just strike the entirety of your testimony.

25              This is going to be true for every other witness that

Hedlund - cross

1    appears here, and so you two would be well advised, you and

2    you would be well advised to tell your witnesses that cross

3    examination is not a sparring match.  It's not.  It's not a

4    sparring match.  If it becomes a sparring match, you're going

5    to get about ten minutes into it.  I'm just going to strike

6    testimony.  That's it from here on in.  We don't have enough

7    time for this kind of nonsense.

8    BY MR. BLEGEN:

9    Q    You found no injury in the area surrounding the

10   retroclival epidural hematoma, correct, immediately sounding

11   it?

12   A    No, sir.

13   Q    That's why you called it a proxy, right?

14   A    Yes, sir.

15   Q    All right.  And but in fact, in the case report in -- is

16   it mister or Miss Kwon?  Do you know?

17   A    I'm not sure.

18   Q    In Kwon's article the person had injury in that area that

19   was visible, correct?

20   A    Yes.

21   Q    The person had straightening of the cervical spine

22   lordosis, correct?

23   A    Yes.  That's straightening of the spine, yes.

24   Q    Injury, right?

25   A    No.  Straightening of the spine is just a finding.  That's

1   an alignment.  It doesn't necessarily imply an injury.  It can

2   be seen with injury.

3   Q   Fair enough.

4       She also had a large prevertebral swelling in front

5   of the clivus and upper cervical spine, correct?

6   A   That's correct.

7   Q   And that's an injury that you could see, right?

8   A   They were able to see that.

9   Q   Let's talk about Mr. Tubbs's article for a second.  And I

10  believe that's article -- excuse me, Exhibit 13 in your

11  binder.

12      Do you see the article?

13  A   Yes, I do.

14  Q   The fact of the matter is that your thinking about this

15  retroclival epidural hematoma is based on very limited

16  knowledge, is it not?

17      Strike that.  Let me ask it a different way.

18      It's based on a very limited amount of reported

19  cases, correct?

20  A   We're probably approaching about 70 cases that have been

21  reported about this type of problem, and over all that's

22  pretty small I would say.

23  Q   At the time of Tubbs they were only talking about 19 cases

24  reported in the literature, correct?

25  A   Yes, sir.

Hedlund - cross

1  Q   And they looked at eight children who were diagnosed with

2  this retroclival epidural hematoma, right?

3  A   Yes.

4  Q   And the children were between the ages of four and

5  17 years, right?

6  A   That's right.

7  Q   So we're not talking about two-month-olds, are we?

8  A   No, we're not.

9  Q   And two of the patients were physically struck by cars,

10  correct?

11  A   Yes.  That's correct.

12  Q   Two were not wearing seatbelts, correct?

13  A   Yes.

14  Q   And they had physical injuries that were visible to go

15  along with the retroclival epidural hematoma, correct?

16  A   Correct.

17  Q   This article also concludes that the pathophysiology of

18  the formation of an REDH is not fully understood, correct?

19  A   Correct.

20  Q   And the article concludes that injury and dislocation of

21  the ligamentous tissue connecting the odontoid process to the

22  cranial base might be involved in this pathophysiology,

23  correct?

24  A   Correct.

25  Q   You didn't see any of that, correct?

1  A   I see blood in front of the membrane that connects to the

2  odontoid.

3  Q   You didn't see dislocation of the ligamentous tissue, did

4  you?

5  A   The fact that the blood is seen between the clivus and the

6  membrane is dislocation of the membrane because the membrane

7  is normally very tightly adhered to the bone, so the fact that

8  we're seeing interposed blood means that that membrane is

9  pulled away.  So I would say that the membrane is displaced or

10 dislocated by virtue of what I showed you on the pictures.

11 Q   By virtue of that white line that you had shown previously

12 today?

13 A   Yes, sir.

14 Q   You're saying that that displaced the -- or dislocated the

15 ligamentous tissue?

16 A   Yes.

17 Q   Did it bruise or contuse the tissue?

18 A   Well, I suspect the tissue was strained, injured, not

19 completely disrupted.

20 Q   But no evidence of that on imaging, correct?

21 A   Not for the limited images we had to look at, no.

22 Q   In the Tubbs article the individuals also -- excuse me,

23 the Tubbs article concludes that the individuals also had

24 associated cranial injuries, including depressed and linear

25 skull fractures, correct?

Hedlund - cross

1    A    They were accidental trauma cases.  That's correct.

2    Q    Obviously we don't have any of those type of injuries in

3    our case, correct?

4    A    We don't have the skull or scalp injuries, no, we don't.

5    Q    But physical injuries, those kind of physical injuries and

6    broken bones and bruising are important for a diagnosis of

7    abusive head trauma, right?

8    A    The absence of those findings can be just as important as

9    the presence of those findings.

10   Q    Well, you've written your own articles on the area of

11   neuroimaging of abusive head trauma, haven't you?

12   A    Yes.

13   Q    Let me show you what I've marked as Exhibit Petitioner's

14   Hedlund 1.

15        Judge, I have two copies for the court.

16        THE COURT:  Thanks.

17   BY MR. BLEGEN:

18   Q    This is an article authored at least in part by you,

19   correct?

20   A    That is correct.

21   Q    You and somebody named Lori Frasier?

22   A    Uh-huh.

23   Q    And in the introduction you talk about abusive head trauma

24   resulting in the greatest risk of mortality and morbidity in

25   infants due to physical child abuse, correct?

Hedlund - cross

1  A   Correct.

2  Q   And you say right immediately after that that, "This type

3  of abuse is reflected in injury to the scalp, bony cranium,

4  and intracranial contents, most specifically, the brain and

5  related structures," right?

6  A   That's correct.

7  Q   So we do not have any injuries to the scalp or bony

8  cranium in this case, correct?

9  A   That's correct.

10 Q   You also indicate -- turn to page it's 285 in the upper

11 right-hand corner.

12 A   Which page?

13 Q   285.

14     You also have indicated in the report that -- excuse

15 me, in your -- should I call this an article?

16 A   Yes.

17 Q   In this article that, "Another important contribution of

18 MRI in the setting of suspected abusive head trauma is

19 evaluation of the craniovertebral junction with particular

20 attention to strain or disruption of the stabilizing

21 ligaments, detection of atlanto-axial separation, injury to

22 the interspinous ligaments, vertebral body compression and

23 epidural and intradural hemorrhages," correct?

24 A   Yes, sir.

25 Q   Did I read all those correctly?

1    I think you might be saying that we have disruption

2  of the stabilizing ligaments here because of where you say the

3  white line is, right?

4  A    No, I didn't say that.

5  Q    All right.  So do we have that here?

6  A    I think we have displacement of the -- what's called the

7  tectorial membrane, which is the membrane that reflects itself

8  onto the clivus by blood.  I don't believe it's been

9  completely disrupted.  But, again, there's just limited

10  imaging.  It wasn't like this was prospectively identified.

11  And because of that, the sort of detail with which we -- the

12  detail with which it was looked at was relatively limited

13  because it wasn't seen prospectively.

14  Q    Is what you're telling us is that the injuries that you

15  say the retroclival epidural hematoma are a proxy for would

16  have already healed by the time of the MRI?

17  A    No, I'm not saying that.  I think, like many injuries in

18  many locations, they're on a continuum from relatively mild to

19  mild to moderate to severe.  And the very severe injuries in

20  this area can be disruptive of a lot of these important

21  ligaments.  But you can have milder forms of injury.  And I'm

22  saying that I believe the injury occurred roughly ten days

23  before the MRI happened, so that some of the blood could have

24  been starting to clear in that interval from the 27th of

25  December to the 7th of January.

1   Q   I'm not sure what blood you're talking about clearing.

2   Are you talking about the epidural hematoma blood or different

3   blood?

4   A   I showed you a picture of the MRI from the 7th of January,

5   and then I showed you one 23 days later, and the blood has

6   gone away completely by that time, and so what I'm saying is I

7   believe that the injury occurred around the 27th and that by

8   the time we got to the MRI, which was almost ten days later,

9   that there was likely some change in the, if you want to call

10  it the thickness or the volume of the blood, and then by the

11  time we get 23 days beyond the 7th the blood is gone.

12  Q   And are you saying that the other injuries that this is a

13  proxy for have also gone away?

14  A   No, I'm not saying that.

15  Q   Well, a proxy is a stand-in for something else, right?

16  A   That's correct.

17  Q   So you're saying the retroclival epidural hematoma is a

18  proxy for another injury that you can't see on imaging,

19  correct?

