<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4   JENNIFER DEL PRETE,            )
                                    )
 5                   Petitioner,    )   Docket No. 10 C 5070
                                    )
 6             vs.                  )
                                    )
 7   MELODY HULETT,                 )   Chicago, Illinois
                                    )   December 19, 2012
 8                   Respondent.    )   10:00 a.m.

 9                            VOLUME 3
                      TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE MATTHEW F. KENNELLY

11

12   APPEARANCES:

13

14   For the Plaintiff:     BLEGEN & GARVEY
                            BY:  MR. PATRICK W. BLEGEN
                                 MS. JODI L. GARVEY
15                               MR. DANIEL A. RUFO
                            53 West Jackson Boulevard
16                          Suite 1437
                            Chicago, Illinois  60604
17

18   For the Defendant:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                            BY:  MR. KARL R. TRIEBEL
19                               MR. NEAL GOODFRIEND
                                 MR. ARI TELISMAN
20                               MS. MONIQUE A. ANAWIS
                            100 West Randolph Street
21                          13th Floor
                            Chicago, Illinois  60601
22

23   Also Present:              MR. ROBERT STANLEY

24         LAURA M. BRENNAN - Official Court Reporter
              219 South Dearborn Street - Room 2102
25                 Chicago, Illinois  60604
                        (312) 435-5785
</pre>

Prange - direct

```
 1        (The following proceedings were had in open court:)

 2             THE COURT:  10 C 5070, Del Prete v. Hulett.

 3             Can one person on each side give the lawyers'

 4    appearances for the record, please?

 5             MR. BLEGEN:  Good morning, Judge; Patrick Blegen and

 6    Dan Rufo on behalf of Ms. Del Prete.

 7             MR. TRIEBEL:  Good morning, your Honor; Karl Triebel

 8    on behalf of the respondent warden.

 9             THE COURT:  Give the names of the other folks.

10             MR. TRIEBEL:  Sorry.  We have also got Ari Telisman,

11    Neal Goodfriend and our law clerk, Kate Kirwan, in the room,

12    along with our medical director, Monique Anawis.

13             THE COURT:  Hang on one second.

14             MR. TRIEBEL:  Yes, your Honor.

15        (Brief interruption.)

16             THE COURT:  Call the next witness.

17             (Witness sworn.)

18             THE COURT:  All right, you can proceed.

19             MR. RUFO:  The petitioner calls Dr. Michael Prange.

20             (Witness sworn.)

21        MICHAEL PRANGE, PETITIONER'S WITNESS, DULY SWORN

22                       DIRECT EXAMINATION

23    BY MR. RUFO:

24    Q    Dr. Prange, can you please state your name, spelling your

25    last name for record?
```

Prange - direct

1   A   Michael Prange.  That's P-r-a-n-g-e.

2   Q   Dr. Prange, I'm going to hand you two exhibits, one marked

3   Petitioner's Exhibit Prange CV and the other marked

4   Petitioner's Exhibit Prange Report.

5           Dr. Prange, do you recognize those documents?

6   A   Yes.

7   Q   What do you recognize them to be?

8   A   Exhibit Prange CV is a copy of my curriculum vitae, and

9   the other one is my report in this case.

10  Q   Now, I'm going to take you through your credentials now.

11          Can you tell the Court a little bit about your

12  educational background?

13  A   Sure.  I got a bachelor of science from -- in biological

14  engineering from North Carolina State University.  I obtained

15  a master's and Ph.D. from the University of Pennsylvania in

16  the field of bioengineering.

17  Q   Have you served in any educational positions?

18  A   Excuse me?

19  Q   Have you served in any educational positions?

20  A   Yes.  I actually was a research faculty position at Duke

21  University after I got my Ph.D.

22  Q   Now, how are you currently employed?

23  A   I'm a consultant with a consulting firm called Exponent.

24  Q   What is Exponent?

25  A   We're basically just a scientific and engineering

1  consulting firm in a variety of different fields.  I'm in the

2  practice of the biomechanics practice.

3  Q    Now, are you licensed in any professional capacity?

4  A    Yes.  I have my professional engineering license in the

5  state of Pennsylvania.

6  Q    You said you were a biomechanical engineer.  Can you

7  explain what biomechanics is?

8  A    Sure.

9        Biomechanics is basically the application of

10  mechanics and physics to the human body.  So a mechanical

11  engineer might apply those to building a bridge or building a

12  car.  We look at these and we look at it in the sense of how a

13  human body moves, how injuries occur, what forces occur in the

14  human body during a variety of different circumstances.

15  Q    Now, as a biomechanical engineer, have you studied injury

16  biomechanics?

17  A    That's my specific specialty is injury biomechanics, so

18  what are the motions and forces that are required to cause

19  injuries.

20  Q    What is the purpose of studying or practicing in injury

21  biomechanics?

22  A    It can be applied in a variety of different topics.

23  Sometimes it's just reconstruction of events to understand

24  what happened during events.

25        A lot of it is understanding the injuries so then we

1    can work on prevention of those injuries.

2            So designing safety standards for, say, automobiles,

3    helmets, child car seats, those types of things that would go

4    into biomechanics, you know, gives information in order to

5    design, you know, better products.

6    Q   Now, specifically as a biomechanical engineer, have you

7    had any subspecialties or area of focus of your work?

8    A   One of the areas I focused in on is pediatric injuries.

9    My Ph.D. was actually in pediatric brain injuries.  I have

10   been doing that, you know, since I was in school for at least

11   15 years now looking at that specifically.

12   Q   And when you look at that sort of thing, do you look at

13   tissue characteristics of pediatric tissue and pediatric --

14   A   There's a lot things that are unique to the pediatric

15   population versus, say, the adult population.

16           There's tissue characteristics.  There's different

17   proportions of the body.  There's a lot of things you need to

18   take into account, you know, different anatomy, those types of

19   things that go into that pediatric biomechanics.

20   Q   And have you published in this field?

21   A   Yes, I've published quite a bit.

22   Q   Can you briefly describe some of the publications that

23   are relevant to this case?

24   A   Sure.  I published a paper talking about the stiffness and

25   characteristics of brain tissue on adults and children.  I've

1  looked -- I have a publication looking at the mechanical

2  exposure of the accelerations involved in the shaken baby

3  syndrome.  I've looked to -- am looking into tolerances.

4      Basically we did human volunteer testing of everyday

5  activities to understand tolerance values in children and also

6  some, you know, actually pediatric cadaver testing.  I have

7  been involved in that as well.

8  Q   And just so everyone is clear, can you explain how

9  biomechanics differs from clinical medicine?

10  A   Sure.  Basically the biomechanics, you know, we want to

11  understand the exposure and mechanics of the actual injurious

12  event.  And so we want to understand basically the mechanics

13  of what causes the injury up until the point of injury.

14      Typically, clinical medicine then, you know, is when

15  this person comes into the ER and they're diagnosing and

16  treating it, that's typical with medicine.  We're in the time

17  points before that when the injury happens and occurs and

18  results.

19  Q   Now, you mentioned causation.  Can you explain how you

20  determine the causation of an injury?

21  A   Sure.  I mean the basic methodology is that we need to

22  understand basically the tolerance levels.  There's an exhibit

23  I had that might be helpful if you --

24      (Brief interruption.)

25          THE COURT:  At some point you're going to give me the

1  exhibits here?

2  　　　　MR. RUFO:  Mr. Blegen was just mentioning to me.  I

3  will tender to the Court the Petitioner's Exhibit Prange CV.

4  　　　　THE COURT:  There's two copies, right?

5  　　　　MR. RUFO:  Two copies, sure.

6  　　　　(Brief interruption.)

7  　　　　THE COURT:  Okay, so do that at the break.

8  　　　　MR. RUFO:  Judge, it appears -- I thought I had two

9  copies.

10  　　　　THE COURT:  Make sure that everybody is on the

11  program here.  Thanks.

12  　　　　MR. RUFO:  I apologize.

13  　　　　THE WITNESS:  It will be the next exhibit.

14  BY MR. RUFO:

15  Q　　Did you say the next slide?

16  A　　The next slide, yes.  Actually maybe two more.  Sorry.

17  　　　　So this is --

18  　　　　To answer your question before of how we kind of go

19  about determining causation from a biomechanics point of view,

20  this is just a flow chart that kind of illustrates what we do.

21  We need to understand the injury thresholds or tolerance

22  levels.  And those consist of data that we get from

23  biomechanical experiments, whether it's cadavers, animal

24  experiments, human volunteers, a variety of different sources,

25  to determine at what level we expect injuries to occur.

Prange - direct

 1         And then we take whatever event we're evaluating and
 2    we need to understand what those exposures are during that
 3    event, what kind of mechanics they do, and we compare the two.
 4    We basically say:  What is the mechanical exposure?  How does
 5    that compare to our injury thresholds?  And we can then talk
 6    about injury potential or injury causation.
 7    Q   Now, before we get into the specific causation in this
 8    case, can you explain some of the fundamentals that we're
 9    dealing with in a case like shaken baby syndrome or abusive
10    head trauma?
11    A   Sure.  There's a couple of definitions that might be good
12    to clarify.
13         One is the term just "acceleration."  Acceleration in
14    engineering terms is basically change of velocity over a
15    certain amount of time.  A good example, just to kind of give
16    an example of acceleration, is that if you're in your car
17    going 60 miles an hour down the road and you then go to -- you
18    see a red light and you stop and you barely apply the brake
19    and you come to a stop, that -- you changed your velocity from
20    60 miles an hour to zero over a relatively long time.
21         That's a lower acceleration as though if you were
22    going 60 miles an hour and, say, slammed on the brakes or hit
23    a brick wall.  That velocity changed over a very short amount
24    of time resulting in higher accelerations.
25         So that's just kind of to get a feel of what

1   accelerations are.  There's different types.  It basically

2   comes down to direction.  There's linear where you basically,

3   like I just kind of said, you're moving in a straight line.

4   And those are, you know, reported.  A lot of times the units

5   are Gs, which is units of gravity.  It's just a unit used.

6   There's other units used, just like you can expose, like,

7   length in inches or feet.  Gs is the unit we use.

8          You also have rotational acceleration, which is

9   basically instead of moving now in a straight line, you're

10  moving now in an arc pattern.  You're rotating it.

11         So the units we used in that are radians per second

12  squared.  You know, a radian is basically is you have

13  57 degrees.  So these are the units that are reported in the

14  literature, and that's what we use.

15  Q   When you say 57 degrees, are you referring to the degrees

16  of a circle?

17  A   Correct, yes, the arc of a circle.

18  Q   Previously you referred to acceleration as a car hitting a

19  wall.  Are deceleration and acceleration different terms in

20  the engineering field?

21  A   Acceleration basically encompasses deceleration as well.

22  In engineering terms, deceleration is basically just a

23  negative acceleration.  It's acceleration in a different

24  direction.  So when you use the term "acceleration," it's

25  taking both into account.

Prange - direct

1   Q    Now, getting back to the injury causation, are you

2   familiar with the mechanics of the shaken baby syndrome

3   theory?

4   A    Yes, I am.

5   Q    Can you describe the mechanics?

6   A    The theory is that a person can grab a child, a young

7   child, by the torso, shake them back and forth, resulting

8   in -- rotational accelerations of the head resulting in a

9   variety of different injuries, subdural hematomas, axial

10  injuries, those types of things.

11          THE COURT:  You said "rotational acceleration."

12          THE WITNESS:  Rotational accelerations, correct.

13  BY MR. RUFO:

14  Q    Can you explain under the theory exactly how the

15  acceleration causes these injuries?

16  A    The idea is that there's -- because you have this

17  acceleration of the head, you have relative motion between the

18  brain and the skull, and there's these bridging veins that go

19  across that space.  And if you rotate it too much and you have

20  too much of a difference in motion, that you will tear these

21  bridging veins, resulting in bleeding into the space.

22  Q    Now, if you were to test the validity of the shaken baby

23  syndrome theory, how would you go about that?

24  A    You know, first, you know, the idea is that we need to

25  understand what's going on, the mechanical exposure during a

1   possible shaking episode, you know, what are the accelerations
2   associated with this.

3   Q   How would you go about determining acceleration?

4   A   One of the things is -- I mean, certainly we can't -- if
5   we're looking for this to be a potential, you know, injurious
6   event, we're not going to use real live, you know, human
7   infants for these kinds of testing.  So we're certainly not
8   going to do that and possibly expose them to something.

9           So what we do in biomechanics is we use test devices,
10  test dummies.  Everyone has seen these in like car crashes.
11  You know, we're not putting people in cars and crashing them;
12  we're putting test devices in there that are used for this,
13  and that's what we can do with shaken baby.  We basically have
14  a test device that we can shake and understand and measure the
15  acceleration going on with that.

16  Q   Now, how do you go about determining the tolerance levels
17  or the injury threshold?

18  A   There's a variety of different sources.  Again, you know,
19  we're not using live human infants for these kinds of testing.
20  We certainly wouldn't do that, but there's a lot of things
21  that go that, you know, understanding the mechanism from
22  certain cadaveric experiments, certain animal experiments,
23  even human volunteers.

24          You know, we do have volunteers at very uninjurious
25  levels to understand what doesn't cause injury because we need

Prange - direct

1  to know that, and what does cause injury, and then we can

2  start to find that threshold.  We can find that line where

3  injury occurs.

4  Q   Dr. Prange, what were you asked to do in this case

5  specifically?

6  A   I was asked to look into whether the theory that shaking

7  could have caused the injuries that were documented in the

8  medical records.

9  Q   Have you reviewed the medical records in this case?

10  A   Yes, I have.

11  Q   And are you aware of the medical findings?

12  A   Yes.

13  Q   Can you briefly describe your understanding of the medical

14  findings?

15  A   Sure.  Just briefly, there was documentation of subdural

16  hematoma, I think, of the frontal lobes as well as in the

17  midline, the tentorium and the falx.  There was documentation

18  of retinal hemorrhages, a couple of negative findings where

19  there was no documentation of any kind of neck injuries in the

20  medical records as well as no documentation of any external

21  injuries to the head.

22  Q   Now, you said you were asked to determine whether shaking

23  was a potential mechanism.  Do you know why you were asked

24  specifically regarding shaking?

25  A   That was my understanding from reading the previous trial

Prange - direct

1   transcripts that that was the allegations in this case.

2   Q   And do you know who those allegations came from or who

3   testified to that theory?

4   A   I think Dr. Flaherty testified that it was -- that this

5   was a shaking episode that caused these.

6   Q   Now, Dr. Prange, can you explain how you went about

7   testing whether or not shaking was a potential cause of injury

8   in this case?

9   A   Sure.  I mean, the first step goes to the mechanical

10  exposure aspect where, you know, there were publications

11  several years ago where we looked at what were the

12  accelerations associated with a shaking event.  So we built a

13  custom, you know, basically test dummy.

14          The idea of this dummy was not to perfectly replicate

15  a human.  The term we use in engineering is biofidelic.  It's

16  not perfectly lifelike.  What we did do, however, was to

17  design a dummy that would give a much more higher

18  accelerations, much -- higher accelerations that we would

19  expect actually in a living human.

20          So we designed it as such that it had a -- for

21  example, it had a hinge for a neck that offered basically

22  little resistance to motion, where we know in a human being,

23  there probably is some resistance to the neck to apply to

24  that.

25          So there were certain things that we did to do that,

1    and then we basically took this test device that had the same

2    basically body, body mass and head mass, and we had volunteers

3    actually shake it as hard as they could.

4         And then we measured.  We had censors on the head

5    that we were measuring the angular accelerations that were

6    occurring in the head during those episodes.

7    Q   Is it fair to say those accelerations were overstated?

8    A   I think, you know -- we reported them as basically over-

9    estimations of what would happen to a real infant in a, you

10   know, shaken episode in the real world.

11   Q   Once you took those acceleration values, what did you

12   compare them against?

13   A   There was a variety of different sources.  We looked at,

14   you know, data on -- you know, there's animal testing.  A lot

15   of the data on subdural hematomas is done on animal testing,

16   specifically primate testing.

17        And we looked at the levels that did and did not

18   result in subdurals.  We also looked at a variety of

19   different -- there is cadaveric testing that is looked at,

20   subdural hematomas as well.

21        And then we have -- again, we have the human

22   volunteer data that kind of shows what doesn't -- doesn't

23   cause it, you know, what kind of exposures do not result in

24   subdurals.  So all these go in, and you can look at that data,

25   and we have an idea where subdurals start to occur.

1  Q   Now, does that data correspond directly to infants?

2  A   A lot of it is not.  I mean, there is -- there is not a

3  lot of infant data or infant, you know, materials to test.

4  Just logically from an ethical point of view, from a societal

5  point of view, we don't have that, and it makes sense.

6        But what we do do is we take these experiments, and

7  from our engineering knowledge, we are able to extrapolate

8  what that data means for an infant.  So there's these methods

9  of scale down to what an infant -- what the equivalent

10  accelerations would be in an infant.

11        Now, these scaling methods have been used for years

12  in a variety of different circumstances and have been -- you

13  know, there are standards in the industry.  They have been --

14  when we do end up having some pediatric data to look at, those

15  scaling methods have actually been validated with this data.

16  So when we do have an opportunity to get some pediatric data,

17  it's been shown that these scaling methods do work.

18  Q   You said those scaling methods have been used in other

19  circumstances.  Can you describe those circumstances?

20  A   Sure.  They're developing, for example, the car safety

21  standards of children of various ages.

22        There's the adult crash test dummy, but there's also

23  a six-year-old, a three-year-old, a one-year-old crash test

24  dummy that these scaling methods have been used to define what

25  is injurious for those dummies that are different from the

1   adults.

2   Q   Are these safety standards?

3   A   Yes.  These are part of the federal motor vehicle safety

4   standards.  These are what the federal government requires

5   automobile manufacturers, car seat manufacturers, to test

6   against in order to sell their products.

7   Q   Now, going back to your specific analysis to this case,

8   I'm going to divide it up into three segments:  Head injury

9   potential, neck injury potential and retinal hemorrhage

10  potential.

11          Can you describe your analysis of the shaken baby

12  syndrome theory in this case with regard to head injury

13  potential?

14  A   Sure.

15          There's probably a -- the next slide might be a good

16  illustration of this.

17          So what the biomechanics field has found is that as

18  you increase head acceleration, that you end up with a higher

19  risk of head injuries, specifically -- in this case,

20  specifically subdural hematomas.

21          So, you know, at low levels, you don't get it; at

22  high levels you do.  So as you increase it, you increase that

23  potential.

24          So this chart just shows kind of, hey, you know, as

25  you increase it, here is the level that you end up getting

1    head injuries.  And so now we want to compare that level to

2    what we get during the shaking episodes I just talked about.

3         So if you go to the next slide, I think I put on --

4    go a couple more.  One more.

5         The other thing is, you know, there's also a neck

6    injury potential here.  We know that children's anatomy are

7    different from adults, their anthropometry, so their size and

8    shape are different.  One of the unique characteristics of

9    infants is they do have a big head compared to the body.  They

10   have a big head and basically a little neck.  And so when you

11   rotate the head in these shaking episodes, you're shaking the

12   torso that is resulting in forces that are transmitted through

13   the neck in order to rotate the head.  That's the mechanics of

14   what a shake is.

15   Q    Let me stop you there for a second.

16        You said "forces."  Does force differ from

17   acceleration in engineering terms?

18   A    They're different measures.  You know, acceleration is

19   what I chose before, force or something that, you know, we

20   kind of understand as pounds of force or weight.  They're

21   different.  They're related.  They are --

22        You know, Newton's second law of motion defines how

23   they're related:  Force equals mass times acceleration.  So

24   they're related, but in engineering terms, you know, we find

25   one maybe correlates a little bit better to injury, and that's

1   why we use acceleration when we talk about head injuries

2   because that's what's been found to be the measure that is

3   best correlated with these injuries.

4          When we talk about neck injuries, it's really the

5   force applied to the neck.  The neck isn't moving that much,

6   but it is resulting in forces on this structure of the neck.

7          So as I mentioned before, as you rotate -- or as the

8   head is rotated, you're putting -- there is a resulting force

9   on the neck.  So we can understand for head acceleration of a

10  certain level, we do get forces on the neck, tensile forces on

11  the neck actually.  So we're pulling -- we're pulling the neck

12  as we do this.  And what --

13         Because the specifics of the anatomy of children, you

14  know, big head, little neck, you know, the levels of

15  acceleration of the head that result in neck injury have been

16  shown to be much lower than the accelerations that have been

17  associated with brain injury.  So as you go up the

18  acceleration, as you increase it, you will get forces on the

19  neck that will result in injury before you would get to the

20  levels of acceleration associated with actual, you know, brain

21  injury.

22  Q   Now, when you say neck injury, what type of neck injuries

23  are you discussing?

24  A   You know, the threshold for neck injuries, we're

25  talking -- this is, you know, catastrophic type neck injuries.

Prange - direct

1    These are ligamentous tears.  These are fractures of

2    vertebrae.  These are separate -- dislocations of the

3    vertebrae from one another.  There's injuries, you know --

4    atlanto-occipital dislocations is the kind of medical term.

5            THE COURT:  What was the medical term?

6            THE WITNESS:  Atlanto-occipital dislocations.  It's

7    basically the top of the head separates, or the bottom of the

8    skull separates from the top of the neck.  You know, in real

9    terms, it's basically an internal decapitation when it comes

10   down to it.

11           Those are the type of injuries that occur when you

12   get to certain accelerations that are far before you get to

13   the brain injury accelerations.

14   BY MR. RUFO:

15   Q   When you say brain injury, what type of brain injury are

16   you referring to?

17   A   Specifically in this case, subdural hematomas.

18   Q   Is that a subdural hematoma caused by ruptured bridging

19   veins?

20   A   Yes.  It's a traumatic type of severe hematoma that we

21   talked about before.

22   Q   Now, have you seen documentation or imaging of these neck

23   injuries?

24   A   Yes.  In other circumstances, there's situations where

25   this does occur outside the context of shaken baby syndrome,

1    and one of the other contexts that I have seen it in, and

2    others have seen it, are in the terms of car accidents.

3            You have a restrained child in a car seat.  The

4    torsos are strained, and they're in a severe, say, frontal

5    crash.  So they're restrained.  Their head goes forward.

6    Again, applying acceleration to the head, tension on the neck,

7    and what results in those cases is the catastrophic neck

8    injuries.  They don't end up with brain injuries.  They end up

9    with catastrophic neck injuries.  And I have seen numerous

10   cases of those.

11   Q    Have you seen those documented grossly or visibly?

12   A    I usually review the medical records that are associated

13   with these injuries, and there is documentation of step-offs,

14   as sometimes it's called, or they will palpate, they will

15   touch, the region, and they will feel there's discontinuity

16   there, so it's something that will happen there.

17           There is also documentation these are typically

18   functional type of injuries, meaning there is injury to the

19   actual spinal cord, so the children will have problems

20   breathing or they can't move their extremities, and so there's

21   a functional result.  There's a functional injury as a result

22   of the structural injury inside.

23   Q    Have you seen these types of injuries documented or

24   recorded as documented on a CT scan?

25   A    Yes, I have seen cases of these injuries and looked at CAT

1   scans and have reviewed them along with radiologists and

2   basically were able to visualize these types of injuries.

3   Q   Can you explain what this PowerPoint is showing here?

4   A   So this is kind of the summary of a lot of data.  So the

5   blue region is where you end up getting these subdural

6   hematomas.

7          The orange region and above is where you start to get

8   these really catastrophic neck injuries.

9   Q   When you say blue injuries, you're referring to the shaded

10  blue area?

11  A   The shaded blue area, I'm sorry.  Yes.

12         And the dark blue bar are the accelerations that we

13  measured during shaking events.  So we can see from where that

14  bar is, we're on -- right on the threshold of maybe causing

15  some neck injuries from these shaking cases, but we have no --

16  we have not reached up there to the blue dotted line to get

17  close to where we would result in subdural hematomas.  The

18  acceleration just isn't there.

19         The green bar shows what I was trying to illustrate

20  before the severe crash.  You know, a car crash of this

21  severity can generate a lot more force than a human could

22  shake in a child.  So we do get higher accelerations of the

23  head.  And what we see in those cases are we see neck

24  injuries, and we don't see head injuries.

25         And that's what fits right with this result.  We get

1  into the orange region, but we do not get into the blue

2  region.  So that kind of -- that's the idea of neck injuries

3  before head injuries.

4  Q    Have you done any research comparing the levels of

5  acceleration in a shaking type incident versus an impact type

6  incident?

7  A    Yes.  Part of the research was looking at those two

8  situations.

9  Q    And what have you found regarding those two situations?

10  A    That the accelerations associated with an impact are much

11  greater than during the shaking event.

12        And if you think about it, it makes sense, right?

13  It's the -- as I said before, it's the time that is important,

14  how long does this happen.  When you shake a child, you're

15  dealing with a lot of motion to the head.  You're getting --

16  you know, you're talking about changing the velocities of

17  maybe a hundred to 200 milliseconds.

18        When you're talking about an impact, you're changing

19  that same velocity, but now it's a very sudden stop.  Now

20  you're talking about maybe 10 milliseconds, so an order of

21  magnitude lower.  So the accelerations just shoot up, and

22  they're much, much higher.

23  Q    Now, is it fair to say that a simple fall could generate

24  forces much greater than a shaking incident based on your

25  research?

1    A    In falls -- I mean, I don't know what you mean by a simple
2    fall.  But in a fall where, you know, a child falls off from a
3    certain distance and hits their head first onto a relatively
4    hard surface, certainly we get accelerations that are higher
5    than shaking.

6    Q    What sort of distance are you talking about?

7    A    We're talking, you know, three feet or more.

8         I mean, as you increase the distance, you get more
9    velocity.  So we're talking falling from like three feet onto
10   your head will result in much higher accelerations.

11   Q    Now, are you aware of any research or studies done
12   regarding the threshold for retinal hemorrhages?

13   A    I think this is kind of a new area, biomechanics.  There
14   are some studies that are out there that try to look at some
15   of the accelerations that are associated with retinal
16   hemorrhages.  They have been done in -- well, there's two
17   studies I know that looked at it.

18        MR. TELISMAN:  Your Honor, pardon me.  I don't know
19   if these were referenced in the --

20        THE COURT:  In the report?

21        MR. TELISMAN:  -- in the report.  If they're not, I
22   don't want him testifying.

23        THE COURT:  Yes.

24        MR. TELISMAN:  If they are, great.  Can you identify
25   them for me?

1        THE COURT:  It may be easier for him to tell you.

2        The two studies you're referring to, do you have your

3   report up there?

4        THE WITNESS:  I do.  It's on page 7, top paragraph.

5   There's two footnotes.

6        THE COURT:  Two footnotes which correspond to the

7   list at the end in one way or another?

8        THE WITNESS:  Yes.  They're also listed at the end.

9        MR. TELISMAN:  Thank you very much.

10        THE COURT:  Go ahead.

11        THE WITNESS:  So these studies have tried to

12   understand from an animal model --

13        This is a piglet model.

14        THE COURT:  It's a piglet, you said?

15        THE WITNESS:  Piglet, yes, small pigs.

16        To look at the accelerations that, you know, that

17   maybe could result in retinal hemorrhages.

18        One of the studies I think was an abstract, and they

19   basically exposed piglets to even greater accelerations than a

20   shake, and they documented no retinal hemorrhages.  I think a

21   follow-up paper to that -- you know, that same research team

22   basically then published a paper with a little bit more data,

23   the same model.  Again, they're exposing these piglets to much

24   more accelerations than a shake, and they're getting some --

25   some of them have some slight retinal hemorrhages in those

Prange - direct

1  studies.

2        I think they're of limited value here because we're

3  not -- you know, those are at levels much higher than the

4  equivalent to a shake.  So it really doesn't tell us anything

5  about what happens during a shaking event.

6  BY MR. RUFO:

7  Q    Now, when you say higher than the equivalent levels here,

8  would you say they're higher than the blue bar on this

9  PowerPoint?

10  A    That is correct.  They would be higher than that blue bar.

11  Q    Dr. Prange, did you come to an ultimate conclusion about

12  whether shaking could have been the cause of the injuries in

13  this case?

14  A    Yes, basically that the biomechanical data shows that

15  based on the information and the information in the medical

16  records that shaking was not the mechanism that resulted in

17  the subdural.

18  Q    Can you explain just overall why?

19  A    I think, again, you know, we don't have a severe neck

20  injury.  That's what we would expect if that was the case.

21        Also, it is that the data shows that a person, an

22  adult, cannot generate the forces necessary to generate the

23  accelerations that are associated during a just shaking event,

24  that the accelerations just aren't there.  They don't reach

25  the level of tolerance values.

1  Q   Dr. Prange, are you aware of a report of state's expert
2  Dr. Rangarajan?

3  A   Yes, I have read it.

4  Q   Are you aware of the criticisms of your opinion that he's
5  put in his report?

6  A   Yes.

7  Q   And are you aware of the specific criticism of the test
8  dummy that you described, the nonbiofidelic model you were
9  discussing?

10  A   He mentions that, and I think he misses the point of that
11  paper.

12      As I explained before, you know, the idea was not to
13  replicate, you know, perfectly replicate, what a human infant
14  would do.  We're not trying -- we did not try to make that
15  dummy biofidelic as the term goes.

16      The idea of that test device was to generate more
17  acceleration.  So we designed it in such a way that we result
18  in more accelerations than what would do if this was a real
19  living human.  So I would agree with him that our dummy isn't
20  biofidelic, but the accelerations that were associated with
21  that biofidelic dummy would be lower than what we're reporting
22  here.

23  Q   Now, are you aware that Dr. Rangarajan's report has
24  criticized your work for relying on data not from infants but
25  from primates?

1  A   Yes.  I mentioned that before, that a lot of these

2  subdural hematoma data that have been reported and reported

3  for, you know, decades has been on primate data.

4        Again, we're not going to injure real live humans

5  here.  So the primate data that was done, you know, decades

6  ago was an option, probably the best option to look at this.

7  Q   I believe you mentioned this earlier, but had the scaling

8  methods been validated?

9  A   They have.  Again, they are industry standards that have

10  been used for decades and have been proven.  When we do get

11  this validation, we do get the data, these methods have been

12  shown to work.

13  Q   Another one of the criticisms is that you have not

14  necessarily analyzed repeated shaking and whether or not that

15  can cause more injury than a single incident of shaking.

16  A   Yes, I am aware of that criticism.

17  Q   Can you tell me from a biomechanical standpoint, is a

18  single incident of shaking different from repeated incidents

19  of shaking or repetitive shaking?

20  A   Basically, you know, when we talk about repeated -- and in

21  engineering terms, when you talk about repeated, it may be --

22  maybe the threshold is lower if you have a repeated, you know,

23  application of force.

24        So in engineering terms, if a piece of metal, say,

25  you know, this paper clip, right, if you bend it once, it

1    doesn't break.  If you bend it back and forth 10 times, it

2    will eventually break.  In engineering terms, that's called

3    fatigue that we do that.

4            Biological materials don't typically show -- I mean,

5    these blood vessels are not brittle metal kind of type of

6    material, so they don't show that fatigue type process.  So if

7    you do it repeatedly, there's not this lowering of the

8    threshold with these types of biological materials.

