<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3

 4   JENNIFER DEL PRETE,          )
                                  )
 5                 Petitioner,    )  Docket No. 10 C 5070
                                  )
 6           vs.                  )
                                  )
 7   MELODY HULETT,               )  Chicago, Illinois
                                  )  December 20, 2012
 8                 Respondent.    )  10:00 a.m.

 9
                            VOLUME 4
10                  TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12   APPEARANCES:

13
     For the Plaintiff:    BLEGEN & GARVEY
14                         BY:  MR. PATRICK W. BLEGEN
                                MS. JODI L. GARVEY
15                              MR. DANIEL A. RUFO
                           53 West Jackson Boulevard
16                         Suite 1437
                           Chicago, Illinois  60604
17

18   For the Defendant:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                           BY:  MR. KARL R. TRIEBEL
19                              MR. NEAL GOODFRIEND
                                MR. ARI TELISMAN
20                              MS. MONIQUE A. ANAWIS
                           100 West Randolph Street
21                         13th Floor
                           Chicago, Illinois  60601
22
     Also Present:               MR. ROBERT STANLEY
23

24         LAURA M. BRENNAN - Official Court Reporter
             219 South Dearborn Street - Room 2102
25                Chicago, Illinois  60604
                      (312) 435-5785
</pre>

1    (The following proceedings were had in open court:)

2         THE COURT:  10 C 5070, Del Prete v. Hulett.

3         Can one lawyer for each side put the appearances on

4    the record?

5         MR. TELISMAN:  Good morning, your Honor.  On behalf

6    of the respondent, assistant attorney general Ari Telisman,

7    assistant attorney general Karl Triebel, Neal Goodfriend and

8    Monique Anawis.

9         MR. BLEGEN:  Good morning, Judge; Patrick Blegen and

10   Dan Rufo on behalf of Ms. Del Prete, who is here.

11        THE COURT:  And Ms. Del Prete is present.  Okay.

12        So what are we doing next?

13        MR. TELISMAN:  Your Honor, when we left off

14   yesterday, Dr. Forbes was still on the stand for cross

15   examination.  Dr. Forbes left to go back to Philadelphia, and

16   just so --

17        THE COURT:  How much more cross did you have, Mr.

18   Blegen?

19        MR. BLEGEN:  Maybe 10 minutes, maybe less.

20        THE COURT:  How much redirect did you have?

21        MR. TELISMAN:  15 minutes.

22        Your Honor, Dr. Forbes is available to appear by

23   videotaped conference tomorrow afternoon.

24        THE COURT:  That assumes that we can all get our act

25   together around here; A, that the video conferencing is

1    available; B, that it can be put in here; C, that it can be

2    sort of melded in with all of this stuff; D, that he's at a

3    place where my person can within the next day confirm that it

4    works because not all the systems are compatible.  So, no,

5    sorry.  I mean, it's going to have to happen later.  It will

6    have to go on the part that we're doing after the first of the

7    year.  You're going to need to give me a specific date that is

8    more than a day away.

9               MR. TELISMAN:  Sure, Judge, no problem.

10              THE COURT:  So that we can make the arrangements for

11   it.

12              MR. BLEGEN:  Can I ask you a question, Judge?

13              THE COURT:  Yes.

14              MR. BLEGEN:  Did you have some questions?

15              THE COURT:  Absolutely.

16              MR. BLEGEN:  You did, all right.

17              THE COURT:  I mean, I may not after I hear the cross

18   and the redirect.  You may cover the points, but as of right

19   now, I do have some, yes.

20              Okay.  Let's call the next witness then.

21          (Brief interruption.)

22              MR. RUFO:  The petitioner calls Dr. Patrick Lantz.

23          (Witness sworn.)

24        DR. PATRICK LANTZ, PETITIONER'S WITNESS, DULY SWORN

25                      DIRECT EXAMINATION

Lantz - direct

1   BY MR. RUFO:

2   Q    Dr. Lantz, can you please state your full name for the

3   record, spelling your last name?

4   A    Patrick Eugene Lantz, L-a-n-t-z.

5           THE COURT:  You don't need to lean all the way into

6   that.  It's counterproductive.

7   BY MR. RUFO:

8   Q    Dr. Lantz, I'm going to hand you three exhibits, the first

9   labeled Petitioner's Lantz Report, the second labeled

10  Petitioner's Exhibit Lantz Supplemental Report, and the third

11  labeled Petitioner's Exhibit Lantz CV.

12          THE COURT:  You're getting them, okay.

13      (Brief interruption.)

14  BY MR. RUFO:

15  Q    Turning to Petitioner's Exhibit Lantz CV, do you recognize

16  that document?

17  A    Yes, I do.

18  Q    What do you recognize it to be?

19  A    That's a copy of my curriculum vitae.

20  Q    Dr. Lantz, how are you currently employed?

21  A    I'm a professor of pathology at Wake Forest University

22  Baptist Medical Center in the department of pathology.

23  Q    And can you briefly describe for the Court your

24  educational background?

25  A    After graduating from the University of Illinois,

1  Champaign-Urbana, I was working at the time at then Burnham

2  City Hospital as a medical technologist, and then was accepted

3  to Southern Illinois University School of Medicine in

4  Carbondale and Springfield, Illinois.

5        I graduated in June of 1983 in an, again, combined

6  anatomic and clinical pathology residency training program at

7  the University of New Mexico Affiliated Hospitals in

8  Albuquerque, New Mexico.

9        I also did a one-year fellowship in forensic

10  pathology at the Office of the Medical Investigator in

11  Albuquerque and then stayed on the faculty there for about a

12  year and a half before assuming a position as associate

13  director, then director of the autopsy service at what was

14  then Bowman Gray School of Medicine, North Carolina Baptist

15  Hospital.

16  Q   Can you explain briefly what pathology is, what field of

17  medicine?

18  A   Pathology is a subspecialty of medicine dealing with the

19  diagnosis of diseases and disorders through laboratory

20  methods, looking at tissue, sections under a microscope,

21  looking at pap smears, blood smears.

22        Pathologists do a number of different functions, help

23  a lot of blood banks, chemistry lab, and in some cases do

24  autopsies.

25  Q   And have you had experience performing autopsies?

Lantz - direct

1    A    Yes.

2    Q    Can you describe your background with regard to performing

3    autopsies?

4    A    After doing my forensic pathology fellowship from 1986

5    through 1987, I was at the Office of the Medical Investigator

6    in Albuquerque, also was a director of their hospital autopsy

7    service for a year and a half before assuming my present

8    position.

9    Q    Now, do you have any particular experience studying

10   retinal hemorrhages?

11   A    Yes.

12   Q    Have you published works regarding retinal hemorrhages?

13   A    Yes.

14   Q    Have you given presentations regarding retinal

15   hemorrhages?

16   A    Yes.

17   Q    And are those works and presentations reflected in your

18   curriculum vitae?

19   A    Yes.

20   Q    Now, can you explain briefly how you became involved in

21   this case?

22   A    I believe I was contacted by Dr. Teas and then Ms. Garvey

23   contacting me by either email or phone sometime in the summer

24   of this -- of 2012.

25   Q    What were you asked to do with regard to this case?

1  A    Ms. Garvey asked me to write a report to Dr. Teas
2  concerning the specificity of the retinal hemorrhages observed
3  in Isabella Zielinski.
4  Q    Now, in preparing that report, what materials did you
5  review or rely on?
6  A    I relied on a medical record review supplied by Dr. Teas.
7  There was a report by Dr. Emily Flaherty in January of 2003.
8  There was a trial transcript of Dr. Flaherty.  I think that
9  was from 2005.  And then there were retinal hemorrhages.
10 There was a retinal diagram that I believe was dated
11 December 28th, 2002.  There were ret cam or images of the
12 retina, of the back of the eye, with retinal hemorrhages from
13 December 30th, January -- of 2002 -- January 6th, 2003, and
14 January 13th of 2003.
15 Q    Now, did you ultimately prepare a report in this case?
16 A    Yes, I did.
17 Q    Is that report, the one you have in front of you, labeled
18 Petitioner's Exhibit Lantz Report?
19 A    Yes.  There is one dated August 29th and a separate one
20 dated December 7th, 2012.
21 Q    And did you prepare a supplemental report in this case?
22 A    Yes, I did.
23 Q    Is that the December 7, 2012, report in front of you
24 labeled Petitioner's Exhibit Lantz Supplemental Report?
25 A    Yes.

Lantz - direct

1  Q    Now, can you explain the circumstances of the supplemental
2  report?
3  A    The supplemental report was supplied after I found out
4  that -- in my original report I had indicated I did not see
5  any indication that scleral depression was done during the
6  dilated fundal examination on Isabella Zielinski on
7  December 28, 2002, in the records I had that were supplied to
8  me.
9  Q    Did you subsequently receive records indicating that there
10 was a scleral depression performed?
11 A    Yes, I did.
12 Q    Does your supplemental report indicate that?
13 A    Yes.
14 Q    Now, based on your review of the retinal cam images, what
15 were your findings in this case with regard to Isabella
16 Zielinski's retinal hemorrhages?
17 A    By the ret cam images that were dated December 30th, 2002,
18 she had bilateral multiple hemorrhages.
19        THE COURT:  What was the date?
20        THE WITNESS:  I think it was December 30th, 2002.
21 BY MR. RUFO:
22 Q    I'm going to pull up the portion of Dr. Forbes'
23 PowerPoint, specifically slide 6 from yesterday.
24        Do you recognize these photos?
25 A    Yes, I do.

Lantz - direct

1   Q   Do you recognize -- what do you recognize those photos to
2   be?
3   A   These photos are a fair and accurate representation of the
4   images supplied to me at the time when I was asked to consult.
5   They were taken, I believe, instead of December 28th, I think
6   the ret cam images were December 30th.  And the images show
7   the back of the right eye and the back of the left eye of
8   Isabella Zielinski on the 3rd of December 2002.
9           Her right eye would be on the left hand of the
10  screen.  The left eye would actually be on the right side.
11  Q   The images are reversed, right, left?
12  A   Not really reversed.  That is how they're typically
13  viewed.
14  Q   And can you explain what these images show?
15  A   The images show numerous retinal hemorrhages.  There are
16  what are called superficial retinal hemorrhages that there are
17  a splinter, flame shape.  There are dot and blot retinal
18  hemorrhages that are deeper in the layers of the retina.
19  There are some what are called preretinal hemorrhages.  They
20  are sort of the boat-shaped or the sort of curved ones that
21  are darker red, have a well-demarcated line.
22          They're best seen on the right eye, the one that is
23  orange.
24          The one that is sort of yellow-green, the hemorrhages
25  don't show up quite as well, but the same types of hemorrhages

1  are in the left eye.

2  Q   We have already heard some testimony about this, but can

3  you just briefly refresh?  What are retinal hemorrhages?

4  A   Retinal hemorrhages are bleeding into the light sensitive

5  area of the back of the eye, the retina.

6  Q   And are there different types of retinal hemorrhages?

7  A   Yes.

8  Q   Are there retinal hemorrhages called perimacular folds?

9  A   A perimacular fold is actually not a hemorrhage; it's an

10 elevation of the retina around it, sort of like looking down

11 on a volcanic crater.  The lip of it, that would be the fold

12 or edge of the retina sort of folded up in a circular fashion.

13         THE COURT:  What is it called?  What kind of fold?

14         THE WITNESS:  It's a perimacular.

15         THE COURT:  Perimacular.

16         THE WITNESS:  Peri and then macular.

17         THE COURT:  And you're saying that's basically the

18 edges around a hemorrhage essentially?

19         THE WITNESS:  Right.  It would be looking almost like

20 down on like a coffee cup.

21         THE COURT:  Right.

22         THE WITNESS:  And it's the edge of the coffee cup.

23 Instead of being flat, it's elevated just slightly.

24         THE COURT:  Okay.

25 BY MR. RUFO:

Lantz - direct

1  Q   Can you explain what retinoschisis is?

2  A   Retinoschisis is splitting of the retina.  There is a

3  number of cell layers in a retina.  Some people say 10, other

4  people say 12, depending on what you count, and it's actually

5  blood filling up and splitting separate layers that are next

6  to each other.

7  Q   Do you see any evidence of perimacular folds in these

8  photos?

9  A   No.

10 Q   Do you see any evidence of retinoschisis?

11 A   No.

12 Q   In any of your records or review, have you seen evidence

13 of perimacular folds in Isabella Zielinski?

14 A   No.

15 Q   Have you seen any evidence of retinoschisis in your review

16 of all of Isabella's records?

17 A   No.

18 Q   Now, can you briefly describe what sort of factors can

19 cause retinal hemorrhages and the circumstances?

20 A   Retinal hemorrhages can be caused by a variety of or be

21 associated with a number of different conditions, both trauma

22 and nontraumatic.

23       The basic mechanisms, you would have to almost look

24 at four different types.  If there's -- if you think about the

25 blood vessels are all connected in a loop going from the heart

Lantz - direct

1  through the arteries in the neck into the artery that goes

2  into the eyeballs and then draining through the capillary bed,

3  coming back through the veins, back into the heart, it's

4  almost a closed loop.

5        So if there is too much pressure going forward,

6  almost like if water -- you know, pumping your car, if you had

7  too much pressure in that, you could blow out your radiator.

8  So if you have hypertension, if someone does, that can cause

9  retinal hemorrhages.

10       If there's blockage of the blood flow coming back

11 into the heart, usually around the eyeball or sometimes in the

12 eyeball, that can cause retinal hemorrhages.

13       If there be direct trauma to the retinal layer, that

14 could cause hemorrhage.  Or the capillaries in the retina, the

15 little blood vessels are made up of cells -- they are sort of

16 joined by cell junctions -- if they become weak and they relax

17 and there's a space in there, blood can leak out.  Those are

18 sort of the four main basic mechanisms.

19 Q   Now, are these mechanisms found in a variety of medical

20 conditions?

21 A   They can be, yes.

22 Q   Can you briefly explain some of the medical conditions in

23 which these mechanisms can be found?

24 A   They can be associated with a number of different things,

25 like I said, like high blood pressure.

1   Q    Let me stop you there.  You said "associated."  Can you

2   explain what you mean by that?

3   A    Association means that they're seen in context with a

4   different condition.  That does not imply causality, that

5   something actually causes what it was.  It could be something

6   else.  It could be caused by that, but we really don't know

7   unless you actually do a very scientific test to prove that

8   that was the causative factor.

9   Q    Perhaps a better question is:  Are retinal hemorrhages

10  associated with a variety of medical conditions?

11  A    Yes.

12  Q    Can you describe some of those?

13  A    They could be anything from trauma.  It can be ruptured

14  aneurysms, vascular malformations, encephalitis, meningitis,

15  rapid brain swelling from a number of different causes.  They

16  could be due to some coagulation disorders, leukemia.  A

17  variety of different things can cause both nontraumatic and

18  traumatic.

19  Q    Now, when you say coagulation disorders, can you explain

20  what you mean by that?

21  A    Either coagulation disorders where someone is bleeding too

22  much, their blood does not clot; or in some cases where their

23  blood is clotting too much abnormally, it can cause little

24  blood clots in the capillaries in the eye or other places and

25  cause hemorrhages.

Lantz - direct

1  Q    I may have missed this.  Can retinal hemorrhages also be

2  associated with infection?

3  A    Yes.

4  Q    Now, are you familiar with the concept of pathognomonic

5  symptoms?

6  A    I'm aware of the term "pathognomonic," yes.

7  Q    Can you explain what pathognomonic means?

8  A    Pathognomonic is a term used in medicine indicating that a

9  sign or a symptom is diagnostically specific for a certain

10 condition.

11 Q    Now, are retinal hemorrhages pathognomonic to trauma?

12 A    No.

13 Q    Are extensive or severe retinal hemorrhages pathognomonic

14 to trauma?

15 A    No.

16 Q    Are retinal hemorrhages extending to the ora serrata

17 pathognomonic to trauma?

18 A    No.

19 Q    Have you seen retinal hemorrhages in -- extensive retinal

20 hemorrhages in cases not involving trauma?

21 A    Yes.

22 Q    What sorts of cases?

23 A    They can be from intracranial hemorrhages, ruptured

24 aneurysms in the brain, ruptured vascular malformations,

25 encephalitis, meningitis, leukemia.  I have seen that in

1  nontraumatic cases.  In cases where babies have stopped

2  breathing, their heart stops and they're resuscitated and

3  their heart gets started again and they are kept alive for a

4  day or two or a number of hours, they can get retinal

5  hemorrhages that can be quite extensive in some cases.

6  Q   Can you explain what you mean by resuscitation?

7  A   Resuscitation is the medical procedure to get someone to

8  start breathing again or get their heart going or getting both

9  of those and getting stabilized enough that their heart will

10  beat by itself and sometimes actually breathe by themselves

11  but not always.

12  Q   Now, have you given any presentations regarding retinal

13  hemorrhages and their association with resuscitation efforts?

14  A   Yes.

15  Q   Was that presentation -- in that presentation, did you

16  submit abstracts?

17  A   Yes.

18  Q   Was that abstract reviewed?

19  A   Yes.

20  Q   Was it accepted?

21  A   Yes.

22  Q   I'm going to hand you a copy of what I've labeled

23  Petitioner's Exhibit Lantz Resuscitation Abstract.

24        THE COURT:  Thanks.

25  BY MR. RUFO:

1  Q    Now, is Petitioner's Exhibit Lantz Resuscitation Abstract,

2  is that the abstract from the presentation we were discussing

3  regarding resuscitation efforts and their association with

4  retinal hemorrhages?

5  A    Yes.

6  Q    Can you briefly describe this presentation?

7  A    This presentation was done last year at the 64th annual

8  meeting of the American Academy of Forensic Sciences in

9  Atlanta, Georgia.  It was based on a series of infants who

10 were found unresponsive in situations like sudden infant death

11 syndrome where they had stopped breathing, their heart was

12 stopped and were resuscitated.

13 Q    Is it that commonly called SIDS?

14 A    Commonly called SIDS.  In other cases it was called sudden

15 unexplained infant death.

16        But they were found unresponsive and resuscitated

17 from variable periods of time.  Some just lasted and were

18 pronounced dead in the emergency department.  Others live for

19 a number of hours, five to six.  I believe the longest

20 survivor after the heart got started again was either 53 or

21 56 hours.

22 Q    Can you explain some of the specific findings from this

23 study?

24 A    These were -- I believe we had 10 or 11 cases.  I think

25 there was 11 cases.  Since this past year, I collected a

Lantz - direct

1    couple of others.  All of these babies had retinal

2    hemorrhages.  Some just had as few as just one on one side.

3    Others had multiple retinal hemorrhages that were flame shape,

4    superficial; some were larger.

5            And in four of the cases, there were scattered

6    retinal hemorrhages that could be seen at the ora serrata,

7    which is the very front part of the eye, right behind the

8    lens.

9    Q    Now, were any of these cases associated with either shaken

10   baby syndrome or abusive head trauma, motor vehicle accidents,

11   crush injuries or large falls?

12   A    No.

13   Q    Was there any indication of trauma with regard to these

14   cases?

15   A    No.  The only trauma -- I think on two or three there were

16   rib fractures that had almost no bleeding that were associated

17   with the chest compressions during the CPR procedure.

18   Q    Have you found in your experience any other types or cases

19   of nontraumatic extensive retinal hemorrhages?

20   A    Yes.

21   Q    And are you presenting one of those cases next month or, I

22   guess, in February of 2013?

23   A    Yes.  There's a case presentation that has been accepted

24   for presentation at the American Academy of Forensic Sciences

25   in February of next year.

Lantz - direct

1  Q    Have you prepared a PowerPoint regarding that case?

2  A    Yes, I have.

3  Q    Dr. Lantz, is this the PowerPoint you prepared regarding

4  that case?

5  A    That's the title slide at the point it's slated for

6  presentation.  It actually -- I have not obviously presented

7  it.

8  Q    Can you explain the background of this case or the

9  circumstances?

10 A    This case presentation or case report was a two-month-old

11 baby infant.  She had been fairly normal.  She had all of her

12 normal well-child checks, and the day this happened was in May

13 of this year.  She woke up from her nap slightly fussy.  The

14 grandmother got her up, took her to the mother who -- one of

15 them changed the diaper.  The mother started fixing a bottle.

16      The father and his sister, the baby's aunt, took her

17 outside to try to calm her down.  While they were walking out

18 there, she sort of acted strange and arched back and became

19 unresponsive.

20      The grandmother is a nurse.  They rushed inside.

21 They called 911.  The grandmother immediately started CPR, and

22 then they called -- and the paramedics soon arrived.  When

23 they got there, she was not responsive.  I can't remember if

24 she had a heart rate or not.

25 Q    Was this child taken to the hospital?

Lantz - direct

1   A    She was transported directly to our medical center, yes.

2   Q    When you say "our medical center," what do you mean?

3   A    That's Wake Forest Baptist Medical Center in

4   Winston-Salem.

5   Q    Now, can you explain the course of action that was taken

6   in the hospital?

7   A    After she got into the hospital, she was successfully

8   resuscitated and then immediately had a CT scan which showed a

9   large amount of hemorrhage at the bottom of her brain which

10  was interpreted as most likely due to an aneurysm, a tumor, or

11  a blood vessel malformation.

12       The radiologist actually indicated that it was sort

13  of diffuse, and he could not rule out nonaccidental trauma.

14  So a child abuse protocol was started at that point.

15  Q    Can you explain briefly the child abuse protocol?

16  A    The child abuse protocol is a set procedure at our medical

17  center where certain things are started.  There will be a

18  skeletal survey, and there is also a protective order saying

19  that there has to be either a security guard or someone at the

20  bedside next to the baby during this time period because, if

21  it is child abuse, they don't want someone in and try to

22  injure the child again.

23       After the skeletal survey was read, the child abuse

24  protocol was actually canceled even though the skeletal survey

25  showed two remote healing rib fractures.

Lantz - direct

1  Q    Do you know why the child abuse protocol was canceled?

2  A    According to the record, the pediatrician, who is the

3  child abuse expert, looked at the x-rays with the radiologist,

4  looked at the CT scans, and decided that this was most

5  likely -- the bleeding was from an aneurysm, a tumor, or a

6  vascular malformation and didn't think that there was child

7  abuse involved, so it was canceled.

8         However, the ophthalmology consultation was not

9  canceled inadvertently.

10 Q    Now, can you explain what occurred at the ophthalmology

11 consult?

12 A    The ophthalmology resident, who's a third year

13 ophthalmology resident, saw the girl at, I believe, 5:30 or

14 5:40 in the afternoon.  It was about 20 hours after the -- or

15 22 hours after the 911 call.  He documented that there were

16 severe rental hemorrhages in the left eye.  They just

17 completely covered the back of the eye.  There was a retinal

18 fold and retinoschisis.  And the right eye had no retinal

19 hemorrhages whatsoever.  And this was 22 and a half hours

20 after the 911 call, and he actually took pictures of both eyes

21 at that time.

22         The baby had already had one clinical brain death

23 examination by the clinicians, indicating that the baby's

24 brain was not functioning.  A cerebral blood flow study to see

25 if there was any blood flow going to the brain was done.  That

1    was at 4:48, and they said there was no blood flow going to

2    the brain whatsoever.  So the brain was clinically dead.

3            Twenty minutes after he did his examination, they did

4    a second clinical examination, and 44 minutes later they

5    pronounced her clinically brain dead, and the parents had

6    graciously agreed to organ donation.  So the organs were

7    actually -- over the next day and a half were given to other

8    little children so they could live.

9    Q   Let me stop you briefly there and go back to this slide

10   from your PowerPoint.  Can you explain what this slide

11   indicates?

12   A   This is the dilated clinical fundal examination that was

13   done on the baby, the two-month-old baby.  This was at

14   5:40 p.m. after the baby had been admitted to the hospital,

15   from the night before.  So this is almost 24 hours.  I believe

16   it's 22 or 22 and a half hours after the 911 call.

17           The OS on the right-hand side is for the left eye.

18   There's massive retinal hemorrhages.  The darker glob of red

19   in the middle is actually -- if you look very carefully, there

20   is actually a fold all the way around it.  That's a

21   perimacular fold.

22   Q   Would you mind standing up and pointing, please?

23           THE COURT:  I see what you are talking about.

24           MR. RUFO:  Okay.

25           THE WITNESS:  Then the center part just has a lot of

Lantz - direct

1  hemorrhage, and you can tell by the hemorrhage that there's

2  actually something called retinoschisis, or splitting of the

3  layers, to get that.

4       Now, the right eye shows --

5       THE COURT:  So the splitting is the splitting of the

6  layers of the retina.

7       THE WITNESS:  The layers, right.  There's like 10

8  different layers.

9       THE COURT:  I heard that yesterday.

10      THE WITNESS:  Like a tablet of paper, yes.

11      The right eye has no retinal hemorrhages whatsoever.

12  And actually the pediatrician had looked earlier in the day,

13  and he said he saw some retinal hemorrhages in the left, did

14  not see any in the right whatsoever, and that was documented

15  by these ret cam images after the baby has a negative cerebral

16  blood flow study.

17      THE COURT:  So, again, what is on the left there is

18  the right eye, and the right is the left eye.

19      THE WITNESS:  Right.  When a doctor examines

20  someone --

21      THE COURT:  They're looking at it.

22      THE WITNESS:  They're looking at it, right.

23      THE COURT:  I get it, right.

24      THE WITNESS:  And the OD stands for right.  OS stands

25  for left.

Lantz - direct

1      THE COURT:  D is dexter and that's --

2      THE WITNESS:  Sinister, right, yes.

3    BY MR. RUFO:

4    Q    Now, looking at what is left on the PowerPoint in the

5    child's right eye, is this a picture of a healthy eye or an

6    eye without retinal hemorrhages?

7    A    It's an eye without retinal hemorrhages.  Obviously, it's

8    not real healthy because the baby is almost -- it is

9    clinically brain dead at this point.

10   Q    Can you explain what that shadowy area is in the middle of

11   the child's right eye?

12   A    The darker area that looks sort of orangish is -- if you

13   see the blood vessels, it sort of looks like spider legs, and

14   the big spider legs are coming down towards 6:00 o'clock and

15   going over towards 8:00 o'clock.  Right in the middle is the

16   area called the macula, which is the light sensitive area that

17   we typically see with, especially color.

18   Q    Is that normally seen in ret cam images?

19   A    Yes, if -- this is a fairly normal looking eye from a ret

20   cam.  There's no hemorrhages.  No other abnormalities are

21   obvious.

22   Q    Can you see the macula on the child's left eye on the

23   right side of the PowerPoint?

24   A    The macula is actually covered by the hemorrhage, by the

25   hemorrhage contained within the perimacular folds.

1  Q   Can you explain what we're seeing here on this slide

2  labeled Retinal Hemorrhages, in parentheses, (PMIO 5/26/12 at

3  23:45)?

4  A   These are the baby's eyes.  I came in after the organ

5  donation coordinator -- I asked to be called when they

6  finished recovering the organs so I could come in and examine

7  the eyes.  They got done late in the evening.  So I came in

8  around 11:30 at night to look at the eyes.

9         I was pretty sure that there were going to be

10 hemorrhages in the left eye because I could see them on the CT

11 scan.  There was so much hemorrhage.  But I came in and took

12 the pictures.

13        THE COURT:  What dogs the PMIO stand for again?

14        THE WITNESS:  PMIO stands for postmortem monocular

15 indirect ophthalmoscopy.

16        THE COURT:  Well, I have seen a picture of an

17 indirect ophthalmoscopy.

18        THE WITNESS:  Yes.  The indirect that the clinicians

19 do, they have this big head thing.

20        THE COURT:  Headset, right.

21        THE WITNESS:  They cost anywhere from 1,200 to 2,500

22 bucks.

23        THE COURT:  You do it differently postmortem.

24        THE WITNESS:  I do it differently because it's

25 cheaper.  The little light I can use costs 50 bucks.  It's not

Lantz - direct

1    quite as fancy as what they do.  It doesn't have all the bells
2    and whistles, but it can still take --
3           Now, this was not taken with that.  I actually have a
4    fundal camera that takes these pictures.  And what this is is
5    actually when they're shining the light through that lens,
6    then the image is actually projected above the surface of the
7    lens.  It's floating out in space here.  You can actually take
8    a picture of it, and that's what these are.
9    BY MR. RUFO:
10   Q   Can you explain what we can see on the child's left eye,
11   the right of the PowerPoint?
12   A   The left eye, the OS, has the indirect lens.  It has all
13   the red, the orange, the red globs, which are the hemorrhages.
14          At the very top running across, there's sort of a
15   squiggly white elevated area.  That's the edge of the retinal
16   fold, and the rest of it is solid hemorrhage.  You can't
17   actually see individual hemorrhages because it's almost like,
18   instead of using a small little brush, painting little dots.
19   Someone took a big brush and just completely covered the
20   entire back of the eye with red.
21   Q   Can you explain what we can see in the child's right eye,
22   the PowerPoint's left picture?
23   A   The right eye that says OD, there's a little tan circular
24   above 7:00 o'clock.  That's the optic nerve coming in.  And
25   then there are the splotches of blood.

1        Directly above the optic nerve at 12:00 o'clock about

2   three-quarters of the way up, there's a little dot, and that's

3   the center of the macula.  That's the fovea.  And then all the

4   other -- there's these, some flame-shaped or splinter retinal

5   hemorrhages.  There's some dot and blot.  The one at about

6   10:00-11:00 o'clock actually has a little bit of a retinal

7   fold around it, and those are preretinal or subinternal

8   limiting membrane retinal hemorrhages.

9        And at this point when I took these pictures, I had

10  not actually seen the ophthalmology report.  I didn't know

11  what it said.

12  Q   Can you explain what is seen in this slide labeled Retinal

13  Hemorrhages Perimacular Retinal Fold, in parentheses (OS)

14  Circinate Retinal Folds, in parentheses (OD) 5/30/12"?

15  A   These are the eyeballs.  After I did the autopsy May 28th,

16  the eyeballs were taken out, put in formaldehyde for two days,

17  and then I actually took sections of them.  And the way I do

18  it, I cut off the front of the eye, and then I can look

19  directly into the back of the eye, just like the

20  ophthalmologist does.

21       So on the left-hand side, the OS, you can see the

22  perimacular fold is that retinal elevation going over the back

23  of the eye.  There is very dense hemorrhage in the middle of

24  the eye, some vitreous hemorrhage which is hemorrhage into the

25  gel within the eye.  And completely covering the eye all the

1   way out to the front is diffuse retinal hemorrhages.

2           On the OD, on the left-hand side of the screen, which

3   is the right eye, it shows the retinal hemorrhages in the back

4   of that eye.  And this was after -- you know, at the time of

5   the autopsy two days later.  And these have been fixed in

6   formaldehyde section and then photographed.

7   Q    What we are seeing on this slide is retinal hemorrhage

8   progression with circinate retinal folds, in parentheses, (OD)

9   ret cam images 5/25/12 at 17:40, and PM ocular images --

10  A    Yes.

11  Q    What are we seeing in the top left corner?

12  A    The top left corner labeled OD is the ret cam image taken

13  by the ophthalmology resident on May 25th, 2012, at 17:40, or

14  it would be 5:40 in the evening.

15  Q    How about in the top right corner?

16  A    The top right corner is the ret cam image taken of the

17  left eye that we previously saw.

18  Q    Can you explain what we're seeing in the lower left

19  corner?

20  A    The lower left corner labeled OD, that is the back of the

21  right eye after it has been fixed in formaldehyde, and the

22  front part is taken off to show the retinal hemorrhages and

23  the types of the retinal hemorrhages that are characterized.

24  Q    And how about in the lower right corner?

25  A    In the lower right corner, again, is the left eye that has

Lantz - direct

1    had the front removed, again, looking into the back of the

2    eye, showing the extensive retinal hemorrhages on the left

3    with a perimacular fold.

