1      IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

4   JENNIFER DEL PRETE,           )
                                  )
5                  Petitioner,    )   Docket No. 10 C 5070
                                  )
6          vs.                    )
                                  )
7   MELODY HULETT,                )   Chicago, Illinois
                                  )   December 21, 2012
8              Respondent.    )   9:30 a.m.

9                      VOLUME 5
10            TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12  APPEARANCES:

13

14  For the Plaintiff:    BLEGEN & GARVEY
                             BY:  MR. PATRICK W. BLEGEN
15                              MS. JODI L. GARVEY
                                MR. DANIEL A. RUFO
16                           53 West Jackson Boulevard
                             Suite 1437
17                           Chicago, Illinois  60604

18  For the Defendant:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                             BY:  MR. KARL R. TRIEBEL
19                              MR. NEAL GOODFRIEND
                                MR. ARI TELISMAN
20                              MS. MONIQUE A. ANAWIS
                             100 West Randolph Street
21                           13th Floor
                             Chicago, Illinois  60601
22
    Also Present:               MR. ROBERT STANLEY
23

24          LAURA M. BRENNAN - Official Court Reporter
               219 South Dearborn Street - Room 2102
25                  Chicago, Illinois  60604
                         (312) 435-5785

1    (The following proceedings were had in open court:)

2         THE CLERK:  10 C 5070, Del Prete v. Hulett.

3         Can I have one person for each side give the lawyers'

4    appearances as usual, please?

5         MR. BLEGEN:  Good morning, Judge; Patrick Blegen and

6    Daniel Rufo on behalf of Ms. Del Prete.

7         MR. TELISMAN:  On behalf of the respondent, your

8    Honor, assistant attorney generals Ari Telisman, Neal

9    Goodfriend, Karl Triebel and Monique Anawis.

10        THE COURT:  Okay, and Ms. Del Prete is here on her

11   way down.  They're bringing her in shortly.

12        So next witness.

13        MR. TELISMAN:  Your Honor, with respect to

14   scheduling?

15        THE COURT:  Did we lose somebody?

16        MR. TELISMAN:  Yes, but actually we are not going to

17   call her.  So here is the situation.  Right now we have Dr.

18   Scheller.

19        THE COURT:  Doctor?

20        MR. TELISMAN:  Scheller, who is on the stand.

21        THE COURT:  Oh, who is still on the stand, right,

22   right.

23        MR. TELISMAN:  Then we have Dr. Rangarajan, who is

24   the respondent's biomechanical expert, and should not be too

25   long, I don't think.  Then we had Dr. Mary Case scheduled.

1  She's the forensic pathologist.  But in reviewing what was

2  went over with Dr. Rorke-Adams yesterday and what we

3  anticipate getting into with Dr. Jenny, in light of the

4  Court's admonishment regarding duplicative testimony, we

5  didn't see much of a benefit in calling her as a witness.

6         THE COURT:  Well, it's your call.

7         MR. TELISMAN:  Right, and we have made that decision.

8         THE COURT:  Okay.  So what we're going to have today

9  is finishing Dr. Scheller, doing Dr. Rangarajan.

10         MR. TELISMAN:  Rangarajan.

11         THE COURT:  Rangarajan, and that's it.

12         MR. TELISMAN:  Also, your Honor, if the Court pleases

13  and if IT is available, Dr. Forbes is available.

14         THE COURT:  Is available.

15         MR. TELISMAN:  And I have the ISDN number.

16         THE COURT:  You have the ISDN number, okay.

17         Let's pause for a second so you can give me that, and

18  let me just think how I'm going to get ahold of those people.

19         (Brief interruption.)

20         THE COURT:  Ms. Del Prete is here.  I just lost Mr.

21  Blegen.  All right, fine.  Let me do this then.  Just take

22  about --

23         Mr. Blegen is here.  All right.  So let me tell you

24  what my only issue is here, and if people don't want to call

25  people, that's fine.  I'm not going to tell you who to call

1   and who not to call.  The problem is, you know, I've got this

2   sort of slotted out for a certain number of days, and, you

3   know, the planning was we were going to get something like six

4   hours in today.  Let's say we get three in today.  What is

5   going to happen with that other three hours?  Is somebody

6   going to come back and say, well, there's just three more

7   hours, so we get to tack it on the end?

8          So you need to figure out how it's going to be dealt

9   with because if the number of witnesses is less, then maybe

10  the allocation is going to go down, too, because I'm not going

11  to have this sort of be kind of a trailing thing that goes on

12  and on and on and on.

13         MR. TELISMAN:  Your Honor, after talking with Mr.

14  Blegen, I think we both agree that all that would be left --

15  if we get Dr. Forbes' testimony today, the only things that

16  are left are Dr. Jenny for the respondent and Dr. Teas.

17         THE COURT:  So just two people left?

18         MR. TELISMAN:  That's it.

19         THE COURT:  Okay.

20         MR. TELISMAN:  I think --

21         THE COURT:  I missed that.  So who is it, Dr. Jenny?

22         MR. TELISMAN:  Carole Jenny is a child abuse

23  pediatrician.

24         THE COURT:  Okay, fine.  So there's just two left.

25  Then we're good.  We've got nothing to worry about.

1              So why don't you take a few minutes just to sort of
2     talk amongst yourselves.  I've got to get the phone number for
3     the guy who is filling in for the tech guy today and call him
4     and have him make a test call to this number.  Do you have an
5     approximate time frame for the doctor?

6              MR. TELISMAN:  If I can just check my phone, Judge.
7     I'm sorry.

8              MR. BLEGEN:  Judge, by saying you're good, I mean, if
9     we have a break a little early today, it's okay.

10             THE COURT:  It's okay given what I was just told,
11    that there's only two more people after the people we're doing
12    today, yes.

13             (Brief interruption.)

14             MR. TELISMAN:  Judge, Dr. Forbes is available in the
15    afternoon.

16             THE COURT:  Let's just keep it general for the
17    moment.

18             All right.  So it's going to take me a few minutes to
19    kind of get into this stupid system here.

20             MR. TELISMAN:  Thank you, Judge.

21          (Brief interruption.)

22             THE COURT:  Okay, I'm ready.

23          I couldn't get him by phone.  I have sent out an e-mail
24    with all the information, and then they're going to email me
25    back.  I'll see it when it comes in, and we're ready to go.

1    We can get the doctor back up on the witness stand.  The

2  name of the person that you guys are not calling was who?

3          MR. GOODFRIEND:  Dr. Mary Case.

4          THE COURT:  Mary Case, okay.  This doesn't need to be

5  on the record.

6          (Brief interruption.)

7   DR. JOSEPH SCHELLER, PETITIONER'S WITNESS, PREVIOUSLY SWORN

8                CONTINUED DIRECT EXAMINATION

9  BY MR. BLEGEN:

10 Q   Dr. Scheller, when we left off yesterday, you mentioned

11 something about looking back retrospectively.

12 A   Yes, sir.

13 Q   Can you tell us what you meant by that?

14 A   When Isabella was seen in the emergency room on

15 October 20th, she was incidentally noted to have an elevated

16 platelet count.  As I mentioned yesterday, platelets are the

17 small cells in the blood that help the blood clot.

18       And that is something that in many cases will just

19 turn out to be nothing, a reaction to an illness and then it

20 will go away.

21       Once again, when she was hospitalized with the

22 subdural hemorrhage on December 27th, about two months later,

23 again, her platelet count was very elevated.  So then

24 retrospectively we can say, well, now knowing that she has a

25 subdural hemorrhage and we can see a blood clot on the CT

Scheller - direct

1   scans December 27th, 28th, 29th, we can say, oh, my gosh, she

2   did have a problem with her platelets that then turned into

3   something serious although that is not usually the case.

4   Q   And is that --

5         Let me see if I can put this in a clear way.  Is it

6   sometimes the case that when you're diagnosing a serious

7   event, there may be minor preceding events that seemed

8   innocuous or at least only slightly troubling at the time?

9   A   Yes.  Many things that we see in medicine start out as

10  something minor or just a slight aberration from normal,

11  different than average, and then a person will be reassured by

12  a family doctor or a pediatrician, and then over time in the

13  unusual case, that will turn into something dramatic or very

14  serious.

15  Q   And is there a term for that kind of combination of events

16  or conditions that is used by doctors?

17  A   Well, we call it a cascade or a --

18        I don't understand the question exactly.

19  Q   I'm sorry.  Is there a term called a cascade of events?

20  A   Yes.  So, in other words, we can take something simple

21  like an asthma attack.  So many children that we know walking

22  around the streets have asthma attacks, and the vast, vast

23  majority of them turn out fine.  And yet if we look at yearly

24  statistics, we do see children die of asthma.

25        And a child who died of asthma is a child who had a

1   more dramatic cascade of events due to the very, very common

2   and usually not life threatening and usually benign condition

3   called asthma.

4   Q   All right.  And so yesterday you talked about the high

5   platelet count and you talked about the ear infection,

6   correct?

7   A   That's correct.

8   Q   Was there an issue related to head circumference that also

9   in retrospect you believe is now important?

10  A   Yes.  And when we see the CAT scan on December 27th, 28th

11  and 29th, it was apparent to everybody that there is a layer

12  of fluid, which was called a chronic subdural hemorrhage.  It

13  is not at all fresh blood.  It is -- it is fluid that is in

14  the process of turning from old blood into spinal fluid.

15          There is a layer of fluid where it doesn't belong in

16  between the edge of the brain and the inside of the skull.

17  It's unmistakable.  It's there on the scans and everybody

18  describes it.  That does not develop in a day or a week.  That

19  is something that takes weeks to develop.

20          And so, again, looking retrospectively at how

21  Isabella's head was growing, we have Isabella's head growth

22  just under the 50th percentile, just a little bit smaller than

23  average when she's born, and then already at one and two and

24  two and a half months of life, her head is -- her head growth

25  is jumping percentiles.  It's growing more than it should,

1  telling us retrospectively, oh, my gosh, her head is growing

2  faster than anticipated.  Something must be going on inside of

3  her skull that is contributing to large head growth.

4       I should just mention parenthetically that the skull

5  grows in response to the brain growing.  The reason my head is

6  not the same size now that it was when I was born is because

7  my brain has pushed the skull out over all the years of my

8  life, actually from zero to 20 or so.  It has just expanded

9  the skull.

10       So skull's growth is a response to what is going on

11  underneath there, and if the brain is growing fine, it usually

12  will stay on track.  But kids with smaller heads will stay on

13  the 25 percent track; the kids with bigger heads will stay on

14  the 75 percent track.

15       But then sometimes there are things that will be

16  going on inside the head that will make the skull grow faster.

17  One of those things is excess fluid either on the surface of

18  the brain or inside the brain, and it was very clear on the

19  scans of December 27th that Isabella had that excess fluid.

20  Q   Let me show you what I have marked as Petitioner's Jenny

21  Head Circumference Chart.  Take a look at that.

22       (Brief interruption.)

23  BY MR. BLEGEN

24  Q   Is that a head circumference chart that you have seen

25  before?

862
Scheller - direct

1    A    Yes.  This was sent to me by email.

2    Q    Was it attached to one of the prosecution expert's, Carole

3    Jenny's, report?

4    A    Yes, sir, it was.

5    Q    Is that her plotting of where she thinks the head

6    circumference was on certain dates?

7    A    Yes, sir.

8    Q    And have you looked at the records of head circumference?

9    A    Yes, sir.  They were in the birth records, and the head

10   circumference was in the birth records, and the growth of the

11   head was documented by the pediatrician on follow-up visits.

12   Q    Even under Dr. Jenny's plotting of the chart, can you see

13   the rapid head growth that you have described?

14   A    Yes.  And if there's anybody in the audience who isn't

15   familiar with these charts, we're going from left to right in

16   time.  So all the way on the left of this chart is when the

17   child is born, and the head circumference is the upper graph.

18   Q    That would be right here?

19   A    So you're pointing to a dot around the time that Isabella

20   was born, and at that point, if we look at where that dot is

21   placed, it's just under the middle of the curve, which is the

22   50th percent, so just a little bit smaller than 50th

23   percentile.

24          Then Dr. Jenny puts another point at one month of

25   age, which is going from left to right, correct.  The next dot

Scheller - direct

1  that you are pointing at, and it's very, very clear that

2  Isabella has moved from just underneath the 50th percentile to

3  now the 75th percentile.

4         So, again, 50, 75, not that big of a difference, but

5  of note.  And, again, as it's going on, let's not rush to an

6  emergency room or anything; let's just keep a mental note of

7  that.

8  Q   But in retrospect, does that help to date when the chronic

9  subdural collection of whatever it was had started?

10        MR. GOODFRIEND:  Judge, I object to leading.

11        THE COURT:  Overruled.

12 BY THE WITNESS:

13 A   For somebody like myself who's a child neurologist who

14 gets referred children who have abnormal head sizes either too

15 small or too big, as a routine from pediatricians and family

16 docs, I typically see this pattern in children who have

17 developed a chronic fluid collection, often subdural

18 hemorrhage, related to birth.

19        So something happened at birth, and it wasn't a major

20 thing.  Nobody dropped child or anything; it was just a little

21 bit of a mildly traumatic birth.  It caused excess fluid,

22 perhaps a little bit excess blood in the space in between the

23 brain and the skull.  And then gradually over the first few

24 months of life, we see that excess fluid accumulate and create

25 this larger than expected.

Scheller - direct

1    So this is a pretty classic pattern of something that

2  is typically benign that a child neurologist would see in an

3  office practice when referred a child whose head is growing a

4  little bit too fast.

5  BY MR. BLEGEN:

6  Q    What about this next dot over here?

7  A    So you are pointing to the third dot going from left to

8  right in the head circumference graph.  And, again, we are

9  seeing a jump from the 75 percent percentile now to the

10  90th percentile.  So, again, we're now at approximately two

11  and a half months of age.  And, again, Isabella's head

12  circumference has jumped.

13    So, again, retrospectively seeing now a pattern of

14  50th to 75th to 90th, we can now say, oh, my gosh, she is

15  accumulating fluid in there.  And this is, again, not

16  something that anybody is going to lose sleep over, and nobody

17  is going to the emergency room, and nobody is recommending any

18  surgery, but it is a little bit unusual that her head is

19  growing faster than expected.

20  Q    But does it help you to date the chronic subdural

21  collection that we know was found by radiology on

22  December 27th?

23  A    Absolutely.  If we just see the collection on

24  December 27th, we can say it's a few weeks old, maybe two

25  weeks, maybe four weeks, maybe six weeks, but there is no way

1    to know because the fluid is in that stage of blood turning

2    into spinal fluid.  It morphs or evolves from blood into

3    spinal fluid.

4             But you can't date it just from looking at it.

5             But dating -- watching her head circumference grow

6    from 50 to 75 to 90th percentile, that tells us very clearly

7    there's a process that's going on already since certainly from

8    one month of life and probably before that because we have

9    jumped from 50 to 75th in the first month of life.

10   Q    If the head were growing at a normal or an average rate,

11   what would the line of dots look like?

12   A    Well, every kid to him or herself -- Isabella started at

13   the 50th percentile, so you just assume she's going to stay at

14   the 50th percentile throughout the first couple of years of

15   life, which is this graph, and then into teenage and

16   adulthood.

17   Q    And is that sort of what is shown on the weight chart?

18   A    Yes, until she gets really, really sick.  So when we have

19   the first few months of life, she's pretty much at the 25th to

20   50th percentile, and she pretty much stays there the first few

21   months of life.

22   Q    And then does the head circumference also start to jump

23   around a lot after December 27th?

24   A    Right.  What happens afterwards, I can't say it's relevant

25   to what happened between birth and three months because she

1  had been through so much as far as her illness and the

2  seizures and all that.

3  Q    One of the state's experts, Dr. Jenny, has indicated that

4  the increase in head circumference on the chart is related to

5  molding of the infant's head.  Did you read that?

6  A    I did read it.

7  Q    First of all, can you tell us what molding is?

8  A    Sure.  Babies and anybody who has seen fresh baby pictures

9  in the first day, two, three of life are aware that babies can

10  have cone heads or unusually looking heads based on how they

11  were taken out, what the squeezing forces were on their skull.

12            That's very, very common, this idea of molding.  And

13  somebody might misjudge a head circumference in the first

14  several days of life based on the molding, but that is usually

15  gone by a week at the latest.

16  Q    So if molding had an impact on the head chart, would it

17  impact the difference between one month here and then the

18  second measurement here?

19  A    No connection whatsoever.  Molding will always be gone

20  before one month and very much typically by one week or so.

21  Q    Now, you have reached a conclusion about the acute brain

22  injury that Isabella suffered on December 27th of 2002?

23  A    Yes, sir.

24  Q    All right.  And is that conclusion reached to a reasonable

25  degree of medical certainty?

1    A    Yes, sir.

2    Q    Tell us what your conclusion is.

3    A    Children don't stop breathing for no reason.  We didn't

4    see a heart or lung reason for her to stop breathing, stop

5    breathing and, I will say, stop their heart rate.  It just

6    doesn't happen for no reason.

7         So we didn't see anything in her heart or lungs that

8    would have made her stop breathing and stop her heart rate.

9    And we do know there was something going on wrong in the brain

10   because we do have hemorrhage.  We have chronic hemorrhage.

11   We have acute hemorrhage.  And then we have a blood clot, what

12   we call a thrombosis, going on in the brain.

13        That could happen in theory with meningitis.  In

14   other words, she would could have had a brain infection.  That

15   could have triggered the brain to misfunction, to have

16   dysfunction, and then tell the heart and lungs to stop

17   working.  That happens all the time.  She was checked for

18   meningitis.  She does not have meningitis -- she did not have

19   meningitis.  That was done at Provena.

20        It could happen with severe trauma.  In other words,

21   a child is in a car accident, falls out of a car seat, hits

22   her head against something.  The brain will swell and

23   misfunction.  The brain will bleed, too, but the brain will

24   swell and bleed and then tell the heart and lungs to -- give

25   poor instructions to the heart and lungs, and then the baby

Scheller - direct

1  will stop breathing for that.

2  Q    Let me stop you for a second.

3        When you talk about swelling, are you talking about

4  significant swelling?

5  A    I'm talking about, yes, very dramatic brain swelling, the

6  equivalent of when somebody twists their ankle really, really

7  bad and the ankle just blows up like a balloon.  So that

8  happens in the brain where the brain develops dramatic

9  swelling.

10        Anybody who's seen a lot of head trauma has seen that

11  in young children.

12  Q    All right.  So what conclusion did you reach regarding her

13  acute brain injury on 12/27/02?

14  A    Even though she did not have brain swelling, she did have

15  blood, the subdural hemorrhage, which was acute, in other

16  words, fresh subdural blood.

17        She did have this apparently acute fresh blood clot,

18  and there had to have been something that had triggered her to

19  stop breathing and her heart rate to stop.

20        The only other thing that can trigger it in the

21  absence of brain swelling is a seizure.  And so I believe very

22  strongly she developed a blood clot in her brain, a blood

23  hemorrhage in the brain.  That triggered her seizure, and then

24  that led to all the other difficulties that she had.

25  Q    Can seizure lead someone to stop breathing?

Scheller - direct

1  A    Absolutely.  It's a very common, I guess, side effect or
2  subsequent problem.
3  Q    And can that also lead to your heart stopping beating?
4  A    Yes, and in children those often go together.
5  Q    And do the high platelet counts play a role in your
6  conclusion that she suffered from cortical venous thrombosis
7  or cerebral venous thrombosis?
8  A    Right.  So "cortico" just refers to the surface of the
9  brain.  "Cerebral" just means another word for the brain.
10        So we see it.  You can see the clot there.  It was
11  described by the radiologist, but if the Court went through
12  the scan, it is something that is visible.
13        A blood clot is something that happens when there is
14  something wrong with the clotting mechanism.  Now, yes, it can
15  happen from a traumatic injury like a kid in a car accident
16  and a kid falling down the stairs.  We did not see any
17  evidence of that.
18        And so the only thing that we have evidence of is
19  that Isabella, both in October and then again in December, had
20  very, very dramatically very high platelet count.  That's what
21  platelets do.  They clot.  And when there are too many
22  platelets, that can lead to a blood clot.
23        So I will just go through the series.  She had
24  probably an infection that triggered it.  I stated in my note
25  that Isabella was found to have a fever and was found to have

1   sinus infection when she was in the hospital December 27th.

2           Infection triggers an increase in platelets.  The

3   platelets are clotting where they're not supposed to be.

4   There is a blood clot in the cerebral vein, the cortical vein.

5   That leaks --

6           As we know, veins are very, very fragile.  That vein

7   leaks some blood into the subdural space, and the subdural

8   space -- and I don't know how much the Court has gotten into

9   this.  Subdural space is closer to the inside of the skull.

10  Underneath there is a subarachnoid space.  Very often when

11  there is subdural blood, there is subarachnoid blood.

12          As described by the radiologist who read the scans of

13  the 27th, 28th, 29th, she did have subarachnoid hemorrhage

14  together with the subdural hemorrhage.  So that blood clot in

15  the vein leaked to create subdural hemorrhage.  The subdural

16  hemorrhage then led to subarachnoid hemorrhage, triggered her

17  seizure and then almost killed her but really caused her to

18  have a very significant brain injury from that.

19          So that's my sequence, and that's how I understand

20  everything.

21  Q   Why does subarachnoid hemorrhage trigger a seizure?

22  A   Blood is very, very irritating to the surface of the

23  brain.  So the classic subarachnoid hemorrhage that all of us

24  are aware of is somebody bursts an aneurysm.  They have some

25  bleeding in the brain, and then they completely pass out.  If

1    they're lucky, they don't die.  If they're unlucky, they die.

2            In the lucky scenario, they're going to coma for a

3    period of time.  That coma happens because the blood in the

4    subarachnoid area, in other words, on the surface of the

5    brain, just on top of the brain, in that space called the

6    subarachnoid space is very irritating and toxic to a regular

7    brain function.

8    Q    Isabella was also found to have severe retinal hemorrhages

9    extending to the ora serrata.  Did you see that in the

10   records?

11   A    I did.

12   Q    What is your --

13           Do the retinal hemorrhages mean that she was abused

14   rather than suffered a seizure from CBT?

15   A    Not at all.  Anytime there is a problem with vein

16   circulation, a child can develop retinal hemorrhage, and

17   clearly she had a problem with vein circulation because she

18   had a blood clot in the vein.

19           Anytime a child is going into repetitive seizures and

20   the brain becomes hypoxic, not enough oxygen, ischemic, not

21   enough blood flow, a child can develop retinal hemorrhages.

22           And so she had two causes for retinal hemorrhages,

23   plus she had this blood clotting problem with her increased

24   platelets.  So I'm not surprised.

25           I will say that, yes, we need to be concerned that a

1   child might be a victim of abuse if a child has retinal

2   hemorrhages, but retinal hemorrhages are not proof of abuse.

3   They're only proof that something is going wrong with the

4   brain venous circulation.

5   Q    If Isabella had showed up at your hospital on

6   December 27th of 2002, knowing the facts that you know them

7   from the records, would you have diagnosed abusive head

8   trauma?

9   A    I would have discussed the possibility with the intensive

10  care doctors and with the child abuse specialists on our team,

11  who I don't always agree with, and I would have said, for the

12  same reasons I'm saying here today, I do not see any evidence

13  of abuse.  I do see evidence of a blood clotting problem, and

14  I believe that's what triggered the whole thing.

15          So I would say at my hospital the same thing that I'm

16  saying here today.

17          MR. BLEGEN:  Judge, can I just have a moment?

18          THE COURT:  Yes.

19      (Brief interruption.)

20          MR. BLEGEN:  That is all, Judge.

21          THE COURT:  Mr. Goodfriend.

22      (Brief interruption.)

23          MR. GOODFRIEND:  We had a little trouble with

24  reproduction.  They're in order but --

25          THE COURT:  Don't worry about it.  I will figure it

Scheller - cross

1   out.

2                          CROSS EXAMINATION

3   BY MR. GOODFRIEND:

4   Q   Dr. Scheller, you mentioned that she had some type of

5   infection, is that correct?

6   A   That Isabella did, yes.

7   Q   That was an ear infection that you're talking about, is

8   that correct?

9   A   Well, she had an apparent ear infection in October, and

10  then in December she was demonstrated on CAT scan to have a

11  mastoid and other sinus infection, plus she had fever.

12         So the mastoid can come from an ear infection because

13  it's the bone directly behind the ear, but it's considered

14  sort of a separate category of infection.  It's a sinus

15  infection.

16  Q   Now, in terms of the fever, didn't she arrive at the

17  hospital with a body temperature of about either 93.1 or 95.1?

18  A   Yes, it was very dramatically as children near death will

19  often have.  We wouldn't count that as a fever.

20  Q   She didn't have a fever, is that correct?

21  A   That moment she didn't.  As she continued her stay in the

22  hospital and they got her body temperature back up and she did

23  develop a fever.

24  Q   But at the moment she arrived at the hospital, she didn't

25  have a fever?

1    A    Absolutely correct.

2    Q    Now, in terms of the ear infection, many children have ear

3    infections throughout the infancy period, is that correct?

4    A    It's the pediatrician's bread and butter, yes.  Almost

5    every child has an ear infection or two growing up.