20  A   Yes, sir.

21  Q   And are you telling us that the reason we can't see it on

22  imaging is because it went away by the time we did the right

23  imaging to look for it?

24  A   We never really looked for it with any care and detail.

25  It was never really looked for.

Hedlund - cross

1      I'm happy to explain what I mean by that if it helps
2  you.
3      MR. BLEGEN:  Put up slide 14.  Maybe that will help.
4  BY MR. BLEGEN:
5  Q  Is this the slide you were talking about where you say
6  that it went away by 1/30/03?
7  A  Yes, sir.
8  Q  This is what you're talking about on 1/7/03, correct?
9  A  Right.  There is a kind of band of whiteness that extends
10  down actually into the upper cervical spinal canal.
11  Q  And that you say is blood, right?
12  A  Yes, sir.
13  Q  What's this over here?
14  A  That is -- that may be fat within marrow of the occipital
15  bone.  That is not a fat --
16      May I approach the screen, sir?  Would that be
17  helpful?
18      THE COURT:  Okay.
19      Just so the record is clear, it's the slide that says
20  Retroclival Hematoma IZ.  And the area Mr. Blegen was pointing
21  to is to the right of where the green arrow is on the
22  left-hand slide.
23      THE WITNESS:  The particular technique is called a
24  T-1 weighted technique.  And this is the back of the skull,
25  the back of the neck.  And one of the things you can observe

1    is that there's a lot of brightness in this region.  That's

2    brightness from fat.  This is not what we would call a fat

3    saturated technique.  So fat will be bright.  This is actually

4    subdural hemorrhage that has settled down around the back of

5    the brain.  That's part of the acute or subacute hemorrhage.

6    That's what this brightness is from.  We also have brightness

7    within fat within the marrow, and so that may be fat within

8    the marrow.

9            If we were prospectively identifying this abnormality

10   today, we would do thinner sections.  We would saturate all

11   the fat away so we could see blood to its optimal degree, and

12   we would look more carefully with other techniques at the

13   integrity of the membrane.  That wasn't done.  I'm not casting

14   aspersions.  It just wasn't done.  The finding wasn't really

15   keyed upon, and so a more detailed evaluation of this anatomy

16   was never undertaken.

17   BY MR. BLEGEN:

18   Q   So are you telling us that there isn't a way to know

19   whether the proxy injuries that you're talking about were

20   actually there?

21   A   Well, I think that's true.  It was never really

22   investigated to an extent we might today.

23   Q   Can lumbar punctures cause a retroclival hematoma?

24   A   I think it to be unlikely without other affiliated

25   findings of intracranial hypotension, which this child does

1   not exhibit any of those findings.

2   Q   But she did get a lumbar puncture before her 12/27/02 CT?

3   A   Um-hum.

4   Q   I'm sorry.  Yes or no?

5   A   That's my understanding.

6   Q   And so it can cause it, but you think it's unlikely,

7   correct?

8   A   I think it's very unlikely.  I've never seen a case in my

9   experience where we thought that had occurred.

10  Q   All right.  But --

11  A   I think it's unlikely.

12  Q   You've talked about your experience, but we're talking

13  about an area where there aren't thousands of these epidural

14  hematomas that have been seen by anyone, right?

15          MR. GOODFRIEND:  Objection, Judge.  I think it's

16  assuming facts not in evidence, and it's argumentative.

17          THE COURT:  I don't think it assumes anything at all

18  unless you believe that this retroclival epidural hematoma

19  only started happening in the world in the last few years.  So

20  the objection is overruled.

21  BY THE WITNESS:

22  A   If I could just say, sir, we image lots of children who

23  have had lumbar punctures that end up having brain MRI's

24  following lumbar punctures worked up for sepsis, worked up for

25  meningitis, many other causes.  I have not seen a retroclival

Hedlund - cross

| | |
|---|---|
| 1 | epidural hematoma following lumbar puncture. |
| 2 | Q   Didn't you tell us earlier today that you're concerned |
| 3 | that you've missed lots of these? |
| 4 | A   I said I may have missed them.  I did say that. |
| 5 | Q   And I thought you said lots, didn't you? |
| 6 | A   I don't remember saying lots. |
| 7 | Q   Fair enough.  You may have missed them, right? |
| 8 | A   Um-hum. |
| 9 | Q   And in the case of a lumbar puncture you might have missed |
| 10 | them, right? |
| 11 | A   I think I have not missed them on MRI.  When I said that, |
| 12 | I was talking about the CT examination because of the bone |
| 13 | around the base of the brain.  I think we do a much better job |
| 14 | picking the blood up on MRI. |
| 15 | Q   But not -- |
| 16 | A   But to be honest with you, I may have missed some of |
| 17 | these, particularly on CT, thinking back in my experience, |
| 18 | yes. |
| 19 | THE COURT:  Let's take a short break. |
| 20 | (Recess taken.) |
| 21 | (The following proceedings were had in open court:) |
| 22 | THE COURT:  Mr. Blegen, you can proceed. |
| 23 | MR. BLEGEN:  Put up slide 7. |
| 24 | BY MR. BLEGEN: |
| 25 | Q   Dr. Hedlund, the dark area up here is the chronic subdural |

Hedlund - cross

1    hematoma that you testified about, correct?

2    A    Yes, sir.

3    Q    And is that -- I know it's your testimony that that's old

4    blood that has turned into fluid by 12/27/02, correct?

5    A    That's old blood.

6    Q    And but it doesn't come out as white because it's old,

7    right?

8    A    Yes, sir.

9    Q    And what is it that's in the blood that is now not showing

10   up?

11   A    Well, it's -- you've got serum that's there, and then

12   blood cells are breaking down and hemoglobin, and the

13   hemosiderin is being resorbed, so the blood is just changing

14   its character.

15   Q    So regardless of the source of the collection of blood or

16   fluid, that is similar to a -- what is called a -- sometimes a

17   benign extra-axial fluid collection, correct?

18   A    No, sir.

19   Q    What's the difference?

20   A    A benign enlargement of the subarachnoid space is the

21   current terms that's accepted, previously called many things,

22   including what you just called it.

23   Q    And so is it similar -- is it similar to a benign, what

24   did you call it, subarachnoid fluid collection?

25   A    Benign enlargement of the subarachnoid fluid space is a

Hedlund - cross

1   different space.  It's a completely different thing than a

2   chronic subdural hemorrhage.

3   Q   So it's -- the benign one is in a different area, correct?

4   A   It's in a different location.

5   Q   Does this cause any of the same problems that the

6   subarachnoid fluid collection causes such as possible

7   stretching of veins?

8   A   Sir, when you say "this," what do you mean?

9   Q   The chronic subdural hemorrhage.

10  A   Well, in benign enlargement of the subarachnoid spaces is

11  benign, so it's not a pathological problem.  Chronic subdural

12  hemorrhages are a pathological issue.

13  Q   But the ones that are the benign subarachnoid ones can

14  occasionally cause problems, right, even though they're

15  generally benign?

16  A   They're called benign because they're benign.

17  Q   Well, I'm sorry.  Then maybe I'm confused.  Can you look

18  at your article Exhibit Petitioner's Hedlund 1 on Page 287.

19  A   Um-hum.

20  Q   And look at the bottom left column.

21  A   Okay.

22  Q   Where you say, "Patients with benign enlargement of the

23  subarachnoid spaces occasionally are found to have associated

24  subdural hemorrhage."

25  A   Yes.

Hedlund - cross

1  Q   So that's a problem even though it's benign, the

2  collection, correct?

3  A   The subarachnoid spaces, even if the fluid is somewhat

4  prominent, that's benign.  The occurrence of a subdural is

5  something that requires investigation.

6  Q   All right.  And as a result of a subarachnoid collection

7  you can get a subdural hematoma based on stretching of veins,

8  correct?

9  A   Well, sir, I pointed out in one of the earlier slides that

10  I believe that Isabella did not have enlargement of the

11  subarachnoid spaces.  I've never -- we have not shown that.

12  In fact, I had a slide to show you that her subarachnoid

13  spaces were, if anything, slightly compressed.

14  Q   I know.  We're just talking in general now.

15  A   Okay.  Restate your question, please.

16  Q   In general, someone with an enlargement of the

17  subarachnoid space can occasionally get a subdural hemorrhage,

18  correct?

19  A   It's very unusual.  It's unusual.

20  Q   You said occasionally in your own article, didn't you?

21  A   Unusual, occasionally.  It's so -- it's so occasional.

22  Q   Never mind.  I don't want to debate it.

23  A   Okay.

24  Q   Does a collection of old blood in the subdural space cause

25  the same sort of problems in the sense of stretching of other

Hedlund - cross

1   veins it can cause them to leak or break?