9            There have been studies that have been trying to look

10   into this issue and very similar to the retinal hemorrhage

11   studies I mentioned a second ago.  There's piglet studies that

12   have tried to somehow look into the issue of does a repeated

13   event somehow result in difference than a single event.  Those

14   papers have been shown -- I mean, what they do is they show

15   during a single event --

16   Q    Can I stop you real quick?

17   A    Sure.

18   Q    Are you discussing the 2004 Raghupathi paper referenced in

19   Dr. Rangarajan's report?

20   A    Correct.

21            THE COURT:  What's the name?

22            MR. RUFO:  2004 Raghupathi.

23            THE COURT:  Just spell it for the court reporter.

24            MR. RUFO:  R-a-g-h-u-p-a-t-h-i.

25            THE COURT:  Thanks.

Prange - direct

1    THE WITNESS:  Yes.  He's the first author.  It was

2   the same group at the University of Pennsylvania here that did

3   these studies.  And they looked at a single event versus two

4   events.

5    And what they basically concluded was during their

6   single event, about half of their piglets ended up with

7   bleeding.  And then when they subjected different piglets to

8   then one, then a second one, they showed that more of them end

9   up having bleeding.

10    You know, there's several flaws to that paper, I

11   think, to applying to this shaken baby case.  You know, first,

12   they're exposing these piglets to much higher accelerations

13   than a shake.  So, you know, we're talking about an event that

14   is above a shake.

15    Second of all, the theory is that you get no injury

16   with one event and maybe you do get an injury with more

17   events.  That's kind of the theory that's going on.  Well,

18   this paper doesn't test that.  Their one event results in

19   injury.  So they're just getting a little -- you know, half

20   injury and then they get more injury later on.

21    You know, another fault of this paper I think that is

22   used in this context is that, you know, if you subject the

23   piglets to two injuries, you know, after the first injury,

24   half of them are already injured.  So going into the second

25   one, you have preinjured piglets going into that rotation, you

1    know, that second insult.  And, therefore, you're getting more

2    severe injuries because you're resulting in preinjured

3    infants.

4           And it's also half of them were injured in the first

5    hit.  Half of them, you know, half -- the ones that weren't

6    injured there, maybe half of those were injured in the second

7    event.  Well, no wonder you get an increase.  You see more

8    percentage.  It's like flipping a coin, you know, six times,

9    three heads and three tails.  And then you take the tails and

10   you flip those again, and now you have, you know, say, five

11   heads and one tail, and then all of a sudden making a comment

12   of, look, I have five heads and one tail, so that somehow it's

13   more likely.  It just doesn't hold water.

14   BY MR. RUFO:

15   Q    Now, are you aware of the expert report of pediatric

16   neuroradiologist Dr. Hedlund?

17   A    I think I did look at that.

18   Q    And are you aware that he found what he referred to as a

19   retroclival epidural hemorrhage?

20   A    Yes, I did see mention of that.

21   Q    Is this the sort of a neck injury you're talking about

22   that would occur in a shaking incident?

23   A    No.  Like I explained before, the tolerance value to the

24   neck injuries are not, you know, a slight bleed in a certain

25   area.  We're talking about, you know, ligamentous disruptions,

1  bony fractures, you know, subluxations typically associated

2  with, you know, functional injuries, functional cervical spine

3  type injuries. So they're much more severe than this injury,

4  this clival injury that he sees.

5      MR. RUFO: One moment, your Honor.

6      THE COURT: Okay.

7      (Brief interruption.)

8  MR. RUFO:

9  Q  Dr. Prange, one last area I would like to go into.

10     Are you aware -- you're aware of Dr. Rangarajan's

11 report?

12 A  Correct.

13 Q  Are you familiar with his statement that knowledge of the

14 injury threshold for subdural hematoma is the key to analyzing

15 incidents in which a child sustains subdural hematoma?

16     THE COURT: Say that slower.

17 BY MR. RUFO:

18 Q  Knowledge of the injury thresholds for subdural hematoma

19 is the key to analyzing incidents in which a child sustains

20 SDH?

21 A  Yes, I would agree with that statement. I think that is

22 kind of the methodology that I just put up and showed you

23 before.

24 Q  Now, are you aware that his ultimate conclusion is that

25 the level of head angular acceleration needed to cause SDH in

1  adults and children due to shaking is a topic of current

2  research and is not yet defined with any level of certainty?

3  A    I disagree with that statement.

4  Q    Why do you disagree?

5  A    There's certain research that's been conducted in this

6  area, but I think there is knowledge.  I think there is a lot

7  of data out there to define what the threshold is.  Maybe Dr.

8  Rangarajan can't do it himself, but I think there's a lot of

9  data and a lot of people -- other people in the industry

10  certainly do define the threshold for subdural hematomas in

11  children.

12  Q    Am I correct that it's your ultimate opinion that shaking

13  cannot cause or cross the threshold into head injuries without

14  first causing neck injury?

15  A    That's correct.

16          MR. RUFO:  Nothing further.

17          THE COURT:  Mr. Telisman.

18          MR. TELISMAN:  Thank you, your Honor.

19                    CROSS EXAMINATION

20  BY MR. TELISMAN:

21  Q    Hi, Dr. Prange.

22  A    Good morning.

23  Q    Good morning.

24          Okay.  First off, you said earlier that you relied on

25  the medical records in this case, right?

1   A   Yes, I reviewed them, and, yes.

2   Q   The medical records.  And you talked a little bit before

3   on direct examination about how there was imaging done on

4   Isabella after she collapsed?

5   A   Correct.

6   Q   And you took a look at that, and did you actually look at

7   the images themselves or the reports?

8   A   I looked at the reports.  I didn't really look at the

9   images.

10  Q   Okay.  And you saw that the reports reflected that there

11  was hemorrhaging in her -- in or around her brain, right?

12  A   Correct.  Between the skull and the brain, there was

13  documentations of bleeding, correct.

14  Q   And there was old blood found, right, old hemorrhage?

15  A   I think there was talk about a chronic subdural hematoma

16  at one point, yes.

17  Q   And new blood, right?

18  A   I think there was -- yes.  There was two different -- two

19  different characteristics.

20  Q   And the report reflected that the hemorrhages were located

21  in different areas of the brain, right?

22  A   I can't recall as I sit right here, but that very well

23  could be true.  I don't remember the details from memory.

24  Q   Okay.  Now, in your report you talked about -- and I think

25  you just talked about this on direct examination -- that your

1    biomechanical analysis in this case was to evaluate whether

2    shaking was a potential mechanism for the injuries noted in

3    Isabella Zielinski's medical records, right?

4    A    That is correct.

5    Q    And that's what you evaluated, whether shaking alone could

6    have caused her injuries, right?

7    A    Yes.

8    Q    And that means when the biomechanical analysis that you

9    conducted here was shaking without her head touching anything

10   during the shaking episode, right?

11   A    It takes into account like, you know, contacting, you

12   know, the back of head with the back of the child and maybe

13   the chin contacting the chest, but not with an external object

14   in anything.  That is correct.

15   Q    Okay.  And you reported that head accelerations from

16   impact are 40 to 50 times greater than head accelerations

17   measured during shaking alone, right?

18   A    Correct.

19   Q    Let me see.  And you also say that head accelerations

20   measured from inflicted impact can exceed the well-

21   established thresholds for head injury, right?

22   A    Yes.

23   Q    So inflicted impact need not be against a hard surface in

24   order to cause injury, right?

25                MR. BLEGEN:  Judge, can I interpose an objection?

1   THE COURT:  Just do it.  You don't have to ask

2   permission to make an objection.

3       MR. BLEGEN:  Except it's kind of a strange objection.

4   There is no report from any of their experts that there was

5   impact in this case.

6       THE COURT:  Well, you know, I am well aware of the

7   subtle proposition that a question is not evidence.  And, you

8   know, he's asking a question.  I don't think there is anything

9   wrong with the question.  Maybe your objection is it assumes

10  facts not in evidence.  I don't know.  But I think he's

11  entitled to test the opinion, and I don't think he's doing

12  anything more than that.

13      MR. BLEGEN:  The rest of my objection is, you know,

14  they can't change the theory of the event, the case, now and

15  expect us to be able to respond in time without taking up

16  your --

17      THE COURT:  Wait.  Back up.  Say that again.

18      MR. BLEGEN:  I don't think they can change the theory

19  of the cause of death or what caused the injury now and expect

20  us to be able to respond to it in the limited time we have

21  left.  It's just -- we can go on.  I just wanted to --

22      THE COURT:  In what way do you think that the theory

23  is being changed?

24      MR. BLEGEN:  They're changing from shaking alone to

25  shaking with impact.

1        THE COURT:  Okay.  I mean, I guess I don't know that

2   I'm reading that much into a single question by Mr. Telisman,

3   but I guess my observation would be that, you know, unless

4   there was some obligation by somebody to disclose in advance

5   what their theory is, which I don't really think there was, I

6   don't really see anything wrong with that.

7        I mean, if you would compare this with your sort of

8   average criminal trial either in state court or federal court,

9   there is no occasion where somebody has to say, or the

10  prosecution has to tell the defense, what's your theory of the

11  crime.  That's something people do in arguments usually.

12       So if that's an objection, it's overruled.  There may

13  be some other objection.

14       Go ahead, Mr. Telisman.

15       MR. TELISMAN:  Thank you.

16  BY MR. TELISMAN:

17  Q   Now, Dr. Prange, and I can't recall if I got an answer,

18  but --

19       THE COURT:  Ask the question again because I don't

20  have it in mind.

21       MR. TELISMAN:  Sure.

22  MR. TELISMAN:

23  Q   Inflicted impact need not be against a hard surface to

24  cause injury, correct?

25  A   Correct.

Prange - cross

1  Q   And, in fact, when the surface is soft, the force of

2  impact is widely dissipated and may not be associated with

3  visible signs of surface trauma even though the brain itself

4  decelerates rapidly, correct?

5  A   Correct.

6  Q   It is the sudden angular deceleration experienced by the

7  brain and cerebral vessels, not the specific contact forces

8  applied to the surface of the head, that results in the

9  intracranial injury, right?

10  A   That's correct.  That goes to what I was saying before.

11  It's the motion of the brain and the skull, not the actual

12  contact on the outside.

13  Q   Right.  And in some patients with inflicted head injury,

14  no extracranial injuries are detected, correct?

15  A   I think that's what has been reported in the literature,

16  yes.

17  Q   And in some patients with inflicted head injury, soft

18  tissue injuries including scalp hemorrhages are really only

19  noted at autopsy?

20  A   Potentially, yes, sure.

21  Q   And in this case, Isabella survived for nearly 11 months

22  after her collapse?

23  A   That's my understanding, yes.

24  Q   And the autopsy, obviously, didn't take place until 11

25  months after her collapse?

Prange - cross

1  A  Correct.

2  Q  Also, scalp trauma is sometimes visible only after the

3  hair has been shaved, right?

4  A  Potentially, yes.

5  Q  Okay.  And just so that we're clear, I'm getting this

6  from -- you know who Ann Christine Duhaime is, of course?

7  A  Yes, I know Dr. Duhaime.

8  Q  Dr. Duhaime is a noted neurosurgeon who has done a lot of

9  work.  She's actually worked with you, correct?

10  A  That is correct.  She was an author on one of my papers.

11  Q  And actually you and Duhaime -- well, I will get into that

12  in a little bit.

13        And this is something actually that she has written

14  in a paper.  Do you know that?

15  A  I can't recall.  The actual words she writes herself, but

16  I don't disagree with you.

17  Q  Okay.  That is all I just wanted to establish.

18  A  Yes.

19  Q  Isabella's scalp in this case, it was never shaved at the

20  hospital?

21  A  Not that I recall.

22  Q  So here is the question.  If Isabella was subjected to

23  inflicted head trauma as part of a shaking event against a

24  soft surface, could it have caused intracranial injuries?

25  A  Potentially.

1  Q   And it would not necessarily have left a visible sign of

2  surface trauma, correct?

3  A   Correct.

4  Q   Or it may have left a soft tissue injury that resolved

5  before her autopsy, right?

6  A   Correct.

7  Q   Was Isabella around any soft surfaces when she collapsed?

8  A   My understanding from the tes -- or the statements was she

9  was on the couch --

10 Q   Right.

11 A   -- when she collapsed.

12 Q   And the petitioner was the only adult present?

13 A   That's my understanding, yes.

14 Q   Okay.  So the petitioner could have shaken Isabella and

15 had Isabella's head during the shaking event impact the couch?

16 A   There is a possibility.

17 Q   Sure.

18 A   Okay.

19 Q   That's not something that you did a biomechanical analysis

20 to test?

21 A   No.  Again, that was not something that I looked into

22 specifically for this case because it wasn't -- I did not see

23 that as the allegations.

24 Q   Okay.  Now, let's talk a little bit about the issue of

25 shaking alone now.  You stated on direct examination that you

1  do not believe that shaking --

2  　　　　Well, you wrote in your report actually that shaking

3  does not provide a mechanism for subdural hemorrhage?

4  A  Yes.  The magnitude is not --

5  Q  Sure.

6  A  -- is not present.

7  Q  Okay.  And so shaking cannot -- shaking a baby, an adult

8  shaking a baby cannot cause brain injury?

9  A  No, I think -- I mean, I think the constellation of

10  injuries we have here without a neck injury, then that is

11  correct.

12  Q  Okay.  So --

13  A  Okay.  It's the combination of the two.

14  　　　　THE COURT:  You have got to stop talking over him.

15  If you want him to stop, you tell me to cut him off.  She's

16  not going to be able to get it down.  I don't understand it

17  when you're talking over him.  So cut it out.

18  　　　　MR. TELISMAN:  Yes, your Honor.

19  　　　　THE WITNESS:  So it's both.  You can't get up to the

20  magnitude of accelerations that can do it, but you also -- if

21  you did, you would have a neck injury as well.

22  BY MR. TELISMAN:

23  Q  Now, your report actually says there is no biomechanical

24  data showing that the head accelerations associated with

25  shaking alone are sufficient to cause the acute subdural

1    hemorrhages in a normal infant.

2            Did I read that correctly?

3    A    That is correct.

4    Q    So putting the neck aside, putting the other issues aside,

5    do you believe that shaking a baby cannot cause brain injury?

6            THE COURT:  Of any kind, you mean?

7            MR. TELISMAN:  Correct.  An adult shaking a baby

8    cannot cause any kind of brain injury.

9    BY THE WITNESS:

10   A    I'm just trying to kind of --

11           You're saying all kinds of brain injuries, so I'm

12   trying to think about what that encompasses.  If you're

13   talking about --

14           I mean, the injuries that I have looked at, like

15   subdural hematomas -- injuries, those types of things,

16   correct, the magnitude is much lower than the tolerance levels

17   of those types of injuries.

18   BY MR. TELISMAN:

19   Q    So even Arnold Schwarzenegger in his prime, shaking a baby

20   a thousand times in a row, would not cause any sort of a brain

21   hemorrhage, would not cause any sort of injury to the tissues

22   of the baby's brain?

23   A    You know, I don't know what Arnold Schwarzenegger can do.

24   Certainly the petitioner in this case is not Arnold

25   Schwarzenegger, but, you know, I don't think so.  Again, I

1    haven't tested, you know, body builders to see what they do.

2         We definitely had, when we looked at our experiments,

3    we had adult males, myself included, that would shake this

4    absolutely as hard and as fast as they absolutely could, and

5    so I think, again, that's an overestimation of what's going on

6    in the real world.

7    Q   Okay.  Dr. Prange, I want to focus on this for a little

8    bit.

9    A   Sure.

10   Q   Now, you agree that trauma can cause subdural and

11   subarachnoid hemorrhages, correct?

12   A   Yes.  They can be trauma related, yes.

13   Q   And have you talked about in your report that the

14   acceleration-deceleration event can cause a hemorrhage as a

15   result of the brain moving relative to the motion of the

16   skull?

17   A   Correct.

18   Q   And that can cause a bridging vein to stretch or rip or

19   leak, is that right?

20   A   Correct.

21   Q   And, also, you agree that trauma can cause injury to the

22   tissue and fibers of the brain, correct?

23   A   Correct.  The axons, I think, is what you're --

24        The actual axons of the brain tissue itself, is that

25   what you mean?  Yes.

1  Q   Okay.  And in order to know that, in order to determine
2  that, you need to know two things, right?
3          And that's here, as we have here on your slide,
4  that's entitled "Evaluation of Injury Potential," you need to
5  know the mechanical exposure, right?
6  A   Correct.  We need to know what the event is.
7  Q   And you need to know the injury threshold?
8  A   Correct.
9  Q   For mechanical exposure, that's what you were talking
10 about with the testing that you had done with dummies and
11 things like that?
12 A   Correct.
13 Q   Okay.  And that is strictly to determine the amount of
14 force that an adult can generate from an event, right?
15 A   It's the measure, yes, the accelerations of the infant
16 head during an event, such as shaking in this case, yes.
17 Q   And what --
18         And when you do that, you are looking at the maximum
19 number, the maximum level of acceleration that can be reached?
20 A   Yes.  We peak, yes.  The peak value, correct.
21 Q   Thank you.
22         And you did that, you said, doing experiments by
23 holding dummies and shaking them, and you have like an
24 accelerometer or something planted at some point on the dummy
25 to measure how much acceleration is gained by that?

1    A    Correct.

2    Q    Okay.  Now, with respect to the second part, the injury

3    thresholds, you need to know that as well, right?

4    A    Correct.

5    Q    And that is to determine whether or not basically whether

6    the baby's brain and the baby's bridging vein can withstand

7    the pressure or the acceleration that you figured out from the

8    first part, right?

9    A    Correct.  We want to compare the event to what causes

10   injury and what doesn't cause injury, so we need to know the

11   threshold.

12   Q    And you simply do that to -- and you simply compare.

13          Once you have determined what the injury threshold

14   is, you simply compare it to the mechanical exposure, and if

15   it's greater than the mechanical exposure, you can say it

16   could not happen?

17   A    Yes.  That was the bar chart I think I showed later on was

18   basically that comparison.

19   Q    Okay.  Dr. Prange, you wrote in your report:

20          "In controlled experiments, deformation of the

21   bridging veins and brain tissue is very difficult, if not

22   impossible, to measure?"

23   A    That's correct.

24   Q    But you determined the force is necessary to cause

25   Isabella's bridging veins to tear?

1    A    Yes.

2    Q    How much force was necessary to cause her bridging veins

3    to tear?

4    A    That's not part of the analysis, and I would be happy to

5    explain.  You know, we don't have a test dummy that has all

6    this perfect anatomy.  We don't have bridging veins in there

7    to look at that.  I mean, we had no way to actually even look

8    at that to begin with.  You know, we couldn't replicate that

9    anatomy.  That would be really difficult to do, that complex

10   anatomy.

11            So that's why I want to present this type of

12   analysis.  This is the engineering, the biomechanics, type of

13   analysis where we know accelerations, basically what levels of

14   accelerations result in those breaking.  So I can't tell you

15   the force exactly on those.

16            There's been some data that have pulled on bridging

17   veins and broken them and reported forces, but I think the

18   most important thing here is we need a metric.  We need

19   something we can measure that has been correlated with that,

20   that bridging vein tear, and acceleration is that measure.

21            So acceleration has been shown to be correlated.  So

22   as we increase acceleration, we then increase the risk of this

23   bridging vein tear.  So it's a surrogate for what is

24   underlying the anatomy, what's going on.  The acceleration is

25   really the metric.  It's the measure.  It's the surrogate to

1 determine that.

2 Q    Okay.  So tell me if I have got this right.  You said that

3 you're not so much relying on testing of the injury threshold

4 of the bridging vein itself; is that fair to say?

5 A    No.  We are implicitly, right, because we're looking at

6 experiments that have resulted and have applied accelerations

7 and resulted in bridging vein tears.

8         So we look at, say, cadaver experiments that have

9 looked at this.  We applied acceleration and we can document

10 whether the tear happened.  Do we measure the force on it?

11 No, but we know that this acceleration resulted in this bleed.

12 So there is -- there was a breaking of the bridging vein in

13 those experiments.  So implicitly it's in there.

14         To measure the exact metric you're wanting to know is

15 really not relevant here.  The accelerations have been shown

16 to break that.

17         THE COURT:  The answer is stricken as nonresponsive.

18         Now, I'm going to tell you what I've told the last

19 two people who have testified.  If you would like me to strike

20 the entirety of your testimony, just keep on editorializing.

21 This is not a lecture.  It's not you presenting a PowerPoint

22 to a group of people at a conference.  It's a

23 question-and-answer format.

24         You are to answer the question directly and do no

25 more.  And if Mr. Blegen or Mr. Rufo, the attorneys for the

Prange - cross

1    petitioner, think that more needs to be done, then they will

2    do it.  I've stricken that answer as nonresponsive.

3                THE WITNESS:  I apologize, Judge.

4                THE COURT:  And if it keeps happening, I'm going to

5    strike the entirety of your testimony.

6                You know, people are supposed to have told you this.

7    And either they didn't or they did and you didn't pay

8    attention to them.

9    BY MR. TELISMAN:

10   Q   Dr. Prange, did you --

11               In order to determine the injury threshold, you do

12   not base that on any experiments with living human infants

13   being shaken, correct?

14   A   That is correct.

15   Q   And you did not base that injury threshold determination

16   on an experiment with a human cadaver being shaken, did you?

17   A   There's cadaver experiments, yes, but not specifically

18   shaken.

19   Q   And the cadaver experiments involved like dropping a

20   cadaver's head onto a surface?

21   A   Or impacting the head, yes.

22   Q   Impacting the head?

23   A   Yes.

24   Q   Impact as opposed to shaking, right?

25   A   A padded impact, yes.

1 Q    And there is kind of a problem with the cadaver

2 experiments or a limitation of the cadaver experiments insofar

3 as the cadavers are -- the bodies are dead, right?

4 A    Correct.

5 Q    And the bodies don't have -- there are certain things that

6 happen to the tissue of the body upon death, correct?

7 A    Sir, yes.

8 Q    You don't have blood flowing through vessels on a cadaver,

9 correct?

10 A    In these experiments, yes, they did.

11 Q    They actually put blood flowing through the vessels of the

12 skull when they dropped them?

13 A    They have -- they pressurized the vessels with fluid, yes.

14 Q    But the tissue of the body is still different when it's

15 dead as opposed to when it's alive, correct?

16 A    It depends on the tissue you talk about, but certainly a

17 possibility, yes.

18 Q    Now, with respect to the injury thresholds here, you base

19 that in large part, as you said before, on animal experiments,

20 right?

21 A    That is part of it, yes.

22 Q    And a lot of it was based on experiments done on adult

23 primates, correct?

24 A    Correct.

25 Q    And tell me if I get this right, but a lot of the

1   experiments involved -- these were done basically in the

2   context of like for automobile safety, is that right?

3   A   I think they were really done in the context of just

4   understanding the mechanism. I don't think they necessarily

5   had a specific goal.

6   Q   Okay. But in these experiments, they would -- they would

7   affix a living adult primate to like a sled?

8   A   That's one of the experiments, yes.

9   Q   They would expose it -- they would basically have the sled

10   go really fast?

11   A   Correct.

12   Q   And then come to a very, very short stop and then see what

13   happened to the primate?

14   A   That is one of the experiments, yes.

15   Q   And that was done with the -- the primate experiments,

16   these were done with adult monkeys or adult primates, correct?

17   A   Yes.

18   Q   And none of these experiments actually shook any primates,

19   correct?

20   A   Correct. I mean, correct.

21   Q   These were primates that were basically exposed to one

22   event, right?

23   A   One event, yes.

24   Q   And in order to draw some information about these adult

25   primate whiplash experiments -- and pardon me. I'm assuming

1  they are whiplash; that's a whiplash event, correct?

2  A   That's not the way I would characterize it.

3  Q   Well, a single rapid acceleration-deceleration event?

4  A   Sure.  You could characterize it like that.

5  Q   Okay.  In order to draw some information about these

6  experiments and apply it to shaking a human infant, you have

7  to account for different things, correct?

8  A   Correct.

9  Q   You have to account for the difference in the species,

10  right?

11  A   Sure.

12  Q   You have to account for the difference in the age; you are

13  dealing with adult primates versus infant children, right?

14  A   Correct.

15  Q   You have to account for the difference in material

16  properties, right?

17  A   Correct.

18  Q   And by material properties, we're talking about the fact

19  that the tissues involved in a primate may have different

20  responses to stresses than the tissues of a human, correct?

21  A   Correct.

22  Q   And you have to account for differences in geometry?

23  A   Yes.

24  Q   And differences in direction?

25  A   Yes.

Prange - cross

1  Q   And if you get any of those wrong, your injury threshold
2  is wrong, correct?
3  A   You have to take those into account.
4  Q   In order --
5  A   If you take those into account, you're fine.
6  Q   Now, but in order to take those into account, you have to
7  get those --
8        You do a process called, as you said before, scaling,
9  right?
10  A   Correct.
11  Q   And when you scale, you have to make sure that you account
12  for all those things and in applying -- in determining what,
13  how -- in order to figure out the injury threshold and apply
14  it to an infant, correct?
15  A   Correct.
16  Q   Now, one of the studies that you rely on is by Duhaime
17  from 1987, correct?
18  A   Correct.
19  Q   And it was kind of a seminal study in the sense that this
20  was -- she had stated that you -- essentially what you're
21  saying here, that shaking alone is insufficient to cause
22  injury, correct, or to cause brain --
23  A   I think that was the conclusion of that paper, yes.
24  Q   And Dr. Duhaime accounted -- took the data from the adult
25  primate study and then scaled it in order to determine what

Prange - cross

1     the infant threshold level would be, right?

2     A    I think so, yes.

3     Q    And the way that she scaled it was through mass scaling,

4     is that right?

5     A    Correct.

6              THE COURT:  Mass?

7              MR. TELISMAN:  Mass.

8              THE COURT:  M-a-s-s?

9              MR. TELISMAN:  Yes.

10             THE COURT:  Okay.

11    BY THE WITNESS:

12    A    Yes.

13    BY MR. TELISMAN:

14    Q    But she did not do any scaling for things like materials

15    or geometry or things like that, correct?

16    A    I don't know if she took that into account and determined

17    whether those values were not applicable.  But certainly that

18    was not in these scaling -- you know, that was not in her

19    relationship.

20    Q    And by definition, biomechanical engineering has to rely

21    on extrapolating, extrapolation of data, to what would happen

22    in a real life event, correct?

23    A    Correct.

24    Q    So you have to make some assumptions?

25    A    Correct.

Prange - cross

1  Q   Now, with respect to these injury thresholds, one of the

2  studies that you talked about on direct examination was a

3  paper that you wrote in 2003?

4  A   Yes.

5  Q   That was where you talk about impact versus shaking?

6  A   Correct.  It was a follow-up to that '87 paper basically.

7  Q   And you wrote there:

8        "Regional tissue thresholds specific to the infant

9  would be required to predict injury on the basis of local

10 intracranial stresses or strains produced by rapid rotations

11 like shaking," right?

12 A   Yes.

13 Q   "Such thresholds are currently unavailable for the

14 pediatric population"?

15 A   Correct.

16 Q   Now --

17 A   That's what the paper says, I should say.  Correct, you're

18 reading that correctly.

19 Q   And you agree that the adult brain is much different from

20 the infant brain, correct?

21 A   It's different.  I don't know if I -- "much" is a very

22 subjective term.

23 Q   Okay, and that's fair.  But it is different, correct?

24 A   Certainly it's different, yes.

25 Q   The infant brain has a very high water content compared to

Prange - cross

1    the adult brain?

2    A    That's what's been documented, yes.

3    Q    The maturity of the development of the glial cells in the

4    infant brain is different from the adult brain?

5    A    That is my understanding.

6    Q    The myelination of the axons of -- and we talked about

7    axonal injury.

8         The myelination of the axons is much -- it's much

9    less mature in an infant as opposed to an adult, correct?

10   A    Correct.

11   Q    And the axons are also smaller in size relative to the

12   brain than an adult, correct?

13   A    Yes.  I think that has been documented, yes.

14   Q    Now, because of those things, you can't just rely on mass

15   alone in scaling an injury threshold from an adult experiment

16   to an infant; is that fair to say?

17   A    Well, you need to take into account some of those other

18   parameters like the material characteristics, which has been

19   done.

20   Q    Now, tell --

21        MR. TELISMAN:  Pardon me, your Honor.

22        (Brief interruption.)

23   BY MR. TELISMAN:

24   Q    Dr. Prange, you have held this belief about shaking being

25   insufficient to cause brain injury for a long time; is that

Prange - cross

1  fair to say?

2  A   I think that study was 2003, so certainly since then, yes.

3  Q   And after that article in 2004, you wrote something in the

4  Journal of Neurosurgery, correct?  Do you recall that?

5  A   I think there was a letter to the editor, maybe a

6  follow-up with it.

7  Q   Exactly.

8  A   Yes.

9  Q   And it was you and Dr. Duhaime?

10  A   I forget who the authors were.  I just don't recall right

11  offhand.

12  Q   In that response -- and this is essentially someone wrote

13  a letter to the editor having some questions about your 2003

14  study, and you had a chance to respond, and it was published,

15  is that correct?

16  A   I think that's the method that was -- that's why I was

17  published, yes.

18  Q   And you wrote:

19        "New research is needed to determine if injuries can

20  occur in the brain, cervicomedullary junction or cervical

21  spinal cord as a result of a single or series of head

22  rotations at these low magnitudes, referring to shaking, and

23  if these injuries are primary or secondary in nature.

24  Therefore, we cannot yet answer if shaking can cause

25  intracranial injury in infants."

1   A    That's what is in the letter, yes.

2   Q    So you wrote that new research is needed to determine if

3   injuries can occur in the brain as a result of shaking?

4   A    Basically that there is some more research that could

5   explain it.  There's always uncertainties in science.  We were

6   just pointing out there's some other avenues to look at.

7   Q    You also -- and, also, you wrote that new research is

8   needed to determine if injuries can occur in the

9   cervicomedullary junction?

10  A    Yes.

11  Q    That's -- and I will spell that for the court reporter.

12  C-e-r-v-i-c-o-m-e-d-u-l-l-a-r-y.

13       That is where the head meets the neck basically?

14  A    Yes.  That's the part of the brain and the spinal cord

15  right there at that junction, yes.

16  Q    And, also, in the cervical spinal cord, new research is

17  needed to determine if injuries can occur in the cervical

18  spinal cord?

19  A    Yes.

20  Q    We're basically talking about the neck there, right?

21  A    Correct.

22  Q    Now, and that's because biomechanics had not yet

23  established the injury threshold of an infant's brain in a

24  shaking scenario as of that point?

25  A    No.  I think it's basically just an explanation of there's

Prange - cross

1    some other avenues to look at.

2    Q    But you said:  We cannot yet answer if shaking can cause

3    intracranial injury in infants.  That's what you wrote, right?

4    A    In 2004, yes.

5    Q    And you already had established you need these two things,

6    right, number one and number two, mechanical exposure and

7    injury threshold in order to determine that, right?

8    A    Part of it, yes.

9         There is also data that has been supplemented to

10   this, but, yes, we did have an understanding of both of those

11   things.