4    Q   Are you aware of how soon after the ret cam images were

5    taken on 5/25/2012 at 5:40 the child passed away?

6    A   The next clinical brain death examination, according to

7    the medical record, was done at 18:00 hours, or 6:00 p.m., and

8    the baby was pronounced dead at 6:24 p.m., which was

9    44 minutes after the ret cam images were taken.

10   Q   Is it fair to say from these pictures that the retinal

11   hemorrhages we see in the lower left corner occurred sometime

12   between 5:40 and the child's death or when these pictures were

13   taken?

14   A   They happened after 5:40 on 5/25/12 and sometime before

15   when I saw the baby on the 23rd -- or 23:45.  Well, the night

16   before on the weekend.

17   Q   Now, is there any indication that the child suffered any

18   trauma in this case?

19   A   No, there was no trauma.

20   Q   Bad question.

21          Was there any indication that before this child came

22   to the hospital, it had experienced any trauma?

23   A   Not to her head, no.

24   Q   Was child abuse ruled out as a cause of this child's

25   injuries?

Lantz - direct

1    A    Yes.

2    Q    What was the ultimate cause of this child's death?

3    A    The child died due to massive brain swelling due to

4    intracranial hemorrhage from what is called a ruptured

5    arteriovenous malformation.  Arterio, a-r-t-e-r-i-o, venous,

6    v-e-n-o-u-s.

7    Q    Can you explain --

8            THE COURT:  Massive brain swelling due to ruptured?

9            THE WITNESS:  Arteriovenous malformation or vascular

10   -- blood vessel malformation.

11           THE COURT:  Got it.

12   BY MR. RUFO:

13   Q    That condition is nontraumatic in nature?

14   A    That is correct.

15   Q    Was there any indication that following the ret cam images

16   on May 25th, 2012, at 5:40, this child suffered any sort of

17   trauma in the hospital?

18   A    No.

19   Q    Now, have you submitted an abstract with regard to this

20   presentation you're going to give?

21   A    Yes.

22   Q    I'm going to hand you what I've labeled Petitioner's

23   Exhibit Lantz Nontraumatic Retinal Hemorrhages Abstract.

24           (Brief interruption.)

25           THE COURT:  Thanks.

1    BY MR. RUFO:

2    Q    Dr. Lantz, is the exhibit you have in front of you,

3    Petitioner's Exhibit Lantz Nontraumatic Retinal Hemorrhages

4    Abstract, the abstract that correlates to this PowerPoint

5    presentation?

6    A    Yes.

7    Q    And has it been submitted for acceptance?

8    A    The abstract has, yes; the PowerPoint has not been sent in

9    yet.

10   Q    Has the abstract been reviewed?

11   A    Yes.

12   Q    Has it been accepted?

13   A    Yes.

14   Q    And you will give this presentation?

15   A    As far as I know, yes.

16   Q    Well, are you familiar with Dr. Emily Flaherty's testimony

17   at the trial in this matter?

18   A    Yes.

19   Q    Are you aware that Dr. Emily Flaherty testified that when

20   you see hemorrhages to the ora serrata, as in Isabella's case,

21   those kinds of extensive hemorrhages are only caused by these

22   acceleration and deceleration forces or seen in shaken baby

23   syndrome?

24   A    Yes, I am aware of the statement.

25   Q    Do you agree with that statement?

Lantz - direct

1   A    No.

2   Q    Can you explain why not?

3   A    Because it's not true.

4   Q    Can you explain what is incorrect about it?

5   A    Because retinal hemorrhages going to the ora serrata can

6   be seen -- be associated with other conditions besides

7   acceleration and deceleration or shaken baby syndrome.

8   Q    And those are the conditions we discussed previously?

9   A    Yes.

10  Q    And as seen in this PowerPoint?

11  A    Yes.

12  Q    And in the abstract regarding resuscitation efforts?

13  A    Yes.

14  Q    Now, do you know if Isabella Zielinski's eyes were

15  examined or removed during the autopsy in this case?

16  A    According to the autopsy report, they were not.

17  Q    Now, based on your review of the medical records, can you

18  explain how Isabella presented to the hospital both in 12 --

19  or December of 2002 and November of 2003?

20  A    The presentations were similar, that she was found not

21  breathing.  CPR was started.  And when the paramedics arrived,

22  I believe in both cases she did not have a heartbeat, and

23  through resuscitating efforts, a heart rate was restored,

24  obviously the first time much longer.

25          I think the second time, November 8th, 2003, she

Lantz - direct

1  survived after her heart got started for a little over a day.

2  Q    Now, are you aware that Dr. Harkey, the coroner in this

3  case, testified that he did not --

4            THE COURT:  Spell that for me, if you would.

5            MR. RUFO:  H-a-r-k-e-y, Judge.

6            THE COURT:  Thanks.

7  BY MR. RUFO:

8  Q    Dr. Harkey testified that he did not remove the eyes

9  during the autopsy?

10  A    Yes, I am aware of that.

11  Q    Are you aware that he testified that at the time that, "I

12  did the autopsy, there was no allegation of a recurrence of

13  trauma and so I did not remove the eyes"?

14  A    Yes, I am aware of that, too.

15  Q    Now, do you routinely review eyes when you perform

16  autopsies?

17  A    In children I look at all the eyes, and adults, who die

18  suddenly unexpectedly, and in other cases, also gunshot wounds

19  of the head because you will see them there, mainly .22

20  calibers that don't exit for some reason.

21  Q    Are you aware that eyes are not routinely examined during

22  autopsies in every case regarding -- unless there's an

23  indication of trauma?

24            MR. TELISMAN:  I will object to foundation.

25            MR. RUFO:  I will move on.

```
 1            THE COURT:  Okay.
 2   BY MR. RUFO:
 3   Q    Do you think there is anything about the retinal
 4   hemorrhages seen in Isabella Zielinski that are specific to
 5   shaken baby syndrome, motor vehicle accidents, long falls or
 6   crush injuries?
 7   A    No.
 8   Q    Do you believe that retinal hemorrhages by themselves can
 9   indicate abuse?
10   A    No.
11            THE COURT:  Say that again.
12   BY MR. RUFO:
13   Q    Do you --
14            THE COURT:  Retinal hemorrhages by themselves, can
15   they indicate abuse, okay.
16   BY MR. RUFO:
17   Q    Do you believe that retinal hemorrhages by themselves can
18   indicate trauma?
19   A    No.
20            MR. RUFO:  One second, Judge.
21            THE COURT:  Yes.
22        (Brief interruption.)
23   BY MR. RUFO:
24   Q    Do you believe that retinal hemorrhages extending to the
25   ora serrata can indicate trauma by themselves?
```

Lantz - cross

1   A   Not just by themselves, no.

2   Q   Is that because retinal hemorrhages extending to the ora

3   serrata have been documented in instances other than trauma?

4   A   That is correct.

5           MR. RUFO:  Nothing further.

6           THE COURT:  Cross.

7                   CROSS EXAMINATION

8   BY MR. TELISMAN:

9   Q   Good morning, Dr. Lantz.

10  A   Good morning.

11  Q   Dr. Lantz, you're a pathologist, correct?

12  A   That is correct.

13  Q   You're not an ophthalmologist, right?

14  A   That is correct.

15  Q   Your residence was in pathology and not ophthalmology,

16  correct?

17  A   That is correct.

18  Q   Your fellowship was in pathology, correct?

19  A   And forensic pathology.

20  Q   And forensic pathology.  Was it in ocular pathology?

21  A   No.

22  Q   Was it in ophthalmology or pediatric ophthalmology?

23  A   No.

24  Q   Are you board certified in ophthalmology?

25  A   No.

Lantz - cross

1  Q   All of your employment as a doctor has been in the field
2  of pathology, is that right?
3  A   That's right.
4  Q   Not in ophthalmology?
5  A   That is correct.
6  Q   You have taught in your career; it's reflected in your CV,
7  right?
8  A   Yes.
9  Q   And you have taught subjects including pathology,
10 pulmonary pathology, and I think even one course in
11 otolaryngology, is that right?
12 A   I was cross-appointed to otolaryngology.  I did some work
13 for them.  I actually did not teach in their department.
14 Q   And otolaryngology is ear, nose and throat?
15 A   Correct.
16 Q   But you have not taught anything about ophthalmology,
17 right?
18 A   Other than giving lectures on retinal hemorrhages seen at
19 the time of autopsy.
20 Q   Okay.  And your practice does not involve examining the
21 eyes of living children, correct?
22 A   That's correct.  Everyone I've examined have been dead.
23 Q   Dr. Lantz, in forming your opinions in this case, did you
24 try to rely on the most accurate information?
25 A   I relied on the information that I had at hand.  So I took

1    that for what it was.

2            As you can see, my opinion actually changed when I

3    was informed about the scleral depression.

4    Q    Right.

5            And the information that you received and that you

6    relied on was you received a medical record review from Dr.

7    Teas, is that correct?

8    A    Yes.

9    Q    And that was --

10           And in addition to that then, you also received Dr.

11   Prange's report, is that right?

12   A    Yes.

13   Q    And Dr. Flaherty's report and her trial testimony?

14   A    Yes.

15   Q    Retinal images from this case?

16   A    Yes.

17   Q    That's the ret cam photos?

18   A    Yes.

19   Q    And eye consultation reports, right?

20   A    Yes.

21   Q    And as you found out later, that was the typed eye

22   consultation reports?

23   A    Correct.  I didn't see the handwritten ones until sometime

24   later.

25   Q    Okay.  And you didn't review any other medical records,

Lantz - cross

1    correct?

2    A    Not at the time of the report, no.

3          Subsequently I have been sent a lot more material,

4    and I've reviewed it since then.

5    Q    Okay.  The materials that you have since reviewed, were

6    those all of the medical records in this case or were those

7    only the handwritten notes, the charts, from the University of

8    Illinois at Chicago Hospital?

9    A    That I don't know.  I have had what's called medical

10   records which were scanned copies of medical records.  But I'm

11   not sure if they were all the handwritten ones or not.  I

12   can't verify that.  It was just sent to me on a CD to look at.

13   Q    Was it more than a thousand pages?

14   A    They were in different folders and I did not count them.

15   Q    Okay.  But in writing your first report, you relied on Dr.

16   Teas to provide an accurate summary of the medical records,

17   correct?

18   A    Yes.

19   Q    And a thorough summary?

20   A    It seemed thorough to me.  I was asked to really address

21   the statement of Dr. Flaherty about the specificity of the

22   retinal hemorrhages.

23   Q    Did you consider it to be an objective summary?

24   A    Dr. Teas' report?

25   Q    Yes.

Lantz - cross

1    A    Yes.

2              MR. TELISMAN:  Your Honor, may I approach?

3              THE COURT:  Yes.

4              MR. TELISMAN:  Thank you.

5              THE COURT:  You don't have to ask.  I will keep

6    telling you that 'til you remember.

7              MR. TELISMAN:  I'm sorry, Judge.

8              THE COURT:  You don't have to apologize.  You're

9    being overly polite is all.  That's not a deficiency.

10   BY MR. TELISMAN:

11   Q    Dr. Lantz, at this point I would like you to turn to the

12   first exhibit there which I believe is marked as Respondent's

13   Exhibit 53.

14   A    Yes.

15   Q    Is that Dr. Teas' medical record review that you

16   referenced in your report?

17   A    Yes, it was.  It is dated August 27th, 2012, yes.

18   Q    What was the date of your first report?

19   A    The date of my first report, I believe, was -- let me

20   check here.  I think it was the 29th of August, 2012.

21   Q    So this was written before you authored your report,

22   correct?

23   A    Yes.  This is what Dr. Teas supplied to me.

24   Q    Could you please turn to page 10 of that exhibit?

25              On page 10 Dr. Teas includes a section about

Lantz - cross

1  Isabella's retinal hemorrhages, correct?

2  A   Yes.

3  Q   She had already reached conclusions about the retinal

4  hemorrhages before you authored your report, correct?

5          THE COURT:  Which page are you on?

6          MR. TELISMAN:  Page 10.

7          THE COURT:  I'm sorry?

8          MR. TELISMAN:  10.

9          THE COURT:  10.

10 BY THE WITNESS:

11 A   There are some conclusions there, yes.

12 BY MR. TELISMAN:

13 Q   Could you please turn to the last page of the exhibit?

14        Do you see a section there entitled Summary and

15 Conclusion?

16 A   Yes.

17 Q   Could you please read the last sentence out loud?

18 A   The very last sentence:

19        "There is no medical, radiologic or pathologic

20 evidence that Isabella was subjected to any trauma on

21 12/27/2002."

22 Q   So Dr. Teas had already concluded that Isabella was not

23 subjected to trauma before you authored your report, correct?

24 A   According to this, this was what she had provided me, yes.

25 Q   And you were given Dr. Teas' conclusions about retinal --

Lantz - cross

1    pardon me -- retinal hemorrhages in the cause of Isabella's

2    collapse as part of the materials that you were going to

3    consider, correct?

4    A    Yes.

5    Q    Dr. Lantz, not all retinal hemorrhages are alike, correct?

6    A    That's correct.

7    Q    They can vary in number?

8    A    Yes.

9    Q    And in distribution?

10   A    Yes.

11   Q    And as you talked a little bit about on direct

12   examination, they can be caused by different things, correct?

13   A    Correct.

14   Q    And the number and distribution of the retinal hemorrhages

15   can help determine what caused them; is that fair to say?

16   A    Some people believe so, but it's sort of like reading tea

17   leaves.

18   Q    Let me ask it this way.  Do you believe that the number

19   and distribution of retinal hemorrhages give any indication as

20   to the likelihood of one possible cause as opposed to another?

21   A    No.

22   Q    Not at all?

23   A    No.

24   Q    Now, in your report and in your supplement, do you give

25   any indication as to the number of retinal hemorrhages that

Lantz - cross

1    Isabella Zielinski had in her eyes?

2    A    Quoting from their ophthalmology report on the 28th:

3            "It showed bilateral, preretinal, intraretinal

4    vitreol hemorrhage."

5            And then the last:

6            "The number, type and distribution of retinal

7    hemorrhages seen in Isabella Zielinski can occur not only in

8    traumatic brain injuries, but also have been observed in

9    infections, spontaneous intracranial bleeding and following

10   resuscitation efforts in infants."

11   Q    So when you --

12           Well, first off, does your report indicate the number

13   of retinal hemorrhages?

14   A    Not the number, no, based on this report.

15   Q    Now, as part of the ophthalmologist's protocol in looking

16   into a subject's eyes, a patient's eyes, for possible retinal

17   hemorrhages, part of the protocol is to identify the number of

18   retinal hemorrhages, correct?

19   A    Yes.

20   Q    And part of the protocol is to identify the type of

21   retinal hemorrhages, correct?

22   A    Yes.

23   Q    And the distribution?

24   A    Yes.

25   Q    Okay.  And you say that the number and distribution of

Lantz - cross

1  retinal hemorrhages provide no insight whatsoever into trying
2  to determine what caused them, correct?
3  A    That's correct.
4  Q    And nothing could possibly be ruled out, no possible cause
5  could be ruled out based upon the number or distribution of
6  retinal hemorrhages?
7  A    I'm not really sure if I understand your question.
8  Q    What I'm saying is you're saying that the number and
9  distribution of retinal hemorrhages provide no assistance, no
10  diagnostic value in determining a diagnosis?
11  A    In and of themselves, no.
12  Q    But in context with other findings, do the number and
13  distribution of retinal hemorrhages provide additional
14  information to help clinicians come up with a diagnosis?
15  A    They provide additional information, but they're not going
16  to tell you exactly what happened.
17  Q    And that was -- but that's not what my question was.
18        THE COURT:  Actually I thought it was exactly what
19  your question was.  So maybe you need to redo your question.
20        MR. TELISMAN:  My apologies.
21  BY MR. TELISMAN:
22  Q    Dr. Lantz, we all agree that -- let me ask you it this
23  way.  Pardon me.
24        In coming up with a diagnosis, doctors rely on many
25  different types of information, correct?

Lantz - cross

1   A    Yes.

2   Q    And looking at different tests and observations, correct?

3   A    Right.

4   Q    And in and of themselves, one piece of information may not

5   completely reveal the full picture of what's going on with the

6   patient, correct?

7   A    Correct.

8   Q    But in context it can provide valuable information about

9   how to diagnose a patient?

10  A    It can, but the problem with retinal hemorrhages is people

11  tend to look for retinal hemorrhages when they suspect abuse.

12  They don't look if they don't suspect abuse, and that's the

13  big problem.

14  Q    So, again, my question is:  With respect to the number and

15  distribution of retinal hemorrhages, is it your belief that

16  they provide no value whatsoever in diagnosing a patient?

17          THE COURT:  When you say "diagnosing," do you mean

18  determining the cause of the retinal hemorrhages?

19          MR. TELISMAN:  Yes.

20          THE COURT:  Because the term "diagnosing" to me is

21  vague.  So do you mean do the number and the distribution of

22  retinal hemorrhages provide any guidance or assistance in

23  determining what caused the retinal hemorrhages?  That's

24  basically your question.

25          MR. TELISMAN:  Yes, or -- yes, or what's wrong with

1    the patient.

2              THE COURT:  Well, what's wrong with the patient, they

3    have retinal hemorrhages.  That's the problem with your

4    question, you see.

5              MR. TELISMAN:  Okay.  I will rephrase.

6              THE COURT:  It's not helping me, I just know that.

7              MR. TELISMAN:  Thank you, your Honor.

8    BY MR. TELISMAN:

9    Q   Dr. Lantz, are you saying that the number and distribution

10   of retinal hemorrhages provide no value in determining what

11   caused the retinal hemorrhages?

12   A   They don't.  I mean, if you want, you need to --

13             THE COURT:  You answered the question.  "They don't"

14   is the answer.  If Mr. Rufo wants to get more, he'll get it on

15   redirect.

16   BY MR. TELISMAN:

17   Q   If that is the case, then there is no need for

18   ophthalmologists to describe the distribution and number of

19   the retinal hemorrhages?

20   A   Not to figure out what happened, that's correct.  They

21   don't do it in adults.

22   Q   I'm sorry.  I didn't catch the end of that.

23   A   They don't do it in adults to see what type of head trauma

24   they have.

25   Q   Now, Dr. Lantz, when you first wrote -- when you wrote

Lantz - cross

1  your first report, you did not believe that Isabella

2  Zielinski's retinal hemorrhages extended to her ora serrata,

3  correct?

4  A   It was not documented in the records that I had, that's

5  correct.

6  Q   And you mentioned it in your report essentially to --

7         Well, why did you put it in your report?

8  A   I put it in the report because the only way to see the ora

9  serrata clinically with indirect, you have to do scleral

10  depression.  And unless someone says they actually did scleral

11  depression, you can't see the ora serrata, and there was no

12  mention in the documents I had that that was actually

13  performed.

14  Q   And in the larger scheme of things, why did you -- why did

15  you reflect, or why did you document that in your report?

16  A   Because if no one did scleral depression, it's inaccurate

17  to say you could see to the ora serrata.

18  Q   But in light of what you had just said about that not

19  providing any additional diagnostic value or any value as to

20  the cause of what happened to Isabella, why did you include it

21  in your report?

22  A   Because unless they document the scleral depression, you

23  can't see the ora serrata.

24  Q   Now, so at the time that you wrote that first report, you

25  did not think that they had performed scleral depression?

1  A    That's correct.

2  Q    And, in fact, based upon the subsequent records that you

3  received, you found out that they did, correct?

4  A    That's correct.

5  Q    And they found extensive round intraretinal hemorrhages

6  OU; that means both eyes, correct?

7  A    Yes.

8  Q    Greatest in the posterior poles extending to ora OU,

9  correct?

10 A    Correct.

11 Q    Now, in your supplement, you wrote:

12        "As I mentioned to Dr. Teas at the time, it appeared

13 that certain records related to the ophthalmology exam were,

14 however, missing."

15        Is that right?

16 A    Yes.

17 Q    So you knew that you didn't have all of the information

18 about what Isabella's treating ophthalmologist did and what

19 they saw, correct?

20 A    Correct.

21 Q    And even though you knew that you were missing some

22 ophthalmology records and didn't have all the information when

23 you wrote your initial report, you still criticized Dr.

24 Flaherty for testifying that Isabella's retinal hemorrhages

25 extended out to her oras, correct?

1    A    Yes.

2    Q    And it turns out that Dr. Flaherty was correct about that,

3    right?

4    A    They did, that's correct.

5    Q    But in your initial report, you didn't put that down, that

6    it's possible that Dr. Flaherty was, in fact, correct and that

7    you didn't know because you didn't have all the records?

8    A    That's correct.

9    Q    Instead, you criticized her?

10   A    Yes.

11   Q    Now, in your report you said that the number, type and

12   distributions of Isabella's retinal hemorrhages have also been

13   observed in infection, spontaneous intracranial bleeding and

14   following resuscitation efforts in infants, correct?

15   A    Yes.

16   Q    You did not, however, write in your report that retinal

17   hemorrhages like Isabella's have been observed in cortical

18   venous thrombosis, correct?

19   A    That is not in my report, no.

20   Q    You did not write in your reports that Isabella's --

21   retinal hemorrhages like Isabella's have been observed in

22   seizures, did you?

23   A    No.

24   Q    You didn't include those things in your second report

25   either, correct?

Lantz - cross

1    A    That's correct.

2    Q    And at the time that you wrote both reports, you had Dr.

3    Teas' medical summary, right?

4    A    Yes.

5    Q    And in the medical summary, she postulated that Isabella

6    had cortical venous thrombosis, right?

7    A    That's correct.

8    Q    And she postulated that Isabella had seizures, correct?

9    A    That's correct.

10   Q    Now, to support your conclusion about the number, type and

11   distribution of Isabella's retinal hemorrhages also being

12   observed in infection, spontaneous intracranial bleeding and

13   following resuscitation efforts, you cite to three references,

14   correct?

15   A    Correct.

16   Q    And those are the only three references that you cite in

17   your report?

18   A    Yes.

19   Q    And you were the author of all three references?

20   A    Yes.

21   Q    Now, two of your three references are abstracts of

22   presentations that you have given in the past at a conference,

23   correct?

24   A    Correct.

25   Q    And they both begin:

Lantz - cross

1           "After attending this presentation, attendees will

2       learn how," and then you explain something, right?

3       A    Yes.

4       Q    The other reference is the one that you gave the

5       presentation here for, the PowerPoint for?  It's the

6       presentation you're going to give in February?

7       A    Correct.

8       Q    And these are not empirical studies, correct?

9       A    Would you explain empirical?

10      Q    Sure.  If it's a bad question, I'm sorry.

11           These are more anecdotal in nature, correct?

12      A    They're case reports or case series.

13      Q    And the abstracts discuss retinal hemorrhages in infants

14      who were apparently not subjected to any sort of abusive

15      trauma, correct?

16      A    That's correct.

17      Q    And the abstracts discuss a total of 12 cases, right?

18      A    I believe there was -- actually for the resuscitation,

19      when it came time to do the presentation, there were 11 that

20      were included.  There were 10 in the abstract, but at the

21      presentation, there were 11.

22      Q    So there were a total of 13?

23      A    Total between the two individual case reports and the

24      series, yes.

25      Q    How many autopsies have you performed in your career?

Lantz - cross

1    A    Probably between 3- and 4,000.

2    Q    How many on infants?

3    A    On infants, probably well over 500, maybe more than that.

4    Q    And you cite to 12 cases here, 12 instances, where retinal

5    hemorrhages were caused by something other than abusive head

6    trauma, right?

7    A    That's just these cases.  I mean --

8    Q    Or 13?

9    A    -- there's a lot of other cases.

10   Q    Of these 13 instances, one involved the child with the

11   PowerPoint presentation that you just presented, which was

12   she -- he or she had an arteriovenous malformation of the

13   choroid plexus adjacent to the hippocampus?

14   A    Yes.

15   Q    So essentially she had like a birth defect in part of her

16   brain?

17   A    Yes.  It was a blood vessel malformation that ruptured and

18   bled.

19   Q    And one of your three abstracts dealt exclusively with

20   this child, correct?

21   A    That is correct.

22   Q    Now, Isabella Zielinski did not have an arterial

23   malformation of the choroid plexus, correct?

24   A    Correct, not according to the autopsy report or the

25   examination of the brain.

1  Q   And the child who you did the abstract on, that you're

2  going to give the presentation on, she had retinal hemorrhages

3  in only one eye, correct?

4  A   She had them in both.

5  Q   I'm sorry.  I thought that it reflected that retinal

6  hemorrhages were only in one eye.  It was both?

7  A   With the vascular malformation?

8  Q   Okay.

9  A   At the time of the autopsy, she had retinal hemorrhages in

10  both eyes.

11  Q   Oh, initially at the time of her collapse, she only had

12  one?

13  A   Right.

14  Q   Okay.

15  A   Well, at the time -- at the time they did the

16  ophthalmology exam, she just had them in one.  They arose

17  after she was in the hospital in the other eye.

18  Q   And that child had progressive anemia?

19  A   There was anemia, yes.

20  Q   And low platelets, correct?

21  A   Yes.

22  Q   And she had a clotting deficiency?

23  A   She was -- a deficiency due to the low platelets, yes.

24  Q   And that's not what Isabella had, correct?

25  A   You mean the low platelets?

Lantz - cross

1   Q    Right.

2   A    I don't believe she had low.  I think she had high

3   platelets, if I remember.

4   Q    Now, another of your abstracts dealt exclusively with a

5   child who had lymphocytic meningoencephalitis, correct?

6   A    Yes.

7   Q    And Isabella Zielinski did not have lymphocytic

8   meningoencephalitis, did she?

9   A    I don't believe so, no.

10  Q    And that child that was discussed in your abstract had

11  extensive retinal hemorrhages in only one eye, correct?

12  A    Correct.

13  Q    And Isabella had extensive retinal hemorrhage in both

14  eyes, correct?

15  A    Yes.

16  Q    Finally, you had an abstract involving 10 -- well, it may

17  have been 11, 11 cases of children, and it was described as

18  sudden unexplained infant deaths that had retinal hemorrhages

19  following resuscitation efforts, but no evidence of head

20  trauma, right?

21  A    Correct.

22  Q    And three of these 10 cases, or 11 cases, I guess -- well,

23  of the 10 that were the abstract, three of them had

24  resuscitation -- pardon me -- resuscitation related rib

25  fractures, correct?

Lantz - cross

1   A    Correct.

2   Q    And that's indicative of the amount of force that was used

3   in resuscitating the infant, correct?

4   A    It can be, yes, or the method that is used.

5   Q    Isabella did not have resuscitation related rib fractures,

6   correct?

7   A    I don't believe so, no.

8   Q    You don't know the amount of force that was used to

9   resuscitate Isabella, correct?

10  A    That's correct.

11  Q    Four of the 10 cases in your abstract had diffuse systemic

12  ischemic and reperfusion injuries affecting the kidneys,

13  adrenal glands, liver, myocardium, intestines, lungs and

14  brain, is that correct?

15  A    Yes.

16  Q    And Isabella did not have diffuse systemic ischemic and

17  reperfusion injuries to these organs, did she?

18  A    I believe she had it to the brain, but I don't believe to

19  the other organs, as far as I can tell anyway.

20  Q    And some of the 10 cases that are in your abstract had

21  very few retinal hemorrhages, correct?

22  A    Correct.

23  Q    And one case even had only one, a single superficial

24  retinal hemorrhage in one eye, correct?

25  A    Right.

Lantz - cross

1    Q    Now, nothing you cite discusses the likelihood of finding
2    retinal hemorrhages in infants who were given these
3    resuscitation efforts, correct?
4    A    Would you rephrase that?  I'm not sure what you're --
5    Q    Sure.
6            THE COURT:  He's asking if you have ever studied what
7    the likelihood is of getting retinal hemorrhages from this
8    sort of resuscitation.  That's basically it, right?
9            THE WITNESS:  Not the incidence or actually what
10   causes them, no.
11   BY MR. TELISMAN:
12   Q    So you don't cite anything that says that retinal
13   hemorrhages can occur in 2 percent or 1 percent of all cases
14   where resuscitation efforts are performed on infants, right?
15   A    That's correct.  I know in the series I've done, it's
16   about 5 percent, but almost all these babies get resuscitated
17   for at least, you know, 20 or 30 minutes before they're
18   pronounced dead.
19   Q    Now, research does show that retinal hemorrhages occur in
20   about 85 percent of all abusive head trauma cases, correct?
21   A    That's what the research cites, yes.
22   Q    And research does show a robust association between
23   retinal hemorrhages and abusive head trauma, correct?
24   A    The literature states that, yes.
25   Q    And this is peer-reviewed published literature, correct?

1    A    It is peer-reviewed for the most part, not all of it.

2    Q    And research also shows that the association between

3    retinal hemorrhages and abusive head trauma is higher with the

4    increasing severity of the retinal hemorrhages, correct?

5    A    Yes, that's what the research has been published, yes.

6    Q    And, in fact, one of the studies that specifically finds

7    that is the Binenbaum study.  Are you familiar with that?

8    A    Yes.

9    Q    That actually found that correlation, that positive

10   correlation, without even taking into account macular folds or

11   retinoschisis, isn't that true?

12   A    Was that the 2010 paper?

13   Q    Yes.

14   A    I believe that they did not have any perimacular folds or

15   retinoschisis in those cases.

16   Q    And the research has also shown that retinal hemorrhages

17   in abuse are usually flame-shaped, bilateral, and multi-

18   layered unlike retinal hemorrhages seen in other postulated

19   etiologies?

20   A    Some research has stated that, yes.

21   Q    And Isabella Zielinski's retinal hemorrhages were

22   flame-shaped, correct?

23   A    Some were.  Some were dot and blot.

24   Q    And they were bilateral, correct?

25   A    Yes.

Lantz - cross

1  Q   And multilayered?

2  A   Yes.

3  Q   Research has also shown that when retinal hemorrhages are

4  bilateral, numerous and extensive in location and of multiple

5  types, they are highly suggestive of abuse, correct?

6  A   Some reports have suggested that, yes.

7         THE COURT:  Find a convenient place to take a break.

8         MR. TELISMAN:  Yes, Judge.

9         THE COURT:  Is this okay?

10         MR. TELISMAN:  Yes.

11         THE COURT:  We're going to break for 10 minutes.

12         MR. TELISMAN:  Thank you.

13         THE COURT:  Can I see the folks in the Gray case, if

14  you could just come over here for a second?

15         (Brief recess.)

16         THE COURT:  Somebody stick their head out there and

17  see if Mr. Blegen or Mr. Rufo are out there.

18      (Brief interruption.)

19         THE COURT:  You can resume.

20  BY MR. TELISMAN:

21  Q   Dr. Lantz, you said on direct examination that increased

22  coagulopathy can cause retinal hemorrhages, yes?

23  A   Yes.

24  Q   You cite some references that say that increased

25  coagulopathy causes retinal hemorrhages, correct?

1  A    That's correct.

2  Q    Now, during direct examination you talked about how

3  retinal hemorrhages are not pathognomonic for trauma?

4  A    That's correct.

5  Q    I'm sorry.  By pathognomonic -- tell me if I get this

6  right -- you're saying that it's not something that is

7  exclusively found in a case of trauma, is that right?

8  A    That's what pathognomonic would mean is that that

9  condition or sign or symptom only occurs in one condition.

10  Q    And the gist of that point is that other things beyond

11  trauma can cause retinal hemorrhages, right?

12  A    Yes.

13  Q    And that's why when a -- that's why --

14          Let me ask you it this way.  Pardon me.

15          You didn't review the medical records, all the

16  medical records, yourself in this case, correct?

17  A    That's correct.

18  Q    And so you don't know exactly what tests the doctors who

19  treated Isabella Zielinski performed before arriving at their

20  diagnosis, do you?

21  A    I didn't review all the reports.  I relied on Dr. Teas'

22  summary more than anything, yes.