6    Q    When you were a pediatrician, did you examine children for

7    ear infections?

8    A    Every day.

9    Q    A sign of an ear infection --

10           If you were testing Isabella on December 27th of '02,

11    you would have examined her ears, is that correct?

12    A    Yes, sir.

13    Q    What type device do you use?

14    A    Otoscope, o-t-o.

15    Q    In terms of using the otoscope, upon a visual exam, that

16    could reveal fluid in the ear, is that correct?

17    A    Of fluid or active infection.  Fluid just means the

18    eardrum looks really full like something is pushing against

19    it, and infection would be it's all red and inflamed.

20    Q    And through the otoscope, a doctor could see that?

21    A    Absolutely.

22    Q    And you would possibly see drainage of some type, is that

23    correct?

24    A    Well, if the eardrum was perforated, yes.

25    Q    Now, in terms of this case, do you recall seeing a record

Scheller - cross

1    where an ear exam was done upon her arrival at Provena
2    Hospital?
3    A    Yes.
4              MR. GOODFRIEND:  Judge, I'm going to turn to Exhibit
5    Number 51.
6              THE COURT:  Okay.  It's right here.
7              MR. GOODFRIEND:  Somehow my pages weren't numbered,
8    Judge.  It's Provena in the bottom right-hand corner, page 45.
9    It's behind -- in my copy it's behind the tab.
10             THE COURT:  45, it's the very last page in what I
11   have here.
12             MR. GOODFRIEND:  Okay.
13             THE COURT:  It's the one that says "patient
14   assessment."  It looks like this?
15             MR. GOODFRIEND:  No.
16             THE COURT:  That's Provena 45.
17             MR. GOODFRIEND:  Provena 45, yes, in the lower
18   right-hand corner?
19             THE COURT:  Yes.
20   BY MR. GOODFRIEND:
21   Q    Dr. Scheller, I'm going to show you what is marked as
22   Respondent's Exhibit 45.
23             That is an assessment in the emergency room from
24   Isabella's coming to the hospital, is that correct?
25   A    That's right.  And as you said, her temperature was 93.1.

Scheller - cross

1    There it is on the top of the page.

2    Q    In terms of the ENT exam on that date, do you see it in

3    the middle of the page, is that correct?

4    A    Yes, sir, and it's normal.

5    Q    And in terms of her eyes, there was no drainage, correct?

6    A    That's right.

7    Q    In terms of the scleral, it was clear?

8    A    Yes, sir.

9    Q    Apparently they looked in her ears?

10   A    Yes, sir.

11   Q    And when they looked in her ears, they found no drainage?

12   A    Right.  I guess this is different than what we're used to

13   because we usually see somebody comment on the eardrum, and

14   I'm not seeing that.

15        A drainage is also something important to note, but

16   your average pediatric practice will comment on what the

17   eardrum looks like, and I don't see that.

18   Q    Well, I guess my question was, in terms of the ears, there

19   was no drainage?

20   A    That's right.  And, again, "drainage" means that the

21   infection was bad enough to perforate the eardrum so that this

22   pus or infectious fluid is draining out into the ear canal.

23        MR. GOODFRIEND:  Judge, I would object for being

24   nonresponsive.

25        THE COURT:  That part of the answer is stricken as

1  nonresponsive.

2          MR. GOODFRIEND:  Thank you, Judge.

3  BY MR. GOODFRIEND:

4  Q   In terms of Isabella's throat, that was normal, also?

5  A   Yes.

6  Q   The exam of the neck was supple?

7  A   Yes, sir.

8  Q   And in terms of this evaluation, there is nothing that

9  would -- no markings or writings that would indicate any type

10  of infection in the ear, is that correct?

11  A   That's right.

12  Q   Now, in terms of I think what you just said, you do agree

13  that Isabella had acute subdural hemorrhages, is that correct?

14  A   Yes.  You're saying plural hemorrhage, hemorrhages.  I'm

15  not sure if there's single or plural.

16  Q   Weren't there multiple hemorrhages?

17  A   No.

18  Q   Well, didn't you just testify that she had subdural

19  hemorrhages as well as subarachnoid hemorrhages?

20  A   That is true.

21          Well, again, you're saying the plural.  Once there is

22  blood in a space, then there is blood in that space.  So it

23  could be subdural hemorrhage and subarachnoid hemorrhage.  I'm

24  not sure what you mean by hemorrhages.

25  Q   Well, aren't the subdural and the subarachnoid two

1  different spaces in the brain?

2  A   Absolutely.  So they're subdural --

3       THE COURT:  I think the point he was making is that

4  you were pluralizing each one of those.  That's the point he

5  was making.

6       MR. GOODFRIEND:  That's why I was trying to clear

7  that up.

8  BY MR. GOODFRIEND:

9  Q   Dr. Scheller, the subdural space is different than the

10 subarachnoid space, is that correct?

11 A   Yes, sir.

12 Q   So you just said on direct examination that she had a

13 subdural hemorrhage, is that correct?

14 A   Acute and chronic, yes, sir.

15 Q   So she had an acute subdural hemorrhage?

16 A   Yes, sir.

17 Q   And she also had an acute subarachnoid hemorrhage?

18 A   Yes, sir.

19 Q   So she had at least hemorrhages in two different places?

20 A   That's right.

21 Q   In terms of two different places, weren't some of the

22 hemorrhages or hemorrhage in the frontal lobes?

23 A   Yes, sir.

24 Q   Weren't there --

25 A   Time out.  No, sir.

1          The frontal lobe is actually the substance of the

2     brain.  They were in front or on the surface of the frontal

3     lobes.  They were not in the frontal lobes.

4     Q     They were on the surface of the frontal lobes?

5     A     Yes, sir.

6     Q     Didn't she also have hemorrhage in the tentorium?

7     A     Yes, sir.

8     Q     The tentorium is in the back of the brain?

9     A     But it's the same space, true, but it's the same space.

10          It's like saying I spilled milk on the front of the

11    table and then it went to the back of the table.  Well, it's

12    the same top of the table.

13    Q     So that doesn't indicate to you that there were two

14    injuries?

15    A     Not at all.

16    Q     It can, though, can't it?

17    A     Yes, it can.

18    Q     Now, in terms of your diagnosis in this case, you

19    indicated that the "cortical" in your report, that the

20    cortical venous thrombosis and the acute subdural hemorrhage

21    caused the seizures, is that correct?

22    A     Yes, sir.

23    Q     Head trauma can cause acute subdural hemorrhages as well

24    as subarachnoid hemorrhage, is that correct?

25    A     Absolutely.

Scheller - cross

1   Q   And you would agree that head trauma can result in

2   seizures?

3   A   Absolutely.

4   Q   You would agree, also, that abusive head trauma could also

5   cause seizures?

6   A   Yes, sir.

7   Q   Yesterday I think you indicated that you're right now

8   working at Winchester Medical Center?

9   A   Yes, sir.

10  Q   Your position there is a fellow?

11  A   Yes, sir.

12  Q   You're a fellow in neuroradiology, is that correct?

13  A   That's right.

14  Q   As a fellow, you began that this year, is that correct?

15  A   I began that in July, yes, sir.

16  Q   That's your only position currently, is that correct?

17  A   That's right.

18  Q   As a fellow in neuroradiology, how long do you have to go

19  to complete your program?

20  A   12 months.

21  Q   In terms of being a fellow, does somebody supervise you?

22  A   Yes, sir.

23  Q   Do you supervise anybody else?

24  A   During the fellowship, sometimes there are people who are

25  there who are less trained than I am and then I will supervise

Scheller - cross

1    them, but not on a daily basis.

2    Q    And in terms of what you do as a fellow, is your primary

3    time spent looking at MRIs and CT scans and other imagery?

4    A    Yes, of the brain and spinal cord, yes, sir, almost all

5    day.

6    Q    And you're not interacting with patients then?

7    A    I'm on call at night, and so I have to interact with

8    patients at night.  But during the day, I'm just looking at

9    brain images.

10   Q    And there's a board certification in radiology, is that

11   correct?

12   A    Yes.  Though I'm a neurologist, so the board for

13   neurologists is a different group of people, but there's a

14   board certification for neurologists who want to be brain and

15   spine imaging specialists.

16   Q    Well, once again, you're not a board certified

17   radiologist, is that correct?

18   A    Right, or board certified neurologist with imaging

19   specialty.

20   Q    Now, you previously were a staff neurologist at Children's

21   National Medical Center, is that correct?

22   A    That's right.

23   Q    And you left that position?

24   A    Yes, in June of 2012.

25   Q    You were an assistant professor of pediatrics at George

1  Washington University?

2  A   Yes.  The hospital is intimately connected with the

3  medical school.

4  Q   You left that position?

5  A   Well, it was the same position, yes, sir.

6  Q   When you were an assistant professor of pediatrics, did

7  you ever teach abusive head trauma?

8  A   Oh, yes.

9  Q   Now, in terms of your curriculum vitae, do you have that

10  in front of you by any chance?

11         THE COURT:  Do you still have this up there?

12         THE WITNESS:  Yes, I do.

13  BY MR. GOODFRIEND:

14  Q   Now, in terms of your curriculum vitae, you have outlined

15  certain things you have done in terms of book chapters and so

16  forth, is that correct?

17  A   Yes, sir.

18  Q   Now, in terms of your book chapters, there are two book

19  chapters listed, is that correct?

20  A   Yes, sir.

21  Q   And those book chapters were written in 1994 and 1995?

22  A   Yes, sir.

23  Q   Those book chapters did not concern abusive head trauma?

24  A   No, sir.

25  Q   Have you published any book chapters since 1995?

Scheller - cross

1  A    No, sir.  I'm working on one now, but it's not going to be
2  about abusive head trauma.
3            MR. GOODFRIEND:  Judge, could I ask that -- I object.
4            THE COURT:  No, you can't.
5            See, there's a difference, and I will tell you what
6  the difference is.  There's a difference between answering a
7  question and then giving an explanation, which is what he just
8  did, and not answering a question and talking about what you
9  want to talk about, which is what I have been talking about in
10 the past.
11           MR. GOODFRIEND:  Okay, thanks.
12           THE COURT:  At least for me, there's a difference.
13           MR. GOODFRIEND:  Thank you, Judge.
14 BY MR. GOODFRIEND:
15 Q    Now, the next section is book reviews, is that correct?
16 A    Yes, sir.
17 Q    You wrote several, three, book reviews?
18 A    I think just two.
19 Q    One of those book reviews on your curriculum vitae you did
20 not write?
21           THE COURT:  No, it's just two there.
22           THE WITNESS:  One was for the Journey of Epilepsy and
23 one was for the Journal of Behavior.
24           THE COURT:  It's the format.
25           MR. GOODFRIEND:  Thanks, Judge.

Scheller - cross

1   BY MR. GOODFRIEND:

2   Q    Those book reviews did not concern abusive head trauma,

3   did they?

4   A    No, they did not.

5   Q    Have you reviewed any books formally since 1995?

6   A    No, sir.

7   Q    In terms of your publications, there's a number of

8   publications between 1979 and 1996, is that correct?

9   A    That's right.

10  Q    None of them involved head trauma, did they?

11  A    That's right.

12  Q    And you haven't published any articles since 1999?

13  A    That's right.

14  Q    In terms of case reports, you list one case report?

15  A    Yes, sir.

16  Q    And that case report has nothing to do with head trauma,

17  is that correct?

18  A    Well, it was a mild head injury, but it was a child who

19  rolled off a bed.

20  Q    It had to do with hydrocephalus.  I mispronounced it.

21  Hydrocephalus?

22  A    Perfect.

23  Q    Then I will move on to your abstracts.  Do you see that

24  section?

25  A    Yes, sir.

1  Q   I think there's 17 or so abstracts listed?

2  A   Yes, sir.

3  Q   You had one abstract back in 1987 that was entitled CT

4  Scans GCS and Outcome in Childhood Head Trauma, is that

5  correct?

6  A   Yes.

7  Q   Except for that one abstract, do any of the other

8  abstracts concern head trauma?

9  A   No, sir.

10 Q   Have you published any abstracts since 1997?

11 A   No, sir.

12 Q   Then there is a last section, Invited Lectures?

13 A   Yes, sir.

14 Q   Have you ever lectured in abusive head trauma?

15 A   If you look at the third thing, it's review of child and

16 adult neurology.  So included in that course was head trauma,

17 and then, I guess you would, a subsection of that would be

18 abusive head trauma.

19         So it's part of a review for neurologists and for

20 family docs and pediatricians.

21 Q   The last time you did an invited lecture was 2004, is that

22 correct?

23 A   That's right.

24 Q   Have you ever published or lectured on the subject of

25 traumatic birth?

1   A   If you look at publications, the fourth one, Twinning and

2   Neurologic Morbidity, children who are twins do have more

3   likelihood for trauma, so it was -- it's, I would say,

4   peripherally involved with that publication.

5        Then the one immediately after that, Does Cesarean

6   Section Prevent Cerebral Palsy, sometimes the issue with

7   cerebral palsy is a traumatic birth.  So, again, it was

8   peripherally involved with those two papers.  It wasn't mainly

9   about traumatic birth.

10  Q   Those two publications were in 1992 and 1994, is that

11  correct?

12  A   Yes, sir.

13  Q   Have you ever published or lectured on the presence of

14  thrombosed cortical veins in infants and children?

15  A   No, sir.

16  Q   Have you ever published or lectured on the causes of

17  retinal hemorrhages in infants and children?

18  A   No, sir.

19        MR. GOODFRIEND:  Judge, I'm turning to Exhibit 48,

20  pages --

21        THE COURT:  That's the one on the top.  Okay, that's

22  fine.  I will follow along.  Don't worry.

23  BY MR. GOODFRIEND:

24  Q   Do you have that in front of you, Dr. Scheller?

25  A   Yes, sir.

Scheller - cross

1    Q    Now, in people's -- Respondent's Exhibit 1 through 4,

2    those are a listing of your testimony that you have given in

3    the last four years?

4    A    To the best that I was able to dig it up.

5    Q    And in terms of the types of cases, the lead exposure, I'm

6    assuming, were noncriminal cases?

7    A    Right, civil, suing a landlord kind of thing.

8    Q    Were the head injury cases criminal cases?

9    A    Some civil, mostly criminal, some civil like a child who

10   fell at the grocery store, hit his head, that kind of thing,

11   but most were criminal.

12   Q    Okay.  And in terms of the case in 2009, it's Alyssa

13   Jerome was the child; the law firm Patrick Donlon -- it's a

14   head injury case.

15            Was that a criminal case?

16   A    I think so, but I'm not positive.  I think it was.

17   Q    And in that criminal case, if it was a criminal case, you

18   would have testified for the defendant, is that correct?

19   A    That's correct.

20   Q    And in 2009, you have listed a number of cases --

21            MR. GOODFRIEND:  One second, if I may.

22            Can I have a second, Judge?

23            THE COURT:  Sure.

24       (Brief interruption.)

25   BY MR. GOODFRIEND:

Scheller - cross

1    Q    In 2009 you testified, I believe, 12 times, is that
2    correct?
3    A    Right.  And that would be in court or at deposition,
4    again, to the best of my recollection -- to the best of my
5    ability to gather up my files.
6    Q    Do you know how much you made in 2009 from being an expert
7    witness?
8    A    How much money?
9    Q    Yes.
10   A    I'm going to guess around $30,000, but that's just a
11   guess.
12   Q    I'm going to direct your attention now to the next page,
13   which is Respondent's Exhibit 48, page 2.  In 2010 I believe
14   you testified 16 times?
15   A    Again, to the best of my ability to record them.
16   Q    Now, in 2010, I think there's four cases of head injuries,
17   is that correct?
18   A    Yes, sir.
19   Q    In those four cases where there is head injury, did you
20   testify for a criminal defendant?
21   A    I remember one for sure was, the Rachael Brand case.  The
22   other ones probably were.  I just don't specifically remember
23   them.
24   Q    You didn't testify for the prosecution in those four
25   cases, did you?

Scheller - cross

1   A   I will tell you, I've never testified for the prosecution

2   in a head injury case.

3   Q   Okay.  Now, in 2010 --

4   A   In a head injury criminal case.  I apologize.

5   Q   In 2010, how much did you make from being an expert

6   witness that year?

7   A   Again, I don't know.  The last few years, I've got more in

8   legal referral, medical legal referral.  So it was more than

9   30,000, maybe 35,000 or even 40,000.  I don't know exactly.

10  Q   If we can turn to the next page, the year 2011 is listed,

11  is that correct?

12  A   Yes, sir.

13  Q   And in 2011 you testified 25 times?

14  A   Yes, sir.

15  Q   In that year I believe there's nine cases detailing head

16  injury?

17  A   Yes, that's right.

18  Q   How many of those were criminal cases?

19  A   Every -- every one but one.  So I think you said nine, so

20  eight out of the nine.

21  Q   Eight were criminal cases and you testified for the

22  defendant?

23  A   That's exactly right.

24  Q   Do you know how much you made in 2011 as an expert

25  witness?

1  A    I assume that when you ask those questions for the other

2  years, you meant for everything, not just the head injury.

3  Q    Right?

4  A    Right.  So, again, it's more 2011, more than 2010.  So an

5  estimate might be $40-or $45,000.  Again, that's a rough

6  estimate.  I don't know exactly.

7  Q    Well, you're making less than $2,000 per case as an expert

8  witness?

9  A    It depends on the case.  In some cases I get just a few

10 hundred dollars.  Some cases --

11         I think the most I have ever billed for a case is $4-

12 or $5,000.

13 Q    Now, finally turning to the next page, that's for this

14 year, 2012, and I believe in 2012 so far you have testified 21

15 times?

16 A    Approximately, yes, sir.

17 Q    In 2012 I believe there's seven criminal cases?

18 A    Right, and this would be the eighth, I guess.

19 Q    So once again, all eight cases you testified for the

20 criminal defendant, is that correct?

21 A    Yes, I think so.  I think so.  Yes, for sure.

22 Q    Now, in preparing your report in this case, did you review

23 the reports of other expert witnesses?

24 A    Yes.  They sent me many reports from a prosecution and

25 defense.

Scheller - cross

1   Q    In this case?

2   A    Oh, yes.

3   Q    Now, before --

4        Well, before you wrote your report, you didn't have

5   any reports from our experts?

6   A    I'm sorry.  I don't remember the exact date.  I wrote my

7   report August 29th, and at some point I did get Dr. Jenny's

8   report.  At some point I did get Dr. Rorke's report.  At some

9   point I got the radiologist's, Dr. Hedlund.

10       There was another one with -- there was an eye

11  doctor, I think it was Dr. Forbes, but I don't know exactly

12  what date I got all those.  It may have been in the last month

13  or two, but I just don't remember.

14  Q    Before you wrote your report in this case, did you read

15  the report of Dr. Patrick Barnes?

16  A    I know I've read it, but I can't say if I read it before

17  or after.

18  Q    Now, Dr. Barnes is a neuroradiologist, is that correct?

19  A    Absolutely.

20  Q    And did you testify yesterday that you don't rely on the

21  reports of neuroradiologists in either your opinion here today

22  or in your work?

23  A    I read it, I appreciate it, but I don't use it.  I decide

24  myself if it's accurate or not.

25  Q    How long have you been deciding by yourself whether the

Scheller - cross

1  radiologist's report is accurate or whether you're going to go
2  on your own visual look at the radiology?
3  A   Well, since I was in practice about three or four years
4  and I got more confident, so back in the early '90s.
5  Q   So since the early '90s, you have been reading your own
6  CAT scans and MRIs?
7  A   Yes.  You can't charge for it because they have already
8  been billed by the radiologist, but I do read them.
9        In other words, every patient that I see, if I'm
10 seeing them in outpatient, I say, please bring me your imaging
11 study.  If I'm seeing them as an inpatient, I can pull up the
12 scans.
13 Q   You're not a radiologist?
14 A   I am not.
15 Q   Back in the '90s, you weren't a radiologist either?
16 A   That's right, just a neurologist.
17 Q   So despite the fact you weren't a radiologist, you were
18 relying on yourself rather than other radiologists to make
19 your opinions and make your diagnosis?
20 A   Yes, but I take everybody into consideration.
21        If I may elucidate with an example?
22        THE COURT:  Do you want to elucidate or do you want
23 to save it for Mr. Blegen?
24        THE WITNESS:  I will save it.
25        THE COURT:  Save it, and I've made a note of it in

Scheller - cross

1   case Mr. Blegen forgets.

2   BY MR. GOODFRIEND:

3   Q   Now, getting back to this case, you say you looked at what

4   Dr. Barnes said or did?

5   A   I absolutely looked at it.

6   Q   But ultimately you made your own decision as to what the

7   CAT scans and MRIs displayed?

8   A   Absolutely.

9   Q   Did you also consider or read the report of Dr. Julie

10  Mack?

11  A   Yes, I did.

12  Q   Once again, if your opinion differed from Dr. Mack's

13  opinion, you used your opinion?

14  A   That's right.

15  Q   And the same would go for Dr. Barnes; if your opinion was

16  not in line with Dr. Barnes, you wrote your report based on

17  your opinion?

18  A   That's right.

19  Q   Now, in your report, you stated that Isabella suffered

20  from a traumatic birth, is that correct?

21  A   Let me take a look.

22      (Brief interruption.)

23          THE WITNESS:  Yes.

24  BY MR. GOODFRIEND:

25  Q   What records did you review in terms of deciding that

1  Isabella suffered from a traumatic birth?

2  A   The main record that I needed was her head growth record

3  and the CAT scan of December 27th.

4  Q   Did you review the birth records from Hinsdale Hospital

5  for Barbara Zielinski?

6  A   I did.

7  Q   Did you review the birth records from Hinsdale Hospital

8  for Isabella Zielinski?

9  A   I did.

10 Q   Did you read the pediatrician records?

11 A   Yes.

12 Q   Do you consider all births to be traumatic?

13 A   When in retrospect they cause problems, yes.  Every birth

14 has the potential for trauma, and so the vast majority of

15 them, nobody ever worries about.  And in retrospect, some of

16 them do turn into problems.

17 Q   Now, what part of Isabella's birth made it traumatic?

18 A   The part that caused her to have a chronic subdural

19 hemorrhage.

20 Q   Now, in your report you mentioned birth trauma.  Did you

21 ever state in your report that the birth trauma caused chronic

22 subdural hemorrhage?

23 A   Yes.  I called it hematomas, but it's the same thing.

24 Q   It's the same time?

25 A   Henorrhage, hematoma, same thing.

Scheller - cross

1 Q    Now, I assume that you have delivered children, is that
2 correct?
3 A    Well, only as a medical student.
4 Q    When was the last time you delivered a child?
5 A    My daughter, accidentally, and that was 1991.  I was
6 already finished with medical school at the time.
7 Q    Have you read any articles on traumatic delivery of an
8 infant?
9 A    Oh, yes.
10 Q    Have you conducted any research in the traumatic delivery
11 of a infant?
12 A    No, sir.
13 Q    When you looked at the records in this case, did you
14 consult with a neonatologist?
15 A    No, sir.
16 Q    When you looked at the records in this case, did you
17 consult with an obstetrician?
18 A    No, sir.
19 Q    In terms of looking at the records, this was a normal
20 pregnancy, is that correct?
21 A    Yes, that's right.
22 Q    The prenatal course was uneventful?
23 A    That's right.
24 Q    It was a full-term baby at 40 weeks?
25 A    That's right.  That is correct.

Scheller - cross

1    Q    Now, if you could turn to People's Exhibit Number 50,

2    please?

3              It's a delivery case record, Judge.

4              THE COURT:  It's right in that little packet.  It's

5    right after your CV.

6              This thing?

7              MR. GOODFRIEND:  Yes.

8              THE COURT:  It looks like this.  Right before.

9              THE WITNESS:  I'm close.

10             THE COURT:  It's the last page before tab 51.

11             THE WITNESS:  Okay, got it.

12   BY MR. GOODFRIEND:

13   Q    Now, in terms --

14             That's a delivery case record, is that correct?

15   A    That's right.

16   Q    Now, in terms of looking at that, on the left-hand column,

17   it states, "presentation cephalic," is that correct?

18   A    Yes, sir, vertex cephalic, yes.

19   Q    Isn't that the preferred way for a baby to come out of the

20   womb?

21   A    Absolutely.

22   Q    So there were no problems in terms of presentation?

23   A    That's right.

24   Q    Now, in terms of vaginal delivery, do you see that box?

25   A    Yes, sir.

Scheller - cross

1   Q   And the X mark is on spontaneous, is that correct?

2   A   Yes.

3   Q   Is that the preferred method of having a baby delivered?

4   A   Yes, sir.

5   Q   And they didn't use forceps, is that correct?

6   A   Did not, correct.

7   Q   And there was no vacuum extraction?

8   A   Right, none of those possibly traumatic things, that's

9   right.

10  Q   There was no rotation whether by manual or by forceps?

11  A   That's right.

12  Q   There was no breach?

13  A   None of that.

14  Q   Now, if we go to the columns on the right, it states there

15  was labor delivery complications.

16          Well, if there are any, it lists them, is that

17  correct?

18  A   That's right.

19  Q   Now, there's two boxes -- or three boxes checked on that,

20  is that correct?

21  A   Under labor delivery, there are three, yes.

22  Q   And one of the first ones represents a meconium stained

23  amniotic fluid, is that correct?