2   A    Chronic subdural collections can -- can have bleeding.

3   You can bleed into a chronic subdural hemorrhage.

4   Q    And that chronic -- that bleeding can be the result of

5   normal handling, right?

6   A    It is speculated as so, and -- well, I hope I could talk a

7   little bit more about what I would expect to see on the

8   imaging if that was the case, which I believe is different

9   than what I'm seeing here.

10  Q    I'm guessing you'll get your chance, but the -- a

11  subdural -- a chronic subdural hemorrhage can cause the same

12  problems as a enlargement of the subarachnoid space with

13  respect to additional hemorrhaging, correct?

14  A    Yes.

15  Q    And the mechanism is actually the same, meaning both can

16  cause veins in the brain to stretch and either leak or tear,

17  correct?

18  A    The mechanism would be different, sir, the way I

19  understand it.  The bleeding that might occur into a chronic

20  subdural would come about by bleeding of tiny veins that

21  relate to the neomembranes, the neovascularization of the

22  membranes that relate to the aging subdural.  And for the

23  occasion where a subdural might occur with benign expanded

24  subarachnoid fluid spaces, that bleeding could come about from

25  let's say tearing of a bridging vein or shearing force of the

Hedlund - cross

1 inner dura.  So I think the mechanism could be different

2 actually.

3 Q    But the collection in the subarachnoid space can cause

4 veins to stretch and then be broken with minimal or normal --

5 minimal force or normal handling, correct?

6 A    Yes.

7 Q    And you call that a clinical conundrum in your own

8 article, right?

9 A    It is.

10 Q    And are you telling us now that the same thing can't

11 happen from collection of blood or fluid in the subdural

12 space?

13        If you are telling us that, you can just say that's

14 exactly what I'm telling you, you're wrong.

15 A    I don't agree with what you've said.

16 Q    Okay.  But both expansion of the subarachnoid space and

17 collection of fluid or blood in the subdural space can be

18 discovered or there are hints to it outside of radiology,

19 right?

20 A    There --

21 Q    I can ask that again if you want.  It was a bad question.

22 A    Sure.  That would probably help me.  Thank you.

23 Q    One sign of a chronic subdural hemorrhage is a rapid

24 increase in head size, correct?

25 A    It can be, yes, sir.

1    Q    Slide 6 is your slide that talked about thrombosed

2    bridging veins, and you cite to an article by Miss Adamsbaum

3    called Abusive Head Trauma, Don't Overlook Bridging Vein

4    Thrombosis, correct?

5    A    Yes, sir.

6    Q    And maybe I just didn't understand your language, but in

7    your report that you submitted did you indicate that you had

8    found bridging vein thrombosis?

9    A    Well, I guess going to point three --

10   Q    On the imaging summary or the conclusions?

11   A    I think two and three.  And I apologize for any lack of

12   clarity in that.  "The multiple foci or focal areas of

13   cerebral convexity hemorrhages that are strongly suggestive of

14   torn bridging reins resulting from trauma," that's what I'm

15   trying to convey.  And my concern is that there's actual

16   injury, tearing, and then the natural history is tearing,

17   bleeding, clotting.  So my concern is that under point two of

18   my conclusions that the findings that I observed on the CAT

19   scan and on the MRI are indicative of torn thrombosed bridging

20   veins.

21   Q    But you'll agree with me that thrombosed bridging veins is

22   not in there anywhere?

23   A    That's correct.

24   Q    The Adamsbaum article --

25        First of all, let me just ask you a couple of

Hedlund - cross

1    questions about the picture that's up there.  That's not

2    actually from the article, is it?

3    A    Yes.  That actually is from one of the patients from the

4    article, sent to me by Dr. Adamsbaum.

5    Q    But the picture itself is not in the article, right?

6    A    That's correct.

7    Q    There's a different picture in the article?

8    A    Um-hum.  She took multiple pictures and then sent me one

9    from the first patient in the article.  It's from --

10   Q    It's from a patient who was studied as part of the

11   article, but it's not the photo that's --

12   A    Oh, yes, that's correct.  Um-hum.  That's correct.

13   Q    All right.  So I assume you're saying that these big

14   things here that the green arrow is pointing at, that's one of

15   the clotted bridging veins?

16   A    Yes, sir.

17   Q    And that resulted from tearing and bleeding into the

18   subdural space?

19   A    Yes.  Dr. Adamsbaum described to me that it had been torn

20   as well as other bridging veins and had clotted and had bled.

21   And imaging, which we're not looking at, I don't have that to

22   show you, but you have the article, the imaging was quite

23   compelling, I believe, to show features very similar to what

24   we see in this case.

25   Q    Do we see any subdural blood here?

Hedlund - cross

1    A    No.  It's been cleared away.  It's been taken away.

2    Q    Do we know how much subdural blood there was?

3    A    I don't know.

4    Q    Do we know how long it took for those bridging veins to

5    become thrombosed?

6    A    She says in the article within a few hours.  That's as

7    specific as it states.

8    Q    Miss Adamsbaum is talking about abusive head trauma and

9    its connection or possible connection to bridging vein

10   thrombosis, correct?

11   A    Torn thrombosed veins, yes, sir.  The veins are torn, and

12   then they bleed, and then they clot or thrombose.

13   Q    But she also points to more than just bridging vein

14   thrombosis as signs of abusive head trauma, right?

15   A    Subdural hemorrhage is mentioned, yes, sir, subarachnoid

16   hemorrhage.

17   Q    Skeletal injury?

18   A    You may.

19   Q    Excuse me?

20   A    You may see that; you may not.

21   Q    But it's mentioned in your report?

22   A    Uh-huh.

23   Q    She also says that while bruises have significant

24   diagnostic value, they may be missed when located in hidden

25   areas like behind ears and in the axilla, right?

1    A    Yes, sir.

2    Q    So at least according to Miss Adamsbaum, whose article

3    you're relying on, bruises do have significant diagnostic

4    value in abusive head trauma, right?

5    A    If they're present.  Yes, sir.

6    Q    Well --

7    A    Yes, sir.

8    Q    I want to ask you about that.  So if they're present, they

9    have significant diagnostic value.  Are you saying that if

10   they're not present, that has no diagnostic value?

11   A    The absence of a finding doesn't mean that there's not

12   been an injury.  The absence of a bruise, for example, in the

13   axilla doesn't mean there's not been an injury.

14   Q    The existence of a bruise doesn't mean there's been an

15   inflicted injury, right?

16   A    Correct.

17   Q    And it doesn't mean that that bruise is related to

18   injuries in the brain, right?

19   A    Correct.

20   Q    On the arm?

21        So are you telling us that because there were no

22   bruise -- or strike that.

23        Are you telling us that the fact that there were no

24   bruises is meaningless?

25   A    It may be.  It may not be of help to us.

Hedlund - cross

1  Q   But if there were bruises, that would assist in the

2  diagnosis of abusive head trauma, correct?

3  A   It's more information, yes, sir.

4  Q   I want to talk to you a little bit about thrombosis,

5  because there's a disagreement between you and Dr. Mack and

6  Dr. Barnes whether there were thrombosed -- at least one or

7  more thrombosed cortical veins.

8  A   Okay.

9       MR. BLEGEN:  And, Rob, I think we're going to move to

10 the back Power Point, Cortical Thrombosis, slide 12.

11 BY MR. BLEGEN:

12 Q   Do you understand, Dr. Hedlund, that the -- what the red

13 and two blue arrows are pointing at, particularly this part

14 here, are what Drs. Mack and Dr. Barnes have called a

15 thrombosed cortical vein?

16 A   I do.

17      THE WITNESS:  Could I approach the screen, sir?

18      THE COURT:  Sure.

19      THE WITNESS:  Yes, I see those arrows.

20 BY MR. BLEGEN:

21 Q   And do you understand that that's what they're saying is

22 at least one thrombosed cortical vein?

23 A   I understand that's their contention, yes, sir.

24 Q   And your contention is that that is not a thrombosed

25 cortical vein, correct?

1   A    I'd like to make a couple of comments about it if I may.

2        THE COURT:  You can answer the question.

3        THE WITNESS:  Just redirect the question, please.

4   BY MR. BLEGEN:

5   Q    Do you understand that that is what Drs. Mack and

6   Dr. Barnes are calling a thrombosed cortical vein, correct?

7   A    I think they pointed out that it is completely normal

8   here.

9   Q    I'm sorry.  This is the thrombosed part of the vein --

10  A    This is.

11  Q    -- that's thrombosed, correct?

12  A    This is the area in question, but I have some concern

13  about the interpretation of that for a couple of reasons.