12   Q    Okay.  And you knew the mechanical exposure, right?

13   A    We had an estimation of it, yes.

14   Q    And you're saying that you knew the injury threshold as

15   well?

16   A    We knew that there's an injury threshold based on the

17   current data.  There could be some more data, more avenues,

18   that we needed to look at.

19        It basically was saying, you know, do we need to look

20   at a repeated mechanism as a possibility, right.  There's

21   other --

22        The current data tells us we didn't meet injury

23   level, but there is also more we can do to maybe look into it

24   further.  That's just basically what that's saying.

25   Q    Okay.  Then there was something you were asked on direct

1　　examination about a single shaking event versus repeated

2　　shaking, right?

3　A　Yes.

4　Q　And first off, there have been no experiments conducted on

5　　humans regarding shaking, correct?

6　A　Like living human infants?

7　Q　Yes.

8　A　Of course not.

9　Q　And you said that you were talking about the concept of

10　　fatigue, is that right?

11　A　Yes.

12　Q　You said basically that vessels don't fatigue?

13　A　There is no data that support that they're of the material

14　　properties that would do that.

15　Q　Okay.　Are you saying that -- and pardon me.　I don't mean

16　　to parse words, but I want to make sure I understand.

17　　　　　Are you saying that blood vessels don't fatigue or

18　　you're saying that you just don't know?

19　A　No.　The current data says that they don't fatigue.

20　Q　And is the current data based upon actually taking living

21　　blood vessels and somehow stretching them repeatedly?

22　A　There is some of that.　It's also knowledge of biological

23　　tissues.

24　Q　Now, I know this sounds a little rudimentary, but, of

25　　course, you are familiar with the concept of Chinese water

1    torture, right?

2    A    Maybe.

3          THE COURT:  You tell me what you mean by that.

4          MR. TELISMAN:  Sure.

5    BY MR. TELISMAN:

6    Q    The idea that you can take a -- if a person has a drop of

7    water hitting their forehead over and over and over again, one

8    single drop, that the effect of one drop of water on the

9    forehead would be very trivial in nature, but after a period

10   of time being subjected repeatedly to that, eventually it

11   starts causing pain and damage?

12   A    My understanding is it's a psychological thing, not a

13   biomechanics thing.  So I don't know how that applies here.

14   Q    Okay, fair enough.

15         THE COURT:  I don't know that analogies to 1950s t.v.

16   shows are actually too scientifically based, but maybe that's

17   just me.

18         MR. TELISMAN:  Okay, Judge.

19   BY MR. TELISMAN:

20   Q    Now, if, in fact --

21         You are familiar with the term "cyclic loading," is

22   that correct?

23   A    Yes.

24   Q    What is cyclic loading?

25   A    Just repeated loading.

1   Q   Repeated loading, okay.

2   A   Yes.

3   Q   Okay.  Now, the injury threshold for a person or a body

4   part is dependent upon the mechanism of injury; is that fair

5   to say?

6   A   Yes.

7   Q   Okay.  And so for a different mechanism of injury, you can

8   have a different injury threshold, correct?

9   A   Correct.

10  Q   So, for instance, in a car accident, you can have a -- you

11  can have -- the injury threshold for a frontal impact would be

12  different than for a side impact, correct?

13  A   No.

14  Q   Or for a rear impact, no?

15  A   No.

16  Q   So you're saying it's all the same?

17  A   That's what we do in engineering.  We find the metrics

18  that don't make a difference in those situations.

19      Acceleration is acceleration, so we can measure that,

20  and we know that.

21  Q   And so you're saying that the body, it's subjected to a

22  certain amount of the injury from the side as opposed to the

23  front as opposed to the back would be -- the injury threshold

24  would be the same?

25  A   Generally speaking, yes.  I mean, you can take some

Prange - cross

1   direction account, but acceleration in these terms are pretty

2   much, you know, universal.

3   Q   Now, with respect to the issue of single versus repeated

4   shaking and fatigue, there have been no direct experiments to

5   test the injury threshold for repeated effects of shaking on a

6   human brain, correct?

7   A   Correct, right.  We really can't do that.

8   Q   And in order to extrapolate whether the injury thresholds

9   established for things like the primate experiment, whether

10   that would apply to the human brain in a shaking event, you

11   have to account for all of the things we talked about before,

12   for scaling purposes?

13          MR. RUFO:  Objection, Judge, asked and answered.

14          THE COURT:  Overruled.  It's a preliminary to the

15   follow-up question, I'm assuming.

16   BY THE WITNESS:

17   A   You have to consider those, yes.

18   BY MR. TELISMAN:

19   Q   Well, you have to account for them, don't you?

20   A   Well, you have to consider them whether they're valid or

21   not.

22   Q   Now, Dr. Prange, you don't only rely on biomechanical

23   articles in forming your opinions, correct?

24   A   I think there's some -- certainly some medical articles

25   that I have looked at as well.

1  Q   And medical research is something that is reasonably
2  relied upon by experts in your field in conducting evaluations
3  such as this one?
4  A   It depends on the article, but, yes, certainly we rely on
5  medical, yes.
6  Q   Are you familiar with the American Academy of Pediatrics?
7  A   Yes, I am.
8  Q   They publish a journal called Pediatrics, correct?
9  A   That is my understanding, yes.
10 Q   You actually cite to an article from this journal in your
11 report, right?
12 A   I don't remember exactly which articles, but it would not
13 surprise me.
14 Q   The Caffey article, C-a-f-f-e-y?
15 A   Sure.  I can take a look to confirm, but --
16     (Brief interruption.)
17         THE WITNESS:  Yes, Pediatrics.
18 BY MR. TELISMAN:
19 Q   And this journal is generally accepted as authoritative in
20 your field?
21 A   I think to characterize a journal as authoritative is --
22 I'm not going to commit to a whole journal is authoritative.
23 Q   Are you familiar with a Dr. Catherine Adamsbaum?
24 A   No.
25         MR. TELISMAN:  Your Honor, at this point I would like

1   the opportunity pursuant to, I believe it's Rule 104, lay a

2   foundation with a subsequent witness regarding the reliability

3   and general acceptance of this and two other articles.

4           THE COURT:  So you're wanting to put something in

5   that you are going to connect up later.

6           MR. TELISMAN:  Exactly, Judge.

7           THE COURT:  You can do that, but you will do it after

8   the ten-minute break that we're about to take.

9           MR. TELISMAN:  Yes, your Honor.  Fair enough.

10          THE COURT:  We'll take a 10-minute break.

11          (Brief recess.)

12          THE COURT:  You can all sit down.  Let me just shut

13  the door.

14        (Brief interruption.)

15          THE COURT:  Mr. Telisman, you can go ahead.

16          MR. TELISMAN:  Thank you, your Honor.

17          Your Honor, for the sake of time, which I know is a

18  major issue for all of us here, I didn't know -- we talked

19  about -- I advised your Honor that I anticipate being able to

20  have the -- I'm going to be referring to three articles now.

21          THE COURT:  Okay.

22          MR. TELISMAN:  And I anticipate being able to

23  establish a foundation for these as a learned treatise through

24  other witnesses.

25          And for purposes of examination of the witness, I

1    would prefer to ask a longer question that is somewhat

2    compound in nature for the sake of simply getting it into the

3    record.

4            THE COURT:  Whatever you want to do is fine.  Just

5    keep in mind that you have somebody who has to understand what

6    you're doing.  This would be me.

7            MR. TELISMAN:  Yes, your Honor.

8            THE COURT:  So don't make it so long and complicated

9    that I'm not going to be able to get it.

10           MR. TELISMAN:  Yes, your Honor.

11           THE COURT:  Okay.

12           MR. TELISMAN:  I do have copies, two copies for the

13   Court for the materials.

14           THE COURT:  Of the articles that you are talking

15   about.

16           MR. TELISMAN:  Yes, your Honor.

17           THE COURT:  Thanks.  Go ahead.

18           MR. TELISMAN:  Thank you.

19   BY MR. TELISMAN:

20   Q   Dr. Prange, when we left off, I had asked you about an

21   article published in Pediatrics journal called -- or pardon

22   me -- by Dr. Catherine Adamsbaum.  That's where we had left

23   off.

24   A   We left off with the Caffey paper, but that's fine.

25   Q   Oh, I'm sorry, citing to Pediatrics.  That's where it was.

1          This article that I'm going to direct your attention

2    to, which is Respondent's Exhibit Number 36, is this an

3    article entitled "Abusive Head Trauma:  Judicial Admissions

4    Highlight Violent and Repetitive Shaking"?

5    A    Yes, that's the title.

6    Q    Are you familiar with this article?

7    A    I've maybe read it, but I'm not familiar with all the

8    content.

9    Q    Now, are you aware that this article involves a study of

10   112 cases of abusive head trauma with subdural hemorrhage that

11   resulted in a criminal conviction?

12   A    I need to read it if you want me to.

13   Q    And I can simply -- I will ask you whether or not you're

14   aware of it, and if you don't know, that is okay to say.

15   A    I don't know if all the details are accurate.

16   Q    And do you know whether the study compares 29 cases where

17   a perpetrator confessed as opposed to 83 cases where there was

18   no confession?

19   A    That's what it says, yes.

20   Q    And are you aware of whether the study showed that of the

21   29 confessed cases, only seven of them involved head impact?

22   A    I don't know.

23   Q    Do you know whether there were confessions of shaking

24   without impact and no evidence of impact in 22 of those cases?

25   A    I don't know.

1   Q    Do you know whether the article contains statements made
2   by the perpetrators describing what they did and why they did
3   it?

4   A    I don't know.

5   Q    Are you aware of whether all of these 112 cases had
6   subdural hemorrhage?

7   A    Yes.  I don't know all the details of this paper.

8   Q    Okay.  Are you aware of whether Dr. Adamsbaum also found
9   retinal hemorrhaging in 24 of the 29 confessed shaking cases?

10  A    I don't know if that's correct or not.

11  Q    And whether Dr. Adamsbaum and her colleagues noted that
12  the 29 confessed cases displayed classic features of abusive
13  head trauma including multiple sites of subdural hemorrhage
14  and hypoxic ischemic lesions?

15  A    I don't know if they say that or not.

16  Q    Do you know whether this is a peer-reviewed article?

17  A    I think it is, yes.

18  Q    Now, Dr. Prange, I'd like now to direct your attention to
19  Exhibit 37.  Are you familiar with the work of Dr. Suzanne
20  Starling?

21  A    I'm familiar with the name but not all of her work.

22  Q    Are you familiar with this article entitled "Analysis of
23  Perpetrator Admissions to Inflicted Traumatic Brain Injury in
24  Children"?

25  A    I've read it at one point in time, but, again, it has been

Prange - cross

1  awhile, and I don't know all the details.

2  Q   Okay.  And this is an article that was published in the

3  Archives of Pediatrics in Adolescent Medicine.  Are you aware

4  of that?

5  A   Yes.

6  Q   And that's part of the journal of the AMA, American

7  Medical Association, network, correct, if you know?

8  A   I don't know that that's the case.

9  Q   In this particular case, do you know whether they compared

10 81 cases of inflicted traumatic brain injury in which the

11 perpetrators admitted to abuse and compared that to 90 cases

12 in which no abuse admission was made?

13 A   Again, I don't know all the details.

14 Q   Do you know whether 32 of those perpetrators admitted to

15 only shaking the infant?

16 A   I don't know if that's the case or not.

17 Q   Do you know whether of those 32, that only four children

18 had evidence of impact?

19 A   I don't know.

20 Q   So you don't know whether there were confessions of

21 shaking without impact and no evidence of impact in this study

22 in 28 cases?  Do you know that?

23 A   Again, I would have to read the article to confirm those

24 numbers, but as I sit here, I don't know.

25 Q   Do you know whether the authors arrived at the conclusion

Prange - cross

1  that this suggests that shaking alone is able to produce the

2  symptoms seen in inflicted traumatic brain injury?

3  A   I don't know if that was their conclusion or not.

4  Q   Now, Dr. Prange, I'd now like to direct your attention to

5  Exhibit Number 38.  Are you familiar with this article?

6  A   Again, I think I have read it at some point in time, but I

7  don't remember the details.

8  Q   This article is by a Matthieu Vinchon, V-i-n-c-h-o-n?

9  A   That is the first author, correct.

10 Q   And it's entitled "Confessed Abuse Versus Witnessed

11 Accidents in Infants:  Comparison of Clinical, Radiological

12 and Ophthalmological Data in Corroborated Cases"?

13 A   That is the title, yes.

14 Q   Do you know whether in it Dr. Vinchon discusses 45 cases

15 of confessed inflicted head injury and compares it to 39 cases

16 of accidental trauma in a public place?

17 A   I think it says that in the abstract, yes.

18 Q   Do you know whether they found evidence of head impact in

19 only 17 of the 45 confessed cases?

20 A   I don't know the details.

21 Q   So you don't know whether there were confessions of

22 shaking without impact and no evidence of impact in 28 cases?

23 A   Yes.  I don't know the details of the paper.

24 Q   Do you know whether the authors concluded that their

25 findings are in apparent contradiction with the shaken impact

1  theory, which states that shaking alone does not provide the

2  required energy to produce diffuse brain damage?

3  A   I don't know if they write that or not.

4  Q   Do you know whether the authors write:

5        "We conclude that shaken impact baby syndrome

6  represents a subgroup of inflicted head injury with a worse

7  prognosis but that shaken baby syndrome without impact can

8  also be fatal"?

9  A   I don't know that they write that or not.

10 Q   Across these three --

11       Do you know whether the study was peer-reviewed?

12 A   Off the top of my head, I would guess so, but I don't know

13 that for sure.

14 Q   But across these studies, do you know whether they

15 identify 78 cases where perpetrators admit to shaking babies

16 without impact and without evidence of impact, yet the babies

17 had brain injury?

18 A   I don't know if they found that or not.

19 Q   I'm almost done.  Just one more topic.

20       Dr. Prange, you write in your report:

21       "There is no biomechanical evidence to support the

22 hypothesis that Isabella's retinal hemorrhages were the result

23 of shaking."

24       Did I get that right?

25 A   I think so, yes.

Prange - redirect

1   Q   So are you saying that the field of biomechanics has

2   conclusively shown that shaking could not have caused

3   Isabella's retinal hemorrhages?

4   A   I'm just basing it on the current knowledge of the field,

5   that it hasn't been shown from a biomechanical point of view.

6   Q   Has it been disproven?

7   A   I don't know if it has been disproven or not.  There's

8   been very limited studies with biomechanics in this issue.

9   Q   So, in other words -- and tell me if I'm characterizing

10  this correctly.  Are you saying that the field of biomechanics

11  can neither prove nor disprove whether shaking causes retinal

12  hemorrhaging?

13  A   Yes.  The current state of the literature just doesn't

14  show one way or another.  The only studies that have shown it

15  have not supported it.

16  Q   There has not been enough research and development in your

17  field to answer this question?

18  A   Yes.  It would be nice to have more data.

19          MR. TELISMAN:  Thank you.  I have nothing further at

20  this time.

21          THE COURT:  Redirect.

22                  REDIRECT EXAMINATION

23  BY MR. RUFO:

24  Q   Dr. Prange, do you know why you were asked to evaluate

25  shaking in this case as opposed to soft surface impact?

1   A   Not exactly the reason why, but, I mean, looking at the

2   testimony of the previous trial, that seemed to be the --

3          MR. TELISMAN:  I would like to impose an objection,

4   speculation.

5          THE COURT:  Overruled.

6          THE WITNESS:  That was the testimony according to Dr.

7   Flaherty in the previous trial.

8   BY MR. RUFO:

9   Q   Are you aware that Dr. Flaherty testified that shaking is

10  the most common cause of the trauma seen in Isabella

11  Zielinski?

12  A   Yes.  That's my understanding of her testimony.

13  Q   Are you aware that Dr. Flaherty testified that the forces

14  would be so severe that if anyone witnessed that shaking

15  occurring or someone shaking a child like that, they would

16  know the child would suffer a severe injury?

17  A   Yes.  I remember reading that, yes.

18  Q   Are you aware that Dr. Flaherty testified that injuries

19  like this could not be caused from a simple fall?

20  A   Yes, I am aware of that testimony.

21  Q   Are you aware that Dr. Flaherty testified that abusive

22  head trauma is a form of child abuse where a child suffers

23  some kind of acceleration-deceleration injuries to the brain?

24  A   Yes.

25  Q   Are you aware that Dr. Flaherty never testified regarding

1  impact?

2  A   Correct.

3  Q   Now, there was some discussion about whether or not you

4  had pulled on bridging veins to test, I guess, the tensile

5  strength.  And you said that you are looking for a metric that

6  can correlate to bridging vein rupture.

7       Can you explain what you meant by that?

8  A   Sure.

9       I mean, there had been studies that had pulled on

10  bridging veins and tore them and measured that, but, really,

11  the important thing is to understand the acceleration levels

12  that result in breaking or damaging of these bridging veins.

13       It's the acceleration that has been shown to be the

14  important factor in determining whether or not these bridging

15  veins break or not.

16  Q   Is this what you understand Dr. Flaherty saying when she

17  said that a child suffers some kind of

18  acceleration-deceleration injury to the brain?

19  A   Yes.  She seems to be referencing this type of research,

20  yes.

21  Q   Now, there was also some discussion about scaling and

22  whether or not geometry, biology, those sorts of things are

23  taken into account.

24       Can you explain how scaling is tested or verified in

25  the biomechanical field?

1    A    Sure.

2            Basically, you know, there's a lot of things you need

3    to consider.  A lot of those considerations will determine

4    whether these things are important to implement into your

5    scaling relationship or not.  And so basically what we do is

6    we --

7            The understanding is we try to incorporate everything

8    we do, and we try to understand what the effects of each one

9    of these kind of issues have involved.  And so we test those

10   issues.  We see whether they actually do play a role.  If they

11   don't, we basically have considered it and dismissed it.

12           And that's with these scaling relationships here,

13   it's the mass scaling that is the important one.  The rest of

14   it is less important.  Even specifically the material

15   properties would actually be -- probably increase the

16   tolerance levels even if we consider those.

17   Q    Is scaling something that is used to determine safety

18   standards for seat belts?

19   A    The vehicle air bag, seat belts, that type of thing, yes.

20   Q    Child seats?

21   A    That's part of it, yes.

22   Q    Helmets?

23   A    Yes.

24   Q    And there was discussion about -- and you mentioned the

25   tissue matter.  Have you done any studies regarding tissue

1  matter in adults versus infants?

2  A   Yes.  I've looked at the actual characteristics of tissue,

3  even specifically human infant tissue.

4  Q   Is the name of that paper "Regional, Directional and Age

5  Dependent Properties of the Brain Undergoing Large

6  Deformation"?

7  A   That is correct.  I think I published it in 2002.

8  Q   Do you consider that paper to be a follow-up to a study

9  done by Kurt Thibault and Susan Marguiles called "Age

10 Dependent Material Properties of the Porcine Cerebrum:  Effect

11 on Pediatric Inertial Head Injury Criteria"?

12 A   Yes, it is.  Dr. Marguiles was an author in both of those

13 papers.

14 Q   She was your coauthor on the follow-up paper?

15 A   She was a coauthor on the follow-up; she was also a

16 coauthor on the original.

17 Q   Can you explain what you determined in the follow-up paper

18 regarding adult tissue versus brain tissue undergoing large

19 deformations?

20 A   Sure.  The previous study had found that really small

21 deformations, that the pediatric tissue was less stiff.  So it

22 was softer.

23         THE COURT:  Less?

24         THE WITNESS:  Less stiff.

25         THE COURT:  Stiff, okay.

Prange - redirect

1        THE WITNESS:  So it was softer than the adult.

2        When they increased it just slightly, they found

3 there was no difference between the two.

4        And my study showed as you increase this to larger

5 deformations, those deformations that are associated with

6 injury, that the infant tissue was actually more stiff than

7 the adult tissue.

8 BY MR. RUFO:

9 Q   Now, is it fair to say that that would mean the

10 acceleration levels would be lower in an infant?

11 A   Yes.  It basically means with brain tissue, they're going

12 to tolerate more accelerations because the brain is not going

13 to move as much.  That's what that would say.

14        When I presented the head injury, you know,

15 thresholds when we talked about before, I actually did not

16 take that into account.  I just -- you know, it was going to

17 increase them, but I decided to put that to the side.  And,

18 again, it lowered that tolerance level down lower to a more

19 conservative level.

20 Q   Now, there was some discussion about a 2004 letter to the

21 editor that you were involved in regarding more research being

22 done to determine neck injuries in inertial or nonimpact

23 situations?

24 A   Yes.  There was talk about the cervicomedullary junction

25 and cervical spine, yes.

Prange - redirect

1   Q   In 2007 did you write a paper called "Inertial Neck
2   Injuries in Children Involved in Frontal Collisions"?
3   A   Yes.
4   Q   Do you believe the state of research has changed since
5   that letter to the editor was written in 2004 until now?
6   A   There has been a lot more data that have come out since
7   then.  There is actually a paper that I published in 2004 that
8   looked at actual infant cervical neck properties and tolerance
9   levels specifically of what it takes to break the infant
10  cervical neck that was published after that letter.
11  Q   And the last thing I want to talk about is Mr. Telisman
12  talked about the retinal hemorrhages.
13          Now, does biomechanical engineering necessarily
14  disprove things?
15  A   It can in some situations.  Sometimes it just doesn't
16  support those situations.
17  Q   Now, are you aware of any attempts to show that retinal
18  hemorrhaging can be used as part of shaking?
19          THE COURT:  Part of?
20          MR. RUFO:  Shaking.
21          THE COURT:  Shaking.
22  BY THE WITNESS:
23  A   There have been certain attempts.  Like the piglet studies
24  I mentioned I think was maybe an intent to look at that.  I
25  think they missed the mark just because their acceleration

Prange - redirect

1   levels were just too high compared to a shaking event, but I

2   think that's where it was trying to go.

3         To me there is no one who's presented any data at the

4   level of a shake that has shown that retinal hemorrhages will

5   occur.

6         MR. RUFO:  One second, Judge.

7         THE COURT:  Okay.

8     (Brief interruption.)

9         MR. RUFO:  Nothing further.

10        THE COURT:  Anything else?

11        MR. TELISMAN:  I have one question.

12                    RECROSS EXAMINATION

13  BY MR. TELISMAN:

14  Q   Dr. Prange --

15  A   Yes.

16  Q   -- are you saying that biomechanical engineering disproves

17  that shaking cannot cause brain injuries that were seen in

18  Isabella?

19  A   There's accelerations above that that have not produced

20  it.  It certainly doesn't support it.

21        Again, I think there is some more research that needs

22  to be done in order to prove it.  All the data seems to

23  disprove it at this point.

24  Q   I apologize.  I'm going to ask the question one more time

25  because I think it just calls for a yes or no answer, which is

1  just, are you saying that biomechanical engineering disproves

2  that shaking could have caused Isabella's brain injury?

3  A  I can't answer that yes or no.

4  MR. TELISMAN:  Thank you.  I have nothing further.

5  THE COURT:  Okay.  I have a few questions here.  Let

6  me make a note.

7  (Brief interruption.)

8  THE COURT:  Let's see.  There is some terminology I

9  want to make sure that I'm understanding properly.  So in the

10  direct examination --

11  THE WITNESS:  Sure.

12  THE COURT:  -- you said it was your opinion that an

13  adult cannot generate the forces necessary to cause these

14  sorts of injuries, and you used the phrase after that, that

15  they don't reach the level of the tolerance values.  And I

16  just want to make sure I understand what you mean by tolerance

17  values.  So explain it to me.

18  THE WITNESS:  Just the levels in an infant that will

19  result in the brain injury.

20  THE COURT:  Ah.  What does the term "tolerance" mean

21  in that context?

22  THE WITNESS:  You know --

23  THE COURT:  Is it like a range?

24  THE WITNESS:  You could look at it a range, but

25  there's a line where you can draw like this acceleration, you

1  will start to see subdural hematoma.  So it's a threshold.

2          THE COURT:  Sort of like that --

3          THE WITNESS:  It's a threshold.

4          THE COURT:  Sort of like that line on your bar chart.

5          THE WITNESS:  That's exactly what that was, yes.

6          THE COURT:  All right.  So second question.  I would

7  assume that in at least a lot of situations where an adult

8  actually shakes an infant, they're not just shaking them once;

9  they're shaking them more than once, a bunch of times.

10         So just from the standpoint of acceleration -- and

11 this is going to be a dumb question.  I never took physics,

12 okay.  I decided to take a second year of chem, not physics.

13         As you're going back and forth more and more times,

14 does the acceleration get more because your head's already in

15 motion?  Does that question even make sense?

16         THE WITNESS:  That actually is a very good question

17 actually, and the answer is no.

18         THE COURT:  It does not.

19         THE WITNESS:  That it stays.  If you look at the

20 traces, they stay the same back and forth.  We don't have a

21 situation where we're amplifying that.

22         THE COURT:  Okay.  So the related question then would

23 be then because -- and I guess this might be similar to this

24 situation about repeated shaking on different occasions, but

25 has there been any studying done about whether -- whether

Prange - redirect

1    prolonging the duration of shaking on a single occasion makes

2    it more likely to cause injury than a short duration?

3            Do you follow what I'm saying?

4            THE WITNESS:  Like the intervals between?

5            THE COURT:  No.  In other words, we're just talking

6    about one time.

7            THE WITNESS:  Okay.

8            THE COURT:  If I shake an infant back and forth three

9    times using the same amount of force and then somebody else

10   shakes an infant 30 times using the same amount of force, is

11   the person who -- is the infant who was shaken 30 times more

12   likely to have the type of injury we're talking about here

13   than the one who was shaken three times?

14           THE WITNESS:  No.  Again, these accelerations are the

15   same throughout, and there is really not this fatigue

16   mechanism.

17           THE COURT:  Okay.  That also goes to the question of

18   fatigue that you talked about, okay.

19           A couple of these studies that you referred to, and I

20   know you had some criticisms of them, involved piglets.  Do

21   you know why they used piglets?  Is there something about them

22   that makes them more or less similar to human beings?

23           THE WITNESS:  I think years ago the primates were the

24   kind of standard to use, and I think that just in science has

25   been kind of more taboo.  And so I think they tried to move on

Prange - redirect

1    to the best, you know, a different animal model, and piglets

2    seemed to be what they have come on.

3         THE COURT:  Okay.  So now I'm actually skipping

4    around a little bit here.  So one of the things that you

5    talked about is needing the mechanical exposure data which I

6    gather is it's the measurement of the amount of acceleration

7    basically.

8         THE WITNESS:  Exactly.

9         THE COURT:  Okay.  And so that is something that you

10   have actually attempted to measure, obviously, not using real

11   live human beings, but using the device that you described

12   earlier in your testimony?

13        THE WITNESS:  That's correct.

14        THE COURT:  Okay.  And did I hear you right that when

15   you were doing that kind of testing, you had people shaking

16   whatever it was they were shaking really sort of as hard as

17   they could?

18        THE WITNESS:  They were instructed to do it at

19   absolutely as maximum force as they could, and I was one of

20   the people who did it, so I can attest to that fact.

21        THE COURT:  All right.  There were some questions by

22   Mr. Telisman about impact on a softer surface as opposed to a

23   harder surface.

24        So just sort of to a layperson, I can imagine that if

25   an object -- if a head hits against a hard object like this

Prange - redirect

| 1 | wall here, you know, it comes to an immediate stop and there's |

1   wall here, you know, it comes to an immediate stop and there's

2   a certain level of force.  If I hit against a soft object, a

3   softer object, let's say the headrest on this chair here,

4   there's a little bit of give in it.  Is there any --

5           I assume somebody has measured whether the

6   acceleration, you know, of a body moving at a certain rate of

7   speed hitting a hard surface is the same or different from it

8   hitting a soft surface.

9           THE WITNESS:  Oh, absolutely.  I mean, that's how

10  helmets work, right, when you have a --

11          THE COURT:  You've got padding inside --

12          THE WITNESS:  You basically are wearing a pad.

13          THE COURT:  -- inside the helmet.

14          THE WITNESS:  Exactly.  The padding will generally

15  decrease.

16          THE COURT:  Decrease the accelerations.

17          THE WITNESS:  The accelerations, yes.

18          THE COURT:  All right.  You may have answered this.

19          So a couple of the papers that -- well, one of the

20  papers of yours that was referred to was 2003, and this

21  response to the letter to the editor is 2004, and some things

22  were quoted from there.  Have your views changed on those

23  topics since that time because of further work that you have

24  done?

25          THE WITNESS:  Yes, it has.

1    THE COURT:  I think I have enough detail on it.

2         The last thing was something that I just didn't get.

3    When petitioner's counsel was asking you about Dr. Hedlund's

4    report regarding the retroclival -- the issue of retroclival

5    epidural hemorrhaging, and you were basically saying it's your

6    view that that could not occur in a shaking incident.  Or did

7    I get it wrong?

8         THE WITNESS:  No, I think --

9         THE COURT:  What was your view about that?  I just

10   need you to tell me again because I just didn't really get it

11   the first time.

12        THE WITNESS:  I think the view on that was if you're

13   going to get to the levels of brain injury, that neck injury,

14   that clival injury, is minor, that you would expect --

15        THE COURT:  You would expect to see more of an injury

16   than just that.

17        THE WITNESS:  Correct.

18        THE COURT:  Now I get it, okay.

19        Do you have follow-up questions based on my

20   questions?

21   BY MR. RUFO:

22   Q    The only thing I want to ask is:  Dr. Prange, your

23   criticism of the piglet study was regarding the levels of

24   acceleration they were exposed to?

25   A    Correct.

1      MR. RUFO:  That's all I have, Judge.

2      THE COURT:  Anything else, Mr. Telisman?

3      MR. TELISMAN:  Nothing, your Honor.

4      THE COURT:  Okay, you can step down.

5      THE WITNESS:  Thanks.

6    (Witness excused.)

7      THE COURT:  Please call the next witness.

8      MR. BLEGEN:  Judge, the next witness is Dr. Jan,

9  J-a-n, Leestma, L-e-e-s-t-m-a.

10      (Witness sworn.)

11      DR. JAN LEESTMA, PETITIONER'S WITNESS, DULY SWORN

12                  DIRECT EXAMINATION

13  BY MR. BLEGEN:

14  Q   Sir, could you give us your name and spell your first and

15  last name for the court reporter?

16  A   Yes.  Jan, J-a-n; Edward, Leestma, L-e-e-s-t-m-a.

17  Q   And, Dr. Leestma -- or excuse me.

18      What is your profession?

19  A   I'm a medical doctor and neuropathologist.

20  Q   And could you tell us a little bit about your education?

21  A   Sure.

22      I graduated from Hope College in Holland, Michigan,

23  in 1960 with a bachelor of arts degree, and went to the

24  University of Michigan for four years, graduating in 1964 with

25  a doctor of medicine degree.

1      I then pursued my postgraduate education by going to

2   the University of Colorado, in Denver, where I completed two

3   years of anatomic or general pathology residency training.

4      I continued on with an additional year of

5   neuropathology training there and then completed that by going

6   to the Albert Einstein College of Medicine in the Bronx, New

7   York, for my last year of neuropathology training.

8      I then entered the United States Air Force.  I was in

9   the service between 1968 and '71, stationed at the Armed

10  Forces Institute of Pathology in Washington, D.C. at the

11  Walter Reed Medical Center, and was honorably discharged with

12  the rank of major U.S. Air Force Medical Corps.