23  Q    And you didn't review -- pardon me.

24          And you don't know all of the observations that were

25  reflected in the records that enabled the doctors to

Lantz - cross

1    ultimately come up with with their diagnosis, correct?

2    A    That's correct.  I didn't review all the medical records.

3    Q    Is it your understanding that the doctors automatically

4    concluded that Isabella was a victim of abusive head trauma as

5    soon as they identified the retinal hemorrhages?

6    A    I believe soon after.  I'm not sure exactly when the

7    diagnosis of abusive head trauma was actually made and put in

8    the record.

9    Q    Is it your understanding that the treating physicians

10   relied solely on the existence of retinal hemorrhages to

11   conclude that she was a victim of abusive head trauma?

12   A    I don't know if it was solely on the retinal hemorrhages

13   or not, no.

14          MR. TELISMAN:  If I could just have one moment, your

15   Honor?

16          THE COURT:  Sure.

17      (Brief interruption.)

18   BY MR. TELISMAN:

19   Q    One last thing.

20          Dr. Lantz, in Dr. Teas' medical record review, she

21   notes -- she talks about coagulopathy being an issue here in

22   this case, correct?

23   A    It may have been mentioned.  I don't recall it offhand

24   right now.

25   Q    And you did not -- despite that, you did not include

Lantz - redirect

1  coagulopathy as being a cause of retinal hemorrhages in your

2  report, correct?

3  A    It was not listed in my report, no.

4        MR. TELISMAN:  I have nothing further.  Thank you.

5        THE COURT:  Redirect.

6                    REDIRECT EXAMINATION

7  BY MR. RUFO:

8  Q    Dr. Lantz, were you asked in this case to give an opinion

9  as to Isabella Zielinski's cause of death?

10  A    No.

11  Q    Have you given an opinion on Isabella Zielinski's cause of

12  death?

13  A    Do I have one or --

14  Q    No.  Have you given one?

15  A    I've never been asked, no.

16  Q    Now, there has been a lot of discussion of diagnosis,

17  causation, association.  I'm going to pull up slide 6 from Dr.

18  Forbes' PowerPoint.  Are these the ret cam images taken of

19  Isabella Zielinski's eyes?

20  A    According to the medical -- or the ret cam images, these

21  are a fair and accurate representation of those except the

22  date is wrong.

23  Q    Are you aware that Dr. Brian Forbes, for lack of a better

24  term, diagnosed these pictures as indicating retinal

25  hemorrhages?

Lantz - redirect

1   A   Do I know that?

2   Q   Yes.

3   A   I don't know what he testified to, but --

4   Q   Have you reviewed his report?

5   A   His report, yes.

6   Q   Yes.

7   A   But, yes, those are retinal hemorrhages, and that's in his

8   report, yes.

9   Q   And do you agree with the diagnosis that those are retinal

10  hemorrhages?

11  A   Yes.

12  Q   Do you agree that they extend to the ora serrata?

13  A   Based on the medical records, yes.

14  Q   Have you authored any medical opinions on Isabella

15  Zielinski other than that?

16  A   No.

17  Q   Now, in your initial report, you stated that Dr.

18  Flaherty's statement that hemorrhages to the ora serrata, as

19  in Isabella's case, those kinds of extensive hemorrhages are

20  only caused by acceleration and deceleration forces or seen in

21  shaken baby syndrome, is an unreasonable opinion and is not

22  and never has been supported by objective scientific evidence.

23          Do you stand by that statement?

24  A   Yes.

25  Q   Mr. Telisman has been asking you about studies correlating

Lantz - redirect

1    abuse to retinal hemorrhages.  I believe he said the studies

2    show in 85 percent of suspected abusive cases, there are

3    retinal hemorrhages?

4    A    In some studies, yes.

5    Q    Are you aware of cases that were considered abusive head

6    trauma that involved retinal hemorrhages to a single eye?

7    A    Yes.

8    Q    Are you aware of abusive head trauma cases or suspected

9    abusive head trauma cases that involved no retinal hemorrhages

10   or minimal retinal hemorrhages?

11   A    There's been reports of up to 15 percent of cases, and

12   some reports may not have any.

13          MR. RUFO:  I will have to figure out how to use the

14   Elmo real fast.

15       (Brief interruption.)

16   BY MR. RUFO:

17   Q    Dr. Lantz, do you see what is up on the screen there?

18   A    Yes.

19   Q    What is that?

20   A    This, I believe, is a fair and accurate representation of

21   the ophthalmology note of December 28, 2002, on Isabella

22   Zielinski with a -- what is called a fundal diagram and the

23   ophthalmology notes about the retinal hemorrhages.

24   Q    Did you have this record when you wrote your initial

25   report?

1    A    I don't believe I had this one.  I believe I just had

2    typed notes initially.

3    Q    And does this report indicate that there was a scleral

4    depression performed?

5    A    There is actually a notation between the two eye diagrams.

6    I believe it says SD 360 degrees OU.  That indicates scleral

7    depression.

8    Q    Is this note why you supplemented your report?

9    A    Yes.

10   Q    Now, in your clinical experience, can you describe

11   situations in which an ophthalmologist would be called for a

12   consult?

13   A    Clinically --

14          I mean, are you talking about child abuse or the

15   morgue?  I'm not sure I understand that.

16   Q    Is it fair to say that ophthalmologists are called

17   frequently or universally in cases of suspected child abuse?

18          MR. TELISMAN:  I will object to foundation.

19          THE COURT:  State the question again, if you would,

20   please.

21   BY MR. RUFO:

22   Q    Is it fair to say that ophthalmologists are called

23   frequently or universally in cases of suspected child abuse?

24          THE COURT:  You need to lay a foundation for that

25   first as to how he knows, how he would know.

1  BY MR. RUFO:

2  Q   You can answer.

3          THE COURT:  No, you need to lay a foundation.

4          MR. RUFO:  I'm sorry.

5          THE COURT:  I sustained the objection, okay, just to

6  be clear about it.

7  BY MR. RUFO:

8  Q   In your experience, are ophthalmologists called in cases

9  of suspected child abuse?

10          THE COURT:  Do you get involved in situations where

11  there's suspected child abuse?

12          THE WITNESS:  Yes.

13          THE COURT:  Okay.  And how often does this happen?

14          THE WITNESS:  On the autopsy service, we average

15  three to five fatal child abuse cases a year.

16          THE COURT:  Okay.  And in situations where you're

17  involved, is it common for an ophthalmologist to be called?

18          THE WITNESS:  Yes.

19          THE COURT:  Okay, there.

20  BY MR. RUFO:

21  Q   Do you review medical records when you perform autopsies?

22  A   Yes.

23  Q   And in cases not involving suspected child abuse, do you

24  always see ophthalmology records?

25  A   Not routinely, no.  It depends on the case.

Lantz - redirect

1  Q   You talked about coagulopathy with Mr. Telisman, and he
2  was referring to the case report, the PowerPoint we went
3  through, and the child having low platelets.
4          What are low platelets indicative of?
5  A   Low platelets, if they're low enough, can actually be
6  associated with bleeding in either an adult or a child.
7  Q   At the opposite end of the spectrum, what are high
8  platelets associated with?
9  A   High platelets can actually be associated with increased
10  clotting or formation of clots in blood vessels.
11  Q   Now, is it a pathologist's job to diagnose a cause of
12  death or prescribe a cause of death?
13  A   As a forensic pathologist, yes.
14  Q   Are you aware if that's the job of an ophthalmologist?
15  A   Not that I'm aware of.
16          MR. RUFO:  One second.
17      (Brief interruption.)
18  BY MR. RUFO:
19  Q   Now, going back briefly to what we were just talking with
20  the high platelets, can clotting disorders also lead to
21  bleeding?
22  A   Yes.
23  Q   Now, on cross examination you were asked about these
24  studies, the Binenbaum was mentioned, that associates retinal
25  hemorrhages with abusive head trauma?

1    A    Yes.

2    Q    Are you familiar with those studies?

3    A    Some of them.  I'd have to look at each individual study

4    to comment more on it.

5    Q    Are you aware that many of those studies rely on

6    confessions?

7    A    Some of the studies do, yes.

8    Q    Are you aware that some of those studies rely on suspected

9    abuse as diagnosed in a hospital?

10   A    Yes, some do.

11   Q    Now, in your experience and in your understanding, is it

12   common for retinal hemorrhages to lead to suspicions of

13   abusive head trauma?

14   A    If they're seen in children with brain swelling or

15   bleeding over the surface of the brain, they can, yes.

16   Q    Are you aware that certain authors of papers that

17   associate retinal hemorrhages with abusive head trauma have

18   noted a, for lack of a better term, a selection bias in their

19   sample pool?

20   A    Quite a few of the papers have selection bias or some type

21   of bias, either selection bias, observation bias or

22   incorporation bias.

23   Q    Can you explain what you mean by those terms?

24   A    Selection bias is how the -- doing a case control study

25   comparing abuse and nonabuse, how the individual children

1  would be allocated or picked, the abuse or nonabuse group.  It

2  would depend on what criteria are used.

3       In some cases for the nonabuse, or like an accident,

4  there has to be more than one witness, whereas in the abuse in

5  some cases, there's a feeling that the injuries are

6  incompatible with the developmental history or there's a

7  multidisciplinary review that says it's abuse.  So it's

8  depending how they get into the different categories and how

9  well they're followed.

10      Selection bias can also depend on if you're comparing

11  infants with older children.  In some cases there's been a

12  comparison with child abuse in people in their seventies.

13 Q   Now, I would like to talk about, very briefly, the

14  resuscitation case report that you presented.  Was the purpose

15  of that presentation to suggest that resuscitation efforts

16  necessarily cause retinal hemorrhages?

17 A   No.

18 Q   Is it fair to say that the purpose of that presentation

19  was to demonstrate an association between retinal hemorrhages

20  and resuscitation efforts?

21 A   Yes.

22      MR. RUFO:  One second.

23      (Brief interruption.)

24      MR. RUFO:  I have nothing further.

25      MR. TELISMAN:  Nothing, Judge.

1          THE COURT:  Can you put back up that slide that has
2     the four pictures on it, the one from the fundal exam and then
3     the others from the pictures that he took?  That's the one.
4          What slide number is this, just so we have it in the
5     record somewhere?  Does anybody know?
6          MR. RUFO:  I don't have numbers.
7          THE COURT:  You don't have numbers, okay.
8          So this is the slide that has the right and left
9     pictures from the retinal camera and then the ocular images
10    that you did.
11         THE WITNESS:  Correct.
12         THE COURT:  So these were on different slides, and
13    this is the one that combines them.
14         Maybe I just missed something or didn't understand
15    completely.  But the one in the upper left-hand corner, which
16    is the right eye in this particular child, it looks pretty
17    normal.
18         THE WITNESS:  Yes, it is.
19         THE COURT:  Then the one right below it, which is the
20    same eye after you did this sectioning process or whatever it
21    was you did, it looks like it's got a bunch of hemorrhages on
22    it.
23         THE WITNESS:  Yes.
24         THE COURT:  Does that mean that those happened after
25    the first picture was taken or does that mean they're just not

1    shown by the first picture?

2              THE WITNESS:  They happened after.

3              THE COURT:  They happened after.

4              THE WITNESS:  Sometime after the baby was in the

5    hospital.

6              THE COURT:  Okay, good.  I wasn't sure which of the

7    two it was, and now I am.  Okay.

8              THE WITNESS:  That's a clear picture of the -- you

9    know, showing the arteries and the veins and everything.

10             THE COURT:  Okay.

11             THE WITNESS:  And there are no retinal hemorrhages.

12             THE COURT:  Does anybody have follow-up questions

13   based on my questions?

14             MR. RUFO:  Just one based on that.

15             THE COURT:  Yes.

16   BY MR. RUFO:

17   Q   Dr. Lantz, can you give a range of time for how long after

18   that top left picture was taken the retinal hemorrhages

19   formed?

20   A   When they happened after the ret cam image?

21   Q   Approximately how long they were noted after that, the ret

22   cam image.

23   A   I have no idea.  Actually, I'm shocked.

24             THE COURT:  You're shocked.  Shocked by what?

25             THE WITNESS:  That they were.

1          THE COURT:  They showed up?

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.

4          THE WITNESS:  I mean, the baby was clinically brain

5     dead.  In fact --

6          THE COURT:  So elaborate on that a little bit.  Is

7     the idea you wouldn't expect to see something like this

8     happening after somebody is already clinically brain dead?

9          THE WITNESS:  Right.  Theoretically there is no blood

10    flow.

11         THE COURT:  There is no blood flow, so why would

12    there be hemorrhages.

13         THE WITNESS:  Right.

14         And the other thing, if he hadn't taken the pictures

15    and I only had the bottom pictures and someone asked when did

16    the hemorrhages happen -- when the vascular malformation

17    started to bleed, they would happen contemporaneously, the

18    right and the left eye together, whereas obviously the right

19    eye doesn't happen for over 22 hours.

20         THE COURT:  Right.  So what does that tell you, or

21    does it tell you anything, it's a mystery or --

22         THE WITNESS:  That's sort of how science works.  It's

23    sort of like that's weird, and we have to --

24         THE COURT:  Then you have to go try to figure out

25    what happened.

Lantz - redirect

1           THE WITNESS:  Bingo.

2           THE COURT:  Let me close this.

3           And on this particular one, you haven't figured out

4   it out yet.

5           THE WITNESS:  No.  There's possibilities that there

6   could be --

7           The artery that supplies the eye is the very first

8   branch coming off the internal carotid right when it comes in

9   the base of the skull.  There could have still been a little

10  bit of blood flow there.  It just doesn't show on that.

11          THE COURT:  Okay.

12          THE WITNESS:  There could have been some back

13  pressure.  I don't know.  It's speculation.

14          THE COURT:  Okay.  Anything further over here?

15          MR. RUFO:  No, Judge.

16          MR. TELISMAN:  No, Judge.

17          THE COURT:  All right, you can step down.

18          (Witness excused.)

19          THE COURT:  Next witness, please.

20          MR. TELISMAN:  Your Honor, the people call Lucy

21  Rorke-Adams to the stand.

22          (Witness sworn.)

23          MR. TELISMAN:  Your Honor, if I could have one

24  moment?

25          THE COURT:  Yes.

1    (Brief interruption.)

2           MR. TELISMAN:  Excuse me.  Your Honor?

3           THE COURT:  Yes.

4           MR. TELISMAN:  I just realized that our materials for

5    the exhibits that we intend on introducing with Dr.

6    Rorke-Adams, they're not here yet.

7           THE COURT:  Okay, just go.

8           MR. TELISMAN:  Thank you.

9      DR. LUCY RORKE-ADAMS, RESPONDENT'S WITNESS, DULY SWORN

10                   DIRECT EXAMINATION

11   BY MR. TELISMAN:

12   Q   Could you please state your name for the record, spelling

13   your last name?

14   A   Lucy B. Rorke-Adams.  R-o-r-k-e hyphen A-d-a-m-s.

15   Q   What do you do for a living?

16          THE COURT:  R-o-r-k-e hyphen Adams.

17          THE WITNESS:  Yes, your Honor.

18   BY MR. TELISMAN:

19   Q   What do you do for a living?

20   A   I'm a neuropathologist.

21   Q   Dr. Rorke-Adams, could you please tell us briefly about

22   your educational background as it relates to your career as a

23   neuropathologist?

24   A   Yes.  I have four degrees from the University of

25   Minnesota, two bachelor's degrees, a master of arts and a

1  doctor of medicine.

2          Following graduation from medical school, I took a

3  rotating internship at the Philadelphia General Hospital.

4          Upon completion of the internship, I was a resident

5  in anatomic pathology for three years.

6          Following that I took a fellowship in neuropathology,

7  and following completion of my training, I passed my boards in

8  anatomical pathology and neuropathology.

9  Q    Could you please briefly summarize your work history in

10  the field of medicine, basically the high points?

11  A    Yes.  Following completion of my training, I was invited

12  to remain on the staff with the Philadelphia General Hospital

13  where I held the position of chief of pediatric pathology for

14  several years, assistant neuropathologist.  Then I was the

15  neuropathologist.  Then I became chairman of the department of

16  pathology at Philadelphia General.  That was in 1969.

17          In 1965 I became neuropathologist at the Children's

18  Hospital of Philadelphia.

19          In 1977 I became neuropathologist for the medical

20  examiner's office of Philadelphia, a position I held until

21  2004 when I retired.  Then I went back to being a consultant

22  for the medical examiner's office in 2007, and I'm currently

23  still a consultant for them.

24          THE COURT:  Which medical examiner's office?

25          THE WITNESS:  The Philadelphia medical examiner.

1  BY MR. TELISMAN:

2  Q   Dr. Rorke-Adams, do you have any experience regarding any

3  of the medical legal aspects of child abuse?

4  A   Yes.

5  Q   Could you please explain?

6  A   Yes.  Since I was -- I am a pediatric neuropathologist,

7  the medical examiner's office has assigned all of the cases of

8  putative child abuse to my area of evaluation.

9        I have in consequence developed some expertise in

10  that area and have been called upon by courts in other

11  jurisdictions and medical examiners in other jurisdictions

12  outside of Philadelphia for assistance in evaluating their

13  cases.

14  Q   Now, Dr. Rorke-Adams, do you have any involvement

15  regarding any journals either regarding an editorial position

16  or reviewing?

17  A   Yes.

18  Q   Could you please explain?

19  A   I have been on the editorial board of the Journal of

20  Neuropathology and Experimental Neurology, Brain Pathology,

21  Pediatric Neuroscience, a surgical journal, a journal of

22  neuroradiology, and I've also been a reviewer for multiple

23  medical journals in the area of my expertise.

24  Q   Dr. Rorke-Adams, could you give an estimate as to how many

25  brains you have worked on in your career?

1  A    Probably around 25,000.

2  Q    How many children's cases have you worked on?

3  A    I would say of those, 10,000 have been children.

4  Q    Have you worked on -- pardon me.

5        Let me ask you it this way.  How many cases of

6  pediatric traumatic brain injury have you worked on in your

7  career?

8  A    Probably by this time around 500.

9  Q    Currently, Dr. Rorke-Adams, what does your practice

10  consist of on a day-to-day basis?

11  A    On a day-to-day basis, I'm at the Children's Hospital in

12  Philadelphia and I diagnose specimens from the operating room,

13  primarily tumors, structures that are malformed.

14        I am responsible for autopsies on children who come

15  to the -- to die at the children's hospital and who have an

16  autopsy.

17        I teach the pathology fellows and the neurology

18  fellows.  I lecture to the medical students.

19        Currently I'm called to the medical examiner's office

20  on an ad hoc basis to help them with the troublesome cases

21  they have.

22  Q    Dr. Rorke-Adams -- pardon me.

23        Dr. Rorke-Adams, are you also involved in any

24  research?

25  A    Yes.

Rorke-Adams - direct

1  Q   What is that?

2  A   Well, my current research is involved in investigating a

3  strain of mice with cardiac and brain malformations.  I have

4  done a considerable amount of research in brain tumors in

5  children and other kinds of central nervous system

6  malformations.

7       I did research for 20 years on multiple sclerosis and

8  infectious diseases of the nervous system, primarily viral

9  infections.

10 Q   Dr. Rorke-Adams, if you could, you have been published

11 before either in a peer-review journal or in book chapters, is

12 that right?

13 A   Yes.

14 Q   Could you please let the judge know about some of the

15 publications that you have authored or -- pardon me -- some of

16 the articles or book chapters that you have authored in the

17 field of child abuse?

18 A   Well, I've authored a number of chapters in books dealing

19 with child abuse.  One of the most recent ones was edited by

20 Carol Jenny from Rhode Island.

21      Another one is another recent publication edited by

22 Robert Reese and Cindy Christian.

23      I've written a number of papers in the medical

24 journals dealing with the problem of child abuse, one in the

25 New England Journal of Medicine with three of my colleagues:

1   Dr. Duhaime, Dr. Christian and Dr. Zimmerman.

2          I wrote a paper in conjunction with Dr. Zimmerman and

3   one of his fellows on child abuse and the neuroradiological

4   aspects.

5   Q   Now, I would like to direct your attention at this point

6   to this case.  Dr. Rorke-Adams, how did you first become

7   involved in this case?

8   A   I received a call from Mr. Goodfriend.

9   Q   As a result of the call, did you agree to conduct an

10  evaluation, a medical evaluation, of the case here?

11  A   Yes.

12  Q   And specifically what was the purpose of the evaluation?

13  A   He asked me if I would be willing to review all of the

14  medical records, the legal records, investigative records

15  dealing with this case, which had actually been tried

16  previously and had resulted in a decision and was now being

17  appealed.

18  Q   And the documents that you obtained, did you rely on those

19  documents as part of the basis for your opinion?

20  A   Yes.

21  Q   Dr. Rorke-Adams, did you write a report in this case?

22  A   I did.

23          MR. TELISMAN:  Your Honor, I believe that counsel

24  will not object to us having the report and Dr. Rorke-Adams'

25  CV entered into evidence once we receive it sometime this

1    afternoon.

2              THE COURT:  Is that right?

3              MR. BLEGEN:  Yes.

4              MR. TELISMAN:  Thank you.

5    BY MR. TELISMAN:

6    Q    Dr. Rorke-Adams, after examining the materials that you

7    just discussed, did you make a diagnosis for Isabella?

8    A    Yes.

9    Q    Did you also form an opinion as to the cause of Isabella's

10   collapse on December 27th, 2002, and her ultimate death?

11   A    Yes.

12   Q    Now, at this point, Dr. Rorke-Adams, I'm going to direct

13   you to some of the materials that you examined, but I'm going

14   to ask you to focus only on those findings that helped you

15   make that determination, okay?

16   A    Yes.

17   Q    Now, first off, did you review the coroner's report and

18   the medical examination that was done, the autopsy that was

19   done?

20   A    Yes.

21   Q    What observations and findings did Dr. Harkey, the medical

22   examiner, perform that you found notable in determining the

23   cause of Isabella's collapse and death?

24   A    Well, he reported that the brain was softened.  He

25   reported in his -- in his report that there had been previous

1   subdural hematomas in this child on the basis of the clinical

2   records.

3           And he came to the conclusion that the child had

4   suffered from some type of trauma and that the cause of death

5   and manner of death was homicide.

6   Q   Did Dr. Harkey find any evidence of any sort of residual

7   disease either in the organs or the brain?

8   A   What do you mean by residual disease?

9   Q   I'm sorry.  Maybe I'm using bad terminology.

10          Anything that would have caused --

11          With respect to the organs other than the brain, did

12  Dr. Harkey note any sort of findings of any sort of residual

13  disease that would have resulted in Isabella's collapse in

14  December?

15          THE COURT:  I think her problem is with the word

16  "residual" maybe.

17          THE WITNESS:  Yes.

18          THE COURT:  So cut that word out.

19          MR. TELISMAN:  You got it, Judge.

20          THE COURT:  Cut the word out of the question and I

21  think you will probably get an answer.

22          MR. TELISMAN:  Thank you, Judge.

23  BY MR. TELISMAN:

24  Q   Dr. Rorke-Adams --

25          THE COURT:  Did he see any sign of disease?

1          THE WITNESS:  No, he didn't.

2          THE COURT:  There you go.

3          MR. TELISMAN:  Thank you.

4    BY MR. TELISMAN:

5    Q   Dr. Rorke-Adams, you also mentioned that among the --

6    well, let me ask you.

7          Among the items that you reviewed, did you review

8    autopsy photos?

9    A   Yes.

10   Q   Did you rely on these photos as part of the basis for your

11   opinion?

12   A   I did.

13   Q   Would it assist the Court in understanding your opinions

14   if we were to show some of the photographs of the autopsy?

15   A   Yes.

16         MR. TRIEBEL:  Sorry, Judge.

17         THE COURT:  If you have a hard copy, you can just put

18   them on the Elmo if the other feed isn't working.

19         MR. TELISMAN:  I think that they might show up

20   better.

21         THE COURT:  Well, if it's not working, they're not

22   going to show up at all.

23         MR. TELISMAN:  I think we have got them here.

24      (Brief interruption.)

25   BY MR. TELISMAN:

1  Q   Now, Dr. Rorke-Adams, would it assist the Court in talking
2  about the photograph on the left there?
3  A   Yes.
4  Q   Okay.  Could you please explain what is significant about
5  that?
6  A   May I step down so I can use this pointer?
7           THE COURT:  You sure can.  That's why it's there.
8  Just keep your voice up when you're down there.
9           THE WITNESS:  I will do my best.
10      (Brief interruption.)
11          THE WITNESS:  This photograph shows the under-surface
12  of the brain.  This is the back part of the brain.
13          THE COURT:  Do you need to move?
14      (Brief interruption.)
15          THE WITNESS:  I will start again.  This is the under-
16  surface of the brain.  This is the back of the brain.  This is
17  the front of the brain.  The front portion of the brain is
18  incomplete.  There is not enough tissue here to be comparable
19  and to look like a normal brain.
20          And what we can see from what tissue is there is that
21  it looks different from tissue elsewhere.  For example, if you
22  look at these structures here, which are called gyri, g-y-r-i,
23  they're wide.  They have varying widths, but they basically
24  look relatively normal.
25          If we look in this area where we have some remnant of

Rorke-Adams - direct

1    the frontal poles, which should be the anatomical structures

2    here, you can see that there's -- the gyri are very small.

3    The space between them is somewhat enlarged and they have a

4    slightly golden cast.

5          On this side we can hardly see anything at all in

6    terms of residual tissue.  There's also some golden

7    discoloration here.  This is part of the under-surface of the

8    temporal lobes.  This is the temporal lobe here.  There is the

9    front of the temporal lobe, but most of the frontal lobe

10   tissue is not present.

11   BY MR. TELISMAN:

12   Q    Would you like to move to the next?

13   A    Yes, please.

14   Q    Dr. Rorke-Adams, tell us if that is the slide that you

15   want.

16   A    No, but if it's here.  This is the top of the brain.  And

17   you can see that it has a rather globular structure.  There

18   should be more tissue in the front here, and that is

19   consistent with what I showed you in terms of what we were

20   looking at the base.

21          If we could -- there was another picture that showed

22   the sectioning of the front part of the brain.  Here we are.

23          All right.  Now, the procedure is that when we look

24   at a brain, we look at the outside, the top and the bottom,

25   the middle aspect of it, and then the brain is turned over,

1  and we take a long knife and we make serial sections from the

2  front to the back.  These are called coronal sections like

3  this.

4       And when you are going to demonstrate them to

5  somebody else, the procedure is to put the front part first

6  and then successive sections as you go back.  So that's

7  what --

8       THE COURT:  They're in order, in other words.

9       THE WITNESS:  That's correct, and that's what's been

10  done here.

11       So this is the first section in the front, and you

12  can see, if you compare this tissue with this tissue, it is

13  hardly recognizable as brain.  It is very severely damaged

14  frontal pole tissue.  The tissue is falling to pieces.  It is

15  very soft.

16       This is the next section, slightly further back.  And

17  now you can see some relatively normal brain here.  You see

18  this outer ribbon here, which is called the cortex, and then

19  the white matter.

20       On this side we still have residual damage because

21  you see that this side is smaller than this side.  And some of

22  the damage is where the tissue is missing.

23       And then if we look here, this is the top of the

24  brain; this is the bottom of the brain.  And you can see that

25  there's a large sort of excavation --

1          THE COURT:  Chunk.

2          THE WITNESS:  -- here where the tissue is missing.

3          Then as we go more posteriorly, now we see the

4    ventricle here.  These are cavities of the brain.  And, again,

5    this half of the brain is damaged here at the surface.  This

6    side for comparison looks relatively normal.

7          THE COURT:  Can you stop for a second?

8          I don't look at brains all the time, okay; you do.

9    So when you look at this and you say that part looks damaged,

10   to me it's sort of like it has this kind of gnarly quality to

11   it.  Is that what you're talking about?

12         THE WITNESS:  That's correct.  You're very

13   perceptive.

14         THE COURT:  Okay.

15         THE WITNESS:  Yes.  That indicates some kind of

16   damage to that tissue.

17         THE COURT:  Okay.

18         THE WITNESS:  Okay.  And then these are some of the

19   sections further back.  This is the structure called the

20   corpus callosum, which is important to evaluate when you're

21   looking at such cases, but the tissue basically looks much

22   more intact.  It certainly doesn't compare with what you see

23   here.  Okay.

24   BY MR. TELISMAN:

25   Q    Now, Dr. Rorke-Adams, is there another photograph you want

Rorke-Adams - direct

1    to look at, or is that it?

2    A    I think that's it.

3    Q    Okay.

4        (Brief interruption.)

5    BY MR. TELISMAN:

6    Q    Now, Dr. Rorke-Adams, did you also review the report of

7    the petitioner's neuropathologist?

8    A    I did.

9    Q    Jan Leestma?

10   A    Yes.

11   Q    And is it your understanding that on July 17th of this

12   year, Dr. Leestma, along with a Dr. Shaku Teas and a Dr.

13   Warren T-o-u-r-t-e-l-l-o-t-t-e, examined Isabella Zielinski's

14   brain and sampled it for further evaluation?

15   A    Yes.

16   Q    Now, what observations and findings did Dr. Leestma report

17   that you found notable in determining the cause of Isabella's

18   collapse and death?

19   A    Well, he observed that there were membranes attached to

20   the under-surface of the dura.  These are called subdural

21   membranes.  And they were present on both sides.  They had

22   kind of a yellowish-brown color.

23        He also reported that the brain itself, which had

24   been in formaldehyde since the time of the autopsy, was quite

25   soft, and he specified that the lateral sides were especially

1  soft.

2          And he also pointed out that there were areas of

3  damage to the cortex scattered areas.  The term that we use is

4  focal, and I think he called it laminary necrosis.  This is a

5  term we use in neuropathology to designate it the cerebral

6  cortex because it's composed of layers.  So there was old

7  laminary necrosis.

8  Q    Now, did Dr. Leestma report finding neomembranes?

9  A    Yes.

10          THE COURT:  Was that the subdural membranes you just

11  referred to?

12          THE WITNESS:  Yes, it is.

13  BY MR. TELISMAN:

14  Q    What is the significance of the fact that --

15          He reported finding multiple neomembranes, is that

16  right?

17  A    Yes.

18  Q    What is the significance of that?

19  A    Well, when there is bleeding into the subdural space, and

20  the individual survives, the body organizes this hemorrhage by

21  the formation of membranes, and these are formed by connective

22  tissue and inflammatory cells which are involved in the

23  reparative process.

24          And what the body tries to do is encapsulate the

25  hemorrhage and isolate it so that you have the formation of

1    these membranes which is characteristic after subdural

2    hematomas.

3    Q    Is it evidence of any sort of bleeding disorder or

4    coagulopathy?

5    A    No.

6    Q    What did Dr. Leestma report about the superior sagittal

7    sinus?

8    A    Well, he looked particularly at the superior sagittal

9    sinus because there was a suggestion that this infant may have

10   had thromboses of the superficial cortical veins and thrombus

11   of the sinus, and he noted specifically that there was no

12   evidence of any residual thrombus in the sagittal sinus.

13   Q    Now, did Dr. Leestma also talk about in his first report

14   whether he was able to identify any thrombosed veins?

15   A    Yes, I think he mentioned a couple.

16   Q    Is it your understanding that he authored a revised report

17   where he said he found -- he later found -- or pardon me.

18            He later stated that he had found thrombosed veins?

19   A    Yes.

20   Q    Now, Dr. Rorke-Adams, what do you see here?

21            For the record, we're looking at Dr. Leestma's slide

22   from Dr. Leestma's presentation.  It's slide number 9 from his

23   presentation when he took the stand.

24            What do you see there?

25   A    May I step down again, your Honor?

1      THE COURT:  Sure.  That's fine.

2      (Brief interruption.)

3      THE WITNESS:  Dr. Leestma has identified this big

4  thing as an ink dot.  And what he's pointing to here are two

5  very small blood vessels which are filled with some clotted

6  material.