24  A   Correct, the acronym for that, yes.

25  Q   That means a baby had a bowel movement into the womb?

Scheller - cross

1   A   That's right.

2   Q   And in terms of that part, there is a fear that the baby

3   would aspirate and get pneumonia, is that correct?

4   A   That's right.

5   Q   Did that happen in this case?

6   A   No, sir.

7   Q   And one of the things that -- one of the reasons why it

8   didn't happen was because it was below -- it didn't get into

9   her lungs, is that correct?

10  A   That's right, and they described it as light, which there

11  wasn't a dramatic amount of meconium.

12  Q   So in terms of the meconium stain and amniotic fluid, that

13  didn't really cause a problem in this case, did it?

14  A   Not at all.

15  Q   Then the other box that is checked is variable

16  decelerations, is that correct?

17  A   That's right.

18  Q   And that's a measure of the baby's heart function?

19  A   The heart rate, that's right.

20  Q   And it's not unusual to have variable accelerations and

21  decelerations?

22  A   Not at all.

23  Q   So in terms of the labor and delivery, the complications

24  are rather minor?

25  A   Yes.  This was a wonderful birth.

Scheller - cross

1  Q   Now, in that same box there's "abruption," not checked?

2  A   Right.

3  Q   What's abruption?

4  A   If the placenta separates from the wall of the uterus.

5  Q   That didn't happen in this case, did it?

6  A   That's right.

7  Q   The next box says prolonged ROM?

8  A   Correct, a rupture of membranes.  It didn't happen.

9  Q   Didn't happen.

10         And premature labor didn't happen, did it?

11  A   Right.  None of those.

12  Q   How do you pronounce that next word, if you could help me?

13  A   Chorioamnionitis.

14  Q   That didn't happen in this case either?

15  A   Also, not.

16  Q   What is that exactly?

17  A   That's an infection of the membrane that surrounds the

18  baby.

19  Q   Then the next box was placenta previa?

20  A   Correct, and also not checked.

21  Q   And in terms of the rest of the labor and delivery

22  complications, none of the box was checked?

23  A   That's right.

24  Q   Now, in terms of afterbirth, they measure Apgar scores, is

25  that correct?

Scheller - cross

1    A    That's right.

2    Q    What are Apgar scores?

3    A    It's a measure of how vigorous the baby is at birth and

4    does this baby need resuscitation or not.

5    Q    There's five different factors?

6    A    Right, five, or you can grade 0, 1 or 2; so maximum 5

7    times 2 is 10.  Minimum score, 5 times 0 would be 0, so 0 to

8    10.

9    Q    And the healthiest babies might get a 10?

10   A    That's right.

11   Q    And in this case, at the one-minute mark, Isabella got an

12   Apgar score of 9?

13   A    That's right.  That's pretty darned good.

14   Q    And she also got an Apgar score of 9 at five minutes?

15   A    Yes, sir.

16   Q    She also got an Apgar score of 9 at ten minutes?

17   A    Yes, sir.

18   Q    So in all indications, at least on this record, there were

19   only minor issues in regards to the birth of Isabella

20   Zielinski when she was born on September 6th?

21   A    That's right.  I would not have anticipated a problem

22   based on this birth record.

23   Q    In terms of -- strike that.

24         Do you remember looking at the measurements that the

25   doctors took right after the birth of Isabella Zielinski?

Scheller - cross

1    A    Yes, sir.

2    Q    In terms of the weight, do you remember if she was in the

3    75th percentile?  I don't have a record in there.  So I'm just

4    asking if you recall.

5    A    I don't recall.

6    Q    Do you recall whether her length was in the

7    90th percentile?

8    A    I also don't recall.  I'm sorry.

9    Q    I think you talked about the concept of molding.

10   A    I did.

11   Q    And when the head goes through the birth canal, it can get

12   molded?

13   A    Misshapened would be another word, yes.

14   Q    Misshapened.

15          If the doctors took the measurement right at the time

16   of birth, it might not be accurate?

17   A    That's right.

18   Q    In fact, if the doctors take the measurement at birth,

19   they might actually get a smaller head circumference than the

20   baby's actual head circumference?

21   A    That could happen, yes.

22   Q    And it might be that Isabella Zielinski's head was

23   actually larger than the 33 and a half centimeters that they

24   measured?

25   A    I'm sorry.  I don't have the records in front of me, and

1    when I worked in a nursery and most nurseries I'm familiar

2    with, they do the head circumference the day of birth and then

3    a day or two later when the child goes home when there's going

4    to be less molding.

5            But I don't specifically remember in Isabella's case,

6    so I can't say.

7    Q    Just to make sure I understand, the head circumference

8    could be larger than it actually is when measured at birth?

9    A    It could be either larger or smaller.

10   Q    In terms of after, right after, Isabella Zielinski was

11   born, do you recall if they did a neurological exam?

12   A    They did.

13   Q    In terms of doing that, it was normal?

14   A    Perfectly normal.

15   Q    In terms of the nursing care after birth, she went to a

16   regular room?

17   A    That's right, did not need intensive care of any kind.

18   Q    In terms of a hearing exam, do you remember that a hearing

19   exam was done?

20   A    Yes, sir.

21   Q    And it was a normal hearing exam?

22   A    Yes, sir.

23   Q    In terms of her newborn maturity rating classification, it

24   was normal?

25   A    That's right.

Scheller - cross

1    Q    If there were any neurological issues, they would have
2    noted it in the record?
3    A    That's correct.
4    Q    The record had no indications of any neurological issues?
5    A    I agree a hundred percent.
6    Q    Now, do you recall reading records regarding her initial
7    newborn visit dated September 20th, 2002?
8    A    Yes, sir.
9    Q    In terms of her visit on September 20th, 2002, there was
10   no indication of any neurological problems?
11   A    None.
12   Q    There was no report of any kind of seizures?
13   A    Nothing, no.
14   Q    It was an indication that she was healthy when she visited
15   the pediatrician on September 20th, 2002?
16   A    That's correct.
17   Q    In terms of that initial visit, they looked at her
18   developmental history?
19   A    Yes, sir.
20   Q    And she fixed -- in terms of fixes, her eyes fixed
21   properly?
22   A    Could fixate on an object, that's right.
23   Q    And they followed, meaning they followed the --
24        When you say "followed" in a report, what does that
25   mean?

1  A   That there was an object held in front of her eyes and
2  then she was able to follow that object as it moved around the
3  room.
4  Q   And at that point in time on September 20th, she moved all
5  for extremities, is that correct?
6  A   That's correct.
7  Q   And she responded to loud noises?
8  A   Yes, sir.
9  Q   There was no mention of any cranial issues?
10 A   None.
11 Q   At that point in time, there were no complications?
12 A   That's right, none.
13 Q   And her weight had increased?
14 A   Appropriately, yes.
15 Q   Now, do you remember looking at the pediatrician's notes
16 from October 8th of 2002?
17 A   Yes, sir.
18 Q   There were no problems or concerns at that time either,
19 were there?
20 A   None.  She checked out perfect -- perfectly.
21 Q   And her weight went up?
22 A   That's right.
23 Q   No report of any abnormalities in or about the skull?
24 A   No, sir.
25 Q   No report of seizures?

1   A   No, sir.

2   Q   Then she had an admission on October 23rd, 2002, at the

3   Edwards emergency room?

4   A   Yes, sir.

5   Q   She had had a fever in the morning?

6   A   That's right.

7   Q   When she got to the hospital, she had a fever of

8   approximately 100.5 degrees?

9   A   Yes, sir.

10  Q   At that point in time she was still nursing well, though?

11  A   That's what they reported.

12  Q   And the anterior fontanelle was opening, not bulging?

13  A   That is right.

14  Q   They checked out for infection?

15  A   Correct.

16  Q   And in terms of checking out for infection, they took

17  samples of the blood and the urine?

18  A   That's right, and those checked out normal.

19  Q   There was an x-ray, a chest x-ray?

20  A   Yes, which was also normal.

21  Q   Now, I think you indicated on direct examination that her

22  platelets were high?

23  A   On that day, yes, that was measured by the emergency room.

24  Q   And if you're ill, your platelets can be elevated, is that

25  correct?

1   A   That can be a response to illness, yes.

2   Q   And, obviously, because of her temperature, she had some

3   type of illness?

4   A   I believe so, yes.

5   Q   And that could account for her platelets being high?

6   A   I guess.

7   Q   And in terms of the shape of her platelets, the morphology

8   of her platelets, those were normal, weren't they?

9   A   That's right.

10  Q   And if they were abnormal, that might mean a clotting

11  problem?

12  A   That's right.

13  Q   But there was no indication of any clotting problem at

14  this point in time because the morphology of her platelets was

15  normal?

16  A   That part of the --

17      Right.  The platelets clot.  Too many of them with

18  normal morphology can clot, and certainly too many of them

19  with abnormal morphology can clot even more.

20      So you're right.  She didn't have the extreme

21  platelet problem, which was platelets that appear abnormal and

22  that clot too much.  She just had too many of them on that

23  day.

24  Q   So I guess my question is:  The shape was normal?

25  A   The shape was normal.

Scheller - cross

1  Q   And on that October 23rd visit, they took blood and urine
2  samples?
3  A   Yes, sir.
4  Q   And they gave them a certain amount of days to grow,
5  right?
6  A   To grow any kind of pathogens, bacteria.
7  Q   In terms of the urine, they let it grow for 48 hours?
8  A   Yes, sir, and nothing grew.
9  Q   It was negative?
10 A   Yes, sir.
11 Q   And they let the blood -- they tested the blood over a
12 five-day period?
13 A   Sometimes they do three days, sometimes five.  I don't
14 recall in her case, but nothing grew.
15 Q   It was negative --
16 A   Yes, sir.
17 Q   -- for infection?
18         Once again, there was no report of any seizure type
19 activity?
20 A   None.
21 Q   She had a November 11th, 2002, two-month visit?
22 A   Correct.
23 Q   That was a regularly planned visit?
24 A   Yes, sir.
25 Q   There were no problems at that point in time?

Scheller - cross

1   A   Also not, no.

2   Q   Review of all the systems were within the normal range?

3   A   That's correct.

4   Q   No report of seizures?

5   A   No, sir.

6   Q   On December 18th she had a -- she was taken to see the

7   doctor, is that correct?

8   A   December, yes, that's right.

9   Q   And that was the point in time where the doctors decided

10  to give her a normal dose of amoxicillin to take care of a

11  possible ear infection?

12  A   That's right.

13  Q   As I said, it was a normal dose for an infant of that age?

14  A   Correct, a typical dose.  I wouldn't say normal dose;

15  typical dose.

16  Q   I think I asked you this before, but ear infections -- you

17  said it already; they're very common in infants and children?

18  A   Yes, sir.

19  Q   And on that December 18th visit, she had a weight recorded

20  of 11 pounds, 10 ounces?

21  A   That's right, which is a very nice weight for a

22  three-month old.

23  Q   In terms of her weight, her weight was increasing?

24  A   Yes.

25  Q   Now, directing your attention to December 27th, 2002, one

1    of the things that you indicated regarding that day was that

2    there was a leakage of some type in one of the -- I believe

3    the hemorrhages or something like that?

4    A    Mr. Blegen asked me what caused the hemorrhage, and I said

5    the vein, the cortical vein, that had a clot leaked into the

6    subdural space and then into the subarachnoid space.

7    Q    Is this a leak from a chronic subdural hemorrhage?

8    A    Oh, not at all, no.

9         This is a leak from an acute clot in her cortical

10   vein, so acute subdural hemorrhage from an acute clot in a

11   cortical vein.

12   Q    Now, the acute hemorrhage that you say you saw in

13   radiology, wasn't that in a different position than the

14   chronic subdural?

15   A    Yes.  The acute hemorrhage was in multiple areas.  As I

16   indicated before, that hemorrhage could go anywhere.  The

17   chronic subdurals that we see in children typically are in the

18   front, in front, in between the front of the brain and the

19   inside of the front of the skull, and so that's where they

20   were in her case.

21        So, yes, the chronic subdural hemorrhages were

22   frontal, and the acute subdural hemorrhage was diffuse, I

23   guess you would call it.  It was all over.

24   Q    And, of course, in terms of that acute hemorrhage that was

25   all over, that could have been caused by trauma, is that

Scheller - cross

1  correct?

2  A   It could have been, yes.

3  Q   And in terms of that acute hemorrhage that was all over,

4  that can be caused by abusive head trauma?

5  A   Can be, yes, sir.

6  Q   Now, you indicated that you reviewed the CAT scan, is that

7  correct?

8  A   Yes, sir.  There were a whole bunch of them, the 27th,

9  28th and 29th and about three or four after that.

10 Q   In your report, I believe you mentioned looking at the CAT

11 scans of December 28th, 29th -- 27th, 28th and 29th, is that

12 correct?

13 A   Yes, sir.

14 Q   In your report do you mention reviewing any other dates

15 with specificity?

16 A   I don't.

17 Q   You didn't mention that you looked at the CT scan of

18 January 4th, did you?

19 A   I didn't put it in my report, that's correct.

20 Q   In terms of your report, you didn't indicate that you

21 looked at the MRI that was conducted on January 7th of 2003,

22 did you?

23 A   That's right, not in my report.

24 Q   In terms of the other CT scans and MRIs that were done

25 between January and February, you didn't mention in your

Scheller - cross

1    report that you looked at any of them, did you?

2    A    I didn't, that's right.

3    Q    In terms of looking at the CAT scan of 12/27/02, you

4    looked at it and made your own conclusions?

5    A    That's right.

6    Q    You didn't rely on the conclusions reached by Dr. Barnes?

7    A    Right.  What I told you before, I reviewed it.  I saw what

8    Dr. Barnes' opinion was, and I then took that into

9    consideration but created my own opinion.

10   Q    When did you start your fellowship again in

11   neuroradiology?

12   A    July of 2012, this year.

13   Q    So in terms of your report, you wrote your report about a

14   month after you began your fellowship in neuroradiology?

15   A    Actually two months, but, still, yes, relatively early

16   into the fellowship.

17   Q    When you looked at the CT scan of 12/28/02, you did see

18   acute subdural hemorrhage again?

19   A    Yes, sir, all three days you could see it:  27th, 28th,

20   29th.

21   Q    Was it still in the subarachnoid space, also?

22   A    Yes, all three days.

23   Q    All three days?

24   A    Yes, sir.

25   Q    And in terms of the location of the blood, once again it

1    was in the bilateral frontal lobes?

2    A    Again, it's not in the frontal lobes, but it's on the

3    surface of the frontal lobes or immediately adjacent to the

4    frontal lobes.

5    Q    In addition to it being on the surface of the frontal

6    lobes, there was also cut hemorrhage in the tentorium?

7    A    Right.  And, again, that's just how it layers out.  We can

8    say it's here or there, but that's just how it layers out.

9         Again, we're talking about a layer of fluid over a

10   surface.

11   Q    Did you indicate in your testimony yesterday that when you

12   see cases of some type of head trauma that they show

13   indications of swelling?

14   A    You would expect in a case of severe head injury that

15   there would be brain swelling either if it was forceful to one

16   side -- example:  A child gets hit on the head with a baseball

17   bat, then you would see most of the swelling just underneath

18   where the baseball bat hit.

19        But in cases where there has been a more diffuse type

20   of injury, then you could see diffuse brain swelling.

21   Q    In this case, did you see any brain swelling?

22   A    Not of note, no.  There's nothing significant, no.

23   Q    Didn't yesterday you say that you didn't see any evidence

24   of brain swelling?

25   A    There may have been a little bit.  I would call it at most

1   a small amount of brain swelling.  It was nothing of

2   significance in my view.

3   Q   Well, in your report, did you mention at all that there

4   was brain swelling?

5   A   I didn't mention it.

6            MR. GOODFRIEND:  Judge, do you have --

7            Actually I also have an extra copy of Dr. Barnes'

8   report.

9            THE COURT:  I've got everything.  Yes.  I need to dig

10  it out.

11           MR. GOODFRIEND:  I kind of marked mine up so I could

12  direct.

13           THE COURT:  It's all right.  Barnes?

14           MR. GOODFRIEND:  Barnes.

15           What exhibit was the Barnes report?

16           THE COURT:  I have the Barnes report right here.

17  It's called -- they call them by little names.  That's right,

18  that's the guy with the two reports.  I have Barnes report; I

19  have Barnes supplemental report here.

20           MR. GOODFRIEND:  I'm going to the June 29th report,

21  the first.

22           THE COURT:  That's not the one I have here.  All

23  right, let me find it.

24      (Brief interruption.)

25           MR. GOODFRIEND:  I have an extra copy, if you want,

Scheller - cross

1   Judge.

2           THE COURT:  I'm not figuring out why I don't have it.

3   I'm supposed to have everything.

4           Yes, let me borrow your copy.  Thanks.

5           MR. GOODFRIEND:  Do you want one, too?

6           THE COURT:  You will have to go without.

7           You're good, Mr. Goodfriend.  Go ahead.

8   BY MR. GOODFRIEND:

9   Q   Dr. Scheller, could you please turn to page 2?

10  A   Sure.

11  Q   And I've highlighted a certain section on page 2, is that

12  correct?

13  A   Yes.  I see a yellow highlight in the middle of the page.

14  Q   And Dr. Barnes in his report of his observations on the

15  CAT scan, he wrote:  "Question cerebral low densities with

16  decreased gray white matter differentiation, brain edema

17  swelling, question mark," is that correct?

18  A   That's right.

19  Q   So at that point in time, he thought there might be brain

20  swelling and brain edema, but he wasn't sure?

21  A   That's right.

22  Q   Now, do you remember what your recollection was of the CAT

23  scan on 12/28/2002?

24  A   I do.

25  Q   And in terms --

1       Did you see any brain swelling on the CAT scan of

2   12/28/02?

3   A   Nothing of note.

4   Q   Well, you didn't note it in your report, did you?

5   A   Did not.

6   Q   And as I said, I believe yesterday, you said there was no

7   swelling?

8   A   It's not swelling that I would comment on or think is

9   important in any way.

10  Q   Why don't we turn to the next page, page 3, which is the

11  --

12          THE COURT:  Page 3 of Dr. Barnes' report?

13          MR. GOODFRIEND:  3 of Dr. Barnes' report.

14  BY MR. GOODFRIEND:

15  Q   And in terms of his observation at that point in time, he

16  said:

17          "Question cerebral low densities, decreased GWD,

18  especially temporal, occipital, parietal, left more than right

19  edema, swelling, question slightly widened sutures."  Is that

20  what he said?

21  A   That's what he said.

22  Q   So on 12/29 Dr. Barnes has now decided there is bridge

23  swelling and edema?

24  A   He has still got that word "question" there.  So to me it

25  doesn't seem like he decided, but maybe you're interpreting it

1   differently.

2          That whole line that you highlighted, that whole

3   three lines is a section.

4          So question the following the way I understand it.

5   Number one, cerebral low densities; number two, decreased GWD,

6   which I'm happy to explain if the Court doesn't know what that

7   means, especially temporal occipital.

8   Q   Where is the question?

9   A   Line number two.

10  Q   The question goes to slightly widened sutures, doesn't it?

11  A   No, no, no, the second line of page 3, the word "question"

12  is there.  And the way I interpret it, I can't read into Dr.

13  Barnes' mind, but the way I interpret it is that all the

14  following are a question, everything on line 3 and on line 4

15  of page 3.

16  Q   In terms of the next paragraph, the CT scan of 1/4, I've

17  highlighted where it says "cerebral low densities with

18  decreased GWD, gray white differentiation involving brain

19  edema and injury," is that correct?

20  A   Yes, that I agree with a hundred percent.

21  Q   Do you also agree that Isabella had brain edema and injury

22  on 1/4/03?

23  A   In looking at her scan of 1/4/03, it looked like she was I

24  can't say recovering.  She was evolving from something that

25  had affected her brain very dramatically which could have been

Scheller - cross

1    either a hypoxic injury or a traumatic injury.  They're

2    different.

3    Q   Well, brain swelling can come from head trauma, is that

4    correct?

5    A   That's right.

6    Q   It can come from abusive head trauma?

7    A   That's right.

8          THE COURT:  What is GWD?

9          THE WITNESS:  Gray, which is the gray matter; W,

10   white, differentiation.

11         So on a CAT scan, if there's not a lot of swelling,

12   you can see, oh, there's the gray matter on the surface,

13   there's the white matter right underneath there.

14         THE COURT:  So if it's decreasing -- okay.

15         THE WITNESS:  So more swelling, less GWD.

16         THE COURT:  Got it.

17   BY MR. GOODFRIEND:

18   Q   Now, in terms of your report, you indicated that Isabella

19   had an infection, is that correct?

20   A   Yes, sir.

21   Q   What infection are you talking about?

22   A   Sinus infection.

23   Q   You reported she had a sinus infection?

24   A   Yes, sir.

25   Q   Associated with the ears?

Scheller - cross

1   A   Well, often the ears connect to the sinuses, and so

2   children with ear infection, if they have bad luck, could

3   develop a sinus infection after that or as part of it.

4   Q   When she was evaluated initially, there was no sign of

5   infection on 12/27 according to the hospital records?

6   A   Well, you can't see a sinus infection on a physical exam.

7   You have to look at it -- for it on an imaging study.

8   Q   But there was no abnormalities when they looked in her

9   ears back on December 27th, is that correct?

10  A   Correct.

11  Q   Now, they did a series of tests to determine if she had

12  any type of infection, is that correct?

13  A   They did blood tests, spinal fluid, urine, the whole

14  thing.

15  Q   And in terms of tests that they did, they did what was

16  called a lactis agglutination bacterial antigen test, is that

17  correct?

18  A   That's right, looking for bacteria, that's right.

19  Q   And in terms of this bacteria, this type of bacteria or

20  test wouldn't be affected by the amoxicillin, is that correct?

21  A   It shouldn't be, that's correct.

22  Q   So in terms of this test, they did a -- I think it was a

23  group B strep test?

24  A   That's right, which is a pathogen usually of newborns.

25  Q   It was negative?

Scheller - cross

1   A    That's right.

2   Q    They did an H influenza B test?

3   A    That's right, which is a bacteria that can affect infants.

4   Q    Negative?

5   A    That's right.

6   Q    They did a couple of meningitis or meningitidis tests?

7   A    You might not be pronouncing it in a way I'm familiar to.

8   Meningococcus maybe?

9   Q    M-e-n-i-n-g-i-t-i-d-i-s.

10  A    Meningitidis, I guess.  So that's the common causes of

11  meningitis.  I don't recall that specific, but that's what

12  pediatricians typically do to look for bacterial infections in

13  children.

14  Q    And do you remember those were negative?

15  A    Yes, sir, they were.

16  Q    Now, on the date of 12/27, they also did a cerebral spinal

17  flu test -- I mean, fluid test.  They tested that fluid?

18  A    They tested that for any evidence of bacterial infection,

19  that's right.

20  Q    What is a gram stain, Dr. Scheller?

21  A    One uses a dye to dye the spinal fluid and one looks under

22  the microscope to see if there are any bacteria that are

23  visible to the naked eye.

24  Q    In terms of the gram stain test done on 12/27/2002, there

25  were no organisms seen, is that correct?

Scheller - cross

1    A    Yes, sir, that's right.

2    Q    So there was no bacteria?

3    A    Right.  She did not have meningitis on that day.

4    Q    Well, did she have meningitis on any other day?

5    A    No.  To my knowledge she never had meningitis.

6    Q    In terms of the gram stain, that would include bacteria,

7    fungi or yeast, is that correct?

8    A    I'm not sure.  I know for bacteria; I forget about fungi

9    and yeast.

10   Q    But in terms of the cerebral spinal fluid, there weren't

11   any --

12            They had cultures done, right?

13   A    That's right, and the cultures didn't grow anything.

14   Q    Now, in terms 12/27/2002, they tested the blood for any

15   indications of infection?

16   A    That's right, and she was not found to have any except she

17   did have a high white blood cell count to my recollection.  I

18   don't have the numbers in front of me.

19   Q    In terms of the cerebral spinal fluid, didn't they test

20   for white blood cells when they took her cerebral spinal fluid

21   out?

22   A    Right, and that ruled out absolutely meningitis but didn't

23   rule out a blood infection that couldn't -- that didn't have a

24   bacteria in it that would grow.

25            I hope I made that clear.

1   Q   Well, in terms of all these tests that they have done from

2   December 27th through February of '02, there was no infection

3   found, right?

4   A   That's right.

5   Q   I mean, they continually tested the blood and the urine

6   while she was in the hospital, is that correct?

7   A   She had several tests, and none actually found a bacterial

8   infection of her blood, her urine or her spinal fluid.

9   Q   They also checked her trachea for infection, is that

10  correct?

11  A   Unfortunately, yes.

12  Q   And once again, those tests were negative?

13  A   That's right.

14  Q   In terms of certain --

15          Like a fever that she may have had, I think she had a

16  fever on December 29th, is that correct?

17  A   I don't have my notes in front of me.  Oh, wait.  Hold on.

18  Yes, according to my report of August 29th, I wrote that she

19  did have a fever on December 29th.