14  Q    Okay.  Is this area not connected to that area?

15  A    It is.  Yes, it is.

16  Q    And are these not tributaries?

17  A    Yes, they are.

18  Q    Indicating that at the very least the bright part is a

19  vein?

20  A    Yes.  And it's enhancing.  It's enhancing.

21  Q    Meaning that it is not thrombosed?

22  A    That's correct.  Yes, sir.

23  Q    This part here is thrombosed, right?

24  A    Well, I'm not sure.

25  Q    It could be?

Hedlund - cross

1    A    Could be.

2    Q    So they might be right?

3    A    They might be right.

4    Q    So why in your report, then, did you say you disagreed?

5    Why didn't you say they might be right?

6            MR. GOODFRIEND:  Judge, should the witness --

7            THE COURT:  Yeah, because I'm having a hard time

8    hearing him over there, so come back up here.

9    BY THE WITNESS:

10   A    There's a couple of things that are -- that lead me to say

11   that.  If you look at the surface of the skull, do you see how

12   it looks very zigzag?

13   BY MR. BLEGEN:

14   Q    My question was why didn't you say they might be right

15   instead of I do not agree?

16   A    Because I think there's some sort of things to consider

17   that could yield that appearance on the CAT scan to make it

18   look like there's clot there.

19   Q    What you said after I do not agree is, "The IV contrast

20   brain CT examinations of 28 and 29 December 2002 showed a very

21   good advantage normal enhancing cerebral dural venous

22   sinuses," correct?

23   A    Right.  That's the deep -- the deep structures.

24   Q    I know the judge asked you some questions about this.  I

25   just want to ask you a couple.

Hedlund - cross

1   A   Certainly.

2   Q   You can have cortical venous thrombosis without venous

3   sinus thrombosis, correct?

4   A   That is correct.

5   Q   And nowhere in Dr. Mack's or Barnes' papers did they ever

6   say that there was venous sinus thrombosis, correct?

7   A   That's not completely correct.  Dr. Mack talks about

8   incomplete opacification of the venous sinus.  Incomplete

9   opacification would imply that it's not normal.

10  Q   But she doesn't come out and say it's a thrombosed sinus,

11  correct?

12  A   That is correct.

13  Q   And in fact elsewhere in her report doesn't she say the

14  sinuses are not thrombosed?

15  A   Yes.

16  Q   All right.  So why did you think she was concluding they

17  were when she said specifically they're not?

18  A   I'm not sure why there was some confusion in the language.

19         MR. BLEGEN:  Can we go back to the Hedlund Power

20  Points.

21  BY MR. BLEGEN:

22  Q   You've attempted to show us, slide 11, a normal dural

23  venous sinus versus somebody with a thrombosed venous sinus,

24  correct?

25  A   Yes, sir.

Hedlund - cross

1  Q  And in fact what you pointed to in the thrombosis was the

2  same darker area, the same kind of darker area that Drs. Mack

3  and Dr. Barnes pointed to in their slides, correct?

4  A  Well, no, not exactly.

5  Q  All right.  What's the difference?

6  A  Well, one difference is we're looking at a much larger

7  tube or drainage structure for the veins, and we're looking at

8  that structure in the plane of the CT image.  The earlier

9  picture we looked at where the grayness that you pointed out

10  with the red arrow believed to be a thrombosed vein, that is

11  running more obliquely.  And the point I was just going to

12  make about the CAT scan was the zigzag nature of the skull is

13  an indication that there was motion occurring during the scan.

14  So you could see how it looked like a zipper effect on the

15  edge of the image.  So it's likely in that phase when that

16  study was done the child was moving, which it just makes it a

17  little confounding in terms of making the interpretation.

18       I could see how they could say that, but what I'm

19  saying is there's a few things that can make you wonder if it

20  really is thrombosed, the obliquity or the way the vein is

21  running and then also the fact that there was some motion

22  artifact.

23  Q  If Drs. Mack and Barnes are correct, that's a very

24  significant finding, cortical venous or cerebral venous

25  thrombosis, with regard to the diagnosis of abusive head

1   trauma, correct?

2   A    Well, I think -- I believe the -- the venous sinuses I

3   believe are normal here.  And there may be -- maybe there is a

4   vein thrombosis.  I believe the bridging veins are the ones

5   that are the injured.  And as I tried to show with my

6   demonstration of the fingers and the hand and the arm, that

7   there's a connection of these structures.

8   Q    If there was a cortical venous thrombosis, that's a very

9   significant finding in deciding whether this child suffered

10  abusive head trauma, correct?

11  A    It can be, yes.

12  Q    Because cerebral venous thrombosis, of which cortical

13  venous thrombosis is a type, can result in seizures, correct?

14  A    Correct.

15  Q    And seizures can cause you to stop breathing, correct?

16  A    Yes, they can.

17  Q    Seizures can --

18           And eventually your heart will stop beating when

19  you're not breathing, correct?

20  A    Yes.

21  Q    Cortical venous thrombosis is hard to find, isn't it?

22  A    Can be difficult.

23  Q    Easy to miss, correct?

24  A    It can be.  Can be easy to miss.

25  Q    I don't know if this is a semantic distinction, but if

Hedlund - cross

1   something can be easy to miss, it's easy to miss, right?

2   A   Yes.

3         Could I make a comment about the -- perhaps the

4   significance or lack of significance of this being a

5   thrombosed vein, or should I wait till later?

6         THE COURT:  If you haven't figured it out by now,

7   doctor, you are never going to figure it out.

8         THE WITNESS:  Okay.

9         That's correct, yes.

10  BY MR. BLEGEN:

11  Q   In addition to seizures, cortical venous thrombosis can

12  present with drowsiness, correct?

13  A   Yes.

14  Q   Respiratory failure, correct?

15  A   Possibly, yes.

16  Q   And a common underlying condition for cortical or cerebral

17  venous thrombosis are infectious diseases, right?

18  A   That's one of the consideration, yes, sir.

19  Q   Including mastoiditis, right?

20  A   Yes, sir.

21  Q   And that's an ear infection, correct?

22  A   Yes, sir.

23  Q   Which we know this girl had, according to her parents,

24  right before she went in the hospital, right?

25  A   Yes, sir.

Hedlund - cross

1  Q  You said towards the end of your direct testimony that the
2  chronic collection, the chronic subdural hematoma did not
3  cause the child to collapse, correct?
4  A  Yes, sir.
5  Q  The acute or acute/subacute subdural hematomas did not
6  cause her to collapse either, did they?
7  A  I think they, in conjunction with what we know as a brain
8  injury, there was a constellation of many things that I think
9  probably lead to that.
10  Q  Here's what I don't understand.  You said that the chronic
11  subdural did not cause her to collapse, correct?
12  A  Um-hum.  Correct.
13  Q  And could a chronic subdural collection cause someone to
14  collapse?
15  A  I think hers were small.  I don't think they caused her to
16  collapse.
17  Q  All right.  Well, they were, according to your own
18  testimony, about the same size as the subacute or
19  acute/subacute ones, correct?
20  A  Correct.
21  Q  So by themselves they could not have caused her to
22  collapse either, could they?
23  A  Well, I think they were part of a very global injury that
24  included injury to the brain tissue in addition to the --
25  Q  Did you hear when I said by themselves?

Hedlund - cross

1   A   By themselves, probably not.

2   Q   All right.  And when you were talking about the chronic

3   subdurals not causing her to collapse, you were talking about

4   them by themselves, right?

5   A   Yes, sir.

6   Q   If they had been accompanied by a variety or another

7   cascade of symptoms, they could have been part of her collapse

8   too, right?

9   A   They could have been part of the picture, yes, sir.

10   Q   So the chronics being about the same size as the

11   acute/subacute bleeds is an important fact in this case,

12   correct?

13   A   Oh, I think it is important, yes, sir.

14   Q   And that's because you believe the child suffered some

15   trauma at a previous point, correct?

16   A   Yes, sir.

17   Q   And are you calling that previous point abusive head

18   trauma?

19   A   It's certainly in my differential.  I have no other

20   explanation for it now.

21   Q   What kind of abusive head trauma are you talking about?

22   A   Shaking.

23   Q   Shaking alone?

24   A   Yes, sir.

25   Q   No impact?

Hedlund - cross

1   A   We have no indication of impact here.

2   Q   All right.

3   A   By imaging I have no indication of that.

4   Q   And that's what leads you to conclude there was no impact,

5   correct?

6   A   I see no imaging evidence of that.  I'm not aware of any

7   clinical evidence of that.