13  Q   Are you licensed to practice medicine in any states?

14  A   Yes.  Illinois and Michigan.

15  Q   Have you had academic appointments in the past that are

16  related to neuropathology?

17  A   Yes.

18  Q   Can you tell us what those are?

19  A   My first formal job in this regard was here in Chicago at

20  Northwestern University School of Medicine where I was an

21  assistant professor of pathology and neurology and chief of

22  neuropathology services.  I stayed at Northwestern for

23  13 years or something like that, finishing up as an associate

24  professor with tenure.

25      And I then went to the University of Chicago where I

1    was an associate dean of the medical school and graduate

2    programs in life science and a full professor in pathology and

3    neurology, and that would be my last academic appointment.  I

4    was there for a couple of years and then went into a private

5    practice situation.

6    Q   What was your most recent hospital appointment related to

7    neuropathology?

8    A   It would be -- I had essentially retired but then was

9    called back to the Children's Memorial Hospital because they

10   had lost their neuropathologist, and they needed somebody

11   until they could replace that person, and I was there for

12   about two years on a part-time basis.

13   Q   And is that Children's Memorial Hospital here in Chicago?

14   A   Yes.

15   Q   Have you published in the field of neuropathology?

16   A   Yes.

17   Q   And does your curriculum vitae list dozens of articles in

18   that area?

19   A   The CV would list them all.  I think some were not in

20   neuropathology, but the vast majority probably would be.  The

21   number is about 104 publications at the present time.

22   Q   Let me show you two documents.  The first is marked

23   Petitioner's Leestma Revised Report and Petitioner's Exhibit

24   Leestma CV.

25   A   Yes, I have seen that.

Leestma - direct

1  Q   Is the revised report exhibit a report that you revised at
2  our request on behalf of Ms. Del Prete?
3  A   Correct.
4  Q   All right.  And can you tell us why it's called a revised
5  report?
6  A   In going over it, I realized that there was some vagueness
7  about the description regarding blood clots or thrombi in
8  vessels, and I inserted some verbiage to make that more clear.
9  Q   Did you essentially clarify that you did see thrombi in
10 one location but not in another location?
11 A   Correct.
12        MR. BLEGEN:  Judge, I have --
13 BY MR. BLEGEN:
14 Q   Last question on your background.  Have you been qualified
15 as an expert witness in neuropathology in the past?
16 A   Yes, I have, probably 300 times or something like that.
17 Q   Any here in Illinois?
18 A   Yes.
19 Q   In the federal courts in Illinois?
20 A   Yes, correct.
21        MR. BLEGEN:  Judge, I have copies for the Court of
22 petitioner's two exhibits.
23        THE COURT:  Thank you.
24 BY MR. BLEGEN:
25 Q   Sir, did you -- or, Doctor, did you conduct essentially a

1   neuropathological examination in this case on July 17th of
2   2012?

3   A   Yes.

4   Q   Where was that?

5   A   In DuPage County at the coroner's facility in Wheaton, as
6   I recall.

7   Q   And did anyone attend that pathological examination along
8   with you?

9   A   Yes.

10  Q   Who?

11  A   Dr. Shaku Teas, T-e-a-s; a Dr. Tourtellotte -- I'm not
12  sure I can spell that -- who is a neuropathologist from
13  Northwestern University.

14          There were three of us.  Those were the medical
15  people, and I believe a representative of the prosecutor's
16  office was there, too.

17  Q   Was it your understanding that Dr. Tourtellotte was a
18  representative of -- was an expert on behalf of the
19  prosecution?

20  A   That was my understanding.

21  Q   All right.  And did the three of you participate in the
22  pathological examination together?

23  A   We did.

24  Q   Can you start out by telling us what the state of the
25  brain was at the time of your examination?

1   A    Yes.   The brain had been sectioned before in the coronal

2   plane and was present in pieces in a plastic container filled

3   with formaldehyde solution, and the dura, pretty much intact,

4   almost untouched in a way, was there as well.

5           And so we proceeded to examine those things washed

6   off with formaldehyde somewhat and arranged the brain in more

7   or less of a serial fashion from front to back on a table top

8   and then proceed to examine those things, photograph them, and

9   make some -- collect some samples by taking a razor blade and

10  cutting out pieces of the brain and the dura to be submitted

11  and prepared into microscopic slides.

12  Q    And who participated in the preparing or taking pieces to

13  get prepared into microscopic slides?

14  A    I think mostly I did, but Dr. Tourtellotte also had a

15  scalpel there, and we would -- we were totally communicating

16  about what should be done, and I think he may have taken a few

17  pieces as well and added them to the collection that we were

18  going to have processed.

19  Q    Was Dr. Tourtellotte participating in the process of

20  taking pieces and then labeling where they came from?

21  A    I was not keeping track, nor was he, I mean, personally.

22          Dr. Teas was making notes at the time, recording

23  where we took these blocks from, pieces of tissue, and

24  assigning numbers to them to put into a little plastic

25  cassette.

Leestma - direct

1  Q   Dr. Tourtellotte was part of that process, though,

2  correct?

3  A   Sure.  We were shoulder to shoulder at the autopsy table

4  there doing that.

5  Q   Have you heard or read that one of the prosecution's

6  experts believes that one of the slides was perhaps

7  mislabeled?

8  A   I'm aware of that.

9  Q   Do you think that's the case?

10  A   No.

11  Q   Did you have any issues with Dr. Tourtellotte related to

12  what was being labeled?

13  A   We were both there, and as Dr. Teas was recording where

14  these sections came from, we obviously heard this, and if

15  there were some disagreement or other, we would have said

16  something.

17  Q   Were you able to obtain much new information from your

18  pathological examination on this date?

19  A   To a limited degree.

20  Q   And am I correct that July 17th of 2012 is a number of

21  years after the child's death?

22  A   Yes.

23  Q   Tell us -- let's start with the state of the preservation

24  of the brain.  How well was the brain preserved?

25  A   Well, the brain was preserved as well as it could be under

1    the circumstances.  The brain was very mushy.  The other term

2    would be friable; that is, it came apart easily, and one had

3    to handle it very carefully; otherwise it would fall apart

4    into pieces and be useless.  So there was that particular

5    problem.

6           Furthermore, there were a lot of artifacts, and by

7    artifacts, I mean places where the brain had come apart, or

8    fragmented, that made observations and handling of it rather

9    difficult.

10   Q   And when you say parts had come apart, that was just a

11   result of the passage of time and deterioration?

12   A   Not necessarily.  I mean, once the brain is in

13   formaldehyde, it's not going anywhere.  This would be the

14   state of the brain as it was put into formaldehyde the first

15   time however many months or years before; that is, the brain

16   suffered from something we call a respirator brain phenomenon,

17   which leads to a very soft and mushy brain in somebody that is

18   comatose and not breathing and not having any circulation to

19   their brain.

20          So that is the way it is when it goes into

21   formaldehyde, and so the passage of time probably doesn't

22   affect that very much.

23   Q   Was it your understanding that the child had been on a

24   respirator for some period of time prior to death?

25   A   Yes.

1  Q   Let's talk then a little bit about the dura.  We have

2  heard some of this, so it doesn't need to be a lengthy

3  explanation, I don't think, but can you tell us from your

4  perspective what the dura is?

5  A   I'm sorry.  Say that again.

6  Q   Can you tell us what the dura is briefly?

7  A   Oh, certainly.  The dura -- excuse me.

8         If you were to reflect the scalp, saw off the top of

9  the skullcap, the first thing you see is the dura, which is a

10  kind of leather-like covering of the brain.  It covers the

11  brain and goes down into the spinal canal.  And if you had a

12  3X5 file card, it would be about that thickness and that color

13  but more flexible than that.

14         And so this would be once you cut through the dura,

15  then you're looking at the brain.

16  Q   I'm going to pull up --

17         Have you prepared a PowerPoint to assist in your

18  testimony?

19  A   Yes, I did.

20  Q   We have gotten some brain anatomy, and so I think I will

21  just jump to the specifics.

22         Could you go to slide 5, Rob?

23  A   Yes.

24  Q   Is that the dura that you examined?

25  A   This is the dura.  And what we're really looking at here

1    is the dura has a division in the middle of it, a septum, if

2    you will, called the falx, f-a-l-x, and the cerebral

3    hemispheres would be up against that on either side.

4           In any case, we're looking at the underside of the

5    dura here, with the falx in the middle.  And it, as I say, is

6    pretty much intact from the hemisphere, like the head band up.

7    Q   So in comparison to the brain, was the dura relatively

8    well-preserved?

9    A   Yes, it was, very well-preserved.

10   Q   All right.  Tell us what findings you made regarding the

11   dura.

12   A   Well, it is at least obvious to me that there's

13   discoloration there, the yellowish-orangish discoloration.

14   There is tissue there, that if you look sort of where that

15   forceps is on our left side, that's pretty much --

16          Some of this neomembrane that I'm talking about here

17   has flipped away, and that's what the dura should look like.

18   There shouldn't be any of this membranous material there.  It

19   shouldn't be discolored at all.

20          So what we're looking at --

21   Q   Let me stop you there for a second, Doctor.

22          When you're talking about neomembrane, maybe you

23   could get up and --

24   A   Sure.

25          THE COURT:  There is a pointer right there.  It

1  slides out if you want to use it.

2      (Brief interruption.)

3      THE WITNESS:  I was talking here is what the normal

4  dura should look like.  All of this material here and this

5  material here is overlaying the dura about a three-millimeter

6  or 4-millimeter thickness and represents a new membrane.  It

7  wasn't -- it is not normally there.  It's there because there

8  has been bleeding and so-called subdural hematomas there which

9  have largely resolved.

10  BY MR. BLEGEN:

11  Q   Can you tell from the I guess what is called a gross

12  examination of the dura itself how many bleedings there were?

13  A   No.  No.

14  Q   Can you tell microscopically?

15  A   You should make a slice in this and make a microscopic

16  slide, and that will give you that information.

17  Q   And did you do that?

18  A   Yes, we did.

19  Q   Is there any significance to these darker-colored areas on

20  the left?

21  A   Yes, there is, and probably here as well.

22      That indicates that there's been some recent bleeding

23  into these membranes.  These are about a centimeter in

24  diameter, maybe half an inch, and there isn't much bleeding

25  there, but there is some, and that may have occurred over the

1  weeks prior to this child's death.

2  Q   I was going to ask you a question about dating.

3        Can you tell when this -- strike that.

4        The bleeding that you are talking about I understand

5  you're saying is small.  Is it within the dura or a dura

6  membrane?

7  A   It's probably not within the dura itself.  It's within the

8  neomembranes, this new tissue that is part of the healing

9  process.

10 Q   When you said something about how old it was, is it

11 possible to date those bleeds?

12 A   Yes, within some limits.

13 Q   Tell us how old or new you think they are.

14 A   All right.  Some of the blood there, as I said, could be

15 present for a week or so before this child died, and it could

16 be some blood came five minutes before the heart quit.  So you

17 can't really age and date it more accurately than that.

18 Q   But it would not have been months old?

19 A   No.

20 Q   Or certainly a year old?

21 A   No.

22       These -- I should hasten to add that these

23 neomembranes can certainly go back that far, and the aging and

24 dating of them becomes not very accurate after about a month.

25       MR. BLEGEN:  Judge, if you already have this, I will

1  stop.

2  BY MR. BLEGEN:

3  Q   Can you tell us just briefly what creates the

4  neomembranes?

5          THE COURT:  I was going to ask that question.  That's

6  good.  Go ahead.

7          THE WITNESS:  What causes them?

8  BY MR. BLEGEN:

9  Q   What causes them to be created?

10 A   When blood somehow gets into this space between the dura

11 and the brain, a healing process goes on, and it begins within

12 a day or two to try to wall off that blood, and it comes from

13 proliferation of cells in the dura, to try to eventually

14 enclose that.  And there's a time sequence which has been

15 known -- it's in the literature -- of what happens almost day

16 by day up until about a month.

17         There's capillaries that come in.  There is

18 hemorrhage that independent of anything else that occurs

19 again.  Inflammatory cells, cells that gather up the blood and

20 process it and extract the iron from it.

21         There's a whole sequence of things that occur.  And

22 if you look at a microscopic slide of something like this at

23 different ages, you can go to these charts that exist in

24 various forensic books and say, well, I've got -- the membrane

25 is this thick.  That corresponds to 8 or 10 days, 12 days, 20

1    days, whatever it happens to be.  The kinds of cells that are

2    in there, you can look at, and that's part of this method,

3    too.

4            And, as I say, all of these things tend to become

5    less distinct and less accurate and reliable after about a

6    month.

7    Q    The bleeds that you have described as relatively new,

8    would they eventually have created additional neomembranes or

9    led to that creation?

10   A    Sure.

11   Q    So then there would have been an additional layer of

12   neomembrane?

13   A    Well, it is part of the natural disease process of a

14   subdural hematoma to rebleed on its own.  The little

15   capillaries leak, and there you have got a puddle of new blood

16   which then starts this process over and over again.  And this

17   can be represented in a microscopic slide of one or two or

18   three or more layers that are there in one form of healing or

19   another.

20   Q    Let's talk about the microscopic slide then.

21           I take it you took microscopic slides from the dura?

22   A    I did.

23   Q    And the neomembrane area?

24   A    Correct.

25   Q    Can you put up slide 7, Rob?

1          Is that one of the -- is that a microscopic view of

2    one of the slides that you took from the dura?

3    A    Yes.

4    Q    Tell us what you see there.

5    A    Okay.  I don't know that I have to get up there, but

6    there's some arrows that can assist in labeling this.

7          The double-headed arrow, dura, that's what the normal

8    dura should look like.  It's sort of orangish-pink, not very

9    many cells in it as represented by purple dots.

10          The neomembrane then is built upon that, and I think

11   it's obvious that there are some layers of stratification

12   there.

13          And, again, by looking at some of those, for example,

14   if I can point it out, this one seems to look a lot like dura,

15   which means that it has some more mature connected tissue in

16   it.  So this might be older than some of these other parts

17   that are in there.  But, unfortunately, these things are

18   coexisting processes and to accurately and precisely date them

19   beyond about the month-long interval, and it could be many

20   months, maybe even longer than that, but our ability to

21   accurately do it beyond about a month is not very reliable.

22   Q    Is it possible to count the number of neomembranes that

23   have been created?

24   A    Well, I think one can appreciate that there is

25   stratification there.  How many different layers there are I

1    guess would be up to whoever wants to look at them and say,

2    well, that's a layer, this isn't, and so forth.

3          But this is not one uniform neomembrane.  It's

4    clearly got stratifications within it which indicate, to me

5    anyway, multiple episodes of bleeding.

6    Q    All right.  So it sounds like you're saying it's very

7    clear that there are multiple layers.

8    A    Yes.

9    Q    Do you have an opinion on how many layers of neomembrane

10   there are?

11   A    Oh, it looked like about four to me, but if someone else

12   said, no, I think it's three, I wouldn't argue with him.

13   Q    Did you also do any examination of the dura to see if

14   there was any thrombi?

15   A    Yes.

16   Q    Maybe you should tell us what thrombi are.

17   A    Okay.  A thrombus is a blood clot.  And we already know

18   there had to be blood clots there for the neomembranes to be

19   present.  That's the subdural.

20         But what we're interested in, and it had not been

21   examined, is in the middle of where the two sides of the dura

22   meet and the falx is, that septum, there is a large venous

23   channel there called the superior sagittal sinus, and it

24   drains venous blood from the brain, returning it eventually to

25   the jugular system.

1          That had not been opened.  So Dr. Tourtellotte and

2    I -- I actually I think he did most of it -- opened this

3    channel to see if there were blood clots there, and there were

4    not.

5          THE COURT:  Okay.  So walk back and tell me what this

6    channel is again because it went a little too fast for me.

7          THE WITNESS:  Okay.  It's the superior sagittal

8    sinus, a sickle-shaped structure that goes from the front of

9    the brain to the back inside the dura.

10   BY MR. BLEGEN:

11   Q   Doctor, we might have a picture of that, correct?

12   A   We might.

13         MR. BLEGEN:  Rob, if you could put up slide 3, and if

14   that's not the right one, it's probably 4.

15      (Brief interruption.)

16         THE WITNESS:  Yes.  Actually go one more.  Advance.

17   There we go.  I can point.

18         THE COURT:  Since the writing is so small, I'm going

19   to walk over here.

20         THE WITNESS:  Here's the front of the --

21         THE COURT:  You're good.

22         THE WITNESS:  -- the front of the brain.  The nose

23   would be down here, back of the head here.

24         And this is a mid cut down through the middle of

25   everything.

1    This blue structure here represents the superior
2  sagittal sinus, which then goes into the jugular system.  The
3  importance of that is this is probably the main venous conduit
4  taking blood from the brain and draining it away.  And if
5  there were blood clots in there, that could have some very
6  important --
7    THE COURT:  So you were saying that had not been cut
8  into and you guys did it?
9    THE WITNESS:  Correct.
10    THE COURT:  All right.  That's what I wanted to be
11  sure of.
12  BY MR. BLEGEN:
13  Q   Am I correct that you did not find evidence of clotting at
14  that point in the sagittal sinus?
15  A   We did not.
16  Q   All right.  Did you look for thrombi anywhere else?
17  A   Sure.
18  Q   Did you find any?
19  A   Yes.
20  Q   Can you tell us where?
21  A   We made a sample of several samples of the cerebral
22  cortex; that is, the brain, and in one of those --
23  Q   Can you --
24  A   -- microscopically I can show that.
25    There were -- at least I put arrows on two of the

1  vessels, but there's actually a third one there, a small one.

2  I can point to that.

3         THE COURT:  It's sort of triangular between the other

4  two.

5         THE WITNESS:  Yes.

6         THE COURT:  I see it.  You don't have to go over

7  there.  I see it.

8         THE WITNESS:  These are distended little veins.  This

9  is part of the surface of the brain.  It's all falling apart.

10  I indicated it was very fragmented.  This is probably an ink

11  dot.  I didn't put it on there; probably someone else looking

12  at the slide did.

13         But here are two veins that are distended and have,

14  what shall I say, a fibrin-platelet thrombus, which probably

15  means they were clotted in life and not a postmortem artifact.

16         MR. TELISMAN:  Your Honor, I'm going to object to

17  that.

18         THE COURT:  On what basis?

19         MR. TELISMAN:  On the basis that it was not

20  disclosed.

21         MR. BLEGEN:  Judge, honestly, I didn't even catch

22  what he said.

23         THE COURT:  What who said?

24         MR. BLEGEN:  Dr. Leestma.

25         THE COURT:  He said that those two veins had -- I

1    missed the first word, but it was something platelet
2    something.
3              THE WITNESS:  Fibrin.
4              THE COURT:  Fibrin-platelet --
5              THE WITNESS:  Thrombus.
6              THE COURT:  Thrombus, which means that it probably
7    occurred in life -- and then the objection --
8    in life as opposed to postmortem, right?
9              THE WITNESS:  Well, before the child's vital signs
10   stopped.
11             THE COURT:  Fair enough.
12             THE WITNESS:  Within the dying process.
13             THE COURT:  So then the objection was that wasn't
14   disclosed.
15             MR. BLEGEN:  The part where he said it probably
16   occurred in life.
17             THE COURT:  What part are you objecting to?
18             MR. TELISMAN:  The last part, your Honor.
19             The doctor writes in his report that it was fibrin-
20   platelet thrombi.  He said he's revised.
21             THE COURT:  Then the add-on is within the scope of
22   the disclosure.  The objection is overruled.
23   BY MR. BLEGEN:
24   Q    Just so I understand what you said, you said you found
25   fibrin-platelet thrombi.  What does that tell you?

1  A    It tells us that this most likely occurred in the dying

2  period, the agonal period of this child, within a day or two

3  of when the child died.

4  Q    Prior to the child's death, you mean?

5  A    Yes.

6  Q    And is there a way to briefly explain --

7  A    Sure.

8  Q    -- why that is so?

9  A    Why that would be so?

10        This child was known to be coagulopathic, meaning

11  that --

12        MR. TELISMAN:  Your Honor, I'm going to object again.

13  And I apologize for interrupting.

14        THE COURT:  The objection is overruled.

15        THE WITNESS:  Okay.  This results from some disorder

16  of blood coagulation where blood actually clots inside the

17  blood vessels, and this would indicate there was some problem

18  like that in the dying period.

19  BY MR. BLEGEN:

20  Q    Dr. Leestma, are you familiar with the report of a Dr.

21  Rorke-Adams who prepared for the prosecution?

22  A    Yes.

23  Q    And is it your understanding that she viewed some of the

24  photos or maybe probably all the photos and the slides taken

25  during your, Dr. Tourtellotte and Dr. Teas' examination?

Leestma - direct

1   A   Yes, I understand that.

2   Q   Would you take a look at --

3           Do you have your report in front of you?

4   A   I have the report.

5   Q   Would you look at page 4?

6   A   Okay, I have it.

7           THE COURT:  This is in his report?

8           MR. BLEGEN:  That's actually -- it's her report.

9           THE COURT:  Oh, okay.

10          MR. BLEGEN:  It's a different witness.  I just want

11  to ask him about --

12          THE COURT:  Do I have this?

13          MR. BLEGEN:  I don't believe that you do.

14          THE COURT:  All right, fine.

15          MR. BLEGEN:  I've only got a couple of things to ask

16  him about it.

17          THE COURT:  Okay.

18  BY MR. BLEGEN:

19  Q   Look at page 4 for a second.  Is it your understanding

20  that Dr. Rorke-Adams indicated that she found evidence of

21  contusions and lacerations on the brain?

22  A   That's what she reported, yes.

23  Q   Did you find any contusions or lacerations on the brain?

24  A   No.

25  Q   In fact, she in her neuropathological diagnosis says that

1   there are -- and this is on page 5 -- organized fronto-orbital

2   contusion/laceration?

3   A   That's what she said.

4   Q   Did you find that?

5   A   I didn't.

6   Q   Did you find any of that grossly?

7   A   No.  This brain was fragmented and falling apart, and I

8   couldn't identify anything that fit that description.

9            THE COURT:  Organized -- give me the term again.

10           MR. BLEGEN:  Organized fronto-hyphen-orbital

11  contusion/laceration.

12           THE COURT:  That was from whose report?

13           MR. BLEGEN:  Rorke-Adams.

14           THE COURT:  Okay.

15  BY MR. BLEGEN:

16  Q   Assuming she is speaking microscopically, did you find any

17  evidence of that microscopically?

18  A   I did not.

19  Q   And is that the area where -- strike that.

20           Is it Dr. Rorke-Adams who believes that one of the

21  slides might have been mislabeled?

22  A   That's my understanding.

23  Q   All right.  And is that -- is it your understanding that

24  she thinks that a slide that was labeled as posterior

25  paraventricular is actually from the fronto-orbital area?

Leestma - direct

1  A    This was labeled.  Each one of these had a number on it,

2  and that would be number 16, block number 16, as I understand

3  it.  And I don't agree with that, that this is not mislabeled.

4  It came from the posterior part of the brain near the

5  ventricle of the brain, and Dr. Teas recorded it as such.

6  Q    And I take it you also disagree that wherever this slide

7  is from that there is any evidence of contusion or laceration?

8  A    No.

9  Q    How do you see a contusion microscopically?

10 A    Well, a contusion, that's another word for a bruise.

11 There should be blood or evidence that there was blood

12 present.  And contusions usually occur -- one expects them on

13 the surface of the brain, not deep within the brain.

14         And there are certain locations that contusions occur

15 and under certain circumstances when they occur.

16         And so my problem with this is a

17 three-and-a-half-month old baby tends not to get contusions

18 because the head is malleable and the mechanisms are not there

19 to produce contusions.  So right away there's a problem.

20         Second of all, if this is a contusion someplace on

21 the surface of the brain, I surely didn't identify one as

22 such, and a laceration certainly not.

23 Q    All right.  Let's just stay with contusion for a second.

24         Were there, microscopically speaking, dead areas of

25 the brain?

Leestma - direct

1   A    Certainly.

2   Q    What are those called?

3   A    Necrosis or infarcts.

4   Q    What is an infarct?

5   A    An infarct is -- the most common thing we know about is a

6   heart attack, where a coronary artery was blocked and the

7   muscle that it serves dies.

8          The same thing can happen in the brain in a stroke.

9   Where no circulation comes, the brain that should be served by

10  that vessel dies, liquifies, scars down or becomes spongy like

11  a kitchen sponge.

12         THE COURT:  I know you're in the middle of a topic,

13  but we need to stop right here.

14         So I have a short status or two at 1:30 and also a

15  scheduled change of plea.  There is some question as to

16  whether the defendant in that case was brought over.  So we're

17  either going to start at 1:40 or 2:00.  So I'd like you to be

18  here ready to go at 1:40 just in case.  But if that person is

19  here, then it will be at 2:00.  Okay, thanks.

20         (The trial was adjourned until 2:00 p.m. of this same

21  day and date.)

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


JENNIFER DEL PRETE,                    )
                                       )
                    Petitioner,        )   Docket No. 10 C 5070
                                       )
          vs.                          )
                                       )
MELODY HULETT,                         )   Chicago, Illinois
                                       )   December 19, 2012
                    Respondent.        )   2:20 p.m.


VOLUME 3
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY


APPEARANCES:


For the Plaintiff:      BLEGEN & GARVEY
                        BY:  MR. PATRICK W. BLEGEN
                             MS. JODI L. GARVEY
                             MR. DANIEL A. RUFO
                        53 West Jackson Boulevard
                        Suite 1437
                        Chicago, Illinois  60604


For the Defendant:      ILLINOIS ATTORNEY GENERAL'S OFFICE
                        BY:  MR. KARL R. TRIEBEL
                             MR. NEAL GOODFRIEND
                             MR. ARI TELISMAN
                             MS. MONIQUE A. ANAWIS
                        100 West Randolph Street
                        13th Floor
                        Chicago, Illinois  60601

Also Present:                MR. ROBERT STANLEY


LAURA M. BRENNAN - Official Court Reporter
219 South Dearborn Street - Room 2102
Chicago, Illinois  60604
(312) 435-5785

1    (The following proceedings were had in open court:)

2    DR. JAN LEESTMA, PETITIONER'S WITNESS PREVIOUSLY SWORN

3    CONTINUED DIRECT EXAMINATION

4    BY MR. BLEGEN:

5    Q   Dr. Leestma, when we left off I was asking you about your

6    disagreement with Dr. Rorke-Adams regarding the location of

7    one of the slides and her finding of a contusion on that

8    slide.

9    A   I recall that.

10   Q   I think it might be helpful just to take a look at what

11   the difference is on the brain.

12        Rob, would you put up slide four from Dr. Leestma's

13   Power Point.

14        Can you point us to where you believe the slide was

15   taken from, the slide at issue, and where Dr. Rorke-Adams

16   thinks it was taken from?

17   A   My recollection is that it was back here someplace near

18   the back part of the brain.

19   Q   And where does Dr. Rorke-Adams think it was taken from?

20   A   The opposite end of the brain down here in the frontal

21   lobe.

22   Q   Is there any difference in those two areas regarding a

23   likelihood for there to be a bruise or a contusion?

24   A   Yes.

25   Q   What's the difference?

1    A    Contusions --

2          Well, let me just keep here.

3          Contusions of the brain from an impact to the head

4    characteristically will be at the base of the brain, other

5    areas not pictured here, but at the base of the brain where

6    the -- presumably the brain moves over structures of the -- in

7    the cranium.

8          THE COURT:  And you were pointing toward the front,

9    not the back.

10         THE WITNESS:  Yeah, I mean, deep in the brain like

11   this, the brain would have to be doing a lot of moving and so

12   forth in order to have any contusions back there.

13   BY MR. BLEGEN:

14   Q    And when you say -- I'm sorry.  You said something --

15         THE COURT:  I just want to make sure I'm getting

16   this.  So the -- whatever it was that Dr. Adams?

17         MR. BLEGEN:  Rorke-Adams.

18         THE COURT:  -- Dr. Rorke-Adams was looking at, you

19   think it came from the front of the brain; she says it came

20   from the back.  Or do I have it flip flopped?

21         THE WITNESS:  Well, her contention is that --

22         THE COURT:  That it's from the front.

23         THE WITNESS:  -- the frontal tip is where this piece

24   of brain came from.  I have to disagree.  It's deep in the

25   brain near the back of the brain.

1    THE COURT:  Okay.  I had it flip flopped.

2    THE WITNESS:  Opposite end of the structure.

3    BY MR. BLEGEN:

4    Q   And is your disagreement based on what you see on the

5    slide as to where it's from?

6    A   Yes.  There are certain structures there.  This big band

7    of white matter that connects the two hemispheres is in the

8    section.  The lining of the ventricle is in the section.  That

9    wouldn't be there in the frontal pole of the brain.  I mean,

10   it just doesn't make any sense.

11   Q   And is your disagreement also based on what was written

12   down during the actual --

13   A   Yeah.

14   Q   -- physical examination that you and the other doctors

15   performed?

16   A   Precisely.  Intracranial.

17   Q   Have you, Dr. Leestma, had an opportunity to look at some

18   of the slides that Dr. Rorke-Adams has prepared?

19   A   I did, yes.

20   Q   It's going to come up on the screen, I think.

21   There's a slide on called gyrus rectus 14 MTH.  Do

22   you see that up on the screen?

23   A   Yes.

24   Q   Can you tell us what that is.

25   A   This presumably is a sample.  I don't know whether it came

1   from this brain or this is from a control somewhere on another

2   case.  But the gyrus rectus is one of those structures at the

3   base of the frontal lobe, and if you lift the brain up, the

4   orbit, your eyes are going to be underneath that.  And this

5   would correspond to a structure that I would recognize in that

6   general area.  It would be reasonable.

7   Q   So and it's -- it appears to be a normal gyrus rectus

8   slide?

9   A   I gather 14 months gyrus rectus is something to compare

10  to, and it didn't come from this case, because I don't think

11  the brain would look that good.

12          THE COURT:  Got it.

13          MR. BLEGEN:  Let's jump to slide 2, Rob.

14  BY MR. BLEGEN:

15  Q   Can you tell us what that slide is representing.

16  A   Yes.  Okay.  Let me get the pointer down here.

17          This curved structure is part of the ventricle or the

18  lining of the center part of the brain where spinal fluid is

19  produced.  And you can tell that, I mean, not with this

20  magnification, but looking at the slide, you can see the

21  lining of cells that are there.  They have cilia on them and

22  so forth and wouldn't be anyplace else.

23          This particular structure is probably something

24  called the corpus callosum, which is where the -- actually if

25  we want to back up, I can show you on that anatomical model

1  where it is.

2          THE COURT:  The picture with all the --

3          MR. BLEGEN:  Yeah.  Do you need to see that again,

4  Judge?

5          THE COURT:  Yes.

6          MR. BLEGEN:  It's Leestma 4, Rob.

7          THE WITNESS:  Yeah, right here.  That's good.

8          This structure is what I'm talking about, the corpus

9  callosum.

10          THE COURT:  So the one that on that picture looks

11  white and it's sort of oblong.