7      The reason why I wanted to step down here, your

8  Honor, is to point out that this is brain tissue.

9      THE COURT:  The pink areas.

10     THE WITNESS:  Yes, these fragmented things are brain

11 tissue.

12     So these are two little blood vessels within the

13 brain.  They are not on the surface of the brain where the

14 thromboses that are alleged to have possibly been present

15 would be expected to be located.  So these are two very small

16 vessels.

17     And these two little thrombi appear to be very recent

18 thrombi.  They're not old thrombi and could not be considered

19 to have occurred in this child who was three-and-a-half months

20 old when she presented with her injury.

21     THE COURT:  What tells you they're recent?

22     THE WITNESS:  Well, because I've looked at many of

23 these things, but they're very pink.

24     Old thrombi -- once a thrombus is formed, it also

25 undergoes organization by the body temperature -- tissues.

1   And an organized thrombus would consist basically of a

2   connective tissue scar.  We would not see this rather pinkish

3   material, this flocculate material.  We wouldn't see these

4   isolated cells here, which are a couple of blood cells caught

5   in there.  And the histologic appearance would be totally

6   different.

7           And, furthermore, if you only have a couple of these

8   little things, they can have no significance from a

9   pathological standpoint at all.

10          (Brief interruption.)

11  BY MR. TELISMAN:

12  Q    Now, Dr. Rorke-Adams, what we see here on the slide, is

13  this indicative of any sort of bleeding disorder or

14  coagulopathy?

15  A    Well, it's certainly not a bleeding disorder.  In a

16  coagulopathy, you can have isolated thrombi, but if they're

17  isolated and there's nothing else anyplace else, they have no

18  clinical significance.

19  Q    And are there other possible causes of thrombosed cortical

20  veins located as see here?

21  A    Well, one of the causes that we see in cases like this is

22  a breakdown of the normal circulation of the blood.  And when

23  you have sludging of the blood in the circulation because of

24  cardiac dysfunction, then you may see this kind of filling up

25  of the veins or blood vessels.

1  Q   Now, Dr. Rorke-Adams, I would like to talk with you about
2  your microscopic analysis in case.
3         You also reviewed pieces of tissue from Isabella's
4  brain and the surrounding areas, correct?
5  A   Yes.
6  Q   How many sets of tissue samples did you receive?
7  A   Well, initially I received a set of slides that were
8  stained with routine sustains, a stain which is called
9  hematoxylin and eosin, H&E for short.
10 Q   If you could just explain very briefly what the purpose of
11 the staining is?
12 A   Yes.  Well, in order to perceive the characteristics of
13 the cells, we have to stain the tissue; otherwise it's
14 basically colorless.
15        So for years and years, the standard routine in a
16 pathology laboratory is to remove the tissue and then use a
17 variety of stains, dyes, to look at the tissue.
18        The basic routine dye, dyes, are hematoxylin, which
19 is a blue dye, and this particular dye stains the nucleus of
20 the cells.  And eosin, which is a pink dye, stains the
21 cytoplasm of the cell.
22        We have a lot of other things that we -- stains that
23 we can use if we're looking for things in particular, but
24 those are the routine -- that's the routine that we use.
25 Q   And so why did you request a second set?

Rorke-Adams - direct

1   A   I wanted to evaluate the changes in the tissues more

2   specifically.  So I asked for recuts from the original

3   paraffin blocks containing the tissues that had been sectioned

4   and sent to me originally.

5         THE COURT:  In the next 15 minutes, are you going to

6   have her go down there anymore?

7         MR. TELISMAN:  Actually I am, Judge.  We were going

8   to be putting up some of the slides.

9         THE COURT:  Fine.  Just keep going.

10        MR. TELISMAN:  Thank you.

11  BY MR. TELISMAN:

12  Q   When you received the tissue pieces, were they labeled

13  somehow?

14  A   Yes.

15  Q   Could you please explain?

16  A   Well, they had the autopsy number that was used by the

17  medical examiner's office, and then they had numbers on them.

18  Q   And did you analyze every tissue sample?

19  A   Yes.

20  Q   You made findings for each?

21  A   Yes.

22  Q   And are they reflected in your report?

23  A   Yes.

24  Q   At this point, for the sake of efficiency, I'm only going

25  to direct your attention to the findings that were

 1  particularly notable in determining the cause of Isabella's
 2  collapse and death, okay?
 3  A   Yes.
 4  Q   Now, first directing your attention to what you had marked
 5  as slide number 3 or what you had received as slide number 3,
 6  what was that tissue sample, if you know?
 7  A   Well, not having my report in front of me, I don't
 8  remember what slide number it was.
 9  Q   Would it refresh your memory to take a look at your
10  report?
11  A   It would.
12  Q   Sure.
13      (Brief interruption.)
14          MR. TELISMAN:  Your Honor, I request permission for
15  the witness to be able to look at her report during her
16  testimony.
17          THE COURT:  That's fine.  No problem.
18          MR. TELISMAN:  Thank you.
19      (Brief interruption.)
20          THE WITNESS:  I'm on page 4 of my report, and slide
21  number 3, according to my listing here, was a slide of the
22  superior sagittal sinus.  And in this slide, there was no
23  evidence of a blood clot in the superior sagittal sinus.
24  BY MR. TELISMAN:
25  Q   I know this was mentioned before, but what is the

Rorke-Adams - direct

1   significance of the lack of a blood clot in the superior

2   sagittal sinus?

3   A   Well, it allows one to eliminate the problem of a sinus

4   thrombosis from consideration in this case.

5   Q   Now, directing your attention to slide 14, what was this

6   tissue sample?

7   A   Slide number 14 was a section of the corpus callosum.

8   Q   What is the corpus callosum?

9           THE COURT:  Say that again.  Corpus?

10          THE WITNESS:  Callosum, c-a-l-l-o-s-u-m.

11          THE COURT:  Thanks.

12  BY MR. TELISMAN:

13  Q   Where in the brain is that?

14  A   The corpus callosum is a band of fibers that connects the

15  cerebral hemisphere -- the two hemispheres with each other,

16  specifically the frontal, parietal and occipital lobes, and it

17  goes from one side to the other.

18  Q   And is one of the diagrams that we have here, would that

19  be helpful in showing the Court where it is?

20  A   Yes.

21          (Brief interruption.)

22  BY MR. TELISMAN:

23  Q   Is this the one or is it the other one?

24  A   Well, that shows the corpus callosum.  That's that band of

25  fibers in the center, but there was another one, another

1    anatomical drawing that I sent you.

2            No, not this one.  That one.  (Indicating.)

3        (Brief interruption.)

4            THE WITNESS:  Are you ready?

5            This is an anatomical drawing which shows the two

6    halves of the cerebral hemispheres, and in this drawing, the

7    artist has put in these lines here on this side and has drawn

8    in the lines coming across here.  These represent the axons

9    which are coming from the neurons in the cortex and which are

10   going to allow cross-talk between the two cerebral

11   hemispheres.

12           And so this bundle of fibers goes from the front of

13   the brain to the back of the brain connecting, as I said, the

14   frontal, parietal and occipital lobes.

15   BY MR. TELISMAN:

16   Q   Dr. Rorke-Adams, what are axons?

17   A   Axons are the nerve processes that come out of the neurons

18   that carry the message from one neuron to another and connect

19   with the other processes from the recipient neurons called

20   dendrites.

21           They have an insulation around them because the

22   message that is going in is like an electrical message like a

23   telephone wire, so they have to be insulated.  But when the

24   axon gets to its connecting neuron, it has a connection called

25   a synapse with a dendrite, d-e-n-d-r-i-t-e, of the recipient

1  neuron.

2  Q    What happens when the axons are injured?

3  A    Well, they die and the connection is severed.

4  Q    Does that -- and what sort of result does that have on the

5  body?

6  A    If it's extensive, it leads to significant neurological

7  impairment.

8  Q    Now, what I will do is I'm going to ask you some questions

9  just with respect to this slide, and I think that may take us

10  to the break, your Honor.

11        I don't know if the Court would like us to go further

12  beyond that because then she will be stepping down again.

13        THE COURT:  I will tell you when to stop.  Just keep

14  going until I say stop.

15  BY MR. TELISMAN:

16  Q    Dr. Rorke-Adams, when you examined slide number 14 of the

17  corpus callosum --

18  A    Yes.

19  Q    -- what did you find?

20  A    I found some degeneration of the central part of the

21  corpus callosum and a reaction to the damage which was

22  obviously quite old on the part of the cells in the brain that

23  form scars.  They're called astrocyes, or for short they're

24  called glia.

25        And this I was able to observe by use of one of the

1    special techniques that I had my technician apply to the

2    tissue that I had requested subsequent to initial exam.

3    Q    What is the significance of finding that glia or scarring?

4    A    That would indicate to me that there had been some injury

5    to that area sometime in the past.

6    Q    Is that type of finding the result of a disease?

7    A    The most typical cause of damage to the corpus callosum is

8    trauma.

9    Q    And is that area of the brain prone to damage from a lack

10   of oxygen or lack of blood flow?

11   A    No.

12   Q    Now, Dr. Rorke-Adams, directing your attention to slides

13   8, 9, 10 and 15, do you know what those tissue samples are?

14   A    8, 9, 10 and 15 I have labeled cortex and white matter.

15   Q    Where in the brain is this?

16   A    Well, they were taken from --

17              THE COURT:  You just did 14.

18              MR. TELISMAN:  I said 8, 9, 10 and 15.

19              THE COURT:  15, sorry.

20              THE WITNESS:  They were taken from somewhere in the

21   cerebral cortex here, and the white matter underlying it

22   would -- I don't have specified here which parts of the brain

23   they came from.

24   BY MR. TELISMAN:

25   Q    What did you find on these slides?

1    A    I found varying degrees of injury to the cortex and the

2    white matter, and it was the type of injury that is

3    characteristic in individuals who have inadequate oxygenation

4    of the tissue.

5    Q    Did you find any evidence of hemorrhage in these slides?

6    A    In those particular slides, I don't believe so.

7    Q    Is there any significance to that?

8    A    Well, in slide 15, there was some intracortical hemorrhage

9    which appeared to be recent.

10   Q    When you say it appeared to be recent, is it something

11   that would date back to December 27th of 2002?

12   A    No.

13        And in slide number 10, which Dr. Leestma had labeled

14   left parietal, p-a-r-i-e-t-a-l, question mark, vessel, there

15   were some calcium deposits.

16   Q    Now, Dr. Rorke-Adams, directing your attention to slide

17   number 16, what was the label on that particular sample?

18   A    The label on that was White Matter Periventricular Trauma,

19   Posterior.

20        THE COURT:  Say it again.  The label is what?

21        THE WITNESS:  White Matter Periventricular,

22   P-e-r-i-v-e-n-t-r-i-c-u-l-a-r, comma, Posterior.

23        THE COURT:  Thanks.

24   BY MR. TELISMAN:

25   Q    And based upon your examination of this sample, did you

Rorke-Adams - direct

1    find it to be accurately labeled?

2    A    I didn't think so, no.

3    Q    Could you please explain?

4    A    Yes.  That slide which is labeled Periventricular

5    Posterior Cortex and White Matter did not have the anatomical

6    configuration of what I would expect the brain to look like in

7    that region.

8    Q    Where do you believe this tissue sample came from?

9    A    I think it came from the front part of the brain in a

10   specific region of cortex called the gyrus, g-y-r-u-s, rectus,

11   r-e-c-t-u-s.

12   Q    Where is that in the brain?

13   A    Well, that's in the front part of the brain and

14   underneath.  This is the one.

15   Q    It's that one?

16   A    No, no.  I was pointing to it on one of the anatomical

17   drawings.  This one.  This one.

18        (Brief interruption.)

19   BY MR. TELISMAN:

20   Q    This is the one you want, Dr. Rorke-Adams?

21   A    Yes.

22   Q    Okay.

23   A    This, again, is an anatomical drawing of the frontal lobe

24   of the brain.

25             THE COURT:  From which perspective?

1      THE WITNESS:  Well, we're looking at -- this is the
2  coronal section.

3      THE COURT:  Got it.  It's a section.

4      THE WITNESS:  That's correct, and it's from that
5  front part that I described was severely damaged.

6      THE COURT:  Okay.

7      THE WITNESS:  The anatomy here shows this is the
8  separation between one hemisphere and the other.  It's called
9  the sulcus.  This is the ventricle, and this is the
10 configuration of the ventricle in this region.

11     This structure here is called the gyrus rectus, the
12 straight gyrus, and it's a standard section that we take when
13 we're looking for evidence of traumatic injury because it's a
14 common site of injury.

15     And so the structure of the slide that I had that was
16 labeled 16 had this configuration.

17     Could we see the next one?

18     (Brief interruption.)

19 BY MR. TELISMAN:

20 Q   Is that what you want?

21 A   No, the next anatomical drawing.

22     THE COURT:  Back to that little thing you had along
23 the bottom that had the drawings on them.

24     (Brief interruption.)

25     THE WITNESS:  This one.

1          Now, this is the posterior part of the brain, and

2     this is also a coronal section.

3          All right.  So now Dr. Leestma says he took this

4     specimen from the white matter periventricular -- here is the

5     ventricle -- and he says posterior.

6          Now, the structure of the anatomy here is quite

7     different from the gyrus rectus and the frontal lobe that we

8     just looked at.  This configuration of the ventricle does not

9     have that sharp angle down here.  These gyri are oriented in a

10    different direction, so that comparing the description of

11    where the specimen is taken with this photograph and the

12    slide, there's -- they do not look alike.  They don't

13    correspond.

14         THE COURT:  You need to find a place to break.  If

15    you need a couple more questions to continue the topic, that's

16    fine.

17         MR. TELISMAN:  I think there's still a few more

18    slides.  I think this is a good spot.

19         THE COURT:  So we'll break now.

20         So at 1:30 I have a couple, I think, very short

21    statuses, so just be ready to go at 1:30.  It will probably be

22    something like 1:35.

23         MR. TELISMAN:  Thank you, Judge.

24         (The trial was adjourned until 1:35 p.m. of this same

25    day and date.)

Rorke-Adams - direct

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

1

2

3

4   JENNIFER DEL PRETE,        )

5                 Petitioner,  )   Docket No. 10 C 5070

6         vs.           )

7   MELODY HULETT,          )   Chicago, Illinois
                      )   December 20, 2012
8           Respondent.  )   1:35 p.m.

9

10                        VOLUME 4
               TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MATTHEW F. KENNELLY

11

12   APPEARANCES:

13

14   For the Plaintiff:    BLEGEN & GARVEY
                  BY:  MR. PATRICK W. BLEGEN
15                      MS. JODI L. GARVEY
                     MR. DANIEL A. RUFO
16                 53 West Jackson Boulevard
                Suite 1437
17                 Chicago, Illinois  60604

18   For the Defendant:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                  BY:  MR. KARL R. TRIEBEL
19                      MR. NEAL GOODFRIEND
                     MR. ARI TELISMAN
20                      MS. MONIQUE A. ANAWIS
                100 West Randolph Street
21                 13th Floor
                Chicago, Illinois  60601
22

23   Also Present:          MR. ROBERT STANLEY

24          LAURA M. BRENNAN - Official Court Reporter
        219 South Dearborn Street - Room 2102
25           Chicago, Illinois  60604
             (312) 435-5785

1     (The following proceedings were had in open court:)

2          THE COURT:  Folks, let's go.

3          THE CLERK:  10 C 5070, Del Prete v. Hulett.

4          MR. TELISMAN:  Your Honor, we have our exhibits for

5     Dr. Rorke-Adams.

6          THE COURT:  Okay, thanks.

7                    DR. LUCY RORKE-ADAMS,

8          RESPONDENT'S WITNESS, PREVIOUSLY SWORN

9               CONTINUED DIRECT EXAMINATION

10    BY MR. TELISMAN:

11    Q    Just for housekeeping, Dr. Rorke-Adams, could I direct

12    your attention to the first exhibit there, Respondent's

13    Exhibit Number 43?

14    A    Yes.

15    Q    Is that a true and accurate copy of the report that you

16    authored in this case?

17    A    Yes.

18    Q    Directing your attention to Exhibits 44 and 45, are those

19    demonstrative exhibits true and accurate copies of the

20    demonstrative exhibits that we have talked about and will be

21    talking about for your testimony?

22    A    44 is as well as 45.

23    Q    Finally, we took a look at number 46.

24          Is that a true and accurate copy of your curriculum

25    vitae?

Rorke-Adams - direct

1  A    The date is wrong.  It's not the up-to-date CV that I
2  currently have.
3  Q    But is it current as of May of 2012?
4  A    December.
5  Q    I'm sorry.  But was this current as of May of 2012?
6  A    Yes.
7  Q    Very good.  We may supplement later with the current copy
8  of your CV.
9        Now, Dr. Rorke-Adams, when we left off, you were
10  testifying about slide number 16 and how you figured out that
11  it was mislabeled.
12        In addition to the diagrams that you were testifying
13  with before, did you also present some micrographs of brain
14  tissue samples to explain where this slide was?
15  A    Yes.
16  Q    Would it assist the Court in showing those?
17  A    Yes.
18  Q    Could you please do so?
19  A    Yes.  I have to step down again.
20  Q    Okay.
21        (Brief interruption.)
22        THE WITNESS:  To assist the Court in understanding
23  the pathology from the victim, I went to the files and I took
24  a photomicrograph of a portion of a brain from a 14-month-old
25  child who had no primary brain disease.

Rorke-Adams - direct

1    THE COURT:  If you need to be closer to hear, go

2  ahead and move.

3    MR. BLEGEN:  Thank you.

4    THE WITNESS:  This is a routine hematoxylin and eosin

5  stain, the type that we use in our work.

6    THE COURT:  So the picture we're seeing is from the

7  sample you took from a healthy brain.

8    THE WITNESS:  That's correct.  It's the gyrus rectus

9  in a 14-month-old baby.

10    THE COURT:  Okay.

11    THE WITNESS:  And this is the configuration.  You can

12  see the gyrus, the gyri here, as they go around.

13    This is the under-surface, the bottom, of the brain.

14  And so this ribbon here, the lighter tissue, is called the

15  cortex.  And the darker tissue is the white matter.

16    If we could have the next one.

17    This is from the postmortem examination of Isabella.

18  It's the section that I think is the gyrus rectus which was

19  labeled as having come from the posterior part of the brain.

20    And here you can see the ventricle.  The ventricle

21  was not apparent in the previous slide because the tissue was

22  so big I couldn't get the ventricle on that slide.  But this

23  is the same region, the gyrus rectus, and it's, of course,

24  very severely damaged.  And you can see that there's hardly

25  any tissue there.

1       The cortex is practically totally destroyed.  The
2   white matter has a paler color, and then here we have the
3   cortex, the gyrus on the other side, and you can see some
4   irregular staining of the cortex, which indicates irregular
5   areas of damage of the cortex.

6       That's the ventricle.  This is the damaged tissue.
7   BY MR. TELISMAN:
8   Q   Would you like the next slide, or is that it for this one?
9   A   No, the next one.

10      This is now a technique that I had my technician do.
11  It's an immunohistochemical technique for expression of the
12  kind of cell in the brain that reacts to injury called an
13  astrocyte, and the antibody that we use is called glial
14  fibrillary acidic protein, GFAP.

15      So this is again the same section.  It was cut from
16  the same block as the previous slide.  There's the ventricle
17  there.  All this brown material contains the reactive cells
18  that are responding to the injury.  And you can see that the
19  surface of the cortex is very irregular.  We have these empty
20  spaces here where the tissue is very severely damaged and
21  incomplete.

22      We have the same kind of severe damage over here,
23  here, here and here.

24      And then the next slide is an iron stain that I had
25  done.  The iron is used to identify areas of old hemorrhage.

Rorke-Adams - direct

1    And the iron by this technique --

2              THE COURT:  Is this, again, the same from the same

3    section?

4              THE WITNESS:  Yes, it is.  These are all serial

5    sections.

6              And these are the deposits of iron in the tissues.

7    These are severely damaged tissues.

8              This was the largest amount of iron that I found in

9    any of the sections that Dr. Leestma had sampled.  There were

10   various quantities of iron, but this one had the greatest

11   deposition of iron.

12             MR. TELISMAN:  Karl, could you put up the other one?

13       (Brief interruption.)

14   BY MR. TELISMAN:

15   Q    Now, what section of the brain --

16             From this diagram, can you tell us what section of

17   the brain the gyrus rectus is on?

18   A    It's here, right here.

19   Q    Right there?

20   A    Yes.

21   Q    And what is the significance of your findings with respect

22   to that slide?

23             THE COURT:  That slide being the previous one with

24   the brownish tint?

25             MR. TELISMAN:  Yes.

1  BY MR. TELISMAN:

2  Q    Slide number 16, the previous pictures that we were just

3  looking at that you were talking about, all came from that one

4  particular tissue sample, is that right?

5  A    Right.

6  Q    What is the significance of your findings with respect to

7  that sample?

8  A    In individuals subjected to abusive head trauma, in

9  babies, part of the trauma oftentimes involves shaking.  And

10  one of the most vulnerable areas to damage in the infant brain

11  under these circumstances is this part of the brain right

12  here.

13        You see the bone right here which is forming the

14  floor of what we call the anterior fossa, the back part of the

15  skull.  That bone is very rough.  And when the soft brain

16  tissue of the baby is roughly pushed over that surface, it

17  tends to become damaged and produce what we call contusions

18  and lacerations.  So this is an area where I always look for

19  any evidence of injury in a case of putative inflicted head

20  trauma, and this is precisely where that damage was in this

21  particular case.

22  Q    Dr. Rorke-Adams, can three-and-a-half-month-old babies get

23  brain contusions?

24  A    Not just in the ordinary course of being a

25  three-and-a-half-month-old baby, no.

1  Q   Can they get them as a result of shaking?

2  A   Yes.

3  Q   And in this particular area of the brain?

4  A   Yes.

5  Q   Can this type of finding that you found on that slide

6  number 16, can that be the result of the brain being removed

7  on autopsy?

8  A   No.

9  Q   Why not?

10 A   Well, first of all, the people who remove brains at

11 postmortem are highly experienced in this procedure.  And they

12 don't produce -- damage to the tissue as the process of

13 removal goes along.  So it's not something that I would

14 consider.  Besides which, if it were a postmortem phenomenon,

15 there would not be evidence of this tissue reaction, the glial

16 reaction, and there wouldn't be any deposition of iron pigment

17 in the tissue.  So that's completely impossible.

18         THE COURT:  Because the bleeding stops when you die.

19 Is that why?

20         THE WITNESS:  Well, it stops when you die, but it

21 takes some time for the hemosiderin to break down and give you

22 this deposition of the iron in the tissue.

23         So that possibility is completely not to be

24 considered.

25 BY MR. TELISMAN:

Rorke-Adams - direct

1  Q   How do these findings with respect to this slide number 16

2  compare with the autopsy photos that you were discussing

3  earlier in your testimony?

4  A   Well, they're entirely consistent because, as I pointed

5  out when we looked at the first photographs, that was the part

6  of the brain that was hardly recognizable as brain, and it

7  showed very extensive damage and injury in the tissue.

8          As you recall when we looked at the photograph, it

9  was very shrunken and distorted and didn't really look much

10  like a normal brain or more normal brain that we saw in the

11  more posterior sections.

12  Q   Could you tell from looking at the slide of whether the

13  damage observed was from Isabella's dying hours or dying days?

14  A   No, it was not acute.  There was evidence in sections of

15  acute injury to her brain, but they were totally different.

16  Q   So this was this --

17          This had to have predated Isabella's dying days?

18  A   That's correct.

19  Q   And where is this damage in relation to the older subdural

20  hemorrhage that Isabella evidenced as reflected in the

21  radiology when she first went to the hospital in December

22  of 2002?

23  A   The subdural hematomas accumulated on the top of the

24  brain, overlying the top of the brain.  These injuries are on

25  the opposite side of the brain, on the bottom of the brain.

Rorke-Adams - direct

1   Q   And, also, you reviewed the reports of the petitioner's

2   expert witnesses, correct?

3   A   Yes.

4   Q   And do you recall one of the petitioner's experts

5   reporting identifying a thrombosed cortical vein somewhere in

6   the imaging?

7   A   Yes.

8   Q   And where is the thrombosed cortical vein that they

9   reported identifying in relation to the area of the gyrus

10  rectus, this slide 16?

11  A   Well, again, it was on the top of the brain.  It was

12  described as a linear structure.

13  Q   Thank you.  And I think that's all I have in the way of

14  slides.

15      (Brief interruption.)

16  BY MR. TELISMAN:

17  Q   Dr. Rorke-Adams, were you able to formulate a

18  neuropathological diagnosis for Isabella to a reasonable

19  degree of medical certainty?

20  A   Yes.

21  Q   And what is your diagnosis?

22  A   Well, she had bilateral organized subdural hematomas.

23          May I refer to my report?

24  Q   Yes, with the Court's permission.

25          I'm sorry.

1    THE COURT:  That's fine.

2    (Brief interruption.)

3    THE WITNESS:  She had organized subdural hematomas.

4  She had organized fronto-orbital -- that means on top of the

5  eye -- contusion/laceration.

6  BY MR. TELISMAN:

7  Q   And is that what you were just referring to on the slide

8  16?

9  A   Yes.

10  Q   Okay.

11  A   Number 3, multifocal, that is many areas, of cerebral-

12  cortical white matter, necrosis-gliosis including corpus

13  callosum.  So she had --

14    THE COURT:  Slow down.  Multifocal cerebral?

15    THE WITNESS:  Multifocal areas of cerebral

16  cortical-white matter, necrosis, n-e-c-r-o-s-i-s, dash gliosis

17  including corpus callosum.

18  BY MR. TELISMAN:

19  Q   What does that mean?  What is the significance of it?

20  A   Well, that's a combination of abnormalities as a

21  consequence to the fact that she had a cardiorespiratory

22  arrest at the time of the original injury.

23    And so the brain was left without proper oxygenation.

24  So it suffered damage.

25    And it underwent organization with this phenomenon

1   called gliosis, the activity of the astrocytes.  And, also,

2   there was this area of damage in the corpus callosum which was

3   related to the trauma but not to the shock phenomenon.

4          The next thing I listed here is chronic cerebellar

5   foliar, c-e-r-e-b-e-l-l-a-r f-o-l-i-a-r, sclerosis.

6          And this is an indication of very old damage to the

7   part of the brain called the cerebellum, and it's clearly

8   related to the cardiorespiratory arrest she had at the time of

9   the original injury.

10          Next, number 5.  Brain stem degeneration/gliosis.

11   The brain stem is that part of the brain that connects the

12   cerebral hemispheres with the cerebellum and the spinal cord.

13   And at the time of shock, when the blood flow is reduced

14   because of cardiac arrest, the structures in a certain part of

15   the brain stem called the tegmentum, t-e-g-m-e-n-t-u-m, are

16   particularly vulnerable to injury.

17          So I saw evidence of old injury in those regions

18   with, again, the reaction on the part of scarred cells, the

19   glia.  So that was all related again to the past episode.

20          And then, finally, acute neuronal necrosis, secondary

21   to cardiorespiratory arrest and acute infarction,

22   i-n-f-a-r-c-t-i-o-n.  And then I named the structure in which

23   there was acute infarction, and that's a structure called the

24   inferior olivary, o-l-i-v-a-r-y, nucleus, n-u-c-l-e-u-s.

25          And I put in parentheses "terminal."  Those were

Rorke-Adams - direct

1  terminal events with her, the last cardiorespiratory arrest
2  before she died.
3  Q    And with respect to that final diagnosis, that was not
4  related to her collapse on December 27th, 2002, correct?
5  A    No.
6  Q    Dr. Rorke-Adams, do you have an opinion to a reasonable
7  degree of medical certainty as to what caused Isabella's
8  collapse on December 27th, 2002, and eventual death?
9  A    Yes.
10 Q    What is your opinion?
11 A    She was a victim of abusive head trauma.
12 Q    What do you base that on?
13 A    I base it on a combination of the clinical information
14 regarding the events surrounding her collapse:
15          The medical records which document the treatment that
16 was given to try to resuscitate the child, her lack of
17 complete response to the treatment such that she was unable --
18 they were unable to restore her to a normal state, the severe
19 neurological deficit that she had as a consequence of the
20 injury, the radiological documentation and the neurosurgical
21 documentation of the presence of bilateral subdural hematomas,
22 and also blood in the lower part of the skull called the
23 posterior fossa, all of which are characteristic of trauma
24 injury, and then on the findings at the time of the postmortem
25 examination, which confirmed the presence of organized

1   subdural hematomas, the presence of the contusions and

2   lacerations, and then the evidence of the secondary injury of

3   the brain because of the cardiorespiratory arrest associated

4   with the traumatic incident.

Rorke-Adams - direct

1    Q    Dr. Rorke-Adams, in reviewing the reports of the

2    petitioner's expert witnesses, did they offer alternative

3    explanations for Isabella Zielinski's death?

4    A    Yes.

5    Q    Do you have an opinion as to whether Isabella died from a

6    repeated upper respiratory or a middle ear infection

7    complicated by seizures?

8    A    There's no evidence for that in the records.

9    Q    Do you have an opinion of whether -- just so we're clear

10   for the record, within the reports, though, correct, the

11   petitioner's experts, they postulated that that may have

12   caused her --

13   A    Yes.  But it's not in the clinical records.

14   Q    How about cortical venous thrombosis?  Do you have an

15   opinion as to whether that caused Isabella's death?

16   A    I do.

17   Q    What is that opinion?

18   A    It had nothing to do with it.

19   Q    How about birth trauma?

20   A    There's no indication that she sustained any significant

21   birth trauma.

22   Q    What about chronic extradural collections leading to

23   hemorrhage and then rehemorrhage?  Essentially this is -- is

24   what's called rebleeding?

25   A    Yes.

Rorke-Adams - direct

1    Q    What did that?  Did that cause her death?

2    A    No.

3    Q    Why not?

4    A    Well, because the presence of these hemorrhages in the

5 subdural space were not sufficiently large to have produced a

6 clinical situation that would lead to death.  Death from

7 subdural hematomas is caused -- is due to increased

8 intracranial pressure and herniation, which she did not have.

9    Q    And, finally, what about an acute or subacute medical

10 condition such as an infection complicated by hypoxia-ischemia

11 or seizures?

12    A    No.

13    Q    Why not?

14    A    Well, the evidence is such that while she had some damage

15 that was related to hypoxia-ischemia, she also had the

16 organized subdural hematoma, she had the contusions and

17 lacerations, and these would not be accounted for by that

18 explanation.

19    Q    In short, Dr. Rorke-Adams, did Isabella Zielinski collapse

20 on December 27, 2002, and ultimately die because of some

21 developing illness or developing process in her body, or was

22 she subjected to trauma?

23    A    She was subjected to trauma.

24         MR. TELISMAN:  If I could have one moment, your

25 Honor.

Rorke-Adams - cross

1    THE COURT:  Sure.

2    MR. TELISMAN:  Thank you.

3    I have no further questions at this time.

4    THE COURT:  Mr. Blegen.

5                    CROSS EXAMINATION

6  BY MR. BLEGEN:

7  Q    Good afternoon, doctor.

8  A    Good afternoon, sir.

9  Q    I may have missed what you said at the end of your

10  testimony about CVT.  I think you said that CVT did not cause

11  Isabella's collapse, correct?

12  A    That's correct.

13  Q    But CVT could have caused it, correct, if she had had

14  cerebral venous thrombosis?

15  A    The clinical picture of CVT does not correspond to what

16  she presented.

17  Q    The fact of the matter is, is that if Isabella had had CVT

18  back in December of '02, no one would even have thought that

19  this was abusive head trauma, correct?

20  A    That's correct.

21  Q    So CVT can explain what happened to the girl, right?

22  A    No.

23  Q    Well, why wouldn't anybody have thought that she had

24  abusive head trauma if they thought she had CVT?