20  Q   And fever can be a result of trauma?

21  A   If somebody has had a very significant head injury and the

22  body regulating systems that are responsible for maintaining

23  normal temperature are affected, then somebody can have a

24  fever from head trauma, yes.

25  Q   Once again, I think we have been over this, but she did

1   not have any type of meningitis?

2   A    Did not.

3   Q    Now, in terms of the hematology part of this case, they

4   had her see a hematologist, is that correct?

5   A    Right, a specialist in blood disorders did see Isabella, I

6   don't know exactly the day, but sometime the end of December,

7   beginning of January.

8           MR. GOODFRIEND:  Judge, I'm referring now to Exhibit

9   Number 52.

10          THE COURT:  The first part of 52?

11          MR. GOODFRIEND:  Yes.

12          THE COURT:  In a few minutes here, the guy who does

13  the tech stuff is going to appear, and that's when we are

14  going to take our break because he needs to set something up

15  and do a test from here.  I don't know if that's him hanging

16  out outside the door or not.

17          I see people hanging out outside the door.  Okay,

18  we're going to take a break right now.  You can take a break,

19  too, if you want.

20          (Brief recess.)

21          THE COURT:  Just everybody watch out for that thing

22  as you're trying to get by.

23          Okay, Mr. Goodfriend, you can go ahead.

24          MR. GOODFRIEND:  Thank you, Judge.

25  BY MR. GOODFRIEND:

1  Q   Dr. Scheller, in terms of your review of all the test

2  results on the blood, urine, cerebral spinal fluid, in terms

3  of your review of those, did they ever diagnose Isabella

4  Zielinski with a sinus infection?

5  A   Blood --

6        One thing has nothing to do with the other.  A sinus

7  infection won't show up in a blood test.  So the blood test

8  showed what you said.  There was no blood infection, no spinal

9  fluid infection, no urine infection, but that can't show and

10  didn't show whether or not there was a sinus infection.

11  Q   Well, in terms of all the doctors that were treating

12  Isabella Zielinski in December of 2002, did any of those

13  doctors find a sinus infection?

14  A   They did not, no.

15  Q   Now, in terms of the platelet count that you talked about,

16  are you aware that when Isabella Zielinski made it over to

17  University of Illinois Chicago Medical School that on

18  December 28th, her coagulation parameters were within normal

19  limits?

20  A   I am aware of that, yes.

21  Q   So by 12/28 her platelets are normal, is that correct?

22  A   Not correct, no.  I don't believe her platelets normalized

23  until later.  I don't have the numbers in front of me.

24        Coagulation parameters typically refer to other

25  things:  Prothrombin time, partial thromboplastin time, other

Scheller - cross

1   factors that they're able to measure.

2          But platelets -- I don't believe her platelets were

3   normal at the end of December or the beginning of January to

4   my recollection, and I'm sorry, I don't have the numbers in

5   front of me.

6          MR. GOODFRIEND:  Judge, I have to get an exhibit.

7      (Brief interruption.)

8          MR. GOODFRIEND:  One moment.

9          THE COURT:  Sure.

10  BY MR. GOODFRIEND:

11  Q   Looking at and showing you what I --

12         Let me show counsel first.

13     (Brief interruption.)

14  BY MR. GOODFRIEND:

15  Q   Dr. Scheller, I show you what has been marked for

16  identification Respondent's Exhibit 53.  Is this an admitting

17  summary for her admission?

18         THE COURT:  Keep your voice up.

19  BY MR. GOODFRIEND:

20  Q   Is this an admitting summary for Isabella Zielinski's

21  admission to University of Illinois Chicago Hospital on 12/28?

22  A   Yes, it is.

23  Q   '02?

24  A   Yes, sir.

25         I'm looking at page 1.  Let me just make sure there

Scheller - cross

1    are other pages.  Page 2.  It says page 1 of 4, but I only
2    have --
3    Q    You have the first three pages?
4    A    I have the first three pages, yes.
5    Q    Have I underlined a comment on page 3?
6    A    Yes, a comment, and I will be happy to say it.
7    Q    Go ahead.
8    A    "Under hem" -- which would be short for hematology --
9    "coagulation parameters within normal limits which are PT,
10   PTT" -- that way we can tell if all the factors are there to
11   allow the blood to coagulate, and then also "platelets
12   normal."
13            THE COURT:  Hang on a second.  I couldn't tell where
14   you stopped reading and started commenting.
15            THE WITNESS:  Okay, I will start again from the
16   beginning.
17            THE COURT:  Just give me the reading.  Just read the
18   thing first, and then let's pause there.
19            THE WITNESS:  Okay.  There is one line underlined.
20            MR. GOODFRIEND:  Judge, can I start my question over?
21            THE COURT:  Yes, that's fine.
22   BY MR. GOODFRIEND:
23   Q    Sir, I underlined a statement at the bottom of the page,
24   is that correct?
25   A    That is correct.

1   Q   Why don't you read just what I underlined, please?

2   A   "Coagulation parameters WNL."

3   Q   Within normal limits?

4   A   Correct.  "Platelets normal."

5   Q   And that was for 12/28/02, is that correct?

6   A   That's right.

7           MR. GOODFRIEND:  Judge, I'm going to go to Exhibit

8   Number 52.

9           THE COURT:  Okay.

10  BY MR. GOODFRIEND:

11  Q   Dr. Scheller, if you could turn to 52.

12          Page 52 -- Exhibit 52, page 95, Dr. Scheller, and

13  tell me when you have found that.

14  A   Got it.

15  Q   Okay.  And in the sentence that starts with "uncomplicated

16  spontaneous vaginal birth," do you see that statement?

17  A   Yes.

18  Q   And as I said, that's a hematology report, correct?

19  A   Hematology what?

20  Q   It's a hematology report?

21  A   That's right.

22  Q   And on that section does it read:

23          "Uncomplicated spontaneous vaginal birth to G2

24  mother, has a four-year-old boy, has never had a bruise and

25  has never had bleeding from mouth, umbilicus stool or urine,

1   hospital at seven weeks of age for possible sepsis.  At the

2   time of the current admission, was on amoxicillin her first

3   seven or ten days for otis media but no other meds, no other

4   illnesses.  She does not have stretchy joints or skin.

5           No one else in the family has easy bruising or

6   bleeding.  Her brother does not bleed or bruise easily.

7   Mother does not have excessively heavy periods, nor does she

8   have -- nor did she bleed excessively at delivery.  She has

9   two brothers who do not bleed easily.  Her parents do not

10  bleed easily.  Father and his family do not have any bleeding

11  problems."

12          Is that what the doctor wrote regarding part of the

13  hematology consult?

14  A   Oh, yes.  You read it exactly as stated.

15          THE COURT:  Actually he didn't.  It's otitis media,

16  not otis media.

17          MR. GOODFRIEND:  I'm having trouble with these

18  medical terms, Judge.  I apologize.

19          THE COURT:  Other than that?

20          MR. GOODFRIEND:  Other than that, I read perfectly.

21          THE COURT:  You did.

22  BY MR. GOODFRIEND:

23  Q   Then on the next page, which is Exhibit 52, UIC record 96,

24  why don't you read the sentence that starts with "doubt

25  bleeding."  Do you see that paragraph?

1   A    Yes.

2   Q    Okay.  Why don't you read that into the record, please?

3   A    "Doubt bleeding diathesis," and I can explain that word if

4   the Court doesn't know what it means, "for several reasons."

5   Q    What is diathesis?

6   A    Tendency.

7            So there are people who, unfortunately, have a

8   tendency to bleed, like they get nosebleeds, their gums bleed,

9   that kind of thing.  And this hematologist is saying that this

10  consultant doubts that Isabella has a bleeding tendency.

11           "For several reasons.  The otherwise benign" --

12           Just stop me when you want me to stop.

13  Q    Keep going.

14  A    "The otherwise benign past history and family history for

15  bleeding argue against a significant coagulopathy spontaneous

16  bilateral subdural hematomas, and simultaneous bilateral

17  retinal hemorrhages are unusual in young infants with bleeding

18  disorders.  The physical exam does not show excessive bruising

19  or petechia."

20           Petechia are little spots of microbruises.

21           "The normal PT and PTT also argue against

22  coagulopathy."

23  Q    What is normal PT and PTT?

24  A    Tests that determine how well the blood is able to lead or

25  trigger the clotting cascade.  So those were normal tests.

Scheller - cross

1   Q    Okay.  And in the next paragraph, I've highlighted a
2   section, and I'm going to read it to you.
3            "Would not do a bleeding time study screen for
4   platelet function defects at this time as bleeding times in
5   infants are technically difficult and false positives are very
6   common.
7            Severe platelet function defects are uncommon, and
8   the clinical picture is not typical for platelet function
9   defects.  This test could be performed when the patient is
10  older if clinically indicated."
11           Is that what the report reads?
12  A    Exactly, yes.
13  Q    So when hematology did their analysis of Isabella
14  Zielinski, they found no bleeding disorders, is that correct?
15  A    That's right.
16  Q    Now, in your report, you state that infection and a high
17  platelet count are known triggers of cortical venous
18  thrombosis, is that correct?
19  A    That is right.
20  Q    In your report do you cite to any article that supports
21  your statement that infection is a known trigger of cortical
22  venous thrombosis?
23  A    No, sir.
24  Q    In that report that you have, do you cite to any article
25  that supports your statement that a high platelet count is a

Scheller - cross

1    known trigger of cortical venous thrombosis?

2    A    No, sir.

3    Q    Dr. Scheller, in terms of the CAT scans that were done

4    between --

5              Did you read -- I'm sorry.

6              Did you read the imaging studies done by the hospital

7    at the time Isabella was admitted from December 27th through

8    February 28th?

9    A    You mean the reports?

10   Q    Yes.

11   A    Yes, sir, I did.

12   Q    In any of those reports, did they find any indication of a

13   sinus infection or disorder?

14   A    So there was a sinus infection documented on the MRI scan,

15   and I don't know if you got up to January 7th, but there was a

16   mastoid sinus infection documented.

17   Q    After she was admitted?

18   A    After she was admitted.

19             So that was about a week -- about ten days later they

20   documented a mastoid sinus infection on the MRI scan,

21   January 7th of 2003.

22   Q    January, is that correct?

23   A    That's right.

24   Q    But in the other CAT scans and MRIs, they didn't note any

25   other sinus infection, did they?

1   A   That's right, they did not.

2   Q   Now, Dr. Scheller, in your report you stated that:

3           "Isabella was found to have retinal hemorrhages on

4   December 28th.  This finding is known to occur in a setting of

5   cortical venous thrombosis and uncontrolled seizures."

6           Is that correct?

7   A   That's what I wrote, yes.

8   Q   Are you an ophthalmologist?

9   A   No, sir.

10  Q   Do you cite to any authority to support your statement

11  that retinal hemorrhages are known to occur in the setting of

12  cortical venous thrombosis?

13  A    In my report I did not cite any literature, no.

14  Q   Do you cite to any authority to support your statement

15  that retinal hemorrhages are known to occur in the setting of

16  uncontrolled seizures?

17  A   No, sir.

18  Q   Didn't Isabella Zielinski have severe retinal hemorrhages?

19  A   She did.

20  Q   Did you read any peer-reviewed published research showing

21  that hypoxia ischemia is associated with severe retinal

22  hemorrhages?

23  A   Yes, sir.

24  Q   Did you cite any of those in your report?

25  A   No, sir.

Scheller - cross

1    MR. GOODFRIEND:  Can I have one minute, Judge?

2    THE COURT:  Sure.

3    (Brief interruption.)

4  MR. GOODFRIEND:

5  Q   Dr. Scheller, I think you, in summary, you're aware and

6  testified that Isabella Zielinski had chronic subdural

7  hemorrhages, is that correct?

8  A   Yes, sir.

9  Q   She had severe retinal hemorrhages?

10  A   I agree with her.

11  Q   She had acute subdural hemorrhage on 12/27/02?

12  A   That's right.

13  Q   She had severe acute subarachnoid hemorrhage on 12/27/02?

14  A   Severe in that it caused her to have a seizure that was a

15  life threatening seizure, not severe in amount or the way it

16  appeared on the scan, but severe in that it was dangerous for

17  her.

18  Q   Severe enough for -- severe hemorrhages and brain trauma

19  to cause a seizure?

20  A   Well, you're throwing out the word "brain tumor," which

21  I'm not going to agree to, but I will say severe enough for a

22  subarachnoid hemorrhage to cause a seizure, absolutely, and to

23  threaten her life because of that seizure.

24  Q   Yesterday you testified there were no signs of abuse in

25  this case?

1  A   That's right, there weren't.

2          MR. GOODFRIEND:  Thank you, Judge.

3          THE COURT:  Redirect.

4                  REDIRECT EXAMINATION

5  BY MR. BLEGEN:

6  Q   Dr. Scheller, can you turn to I believe it's Respondent's

7  Exhibit 51, the very last page?

8  A   Yes, sir.

9  Q   Do you see that?  That's the record that has the

10 temperature in the upper-left corner?

11 A   Yes, sir.

12 Q   In the upper-right corner, it says "Pediatric Admission

13 Assessment Record"?

14 A   Got it.

15 Q   From Provena Hospital?

16 A   Yes, sir.

17 Q   Correct.  It says it's page 4 of 5, correct?

18 A   Yes, sir, got it.

19         MR. BLEGEN:  Rob, would you pull up page 1 of those

20 four pages?

21 BY MR. BLEGEN:

22 Q   Do you see on page 4 of 5, the temperature is 93.1

23 degrees?

24 A   That's right.

25 Q   Do you know what time this report was generated or made?

1  A    Approximately 2:00 in the afternoon, but that's just a

2  guess.

3  Q    That's just a guess because it says "admission" on it,

4  right?

5  A    That's right.

6              MR. BLEGEN:  Turn to page 1 of that, Rob.

7  BY MR. BLEGEN:

8  Q    I don't know if you remember from --

9              THE COURT:  Can you zoom it?

10             MR. BLEGEN:  Right up there.

11  BY MR. BLEGEN:

12  Q    Do you now see that this admission record was dated and

13  timed 4:00 p.m.?

14  A    I do.

15  Q    And so that's actually a few hours after Isabella had made

16  it to the hospital, right?

17  A    Yes.  My recollection was the phone call was around 1:30.

18  The emergency room personnel got there between 1:30 and 2:00,

19  got her to the hospital around 2:00, but I might be a little

20  fuzzy on those details.

21  Q    Do you remember seeing something called like a code blue

22  record that had a different temperature on it?

23  A    I did.

24  Q    And that temperature, do you recall that being 95.

25  something degrees?

1    A    I do.

2    Q    Mr. Goodfriend also asked you some questions about the

3    pediatric records and whether there were complications or

4    trauma related to the birth.

5         Do you remember that?

6    A    That's right.

7    Q    And do I understood you correctly to be saying that this

8    was not a birth that somebody would have at the time thought

9    was a problem?

10   A    That's exactly right.

11   Q    All right.  But there were some issues with the birth,

12   were there not?

13   A    Yes, there were.

14   Q    Do you remember there being a cephalohematoma?

15   A    Right.  And if the Court doesn't know what that is, I can

16   elaborate.

17   Q    He probably does, but I've forgotten.

18   A    So --

19        THE COURT:  Go ahead.

20        THE WITNESS:  It is a bulge outside of the brain in

21   between the skull and the skin of the scalp.  And hematoma is

22   blood, so cephalo, a skull.  A blood clot that makes the scalp

23   bulge.  So it's an external -- external sign of a delivery

24   trauma.

25   BY MR. BLEGEN:

Scheller - redirect

1   Q    And what is the kind of trauma that causes a

2   cephalohematoma?

3   A    Excessive -- getting squeezed excessively, and it happens

4   to some babies, some babies it doesn't, so the skull being

5   squeezed excessively.

6   Q    Do you recall seeing in the records that the baby received

7   free-flow oxygen for two to three minutes?

8   A    I do.

9   Q    Does that happen in every birth?

10  A    It does not.

11  Q    What is the purpose for giving oxygen for two to

12  three minutes?

13  A    To help the baby achieve a more easy respiration and to

14  improve the color.

15  Q    Is it usually done when there is at least some sort of

16  problem, maybe minor, with respiration?

17  A    Yes.

18  Q    Was there also an occipital caput?

19  A    That is correct.

20  Q    What is an occipital caput?

21  A    So a caput and cephalohematoma are both external bulges of

22  the scalp, and a caput is a bulge that can go over sutures,

23  and a cephalohematoma is a bulge that doesn't.

24       But they're basically bulges from minor trauma that

25  happened on the scalp that could be noticed at birth.

1   Q    Do you remember seeing records about overlapping sutures,
2   bruise and molding?
3   A    Yes, sir.
4   Q    And how do you get overlapping sutures and bruise from
5   birth?
6   A    I assume the Court knows what sutures are.  Do I need to
7   explain?
8             THE COURT:  That's where the skull knits together.
9             THE WITNESS:  Where the skull bones meet.
10            THE COURT:  Meet, sorry.
11            THE WITNESS:  So the skull bones have not yet fused
12  in babies, and so they are movable and they're squeezable, and
13  so they should be -- they should align just right, just like
14  you align my fingers side by side.  But if the skull gets
15  squeezed excessively, I will just demonstrate that one skull
16  bone can overlap the other just from being squeezed
17  excessively.
18            THE COURT:  And what is that called, suture overlap?
19            THE WITNESS:  Yes.  That would be fine.
20            THE COURT:  If there's a different term.
21            THE WITNESS:  No, that's fine.  Overlapping sutures
22  is what we'll write in the note.
23  BY MR. BLEGEN:
24  Q    Mr. Goodfriend asked you some questions about the baby's
25  having been diagnosed with an ear infection on December 18th,

Scheller - redirect

1    2002.  Do you remember that?

2    A    Yes, sir.

3    Q    Do you know whether a platelet count was done at that

4    time?

5    A    Was not, to my recollection.

6    Q    Was a platelet count done when the child was taken to the

7    hospital for a fever back in October, October 20th of 2002?

8    A    Yes, sir.

9          MR. BLEGEN:  Would you pull up Pediatrician 26?

10         (Brief interruption.)

11   BY MR. BLEGEN:

12   Q    I think you said on cross that you don't remember exactly

13   what the numbers are.

14   A    Well, I do remember that number because it was pretty

15   distinctive.

16   Q    What is it?

17   A    It was over 700,000, I think 768 or something like that,

18   normal being up to about 450,000 platelets per drop of blood.

19         THE COURT:  Mr. Blegen, is that in this little thing?

20         MR. BLEGEN:  It's not, but it can be pulled up here.

21         THE COURT:  There is no way on God's green earth I'm

22   going to see that thing.

23         MR. BLEGEN:  Okay.

24         THE COURT:  Well, even then.

25         Am I going to have this document at some point?

1       MR. BLEGEN:  Well, there is a disagreement.  I want

2  you to have it, but I have been told that they're going to

3  object.  I was going to put these things in through Dr. Teas,

4  so I can wait.

5       THE COURT:  What's the objection going to be to this?

6       MR. GOODFRIEND:  I think we're objecting to the whole

7  medical record going in.

8       THE COURT:  Why?  On what grounds?

9       MR. TRIEBEL:  For the reasons that the Court ruled

10  on, I think --

11       THE COURT:  I don't remember, so tell me.

12       MR. TRIEBEL:  -- a couple months ago.

13       Basically privacy concerns, your Honor, because it

14  contains both birth and treatment and death records for the

15  baby, of course, but also the birth records for the mother.

16  So there's privacy concerns with the medical data.

17       THE COURT:  With regard to the mother?

18       MR. TRIEBEL:  Correct, your Honor.

19       THE COURT:  First of all, the name of the baby has

20  been mentioned about 8,000 times here, okay.

21       MR. TRIEBEL:  No, we're not concerned at all about

22  the privacy of her name, just for the mother to have her

23  medical records out for the public to --

24       THE COURT:  We could do this.  Okay, so here's what I

25  want you to do because I want to have the stuff.  I mean,

1   nobody can expect me to remember a line on a document in a

2   seven-day hearing or whatever it ends up being, sit down,

3   figure out --

4         I agree with the concern.  You have reminded me of my

5   ruling.

6         -- sit down and figure out what needs to be protected

7   and what doesn't.  And the part that needs to be protected, it

8   will be taken in camera or under seal or whatever and the rest

9   not.  Okay.

10        MR. TRIEBEL:  Thank you, your Honor.

11        THE COURT:  I would like to have it, though.

12        But, anyway, go ahead and blow it up here.  I will

13   just get close.

14   BY MR. BLEGEN:

15   Q   Can you see the platelet count here, Dr. Scheller?

16   A   Yes.  I don't see the day.

17        THE COURT:  Tell me what the date on this is again.

18        MR. BLEGEN:  10/23/02.

19   BY THE WITNESS:

20   A   I remembered it incorrectly, and it is 685,000.

21   BY MR. BLEGEN:

22   Q   What does the H there stand there?

23   A   High, too high.

24        THE COURT:  You said 685,000.  So 685 is in

25   thousands, in other words.

1     THE WITNESS:  And I will just point out, at the end

2  of the line is the official normal for a child.

3     THE COURT:  The reference range.

4     THE WITNESS:  And that's 150 to 450.

5  BY MR. BLEGEN:

6  Q   At the bottom, Rob, if you can blow it up, it says

7  something about platelet morphology normal?

8  A   Right.  That just means under the microscope, they looked

9  like they were regular, plain old platelets.

10 Q   Tell us a little bit about what that means.  Does that

11 have anything to do with platelet count?

12 A   Well, they're two separate things, and each one could be

13 good or bad.  If the morphology is abnormal, then that could

14 mean an abnormality in the clotting ability.  And then if the

15 number is abnormal, that could mean it.

16    So they're both important.  They both can be abnormal

17 together or they can be separate.

18 Q   Mr. Goodfriend asked you some questions about the

19 difference between, I think, high platelet counts that are

20 reactive to something and high platelet counts that are maybe

21 self-generating?

22 A   He asked me one question about that, in other words, can

23 illness trigger a high platelet count.  He asked me that

24 question.

25 Q   And the answer is what?

1   A    Yes, absolutely.

2   Q    Okay.  For purposes of your diagnosis of thrombosis -- CVT

3   that led to seizures, does it matter to you whether the high

4   platelet counts are reactive, or would the term be primary?

5   A    No, they're still abnormal.  And if there is a blood clot

6   that shouldn't happen, then that's not a good thing.

7   Q    And is it --

8         If there were high platelet counts on, let's say, at

9   the time of the ear infection on 12/18/02, could that have

10  started the process for the CVT and the thrombosed cortical

11  vein that was present on 12/27/02?

12  A    Absolutely, because it seems that we have a pattern; when

13  Isabella gets sick, her platelets jump way high.

14  Q    Does it impact your conclusion whatsoever that perhaps the

15  amoxicillin had taken care of the ear infection by 12/27/02?

16  A    No, I'm not talking about an ear infection.  And I hope I

17  made that clear with Mr. Goodfriend.  I was talking about a

18  sinus infection.

19        Ear infections can lead to sinus infections, but the

20  ear infection might be gone, but one could still have a sinus

21  infection.

22  Q    And both kinds of infections -- correct me if I'm wrong --

23  can lead to CVT?

24  A    Both kind of infections can lead to a high platelet count.

25  It's interesting, sinus infections more than ear infections.

1    If one chooses to pull up any kind of literature

2    about CVTs, cerebral venous thrombosis, one of the top few

3    causes is always said to be a skull sinus infection because

4    there are factors released by the infection that can promote

5    clotting, excessive clotting, and so that's a common finding,

6    cerebral venous thrombosis and sinusitis somewhere in the

7    skull.

8    Q    So I said that high platelets can lead to CVT.  Did I miss

9    a step in between high platelets can lead to --

10    I'm sorry.  I said infections can lead to CVT.  Did I

11    miss the high platelets in the middle?

12    A    Yes.  They can both happen.  Infections can lead to CVT

13    without high platelets.  Infections can lead to CVT certainly

14    with high platelets.

15    MR. BLEGEN:  Continuing along with the high

16    platelets, Rob, can you pull up Provena 20?

17    (Brief interruption.)

18    BY MR. BLEGEN:

19    Q    I will have you expand or zoom in on the middle.

20    A    There's the number I remember.

21    THE COURT:  What's the date on this one again, Mr.

22    Blegen?

23    MR. BLEGEN:  This is --

24    Rob, can you read the date?

25    (Brief interruption.)

                         Scheller - redirect

1              MR. BLEGEN:  12/27/02.

2       BY MR. BLEGEN:

3       Q    What's the platelet count there?

4       A    768,000.  Again, the normal would be the same, between 150

5       and 450,000 per drop of blood.

6       Q    Again, the H is for high?

7       A    Yes, that's right.

8              MR. BLEGEN:  Rob, can you pull up UIC Labs 6?

9            (Brief interruption.)

10      BY MR. BLEGEN:

11      Q    What is the date on UIC Labs 6?

12             Can you see the platelet found on UIC Lab 8?

13      A    Right.  And they're going from right -- from right to

14      left, and they follow the dates, but I can't see the dates

15      from where I'm siting.