8   Q   All right.  And so no soft impact either, soft surface

9   impact?

10  A   I don't know if that happened.

11  Q   The tissue injury to the brain that you were talking about

12  at the end of your direct examination is the result of a lack

13  of oxygen and blood to parts of the brain, correct?

14  A   I believe so, yes.

15  Q   You saw no contusions or lacerations on the brain in any

16  of the images, correct?

17  A   That's correct.

18  Q   And neither did Dr. Mack, correct?

19  A   That's my understanding, yes.

20  Q   Dr. Smith, correct?

21  A   Correct.

22  Q   Dr. Barnes, correct?

23  A   Correct.

24  Q   And the radiologists at the actual hospitals that Isabella

25  was taken to didn't see any contusions or lacerations,

Hedlund - cross

1   correct?

2   A    Yes.

3   Q    Did you notice that there was some -- I don't mean "some"

4   condescendingly -- there was a neurosurgeon who says that he

5   saw contusions and lacerations as part of the imaging?  Did

6   you see that in the records?

7   A    I didn't catch that, sir.  I'm not aware of that.

8   Q    But if he did say that, he was wrong, correct?

9   A    I don't know what he saw.  I didn't see it.

10  Q    Assuming he saw the same images as you did, the two of you

11  would disagree about that, correct?

12          MR. GOODFRIEND:  Objection, Judge.  Speculative.

13          THE COURT:  Overruled.

14          You can answer.

15  BY THE WITNESS:

16  A    Yes.  I think it's true.  Yes.

17  BY MR. BLEGEN:

18  Q    The acute/subacute subdural hemorrhages in this case are

19  not large, are they?

20  A    Well, I called them, I think, small to medium in size.

21  Q    So they're not large, correct?

22  A    Yes, sir.

23  Q    And you called -- actually on your 12/27/02 review you

24  called the chronic subdurals, which you said are about the

25  same size, small chronic subdural hemorrhages, correct?

1   A   Yes, sir.

2   Q   So they're -- if they're on the scale between small and

3   medium, they're on the small end, right?

4   A   Yes.

5   Q   Have you seen cases of abusive head trauma, accidental or

6   other sorts of trauma to the head, where there have been

7   ruptured bridging veins resulting in much larger amounts of

8   blood?

9   A   I think -- yes, I have, but I think it's variable, and I

10  think it depends on the number of veins you could tear and how

11  big they were.

12  Q   Are you familiar with this imaging from Isabella's case?

13  A   Yes.  I have reviewed that.

14          THE COURT:  Whose slide 17 is that?

15          MR. BLEGEN:  This is Mack.

16          THE COURT:  Mack 17.

17          MR. BLEGEN:  That we used with Dr. Barnes.

18          THE COURT:  Thank you.

19  BY MR. BLEGEN:

20  Q   Over here on the right, those are actually intact bridging

21  veins, right?

22  A   Would you please state the date of this examination.  It

23  would either be the 28th or the 29th, I believe.

24  Q   I'm not sure I can give you the date right this second,

25  but we can assume it was after she got to the hospital.

Hedlund - cross

1   A   I think it would either be -- the only contrast enhanced

2   studies were the 28th and 29th, so it would have to be one of

3   those two days.

4   Q   That is a contrast enhanced CT?

5   A   On the right side, yes, sir.

6   Q   And those are in fact intact bridging veins that I'm

7   pointing to, correct?

8   A   Yes, sir.

9   Q   So if any bridging veins ended up getting torn, it wasn't

10  the ones that I've just pointed to?

11  A   I would agree with you, sir.

12  Q   How many can we count on the right side here, which I

13  guess is really the left side of the brain?

14  A   I think we're seeing one here, and I think we're probably

15  seeing one coming in here.

16  Q   That's part of this one?

17  A   I don't know from this image, sir.

18  Q   So you could be seeing two or three on this side?

19  A   Yes.

20  Q   How about this side?

21  A   Well, I think we're seeing one here, and I'm not sure if

22  this is connected to that.  This could be one as well.

23  Without looking at all those images, it would be hard to know.

24  Q   This one?

25  A   Could be another one, yes.

Hedlund - cross

1   Q   So maybe two?

2   A   It looks like actually the convergence of two of the

3   cortical veins probably coming into a bridging vein.

4   Q   So maybe two or three --

5   A   Yes, sir.

6   Q   -- on that slide?

7   A   Yes, sir.

8        MR. BLEGEN:  Just for the record, Judge, that is the

9   12/28, pre and post contrast CT.

10        THE COURT:  Okay.

11   BY MR. BLEGEN:

12   Q   I may have misunderstood what you were saying about

13   bridging veins and low pressure, low flow.  Can you tell me

14   what you mean by that.

15   A   Well, I think, you know, really what I'm speaking to is

16   more on a comparative basis.  We have two basic systems in our

17   body.  We have a high pressure arterial artery system, you

18   know, carrying blood to our tissues under greater pressure,

19   and then we have a lower pressure return system, our venous

20   system.  So I was really speaking in a relative way.

21   Q   All right.  So you were comparing bridging veins to what?

22   A   Well, I was comparing it to arteries.

23   Q   Arteries where?

24   A   Well, I was speaking generally about arteries and veins in

25   our body in terms of their pressure differences, that we have

1   generally a high pressure system, and it goes to all the

2   different locations of our body.  That's the arteries.  And

3   then we have the lower pressure venous system that brings

4   blood back to -- eventually to our lungs.  So I was speaking

5   in that kind of -- that comparative way.

6   Q   Were you suggesting that a ruptured bridging vein will not

7   lose much blood because it is low flow or low pressure?

8   A   Well, no, I wasn't trying to make that implication.

9   Compared to an artery, that would be true.

10  Q   And excuse me for my horrible ignorance, but are there

11  arteries in the brain?

12  A   Yes, sir.

13  Q   All right.  Is there any suggestion that those get

14  ruptured by abusive head trauma?

15  A   They may.  But if I may just say, sir, there's no

16  accompanying paired artery running with these veins.  There's

17  not a companion artery running with this.  The veins do not

18  have that kind of matched structure.

19          MR. BLEGEN:  Judge, I'm going to put up the Power

20  Point that was used at the trial of this case --

21          THE COURT:  Okay.

22          MR. BLEGEN:  -- in the state court, which is already

23  part of the record.

24  BY MR. BLEGEN:

25  Q   Do you see this sort of cartoon-ish drawing?

1   A   Yes, sir.

2   Q   Are those -- the blue things that look like veins on the

3   top, are those bridging veins?

4   A   Yes, sir.

5       MR. BLEGEN:  All right.  Go to the next one.  Next

6   one.

7   BY MR. BLEGEN:

8   Q   Do you see that, indicating of the breaking?

9   A   Yes, sir.

10      MR. BLEGEN:  Next one, Rob.

11  BY MR. BLEGEN:  This is the Power Point that was shown at the

12  trial of this case in the state court.  Do you see this amount

13  of blood that is depicted?

14  A   Yes.

15  Q   Can ruptured bridging veins lead to this amount of blood

16  from shaking alone?

17  A   I think that's possible, yes, sir.

18  Q   But we know that nowhere near that amount of blood

19  happened in this case, correct?

20  A   Well, I think it's true.  I'm looking at an artist's --

21  I'm looking at an artist's rendition of blood.

22  Q   I understand.

23      Did you say I think it's true before you --

24  A   Yes, sir.  Yes.

25      MR. BLEGEN:  Judge, if I could just have a minute.

1         THE COURT:  Um-hum.

2   BY MR. BLEGEN:

3   Q    Dr. Hedlund, are you familiar with any studies relating to

4   how much blood flow goes through a bridging vein?

5   A    No, sir.

6   Q    Have you read the reports of your fellow experts from the

7   prosecution side?

8   A    Yes, I have.

9   Q    Are you familiar with one of the experts indicating that

10  there's ten thousand times the amount of blood flow through a

11  bridging vein as through a capillary?

12  A    Yes.  I'm not sure if they're speaking of adult findings

13  or in infants such as Isabella's age.  It's uncertain to me.

14  Q    The case we're talking about here is obviously an infant,

15  right?

16        THE COURT:  You need to get closer to the microphone.

17  I can't hear you either, and the court reporter certainly

18  can't.

19        THE WITNESS:  Their report, I'm not certain --

20        THE COURT:  He was asking a question.  That's the

21  part that couldn't be heard.  You were saying something.

22        MR. BLEGEN:  I was.

23        THE COURT:  None of us heard you.

24        MR. BLEGEN:  I will have to ask --

25        THE COURT:  That's what happens when you don't get

1    heard.