12          THE WITNESS:  Yes.  And what we're really looking at

13  here are fibers coming from both hemispheres, crisscrossing so

14  that the left talks to the right, the right talks to the left.

15  And where we're talking about that I believe the section that

16  we just showed, and we can come back to it in a second, is

17  somewhere back in this general region where we have a corpus

18  callosum, and we have the ventricle, which is not well shown

19  here, and we have some cerebral cortex, which would probably

20  represent something about here.

21          And now we can return, I think, to that.

22  BY MR. BLEGEN:

23  Q    And, Dr. Leestma, then am I correct that you still believe

24  that the slide in question came from where you thought it came

25  from?

Leestma - direct

1  A    Yes.

2       And when we get that up, I want to point out a couple

3  of other things here.

4       Okay.  Ventricle, corpus callosum, white matter.

5  Cerebral cortex is along here, and it's essentially necrotic.

6  It's like a walnut.  It's all shrunken down.  And there are

7  some other bits of the brain here which show similar kinds of

8  things.

9       So this is infarcted or dead brain, and I don't

10  believe this came from the frontal part of the brain.  I think

11  it came, as I've indicated, from the posterior part of the

12  brain.

13  Q    And do you believe it has contusions or lacerations?

14  A    No contusions there.  Necrosis or death of the surface of

15  the brain in a few places and some reactions to not enough,

16  not enough blood flow.  But laceration, certainly not.

17  Contusion, no.

18       MR. BLEGEN:  Let's go to slide 3, Rob.

19  BY MR. BLEGEN:

20  Q    Can you tell us what is depicted here.

21  A    Okay.  These words, the GFAP is short for glial fibrillary

22  acidic protein.  It's a special stain that shows where the

23  supporting cells of the nervous system are replacing dead

24  brain and scarring.  And you really can't see much here.  The

25  brown would be the reaction product that shows that.  And it's

1    present around the necrotic cerebral cortex near the corpus

2    callosum and so forth.  That tells us something we could

3    already see in the purple stained section that came before.

4    Q    Does it tell you there's a contusion?

5    A    No.

6    Q    What does it tell you?

7    A    It's to me superfluous and doesn't add anything to what we

8    already know.

9    Q    And would you call that, what's depicted on slide 3,

10   evidence of a contusion or a dead brain, or what would you

11   call it?

12   A    Well, it's necrotic brain.  A contusion that came about

13   because of physical forces, I can't infer that.  I don't -- I

14   would not hold that opinion.

15   Q    Let's go to slide 4, slide marked Iron.

16   A    Okay.

17   Q    Do you understand what's being depicted here?

18   A    This is another special stain in which chemical reaction

19   is carried out on a slide to determine if iron is present.

20   And if iron is present, it means there's been bleeding there

21   and the red blood cells have given up their iron.  And that's

22   represented by these blue -- anything you see there in kind of

23   Prussian blue, that's the name of the stain, would be

24   indicative of iron having been released there at some point.

25        And that happens -- you know, it's not specific

1   really.  It just tells us that there's been some blood there
2   at some time.
3            THE COURT:  What part of the brain is this coming
4   from then?
5            THE WITNESS:  What kind of what?
6            THE COURT:  What part of the brain is this?
7            THE WITNESS:  I don't know where -- this is cerebral
8   cortex.
9            THE COURT:  Okay, cerebral cortex.
10           THE WITNESS:  But where precisely it's from --
11           THE COURT:  Understood.
12           THE WITNESS:  -- I can't tell you.
13           THE COURT:  What slide number was this again?
14           MR. BLEGEN:  That's slide 4.
15           THE COURT:  Thanks.
16  BY MR. BLEGEN:
17  Q   Let's presume for the moment, and maybe I'm wrong too,
18  that it's from the same area as where Dr. Rorke-Adams is
19  calling a contusion.
20  A   Okay.  If we can -- I don't know that, but it could be so.
21  Q   Fair enough.  I don't know it either.  But would this
22  slide represent evidence of a contusion?
23  A   No.  It just represents that there's been some bleeding.
24  There's lots of causes for bleeding.
25  Q   What are the other causes of bleeding?

Leestma - direct

1    A    Hypoxia, a respirator -- not respirator brain because the

2    brain can't react at that point.  This would have been from

3    some -- an infarct, anything that released blood from its

4    blood vessels, and --

5    Q    Maybe I --

6    A    -- we know that happened, so --

7    Q    Does a dying or dead brain release blood vessels?

8              THE COURT:  Release blood.

9              MR. BLEGEN:  I'm sorry.

10             THE WITNESS:  Say it again.

11   BY MR. BLEGEN:

12   Q    Does a dying or dead brain release blood?

13   A    Yeah.  But it takes time for this to happen.  Once blood

14   is released into tissues, it takes about five, seven days

15   before this chemical reaction is even possible.  It takes that

16   long for the scavenger cells to digest the red blood cells and

17   process it.

18   Q    Maybe you could say it better than I can.  So tell us why

19   that doesn't mean it's a contusion.

20   A    Well, first of all, in this particular structure, I can

21   still recognize brain tissue there.  An old contusion months

22   old would look like a sponge, a kitchen sponge, and it doesn't

23   look like that.

24   Q    What would a contusion that was 11 months or a year old

25   look like?

1   A   Look like a sponge.  It would be cystic.  All the brain

2   tissue would have been destroyed and replaced by bubbles and

3   holes and cysts and so forth.

4   Q   Dr. Rorke-Adams also indicated in her report that on

5   photos of the unfixed brain, uncut and sectioned, she

6   indicates that the photos appear to be of poor quality but

7   there appears to be scarring of the frontal lobes, especially

8   poles, left greater than right.  Did you see any of that?

9   A   I do not get that message from looking at those

10  photographs or looking at the brain.

11          MR. BLEGEN:  That's all I have, Judge.

12          THE COURT:  Cross.

13          MR. TELISMAN:  Thank you.

14                       CROSS EXAMINATION

15  BY MR. TELISMAN:

16  Q   Good afternoon.  It is -- doctor, is it Leestma or

17  Leestma?

18  A   Leestma, L-e-e-s-t-m-a.  Just pronounce everything that's

19  there.

20  Q   Okay.  Good afternoon, sir.

21          Dr. Leestma, where are cortical veins in relation to

22  the dura?

23  A   If you take the dura off and look at the exposed brain,

24  just about all the vessels you're going to see on the surface

25  that are going in the crevices are going to be veins.  The

Leestma - cross

1    arteries are going to be deeper to that.  And they will all
2    tend to approach, most of them, the midline and dump into the
3    superior saggital sinus, which, obviously, wouldn't see if you
4    took the dura off.  But in you lifted up a leaflet, you can
5    see them going on the surface of the brain, crossing the
6    barrier and entering the superior saggital sinus.  Got about
7    ten or twelve of them on each side.

8    Q    Okay.  And so are there cortical veins in the dura?

9    A    Well, they pass into the dura.  They wouldn't be a
10   cortical vein anymore.  I mean, it would be leaving one
11   structure and entering another.

12   Q    So are there cortical veins in the -- let me ask it this
13   way:  In your revised report, the one that was admitted here,
14   on the second page in your conclusions you write, tell me if I
15   get this right, the last sentence of the first paragraph
16   there.

17   A    I see it.

18   Q    "I was not able to discover any vessels that appeared to
19   contain thrombi," and then in parentheses you wrote, "in the
20   sections of the dura.  But some small cortical veins had fiber
21   and platelet thrombi."  Did I read that correctly?

22   A    Yes, you did.

23   Q    Okay.  So when you say that you did not -- that you were
24   not able to discover any vessels that appeared to contain
25   thrombi in the sections of the dura, are you referring to any

Leestma - cross

1   cortical veins or --

2   A    No.  These would be vascular structures within the dura

3   itself.  Maybe downstream there could have been a cortical

4   vein attached to that, but in the dura, no.  That's a

5   different structure now.

6   Q    Okay.  Now, Dr. Leestma, you are -- are you retired from

7   the practice of medicine outside of consulting work such as

8   this?

9   A    Well, I'm not involved in an institutional role any

10  longer.  I'm not involved in an academic appointment.  And I

11  have only an emeritus appointment at Children's Memorial

12  Hospital and St. Joseph Hospital.

13  Q    So your only medical work now, is that through consulting?

14  A    It would be on my self employment acting as a basis of

15  consultant in neuropathologic matters such as a case like

16  this.

17  Q    And all of your earned income comes from consulting such

18  as this?

19  A    Earned income, yes, it does.

20  Q    And you testify more for the defense in criminal cases

21  than you do for the prosecution?

22  A    In criminal cases, that's true.

23  Q    The last time that you testified for the prosecution is --

24  was back in 1999; is that right?

25  A    Oh, I don't recall exactly, but it could be that.

Leestma - cross

1    Q   And, again, and if you'd like to refresh you recollection

2    with the testimony list that the other side -- that

3    petitioner's counsel provided for me?

4    A   That would be -- I don't remember the exact case, but I

5    have done so, and that would be about right.

6    Q   And since then you've testified in 123 criminal cases?

7    A   I believe that's so.

8    Q   And in every one of those cases you testified for the

9    defense; is that right?

10    A   Well, the criminal cases would include some that I

11    testified for the prosecution, but that would be some time

12    ago.

13    Q   I'm talking about since 1999.

14    A   Oh, 1999. That would be true.

15    Q   So 123 consecutive times for the criminal defense in

16    criminal cases?

17    A   In criminal cases. I haven't -- I'm involved in a couple

18    criminal matters where I will be testifying for the

19    prosecution, but they're not on the list yet.

20    Q   Now, Dr. Leestma, how did you become involved in this

21    case?

22    A   I received a call, I believe, from Dr. Teas saying she had

23    a case that she was involved in and would I consent to look at

24    the brain and would I be interested in going to DuPage County

25    to do a second examination of the brain if that could be

Leestma - cross

1    arranged, and I agreed to do so.

2    Q    And you have worked with Dr. Teas in the past, correct?

3    A    Yes.

4    Q    Have you worked with her in your consulting capacity?

5    A    I have.  I worked with her also for about 12 or 15 -- 12

6    years or so at the Cook County medical examiner's office, and

7    she left that office, and so did I, and I've had a continued

8    professional relationship with her.

9    Q    Dr. Leestma, have you worked with Dr. Teas as a consultant

10   for or a witness, expert witness for the defense in a case

11   involving alleged abusive head trauma before this one?

12   A    Yes.

13   Q    How many times?

14   A    I don't recall.  It would probably be at least half a

15   dozen times.

16   Q    At least half a dozen times?

17   A    Yes.

18   Q    And in those cases was the defense ever -- did the defense

19   ever attribute findings that were claimed to be abusive head

20   trauma to cortical venous thrombosis?

21   A    I specifically can't recall, but that wouldn't be crazy.

22   I mean, it's entirely possible that this could have occurred.

23   Q    And so that I understand your answer, what you're saying

24   is it may well be true?

25   A    It may well be true.  I just don't put tags in my memory

1  or my files with Dr. Teas and what the case was and all of

2  that.  But it's a problem that comes up, and it wouldn't

3  surprise me if I was involved.

4  Q    But there were cases in the past where you as an expert

5  witness in a abusive head trauma case opined that the -- that

6  what looked like abusive head trauma was in fact cortical

7  venous thrombosis?

8  A    I've made that opinion and testified to that effect, yes.

9  Q    In this case were you given any materials before you

10  authored your report?

11        And actually, if I could back up.  Let me ask a

12  question before that.

13        You've authored more than one report in this case,

14  correct?

15  A    Yes.

16  Q    Back on August 20th of 2012 you wrote a report addressed

17  to Dr. Teas, correct?

18  A    That's correct.

19  Q    Okay.  And so we'll get into my other question in a

20  minute, but I would like to first show this to you.

21        THE COURT:  I just want to clarify something.  The

22  report that I have is dated August 20th.  Is that the one --

23  is that the one I'm supposed to have?  If that's his original

24  report.  I thought you were maybe giving me the supplemental

25  report.

1          MR. BLEGEN:  What does it say on the bottom, Judge?

2          THE COURT:  Leestma report.

3          MR. BLEGEN:  You should have the revised report.  I'm

4     sorry.

5          THE COURT:  I got the wrong one.

6          MR. BLEGEN:  It sounds like you're going to get this

7     one in a second anyway.

8          THE COURT:  I'll hang onto it, obviously, but you

9     don't perchance have a second.

10          MR. BLEGEN:  I do.

11          THE COURT:  Just dig it out and just hand her one

12     when you get it.  Go ahead.

13          MR. TELISMAN:  And just so that we're clear, and I

14     want to make sure, your Honor, that I understand, for the

15     record, we have the Petitioner's Leestma Revised Report in

16     evidence.  That's right?

17          THE COURT:  Yes.  The one that Mr. Blegen intended to

18     give me but did not was the revised report.  The one he gave

19     me was the report.  I now have both of them in front of me.

20          MR. TELISMAN:  And so for purposes just of the

21     record, we're going to call the petitioner's revised, Leestma

22     revised report is --

23          THE COURT:  That's the one that the petitioner put

24     in.

25          MR. TELISMAN:  Right.

Leestma - cross

1          THE COURT:  Yes.

2          MR. TELISMAN:  Okay.  And that's the one dated

3     December 14th, '12?

4          THE COURT:  Yeah.  So the date is kind of mushed in

5     with the address over here, but, yeah, it's December 14th.

6          MR. TELISMAN:  Okay.  And then what I'm going to do

7     is I have marked as Respondent's Exhibit No. 39.

8          THE COURT:  So I'm just going to scratch out what I

9     have on mine, and I'll just call it Respondent's 39.  That's

10    the 8/20 report.

11         MR. TELISMAN:  Yes.

12         THE COURT:  Okay.

13         MR. TELISMAN:  And does the court need an additional

14    copy?

15         THE COURT:  No.  I'll just go with this one.

16         MR. TELISMAN:  Very good.

17         All right.  If I may approach the witness.

18         THE COURT:  Yes.  No need to ask.  Just go ahead and

19    do it.

20    BY MR. TELISMAN:

21    Q    Dr. Leestma, I'm handing you what's been marked as

22    People's Exhibit No. 39.  If you could take a look at that and

23    let me know when you're ready.

24    A    I am.

25    Q    Is that the first report that you authored in this case?

1   A   Yes.

2   Q   And that's the one dated August 20th of 2012?

3   A   Yes.

4   Q   Now, prior to writing that report, what, if any, materials

5   were you given regarding this case?

6   A   My best answer is not very much.  I think it was mostly

7   verbal.  And I wasn't at all sure I'd be involved in any

8   further thing than examining the brain and rendering a report

9   about it, so I don't think I received anything that was not of

10   a -- you know, in a printed fashion or the records or

11   anything.  I didn't get that.

12   Q   So you don't believe that you received any medical records

13   from the case?

14   A   I'm almost certain I didn't.

15   Q   No trial transcripts?

16   A   No.

17   Q   Any reports from the petitioner's --

18   A   I don't think I got anything.

19   Q   And if you don't mind, let me just finish the question.

20   I'm learning pretty quickly.

21        Okay.  So -- all right.  So no other reports from the

22   petitioner's other expert witnesses?

23   A   I have no memory of that.

24   Q   Now, you said that you had received some information

25   verbally.  Who was that from?

Leestma - cross

1   A   Probably Dr. Teas.

2   Q   Was this before or after you had gone over to examine

3   Isabella Zielinski's brain on July 17th of 2012?

4           THE COURT:  This being the information he got

5   verbally from Dr. Teas?

6           MR. TELISMAN:  Yes.

7   BY THE WITNESS:

8   A   Yes.  This would be -- I don't know how long we had a

9   conversation before that before we could work it out that I

10  could get out there, but we probably had a couple of

11  conversations, and that would be where some basic information

12  about what the issues were.

13  BY MR. TELISMAN:

14  Q   And was one of the issues discussed whether Isabella's

15  collapse could have been attributable to cortical venous

16  thrombosis?

17  A   I didn't have any particular notion of that.  I hadn't

18  examined anything else, and so I was coming to see this brain

19  pretty much uncluttered with anything.

20  Q   Now, in your August 20th, 2012, report, you wrote in your

21  conclusions, "I was not able to discover any vessels that

22  appeared to contain thrombi."

23  A   Right.  That's what I said.

24  Q   And then on December 14th, which was six days ago, you

25  wrote a new report, right?

Leestma - cross

1   A   Well, an appended one with the last sentence changed

2   somewhat.

3   Q   The last sentence, and then you also included another

4   sentence inside the body of the page?

5   A   That's right, yes.

6   Q   And the difference here is you included one sentence near

7   the -- on the last paragraph of the first page, I believe?

8   A   Yes.

9   Q   That reads, "Several small cortical veins in a section of

10  cerebrum show recent fibrin platelet thrombi, but none were

11  found in sections of the dura."  Did I read that correctly?

12  A   You did.

13  Q   And then you also added -- or changed the last sentence,

14  which had previously read, "I was not able to discover any

15  vessels that appeared to contain thrombi," period, and you

16  added in parentheses "in the sections of the dura," and then

17  added, "but some small cortical veins had fibrin platelet

18  thrombi."

19  A   That's what I did.

20  Q   Now, how did you discover this error?

21  A   In realizing we were going to be coming to trial and that

22  we started talking about exhibits, I made some photographs, or

23  I had made some photographs of the slides, and in those

24  photographs there are quite clearly thrombi there, and I said

25  my statement in the prior report was not completely accurate.

1   It to some degree is wrong.  So I said, I need to make a

2   correction here because I'm going to show you a slide with

3   some fibrin and platelet thrombi in there, and the report

4   needs to, you know, take awareness of that.

5   Q   When did you first discover the fibrin platelet thrombi in

6   the cortical veins?

7   A   Oh, I must have made these -- well, I made my microscopic

8   examination and notes and so forth on 8/7/2012, so that would

9   be August 7th, and I obviously noticed that, but somehow it

10  slipped my mind to put it in the report.

11  Q   So at the time that you wrote your August 20th, 2012,

12  report, you knew -- or you had found thrombosed cortical

13  veins?

14  A   Yes.  I had -- it's in my notes, and I took some pictures

15  of them at that time, which is the exhibit you saw.

16  Q   And at the time that you wrote your initial report, you

17  were aware that cortical vein thrombosis is a common defense

18  against claims of abusive head trauma, correct?

19  A   It's a common problem, and sometimes it enters into the

20  defense of these cases.

21  Q   And you gave that initial report to counsel to review?

22  A   Yes.

23  Q   And you gave it to Dr. Teas so that she could rely on it?

24  A   Sure.  I did.

25  Q   Had you told her before -- before submitting your report

1  did you tell her that you found thrombosed cortical veins?

2  A   I don't remember.  We looked at the slides together, and

3  I'm quite certain we talked about it, and there was a focus

4  concerning superior saggital sinus thrombosis.

5  Q   Which was not present in this case?

6  A   We didn't -- couldn't find anything there, and I put that

7  in the report and neglecting somehow to say of course there

8  are a couple of little ones in a slide of cortex.

9  Q   So and I'm sorry to ask again, but I don't know.  Are you

10  saying that you don't recall whether you spoke with her about

11  the presence of cortical -- cortical -- pardon me.  Are you --

12  let me try this again.  Are you saying that you don't recall

13  whether you discussed the presence of thrombosed cortical

14  veins with Dr. Teas?

15  A   I must have because we looked at the slides on more than

16  one occasion, and I took pictures of those slides, and we must

17  have discussed that.

18  Q   And that is something that you must have done before

19  August 20th of 2012 when you authored your first report?

20  A   Well, I took these pictures, as I say, on the 7th of

21  August and met with Dr. Teas, I think, at another time, a

22  couple of times looking at those slides.  I don't recall the

23  date.  And we must have discussed those things at that time,

24  probably looking at the slide and -- together so --

25  Q   And that would have been prior to August 20th of 2012,

1   right?

2   A    Prior to which date?

3   Q    August 20th, 2012, the date of your first report.

4   A    I don't remember.  I think probably after that.  We met a

5   couple of times, and it was probably after I sent that report.

6   Q    But you did review the slides with Dr. Teas on August 7th

7   you said?

8   A    I don't think -- I don't think she was there at that time.

9   I think it was later after I drafted my report.

10  Q    Now, Dr. Leestma, you know Dr. Lucy Rorke-Adams, correct?

11  A    I do.

12  Q    She's a very well-respected expert in the field of

13  neuropathology, correct?

14  A    Certainly well known, been around for a long time, and I

15  guess I've probably known her for 40 years maybe.

16  Q    Now, Dr. Leestma, she's written numerous authoritative

17  treatises in the field of neuropathology?

18  A    She's been very productive in writing and making books and

19  writing peer reviewed literature articles.  There's nothing

20  that any of us writes that's authoritative.  Hopefully it's

21  well informed, but in terms of being immutable truth, neither

22  she nor I ever would claim to do that.

23  Q    And that's fair.  What I mean, though, is that she has

24  authored treatises that are generally accepted and relied upon

25  in your field?

Leestma - cross

1   A    I think that's probably true in some areas, yes.

2   Q    Now, Dr. Leestma you had sampled Isabella Zielinski's

3   brain tissue and made slides, as you discussed in direct

4   examination, right?

5   A    We selected tissues, and then technicians somewhere made

6   the slides.  I didn't make them.

7   Q    And the slides were all then turned over to -- do you know

8   if they were all turned over to counsel for the petitioner?

9   A    Here's where I don't know what all the details.  When you

10  make slides, you can make multiple recuts of them.  And I

11  don't know whether everybody involved in the case looked

12  exactly at the slides that I'm looking at.  So I don't know

13  what the ebb and flow of this material was.

14  Q    Now, of the slides that -- of Dr. Rorke-Adams that you

15  just discussed here, these are not slides that you personally

16  have seen, correct?

17  A    I have seen the images that were projected here.  I

18  haven't actually looked at those -- the slides that she's made

19  pictures of.

20  Q    And you have not looked at them under a microscope?

21  A    No, I have not.

22  Q    You are aware from reviewing Dr. Rorke-Adams' report that

23  she had requested and obtained a second set of slides with

24  which she would do her own staining and examination?

25  A    That's my understanding.

1   Q   Did you ever request to see those slides?

2   A   I don't recall.  I never looked at the special stains that

3   were done.  They were never provided to me, and I don't recall

4   whether I asked to see them or not.

5   Q   If in fact there was evidence of a contusion on the area

6   of the frontal lobe of the brain, would that be a marker for

7   trauma?

8   A   It's conceivable.  It could be.  Except in a

9   three-month-old you probably cannot get contusions from head

10  impacts.  So it would be -- if someone said that, it would be

11  subject to some examination and thought.

12  Q   And another question.  When looking at one of the last

13  slides, the iron --

14  A   Yes.

15  Q   -- slide, that is -- you said that that is evidence of

16  bleeding.

17  A   Yes.

18  Q   Is what you had said.

19      Now, and that blood, that predates Isabella

20  Zielinski's death, correct?

21  A   Oh, yes.  Sure.

22  Q   So it had to have been from some other event, correct?

23  A   Some whatever.  I don't know what it is.  But there had to

24  be plenty of time for those cells to digest that blood and

25  metabolize the iron, so it would have to be a minimum of seven

Leestma - cross

1    days.  And the stuff stays around for a long time, so it could

2    be months.

3    Q    Going back to the thrombosed cortical veins.

4    A    Yes.

5    Q    When you had sent Dr. Teas your report, and you also sent

6    the same report, the first report, the August 20th, 2012,

7    report, you also sent that to the petitioner's attorneys as

8    well?

9    A    I think Dr. Teas probably forwarded it.  I was doing my

10   work or, quote, my business with Dr. Teas, and it was with her

11   that I communicated, and I fully assume that she would forward

12   whatever I sent to her on to counsel, whom I had not met or

13   had, I don't think, any conversation with at that time.

14   Q    And prior to December 14th of 2012, did she ever say to

15   you, Dr. Leestma, what you have in your report is wrong?

16   A    Well, I think she raised the question.  She said, "Well,

17   what do you mean here?"  And I said, "Yes, we didn't see any

18   thrombi in the saggital sinus," and I said, "Oh, my gosh, I

19   need to mention that we did see it in a slide of cortex."  And

20   she said, "Well, you should probably append your report,"

21   which I did.

22   Q    Did that conversation take place in December of this year?

23   Like did it take place this month?

24   A    Yeah.  It wasn't long -- I mean, it was -- I think I

25   appended the report the same day and then sent it to counsel

1    and gave it to Dr. Teas.

2    Q    But for nearly four months you had -- Dr. Teas had your

3    report that -- and it had the wrong information on it?

4    A    Well, incomplete information and in a sense wrong that I

5    pointed out.

6    Q    I don't want to mince words with you, but when you wrote,

7    "I was not able to discover any vessels that appeared to

8    contain thrombi," that's an incorrect statement, correct?

9    A    That's an incorrect statement.  Absolutely.

10   Q    One last thing with respect to the cortical -- the

11   thrombosed cortical veins that you identified.  You said that

12   this was coagulation in the blood vessel -- or pardon me.

13   This was -- yeah, it was coagulation in the blood vessel in

14   the dying period.

15   A    Yes.

16   Q    And that's what you wrote, correct?

17   A    Correct.

18   Q    So and you said that this was -- this occurred some point

19   before Isabella died but you can't say how soon before?

20   A    Correct.  It was some days probably.  I can't be anymore

21   specific than that.

22   Q    But could it have happened during the last day of her

23   death -- or day of her life?  Pardon me.

24   A    They look older than that to me.  But in terms of precise

25   aging and dating, you know, to say, well, it happened this day

1    or a day before, I wouldn't want to hang my hat on that.

2    Q    But certainly those -- the thrombosed cortical veins that

3    you identified, they were not the cause of her collapse on

4    December 27, 2012; is that true?

5    A    Absolutely not.

6              MR. TELISMAN:  If I could have one moment?

7              THE COURT:  Sure.

8              MR. TELISMAN:  Thank you.  I have no further

9    questions.

10             THE COURT:  Redirect.

11                        REDIRECT EXAMINATION

12   BY MR. BLEGEN:

13   Q    Dr. Leestma, Mr. Telisman asked you some questions about

14   how you get your current income.  Remember that?

15   A    Yeah.

16   Q    Are you being paid anything at all for your work in this

17   case?

18   A    I have received not one dime.

19   Q    Are you -- anybody intending to give you any money as far

20   as you know?

21   A    I would hope I could -- would be reimbursed for out of

22   pockets, but I don't know what the situation is.

23   Q    You were asked some questions about cortical venous

24   thrombosis.  Do you remember that?

25   A    Yes.

Leestma - redirect

1   Q   Did anybody suggest to you that you should do whatever you
2   could to find cortical venous thrombosis?
3   A   No.  Do an examination, and I find what's there, and that
4   I tried to do.
5   Q   Did you try to color your conclusions in this case to try
6   to reach certain facts or --
7   A   That isn't appropriate or professional.  I wouldn't do
8   that.  I didn't do that.
9   Q   Is CVT a diagnosis that's easy to miss?
10  A   You mean intravascular coagulation?
11  Q   Yes.
12  A   Sure it is.  Yes.  It's missed all the time.
13  Q   And even by doctors who are examining a live child or
14  person?
15  A   Well, you can take it at whatever window you want to.  In
16  the clinic, in a living child, missed all the time.  Can be
17  missed radiologically even by people that are acquainted with
18  the problem, and it could be missed at an autopsy by a
19  pathologist.
20  Q   Mr. Telisman asked you that if there was a contusion in
21  the frontal area, could that be the result of abusive trauma.
22  Remember that question?
23  A   First of all, given the notion that producing bruises on
24  the brain by physical actions in a young child of a few
25  months' age probably is well-nigh impossible unless you

1    fracture the skull and do all kinds of mayhem and like that,

2    but if you see lesions that you feel are contusions, then it

3    seems to me you'd better look at whatever possibilities it

4    might be.  It might be an artifact of removal of the brain.

5    It might be related to the respirator brain phenomenon, which

6    makes the brain very soft and mushy.  There could be some

7    other lesion that might be misinterpreted that way.

8            It would seem to me that's where you have to begin to

9    turn up the microscope and do some work.

10   Q   If there were a contusion, would you be able to accurately

11   date it?

12   A   You could make some estimates.  There clearly is a time

13   continuum that involves what happens to a contusion, or almost

14   any brain lesion.  Takes some weeks for the supporting

15   elements to begin to react and make a scar.  Takes a while for

16   the brain that's dead to be policed up and metabolized in good

17   a way and blood to be processed and so forth and so on.  You

18   can make some passes at estimation, but it is -- some are

19   better than others.  Let me put it that way.

20   Q   If you found a contusion in 2012 in the frontal area of

21   the brain, could you date it to a specific day in 2002?

22   A   No.  Impossible.

23   Q   I just want to ask you a couple of questions about your

24   supplemental report.  The sentence in your original report,

25   excuse me, says, the last sentence, the one at issue says, "I

1   was not able to discover any vessels that appeared to contain

2   thrombi," correct?

3   A   Correct.

4   Q   Is that sentence right at the end of two sentences that

5   are talking about -- or, excuse me, at the end of a sentence

6   that's talking about something that's going on in the subdural

7   or subdural membranes?

8   A   Yes.

9   Q   And so what you were saying there, that there's no thrombi

10  within the dura?

11  A   No.  In a sense, yes.

12  Q   That's --

13  A   This is imprecision.  I admit my error.  I'm embarrassed

14  by it, but it needs to be corrected, and that's what I did.

15          MR. BLEGEN:  That's all I have, Judge.

16          THE COURT:  Anything else?

17          MR. TELISMAN:  No thanks.

18          THE COURT:  The witness is excused.  Please call the

19  next witness.

20          MR. TELISMAN:  Your Honor, the people call Brian

21  Forbes to the stand.

22          THE COURT:  It would be the respondent.

23          MR. TELISMAN:  I'm sorry, Judge.

24          THE COURT:  It's habit.  I know.

25          MR. TELISMAN:  It's habit.

Forbes - direct

1    (Witness sworn.)

2         MR. TELISMAN:  May I proceed?

3         THE COURT:  Yes.

4         MR. TELISMAN:  Thank you.

5      DR. BRIAN FORBES, RESPONDENT'S WITNESS, DULY SWORN

6                    DIRECT EXAMINATION

7    BY MR. TELISMAN:

8    Q   Good afternoon.

9    A   Good afternoon.

10   Q   Could you please state your name, spelling your last name

11   for the record.

12   A   My name is Brian Forbes, F-o-r-b-e-s.

13        THE COURT:  Brian with an I or a Y?

14        THE WITNESS:  I.

15   BY MR. TELISMAN:

16   Q   What do you do for a living, sir?

17   A   I'm a pediatric ophthalmologist at the Children's

18   Hospital, Philadelphia.  I'm on faculty at the University of

19   Pennsylvania School of Medicine.

20   Q   Now, if you don't mind, doctor --

21        THE COURT:  Slow down.  I'm going to tell you right

22   now.  I'm a fast talker.  You got me beat by about a hundred

23   percent, so just slow it down.

24        THE WITNESS:  You got it.

25   BY MR. TELISMAN:

Forbes - direct

1  Q   Dr. Forbes, if you could very briefly tell us about your

2  educational background as it relates to your career as a

3  pediatric ophthalmologist.