25  A    Well, diagnosis of CVT is a easy diagnosis to make by

1  clinicians, and the possibility of abusive head trauma never

2  would have been considered.

3  Q   Because everything could have been explained by CVT,

4  correct?

5  A   No.  The subdural could not have been explained by CVT.

6  Q   All right.  I want to talk to you a little bit about

7  subdural, and then I'll go back to CVT.  You mentioned at the

8  end of your testimony a chronic subdural.  Do you remember

9  saying that?

10  A   Yes, I do.

11  Q   In your report you never mention the chronic subdural

12  once, do you?

13  A   Yes.  It's number one in my final diagnosis.

14  Q   You indicate that she had a chronic subdural that

15  preexisted 12/27/02?

16  A   No.

17  Q   You know that's the case now, though, right?

18  A   No, she didn't have a chronic subdural prior to

19  December 27th.

20  Q   Have you read the expert reports from your own side in

21  this case?

22  A   I read Dr. Forbes's report, and I believe I read

23  Dr. Hedlund's report.

24  Q   Okay.  Well, do you recall that in Dr. Hedlund's report he

25  indicated that on December 27th of '02 there was a chronic

1   subdural hematoma that was greater in age than two weeks?  Do

2   you recall that?

3   A   Yes.  I do.

4   Q   So I'm sorry, did you just misspeak when you said she did

5   not have a chronic subdural that predated 12/27?

6   A   I would not like to second guess Dr. Hedlund.

7   Q   All right.  So he's right, correct?

8   A   I'm not the judge of that.

9           THE COURT:  Well, you still have to answer his

10  question, though.

11  BY THE WITNESS:

12          THE WITNESS:  I think he's wrong.

13  BY MR. BLEGEN:

14  Q   Did you read the report of Dr. Smith?

15  A   Dr. Smith, I don't believe so.

16  Q   He's an expert on your side of this case, isn't he?

17  A   No, I didn't read his report.

18  Q   Would it surprise you to learn that he also found a

19  chronic subdural hematoma that predated 12/27/02?

20  A   Well, radiologists agree with each other.

21  Q   You must not have been in court the last couple of days,

22  but do you know that Dr. Barnes identified a chronic subdural

23  hematoma that predated 12/27/02?

24  A   Yes.

25  Q   Do you know that Dr. Julie Mack identified a chronic

1   subdural that predated 12/27/02?

2   A   Yes.

3   Q   Do you know that the radiologists at the time of the

4   incident at Provena St. Joseph Hospital and the next ones at

5   UIC Hospital also identified a chronic subdural that predated

6   12/27/02?

7   A   Yes.

8   Q   They're all wrong?

9   A   Yes.

10  Q   And you're right?

11  A   Yes.

12  Q   If they're right and you're wrong, this girl did not

13  suffer abusive head trauma from Jen -- excuse me, Jennifer Del

14  Prete on 12/27/02, did she?

15  A   Well, she had a lot of other injuries besides subdural

16  hematoma.

17  Q   Tell me what changes in your diagnosis, if anything, if

18  you come to agree -- if you were to agree that Isabella

19  Zielinski had a chronic subdural hematoma that predated

20  12/27/02?

21  A   It was irrelevant to her clinical picture because it was

22  asymptomatic.

23  Q   Because it was what?

24  A   Asymptomatic.

25  Q   How do you know it was asymptomatic?

Rorke-Adams - cross

1    A    Because she was described as a normal healthy baby without

2    any problems.

3    Q    Without any problems?

4    A    That was the clinical history.

5    Q    Well, she was hospitalized for a fever less than a month

6    before her collapse, right?

7    A    Well, fevers don't cause subdural hematomas.

8    Q    Well, that's not the question.

9         Are fevers problems?

10   A    Yes, they can be.

11   Q    All right.  And they can lead to hospitalization, correct?

12   A    Yes.

13   Q    So do we agree that they're problems?

14   A    Yes.

15   Q    Okay.  Now, let's move on to another thing that she had.

16   She had an ear infection, correct, prior to 12/27/02?

17   A    Yes.

18   Q    Is that a medical problem?

19   A    Yes.

20   Q    All right.  She had trouble feeding.  That's in the

21   records, correct?

22   A    Yes.  But I don't remember what the relationship of

23   troubled feeding was to her collapse on the 27th.

24   Q    Let me ask you a couple of things about babies in general.

25   When they're very young, it's harder to diagnose problems that

Rorke-Adams - cross

1   they have, medical problems, correct?

2   A    Sometimes, yes.

3   Q    What do you mean "sometimes"?

4   A    Well, sometimes the problem is obvious.

5   Q    Depending on the medical problem?

6   A    Yes.

7   Q    All right.  How about problems inside their head?  Those

8   are always harder to diagnose than with an adult, correct?

9   A    They can be.

10  Q    They are, aren't they?

11  A    They can be.  It depends on how serious they are.

12  Q    Well, adults can talk, right?

13  A    Yes.

14  Q    And they can tell you what hurts, correct?

15  A    If they're conscious, yes.

16  Q    All right.  Let's presume they're conscious when they're

17  talking.  They can tell you where something hurts in their

18  head, correct?

19  A    Yes.

20  Q    They can tell you if they're drowsier or sleepier than

21  normal, correct?

22  A    Well, they don't have to tell you.  You can see.

23  Q    Drowsiness can present itself at various times, right?

24  A    Yes.

25  Q    Somebody could say I was drowsy all day today but now I

1  feel fine, right?

2  A    Yes, of course.

3  Q    And they can tell you those things, right?

4  A    Yes.

5  Q    Babies can't do that, right?

6  A    That's correct.

7  Q    So the symptoms in a baby are harder to find, one, because

8  they can't communicate, correct?

9  A    Yes.

10 Q    Two, because babies cry naturally, right?

11 A    Yes.

12 Q    So they might be crying because there's something wrong in

13 their head, or they might just be crying like an ordinary

14 baby, right?

15 A    Yes.

16 Q    And you know all that to be the case, correct?

17 A    Yes.

18 Q    So when you say a subdural hematoma in a baby is not a

19 problem, that's ridiculous, isn't it?

20 A    No, it's not ridiculous at all.

21          MR. GOODFRIEND:  Objection.

22          THE COURT:  I'm sorry.  What's the objection?

23          MR. GOODFRIEND:  Mischaracterizes the --

24          THE COURT:  Let's let him object since he was the

25 questioning lawyer.

1        Did you want to make an objection, Mr. Telisman?

2        MR. TELISMAN:  No, not at this time.

3        THE COURT:  Okay.

4   BY MR. BLEGEN:

5   Q    You don't agree with me that a chronic subdural hematoma

6   in a two or three-month-old child is a problem?

7   A    No.  If it's a small one, it's not a problem at all.

8   Q    All right.  Well, how are you characterizing that the one

9   Isabella Zielinski had was a small one?

10  A    Because she had no clinical manifestation of central

11  nervous system dysfunction.

12  Q    Did you look at it on radiology, on the films?

13  A    No.  I don't read films.  I'm a pathologist, not a

14  radiologist.

15  Q    Okay.  But we're talking about something that she had in

16  her head long before she passed away, right?

17  A    Yes.

18  Q    So if you're going to say that it's small, you might want

19  to go back and look at the films that took a picture of it,

20  right?

21  A    Well, at the time they took the picture they were

22  clinically manifested.

23  Q    Which was bigger, the chronic subdural hematoma or the

24  acute subdural hematoma, hematomas, on 12/27/02?

25  A    According to the reports I read, they were mixed.  The one

Rorke-Adams - cross

1  was mixed with the other.

2  Q  A subdural hematoma in a baby can manifest itself with a

3  rapid increase in head circumference, correct?

4  A  Yes.

5  Q  And a collection of blood in the subdural compartment can

6  cause future problems if it doesn't resolve itself, can't it?

7  A  In babies that's never been demonstrated.

8  Q  There's never been a problem in a baby that resulted from

9  a chronic subdural hematoma?

10  A  And cause death like this, no, not as far as the

11  literature is concerned.

12  Q  We're not talking about death yet.  We're talking about

13  problems.

14      Can they cause other medical problems?

15  A  I can't think of any.

16  Q  Do any blood vessels or veins run through the dura to the

17  brain?

18  A  They run from the brain through the subarachnoid space and

19  go into the sinuses.

20  Q  All right.  Do they go through the dura at all?

21  A  They empty into the sinuses, and the sinuses are in the

22  dura.

23  Q  Okay.  And so can an expansion of the subdural space

24  stretch veins?

25  A  Expansion of the subdural -- yes, they can.

Rorke-Adams - cross

1    Q    Okay. And when veins get stretched, they get weak, don't

2    they?

3    A    Yes.

4    Q    And when a vein gets weak they can bleed, can't they?

5    A    Just not spontaneously, no.

6    Q    How about from minor trauma or normal handling?

7    A    In what circumstance?

8    Q    In the circumstance of a chronic subdural collection that

9    has expanded and stretched the veins, can't minor trauma or

10    normal handling cause the vein to leak or bleed?

11    A    Minor trauma may when you have brain atrophy and you

12    stretch the veins.

13    Q    I don't know where brain -- did you say brain or vein

14    atrophy?

15    A    Brain atrophy.

16    Q    Let's leave brain atrophy out of it.

17    A    Well, but that's the circumstance in which you're setting

18    up your question.

19    Q    I disagree, so let me ask the question a different way.

20      The expansion of the subdural space can cause veins

21    to stretch with or without brain atrophy, correct?

22    A    Well, there's no --

23      You have to have a reason for the veins to stretch in

24    the subdural space to increase prior to the problem.

25    Q    Well, I think maybe we're doing it a little backwards.

1      The subdural space increases first, correct, in my

2  scenario, and then the veins stretch?

3  A   Well, I don't know what your scenario is.  I'm sorry.  I

4  don't understand your question.

5  Q   All right.  We'll start over.

6      Isabella Zielinski had a chronic subdural hematoma

7  that predated 12/27/02 by more than two weeks.  Accept that

8  proposition.  Okay?

9  A   Okay.

10  Q   A chronic subdural hematoma can cause veins in the brain

11  to stretch, correct?

12  A   No.  The subdural hematoma does not cause the veins to

13  stretch.

14      THE COURT:  Don't you mean the bridging veins?

15  BY MR. BLEGEN:

16  Q   Any kind of veins.

17  A   There are all kinds of veins in the brain.  You have to

18  specify which ones you're talking about.

19  Q   All right.  Can a chronic subdural hematoma cause any of

20  the veins in the brain to stretch?

21  A   No.

22  Q   None?

23  A   No.

24  Q   Okay.  So if a child has a chronic subdural hematoma,

25  they're in no danger?

Rorke-Adams - cross

1   A   It undergoes organization.

2   Q   How do you think the chronic subdural hematoma that

3   predated 12/27/02 came to exist?

4   A   It could have occurred from some kind of a minor trauma

5   that didn't cause any major problems.

6   Q   So, therefore, the acute subdural hematomas that they

7   found on 12/27/02 could similarly have resulted from minor

8   trauma, correct?

9   A   It's possible.  I wouldn't expect minor trauma to produce

10  such a small subdural but --

11  Q   Are you saying that minor trauma causes bigger subdurals?

12  A   No.  I'd say minor trauma causes minimal subdurals.

13  Q   And which one are you -- which subdural are you saying is

14  minimal, the acute or the chronic?

15  A   I don't understand your line of questioning because you're

16  jumping around, and it's very confusing to me.

17  Q   All right.  I'm sorry.  I'll start over.

18          We know that Isabella had a chronic subdural

19  hematoma, correct --

20  A   Yes.

21  Q   -- according to every radiologist?

22  A   Okay.

23  Q   You just told us that minor trauma could have caused that,

24  correct?

25  A   Yes.

1  Q   Now, we also know that on 12/27/02 she had acute subdural
2  hematomas, correct?
3  A   Yes.
4  Q   And we've heard testimony that they were relatively the
5  same size, correct?
6  A   I didn't hear that testimony.
7  Q   Assume that -- for my scenario that that's the case.
8  Okay?
9  A   Okay.
10 Q   If that is the case, then the same minor trauma could have
11 caused the acute subdural hematoma?
12       THE COURT:  You mean, the same type of minor trauma?
13 BY MR. BLEGEN:
14 Q   Same type of minor trauma could have caused the acute
15 subdural hematomas, right?
16 A   Theoretically.
17 Q   All right.
18       Before I started talking about the chronic subdural
19 hematoma, you mentioned -- I think what you said was that
20 cerebral venous thrombosis is easy to diagnose and that's why
21 we know she didn't have it, right?
22 A   Yes.
23 Q   And that's why we went on to abuse instead of saying this
24 isn't an abuse case, let's look a different direction,
25 correct?

1  A    I wasn't there taking care of this child, so the

2  clinicians were the ones who made the decisions.

3  Q    I know you weren't there, but you told us ten minutes ago

4  now maybe that if there was a thought that the child had

5  cerebral venous thrombosis they would not have suspected

6  abuse, right?

7  A    That's correct.

8  Q    Okay.  And then you told us but don't worry about that

9  because cerebral venous thrombosis is easy to diagnose, right?

10  A    Yes.

11  Q    That is not true, is it, that it's easy to diagnose?

12  A    It's easy for the doctors at the Children's Hospital to

13  diagnose.  I don't know about other doctors.

14  Q    How about the American Heart Association?  What do you

15  think they think about the ease of diagnosing cerebral venous

16  thrombosis?

17  A    I haven't any idea.

18  Q    Well, let me show you what I've marked as Petitioner's

19  Exhibit Rorke-Adams 1.  That's a relatively lengthy document,

20  but I'll direct your attention to the third page in, the very

21  top left that starts with a big capital T.  Do you see that?

22  A    Is that Page 1159?

23  Q    Yes.

24  A    Yes, I see it.

25  Q    Now, this is a article from the American Heart Association

1   and the American Stroke Association written by some doctors

2   called Diagnosis and Management of Cerebral Venous Thrombosis,

3   a Statement For Health Care Professionals From the American

4   Heart Association/American Stroke Association, correct?  Do

5   you see that on the front cover?

6   A   Yes.

7   Q   And back on Page 1159 they say in the article, "Thrombosis

8   of the dural sinus and/or cerebral veins" --

9         THE COURT:  Where are you reading?

10         MR. BLEGEN:  Top left corner starting with

11   "thrombosis."

12         THE COURT:  The very beginning.  Okay.

13   BY MR. BLEGEN:

14   Q   "Thrombosis of the dural sinus and/or cerebral veins, CVT,

15   is an uncommon form of stroke usually affecting young

16   individuals.  Despite advances in the recognition of CVT in

17   recent years, diagnosis and management can be difficult

18   because of the diversity of underlying risk factors and the

19   absence of a uniform treatment approach."

20         Do you see that?

21   A   I do.

22   Q   All right.  Do you disagree with that conclusion?

23   A   Well, it's a very compound sentence, so it has some

24   modifiers.

25   Q   It has a lot of what?

1   A   Modifiers.

2   Q   All right.  Let's talk about modifiers.

3       Let's focus on the sentence, "Despite advances in the

4   recognition of CVT in recent years, diagnosis and management

5   can be difficult because of the diversity of underlying risk

6   factors."  Do you see that sentence?

7   A   Yes.

8   Q   What's the modifiers you're concerned about there?

9   A   It says "can be difficult," it doesn't say it's always

10  difficult or easy.  And it's modifying the problems in

11  diagnosis because they say that there are a diversity of

12  underlying risk factors, and that certainly is true.

13  Q   And it's the diversity of risk factors that makes it hard

14  to diagnose, right?

15  A   Well, that's the job of the clinician, who has the patient

16  and pursues it further and makes the diagnosis.

17  Q   I know.  Why are you talking about the clinician?  We're

18  talking about in general, right?

19      Is it hard or easy to diagnose CVT for a clinician?

20  A   In my experience, it's an easy diagnosis.

21  Q   All right.  You're not a clinician, right?

22  A   No.

23  Q   Okay.  This article is telling clinicians that it's hard

24  to diagnose and explaining why, correct?

25  A   That's what it purports to do.

Rorke-Adams - cross

1   Q    So you disagree with this article?

2   A    Yes.

3   Q    All right.  Let me show you what I've marked as

4   Defendant's Exhibit Rorke-Adams 3 -- Petitioner's Rorke-Adams

5   3.  Look on the second page.  You can see that this article is

6   from -- apparently from Stroke Magazine of April 2006, written

7   by various doctors, correct?  Do you see that on the front?

8   A    Yes.

9   Q    Peer reviewed and eventually accepted back in '05?

10  A    That's what it says.

11  Q    Read the very first sentence of the body starting with

12  "cerebral."

13  A    "Cerebral venous thrombosis is a rare condition which is

14  notoriously difficult to diagnose because of its various modes

15  of onset and its wide spectrum of signs and symptoms."

16  Q    All right.  You disagree with this article as well?

17  A    Well, again, in my experience, the doctors at the

18  Children's Hospital don't have any difficulty diagnosing

19  cerebral vein thrombosis.

20  Q    How do you know they don't have any difficulty diagnosing

21  cerebral venous thrombosis?

22  A    Because every week I go to the neuroradiology conference,

23  at which time the radiological studies of the patients are

24  presented and discussed, and not infrequently we will have a

25  child who has a MRI or a CT and a cerebral vein thrombosis is

Rorke-Adams - cross

1  diagnosed.

2  Q   Okay.  So you're saying that you know that they are good

3  at finding it and don't miss it much because of the number of

4  times they found it?

5  A   Yes.  And also I go to the weekly neuroscience conference,

6  which is held by the neurologists, and from time to time we

7  have presentations by the fellows dealing with their study of

8  the children who were diagnosed with cerebral vein thrombosis

9  and who were treated and what the outcomes were.

10 Q   How about the number of times they've missed it?  How do

11 you know that?

12 A   I don't know that.

13 Q   Okay.  So how can you conclude that they find it the

14 correct amount of times or even a lot of the times?

15 A   From my exposure to what the clinicians and the

16 radiologists have shared.

17 Q   Meaning nobody has walked up to you and said, gee, I

18 missed a CVT and never knew about it?

19 A   I wouldn't expect anybody to make such a statement.

20 Q   Right, because if they missed it, they wouldn't know,

21 right?

22 A   That's correct.

23 Q   So you have no idea how often people at your hospital miss

24 CVT, do you, or you know how many times they find it, right?

25 A   Yes.

Rorke-Adams - cross

1    Q    And if there was a CVT in Isabella Zielinski's case that

2    had been recognized on 12/27/02, no one would even have

3    suspected abuse, right?

4    A    Yes.

5    Q    And Jennifer Del Prete would not have gotten arrested,

6    right?

7    A    Yes.

8    Q    Do you know that two of the defense experts have testified

9    that there was a thrombosed cortical vein on imaging?

10   A    Yes.

11   Q    Do you know that one of the prosecution experts,

12   Dr. Hedlund, said that they might be right?

13              MR. TELISMAN:  Objection.

14              THE COURT:  Overruled.

15   BY THE WITNESS:

16   A    Yes.

17   BY MR. BLEGEN:

18   Q    Who told you that?

19   A    Yes.

20   Q    Who told you that?

21   A    I read it in his report.

22   Q    He wrote in his report that they might be right?

23   A    No, he didn't write that in his report.

24   Q    Okay.  If you were to learn now that Dr. Hedlund has

25   conceded that they might be right, would that change your

Rorke-Adams - cross

1  diagnosis?

2  A   No.

3  Q   Well, but you'll have to explain that to me because it

4  doesn't make sense.  No one would have suspected abusive head

5  trauma if she had CVT, right?

6  A   Individuals who have CVT do not have bilateral subdural

7  hematomas.

8  Q   But we know the girl had a subdural hematoma that predated

9  her collapse by more than two weeks, correct?

10  A   Well, that's what you're alleging.

11  Q   Well, that's what your own experts are alleging, right?

12  A   If that's what they say.

13  Q   Well, you read their reports, didn't you?

14  A   I read Dr. Hedlund's report.

15  Q   Well, he's the one who makes it crystal clear, puts a

16  greater than sign right in front of the two weeks next to the

17  chronic subdural hematoma, doesn't he?

18  A   I don't remember whether he did or not.

19  Q   CVT can lead to seizures, correct?

20  A   Yes.

21  Q   It can lead to a child stop breathing, correct?

22  A   I guess it can, yes.

23  Q   By way of a seizure, right?

24  A   Yes.

25  Q   And seizures with -- that lead to stopping breathing can

1  lead to your heart stopping from beating, correct?

2  A   Yes.

3  Q   And that's what happened to Isabella in this case, right?

4  A   No.

5  Q   Well, she stopped breathing; we know that, right?

6  A   Yes.

7  Q   And her heart stopped beating, right?

8  A   Yes.

9  Q   You're just --

10  A   She didn't have any seizures as far as I know.

11  Q   Well, how do you know?

12  A   I don't remember seeing anything in the records that she

13  had a seizure at the acute onset.

14  Q   Do you remember Miss Del Prete reporting that the baby's

15  lips started quivering or something like that?

16  A   Well, that's not necessarily a seizure.

17  Q   It's not necessarily a seizure, but it could be, right?

18  A   I wouldn't expect quivering of the lips, if it were a

19  seizure, to cause sudden death.

20       THE COURT:  Do you know what.  Excuse me.

21       MR. BLEGEN:  I'm sorry.

22       THE COURT:  So I don't know whether you're the sixth

23  or seventh person who's testified here.  And I'm the person

24  who's got to find facts.  But it would be much preferable to

25  me if you were to answer his question rather than turning it

1  around and answering some other question that you would prefer

2  to answer.  I've gotten quite tired of it over the past

3  four days.  Okay?

4        THE WITNESS:  Yes, your Honor.

5        THE COURT:  And I'm going to tell you what I've told

6  the other five or six people.  It detracts from the

7  credibility of a witness if the witness will not directly

8  answer a question posed by the opposite side's attorney.

9        Now I've said it.  Okay?  You've heard it.  You're

10  the sixth person to hear it or the fifth.

11        You deflected that last question.  You didn't answer

12  it.  You answered some other question that you preferred to

13  answer.  If you want to keep doing that, be my guest.

14        MR. BLEGEN:  I've forgotten what the question was,

15  but I'll move on to another one.

16  BY MR. BLEGEN:

17  Q   Isabella Zielinski could have had a seizure, right?  You

18  don't know?

19  A   That's correct.

20  Q   And there's at least some indication in Miss Del Prete's

21  explanation of what happened that she might have had a

22  seizure, right?

23  A   Conceivable.

24  Q   Okay.  And that could have led to the lack of breathing

25  and the heart stopping, right?

Rorke-Adams - cross

1   A   Conceivable.

2   Q   And what you said a minute ago was seizure doesn't lead to

3   sudden death, right?

4   A   I didn't say that.

5   Q   Tell me what you said about sudden death.

6   A   I said that kind of seizure.

7   Q   That kind of seizure doesn't lead to sudden death?

8   A   That's correct.

9   Q   Well, as far as you know, Miss Del Prete's not a doctor

10  who can -- is good at recognizing the different kinds of

11  seizures, correct?

12       You read the trial transcript, right?

13   A   Yes.

14   Q   You know she's not a doctor, right?

15   A   Yes.

16   Q   Would you expect her to be able to recognize one kind of a

17  seizure from another?

18   A   No.

19   Q   And there wasn't a sudden death here, was there?

20   A   No.

21   Q   So your answer that other kind of seizures -- or this kind

22  of seizure doesn't lead to a sudden death, that's irrelevant,

23  isn't it, cause she didn't do that here?

24       Strike that question.  It was a bad question.

25       Having learned about the possible agreement on the

1   thrombosed cortical vein and having apparently learned now

2   about the chronic subdural collection that's greater in age

3   than two weeks, do you want to change your opinion about the

4   cause of death?

5   A    No.

6   Q    You still believe it was abusive head trauma, correct?

7   A    Yes.

8   Q    And do you believe that it was -- that this abusive head

9   trauma was inflicted only on December 27th of '02?

10  A    Yes.

11  Q    What kind of abusive head trauma do you believe was

12  inflicted?

13          THE WITNESS:  May I answer that, your Honor?

14          THE COURT:  Unless somebody objects or I tell you not

15  to, and that hasn't happened, so go ahead.

16  BY THE WITNESS:

17  A    She was subjected to abusive head trauma by a shaking of

18  her head.  There may have been an impact associated with the

19  attack.  This lead to the development of bilateral subdural

20  hematomas, contusion and laceration of her brain, and it led

21  to cardiorespiratory arrest.  And even though she was

22  resuscitated and survived, she had serious neurological

23  deficit, and she finally died some months after the injury.

24  Q    Let's talk about the shaking.  Do you believe this is a

25  result of shaking alone?

Rorke-Adams - cross

1   A    I don't know whether it's shaking alone or shaking and
2   impact.
3   Q    All right.  You told us a minute ago that you read the
4   trial testimony, correct?
5   A    Yes.
6   Q    Did you read the testimony of the shaken baby expert
7   Dr. Flaherty?
8   A    Yes.
9   Q    Did you read her testimony that this was a shaking alone
10  incident?
11  A    That was her opinion.
12  Q    All right.  So she could be wrong about that, right?
13  A    Yes.
14  Q    Because there could be impact?
15  A    Yes.
16  Q    There was no external evidence on the child of impact, was
17  there?
18  A    No.
19  Q    And your testimony today is that there was evidence on the
20  brain of impact or shaking?  I wasn't sure.
21  A    Shaking.
22  Q    All right.  Did you find any brain evidence of impact?
23  A    No.
24  Q    So where do you come to the conclusion that there might
25  have been impact?

1  A   Because that is oftentimes a component of shaking, but I

2  don't know.

3  Q   Well, stabbing is oftentimes a component of murder but not

4  always, right?

5  A   That's correct.

6  Q   So why did you suggest that there might be impact when

7  there's no evidence of it whatsoever?

8  A   Because this is a phenomenon which may occur at the time

9  of the shaking and show no evidence of impact because the

10  impact is against a soft surface.

11  Q   What phenomenon are you talking about?

12  A   I don't understand your question.

13       THE COURT:  Your answer was this is a phenomenon that

14  can occur without evidence of impact because the impact is

15  against a soft surface, so he's asking what you meant by the

16  word "phenomenon."

17       THE WITNESS:  The impact.

18  BY MR. BLEGEN:

19  Q   Okay.  And what causes you to come to the conclusion that

20  there might be impact?

21  A   I'm raising that as a possibility.

22       THE COURT:  You're not saying you have any evidence.

23  You're saying that that's just something that happens

24  sometimes in these same situations.

25       THE WITNESS:  That's correct, your Honor.

Rorke-Adams - cross

1          THE COURT:  That's what she's saying.  I got it about

2     three questions ago.

3     BY MR. BLEGEN:

4     Q    In other cases, right?

5     A    Yes.

6     Q    And are you comparing Miss Del Prete's case to some other

7     impact case?

8     A    No.

9     Q    Is your testimony that there might be impact based on the

10    fact that the medical science and biomechanical science

11    regarding shaken baby has changed over the last five or

12    six years?

13    A    I'm sorry.  I don't understand your question.

14    Q    If this -- if I were talking to you right now and it was

15    the year 2000, would you be saying that this was shaking and

16    maybe with impact, or would you be saying this was just

17    shaking?

18    A    I would be saying the same thing regardless of when.

19    Q    Isn't it the fact that you're suggesting that there's

20    impact because of relatively recent studies showing that

21    impact causes much greater forces than shaking alone?

22    A    No.

23    Q    That's not why?

24    A    No.

25    Q    So were you testifying about shaken baby cases back in the

Rorke-Adams - cross

1    '80s, for example?

2    A    Very rarely.

3    Q    How about the '90s, early '90s?

4    A    Conceivable, yes.

5    Q    All right.  And were you saying then that it was shaking

6    but also maybe with impact?

7    A    I can't remember what I was saying that long ago.

8    Q    But maybe you could just explain it to me briefly.  Why

9    are you adding an impact component to a case which -- for

10   which there is no evidence of impact?

11   A    I'm not adding it.  I said it was a possibility.

12   Q    Well, but is it part of your diagnosis for how the child

13   died?

14   A    No.

15   Q    So we can throw it out, right?

16   A    Yes.

17   Q    That was just a suggestion on the stand today?

18   A    Yes.

19   Q    All right.

20            I want to talk to you about the parts of the brain

21   that you were discussing earlier in which you said that there

22   was gross, and by "gross" I mean nonmicroscopic, evidence of

23   contusions and lacerations on the brain.  Remember that?

24   A    Yes.

25   Q    Where did you see contusions and lacerations?

1  A   In one of the photographs.

2  Q   Let me show you the -- it's part of their -- your

3  presentation.  If you think there's a photograph that's not

4  right, you let me know, but is this one of the ones that you

5  saw when Mr. Telisman was asking you questions?

6  A   It's a terrible photograph.

7  Q   It is.

8         Is that any better?

9  A   Not much.

10        THE COURT:  Just hand it to her.

11        MR. BLEGEN:  I will.

12        THE COURT:  It's not a great photograph, but it's

13  worse when they put it on the screens.

14  BY MR. BLEGEN:

15  Q   Is this one of the photographs that you were identifying

16  as an area where there's contusions or lacerations to the

17  brain?

18  A   It's out of context, but, it -- yes, these look like the

19  frontal lobes.

20  Q   And that's the area that you say there's evidence of

21  contusions and lacerations?

22  A   Yes.  This one in particular, that one not quite so much.

23  Q   And I think you said when the judge was asking you some

24  questions that it was kind of mushy or gnarly looking?

25  A   Yes.

Rorke-Adams - cross

1   Q   Do you know whether anyone else in this case has ever

2   concluded that there were contusions or lacerations on the

3   brain?

4   A   I saw nothing in the reports to that effect.

5   Q   And you told us earlier that this could not be -- what

6   you're calling contusions and lacerations, there's no way that

7   could be something that happened when the coroner was taking

8   the brain out of the skull, correct?

9   A   That's correct.

10  Q   You said that's a -- I think you might have said it's an

11  impossibility or not a consideration?

12  A   Yes.

13  Q   And that's because there was a very highly trained

14  qualified coroner who did this, right?

15  A   I didn't say he was highly trained and qualified, no.

16  Q   Did you say coroners in general are trained -- highly

17  trained and qualified?

18          THE COURT:  The real term is medical examiner, just

19  to be clear.  Coroner tends to be an elected position usually,

20  not even a doctor sometimes.

21  BY MR. BLEGEN:

22  Q   Maybe you said that medical examiners in general are good

23  at taking brains out and they wouldn't mess anything up,

24  right?

25  A   Well, they usually have assistants who do that all the

Rorke-Adams - cross

1  time.

2  Q   And their assistants are well trained at it, right?

3  A   Yes.

4  Q   But medical examiners are also well trained in looking for

5  contusions, lacerations on the brain, right?

6  A   Yes.

7  Q   And the medical examiner in this case did not find any

8  contusions or lacerations on the brain, right?

9  A   He did not report any.

10  Q   Do you think he might have found some and didn't report it

11  for some reason?

12  A   I don't think so.

13  Q   Okay.  So the fact that he didn't report it means he

14  didn't find it, right?

15  A   He didn't recognize it.

16  Q   He had the brain to put in his hands, move around, lift

17  up, inspect with his eye, a microscope, a magnifying glass,

18  whatever they use, right?

19  A   He didn't take any microscopic sections.

20  Q   Forget I said microscope.  I was thinking of a magnifying

21  glass or like one of those big lighted magnifying glasses.