16      Q    You have a collection date of January 1st, 2003?

17      A    I think they're going back in time, is that correct?

18      Q    12/28/02?

19      A    So that would be far right, so that would be 628,000.

20      Q    12/29/02?

21      A    A little bit higher, 669,000.

22      Q    12/30/02?

23      A    A little bit lower, 557,000.

24      Q    January 1st, 2003?

25      A    629,000, so all of those are abnormally high.  Again,

Scheller - redirect

1   there's the H.

2   Q    And they're also fluctuating, correct?

3   A    We wouldn't consider that a significant fluctuation.

4   They're just all elevated.

5   Q    They're just all high?

6   A    550,000 and 650,000, it's abnormal, but not horrendous,

7   but not normal.

8   Q    And by January 1st, she had been in the hospital for five

9   days?

10  A    27, 28, 29, 30, 31, five, six days.

11  Q    Mr. Goodfriend asked you some questions about a hematology

12  report that took some family history regarding bleeding

13  disorders?

14  A    Yes, sir.

15  Q    Does a lack of family history rule out -- what is it

16  called, thrombophilia?  Is that what the problem is with high

17  platelets?

18  A    Yes.  There are two questions that in theory should have

19  been asked to the hematologist, and it seems like only one

20  question was asked to the hematologist, and the hematologist

21  only replied to that question.

22          And there are two things could happen.  One thing

23  could happen is somebody could clot too much.  Those clots

24  happening in thin veins can then cause bleeding, so that's not

25  really a bleeding problem.  That's too much clotting problem.

1         The other problem that could happen is that

2    somebody's blood could be very, very thin and just bleed for

3    any reason and just leak out for any reason.

4         So the hematologist was very focused -- I mean,

5    focused on that is a good thing -- but missed the other side

6    of the focus.  The hematologist was very focused on does this

7    child have anything that will make it bleed -- that make her

8    bleed more, or the family somehow make it bleed more, but the

9    hematologist did not address is there something going on in

10   the child or in the family that would make the family clot

11   more.

12   Q   What kind of questions would you ask for clotting more?

13   A   Well, the famous things that people get are pulmonary

14   emboli, those clots in the calf, calf muscles; DVT, deep

15   venous thrombosis, that people have heard about, those kinds

16   of problems.  So that's excessive clotting versus excessive

17   bleeding.

18        And so my theory with Isabella, or my opinion that I

19   have expressed to you, is not that she had a bleeding problem;

20   she had a clotting problem that triggered bleeding, and that

21   led to all her seizures and so on.  Unfortunately, we don't

22   see that addressed at all in the hematology note.

23   Q   Well, the family members probably don't likely know what

24   DVT is.

25        What would a hematologist ask to find clotting

Scheller - redirect

1    disorders?

2    A   Pulmonary embolus I think most people have heard about.

3    So a hematologist would ask about that.

4    Q   So a family history for that?

5    A   That would have been an appropriate question.

6    Q   All right.  Even later on January 4th and January 8th at

7    UIC, the platelets went up even higher, did they not?

8    A   That's correct, over a million platelets per drop.

9            MR. BLEGEN:  Rob, would you pull up UIC Labs 7?

10       (Brief interruption.)

11   BY MR. BLEGEN:

12   Q   Do you see the platelet levels here?

13   A   Right.  And, again, we're going dates from right to left.

14   So on the right side would be earlier in January; on the left

15   would be later in January.

16   Q   So January 2nd, 2003?

17   A   773,000, high.

18   Q   January 4th?

19   A   Just over a million platelets per drop, again high.

20   Q   January -- the next, 1/8/2003.

21   A   1.2 million.

22   Q   January 10, 2003?

23   A   900,000, and then it starts to drop a little bit after

24   that.

25   Q   January 12th?

1  A    603,000.

2  Q    January 14th?

3  A    791,000.

4         I'm not able to see what those little -- the Hs I can

5  see, but I can't see the other little footnotes.  I don't know

6  what you call it.

7         THE COURT:  You can walk over there if you want.

8  BY MR. BLEGEN:

9  Q    It looks like R7 and R8.  It may be a line in front of

10 them.

11 A    I don't know what that means.

12 Q    Is 1.2 million a very high platelet count?

13 A    It's incredibly high, something we very, very, very rarely

14 see in pediatrics and something I was very surprised that the

15 hematologist didn't address.

16 Q    Mr. Goodfriend asked you some questions about swelling in

17 the brain that is openly seen on the radiology.

18         Do you remember those questions?

19 A    It can be seen, yes.

20 Q    And he asked whether swelling could be caused from trauma,

21 correct?

22 A    Absolutely, it could be.  He asked me, and I do recall

23 that, yes.

24 Q    He asked you about whether it could be caused from abusive

25 head trauma?

1    A    And I replied in the affirmative, yes, sir.

2    Q    What other things can cause swelling in the brain?

3    A    Seizures and hypoxia, so not enough oxygen and seizures

4    that are out of control.

5    Q    And did Isabella's brain start to receive not enough

6    oxygen at some point?

7    A    Oh, absolutely.  I mean, she needed a CPR for a period of

8    time, I can't tell you exactly how many minutes, but she

9    wasn't breathing and her heart was not working, was not

10   pumping at the right amount.

11            MR. BLEGEN:  If I could just have one second?

12            THE COURT:  Sure.

13       (Brief interruption.)

14   BY MR. BLEGEN:

15   Q    Dr. Scheller, the fact that the blood tests done in the

16   hospital came out clean, does that affect your conclusion in

17   this case?

18   A    No, sir, not at all.

19   Q    Tell us why not.

20   A    Number one, she had a fever on December 29th.  The number

21   one common cause for a fever in children is infection.

22            Number two, the hospital found that she had a sinus

23   infection on January 7th, and I -- according to my

24   interpretation of the scan, she had sinus infection prior to

25   that.

1    And so when one has a sinus infection and when one

2 has fever, one very commonly will not have blood culture and

3 urine culture and spinal fluid culture that are positive.

4 They will be negative, but one can still have an infection.

5 Q   Then, lastly, you said at some point you wanted to

6 elucidate on something.  Frankly, I don't remember what it

7 was.  Do you remember what it was?

8 A   I do.

9 Q   Tell us what it was.

10 A   Mr. --

11    Is it Goodfriend?

12 Q   Goodfriend.

13 A   -- asked me over and over again and in several different

14 ways about several different doctors, well, this radiologist

15 said this and that radiologist said that, and what did that

16 mean to you.

17    I work with medical students and residents and

18 younger doctors all the time, and very often I will come to

19 see a patient with them and they will say, well, Dr. Scheller,

20 I found dut, dut, dut, dut, dut, dah, and based on that I'm

21 making this conclusion.  I don't throw that away.  That means

22 a lot to me, but then I have to come to my own decision:  How

23 am I going to treat this patient?  Am I going to treat it for

24 what the younger doctor's recommending or I'm going to trust

25 my own judgment and experience?

1       And the same is true for a radiologist.  The

2   radiologist will say, well, Dr. Scheller, I saw subarachnoid

3   hemorrhage, I saw subdural hemorrhage, I saw this, I saw that.

4   You know, I have to then decide, do I agree with that, what

5   does that mean to me, and what approach am I going to take.

6       So it's a kind of thing that happens on a daily basis

7   in my profession.

8   Q   So you do take the radiologists' opinions into account?

9   A   Absolutely.

10      MR. BLEGEN:  That is all, Judge.

11      THE COURT:  Mr. Goodfriend, anything else?

12      MR. GOODFRIEND:  Can I have a minute, Judge?

13      THE COURT:  Yes.

14   (Brief interruption.)

15      MR. GOODFRIEND:  No questions.

16      THE COURT:  I have a couple of questions, one just to

17   kind of follow up on that.

18      So if you're going to treat somebody or diagnose them

19   as a precursor to treatment, what you're basically saying is

20   that you're certainly going to look at what the radiologist

21   has said about the xrays, the CT scans, the MRIs or whatever,

22   but you're also going to look at them yourself.

23      THE WITNESS:  In almost every case I actually look at

24   the scans.

25      THE COURT:  Are there doctors that don't do that?  I

1   mean, that seems pretty routine to me, you would want to look

2   at it yourself.

3          THE WITNESS:  Sadly, it is very often the case.

4          THE COURT:  Okay.  You're certainly qualified to read

5   a CT scan?

6          THE WITNESS:  When the neurologist finishes training,

7   we are examined on our ability to read scans just like we are

8   examined on our ability to diagnose multiple sclerosis and

9   Alzheimer's disease and all that.

10         However, the way things have panned out, radiologists

11  who read xrays, they have special certification in looking at

12  brain and spine, and now to -- how I do say this -- to sort of

13  keep up with the Jones' radiologist, neurologists have now

14  created their own certification.

15         THE COURT:  This is what you were referring to.

16         THE WITNESS:  And that's what I'm doing now.

17         THE COURT:  That's what you're working on now.

18         THE WITNESS:  Correct.

19         THE COURT:  Okay.  There were some questions about

20  how your report, which, you know, is only two pages long and

21  basically just gives your opinions, doesn't cite within the

22  report to literature.  Is there literature that supports the

23  various things that you have said today?

24         THE WITNESS:  Yes, and if the Judge allows, if I'm

25  saying too much, please stop me.

Scheller - redirect

1      THE COURT:  Yes.

2      THE WITNESS:  The idea of retinal hemorrhages being a

3  powerful factor for child abuse versus a factor versus

4  associated with is there's great dispute about this in the

5  medical literature.  And I happen to agree with one particular

6  direction, but it's out there.  This fight is being fought as

7  we speak.  How powerful do retinal hemorrhages and the

8  severity of retinal hemorrhages, what do they mean in being

9  indicative of child abuse?  So there is literature for that.

10      There was another issue where the literature came up.

11  Oh, about cerebral venous thrombosis --

12      THE COURT:  Yes, right.

13      THE WITNESS:  -- causing subdural hemorrhage and

14  causing retinal hemorrhages.  And that's also an issue of very

15  great debate.  I believe in adults, everybody agrees that

16  subarachnoid hemorrhage and cerebral thrombosis can cause

17  retinal hemorrhage and subdural hemorrhages.  In children this

18  is an area of what I would call hot debate.

19      THE COURT:  The last thing I wanted to ask you about

20  had to do with this whole platelet issue.  And I'm not

21  necessarily asking for the short course in blood and

22  infections and whatnot, but does your platelet count go up

23  when you have an infection sort of as a matter of routine?

24  That's pretty normal?

25      THE WITNESS:  A little bit.

1      THE COURT:  A little bit.  Okay.  But the question is

2  what we're talking about is the extent.

3      THE WITNESS:  The extent, exactly.

4      THE COURT:  Okay.  So it's not unusual for a person's

5  platelet count to rise when they have an infection.  What

6  you're saying here is that the levels that you're seeing in

7  these particular reports that were put up on the screen and

8  the ones you talked about is really, really high.

9      THE WITNESS:  Very dramatic, right.

10      THE COURT:  You said at one point, I think it was

11  towards the end maybe when Mr. Blegen got back up -- oh, the

12  platelet count of over a million.  You said it was rarely seen

13  in a pediatric setting.

14      Did I catch that right?

15      THE WITNESS:  I did.  The number one problem that a

16  hematologist/oncologist deals with in pediatrics is leukemia,

17  and we do see it in leukemia.  But in a regular child, to have

18  a platelet count of a million is, like, oh, my, God what is

19  going on.

20      THE COURT:  So what does it mean in terms of how your

21  blood works if you have a high platelet count?  What does it

22  do?

23      THE WITNESS:  So there shouldn't be --

24      As we are all sitting here today, we have a fight

25  going on in our bloodstream.  And our fight is should we leak

1    out blood or should we just stay where we belong or should we

2    clot a lot.  And everybody has to have that perfect balance.

3           And we have all heard the stories of old people who

4    have to take blood thinners because they had a heart problem

5    or this problem or that problem.  And, oh, my God, that old

6    person was found on the floor and bled into the head because

7    that balance was messed up.  And so they're bleeding too much,

8    and it just sort of -- the blood leaks out.

9           You can have the balance the other way.  Oh, my gosh,

10   an old person has to take medicine.  There's a side effect

11   that there's too much clotting, and the blood gets clumpier

12   and thicker and more -- more syrupy, and then they develop a

13   stroke from that.  That stroke could often be a cerebral

14   venous thrombosis.

15          And so we're all running that balance, and I'm

16   suggesting that Isabella, bad luck, genes, whatever it was, I

17   really don't know, got out of balance because of infection, we

18   know on one occasion in October and then --

19          THE COURT:  Got out of balance in the sense that

20   would tend to cause greater tendency to clot.

21          THE WITNESS:  A greater tendency to clot, and just

22   her bad luck, and we saw the clot.  There's the clot, and,

23   boom, she's got problems because of that.

24          THE COURT:  Okay, thanks.

25          Mr. Blegen, do you want to ask any further questions

Rangarajan - direct

1    based on what I've asked?

2              MR. BLEGEN:  No.

3              THE COURT:  Mr. Goodfriend?

4              MR. GOODFRIEND:  No, Judge.

5              THE COURT:  Thanks.  You're excused.

6         (Witness excused.)

7              THE COURT:  We can start with the next person.  It's

8    your person, right?

9              MR. TELISMAN:  Yes, your Honor.

10             The respondent calls Dr. Nagarajan Rangarajan to the

11   stand.

12        (Witness sworn.)

13      DR. NAGARAJAN RANGARAJAN, RESPONDENT'S WITNESS, DULY SWORN

14                       DIRECT EXAMINATION

15   BY MR. TELISMAN:

16   Q    Good morning.

17   A    Good morning.

18   Q    Could you please state your name for the record, spelling

19   both your first and last name?

20   A    First name N-a-g-a-r-a-j-a-n.  Last name spelled

21   R-a-n-g-a-r-a-j-a-n.

22   Q    How do you pronounce that?

23   A    Nagarajan Rangarajan.

24   Q    All right.

25   A    Everybody calls me Ranga because it's too long.

Rangarajan - direct

1   Q   What do you do for a living, sir?

2   A   I'm an associate professor in the Neurological Sciences

3   Lab at the Medical College of Wisconsin in Milwaukee.

4   Q   And in what field do you practice?  What is your area of

5   expertise?

6   A   Impact biomechanics.

7   Q   What does that mean?

8   A   Can I give you an example?

9   Q   Sure, if you believe it will be helpful and with the

10  Court's permission.

11          THE COURT:  Sure.

12          THE WITNESS:  I study -- for instance, I study the

13  effect of blast waves on human body including the brain.

14  That's a part of biomechanics.  I study the injury potential

15  of collaborative robots which work in close coordination with

16  humans.

17          I also have a project at the children's hospital

18  where we are collecting data to try and understand what causes

19  child skull fracture.  That is my part of biomechanics, yes.

20  BY MR. TELISMAN:

21  Q   Now, could you please tell us your educational background

22  as it relates to your career in biomechanics?

23  A   I got my marine engineering degree from the Navy.  I went

24  to the Naval College.

25          After that I went to the Queen's University at

Rangarajan - direct

1    Kingston to get mechanical engineering degree, a master's

2    degree in mechanical engineering.

3         And finally I got a Ph.D. in biomedical engineering

4    and engineering mechanics from the Iowa State University.

5    Q    What are biomechanical engineering and engineering

6    mechanics?

7    A    Engineering mechanics is sort of old department of -- from

8    which mechanical engineering sprung.  So engineering mechanics

9    people tend to study more theoretical formulations of

10   problems.  They may study -- I had a professor who was a

11   mathematician who studied turbulence.

12   Q    I'm sorry.  Who studied what?

13   A    Turbulence in fluids.

14   Q    Okay.

15   A    So that's a little different from mechanical engineering

16   although these days they tend to combine the two departments

17   together.

18   Q    Okay.  And how about biomedical engineering, what is that?

19   A    In my university, biomedical engineering, they conducted

20   research in a number of fields.  My professor conducted

21   research in trying to find out where stenosis was located in

22   an -- object.  Stenosis is blockage in the artery.  That's

23   what I did for my Ph.D.

24        There was another professor who was studying material

25   to replace dental structure.  There was a professor who was

Rangarajan - direct

1    studying noninvasive ways to identify fat in meat because

2    Iowa, you know, has got big slaughterhouses.

3    Q    Okay.

4    A    Many things, yes.

5    Q    And could you please very briefly tell us about your work

6    history?

7    A    My work?

8    Q    Work history, yes.

9    A    After I graduated, I got a job as a research professor,

10   assistant professor, at Drexel University in Philadelphia.

11   And most of my research was to develop a model, a computer

12   model, of the whole circulatory system so we could design

13   better g-suits and also left ventricular assist devices.

14          After I left that place, I got a job in Washington.

15   They called me and asked me if I would come there.  I worked

16   for a small company, and most of my research work there was on

17   head injuries to adults in cars.

18          So I was developing finite element models of the

19   skull and the brain.

20          And after I -- after I left that company, I started

21   my own company which did nothing but biomechanics research.

22   So we were very fortunate, and we were funded by the

23   Department of Transportation to design the next generation of

24   crash test dummies.  We were funded by the U.S. Coast Guard to

25   design dummies that floated like human beings so that life

Rangarajan - direct

1  jackets can be tested.

2          We also won a number of small business innovative

3  research awards from the Army, from FAA, from the Air Force.

4  That has been my career.  And after that I came to Medical

5  College of Wisconsin.

6  Q    What is the name of the company that you founded?

7  A    General Engineering and Systems Analysis Company.

8  Q    That's short for GESAC?

9  A    GESAC, yes.

10 Q    Very good.

11         Now, you mentioned before that you have -- that

12 currently you're an associate -- I believe associate

13 professor, research professor or associate professor at the

14 Medical College of Wisconsin?

15 A    That's correct.

16 Q    All right.  And what do you do there?

17 A    I study effective blast on human beings.  I study the

18 engineering potential of collaborative robots, and I have a

19 small program to study skull fracture in small children.

20 Q    In addition to your work, Dr. Rangarajan, do you do any

21 lecturing?

22 A    When I am asked to, yes.

23 Q    Have you given any lectures or presentations relating to

24 child injury or child abuse?

25 A    I have been invited, I think, two or three times in the

1    last ten years, or last six years, by mainly Don't Shake the

2    Baby.  I think that is some organization based in Utah.  So

3    they asked me to come and talk about biomechanics of head

4    impact.

5            And, also, once I gave a seminar on finite element

6    modeling of the head, the skull and the brain.

7    Q    And with respect to --

8            Have you also published peer-reviewed works that you

9    have authored?

10   A    Yes.  I think I provided a list in my --

11   Q    In your CV?

12   A    Yes.

13   Q    If you could, please turn to Exhibit 1.

14           Is that a true and accurate copy of your curriculum

15   vitae?

16   A    Yes.

17           MR. TELISMAN:  Your Honor, I ask that Respondent's

18   Exhibit, I guess we'll call it, Rangarajan 1, if that's okay,

19   be admitted into evidence.

20           THE COURT:  It's admitted.

21           So we're going to have an issue on some of these

22   things because, you know, we had this in -- Mr. Triebel

23   reminded me of it before when you referred back to the earlier

24   ruling in terms of what happens with these documents.  I mean,

25   once something is admitted in evidence, it's a matter of

1  public record, and his CV, for example, has his home address

2  and phone number in it, which, under a rule of court, can't be

3  part of the public record.  You guys haven't deleted those.

4  I'm not going to be the person who is going to do the

5  sweep through all of the materials to see that that's been

6  complied with.  So I guess what I am going to say is that

7  although I am making rulings, I'm not going to admit anything

8  in evidence.  Nothing is admitted in evidence until everybody

9  has gone through and cleaned it all up to make sure that we

10 don't have issues like that.

11 MR. TELISMAN:  Okay, your Honor.  Thank you.

12 THE COURT:  Yes.

13 BY MR. TELISMAN:

14 Q   Dr. Rangarajan --

15 MR. TELISMAN:  Well, first off, your Honor, I'm now

16 tendering Dr. Rangarajan as an expert witness in the field of

17 biomechanics.

18 THE COURT:  We don't need to do that.  I made that

19 clear several times --

20 MR. TELISMAN:  Yes, your Honor.

21 THE COURT:  -- in the beginning of the hearing.

22 BY MR. TELISMAN:

23 Q   Dr. Rangarajan, how did you become involved in this case?

24 A   I was called by Mr. Neal Goodfriend, and he asked me if I

25 would make him an expert witness in this case.

1   So I requested him to send me as much information

2   about the case so that I could study it first and then

3   determine if I knew anything about what is going on.  And

4   after I studied those documents, I called him or sent him an

5   e-mail saying it is okay.

6   Q   Now, did you write a report in this case?

7   A   Yes, I did.

8   Q   And is that what is reflected as Rangarajan Exhibit 2 in

9   the documents in front of you?

10  A   Yes, yes.

11  Q   That's a true and accurate copy of the report you authored

12  in this case?

13  A   Yes, sir.

14          MR. TELISMAN:  Your Honor, I ask that Exhibit 2 be

15  admitted into evidence subject to what the Court provided

16  before.

17          THE COURT:  Yes.

18          MR. TELISMAN:  Thank you.

19  BY MR. TELISMAN:

20  Q   Dr. Rangarajan, do you have an opinion about whether

21  biomechanics can be used to explain the causes of Isabella

22  Zielinski's injury in this case?

23  A   No, I don't think so.

24  Q   My question is:  Do you have an opinion about that?

25  A   My opinion --

Rangarajan - direct

1    THE COURT:  I got it, though.

2    MR. TELISMAN:  Okay.

3    THE COURT:  Don't worry about that kind of stuff.

4    MR. TELISMAN:  Yes, Judge.

5    THE COURT:  We can sort of collapse the two

6  questions.

7    You have an opinion and your opinion is it can't be

8  used.

9    THE WITNESS:  Yes, sir.

10    THE COURT:  Right, okay.

11  BY MR. TELISMAN:

12  Q   Do you hold that opinion to a reasonable degree of

13  biomechanical certainty?

14  A   I do.

15  Q   Dr. Rangarajan, are you familiar with the term "injury

16  threshold"?

17  A   Yes, sir.

18  Q   What does that mean?

19  A   Injury threshold for any kind of injury is the amount of

20  mechanical input, generally mechanical input, which it can

21  impose on the body before injury occurs.

22  Q   How is it determined?  How is it measured?

23  A   Oh.  Again, is it possible for me to give an example of

24  this?

25    THE COURT:  Sure.

Rangarajan - direct

1     THE WITNESS:  Okay.  So I will try to explain how

2  injury threshold for head injury in adults was developed.

3  This was done in the sixties, mostly by people doing

4  automotive work, such work.  And what they did was they had a

5  pallet with a pin at the bottom of the pallet, and they

6  attached the cadaver, a human cadaver, to the pallet, strapped

7  it onto the pallet, so that only the neck and head were free.

8     Then they pulled the pin out of the pallet.  The

9  whole thing swung down, and the head made contact with a very

10  stiff plate, with a steel plate at the time, and they kept

11  varying the height of fall to study when they first saw a

12  simple linear fracture.  And that was determined to be the

13  threshold of skull fracture for adults, in that case the

14  50th percentile male.

15  BY MR. TELISMAN:

16  Q   Now, how about --

17     Well, have there been other experiments done to try

18  to measure, for instance, injury thresholds in a case of, say,

19  a whiplash injury as opposed to a skull fracture?

20  A   There have been animal experiments; as far as I know, no

21  human experiments.

22     There have been some volunteer experiments at very

23  low velocities in Japan.

24  Q   How are the animal experiments conducted?

25  A   They were conducted on adult primates, monkeys.  The

1    monkeys were strapped to a seat, and the head was constrained
2    to move in the front-to-back direction, and it was
3    instrumented.  And the seat was moved in such a fashion that
4    the head and neck snapped forward one time very quickly.
5    Q    What was measured by doing that?
6    A    They measured the acceleration of the head, and they tried
7    to correlate -- and, therefore, angular velocity also -- and
8    they tried to correlate these input variables with brain
9    injury.
10              THE COURT:  Okay, that's a good place to break for
11   lunch.
12              I have to take a guilty plea at 1:30.  Assuming it
13   happens, which I'm told it will, that will take until 2:00.
14   But, you know, a lot of times people come in and say, well,
15   not quite ready yet.  So why don't you get here about 1:40.
16   If I'm in the middle of a guilty plea, you will know it and
17   you will come back at 2:00.
18              MR. TELISMAN:  Okay, thank you, Judge.
19              (The trial was adjourned until 1:40 p.m. of this same
20   day and date.)
21
22
23
24
25

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4   JENNIFER DEL PRETE,            )
                                    )
 5                 Petitioner,      )   Docket No. 10 C 5070
                                    )
 6            vs.                   )
                                    )
 7   MELODY HULETT,                 )   Chicago, Illinois
                                    )   December 21, 2012
 8                 Respondent.      )   2:00 p.m.