2                MR. BLEGEN:  Yes.

3    BY MR. BLEGEN:

4    Q    Are you aware that one of your fellow experts in this case

5    has said that there's ten thousand times the amount of blood

6    in a bridging vein than a capillary?

7    A    I read that.

8    Q    Okay.  And you think maybe that person was talking about

9    an adult as opposed to a child?

10   A    I'm not certain.  It's not clear to me.

11   Q    Are you familiar with a paper by Waney Squier called The

12   Shaken Baby Syndrome, Pathology and Mechanisms?

13   A    Yes, sir.

14   Q    You are?  Good.  Let me show you a copy, and I'll mark it

15   Petitioner's Exhibit Squier Article.

16               MR. BLEGEN:  Judge, is it okay if I give you unmarked

17   ones for the moment?

18               THE COURT:  Yes.  That's fine.

19               THE WITNESS:  Thank you.

20   BY MR. BLEGEN:

21   Q    If you look at page, it's not numbered, but counting from

22   Page 1, Page 7.  There should be a picture of -- at the top of

23   a -- looks like a radiology image and then some stretching.

24   A    Yes, I see that.

25   Q    Take a look at that Photo B.  Are those bridging veins

1    being stretched?

2          THE COURT:  These don't have numbers on them.  It's

3    the, you said the seventh page or the sixth page?  Looks like

4    this?

5          MR. BLEGEN:  Yes.

6          THE COURT:  Okay.  Which photograph have you shown

7    him?

8          MR. BLEGEN:  Photograph B.

9          THE COURT:  B, okay.

10   BY MR. BLEGEN:

11   Q    Do you see that, doctor?

12   A    Yes.

13   Q    Those are bridging veins being stretched away from the

14   brain by almost looks like two centimeters, correct?

15   A    Yes.

16   Q    And they haven't broken, correct?

17   A    That's correct.

18   Q    Is it commonly understood that bridging veins are strong?

19   A    I think it would depend on the type of force applied,

20   whether it was a tensile stretching or a shearing force.  I

21   think it would vary on the type of force.  I'm not a

22   biomechanical expert, but I think it would vary on the kind of

23   force.

24   Q    Fair enough.

25          Would you look down on the right column.  There's a

Hedlund - cross

1  paragraph that starts with, "Not only are there no convincing
2  pathological examples." See that?
3  A    I see that.
4  Q    Do you see the next sentence in that, "Bridging veins are
5  few in number, about eight to 11 on each side"? Do you see
6  that?
7  A    I do see that.
8  Q    Do you agree with that?
9  A    I think -- I think that's within the range of normal.
10 Yes, sir.
11 Q    "And carry high blood flow." Do you agree with that?
12 A    Well, certainly collectively. All of them together, yes.
13 They're returning a lot of blood.
14 Q    "And in a six-month baby nearly 260 milliliters of blood
15 flows into the dural sinuses per minute, and the majority of
16 cortical blood flows via the parasagittal BV or bridging veins
17 into the superior saggital sinus where flow rate is 9.2
18 centimeters per second in an infant." See that?
19 A    Yes. They're talking about the flow rate within the
20 superior saggital sinus.
21 Q    Right. And but the implication is that because the --
22 that the bridging veins clear the saggital sinus of blood?
23 A    No, sir. They empty into it.
24 Q    That's -- I'm sorry. They empty into it, correct?
25 A    Yes, sir.

Hedlund - redirect

1  Q   So the amount that goes into the superior saggital sinus

2  is carried by the bridging veins in total, correct?

3  A   Yes.  Taking all of the bridging veins into account, yes,

4  sir.

5  Q   And that's a large amount of blood, at least in the

6  perspective of the brain, correct?

7  A   Within the superior sagittal sinus, yes.

8          MR. BLEGEN:  Judge, I think that's all I have.

9          THE COURT:  Redirect.

10         MR. GOODFRIEND:  Thank you, Judge.

11         May I have one minute, please.

12                  REDIRECT EXAMINATION

13  BY MR. GOODFRIEND:

14  Q   Dr. Hedlund, based on your experience as a radiologist,

15  can you tell whether a chronic subdural hemorrhage is two

16  weeks old or three weeks old?

17  A   No.

18  Q   Counsel asked you questions about the aging or timing of

19  acute hemorrhages and hyperacute on the 12/27/2002 scan; is

20  that correct?

21  A   Correct.

22  Q   Do you remember what time on December 27th of 2002 that

23  Miss Del Prete talked about the baby going limp and the

24  ambulance being called?

25  A   I probably won't be completely accurate.  I thought it was

Hedlund - redirect

1   around midday, sometime middle of the day.

2   Q   And in terms of what time the first CAT scan took place,

3   how many hours had elapsed?

4   A   I'll have to have your help on that.  I'm not sure.

5        MR. GOODFRIEND:  Judge, I'm going to mark two

6   exhibits as 20 and 21.  I don't have extra copies right now,

7   but we can --

8        THE COURT:  You're just doing this to refresh his

9   memory anyway, right?

10       MR. GOODFRIEND:  Yes.

11       THE COURT:  Okay.

12  BY MR. GOODFRIEND:

13  Q   On Exhibit No. 21, if you could take a look at that,

14  please, and if you could tell what time approximately the

15  ambulance was called in this case?

16  A   Well, it says, "At 13:38 hours on the 27th of December,

17  FFA McLin and myself responded to call No. 4420."

18  Q   And I want you to assume that's this case, okay?  Assume

19  that, please.

20  A   Okay.

21  Q   So that it indicates that an ambulance was called at

22  approximately 1:30 in the afternoon; is that correct?

23  A   Yes, that's correct, 1:38.

24  Q   Now, in terms of that first CAT scan, I'm showing you

25  Exhibit No. 20.  Is that a hospital report?

1    A    Yes.  It's from Provena St. Joseph's Hospital.

2    Q    And in the body of that report does it state approximately

3    the time the CAT scan began?

4    A    It states 7:34 p.m., it says to CAT scan, and then it

5    looks like it's with an RN, two RN's, actually.

6    Q    So six hours elapsed between the time the ambulance was

7    called and the time the CAT scan was scheduled; is that

8    correct?

9    A    Yes.

10   Q    So at the time of the CAT scan you would not expect to see

11   a hyperacute subdural hematoma; is that correct?

12   A    Correct.

13   Q    And that is within the window that you would see an acute

14   hemorrhage?

15   A    Yes.

16   Q    Counsel asked you about the clinical conundrum that you

17   mentioned in an article that you wrote.

18   A    Correct.

19   Q    You said it was different from this case; is that correct?

20   A    Correct.

21   Q    And could you explain how it was different.

22   A    Well, when we have a child that we think has a predominant

23   pattern of benign subarachnoid space enlargement, first

24   there's usually -- there's imaging evidence for that.  And I

25   don't see that in Isabella's case.  I see nothing to indicate

1   that her subarachnoid spaces were ever enlarged.  In fact, I

2   stated it on the 28th that they looked small.

3           And when we do have a child that develops or is

4   detected to have a subdural hemorrhage in the context of what

5   we otherwise think are benign expanded subarachnoid spaces, it

6   is our institutional policy to evaluate the child and to look

7   for any evidence of trauma, to look into it.

8   Q   Now, in terms of the spinal tap in this case, you weren't

9   sure whether it was before or after the CAT scan; is that

10  correct?

11  A   I'm not certain.

12  Q   This is Exhibit No. 22.

13          Now, I'm going to show you what's been marked as

14  Exhibit No. 22.  If you could read that to yourself, please.

15  Read it to yourself.

16  A   All right.

17  Q   After reading Exhibit No. 22, does that indicate that the

18  spinal tap took place after the CAT scan?

19  A   Well, I'm a little concerned about the date here.  On my

20  sheet here that's highlighted, it looks like it's highlighted

21  12/17/02.  Is that 12/27?

22  Q   I can't tell.  I'm going to withdraw this at this time.

23          Finally, Dr. Hedlund, in terms of the gold standard,

24  what is the best way to see brain contusions?  Would it be on

25  a imaging, or might it be on some type of pathology?

Hedlund -

1    A   Well, I think that we can miss it.  I think you can have

2    contusion and not see it on CAT scan or even MRI.  So if you

3    had an ability without doing autopsy or at autopsy more

4    acutely, you probably would see the contusion better there.

5    I'm not a pathologist.  I know that there's times when we

6    can -- I know there's times when we don't see much but the

7    child clinically has a concussion or contusion and we might

8    not detect it on imaging.

9          MR. GOODFRIEND:  Thank you.

10         THE COURT:  Mr. Blegen, do you have anything else

11    based on the redirect?