4  A   I went to medical school at the University of Pennsylvania

5  School of Medicine.  I did a residency in ophthalmology at

6  UMDNJ in Newark, New Jersey.  I did my pediatric ophthalmology

7  fellowship at the Willis Eye Hospital in Philadelphia, P.A.,

8  and I've been at the Children's Hospital Philadelphia acting

9  as a pediatric ophthalmologist since 2000 or maybe 2001.

10  2000.

11  Q   What does your work involve at the Children's Hospital of

12  Philadelphia?

13  A   Basically I take care of children's eyes.  That

14  encompasses a number of different things.  I see patients as

15  an outpatient, and I a lot of times do simple things such as

16  straighten their eyes out surgically, assess whether or not

17  they need glasses.  And I see a lot of children who have

18  metabolic or genetic disorders that they want to make sure

19  that there's nothing with the eyes.

20       In addition, I do a lot of in-patient consults at the

21  hospital.  That involves seeing children with a whole plethora

22  of different underlying problems from infections to genetic

23  disorders to retinopathy at prematurity to trauma to various

24  metabolic diseases and such.

25       And I do all my work at the Children's Hospital of

Forbes - direct

1    Philadelphia except I see kids for retinopathy at prematurity

2    at the Hospital of the University of Pennsylvania.

3    Q    What is retinopathy?

4    A    Retinopathy is basically pathology of the retina.  So

5    retinopathy at prematurity is a particular pathology that

6    occurs in very prematurely born children.

7    Q    How many children approximately do you treat each year?

8    A    I think -- I know that I see about 3,000 as outpatients,

9    and I see about 150 consults for different things as

10   in-patients, and then retinopathy at prematurity varies, but

11   probably about 200 or something like that.

12   Q    That's per year?

13   A    Yes.

14   Q    So we're talking roughly 33 -- 3,350, somewhere around

15   there?

16   A    3,300.

17   Q    3,300, okay.

18   A    Actually 35, I think, if you do the math better.

19   Q    Okay.  And also at the University of Pennsylvania School

20   of Medicine what subjects do you teach?

21   A    I teach basic embryology in the medical school itself.  I

22   do a couple of labs for the medical students.  I teach the

23   ophthalmology residents.  I always have two on service with me

24   at any given time.  And then I have two fellows in pediatric

25   ophthalmology with me.  I also do some research, some basic

Forbes - direct

1    research at the Hospital of the University of Pennsylvania.

2    Q    Now, you mentioned before that some of your work involves

3    treating children for trauma-related eye injuries; is that

4    right?

5    A    Yes.

6    Q    Have you -- has any of your work involved treating or

7    evaluating cases of suspected child abuse?

8    A    Certainly, yes.

9    Q    Could you please explain.

10   A    Generally what happens is there's a service at the

11   Children's Hospital of Philadelphia called a SCAN team or the

12   Suspected Child Abuse and Neglect team.  In general they will

13   consult us when there's a suspicion of a child having been

14   abused in one way or another.  And as an ophthalmologist, we

15   generally can do a better evaluation of the eyes than the

16   general pediatric service or the SCAN team.

17   Q    What role does ophthalmology play in cases of child abuse?

18   A    Again, we usually are an outside consult or a consult from

19   that service, and we go in and primarily evaluate the eyes

20   themselves, you know, for any findings in general, but

21   obviously retinal hemorrhages are a big part of that,

22   subconjunctival hemorrhages can be a part of that, and

23   sometimes palsied muscles can be part of that.

24          You know, in most kids obviously you're going to want

25   to know the medical background of them, so you would do a

Forbes - direct

1   relatively thorough chart review at least as it pertains to

2   the question being asked of us.

3   Q   When encountering a case of suspected child abuse, if you

4   could just walk us through, what is it that you do?

5   A   So what generally happens is -- what happens is we're

6   asked to see the child, so what we do is we initially take a

7   look at the child to see if there's a palsied muscle or some

8   external evidence of trauma.  And then we put drops in the

9   eyes at that point.  The drops allow us to get a better view

10  of the back of the eye because it makes the pupil large, and

11  basically it makes the window into the back of the eye better.

12       That takes probably 30 or 40 minutes to really take

13  effect, so we do what we did in terms of the initial

14  consultation and come back somewhere between a half an hour

15  and two hours later to evaluate the back of the eye.

16       We use an instrument called an indirect

17  ophthalmoscope, which is something nearly specific to

18  ophthalmologists, which allows us to get a better or a more --

19  a larger view of the back of the eye, and also it's binocular,

20  which allows us to see in terms of depth perception or three

21  dimension in the back of the eye.

22       So, anyway, we do a thorough evaluation of the back

23  of the eye and look for anything that, you know, is consistent

24  with the question at hand.

25  Q   Now, are you familiar with the term differential

Forbes - direct

1   diagnosis?

2   A   Yes.

3   Q   What is a differential diagnosis?

4   A   So a differential diagnosis is basically a written writing

5   out of the thought process of the physician or whomever is

6   evaluating a situation.  So we write down what the

7   possibilities are at least initially in terms of what we know

8   about the circumstances of the consult at hand.

9   Q   As part of the SCAN team that you talked about before that

10  you're a part of, are you involved at all in offering a

11  differential diagnosis in cases of suspected child abuse?

12  A   Just to back up one step, I'm not part of the SCAN team.

13  The SCAN team is the Suspected Child Abuse and Neglect team,

14  which is the hospital -- is part of the hospital.  I'm

15  consulted by the SCAN team.

16          But specifically to answer your question, yes, I look

17  in the eyes, and I'm almost always asked to give my opinion as

18  to how the eye findings pertain to the situation at hand.

19  Q   Have you authored any peer reviewed published articles or

20  studies regarding retinal hemorrhages?

21  A   I have.

22  Q   Now, at this point, Dr. Forbes --

23          If I may approach the witness.

24          Dr. Forbes, I'm going to hand you some documents

25  here, Respondent's Exhibit 40 through 43, and I'm just going

Forbes - direct

1   to ask you to direct your attention to Exhibit 40.

2   A   I'm not sure I'm talented enough to do that.

3            THE COURT:  It's the first one.

4            THE WITNESS:  Okay.

5            THE COURT:  CV.

6            THE WITNESS:  Okay.

7   BY MR. TELISMAN:

8   Q   Is that a true and accurate copy of your curriculum vitae?

9   A   I'm sure it is, yes.

10           MR. TELISMAN:  And I guess we're stipulating that the

11  CV's go into evidence; is that right?

12           THE COURT:  Yes.  That's true.

13           MR. TELISMAN:  Very good.

14           Your Honor, I'm tendering -- or I'm requesting

15  that --

16           THE COURT:  Yes, it's in.

17           MR. TELISMAN:  I'm requesting that Dr. Forbes be

18  found to be an expert.

19           THE COURT:  He is.

20           MR. TELISMAN:  Thank you.

21  BY MR. TELISMAN:

22  Q   All right.  Let's talk about this case, Dr. Forbes.  How

23  did you become involved in this case?

24  A   You called me and asked me to -- if I would be interested

25  in becoming involved in the case.

Forbes - direct

1  Q  What was the purpose of your evaluation?

2        Oh.  Specifically, did -- were you asked by my office

3  to --

4  A  I was asked by your office to become involved, which I

5  acquiesced.

6  Q  And just so that we're clear, have you ever been qualified

7  to testify, or have you ever testified in court as an expert

8  witness before?

9  A  Yes.

10  Q  How many times?

11  A  Twice.

12  Q  Twice, okay.

13  A  Actually once.  One time it was a fact -- or an ex -- or a

14  fact witness.

15  Q  Okay.

16  A  I don't know if that's the same thing.

17  Q  Now, Dr. Forbes, so you conducted an evaluation in this

18  case?

19  A  I did.

20  Q  As part of the evaluation process, did you review any

21  documents?

22  A  I did.  I reviewed quite a few documents.  I reviewed the

23  medical records in the case.  I reviewed the written reports

24  of the other experts.  I reviewed imaging studies.  I reviewed

25  fundus photographs.  I reviewed a lot of different things that

Forbes - direct

 1   I have written down on the thing, and I can't really remember.

 2   Q   Are these the types of records that are reasonably relied

 3   upon by experts in your field in doing this type of

 4   evaluation?

 5   A   Absolutely.

 6   Q   And did you rely on these documents as part of the bases

 7   for your opinion?

 8   A   I did.

 9   Q   And in addition to reviewing these documents, did you also

10   rely upon the literature that's generally accepted in your

11   field?

12   A   Yes.

13   Q   And specifically the reference that you cite -- and I'm

14   going to direct your attention actually at this point to

15   Respondent's Exhibit No., I think we're on 42, I believe.  42.

16   A   Yes, it's 42.

17   Q   42 lists the references that you relied on in part in

18   arriving at your opinions?

19   A   Yes.

20   Q   And are those references that you cite, are those

21   generally accepted and considered authoritative in your field?

22   A   Yes.

23   Q   And did you also rely on your training and your clinical

24   experience in -- as a treating pediatric ophthalmologist in

25   arriving at your opinions?

Forbes - direct

1   A    Yes.

2   Q    Now, you also wrote a report in this case, correct?

3   A    I did.

4   Q    Okay.  And that is marked as Exhibit -- and I think it's

5   40, and I apologize.

6   A    41.

7   Q    41?

8        THE COURT:  41.

9   BY MR. TELISMAN:

10  Q    Okay.  Is that a true and accurate copy of the report that

11  you authored in this case?

12  A    Yes.

13       MR. TELISMAN:  Your Honor, I move to admit

14  Respondent's Exhibit No. 41 into evidence.

15       THE COURT:  It's admitted.

16       MR. TELISMAN:  Thank you.

17  BY MR. TELISMAN:

18  Q    Now, Dr. Forbes, have you prepared any materials other

19  than your report in anticipation of your testimony today?

20  A    I did.  I prepared a very brief Power Point slide.

21  Q    And are those, copies of those slides marked as Exhibit 43

22  in the packet there?

23  A    They are.

24  Q    And would that Power Point assist the court in

25  understanding the condition of Isabella Zielinski's eyes and

Forbes - direct

1    what happened to her in this case?

2    A    I believe so, yes.

3                MR. TELISMAN:  If I may.

4                THE COURT:  Sure.

5                MR. TELISMAN:  Thank you.

6                THE WITNESS:  So how do I advance this or --

7                MR. TELISMAN:  Actually, we'll do the moving of the

8    slides.

9                THE WITNESS:  Okay.

10                MR. TELISMAN:  And I'll ask you to identify things on

11    the slide.  And if at any point in time --

12                THE COURT:  If you need to step down there, just take

13    that pointer with you that's just to your left here.

14                THE WITNESS:  This pointer.  Okay.  Thank you.

15                MR. TELISMAN:  And I'd just ask, Dr. Forbes, that if

16    you do step off the stand to talk and identify things, make

17    sure that you speak in a loud voice.  Okay.

18                Thank you.

19                Now, if we could move to the next slide.

20    BY MR. TELISMAN:

21    Q    What do we have here, Dr. Forbes?

22    A    So this is just the basic overview of the eye.

23                Actually I think it would be best if I did go over.

24                I don't want to go on in detail, but I thought that

25    this cross section would be of some advantage or some

1   assistance to you guys understanding.  I know it's very basic,

2   and I apologize.  But otherwise this is a cross section of an

3   eyeball.

4          Things I guess I'd like to point out mainly are the

5   presence of the retina, which is this red here.  It goes on

6   the full inside of the eye, so the whole inside of the eye is

7   covered with this retina except for the very far periphery.

8   The retina, the most important part of the retina is called

9   the fovea.  It's sitting here.  It's the 20/20 part of vision.

10  The rest of the retina, the purple retina is on the order of

11  2,200, so really the keen eyesight comes from that.

12         All the light tries to focus.  It goes through the

13  clear part of the eye, which is the cornea.  It gets focused

14  again by the lens here and then focuses here.

15  Q   If I could just ask one clarifying question.  Before you

16  said that the retina goes all the way up to the periphery.

17  What do you mean by "periphery"?

18  A   The periphery is the far periphery.  It's also called the

19  ora serrata, the far area outside.  So I guess maybe this

20  would be a better section.  So the retina is all on the inside

21  of the eye out to this area called the ora serrata or far

22  periphery.

23  Q   Okay.

24  A   One thing about the retina that I think you should know is

25  that the retina is actually not physically attached to the

1    underlying material, but it's sucked on.  So there's an active

2    pump mechanism that pulls the retina onto the eye or onto the

3    back of the eye, and that's why when you get a small crack or

4    tear in the retina, a lot of times it will become detached

5    because fluid leaks into that crack and allows it to become

6    detached.

7         Another point is that the inside of the eye is filled

8    with a material called vitreous, which is almost exactly

9    analogous to a jellyfish, so the material is somewhat stiff

10   but very clear.  As you get older, that jelly becomes liquidy,

11   and that's why when you become 45, 50, 60 you a lot of times

12   get floaters because in that jelly it becomes liquid and stuff

13   floats around and you see that.

14        And so and this just is a cross section of the

15   retina, of which there are nine layers, and they're marked

16   here, but I don't think we specifically need to see that.  But

17   there are nine different layers of the retina.  And, again,

18   that's just a small cross section.

19        THE COURT:  Before you do that, I need to take a

20   short break.  We're going to break for about ten minutes or

21   let's say -- yeah, ten minutes and then we'll resume after

22   that.

23        (Recess taken.)

24        (The following proceedings were had in open court:)

25        THE COURT:  Okay.  You can proceed.

1        THE WITNESS:  So just one other thing I think I

2   wanted to add is that what the retina does, there's about a

3   million retina cells.  They all come together in the optic

4   nerve and take the information that the retina gets from the

5   light back to the brain.  And this is a schematic picture of

6   the optic nerve there.

7        Can I have the next slide, please.

8        So this is actually the similar thing except it's an

9   actual photograph.  The optic disc is shown here.  It's called

10  the papilla.  So if you see the word "peripapillary," it means

11  around the papilla or the optic nerve, or around the optic

12  nerve.

13       These are an artery and a vein that come off the

14  optic nerve.  They're call the peripapillary vessels.  And,

15  again, when you're looking back at the eye, this is the fovea

16  that I was talking to you about, and this is the macula.  And

17  this is just an actual picture of a left eye.

18       Next photo, please.

19       I like to show this because it gives you an idea of

20  what we can really see when we look into the eye.  First off,

21  the device I spoke to you about --

22       THE COURT:  That picture's really small, so I'm going

23  to come over here and look.

24       THE WITNESS:  So the device I talked to you about

25  called the indirect ophthalmoscope is shown on his head.  It's

1    just a head piece that we wear that allows us to have a

2    binocular view of the back of the eyes.  In this particular

3    instance it's a young infant for retinopathy prematurity, but

4    it shows the same thing.

5         In most doctors' offices there's something called a

6    direct ophthalmoscope, which enables you to get a view of the

7    back of the eye with one eye and shows about this much of the

8    area of the back of the eye, about the same as the optic

9    nerve, as opposed to the indirect ophthalmoscope, which allows

10   you to see about, you know, ten times that area.

11        THE COURT:  That doctor has a device right over the

12   infant's --

13        THE WITNESS:  That's a good point.

14        THE COURT:  What is that?

15        THE WITNESS:  So that is the lens.

16        THE COURT:  That's the lens.

17        THE WITNESS:  Bends the light through the pupil, and

18   then everything you see actually is actually upside down and

19   backwards because it goes through and bends it and goes up and

20   down.  And so that's the lens that he's looking through.

21        And then this is just the camera that is utilized in

22   a lot of kids to photograph the back of the eye.  And the

23   camera view is about the size of the outside orange thing.

24        The thing about with our head, we can bend the eye

25   and twist the eye and push the eye in different directions so

1    we can get a view of most all of the eye.  Okay.

2         Next photograph, please.

3    BY MR. TELISMAN:

4    Q   We're not there yet.  We're going to talk about this, but

5    first I want to ask you some other questions.  Okay?

6    A   Sure.

7    Q   Thanks.

8         Now, Dr. Forbes, you talked before about how you

9    observed or reviewed records and photographs regarding

10   Isabella Zielinski and the treatment of her eyes after --

11   starting on, I think, 12/27 or 12/28 of 2002; is that right?

12   A   The photographs were actually from 12/30, but the

13   evaluation was from 12/28.

14   Q   In reviewing the records --

15   A   Yes.

16   Q   -- did you also see records that were prior to

17   December 27th of 2002, pediatric records, things like that?

18   A   Pediatric records, but no real eye records.

19   Q   Right.

20        And so was there anything in the pediatric records

21   that reflected any sort of problems with Isabella's eyes prior

22   to December 27th of 2002?

23   A   Not that I can recall, no.

24   Q   Now, is it your understanding that Isabella went into full

25   cardiac and respiratory arrest on December 27th, 2002?

Forbes - direct

1    A    Yes, that's my understanding.

2    Q    And after she -- after her collapse did you see records

3    concerning treating physicians or treating ophthalmologists

4    looking into her eyes?

5    A    Yes.

6    Q    And did that involve a -- well, actually if you could tell

7    me what types of doctors looked into her eyes.

8    A    Three different ophthalmologists, or at least two, but

9    three are in the records.  There's a retina fellow, which

10   again, like I talked about earlier, a retina fellow would be

11   someone who had trained in ophthalmology and now is doing a

12   retina fellowship.  And there was a resident with him.

13        I suspect that they looked into the eyes, but it

14   doesn't specifically say that the resident looked.

15        So the resident and the retina fellow and then later

16   on the attending ophthalmologist, who is a retina specialist.

17   Q    What were their observations of Isabella's eyes?

18   A    The observation was that there were numerous retinal

19   hemorrhages.  They said they were intraretinal, preretinal and

20   that there was some vitreous blood at that time.

21   Q    And so what I'd like to do at this point is if you could

22   explain, do you have a slide that shows what the -- what a

23   retinal camera would display on a picture of an eye?

24   A    Yeah.  I think --

25   Q    Let me first -- and I'll just back up with a couple of

Forbes - direct

1  questions before we get into some of the details.

2          Were photos takes of Isabella's eyes?

3  A   Yes, they were.

4  Q   And they were taken using what type of device?

5  A   A ret camera, retinal camera.

6  Q   And these photos were taken on what day, you said?

7  A   12/30, I believe.  12/30.

8  Q   And the slide actually is going to show, I believe, a

9  12/28 date, but in fact it was December 30th of --

10 A   12/28 was the day the consult was done, so I wanted to

11 point that out.

12 Q   And in fact, though, the ophthalmologists who treated

13 Isabella that you just mentioned, what day did they first look

14 into her eyes?

15 A   12/28.

16 Q   All right.  Now, if we could move on to the next slide.

17 A   Actually I think you might want to go back one slide.

18 Q   Sure.

19 A   Because that shows an actual -- so this picture right here

20 is a ret cam photo of the back of the normal eye that I just

21 had in my mind.  So that's what -- you asked what a camera

22 view of the back of the eye looks like, and that's what it

23 looks like.

24          Again, you can see the optic nerve and then the

25 vascular arcade, where the vascular arcade.  And you can see

1    that it's a little darker in the middle, but that's because

2    the component of the macula is a little bit different.

3    There's nothing abnormal about that.  That's normal for it to

4    be a little bit darker.

5              THE COURT:  What's the other darker area a little bit

6    above it there?

7              THE WITNESS:  That's a good point.  That's

8    photographic -- we don't know.  It's --

9              THE COURT:  It's an artifact of some sort.  Okay.

10   All right.

11             THE WITNESS:  Right.

12             MR. TELISMAN:  Now if we could go on to the next

13   slide.

14             THE WITNESS:  Actually, that's a good point, though.

15   Taking these photos is not the easiest thing in the world

16   because you're compressing a young child's eyes, and so, you

17   know, getting perfect pictures is not the easiest thing in the

18   world, although the next slide is --

19             THE COURT:  Is the ophthalmoscope, is that the thing

20   that they can press your eye with when you're going in to get

21   an eye exam?

22             THE WITNESS:  You know, it's not.  The ophthalmoscope

23   you don't contact the eye.  It's the ret cam that you do.  And

24   the reason that the view in the next slide --

25             Could you show the next slide real quickly?  Sorry.

1    One more.  Back the other way.

2          So the reason the ret cam gets a better view or a

3    wider peripheral view is because it's actually on contact with

4    the eye, so the light can spread out more and it doesn't need

5    to shoot in.

6          THE COURT:  All right.  Thanks.

7          THE WITNESS:  That's a good question.

8    BY MR. TELISMAN:

9    Q   Now if we could go to the next slide.  And what do we have

10   here?

11   A   So this is a normal right fundus, and this is a normal

12   left fundus.  Again, it just shows the things I already talked

13   to you about, the vascular arcades, the arteries and vessels,

14   the optic nerve and the little bit darker central area.

15         Keep in mind that this is probably about 40 percent

16   of the eye and that there's the peripheral retina that you

17   can't actually see.  That's one disadvantage of the camera

18   because it's very difficult to take peripheral views because

19   you can't do certain manipulations that you can do with the

20   indirect ophthalmoscope on your head.

21   Q   And now if we could take a look at the next photo.  And

22   what do we have here?

23   A   So this is the ret cam photos of Isabella on 12/30/2002.

24   Before we make a big deal about the difference in color,

25   again, that's probably -- that is camera artifact.  Just the

1    lighting was higher when they did the left eye than the right

2    eye.

3              So what we're seeing here are, you know, numerous,

4    too numerous to count actually retinal hemorrhages at many

5    different layers of the retina.

6              The darker spotted red, as you can see here, there's

7    a number of them.  They're actually on top of the retina

8    between the vitreous and the retina.  And if you try to look

9    at the blood vessels that would course underneath them, it's

10   blocked because the blood is on top of the retina.

11             Then there's other types of retina --

12   Q   Pardon me, but those hemorrhages that you were just

13   referring to, what is the terminology to describe those?

14   A   So these would be preretinal.

15   Q   Preretinal.  Okay.

16   A   Yeah, these would be preretinal.

17             And then there's two different types of intraretinal

18   that you can see here.  The distinction isn't ecumenically

19   important.  It just has to do with what particular layer of

20   the retina they're in.  But the flame-shaped ones are sort of

21   exactly that, sort of flame shaped, and then there's a lot of

22   them, but the dot ones, the rounder ones, are dot and blot

23   hemorrhages.  They're a little deep in the retina.

24             THE COURT:  And those are the ones you referred to as

25   intraretinal?

Forbes - direct

1    THE WITNESS:  Yes.  Those are the intraretinal.  So

2  intraretinal are those flame shaped and the dot and blot

3  hemorrhages.

4    There are -- you can't really see here, and I'm not

5  sure they're there, there's subretinal, which means between

6  the retina and the choroid too.  They're more difficult to see

7  in most cases because the retina, the bloody retina is on top

8  of it, so even if they're there, it's a lot of times hard to

9  see.  But in this case I honestly don't see any in particular.

10  Q   Now --

11  A   And this is a pretty substantial amount of hemorrhages if

12  you compare it to the normal retina.

13  Q   That was going to be my next question.  If we could --

14  now, if we could go on to the next slide.  What do we have

15  here?

16  A   So this is what the judge asked about.  He asked about the

17  different types.  These just show it a little bit better.

18  This is a flame-shaped hemorrhage that's coming off the optic

19  nerve, and these are the dot and blot ones that are out here,

20  and this is preretinal.

21    And then this just shows the different layers of the

22  retina.  Like I told you about earlier, there's nine different

23  layers.  The superficial ones are in the neurofiber layer

24  right up top.  The dot and blot are deeper within the retina,

25  sort of in the middle of the retina.  And then preretinal are

Forbes - direct

1    on top of the retina between that and the vitreous.

2          A lot of times the preretinal will bleed into the

3    vitreous as well.

4    Q   Now, the photographs that we have here, is this of

5    Isabella Zielinski's eye or no?

6    A   No, this isn't.

7    Q   This is just an example?

8    A   This is an example.

9    Q   And what's up in the top right-hand corner?

10   A   This is normal.  I just always like to have a normal so

11   you can get an idea of what you're comparing it against.

12   Q   All right.  Now, how about the next slide?

13   A   This slide, if you could push ahead, it's just -- you

14   know, scleral depression comes up, and it's kind of hard a lot

15   of times to really see what we're talking about when we're

16   talking in terms of scleral depression, but what --

17   Q   Can I -- and if you don't mind, before you explain, could

18   I just provide a little bit of context through a couple of

19   questions with respect to it.

20   A   Yes.

21   Q   You mentioned before that the treating ophthalmologists on

22   December 28th of 2002, that they looked into Isabella

23   Zielinski's eyes, right?

24   A   Yes.

25   Q   And in doing so, did they use scleral depression in order

1    to get as good of a view of the back of her retina as

2    possible?

3    A    They did.  And I'll show you that a little later, but

4    there's a notification that says SD360-OU, and that's just an

5    abbreviation ophthalmologists use for scleral depression

6    360 degrees, which just, of course, means around the eye.  OU

7    means both eyes.

8    Q    All right.  If you could please continue.

9    A    So scleral depression is a manipulation we use to get us a

10   better view of the peripheral retina or the ora serrata.  Not

11   just the ora serrata, but the peripheral retina.  So what we

12   do is we push on the outside of the eye with a round device

13   that pushes the retina in here, in the whole globe for that

14   matter, and allows us to get a view because we've pushed the

15   retina into there and we can get a view of the retina.

16         Actually if you pushed it, there's little arrows.

17   Could you push one?  Yeah.  So this is where we push.  And

18   then one more.  Yeah, there we go.

19         So anyway, we pushed right out there with a device

20   that actually doesn't look all that different than the top of

21   this pointer.  And you push hard against the eye, and then you

22   do it 360 degrees around to make sure that there's nothing out

23   there.  You know, we'll do it in adults all the time because a

24   lot of times we're concerned of retinal detachments right at

25   the ora serrata.  That's because that's where it's attached to

Forbes - direct

1    the sclera and that's a lot of times where there's a break or
2    a tear.
3    Q    Now, when -- how does the view of the retina when using
4    scleral depression, the range of the view, compare with the
5    ret cam photograph?
6    A    I think I showed you that earlier, but I think with a ret
7    cam you can visualize about 40, I don't know the exact number,
8    probably 40 percent of the retina, and then scleral depression
9    allows you to see about, you know, 60 percent beyond that.
10   Maybe 50 percent with the ret cam, something like that.
11   Q    Now, let's see here.  Can we go on to the next slide,
12   please.  What do we have here?
13   A    So this is the actual consult note from -- this particular
14   drawing is actually from the retina fellow on 12/28/2002.
15         What it does is I had mentioned that it's scleral
16   depression of 360 degrees OU.  Just made a note right there.
17   And it also shows these little curvilinear lines here.  That's
18   how the ora serrata actually looks when you look in.  There's
19   little loops like that.  And that's how we diagram them.  We
20   actually looked out to the far periphery.  And, you know, it's
21   very difficult.  All of us aren't great artists.  But this is
22   what many of us do to show the types of hemorrhages that are
23   there.  We put little slashes for intraretinal flame-shaped
24   hemorrhages and dots for the dot and blot hemorrhage, and
25   sometimes a round area is filled with ink to show the

1  preretinal hem.

2      In this case, I mean, they say that I can't -- you

3  know, they talk about the hemorrhages, extensive retinal

4  hemorrhages in both eyes, and you can see they're drawing that

5  the retinal hemorrhages go way up.

6  Q    And the diagram that the opthalmologist has drawn here,

7  this -- because this is scleral depression and not the ret cam

8  photo, does this show more of the retina?

9  A    Yes.  For sure.

10 Q    Now, was there a subsequent set of photos taken using that

11 ret cam of Isabella Zielinski's eyes?

12 A    There was.  On January 13th, I think.

13 Q    And, first off, what do we have here?

14 A    We have here is just a comparison of a normal left eye and

15 a normal right eye and Isabella's right fundus and right --

16 Isabella's left fundus.

17     I think actually one -- go ahead.  But it's of

18 interest to note that these preretinal hems, which are the

19 darker spots, and you can see them there pretty clearly, more

20 on the left eye because there's less of them, but they're also

21 obviously present there, but you'll see on the next slide that

22 over the course of I guess it was about two and a half weeks

23 most of the intraretinal hemorrhage had cleared but the

24 preretinal hemorrhage is still there because they take longer

25 to heal.

Forbes - direct

1    And so those are the preretinal hem.  There's just
2  not as much going on.  There's not as metabolic issues going
3  in the vitreous as are in the retina, so the retina blood gets
4  absorbed more quickly than the preretinal blood.

5  Q  And what's the significance here of the changes that we
6  see?

7  A  In terms of significance, as an ophthalmologist, if that
8  blood is stuck right smack dab on the fovea like I talked
9  about earlier, you a lot of times need to intervene surgically
10  to get it out because the visual system won't develop.  I
11  think the one thing it allows you to do is you get a gross
12  idea of when an event occurred.  You can tell this is -- you
13  get a better idea that this is a down the road kind of thing
14  because there's only preretinal hem and not intraretinal hem,
15  and in general intraretinal hem clearly clears more quickly.
16  So it gives you an idea of the time frame.  But specifically
17  I'm not sure if it does tell me a whole lot other than that
18  it's getting better.

19  Q  Sure.  All right.  Okay.  Let's talk a little bit before
20  we go back to another slide, so if you wouldn't mind taking
21  your seat.

22    Dr. Forbes, in formulating a differential diagnosis,
23  is there significance attached to the order of the
24  differential diagnoses?

25  A  Yes.  Almost exclusively they -- the more -- the one they

Forbes - direct

1  think is more likely the actual cause is listed in order,

2  first, second, third and fourth.

3  Q   And what was the number one differential diagnosis that

4  the ophthalmological fellow provided when providing a

5  differential diagnosis for Isabella?

6  A   Trauma.

7  Q   What about the attending ophthalmologist?

8  A   Trauma.

9  Q   Did you arrive at a differential diagnosis for Isabella

10  Zielinski?

11  A   I did.

12  Q   What I'd like to do is --

13       MR. TELISMAN:  With the court's permission, is it

14  okay if Dr. Forbes takes a look at his report during this part

15  of the testimony?

16       THE COURT:  Yes.

17       MR. TELISMAN:  Thank you.

18  BY MR. TELISMAN:

19  Q   Dr. Forbes, what was your differential diagnosis for

20  Isabella?

21  A   I have it listed here.  Again, or not again, but whenever

22  I formulate a differential, obviously, you want to -- you want

23  to be open-minded.  You want to think about all the different

24  possibilities, and you don't want to not consider something

25  just based on what you intuitively think right off the bat, so

Forbes - direct

1    I have a rather substantial or long differential diagnosis.

2            But as shown here, on page -- I don't have a page.

3    Sorry about that.  Page probably about four or so I have child

4    abuse, abusive head trauma as most likely diagnosis, and then

5    second, severe accidental injury, and then less likely,

6    vaginal delivery from birth trauma, coagulopathy, Terson's,

7    extended CPR pressures, retinopathy, epidural hematomas,

8    meningitis or metabolic diseases.

9            And, again, I include in the list -- I just want to

10   be open-minded and think about, you know, I don't want to

11   exclude things based on a knee-jerk reaction.