22  Have you seen those?

23  A   No.

24  Q   Do they use them in the medical examiner's offices?

25  A   We don't have one in ours.

Rorke-Adams - cross

1    Q    All right.  Do you use anything other than a microscope to
2    take a closer look at things?
3    A    No.  Usually I just eyeball it or look at it with a
4    microscope.
5    Q    But you certainly move it around and handle it, right?
6    A    Yes.
7    Q    And this guy, Dr. Harkey, the medical examiner, had the
8    opportunity to do that, right?
9    A    Yes.
10   Q    And you did not, correct?
11   A    Correct.
12   Q    Because these photos are from 2003, correct?
13   A    Right.
14   Q    And let me show you what we've marked for identification
15   as Defendant's Exhibit Petitioner's Rorke-Adams 14.
16         Just take a quick look at that and tell me if it's
17   the medical examiner's report in this case.
18         THE COURT:  I guess there is a coroner in DuPage
19   County.  My mistake.  Sorry about that.
20         THE WITNESS:  It's his report.
21   BY MR. BLEGEN:
22   Q    All right.  Turn to page it would be labeled Harkey
23   triple -- or a lot of zeros and then a five in the bottom
24   right corner.
25   A    I have it.

Rorke-Adams - cross

1  Q   Do you see the part where he describes the head?

2  A   Yes.

3  Q   And then he says, "No abnormality was noted in the

4  reflected scalp."

5  A   Yes.

6  Q   All right.  "No scalp injuries and no acute bleeds."  Do

7  you see that?

8  A   Yes.

9  Q   All right.  Then he jumps down to the brain, correct?

10 A   Well, then he describes the dura.

11 Q   Okay.  But, I mean -- all right.  He describes the dura;

12 he describes some other things, correct?

13 A   Yes.

14 Q   Then he talks about the brain, right?

15 A   Yes.

16 Q   What does he say about the brain?

17 A   "The brain was very soft, consistent with autolysis, and

18 was placed directly into formalin for fixation prior to any

19 further examination."

20 Q   All right.

21 A   Then he gives the weight of the brain after it was fixed

22 as 930 grams.  And then he says, "Despite weeks in formalin,

23 the cortex of the brain remained a soft, semi-solid

24 consistency rather than becoming firm with fixation."

25 Q   All right.  I didn't mean this to be a reading test.

Rorke-Adams - cross

1       He says the brain was very soft, consistent with

2   autolysis, correct?

3           THE COURT:  What's autolysis?

4           THE WITNESS:  Autolysis is disintegration of the

5   tissue because of poor fixation.

6           THE COURT:  Got it.

7   BY MR. BLEGEN:

8   Q   And he means -- he says the brain was very soft, right?

9   A   Yes.

10  Q   Not just certain portions of the brain, correct?

11  A   Yes, yes.

12  Q   All right.  So the part that you're describing as

13  contusions, lacerations could be soft brain from autolysis,

14  correct?

15  A   No.

16  Q   Well, he's talking about the whole brain, right?

17  A   Well, he's wrong.

18  Q   Ah, okay.

19          He also says the cerebral hemispheres were

20  symmetrical in the next paragraph, correct?

21  A   Yes.

22  Q   Is he wrong about that?

23  A   No.

24  Q   So the mushy part at the front wouldn't throw off the

25  hemispheres at all?

Rorke-Adams - cross

1   A   Well, it is part of the hemispheres.

2   Q   So would it throw off the symmetry of the hemispheres?

3   A   No, because both of them were the same.

4   Q   They were equally mushy on both hemispheres of the brain

5   in the front?

6   A   Yes.

7   Q   And you were able to determine that from a photograph?

8   A   Yes.

9   Q   What about no lateral alleviation of the midline

10  structures?

11  A   What about it?

12  Q   Did that have any impact on your conclusion from the

13  photographs that there was a part that was contused, contused

14  or lacerated?

15  A   No.  It has nothing to do with it.

16  Q   All right.  Incidentally, can you tell us --

17          Is that picture any better for you?

18  A   Yes.

19  Q   Which part is a contusion and which part is a laceration?

20  A   The two of them generally go together.

21  Q   Excuse me?

22          THE COURT:  The two generally go together.

23          THE WITNESS:  Contusions and lacerations are usually

24  talked about together.  This is the part that's most severely

25  damaged.  This is the part that's slightly behind it, and it's

1  not as severely damaged except for this region here.  And then

2  as these sections of the brain are cut more and more

3  posteriorly, they look more and more normal.

4  BY MR. BLEGEN:

5  Q   All right.  Let me ask you about contusions and

6  lacerations.

7        So you wrote them separately in your report that the

8  child's brain had contusions and lacerations, correct?

9  A   Yes.

10  Q   Did you really mean the same thing?

11  A   Those two terms generally go together.

12  Q   All right.  My --

13        THE COURT:  His point is they describe two different

14  things, right?  A contusion's a bruise; a laceration's a cut?

15        THE WITNESS:  Yes.

16        THE COURT:  Okay.

17  BY MR. BLEGEN:

18  Q   When you say they go together, what do you mean?

19  A   Usually when you have severe injury, you have a surface

20  injury, and then you have laceration into the deeper portion

21  of the tissue.

22  Q   All right.  So point me to one -- where one of the

23  lacerations are.

24  A    It's best seen here.  This is so severely damaged that all

25  of the normal architecture is totally destroyed.  This part is

1  more destroyed than this part.  And the surface is irregular.

2  It shows none of the normal external configuration of what the

3  front part of the brain should look like.

4  Q    I just want you to point me to a laceration.

5  A    Right here.

6  Q    That's a laceration?

7  A    Yes.

8  Q    Why isn't that a laceration?

9  A    That looks like a little bit of hemorrhage.

10 Q    Can you stay there for a second, Dr. Rorke-Adams.  I'm

11 sorry.

12         How could you tell which part is the front of the

13 brain and which is the back part of the brain on these laid

14 out sections?

15 A    The convention is when you're laying out the sections to

16 put the most anterior part at the top, then the next and the

17 next and the next.  And I can tell by the anatomy of the

18 sections of the brain that have been laid out that this is the

19 back of the brain.  These are the occipital horns.  These are

20 the occipital bones.  And this is all I can tell of the

21 anatomy.

22 Q    On the front part --

23         MR. BLEGEN:  Can you go back to this one again, Rob?

24 BY MR. BLEGEN:

25 Q    Can you see any corpus callosum on these photos?

1   A   No.  It's too far anterior.

2   Q   The corpus callosum is too far anterior?

3           THE COURT:  You said interior or anterior?

4           THE WITNESS:  Anterior.

5           THE COURT:  Anterior.  Okay.

6   BY MR. BLEGEN:

7   Q   All right.  So this is sections of the front of the brain

8   because there is no corpus callosum pictured?

9   A   Well, not just because of that.

10  Q   All right.  What are the other reasons?

11  A   Because of the anatomy of the front part of the brain and

12  the manner in which they have laid out the sections, I can

13  tell what's front and what's back.

14  Q   Let's deal with the manner of laying it out for a second.

15  Do you know how Dr. Harkey lays out his sections of brain?

16  A   No.  But it looks like the standard way that most

17  neuropathologists or pathologists lay out.

18  Q   Did you call him and ask him?

19  A   No.

20          THE COURT:  Is it okay for the doctor to sit back

21  down?

22          MR. BLEGEN:  I think so, yes.

23          THE COURT:  While we have a short pause here, I've

24  communicated with the people about the video conferencing.  It

25  is conceivable that they could get it set up for tomorrow, but

1    I would need the ISDN number to dial so that they can do a

2    test.  So it doesn't have to happen right now, but have

3    somebody find that and you'll give it to me at the break.

4              MR. TELISMAN:  My only issue is --

5              THE COURT:  You already called him off?  Don't worry.

6    If you already called him off, we'll do it later.  Not a

7    problem.

8              Keep going, Mr. Blegen.

9              I communicated with them this morning and they just

10   now got back to me, so took them a long time.

11             MR. TELISMAN:  Could we bring it up at the next

12   break, your Honor?

13             THE COURT:  Yes.

14   BY MR. BLEGEN:

15   Q    Dr. Rorke-Adams, you also indicated, I think, in this

16   photograph, correct me if I'm wrong, that is there the -- what

17   you think is the damaged frontal part of the brain depicted on

18   this photo?

19   A    It's hardly visible.

20   Q    Which is the front, this or this?

21   A    The former.

22   Q    This is the front?

23   A    Yes.

24   Q    What's this big area back here?

25   A    That's a shadow.

Rorke-Adams - cross

1   Q  Can you see --

2        It's a what?

3   A  A shadow it looks like to me.

4   Q  A shadow?

5   A  Yes.

6   Q  Can you see the pons or the medulla on this photo?

7   A  The pons should be right in here.

8   Q  Is it there, or it should be there?

9   A  Well, let's see.  This looks like the cut end of the

10  medulla.  And the pons is difficult to be seen, but it's right

11  above the medulla.

12   Q  That's -- distinguishing the pons and the medulla helps

13  you figure out what part's the front and the back, right?

14   A  No.  This is the cerebellum.  That's the back.  These are

15  the temporal lobes -- poles -- lobes and the frontal lobes.

16        THE COURT:  Is this the view from the top or the view

17  from the bottom?

18        THE WITNESS:  The view from the bottom.

19  BY MR. BLEGEN:

20   Q  So is this the top of the brain but flipped over?

21   A  It's the bottom of the brain.

22   Q  It's the bottom of the brain.  Okay.

23        And it's your belief that the front part of the brain

24  was injured, and you further confirmed that through

25  microscopic slides, correct?

Rorke-Adams - cross

1   A   Yes.

2   Q   But the microscopic slides only help you if you're right

3   about where the -- what part of the brain was cut to get to

4   that slide 16, right?

5   A   Well, I can -- I confirmed it by the microscopic, yes.

6   Q   All right.  Well, you know that there were other doctors

7   present when the slides were taken, correct?

8   A   Yes.

9   Q   Dr. Leestma was there, correct?

10  A   Yes.

11  Q   Dr. Teas was there, correct?

12  A   Yes.

13  Q   Both medical examiners, or former ones at least, right?

14  A   I don't know what Dr. Tourtellotte's background was.

15  Q   I haven't asked about him yet, but he was there, correct?

16  A   Yes.

17  Q   And Dr. Tourtellotte was a state doctor, one of the

18  prosecution's doctors, correct?

19  A   Yes.

20  Q   And his purpose for being there was to make sure that

21  everything was accurately recorded, right?

22  A   I presume so.

23  Q   And you haven't heard anything from him that says, gee,

24  maybe we got this wrong, have you?

25  A   No.

1   Q   There was actually one of the prosecutors was there too,

2   right?  Did you know that?

3   A   No.

4   Q   So there was a system in place set up by the parties to

5   make sure that all of the slides and everything that was done

6   was viewed by everyone and all agreed, right?

7   A   Yes.

8   Q   But it's your testimony that all of them got it wrong

9   about where that slide came from, right?

10          MR. TELISMAN:  I'll object.

11          THE COURT:  Overruled.

12  BY MR. BLEGEN:

13  Q   They're wrong about where this slide came from?

14  A   Well, I don't know that they all had a part in that

15  decision.

16  Q   Okay.

17          THE WITNESS:  Excuse me.  May I have some water.

18          THE COURT:  Oh, absolutely.  Sure.

19  BY MR. BLEGEN:

20  Q   In addition to your own conclusion that Isabella died

21  based on abusive head trauma, you also told us in your direct

22  testimony that the coroner, Dr. Harkey, also concluded that

23  that's how she died, right?

24  A   He declared it a homicide.

25  Q   And I thought you said he declared it based on --

Rorke-Adams - cross

1    A    Yes.

2    Q    -- abusive head trauma that happened back in December?

3    A    Yes.

4    Q    But you know from your review of the transcripts that

5    Dr. Harkey was relying on what Dr. Flaherty had written up in

6    a report, right?

7    A    No, I didn't know that.

8    Q    You didn't -- I know you read the transcripts.  Maybe you

9    don't remember them.  But let me show you a portion of

10   Dr. Harkey's -- why don't you take a look at this, Page 58 of

11   Dr. Harkey's transcript, and take a look at the bracketed

12   portion.  If you want to read more, you can.

13            THE COURT:  This is from the trial.

14            MR. BLEGEN:  The trial transcript, yes.

15   BY MR. BLEGEN:

16   Q    Do you see that?

17   A    I do.

18   Q    Do you now recall that Dr. Harkey relied in particular on

19   Dr. Flaherty's report regarding what happened to Isabella?

20   A    Yes.

21   Q    And so that's how he reached his conclusion, correct?

22   A    Well, that's what he said.

23   Q    You have no reason to believe he was lying, right?

24   A    No.

25   Q    Okay.  In your report you indicated that in this case all

1   of the doctors, and in fact I think what you're saying is that

2   pediatricians and neuroradiologists and neurosurgeons and

3   critical care physicians and forensic pathologists in general,

4   all of them do their utmost to find a natural cause for an

5   infant who presents with a catastrophic, sudden life

6   threatening event, correct?

7   A   Yes.

8   Q   And is that what you think happened here, that everybody

9   did their utmost and nobody jumped to any conclusions?

10  A   Yes.

11  Q   Did you read the testimony of the ER physician in this

12  case Dr. Meka?

13  A   I'm sure I did.

14  Q   Do you remember it very well?

15  A   No.

16  Q   All right.  Let me show you -- why don't you read where

17  I've marked.  See that?

18  A   Yes.

19  Q   And Dr. Meka was the ER physician on that day, right?

20  A   Yes.

21  Q   And he, after seeing the -- noticing that there was

22  bleeds, he said because -- because there's no car accident,

23  you have to assume that it was a child abuse or baby shaking,

24  right?

25  A   Yes.

1    Q    So he didn't do his utmost, did he?

2    A    Well, he was the first line of command.

3    Q    I know, but -- well, we'll talk about where he was in the

4    chain of command in a second.  Did he do his utmost in your

5    opinion, or did he come to a conclusion?

6    A    He came to a preliminary diagnosis.

7    Q    He shouldn't have done that, right?

8    A    No, you have to come to a preliminary diagnosis when

9    you're presented with a patient.

10   Q    Maybe I misunderstood.

11        Well, what he said was that you have to assume that

12   it was a child abuse or baby shaking, correct?

13   A    Yes, in the absence of any kind of story of trauma,

14   serious trauma.

15   Q    But he's the -- wait a minute.  The finding of a subdural

16   bleed in the absence of evidence of any kind of a serious

17   trauma you should jump to the conclusion that it was shaken

18   baby?

19   A    That's the next possibility.

20   Q    Well, then, when Isabella Zielinski developed a chronic

21   subdural hematoma more than two weeks before 12/27/02, should

22   somebody have jumped to the conclusion that she had been

23   abused?

24   A    It wasn't diagnosed two weeks before she presented to the

25   ER.

Rorke-Adams - cross

1    Q    Well, I know, because nobody had a CT out at her house,

2    but let's say they did and they had seen it.  Should they have

3    jumped to the conclusion that this was shaken baby syndrome?

4    A    I can't answer that.

5    Q    How about when her head circumference grew in size rapidly

6    between zero and one month and one and two months?  Should

7    somebody have thought there was a problem then?

8    A    I can't answer that.  I'm not a pediatrician.

9    Q    At the beginning of your report you went through some

10   clinical facts, correct?

11   A    Yes.

12   Q    And at the end of your report you talked about clinical

13   facts that have been cited by the defense that were not

14   present, right?

15   A    Yes.

16   Q    In fact, what you said -- you went through a list of five

17   alternative explanations offered by the defense, correct?

18   A    Yes.

19   Q    And then you concluded or started the next paragraph by

20   saying, "None of these explanations credibly explains the

21   entire clinical and pathological features of Isabella's case,

22   and equally important is the fact that the records do not

23   document the presence of any of them," correct?

24   A    Yes.

25   Q    Well, that's not true, is it?

Rorke-Adams - cross

1    A    It was true as far as I was concerned.

2    Q    But we're talking about the records, not your beliefs,

3    right?  You said they weren't confirmed by the records.

4    A    That's correct.

5    Q    All right.  So what do you mean as far as you were

6    concerned?

7    A    As far as my reading of the records, none of these

8    alternate possibilities was significant to explain what

9    happened to her.

10   Q    But excuse me, ma'am.  That's not what you said.  You said

11   equally important is the fact that the records do not document

12   presence of any of them, right?

13   A    Yes.

14   Q    And number one on your list is repeated respiratory and

15   middle ear infections complicated by seizures, right?

16   A    That's what I have, yes.

17   Q    Well, you know that the girl had ear infections, or an ear

18   infection, right?

19   A    Yes.

20   Q    So why did you say that none of these are present?

21   A    Because in isolation they would not explain the entire

22   clinical pathological picture.

23   Q    Then why did you say equally as important, the records do

24   not document the presence of any of them?  That's not what

25   you're saying now on the stand, is it?

1    A    I'm talking about in looking at the picture as a whole.

2    In isolation, none of these things that are put forward would

3    explain the clinical and pathological picture that was present

4    in this child.

5    Q    I understand that.  You said it in the first part of the

6    sentence, correct?

7    A    Yes.

8    Q    Why did you write the second part of the sentence that

9    starts with "and equally important"?

10   A    I'm trying to emphasize what I said.

11   Q    You're trying to suggest that the defense experts are

12   lying about what was in the records, right?

13   A    No.

14   Q    Trying to suggest that they're wrong about what's in the

15   records?

16   A    No.

17   Q    Venous thrombosis, number two.

18        THE COURT:  Actually, we're going to stop.  We're

19   going to take a break at this point for ten minutes.

20        You can step down if you want to take a break.  I

21   just need to discuss something with these folks.

22        So I tried to communicate this morning with the

23   person at our court that deals with the video stuff, and he

24   wasn't in, so I forwarded the email to the person who deals

25   with it in his absence, and I got one back a bit ago here that

1 ‖ says it's doable tomorrow.

2 ‖ I mean, logistically it's doable tomorrow, but they

3 ‖ would need to -- they would need the ISDN number for dialing.

4 ‖ But if you've already called him off and he's already probably

5 ‖ made plans about tomorrow, there's really no need to do it

6 ‖ now.  We can do it, you know, in January when we come back.

7 ‖ MR. TELISMAN:  Here was my concern, Judge.  Tomorrow

8 ‖ we have two witnesses slated to testify.  One is coming from

9 ‖ St. Louis.  One is coming from Milwaukee.  The one from St.

10 ‖ Louis, her flight is due to arrive this evening, which as of

11 ‖ the lunch hour there were already flights being canceled for

12 ‖ O'Hare and Midway.  I don't know if she's going to make it in.

13 ‖ THE COURT:  She might not make it in.

14 ‖ MR. TELISMAN:  And so what I'm thinking is if we are

15 ‖ going to be short a witness, then it might be a good idea to

16 ‖ get Dr. Forbes lined up.

17 ‖ THE COURT:  Okay.  Well, I mean, it doesn't sound

18 ‖ like with Dr. Forbes it's going to be a really terribly long

19 ‖ time.  I mean, we're talking about half an hour probably at

20 ‖ most one way or the other, and my guess is that even if there

21 ‖ are other witnesses, we could probably fit it in somewhere.

22 ‖ So my suggestion would be that somebody -- you have somebody

23 ‖ make some contacts over the break.  I need something called

24 ‖ the ISDN number, ISDN number to dial into whatever the system

25 ‖ is.  And if you can get that to me, I can forward it to this

 1   person and have him do a quick test on it.

 2          MR. TELISMAN:  Okay.

 3          THE COURT:  Okay.

 4          MR. BLEGEN:  Judge, I imagine with the rest of cross

 5   and redirect we're going to get at least till four.  We have a

 6   doctor who's sitting out there, but his family also lives in

 7   Chicago, so I was thinking maybe he could -- he was going to

 8   visit them on the day he wasn't testifying.

 9          THE COURT:  Okay.  So we are going to use up every

10   bit of the day today because we are, because, you know, I need

11   to do that because I can't plan for the weather.  There may be

12   some day where we can't use all of our time because of the

13   weather.

14          (Recess taken.)

15          (The following proceedings were had in open court:)

16          THE COURT:  Okay, Mr. Blegen, you can proceed.

17   BY MR. BLEGEN:

18   Q   Dr. Rorke-Adams, on your list of things that you've

19   indicated are not documented in the records, you list venous

20   thrombosis as number two?

21   A   Yes.

22   Q   Isn't it a fact that Isabella had high platelet counts on

23   multiple occasions?

24   A   Yes, she did.

25   Q   And isn't that a sign of venous thrombosis?

Rorke-Adams - cross

1    A    Not as far as I know.

2    Q    It's not?

3    A    Not as far as I know.

4    Q    Is it that you just don't know, or do you think I'm wrong

5    about it?

6    A    I don't know.

7    Q    Oh.

8         But if it is, then the suggestion of venous

9    thrombosis would be consistent with the records, right?

10   A    It would be.

11   Q    Okay.

12        Birth trauma is number three on the list of things

13   that you say is not documented in the records, right?

14   A    Yes.

15   Q    Was there any birth trauma?

16   A    Not as far as I could see.

17   Q    Well, was there an occipital caput?

18   A    That's a very common, nonimportant thing.

19   Q    How about meconium stained amniotic fluid?

20   A    That certainly is not significant.

21   Q    Say again?

22   A    That's not a sign of birth trauma.

23   Q    How about the fact that the child was intubated right at

24   the time of birth?

25   A    That's not a sign of birth trauma either.

Rorke-Adams - cross

1   Q  How about cephalohematoma?

2   A  That's an external trauma, but it doesn't say anything

3  about what's inside.

4   Q  But it is a sign of birth trauma, right?

5   A  One form, yes.

6   Q  There were in fact complications in this birth, were there

7  not?

8   A  There were events that occurred, yes.

9   Q  Did you say events that occurred?

10   A  I wouldn't call them complications.

11   Q  Okay.  Well, then let's take a look at the birth records.

12  I'll hand you what I have marked as Exhibit Petitioner's

13  Rorke-Adams 5.  Take a quick look at those and let me know

14  when you're ready to talk about them.

15   A  Okay.

16   Q  Is that the birth records for Isabella Zielinski?

17   A  Yes.

18   Q  Does it indicate that the baby was intubated with a number

19  10 FR suction catheter?

20   A  Yes.

21   Q  That's not a birth complication?

22   A  No.

23   Q  Does it indicate that there was meconium stained amniotic

24  fluid?

25   A  Yes.

Rorke-Adams - cross

1   Q   Is that a birth complication?

2   A   No.

3   Q   Are you sure?

4   A   Yes.

5   Q   Can you turn to the next page.  Do you see the section

6   labeled labor/delivery complications in the upper right

7   corner, third box from the top?

8   A   Yes.

9   Q   Is there a box for MSAF?

10  A   Yes.

11  Q   Doesn't that stand for meconium stained amniotic fluid?

12  A   Yes.

13  Q   And is it checked?

14  A   Yes.

15  Q   And is it checked as light?

16  A   Yes.

17  Q   And isn't that listed under the various complications?

18  A   Yes.

19  Q   So do you disagree with the hospital that calls that a

20  complication?

21  A   Well, that's common.  I mean, that's a common finding in

22  many deliveries.

23  Q   It's a common complication, right?

24  A   Yes.

25  Q   So it is a complication, correct?

1   A   Yes.

2   Q   Do you see the one that's marked that says

3   V-A-R-D-E-C-E-L-S?

4   A   No.  Where's that?

5        THE COURT:  Just in the same box a little bit to the

6   right and below.

7        THE WITNESS:  Oh, I see it.

8   BY MR. BLEGEN:

9   Q   What's that?

10   A   That is variable decelerations.

11   Q   That's another complication, right?

12   A   Yes.

13   Q   And it's checked?

14   A   Yes.

15   Q   There's some things check under resuscitation too, right?

16   A   Yes.

17   Q   Suction, do you see that?

18   A   Yes.

19   Q   So all of these things can happen in a birth, correct?

20   A   Yes.

21   Q   But they are complications, aren't they?

22   A   Yes.

23   Q   Number four on your list of things that isn't in the

24   records is chronic extradural collections leading to

25   hemorrhage van rehemorrhage.  Do you see that?

Rorke-Adams - cross

1   A   Yes.

2   Q   What do you mean by chronic extradural collections?

3   A   Well, that's what the expert said, so I'm repeating what

4   the expert said.

5   Q   And by extradural do you mean subdural?

6   A   No.  The expert who was writing a report used that

7   terminology, so I'm simply listing that terminology.

8   Q   Oh, I see.  Which expert do you -- do you know which one

9   you're talking about there?

10   A   No.

11   Q   And then you say leading to rehemorrhage then -- then --

12   leading to hemorrhage then rehemorrhage, right?

13   A   Yes.

14   Q   And you don't agree that there was at least two

15   hemorrhages?

16   A   I do agree.

17   Q   You do?

18   A   Yes.

19   Q   Okay.  All right.  So they're right about that, right?

20   A   Yes.

21   Q   So that shouldn't have been in the list of things that are

22   not supported by the records, correct?

23   A   Yes.

24   Q   But on your direct testimony you testified about I think

25   some disagreement that you had with Dr. Leestma regarding the

1  finding of neomembranes?

2  A   No, I didn't disagree with him.

3  Q   Well, you agree that there are neomembranes seen on the

4  dura microscopically, correct?

5  A   Yes.

6  Q   But what you disagreed with was that that was a sign of

7  multiple hemorrhages or multiple incidents of bleeding, right?

8  A   No.  I agreed with him.  There was evidence.

9  Q   Okay.  Well, then let's pull up the slide.  This is a

10 slide that Dr. Leestma prepared for a Power Point.  I assume

11 you've seen this?

12 A   Yes.

13 Q   And the two of you agree, am I right, that this

14 neomembrane or neomembranes is the result of bleeds that have

15 healed?

16 A   Yes.

17 Q   And there's multiple layers of it, right?

18 A   Yes.

19 Q   How many do you count?

20 A   Well, some of it could be artifact, so I wouldn't count

21 it.

22 Q   All right.  Well --

23 A   I can't count it.

24 Q   What do you mean it's artifact?

25 A   It could be artifactual separation of the tissue in the

Rorke-Adams - cross

1  preparation of the slide.

2  Q  Could they all be artifacts?

3  A  No, I didn't say that.

4  Q  Then how do you decide which one's an artifact and which

5  one isn't?

6  A  I don't know.  That's why I can't give you an accurate

7  count.

8  Q  Leave the possibilities of artifacts aside for the moment

9  and tell me how many layers you count.

10 A  I'm sorry, I can't do that.

11 Q  You can't or you don't want to do it?

12 A  Well, I can't do it with any degree of accuracy.

13 Q  Does that appear to be a separate layer up here?

14 A  Could be.

15 Q  Does this appear to be another layer up here?

16 A  Could be.

17 Q  Does this appear to be another layer here?

18 A  Yes.

19 Q  All right.  So there's at least, it appears, three

20 separate layers, right?

21 A  Yes.

22 Q  All right.  So that would indicate three episodes of

23 bleeding, correct?

24 A  Not necessarily, because the histology looks relatively

25 similar.

Rorke-Adams - cross

1    Q    What do you mean?  They look like to be the same age or
2    something?
3    A    Could be.
4    Q    So there could have been multiple episodes of bleeding
5    around the same time, right?
6    A    Yes.
7    Q    Okay.  And the reason that you're suggesting that some of
8    this is artifact is because you know that if there's evidence
9    that she had more than two episodes of bleeding, then the
10    theory of abusive head trauma leading to the subdural
11    hematomas is out the window, right?
12    A    No.
13    Q    It's not?
14    A    No.
15    Q    So let's assume for the moment that there's three layers.
16    Okay?  Will you assume that?
17    A    All right.
18    Q    Do you think -- tell me first, do you think there's three,
19    or do you not --
20    A    Well, there would be.
21    Q    So let's assume there's there.  And two of them -- we know
22    one of them would be the chronic subdural that existed more
23    than two weeks before she collapsed, right?
24    A    Okay.
25    Q    And the next one would be around the time of December

1    27th, sometime around then, right?

2    A    Right.

3    Q    When would the next one be, the third one?

4    A    Well, actually it looks as though there's fresh blood in

5    there, so I can't say.

6    Q    Okay.  Wait a minute.  What does "fresh" mean?

7    A    Recent bleeding.

8    Q    How recent?

9    A    I can't say.

10   Q    Can you say within a month?

11   A    Well, there's no iron stain on that, so I don't know.

12   Q    Then how can you call it fresh?

13   A    Because it looks as though there are intact red cells

14   there.

15   Q    All right.  So you can somewhat date it by the fact that

16   there's intact red cells?

17   A    Yes.

18   Q    What's your best estimation of the --

19   A    Well, a red cell lives for 120 days.

20   Q    And then it's gone?

21   A    It disintegrates into -- it breaks up into hemosiderin.

22   Q    So what's that?  Four months?

23   A    No.  The hemosiderin breakdown can occur within 36 to

24   48 hours.

25   Q    I thought you said that you can tell it's fresh because

Rorke-Adams - cross

1    there's red blood cells in there?

2    A    Yes.

3    Q    And red blood cells last 120 days?

4    A    Right.

5    Q    So if the red blood cells are there, it's 120 days old or

6    less, right?

7    A    Right.

8    Q    Okay.  So we can date it to four months, right?  It's

9    four months or younger.

10   A    Okay.

11   Q    Do you agree with me?

12   A    Yes and no.

13   Q    I guess I got to know what the no part is.  What part do

14   you not agree with?

15   A    It's complicated.

16   Q    Are you not willing to date the freshest one within four

17   months or less?

18   A    It could be, yes.

19   Q    And four months --

20        And are you talking about four months from the time

21   of death?

22   A    I'm not specifying.  You're talking about the four months.

23   Q    All right.  Well, let's -- you just said it could be four

24   months, right?

25   A    Okay.

Rorke-Adams - cross

1   Q   Okay.  Let's go with -- could it be a year?

2   A   Not with the fresh red cells, no.

3   Q   Could it be ten months?

4   A   Not the fresh red cells.

5   Q   Could it be eight months?

6   A   No.

7   Q   All right.  So we know that that bleed turned into a

8   membrane sometime after Isabella collapsed and was sent home,

9   right?

10  A   You mean after the December 27th collapse?

11  Q   Yes.

12  A   Yes.

13  Q   Well, it didn't happen on December 27, this newer one with

14  the red blood cells, right?

15  A   Yes.

16  Q   And it didn't happen within even a couple of months of

17  that, correct?

18  A   Correct.

19  Q   Because she survived for 11 months after 12/27, right?

20  A   Yes.

21  Q   So we know, do we not, that she continued to have bleeding

22  problems sometime between the time she was sent home from the

23  hospital and the time that she expired, right?

24  A   Yes.

25  Q   And I thought you said on direct that she didn't have a

Rorke-Adams - cross

1  problem with bleeding.

2  A   She didn't have a coagulopathy.

3  Q   Oh, that's what you meant.

4         She does have a problem with bleeding into the

5  subdural space, right?

6  A   It's not a problem.  This is part of the behavior of the

7  organization of subdural hematomas.

8  Q   Well, I know it's not a problem that they create these

9  membranes to heal, but it is a problem if that part continues

10  to bleed unprovoked, right?

11  A   It's not generally a problem.  It's part of what happens

12  with the organization of subdurals and what may result as a

13  consequence of the organization of the subdurals because of

14  the vascularity in the membrane.

15  Q   So you're saying that the dura is a vascular membrane?

16  A   The membrane is a vascular structure.

17  Q   Okay.  And it can bleed easily?

18  A   Yes.

19  Q   And then without any trauma, right?

20  A   Yes.

21  Q   And it can present or show up as a subdural hematoma,

22  right?

23  A   Usually the hemorrhage under those circumstances remains

24  confined to the membrane.

25  Q   But here it didn't, right?

Rorke-Adams - cross

1    A    It's in a membrane.

2    Q    Oh, it's within in the neomembrane, not the dura membrane?

3    A    Well, the dura is on the outer part, and then it's just

4    below that with the neomembrane, so it's part of the

5    organization of the subdural membrane.

6    Q    This part here with the line and the arrows is the dura,

7    right?

8    A    Well, the bleeding is actually included with the dura, and

9    that's wrong.