 9                          VOLUME 5
10                  TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12   APPEARANCES:

13

14   For the Plaintiff:    BLEGEN & GARVEY
                           BY:  MR. PATRICK W. BLEGEN
                                MS. JODI L. GARVEY
15                              MR. DANIEL A. RUFO
                           53 West Jackson Boulevard
16                         Suite 1437
                           Chicago, Illinois  60604
17

18   For the Defendant:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                           BY:  MR. KARL R. TRIEBEL
19                              MR. NEAL GOODFRIEND
                                MR. ARI TELISMAN
20                              MS. MONIQUE A. ANAWIS
                           100 West Randolph Street
21                         13th Floor
                           Chicago, Illinois  60601
22
     Also Present:              MR. ROBERT STANLEY
23

24           LAURA M. BRENNAN - Official Court Reporter
                219 South Dearborn Street - Room 2102
25                   Chicago, Illinois  60604
                         (312) 435-5785
```

Rangarajan - direct

1        (The following proceedings were had in open court:)

2        THE COURT:  Recalling 10 C 5070.

3        So the video conference thing is good to go.

4   Actually, if we flip it back on, we are seeing the back of the

5   doctor sitting at his screen typing stuff.  How do people want

6   to do this sequentially, completely finish with the witness

7   who's on the stand and then do that, or what?  I don't care.

8        MR. TELISMAN:  Yes, your Honor.  I actually spoke

9   with Dr. Forbes over the break.

10       THE COURT:  He's good with that?

11       MR. TELISMAN:  He is good.

12       THE COURT:  Okay.  Fine.  That's the way we'll do it.

13       Okay.  So, Dr. Rangarajan, do you understand you're

14  still under oath?

15       THE WITNESS:  Yes, sir.

16       DR. NAGARAJAN RANGARAJAN, RESPONDENT'S WITNESS

17                    PREVIOUSLY SWORN

18              CONTINUED DIRECT EXAMINATION

19  BY MR TELISMAN:

20  Q   Dr. Rangarajan, I believe when we let off you were talking

21  about the -- how efforts were made to try to determine the

22  injury threshold for a whiplash injury and the experiments

23  that were being done.  Is that where we were?

24  A   We were talking about how effort was done on -- in an

25  animal experiment, yes.

Rangarajan - direct

1   Q   Right.

2           And so and I'm not sure if you completed the answer.

3   I was -- I think I was asking you --

4           THE COURT:  He was talking about -- the last one he

5   talked about was a primate experiment where it was one snap

6   forward, measured the acceleration, measured the angle of

7   velocity, tried to correlate everything.

8           THE WITNESS:  Brain injury.

9           THE COURT:  Brain injury, right.

10  BY MR. TELISMAN:

11  Q   Now, have researchers attempted to translate the

12  information gained from those experiments, those animal

13  experiments, to humans?

14  A   Yes.

15  Q   How was that done?

16  A   Initially it was done through mass scaling.

17  Q   Mass scaling, m-a-s-s?

18  A   Yes.

19  Q   What does that mean?

20  A   It just -- it means that one way to -- if you think of two

21  engineering systems, one is ten pounds heavy and the other is

22  fifty pounds heavy, there's a way of reducing or modulating

23  whatever you see in the fifty-pound system as a threshold for

24  a ten-pound system.  That's what -- essentially you are

25  dividing by some power of the ratio of mass, fifty by ten.  I

Rangarajan - direct

1    think it is one third power.

2    Q    Okay.  And so you said initially it was done through mass

3    scaling?

4    A    Right.

5    Q    Attempting to translate the information that was gained

6    from the primate experiments to humans?

7    A    Yes.  Adults, human adults.

8    Q    Human adults?

9    A    Yes.

10   Q    And is that sufficient to then definitively establish the

11   injury threshold for adults for the whiplash injury?

12   A    For a long time it was thought to be sufficient, and then

13   some questions came about material properties, the difference

14   in material properties and anatomy between the test subject,

15   which was a monkey, and a human being.

16   Q    When you say "material properties," what do you mean by

17   that?

18   A    One material property could be called stiffness or Young's

19   modulus.

20           THE COURT:  What was the second term?

21           THE WITNESS:  Young's modulus.

22           THE COURT:  Okay.

23           THE WITNESS:  Y-o-u-n-g.

24   BY MR. TELISMAN:

25   Q    So I take it it was assumed that the material properties,

Rangarajan - direct

1    the -- for instance, the stiffness of the brain tissue was --

2    it was assumed that it was the same for adult primates as for

3    human adults?

4    A    Yes.

5    Q    And did that turn out to be true?

6    A    Well, everybody's always trying to improve their results,

7    you know, their estimates, and they thought if I also take

8    into account the differences in material properties, I might

9    get a better estimate.  Because all you are getting is an

10   estimate from real experimental data, which is from monkeys.

11   You are getting an estimate for a human being.

12   Q    Now, how about taking into account the differences -- well

13   let, me ask it this way:  Are there differences between an

14   adult and a baby when it comes to issues like injury

15   threshold?

16   A    Yes.

17   Q    How so?  Could you please explain.

18   A    It is because the anatomy, the structure of an infant's

19   skull is very different from that of a human.  For example,

20   very young children have soft spots on their head called

21   fontanels, and we have sutures which get fused as time goes by

22   to make the full adult skull.  So there is a difference in the

23   anatomy of the skull between a full grown adult and a small

24   child.

25   Q    And how about the issue of material properties of an adult

1 human versus a baby?

2 A   My understanding of this is that there is a lot more

3 non-myelinated nerves in the young child.

4          THE COURT:  Non-myelinated?

5          THE WITNESS:  m-y.

6          THE COURT:  That's the sheath around the nerve.

7          THE WITNESS:  The sheath, yes.

8          And therefore the material properties could be

9 different.  And the fact that the brain itself resides in a

10 compartment which can expand much more easier than in a full

11 grown adult, that would make the overall properties look

12 different.

13 BY MR. TELISMAN:

14 Q   And is there a way for biomechanical engineers to

15 definitively account for these differences in material

16 properties and anatomy that you have described in trying to

17 translate the injury threshold from the adult primate

18 experiments to, for instance, an adult human or a baby for

19 this front impact -- or, pardon me, for this whiplash

20 experiment?

21 A   If I go back, I talked about mass scaling.

22 Q   Yes.

23 A   You know the difference in mass between a young child's

24 head and a human head -- I mean adult head, so that part is

25 probably okay.  You know the geometry.  But the material

Rangarajan - direct

1  inside, that is very hard -- to get a ratio of material
2  properties for each type of insult between adult and child is
3  very hard to do because we can't do any experiments with
4  humans.

5  Q   Now, there was one thing in your answer that you just
6  said, you talked about the -- it's very difficult to get the
7  material properties for each insult.  What do you mean by
8  that?

9  A   Well, because the response of a system, biological system,
10 depends on what is the external input to the system.  Are you
11 hitting it with a hammer?  Are you hitting it with a ball peen
12 hammer?  Are you hitting it with a broad faced hammer?  Are
13 you shaking it?  Each of these are different insults.  And the
14 way you hit it, how fast you hit it, that is different too.
15 And that might make a difference in the response of the
16 system.

17 Q   So is the injury threshold for a particular system, for a
18 particular body part, is it dependent upon the type of insult
19 that is placed upon it?

20 A   Yes.

21 Q   Now, Dr. Rangarajan, is whiplash the same as shaking?

22 A   Colloquially whiplash involves just maybe one time motion
23 of the -- very quick motion of the neck and head.  Whereas
24 shaking, colloquially it involves the head and neck rotating
25 about the trunk many times in a -- whatever time it is.

Rangarajan - direct

1    Q   And are those different types of insults on -- if it were

2    done on the same person, on the same system?

3    A   Yes.

4    Q   So are the injury thresholds for those two different types

5    of insults necessarily the same?

6    A   No.

7    Q   Why not?

8    A   Simply because in one case you are subjecting -- let us

9    take just even if you had a baby that you are subjecting to

10   whiplash, it is one motion, front to back let's say.  Whereas

11   in a shaking it is moving so many times every few seconds.  So

12   the input to the system is different, and because material

13   properties may depend on this, you cannot say that the

14   response of the system is going to be the same.

15   Q   Now, Dr. Prange -- you read the report of Dr. Michael

16   Prange, correct, the petitioner's biomechanical expert?

17   A   Yes, sir.

18   Q   One of the studies he cites to is by a Dr. Anne Christine

19   Duhaime from 1987.

20           THE COURT:  Spell that for me.  I have it somewhere,

21   but I've forgotten it.

22           MR. TELISMAN:  D-u-h-a-i-m-e.

23           THE COURT:  Thanks.

24           This is the '87 report you said?

25           MR. TELISMAN:  Yes.

Rangarajan - direct

1       THE COURT:  Okay.

2  BY MR TELISMAN:

3  Q  Could you please explain to the court what that study

4  involved.

5  A  Dr. Duhaime and our colleagues wanted to study if it is

6  possible to cause injuries to a child by shaking it, so they

7  needed two pieces of information.

8       The first one is they needed either a child or a

9  child surrogate which they could shake without it falling

10  apart, which they constructed out of commercial material.  I

11  think she used a doll's head, Toys 'R Us, I don't know what,

12  something like that, and it was stuffed with cotton which was

13  weighted to make it have the same weight as the human brain,

14  the child brain.  And she also construct -- that dummy also

15  had a hinged neck which connected it to some kind of torso.

16  So she had that.  She made that.  And she said, okay, this is

17  most like a human being, human baby that we can construct

18  today.

19       The second thing she needed was an injury criterion

20  for shaking.

21  Q  And when you say "injury criterion," are we talking

22  about --

23  A  Injury tolerance.

24  Q  -- an injury threshold?

25  A  Yeah.

Rangarajan - direct

1    Q    Same thing?

2    A    Yes.

3    Q    So injury criterion, injury threshold and injury tolerance

4    are all the same thing, roughly the same thing?

5    A    Roughly the same thing, yes.

6    Q    Very good.

7         Please continue.

8    A    So she had -- she tried to reproduce what would happen to

9    a child when a full grown adult shook it, so she had adults

10   shake this toy or dummy as hard as they could for a certain

11   amount of time, and she recorded the acceleration of the head.

12   Everything was cool till now.  It's a good experiment.  It

13   gave you some data which is very nice.

14        And then she needed an injury tolerance level.  And

15   there she used -- she compared the response angular

16   acceleration of the doll with the angular acceleration

17   required to create a brain injury from animal experiments

18   after scaling it to a baby's size.

19   Q    What's the problem with that?

20   A    The same thing that we talked about, that the animal

21   experiments used whiplash-like motion.  They were shaken once.

22   Whereas the doll was shaken many, many times.

23   Q    Was there also a problem as far as -- pardon me.  Let me

24   ask it this way:  Was there any effort to try to account for

25   the difference in the material properties that you discussed

Rangarajan - direct

1   before?

2   A   Not initially, no.

3   Q   Now, was Dr. Duhaime's experiment ever reproduced?

4   A   No.

5   Q   Were there ever efforts to try to reproduced the results

6   of Dr. Duhaime's experiment?

7   A   Yes.

8   Q   Could you please tell us what happened.

9   A   I think Corey, I forget which university in England, she

10  tried to reproduce the same doll and shake it the same way

11  just to confirm the results, and her report says that she was

12  unable to do that.  And so she made her own dummy and said

13  this is biofidelic, and then she shook it many different ways,

14  and she finally hit on one way of shaking it which she called

15  gravity assisted shaking, which meant you just take -- extend

16  your arm above your head with the baby in your hands and then

17  shake it violently bringing it down to about your knee level.

18  And then she reported the dummy that she was using had the

19  same levels of acceleration as Duhaime said were required to

20  cause brain injury.

21  Q   And the injury criterion or the injury threshold that

22  Dr. Duhaime said is -- in her 1987 paper was needed to cause

23  injury in a baby from shaking?

24  A   Yes.

25  Q   Is that -- was that conclusively established as the injury

Rangarajan - direct

1   threshold for shaking a baby?

2   A   No.

3   Q   Why not?

4   A   Because to establish an injury criterion, you need to

5   conduct experiments like we did with adults.  I don't think

6   any parent would allow their child, dead child even, to be

7   used in an experiment.

8   Q   Well, there have been experiments done with cadavers,

9   haven't there?

10   A   I think Michael Prange when he was at Duke, he drop tested

11   three infant heads, and they were like just born, zero-day-old

12   to 11-day-old, but they were drop tests.

13   Q   And did that establish the injury threshold for shaking a

14   human baby?

15   A   They were drop tests.  They did not involve any shaking.

16   It was just a disarticulated head, just a head, and he dropped

17   it on a steel platform.

18   Q   What about adult cadavers?  Have there been any

19   experiments with adult human cadavers that have established

20   the injury threshold for shaking a child?

21   A   Not that I know of, no.

22   Q   Are there any limitations to using a human cadaver in

23   trying to determine an injury threshold for a living human?

24   A   Yes.

25   Q   Please explain.

1   A   Well, when somebody dies, colloquially you can say the

2   brain turns to mush pretty soon, so it doesn't have the

3   properties that you have in a live human being who has got

4   blood pumping through his or her brain.  So if I was to

5   conduct an experiment with a cadaver and I'm looking for let's

6   say hematoma, for instance, I may be able to pressurize the

7   skull and some of the vessels, but it will be a very

8   incomplete experiment.

9   Q   Have there been any experiments on human cadavers where

10  there have been efforts to try to replicate circulation of

11  fluid through blood vessels or anything like that?

12  A   Actually there's a guy who sent me his paper from England,

13  from Surrey, who is -- who published a paper just on this, but

14  it is very, very preliminary.

15  Q   And did that establish the injury threshold for shaking a

16  baby?

17  A   No.  He was looking to see what's the pressure in the

18  vessels.

19  Q   What about finite element modeling?  And that was

20  something I think you mentioned when talking about your own

21  work.  If you could very briefly describe what finite element

22  modeling is.

23  A   Okay.  When you have a very complicated system, like say

24  the brain or the skull, and the material properties are

25  changing inside the system, they are different at each place.

1   One way to solve that engineering problem is to subdivide the
2   system into very small, little parts so that you can say in
3   this small part all properties are the same in the small
4   volume, and then you sort of stitch them together
5   mathematically and then expose the system to the insult that
6   you want to expose it to and hope like crazy the math works
7   right and you get some numbers.
8           THE COURT:  And this is called what again?
9           THE WITNESS:  Finite element, each element.
10          THE COURT:  Finite element.
11          MR. TELISMAN:  Finite element modeling.
12          THE COURT:  Modeling.  Modeling.  Okay.
13          Thanks.  Go ahead.
14  BY MR TELISMAN:
15  Q   Are these experiments -- are finite element models done in
16  the material world, or are they done on computers?
17  A   They are done on computers.
18  Q   Have finite element modeling -- has, pardon me, has finite
19  element modeling determined the injury threshold for shaking a
20  baby?
21  A   No, because for a finite element model to respond like a
22  human system, we need the properties of the material inside.
23  It is a circular problem.  I can't get the material property.
24  Therefore, I cannot make a model.  Therefore, I can't -- you
25  know, I can't estimate the tolerance.

Rangarajan - direct

1   Q   Now, you mentioned before -- when we first started talking

2   about injury thresholds, we were talking about the whiplash

3   experiments that were done with adult primates.  Were there

4   any other animal experiments that have been done to try to

5   look into the shaking of a baby?

6   A   Yes.

7   Q   Could you please explain what those experiments are.

8   A   They have run the gamut.  There were people, I think

9   some -- some were in South America, who shook rats -- who

10  shook cats, and then I think Smith '98, something like that,

11  she shook rats.  And then people at University of

12  Pennsylvania, they exposed pigs and piglets to more than one

13  shake.  And in 2012 some Australian researcher, Finney, they

14  shook newborn lambs, sorry, very young lambs.

15  Q   What were the results of these experiments?

16  A   Okay.  The cat experiments were a bust because they

17  couldn't establish anything, and they were bad experiments.

18          The rat experiments proved, according to Smith, that

19  unless there is hypoxia, that means deprivation of oxygen, one

20  cannot cause the kinds of injury that is seen in what we call

21  shaken baby.

22  Q   Okay.

23  A   And then in the case of University of Pennsylvania

24  researcher, Raghupathy was the main researcher there --

25  Q   And for the benefit of the court reporter, that's R-a-g --

Rangarajan - direct

1    A    g-h-u-p-a-t-h-y.

2    Q    Thank you.

3    A    He was able -- he did an interesting experiment.  He said

4    if I have a pig and I shake it once, and he imposed a

5    velocity, angular velocity I think of about 200 radians per

6    second.  A radian is 57 degrees roughly, give or take.  And

7    then the next experiment -- and he observed -- he did an

8    autopsy, and he looked at the brain and looked at the injury

9    pattern, if there was anything.

10        Then he reduced the insult by reducing the velocity

11   of loading and then but shook it twice instead of once, and

12   his conclusion was, from his studies was that he saw more

13   injury to the brain when it was shaken in succession.  It was

14   only twice.

15        And Finney's experiment, he shook about nine lambs, I

16   think, newborn, in his latest paper, and three of them were

17   sort of underweight.  His aim was to see can we cause death by

18   just shaking.  So he got ahold of these lambs under their

19   armpit and shook them.  And when he shook them, he laid

20   them -- you know, he laid them to rest for about six hours,

21   and he maintained them without hypoxia.  That means he kept

22   providing oxygen to the brain so that one part of this thing

23   was answered, that it is always hypoxia which cases it.  And

24   then he was going to section them after six hours.  But he

25   found that three of these lambs, which were underweight

1    compared to the others, statistically underweight, they died

2    in a couple of hours just because of shaking.  That is his

3    conclusion, that there was nothing else done to them and they

4    just died because they were shaken.

5              And the other lambs that he found, he found kinds of

6    injury which he had seen in an impact test which he had done

7    before with similar kinds of lambs.  So injury pattern was

8    sort of similar, not exactly the same.  And very

9    interestingly, he didn't see too much subdural hematoma.

10   Q   So what do these animal experiments tell us about injuries

11   or injury thresholds for shaking a human baby?

12   A   This is going to take a long time because now we have to

13   first reproduce these experiments somewhere else to make sure

14   that this was not a fluke.

15   Q   So these have not been reproduced?

16   A   No.  They're new.  2012.

17   Q   That's the Finney one, but the other ones you talked about

18   are older, right?

19   A   Raghupathy's experiments, to my knowledge, nobody has

20   repeated them.

21   Q   Okay.

22   A   So Finney's experiments, first they have to be confirmed.

23   Then we have to figure out -- and Finney also made interesting

24   point.  He said maybe the reason why the rat experiments

25   didn't succeed was because the rat brain structure is very

Rangarajan - direct

1    different from the human.  That means they don't have the

2    folds and knobs that human brains has.  Whereas lambs have

3    that.  So he picked lambs because their brain structure is

4    sort of similar to human.  So he tried to explain the lack of

5    fatality in the rat experiments.

6         So now we have to go back, confirm these experiments

7    that these were really true.  I mean, some other lab can do

8    them.  Then we have to figure out how do I -- what do I have

9    to do to translate these results to a human being.  So it

10   would involve studying the anatomy, the material properties

11   and God knows what else, you know, experimental variable that

12   I have not accounted for yet.

13   Q   And has any of that been done yet?

14   A   No.

15   Q   Now, what about neck injury?  We've been talking about

16   head injury or brain injury up to this point.  How about neck

17   injury?  Have neck injury thresholds been determined for

18   shaking a baby?

19   A   Not for shaking a baby.

20   Q   Now, Dr. Prange in his report cited to an article by a

21   Dr. Bandak, B-a-n-d-a-k, from I think 2005 or 2006.  What

22   about that study?

23   A   Faris's paper idealized --

24   Q   Pardon me.  When you say "Faris," you're talking about --

25   A   Sorry.  Bandak.

1  Q   Dr. Bandak.

2          Okay.  Please continue.

3  A   I know him, so I just call him Faris.  Sorry.

4          So Bandak's paper idealized the baby's head/neck

5  system as a sort of concentrated weight on a stick, which was

6  the neck.  And his contention was that if -- and he did some

7  simple mathematical calculation, engineering calculation to

8  prove that if the head indeed moved as fast as we think it

9  should move to cause injuries, that means it rotated so fast,

10 then there should be neck injury.

11         He used the neck injury criterion from static -- some

12 static tests.  Static means very slow loading.  I think in

13 1800's there was an English obstetrician, I think in

14 Cambridge, who wanted to find out when I'm delivering a baby

15 with a forceps, how much load can I put on the head to draw

16 the baby out, and so he took some dead infants, and he kept

17 adding weight and he hung them up, and he kept adding weight

18 to their head till the neck snapped.  And that came to

19 something like hundred newtons or 40 pounds, something like

20 40 pounds.  So Bandak used that number, among others -- he

21 looked at two more studies -- as the load that would cause

22 neck injury.  And when he did his mathematical calculation, it

23 turned out every one of his calculations proved that the load

24 on the neck would be more than this injury criterion.

25 Q   Were there any criticisms of that paper?

1    A    Yes.  I think Professor Margulies and Mr. Prange and

2    researcher from Duke University wrote -- me and my colleagues,

3    we wrote a letter because we tried to use the same formulae

4    that Bandak had used in his paper, and we tried to calculate

5    the numbers that he had calculated for load, and we were off

6    by a factor of ten, so we just assumed it was an Excel spread

7    sheet error, so we wrote a letter saying this needs to be

8    corrected, so please correct it.

9    Q    Did that study by Dr. Bandak, did that specifically, or

10   did that establish what the injury thresholds are for a baby's

11   neck in a shaking episode?

12   A    No.  He used -- he already used data from other studies of

13   static loading of the neck.  All he proved was if I use that

14   as my injury criterion, then you ought to see neck injury.

15   Q    And what's the problem with just -- with using that injury

16   criterion?

17   A    Many, because the English obstetrician study was static

18   loading.  That means it was just weights being hung from a

19   head, which is different -- which may be different from what

20   you see in a real neck when it is being shaken back and forth.

21          The second part of this thing is I think in 2010 my

22   colleagues and I, we looked at the anatomy of a baby's neck,

23   and we studied something like 110 CT scans of children of

24   various ages, and we were looking for places where the bone

25   was still not formed fully.  That means structurally the neck

1   was not a neck as we know it, you know.  And it turned out

2   that till about the age of seven and a half or so there was a

3   50 percent chance that you will find one part of the neck was

4   not fully ossified or has become a bone and that everything

5   started from the bottom and ossification worked its way up.

6   Q    And when you say the parts of the neck weren't fully

7   developed or ossified, what are you talking about?  What

8   specific parts of the neck?

9   A    The vertebral bodies, you know, you want them to be bony,

10  fully bony to support the neck, and if you have parts of it

11  which are still cartilaginous, it would, say, it makes the

12  system more flexible and perhaps weak in some kinds of

13  loading.

14  Q    Now, what about recent developments in your field?  Have

15  there been biomechanical studies in the past, say, seven or

16  eight years that have established brain and neck thresholds

17  for injuring a baby?

18  A    No, I don't -- I have not read any papers like that, no.

19  Q    Well, haven't there been improvements in identifying the

20  material properties of a baby to be able to establish to try

21  to -- for purposes of that scaling, material scaling?

22  A    People are trying.

23  Q    And have they conclusively determined the material

24  properties of a baby for how it reacts to things like shaking?

25  A    I have not seen any papers like that.

Rangarajan - direct

1  Q   How about what Dr. Prange cites in his report?  Did you
2  read all of his references?
3  A   Yes.
4  Q   And do any of the papers that he cites, do they establish
5  the material properties?
6  A   I don't think so.  I mean, he -- he may have read it
7  differently, but to me, no.
8        MR. TELISMAN:  If I could just have one moment, your
9  Honor.
10       THE COURT:  Sure.
11  BY MR TELISMAN:
12  Q   So, Dr. Rangarajan, do you have an opinion about whether
13  biomechanics can be used to explain the causes of Isabella
14  Zielinski's injury?
15  A   My opinion is no, it cannot be.
16  Q   And, Dr. Rangarajan, are your opinions limited to the
17  discipline of biomechanics?
18  A   Yes.
19  Q   So do you have an opinion about whether medicine can
20  determine whether Isabella was shaken?
21  A   I don't think I'm smart enough to make that opinion.  I'm
22  not a doctor.