12         MR. BLEGEN:  No.

13         THE COURT:  Okay.  I have a question or two.  So I

14    want to go back and clarify something that has to do with

15    blood.  You talked about this issue of pressure and blood flow

16    and whatnot.  Is the pressure of the blood flow in a bridging

17    vein different for an infant than it is for an adult?

18         THE WITNESS:  The pressure may be similar.  The size

19    of the vein would be bigger, and so the amount --

20         THE COURT:  Bigger in an adult.

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Okay.

23         THE WITNESS:  The amount of blood moving through that

24    at any given moment in an adult would be greater.  The

25    pressures might be quite similar.

Hedlund -

1    THE COURT:  Because probably the infant has less
2  blood.

3    THE WITNESS:  Well, the size of that structure.  You
4  know, it's --

5    THE COURT:  I guess here's my point.  So and what you
6  just said is what I understood.  So the bridging vein is going
7  to be bigger in an adult than it would be in a child.

8    THE WITNESS:  Yes, sir.

9    THE COURT:  But the adult has more -- and maybe I'm
10  wrong about this.  Doesn't an adult have more blood than a
11  child does?

12    THE WITNESS:  Yes.

13    THE COURT:  Okay.  So is it not proportional?  In
14  other words, your bridging vein is bigger as your blood
15  flow -- or as your total amount of blood is greater?

16    THE WITNESS:  Yes.

17    THE COURT:  Okay.  So why would there be a higher
18  rate of blood flow in one than in the other, one being infant,
19  one being an adult, or vice versa?

20    THE WITNESS:  Well, I guess it could relate to your
21  circulation time, you know, the heart rate.  So circulation
22  time would be a little faster in a child, but if you're
23  looking -- I think flow rate and volume would be actually two
24  different things.

25    THE COURT:  Two different things.

Hedlund -

1      THE WITNESS:  Yes, sir.

2      THE COURT:  Okay.  And so is one -- the volume is

3   going to be greater in an adult?

4      THE WITNESS:  Yes, sir.

5      THE COURT:  The flow rate might be roughly similar?

6      THE WITNESS:  Or it could be -- I could envision for

7   let's say a child with a very fast heart rate or a faster

8   heart rate that the flow per second, the flow could be

9   greater, but the absolute volume could be considerably smaller

10  because of the tube that it's running through.

11     THE COURT:  Right.

12     I wanted to ask you a couple of follow-up questions

13  about something that Mr. Blegen had asked you about a while

14  ago.  Let me just find the right part of my notes here.  There

15  it is.  This was when he was talking to you about -- well,

16  forget that part.

17     This is when Mr. Blegen was asking you about the

18  presence or absence of what I'd refer to as physical signs of

19  injury, so he said bruising, but let me just sort of broaden

20  that to physical signs of injury.  And I thought I heard you

21  say that if physical signs of injury in the area that we're

22  talking about, neck, head, whatever, are present, that's a

23  very significant factor in determining whether something is

24  abusive head trauma or not.

25     THE WITNESS:  Well, I think it can be very important

Hedlund -

 1    as an indicator of impact.

 2            THE COURT:  Okay.  Then I thought I heard you say

 3    that the absence of signs like that is irrelevant.  Did I

 4    misunderstand you?

 5            THE WITNESS:  If I conveyed that, I'm sorry.  The

 6    absence can be extremely important.

 7            Could I just take a moment?

 8            THE COURT:  Because it would tell you that certain

 9    types of things didn't happen, right?

10            THE WITNESS:  Right.  But could I take a moment to --

11            THE COURT:  Well, just try answering the question

12    first.

13            THE WITNESS:  I'm sorry.  Yes.

14            THE COURT:  Okay.  So the absence of physical signs

15    could be important?

16            THE WITNESS:  Yes, sir.

17            THE COURT:  Now, tell me why.  Or explain further

18    why.

19            THE WITNESS:  Roughly a year after the article that

20    we wrote for Forensic Medical Pathology came out, Dr. Vinchon

21    and other colleagues from France came out with a very -- I

22    think a very helpful article.  They established a prospective

23    registry of -- in children under two years of age in the Lyon

24    area in France, and all children who were coming in with

25    suspected or actual trauma to the head were put into this

Hedlund -

1  registry.  And the value of it, I think, to me in reading that

2  article, and it is in my reference list, was they

3  prospectively set up very detailed points of analysis, for

4  example, looking very carefully for scalp and skull injury,

5  the presence or absence of, as well as many other factors.

6  And as they analyzed their data from that at least initial

7  prospective setup for their registry, if you will, they

8  created two buckets of data.  One bucket of data were children

9  who had actual observable in public domain accidental injury,

10  so documented in the public domain.

11          THE COURT:  You knew it was accidental, in other

12  words.

13          THE WITNESS:  Yes, sir.

14          And so they had that group.  And, of course, as you

15  might anticipate, impact findings were much higher there.

16          The second bucket that they had were patients that

17  there was confession of shaking and/or -- well, shaking in

18  these patients.  There was confession of abusive head trauma.

19  They looked carefully, and what they found to be the most

20  strong predictors or indicators of inflicted injury in that

21  category were the presence of severe retinal hemorrhages, the

22  absence of scalp or skull trauma, and the presence of subdural

23  hemorrhages.

24          THE COURT:  And the absence of scalp or skull trauma

25  presumably would be attributable to the fact that in just

Hedlund -

1    plain old shaking cases the head isn't getting hit against
2    anything?
3            THE WITNESS:  That's correct.
4            THE COURT:  Okay.
5            THE WITNESS:  The value that I took away from the
6    work they did was that there was a thoughtful upfront laying
7    out of the landscape.
8            THE COURT:  Did they say anything about neck,
9    observable neck signs one way or the other?
10           THE WITNESS:  No.
11           THE COURT:  Okay.  All right.  Anybody have any
12   follow-up questions based on that?
13           MR. BLEGEN:  I do.
14           THE COURT:  Go ahead.  That's fine.
15   BY MR. BLEGEN:
16   Q    Is the Vinchon article you're talking about the one that
17   is Exhibit 16 in your notebook there?
18   A    Yes, sir, it is.
19   Q    Okay.  Do you know the -- any of the details of the
20   confessions that supposedly support the group of known abusive
21   head trauma?
22   A    I'm not sure of the detail, sir.
23   Q    Do you know whether Vinchon or any of his partners whose
24   names I probably can't pronounce know the level of certainty
25   of the confessions?

Hedlund -

1    A    I'm not sure, sir.

2    Q    So it doesn't say it anywhere in the article what kind of

3    confessions they're basing their conclusions on, correct?

4    A    Yes.  I don't know.

5    Q    Is that also the same case for the article Don't Overlook

6    Thrombosed Bridging Veins that we've been discussing?

7    A    Yes.

8    Q    Those -- the patients there with the thrombosed bridging

9    veins that have been attributed to abusive head trauma are

10   also based on confession studies, correct?

11   A    Yes, sir.

12   Q    Do you know the details of the level of certainty or the

13   quality of any of those confessions?

14   A    I do not.

15   Q    Do you know whether they were confessions that were --

16   that followed hours of --

17          THE COURT:  I think you've made it clear he doesn't

18   know anything about the confessions.  Okay.

19          MR. BLEGEN:  Thank you.  Sorry.

20          THE COURT:  Do you have that up in front of you?  I'm

21   looking at the table 1 on Page 640.  Is that the, sort of the

22   table of the two buckets that you were referring to?  The

23   little numbers up at the top, top left-hand corner.  You're

24   looking at the same thing I am.  Is that the table you're

25   referring to?

1        THE WITNESS:  Right.  They're categorizing several --

2        THE COURT:  Several presentations in the IHI and --

3   inflicted head injury I assume that means.

4        THE WITNESS:  Yes, sir.

5        THE COURT:  And AT, accident trauma groups.

6        And so if you go down towards the bottom, there's a

7   line item that says impact on head, other impact, peripheral

8   fracture.

9        THE WITNESS:  Yes, sir.

10        THE COURT:  So if you go over to the column for

11  accident, it's saying 34 of the 39 or 87 percent showed some

12  physical sign of impact on head.

13        THE WITNESS:  Yes.

14        THE COURT:  Six of the 39, or 15.4 percent, showed

15  some physical sign of other impact, et cetera.  And then this

16  is what you're referring to on the inflicted head injury

17  column.  It was 37.8 percent that showed some clinical feature

18  of -- clinical sign of an impact on the head and 24.4 percent

19  for other impact.  That's what you were referring to a moment

20  ago?