12           MR. TELISMAN:  With the court's permission, rather

13   than have the doctor get into details about each one, since

14   it's accurately reflected in the report, I would just -- and

15   the report is in evidence --

16           THE COURT:  Yes.

17           MR. TELISMAN:  Is it okay?

18           THE COURT:  Yes.

19           MR. TELISMAN:  And I didn't know if your Honor had

20   questions about this.

21           THE COURT:  If I do, I'll ask them later.

22           MR. TELISMAN:  Thank you.

23   BY MR. TELISMAN:

24   Q    Dr. Forbes, as part of your evaluation, did you also

25   review reports authored by the petitioner's expert witnesses?

Forbes - direct

1  A  I did.

2  Q  And did those expert witnesses offer alternative

3  explanations for Isabella Zielinski's retinal hemorrhages?

4  A  They did.

5  Q  And what I'd like to do now is talk about some of them.

6  A  Yes.

7  Q  In your opinion -- and they offered -- one of the

8  alternative explanations they offered was cortical venous

9  thrombosis?

10  A  Yes.

11  Q  In your opinion, to a reasonable degree of medical

12  certainty, were Isabella's retinal hemorrhages caused by

13  cortical venous thrombosis?

14  A  No.

15  Q  Why not?

16  A  It's a good question.  There's not a lot of literature on

17  eye findings in cortical venous thrombosis.  That said,

18  through my clinical experience, I've seen, to my knowledge,

19  about 24 of these kids.  In them I haven't even seen any

20  hemorrhages at all.  In talking to fellow colleagues, I have

21  never heard of cortical venous thrombosis causing hemorrhages,

22  certainly to this degree.

23        There are reports of a few peripapillary, as I spoke

24  earlier, around the optic nerve hemorrhages from cortical

25  venous thrombosis, but nothing to the extent shown here.

Forbes - direct

1  Q   And what is the significance, when you talk about extent,

2  what are the different things, when you talk about extent,

3  what's the significance of the extent and type of retinal

4  hemorrhages in trying to make a differential diagnosis?

5  A   The extent of hemorrhages that are in this case are pretty

6  substantial.  There are some things that can cause a few

7  peripapillary hemorrhages, some things that can cause a

8  hemorrhage or two in the posterior pole.  And there's no

9  question if I look in a kid's eyes and there's only a few

10  hemorrhages in the back of the eye and they want an answer

11  from me, I'll say yeah, you know, it's in the differential

12  abusive head trauma, but there are these other things that

13  realistically could be.

14         But when it gets to be a whole lot of hemorrhages

15  like shown here, I'm hard pressed to really come up with other

16  things, you know, other explanations of this degree of

17  hemorrhages short of, you know, significant accidental injury

18  like a motor vehicle accident or falling out of a window.

19  I've seen it in leukemia, in kids that have leukemia and that

20  sort of thing, but, you know, simple things like CPR or minor

21  trauma, that sort of thing, the hemorrhages are nearly always

22  confined to posterior pole and very, very small in numbers.

23  Q   Now, you just talked about -- one of the terms that you

24  used there was peripapillary, and I know you talked about the

25  papilla before.  Do we have a slide, I think, that actually

1    shows a peripapillary pattern on a hemorrhage?

2    A   I do.

3          So like I said before, certain things -- you know,

4    things include that you're worried about with peripapillary

5    hemorrhages are usually increased intracranial pressure, at

6    least in this setting, hypertension and that sort of thing.

7          THE COURT:  Increased intracranial pressure you said?

8          THE WITNESS:  Yeah, increased intracranial pressure.

9          So what happens a lot of times is I am called on to

10   evaluate whether a child has increased intracranial pressure

11   because the kid has headaches or something like that, and on

12   occasion you will see when kids have markedly elevated

13   intracranial pressure they'll have a hemorrhage or two or even

14   three or four off the optic nerve, but always confined to the

15   peripapillary region or the papilla as shown here.

16         And I can walk over and show you if you want.

17         MR. TELISMAN:  If you don't mind.

18         THE WITNESS:  So this is just, again, I show a

19   normal, just show normal.  And here I think one thing that you

20   might not -- I'm sure you see the hemorrhages coming off the

21   optic nerve, but the optic nerve here is swollen, and that's

22   because the intracranial pressure was increased.  And when

23   it's increased, it gets sort of congestion at the optic nerve

24   head, which can cause a little bit of hemorrhaging off the

25   optic nerve.  And, again, that's one, some over there.

1    And what you're seeing here, over here you see sort

2  of a nice demarcation to the optic nerve.  Here it's blurred

3  because there's swelling.

4  BY MR. TELISMAN:

5  Q    Now, you talked just now about some other things that

6  you -- that could cause retinal hemorrhages but not to this

7  degree, and one thing that you mentioned was CPR?

8  A    Yes.

9  Q    Okay.  And what -- if we could talk about CPR and

10 resuscitation efforts, in your opinion to -- and for all these

11 questions when I ask in your opinion, I mean to a reasonable

12 degree of medical certainty.

13    But in your opinion, were Isabella Zielinski's

14 retinal hemorrhages caused by CPR or resuscitation efforts?

15 A    No.

16 Q    Why not?

17 A    Because they're -- just like I just said, it's so

18 substantial.  And there's a lot of literature about CPR and

19 retinal hemorrhages.  You know, in my own experience, I see a

20 lot of kids who've had CPR as an inpatient.  But I would base

21 that more on the literature.  The literature shows that, you

22 know, in kids that have CPR, yeah, you can maybe get one, two,

23 hemorrhages in the posterior pole, but nothing like this.

24 Q    What about other types of resuscitation efforts, bagging

25 or anything like that, trying to assist the baby with oxygen,

1  something like that?

2  A    I'm not aware of anything like that.  I'd be really

3  surprised if any of the -- any bagging or anything like that

4  would cause anything like this.  These are -- this is a lot of

5  hemorrhaging.

6  Q    How about blood disorders?  This was another -- in

7  reviewing the petitioner's experts' reports, did they talk

8  about blood disorders as being a possible cause for retinal

9  hemorrhaging?

10  A    Briefly, yes.

11  Q    If you could.

12  A    I'm not a hematologist, but, you know, the blood work that

13  I reviewed, and I did review it, really didn't show any

14  significant blood disorder going on or any numbers that were

15  really out of the ordinary.

16        That said, I mentioned earlier that in cases of

17  leukemia, things like that, where the platelets are very, very

18  low, you know, on the order of less than ten thousand or

19  something like that, you can have spontaneous bleeding, which

20  I assume in those kids is from the low platelets, but I don't

21  actually know that.  It could be from the leukemia itself in

22  some way, shape or form.

23  Q    Okay.  But what you just said, though, is that with a

24  child with a low platelet count that you see more likely --

25  would be more likely to see greater retinal hemorrhaging?

Forbes - direct

1    A    Yes.

2    Q    Is that right?

3         What about patients with higher platelet counts?

4    A    Higher platelet -- what platelets do is they serve as

5    clotting factors, so you would -- the problem with lower ones

6    is that, you know, they leak because there's no clotting

7    factors or factors to stop the bleeding.  Higher ones would in

8    those cases be less inclined to have any leakage from the

9    vessels.

10        Numbers, I mean, you can have spontaneously clotting

11   of the vessels, but the numbers to have those are like

12   platelets of a million or something like that, and we were

13   nowhere near that.

14   Q    And even if the platelets were in the millions?

15   A    Even if that, I would expect clotting and not bleeding.

16   Q    Now, what about uncontrolled seizures?  That was another

17   thing that the petitioner's experts talked about as being a

18   possible cause here.  In your opinion, did uncontrolled

19   seizures cause her retinal hemorrhages?

20   A    No.

21   Q    Why not?

22   A    Very similar to my previous argument.  You know, there's

23   quite a bit of literature on kids that have been looked at

24   after having had seizures.  You know, there really aren't

25   reports of significant retinal hemorrhages in those kids.

1  And, again, these are very substantial retinal hemorrhages.

2  And any of those kids that had them, confined to the posterior

3  pole, few in numbers.

4      In addition to that, kids that have seizures usually

5  have a reason for them and have an underlying etiology or

6  underlying problem as it is, so there's confounding factors

7  even if there are hemorrhages, which, again, are very rare and

8  very few in number.  You know, Lord knows if they're from the

9  seizure itself or from whatever the underlying diagnosis is

10  that caused the seizure.

11  Q   What about illness or infection?  Did the records reflect

12  that Isabella Zielinski had an ear infection in the week or

13  so, ten days prior to her collapse?

14  A   Yes.

15  Q   Now, if she persisted in having an ear infection, would

16  that be the cause of this type of retinal hemorrhaging?

17  A   Certainly not in my opinion.  You know, the kind of

18  infection you need or that's been reported to cause retinal

19  hemorrhages is a full meningitis or something along those

20  lines.  I can't tell you the number of kids that I've looked

21  in their eyes have had ear infections that certainly didn't

22  have anything going on.

23      Not only that, one of the more annoying parts of my

24  job is I'm consulted all the time to look in eyes of kids who

25  have sepsis on the floors, and I'm supposed to evaluate

1   whether or not there's a fungus inside the eye because that's

2   one of the complications of central lines a lot of times.

3   And, you know, in those kids, which number hundreds over the

4   last couple of years, I've never seen hemorrhages.  And those

5   are kids that are pretty sick.

6   Q   How about the birthing process?  In your opinion, could

7   these retinal hemorrhages have been residual from the birthing

8   process, because she was what, three and a half months old

9   when this happened, when she collapsed?

10  A   No.

11  Q   Why not?

12  A   While it's kind of true that retinal hemorrhages from

13  birth can be pretty substantial, nearly always they're

14  intraretinal and clear by seven to ten days.  There's reports

15  of maybe going a little bit longer than that, but if they do

16  go beyond that, which, again, maybe two, three weeks, they're

17  preretinal for the reasons that I showed you earlier.  The

18  intraretinal hemorrhages almost always clear that.  But, you

19  know, hemorrhages from birth at four months to this extent, it

20  just isn't consistent with the known knowledge, and there's a

21  lot of papers on that to back that up.

22  Q   Just a couple more.

23      Increased intracranial pressure, that's something

24  that you talked about before?

25  A   Um-hum.

Forbes - direct

1  Q   And you said that if that were the case, you would expect
2  to see what kind of pattern?
3  A   Peripapillary.
4  Q   Okay.  And we don't have that here, right?
5  A   We have hemorrhages off the optic nerve.
6  Q   Right.  We don't have -- I apologize.
7  A   Yeah.
8  Q   We don't have only hemorrhaging in the peripapillary
9  pattern, right?
10 A   Right.
11 Q   Okay.  Then we have -- how about spontaneous intracranial
12 hemorrhage?  In your opinion, did -- were Isabella's retinal
13 hemorrhages caused by spontaneous intracranial hemorrhage?
14 A   No.
15 Q   Why not?
16 A   You know, because the hemorrhages that you get, and you
17 can get some from intracranial hemorrhages in a Terson's-like
18 picture, but almost always they don't look like this, but
19 they're also white infarcted areas or patches of white retina.
20 They're more confined to the posterior pole.  They just don't
21 look like this.  And they're not that significant.
22        And the kind of cases that you get hemorrhages from,
23 intracranial bleed, are large vessel arterial bleeds that
24 break.  And I just don't see this in the imaging studies.
25 Nor -- I don't want to put that on me.  Nor did the attending

Forbes - direct

1   ophthal -- or the attending neuroradiologists and such see it
2   either.
3   Q   Okay.  And, again, so that we don't venture into a field
4   that you're not --
5   A   Yes.
6   Q   But from reading the reports, there was no evidence of
7   that?
8   A   Right.
9   Q   Okay.  And you're just basing that upon your view of the
10  imaging reports that were in the records?
11  A   Yeah.
12  Q   Okay.  And finally the last one.  What about a lack of
13  oxygen?  Is -- I think it's called hypoxia or lack of oxygen.
14  In your opinion, could Isabella's retinal hemorrhages, were
15  they -- pardon me.  Were Isabella's retinal hemorrhages caused
16  by hypoxia?
17  A   No.
18  Q   Why not?
19  A   There's really not anything to support that the
20  hemorrhages would be caused by that, but, gosh, it's just such
21  a significant amount of hemorrhages.  I'm not aware of a
22  remark that -- a hypoxic episode that happened previous to
23  this.  And there's just no literature to support that a
24  hypoxic episode is going to cause hemorrhages to this extent.
25          MR. TELISMAN:  If I could just have one moment, your

Forbes - cross

1  Honor.

2           THE COURT:  Yep.

3  BY MR. TELISMAN:

4  Q   Just to sum up, Dr. Forbes, in your professional opinion

5  within a reasonable degree of medical certainty and based upon

6  everything that you've testified to here today, what caused

7  Isabella Zielinski's retinal hemorrhages?

8  A   A nonaccidental injury or something consistent with an

9  abusive head trauma.

10 Q   And the methods that you used to arrive at this

11 conclusion, are those generally accepted in the field of

12 medicine?

13 A   Yes.

14          MR. TELISMAN:  Okay.  Thank you.

15          I have nothing further at this time, your Honor.

16          THE COURT:  Cross.

17                    CROSS EXAMINATION

18 BY MR. BLEGEN:

19 Q   Good afternoon, Dr. Forbes.

20 A   Good afternoon.

21 Q   You've testified regarding several proposed causes of the

22 retinal hemorrhages in this case and have essentially shot

23 them down other than abusive head trauma, correct?

24 A   In the clinical scenario, yes.

25 Q   What do you mean "in the clinical scenario"?

Forbes - cross

1    A    In a scenario of a kid of not having been in a motor

2    vehicle accident and not having leukemia and not some of those

3    predisposing things that might have had a picture not that

4    dissimilar to this, yes.

5    Q    So you mean within this clinical scenario?

6    A    Yes.

7    Q    All right.  But -- and you've told us that the extensive

8    retinal hemorrhages in this case could only be caused by

9    abusive head trauma because your experience and literature has

10   not found them in other instances or other illnesses or other

11   situations, correct?

12   A    Yes.

13   Q    All right.  And you know that there is a problem in the

14   sense of ophthalmologists don't get to see enough eyes to say

15   whether retinal hemorrhages can occur in other -- as a result

16   of other illnesses or other traumas, correct?

17   A    No.

18   Q    Is that not the case?

19   A    I don't believe that to be the case in every -- everything

20   about ophthalmology, no.  I mean, there --

21   Q    You yourself want to get to see more eyes to help

22   alleviate the bias resulting from the fact that you're

23   normally called to look at eyes after somebody has already

24   suspected abusive head trauma, correct?

25   A    Can you rephrase that a second.

Forbes - cross

1    Q    Yeah.  Let me do that.  Maybe I'll just ask you about an

2    article.

3              Let me show you what I've marked as Petitioner's

4    Exhibit Forbes 1.  Do you have that in front of you?

5    A    I do.

6    Q    And this is an article in part authored by you, correct?

7    A    Yes.

8    Q    Along with some other doctors, it looks like?

9    A    Yes.

10   Q    And it's -- the date of the article is what, March

11   of 2009?  I think it's on the front.

12   A    June of 2009 but --

13   Q    Say that again?

14   A    June of 2009, I think.

15   Q    Do you not say in this article, or you and your fellow

16   doctors, "In general, we recommend casting the net wide by

17   consulting ophthalmologists for any infant with intracranial

18   hemorrhage even in the setting of likely accidental trauma,"

19   correct.

20             I'm sorry.  On Page 270.

21             THE COURT:  Right-hand column about halfway down.

22             THE WITNESS:  Yeah, I found it.

23             Yeah.

24   BY MR. BLEGEN:

25   Q    All right.  And the reason that was written in there is

Forbes - cross

1   because the net is not wide enough, correct?

2   A   Yeah.  I guess.

3   Q   I couldn't hear you.

4   A   Yeah.

5   Q   Okay.  And the fact of the matter is that even in

6   accidental head trauma, the doctors don't call the

7   ophthalmologists, right?

8        Strike that.

9        They don't always call the ophthalmologists?

10  A   They don't always call the ophthalmologists.

11  Q   They call you guys when they've already kind of come to

12  the conclusion that it is abusive head trauma, right?

13  A   I would say no to that.

14  Q   All right.  Well, you agree that there's a potential bias

15  resulting from the fact that referrals are consistently made

16  only for the strong suspicion of abusive head trauma, right?

17       Look at the same part of your article.

18  A   I can say that the reason we brought that up in this

19  article is because we felt like that was the case, and so in

20  this article we tried to broaden -- we tried to insist that

21  other people broaden how broad their umbrella is.

22  Q   I'm a bit confused by that.  You thought that was the

23  case, so you wrote it in the article, correct?

24  A   Yes.

25  Q   That there's an inherent bias based on when you get

Forbes - cross

1    called, correct?

2    A    No.  The reason I'm differentiating is because I don't

3    really feel like our hospital, which Cindy Christian is the

4    head of the SCAN team, really is like that, but I do feel like

5    worldwide it's not necessarily as wide an umbrella as there --

6    as other places.

7    Q    And I assume you're not telling us that you think you can

8    diagnose abusive head trauma based on retinal hemorrhages

9    based only on the people that come to your hospital, are you?

10   A    No.

11   Q    You know you need much larger numbers than that, right?

12               THE COURT:  I think what he was trying to say was

13   that the comment that you quoted, he doesn't believe it

14   applies at his hospital, but on a broader -- in a broader

15   field it does.  Is that -- did I kind of get that right?

16               THE WITNESS:  Yes.  That's exactly what I'm trying to

17   say.

18   BY MR. BLEGEN:

19   Q    So there is a problem with a bias in the literature,

20   correct?

21   A    You keep speaking in terms of bias.  I'm not sure that

22   statement talks to bias.  It talks to, you know, how broadly

23   the stroke is made there.

24   Q    All right.  Does it say "Doing so," meaning casting the

25   wider net, "may increase the identification of child abuse,

Forbes - cross

1  help reduce potential bias in the interpretation of ocular

2  findings when referrals are consistently made only for a

3  strong suspicion of abusive head trauma and lead to discovery

4  of other things such as papilledema"?  Isn't that what it

5  says?

6  A   Yes.

7  Q   You have to speak up a little bit.

8  A   Yeah.

9  Q   And so the word "bias" is in there, right?

10 A   Yep.

11 Q   Okay.  So I didn't make up the word "bias," right?

12 A   I don't think so.

13 Q   Okay.  And you indicate in the article that, "Identifying

14 the presence of retinal hemorrhages in a variety of injury and

15 disease states could also help elucidate the pathophysiology

16 of retinal hemorrhages in infants," right?

17 A   Yes.

18 Q   And by that, correct me if I'm wrong, you mean it could

19 help us figure out what causes the retinal hemorrhages that we

20 see in abused or nonabused infants, correct?

21 A   Correct.

22 Q   And the reality is you don't know what mechanism causes

23 it, right?

24 A   I don't think I know the precise mechanism.  You're

25 correct.

Forbes - cross

1   Q   Nobody knows it, right?

2   A   Right.

3   Q   Not just singling you out.  Ophthalmologists in general do

4   not know it, correct?

5   A   Right.

6   Q   The American Academy of Ophthalmology says we don't know

7   what causes it, right?

8   A   Gosh, that's a broad stroke.  I think they don't know the

9   specifics of it, but I don't know that to be certainly the

10  statement of the American Academy of Ophthalmology.

11  Q   Does the American Academy of Ophthalmology think maybe

12  there's a couple of different ways that it could be happening?

13  A   Yes.

14  Q   And --

15  A   I think more a combination of ways, I think would be a

16  better way of putting it.  I think that we don't think that

17  there's a single mechanism that causes all the problems but

18  that there's a combination of different factors.

19  Q   One of the possibilities of the mechanisms for causing

20  these retinal hemorrhages is increased -- is it inter or

21  intracranial pressure?

22  A   Intra.

23  Q   -- intracranial pressure, correct?

24  A   So when you say these hemorrhages, that's -- the cause of

25  some retinal hemorrhages from increased intracranial pressure

Forbes - cross

1   or what I talked about earlier, they're usually in a

2   peripapillary pattern, so when you say these hemorrhages, I'll

3   give you that the intracranial pressure can cause

4   peripapillary, but when you say these and you're talking about

5   extension into the ora serrata, I'm not sure I agree with that

6   statement.

7   Q   All right.  Let's just talk about retinal hemorrhages in

8   general for a second.

9   A   Okay.

10  Q   It is believed one of the possibilities for the mechanism

11  of retinal hemorrhages is increased intracranial pressure,

12  correct?

13  A   Yes.

14  Q   And is it your testimony that the extent and kind of

15  retinal hemorrhages seen in Isabella's case are not the kind

16  that can be caused by increased intracranial pressure?

17  A   Yes.

18  Q   Is one of the reasons you're saying that because in

19  Isabella's case there were retinal hemorrhages extending to

20  the ora serrate?

21  A   Extended beyond the vascular arcade, and extension of the

22  ora serrata is certainly part of it as well, yes.

23  Q   All right.  But we know you can get retinal hemorrhages

24  extending to the ora serrata from increased intracranial

25  pressure, right?

Forbes - cross

1   A   I don't know that.

2   Q   Oh, all right.  Maybe I'm confused.

3       You have told us that -- you told us today that falls

4   from a window can cause extensive retinal hemorrhages like the

5   one Isabella had, correct?

6   A   Similar probably, yeah.  Similar.

7   Q   And what's the mechanism that causes those similar retinal

8   hemorrhages in a fall from a window?

9   A   You know, probably there's a component of vitreous pulling

10  on the retina, you know, direct trauma to the eye, maybe the

11  spinning and the acceleration forces on the way down.  I don't

12  know that.

13  Q   Maybe increased intracranial pressure from hitting her

14  head on the sidewalk?

15  A   I guess that could be -- play a role in the peripapillary

16  part, but I don't think that, you know, to the extent that

17  it's going to cause, you know, to the ora serrata or far

18  periphery, I won't think that, no.

19  Q   I want to talk to you for a second.  Did you say something

20  about vitreal traction as part of the reasons why a fall from

21  a window might cause retinal hemorrhages to the ora serrata?

22  A   I did.

23  Q   And am I right that vitreal traction is the theory for

24  shaken baby syndrome where the vitreous is repeatedly pulled

25  and tugged by the repetitive back and forth motion of the

Forbes - cross

1  head?

2  A    So you said is it the mechanism.  We think it's a part of

3  the mechanism involved, yes.

4  Q    What -- where you get a repetitive back and forth motion

5  from falling out of a window?

6  A    Well, like I said, probably spun around and then slammed

7  on the floor, and it pulled it once it hit.

8  Q    Are you talking about tumbling through the air before you

9  hit the ground?

10  A    Yes.

11  Q    Do you have some literature that supports that most people

12  who fall out of windows spin before they hit the ground?

13  A    No.

14  Q    Where did you get that theory?

15  A    I didn't really say it was a theory.  You asked me what

16  possible causes of it were, and that's what I think.

17  Q    So you think that the vitreal traction theory fits falls

18  from a window because someone, the child, might be tumbling as

19  they go down?

20  A    Actually, no.  What I said, I think, if you go back, was

21  when they have the impact, I think that it could yank on the

22  retina when it hits there.

23  Q    What does that have to do with a repetitive back and forth

24  motion?

25  A    I didn't say it's repetitive.  It's a single force.  It's

Forbes - cross

1    a pull.

2    Q    What were you talking about when you said possibly the

3    child tumbles or there is a tumbling motion?

4    A    You know, I just -- they're tumbling out the window.  I

5    don't really know the mechanism.

6    Q    Where does that idea come from?  Just your head?

7    A    Yeah, sure.  It's just a thought, you know.

8    Q    That you just postulated here on the witness stand, or

9    have you written it somewhere before?

10   A    Well, no.  I think that it probably came from the

11   conversation I had with people that tumbling down stairs, you

12   know, they think the vitreous plays a role in that, so that's

13   why I brought it up.  But, you know, when I'm talking about

14   the vitreous pulling, I'm talking about primarily when it hits

15   the ground it has a single pull.

16   Q    But your literature supporting the vitreous hemorrhage

17   pulling theory talks about repetitive head motion, right?

18   A    Yes.

19   Q    So you think it can come from repetitive head motion and

20   single head motion?

21   A    Actually, yes, I do.  The pig studies --

22   Q    Why do you bother putting repetitive in the literature?

23   A    Because probably if you do it more than once, then it

24   would pull more.  I mean, I think Alex Levin's model studies

25   show that there's a combination of forces that along the

Forbes - cross

1    perivascular arcade that combine with repeated shaking

2    incidents, so that's why I brought that up.

3            I think my work with the pig studies showed that a

4    single high acceleration motion can cause pulling or at least

5    production of retinal hemorrhages at the ora serrata.

6    Q   You've also said in your report that retinal hemorrhages

7    to the ora serrata can also occur in fatal crush injury,

8    right?

9    A   Um-hum.

10   Q   Okay.  That's not somebody tumbling out a window, right?

11           You have to speak answers.  You can't --

12   A   No.

13   Q   Okay.

14           What's the mechanism that causes the retinal

15   hemorrhages to extend to the ora serrata in a fatal crush

16   injury?

17   A   I think we just went through that.  I think that probably

18   the actual crush injury itself, you know, trauma directly to

19   the eye, vitreous traction.  I guess I don't really know the

20   answer to that.

21   Q   Could it be increased intracranial pressure?

22   A   Could that play a role in the production of peripapillary

23   hemorrhages?  Probably.

24   Q   How about hemorrhages extending to the ora serrata?

25   A   I would say no.

1  Q   Well, you say that hemorrhages extending to the ora

2  serrata are found in fatal crush injuries, right?  You said

3  that in your report, correct?

4  A   In this report here?

5  Q   Yeah, the one you -- I'm sorry.  The report you wrote for

6  this case.  I don't remember the exhibit number but --

7  A   Yeah.  Yeah.

8  Q   Maybe it will help if I read you what you said.  You said,

9  "Retinal hemorrhages extending to the ora serrata are

10  extraordinarily uncommon in a child in settings other than

11  abusive head trauma in the absence of fatal crush injury,

12  motor vehicle accidents or a fall from significant heights

13  such as a 10-story building," right?

14  A   Um-hum.

15  Q   We've covered falling from a window, correct?

16  A   Sure, yes.

17  Q   Now we're talking about the fatal crush injury.  What do

18  you mean when you say a fatal crush injury?

19  A   It's not me.  It's the literature by Jane Kivlin that

20  showed that most vehicle accidents that you can have, you

21  know, retinal hemorrhages to that extent.  So it's not like

22  I'm really proposing a mechanism for that.  I'm just pointing

23  out what the literature states.

24  Q   All right.  Hang on for a second.  We're not talking about

25  motor vehicle accidents yet.  That's in the list.  We'll get

Forbes - cross

1    there.

2    A    Okay.

3    Q    So talking about fatal crush injury.  What do you mean

4    when you say in your report fatal crush injury?

5    A    Well, I'm just speaking the cases in the literature of

6    fatal crush injuries.  There's one with a TV that fell on a

7    head in particular that showed, you know, retinal hemorrhages

8    that were pretty substantial and so I'm just --

9    Q    Injuries to the ora serrata, right?

10   A    Yes.

11   Q    Okay.  What's your theory as to the mechanism that causes

12   the retinal hemorrhages to the ora serrata in the television

13   falling on somebody's head scenario?

14   A    It's a pretty direct injury to the head, you know.  I

15   mean, if you smash a head with a TV, I would expect you to

16   have significant damage, you know, to most of the head and to

17   the eye and the skull.  So I don't know that I -- I've

18   proposed or say that I proposed a mechanism for that anywhere,

19   have I?

20   Q    I'm asking you now.

21   A    No, I haven't actually postulated it as a mechanism.

22   Q    Well, it wouldn't be vitreous traction, would it?

23   A    No.

24   Q    Okay.  And is there anything in that report that you're

25   talking about with the television falling on the child's head

Forbes - cross

1   that says the television fell on the child's eyeballs?

2   A   Not that I can recall.

3   Q   The theory is that the child's head was crushed, correct?

4   A   Yes.  I'm sure it was crushed, yes.

5   Q   Causing increased intracranial pressure, correct?

6   A   I don't know offhand.

7   Q   Well, would crushing someone's head cause increased

8   intracranial pressure?

9   A   Probably.  Yes, I would think.

10  Q   Is that yes?

11  A   Yes.

12  Q   Okay.  And that is thought of as one of the mechanisms to

13  cause even these severe retinal hemorrhages, correct?

14  A   When you say "that is," you're talking about increased

15  intracranial pressure?

16  Q   Increased intracranial pressure.

17  A   So, I guess it has been put forth as a possible mechanism

18  or a component of a mechanism.

19         You know, I think that it's a little bit deceiving to

20  say that the extent of the hemorrhages with isolated

21  intracranial pressure alone can cause that.  I mean, it's not

22  published, but myself and a group from Ohio State looked at

23  109 consecutive kids with pressures over 28 millimeters

24  mercury and didn't see anything like that.

25  Q   So who's being deceiving?  Me?

1       MR. TELISMAN:  Your Honor, I'm going to object.  This

2   is argumentative now.

3       THE COURT:  Well, he's picking up on a word.  I don't

4   think there's anything improper about the question, so the

5   objection is overruled.

6   BY MR. BLEGEN:

7   Q   Who's being deceiving?

8   A   Did I use that word?  I'm sorry.

9   Q   You did.  If you didn't mean it, that's fine.

10  A   What's that?

11  Q   If you didn't mean to say deceiving, that's fine.  We can

12  move on.

13  A   You know, I wasn't really talking about you being

14  deceiving.  What I was saying is that it's just not -- I think

15  it's not appropriate to -- what's the word?  It's not

16  educational to -- it's not -- I wouldn't expect that -- the

17  hemorrhages to cause to that extent, and I think it's

18  misleading is a better word.  It's misleading that

19  intracranial pressure would cause, in my opinion, that extent

20  of hemorrhages, and I think there's a lot of data to support

21  that, including my own.

22  Q   Well, let's take a look at an article called Petitioner's

23  Forbes 6.  Can you take a look at that exhibit.  Take a

24  look -- this is an article in part authored by you, correct?

25  A   Correct.

Forbes - cross

1   Q   Accepted March 31st of 2010, correct?  It's on the lower
2   left-hand --
3   A   September of 2010, but yeah.
4   Q   Do you agree it's 2010?
5   A   September 2010, yeah.
6   Q   Look at the second column, first full paragraph that
7   starts with, "There is a lack of."
8   A   First page?  Oh, there we go.  Okay.  Yeah.
9   Q   So it's true, according to you, there is a lack of
10  agreement about the mechanisms that -- by which retinal
11  hemorrhages develop in abusive head trauma?
12  A   Yes, yes.
13  Q   One of the theories is vitreous traction, correct?
14  A   Yes.
15  Q   Another theory is acute increases in retinal arterial or
16  venous pressures from raised intracranial or intrathoracic
17  pressure and tracking of intracranial blood, right?
18  A   Correct.
19  Q   All right.  So the increased intracranial pressure
20  mimicking retinal hemorrhages found in abusive head trauma is
21  right in that article, right?
22  A   It says that that's one of the theories to the cause,
23  yeah.
24  Q   Right.
25          Haven't you just spent the last ten minutes telling

Forbes - cross

1    us that's not one of the theories that can cause retinal

2    hemorrhages extending to the ora serrata?