10   Q    So this is now part of the dura too?

11   A    No.

12            May I step down?

13   Q    Sure.

14   A    This is the dura.  This appears -- from a distance it

15   appeared to be fresh blood, but now that I get closer to it,

16   it looks membranous.  So there is no fresh bleeding in here.

17   So I was wrong from my view from the witness stand.

18            So this is the dura.  These are the membranes that

19   have formed.  And this is the other membrane on the one side

20   of the subarachnoid.

21   Q    As long as you're down here, would you count up the

22   neomembranes for us, the layers.

23   A    I can't tell whether this is an artifactual separation of

24   this membrane.  It could be because it's irregular.  There's

25   another opening over here.  This is an opening over here.

Rorke-Adams - cross

1   Then there's some separations over here.  So then there's a

2   separation over here.  So I can't really give you a precise

3   count.

4   Q   Can you give us an imprecise count?

5   A   No.

6   Q   Have you seen Dr. Leestma's slide of the fixed dura that's

7   up on the screen now?

8   A   Yes.

9   Q   Do you see any fresh blood on there?

10  A   There are just a little two dark spots on the left side.

11  Q   Is that fresh blood?

12  A   It could be relatively recent.  The rest of it is very

13  old.

14  Q   That's the membranes that have healed up, right?

15  A   Yes.

16  Q   But these two blotches here are fresh blood, aren't they?

17  A   They look more recent.

18  Q   And by "more recent," how old do you think they are?

19  A   I can't tell.

20  Q   They're more recent than the last healed neomembrane,

21  right?

22  A   Yes.

23  Q   And they certainly wouldn't date back to December 27th of

24  '02, correct?

25  A   That's correct.

1  Q  So there was a bleeding problem -- or strike that, the

2  problem part.

3       There was bleeding below the dural area of Isabella

4  Zielinski after she left the hospital and in the months and

5  months before she expired?

6  A  It's not below the dura.  It's within the dura.

7  Q  Within the dura.  Okay.

8       Well, is the dura supposed to bleed spontaneously in

9  a normal person?

10 A  No.  But when it has a membrane it does bleed because it

11 has abnormal vascularity.

12 Q  So do you think that's bleeding within a membrane?

13 A  Yes.

14 Q  And that membrane continued to bleed even after she was

15 sent home, right?

16 A  Yes.  In that spot.

17 Q  It's not what?

18 A  I said yes.

19 Q  Oh, in that spot.  I thought you said it's not.

20      Number five on the list of things that you said are

21 not supported by the records is acute or subacute medical

22 condition such as infection complicated by hypoxia-ischemia or

23 seizures, right?

24 A  Right.

25 Q  And we talked about the seizures previously, correct?

Rorke-Adams - cross

1    A    Yes.

2    Q    You said that lip quivering could be a seizure, right?

3    A    Right.

4    Q    But she also had an infection, correct?

5    A    She had an infection before she had her December 27th

6    episode.

7    Q    After the December 27th episode wouldn't be very relevant,

8    would it?

9    A    No.

10   Q    But beforehand it would be, right?

11   A    Could.

12   Q    And she had an infection before December 27th, right?

13   A    Yes.

14   Q    She was given amoxicillin and was actually on it at the

15   time she collapsed, correct?

16   A    Yes.

17   Q    So that's also -- that is supported by the records, right?

18   A    Yes.

19   Q    Let's go to your section of clinical facts in your report.

20   It's on Page 2.  Do you see that?  Are you there?

21   A    I'm there.

22   Q    We already talked about uncomplicated pregnancy and

23   delivery.  You also indicated, however, that when she arrived

24   at St. Joseph Medical Center, her body temperature was

25   93.7 degrees.

Rorke-Adams - cross

1   A   Yes.

2   Q   Right?

3       Does that have some significance to you?

4   A   It indicates collapse of the cardiovascular system.

5   Q   But does the temperature itself have any significance?

6   A   I don't understand your question.

7   Q   Okay.  Are you suggesting that Jennifer Del Prete did not

8   call 911 when she says she did because of the body

9   temperature?

10  A   I'm not suggesting anything of the sort.

11  Q   Is there any way to judge how fast or slow somebody's body

12  temperature is going to drop when they -- their heart stops

13  beating and they stop breathing?

14  A   It's not a very accurate practice.

15  Q   So if somebody is suggesting that, they're out on a limb,

16  right?

17  A   Well, it's very imprecise.

18  Q   And you're a medical examiner, right?

19  A   Yes.

20  Q   So you're the kind of person who, if there was some

21  precision in that, you would want to use it, correct?

22  A   Yes.

23  Q   Because time of death is critical -- or excuse me.  Time

24  of an injury is critical to a medical examiner, right?

25  A   Yes.

Rorke-Adams - cross

1    Q    And especially in this kind of case, correct?

2    A    Yes.

3    Q    Do you know where you got the 93.7 degrees from?

4    A    I found it in the records, but I was subsequently given

5    information by the Attorney General's office that there were

6    some variations in the body temperature at various times.

7    Q    Did they tell you you were wrong about the body

8    temperature when she got to the hospital?

9    A    Yes, because it apparently was 95.1 and not 93.7.

10   Q    So she was at least a couple of degrees warmer when she

11   got there, right?

12   A    Yes.

13   Q    Suggesting at least even under the imprecise measurement

14   that she got there sooner rather than later, right?

15   A    Well, I didn't draw any conclusion.  I simply listed it.

16   Q    Fair enough.

17           In the next paragraph you indicate that the CT scan

18   of the head disclosed bilateral supratentorial subdural

19   hematomas, a posterior fossa subdural and a skull fracture of

20   the right frontal bone anterior and superior to the petrous

21   pyramid, correct?

22   A    Yes.

23   Q    Now, first of all, you didn't mention anything about the

24   chronic subdural hematoma in your explanation of where they

25   found and what kind of subdural hematomas were found, right?

1   A   No.

2   Q   Why didn't you mention that?

3   A   I didn't see any reason to.

4   Q   You did mention, however, a skull fracture of the right

5   frontal bone anterior and superior to the petrous pyramid,

6   right?

7   A   Yes.

8   Q   But you know that that wasn't even there?

9   A   Yes, that's correct.

10   Q   So am I right that in your report you left out something

11   that actually was there, the chronic subdural hematoma, but

12   put in your report something that you knew and know now was

13   not there, right?

14   A   I noted later on in my report that the fracture was not

15   confirmed.

16   Q   So why did you put it in the clinical facts if it's not a

17   clinical fact?

18   A   Because that's what the radiologist who read the film when

19   she first came in said was there.

20   Q   Your clinical fact section was not a -- just a list of all

21   the medical findings, was it?  Medical findings are thousands

22   of pages long, aren't they?

23   A   Yes, they are.

24   Q   You also when you -- when you withdraw the skull fracture

25   as not being confirmed, you indicate left frontal contusion

Rorke-Adams - cross

1  was noted, right?

2  A  Yes.

3  Q  But that's not true either, is it?

4  A  I got that from Dr. Flaherty's testimony.

5  Q  I know.  And you know she's wrong now, right?

6  A  Yes.

7  Q  Okay.  So why did you put it in your report?

8  A  Because, again, that's what I found in the records, but it

9  is apparently incorrect.

10  Q  Did you withdraw that anywhere later in your report?

11  A  No.

12  Q  But you're withdrawing it verbally now?

13  A  Well, I -- it's confirmed by the autopsy, so I left it in

14  there.

15  Q  You think that the left frontal contusion is confirmed by

16  the autopsy?

17  A  Absolutely.

18  Q  Dr. Harkey's autopsy?

19  A  Yes.

20  Q  Dr. Harkey said he didn't find any contusions.

21  A  Well, they're in the pictures.

22  Q  Excuse me?

23  A  They're in the photographs and in the microscopic slides.

24  Q  I'm sorry.  You're saying that it's confirmed by your view

25  of photographs and slides that you think are from a place

Rorke-Adams - cross

1   other than what they're labeled, right?

2   A   Yes.

3   Q   Incidentally, that slide you're talking about from that

4   part of the brain, is that near the surface of the brain or

5   deep in the brain?

6   A   The surface.

7   Q   And you say there was a contusion right there?

8   A   Yes.

9   Q   Easy to see?

10  A   Easy for me to see.  I'm accustomed to looking at such

11  things.

12  Q   I'm not comparing it to me.

13      Easy for a medical examiner to see?

14  A   If they're sufficiently trained.

15  Q   Medical examiners are generally trained in looking for

16  contusions on the brain, aren't they?

17  A   I don't know what Dr. Harkey's level of expertise was.

18  Q   One of the pathological findings that Dr. Harkey did make

19  was congestion of the liver, correct?

20  A   Yes.

21  Q   I thought you said on direct that he didn't make any

22  findings of any organ problems?

23  A   That's insignificant.  That's a terminal finding.

24  Q   It's a what finding?

25  A   Terminal.

Rorke-Adams - cross

1    Q    Meaning it resulted from the death or is connected just to

2    the death?

3    A    It's a reflection of cardiorespiratory arrest.

4    Q    Dead parts of the brain are also terminal findings, right?

5    A    I don't understand what you mean by "dead parts of the

6    brain."

7    Q    All right.  Well, maybe I don't either.

8         When a brain doesn't get oxygen through blood, it

9    dies, right?

10   A    Yes.

11   Q    And that shows up on an autopsy as a dead part of the

12   brain, right?

13   A    Yes.

14   Q    What does it look like?

15   A    Well, it depends on the length of time between the lack of

16   oxygen and the death.

17   Q    Let's say a day.

18   A    All right.  Well, this brain showed necrosis of the

19   neurons and a actual area of infarction in the brain stem,

20   which are quite consistent with her cardiorespiratory arrest

21   the day before she was declared dead.

22   Q    Have you heard of something called respirator brain?

23   A    Yes.

24   Q    What is that?

25   A    A respirator brain is a brain that has undergone

Rorke-Adams - cross

1   intravitam autolysis after circulation to it has stopped, and

2   the severity of the changes in the respirator brain are a

3   function of how long the individual is kept on the respirator.

4   Q   And what does it look like grossly?

5   A   It's a very soft, dirty gray color with loss of the normal

6   anatomical markings.  It sort of feels like butter, and it

7   kind of fritters away when you try to handle it.

8   Q   It's mushy, right?

9   A   Yes.

10  Q   Kind of smushed up, right?

11  A   Yes.

12  Q   You described in your review of the photos a photo of the

13  interior surface of the cranial cap which shows remnants of

14  bilateral subdural membranes and some dark red blood most

15  abundant along the left inferior lateral border, correct?

16  A   Yes.

17  Q   Is this the photo that you're talking about?

18  A   No.

19  Q   Did that finding that you just -- that I just read to you

20  have any significance in this case?

21  A   No.

22  Q   But you also indicate that two photos of the skull base

23  following removal of the brain display no striking lesion,

24  right?

25  A   Yes.

Rorke-Adams - cross

1  Q   And by that you mean there was no evidence of any trauma
2  around the skull base, correct?
3  A   Yes.
4  Q   When you were talking about the part of the brain that you
5  say is -- has contusions and lacerations, maybe I missed it,
6  did you say anything about whether you can date those
7  contusions or lacerations?
8  A   I can only date them to say that they're chronic.
9  Q   All right.  And by "chronic" you mean how old?
10 A   Months.
11 Q   Can you say how many months?
12 A   No.
13 Q   So it's months all the way back to birth?
14 A   It's conceivable.
15 Q   Tell me is there an outer limit to how old they could be?
16 A   There's a what?
17 Q   Is there an outer limit to how old they could be?
18 A   No.
19 Q   So in this case it would be months all the way back to
20 birth, right?
21 A   Conceivable.
22 Q   Would you take a look at Page 4 of your report.  Before we
23 get -- I'm going to get to that page, but would you take a
24 look at Dr. Leestma's slide that's up there on the screen.
25 A   Yes.

Rorke-Adams - cross

1   Q   And you discussed this a little bit on direct.  Those are

2   clotted cortical veins, right?

3   A   Intracortical veins.

4   Q   Say that again?

5   A   Intracortical veins, or within the cortex.

6   Q   Okay.  Now, you said that those are nowhere near where the

7   thrombosed cortical vein that showed up on the radiology was,

8   right?

9   A   Yes.

10  Q   But CVT can happen in lots of places, correct?

11  A   Yes.

12  Q   So the fact that it wasn't in the same place as the

13  thrombosed vein that shows up on imaging doesn't say that she

14  didn't have CVT, does it?

15  A   No.

16  Q   In fact it says she had more CVT than showed up on the

17  imaging, right?

18  A   What says?

19  Q   This picture showing two cortical veins that are nowhere

20  near the one that they saw on imaging.

21  A   Those are acutely thrombosed veins.

22  Q   What do you think caused them to become acutely

23  thrombosed?

24  A   Terminally she had cardiorespiratory arrest.  She was kept

25  alive for a day or so.  Under those circumstances, there's a

Rorke-Adams - cross

1    slowing down of the cerebral circulation, and so what happens

2    is that you get a sludging of the blood in the blood vessels

3    and you get formation of small clots.

4    Q    How come there's only a couple of them?

5    A    Only a couple in that picture.  I don't know how many more

6    there were.

7    Q    All right.  So your contention is, is that's acute

8    thrombosed cortical veins, right?

9    A    Yes.

10   Q    How old is acute in your view?

11   A    Well, it's certainly consistent with 24 hours, which is

12   what the clinical record --

13   Q    Consistent on the near end or the far end?

14   A    I'm sorry?

15   Q    What do you mean when you say acute?  Forget the clinical

16   facts of this case.  When you say acute thrombosed cortical

17   veins, what's the date range?

18   A    I would say a day or two.

19   Q    That's it?

20   A    Yes.

21   Q    A day or two?

22   A    Yes.

23   Q    It couldn't be any older than that?

24   A    No, because you start getting a cellular reaction if

25   the -- everything else is equal, and then you start getting

Rorke-Adams - cross

1   cells coming in and doing things and changing the appearance.

2   Q   All right.  So a day or two?

3   A   Yes.

4   Q   That's what your belief is?

5   A   Yes.

6   Q   She could have had many more thrombosed cortical veins

7   prior to her being hospitalized near the end of her life,

8   couldn't she?

9   A   It's possible.

10  Q   And she had the high platelet counts on a couple of

11  occasions, right?

12  A   That was a long time ago.

13  Q   Well, but people's platelet counts can fluctuate, can't

14  they?

15  A   Yes.

16  Q   That's actually a problem or an illness in and of itself,

17  right?

18  A   Yes.

19  Q   You can have low platelet counts, right?

20  A   Yes.

21  Q   High platelet counts, right?

22  A   Yes.

23  Q   Or the kind that fluctuate, right?

24  A   Yes.

25  Q   So the fact that she had high platelets long ago doesn't

Rorke-Adams - cross

1  mean she didn't have a clotting problem, does it, near this

2  time?

3  A    It's conceivable.  Unlikely.

4  Q    Why is it unlikely?

5  A    Because that's not the way the body works.

6  Q    The part about it going up and down is not how it works?

7  A    No.  There's a perfectly good explanation for what we're

8  seeing here that doesn't require any other theories as to what

9  the pathogenesis is.

10  Q    What we're seeing here, or are you talking about in

11  general?

12  A    Here, in this picture.

13  Q    Okay.  And your explanation is that it's a -- thrombosed

14  cortical veins that are connected only with her death and not

15  to some preexisting condition?

16  A    That's correct.

17  Q    But you can't rule out that there are other or that these

18  are a little bit older than you think, right?

19  A    I don't think they're older than two days.

20  Q    On Page 4 of your report, subparagraph I, you discuss or

21  note meningeal varices with calcium deposits:  one is clotted.

22  What do you --

23  A    Is that a question?

24  Q    Say again?

25  A    Is that a question?

Rorke-Adams - cross

1    Q    Yes.

2              Did you put that in your report?

3    A    I did.

4    Q    What are you talking about there?

5    A    Well, I'm describing this particular slide which

6    Dr. Leestma had labeled left parietal, question mark, vessel.

7    It was slide 10.  So I'm describing that this particular slide

8    contains some fragmented brain tissue, and in the subarachnoid

9    space there were some irregularly dilated veins, which I call

10   varices like varicose veins of the leg, and there were some

11   calcium deposits, indicating that this abnormality had been

12   present for a while.  And one of these veins on the surface

13   had a clot in it.

14   Q    All right.  What kind of clot?  How old?

15   A    A fairly recent clot again.

16   Q    But not one day or two, right?

17   A    I'm sorry?

18   Q    You didn't call it acute?

19   A    No, I didn't call it acute.

20   Q    And it's not acute, is it?

21   A    It could have been more than a couple of days old, but it

22   was not a four or ten-month-old clot.

23   Q    All right.  But it could have been a one-month-old clot,

24   right?

25   A    Unlikely.

Rorke-Adams - cross

1   Q  Three-week-old?

2   A  It didn't have the cellular reaction that I would expect

3  in an organized clot.

4   Q  All right. Well, you said it was older than a day or two?

5   A  Yes.

6   Q  And you said but it wasn't ten months old?

7   A  Right.

8   Q  So where in between did it --

9   A  I would say a few days.

10  Q  So but older than the acute ones that you're talking about

11 on the picture there, right?

12  A  It could have been the same age or it could have been

13 slightly older.

14  Q  You just said to us it was more than a few days old.

15  A  I said slightly older.

16  Q  I know, but now you're saying it could be just the same as

17 these?

18  A  Yes, they could be.

19  Q  But didn't you say when you first talked about it it was

20 more than a day or two old?

21  A  I was trying to give myself a little bit of latitude in

22 terms of the age of the clot, but it was clearly not a

23 ten-month-old clot.

24  Q  But it also is clearly not connected to the death, right?

25  A  That's correct.

1    Q    You testified a little bit about the corpus callosum and
2    that being somehow different than other parts of the brain as
3    it relates to dead areas in it.  Remember that?
4    A    I remember testifying about the corpus callosum.  I don't
5    know what else you mean by the rest of your question.
6    Q    All right.  I'll -- maybe I was wrong.
7            I thought what you said was that the corpus callosum,
8    which you describe as having cortical white matter necrosis-
9    gliosis as -- strike that.
10           Do you see subparagraph three on Page 5 where you
11   discuss the corpus callosum?
12   A    At which page?
13   Q    Page 5, number 3 under Neuropathological Diagnosis.
14   A    I see that.
15   Q    And you see where you say, "Multi-focal areas of cerebral
16   cortical white matter necrosis-gliosis including corpus
17   callosum"?
18   A    Yes.
19   Q    All right.  Generally speaking when you're talking about
20   white matter necrosis-gliosis, you're just talking about dead
21   parts of the brain, right?
22   A    Yes.
23   Q    And generally speaking you're talking about parts of the
24   brain that died as a result of not getting blood oxygen,
25   right?

Rorke-Adams - cross

1   A    Or which had other kinds of damage.

2   Q    Well, you said something about the corpus callosum being

3   different, didn't you?

4   A    Yes.

5   Q    What -- tell us -- tell me again what you said.

6   A    The cerebral cortical necrosis and gliosis, aside from the

7   area of the contusion laceration, was a consequence of the

8   lack of oxygen when she had cardiorespiratory failure.  So the

9   microscopic appearance of those was what I would expect when

10  you cut off the blood supply because of shock.

11          The damage in the corpus callosum was different from

12  that because the corpus callosum is composed of white matter,

13  which has a very low vulnerability to lack of oxygen.  So if

14  you have hypoxia-ischemia associated with shock such as she

15  had and was documented, you would expect to get the kind of

16  changes that I saw in the cortex.  You would not expect to see

17  the same kind of changes in the corpus callosum.

18  Q    Ever?

19  A    If you have a global necrosis of the whole brain, you

20  would get it.

21  Q    What about ever in time?

22  A    What does that mean?

23  Q    Well, parts of the brain are dying from lack of blood

24  oxygen, right?

25  A    Yes.

Rorke-Adams - cross

1  Q  And you say the parts that die and the other parts of the

2  brain non-corpus callosum, you just attribute that to the lack

3  of blood oxygen, correct?

4  A  Your question is a very mixed up question.  I'm sorry.  I

5  don't understand it.

6  Q  You've told us that the corpus callosum is different than

7  the other parts of the brain relating to its death from lack

8  of oxygen, right?

9  A  Yes.

10  Q  Can the corpus callosum ever get white matter

11  necrosis-gliosis from lack of oxygen?

12  A  Yes.

13  Q  How long would it take?

14  A  It's not a matter of time.  It's a matter of what causes

15  it.

16  Q  How long would it take for it to get that way from lack of

17  oxygen?

18  A  What way?

19  Q  White matter necrosis-gliosis, that way.

20  A  It's an impossible question to answer because from the

21  pathologic point of view it doesn't make any sense.

22  Q  Let me just ask it to you this way then and I'll move on.

23  Can the corpus callosum get multi-focal areas of cerebral

24  cortical white matter necrosis-gliosis?  Is it possible?

25  A  No, because the corpus callosum is a unique structure, and

 1  it's not related to the cortex and the white matter elsewhere.
 2  Q   So it doesn't die the same way from lack of oxygen?
 3  A   The end result is the same, but you can't lump all of
 4  those lesions together.
 5          THE COURT:  I need to see Mr. Blegen and
 6  Mr. Telisman, please, just the two of them.
 7          (Side bar conference off the record.)
 8          (The following proceedings were had in open court:)
 9  BY MR. BLEGEN:
10  Q   Dead parts of the brain can be viewed on -- by CAT scans,
11  can they not?
12  A   Some of them can, yes.
13  Q   They can be viewed even better with MRIs, correct?
14  A   Somewhat better than with CAT scans, yes.
15  Q   There were multiple CAT scans with and without contrast
16  and MRIs taken of Isabella Zielinski's brain starting on
17  12/27/02 and thereafter, correct?
18  A   Yes.
19  Q   None of them saw the brain contusions and lacerations that
20  you see you said -- you say you see, correct?
21  A   Yes.
22          MR. BLEGEN:  That's all I have, Judge.
23          THE COURT:  Mr. Telisman.
24          MR. TELISMAN:  Thank you.
25                      REDIRECT EXAMINATION

Rorke-Adams - redirect

BY MR. TELISMAN:

Q   All right, Dr. Rorke-Adams, let's start at the beginning.
Counsel asked you some questions about the finding, the
radiological findings of a chronic subdural hemorrhage.  Do
you recall that?

A   Yes.

Q   And the question of whether or not a chronic subdural
hemorrhage or the subdural hemorrhages predated December 27th,
2002.

A   Yes.

Q   And you said that you disagree with the radiological
findings of the radiologist.

A   Yes.

Q   And why do you think so?

A   Because when I get these cases to evaluate, practically
always the neuroradiologist says that there's an acute and a
subacute subdural hematoma, and the problem here is, and I've
discussed it with our neuroradiologists, is that there's a
mixture when there is a subdural of both cerebrospinal fluid
and the blood, which has a certain appearance on the CAT scan
and the MRI which the neuroradiologists have been interpreting
as old subdural mixed with new subdural.

Q   Is that because the cerebral spinal fluid is -- appears
almost black on a CT scan?

A   Yes.

Rorke-Adams - redirect

1  Q   And so when it's mixed in with blood, it gives it a darker
2  tint?
3  A   It gives it a different appearance, so they call that an
4  acute and a chronic subdural.
5       When those cases come to autopsy, there's no evidence
6  of an old subdural.  It's just the new subdural.
7  Q   You're not the only neuropathologist to have this concern
8  about radiology; is that right?
9  A   Yes.
10      MR. BLEGEN:  Judge, can I object to foundation?
11      THE COURT:  Sustained, unless you lay the foundation
12  for it.
13 BY MR. TELISMAN:
14 Q   Dr. Rorke-Adams, have you spoken with other
15 neuropathologists in your field about the concerns regarding
16 the neuroradiological dating of subdural hemorrhages?
17      THE COURT:  So now we're going to put in what other
18 neuropathologists have told her?
19      MR. TELISMAN:  I will move on, your Honor.
20      THE COURT:  I'm just asking a question.  Okay.  If
21 you want to move on, move on.  It's a question.  I just wanted
22 to make sure I was getting it.
23 BY MR. TELISMAN:
24 Q   Now, counsel asked you about the -- Isabella's condition
25 before her December 27th, 2002, collapse, and you had

1    explained that she was a normal healthy baby, right?

2    A    Yes.

3    Q    And counsel pointed out that she had been hospitalized for

4    fever and had an ear infection, right?

5    A    Yes.

6    Q    Do normal healthy babies have fevers, have a fever, have

7    an ear infection?  Is that a normal thing to happen?

8    A    Yes.  It happens frequently.

9    Q    Counsel asked you about the -- about the emergency room

10   treatment at Provena Medical Center, Provena Hospital.

11   Provena St. Joseph Medical Center I think is what it's called.

12   And I think counsel asked you questions about jumping to

13   conclusions.  Do you recall that?

14   A    Yes.

15   Q    Do you recall the various diagnoses, differential

16   diagnoses that the treating physicians there had come up with

17   with respect to Isabella?  Do you recall that off the top of

18   your head?

19   A    No.

20   Q    I'm handing you records marked Provena 28, Provena 29 and

21   Provena 32.  If you could take a look.  Tell me what were the

22   differential diagnoses that the treating physicians in the

23   emergency room came up with for Isabella?

24   A    Well, highlighted in yellow is -- the first diagnosis is

25   cardiopulmonary arrest.  The second one is rule out -- I can't

Rorke-Adams - redirect

1    read the handwriting.  Then the third one was hypoglycemia.

2    And the fourth one is rule out child abuse.  I can't read what

3    the second one is.

4    Q   How about the next page?

5    A   This is also highlighted in yellow.  Number one,

6    cardiorespiratory arrest; number two, rule out sepsis; number

7    three is hypothermia; number four is hyperglycemia, I guess it

8    is, yes, hyperglycemia; number five, rule out child abuse.

9         On the next page, highlighted in yellow, it starts

10   out with number two.  I don't know where number one is.  Rule

11   out sepsis or something, hemocytoma or something like that.

12   Number three is hypoglycemia.  Then there's another word,

13   "resolving."  Number four is hypo, hypo something resolved.

14   And number five is rule out child abuse.  And then it says the

15   CT finding.

16   Q   And then -- and I just have -- this is Provena 31.  It's

17   the -- at the bottom of the page you'll see the first part of

18   that differential?

19   A   Oh.  The first part is neurologic depressed with possible

20   something activity, possible maybe seizure activity.  It

21   doesn't look like that, but that might be what it is.

22   Q   So the treating emergency room physicians didn't just

23   assume that this was child abuse; is that right?

24   A   Yes.

25   Q   Now, counsel also asked you about the issue of birth

Rorke-Adams - redirect

1   trauma.  Do you recall that?  And birth complications?

2   A   Yes.

3   Q   Dr. Rorke-Adams, with respect to Isabella's birth -- well,

4   I'll simply ask you.  Do the records reflect whether there was

5   a prolonged rupture of the membrane during the labor and

6   delivery?

7   A   I don't remember.

8   Q   Would it refresh your recollection to take a look at the

9   consultation record of the attending delivery?

10  A   Yes.

11      There was no prolonged rupture of the membranes.

12  Q   Was there any meconium below the cord?

13  A   No.

14  Q   And what's the significance of that, if you know?

15  A   If you have a long-term intrauterine problem with delivery

16  of oxygen to the baby and meconium is expelled and it takes

17  place over a long period of time, the presence of meconium

18  below the vocal cords indicates that the baby has aspirated

19  the meconium.

20  Q   Did that happen here?

21  A   No.

22  Q   How about respiratory and cardiovascular exam?

23  A   That's normal.  She had no respiratory distress or

24  depression was noted.

25  Q   And the abdominal exam was?

Rorke-Adams - redirect

1  A   Normal.

2  Q   Extremities?

3  A   Normal.

4  Q   Was there any respiratory distress?

5  A   No.

6  Q   I'll take that.

7      Do you recall what her Apgar scores were at one and

8  five minutes?

9  A   I think they were eight and nine.

10 Q   Why don't you take a look at that.  What were her scores?

11 A   Nine and nine.

12 Q   And that's out of how much?

13 A   Ten.

14 Q   And what does that measure?

15 A   That's a very good Apgar score.

16     Apgar scores are values that are given to the

17 appearance of the baby at the time of delivery.  The baby is

18 evaluated at one minute and at five minutes and if there's a

19 problem with the Apgar, at ten minutes.  And basically it

20 takes into consideration the skin color, the respiratory

21 effort, the cardiac rate, the tone of the baby.  And so you

22 look at -- evaluate all those things on a three-point scale,

23 and then you add them all up, and you give an Apgar at one and

24 five minutes.  And those are -- they couldn't be better Apgar

25 scores.

Rorke-Adams - redirect

1  Q   And what about the diagnosis for Isabella after delivery?

2  A   Normal newborn.

3  Q   Did Isabella Zielinski spend any time in the neonatal

4  intensive care unit?

5  A   I don't believe so.

6  Q   Were there any records reflecting that she did?

7  A   I don't remember seeing any.

8  Q   Now, counsel asked you questions about respirator brain.

9  A   Yes.

10 Q   Do you believe that your observations of the front of

11 Isabella Zielinski's brain were the result of respirator

12 brain?

13 A   Absolutely not.

14 Q   Why not?

15 A   Because the rest of the brain did not look like a

16 respirator brain, and the frontal lobes are not selectively

17 involved with respirator brain, and they also showed severe

18 damage.

19 Q   Counsel asked you questions regarding the issue of

20 bleeding and rebleeding.  Do you recall?  And in the slide

21 from Dr. Leestma that he put up there?

22 A   Yes.

23 Q   Does that change your opinion about what caused Isabella

24 to collapse on December 27th, 2002?

25 A   No.

1  Q   Why not?

2  A   Because as I indicated in the cross examination, you may

3  have rebleeding in a organized subdural hematoma because part

4  of the organization of the subdural in the formation of the

5  membrane involves the growth of new blood vessels.  And these

6  new blood vessels have very delicate walls, and they can

7  easily rupture and bleed into the membrane.  And in babies

8  they don't bleed in a subdural space.  They may in older

9  individuals, but they don't in babies.  And so it's not

10 uncommon to see an organized subdural hematoma at a younger

11 age in which there is some intradural bleeding, but it has no

12 clinical significance.

13 Q   Counsel also asked you about the fresh blood on the dura

14 that was shown in the -- one of the photos that Dr. Leestma

15 took in July.  Do you recall that?

16 A   Yes.

17 Q   Does that -- anything about that change your opinion?

18 A   No.  It was two tiny little arrows that looked as -- or

19 areas that looked as though they were intradural.

20 Q   Counsel also asked you about your report reflecting a

21 clot, and I think it was in the context of varices?

22 A   Yes.

23 Q   What's the significance of that?

24 A   It's not uncommon when you have a vascular malformation to

25 have aberrant blood flow through these abnormal vessels, and

Rorke-Adams - redirect

1  so they may clot spontaneously, and it's a phenomenon that we

2  see under these circumstances.

3  Q   And that's indicative of the fact that that particular

4  blood vessel was -- was, I'm sorry, abnormal or something like

5  that?

6  A   Yeah.  It looked like an abnormal blood vessel.

7  Q   Counsel also asked you about whether Isabella's chronic

8  subdural hemorrhage could have occurred, or if there was a

9  chronic subdural hemorrhage, whether it could have -- whether

10 that could have occurred from minor trauma.  Do you recall

11 that?

12 A   Yes.

13 Q   Is it your opinion that minor trauma could have caused

14 Isabella Zielinski's collapse?

15 A   No.

16 Q   Why not?

17 A   Because if it's minor trauma, it doesn't cause any

18 clinical problem.

19 Q   Counsel showed you articles from the American Heart

20 Association, I think, regarding diagnosis and management of

21 cerebral venous thrombosis?