23  Q   Dr. Rangarajan, are you saying that the field of
24  biomechanics can never be able to explain the causes of child
25  brain injury in a shaking episode?

Rangarajan - cross

1    A    Oh, no.  No, no, no, no.  All I am saying is right now we
2    don't have data.  And, like I said, even as we speak, I'm
3    trying to collect some data, and I'm also trying to collect
4    data from surgery of very small infants to study the material
5    properties at high loading rates.  It will be done.  It is
6    just going to take some time.
7              MR. TELISMAN:  Thank you.  I have nothing further
8    right now.
9              THE COURT:  Mr. Rufo.
10                      CROSS EXAMINATION
11   BY MR. RUFO:
12   Q    Good afternoon, Dr. Rangarajan.
13   A    Good afternoon, sir.
14   Q    Now, you just testified that biomechanics is not advanced
15   enough right now to determine whether or not shaking was a
16   viable cause of death for Isabella Zielinski?
17   A    Yes.
18   Q    And so you're saying it's not been proven as a cause?
19   A    Okay.  Are you -- I'm sorry.  I missed that question.  Can
20   you repeat it, please.
21   Q    Well, your ultimate conclusion is that biomechanics has
22   not advanced to have an opinion one way or the other on
23   Isabella Zielinski's cause of death?
24   A    One way or other, yes.
25   Q    So you're not saying it's been disproven, the shaken baby

Rangarajan - cross

1   hypothesis?

2   A    I said one way or the other.

3            THE COURT:  And I've gotten it, actually, all three

4   times that he said it.  You don't need to keep cementing it

5   in.  It's pretty clear.

6   BY MR. RUFO:

7   Q    You testified that you appear at conferences related to an

8   organization called Don't Shake the Baby?

9   A    I appeared as what?  Sorry.

10  Q    At conferences or you give lectures to organizations

11  called Don't Shake the Baby?

12  A    I think that is their name, yeah.

13  Q    And what do you give lectures regarding?

14  A    Oh, first time they asked me to talk about biomechanics of

15  skull fracture, so I described what I described here, yeah.

16  And the second time they asked me to talk about what is finite

17  element modeling, and that's what I did.

18  Q    Have you explained to them your conclusion regarding the

19  limits of biomechanics?

20  A    I talked about skull fracture biomechanics and finite

21  element modeling.

22  Q    Now, your report states that "knowledge of the injury

23  threshold for subdural hematoma is the key to analyzing

24  incidents in which a child sustains subdural hematoma."

25  A    Will you excuse me, please.  I'm a little hard of hearing.

Rangarajan - cross

1   Can you speak up a little bit.

2   Q   Your report states "knowledge of the injury threshold for

3   subdural hematoma is the key to analyzing incidents in which a

4   child sustains SDH, subdural hematoma."

5   A   That's what it says, yes.

6   Q   Now, it's not just the key for analyzing it, it's the key

7   to determining whether the theory even holds water?

8   A   Yes, I would think so.

9   Q   And you're aware of the mechanics behind the shaken baby

10  theory?

11  A   That a baby is shaken?

12  Q   The theory behind the causation of the injury.

13  A   I know there are several theories.

14  Q   Well, in your report you state that "the injury threshold

15  for subdural hematoma can be most appropriately stated in

16  terms of head angular acceleration."

17  A   Yes.

18  Q   So the theory behind shaken baby syndrome hinges on

19  acceleration?

20  A   Right now, yes.

21  Q   The movement of the brain relative the head?

22  A   Well, it is the motion of the head itself, because we can

23  only measure angular acceleration of the head.

24  Q   I'm talking about the theory right now, not what we can

25  measure.   The theory is at levels of acceleration associated

Rangarajan - cross

1    with shaking, the head moves relative to the brain, causing

2    tearing of bridging veins?

3    A    I believe that's one of the theories, yes.

4    Q    Are you aware that that's what Dr. Emily Flaherty

5    testified to at trial in this matter?

6    A    Beg your pardon?

7    Q    Are you aware that that's what Dr. Emily Flaherty

8    testified to at trial in this matter?

9    A    I'm not sure who she is.

10   Q    Now, I want to talk briefly about the fundamentals of

11   acceleration.  Acceleration refers to the change in velocity

12   over time?

13   A    Yes, sir.

14   Q    And so there's an inverse relationship in that formula?

15   A    Inverse relationship between?

16   Q    Between --

17           THE COURT:  Slower and clearer.

18   BY MR. RUFO:

19   Q    There's an inverse relationship in that formula, the

20   change in velocity over time?

21   A    I don't understand this question.

22   Q    A larger change in velocity --

23   A    Yes.

24   Q    -- results in higher acceleration?

25   A    Large, so that would be a direct relationship, not

1    inverse.

2    Q    I could have that wrong.

3    A    Sorry.

4            THE COURT:  That would be a direct relationship as

5    opposed to an inverse.

6    BY MR. RUFO:

7    Q    A shorter time frame results in increased acceleration as

8    well?

9    A    Shortening the time frame, if the initial and final

10   velocities are the same, that would increase acceleration,

11   yes.

12           THE COURT:  In other words, same velocity, shorter

13   time, greater acceleration.

14           THE WITNESS:  Right.

15           THE COURT:  Okay.

16   BY MR. RUFO:

17   Q    So the acceleration is higher when things come to a more

18   abrupt stop?

19   A    Higher compared to?

20   Q    Compared to a control.  Or in theory, if something comes

21   to a shorter -- or a stop in a smaller time period than in

22   another experiment, it's going to have higher levels of

23   acceleration?  The shorter the change in time, the higher the

24   acceleration?

25   A    Is there an assumption behind this?

Rangarajan - cross

1    Q   Assuming a constant change of velocity.

2    A   Yes, if you say the velocity change is the same and the

3    time is lower, acceleration will be higher.

4    Q   If I fall from the same height onto a hard surface or onto

5    a trampoline, under which scenario am I going to see higher

6    accelerations?

7    A   If you fall exactly the same way.

8    Q   Exactly the same way.

9    A   Okay.  Then --

10           Did you say a floor?

11   Q   Yeah.  Concrete, a hard surface.

12   A   Hard surface, yeah, hard surface.

13   Q   That's because of the shorter change of time?

14   A   Yes, sir.

15   Q   Now, I want to take you through a study that I believe you

16   were involved in.  Are you familiar with the -- a research

17   paper published called Development of a Biofidelic 2.5

18   Kilogram Infant Dummy and Its Application to Assessing Infant

19   Head Trauma During Violent Shaking?

20   A   I must have been an author in there.

21   Q   You are an author in there.

22   A   Yeah.

23   Q   Along with Carol Jenny?

24   A   Yes.

25           May I correct you there?  It was not a paper.  It was

Rangarajan - cross

1  read at a biomechanics workshop where such papers are read to
2  ask for opinion from people, am I going in the right
3  direction.  It is not like a peer reviewed paper or anything
4  like that.

5  Q  Fair enough.

6        Now, I've handed you what Petitioner's Exhibit I
7  called Ranga 8, and I'm going to call it, for lack of a better
8  term, this non-peer-reviewed paper.  And in this paper you
9  attempted to develop and test a biofidelic infant dummy; is
10  that correct?

11  A  You are right about one part.  I designed the dummy.

12  Q  In this paper was that dummy then tested?

13  A  In this paper the dummy was tested by Carol Jenny.

14  Q  I'm going to direct your attention to Page 138.

15  A  Yeah.

16  Q  Now, do you see where it says Table Two, Linear
17  Acceleration Recorded During Events?

18  A  Yes.

19  Q  And do you see that Carol Jenny tested a variety of
20  situations and measured the linear accelerations seen in those
21  events?

22  A  Yes.

23  Q  She tested violent shaking alone?

24  A  Yes.

25  Q  Violent shaking followed by slamming to thin carpet over

Rangarajan - cross

1  wood floor?

2  A     Right.

3  Q     Violent shaking followed by slamming to sofa?

4  A     Right.

5  Q     No shaking, slamming to a tatami mat?

6  A     Right.

7  Q     Dropped from chest level when carrier stumbles when

8  walking?

9  A     Right.

10  Q     And rolls off sofa?

11  A     Right.

12  Q     Now, looking at the values, the linear accelerations

13  recorded, violent shaking alone is by far the lowest value

14  seen?

15  A     That's what it looks like, yeah.

16  Q     And dropped from chest level when carrier stumbles when

17  walking has a value roughly twelve times levels acceleration

18  seen in shaking?

19  A     You're right.

20  Q     And violent shaking followed by slamming to thin carpet

21  over wood floor is only 10 percent or so higher than dropping

22  from chest level when carrier stumbles when walking?

23  A     Right.

24  Q     And so the acceleration seen in violent shaking by

25  themselves are relatively low in comparison to these other

Rangarajan - cross

1  situations?

2  A    That's what it says.

3  Q    That's what Carol Jenny's data showed?

4  A    Yeah.  That's what I said.  It says that.

5  Q    Now, are you aware that Dr. Emily Flaherty testified at

6  trial -- well, she was asked, "Could somebody who -- could

7  this child receive an injury like this from a fall," referring

8  to Isabella Zielinski's injuries.  And she responded, "From a

9  simple fall, no."

10         Now, looking at this data --

11         Are you aware of that testimony?

12  A    No.

13         THE COURT:  Did you read any of the trial testimony

14  in the case?

15         THE WITNESS:  No.

16         I read -- I read -- I think I listed what I read.

17         THE COURT:  Okay.

18  BY MR. RUFO:

19  Q    Well, you would agree with me that the levels of

20  acceleration seen in a simple fall can be much greater than in

21  a shaking incident?

22  A    That is what these data say.

23         Excuse me.  There's a caveat.  For this head, for

24  this dummy, the way it was dropped.

25  Q    Are you familiar with any other studies that have tested

Rangarajan - cross

1    dropping versus shaking?

2    A    Can you give me a hint which one that would be?

3    Q    Are you familiar with a study called Anthropomorphic

4    Simulations of Falls, Shakes and Inflicted Impacts in Infants?

5    A    You're talking about Prange's 2003 study.

6    Q    I am talking about Prange's 2003 study.

7    A    Yeah.  I read it.

8    Q    And are you aware that this paper reached the same general

9    conclusions as the Jenny paper, that violent shaking alone

10   produces lower levels of acceleration than falls?

11   A    Yes, I'm aware of that.

12   Q    Now, your report criticizes this paper, or at least

13   mentions criticism of this paper?

14   A    Yes.

15   Q    It discussed a study by Coates in 2007 which found much

16   lower peak accelerations when a biofidelic test dummy was

17   dropped than the dummy used in the Prange study?

18   A    That was Coates's conclusion.

19   Q    Now, the Prange study used a rather primitive dummy,

20   correct?

21   A    It was a dummy.

22   Q    And it had a hinge for a neck?

23   A    Possibly, yes.

24   Q    And are you aware of the purpose of that hinge was to

25   minimize resistance in the neck area?

Rangarajan - cross

1    A    I suppose, yes.

2    Q    And the purpose was to overestimate the levels of

3    acceleration seen in shaking?

4    A    It could be.  I don't know what their intent was in

5    designing the dummy.

6    Q    And the conclusion of that paper was that shaking does not

7    produce accelerations high enough to cross the threshold into

8    brain injury?

9    A    You're talking about Prange's paper now?

10   Q    I'm talking about Prange's paper now.

11   A    Okay.

12        Yeah.  Prange's paper said you cannot produce enough

13   angular acceleration to cause shaken baby type like injury.

14   Q    I mean, you would say angular acceleration, that's the

15   same type of acceleration that is considered the metric for

16   subdural hematoma?

17   A    Yes.  Currently, yes.

18   Q    Now, you've criticized the idea of scaling as used in some

19   of these studies?

20   A    Okay.  I did not just criticize them.  I quoted papers

21   which discussed this idea of scaling.

22   Q    You criticized them on direct examination.

23   A    Beg your pardon?

24   Q    You criticized them on direct examination.

25   A    Okay.

Rangarajan - cross

1  Q    But, and correct me if I'm wrong, scaling is a large part
2  of biomechanical engineering?
3  A    Between appropriate subjects, yes.
4  Q    You can't crash human beings into a wall in a crash test;
5  you use crash test dummies?
6  A    You first crash cadavers, and then you build a dummy, and
7  then you crash the dummies.
8  Q    But I suppose what I'm trying to say is you're always
9  looking for surrogates, data points, things to compare to
10 develop a threshold, a robust model?
11 A    That would be true in science, yes.
12 Q    And scaling is used in other fields; it's used to scale
13 the size of crash test dummies?
14 A    Like I said, scaling is very appropriate when you have
15 appropriate subjects.  I'll give you an example.  Between a
16 fiftieth percentile female and fiftieth percentile male, both
17 fully grown adults, separated by weight and stature, mass
18 scaling is a good way to do it, yeah.
19 Q    Can you scale across ages?
20 A    That is a problem.  It's very difficult to do so.
21 Q    You can't test at every age every day of an infant,
22 correct?
23 A    I don't think you can test infants.  That is a problem.
24 Q    Fair.
25         So you must use scaling, and it's relied upon in

Rangarajan - cross

1    child safety measures, child seats?

2    A    It is not used in child seats.  I don't know what you mean

3    by saying scaling is used in child seats, because this is a

4    very technical thing, and I want to get it right, for both of

5    us to get it right, so maybe you can ask this question again a

6    different way.

7    Q    The idea of mass scaling takes into account the relative

8    differences between a child's head and a human's head,

9    correct?

10   A    Mass scaling, only the mass.

11   Q    And if a human's brain is six percent of its mass and an

12   infant's brain is 33 percent of its mass, that's taken into

13   account in mass scaling?

14   A    Yeah.  That is done, yeah.

15   Q    You talked a lot on direct examination about the injury

16   threshold in a shaking situation compared to a whiplash

17   situation, correct?

18   A    Did I talk about it?  Yes.

19   Q    Yes.

20   A    Yes.

21   Q    And it seemed to me that you were hinting at the idea of

22   repetition?

23   A    Yes.

24   Q    That the more you shake something versus a single

25   incident, the more you might see injury?

Rangarajan - cross

1   A   Certainly at least two experiments seemed to suggest that.

2   Q   It's the idea of fatigue?

3   A   Can you define for me what you mean by "fatigue"?

4   Q   Let me just talk about one of those studies.  You

5 mentioned the Raghupathy study, Raghupathy?

6   A   Raghupathy, yeah.

7   Q   From 2004.

8   A   Yeah.

9   Q   And you're referring to Axonal Traumatic Injury is

10 Exacerbated Following Repetitive Closed Head Injury in the

11 Neonatal Pig.

12   A   Yes.

13   Q   Now, is this the study you're referring to?

14   A   2004.  Yeah, I guess so, yeah.

15   Q   I've handed you, for the record, what was Petitioner's

16 Exhibit Ranga 6.

17        Now, the purpose of this study was to test the idea

18 of repetition, correct?

19   A   That's what it was, yeah.

20   Q   And to do so, they shook anesthetized infant piglets,

21 correct?

22   A   Yes.  That's what it says.

23   Q   Two groups of piglets?

24   A   Yes.

25   Q   One was shaken once, and the other was shaken twice, and

Rangarajan - cross

1  what they found was, for lack of a better term, the injuries
2  were worse in the group that was shaken twice?
3  A   Yes, sir.  I think that's what the paper says.
4  Q   Now, are you suggesting that it's a cumulative thing?
5  A   That's?
6  Q   The acceleration is cumulative?
7  A   No.
8  Q   Does this paper suggest that the idea of shaken baby can
9  be considered cumulative?
10 A   No.  It just says if you shake them twice.  To me,
11 cumulative means adding the two together.  That means if I get
12 five Gs in one test and ten Gs in the other, I say the
13 cumulative value is 15 G.  No.  That is not what this said.
14 To me, that's cumulative.  That's cumulative.
15 Q   Don't you say in your report that the research suggesting
16 that shaken babies -- or subdural hematomas can be caused by
17 high peak angular accelerations are based on an inappropriate
18 assumption that very high angular accelerations are needed to
19 cause subdural hematomas in shaking?
20 A   Yeah, I say that.
21 Q   Two of your report.
22 A   Yeah, I say that.
23 Q   You say, "The assumption that high angular accelerations
24 are needed is unproven and questionable as it does not take
25 the effect of repeated shaking into consideration."

Rangarajan - cross

1    A    Yes, because there are no criteria for that.

2    Q    And this Raghupathy study, in the control group that was

3    only struck or shaken once, there were injuries?

4    A    Yes.

5    Q    And in the group that was shaken twice, there were more

6    injuries?

7    A    But in the group that was shaken twice, the velocity was

8    lower.

9    Q    Well, that's fair.  But they didn't have a control group

10   that wasn't hurt on one shake and then a second group that was

11   hurt on two shakes?

12   A    They don't say that, no.

13   Q    No.  So this paper suggests that if you shake a pig in an

14   injurious situation twice, it will have more injuries than if

15   you shake it once?

16   A    That's what this says.

17   Q    Now, you aren't familiar with any studies that have

18   established that retinal hemorrhages, biomechanical studies,

19   are highly associated with shaking?

20   A    There are, I think, some clinical studies, and I published

21   one paper.

22   Q    Discussing biomechanical studies?

23   A    I published one paper, which is a very preliminary study.

24   Q    Now, in your report you reference a study done by Finney

25   in 2010?

Rangarajan - cross

1   A   Yes.

2   Q   In that study lambs were shaken without impact?

3   A   Yes.

4   Q   This isn't a memory quiz.  I'll give you a copy of it.

5       I'm going to show you what I've marked as

6   Petitioner's Exhibit Ranga 5.

7   A   This is Finney's study.

8   Q   Is that the study you referenced?

9   A   Yes.  I think so.

10  Q   These lambs were shaken regularly over a 30-minute period

11  at a rate of three shakes per second?

12  A   Yes.

13  Q   And when this was over, they examined the pigs?

14  A   Yes, sir.

15  Q   And what they found was that in only two of seven pigs

16  retinal hemorrhages were found?

17  A   Right.

18  Q   And those retinal hemorrhages were minor in nature?

19  A   Right.

20  Q   Now, on direct examination and in your report you bring up

21  a study by a guy named Bandak?

22  A   Yes.

23  Q   And this study was pretty widely criticized for a error in

24  calculation?

25  A   Two groups of researcher wrote letters.

Rangarajan - cross

1   Q   And you discussed a letter to the editor?

2   A   Yes.

3   Q   That your colleagues wrote?

4   A   Me and my colleague and people from University of

5   Pennsylvania, two different letters.

6   Q   Are you aware of a letter written by Michael Prange?

7   A   The only ones I read was from Susan Margulies, which had

8   Michael Prange as an author.

9   Q   This is by Susan Margulies.  I'm going to show you what

10  I've marked as Petitioner's Exhibit Ranga 4.

11  A   Thank you.

12  Q   Now, was this a letter to the editor regarding the flawed

13  biomechanical analysis paper written by Bandak?

14  A   This seems to be Susan Margulies's paper.

15  Q   Susan Margulies's letter?

16  A   Yeah.

17  Q   Not your letter?

18  A   Oh, yeah.  Okay.  Yeah.

19  Q   And it discusses the error in Bandak's calculations?

20  A   Yes, sir.

21  Q   And you agree that there was an error in the calculations?

22  A   Yes, because we tried to use the same formula and we

23  couldn't get it.

24  Q   Now, do you understand the purpose of this letter to be

25  that Bandak's calculation or study was flawed or that his

Rangarajan - cross

1  conclusion was flawed?

2  A   I would think you should ask Professor Margulies.  I have

3  no idea why she wrote this.

4  Q   Well, can you turn to the second page of it for me.  And

5  the top left quarter, I think it's the second sentence --

6  third sentence starts with, "In light of the numerical

7  errors."

8          THE COURT:  What's the question again?

9          MR. RUFO:  I asked him to look at page --

10          THE COURT:  No.  What was the question that led you

11  to tell him to look at the page?

12          MR. RUFO:  Oh.  The question was whether the

13  calculations were flawed or the entire study was flawed.

14          THE COURT:  Are you asking him what he thought, or

15  are you asking him what Margulies said?

16          MR. RUFO:  I'm asking him about this letter.

17          THE COURT:  Okay.  I guess I would have the same

18  criticism.  I guess I'm just not getting this as a cross

19  examination strategy on either side, to have people just sort

20  of read out of letters.  You can just give me the letters and

21  I could read them.  But, you know, fine.  It's got to come in

22  at some point.

23  BY MR. RUFO:

24  Q   Is this Susan Margulies's letter?

25  A   This is what it says.

Rangarajan - redirect

1    MR. RUFO:  I move for the admission of --

2    THE COURT:  We're going to do this all later.  I want

3    to get this witness done so that we can get the other witness

4    who's sitting by the TV in Philadelphia done too.

5    BY MR. RUFO:

6    Q    Dr. Rangarajan, you stated on Page 2 of your report that,

7    "It must also be understood that a number of preexisting

8    health conditions might affect the injury threshold."

9    A    I believe that to be correct, yes.

10   Q    When you say "preexisting conditions might affect the

11   injury threshold," do you mean that certain medical conditions

12   might lower the injury threshold for children?

13   A    Possibly.  Don't know.

14   Q    Would that necessarily lower the levels of acceleration

15   required to cause an injury?

16   A    I don't know what the effect would be.  I would think

17   preexisting conditions might affect the study.

18   MR. RUFO:  One second, Judge.

19   I have nothing further.

20                    REDIRECT EXAMINATION

21   BY MR. TELISMAN:

22   Q    Dr. Rangarajan, counsel asked you questions about

23   Petitioner's Exhibit Ranga 8, the injury biomechanics

24   research.  It's the paper that Dr. Jenny wrote that you were

25   an author of?

Rangarajan - redirect

1    A    Yes, sir.

2    Q    Could I direct your attention back to Page 138 that has

3    that table there.

4    A    138, yes.

5    Q    Remember counsel was asking you questions about the

6    maximum linear acceleration?

7    A    Which is listed on column two.

8    Q    So what kind of -- that's linear acceleration?

9    A    That is linear.

10   Q    How is that different from rotational or angular

11   acceleration?

12   A    One is acceleration you feel when you travel in a straight

13   line of some kind.  The other one is when the head is

14   rotating.

15   Q    Which type of acceleration better describes the forces or

16   the acceleration that is placed on the head during a shaking

17   episode?

18   A    Most usually angular acceleration or rotation

19   acceleration.

20   Q    Also this measures maximum linear acceleration?

21   A    Yes, sir.

22   Q    Does it take into account the repetitious nature of a

23   shaking episode?

24   A    I don't know how Jenny derived this data.  All I know is

25   that these were recorded.

1    THE COURT:  You mean other than what she says in the

2    previous page?  Like I said, I can read these things.

3    Previous page, each time the dummy was shaken for

4    four seconds.

5    BY MR TELISMAN:

6    Q    Now, Dr. Rangarajan --

7    THE COURT:  If you want to go ahead and get an answer

8    out of him for the question, because maybe I'm misreading

9    something here, but, I mean, the thing on its face says what

10   was does.

11   THE WITNESS:  Maximum and mean peak linear

12   acceleration, Table Two shows that.

13   BY MR. TELISMAN:

14   Q    Dr. Rangarajan, counsel asked you questions about the --

15   Dr. Prange's 2003 study?

16   A    Yes, sir.

17   Q    And about the conclusion that shaking did not produce the

18   angular acceleration level to meet the injury threshold?

19   A    Yes.

20   Q    What is the -- does that change your opinion about whether

21   biomechanics has established the -- has -- pardon me.  Does

22   that change your ultimate opinion in this case?

23   A    No.

24   Q    Why not?

25   A    Because he was using the same injury threshold that

Rangarajan - redirect

1  Duhaime used, which was whiplash.

2  Q   Finally, counsel asked you about retinal hemorrhages and

3  the Finney experiment regarding the lambs?

4  A   Yes.

5  Q   Does that conclusively establish that shaking a baby will

6  not cause retinal hemorrhages?

7  A   I would think just proves the point that biomechanics is

8  still evolving and different people get different results.  We

9  are nowhere near finding out what goes on.

10          MR. TELISMAN:  Thank you.  I have nothing further.

11          THE COURT:  Anything else?

12          MR. RUFO:  No.

13          THE COURT:  You're excused.

14          Okay.  We're taking a break.  During the break my law

15  clerk is going to stay out here.  She's going to get this

16  thing turned back on.  You're going to get him queued up and

17  ready to go.  When we come back we're doing that.

18          Ten minutes.

19          (Recess taken.)

20          (The following proceedings were had in open court:)

21          THE COURT:  We're going to go back on the record now.

22  Once we do, we're going to turn this thing back on.  He can't

23  hear us right now, but he's about to be able to hear us.

24          Dr. Forbes, can you hear me at this point?

25          THE WITNESS:  I can hear you very well.

Forbes - cross

1       THE COURT:  Can you see me okay?

2       THE WITNESS:  I sure can.

3       THE COURT:  And I can see you as well.

4           So I think where we're going to pick up --

5           And by the way, thanks for making yourself available

6  this afternoon.  I know you've been sitting in your office all

7  afternoon waiting for it.

8           Where we're going to pick up is Mr. Blegen is going

9  to pick up with his examination of you.  In a second here

10 we're going to turn the camera around so that you can see him.

11 And then after that Mr. Telisman will do his redirect, and

12 I'll ask whatever questions I have.  Okay?

13          Do you understand that you're still under oath?

14      THE WITNESS:  Yes.

15      THE COURT:  So all I'm going to ask on the lawyers is

16 that there's a teenie, tiny, itty-bitty delay, but you, you

17 know, just wait to make sure you get his full answer before

18 you jump in again.  That's all I'm saying.

19          All right, Mr. Blegen.  He can see what's in that

20 little window there.

21          All right.  Go ahead.

22    DR. BRIAN FORBES, RESPONDENT'S WITNESS PREVIOUSLY SWORN

23              CONTINUED CROSS EXAMINATION

24 BY MR. BLEGEN:

25 Q   Dr. Forbes, at the end of your direct testimony, and I may

Forbes - cross

1  have misheard it, did you indicate that you had come to an

2  opinion as to the cause of Isabella Zielinski's collapse on

3  December 27th of '02?

4  A   It was my opinion with the findings of the retinal

5  hemorrhages and other things that I had read in the medical