21        THE WITNESS:  Right, right.  And they looked at the

22  strongest positive predictors in that cohort or that group for

23  inflicted trauma, and from that, in terms of their statistical

24  analysis, they determined the most strongly predictive

25  features were the lack of impact, the presence of retinal

1  hemorrhages, and subdural hemorrhages.

2         THE COURT:  Okay.  Thanks.  I just wanted to make

3  sure that was what you were talking about.

4         Okay.  Anything else anybody has?  You can step down.

5         Who is the next witness?

6         MR. BLEGEN:  Michael Prange.  He's a biomechanical

7  engineer.  He can stay till tomorrow.

8         THE COURT:  It's 4:28.  Well, I mean, that's kind of

9  a foregone conclusion at this point, isn't it?

10        All right.  So let's just use this opportunity to

11 talk a little bit here.

12        So I think I told you before that, and it doesn't

13 need to be now, but at some point, and I think it probably

14 makes more sense for it to be later, once everything has come

15 in, I would like from each side, or from whoever it is, from

16 somebody, I don't care who it comes from, a flash drive, a

17 thumb drive that has the Power Points on it because the

18 photocopied scans or the photocopied versions of those are

19 just not all that clear.  The ones on the TV are clearer.

20 That's item one.  I think I said that before.

21        So I don't know whether I'll be able to do it

22 tonight.  It may be early in the morning.  You're going to get

23 an order that's basically going to say this is how much time

24 each side has left.  So what I've basically heard now is I've

25 heard the corresponding, I'm not even going to try to give the

1   sub-specialty because I'll do it wrong and then two people
2   will be mad at me that I missed their subspecialty.
3              MR. TELISMAN:  Neuroradiologist.
4              THE COURT:  There you go.
5              We've heard the two corresponding neuroradiologists.
6   So everybody's kind of on the same footing at this point
7   because my sense is is that the experts on both sides are
8   roughly corresponding.  And if not all across the board, at
9   least these two were.  They're on the same topic.  And so I
10  don't think there's anything -- I don't think one side is
11  being -- and, frankly, they both took about the same time on
12  the witness stand.  I don't think either side is being
13  disadvantaged as compared with the other side if I now impose
14  time limits.
15             I mean, honestly, if I had known -- I made the
16  mistake in this case, frankly, of believing what I was told
17  about the length of the trial.  I should know better.  But if
18  I had known it was going to go as long as it would have, I
19  would have given you these time limits ahead of time.  And I'm
20  not sure exactly what they're going to be.  It's partly --
21  and, I mean, it's just the fact of life.  It's partly defined
22  by the amount of time that I have available for this.  And so
23  you're going to get a time limit that's going to say this is
24  how much time each side has.  It's going to be equal.  And the
25  clock's going to be running when you're questioning a witness

1   whether it's your witness or the opposing side's witness.

2   It's going to be running when you say, Judge, can I have a few

3   minutes.  It's going to be running for that.  It won't be

4   running for breaks.

5          I'm going to try to do -- I've done a lot of

6   interjecting.  I'm going to try to save that from now on for

7   the end of the questioning so it doesn't make it hard to count

8   time.

9          And you're also going to see something in there that

10  says that if one of your witnesses is being nonresponsive, the

11  time counts against you even if the other side's questioning

12  him.  So this is kind of the incentive behind what I told both

13  sides before, to talk to your people about how cross

14  examination is not a sparring match, or at least shouldn't be.

15  It's just not beneficial.

16         And I'll give you at the end of each day this is what

17  the count is so far.  And, like I say, I'll get you an order

18  either tonight or early in the morning tomorrow that says what

19  the time is.

20         And so what I'd like you to be able to tell me

21  sometime during the day tomorrow is what the plan is.  And I

22  think you basically -- we basically had talked through that we

23  were going to go kind of back and forth on the experts.

24         MR. TRIEBEL:  Just based on the scheduling.

25         THE COURT:  Based on the scheduling, okay, so however

1    you want to do it.  I don't really care.  But I'd like to know
2    what the plan is just so I know that there is a plan.
3            MR. GOODFRIEND:  Judge, I think we have a plan
4    somewhat in place that we've kind of worked out during the
5    break.
6            THE COURT:  Okay.  What's that?
7            MR. BLEGEN:  Tomorrow I believe you're going to hear
8    from, I guess, Michael Prange, the biomechanical engineer.
9            THE COURT:  That's your expert.
10           MR. BLEGEN:  Yes.
11           THE COURT:  Okay.
12           MR. BLEGEN:  Jan Leestma, who is a neuropathologist,
13   and he will be the shortest witness we've heard so far, I'm
14   very confident.
15           THE COURT:  He's five foot two, that's what you mean?
16           MR. BLEGEN:  He's rather tall.
17           THE COURT:  Or she.
18           MR. BLEGEN:  And they're calling an opthalmologist,
19   Brian Forbes.
20           THE COURT:  Okay.
21           MR. BLEGEN:  We've decided, I think, already to move
22   a couple of the witnesses to that January 13th date.
23           MR. GOODFRIEND:  14th.
24           MR. BLEGEN:  14th.
25           And we've also talked about shortening everybody up.

1     THE COURT:  All right.

2     MR. TRIEBEL:  And we'll reiterate to our witnesses

3   how they should be responding on cross, your Honor.  I

4   apologize for that.

5     THE COURT:  You know, I have to say, you know, it's a

6   funny thing.  I think a lot of people who testify commonly,

7   and even experts who don't testify commonly, have this view,

8   for whatever reason, and I could give you a nice, long,

9   hour-long, Castro-length speech of where I think this comes

10  from, but they have this view that what they got to do on

11  cross examination is not answer the question but make their

12  points.  And, you know, who knows.  There's thousands and

13  hundreds of thousands and probably millions over time of fact

14  finders in the world if you count all the jurors, or in the

15  county, at least, and I've talked to a lot of them, and I've

16  been a finder of fact, and I find it completely

17  counterproductive.  I mean, when somebody wouldn't answer a

18  question, even if they think it's a stupid question, which is

19  what a lot of it involves, it just does not reflect well on

20  them.

21      And somehow lawyers, some lawyers at least, have this

22  in their head, that don't let that other side get something in

23  here, you never know how it's going to be used.  So I don't

24  know.  I'm going to say I don't think I ever thought that, but

25  certainly I don't think it now, being on the other side of the

1  fence.

2  So and then the plan is going to be I'm going to give

3  you a date for post-hearing briefs.  We're not going to do

4  this right now.  It will be after the 18th, but almost

5  certainly not long enough after for you to assume that you're

6  going to have the transcript.  This is what I was saying

7  before.  And so you're just going to have to go from your best

8  recollection.  I, on the other hand, probably will have the

9  transcripts, or at least most of them, by the time I rule on

10  it.

11  Did you ever give me back that other version of

12  the -- the signed version of the form?

13  MR. BLEGEN:  I did not.

14  THE COURT:  Got it now.  Okay.  All right.

15  So tomorrow, with some work, I've managed to, I

16  think, get the call down so there's actually some chance I

17  could start a few minutes before ten, so why don't you shoot

18  for 9:50 tomorrow.

19  Okay.  Make sure you turn the equipment off.

20  Anybody have anything you want to take up?

21  MR. TRIEBEL:  And I think we're just trying to hear

22  back from a couple of witnesses on finalizing the exactly

23  schedule for Thursday and Friday, your Honor.  We should have

24  that worked out by tomorrow.

25  MR. GOODFRIEND:  Judge, the date you want to resume

1   is January 14th.

2              THE COURT:  January 14th.  The other people are

3   coming in very early tomorrow morning.  I'm going to tell them

4   they're off, and so the week's going to be yours.

5              MR. BLEGEN:  Judge, can I just ask one last thing?

6              THE COURT:  Yes.

7              MR. BLEGEN:  You said that you got an email on your

8   computer that somebody's flight got changed and it cost money.

9              THE COURT:  Yes.

10             MR. BLEGEN:  So if you want us to eat those expenses

11  or --

12             THE COURT:  Don't worry about it.

13             MR. BLEGEN:  Thank you.

14             THE COURT:  You know, it's bad, but we can afford

15  five hundred bucks, I think.

16             MR. BLEGEN:  A lot more than I can.

17             THE COURT:  Divided among, you know, 300 million

18  people, it's really not that much.

19             MR. TELISMAN:  So as long as I'm here by 9:45 we're

20  okay.

21             THE COURT:  Yes.  See you tomorrow.

22             MR. TELISMAN:  Thank you.

23             (Which were all the proceedings had in the

24             above-entitled cause on the day and date aforesaid.)

25