3             MR. TELISMAN:  Your Honor, I'm going to object.

4             THE COURT:  Overruled.

5             THE WITNESS:  I didn't say that.  I said that the --

6    like I said before, I think that there's a -- most people

7    would -- most people in pediatric ophthalmology would agree

8    that there's a component of different factors going on and

9    that the isolated increased intracranial pressure in and of

10   itself doesn't cause hemorrhage to that extent.

11   BY MR. BLEGEN:

12   Q   You present in your article where we just read from three

13   separate theories, correct?

14   A   I'm not presenting my theories.  I'm presenting the

15   theories that have been proposed.

16   Q   All right.  You present three separate theories proposed

17   by the worldwide network of ophthalmologists, correct?

18   A   And child abuse experts, yeah, specialists.

19   Q   Fair enough.  All those people, correct?

20   A   Yes.

21   Q   They can't agree on which one of these three theories it

22   is, right?

23   A   Well, it could even be more than these theories as to

24   what's going on, but there's not a total agreement as to

25   exactly what causes it.

Forbes - cross

1   Q   There could be more than these theories because when you

2   don't know which one it is, there could always be others,

3   right?

4   A   Um-hum.

5   Q   So it's true that maybe there's something else that causes

6   the retinal hemorrhages to this extent and it just hasn't been

7   discovered yet, right?

8   A   Yes.

9   Q   All right.  But nowhere in there do you say that these

10  three theories are a combination of each other, correct?

11  A   I'd have to read through, but I guess not.  I don't know

12  that for a fact.  I don't remember offhand what I wrote.

13  Q   You don't say it right after you describe the various

14  theories, do you?

15  A   No.

16  Q   You could have said or a combination thereof, right?

17  A   Well, I could have, yes.  I think --

18  Q   But you did not, correct?

19  A   Again, yes, I did not.

20  Q   Let's talk about car accidents.  That was one of the other

21  areas in which you said you could get retinal hemorrhages

22  extending to the ora serrata, correct?

23  A   Correct.

24  Q   Do you have a preferred theory on the how you get retinal

25  hemorrhages to the ora serrata from a car accident?

Forbes - cross

1    A    Direct impact.  I don't have a preferred theory, though,
2    no.
3    Q    Are you saying -- you're talking about car accidents
4    involving children who are not in car seats?
5    A    I'd have to go back and look at the various reports.  I'm
6    not sure if they are or not.
7    Q    Well, when you wrote your report, what kind of car
8    accidents were you thinking about?
9    A    I didn't write it.  Jane Kivlin wrote it.
10   Q    You wrote a report in this case, correct, in our case, the
11   Isabella Zielinski case?
12   A    Oh, okay.
13   Q    And in there one of the things you say would cause retinal
14   hemorrhages extending to the ora serrata is motor vehicle
15   accidents, correct?
16   A    Correct.
17   Q    So what did you mean when you wrote motor vehicle
18   accidents back in October of this year?
19   A    I meant that, you know, there's a report by Jane Kivlin on
20   13 children that had -- who were victims of motor -- or were
21   in motor vehicle accidents and had retinal hemorrhages that
22   were pretty substantial, some of which went to the ora
23   serrata, and that is in a differential diagnosis of retinal
24   hemorrhages to this extent.
25   Q    All right.  And so there's some mechanism as of yet

Forbes - cross

1  undetermined that caused retinal hemorrhages to extend to the
2  ora serrata in one or more motor vehicle accidents?
3  A   Yes, yes.
4  Q   And if people -- excuse me.  Strike that.
5         If doctors brought more children to have you look at
6  their eyes, you might find more circumstances where there are
7  retinal hemorrhages extending to the ora serrata, right?
8  A   I would assume that to be the case, yes.
9  Q   You would assume that you might find them, right, in fact?
10 A   Well, I might not find a mechanism, but I might find
11 retinal hemorrhages in those children.
12 Q   And the ever expanding list for the differential diagnosis
13 would continue ever expanding, right?
14 A   Maybe.  I don't know that to be true.
15 Q   Well, if you found another illness or causation of
16 extensive retinal hemorrhages like we have in Isabella's case,
17 I assume you would add it to your differential diagnosis for
18 the future, right?
19 A   I would.
20 Q   Okay.
21 A   But you said ever expanding, so I don't know that it would
22 continue onward I guess is why I said I didn't know.
23 Q   Meaning?
24 A   It was an endless list.
25 Q   I suppose nothing's endless, right?  Maybe your testimony

Forbes - cross

1   here today?

2          THE COURT:  Except the hearing.

3   BY MR. BLEGEN:

4   Q   One of the statements by the experts from the petitioner's

5   side that you took issue with was an objection to the

6   testimony of the shaken baby expert at the original trial.  Do

7   you remember that?  Let me point it to you.

8   A   Yeah.

9   Q   Look at your report on Page 3.

10  A   Thanks.

11  Q   The pages are not numbered, but it's the third one in.

12         THE COURT:  Which paragraph?

13         MR. BLEGEN:  It's the --

14         THE COURT:  From the bottom?

15         MR. BLEGEN:  The second one from the bottom, the big

16  one that says, "In Dr. Patrick E. Lantz's report."

17         THE COURT:  Oh, that's the paragraph.  That's the

18  first one from the bottom on what I have.

19         MR. BLEGEN:  Judge, it looks like there's been a bit

20  of a change.

21         THE COURT:  I have a 10/29/12 report.

22         MR. BLEGEN:  I have a 10/22/12 report.

23         I'm going to have to work off this one cause it's

24  marked up.

25         Can you find, Dr. Forbes --

Forbes - cross

1      THE COURT:  It's the last -- on what you have, it's

2  the last paragraph on Page 3 in the Dr. Patrick E. Lantz

3  report.

4  BY MR. BLEGEN:

5  Q   That paragraph starts by saying, "In the Dr. Patrick E.

6  Lantz report, he states that Dr. Flaherty's statement that

7  hemorrhages to the ora serrata, as in Isabella's case, are

8  only caused by acceleration or deceleration forces or seen in

9  the shaken baby syndrome," do you see that quote?

10  A   Yes.

11  Q   And do you understand that Dr. Flaherty testified to that

12  in the original trial in this case?

13  A   Yes.

14  Q   Okay.  And she's wrong, right?

15  A   She's wrong that hemorrhages are only caused by

16  acceleration or deceleration injuries.  That's correct.

17  Q   Because you listed several -- a couple of things, three

18  things that --

19  A   What I was saying isn't a reasonable opinion is that

20  retinal hemorrhages can be caused by acceleration and

21  deceleration, and that is supported by the literature, is what

22  I was saying in that sentence.

23  Q   All right.  So you agree with the proposition that

24  Dr. Flaherty when she testified at the original trial was

25  wrong that hemorrhages to the ora serrata are only caused by

Forbes - cross

1    acceleration and deceleration forces, correct?

2    A    Yes.

3    Q    She's a hundred percent wrong about that, right?

4    A    Yes.

5    Q    There are other things that can cause it, right?

6    A    Yes.

7    Q    You then say, "I disagree with this statement in that

8    there is extensive literature regarding the presence of

9    retinal hemorrhages in abusive head trauma cases," correct?

10   A    Correct.

11   Q    But the fact that there may be extensive literature

12   documenting the presence of retinal hemorrhages in abusive

13   head trauma cases doesn't tell us that repetitive shaking

14   causes retinal hemorrhages, does it?

15   A    No.

16   Q    There's a difference between association and causation,

17   correct?

18   A    Correct.

19   Q    And in fact, all of your testimony and belief about

20   retinal hemorrhages in conjunction with abusive head trauma is

21   association, right?

22   A    Well, there is some scientific experiments, you know, pig

23   studies and such that show that hemorrhages can occur as a

24   result of a single acceleration force, so I wouldn't say it's

25   all association based on that.  But you're right that a lot of

Forbes - cross

1   what -- we can't do an experimental model on a child, so it's

2   hard to do that in an experimental way, correct.

3   Q    But regardless of whether you can experiment on a child,

4   you haven't figured out the causation yet, correct?

5   A    The causation of retinal hemorrhages.

6   Q    Yes.

7   A    So, I think we have in many cases, and, you know, I think

8   that the literature of confessions in -- you know, supports

9   the fact that children that have been abused and shaken by

10   their parents is supported in what they say that they did to

11   their children.

12          My own personal experience, and I didn't want to have

13   the personal experience, is that the people confess to me, and

14   then I'm just an ophthalmologist, you know, doing an

15   examination, and they tell me that all I did was shake him

16   four times, I didn't mean it.  And so I'm not sure that, you

17   know, is that -- is that just an association?  I mean, they

18   told me they did it, and I didn't ask them, and I think in the

19   confession evidence, of which there is a lot of literature,

20   sort of says that, you know, hemorrhages can occur in those

21   kids.

22   Q    Have you written any papers on these supposed confessions

23   to you?

24   A    Have I read them?

25   Q    Written any.

Forbes - cross

1    A    No, I have not.

2    Q    So you're telling us that you have evidence of a uncoerced

3    statement to you demonstrating that retinal hemorrhages result

4    from shaking and you haven't written anything about it?

5    A    I mean, he -- the gentleman who told me just told me.  I

6    didn't videotape it.  I didn't care to -- I mean, I didn't

7    videotape it, so how would I report it?

8    Q    I mean write an article about it.

9    A    I'm not sure that it could be approved by a peer reviewed

10   thing because I don't really have -- you know, I don't have

11   him saying it to me.  He just told me.

12   Q    I do not understand what you just said.  "I do not have

13   him saying it to me; he just told me"?

14   A    He just told me the story, so how would I write it -- I

15   mean, I can't write a paper about that, right?

16   Q    Why not?

17   A    Because it's just what he told me.

18   Q    So it doesn't have any evidentiary value?  Is that what

19   you're saying?

20   A    I'm saying to me it does, but, you know, in the literature

21   it wouldn't by -- or wouldn't go through a peer reviewed --

22   Q    What is that gentlemen's name?

23   A    I don't remember offhand.

24   Q    Excuse me?

25        MR. TELISMAN:  Your Honor, I'm going to object.

1      THE COURT:  He says, "I don't remember offhand."

2      THE WITNESS:  I don't remember offhand.

3  BY MR. BLEGEN:

4  Q   When did he tell you?

5  A   I'd say it was about five years ago, because I remember

6  when it happened cause my one daughter was really young at the

7  time, Gracie.

8  Q   We'll take your memory it was five years.  That's what you

9  think, about five years ago?

10 A   I think so, yeah.

11 Q   So did you write anything to the police about it?

12 A   I told the SCAN team.

13 Q   Did you end up testifying in court about it?

14 A   I did not.

15 Q   So a gentleman confessed to you, and the person didn't go

16 to court?  Do you know?

17 A   He did.

18 Q   And you did not end up testifying against him?

19 A   I did not.

20 Q   Did you report it in your medical records that this

21 gentleman had confessed shaking to you?

22 A   The SCAN team.

23 Q   Did you write it down in records?

24 A   The SCAN team wrote it down because they called me and

25 asked me about it, so they wrote it down.

Forbes - cross

1    Q    Do you know whether it was used in court?

2    A    The case that I'm talking about didn't go to court cause

3    he -- he whatever the word is in law, plea bargained or

4    whatever the word is, I don't know, phrase.

5    Q    How many other people have confessed shaking children to

6    you and then you thereafter found retinal hemorrhages

7    extending to the ora serrata?

8    A    I've never done it -- they've never confessed before.

9    Q    Or since?

10   A    No.  They've never confessed before I did the eye

11   examination.  You asked how many times have they confessed to

12   me and then I did an eye exam and there were retinal

13   hemorrhages, so none.

14   Q    I meant in the past.  So are you telling us that this

15   gentleman confessed after you did the eye exam?

16   A    He did.  Because I went over to tell him that the child

17   had hemorrhages in the eye, and I told -- was going to tell

18   him that -- I was telling him the differential diagnosis, and

19   he just told me.

20   Q    So when you say you told him the differential diagnosis,

21   you told him?

22   A    No.  I said I was going to tell him the differential

23   diagnosis.

24   Q    Oh.  And he blurted it out before you said what the

25   differential diagnosis was?

Forbes - cross

1  A   I don't remember exactly offhand.  I think I started to

2  tell him what I thought the differential diagnosis was, and I

3  asked him a little bit of the history of the child, and then

4  he just kind of broke down and started to tell me.

5  Q   Did you suggest to him that he had shaken the child?

6  A   Did I suggest it?

7  Q   Yes.

8  A   I did not suggest to him that he shook the child.  I

9  suggested that shaking a child is one way that you can cause

10  retinal hemorrhages.

11  Q   How hard did the gentleman say he shook the child?

12  A   Do you know what, five years ago, I guess I don't know for

13  sure.  He said he -- he -- he -- he just said, "I was angry,

14  and I just shook her one or a couple of times, and then I

15  stopped."

16  Q   Are you telling me you're having trouble remembering this

17  confession?

18  A   I guess I'm telling you the specifics of it.  I remember

19  it, though.

20  Q   All right.  Well, you've written dozens of articles

21  regarding abusive head trauma, correct?

22       You've got a --

23       Honestly I cannot hear you.

24  A   Correct.

25  Q   You've got a very lengthy CV filled with articles about

Forbes - cross

1  abusive head trauma, correct?

2  A    Correct.

3  Q    You have cited to us here today that you believe

4  confessional studies support the proposition that retinal

5  hemorrhages are highly associated with abusive head trauma,

6  correct?

7  A    Correct.

8  Q    And you haven't written an article or put in a single

9  paragraph of one of your articles a incident where a man

10  allegedly confessed to you that he shook a child and then

11  there were the retinal hemorrhages?

12  A    Correct.

13  Q    You mentioned that there are good animal studies, correct?

14  A    Yeah, there are animal studies, yes.

15  Q    All right.  So you're going to leave out the good animal

16  studies?

17  A    I am.

18  Q    Cause they're not good, are they?

19  A    No, they're good animal studies, but you're going to want

20  me to -- or, you know, how they parlay back into human beings,

21  you know, there's question because the eyeballs in animals are

22  different than human beings.

23  Q    All right.  Well, let's leave aside the fact that

24  everybody agrees that humans and pigs and sheep are different,

25  okay?  You also didn't get many results of retinal

Forbes - cross

1  hemorrhages, did you?

2  A   I think we got 78 percent.

3  Q   Let's talk about the lamb study.  You were part of a --

4  or, I'm sorry.  One of the animal studies you're referencing

5  is Diffuse Neuronal -- I'm not going to read it.  It's the

6  lamb study, right?  Do you know which one I'm talking about?

7  I'll show it to you if you don't.

8           I'm going to show you Petitioner's Exhibit Forbes 7.

9           Take a second if you need to, but are you familiar

10  with this article, Dr. Forbes?

11  A   I'm familiar with it, but I don't know the specifics of it

12  offhand.

13  Q   Is this one of the articles you were referring to when you

14  said there are good animal studies supporting retinal

15  hemorrhages being associated with abusive head trauma?

16  A   Since there aren't really that many, I'll say yes.

17  Q   There are maybe what, like three or four?

18  A   Yes.

19  Q   All right.  And in this study there were -- they took a

20  group of lambs, seven of them, correct?

21  A   Correct.

22  Q   And shook them regularly ten times over a 30-second

23  duration over a 30-minute period, correct?

24           That's on the very next page.

25  A   Yes.

Forbes - cross

1    Q    And if you turn to Page 239 in the upper right corner,

2    halfway down the page do you see the results regarding retinal

3    hemorrhages?

4    A    "There have been very few animal models," is that where

5    you're talking about?

6              Show me.

7    Q    Just read it to yourself.

8    A    Okay.

9    Q    It says that retinal hemorrhages were found, correct?  It

10   says -- I'll just read it to you:  "But retinal hemorrhages

11   were minimal and only seen in two animals," correct?

12   A    Yes.

13   Q    So you did not get -- not you, but these scientists did

14   not get retinal hemorrhages extending to the ora serrata,

15   correct?

16   A    They did not.

17   Q    They did not get the kind of retinal hemorrhages that you

18   say are highly associated with abusive head trauma, correct?

19   A    Correct.

20   Q    The results regarding the finding of retinal hemorrhages

21   resulting from a shaking incident were similarly disappointing

22   for pigs, right?

23   A    Again, our studies were dissimilar from this in that they

24   were single rotational movement.  To be honest with you, I was

25   surprised that we found any at all cause I didn't think that a

Forbes - cross

1  single rotational movement would cause hemorrhages.  To be

2  honest, this study was more parlayed off head trauma injuries

3  that weren't really specifically to look at child abuse or an

4  analogy with child abuse, but rather single impact head trauma

5  for car seats and stuff like that.

6  Q   Then the pig study was not one of the good animal models

7  that you were citing to to say that there's biomechanical

8  evidence of abusive head trauma causing extensive retinal

9  hemorrhages, correct?

10 A   I don't think I said that there were good animal models to

11 show extensive retinal hemorrhages, but, no, I'm not saying

12 that.  I'm saying that these were single rotational movement

13 and not designed for that, so --

14 Q   Well, that's a -- I guess, a fair criticism, but you are

15 the one who decided to do that, right?

16 A   Yes.

17 Q   All right.  So you could have done it by shaking the pigs

18 too, correct?

19 A   No.  We weren't allowed to by our IRB.

20 Q   I don't know, I-R --

21 A   The institutional review board.

22 Q   Okay.

23 A   We didn't even apply for an institutional review board

24 based on shaking pigs, so Susan Margulies, who runs the

25 biomechanical lab, wanted to do really graded acceleration

Forbes - cross

1 injuries, and so the studies, again, were mainly modeled for,

2 you know, single impact injury from -- or single movement

3 injuries from car seats and stuff like that.  So I don't know

4 that we could and we didn't do that.  We didn't do multiple

5 shaking.

6 Q Well, so we've got the lamb model that we just spoke

7 about, right?

8 A Right.

9 Q We've got the pig model with only one acceleration,

10 correct?

11 A Um-hum.

12 Q What are the other animal models you're talking about,

13 then?

14 A I didn't talk a whole lot about them, but those two, and

15 there's the rat studies or the mice studies.

16 Q Everybody agrees the rats or mice studies are no good,

17 right?

18 A I agree that they're not a good model.

19 Q Okay, then.  Let me ask you this:  You are the Brian

20 Forbes who wrote a report stating, "There are well-designed

21 animal model studies which show that retinal hemorrhages can

22 occur from rotational injury," and then you go on to

23 confessional studies, right?

24 A Sure.  Yes.

25 Q So you just told us the models are not good.

1   A   I didn't say it was a good model.  I said it was a

2   well-designed study.

3   Q   Wait a minute.  This is what your report says on Page 4.

4   Please.

5   A   Sure.

6   Q   Do you know what part I'm talking about?  Do you know

7   where you talk about responding to Dr. Teas?

8           THE COURT:  Oh, we're back to his report.

9           On the one you have it's at the top of Page 5 at the

10  very end of the carryover paragraph, "There are well-designed

11  animal model studies which show that retinal hemorrhages can

12  occur from rotational injury and numerous confession studies

13  in humans as well."

14          THE WITNESS:  So, again, I said well-designed

15  studies.  I didn't really say that they were great models.

16          It's a well-designed study.  We did exactly the

17  degree of rotational injury, and then we measured it very

18  well.

19  BY MR. BLEGEN:

20  Q   But you didn't get the results you were looking for?

21  A   I actually wasn't looking for a specific result.

22  Q   You certainly are relying on those studies because what

23  you said was, "Dr. Teas states there is no biomechanical

24  evidence that suggests that shaking can cause retinal

25  hemorrhages, which is not true."  You say that, correct?

Forbes - cross

1  A    Um-hum.

2  Q    And then you say, "There are well-designed animal model

3  studies which show that retinal hemorrhages can occur from

4  rotational injury," correct?

5  A    Correct.

6  Q    You've just finished telling us that the animal models,

7  the pigs and the lambs, are not good, correct?

8  A    I -- just getting back again, I said well designed.  My

9  study is well designed.

10 Q    Are you telling us --

11        THE COURT:  Mr. Blegen, I get the point.  I think

12 you've wrung out of this pretty much everything you can wring

13 out of it.

14        I may have a question for him when it gets to be my

15 turn, but seeing as how it is now past 4:45, you need to get

16 on to other topics if you're going to get on to them.

17        MR. BLEGEN:  I'm trying, Judge.  I will.

18 BY MR. BLEGEN:

19 Q    The eye examination in this case occurred on December 28

20 of 2002, correct?

21 A    Correct.

22 Q    The child had already been in the hospital for a day by

23 that point, correct?

24 A    Correct.

25 Q    And so --

Forbes - cross

1           Honestly, I cannot --

2    A    Correct.

3    Q    The retinal hemorrhages may not have been there on

4    December 27th, correct?

5    A    Correct.

6    Q    Alternatively, they could have been there long before

7    December 27th, correct?

8    A    They could have been there December 27th, yeah.

9    Q    All right.  Well, let's talk about the word "long."

10   A    Good.

11   Q    They could have been there weeks before December 27th,

12   correct?

13   A    I would say probably up to two weeks, but, again, I -- I'm

14   not saying I know that for a fact, but, again, for the reasons

15   that I told you, the intraretinal hemorrhages generally clear,

16   but, yeah, you're right.  The specific timing of the

17   hemorrhages, I cannot pinpoint that at all.

18   Q    Did Isabella have any preretinal hemorrhages?

19   A    Yes.

20   Q    Okay.  Preretinal hemorrhages can persist for four to six

21   weeks, right?

22   A    Yes.

23   Q    You say a couple of weeks, but they could have been there

24   four to six weeks earlier, right?

25   A    The preretinal could, sure.

Forbes - cross

1    Q    Okay.  What about did she have any solitary isolated dense

2    hemorrhages?

3    A    Sure.  Yes.

4    Q    Those can also persist for four to six weeks, correct?

5    A    Correct.

6    Q    So it could have been -- could have been there four to six

7    weeks before December 28, right?

8    A    Again, and I'm not trying to pinpoint.  I'm just trying to

9    educate.  The intraretinal hemorrhages that are there when I

10   see them, it would be unlikely for them to have persisted for

11   four to six weeks.  But you're right.  The preretinal

12   hemorrhages absolutely could have been there for a longer

13   period of time.

14   Q    And you're saying she had those, correct?

15   A    Yes.  Absolutely.

16   Q    Retinal hemorrhages in flame and dot shapes and extending

17   to the ora serrata are not the only eye problems that

18   ophthalmologists believe are associated with abusive head

19   trauma, correct?

20   A    Correct.

21   Q    There is also perimacular folds, correct?

22   A    Correct.

23   Q    And there were no perimacular folds here, correct?

24   A    Not at all.

25   Q    And you and other ophthalmologists believe that those are

Forbes - cross

1   highly associated with abusive head trauma, correct?

2   A    Yes.

3   Q    And in fact, the retinal folds fit the vitreous traction

4   theory, correct?

5   A    Yes.

6   Q    Because the theory is that the repetitive shaking back and

7   forth pulls repeatedly on the vitreous, causing the fold,

8   right?

9   A    It doesn't pull repeatedly on the vitreous.  It pulls

10  repeatedly on the retina.

11  Q    But it's the repetitive motion that you believes causes

12  the fold, correct?

13  A    Yes.

14  Q    So she didn't have perimacular folds, right?

15  A    Yes.

16  Q    So that makes the repetitive back and forth motion less

17  likely, doesn't it?

18  A    Um -- um -- I wouldn't say that because I think a lot of

19  times they'll see these kids, and they'll have the

20  hemorrhages, and there are levels of involvement of the

21  hemorrhages, so you'll look in the kid and see a few

22  hemorrhages, and you wouldn't expect to see a retinoschisis,

23  but as they become more and more and more extensive, you can

24  develop a hemorrhagic macular cyst.  So I'm not sure I agree

25  with that statement.

Forbes - cross

1  Q  I thought we were talking about retinal folds?

2  A  We were.  Schisis is the pulling apart of the retinal

3  layers.  So actually it's not a fold.  It's a schisis cavity.

4  Q  Those are also considered by ophthalmologists to be highly

5  associated with abusive head trauma, right?

6  A  Correct.

7  Q  And we didn't have any retinoschisis here either, did we?

8  A  Correct.

9  Q  Which of the three types of findings, extensive and

10  certain pattern retinal hemorrhages, perimacular folds, or

11  retinoschisis, which of those is more likely to be caused by

12  this vitreal traction theory created by a repetitive back and

13  forth motion?

14  A  I would say retinoschisis.

15  Q  And we didn't have that, did we?

16  A  No.

17  Q  So your theory -- strike that.

18      Your belief, then, is that this abusive head trauma

19  was not the repetitive back and forth motion?

20  A  No, not at all.  Not -- no, that's not my theory.

21  Q  So --

22  A  My theory is this wasn't to the extent that the macula got

23  pulled off.

24  Q  You've told us that coagulation disorders can cause

25  retinal hemorrhages of the type and extent seen in Isabella,

Forbes - cross

1   correct?

2   A   Correct.

3   Q   So it's your belief that she didn't have any of those

4   coagulation disorders, correct?

5   A   To the extent that it would have caused this -- to the

6   extent that it would have caused these, yes.

7   Q   And you told us that it's really, in your view, only

8   bleeding disorders that could cause these kind of retinal

9   hemorrhages, meaning a propensity to bleed more, right?

10  A   Yes.

11  Q   And then Mr. Telisman asked you about whether problems

12  with clotting or thrombophilia could cause retinal

13  hemorrhages, right?

14  A   He did.

15  Q   And you said no?

16  A   I said -- actually I said that if you had a bad enough

17  thrombophilia or platelets less than ten thousand, you

18  probably could get retinal hemorrhages, pretty significant

19  retinal hemorrhages.

20  Q   Maybe I'm getting confused.  I thought thrombophilia was

21  high platelets.

22  A   I'm talking about low platelets, less than ten thousand or

23  so.

24  Q   All right.  Can high platelets cause retinal hemorrhages?

25  A   Not to my knowledge.

Forbes - cross

1  Q   All right.  And then I think you explained something about

2  the difference between bleeding and clotting, right?

3  A   Again, and I prefaced that with the fact that I'm not a

4  hematologist, but, yes, I talked about that.

5  Q   I know.  But you're rendering an opinion about what a

6  disease of the blood could do to the eyes, correct?

7  A   Correct.

8  Q   Do you think you probably should be a hematologist to

9  render that opinion?

10 A   I think that certain gross numbers from hematological

11 numbers I could render an opinion of.

12         THE COURT:  I'm stopping in five minutes.  It's 4:55.

13 Wherever we are, I am stopping in five minutes.  I can only

14 absorb so much information, and we've reach that point in five

15 minutes.

16         I'm not saying what you have to do.  I'm not telling

17 you to stop.  I'm just telling you I'm stopping in five

18 minutes.

19 BY MR. BLEGEN:

20 Q   Clotting can lead to blood coming out of a vein, can it

21 not?

22 A   I'm sorry.  I didn't get that.

23 Q   Clotting can lead to blood coming out of a vein, can it

24 not?

25 A   Clotting generally leads to blood not coming out of the

Forbes - cross

1  vein.  It clots the hole in the vein.

2  Q   Clotting leads to blood not going through the vein,

3  correct?

4  A   Well, if there's a hole in the vein, the clotting factors

5  will close off the hole in the vein, so -- I mean, clotting

6  within the vein can stop the movement of blood within the vein

7  itself as well, but clotting factors in general or if there's

8  a tear in the capillary or a tear in the vein or tear in

9  something like that, it helps to clot it off.

10  Q   So it's your testimony that blood cannot leak out of a

11  vein that is clotted?  You never heard of that?

12  A   I mean, if it's -- the clot -- the clots are not as good

13  at holding blood in, so it takes a while for it to evolve

14  from, you know, a torn vessel to a repaired vessel, so of

15  course it's weaker, so they can leak out.

16  Q   And those leaks could be in your eye, right?

17  A   Yes.

18  Q   There are veins in your eye, correct?

19  A   Yes.

20  Q   So if there's a clotted vein there, blood could leak out,

21  correct?

22  A   Yes.

23  Q   And that would be a retinal hemorrhage, right?

24  A   Sure.

25  Q   And if you had very high clotting factors or a significant

Forbes - cross

1  problem with clotting, you could get extensive retinal

2  hemorrhages from that leaking, correct?

3  A    Like what I said before, the clotting factors will repair

4  a hole in a vein.  If there were extensive holes in the veins

5  of the eye and the clotting factors tried to come in and fix

6  that, there could be some leaking from that.  But I'm not sure

7  what scenario there would be a bunch of holes in the vein of

8  the eye.

9  Q    You wrote in your report that severe infectious processes

10 could cause retinal hemorrhages extending to the ora serrata?

11 A    They can rarely, yes.

12 Q    And but it was your belief that there was no such

13 infectious process here?

14 A    There was no noted perimeningitis or anything to that

15 extent, which are consistent with the case of hemorrhages in

16 eyes, so no.

17 Q    But there may well be unknown infections out there that

18 can cause retinal hemorrhages, correct?

19 A    I suppose.

20 Q    And you and your fellow ophthalmologists have not been

21 called to look at the eyes when they know what infection

22 someone has, correct?

23 A    Correct.

24 Q    If they know what infection someone has, they're going to

25 treat it, correct, the doctors?

Forbes - cross

A    They're going to treat it, but I see these kids all the
time.  They know what they're treating, but they want to make
sure there's not a sign of an infection.

          And we're not talking about blood in the eye.
Usually we're talking about bacteria in the eye or fungus in
the eye.  So I look in those eyes all the time, so I'm
actually consulted a lot to see those kids.

          Does that answer your question?

Q    I don't know which kid you're talking about.  Kids with
infections?

A    Yes, kids with infections.  So there's a lot of kids that
are septic on the floor that we're asked to evaluate the eyes
for signs of infection inside the eye.

Q    And you get called for other infections as well?

A    Sure.

Q    In this case the child was on antibiotics for about
ten days leading up to her hospitalization, correct?

A    Correct.

Q    So there could have been an infection that had gone away,
right?

A    Correct.

Q    That's what antibiotics do, correct?

A    For bacterial infections, not viral infections, but yeah.

Q    And if there was a viral infection, the cultures that they
did would not have found it, right?

Forbes - cross

1    A    If they did viral cultures they probably would.

2    Q    Do you know whether they did or not?

3    A    I do not.

4         MR. BLEGEN:  Judge, if I could just have one minute

5    or second maybe.

6         THE COURT:  You can have about ten seconds.

7         MR. BLEGEN:  No further questions.

8         THE COURT:  That's when I'm getting up and leaving.

9    I'm not telling you you have to be finished.  You can ask as

10   many questions as you want.  I'm leaving now.  Okay.  So in

11   other words, you're asking your questions tomorrow.

12        And, by the way, nobody is making a 6:30 plane anyway

13   unless the helicopter is landing on the plaza across the

14   street.  I'm just saying, it's just not going to happen.  So

15   we're going to stop now.  See you in the morning, 10:00.

16

17            (Which were all the proceedings had in the

18            above-entitled cause on the day and date aforesaid.)

19

20

21

22

23

24

25