22 A   Yes.

23 Q   And then another article about MRIs of clots in CVT.  Do

24 you recall that?

25 A   Yes.

Rorke-Adams - redirect

1   Q   Do those change your ultimate opinions in this case?

2   A   No.

3   Q   Why not?

4   A   There was no evidence of significant clinical venous

5   thrombosis, and in the absence of that, if we agree that there

6   was one thrombosed vein, it still explains none of the

7   findings of the bilateral subdural hematomas because subdural

8   bleeding is not associated with venous thrombosis.  And it

9   does not explain the contusions and lacerations and the severe

10   destruction of the two frontal lobes and the contusions in

11   the -- in that tissue in that area.  So it has no relevance as

12   far as this case is concerned.

13   Q   And ultimately when counsel asked you if Isabella had

14   cortical venous thrombosis on December 27, 2002, then no one

15   would have suspected abusive head trauma, do you recall him

16   asking you that?

17   A   Yes.

18   Q   Is it your opinion that Isabella had cortical venous

19   thrombosis on December 27, 2002?

20   A   I don't think so.

21   Q   Why not?

22   A   Well, because if she had significant cortical venous

23   thrombosis that caused her clinical picture, the pattern of

24   damage to the brain would have been totally different than

25   what was found at the autopsy.

Rorke-Adams - redirect

1   Q   And could you please be more specific?

2   A   Yes.

3           When there is significant cortical venous thrombosis,

4   there is a backup of the -- of venous drainage in the brain,

5   and because of the changes that are taking place in the tissue

6   as a consequence of the thrombi, the brain undergoes necrosis

7   and hemorrhage.  So the pathological picture is very

8   distinctive, and you have large areas of hemorrhage through

9   the cortex and the white matter underneath the area of the

10  thrombosed veins.

11          Thrombosed veins are typically on the top of the

12  brain, and so you would expect hemorrhagic necrosis or the

13  chronic effects thereof when she died months later to be

14  located in the top of the brain.  There was no evidence of

15  that at all.

16          Also when you have venous thrombosis, the veins in

17  the middle two thirds of the brain are primarily affected.

18  The frontal lobes are not specifically involved in venous

19  thrombosis.  And the major damage was in the frontal lobes,

20  not in the middle two thirds of the brain.

21  Q   And when counsel spoke with you about the ease or possible

22  difficulty in detecting cortical venous thrombosis, do you

23  find it difficult to detect it from a pathological

24  perspective?

25  A   No.

1  Q   For the -- because of the findings that you just

2  described?

3  A   Yes.  It's an easy diagnosis.  You find the veins.  They

4  look like sausages on the surface of the brain.  You have this

5  extensive area of necrosis with massive hemorrhage when you

6  look at it grossly.  And then when you look at it

7  microscopically, you confirm the fact that there are these

8  thrombi in the veins, not just one, but multiple veins.  It's

9  a very easy diagnosis to make pathologically.

10         MR. TELISMAN:  If I could have one moment, your

11  Honor.

12         THE COURT:  Um-hum.

13         MR. TELISMAN:  I have no further questions.

14                    RECROSS EXAMINATION

15  BY MR. BLEGEN:

16  Q   Dr. Rorke-Adams, when there is a subdural bleed, how long

17  does it take for one of these neomembranes to form?

18  A   It begins within a couple of days you get an activation of

19  the cells called fibroblasts.  The membrane really doesn't

20  form very well until at least a week or two after the bleed.

21  Q   Now, you're saying that radiologists often confuse

22  subdural hematomas with just liquid, right, or fluid, spinal

23  fluid?

24  A   No.  If you have pure spinal fluid, they can recognize

25  that.

1  Q   So what is it you're saying that they misdiagnose as a

2  chronic subdural hematoma?

3  A   What happens when you tear the bridging veins and get the

4  bleeding that causes the subdural, you also tear the

5  subarachnoid membrane, and the spinal fluid, which is in the

6  subarachnoid space, intermixes with the blood, and it gives

7  you a different picture than pure blood or pure spinal fluid.

8  Q   So you think it's new blood mixing with fluid?

9  A   Yes.

10 Q   Are you talking about kids who have benign extra-axial

11 fluid collection that gets mistaken?

12 A   No.

13 Q   You're not?

14 A   No.

15 Q   You're saying that the blood mixes with the fluid and

16 therefore is a different shade than they would expect with

17 just pure blood?

18 A   Their shadows are different.

19 Q   All right.  So you think the radiologists got it wrong

20 here and it wasn't a chronic subdural, right?

21 A   That's correct.

22 Q   Do you know that there was also an operation done?

23 A   Yes.

24 Q   And that the operation found membrane?

25 A   Yes.  But that was two weeks later, so you would have

Rorke-Adams - recross

1   expected to find what the neurosurgeon described at that time.

2   Q   Well, let's pull up the operative report.

3           There was an operation that was performed on I think

4   it's January 10th of 2003.  Do you recall that?

5   A   Yes, I do.

6   Q   And that was essentially to evacuate the collection of

7   what you think was fluid at the front of the brain?

8   A   Well, in my note to you I say the subdurals were drained

9   by the neurosurgeon on 1/10/03, who described them as

10  xanthochromic liquified hematoma.

11  Q   Right.  What is that?  Blood, right?

12  A   I'm sorry?

13  Q   That's -- the hematoma means it was blood, right?

14  A   Right.  It's liquified, and then there's xanthochromic

15  fluids.  Xanthochromia refers to a yellow color of the fluid.

16  And it's a color that we see after there's been bleeding into

17  the subarachnoid space because of the breakdown of the red

18  cells, and it simply confirms what I interpreted before as a

19  mixture of blood and spinal fluid that was seen on the films

20  when she had the initial studies.  So mixture of cerebral

21  spinal fluid and blood.

22  Q   Can you tell me what page you're reading from?

23  A   I'm on the second page of my report.

24  Q   Is there a -- can you tell me -- oh, I see it.

25  A   It's the third paragraph from the bottom.

Rorke-Adams - recross

1  Q   So the surgeon described what was drained as

2  xanthochromatic liquified hematoma, correct?

3  A   Yes.

4  Q   Xanthochromatic means it's like yellow orange, right?

5  A   Yes.

6  Q   How long does it take for the blood to turn yellow orange?

7  A   It takes several days.  I can't give you a precise number.

8  Q   But also there was a blue membrane found, correct?

9  A   Blue?

10        THE COURT:  No human being can see that.  You're

11  making it bigger.  All right.

12  BY MR. BLEGEN:

13  Q   Do you see where the surgeon writes, "The bluish outer

14  membrane of the chronic subdural hematoma was identified"?

15  A   That's absolutely the way it looks.  That's a normal

16  description of a subdural hematoma as viewed from the outside

17  of the dura.

18  Q   Well, he's calling it a chronic subdural hematoma, right?

19  A   Yes.  It was a chronic one by that time.

20  Q   I see.

21        And what's your -- how do you date chronic?

22  A   Well, one that is not absolutely acute.  It's one that's

23  been there for a while and shows the characteristics that he

24  described in his surgery.

25  Q   How do you date it in number of days?

1  A   I can't give you a precise number.  I would say at least

2  five to seven days would start being organizing in chronic.

3  Q   So five to seven days or more, or that's it?  Seven days

4  is the outside?

5  A   Well, once you get past that you can't date it at all.

6  Q   That existing membrane was still bleeding, right?

7  A   Yes, it could have been.

8  Q   Well, did the surgeon do anything to stop it from

9  bleeding?

10  A   He says good hemostasis of the something I can't read from

11  here.

12  Q   And what does that mean?

13  A   Hemostasis means he stopped the bleeding.

14  Q   So it was still bleeding what is that 13 or 14 days after

15  December 27th?

16  A   Well, I don't know what hemostasis he's talking about.

17  There could have been some little blood vessels that were not

18  bleeding that -- or he wanted to prevent them from bleeding,

19  so it's not clear.

20  Q   Do you understand that Dr. Hedlund also indicated that he

21  saw a membrane on radiology?

22  A   Yes.

23  Q   Prior to this surgery?

24  A   That part I don't remember.

25  Q   Well, is he wrong about finding a membrane?

Rorke-Adams - recross

1  A   There could have been a membrane from a previous subdural

2  bleed at the time of birth.  Subdural bleeds at the time of

3  birth are not uncommon.  They usually resolve by a month of

4  age, and they may leave behind a little thin membrane.

5  Q   Are they as big as the one we saw in this case?

6  A   No.

7  Q   Including the chronic one, right?

8  A   That's correct.

9  Q   At the end of your redirect testimony you said that

10 cortical venous thrombosis, what you had been telling us was

11 that it's not hard -- it's not easy -- strike that.

12      You said that on pathology it's easy to find CVT,

13 correct?

14 A   Yes.

15 Q   But in your report you said it was -- you said "besides,

16 clinical and/or pathological diagnosis of CVT is not

17 difficult," didn't you?

18 A   Yes.

19 Q   So do you think now that in light of what the American

20 Heart Association said that maybe clinically it is hard to

21 see?

22 A   Well, maybe they think so, but as I said several times in

23 my cross examination, the clinicians at our hospital don't

24 have difficulty diagnosing it.

25 Q   And you know that because sometimes they find it?

Rorke-Adams -

1        THE COURT:  We don't have to go through that again.

2        MR. BLEGEN:  I'm done.

3        THE COURT:  Okay.  I need you to put up -- so during

4 the direct examination towards the beginning there was that

5 series of photographs of the brain.  The first one was from

6 the bottom, the second one was from the top, and the third one

7 that you used was the one where it had been sectioned and it

8 was all laying out on the table.  I need you to put that one

9 up there.

10       And if you need to go down there to look more

11 carefully, feel free, but when he gets it up.

12       THE WITNESS:  Thank you.

13       THE COURT:  Yeah, that's the one.

14       Okay.  So, now, just give me the top part of that,

15 please.  Just give me what I ask for, not something else.

16 You've lost it.  You now lost it.

17       Yes, that right there.  Stop.  Okay.

18       So you were saying before, you were talking about the

19 way that this -- the lower one on the left-hand side there,

20 the way that looks.

21       THE WITNESS:  Yes.

22       THE COURT:  And you're saying that that shows all

23 sorts of damage, it's not the way it's supposed to look

24 basically, right?

25       THE WITNESS:  Yes.

Rorke-Adams -

1        THE COURT:  Okay.  So this, that particular slice,

2  you were telling me, I think, that the sections are made

3  vertically?

4        THE WITNESS:  Coronally we call it.

5        THE COURT:  Coronally, but from top to bottom.

6        THE WITNESS:  Yes.

7        THE COURT:  So on that one which is the top, which is

8  the bottom?

9        THE WITNESS:  Well, if they're laid out

10  anatomically --

11        THE COURT:  If they're done the way you would

12  normally see it.

13        THE WITNESS:  -- this is the top, this is the top,

14  and this is the top.

15        THE COURT:  Got it.

16        THE WITNESS:  Okay?

17        THE COURT:  Okay.  So what's on the picture, what's

18  at the lower level is actually the top?  Right?

19        THE WITNESS:  This is the top of the --

20        THE COURT:  That's the top of that particular

21  section.

22        THE WITNESS:  That's correct.

23        THE COURT:  And is that the one that you're pointing

24  to right now at the bottom left there, is that the one that's

25  at the very -- is that from the very front of the brain?  Is

Rorke-Adams -

1 | that like the first one?

2 | THE WITNESS: Yes, the frontal, we call it the

3 | frontal pole.

4 | THE COURT: Got it.

5 | On that particular section there, are there some

6 | parts that are more damaged than others, or is it pretty much

7 | damaged all through it?

8 | THE WITNESS: Well, this side looks more damaged than

9 | this.

10 | THE COURT: So the side that you think is more

11 | damaged, would it be the right side of the head or the left

12 | side of the head?

13 | THE WITNESS: No, I can't tell --

14 | THE COURT: Can't tell. Okay. Fair enough.

15 | THE WITNESS: -- from the way they put it down.

16 | THE COURT: But in terms of top versus bottom, does

17 | the top look more damaged than the bottom, the bottom look

18 | more damaged than the top?

19 | THE WITNESS: Well, this whole frontal pole looks

20 | more damaged than this one because I can make out some gyral

21 | markings here.

22 | THE COURT: Right. The gyral markings before a

23 | little sort of sectioning?

24 | THE WITNESS: Yes, that's right. The little lines

25 | separating the gyro, and they correspond to these lines going

Rorke-Adams -

1  in here like that.

2          THE COURT:  But in terms of -- so this would be on

3  the section, this is from the top.

4          THE WITNESS:  Yes.

5          THE COURT:  This is the bottom.

6          THE WITNESS:  That's correct.

7          THE COURT:  Okay.  Do you think it -- can you tell

8  that it's more damaged at the top or more damaged at the

9  bottom, or is it really hard to -- damaged all throughout?

10         THE WITNESS:  In this one it looks relatively intact.

11 On this one the anatomy is so severely damaged I would say

12 that --

13         THE COURT:  It's all the way from top to bottom

14 basically.

15         THE WITNESS:  Right.

16         THE COURT:  Okay.

17         THE WITNESS:  With a little bit of tissue which is

18 still recognizable as brain, but most of it is severely

19 damaged.

20         THE COURT:  So what's the, if you will, the laundry

21 list of things that can cause what you're seeing there?

22         THE WITNESS:  The laundry list is not very long.

23         THE COURT:  You can give me from the most likely to

24 least likely.

25         THE WITNESS:  For something to be localized to the

Rorke-Adams -

1  frontal poles, leaving intact most of the rest of the brain

2  except for patchy involvement.

3          THE COURT:  Okay.  Which is what you're seeing?

4          THE WITNESS:  Right.  I can't think of anything but

5  trauma.

6          THE COURT:  Okay.

7          THE WITNESS:  I can't think of a single natural

8  disease that would do that.

9          THE COURT:  Okay.

10          And the nature of the trauma is what?  Is it hitting

11  against the skull, or is it the scraping that you were

12  referring to before, or what exactly?

13          THE WITNESS:  Yes.

14          THE COURT:  Both?

15          THE WITNESS:  The movement of the brain inside the

16  skull.  The brain of a baby is much softer than your brain and

17  mine.

18          THE COURT:  I've heard that from other witnesses.

19          THE WITNESS:  They have a very high water content,

20  and it makes it very vulnerable to easy injury.  When you're a

21  baby, it's sort of like Jello.  And so this very soft brain

22  hitting against the inside of the skull and the bone in the

23  front of the skull --

24          THE COURT:  That's the one that's kind of in here

25  going horizontally, right, that you showed me on that other

837

Rorke-Adams -

1  diagram?

2          THE WITNESS:  That's right.

3          THE COURT:  You said it's rough and it scrapes

4  against that.

5          THE WITNESS:  Exactly.

6          THE COURT:  But that wouldn't cause the damage to the

7  top part; that would only be the damage to the bottom part,

8  right?

9          THE WITNESS:  That's correct.

10          There must have been so much force in the movement of

11  the brain that something interfered with the -- all of the

12  tissue, sparing this one a little bit, but --

13          THE COURT:  So let me ask you this.  And this is

14  going to be one of those questions that doctors don't like to

15  answer because it's not quantifiable, but you've seen a lot of

16  brains.

17          THE WITNESS:  Right.

18          THE COURT:  You've seen a lot of postmortem brains in

19  cases involving trauma.

20          THE WITNESS:  That's correct.

21          THE COURT:  What you're seeing in the front of this

22  brain here, where is it on the scale?  Is it really, really

23  bad, not so bad?

24          THE WITNESS:  It's horrible.

25          THE COURT:  So it's really, really bad?

Rorke-Adams -

1      THE WITNESS:  Yes.

2      THE COURT:  It suggests really very serious trauma?

3      THE WITNESS:  That's correct.

4      THE COURT:  Okay.  Okay.  Fine.  That's what I wanted

5  to know.  Thanks.

6      Follow-up questions based on that?

7      MR. BLEGEN:  No thank you, Judge.

8      THE COURT:  Mr. Telisman.

9      MR. TELISMAN:  If I could just have one second, your

10  Honor.

11      THE COURT:  Um-hum.

12      MR. TELISMAN:  No, your Honor.

13      THE COURT:  Okay.  Thanks very much.  You can step

14  down.

15      Next witness, please.  We're going to get another 15

16  or-ish minutes in.

17      MR. BLEGEN:  Judge, can I just ask a quick question?

18  What's the rule on talking to witnesses who are on direct

19  examination?

20      THE COURT:  I don't have a problem with it.  They're

21  on cross is when I have a problem with it.  Everybody's got a

22  little bit different practice on that.  Well, there's two

23  schools of thought.  Not everybody has a different practice.

24      The witness's name is going to be.

25      MR. BLEGEN:  Joseph Scheller, S-c-h-e-l-l-e-r.

1      THE COURT:  Raise your right hand, please.

2          (Witness sworn.)

3      DR. JOSEPH SCHELLER, PETITIONER'S WITNESS, DULY SWORN

4                    DIRECT EXAMINATION

5   BY MR. BLEGEN:

6   Q   Sir, could you please tell us your name and spell your

7   last name for the court reporter.

8   A   Joseph Scheller, S-c-h-e-l-l-e-r.

9   Q   And how are you employed, Mr. Scheller?

10  A   I work for the Winchester Valley Medical Center,

11  Winchester, Virginia.

12  Q   And is that -- is that a hospital?

13  A   Yes, sir.

14  Q   What kind of hospital is it?

15  A   It's a big sort of community regional hospital for the

16  western part of the state of Virginia.

17  Q   Can you tell us a little bit about your background and

18  education.

19  A   Sure.

20          I'm from Chicago, so I went to medical school at

21  University of Illinois, finished there way back in 1982.

22  First I trained to be a pediatrician at Children's Hospital of

23  Michigan, and then I followed that with specialty training to

24  be a child neurologist in San Diego California at UCSD.  And I

25  finished all that in 1987.  And then since that time, with the

1  exception of one year, I've been a practicing child

2  neurologist.

3  Q   And is that what you currently do at the Winchester

4  Medical Center?

5  A   Yes, sir.

6  Q   Are you -- do you have any medical licensing?

7  A   Yes, sir.  I'm licensed in the state of Maryland, the

8  state of Virginia, and in D.C.

9  Q   Have you published any articles or book chapters in the

10  area of pediatric neurology?

11  A   Yes.  I wrote a book chapter about seizure disorders, a

12  book chapter about neonatal problems, and I've written some

13  articles about cerebral palsy, seizures, some other things

14  that don't come to mind right now.

15  Q   That's fine.

16      Let me show you what I've marked as Petitioner's

17  Exhibit Scheller CV.

18      MR. BLEGEN:  And, Judge, just so you know, we blacked

19  out the person's --

20      THE COURT:  Yeah, addresses and things like that,

21  right.

22  BY MR. BLEGEN:

23  Q   Dr. Scheller, is that your curriculum vitae?

24  A   Yes, sir.

25  Q   Does it set forth more details about publications and your

Scheller - direct

1   education?

2   A   Yes, sir.

3   Q   Do you recall how it is that you came to be involved in

4   this case?

5   A   I don't.

6   Q   Did somebody call you?

7   A   Oh, somebody called or emailed me and said there's a child

8   abuse case going on and would I participate, but I don't

9   recall if it was your office or somebody else's office.

10  Q   Might it have been Dr. Teas?

11  A   It may have been.

12  Q   Might it have been Jodi Garvey from our office?

13  A   One of those two it's most likely, but I'm just not sure.

14  Q   Did anyone suggest to you what findings you should make in

15  this case?

16  A   Absolutely not.

17  Q   And would you allow your findings to be influenced by

18  anyone in any event?

19  A   No, sir.  I have to take the case on the way I see it and

20  the way I understand the pathophysiology.

21  Q   Let me show you a copy of what's been marked as

22  Petitioner's Exhibit Scheller Report.

23          Is that a copy of a report that you provided to Jodi

24  Garvey in this case?

25  A   Yes, it is, dated August 29th, 2012.

Scheller - direct

1  Q   Prior to preparing your report what did you do?

2  A   I requested all the medical records that were available,

3  so what I requested and I received was birth records,

4  pediatrician records, the emergency room visit records,

5  hospitalization records and brain imaging studies.  So I was

6  able to get all that and review all that.

7  Q   And is that the kind of information that you generally

8  review in your employment as a pediatric neurologist?

9  A   Yes.  So I might get a consultation from a community

10 physician or from another specialist, and I'll try to get

11 whatever records that are available.  Sometimes it's --

12 they're not always available, but I'll try to get everything.

13 Q   Let me ask you about what kind of kids you see in your

14 general practice.  I assume you see children who have issues

15 related to their heads?

16 A   To their nervous system, which includes brain, spinal cord

17 and nerves, and then we also extend that to muscles.

18 Neurologists have sort of adopted the muscle cause it's

19 connected to the nerves.  So anything in the central or

20 peripheral nervous system.

21      MR. BLEGEN:  Judge, part of his CV indicates that he

22 has some expertise in neuroradiology.  The Attorney General

23 has asked me to specifically tell you that I'm not seeking to

24 qualify him as an expert in neuroradiology.

25      THE COURT:  Okay.

Scheller - direct

1  BY MR. BLEGEN:

2  Q   And how many kids would you say you see during a regular

3  year, if you can count it?

4  A   I've estimated that over -- it's about a thousand kids a

5  year.

6  Q   And do you see any children for which there is suspected

7  abusive head trauma?

8  A   Yes, sir.

9  Q   Going back to this case, you made some findings and

10 ultimately reached a conclusion regarding what happened to

11 Isabella Zielinski?

12 A   Yes, sir.

13 Q   All right.  And did you conclude that she suffered abusive

14 head trauma?

15 A   I concluded that she did not, or there was no evidence

16 that she had suffered any kind of abuse, and particularly

17 abusive head injury.

18 Q   Tell us what the lack of what kind of evidence was

19 important to you.

20 A   The -- one tries to get a big picture of what's going on

21 and then try to make sense of everything, make sense within

22 the big picture.  So that big picture includes any past

23 history of problems that Isabella might have had.  It includes

24 the way she looked externally to the emergency staff and to

25 the hospital staff that admitted her.  In this case it was at

1  Provena, and it was also at University of Illinois Hospital.

2  Q   Can I stop you there for a second.

3  A   Sure.

4  Q   What do you mean by how she looked externally?

5  A   While it is theoretically possible for a child to be a

6  victim of abuse and not have any external injury if -- and we

7  are assuming somebody lost her temper or lost his or her

8  temper and acted violently towards a child, it would be more

9  likely to see some evidence of that violent effect.  So that

10 would be external bruising, bumps, external bleeding, that

11 kind of thing.  And then with X-ray one would expect to see

12 broken bones, something similar to that.  And none of that was

13 reported by anybody.

14 Q   So the lack of what I will call physical injuries, let's

15 leave the brain aside for a second, but the lack of those kind

16 of injuries is important as part of your diagnosis?

17 A   Absolutely.

18         And, again, you know, one particular part of a

19 finding is not -- doesn't create a whole conclusion, but that

20 is a building block to then create conclusions if other

21 findings agree with that or suggest another diagnosis.

22 Q   But you certainly wouldn't call it irrelevant?

23 A   Oh, absolutely very relevant, very relevant.

24 Q   Going back to the big picture, what other sort of things

25 are you looking for globally?

Scheller - direct

A    I'm looking for on the immediate brain imaging any
evidence of brain swelling.  And what happens is the brain has
this in common with every other organ that if that brain is
traumatized, it will just swell, become fluid filled, boggy.
The medical term would be edema, brain edema.  If one is
looking -- if one is suspecting that a child has suffered a
traumatic injury to the brain, one would look for brain edema.
There wasn't anything.  So that's factor number two, no
external injury, no brain edema.

Q    When you say there wasn't any brain edema, when?

A    December --

Q    Are you talking about upon entry to the hospital?

A    Right.  So if I have the dates right, December 27th, 2002.
And then she had repeated scans, as I write in my note, on the
27th and 29th.  There just is no brain swelling, which is very
unusual when somebody has suffered a physical traumatic injury
to the brain.

Q    What other global things are you looking for?

A    When somebody has suffered a specific forceful injury to
the brain, one would look for parenchymal injury, so the
brain -- evidence of bruising or bleeding in the substance of
the brain, not just on the surface of the brain.

        I didn't get to this, but I'm sure everybody here
knows Isabella was found to have subdural hemorrhage, which is
blood on the surface of the brain.  At no time was she found

1   to have blood in the brain substance itself or what we would

2   call parenchymal injury.  If one can imagine a force, a

3   baseball bat, a brick or a wall impacting against a child's

4   skull with a great amount of force, then one can image that

5   force being transmitted not just to the bone and not just to

6   the subdural space, but also to the brain substance itself.

7   There was no evidence of that at all in Isabella's scans.

8   Q   What else globally are you looking for?

9   A   Neck injury.  And there is this idea out there that it is

10  possible to severely harm babies by shaking them violently.

11  It's an idea that makes sense.  And so if we are imagining

12  that scenario, we can imagine the head forcefully going back

13  and forth, to and fro, and we can imagine the neck being under

14  a great deal of stress from that.  And so one would look for

15  evidence of spinal cord injury or neck ligament injury.

16          Isabella had that looked at by MRI scan.  I don't

17  have the exact date.  Approximately January 7th of 2003.  And

18  there was no evidence of spinal cord injury, no evidence of

19  neck ligament or neck bone injury that would -- one would

20  anticipate if the head is being thrown violently to and fro.

21  Q   As a pediatric neurologist, do you rely on the findings of

22  radiologists?

23  A   Almost never.  I do take it into account.  The

24  radiologists obviously know what they're doing.  But in my

25  view, I need to, number one, see if I agree, and then, number

1    two, see if it explains the -- what they're describing

2    explains the picture in the terms I call pathophysiology, what

3    happened, what went wrong with the normal physiology of the

4    body.

5    Q    Do you also look at clinical issues?

6    A    Absolutely.  So I'm trying to put everything together, the

7    description of what medical personnel and care givers say what

8    happened, the physical findings, vital signs, and then all the

9    imaging studies and the blood tests.  I try to put that all

10   into a package.

11   Q    And maybe I missed it, but radiology is part of that

12   equation, right?

13   A    Oh, absolutely.  Laboratory tests, blood tests, physical

14   findings and the history.

15   Q    Anything else that you look at in your global picture, or

16   have we covered it?

17   A    Oh, I think that's it.  In this case, I mean, there was an

18   autopsy, but that was almost a year later, and from my point

19   of view, that wasn't really relevant because it was reflecting

20   a chronic injury, but it couldn't really describe what had

21   happened ten months before or 11 months before.

22   Q    Have you read the report of Dr. Rorke-Adams?

23   A    Yes, I did.

24   Q    Did you glean from that report that she was indicating

25   that there were contusions and lacerations to that part of the

Scheller - direct

1   brain?

2   A   Oh, you say "that part."  I'm not sure specifically which

3   part, but she did use the term "contusions."

4   Q   Let's say she said it was the front part of the brain.  Is

5   that what you're talking about when you say in this case

6   the -- because the autopsy was so late it didn't factor into

7   your calculation?

8   A   That and the fact that an MRI scan is -- one might say,

9   well, a CAT scan isn't going to show a brain contusion.  I

10  don't know if the people in the courtroom have actually seen

11  what a CAT scan looks like, but it's a very grayish, fuzzy

12  kind of image relative to an MRI scan, which is crystal clear.

13  And what we've learned about MRI scans over the years is that

14  they're great at showing brain contusions.  A kid gets hit on

15  the head with a baseball bat.  You'll see that contusion.

16          And so the MRI was done January 7th.  There were no

17  brain contusions.  Could a contusion have happened between

18  January 7th and Isabella's death months later?  Yes.

19  Certainly she had all kinds of problems.  But there were no

20  brain contusions on January 7.

21  Q   All right.  And in your experience have you seen horrible

22  big brain contusions show up on MRI?

23  A   Oh, all sizes, small and big, but, yeah, even horrible big

24  ones.

25  Q   And is that in fact how doctors find where they are, where

1  the contusions are?

2  A    Right.  We are able to document them based on seeing MRI

3  features of them, and then very often just based on the MRI we

4  can estimate how a head injury happened.

5  Q    In this case was there anything in Isabella's clinical

6  history that was particularly relevant to you?

7          Let me start with one.  Was there any particular

8  relevance to the high level of platelet counts?

9  A    To me that has very, very dramatic and important relevance

10 to this case because, as the court has probably heard,

11 platelets are responsible for blood clotting, and too many

12 platelets means that the blood is going to be too prone to

13 clot.  And so as I tried to explain in my letter of August

14 29th, I think in retrospect, knowing that Isabella had a

15 tendency to run high platelet counts and knowing that she

16 actually did develop a blood clot on the surface of the brain

17 on December 27th, that sort of puts the whole picture together

18 in my view with a couple of little additives for extra

19 support.

20 Q    I want to ask you --

21         THE COURT:  Somewhere in here we're going to need to

22 find a place to stop for the day.

23         MR. BLEGEN:  Whenever, Judge.

24         THE COURT:  Is this okay?  I mean, if you're in the

25 middle of a thought, I don't want to --

1    MR. BLEGEN:  I was going to ask him about what he
2  meant "in retrospect," but it might have gone on for a little
3  while.

4    THE COURT:  Okay.  All right.

5    MR. BLEGEN:  We can break.

6    THE COURT:  Okay.  We're going to stop for the day.
7  We're going to start a little earlier tomorrow because I don't
8  have a court call, so 9:30 will be the start time.

9    One thing just to make a mental note of for when we
10  come back in January, we're going to have to do a new writ
11  because it only goes for this week, so someone just needs to
12  keep a mental note that --

13    MR. BLEGEN:  Miss Garvey was talking about that.

14    THE COURT:  Honestly, my advice is bring the stuff
15  tomorrow because I'm not going to be here next, I'm not going
16  to be here part of the week after that, and we need to get it
17  in place.

18    MR. BLEGEN:  Okay.  We're trying to figure --

19    THE COURT:  If it's not necessary, then don't do it.

20    MR. BLEGEN:  And if she doesn't -- she may not want
21  to come because this is a really disrupting time.

22    THE COURT:  It's up to her.

23    MR. BLEGEN:  Okay.  Fair enough.

24    THE COURT:  She's not required to be here unless she
25  was going to testify or something.

1          MR. BLEGEN:  Okay.  Thank you.

2          THE COURT:  All right.  So we're going to stop for

3    the day.  A couple of little things.

4          So, number one, I've been keeping this time chart

5    here.  I want to forward it to you, so I need a couple of

6    email addresses on each side.  If somebody could just pull out

7    a sheet of paper and give me two email address on the side

8    before you leave the room here so I can do it.

9          Number two, turn off that thing.

10         And, number three, I'm assuming since I didn't get an

11   ISDN number we've just all sort of collectively decided by

12   default to wait for January for that?

13         MR. TELISMAN:  We tried, Judge.

14         THE COURT:  Couldn't get it?  That's fine.

15         MR. TRIEBEL:  IT people were already gone for the

16   day, so tomorrow morning maybe.

17         THE COURT:  Yeah, but, I mean, they typically want to

18   test this like a day or two before they're going to do it --

19         MR. TRIEBEL:  Right, right.

20         THE COURT:  -- just to make sure it's going to work.

21         MR. TELISMAN:  Should I just call it off then?

22         THE COURT:  I would say bring it tomorrow, and then

23   we'll have a status sometime before the 14th, and that will

24   kind of be my trigger to get that done.

25         MR. BLEGEN:  So we're not going to do Forbes

1    tomorrow?

2            THE COURT:  I gather not because we don't have any --

3    I mean, the arrangements aren't in place.

4            So put your email addresses on the same sheet of

5    paper so I can do it all at once.

6            Okay.  9:30.

7            MR. BLEGEN:  Okay.

8

9            (Which were all the proceedings had in the

10           above-entitled cause on the day and date aforesaid.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25