6  report that it was a nonaccidental injury.

7  Q   All right.  And have you ever diagnosed a cause of death

8  in your career as an ophthalmologist?

9  A   Not as an ophthalmologist, no.

10  Q   All right.  And do ophthalmologists generally diagnose

11  causes of death in criminal cases?

12  A   I wouldn't think so, no.

13  Q   All right.  But you've done so here?

14  A   I was asked an opinion as to what happened to her, and

15  that's the opinion I gave.  I don't know that I've been asked

16  to make a diagnosis of that.

17  Q   But your interest in this case, or in your report you say

18  that you are inclined to comment on retinal hemorrhages

19  because you're an eye doctor, right?

20  A   Yes.

21  Q   All right.  So you're not taking the other factors of --

22  into account, are you?

23  A   I do take them into account, but I said I'm inclined as an

24  eye doctor to comment primarily on the eye findings, yes.

25  Q   Are you cable of determining whether someone had a seizure

Forbes - cross

1  or not from a preexisting medical condition?

2  A    I would say I am capable of doing that, but I don't do it

3  routinely.  I mean, if I saw somebody having a seizure, I

4  would know they're having it, but I wouldn't be the person you

5  would have to --

6  Q    Certainly at the hospital they don't come to you to

7  diagnosis a seizure, correct?

8  A    Absolutely not.

9  Q    Okay.  What you're saying is that you believe that there

10 is a high correlation between retinal hemorrhages and abusive

11 head trauma, correct?

12 A    I am.

13 Q    All right.  And but there are high correlation with other

14 things and abusive head trauma in your view as well, correct?

15 A    There are.

16 Q    Skeletal injuries are highly correlative to abusive head

17 trauma, in your view, correct?

18 A    They are.

19 Q    And in your papers you primarily do discuss this

20 percentage of correlation, and I think you tab it somewhere

21 around 85 percent or something?

22 A    85 percent of cases are reported to have retinal

23 hemorrhages, yes, in general.

24 Q    And that's -- we talked about that previously about

25 whether they properly diagnosed abusive head trauma in the

Forbes - cross

1    first place or not, correct?

2    A    We did.

3    Q    Are you familiar with -- I'm sure you're familiar with it,

4    but do you remember a paper that you participated in called

5    Evaluation and Management of Retinal Hemorrhages in Infants

6    With and Without Abusive Head Trauma?

7    A    Yes.

8    Q    All right.  And that was -- is that back in 2010,

9    published in something called AA -- or, I'm sorry -- yeah,

10   published in something called AAPOS workshops?

11   A    It was a JPOS workshop paper in the JPOS Journal, yes.

12   Q    In addition to sort of a percentage correlation for

13   retinal hemorrhages, you talk about other percentage

14   correlations, correct?  Do you recall that?

15   A    I believe so.

16   Q    And --

17   A    I --

18   Q    I didn't mean to interrupt you.

19           Let me just point you to it, or at least say it to

20   you since I can't hand you the document.  You and your

21   colleagues on that paper decided that babysitters are the

22   perpetrators in only four to 20 percent of abusive head trauma

23   cases, correct?

24   A    You know, in the paper I didn't really decide upon that.

25   What we were doing, it was a review of the subject.  That's

Forbes - cross

1  actually not an original report but a workshop paper.  It's a

2  different type of paper, and so we reported on other findings

3  that have been reported.  But, yes, those are the numbers that

4  are reported there.

5  Q   You did that with retinal hemorrhages too, though.  You

6  relied on other people's reports in the past, right?

7  A   Absolutely, yes.

8  Q   You didn't go out and reexamine historical shaken baby

9  cases and get their eyes, correct?

10  A   I did not.

11  Q   Right.  You relied on what other people had concluded in

12  papers, correct?

13  A   Yes.

14  Q   And that's the same thing you did to conclude that there

15  was a very low statistical correlation between babysitters and

16  abusive head trauma, correct?

17  A   I don't know that's a statistical association.  That's a

18  reported percentages of perpetrators in those cases.

19  Q   Well, your percentage of 85 percent for retinal

20  hemorrhages is a reported or concluded percentage of where you

21  find extensive retinal hemorrhages in what you believe are

22  abusive head trauma cases, correct?

23  A   Correct.

24  Q   I know you don't have it here in front of you, but do you

25  recall when we were in court last time there was a little bit

Forbes - cross

1    of confusion between the report I was looking at and the
2    report that you were looking at?
3    A    I do recall that, yes, sir.
4         MR. BLEGEN:  I'm going to hand to the judge what
5    we've marked as Petitioner's Exhibit Forbes October 22nd
6    report.
7         THE COURT:  Do you have that one there, Dr. Forbes?
8         THE WITNESS:  I've got the one that I had last time.
9    I'm not sure exactly which one that is.
10        THE COURT:  Okay.  So the one I'm looking at here
11   says October 22, 2012, at the top.
12        THE WITNESS:  This says October 29, 2012.
13        THE COURT:  He's got the later one.  I've got the
14   earlier one.
15        MR. BLEGEN:  I know.  I think I can handle it.
16        THE COURT:  Okay.  All right.
17   BY MR. BLEGEN:
18   Q    You do recall, Dr. Forbes, that you provided at least two
19   reports to the Attorney General's Office in this case,
20   correct?
21   A    Um --
22   Q    Two versions of a report?
23   A    Say that again.  I'm sorry, sir.
24   Q    You provided two versions of a report to the Attorney
25   General's Office?

Forbes - cross

1    A    I provided the reports, and I -- I had them formatted

2    differently and that sort of thing, so I guess I did at

3    different dates.

4    Q    But didn't you take some words out too at Mr. Telisman's

5    request?

6    A    I wouldn't have done anything at Mr. Telisman's request,

7    but I may have edited it.  I have different reports.

8    Q    So you're telling me that you did not have an either email

9    or telephone conversation with Mr. Telisman where he requested

10   that you make some changes to the report?

11   A    I talked about the report with him, and he didn't tell me

12   to change anything.  I -- I -- I don't know what changes

13   you're talking about to be perfectly honest with you.

14   Q    Look at your report on the paragraph that starts, "In

15   Dr. Patrick E. Lantz's report he states."

16            THE COURT:  Which page?

17            MR. BLEGEN:  Page 3.

18            THE WITNESS:  Do you know which page that is, sir?

19            MR. BLEGEN:  I can find it.

20            THE WITNESS:  Thank you.

21   BY MR. BLEGEN:

22   Q    So in the report that you have in front of you dated

23   October 29th, 2012, there's a paragraph that states -- that

24   starts with, "In the Dr. Patrick E. Lantz report."  Do you see

25   that?

Forbes - cross

1    A    Yeah, I do.  Thank you.

2    Q    And it ends with a -- the line "never has been supported

3    by objective scientific evidence," period, quote.  Do you see

4    that?

5    A    Yes.

6    Q    The report you have in front of you says, "There is

7    extensive literature," correct, as the next sentence?

8    A    Yes.

9    Q    The previous report that you had said, "I disagree with

10   this statement in that there is extensive literature,"

11   correct?  Do you remember that?

12   A    I don't remember offhand, you know, but, you know, I

13   edited it, so it could very well say that, yeah.

14   Q    Well, did you edit it -- my question is did you edit it at

15   the request of the prosecutors?

16   A    I really wouldn't change it based upon what someone said.

17   You know, I honestly wrote what my opinion is.

18   Q    I'm not saying you changed --

19        THE COURT:  Hang on a second.

20        I think what Mr. Blegen is asking is what prompted

21   you to make the changes.

22   BY MR. BLEGEN:

23   Q    Yes.  What prompted you to make the changes?

24   A    Gosh, you know, I edited it in a way that I thought would

25   better state it, I think.  And actually that sentence is

Forbes - cross

1   actually not very good.  You talked about that one earlier,
2   where I offered it as an unreasonable opinion which was never
3   supported by scientific evidence.  I didn't like the
4   sentencing when I was done.  I did a lot of different things
5   along the way.
6   Q    I agree with you that I didn't like the sentence either,
7   but I'm trying to figure out how it came to be changed.  Was
8   it your idea or somebody else's?
9   A    It would be my idea.  It's my report.
10  Q    I'm not quibbling with whether the conclusions are yours.
11         THE COURT:  It's too painful.  Let me ask you a
12  couple of questions to get at what I think --
13         Did you just wake up in the morning one day and say,
14  hey, my report's wrong or it's got some mistakes, I got to
15  change it or I got to edit it or correct it, or did somebody
16  say would you go back and look at this and edit it and correct
17  it, or was there something else?  Which of those?
18         THE WITNESS:  I edited probably 15 times along the
19  way.
20         THE COURT:  But you edited it 18 times before the
21  first time you sent it to the lawyer at the Attorney General's
22  Office or after or both?
23         THE WITNESS:  Probably both actually.  I mean, I
24  just -- I just want to be very careful with the way I put
25  things.  And, you know, this is actually the second report I

1  put together, I think, so I was really trying to be cautious

2  of what I did.  And it started out and I felt like I wrote

3  what I wrote, and then I changed -- or I would sit back and

4  let it sit for a while and then marinate and then go back and

5  write some of the things because when you write something I

6  feel like it becomes stagnant and you don't realize things you

7  wrote, so I rewrote it a lot of times.

8          THE COURT:  Okay.  So here's a very specific

9  question:  So the first report that Mr. Blegen has is dated

10  the 22nd of October.  That's not the one you have, so just

11  take it on faith.  The second one is dated the 29th of

12  October.  It's a week later.  Okay?  Right?

13          Is that right, Mr. Blegen?

14          MR. BLEGEN:  Yes.

15          THE COURT:  Okay.  So did anything happen, did you

16  have any conversations with anybody, anybody at all in the

17  entire world other than yourself, about the report between

18  October 22nd and October 29th?

19          THE WITNESS:  I -- let me think of the time frame of

20  the academy.  The Academy of Ophthalmology was in Chicago, and

21  I had conversations with Dr. Kelton there, but I don't

22  remember the dating.

23          THE COURT:  Okay.

24          THE WITNESS:  Doctor -- or Mr. Goodfriend.

25          THE COURT:  Goodfriend.  All right.

Forbes - cross

1           THE WITNESS:  Goodfriend.

2           THE COURT:  And would those conversations have

3    involved, among other things, the report?

4           THE WITNESS:  Yeah, it did.

5           THE COURT:  Okay.  And just to kind of get at what

6    Mr. Blegen is saying, and there's no right or wrong answer to

7    this other than what's true.  Okay?  Were there any

8    suggestions made to you about whether there should be any

9    changes in the report at all by any -- by them or anybody else

10   between -- within that time frame?

11          THE WITNESS:  Within the time frame of that week?

12          THE COURT:  Yeah.

13          THE WITNESS:  Honestly, sir, even if someone did

14   suggest it --

15          THE COURT:  You know what, doctor, if you didn't get

16   this from the other day, you're never going to get it.  I do

17   not want you to answer the question you wish that I asked.  I

18   want you to answer the question that I asked.  Okay?

19          THE WITNESS:  Okay.

20          THE COURT:  So do you have it in mind, or do you want

21   me to restate it?

22          THE WITNESS:  Could you restate it real quick,

23   please.

24          THE COURT:  Between the 22nd and the 29th of October,

25   in any of the discussions you had with either the lawyers from

Forbes - cross

1    the Attorney General's Office or anybody else, did anybody say

2    would you go back and look at the report, would you edit the

3    report, would you change the report, would you correct this,

4    would you look at that, anything along those lines at all?

5    Did anything like that happen between those two dates?

6            THE WITNESS:  I don't know the dates, but yes, at

7    some point that probably did happen.

8            THE COURT:  All right.  And then the last question

9    I'm going to ask you is I don't know whether you're being paid

10   a flat fee or -- for your time or not at all.  I'm asking him.

11   Which is it?  I have a reason for asking.

12           THE WITNESS:  I'm actually not getting paid, but I do

13   donate --

14           THE COURT:  That's not why I asked.  The reason I

15   was -- it was a precursor to a question are you keeping track

16   of your time.

17           THE WITNESS:  Oh.  More or less, yeah.

18           THE COURT:  Okay.  So would there be -- do you have

19   like a time record that would indicate whether you had a

20   discussion with person A, person B, person C on a particular

21   date?  Is it that detailed, or it is it not that detailed?

22           THE WITNESS:  Not at all, sir.  Sorry.

23           THE COURT:  Okay.  Fine.  I'm done.  And I think this

24   subject has been covered.  Okay?  If you want to put somebody

25   else on the witness stand and ask them what they said to him,

Forbes - redirect

1    we'll do that later.  Let's get finished with him.

2         MR. BLEGEN:  I'm done.

3         THE COURT:  Okay.  Redirect.

4         MR. TELISMAN:  Thank you.

5                    REDIRECT EXAMINATION

6    BY MR TELISMAN:

7    Q    Hi, Dr. Forbes.  How are you?

8    A    Good.  Thanks.

9    Q    Just one question.  I guess not yesterday but Wednesday

10   when you were on cross examination counsel asked you some

11   questions regarding perimacular folds and retinoschisis.  Do

12   you recall that?

13   A    I do.

14   Q    All right.  Now, Isabella Zielinski didn't have

15   perimacular folds or retinoschisis, correct?

16   A    She did not.

17   Q    Does that change your opinion in any way?

18   A    It does not.

19   Q    Why not?

20   A    There are plenty of instances, as a matter of fact, it's a

21   minority of cases that have retinoschisis or macular folds, so

22   certainly that's not -- or that doesn't necessarily need to be

23   present for a child who had been shaken, in my opinion.  I

24   don't know the exact number.  I think it's on the order of

25   five percent, but I don't want to make it up.  Five percent of

Forbes -

1  the positive cases have a schisis or macular fold or

2  hemorrhagic macular cysts.  At least that's been my

3  experience.

4          MR. TELISMAN:  Thank you.  I have nothing further.

5          THE COURT:  Okay.  So flip this thing back around to

6  me.  I think I just have one other question.  She's going to

7  turn the camera around.

8          Okay.  Hi.

9          So I'm referring back to my notes from the direct

10  examination from the other day by Mr. Telisman, and I'm going

11  to try to give you some context because I want to ask you

12  about a phrase that you used and what you meant by it.  So the

13  context was there was a discussion about you having reviewed

14  reports by the experts for Ms. Del Prete on the question of

15  CVT or cortical venous thrombosis.  And you talked about there

16  was literature on this, and then you used this phrase.  You

17  said, "I've seen 24 of these kids," and you went on to say

18  that you haven't seen hemorrhaging in them.

19          When you said 24 of these kids, I wasn't sure what

20  you meant, and I didn't butt in at the time to ask.

21          THE WITNESS:  I apologize.

22          THE COURT:  No, it's no apology necessary.

23          THE WITNESS:  What's that?

24          THE COURT:  No apology necessary.

25          THE WITNESS:  Okay.

Forbes -

1   He was just asking me about the association between

2   retinal hemorrhages and venous thrombosis is my recollection.

3   THE COURT:  Right.

4   THE WITNESS:  And in those cases, I'm not aware of

5   any literature that talks about the specific relationship

6   between the two, so I just -- I had been asked that before and

7   not -- nothing to do with this case, but previously a partner

8   and I were asked about that, so we went back and looked at 24

9   charts, which I'm not going to even sit here and say it's very

10  scientific in any way, shape or form, but we went back to look

11  to see how many kids we as ophthalmologists had talked over

12  the period when we had electronic records and could go back

13  and look at it, saw that scenario and looked in the eyes.

14  There were only 20 to 24.  Honestly, I forget the exact

15  number, but it was somewhere in that ballpark.  And we didn't

16  see any.

17  I'm not inclined for a second that that's super

18  science or anything, but that's what I was talking about.

19  THE COURT:  Understood.

20  Now you've said two things that I want to make sure

21  what you're talking about here.  What did you say you didn't

22  see when you looked back at those 20 or 24 people?

23  THE WITNESS:  Oh, I'm sorry.  We didn't see any

24  hemorrhages of any sort in the eyes.

25  THE COURT:  Okay.  And the group where you were

Forbes -

1  pulling files and records and whatnot, the group of children,
2  they were children that you had seen for what reason?
3          THE WITNESS:  Because they had venous thrombosis
4  and --
5          THE COURT:  Got it.  Got it.  Now I understand, so
6  let me state it back to you so I can make sure I've got it
7  right.  So what you're basically saying is that you looked at
8  records for 24 kids who had had venous thrombosis, and you did
9  not see retinal hemorrhaging to this type of degree that
10 you're seeing in Isabella Zielinski.
11         THE WITNESS:  Correct, sir.
12         THE COURT:  Okay.  Now I understand.  That's all I
13 wanted to do.
14         I don't have any other questions.  Does anyone have
15 questions based on my questions?
16         MR. BLEGEN:  No.
17         MR. TELISMAN:  Just one, your Honor.
18         THE COURT:  Yeah.  Go ahead.
19 BY MR TELISMAN:
20 Q   Dr. Forbes, of those -- of that group of children that --
21 whose records you looked at, were there any retinal
22 hemorrhages?
23 A   Not that I can recall.  And this is what I recall.
24         MR. TELISMAN:  Thank you.
25         THE COURT:  Okay.  Anything else that anybody has?

1    MR. BLEGEN:  No.

2    THE COURT:  Thanks very much, doctor.  We're done

3  with you.  And we're going to switch it off from our end, but

4  you probably have to have somebody do that at your end too.

5  Thanks very much.

6    THE WITNESS:  Okay.  Thank you, very much.

7    THE COURT:  All right.  So first of all, I was

8  advised by my courtroom deputy that you actually don't want me

9  to sign a writ for Ms. Del Prete for the remaining days of the

10 hearing.

11   MR. BLEGEN:  Yes.

12   THE COURT:  All right.  And I just wanted to sort of

13 confirm that on the record in her presence.  She doesn't feel

14 like she wants to be here, which is fine.  I don't care one

15 way or another.  I just want to make sure she knows that --

16   MR. BLEGEN:  It's not that she doesn't want to be

17 here.  It's a bit --

18   THE COURT:  It's a production.  I know that.

19   MR. BLEGEN:  Yes.  And it's very disturbing to be in

20 intake at a jail all the time as opposed to a regular place.

21   THE COURT:  And while you're switching off that green

22 button in front of you so we don't burn out those lights, so

23 let's talk about what else is happening.

24   So you had told me at the beginning of the day today

25 that you had, I think -- was it two other people?  One of

 1    them's Dr. Jenny.

 2              MR. TRIEBEL:  Yes.

 3              THE COURT:  And one of them is who?

 4              MR. BLEGEN:  Dr. Teas.

 5              THE COURT:  Oh, Dr. Teas, right.

 6              And as everybody stands there right now, that's it?

 7    Nobody is going to call anybody else?

 8              MR. TRIEBEL:  That's correct, your Honor.

 9              THE COURT:  I'm assuming that -- and Dr. Jenny is,

10    remind me, what type of expert?

11              MR. BLEGEN:  Pediatric with an expertise in child

12    abuse.

13              THE COURT:  And Dr. Teas is a forensic pathologist.

14    I know that.

15              So I'm assuming that these are -- on the scale, these

16    are both going to be lengthier witnesses, I would assume.

17              MR. TELISMAN:  Yes.

18              THE COURT:  Okay.  All right.  So it's like maybe we

19    may not finish Monday.  It may be -- Monday, the 14th.  It may

20    go into Tuesday.

21              MR. TELISMAN:  I think that's quite likely.

22              THE COURT:  All right.  So let's talk about this

23    exhibit situation here.  And I might not be as cautious about

24    some of these things if we didn't have the -- if we hadn't had

25    the little history here where somebody wanted to get all the

1   exhibits ahead of time.  It's important for some privacy

2   related reasons to be really sort of super careful about this,

3   and I need everybody to spend some time in the intervening

4   days and before we finish the hearing kind of going back over

5   things.

6           And I'll give you one example.  So, for example, the

7   other day, yesterday I believe it was, when I asked some

8   questions of doctor -- the one with the hyphenated last name.

9   I'm blanking.

10          MR. BLEGEN:  Rorke-Adams.

11          THE COURT:  Dr. Rorke-Adams.  And I asked for a

12  picture of the sectioned brain.  For a moment there was a

13  picture of the whole autopsy.

14          MR. TRIEBEL:  Which is what I was trying to avoid,

15  your Honor.

16          THE COURT:  And that's not in evidence.  If it goes

17  into evidence, it's not going to go into the public record.  I

18  even have questions about pictures of sectioned brain tissue.

19  I don't know.  I think people need to give some thought to

20  this and, you know, consult with whoever you think you need to

21  consult with.

22          At a very much lower level, of course, we've got

23  issues, I think, on some of the curriculum vitae.  We've got

24  home addresses, home phone numbers, home email addresses.

25  We've got somebody's website address on the -- the doctor --

1    the guy from Philadelphia.  No.  The guy from rural Virginia.

2            MR. BLEGEN:  Dr. Scheller.

3            THE COURT:  The guy from this morning.

4            MR. BLEGEN:  Scheller.

5            THE COURT:  It's his email address that's on there.

6    That needs to come off.  And so somebody needs to really spend

7    some time on both sides kind of vetting all these exhibits.

8    I'm not going to -- I mean, I've made rulings on

9    admissibility, but I haven't received anything in evidence

10   yet, okay, in terms of exhibits.  I am saying that to be

11   clear, and I'll do that at the end of the hearing, but I think

12   it's really important for people to go back and kind of go

13   through all that stuff.

14           MR. TRIEBEL:  Your Honor, would you prefer to have as

15   many exhibits in electronic format as we can give you?

16           THE COURT:  Well, honestly, on some of the stuff

17   you've given me I marked up.  So what I would like you to do,

18   but along those lines, what I would like you to do when you

19   come back on the 14th -- and we'll talk in a second about

20   whether we need a quick status before that just to sort of

21   touch bases.  And I think you ought to do this kind of

22   cooperatively.  Come up with a list so that we're all on the

23   same page about what exhibits there are and what there aren't

24   and so on so that we can at some point read that into the

25   record.

1    And I guess the only other question I would have is
2  should we have some sort of a quick status check, you know,
3  towards the end of the week before that or towards the middle
4  or the end of the week before that just to make sure that
5  everything is still on course?  Wouldn't have to have
6  everybody come, obviously.
7    I'm just going to do it.
8    MR. TRIEBEL:  Yeah.  I don't have a preference one
9  way the other, your Honor.
10    THE COURT:  It can't hurt.  So let's say I'm going to
11  set it for a status on the 10th of January at 9:30, then.
12  Actually, if it would be easier, we could do it in chambers at
13  9:00.  You wouldn't have to hang around.  Let's do it in
14  chambers at 9:00.  You won't have to hang around waiting for
15  other people on the call.
16    And it's just to basically say, okay, we're good to
17  go, you know, we've got everybody lined up, we're working on
18  the exhibits, et cetera, et cetera.
19    MR. TRIEBEL:  And one more question.  On the
20  exhibits, we've had a number of Power Points.  Could those
21  just be demonstrative that we give to you on a USB disk that
22  just comes back to the court?
23    THE COURT:  That would be fine.
24    MR. TRIEBEL:  There's pictures on those.
25    THE COURT:  That would be fine.  I'm okay with that.

1  I'm going to want to look at them, the electronic versions,

2  because it helps me sort of remember what was testified to,

3  but, yeah, that would be fine.

4           MR. TRIEBEL:  Okay.

5           THE COURT:  Okay.

6           MR. BLEGEN:  Judge, can I just address one thing?

7  And I really don't know what to do about it, frankly.  But I

8  don't really care if somebody with their lawyer, the lawyer

9  who's hired them, edits their reports.  I think it was

10 Dr. Barnes talked about lawyers helping him edit things and

11 those kind of things.  The problem I was having is

12 Mr. Telisman told me what happened with the supplemental

13 report for Dr. Forbes, who was just on.  And then he told me

14 that essentially I asked him to make these changes and then he

15 did.

16          THE COURT:  So your question is how do you get this

17 in.

18          MR. BLEGEN:  No.  I don't even care as long as we're

19 not going to have -- if we're going to have sniping back and

20 forth in briefing about who edited whose report and it's not

21 really theirs and those kinds of things.  And also I didn't

22 expect him to say I did not take suggestions from someone to

23 change the report.

24          THE COURT:  Well, honestly, I mean, without making a

25 finding of fact, it was pretty clear from what he said to me

1  that between day one and day two he was in Chicago for a

2  conference, he talked to people, you know, some of the

3  discussion, a good chance it involved the report, and he made

4  edits to it.  Okay.

5        Now, you know, if you want to get something more than

6  that, maybe you can come up with a stipulation or something.

7  I don't care.  And I'm not going to tell anybody in advance

8  what they should or shouldn't snipe about in briefs.  People

9  tend to be able to figure that out on their own.  They don't

10  always guess right, but whatever.  Okay.  So you'll figure it

11  out.  That's what they -- I was going to say what they pay you

12  the big bucks for, but I guess it doesn't apply here.

13        MR. BLEGEN:  We don't get paid the big bucks either.

14        THE COURT:  My employer is about to go out of

15  business in another ten days, so you know.

16        I think it's been decided that no matter what happens

17  we'll be open through January, so you guys are good.

18        MR. TRIEBEL:  Great.

19        THE COURT:  Good heart warming thought.

20        Okay.  Everybody have nice holidays.  We'll see you

21  in January, then.

22        MR. BLEGEN:  Thank you, your Honor.

23        MR. TELISMAN:  You too.

24        (Which were all the proceedings had in the

25          above-entitled cause on the day and date aforesaid.)